IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>　　　　　　Plaintiffs,<br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i,<br>　　　　　　Defendant. | Civil No. 05-00247 JMS/BMK CONSOLIDATED (Other Civil Action)<br><br>MEMORANDUM IN SUPPORT OF MOTION AND CERTIFICATE OF SERVICE |
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>　　　　　　Plaintiffs,<br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent,<br><br>　　　　　　Defendants. | Civil No. CV 04-00442 HG/BMK CONSOLIDATED (Other Civil Action) |

## **MEMORANDUM IN SUPPORT OF MOTION**

I.　　INTRODUCTION

　　This is a case about a young boy who came to Hawaii with high hopes and left five years later in worse physical and emotional condition. The boy is named

Bryan Wiles-Bond and he came to Hawaii with his family (his mother, father and brother) in 1999 when he was seven years old. The problem was that Bryan was, and is, autistic and the other part of the problem, as it turned out, was that the Wiles-Bond family came to live on the Big Island of Hawaii.

For the five years which Bryan lived here, he was constantly in court trying to enforce his rights to a free appropriate public education (FAPE). For almost a five-year period, the Defendants never provided Bryan with all of the services which Defendants agreed to provide him in his various Individual Education Programs (IEP). Bryan was already well along in toilet training when he first came to Hawaii. However, solely because of Defendants conscious and intentional acts and failures to act, Bryan lost most of his ability to toilet properly. This was made abundantly clear when Mrs. Wiles Bond came to pick him up and he was self-stimming in a pool of his own urine.

Over the period of five years, Bryan's parents were forced to file two federal court lawsuits, pursue at least four administrative hearings, and enter into several consent decrees with the Defendants. These continual promises by Defendants to provide Bryan with FAPE are the basis of the deliberate indifference claim. After discussing a brief background of the applicable IDEA provisions of the memo will deal with the clear evidence of deliberate indifference.

## II. STATUTORY FRAMEWORK

### A. SECTION 504 AND THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT.

The claims in this lawsuit arises under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794. Section 504 is one of several anti-discrimination laws which seek to level the playing field for the disabled by eliminating impediments to full participation by disabled persons in programs receiving federal funding. Modeled after Title VI of the Civil Rights Act of 1964, which proscribed discrimination against racial and ethnic minorities by recipients of federal funding, Section 504 was intended to stop all discrimination against the disabled by federal grantees, intentional as well as that which resulted from "thoughtlessness and indifference – by benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985).

Another law with the same purpose, but more narrowly tailored, is the *Individuals with Disabilities Education Act*, 20 U.S.C. Section 1401 ("the IDEA"), which requires specially designed instruction to address the unique needs of qualifying disabled students.

### B. SUMMARY OF SECTION 504.

Section 504 provides that:
> No otherwise qualified individual with a disability shall, solely by reasons of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The definition of a disability under Section 504 is much broader than the definition under the IDEA. All IDEA students are covered by Section 504, but not all Section 504 students are eligible for services under the IDEA. Thus, under the IDEA, students must be "eligible" under certain specified disability categories, while Section 504 is less discriminatory. It protects all persons with a disability who (1) have a physical or mental impairment which substantially limits one or more major life activities; (2) have a record of such an impairment; or (3) are regarded as having such an impairment.

The regulations adopted to implement Section 504 require the provision of a free appropriate public education ("FAPE") to the disabled. FAPE is defined as:

> [t]he provision of regular or special education and related aids and services that ... are designed to meet individual educational needs of persons with disabilities as adequately as the needs of persons without disabilities are met and ... are based upon adherence to specified procedures.

34 C.F.R. Section 104.33(b)(1). One means of providing FAPE under Section 504 is to provide FAPE under the IDEA. 34 C.F.R. Section 104.33(b)(2).

In addition, Section 504 has specific procedural requirements for the identification, evaluation, placement, and procedural safeguards of preschool, elementary and secondary student. The State of Hawai`i has adopted regulations to implement Section 504, found at HAR Section 8 Chapter 53.

C. **SUMMARY OF THE IDEA.**

The IDEA is designed to assist states to meet the educational needs of qualified children with disabilities, and it establishes an enforceable right to a FAPE. No state or local educational agency may receive federal funding unless it provides children with disabilities the right to a free appropriate education.

The IDEA defines FAPE as special education and related services that:

a. Have been provided at public expense, under public supervision and direction, and without charge;

b. Meet the standards of the State educational agency;

c. Include an appropriate preschool, elementary, or secondary school education in the State involved; and

d. Are provided in conformity with the individualized education program [IEP] required under Sec. 614(d) [1414(d)].

20 U.S.C. § 1401(8)(emphasis added).[1]

The IDEA requires the preparation of a substantively and procedurally correct individualized education program ("IEP"), which is a comprehensive

---

[1] The Ninth Circuit has issued numerous decisions on claims arising under the IDEA. Each is instructive regarding the seriousness with which the court regards the rights accorded children and parents under the IDEA, and the rigorousness with which the court enforces the rights of disabled students under the procedural and substantive requirements of the IDEA. These cases include: *Shapiro v. Paradise Valley Unified School District*, 317 F.3d 1072, (9th Cir. 2003) *Amanda J. ex rel. Annette J. v. Clark County School Dist.*, 267 F.3d 877 (9th Cir. 2001) *Seattle School Dist., No. 1 v. B.S.*, 82 F.3d 1493 (9th Cir. 1996); *Capistrano Unified School Dist. v. Wartenberg*, 59 F.3d 884 (9th Cir. 1995); *Clyde K. v. Puyallup School District, No. 3*, 35 F.3d 1396 (9th Cir. 1994); *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467 (9th Cir. 1993); *W.G. v. Bd. Of Trustees of Target Range School Dist.*, 960 F.2d 1479 (9th Cir. 1992); *Gregory K. v. Longview School Dist.*, 811 F.2d 1307 (9th Cir. 1987).

written statement developed jointly by the child's parents and the school district. The IEP outlines the child's special educational needs and the specially designed instruction and services to be provided by the school system to meet those needs. 20 U.S.C. Section 1414(d).

In *Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-189 (1982)("Rowley"), the Supreme Court established the framework for determining whether a child has been offered or received FAPE under an earlier version of the IDEA. First, has the State complied with the procedures set forth in the IDEA? And second, is the IEP developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206-07. *Rowley* and the IDEA require a program "individually designed to provide educational benefit to the handicapped child." *Id.* at 201. The school district must show that it has adopted "the plan, policies, and assurances required by the Act, but also ... that the [district] has created an IEP for the child in question which conforms with the [statutory] requirements." *Rowley*, 458 U.S. at 206-07 n. 27.

Since *Rowley*, Congress has amended the IDEA, and <u>heightened</u> the standard of educational benefit required under the law. The amendments are important in the instant cases, because many of the events complained of straddle the 1997 period when the amendments were adopted. In particular, the IDEA now requires that:

(1) The statement of the child's present levels of educational performance includes specific indication of "how the disability affects the child's involvement and progress in the general curriculum (34 C.F.R. Sec. 300.347(a)(1)(i));

(2) [that the IEP include a] statement of measurable annual goals related to enabling the child to "be involved in and progress in the general curriculum" (34 C.F.R. Sec. 300.347(a)(2)(i));

(3) The statement of specific educational services to be provided to the child include the "program modifications or supports for school personnel that will be provided for the child to: (a) advance appropriately toward attaining the annual goals, (b) be involved in and progress in the general curriculum" (34 C.F.R. Sec. 300.347(a)(3)); and

(4) The statement of objective criteria and evaluation procedures for determining whether the child is achieving the IEP's objectives include: (a) the method of measuring the child's progress toward annual goals, and (b) the method of informing parents, such as through periodic report cards, of their child's progress toward the annual goals and the extent to which the progress is sufficient to enable the child to achieve the annual goals. 34 C.F.R. Sec. 300.347(a)(7).

To ensure a FAPE to individual students, the IDEA requires the annual preparation of an IEP for each child with a disability. 20 U.S.C. § 1414(d)(4); 34 C.F.R. §300.343(d). Further, at the beginning of each school year, the DOE must have in effect, for each child with a disability in its jurisdiction, an IEP. 20 U.S.C. §1414(d)(2)(A). The DOE must ensure that the IEP is implemented, 34 C.F.R. Section 300.350(a)(1). Furthermore, the DOE maintains legal responsibility for ensuring implementation, even if some other agency (such as the Department of

Health) also has obligations for services (such as mental health services) under the IEP. 34 C.F.R. Section 300.341.

The IDEA requires states to develop procedural safeguards that enable the parents or guardians of disabled children to "present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. 1415(b)(6). When a parent presents such a complaint, the state must provide "an impartial due process hearing" conducted by an impartial hearing officer. See 20 U.S.C. Section 1415(f)(1). The IDEA also provides the right to institute a *de novo* federal district court action to review the state administrative decision. 20 U.S.C. 1415(f) and (i)(2).

To comply with the IDEA requirements, the Hawaii DOE has promulgated regulations permitting *inter alia* parents to request a hearing to challenge a child's placement or the provision of FAPE to the child. See HAR Section 8 Chapter 56. The hearing decisions in this case determined that the student had been denied FAPE under the IDEA, and ordered specific equitable relief.

### D. SIGNIFICANT AREAS OF OVERLAP BETWEEN SECTION 504 AND THE IDEA.

There are several overlaps and several distinctions between Section 504 and the IDEA that have relevance to this mediation. First, the IDEA provides schools with some additional funding to help provide the additional services that may be

necessary to provide FAPE to qualified disabled students. In contrast, Section 504 does not provide direct additional federal support for the provision of FAPE. This means that schools often drag their feet in providing needed services to children under Section 504, and will obviously drag their feet at settling Section 504 claims.

Second, the two statutes have different, but overlapping, remedial schemes. In this circuit, the relief available under the IDEA is essentially equitable, such as directing the school districts to provide services, which should have been provided all along, or to reimburse the parents for costs that the school district should have been bearing. *See Taylor v. Honig,* 910 F.2d 627, 628 (9th Cir. 1990) (stating that "injunctive or other prospective relief is ordinarily the remedy under the [predecessor to the IDEA] and damages are usually inappropriate"); *Charlie F. v. Bd. Of Educ.,* 98 F.3d 989, 991 (7th Cir. 1996) (holding "that damages are not 'relief that is available under' the IDEA).

The relief under Section 504, however, is the same as that set forth in Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d et seq. See 29 U.S.C. Section 794a(a)(2); *Ferguson v. City of Phoenix,* 157 F.3d 668, 674 (9th Cir. 1998). Because of the possible overlap in remedies and claims under Section 504 and the IDEA, courts have held that in cases involving the provision of FAPE under the IDEA <u>and</u> Section 504, the parties must first exhaust the IDEA state administrative process to resolve all educational issues that can be addressed with

equitable relief before bringing a separate federal action based on claims for monetary damages under Section 504. *See Witte v. Clark County School District*, 197 F.3d 1271, 1275 (9th Cir. 1999)(Exhaustion of IDEA administrative process not required where Plaintiff seeks only monetary damages, which is not "relief that is available under" the IDEA, and where all educational issues already have been resolved to the parties' mutual satisfaction through the IEP process, Plaintiff is not "seeking relief that is also available" under the IDEA, 20 U.S.C. Section 1415(l)). *See also Robb v. Bethel School Dist. # 403*, 308 F.3d 1047, 1250 (9th Cir. 2002), where the court explained:

> Our primary concern in determining whether a plaintiff must use the IDEA's administrative procedures relates to the source and nature of the alleged injuries for which he or she seeks a remedy, not the specific remedy requested. The dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies. If so, exhaustion of those remedies is required. If not, the claim necessarily falls outside the IDEA's scope, and exhaustion is unnecessary. Where the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem.

The claims in this case seek retrospective damages for injuries suffered that cannot be cured through services under the IDEA. *See Robb, supra*, 308 F.3d at 1052. Indeed, the claims that remain in this case involve the brutal effects of the DOE's deliberate indifference to Bryan's rights and his parents' rights — effects that cannot be cured by remedial services. Essentially, the actions of the

12

government at issue here severely damaged the lives of the Plaintiffs, consigning Bryan to a life of complete dependence and depriving his parents of jobs, health, and normal familial and marital relationships. Consequently, the damages sought in this case is substantial.

## III. BRYAN'S RIGHTS TO FAPE WERE CLEAR AND UNCONTESTABLE.

### A. THE FIRST AGREEMENT WITH THE DEFENDANT

Under the IDEA, states are encouraged to provide a whole range of services and programs to disabled children aged 3 to 20, Hawaii as a state has always participated in the IDEA program and as a result collected millions of federal dollars to help provide programs and services to disabled students. Of course, Hawaii's participation has been that of one school district since it is a unitary state.

Under the IDEA, the student who is disabled according to the federal definition of disability is entitled to a FAPE. This has been interpreted by the courts to be an adequate education but not the best money could buy. Depending on the disability, the student is provided FAPE when he has an appropriate program in which he can make some educational progress.

Hawaii has a history of tumultuous changes in the delivery system to disabled students of needed services. In fact, in 1993, Hawaii was sued in the infamous *Felix* case which caused the entire revamping of the mental health care delivery system. For about twelve years, there was constant monitoring of the

programs and the delivery of those programs to disabled children across Hawaii. Unfortunately for Bryan, he arrived in Hawaii at the tail end of Felix monitoring period and the state was still reeling from the institutional impact of Felix, particularly on the neighbor islands.

When Bryan arrived in Hawaii, he had an IEP from his last home state of Maryland. Mrs. Wiles-Bond enrolled him at the local school near his home and proceeded to attend an IEP meeting. The IEP team decided that there was not one school on the Big Island that could meet all of the IEP requirements. So two schools were selected by the DOE to provide the services. Overall, the IEP required about 65 hours per week in skills trainer time. This included time for Saturday and Sunday.

From the very beginning there were severe problems with the quantity and quality of the available skills trainers for Bryan; there were too few trained skills trainers and the DOE had no viable alternatives. Because of Bryan's concentrated need for quality trainer time, the parents urged the DOE to be more aggressive in the training and recruitment of skills trainers. However, the DOE found itself unable to satisfy the requirements of Bryan's IEP and by May, 2001, the parents were sufficiently frustrated to bring the DOE before an administrative hearing officer, Mr. Richard Chun. The parties finally reached a settlement of the hearing request based on some strong commitments. Mr. Chun, while he held no hearing,

issued a decision on the settled issues and he memorialized the understanding that the DOE would:

1) Followup and implement the IEP dated 1/28/01 and the coordinated service plan 10/17/00. The plan and the IEP recommended that with treatment and education of autistic and related communication handicapped;

2) (or DOH) would train an adult aide in these disciplines and would assure that the adult aide was trained in all of these disciplines and that training would be done by Kim Smalley or Dr. Hana Ortiz or someone with similar qualifications;

3) The adult aide was assigned to Bryan's case and he/she was to provide services to Bryan during normal school hours and to provide services after school from 4:00 p.m. to 7:00 p.m.;

4) For each say that the aide missed servicing Bryan, those days were to be made up after October 1, 2001;

5) If for any reason the aide did not complete the full services to Bryan, then the DOE and/or the DOH were required to have a replacement within two weeks of the date that the previous aide left; and

6) Mr. Chun memorialized these terms in a decision from which there was an appeal if either side was dissatisfied.

No appeal was filed from this hearing decision.

## B. THE SECOND AGREEMENT WITH THE STATE

During the ensuing months, the Respondent did not live up to its commitments in the May, 2001 decision. DOE was unable to obtain qualified skills trainer applying and Bryan failed to receive the specialized services he required, the May, 2001 decision. The parents were in constant battles with the DOE over Bryan's IEP not being implemented. It was a domino effect. There were no trainers so Bryan's program could not be implemented; therefore, essential toilet training and one-on-one time was lost and Bryan began regressing and lost the progress he had made in Maryland in crucial social and non-social areas.

By February, 2002, the situation reached unacceptable limits and Mr. and Mrs. Wiles-Bond filed suit in federal court for enforcement of the May 2001 decision. They alleged the non-compliance with the May 2001 decision and with the IEP. For example, the parents told the federal court about how between September, 2000 and December, 2000, Bryan did not have any skills trainers. On February 27, 2001, the parents told the federal court about the observation of the impact of the failure to have one-on-one skills trainers for Bryan had.

From May, 20, 2001, to October 1, 2001, Bryan had three different skills trainers but still went at least 53 days without one and did not have an after-school trainer for all but three days. At the time of the federal court complaint, there was

16

a skills trainer in place. Since at least October 15, 2001, Bryan had only partial skills trainer services. This meant no skills trainer for at least two days a week after school. Eventually, at two-hour blocks of time on Tuesdays and Thursdays was added. The major issue between the parties was the DOE and/or the DOH obligation to make up days missed between May through October, 2001.

The second formal settlement was agreed to on July 1, 2002. This agreement recounted the first agreement of May 2001 and offered a new promise to "hire, train, and have in place the skills trainers needed to consistently provide Bryan with not less than ninety-five (95%) per calendar month of the skills trainer hours to which he is entitled."

This agreement offered the family the "expedited contract process," in which the state agreed to pay at a minimum of $20.00 per hour and the state may offer bonus/incentive payments for three months or longer. The State agreed to pay skills trainers within 30 days of submittal. To assist the state, this settlement authorized the parents to advertise in the newspaper with a total budget of $1,000 per year. The state still retained the right to approve of the qualifications of all skills trainers produced by the parents. Also, the agreement provided that the state shall create a pool of qualified skills trainers to be available to step in. The agreement provided that the skills trainers must keep all the pertinent data on

Bryan and the state agreed to provide skills trainer services when school was not in session. There were many other less pressing issues resolved by the agreement.

Immediately after the agreement, the family wrote to the state's attorney to clarify certain details by July 18th. There were problems with State's compliance with the agreement. Meanwhile, Bryan, was still experiencing a definite lack of skills trainer time. See Kim Smalley's report, Exhibit D.

### C.    THIRD EFFORT

During the period from July 1, 2002 and February 26, 2004, Bryan experienced very spotty and erratic skills trainer services. February 26, 2004 was the day that Bryan's parents had too many broken promises from the DOE that they decided it was necessary to get some help and obtain for something like his program as envisioned by his IEP. During this period, the parents had attended at least two IEP meetings at which very good IEPs were drafted. There was only one large problem – the DOE could not implement the IEP throughout the remainder of 2002 and for the entire 2003, there was a serious problem with obtaining properly trained and qualified skills trainers. The DOE insisted on keeping Bryan in public school. However, with this decision came the responsibility for implementation of the IEP.

The situation with Bryan worsened – it was clear, that he was entitled to at least 65 hours per week skills trainer time and there came a time in 2003 when the

DOE could not find any skills trainers. No skills trainers were provided from October, 2003 until February, 2004. The ramifications of this absolute failure are manifold – Bryan's behavior and his ability to go to the toilet were the first and the most obvious areas adversely affected by this failure.

Hearing Officer Alm said that:

> 16. A second significant area of regression involved learning to behave independently and respecting the personal space and personal property of others (boundaries). Bryan has no concept of respecting the personal space or the personal property of others. Skills trainers are required to monitor Bryan's behavior and provide consistent feedback to him regarding his actions and behaviors in these areas. For example, each door in Petitioners' house has a lock on it. Without locks Bryan might engage in activities that would jeopardize his safety or cause damage to property. Bryan must be taught what is and is not acceptable behavior. The goal is to have Bryan learn appropriate behavior and eventually remove the locks from all of Petitioners' doors. Petitioners testified that before the gap in service, Bryan could remain in the downstairs room alone for an hour without any boundary problems. At that point, Petitioners were almost ready to remove the lock from the downstairs room. As a result of the gap in service, Bryan must now relearn appropriate boundary behaviors.

Findings of Fact, Conclusions of Law and Decision filed on May 11, 2004 in the matter of *Bryan Wiles-Bond v. Department of Education*, DOE-2004-026 at p. 5.

Another specific finding of Ms. Alm was that:

> 18. In the Fall of 2003 through February 2004, Respondent attempted to locate skills trainers for Bryan through CFS and TIFFE. Respondent, however, was unable to provide Bryan with the number of skills trainer hours required by his January 9, 2004 IEP until March 2004.

Findings of Fact, Conclusions of Law and Decision filed on May 11, 2004 in the matter of *Bryan Wiles-Bond v. Department of Education*, DOE-2004-026 at pp. 5-6.

The Hearing Officers who reviewed this situation on three separate occasions all concluded that the DOE's failure to supply enough trained skills trainers was a clear denial of FAPE. There were also some very serious issues regarding the few skills trainers that were supplied. For example, as of March, 2004, none of the skills trainers were proficient in American Sign Language (ASL). It took a decision by a hearing officer in 2004 to require the DOE to supply an ASL teacher for Bryan's homeroom. Until the decision was issued, the DOE took the position that the primary person who dealt with Bryan did not have to have ASI training. Mrs. Alm demolished that notion. None of these administrative hearing decisions were appealed, so they are clearly res judicata.

## IV.   THE STATE HAS ACTED WITH DELIBERATE INDIFFERENCE.

In order for Plaintiffs to recover against Defendants, their conduct must meet the standard of "deliberate indifference" to the federally protected rights of Bryan and his family. The seminal case is the Ninth Circuit's decision in the case of *Duvall v. Kipsat County*, F.3d (9th Cir. 2002). In *Duvall*, the court acknowledged the problems in other circuits about deciding on a standard for the entitlement to damages under Section 504 of the Rehabilitation Act of 1973. *Duvall* involved the alleged violations of the Americans with Disability Act and the court's failure to

provide the hearing-impaired Plaintiff with real-time transcriptions. The issue in this case is whether the absolute failure to provide any services to a disabled student was done to make it clear as a matter of law that the Plaintiffs prevail. The answer is 100% affirmative.

Looking at the *Duvall* decision, the first part of the analysis requires knowledge on the part of the Defendant. In *Duvall*, that meant knowledge of his hearing impaired condition. This element is easily met because there were settlement type discussions from the day in 2000 when that first IEP was agreed. Mr. Alvin Rho, the District of Hawaii was deeply involved in the identifying and solving of Bryan's educational problems.

The second element of *Duvall* requires more than mere negligence. It requires a knowing decision not to remedy the violation of federal rights. The DOE decision not to supply the trainers and knowing the DOE could not claim inadequate money as excuse. See e.g. Kruelle v. *Castle County School District*, 642 F.2d 687 (3d Cir. 1981). The DOE was aware of a similar situation on Molokai where in 2001 the DOE was ruled deliberately indifferent to a teenage Down's Syndrome boy because he went without a certified teacher or any speech

therapist for about four years. See Stephen L. v. LeMaheiu, ___F.Supp.2d ___, Civil No. CV 00-00338.[2]

There is no question that for the DOE not to deliver on a knowing promise in the IEP. Then to have it break another promise in the Settlement Agreement and then have the DOE still not deliver after three adverse administrative hearing decisions, falls squarely within the Duvall standard.

## V.　CONCLUSION

For the foregoing reasons, Plaintiffs' request for partial summary judgment should be granted and the Defendants should be held liable to Plaintiffs for their deliberate indifference.

DATED:　Honolulu, Hawaii, February 22, 2006.

/S/STANLEY E. LEVIN
STANLEY E. LEVIN
MICHAEL K. LIVINGSTON
SHELBY ANNE FLOYD
MEI-FEI KUO
Attorneys for Plaintiffs

---

[2] This decision was not recognized by Judge Real, the visiting judge who let the case languish. However, the decision if it did nothing else it put the DOE on notice that the insufficient funds defense was not available in section 504 cases.

22