# TRANSCRIPT OF PROCEEDINGS TAKEN 04/05/04

*Page 1 to Page 156*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596



EXHIBIT E

001

## Page 1

OFFICE OF ADMINISTRATIVE HEARINGS
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
STATE OF HAWAII

In the Matter of    ) DOE-2004-026
                    )
BRYAN WILES-BOND, by and )
through his parents, DR. )
and MRS. STAN BOND,    )
    Petitioners,    )
    vs.    )
                    )
DEPARTMENT OF EDUCATION, )
STATE OF HAWAII,    )
    Respondent.    )
_____)

TRANSCRIPT OF PROCEEDINGS

Taken on behalf of Respondent at the offices of Ralph Rosenberg Court Reporters, Incorporated, Suite D212, 75-170 Hualalai Road, Kailua-Kona, Hawaii, commencing at 9:00 a.m. on April 5, 2004, pursuant to Notice.

BEFORE: HAUNANI HO ALM, HEARINGS OFFICER

## Page 2

**REPORTED BY:**
    DEBORAH A. NG, CSR 336
    Registered Professional Reporter
    Notary Public, State of Hawaii


APPEARANCES

For Petitioner      SHELBY ANNE FLOYD, ESQ.
Dr. & Mrs. Stan Bond:   Alston Hunt Floyd & Ing
                    65-1245 Opelo Road
                    Kamuela, Hawaii 96743

For Respondent      STELLA M.L. KAM, ESQ.
State of Hawaii,    Department of the Attorney
Department of           General
Education:          Room 304
                    235 S. Beretania Street
                    Honolulu, Hawaii 96813

Also Present:       Dr. & Mrs. Stan Bond

## Page 3

INDEX

| EXAMINATION OF NAOMI SHIRAISHI BY: | PAGE |
|---|---|
| Ms. Kam | 7 |
| Ms. Floyd | 13 |

| EXAMINATION OF LINDA PRICE BY: | |
|---|---|
| Ms. Kam | 15 |
| Ms. Floyd | 26 |
| Ms. Kam | 39 |

| EXAMINATION OF KELLY STERN BY: | |
|---|---|
| Ms. Kam | 41 |
| Ms. Floyd | 55 |
| Ms. Kam | 63 |
| Ms. Floyd | 64 |

| EXAMINATION OF DRU COPELAND BY: | |
|---|---|
| Ms. Kam | 66 |
| Ms. Floyd | 70 |

## Page 4

| EXAMINATION OF ANN KIMBALL WILES BY: | |
|---|---|
| Ms. Floyd | 82 |
| Ms. Kam | 134 |

| EXAMINATION OF DR. STAN BOND BY: | |
|---|---|
| Ms. Floyd | 136 |

EXHIBITS FOR IDENTIFICATION

There were no exhibits marked.

Page 17

(1) A. Uh-huh.
(2) Q. Was there any problem that you're aware of
(3) during the fall semester 2003 with the provision of
(4) the skills trainer?
(5) A. With Bill?
(6) Q. Yes.
(7) A. No, none that I'm aware of.
(8) Q. Other than Bill, was there anybody else, any
(9) other skills trainers, that you were involved with?
(10) A. Bill was the only skills trainer that we had
(11) that was actually employed to work with Bryan. We had
(12) other skills trainers who we could never make the
(13) system work out for them, but Bill would be the only
(14) one.
(15) Q. When you talk about the system not being able
(16) to work out, what time period are you talking about?
(17) A. I'm talking about, I'm going to say, probably
(18) around October through November.
(19) Q. Of 2003?
(20) A. Right.
(21) Q. Can you describe what efforts you were making
(22) and why it didn't work out?
(23) A. We could not procure a skills trainer that the
(24) hours would match their availability.
(25) Q. And whose availability?

Page 18

(1) A. The skills trainers' availability.
(2) Q. So you were trying to find skills trainers, but
(3) the skills trainers' availability wouldn't match with
(4) Bryan's schedule?
(5) A. Correct.
(6) Q. And is there any problem with Bill's provision
(7) of the skills trainer services?
(8) A. No.
(9) Q. And Bill is still currently providing skills
(10) trainer services to Bryan?
(11) A. No, no.
(12) Q. When did he stop?
(13) A. He stopped -- I should have wrote that down.
(14) Let's see. It's about the end of January, end of
(15) January.
(16) Q. And so are you currently looking for anyone to
(17) replace Bill?
(18) A. No. The person that I had to replace Bill
(19) could only work during the day, during the school, and
(20) another skills trainer took that position.
(21) Q. So that other current skills trainer, as far as
(22) you know, is currently providing those hours to Bryan?
(23) A. Right.
(24) Q. Are there difficulties in finding skills
(25) trainers for Bryan in Kona?

Page 19

(1) A. Yes.
(2) Q. Can you tell us about what causes those
(3) difficulties?
(4) A. The difficulties -- well, there is two
(5) different sets of difficulties. One set is we have to
(6) find somebody who is willing to learn sign language
(7) and bright enough to learn sign language.
(8)     And then the other problem has been that the
(9) skills trainers talk about some of the duties that
(10) they're asked to do in the home and most people don't
(11) want to do those duties.
(12) Q. And what kind of duties are those?
(13) A. Being alone with the child when the family is
(14) not available and taking care of the toileting issues
(15) in his bedroom.
(16) Q. Can you talk a little bit about the efforts
(17) that you made, specifically, to find a skills trainer
(18) for Bryan back in the fall semester 2003? What
(19) actions did you take to recruit skills trainers?
(20) A. We ran ads in the newspaper about every other
(21) week for about a month and a half. We had a job fair
(22) where we had open applications. On a Saturday we --
(23) we rented a room downtown on a Saturday and had HR
(24) available with the application process, all the people
(25) available so we could process people quickly.

Page 20

(1) Q. And did you get any possibilities for Bryan?
(2) A. Yeah, we did.
(3) Q. How many possible applicants did you get?
(4) A. We had three.
(5) Q. And why didn't those three work out?
(6) A. One of them just went someplace else. She was
(7) acceptable and we called to say, well, we need you to
(8) do the work here. She said, oh, I just accepted
(9) another position.
(10)    And another one was not available during
(11) Saturdays, on the weekends and evenings, just couldn't
(12) work those hours.
(13) Q. And the third person?
(14) A. Bill.
(15) Q. So when did Bill begin providing the skills
(16) trainer hours to Bryan?
(17) A. In about the middle June, July time period.
(18) Q. I guess I'm getting a little bit confused. But
(19) you were still recruiting sales trainers in the fall
(20) of 2000?
(21) A. Correct. We have an ongoing process recruiting
(22) skills trainers.
(23) Q. But particularly for Bryan?
(24) A. Did I run a specific ad for Bryan?
(25) Q. No, no, no. Did you earmark specific

### Page 29

1. Q. With respect to Bryan Wiles-Bond, would it be
2. fair to say that he is one of the more difficult
3. children, autistic children that your skills trainers
4. provide services for?
5. A. One of, yes.
6. Q. And is that because of his behaviors?
7. A. Yes, behaviors and disability, yeah.
8. Q. The degree of disability --
9. A. Yes.
10. Q. -- that he has; is that correct?
11. A. Correct.
12. Q. And is that also true because of his language
13. deficits?
14. A. The language deficits haven't been as
15. troublesome as the spectrum of the disability because
16. I only get to observe briefly, but the language seems
17. to be developing with the sign language so that's not
18. as difficult of a communication issue as it was, I
19. think.
20. Q. Have any of the applicants that have applied to
21. CFS had sign language, American Sign Language, or sign
22. language skills?
23. A. No, I don't think so.
24. Q. You provided me with documents from your files
25. in response to a subpoena, correct?

### Page 30

1. A. Correct.
2. Q. And as part of that, you provided progress
3. notes by Bill Beljean, correct?
4. A. Correct.
5. Q. And do you review those in the normal course of
6. your work?
7. A. I don't specifically review every one, no.
8. Q. Would you communicate with Mr. Beljean while he
9. was a skills trainer for Bryan about how things were
10. going?
11. A. Yes, during supervision.
12. Q. Were you aware that on a number of occasions in
13. the fall of 2003 that Bryan had hit him?
14. A. Yes.
15. Q. And had he reported those to you?
16. A. Yes.
17. Q. Is that an obligation, he's supposed to report
18. those kinds of incidents to you?
19. A. Yes.
20. Q. And do you recall on how many occasions that
21. happened?
22. A. No, I don't have that information without going
23. through the record.
24. Q. Do you recall that it was more than once?
25. A. Yes.

### Page 31

1. Q. And do you recall that Bryan, actually, hurt
2. him several times?
3. A. How would you describe hurt?
4. Q. Well, drawing blood.
5. A. Yes.
6. Q. And were you aware that Bryan had hit other
7. skills trainers as well, in the classroom?
8. A. In the classroom, yes.
9. Q. You mentioned that in your recruiting efforts
10. you ran ads and you had a job fair. Was the job fair
11. in Honolulu or here?
12. A. Here.
13. Q. Were there any recruiting efforts in Honolulu
14. that CFS made?
15. A. CFS recruits skills trainers in Honolulu, too.
16. Q. For positions over here?
17. A. If someone wanted to move. We don't,
18. specifically, put an ad in the Honolulu paper for Kona
19. positions.
20. Q. So the ads that you did run, ran only on the
21. Big Island?
22. A. That's correct.
23. Q. And did you do any mainland recruiting?
24. A. We get applicants from the mainland because we
25. have all of our postings on the web site, so we get

### Page 32

1. applicants or letters of interest from the mainland.
2. Q. If people happen to see your web site and have
3. an interest in coming to Hawaii to work?
4. A. Correct, correct.
5. Q. And do you do any active recruiting other than
6. that on the mainland for skills trainers?
7. A. No.
8. Q. Ms. Price, in addition to the skills trainers
9. that you mentioned, did Child and Family Services have
10. an application from Courtney Flouhog? Is that name
11. familiar?
12. A. No, not that I know of. Do you want me to -- I
13. can check.
14. Q. No, that's okay, if you don't recall. How
15. about Ritchi Stollard?
16. A. Yes, we had an application for Ritchi.
17. Q. Was she then placed with Bryan?
18. A. She was working with Bryan, not through CFS.
19. She applied to come to work for us. She was never
20. completely processed with us and was employed by us.
21. Q. So she was never employed by CFS?
22. A. Correct.
23. Q. Prior to the fall of 2003, were you aware that
24. there was an agreement between the Bonds and the
25. Department of Education concerning substitute skills

Page 33

(1) trainers or therapeutic aids?
(2) A. No.
(3) Q. Not at all?
(4) A. Huh-uh.
(5) Q. No. When did you first -- or did you ever
(6) become aware that there was such an agreement?
(7) A. I'm not quite sure what you're talking about so
(8) probably not.
(9) Q. Well, let me ask if you would look at
(10) Exhibit P4 which I will provide you a copy with.
(11)    Have you seen that before?
(12) A. No.
(13) Q. Never?
(14) A. No.
(15) Q. Were you informed at any time prior to, let's
(16) say, October of 2003 that the DOE had an obligation to
(17) identify and train skills trainers as potential
(18) substitutes to provide services for Bryan?
(19) A. I recall hearing something about that, but I
(20) knew no details about that.
(21) Q. So you may have had some vague awareness, but
(22) no direct communication with the DOE about that
(23) obligation?
(24) A. No.
(25) Q. And who was the person in the Department of

Page 34

(1) Education in the fall of 2003 that you would interact
(2) with with respect to the provision of skills trainers
(3) for an autistic child?
(4) A. In this case, specifically?
(5) Q. Well, starting with any case. Was there any
(6) single person you normally had contact with?
(7) A. The SSC from the individual schools is who I
(8) normally have the most contact with, procurement of a
(9) skills trainer.
(10) Q. So the SSC, or student services coordinator,
(11) from a particular school would contact you and request
(12) that you provide services --
(13) A. Correct.
(14) Q. -- or provide skills trainers?
(15) A. Yes.
(16) Q. And in the fall of 2003 the school that Bryan
(17) was at was Kealakehe Intermediate School, correct?
(18) A. Correct.
(19) Q. And the SSC was Karen Johnson?
(20) A. Correct.
(21) Q. Did you communicate with Ms. Johnson in the
(22) fall of 2003 about the need for skills trainers for
(23) Bryan?
(24) A. No. I communicated that need to the DOE
(25) directly, to Barbara Coffman and Sheri Adams.

Page 35

(1) Q. So Barbara Coffman at that time was a social
(2) worker working for the district; is that correct?
(3) A. That's correct.
(4) Q. Yes?
(5) A. Yes.
(6) Q. And Sheri Adams was a speech pathologist
(7) working for the district?
(8) A. Yes.
(9) Q. So you communicated directly with those
(10) district people about Bryan's needs; is that right or
(11) the skills trainers' issues?
(12) A. What are you asking me if I communicated to
(13) them?
(14) Q. I'm only asking who you were communicating with
(15) working for the DOE in the fall of 2003 about the
(16) skills trainers' need, issues for Bryan?
(17) A. I wouldn't have communicated the skills
(18) trainers' issues with them. I would have communicated
(19) that I didn't have a lot of applicants. That's what I
(20) would have communicated.
(21) Q. And you did have those communications with
(22) them; is that correct?
(23) A. That I had trouble coming up with additional
(24) people to fulfill the positions, yes.
(25) Q. And what was their response?

Page 36

(1) A. They knew it was tough, please keep trying.
(2) Q. Did you have any discussions with them about
(3) other incentives that might be offered to attract
(4) skills trainers for Bryan?
(5) A. No. By that do you mean additional salary?
(6) Q. I mean by "incentive" either salary or other
(7) benefits or other working conditions or anything else
(8) that might permit you to attract more applicants.
(9) A. No.
(10) Q. Now, in the fall of 2003 and through February
(11) of 2004, CFS wasn't the only agency providing skills
(12) trainers for Bryan or children in the DOE, generally,
(13) correct?
(14) A. Correct.
(15) Q. Did you communicate with other agencies about
(16) the availability of skills trainers for Bryan?
(17) A. Correct, yes.
(18) Q. And that would be with TIFFE?
(19) A. Yes.
(20) Q. And would the person at TIFFE be Kelly Stern?
(21) A. Yes.
(22) Q. So that did you attempt to coordinate the
(23) efforts of finding skills trainers with Kelly Stern?
(24) A. Not a formal coordination. We would have
(25) conversations back and forth, do you have anybody on

Page 37

(1) the horizon.
(2) Q. In the months from October 2003 through
(3) February of 2004, did you know how many hours of
(4) skills trainers' services Bryan was entitled to
(5) through his IEP?
(6) A. Yes.
(7) Q. And did you know how many hours of skills
(8) trainers' services he was receiving?
(9) A. I would only know the hours he was receiving
(10) from our agency.
(11) Q. So if there were hours that weren't covered but
(12) the shortfall wasn't from absenteeism or something
(13) with a skills trainer working for CFS, you wouldn't
(14) know about it?
(15) A. That's correct.
(16) Q. Does CFS provide training in American Sign
(17) Language to skills trainers?
(18) A. On an as needed basis.
(19) Q. Has it ever provided training for Bryan, skills
(20) trainers in ASL?
(21) A. Informally, yes; not in a formal class, no.
(22) Q. And what kind of informal training?
(23) A. Books, flash cards, computer.
(24) Q. Would it be fair to say that those were
(25) supports for someone to learn on their own?

Page 38

(1) A. Yes, yes, that would be fair.
(2) Q. And if they spent the time learning on their
(3) own, would they be paid by CFS for that?
(4) A. Boy, if somebody requested that, it would be
(5) a -- it would be considered. I haven't had to -- I
(6) haven't had that request before, so I haven't ever had
(7) to figure that one out, but we do pay for training.
(8) Q. I take it from what you're saying then, it
(9) should be no problem if it was determined that a
(10) skills trainer needed training in ASL to communicate
(11) with Bryan for CFS or any other agency to acquire that
(12) training and pay the skills trainer for it?
(13) A. No, it would be no problem whatsoever. We even
(14) talked about being willing to attend the class we were
(15) looking to find, yes, no problem.
(16) Q. Do you remember in October of 2003 that Kim
(17) Wiles called you about the need for skills trainers?
(18) A. I don't have the exact date, but yes.
(19) Q. And in these conversations was she trying to
(20) get information from you about who might be out there
(21) available?
(22) A. I'm not quite sure I understand that.
(23) Q. Well, maybe I'll ask a broader question. What
(24) communications do you recall with Kim Wiles about the
(25) need for skills trainers?

Page 39

(1) A. Did I have anybody who could take the place for
(2) I think it was Ritchi.
(3) Q. And was it your understanding at that time that
(4) Ritchi was sick, had had a stroke?
(5) A. Correct, yes.
(6) Q. And is that the point at which you identified
(7) the two people you mentioned who were current CFS
(8) employees?
(9) A. Correct, correct.
(10) Q. Just so I'm clear, from -- well, for all of
(11) 2003, CFS provided one skills trainer for Bryan. That
(12) was Bill Beljean, correct?
(13) A. Correct.
(14)      MS. FLOYD: That's all the questions.
(15)      HEARINGS OFFICER: Anything else?
(16)           FURTHER EXAMINATION
(17) BY MS. KAM:
(18) Q. Was Bryan's mom aware of Bill's lack of
(19) experience when he began providing services to Bryan?
(20) A. Yes.
(21) Q. And did you attempt to talk to Bryan's mom
(22) about the other applicant in fall 2003 who was not
(23) experienced but who you felt would be a good candidate
(24) for providing services to Bryan?
(25) A. Yes, I said a couple names.

Page 40

(1) Q. Did you point out to her that Bill had not been
(2) experienced?
(3) A. No, I don't recall if I said those words or
(4) not.
(5) Q. Did you attempt to convince Bryan's mom to
(6) consider the other applicant who was not experienced?
(7) A. Yes.
(8) Q. But did she meet with that applicant?
(9) A. You know, I wasn't involved in that process.
(10) I'm not sure if they met or if they were on the
(11) telephone. I was not there.
(12) Q. But you gave her that person's name and number?
(13) A. Yes.
(14) Q. And then at that point then it would be Bryan's
(15) mom talking with that person?
(16) A. Right.
(17) Q. And then she would let you know whether she was
(18) agreeable to that?
(19) A. Yes.
(20) Q. So then she called you afterwards and said she
(21) didn't think that that person was acceptable?
(22) A. Didn't think that that would work.
(23) Q. Did CFS pay for Bill's ASL class?
(24) A. He never got to the point that he took that ASL
(25) class.

Page 41

(1) Q. But CFS would have paid for it, if they asked
(2) for reimbursement?
(3) A. Yes, if we had been able to locate one.
(4)   MS. KAM: No further questions.
(5)   HEARINGS OFFICER: Anything else, Ms. Floyd?
(6)   MS. FLOYD: No.
(7)   HEARINGS OFFICER: Thank you very much. Why
(8) don't we take a 10-minute break so the court reporter
(9) can rest her hands and we'll start with the next
(10) witness. It's about 10:00; 10 minutes.
(11)   (Recess was had.)
(12)   HEARINGS OFFICER: We're back on the record.
(13) It's 10:11 a.m., and Ms. Kam, how would you like to
(14) proceed?
(15)   MS. KAM: Can you swear in the witness?
(16)        KELLY STERN
(17) called as a witness at the instance of the Respondent,
(18) being first duly sworn to tell the truth, the whole
(19) truth and nothing but the truth, was examined and
(20) testified as follows:
(21)        EXAMINATION
(22) BY MS. KAM:
(23) Q. Could you state your name and your current
(24) position for the record?
(25) A. I'm Kelly Stern and my position is program

Page 42

(1) manager, clinical supervisor, The Institute for Family
(2) Enrichment.
(3) Q. And are you familiar with Bryan Wiles-Bond?
(4) A. Yes.
(5) Q. And how are you familiar with Bryan?
(6) A. I provide skills trainer services to him right
(7) now. I don't do direct work with him, though. I do
(8) direct work with the skills trainers and the
(9) supervision of them in their work -- not directly with
(10) that either. Dru does the direct clinical work. I do
(11) the administrative work.
(12) Q. And when did you begin working on Bryan's case?
(13) A. A year ago. It would be the first Monday in
(14) February of 2003, 1st, 2nd, something like that.
(15) Q. And at that time how many skills trainers did
(16) your agency provide who were working with Bryan?
(17) A. At that time we were providing two skills
(18) trainers and we had one that was going through a
(19) hiring process. I believe she, Rebecca Gavin, was
(20) already working with the family, but she was going
(21) through the process of being hired with us.
(22) Q. And were there any problems with the provision
(23) of the skills trainer services thereafter?
(24) A. Problems, not that I know of. When Christy
(25) left to go back to the mainland, we had to -- she let

Page 43

(1) me know that she would be resigning, so we had to
(2) start looking for services then.
(3) Q. And when was this?
(4) A. May, somewhere in maybe April, May of last
(5) year. She was moving back to the mainland. She had
(6) had some problems with a miscarriage and such and so
(7) it didn't seem like it was going to work out staying
(8) here. She gave her resignation and then Sandy
(9) Harrington, the person who worked with Bryan's school,
(10) gave her resignation as well.
(11) Q. And were you able to find replacements for
(12) these two individuals?
(13) A. No.
(14) Q. Did this occur in the fall of 2003 --
(15) A. Huh-uh.
(16) Q. -- or this was in the spring?
(17) A. This was late spring, early summer.
(18) Q. So during this time do you know if the DOE or
(19) another agency was providing skills trainers' services
(20) for Bryan?
(21) A. I think the DOE found Sasha. The thing that we
(22) -- was happening with us was because this case was so
(23) sensitive and we knew that it was important to get the
(24) right kinds of services for this case, it was
(25) something, and I don't know if you know this, but it

Page 44

(1) really pulled us all together as agencies and the DOE.
(2) So whoever could figure it out, we were all
(3) trying to figure it out together. And so at that
(4) time, I don't know -- sometimes I don't know the
(5) details of how things got put together, but I believe
(6) Sasha was somebody who came in and covered one of -- I
(7) think Christy's role and that was with the DOE, as far
(8) as I know. I don't know if she got hired on with CFS
(9) or whatever. And then after Sandy finished working
(10) with Bryan, then CFS brought on a person to work with
(11) Bryan during the school day and that was Bill.
(12) And then I don't know when the switchover was.
(13) Sasha could only work, I think, to the end of the
(14) summer because Kim and I had been in conversation and
(15) she had checked with me to see if I had anybody. I
(16) didn't have anybody. And so the DOE provided Ritchi.
(17) And I always thought Ritchi was with CFS, but I
(18) learned in the last few months that she wasn't with
(19) CFS.
(20) And then I think the real problems hit when
(21) Ritchi had a heart attack and then all of us were
(22) looking, scrambling for people to provide services
(23) with Bryan.
(24) Q. What kind of efforts was your agency making to
(25) find applicants?

Page 45

(1) A. Our agency is constantly recruiting and we
(2) never stopped, as far as recruiting here, through the
(3) newspaper. We don't have an ad going like every month
(4) out of the year, but about every six to eight weeks
(5) you'll start seeing an ad come up for a season,
(6) possibly one to two weeks.
(7)    And in between those times we usually get an
(8) influx of people and then I process those
(9) applications. I try to see what happened -- what kind
(10) of skills are within those applications and then do
(11) the interviews. And then if there is not a good pull
(12) or a good mix of what comes in, then we advertise
(13) again. And we are constantly in advertising and in
(14) training.
(15)    Our agency is fortunate that we have probably
(16) the largest piece of this contract. I have 50 skills
(17) trainers on this side of the island who serve about 45
(18) kids. And because of that I'm able to, typically,
(19) hire and have substitutes who are -- typically, the
(20) way that I'm running the program is my substitutes are
(21) in training.
(22)    So my substitutes get basic training and then
(23) they are placed in substitute roles with different
(24) kids. That way they get experience, they get to
(25) practice, they get to see what working with a variety

Page 46

(1) of teachers is like, and it gives me a chance to see
(2) if there is the kind of quality that is worth really
(3) investing in to step them up to higher cases.
(4)    And actually, I've had on a full scale with our
(5) employees, we are moving them toward being marketable
(6) in as far as it's -- pretty much I know here in Hawaii
(7) you have to train. And so we have been in an ongoing
(8) training effort. We continually keep our pool of subs
(9) relatively large. Sometimes it's only one or two, but
(10) sometimes it's all the way up to five. And those
(11) people are in training, if they can be.
(12)    This is a delicate case as well because if
(13) they're in training, they're not employed all the time
(14) and so they have other jobs and so sometimes it's very
(15) difficult. Sometimes they end up staying, staying for
(16) two to three months and then they drop out because
(17) either they didn't get full-time employment, or they
(18) didn't -- they really aren't really up to par for the
(19) work.
(20) Q. Were any of those substitutes used to provide
(21) some of the hours for the skills trainers who had
(22) left?
(23) A. No. There were certain -- I was under the
(24) impression that there were certain things that had to
(25) be done in order to work for Bryan. So there had to

Page 47

(1) be certain kinds of training, certain kinds of skills.
(2) And as far as I was understanding, these people didn't
(3) have skills in DTT, discrete trial teachings. They
(4) didn't have skills in TEACHH. They only had basic
(5) overviews. And so to me they weren't at the caliber
(6) yet to be able to work for this family. And if they
(7) had stayed longer, they could possibly do that, but,
(8) typically, they weren't.
(9) Q. What are the minimum qualifications that your
(10) agency is looking for for skills trainers?
(11) A. The minimum, the minimum is that they have to
(12) have at least an AA degree. We're really strict.
(13) There is some leeway within that, but our agency has
(14) strictly held and adhered to the AA in related fields.
(15) It can't even be an AA in auto mechanics. Even things
(16) like communication are questionable.
(17)    When we say "related fields," it's usually
(18) education or social sciences and that would be
(19) psychology, sociology, human services, something to
(20) that effect.
(21) Q. Is there any experience requirement?
(22) A. And then -- yes, the hope is that they will
(23) have at least -- at least a couple of year's
(24) experience with special needs children. Now,
(25) sometimes that's attention deficit disorders,

Page 48

(1) sometimes that's behavioral problems, anything in the
(2) mental health area, and that's broad because not
(3) everybody has experience with autism.
(4)    My hope is that they'll provide -- I mean that
(5) they'll have had skills with children with special
(6) needs. Sometimes all they've done is tutored in A
(7) Plus after school, they've run camps, so they've had
(8) more of the hyperactive type of kids, but they really,
(9) typically, don't have the skill with autism,
(10) particularly autism; sometimes SMR, sometimes they've
(11) worked with Downs Syndrome or maybe mental retardation
(12) or something like that, but autism is a little bit
(13) harder to find people who have that experience.
(14) Q. What is your understanding of the requirements
(15) for skills trainers for Bryan?
(16) A. My understanding is that they have
(17) experience -- that they're highly trained and
(18) experienced in discrete trial teaching and picture
(19) exchange system, visual systems; that they understand
(20) his program; that they've been trained in his --
(21) understanding what his IEP says; what his schedule is;
(22) that they have some experience with sign language,
(23) although I've even been open to taking people who are
(24) willing to learn sign language because that's not a
(25) requirement by our contract. But it's -- he has -- he

Page 53

any way that this type of a situation could help to facilitate that.

He's willing to go back to school and enroll in school as soon as summer and as late as fall. And he's very interested in the possibility of -- again, this would be a backup situation. I'm tempted to send him either the DOE way or CFS way because, again, our agency is a little more stringent about our hiring policies.

Q. Does Kathryn know ASL?

A. No, not that I know of. I think she knows basic signs, but -- it's, typically, I ask that in my interview, but I can't remember. I don't have my notes in front of me as to what she knows.

Q. Do you know if she's receiving training in ASL?

A. No, I don't, other than the training and side by side with Rebecca and learning what the others are doing with Bryan.

Q. Would you be sending Danielle and this other man, this possibility, to training if they do end up working with Bryan?

A. Yeah. The DOE has authorized 40 hours, 32 hours last month, I have to get it renewed for this month, so that the others could come and cross train and be trained by Dru, specifically for Bryan. And

Page 54

Danielle already spent a whole day last week in training with Dru and Rebecca and Rae. And I don't know yet about Danielle because she was going to be actually substituting and I wanted to get her on board with the program, the basic program.

And then this month, again, I'm going to ask the DOE to do that again so that -- again, I'm trying to recruit within my own pool of skills trainers that don't maybe provide services after school or weekends.

I had a potential person, but -- I mean I continually get people who say yes, I'm willing, and then for some reason they back off. And my concern is that sometimes hearing through the grapevine the nature of the case, they hear things and they get scared and they don't want to be a part of it.

And in this case that was the situation and she just said, you know, I just want things to be a little bit more smooth. And I wasn't quite sure whether or not she was really up to par for this case anyway, so I like it better when my employees come to me and say I don't think I'm cut out for this. As a matter of fact, I think that's professional. And I'd rather them do that. And people who think they can do it, then I'm willing to really say let's put forth the effort and get you trained.

Page 55

The DOE provides a certain amount of hours. I can provide a certain amount of hours as well of training for specific cases. And I can provide two hours here, two hours there, sometimes up to four in a month for individualized, like one-to-one training. And I would do that with anybody who I felt needed that at this point.

Q. You would be providing the training?

A. Our agency would.

Q. Your agency?

A. Our agency would pay for them, so I would put them either in with Rebecca or on the side or mostly with Rebecca. Rebecca has the most experience right now. And Danielle is also highly experienced, but Danielle doesn't know this case, she doesn't have years in or time in. So I'm wanting to get some strong people for this case that know what they're doing.

MS. KAM: Thank you.

HEARINGS OFFICER: Ms. Floyd.

MS. FLOYD: Thank you.

EXAMINATION

BY MS. FLOYD:

Q. Ms. Stern, have you seen this document which is marked as Petitioner's Exhibit 4 previously?

Page 56

A. No. Is this the settlement from last year or a couple of years ago?

Q. This is the settlement agreement between the DOE and the Bonds from 2002.

A. Right.

Q. But you haven't seen that?

A. I haven't seen it. I've requested it.

Q. And who did you request it from?

A. The DOE.

Q. And when did you do that?

A. I requested it last year around the time that Kim -- Kim and I made our contact very early in February or somewhere, February, March of the last year when I first came on. And Kim said are you aware of what the settlement agreement is and I wasn't at the time, and so I had asked and requested the DOE to fax me a copy of this as to which I never did get a copy.

Q. You never got a copy?

A. No.

Q. Did somebody ever tell you, other than Kim Wiles, tell you what was in the agreement?

A. I had heard that it was about a certain amount of hours, I had heard that anybody that worked with Bryan had to be approved of by the family; that they

Page 57

had to have training; to what degree that was, I don't know, but that they already had to have a lot of skill before they came in, as far as being able to work with children with autism, so they had to have experience in autism.

They had to be familiar with DTT, TEACHH, structured teaching, the typical curriculums that are the best practice curriculums, and they had to be very aware of what his program was whatever time that was and that changes from year to year, but they had to be very aware of it.

That's pretty much my recollection of what I needed to know. And I don't know if -- the DOE had some things about whether or not they should send that to me or if they should just tell me the information that pertained to me.

Q. And who in the DOE did you communicate with about these details?

A. I was in really close communication with Sheri Adams.

Q. Sheri Adams was the district speech pathologist; is that right?

A. Yes, specifically, though, set up for the autism population, not anybody else; and Barbara Coffman, I was just getting to know Barbara at the

Page 58

time. She was new. She came on the DOE when I came on to TIFFE, and so we got to know each other and she often would let me know gaps and such, if there were any anticipated gaps and things like that.

Q. So you had an understanding that there was an agreement between the Bonds and the DOE about the type of training and experience that would be necessary for a skills trainer to work effectively with Bryan; is that right?

A. Uh-huh, uh-huh.

Q. And was there anything in writing that spelled this out more, or was it just this communication?

A. This communication, oral, verbal, over the phone.

Q. Did you understand that the DOE was to create a pool of trained substitutes to be available to provide services in the event that the more regular skills trainers were not available?

A. I knew that that was something they had to do, but it was also something that I was trying to do, so I don't know if they were supposed to do it on their own aside from the agency, but I felt it was important that I do it as well, but I wasn't meeting with a lot of success.

My idea of highly trained --

Page 59

Q. Let me just interrupt for a second. I want to not lose this train of thought.

When you started in February of 2003 with TIFFE, was there a pool of trained substitutes available for Bryan?

A. Not that I know of, no.

Q. Was there any point up from February of 2003 up until, let's say, October of 2003 where, to your knowledge, there was a pool of trained substitutes for Bryan?

A. Let me say one thing. There may not have been a pool outside the three that were providing services, but within the three that provided the services they covered each other. And because they covered each other, typically, it wasn't something that I was like on the front burner, like I was really worried about. It was more when Christy said she was leaving, that I started saying, oh, my gosh, we got to get someone.

So it was my understanding there was coverage between the three of them, so yes, there was not any pool of extra subs that I knew of that could serve Bryan at the time.

Q. And was that true also; that is, there wasn't a pool of trained substitutes through February of 2004?

A. That's true.

Page 60

Q. So from the time you came on in February of 2003 until February 2004, to your knowledge, there was no pool of trained substitutes?

A. That's correct.

Q. Would it be fair to say -- well, first of all, you've met Bryan, haven't you?

A. Uh-huh.

Q. But not many times, I take it?

A. Probably been up there about 15, 20 times.

Q. That's to the school?

A. In the last year, yeah.

Q. Would it be fair to say that Bryan's needs are greater than many autistic children; that is, he's on the relatively high end of the spectrum of autistic children?

A. I have different criteria for that. I sometimes put -- I put kids into ranges of 1, 2, and 3; 1 being most severe and 3 being least severe. I put him between a 2 and a 3, as far as degree of difficulty.

I don't find him to be as difficult as some of my other ones are, but I would put him as probably out of the 45 I have, he would probably be around 15, between 10 and 15, as far as the severity of his needs.

Page 69

(1) I don't decide who gets hired or anything like
(2) that. Since I'm in several schools, I'm kind of aware
(3) of what's going on, who's leaving.
(4) Q. The skills trainers who work with Bryan, do
(5) they require specific types of traits or skills?
(6) A. Well, let me just answer it this way. I don't
(7) think -- there is two skills trainers out of that 12
(8) who had some experience working with an autistic child
(9) by virtue of their job.
(10) The others have had no experience, but they
(11) were hired, I believe, because they looked trainable.
(12) They had a degree in psychology and maybe they taught
(13) a special ed class, so it looked like this was a
(14) person we could train.
(15) When I started working with him, he had about
(16) six signs. Signing was not an issue. Now he has
(17) about 140. Signing is an issue. Either the person
(18) needs to know how to sign already or be really willing
(19) to jump in, and not just learn the 140 signs, but
(20) become better than that.
(21) One of the skills trainers we have right now
(22) does sign and when she's with him, she's signing a lot
(23) and it makes a difference. He tries to start
(24) imitating what she's doing. The other skills trainers
(25) know the 140 signs and use them sometimes. They don't

Page 70

(1) always use them.
(2) So signing would be -- or a great willingness
(3) to really take it on. I would say, ideally, I would
(4) want them to have at least a bachelor's degree, I
(5) would like them to have two year's experience working
(6) with an autistic child. I would like them to be able,
(7) obviously, to relate to him and his family and the
(8) other people in the classroom. It's a big team.
(9) MS. KAM: No further questions.
(10) HEARINGS OFFICER: Ms. Floyd.
(11) MS. FLOYD: Thank you.
(12)         EXAMINATION
(13) BY MS. FLOYD:
(14) Q. Dr. Copeland, can you give us some information
(15) about your background?
(16) A. Yes. I have been in Hawaii for 18, 20 months,
(17) actually. I came here from Texas and I was on the
(18) faculty at the University of Texas medical branch in
(19) Galveston, Texas in the department of pediatrics in
(20) the division of special services.
(21) So we worked with not only autistic children
(22) but other children who had special needs. And I did
(23) that for 20 years.
(24) Q. And what is your educational background?
(25) A. I have a Ph.D. in clinical psychology, I did a

Page 71

(1) post doctoral fellowship at University of Texas
(2) medical branch in child psychology.
(3) Q. And since you've been in Hawaii have you been
(4) working in the same capacity; that is, as an IISC?
(5) A. Yes.
(6) Q. Sometimes we refer to these as autism
(7) consultants?
(8) A. That's the old name.
(9) Q. Old name, but the same position?
(10) A. Same thing, right.
(11) Q. And you mentioned you work for Alakai Na Keiki.
(12) And what is that?
(13) A. That's an agency that contracts with DOE to
(14) provide services such as mine and skills trainers.
(15) Q. Can you describe what Bryan's program is like?
(16) What does it consist of?
(17) A. Do you want me to walk you through the day?
(18) Q. That would be good.
(19) A. He arrives at school at about 7:30, it's a
(20) little bit before the class is convened, meets his
(21) skills trainer, goes to the room, and kind of sets up
(22) the room. That's part of his functional skills,
(23) opening the blinds, taking chairs off the table.
(24) Then he goes to breakfast in the cafeteria.
(25) Usually, he eats breakfast in the cafeteria.

Page 72

(1) Sometimes he brings it up to the classroom. And that
(2) is to focus on functional skills and social skills,
(3) interacting with typical peers which he's now
(4) beginning to acknowledge or his classmates.
(5) Then he has five, in the morning from, say,
(6) from about 8:00 to 11:30, has five, what we call, work
(7) sessions. And that work session includes -- and it's
(8) usually doing DTTs or some kind of direct instruction.
(9) Q. Can you explain what DTT is?
(10) A. Discrete trial training where you teach a child
(11) something by repeating it within a very restricted
(12) kind of presentation. So you might give me 10 trials
(13) of show me a certain sign or what does this say, and
(14) then you keep percentages on how well he does.
(15) They're not all DTT.
(16) So we do two sessions of signing, two of sight
(17) words because he's now beginning to -- he has a sight
(18) vocabulary and then one of math in the morning. He
(19) works 20 minutes and then we do a 10-minute break.
(20) The purpose of the 10 minute break is for him to
(21) develop independent recreational/leisure skills. So
(22) he chooses, we give him a choice, what he's going do
(23) and he engages in that activity for 10 minutes.
(24) In that block of time there is recess which the
(25) class goes to a certain spot on the playground and

### Page 81

(1) sometimes not, and we kind of review the program, what
(2) things need to be tweaked at home, what she can do,
(3) what she shouldn't do, whatever, as the case may be.
(4) Q. So is it fair to say that the parents also
(5) participate in delivering Bryan's program?
(6) A. Yeah. Kim is the one who really got Special
(7) Olympics going. She went to those first
(8) organizational meetings and she's made materials last
(9) spring and summer. She's very involved.
(10) Q. Of the skills trainers that you've mentioned,
(11) you said that 2 of the 12 had experience working with
(12) autistic kids?
(13) A. One, when I came, had been working with him and
(14) so she had that experience. One has developed that
(15) with him on the job so if you saw her now, you would
(16) say yes, she's experienced, but she developed it with
(17) him.
(18) In terms of having someone walk through the
(19) door new who's had experience, the substitute that
(20) came last week is the only one.
(21) Q. So in the entire 20 months until this last week
(22) there were no skills trainers that were working with
(23) Bryan who had experience with autistic kids?
(24) A. No.
(25) Q. And with respect to the training that they had

### Page 82

(1) received prior to beginning as skills trainers with
(2) Bryan, had they been trained in DTT and TEACHH?
(3) A. No.
(4) MS. FLOYD: That's all I have, thank you.
(5) HEARINGS OFFICER: Ms. Kam, anything else?
(6) MS. KAM: No.
(7) HEARINGS OFFICER: Thank you very much.
(8) MS. KAM: And I'm done.
(9) HEARINGS OFFICER: You rest. Ms. Floyd.
(10) MS. FLOYD: I'm going to call Ann Kimball Wiles
(11) first.
(12) HEARINGS OFFICER: It's 2:00. Let's take a
(13) break.
(14) (Recess was had.)
(15) HEARINGS OFFICER: We're back on the record.
(16) It's 2:05 p.m.
(17)            ANN KIMBALL WILES
(18) called as a witness at the instance of the Petitioner,
(19) being first duly sworn to tell the truth, the whole
(20) truth and nothing but the truth, was examined and
(21) testified as follows.
(22)              EXAMINATION
(23) BY MS. FLOYD:
(24) Q. Mrs. Wiles, state your real name for the
(25) record.

### Page 83

(1) A. My legal name is Ann Kimball Wiles.
(2) Q. And you're Bryan's mom?
(3) A. I am.
(4) Q. Can you tell the hearing officer what your
(5) current employment is?
(6) A. I work for the Department of Education. I'm a
(7) vice principal at Honaunau School.
(8) Q. And how long have you been a vice principal?
(9) A. This is my third year.
(10) Q. And has that been for Honaunau the whole time?
(11) A. No. I was at Konawaena Elementary School for
(12) two years.
(13) Q. And before you were vice principal did you work
(14) for the DOE?
(15) A. I did.
(16) Q. In what capacity?
(17) A. I was a counselor at Konawaena High School.
(18) Q. And when did your family first arrive in
(19) Hawaii?
(20) A. We arrived in the summer of 1999.
(21) Q. And when did you go to work for the DOE?
(22) A. In August of 1999.
(23) Q. And you've been there ever since?
(24) A. I have.
(25) Q. Can you briefly describe your educational

### Page 84

(1) background?
(2) A. I have a bachelor's in psychology and
(3) sociology. I have a master's in counselor education,
(4) and I have a specialist degree in counselor education,
(5) and I have a master's in education administration.
(6) Q. Why don't you tell us about Bryan, just give us
(7) some background about Bryan's development and his
(8) educational experiences until he came to Hawaii and
(9) then we'll go from there.
(10) A. To tell you a little bit about Bryan,
(11) basically, Bryan is a very loving boy, a very loving
(12) child, he wants to please, he's a pleaser. He kind of
(13) struggles in a world that he can't communicate in.
(14) He's a child that gets very attached to the
(15) people who are with him, whether, obviously, his
(16) family, but as far as his skills trainers or whoever
(17) is with him, he constantly refers back to them to make
(18) sure everything is okay and he's doing right. That's
(19) one of the reasons it's really important that you have
(20) a good match working with Bryan.
(21) So Bryan, I would say, is a child first and he
(22) has autism second, but he is severely disabled. And
(23) because he is disabled we make a lot of modifications
(24) in our daily living, and basically, we do realize that
(25) unless we get the help he needs, he's going to have a

Page 117

(1) and that's time that's basically lost. It's also time
(2) that when they have just applied a little bit of it,
(3) if Bryan is going to be signing to them, they're not
(4) going to be understanding the signs, that's going to
(5) become frustrating for him. He will not be
(6) progressing when that's occurring. It's like with
(7) each new skills trainer, we basically repeated that
(8) process.
(9) Q. Now, you do have one skills trainer recently
(10) who is experienced at ASL?
(11) A. And that was the main reason we hired her was
(12) she, basically, taught ASL classes and it's been
(13) really successful.
(14) Q. In what way, how is this good for Bryan?
(15) A. Basically, what she does is she is
(16) spontaneously signing to him all the time. She's
(17) talking to him, signing to him, he has been repeating
(18) it. His signing has actually increased. He probably
(19) signs more with her than with anybody else, obviously,
(20) because she is -- she's signing. And it's --
(21) basically, it's like he's found somebody who he can
(22) communicate with.
(23) He's also learning signs that we don't have on
(24) our structured signs to be learned, but he's just
(25) learning them through interacting with her.

Page 118

(1) The other thing is once you learn signs you
(2) have to also be very careful with an autistic child
(3) that if you're learning the sign for door, it is being
(4) generalized all doors. It's not just that door. So
(5) when she is doing activities with him, she's
(6) repeating, oh, look in the book, there is a door; we
(7) go to Home Depot, there is a door; that's a door,
(8) there's a car door, doors in every kind of different
(9) context, so he, actually, gets the full concept. And
(10) someone who signs is, obviously, there is a big
(11) advantage for doing that.
(12) Q. In the communications that you've had either
(13) with the DOE or with the agencies providing skills
(14) trainers, have they ever indicated that there was
(15) anything other than lack of training and experience
(16) which was preventing you getting the skills trainers
(17) for Bryan that he needed?
(18) A. A lack of availability of people on the island
(19) who were responding to their ads.
(20) Q. Have at any point they come to you and said
(21) that you or your husband are the problem with respect
(22) to this?
(23) A. No.
(24) Q. In this hearing we've asked that the hearing
(25) officer make a ruling with respect to Bryan not

Page 119

(1) receiving the services that are included in this IEP.
(2) Is that your understanding?
(3) A. Yes.
(4) Q. Based on your participation in his program and
(5) communications with these agencies?
(6) A. Yes.
(7) Q. And the hearings officer has indicated that
(8) she's not going to address the settlement agreement
(9) issue.
(10) With respect to what services can be provided
(11) to Bryan in the future that will compensate him for
(12) these losses of services -- right now tell us how many
(13) hours in his day are filled up with at least,
(14) officially, supposed to be filled up, with skills
(15) trainer services or school services?
(16) A. I don't have that number in front of me. I
(17) want to say it's like --
(18) Q. Let me ask another way. He goes to school in
(19) the morning at what time?
(20) A. 7:30.
(21) Q. He comes home at what time?
(22) A. You mean what time do the services end?
(23) Q. No. Right now he comes home from school what
(24) time?
(25) A. He gets home around 4:30.

Page 120

(1) Q. And when he comes home, it's with a skills
(2) trainer?
(3) A. That's correct.
(4) Q. So during the week he's got a skills trainer
(5) from 7:30 at school and then at home until what hour?
(6) A. 6:30.
(7) Q. So it's only after 6:30 in the evening that
(8) Bryan is alone with the family?
(9) A. That's correct.
(10) Q. And on the weekends, on Saturday, what hours is
(11) the skills trainer there?
(12) A. From 1:30 to 7:30. That's on Saturday, and on
(13) Sunday it's 1:00 to 7:00.
(14) Q. So family time is morning Saturdays and morning
(15) Sundays?
(16) A. And also once the skill trainer leaves.
(17) Q. In the evening, after 7:00?
(18) A. Yes, at 6:30.
(19) Q. What time does Bryan go to bed?
(20) A. Basically, we usually get home about 5:30
(21) ourselves and cooking dinner, clean-up, check with my
(22) other son, how his day was. And then the skill
(23) trainer leaves about 6:30. We do spend some time with
(24) Bryan for about half hour to an hour, and then he goes
(25) to bed usually.

Page 121

(1) Q. And during this time is he getting a bath?
(2) A. Yes.
(3) Q. And how about Saturdays and Sunday mornings?
(4) A. Saturday and Sunday mornings, we basically
(5) carve out family time. Stan and I don't plan any
(6) other activities. We don't do anything else but spend
(7) time with our family and we take Bryan and my other
(8) son either to the beach or hiking or something like
(9) that.
(10) Q. So is it your belief that Bryan can't be
(11) compensated for these lost services by adding more
(12) services on top?
(13) A. No, not time wise.
(14) Q. So what needs to happen to compensate for these
(15) gaps in services?
(16) A. Basically, what I would like to see is -- I
(17) guess right now I feel at risk as far as sustaining
(18) services. I mean we do have services in place right
(19) now, but Rebecca has already shared that her father is
(20) critically ill and going through chemotherapy. She
(21) may be moving back to California.
(22) Q. This is one of your skills trainers?
(23) A. This is one of our skills trainers that has
(24) been with us like since January '02. Apparently,
(25) TIFFE has already approached Rae about possibly

Page 122

(1) picking up somebody who may become available in Waimea
(2) or Waikoloa. She lives in Waimea so there is a
(3) possibility that she may either transition to a
(4) different client or transition part of the time to a
(5) different client.
(6) Our third skill trainer is Kathryn and she
(7) works three jobs and seven days a week. I'm really
(8) concerned that she's going to begin to get a burnout
(9) factor.
(10) So I guess what my point is all of them have
(11) the potential at some point to be transitioning off
(12) the case or partially transitioning off the case, and
(13) there are no supports available in case that happens
(14) and we will be back right where we were in October.
(15) What I would really like to see is to be able
(16) to have either the process in place or the ability to
(17) broaden our range of recruitment for skill trainers so
(18) we can get someone who has more expertise. I also
(19) would like to see trainers who have more expertise.
(20) Q. Along the lines that Dr. Copeland was talking
(21) about?
(22) A. Along the lines that Dr. Copeland was talking
(23) about, someone could walk in, have a minimal amount of
(24) training, and really be able to implement this
(25) program.

Page 123

(1) As it stands now, we really look at a long
(2) process of training people. And by the time they
(3) really begin to effectively implement the program,
(4) something seems to happen and you start right back at
(5) the beginning again.
(6) I also would like to see -- I think Dru has
(7) worked very hard and I think she's been pulled at both
(8) ends because she's really had to assume the
(9) responsibility of both the training and the program.
(10) And what happens is when her focus on her hours was
(11) with the training, the program isn't getting as much
(12) attention and it begins to kind of stagnate.
(13) So I would also like to see her have more hours
(14) or some training mechanism and I would also like to
(15) see there be some training in ASL so whoever comes to
(16) work with Bryan if we can't recruit someone who
(17) already has some ASL background.
(18) Q. Well, I think it was Linda Price who testified
(19) this morning there was no problem about training for
(20) ASL.
(21) To your knowledge, has anybody done it?
(22) A. Well, she's only had that one skills trainer
(23) which was Bill Beljean and he was in our class when we
(24) took the skill training class. So he, in fact -- not
(25) skills trainer, that was a signing class, so he, in

Page 124

(1) fact, did take the signing class.
(2) Q. But the others, they have not trained, TIFFE
(3) hasn't trained --
(4) A. No. Basically, the training has consisted
(5) really -- I don't know what they've done at the school
(6) or what Naomi may have done. Dru stated earlier that
(7) she doesn't do any of the signing training and I do
(8) believe that. Sheri Adams, when she was here in the
(9) earlier part like in the 2002 time frame, she would do
(10) training with the group.
(11) But basically, what has happened for the last
(12) several months is literally when they come on board, I
(13) sit with them and I go over the signs with them
(14) because there seems to be a real gap between bridging
(15) that component.
(16) Q. You're talking about just basically going over
(17) signs, not teaching them ASL?
(18) A. I am talking about just trying to learn the
(19) words in Bryan's vocabulary, nothing beyond that.
(20) That's not been very successful. I mean what really
(21) helped is like when Sheri Adams was here, what we
(22) would do is we would meet once a month, we'd go over
(23) the signs together. That occurred maybe two or three
(24) times.
(25) And what that did is not only refresh

Page 125

(1) everybody's memory about the signs, bring it to the
(2) forefront that we need to be using the signs, but it
(3) also kept the integrity of the signs because what
(4) tends to happen is when people really don't learn ASL,
(5) you start seeing deviations and before long you get
(6) two or three people and they're doing different signs
(7) which is extremely confusing to Bryan.
(8) The other thing is we found that people tend to
(9) use the same signs over and over again. For instance,
(10) signs that get used are the nouns you communicate
(11) instructively or that you use constantly, like the
(12) word cracker or toilet or the things -- he has this
(13) large bank of vocabulary words, and actually, one time
(14) what we did was we divided the words into seven
(15) categories and we would rotate through.
(16) So every Monday you would have like a different
(17) set of words and the skill trainers would all try at
(18) some point in the day to at least find a way to hit
(19) those seven words. And that worked out pretty well,
(20) but it became kind of cumbersome and it faded out.
(21) Q. And when you're spending time with the skills
(22) trainers teaching them these signs, is this during the
(23) hours they're supposed to be providing program to
(24) Bryan?
(25) A. Some of it is, some of it they come in -- I

Page 126

(1) mean one of the things I talked to them about when
(2) they -- when I interviewed them is they would need to
(3) be learning ASL and I put that right up front. And I
(4) just said before you start, you really need to come in
(5) and let me show you the signs. And most of them are
(6) like, yeah, I really would like to learn them.
(7) HEARINGS OFFICER: Excuse me, it's been more
(8) than an hour so let's take a break, it's now 3:12, for
(9) 10 minutes so the court reporter can rest her hands.
(10) (Recess was had.)
(11) HEARINGS OFFICER: We're back on the record.
(12) It's 3:20 p.m.
(13) BY MS. FLOYD:
(14) Q. Mrs. Wiles, I was asking you about your belief
(15) as to what services or additional supports might be
(16) necessary to compensate Bryan for the loss of services
(17) that he's had.
(18) One of the issues that we've raised as
(19) compensatory for Bryan is the provision of a nighttime
(20) monitor to reinforce his toilet training. And you've
(21) already testified that you saw regression with respect
(22) to the toileting?
(23) A. Yeah.
(24) MS. KAM: You know, I'd like to object to this
(25) line of questioning because I understood that we were

Page 127

(1) not going to be addressing the toileting issues, so I
(2) didn't question any of my witnesses on that.
(3) MS. FLOYD: I'm not addressing the toileting
(4) issues from the standpoint of the issue raised in the
(5) hearing request which was the failure to provide
(6) services but as the compensatory component that was
(7) laid out in my brief relating to toileting services.
(8) I want the mother to testify about why that
(9) would be compensatory for Bryan in light of a
(10) regression.
(11) MS. KAM: I guess I'd like to reserve the right
(12) to recall witnesses if need be to testify as to what
(13) kind of services could be provided with regard to the
(14) nighttime monitoring of the toileting issues.
(15) HEARINGS OFFICER: That's fine. Do you want to
(16) continue?
(17) BY MS. FLOYD:
(18) Q. So can you explain what this issue is with
(19) respect to the nighttime monitoring?
(20) A. Basically, we've been struggling with toileting
(21) for, I guess, 12 years. It's always been on his IEP.
(22) It's always -- it's one of the basic life skills as
(23) Dru said earlier that limits you. It limits you not
(24) only as far as what you can do in the future, it's
(25) actually a limiting factor right now.

Page 128

(1) There are a lot of people, skill trainers that
(2) we probably are not able to access because people do
(3) not want to work with a 12-year-old who's not toilet
(4) trained. It excludes you from a lot of different
(5) types of things, and it's going to continue to exclude
(6) him as he gets older in even a greater capacity.
(7) We have been working at it. We met with Kim
(8) Smalley.
(9) Q. And who is Kim Smalley?
(10) A. I'm sorry, Dr. Kim Smalley, she's a
(11) psychologist who has expertise in toileting behaviors,
(12) and we met with her several years ago. She came up
(13) with a plan. We were able to kind of chip away at
(14) that at the IEP. It was decided once again by
(15) the team -- Dru said that she felt that we needed to
(16) bring someone in with more expertise on toileting.
(17) Q. This is the January 2004 IEP?
(18) A. Yes. Kim Smalley was brought in again to
(19) consult. It is both her belief and Dru's belief that
(20) you cannot effectively toilet train Bryan without
(21) having someone there at night to monitor his behaviors
(22) and take him to the rest room and to catch him when he
(23) is in his room and wakes up and needs to go to the
(24) bathroom, to go into the toilet which means someone
(25) has to stay awake.