IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>　　　　　　　　Plaintiffs,<br><br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent,<br><br>　　　　　　　　Defendants. | CIVIL NO. CV 05-00247 HG/BMK<br>CIVIL NO. CV 04-00442 HG/BMK<br>Consolidated (Other Civil Action)<br><br>MEMORANDUM IN SUPPORT OF MOTION |

**MEMORANDUMM IN SUPPORT OF MOTION**

**I.　INTRODUCTION**

By this motion, Plaintiffs seek an order taking judicial notice of prior administrative findings applying the doctrine of res judicata to those findings in the present case. In this case, there have been three prior administrative adjudications. Trial is set for July 25, 2006. It would useful at this time for the parties to have the Court's ruling regarding the application of res judicata now in order to avoid needless and duplicative discovery.

## II. FACTS

Plaintiffs and Defendants in the present case were litigants in three prior due process hearings initiated under the Individuals with Disabilities Education Act ("IDEA").

There are several common themes running through these 3 administrative decisions. In all three, the State made concessions regarding liability and other issues. All three decisions were unappealed.

The findings made by the Hearings Officer in the administrative proceedings found in the May 11, 2004 Findings of Fact, Conclusions of Law and Decision (attached hereto as Exhibit "A") were:

1)  Bryan was denied FAPE. Exhibit "A" at pp. 7, 8, and 10;

2)  There were an inadequate number of qualified skills trainers sent to the household by the DOE or supporting agencies. Exhibit "A" at pp. 3, 4, 6, and 7;

3)  Bryan communicated by American Sign Language (ASL); otherwise Bryan did not communicate. Exhibit "A" at p. 3;

4)  Bryan had many hand signals (at least 120) in his knowledge base. Exhibit "A" at p. 2;

---

[1] Plaintiffs recognize the limits of the Stephen L. decision because it is currently languishing due to the efforts of Judge Real. However, Plaintiffs are confident that the Ninth Circuit will right the ship in Mark H. and the companion cases.

    5)    Bryan needed a teacher and all aides trained in the methodologies of autism (DTT and TEEACH) and in American Sign Language. Exhibit "A" at p. 9;

    6)    Bryan regressed in several important areas because he did not receive consistent and experienced skill trainer services starting at least in the Fall of 2003. Exhibit "A" at pp. 4 and 5;

    7)    Direct adult supervision is required is pivotal to Bryan's program's success. Exhibit "A" at p. 2;

    8)    The IEP drafted for Bryan on January 9, 2004 if implemented properly could provide Bryan with educational progress. Exhibit "A" at p. 8;

    9)    The IEP drafted for the 2003-04 school year provided:

        a)    During the school day, Monday through Friday, for 6.5 hours (from approximately 7:30 a.m. to 2:00 p.m.);

        b)    During after school hours, Monday, Tuesday, Thursday, Friday, for 4.5 hours (from approximately 2:00 p.m. to 6:30 p.m.) and Wednesday for 5.5 hours (from approximately 2:00 p.m. to 7:30 p.m.); and

        c)    On Saturday and Sunday for 6 hours per day (from approximately 12:30 p.m. to 6:30 p.m.).

    A total of 68 hours of skills trainer services per week. Exhibit "A" at p. 3;

10) From October 2003 to February 2004, the Department of Education ("DOE") failed to provide Bryan with the required number of skills trainer service hours per week as required in his relevant IEPs.[2] Exhibit "A" at p. 3;

11) The six skills trainers Respondent provided to Bryan in the Fall of 2003 through February 2004 did not have prior experience working with autistic children. Five of the six skills trainers had no prior experience with ASL. Exhibit "A" at p. 8;

12) Neither of the two agencies, Child and Family Services ("CFS") and The Institute for Family Enrichment ("TIFFE"), who provided skills trainers to Bryan during that period were able to locate individuals who had experience working with autistic children or who were proficient in ASL. Exhibit "A" at p. 4;

13) Since Bryan's skills trainers had no experience in working with autistic children, Dr. Copeland had to train them. During the 18 months she worked with Bryan Dr. Copeland trained 12 skills trainers. Training included instruction in two basic programs[3] used to teach autistic children, managing Bryan's behavior, developing Bryan's social skills, and data collection. Dr. Copeland works with Bryan for 6 hours each week. Training his skills trainers left

---

[2] Bryan's November 18, 2002 IEP is also relevant because it covers the period from November 18, 2002 to November 18, 2003. The November 18, 2002 IEP required Bryan to have 30 hours of skills trainer services during the school day, 23.5 hours of skills trainer services after school, and 12 hours of skills trainer services on the weekend days for a total of 65.5 skills trainer hours per week. From October 2003 through November 2003, the DOE failed to provide Bryan with 65.5 hours of skills trainer services per week as required by his IEP.

[3] This included the Treatment and Education of Autistic and Related Communications Handicapped Children ("TEACCH") program and Discreet Trial Training ("DTT").

little time for the other related duties such as coordinating matters with Petitioners and working on and expanding Bryan's program. Exhibit "A" at p. 4;

14) Petitioners, on their own, placed advertisements in newspapers to locate skills trainers for Bryan. Over time, Petitioners located 8 skills trainers for Bryan who were hired by Respondent. Exhibit "A" at p. 4;

15) Naomi Shiraishi, Bryan's speech pathologist, communicates with Bryan through ASL. Ms. Shiraishi testified that Bryan uses ASL in single words or short phrases and needs prompting to use short phrases. The person prompting Bryan must use ASL. Bryan understands language and processes language better if a combination of verbal and visual cues ASL are used. Bryan's skills trainers must be proficient in ASL and use Bryan's vocabulary bank of ASL signs. Exhibit "A" at p. 4;

16) Mrs. Bond testified that Bryan's teacher does not know ASL and does not use ASL to communicate with Bryan and two other children in his class who use signs as their primary mode of communication. It is frustrating for Bryan to communicate with someone who does not know ASL and he does not progress. Exhibit "A" at p. 4;

17) When Bryan did not receive the number of skills trainer hours specified in his IEPs from October 2003 through February 2004, he regressed in a number of areas. Exhibit "A" at pp. 4 and 5;

18) One significant area of regression involved toileting skills. Petitioners testified that Bryan does better with toileting when his skills trainer services are in place. With more people around, Bryan can be monitored frequently and will use ASL to express his need to use the toilet. When services were not in place, Petitioners noticed an increase in toileting problems. Bryan started doing things he hadn't done for several moths to a year and a half. This included urinating on the sofa, developing a self-stimulating pattern of drinking and urinating, and a preference for urinating outdoors, instead of in the toilet. Exhibit "A" at p. 5;

19) A second significant area of regression involved learning to behave independently and respecting the personal space and personal property of others (boundaries). Bryan has no concept of respecting the personal space or the personal property of others. Skills trainers are required to monitor Bryan's behavior and provide consistent feedback to him regarding his actions and behaviors in these areas. For example, each door in Petitioners' house has a lock on it. Without locks Bryan might engage in activities that would jeopardize his safety or cause damage to property. Bryan must be taught what is and is not acceptable behavior. The goal is to have Bryan learn appropriate behavior and eventually remove the locks from all of Petitioners' doors. Petitioners testified that before the gap in service, Bryan could remain in the downstairs room alone for an hour without any boundary problems. At that point, Petitioners were almost ready

to remove the lock from the downstairs room. As a result of the gap in service, Bryan must now relearn appropriate boundary behaviors. Exhibit "A" at p. 5;

20) Bryan must learn appropriate boundary behaviors in order to function at school and in the community. Petitioners testified to two incidents where Bryan acted inappropriately in the community. In the first incident, he took a man's sunglasses while he was at the beach. In the second incident, Bryan went back to his old habits of randomly pulling items off of shelves, touching people in the grocery store and taking items out of their carts. Bryan had not acted this way for quite a while. Before the gap in service, Bryan could go to the grocery store and act appropriately. Exhibit "A" at p. 5;

21) In the Fall of 2003 through February 2004, Respondent attempted to locate skills trainers for Bryan through CFS and TIFFE. Respondent, however, was unable to provide Bryan with the number of skills trainer hours required by his January 9, 2004 IEP until March 2004. Exhibit "A" at pp. 5 and 6; and

22) Petitioners' February 26, 2004 request for impartial hearing raised the following issues with regard to Bryan's services from October 2003 through February 2004:

    1) The DOE's repeated failure to provide the services required by Bryan's IEP;

    2) The DOE's failure to ensure that trained skills trainers are hired and available to provide services for children like Bryan;

    3)    The DOE's failure to provide skills trainers who can communicate with Bryan, who communicates with American Sign Language;

           * * *

    5)    The DOE's failure to provide Bryan's parents with prompt and complete information about complaints which the DOE now states prevented it from providing skills trainers;[4] and

    6)    The DOE's failure to promptly address Bryan's needs for additional expertise to provide effective toilet training, after acknowledging the need in October 2003. Hawaii Administrative Regulations [sic] provide that if "the IEP team determines that a student needs a particular device or service (including an intervention, accommodation, or other program modification) in order for this student to receive a free appropriate public education, the IEP team shall include a statement to that effect in the student's IEP."[5]

Exhibit "A" at p. 6.

Plaintiffs now request that: (1) the Court take judicial notice of these findings; and, (2) the Court determine that these findings are established as a matter of law and, thus, cannot be relitigated.

### III. ARGUMENT.

    A.    <u>The Court Must Take Judicial Notice of the Prior Findings. They are Conclusive</u>.

---

[4] There was insufficient evidence for the Hearings Officer to determine whether the DOE failed to provide Bryan's parents with prompt complete information about complaints which the DOE now states prevented it from providing skills trainers.

[5] During the hearing Ms. Floyd stated that Petitioners did not intend to introduce evidence relating to the toilet training issue and requested a decision on the other stated issues. Ms. Floyd did, however, present evidence on the need for a nighttime toilet monitor for Bryan as part of Petitioners' request for compensatory relief.

Pursuant to FRE 201, this Court may take judicial notice of any adjudicative fact. The rule explains that a "judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The Rule mandates that a court shall take judicial notice if requested by a party and supplied with the necessary information to determine that the fact is adjudicative. Judicial notice may be taken at any stage of the proceeding. The Rule states that in a civil action: "the court shall instruct the jury to accept as conclusive any fact judicially noticed." This means that the opposing party cannot present contradictory evidence on the fact once it has been judicially noticed; the time for presenting such evidence is when the matter is heard by the Court under Rule 201(e).

Applying the Rule, Courts have taken judicial notice of the record of prior administrative and court proceedings. *E.g., Furnari v. Warden,* 218 F.3d 250, 255-56 (3rd Cir. 2000)(notice taken of affidavit filed in another case); *Aldrich v. SEC,* 139 F.3d 221, 226 (D.C. Cir. 1998) (taking judicial notice of agency decision issued after decision under review by the Court); *Opoka v. INS,* 94 F.3d 392, 295 (7th Cir. 1996) (taking notice of INS decision to suspend deportation proceedings against applicant's wife); *Burbank-Glendale-Pasadena Airport Auth v. City of*

9

*Burbank,* 136 F.3d 1360, 1364 (9th Cir. 1998) (records from other lawsuit between the parties demonstrating that it had been dismissed).

Given the vigor with which Hawaii applies the principles of issue preclusion to administrative decisions (*see, Bator v. State of Hawaii*, 39 F.3d 1021, 1027 (9th Cir. 1994)), there should not be any question that the findings below, unappealed, are judicial in nature and the jury must be instructed that they are conclusive.

B.   Issue Preclusions Applies to Hawaii Administrative Decisions.

Federal courts must give the same preclusive effect to state administrative decisions that they give to state court judgments. Under Hawaiʻi law, the "doctrines of res judicata and collateral estoppel . . . apply to matters litigated before an administrative agency." *Santos v. State Hawaiʻi Transportation Dept., Kauai Div.*, 64 Haw. 648, 653, 646 P.2d 962, 966 (Haw. 1982). The Ninth Circuit has ruled that under Hawaii law preclusive effect should be given to the findings of administrative agencies if: (1) the issue decided in the prior action is identical to the issue in the current action; (2) final judgment on the merits was obtained; and (3) the parties are the same. *See Bator v. State of Hawaii*, 39 F.3d 1021, 1027 (9th Cir. 1994). Therefore, a final administrative determination that is neither appealed nor otherwise challenged becomes final and operates with preclusive effect. *Misischia v. Pirie*, 60 F.3d 626, 628 (9th Cir. 1995) (holding that where appellant did not pursue an available state court appeal, the Hawaiʻi Dental Board's order

rejecting his application for a license "became final and operated with preclusive effect"); *accord, Leong v. Hilton Hotels Corp.* 698 F. Supp. 1496 (D. Haw. 1986).

The Court has explained the application of these principles under Hawaiʻi law, stating:

> [T]he findings of a state administrative agency may be given preclusive effect pursuant to the doctrines of collateral estoppel or res judicata. *Santos v. State of Hawaii Dept. of Transportation, Kauai Division*, 64 Haw. 648, 653, 646 P.2d 962 (1982). The appropriate test in determining whether the principles are applicable is as follows: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privy with a party to the prior adjudication?

*Matson Navigation Co. v. Hawaii Public Utilities Commission*, 742 F. Supp. 1468, 1479 (D. Haw. 1990). Where the same parties have had ample to fully address a particular issue in question, but do not do so, they will be bound by the administrative determination regarding that issue. Such findings of fact by administrative agencies acting in quasi-judicial capacities as well as legal determinations may receive preclusive effect. *Patricia N. v. LeMahieu*, 141 F. Supp. 2d 1243,1257 (D. Haw. 2001) (applying principles of Hawaiʻi law and holding Hearings Officer's findings in IDEA cases preclude relitigation of facts); *Ancheta v. Watada*, 135 F. Supp. 2d 1114, 1119 (D. Haw. 2001) (prior administrative determination of fact cannot be relitigated).

Employing this analysis in the present case, the previous IDEA hearings afforded Defendants ample opportunity to contest the facts found by the Hearings Officers after those proceedings. Those findings became final when they were not appealed. The Court must conclude the Defendants are precluded from relitigating factual issues described above in which are final and determinative of those issues here. Applying that doctrine to the instant case, the findings in the administrative decisions of May 21, 2001, May 11, 2004 and July 24, 2004, must be determined as conclusive and given to the jury as uncontroverted.

DATED:  Honolulu, Hawaii, April 24, 2006.

/S/ STANLEY E. LEVIN
_____
STANLEY E. LEVIN
MICHAEL K. LIVINGSTON
SHELBY ANNE FLOYD
MEI-FEI KUO
CARL M. VARADY

Attorneys for Plaintiffs