IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>　　　　　　　Plaintiffs,<br><br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent,<br><br>　　　　　　　Defendants. | Civil No. CV 05-00247 HG/BMK<br>Civil No. CV 04-00442 HG/BMK<br>Consolidated (Other Civil Action)<br><br>MEMORANDUM IN SUPPORT OF MOTION |

## MEMORANDUM IN SUPPORT OF MOTION

**I.　INTRODUCTION**

　　　This motion is necessary because there are essential facts and testimony of Dr. Kimberly Smalley, Defendants' hired contract employee and an experienced and well-respected behaviorist (nationally recognized and certified) which were just revealed at her deposition taken on July 27, 2006 by Defendants. Exhibit "A" is a copy of the condensed version of Dr. Kimberly Smalley's deposition. Stated simply, she gave devastating testimony to any proposed defense the State has made or could take to the claims in this case. In short, Dr. Smalley's testimony is the "smoking gun" in this case. Where the court intends to deny the claims on any

grounds, it is crucial that the court at least be aware of this testimony before any further disposition in this case.

It is also crucial that the court is aware of the contents of Plaintiffs' rebuttal expert, B. J. Freeman, by her report which is attached hereto as Exhibit "B." Dr. Freeman is a nationally known and respected expert in autism. Unlike the Defendants' expert, Dr. Siegel, B. J. Freeman is a very experienced and knowledgeable clinical psychologist. Dr. Freeman's report goes to the heart of the State's defenses in this case, and it pulverizes them. Hence the instant motion to amend and/or supplement the record on an nunc pro tunc basis.

## II.   THE TESTIMONY OF DR. KIMBERLY SMALLEY TAKEN ON JULY 27, 2006

Plaintiffs realize that the court does not have a copy of this deposition yet and therefore, Plaintiffs do not claim that all 208 pages are essential. However, there are multiple pages and multiple entries that are relevant and clearly positive to Plaintiffs' case.

In her deposition, Dr. Smalley recounted a very positive earlier encounter with Bryan as follows:

> Q.   (By Mr. Ushiroda): Then you said after that time when you ran into him at the school and had the conversation –
> A.   Things were good.
> Q.   Mother crying.
> A.   Yeah.
> Q.   By the way, was – the mother just happened to be there?

> A. She was picking him up. It was the end of the school day. I was there providing technical assistance for another child. I was exiting. He was exiting. I saw him. And I insist on making people communicate with me when I know they were trouble. So I stopped him and said, hi, Bryan. How are you? And he said fine. And I went, whoa. And I asked him several more questions, and he answered me. His mom pulled up, and I got into a conversation with her, and it was all great. He wasn't wearing a diaper, you know, at that time. We were talking about that. He had made, you know – he had made really good gains in the last couple, maybe six months or --
> Q. Now was this – in this chance encounter when you saw him, Bryan, was his signing, for lack of a better term, spontaneous?
> A. Well, no, I initiated.
> Q. Okay.
> A. I said, hi, Bryan. How are you?
>   I have seen him throughout the time I've known him, even in the beginning when he only had a small vocabulary, initiate. He initiates for his needs. I want to eat something. I want crackers. He's somebody who loves carbs. So he'll actually initiate to get his needs met typically around food, bathroom, preferred object. He was never to that point conversant, you know, and I wouldn't imagine even then he would say, hey, nice shirt. He, you know – majority of his vocabulary would have been at that time nouns and verbs.

Deposition of Dr. Kimberly Smalley at p. 58, line 17 to p, 60, line 1.

The court must understand that this testimony is entirely based on the events that Dr. Smalley observed and experienced as she was observing Bryan in preparation for doing and completing the functional behavior assessment which her report and the one of which she will testify.

During the first part of her deposition, she was asked about and she established her credentials in working with autistic children like Bryan for about

3

20 years.  Dr. Smalley testified that she was in a unique position because she had seen Bryan through all other points in his education—e.g., she had developed a toileting plan for Bryan during the 2000-01 school year.  She had, as a consultant with the State and while employed by the Department of Health, met with the district people and the school level officials to make other suggestions about Bryan's program.  Now in 2004, she was back to fulfilling her consultant role while employed at BCRC and Hawaii Behavioral Health.  She told defense counsel all about how she went about preparing for and completing a thorough functional behavior plan.  She testified that the "best practices" methodology was employed and that this required many hours of observation of Bryan with his teachers, his skills trainers, and definitely at home.

In the process of conducting all of these observations, Dr. Smalley saw what was really happening at school with Bryan—it's what she called "abuse" and "neglect."  Dr. Smalley was not using these terms loosely because she was at one time a consultant to the Child Protective Service,

> Q. (By Mr. Ushiroda): Okay.  Well, are – basically, are all your opinions contained in this report?
> A. I have stronger opinions than are contained in that report, but the function and content of everything I would have to say is certainly there.
> Q. Okay.  I'm sorry.  You have stronger opinions?
> A. I don't describe what I said to you as neglect in that report.
> Q. Okay.

4

> A. Nowhere in that report do I say I saw him slipping and sliding in his own feces because it wasn't pertinent to what I was filling out. If you were to ask me that, I would answer that.
> Q. Well, let's – do you have an opinion on that?
> A. Yes. I think it was –
> Q. Please tell me.
> A. I think it's neglect. Actually, I think it's abusive. I think he was not educated or treated effectively for a period at this time, a period of months, probably.
> Q. And the basis for this opinion is that –
> A. Observation, data collection, record review, and interview.
> Q. Okay. So you believe it's your opinion that in this period of time in '04 that Bryan was being neglected?
> A. I believe some of what I say absolutely met the definition for neglect. Come into a classroom and the skills trainers are reading a book and the other one's on the phone and the child is dirty with fecal matter and urine, rolling around on a mat. That is not education.
> Q. And have you rendered such opinions before?
> A. I rendered such opinion right there at the moment, walked down the hallway and passed it on to people in power and very nicely said to the skills trainer, all right, well, let's take him off to the bathroom and get him cleaned up.
> Q. Okay. Do you believe this neglect was intentional?
> A. I don't know how to describe someone who thinks it's okay to read at work.
> Q. I'm sorry?
> A. I don't know how to describe someone who thinks it's okay to read a novel on shift.
> Q. I'm not following you.
> A. I don't know if it was intention or not, but if somebody chooses to read a novel when they should be working, that brings their work ethic to question.

Deposition of Dr. Kimberly Smalley at p. 199, line 6 to p, 200, line 25.

She started her description by explaining how much of a "mess" Bryan was and that he had significantly deteriorated. She said that:

5

>Then I was brought back in by the DOE through CFS. And then I saw him for the first time in many – in many months, and he was – he was a mess. He was significantly deteriorated from when I had seen him last.

Deposition of Dr. Kimberly Smalley at p. 69, lines 9 to 12.

Immediately she was asked about the skills trainers employed by the DOE and she said that:

>A. Being there and there being no staff, coming to observe and there being no staff, and then spending the time observing him with his mom, which is also very useful, but clearly that's not what I expected to do, and then just report from the DOE, the consultant, the autism specialist, his mom. Just – you don't have enough bodies. You don't have somebody hired at this time who knows what they're doing, or being asked to talk to a sub, so here's a new person, and temporary hires. They're going to be subbing for a couple weeks. Can you please give me the rundown?

Deposition of Dr. Kimberly Smalley at p. 73, lines 14 to 23.

She then continued on by saying about the skills trainers that: "Everyone" was concerned about Bryan and some of the concerns were:

>A. There were lots of concerns. His behaviors had escalated pretty significantly. Bryan didn't use to be an aggressive person. He would – you know, he was big. He took up all the air in a room. He would throw a tantrum and throw things and make a lot of noise and flap, and he would flail, and he had actually hit people by accident. But he was not someone who would, you know, make a fist and punch you.
>    And in the end, he had learned to be aggressive. He had learned to head-butt, and he had learned to kick, and he had learned to – I think he bit someone. I know he bit himself. His behaviors and deteriorated pretty – you know, I'm sure his mother was very, very upset. He was self-injurious. He was aggressive. He had always done property destruction, but now it was bigger.

6

    And so whenever something like that happened, she would contact everybody she knew who could help. And then – so I would either converse with her or potentially with Drew or potentially with Barbara or whoever else was in his life at that point.

Deposition of Dr. Kimberly Smalley at p. 74, line 12 to p. 75, line 6.

When asked about her opinion about why Bryan had deteriorated, she said that:

> A. Well, several factors, but the most important are being what we call behavioral drift. His plan had kind of faded away, you know. I don't think it was intentional. But either staff wasn't available, or trained staff wasn't available, or the rules got a little lax, or it was summer school. You know, for a whole variety of explanations, the plan wasn't being followed and wasn't being implemented. His engagement was extraordinarily low. He wasn't doing anything.
>     At one point in the classroom during my observations for the FBA, I was going through the drawers pulling out materials and, you know, handing his materials off to the skills trainer. Here, he used to know how to do this. He used to know how to do this. Here's a CD ROM, going through the teacher's materials that were in bins going, Bryan can do this. Bryan can do that, because he was literally not engaged at all. He was literally on the floor stemming and urinating all day. So that was huge. And I think they also had the additional problem of his becoming pubescent.

Deposition of Dr. Kimberly Smalley at p. 75, line 17 to p. 76, line 11.

Dr. Smalley described the staff and their neglect of Bryan in this way:

> A. Again, I think it's a multi-pronged, multi-faceted problem. I think that people who wanted to do things didn't know what to do and didn't have the instruction or the support, the supervision, or the monitoring to do it. I think people – some people thought that was their job to just sit there and watch him. I think that if you were to interview all of the skills trainers, you

> would probably get a variety of responses from each of them. There may very well have been some people who just didn't care. In their case, it may have been intentional. In many of the other people's cases, it may have been unintentional. But the need result is a dirty – unengaged, dirty, aggressive child.

Deposition of Dr. Kimberly Smalley at p. 203, lines 12 to 24.

Dr. Smalley added that:

> But unfortunately, since I now saw him last, he's now learning that aggression gets his own way. He's now learned if a little property destruction doesn't work, get something really big. He's now learned if someone's trying to get you, be really quick and head-butt him. He got smarter and faster about acting out.

Deposition of Dr. Kimberly Smalley at p. 78, lines 13 to 18.

Dr. Smalley finally described the real problems by saying that:

> A. When I saw Bryan, prior to this report and during this report – he was awful. He was com – soaked in urine all the time. He was aggressive. He was self-injurious. He was ignored. He was unengaged. He had no direct instruction. He had no direct communication instruction. His skills trainers did not know what they were doing. Some of them were motivated and interested and sat down and asked me questions. Some of them could care less. His teacher did not know what to do with him and verbally was receptive to suggestions, but then implementation appeared at least to be nonexistent. Then it was either – I think it was the end of the school year, so then there was no teacher.
> Q. Was he in some kind of summer program?
> A. Yeah. Many of the times I saw him, he was alone in a room with his skills trainers sitting in his own urine stimming. They had a big box of stim toys. Like Mardi Gras beads, bubble wrap, stupid stuff, infants' stuff, things that were much too young for him. They just let him law and play with it.
>     And I would come in, and because I wasn't perceived as a person of authority, their behavior wouldn't change. And I

8

would wait and take notes.  And then after a certain amount of time it would be, okay, now what are you gonna do?  Maybe we should check the schedule – and try to provide them some technical assistance – rather than leave him there and feces and urine.  The longer you get to do that, the more you're going to want to do that.  And then they would go up to him and try to interrupt him because I was here, and he would protest.  I remember one girl turning to me crying.  See, he's too tough.

And I – at that point I think he even had two-on-one, two-on-one staffing.  And I remember trying to work with the male staff.  Don't be aggressive.  Don't be forceful.  Don't be restraining.  You're not here as an enforcer.  You're here as an educator.  Pull out his favorite CD ROM.

That's what – I would literally go through the boxes in the classroom trying to find things for him to do.  The academics that were there he had already mastered.  It's a ball.  It's a fish.  It's red.  It's green.  He had known his colors when I first met him.  He had known hundreds of labels a year ago.  They were working on the same four words over and over again: ball, fish – I can't think of what the others were – and his colors.  I would explain to the skills trainers, this is material he has mastered.  He may be ignoring you because he's sick of seeing it.

They would say back to me, we don't know what to do.  We have no materials, no instruction.  No one is helping us.  No one is telling us what to do.  I would give them some things to do, that way I could watch how Bryan responded and take notes on that.  That involved literally like setting up the computer.  The skills trainer and I were trying to put the computer back together so they could then work on it so I could know whether Bryan knew what he was doing or not or protested doing it.  It was very, very unfortunate.

There was an ECSY, extended classroom school year, going on that Bryan would typically be a part of, but due to the extreme nature of his behavior, the IEP team – I don't know whose decision it was, but it was an IEP decision to isolate him, so he was being educated by himself one-on-one.  That was even harder.  He didn't have any friends.  He didn't have any activities.  He didn't have anything interesting to do.  He wasn't motivated by anything that there was, so it was just long periods of down time.

Deposition of Dr. Kimberly Smalley at p. 88, line 7 to p. 90, line 22.

Dr. Smalley also observed that the real problems were implementation, staff training staged supervision, staff monitoring and all responsibility was clearly placed at the DOE's doorstep.

> Q. (Mr. Ushiroda): Okay. What were the problems – why was the implementation a problem at this point?
> A. Why – well, there was no structure, no materials, no teacher with expertise in Bryan's needs. The skills trainers lacked the expertise to work with him, lacked the training to work with him. Some of them lacked the mere fortitude to work with him. There was limited to no sign language. At one point there was a staff person who had some sign language. I worked with her a little bit. But for the most part, everything about his plan that we had agreed to and done successfully sometime in the past had just completely dissipated.
> Q. And did you come to find out why, why that happened?
> A. I was besides myself at the time, and I kept asking why. And like I said, I called the training person at HBH, and I spoke to the DOE person, and I believe the explanation was just turnover. You know, people – didn't have people, and they didn't have people – the people they did have didn't have the background that the previous people who served him had had.

Deposition of Dr. Kimberly Smalley at p. 92, lines 3 to 22.

Dr. Smalley then recited that during the reporting period he did have staff but that:

> A. But even with all that, every time I came to see Bryan, he was laying on the floor, stimming, in his own urine or feces. It was – I mean, it was neglect. There's – I was very upset, and I took it to the DOE, and I called HBH, and I tried to help these individuals to do a better job. It wasn't good.

Q. (Mr. Ushiroda): Okay. Who did you speak to?
A. Whoever would be down the hallway in the SSC's office. Again, if you give me names, I will recognize them.
Q. Kate Tolentino?
A. Was she SSC? I know that name –
Q. I don't know.
A. -- but I'm not sure what role. I would – for ESY summer school, the office was three doors down. I would go down and I would say, okay, here's – you know, he's locked in the room. He's all wet. Nobody's doing anything with him. And, you know, I would pass that information on. I'm obligated to report. I would pass that information on.

   I know I called. And again, I think the woman's name is Leilani. Hopefully that's not the new trainer versus who the trainer was at that time. I called CFS, said, your people need Problem Solver training in crisis prevention. I know I recommended other names in my report. It's a different acronym, same name, but also Problem Solver because those are people working with severe cognitive disability.

   CPT, the intervention the State uses, relies more with people with language. They teach you how to talk somebody down. If you're dealing with someone with a mental illness or someone who's irate, you might have the ability to talk them down where if you're dealing with somebody with no receptive language skills or limited receptive language skills, blah, blah, blah. Doesn't matter what you're saying. That whole part of your training isn't going to help you in this instance where Problem Solver focuses a little bit more on developmental disabilities.

   I recommended HBH, I can train you. I recommended other people that can come out and provide training for their staff. Actually, at that time I was in conversation with HBH about providing some training for them just globally as an agency, not specific to Bryan, but clearly Bryan would have benefited, and that never came to fruition.

   At some point in there, that short time frame, they just – Bryan accidentally knocked someone's tooth out, and it really was accidental. He was also aggressive at this time, but in this particular incident he was flailing, and he elbowed a woman and knocked her tooth out. And that was an expensive, you know, workmen's comp claim or whatever it was for HBH, and

11

>   I think they – I don't know.  This is my opinion.  I think they
>   came to the conclusion that they cannot serve this child safely,
>   and then they stopped serving him.
> Q. Okay.  I'm sorry.  You said you came –
> A. I think they came to this conclusion.  I had called HBH and
>   said, you know, help.  And the person I spoke to said, we're not
>   gonna do this anymore.  So they didn't need me to come train
>   his staff because they weren't going to continue serving him.

Deposition of Dr. Kimberly Smalley at p. 94, line 5 to p. 96, line 13.

Then Dr. Smalley described the process which she took to perform the functional behavior plan:

> Q. (By Mr. Ushiroda)  Go ahead though as it relates to Bryan.
> A. Bryan had good experiences with typically developing peers.
>   Being around typical kids, you learn the social expectations and
>   are much more communicative than kids develop in a
>   classroom just with kids also with disabilities.  If you are in a
>   special day class, it is often the case – and it was the case with
>   Bryan – they end up having adults to talk to.  So the more time
>   you spend with regular ed kids, the more time you spend with
>   typically developing kids, often that's great asset to the
>   program.

Deposition of Dr. Kimberly Smalley at p. 9, lines 13 to 24.

Dr. Smalley testified regarding the great efforts made by the parents to try to meet Bryan's needs.  She said:

> A. They were very, very involved.  They were – they changed the
>   whole structure of their home.  They had changed the whole
>   structure of their home life-style.  They had strangers in their
>   home, you know.  At this point they were trying for 24/7.  They
>   were tying (sic) to get somebody who would be awake at night
>   and run into the bathroom because we were still – we could
>   handle toileting during the day, but then at night we were

12

      making no gains. So they were very, very involved. They were nurturing parents.

      I mean, they had the refrigerator in their bedroom locked. They had the water shut off to the bottom half of their house. They did – if their son wanted a soda, he needed the key to the bedroom and then the key to the refrigerator to get in there. They went above and beyond to try to keep their son at home in their family. I work with lots of families that kind of opt out and feel like it's all the DOE's job. That is not this case.

Q.  (Mr. Ushiroda): Okay. Now in Hawai'i were there residential care facilities for children such as Bryan?

A.  There are no residential options available in the State of Hawai'i for people under 18. Developmental Disabilities operates 18 and up limited residential options. Child and Adolescent Mental Health Division has a whole system for people with mental illnesses, people with drug abuse issues, people with – Adult Mental Health has options for adults. But if you are under 18 and you have retardation and autism, there is nothing available for you.

Deposition of Dr. Kimberly Smalley at p. 178, line 22 to p. 179, line 23.

Dr. Smalley said that she thought that this terrible experience in Hawaii damaged Bryan when she said that:

    Prior to this, you know – there's a whole level system of residential services in California. Prior to being an aggressive person, he could have been served at a much lower level, had, you mow (sic), more fun things to do, more freedom, better places to be. Once you become aggressive, you move up the, you know – level 1, level 2, level 3, level 4; and then they go into the alphabet at that point, A, B, C, D, E, F., G. H. Then you move into institutionalization.

Deposition of Dr. Kimberly Smalley at p. 174, lines 14 to 22.

Dr. Smalley testified regarding what caused the damage experienced by Bryan.

Q. (Mr. Ushiroda): Or if there was any damage?
A. Oh, there's definitely damage.

13

Q. Okay.
A. Yeah.
Q. And what was the damage caused by?
A. Lack of programming. You know –
Q. the implementation?
A. Lack of implementation, lack of communication.
Q. But what I'm trying to get at here is whether you have an opinion that that is something that is permanent, that can be made up?
A. I think he missed some valuable time. There is this notion in autism of a window of opportunity, and he was already old when I met him, and he made great gains. So I think it's really unfortunate that those were then lost and that he learned some horrible things that you never want him to learn, you know, to be aggressive and self-injurious to get his own way. And I think those things are likely to have lifelong implication.
Q. Are they irretrievably lost?
A. I hope not, but I have no way of knowing without seeing.

Deposition of Dr. Kimberly Smalley at p. 152, lines 2 to 23.

Of the DOE's action in isolating Bryan by himself in a classroom behaviorally, Dr. Smalley opined that:

Q. (Mr. Ushiroda): How about in '04?
A. In '04 my understanding is he was completely segregated. And whenever I saw, he was completely segregated or having limited interaction with the other kids in his class, and they were in another room. They were all supposed to be in a room together, and they chose to put Bryan in his own room. So once or twice while I was there doing observations, like he and his staff would walk up to the picnic table, and they would be sitting at another picnic table. So there was some availability for crossover, but there was no group instruction, group recreation. Bryan was really doing very poorly at this point. I think people were either afraid of him or angry at him or, you know, not clear what would happen.

Deposition of Dr. Kimberly Smalley at p. 167, line 16 to p. 168, line 4.

In summary, Dr. Smalley said that:

14

> Q. And (By Mr. Ushiroda):  Was it a case where there was just a limited resource pool of qualified skills trainers to fit Bryan's particular needs –
> MR. LEVIN:  Objection.  Asked and answered.
> (By Mr. Ushiroda) – at this point in time?
> THE WITNESS:  Objection.  Asked and answered. (sic?)
>   That was one component.  It was a multi-pronged issue.  There was a lack of oversight.  There was lack of teacher.  There was lack of plan.  There was lack of implementation.  There was a lack of materials.  There was some actively bad things happening.  Absolutely a component of the problem was insufficient bodies.  A component of the problem was that some of the bodies there didn't have the right work ethic or the right training or the right values or the right skill set.  And the people above them also were not doing their job, and the things they should have had available to them also were not there.  It was a really pervasive multi-component issue.

Deposition of Dr. Kimberly Smalley at p. 193, lines 1 to 18.

### B.    DR. FREEMAN'S REPORT

In the first part of her report, Dr. Freeman lays to rest any notion that the State has hired qualified professionals by her accurate description of Drs. Goka and Siegel's reports.  Dr. Freeman properly finds that these State reports are second-class reports and not within the same level as are Plaintiffs' reports.  She then proceeds to provide the basis for her professional conclusions.  Dr. Freeman conducted extensive interviews with the family and staff at Bryan's new school and she observed him for long periods of time at school and at home.  She also administered tests to Bryan.  She also listed extensive legal and non-legal documents reviewed.

Dr. Freeman's conclusions were totally in line with the conclusions of Dr. LeGoff and Dr. Smalley.  In conclusion she states that:

> Bryan's outcome and current functioning have been severely impacted by his lack of consistent services between the ages of 7 and 13 years, while he was a student in Hawaii.  As a direct result of the failure to implement a consistent behavioral and sign language program, which was to be implemented, monitored and supervised by trainers who were competent in both sign language and applied behavior analysis (ABA).  Bryan failed to develop social skills and functional communication skills commensurate with his level of cognitive functioning.  In addition, he showed significant deterioration prior to leaving the school district in Hawaii.  Bryan's deterioration occurred in his communication skills and as a result he developed severe behavioral disturbance.  His progress in his current program indicates that had an appropriate program been implemented, he would in all probability be functioning at a much higher level than he is currently.  Evidence comes from all areas of functioning, particularly communication.
>
> \* \* \*
>
> While Bryan has made progress over the past year he remains severely impaired.  Currently Bryan's behaviors are for the most part under adult control.  He is now at the point where new skills may be taught to him and, hopefully, he can learn to control his own behavior.  Again, the research suggests that this would more likely have been accomplished had it begun when Bryan was younger.  In addition, brain research on development clearly supports the notion that skills are more easily acquired when children are younger, independent of a child's level of functioning.  It is easier to change behavior in a 7-year-old child with autism than in an almost 15-year-old, as the child has not had all that time for the behavior to become his primary means of interacting with his environment.
>
> \* \* \*
>
> In summary, while Bryan is a young man who would have been affected by his disability throughout his life, the severity of his disability has obviously been impacted by his lack of access to and consistency of appropriate services at the critical ages of development.

> He now requires one-to-one supervision even in a highly structured school setting. Bryan is also going to require a greater degree of support as an adult than he in all likelihood would have needed had appropriate services been implemented. In addition, despite Bryan's disability, the quality of his life and that of his family has been greatly impacted by his lack of services and resulting behavioral presentation. Further, Bryan's options in life have been reduced as a direct result of his lack of intervention. Currently, rather than receiving services with typical children as would have been predicted from his initial assessment and based on what we know about the trajectory of development in children with autism, Bryan requires a much more restrictive environment in a special education school setting with a one-to-one aide at all times. At this point it is not clear whether Bryan will be able to achieve any high degree of developmental catch-up. It is mandatory that intensive services beyond that which can be accomplished in the current school setting be provided for Bryan in order to remediate the lack of consistent services when he was younger. Research indicates that because of the lack of services when he was younger Bryan may never catch up, as he became too far behind too early. However, Bryan's quality of life and ability to function more independently can be substantially improved with additional intervention.

B. J. Freeman, Ph.D. report dated 7/22/06, pp. 17, 18 and 19.

### III.  THE TESTIMONY SHOULD BE MADE PART OF THE RECORD

This request is not one that is done daily in federal court. However, it is essential here for this court to be fully apprised of the case before the court makes any decisions on the merits. As authority for this motion, Plaintiffs cite to Rule 1 of the federal rules which gently expresses Plaintiffs' approach by providing:

> These rules govern the procedure in the United States District Courts in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty, with the exceptions stated in Rule 81. They shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.

Rule 1, Federal Rules of Civil Procedure.

>   (1) An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefore, and shall set forth the relief or order sought.  The requirement of writing is fulfilled if the motion is stated in a written notice of the hearing of the motion.
>   (2) The rules applicable to captions and other matters of form of pleadings apply to all motions and other papers provided for by these rules.

Rule 7(b)(1)(2), Federal Rules of Civil Procedure.

DATED:  Honolulu, Hawaii, August 17, 2006.

/S/ STANLEY E. LEVIN

_____
STANLEY E. LEVIN
SUSAN K. DORSEY

Attorneys for Plaintiffs