# Transcript of the Testimony of
# **KIMBERLY SMALLEY**

**Date:** July 27, 2006
**Case No.:** CV04-00442, CV05-00247
**Case:** WILES v. DEPARTMENT OF EDUCATION

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

# EXHIBIT  A

CV04-00442, CV05-00247                WILES v. DEPARTMENT OF EDUCATION

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
--|---

ANN KIMBALL WILES and STANLEY ) CIVIL NO.CV 04-00442 HG/BMK
BOND, individually and as       ) CIVIL NO.CV 05-00247 HG/BMK
next friends of their son,       ) CONSOLIDATED
BRYAN WILES-BOND, a minor,       ) (Other Civil Action)
                                 )
          Plaintiffs,            )
                                 )
     vs.                         ) TRIAL DATE:October 11, 2006
                                 )
DEPARTMENT OF EDUCATION,         )
State of Hawaii, and ALVIN       )
RHO, in his official capacity    )
as West Hawaii District          )
Superintendent,                  )
                                 )
          Defendants.            )

DEPOSITION OF KIMBERLY SMALLEY, Ph.D.

Taken on behalf of the Defendants, at the law offices of Davis Levin Livingston Grand, 400 Davis Levin Livingston Grand Place, 851 Fort Street, Honolulu, Hawai`i 96813 commencing at 9:02 a.m., on Thursday, July 27, 2006, pursuant to Notice.

BEFORE:

          Valerie Mariano, CSR No. 353
          Notary Public, State of Hawai`i

---

**Page 2**

1  APPEARANCES:
2
3  For the Plaintiffs:
   [All colloquy of Mr. Levin is via Litewriter text.]
4          STANLEY E. LEVIN, ESQ.
           Davis Levin Livingston Grand
5          400 Davis Levin Livingston Grand Place
           851 Fort Street
6          Honolulu, Hawai`i 96813
7
8  For the Defendants:
           GREGG M. USHIRODA, ESQ.
9          Watanabe Ing & Komeiji LLP
           First Hawaiian Center, 23rd Floor
10         999 Bishop Street
           Honolulu, Hawai`i 96813
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              I N D E X
2  EXAMINATION BY:              PAGE
   Mr. Ushiroda              4
3
4
5  EXHIBITS FOR IDENTIFICATION:      PAGE
6  1 - Curriculum Vitae; 16 pages.      7
7  2 - Fee Schedule.            79
8  3 - Behavioral Assessment dated
       8/18/04; 21 pages.        79
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1      (Whereupon, disclosure was made available to counsel.
2   All colloquy of Mr. Levin is via Litewriter
3   texting.)
4          KIMBERLY SMALLEY, Ph.D.,
5   called as a witness on behalf of the Defendants, being
6   first duly sworn, was examined and testified as follows:
7          EXAMINATION
8   BY MR. USHIRODA:
9   Q. Please state your full name for the record.
10  A. Kimberly Anne Smalley.
11  Q. Good morning. Would you prefer that I address you
12  Dr. Smalley?
13  A. Kim is fine.
14  Q. Kim is fine? Okay.
15     Kim, my name is Gregg Ushiroda. I represent the
16  Department of Education, State of Hawaii, in a lawsuit
17  brought by the parents of Bryan Wiles-Bond. I'm here to
18  take your deposition today.
19     Before we start, have you had your deposition taken
20  before?
21  A. By you in this state? No. I mean, generally, yes.
22  Q. Are you familiar with the guidelines in a deposition?
23  A. I believe I am. But if you'd like to review them,
24  that's fine.
25  Q. Okay. First of all, do you understand that the

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

Page 5

1 testimony you give today is under oath?
2 A. Yes.
3 Q. Okay. And do you also understand that your responses
4 to my questions today have to be verbal so that the court
5 reporter can take them down to make a transcript?
6 A. Yes, I do.
7 Q. And the only other thing I require is that one person
8 speak at a time, and that's only to make it easier for the
9 transcript -- for the court reporter so she can create a
10 clear and accurate record; okay?
11 A. Yes.
12 Q. Okay. Have you ever had your deposition taken as an
13 expert witness?
14 A. Yes, I have.
15 Q. About how many times?
16 A. Very recently in Hawai`i and then several times in
17 California. So less than ten.
18 Q. Less than ten.
19     What was this recent deposition about, kind of case?
20 A. A special ed case with the Department of Education.
21 Q. Were you testifying as an expert witness?
22 A. I was testifying as an expert witness for the
23 Department of Ed.
24 Q. And who took your deposition?
25 A. It was in a due process hearing.

Page 6

1 Q. I see.
2     And the other several times in California, what were
3 those in?
4 A. Those were also court cases with a school district and
5 a parent, typically, where I was brought over or when I
6 still lived there and provided expert testimony in the area
7 of behavior.
8 Q. Dr. -- Kim, what do you consider your areas of
9 expertise to be?
10 A. My areas of expertise include -- I'm a board certified
11 behavior analyst. I have a specialty in transitions,
12 school-to-work issues for individuals with developmental
13 disabilities. I am an inclusionist. I'm an integrated
14 service specialist, so someone who has a broad knowledge in
15 multiple fields related to disability. You get a
16 credential in that which sort of brings nursing, mental
17 health, social work, education, rehab all together. I am
18 an expert in networks of social support, sort of a
19 generalist in DDD. I have many hats that I wear.
20 Q. Okay. Sounds like it.
21 A. Yeah.
22 Q. Do you have any expertise in or training in working
23 with children with autism?
24 A. Extensive expertise and training working with children
25 with autism.

Page 7

1 Q. And how did you develop this training? What kind of
2 education and training did you undergo for that?
3 A. I've been working in the field of autism and
4 developmental disabilities for 20 years. I have a
5 bachelors from the University of Florida in psychology. I
6 have a masters from Harvard University in international
7 education, which is education with an emphasis on cultural
8 issues, how education applies across a variety of cultural
9 expectations. And I have my Ph.D. from University of
10 California at Berkeley in special education.
11 Q. Dr. -- I'm sorry.
12 A. Either way. It's fine.
13     MR. USHIRODA: Off the record.
14     (Discussion off the record. Deposition Exhibit
15     Number 1 was marked for identification.)
16 Q. (By Mr. Ushiroda) Kim, I've handed you what I've
17 marked as Exhibit 1 to your deposition. It is a curriculum
18 vitae of yours?
19 A. Correct.
20 Q. Is this your most current version? You can take a few
21 moments to look through it.
22 A. This is -- yeah, there's a couple trainings that have
23 been added since then, but yes, this is my most current
24 version.
25 Q. What things would you have to add to your CV?

Page 8

1 A. Well, actually, let me turn and look.
2     There are several workshops for Behavior Counseling
3 Research Center. Yeah, this only goes to 2005. So I just
4 presented it at the Hawaiian -- Association for Behavior
5 Analysis International in Atlanta, so that's not on here
6 yet. Otherwise -- what else is missing -- couple workshops
7 and a competitively selected presentation in Atlanta.
8 Q. Now going back to your training and background, Kim, I
9 think you -- when I asked you about what your areas of
10 expertise were, you mentioned an inclusionist. What is
11 that?
12 A. You know, inclusion is a new thing in Hawai`i; or not
13 a popular thing, I should say. But in California where I
14 spent 12 years before I came here, and most of the
15 United States, inclusion has a bigger presence. It's a
16 notion that people with disabilities belong in communities.
17 Kids with disabilities belong in schools with their peers,
18 with typically developing children. If you are someone
19 with less abilities and/or needs, it's often helpful to be
20 around people who can present a more sophisticated model,
21 so you learn language and social skills by being around
22 typical kids.
23 Q. I see.
24     MR. USHIRODA: Off the record.
25     (Discussion off the record.)

KIMBERLY SMALLEY                                        7-27-2006

Page 9

1    MR. LEVIN [via Litewriter texting]: This is a big
2  issue with parents and -- disabled kids.
3    THE WITNESS: It is a big issue with parents and
4  disabled kids, but then the middle sentence was scrambled
5  when you typed it.
6    Yeah, inclusion is a big issue here in Hawai`i with
7  parents and kids with disabilities?
8    MR. USHIRODA: I don't know if that was a request for
9  elaboration.
10   MR. LEVIN: Hot issue.
11   THE WITNESS: Yeah, Bryan had some experience -- well,
12  we're not actually on him yet, so excuse me.
13   Q.  (By Mr. Ushiroda) Go ahead though as it relates to
14  Bryan.
15   A.  Bryan had good experiences with typically developing
16  peers. Being around typical kids, you learn the social
17  expectations and are much more communicative than kids
18  develop in a classroom just with kids also with
19  disabilities. If you are in a special day class, it is
20  often the case -- and it was the case with Bryan -- they
21  end up having adults to talk to. So the more time you
22  spend with regular ed kids, the more time you spend with
23  typically developing kids, often that's a great asset to
24  the program.
25              (Discussion off the record.)

Page 10

1    MR. LEVIN: The DOE is about 30 years behind on this
2  issue.
3    THE WITNESS: The DOE is about 30 years behind on this
4  issue, says Stan.
5    MR. USHIRODA: Is that on objection?
6    THE WITNESS: Statement.
7    MR. USHIRODA: Statement for the record? Okay.
8    Let the record reflect that that was not testimony
9  from the witness but rather a typed-out message from
10  Mr. Levin.
11   THE WITNESS: Anyway, that's some examples of what
12  inclusionism includes.
13   MR. USHIRODA: I guess I'll come back to that when we
14  get around to Bryan.
15   Q.  (By Mr. Ushiroda) Okay. Do you have a -- could you
16  describe your work experience with children with autism?
17   A.  I have been working with people with autism my full
18  career. Children.
19   My professional experience started in 1985 at
20  Threshold Incorporated, which is a -- which was at that
21  time a highly behavioral, both a day facility and a
22  residential facility for young individuals with autism who
23  present severe and challenging behavior. At the time, and
24  actually, probably still, it's one of the premier places to
25  send your kid in the state of Florida.

Page 11

1    When I lived in Florida, I was certified as a Florida
2  State Behavior Analyst, with a strong focus on autism. I
3  worked in many other places subsequent to that as a group
4  home manager, an educator, at in-hospital settings. I've
5  worked in five institutions.
6    I have taught at the university level, specifically on
7  autism, developmental disabilities, and behavior. I worked
8  as a supervisor for people getting their masters degree and
9  supervised them in classrooms serving children with autism,
10  providing technical support for them and their -- the
11  teacher in the classroom they were serving.
12   As program coordinator for the Point of Transition
13  Project, I helped agencies and school districts assist
14  individuals with autism who are leaving the school district
15  to get their first employment, first competitive employment
16  jobs.
17   In California, for a decade I was behavior specialist
18  for the local school districts in the area I worked,
19  supporting children with autism, mental retardation,
20  developmental disabilities in both inclusive setting with
21  their age peers in their regular grade level and what we
22  call in Hawai`i fully self-contained classrooms, as well as
23  non-public school, which we don't have that category in
24  Hawai`i, but those are schools just for children with
25  autism, and, of course, in residential group homes and in

Page 12

1  families' homes through what in California is called the
2  Regional Center and here would be the Developmental
3  Disabilities Division.
4   Q.  Okay. When you say here in Hawai`i, self-contained
5  classrooms --
6              (Discussion off the record.)
7    MR. USHIRODA: Let's go back on.
8   Q.  (By Mr. Ushiroda) Let me start over.
9   A.  Please.
10   Q.  Yeah. A little while ago you mentioned here in
11  Hawai`i with a reference to self-contained classrooms.
12  What does that mean? Is it only children with a disability
13  in that classroom?
14   A.  You were asking me about my history, so I was
15  describing other states.
16   Q.  Okay.
17   A.  And I have lived and worked in Hawai`i for almost
18  seven years now, and it is done a little differently here.
19  A fully self-contained classroom as we describe in Hawai`i
20  would be one that only serves children with autism or
21  developmental disabilities. There are fully self-contained
22  classrooms that serve children with other disabilities as
23  well, such as mental health needs or milder learning
24  disabilities. But typically the acronym we use is FSC, and
25  that refers to a classroom with children of multi-age all

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

Page 13

1  with significant disabilities.
2  Q.  So there are no other -- I hate to use this word, lack
3  of a better description -- well, children with no
4  disabilities?
5  A.  Typically developing?
6  Q.  Yeah.
7  A.  Yeah, so in that classroom there wouldn't be typically
8  developing children receiving the core of their education,
9  though a good classroom would bring typically developing
10 children in to do what we call reverse mainstreaming.  They
11 might do some social activities, some games.  They might do
12 some tutoring, the whole broad range.
13 Q.  This is Hawai`i?
14 A.  There are some classrooms in Hawai`i that do that,
15 yes.
16 Q.  What is your experience?  The prevalence is the
17 self-contained class?
18 A.  My experience is working in the self-contained class.
19 Because of my expertise, I tend to work where people are
20 presenting more challenging behaviors.
21 Q.  I see.  Okay.
22     Now Kim, you mentioned that you had worked a lot with
23 adults with autism.  Is that where your primary focus is,
24 with adults?
25 A.  No.  I do have lots of experience with adults as well.

Page 14

1  Q.  Do -- aside from the age difference, do -- does
2  working with children with autism present certain
3  challenges unique that you would not find with treating
4  adults?
5  A.  Unique challenges.  Unique potential.  You know, if
6  you work with a child, you can change their outcome.  You
7  can improve their communication skills and their social
8  skills and make a difference in how the next 40 years of
9  their life go in the first 20 when they're in the
10 Department of Ed.
11     The National Research Council put out a book which
12 you're probably familiar with, Educating Children With
13 Autism, and it emphasizes that which are best practices in
14 young children autism.  And by "young," I guess I think the
15 book focuses on zero to 12 though it doesn't actually say
16 that.
17     When someone is older, 18, 19, 20, they're getting
18 ready to leave the school district.  Then you do focus on
19 different things, home skills and bus skills and
20 competitive employment.
21     And then obviously when they're an adult, their window
22 for picking up things like new language, you know, is gonna
23 be unlikely and/or just significantly more difficult.
24 Q.  I see.
25 A.  So if you can do it when they're young, you can get

Page 15

1  more bang for your buck.
2  Q.  I see.  Okay.
3     Now Kim, do you have -- hold any licenses?
4  A.  I'm a nationally certified behavior analyst.
5  Q.  Okay.
6  A.  Hawai`i does not have a behavior analyst license at
7  this time.
8  Q.  Now I know you mentioned you have a degree in
9  psychology.
10 A.  A B.A. in psychology, my undergrad degree.
11 Q.  Is that in clinical psychology?
12 A.  My emphasis there was human behavior.
13 Q.  I see.
14     Are you a licensed psychologist?
15 A.  I'm not a licensed psychologist in the state of
16 Hawai`i.
17 Q.  Anywhere else?
18 A.  Or any other state.
19 Q.  So the only license you hold is a national license for
20 being a behavioral analyst?
21 A.  I'm a nationally board certified behavior analyst.
22 Q.  Okay.  When did you sit for your boards?
23 A.  In 1985 would be the first time, and I let that lapse,
24 as I was young and that seemed like an awful lot of money.
25 Again, in California, I think was -- I should be able to

Page 16

1  figure that out.  Well, before I came here, so let me see.
2  '98.  Then California went national in 2000, and all the
3  States turned to the national certificate.
4  Q.  Okay.  Do you belong to any particular societies or
5  organizations?
6  A.  Would you like me to read them all?
7  Q.  Well, are they all in your CV?
8  A.  Quite a few of them are.  I am the president of the
9  Hawaiian Association for Behavior Analysis.  I am a member
10 of the Association for Behavior Analysis International.  I
11 am a member of the Autism Society of America and the Autism
12 Society of Hawai`i.
13 Q.  You don't need to -- if they're all there, I'll take
14 your word for it.
15 A.  Quite a few of them are here.
16 Q.  Okay.  Okay.  No sense in burning paper just reading
17 them off when it's right there.
18 A.  Okay.
19 Q.  Okay.  Thank you, Kim.
20     Okay.  Do you have any -- I didn't get a chance to go
21 over your CV in any great detail.
22 A.  Okay.
23 Q.  But do you have any publications that relate to
24 working with children with autism in Bryan's age group, in
25 that about 10-to-12-year-old?

4 (Pages 13 to 16)

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

Page 17

1  A.  Not specifically.  I have several publications related
2  to working with people with autism and developmental
3  disabilities in employment, transition to school to work,
4  community-based instruction areas.  Typically a
5  10-to-12-year-old would still be focusing on academics.
6  Bryan's particular case, his class did CBI instruction.  I
7  wouldn't say they're not relevant to his instruction, but I
8  would say they're relevant to his age group.
9      THE WITNESS:  You got to type it for me Stan.
10     MR. LEVIN:  Bryan was seven years old when --
11     THE WITNESS:  Bryan was seven years old when I worked
12  with him?  Is that what you're --
13     MR. LEVIN:  When he first --
14     THE WITNESS:  When he first --
15     MR. LEVIN:  -- went to the DOE.
16     THE WITNESS:  When he went to the DOE?  I don't think
17  I met him at seven.  I met him in 2000, 2001.
18     I -- so, you know, I have no records, right, when I
19  worked for the State Department of Health.  When I left
20  there, clearly, no records came with me.  I worked again
21  with Bryan's family when I was at Developmental
22  Disabilities, CAMHD being the first time, Child and
23  Adolescent Mental Health Division.  So I have none of those
24  records.  Then when I moved over to Developmental
25  Disabilities, I have none of those records.  And then when

Page 18

1  I went into private practice, I served him again; and as a
2  subcontractor, we are not allowed to maintain our own
3  records either.  So every piece of paper I've ever written
4  on or about Bryan is not at my disposal.  So I may mess up
5  a date.  I may need assistance with, you know, information
6  specific to that time period.
7      So I didn't meet Bryan at seven.  I met him in 2000,
8  2001, however old he was at that time.
9  Q.  (By Mr. Ushiroda)  Okay.  And yes, I -- I don't -- the
10  only thing I brought with me today is your CV and your
11  report.
12  A.  Okay.
13  Q.  I don't have any of your records.
14  A.  There are several reports I wrote on Bryan over the
15  years.  It was potentially three that precede the
16  cumulative report --
17  Q.  I see.
18  A.  -- that you've asked me about today.
19  Q.  Well, the only one I'm interested in is this one that
20  is dated --
21  A.  '04.
22  Q.  -- August 18th, '04 --
23  A.  Yeah.
24  Q.  -- because that's the one that has been disclosed as
25  your expert report in this case.

Page 19

1  A.  Okay.
2  Q.  But we'll get to that.
3  A.  Okay.
4  Q.  Let's see.
5  A.  I was -- I was -- I don't know if we're still on
6  history.  I was recruited here by the Felix Consent
7  Decree --
8  Q.  Okay.
9  A.  -- to provide expert assistance in specifically
10  behavior analysis.  I was hired as the MRDD behavior
11  specialist for the Department of Health under the Felix
12  Consent Decree, one of the nine court-ordered positions in
13  the end years of Felix there.
14  Q.  Okay.  When was this?
15  A.  2000.  I think I got here in September, but I don't --
16  I don't know when I met Bryan specifically, some months
17  after that.
18  Q.  Okay.  So you came to Hawai`i to work in 2000?
19  A.  Yes.
20  Q.  Okay.  And prior to that you were in Florida?
21  A.  I was in the Bay Area.
22  Q.  California Bay Area?
23  A.  I was behavior analyst in the school system there.
24  Q.  Are you familiar with the Benicia school district?
25  A.  Loosely.  I haven't worked in it directly, but I've

Page 20

1  worked around it.
2  Q.  Okay.  Now tell me about this.  How did this come
3  about, your being recruited by the Department of Health,
4  the Felix Consent Decree?
5  A.  To the best of my knowledge, as it was explained to
6  me, there came a time in the end of Felix -- and Stan can
7  probably correct me if I'm inaccurate -- where the Court
8  made it clear that there were some deficit areas in Hawai`i
9  that needed to be recruited from outside of Hawai`i.
10     THE WITNESS:  Off the record.
11         (Discussion off the record.)
12     THE WITNESS:  Yeah, that's my understanding as well,
13  having read the Felix Consent Decree and much of the
14  paperwork -- and hired me.
15     There were several areas of deficit that Judge Ezra
16  felt could not be filled with people who lived and worked
17  in Hawai`i, and the State was court-ordered to hire from
18  without.  And I was the first of the experts to arrive.
19  And so I filled the position of MRDD, Mental Retardation
20  Developmental Disabilities Behavior Specialist, at CAMHD,
21  Child and Adolescent Mental Health Division, for the Felix
22  Consent Decree.  I was the first and only one here for
23  about a year, and then slowly those other positions began
24  to fill as well.
25  Q.  (By Mr. Ushiroda)  How long did you hold that

KIMBERLY SMALLEY                                      7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

Page 21

1  position?
2  A.  I was at CAMHD for two years when we successfully
3  closed our portion of -- of Felix.  The monies and services
4  for children with autism were transferred from CAMHD over
5  to DOE, where they belong.  They're education services
6  related to accessing benefit from your education.  There
7  were some services that were not related to your education
8  at that time, such as residential care, things that
9  happened outside of school.  Those services, those monies,
10 and the positions related to those, were transferred to
11 DDD.  So at that time, 214 children who were receiving
12 respite care, 12 that were in out-of-home placement, and my
13 position and all the monies attached therein moved over to
14 DDD.
15 Q.  DED?
16 A.  Developmental Disabilities Division.
17 Q.  Ah.  Is that under the Department of Health?
18 A.  It is also under the Department of Health.
19 Q.  Okay.  Sorry.  I just have to get a little used to all
20 these acronyms.
21 A.  My fault.
22 Q.  Okay.  Now what is your current employment, Kim?
23 A.  Twofold.  I work for Behavior Counseling Research
24 Center as an employee.  They're one of the behavioral
25 agencies in the state.  They serve children with autism

Page 22

1  under the intensive services contract.
2       I also have my own business, my own private practice,
3  and through that business I subcontract other -- under
4  other agencies, at this time currently, Child and Family
5  Services.  And actually, that's who I served Bryan through
6  as well.
7       I also through my own business provide training in
8  behavior and autism for many of the other intensive service
9  provider agencies such as HBH, Nursefinders, and some
10 agencies that don't serve DOE but serve DDD as well.
11 Q.  So you have a private practice; correct?
12 A.  Part-time, yeah.
13 Q.  And that services the DOE?
14 A.  Those are subcontracted positions under agencies which
15 are providers to the DOE, intensive services contract.  The
16 intensive services contract is the one that serves people
17 with autism.
18 Q.  Okay.  And how long were you with Child and Family --
19 A.  I'm still with Child and Family.  I'm not their
20 employee.  They -- I work under them to do a whole variety
21 of things.  I provide currently supervision for their
22 IISCs.  Those are the consultants who develop and implement
23 the plan for people with autism.  I do training for them.
24 And just like Bryan's situation, they subcontract me as an
25 IISC to serve children with challenges in a variety of

Page 23

1  ways.
2  Q.  What does that stand for?
3  A.  Intensive Individual Service Consultant, essentially.
4  It used to be the autism consultant, and because under ADA,
5  anybody could have this service, the DOE had to change that
6  name from autism consultant to include other populations
7  such as Down syndrome or AHD for that matter.
8  Q.  I see.  Okay.
9       Now Kim, do you have any experience testifying in
10 state Circuit Court as an expert witness?
11 A.  State Circuit Court.  I believe all the testimonies
12 I've done here have been due process or fair -- fair
13 hearings level.
14 Q.  I guess those are administrative hearings with the DOE
15 or --
16 A.  Yeah.
17 Q.  Okay.
18 A.  Yes.
19 Q.  Okay.  How about in federal court, have you testified
20 in federal court?
21 A.  I have not testified in -- well, no, that would have
22 been state court.  No, I've not testified in federal court.
23 Q.  Okay.  So your testimony as an expert witness is --
24 has been limited, is it fair to say, in Hawai`i state
25 courts to these two process hearings?

Page 24

1  A.  Thus far, yes.
2  Q.  Okay.  Have you ever been disqualified as an expert in
3  any of those hearings?
4  A.  No.  I've not been put up as an expert, but I've not
5  been disqualified.
6  Q.  Oh, what were you put up as?
7  A.  No, I've not been put up.  I've testified without the
8  tag of being an expert witness, but I've never been
9  suggested as an expert and disqualified.
10 Q.  Okay.  Is it fair to say this is the first time you've
11 ever been asked to testify as an expert witness in a civil
12 case?
13 A.  In the state of Hawai`i, yes.  In the state of
14 California as well, is not the first time ever, but the
15 first time in Hawai`i.
16 Q.  Okay.  Tell me about the ones in California.
17 A.  One young man, just one, who was trying to get
18 residential care.  He had significant developmental
19 disabilities and behavioral challenges, and the State felt
20 that he was too disabled to have an apartment of his own,
21 and his family, after exhausting all the due process
22 avenues available to them, eventually had to go to a higher
23 court.
24 Q.  Okay.  And did you testify?
25 A.  I did testify as an expert witness.

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                WILES v. DEPARTMENT OF EDUCATION

Page 25

1  Q.  Who did you testify for?
2  A.  For the family.
3  Q.  Okay.  And did that case go to trial?
4  A.  It did not go to trial.
5  Q.  Okay.  So your testimony was in a deposition much like
6  this?
7  A.  Similar to this.
8  Q.  Okay.  Any other experiences testifying?
9  A.  In civil, no.
10  Q.  Okay.  And in that California case you were testifying
11  as an expert in the area of behavioral analysis?
12  A.  Uh-huh.
13  Q.  Yes?
14  A.  Behavior -- behavior analysis, yes.
15  Q.  Okay.
16  A.  I'm sorry.
17  Q.  Okay.  By the way, Kim, I know that you have a busy
18  schedule, and any time you need to take a break to make a
19  call --
20  A.  Okay.
21  Q.  -- you know, just let me know.  I'm very flexible
22  about that, so it's not a problem.
23         Okay.  Now for this case, I -- I understand that
24  you've been retained as an expert witness on behalf of
25  Bryan's family?

Page 26

1  A.  I've been subpoenaed to be here today.  I think I'm --
2  I think you're paying me, actually.  I don't know who I'm
3  billing.  Am I billing in you?  I'm billing somebody.
4  Billing you?
5  Q.  Yes, you are billing me today, yes.
6         But what I meant was -- and no, I have not subpoenaed
7  you here today.  My understanding is that you have been
8  disclosed by the -- Bryan's family as an expert witness.
9  A.  Uh-huh.
10  Q.  Is that your understanding?
11  A.  That -- I haven't spoken to Bryan's family, but yes,
12  that's my understanding.
13  Q.  Okay.  Who retained you on behalf of Bryan's family?
14  A.  First I heard of it, I received a subpoena from you
15  guys to turn over records.  Subsequently, I got some
16  e-mails -- or maybe I actually got an e-mail first from
17  Bruce asking if this -- you know, if this was a correct
18  copy of my report and letting me know that this was going
19  to court.  So I had maybe three e-mail exchanges total.
20  I've actually had very little prior contact.  I don't know
21  where this is going.
22  Q.  Okay.  Sounds like you --
23  A.  I got a couple e-mails and a subpoena, and I showed
24  up.  That kind of covers that.
25  Q.  Well, let me back up and kind of at least bring you up

Page 27

1  to speed on what's going on.
2  A.  Thank you.
3  Q.  In the federal court system, if a party is going to
4  use an expert to render expert opinions in a case, they
5  have to make what is called a disclosure.  So in your
6  case -- well, in this case, the plaintiffs, who are Bryan's
7  parents, disclosed several expert witnesses along with
8  their expert reports.  This was earlier this year.  Your
9  report was disclosed, and a report by a Daniel LeGoff, and
10  a report by am economist named Keynes von Elsner.
11  A.  I don't know the person.
12  Q.  Okay.  Anyway, so with those disclosures, that told us
13  that the plaintiffs, Bryan's family, were going to be using
14  you as an expert witness to render expert opinions for
15  them, and that is why we subpoenaed your records.
16  A.  That's fine.
17  Q.  Did you understand that to be your role?
18  A.  As an expert witness, yes.
19  Q.  And your contact regarding that role was, I guess, the
20  e-mails you received from --
21  A.  Couple e-mails from Bruce.
22  Q.  What were the sum and substance of those e-mails?
23  A.  Just as I said, asking me for a copy of my vitae,
24  asking me if this was a true and accurate copy of the
25  report I had submitted.  I sent an e-mail to him after I

Page 28

1  received the subpoena from you saying that I don't have any
2  of these records; you'll have to subpoena CFS.  I don't
3  know what else.  I mean, minimal.
4  Q.  Okay.  Have you ever spoken with an attorney named
5  Carl Varady, V-A-R-A-D-Y?
6  A.  About this case?
7  Q.  Yes.
8  A.  No.
9  Q.  How about Mr. Levin?
10  A.  No.  I -- well, just this morning when I walked in.
11  Q.  Okay.  Now between the time you received those e-mails
12  from Bruce and today, have you had any contact with
13  Mr. Levin?
14  A.  No.
15  Q.  Okay.  So since those e-mails from Bruce, today was
16  your first meeting with Mr. Levin?
17  A.  Yes.
18  Q.  Okay.  And how about in that interim, that same time
19  period, have you had any contact with Bryan's parents?
20  A.  I left them a phone message after I received the
21  subpoena 'cause I didn't -- I didn't know who it was for.
22  At that point I didn't realize yet that I was -- they were
23  hoping that I would be their expert witness.  So I left
24  them a phone message, one.  I left probably Bruce an e-mail
25  and came to your office and met the woman who received the

KIMBERLY SMALLEY                                      7-27-2006

CV04-00442, CV05-00247                 WILES v. DEPARTMENT OF EDUCATION

---

**Page 29**

1  documents and let everybody know that I have nothing; that
2  if there are documents, you would need to get them from
3  Child and Family Services.
4      I didn't actually speak to them. I just simply left
5  them a voice message. That was it. That was the full
6  content of it.
7  Q.  So all of your work that is related to Bryan
8  Wiles-Bond, your preparation of reports, your observations,
9  any notes you may have, those would all be --
10 A.  At -- well, for this particular report, they would be
11 at CPS. The reports that precede this report and feed into
12 it, the raw data or whatnot would be at the Department of
13 Health.
14 Q.  Any particular department?
15 A.  No. I mean, I -- I would assume it would be at DDD.
16 When I -- I met Bryan initially, it was under CAMHD,
17 Child and Adolescent Mental Health Division. And so any
18 notes I have from those initial meetings, I don't know what
19 CAMHD would have done with them. When I moved over to DDD,
20 I again -- there was another due process, and I provided
21 additional expertise to Bryan's team at that time. Any
22 notes on that would be at DDD. When I left the state
23 department and as a subcontractor at CFS, anything that
24 they have on Bryan would be at CFS.
25 Q.  Okay. So anything you performed for Bryan as a

**Page 30**

1  subcontractor to CFS, that would still be with CFS?
2  A.  It's a HIPAA violation for subcontractors to have a
3  duplicate file.
4  Q.  I see.
5  A.  So I don't -- I don't get to keep anything.
6  Q.  Okay. Do you know what areas that you are expected to
7  testify on in this case?
8  A.  I would assume my areas of expertise. No one has said
9  to me, please talk about X, Y, or Z. I don't know what
10 your expectation is.
11 Q.  Well, that's what I'm trying to find out because I
12 didn't disclose you.
13 A.  Behavior analysis, autism, special identification,
14 Bryan's team in particular, the implementation of his plan,
15 how I developed his plan. I can speak fluidly about any of
16 those topics and probably many more.
17 Q.  The only report that's been disclosed as an expert
18 report is your August 18th, '04 report.
19 A.  Uh-huh.
20 Q.  And are you prepared to --
21 A.  Absolutely.
22 Q.  Okay. Now before we get into the substance of your
23 report, Kim, has there been any discussion about the terms
24 of your retention as an expert witness?
25 A.  Bruce, I believe, sent me an e-mail asking me my

**Page 31**

1  rates. I provided the information back to some secretarial
2  staff, whose name escapes me, and that's what I intend on
3  charging you.
4  Q.  What is the rate that you are charging me today for
5  this deposition?
6  A.  Well, there are different rates for preparation, which
7  is minimal, and I believe it's 225 an hour, as I sit here.
8  Q.  Okay. And before we go any further, are you gonna be
9  testifying at trial in this case, should this matter
10 proceed to trial?
11 A.  Should I be called.
12 Q.  Okay. But do you understand when the trial is in this
13 case?
14 A.  No, I have none of those details.
15 Q.  Okay. Before we go on, you've said you have a private
16 practice. What is the address of your private practice?
17 A.  It is my home address. I do business as myself.
18 Q.  Okay.
19 A.  So there isn't an actual office front. All my, you
20 know -- my materials are in the car, and my papers are at
21 the respective agencies I'm subcontracting for.
22 Q.  Cuts down on storage space, huh?
23 A.  Yeah, but gas what it is --
24 Q.  They don't reimburse you for gas?
25 A.  No.

**Page 32**

1  Q.  Oh, fix that right now.
2      What is your home address then?
3  A.  45-009 Mahalani Circle, Kaneohe, Hawai`i 96744.
4  Q.  Okay. Now as part of your retention as an expert
5  witness in this case from the plaintiffs, were you asked
6  specifically -- what were you specifically -- were you --
7  strike that.
8      Were you specifically asked to do anything in
9  particular?
10 A.  No.
11 Q.  Okay. So Mr. Levin, or Bruce on behalf of Mr. Levin,
12 hasn't told you, we want you to testify on --
13 A.  No. It was actually a little unnerving walking in
14 here today because I had no prep. I don't even know what
15 the Bonds are asking for.
16 Q.  And part of my query, too, is to find that out.
17 A.  Right.
18 Q.  So that's why the reasons for my question is.
19 A.  No, I mean, I assume I'm here to speak about my report
20 and my experiences with Bryan.
21 Q.  Okay. How long did you meet with Mr. Levin and Bruce
22 this morning?
23 A.  I don't know, five minutes tops. I walked in with the
24 court reporter.
25 Q.  Okay. And what did you discuss?

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                WILES v. DEPARTMENT OF EDUCATION

Page 33

1   A.  Just -- actually, just what you asked me here.  I said
2   I've had no prep.  I don't know what I'm -- what the Bonds
3   are even asking for.  And what am I supposed to be doing
4   here?  And Stan said, you know, you're gonna talk about
5   your report.
6   Q.  Your August 18th report?
7   A.  The '04 report.
8   Q.  Yes.  Okay.
9       Now since the time you were initially contacted by
10  Bruce, has Mr. Levin's office provided you with any
11  materials?
12  A.  Very recently, three days ago, I sent an e-mail to
13  Bruce and said, I don't even have a full copy of my report.
14  You know, in order for me to speak to it, I would really
15  need to reread it.  I -- you know, I haven't seen this kid
16  in a while.  And he e-mailed me maybe two, three nights ago
17  the original copy presuming he gave you.  And so I was able
18  to review that last night and this morning.  But that's it.
19  Q.  Okay.  When -- I take it you've read the report?
20  A.  Yes, I read it last light and again this morning when
21  I walked in so I'd be fresh.
22  Q.  So you refamiliarized yourself with your '04 report?
23  A.  Yes.
24  Q.  Any other materials provided to you by Mr. Levin's
25  office other than your '04 report?

Page 34

1   A.  No.
2   Q.  Okay.  So just to be clear, the only thing that
3   Mr. Levin's office sent you was your '04 report?
4   A.  Correct.
5   Q.  Okay.  Are you familiar with a person named Bryna
6   Segal?
7   A.  Yes.
8   Q.  Okay.  Have you work with Dr. Segal before?
9   A.  Tangentially.  Bryna and I have consulted on the same
10  cases, sometimes on the same side, sometimes on opposite
11  sides.  Last year, maybe two years ago, she came to do an
12  evaluation of CFS's therapeutic rec program.  I was the
13  clinical lead for that, so I spent some time with her
14  driving her from site to site and answering questions about
15  the therapy rec program.  In California I worked with her,
16  again, not directly with her, but she's either on the same
17  side or the opposite side of a case that I may also be
18  working on.
19  Q.  When you say the same side or opposite side, what do
20  you mean?
21  A.  Well, I mean either one of us can be brought in to
22  serve a child or to provide technical assistance for a
23  child either by the Department of Education or by the
24  family.
25  Q.  I see.

Page 35

1   A.  So here in Hawai`i, yeah, I've been on both sides.  So
2   sometimes she's the expert witness for the Department of
3   Education and I have been the provider.
4   Q.  What is your understanding of Dr. Segal's area of
5   expertise?
6   A.  Dr. Segal's areas of expertise, to the best of my
7   knowledge, is autism.
8   Q.  Have you found her to be very professional?
9   A.  I think I'd rather decline to answer that.  Dr. Segal
10  and I worked off and on together for years, and I think we
11  have a decent, though probably mild rapport.  She doesn't
12  know me well, but she would know me by name, I assume.
13      THE WITNESS:  Off the record.
14          (Discussion off the record.)
15      MR. USHIRODA:  Is there an objection you wanted to
16  state, Stan?
17      THE WITNESS:  I don't -- I didn't even know that Bryna
18  was on this case.
19      You got to type it.  I'm sorry.
20      Misstatements.
21      MR. LEVIN:  Misstatements, her testimony.
22      THE WITNESS:  My testimony is a misstatement?
23      MR. USHIRODA:  Stan, is this objection you want for
24  the record?  Stan?
25      MR. LEVIN:  Proceed.

Page 36

1       THE WITNESS:  Proceed.
2       MR. USHIRODA:  Okay.
3       MR. USHIRODA:  I'm sorry about that.
4       THE WITNESS:  That could have been my fault.
5       I am familiar with Bryna, but, you know, we're not
6   buddies or --
7   Q.  (By Mr. Ushiroda)  You have a --
8   A.  On and off over the years we've crossed paths.
9   Q.  You say you have a professional respect for her?
10  A.  Sure.
11  Q.  Okay.  And just to clarify, I didn't mean to misstate
12  any of your testimony, but did you and Bryna ever work on
13  Bryan's case together?
14  A.  No.
15      MR. USHIRODA:  Off the record.
16      (Whereupon, a recess was taken from 9:54 a.m. to
17      10:01 a.m.)
18      MR. USHIRODA:  Okay.  Let's go.
19      THE WITNESS:  All right.
20  Q.  (By Mr. Ushiroda)  Kim, before we get into your
21  report, why don't you tell me -- give me some background on
22  how it is you came to work with Bryan?
23  A.  Okay.  Again, without records, I may mess up the order
24  of things or the dates.  But as the Felix Consent Decree
25  MRDD behavior specialist for the Department of Health, I

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

---

**Page 37**

1  was asked, amongst other duties, to provide technical
2  assistance to kids and teams that were struggling around
3  the state. There were many children in the state that had
4  areas of need in their team or were in due process or
5  heading to due process, or the child may have been a danger
6  to self or others. There are a variety reasons why a name
7  might have popped up to me.
8      Bryan was somebody who was challenging the people who
9  were working with him. Because he lived on the Big Island,
10  his main consultant at that time, if I have my dates
11  correctly, was somebody who was being flown from Oahu over
12  to the Big Island. So I had met with her to provide
13  technical assistance to her about -- I don't know -- maybe
14  ten of her cases, Bryan being one of them. I came to the
15  house and did some observation for Bryan and provided
16  suggestions and techniques to his team at that time, which,
17  if I'm remembering correctly, was two women from Oahu, some
18  local consultants, and then, of course, his folks.
19  Q. Let me stop you right there. About what time -- is
20  this 2000?
21  A. Either the end of 2000 or the beginning of 2001.
22  Q. Okay.
23  A. I know I provided a list of children that I had
24  provided technical assistance to the Department of Health
25  in January, and his name -- you know, he was included in

---

**Page 38**

1  that. So either the beginning of '01 or the end of 2000 is
2  where I met him.
3  Q. Okay. And that was at his home?
4  A. I -- I remember being -- I remembering being in his
5  home. I remember be being in his school. I couldn't tell
6  you what came first. I saw Bryan over the time from 2000
7  until he moved intermittently like every couple months for
8  a different reason. So I had gone to see him initially
9  through Felix and made some technical assistance and some
10  suggestions and then went back -- I don't know how many
11  weeks or so later -- and, you know, met with his team again
12  and answered any questions they had and talked about what
13  had worked what didn't work that I suggested.
14      Then I saw him again, you know, several months later
15  for the -- as I recall, the one thing that I had suggested
16  that they still hadn't made success with was toileting. So
17  then I wrote them a very specific toileting plan. I had
18  given them in the initial meetings general information
19  about how to do this, but the actual implementers were his
20  family and some skills trainers and potentially
21  some -- and I don't recall if it was respite or PA, but
22  some people who were struggling, and so I had written a
23  behavior plan really, really -- I mean, a toileting plan --
24  I'm sorry -- very, very first-person language, you know.
25  Okay, now try this. You know, really simple, the way that

---

**Page 39**

1  I would talk, so that even somebody with no experience
2  whatsoever, like baby-sitter -- not that Bryan's the type
3  of kid who could be served by a baby-sitter -- could read
4  it and understand it, the idea that everybody could carry
5  it out.
6  Q. Was this the first toiling plan you prepared for
7  Bryan?
8  A. Well, toileting has always been an issue as long as
9  I've known him, so I provided technical assistance to Jana
10  and his mom when I first met them, but I had to sort of
11  rewrite -- I think it's like seven, eight pages long, in
12  big letters and small words, for other people that served
13  him as well.
14  Q. I see.
15      But in terms of a plan, putting it down on paper, this
16  was your first one for Bryan, toileting plan, that you put
17  down on paper?
18  A. Well, no, I gave them -- I gave them clinical notes
19  when I was there before, but yes, this is the first
20  seven-pager. And it was not written in a professional
21  manner with any jargon. It was, you know, for the level of
22  a grandma, for somebody who could, you know, make sure this
23  happened every day.
24      I then had to rewrite that plan later, maybe a couple
25  years later, as Developmental Disabilities either in '03 or

---

**Page 40**

1  '04 was going to provide him with overnight service, and
2  they weren't willing to do that unless they had a written
3  toileting plan because that was his need. And the plan I
4  had written before wasn't acceptable to them because I had
5  written it for the, you know -- the general consumption.
6  So then I had to rewrite that plan to include, you know,
7  some changes that happened. He'd become more successful
8  with moving his bowels than he had with urinating. There
9  were some changes in it. I rewrote the plan again a couple
10  years later. So there's at least those two documents.
11  Q. I see.
12      And when you first met the team and the parents and
13  gave them your -- and you did your observations, was this
14  only to comment on the toileting, or were there other
15  aspects --
16  A. No, no. Bryan had -- Bryan's a tough kid.
17  Q. Yeah.
18  A. He had lots and lots of needs. He had limited
19  communication. And he's one of the more self-stimulatory
20  people that we were serving at that time. He had a sleep
21  disorder. He urinated everywhere. He -- boy, he had lots
22  and lots of deficits. So I gave them lots of information
23  about receptive communication, expressive communication --
24  these are jargon words -- antecedent management, how to
25  prevent behavior from ever happening to begin with; what to

---

KIMBERLY SMALLEY

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

Page 41

1   teach him so he knows what to do next time instead of these
2   behaviors he'd been using up until then to express himself
3   or get his own way; then, of course, what to do when he did
4   something wrong.
5   Q.  With the frequent urination when you first met him
6   back in 2000 or 2001, was this a medical condition?
7   A.  No, I mean, to the best of my knowledge, you know,
8   I -- part of doing consultation and certainly part of a
9   functional behavior assessment, when we get to that, is
10  reviewing all the information available.  And his folks let
11  me read their papers, and, of course, I read his entire DOE
12  file, or at least the most recent parts of it that were
13  relevant.  And to the best of my knowledge, he doesn't have
14  like a medical condition the way you would think of it like
15  a UTI.  He does have diagnoses to go with the things he
16  does.
17  Q.  Such as?
18  A.  People who eat non-edibles typically receive the label
19  of PICA.  He would pull leaves right off the tree and eat
20  them.  P-I-C-A.  He'll eat anything that falls on the
21  ground, small plastic toys.  So he has medical diagnoses
22  which are symptomatic of his autism.
23  Q.  I see.
24      Now this period when you first got acquainted with
25  Bryan and his family, how was -- what was his -- what was

Page 42

1   the mode of communication?
2   A.  At that point, as I recall, they were relying heavily
3   on PECS, Picture Exchange Communication System.  They were
4   also using some sign language.  They had a visual schedule
5   up in his home.  They had some icons.  So like a little
6   picture of the toilet represents going to the toilet.  A
7   little picture of a plate and a spoon represent eating.
8   They had these systems both at school and at home.
9       So he himself did not have what I would consider
10  formal communication system.  He didn't understand most of
11  what was being said to him, and he had a very limited way
12  of expressing himself.  And best practice of people with
13  autism is -- they are visual learners and not auditory
14  learners -- is to back up everything you say verbally with
15  pictures or written word or computer technology.
16  Q.  With this visual support system, was that working at
17  the time?
18  A.  It wasn't working well enough, but yes, he was
19  learning the concepts.
20  Q.  Did you make any suggestions to his team at that
21  point?
22  A.  I did.
23  Q.  What kind of suggestions did you make?
24  A.  Without having my notes in front of me, I don't know
25  how accurate it is, but I know I suggested they put up

Page 43

1   toilet symbols everywhere so he might go by and say, oh,
2   yeah, that's a good idea.  I think I even wrote it that way
3   in my report.  I recommended that he learn more sign.  He
4   seemed to do fairly well with sign language, and I thought
5   that he might pick that up quicker.
6   Q.  In this initial observation and this time period --
7   we're talking about the beginning still yet -- was his --
8   was he able to sign?
9   A.  He definitely had some sign language at that time.
10  I -- you know, I don't know how many words.
11  Q.  Okay.
12  A.  Ten, thirty, something like that.  But the thing about
13  using sign language is you have to have people to talk to
14  and talk with, so the frequency of his sign would be
15  dependent on the other people around him.
16  Q.  Do you know where he learned the signs from at that
17  point?
18  A.  His mother or Jana would be my guess.
19  Q.  Oh.  Is Bryan's mother fluent in American Sign
20  Language?
21  A.  I don't know that anybody that works with him is
22  fluent.  At one time -- two -- several times he actually
23  had fluent staff.  Is she proficient?  Yes.  Can she sign
24  at his level and slightly above?  She -- she can
25  communicate with him.

Page 44

1   Q.  When you say "she," you're referring to Bryan's
2   mother?
3   A.  Correct.
4   Q.  Do you know where she learned to be become proficient?
5   A.  Early on.  I'm assuming that Jana provided them with
6   information, and they picked it up.  Subsequently to my
7   meeting him personally, they took a class.  But in the
8   get-go, I think it was my or Jana's idea.  But again, I
9   could be wrong.
10  Q.  And I'm sorry.  Jana is?
11  A.  Jana Ortiz is -- again, if I have my time lines
12  correct -- the consultant serving him in either '0 or '01.
13  Q.  Okay.  In this beginning time period, were you also
14  assisting with the development of IEPs for Bryan?
15  A.  I don't recall if I attended IEP at that time.  I
16  don't think so.  I think it was just technical assistance I
17  did.  I probably commented on the goals that he could
18  learn, things that could be addressed later.  I don't -- I
19  recall attending an IEP at the middle school with a
20  Columbus teacher, but I think that was sometime after.
21  Q.  What school was Bryan attending at this time?  This is
22  the beginning part.
23  A.  I don't even know the name of it.  The middle --
24  Q.  This is on Big Island?
25  A.  On the Big Island, yes.

11 (Pages 41 to 44)

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

---

**Page 45**

1    In the time I knew him, he transitioned from the el to
2  the middle. At the time I met him, he would have been at
3  the el, and then at the end he was at the middle.
4  Q. Getting back to the toileting, what was his level
5  like? I don't know if that's the correct terminology, but
6  when you first saw him?
7  A. Bryan is a very self-stimulatory guy. He likes to be
8  wet. He likes squishy things like the gel in your diaper
9  once you've urinated in it. He likes that. He loves
10  water. When I met Bryan, he urinated, I would probably
11  guess, every 10 minutes, every 15 minutes. And whether
12  there was several small drops or whether that was a stream
13  would depend on how much water he got, too.
14    Bryan is the only person I have ever met that I've
15  seen do this. He can put the hose in his mouth, an open
16  hose, the hose running, close his lips over the hose and
17  take in all that water, which is, of course, very, very
18  dangerous. Loves water. His most favorite thing at that
19  time would be to be drinking and urinating at the same
20  time.
21    These are, you know -- these are not atypical of
22  people with severe developmental disabilities, but his
23  needs were extreme. When I first met him, I believe he was
24  also still defecating outside. His parents worked against
25  that, obviously, but he had -- he liked to do that, and he

---

**Page 46**

1  would sneak away and try to do that. There was a couple
2  areas in the yard where that's where he was very adamant
3  about that's where he wanted to defecate.
4  Q. When you say "outside," you mean like --
5  A. Like in his yard.
6  Q. Okay.
7  A. Yeah. And so I had talked to his folks and his team
8  at that time about how to shape that behavior back into the
9  house, how to shape him from squatting and going in his
10  pants to pulling his pants down. How -- you know, clearly
11  there are hygiene issues as well as public decency issues
12  as well as habits. People with autism and severe
13  developmental disabilities tend to get in a habit and then
14  not get out of it where I might be able to explain to you,
15  we can't do that here. Once Bryan established a habit,
16  it's very difficult to break.
17    When I first met him, he was still choosing to
18  defecate outside. He was wet. His clothes were wet. His
19  house was wet a lot. He was still wearing a diaper at that
20  time. They were headed in the right direction. They knew
21  what to do. They just needed some expertise on these sort
22  of harder issues.
23  Q. The harder issues were?
24  A. Breaking the habit, getting him inside. You can't
25  force someone to do something different, particularly

---

**Page 47**

1  someone with autism. They're just gonna tantrum. So if
2  they caught him, for example, squatting in the yard, maybe
3  he ran from them in an attempt to poop where he wanted to
4  poop, and now they're trying to lead him back in the house,
5  he's going to protest. Well, we don't want to restrain a
6  child, particularly a child with autism. They tend to like
7  that deep pressure. Even though it looks like no one's
8  having fun -- we're sweating and crying and occasionally
9  bleeding -- in fact, it's a reinforcer.
10    They don't want to stress him, but they don't want him
11  to move his bowels in the yard. They were stuck on what he
12  was insisting on doing. I made some suggestions with that.
13  His parents followed them all. At that time I believe they
14  had the water shut off in the bathroom downstairs. I don't
15  recall if there was a door on the bathroom or not. That's
16  to prevent him from putting his mouth under the spigot and
17  drinking. They had a gate that kept him away from the
18  areas where there are spigots and hoses.
19    I suggested they put something large over his spot
20  that was no longer available. I don't recall if they put a
21  pool or what they put. They put something over that spot,
22  thereby eliminating use. We talked about using a potty like
23  a toddler would use, building it up large with a bucket or
24  something underneath, then moving that closer and closer to
25  the bathroom, put icons up all over the house. Then mainly

---

**Page 48**

1  we talked about reinforcement, as I recall, because Bryan
2  was so challenging that he got a lot of redirection, and it
3  was very difficult to find times where he's doing something
4  right to reinforce him.
5    Bryan, as I said, loves squishing things, slimy
6  things, loves soap, shampoo. Lots of children will
7  defecate in their pants in order to get a shower if that's
8  a reinforcer for them, water or soap. So we talked about
9  saving the best reinforcer, which at that point I think was
10  shampoo, for moving his bowels appropriately.
11    We talked about teaching him the correct response. At
12  that time I don't think he knew what I wanted of him. This
13  is going to sound very base to you guys who are not in
14  special ed, but I suggested they take the feces from his
15  diaper, dump it in the toilet, and then reward him even
16  though he himself did not put it in the toilet so he'd get
17  the idea, oh, that's what they want.
18    After a short period of time I gave them time lines.
19  He would only get the reinforcer if he put it there
20  himself, so to speak. They did much of that. And then he
21  made, to the best of my knowledge, pretty good gains with
22  the bowel movements. Everybody was feeling pretty excited
23  about that. But he was still urinating on the couch. And,
24  you know, he had like a gymnastics mat. He just likes wet
25  clothing.

KIMBERLY SMALLEY                                      7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

---

Page 49

1    And so they asked me to come back sometime later -- I
2  don't know whether it was many weeks or a couple months --
3  to help shore it up because some of it had worked, and some
4  of it they were still struggling with.
5  Q.  I see.
6    Then this eventually led to a more formal plan?
7  A.  Yes.  Sometime near the end of the time I knew Bryan,
8  Developmental Disabilities requested a more formal plan for
9  their records before they would be willing to supply
10  additional staff for this effort.
11  Q.  Okay.  And this would be probably towards the latter
12  part of '01, maybe '02?
13  A.  No, I -- you know, I don't know.  I think the first
14  plan was '01, and then I think the last one might even have
15  been '03 or '04.  But the whole time toileting was being
16  worked on, and they would call me or I would speak to
17  somebody and adjustments were made.  But as far as written
18  documents, I think there's one '01 then maybe another
19  one '03, '04.
20  Q.  Okay.  And along with toileting training, the issue of
21  communication?
22  A.  Absolutely.  That would be one of Bryan's greatest
23  deficits.
24  Q.  Okay.  Tell me how that worked hand in hand with the
25  toileting?

---

Page 50

1  A.  Oh, I mean, Bryan has lots of needs, and you cannot
2  address them in isolation.
3  Q.  Yes.
4  A.  So you can't wait for me to get a skill in one area to
5  teach me another.
6  Q.  Right.
7  A.  So at the same time they were working on toileting,
8  they were also working on self-stimulation, education,
9  obviously, social skills, and maybe most importantly,
10  expressive and receptive communication skills.
11    So as I said, when I first met him, I think their
12  focus was pictures.  PECS, Picture Exchange Communication,
13  that's a name brand way of teaching people with autism to
14  communicate.  And at that time he clearly already had some
15  sign language, and then we talked about expanding that
16  dramatically, and they did.
17    And I recall, you know, referring them to some
18  websites that -- if you Google "American Sign Language,"
19  the very first hit is a dictionary, and you type in a word,
20  and a lady will appear on your screen and make the sign for
21  you:  seasoning, seasoning.  So you can really look up any
22  words that you want to teach them.  And his team was
23  supposed to learn one to two new words every week and use
24  them with each other and with him, you know, as pervasively
25  as possible so he could see other people talking to each

---

Page 51

1  other using sign and have that go-between them and a
2  person, someone he was talking to.  And they did that.
3    And I saw Bryan in passing.  I wasn't there for him.
4  I was on the Big Island for another student, and I saw him
5  come out of his classroom, and I stopped, and I said,
6  hello, and I signed.  I'm not fluent.  I'm proficient.  And
7  he stopped and had a conversation with me.  It was
8  shocking.  He had picked up so much sign so quickly.  At
9  that point it was thought that he had a vocabulary of a
10  couple hundred words.  I saw his mom.  She was picking him
11  up.  You know, she cried, and I was happy, and we're all
12  like, oh, my God, you know, it was -- said hello to me and
13  had a social communication with me.  It was
14  stunning.  It was wonderful.
15  Q.  Couple hundred words?
16  A.  Oh, yeah, he has a great sign vocabulary.  I don't
17  know about right now, but at one point when I was there, he
18  read me a book, you know, just randomly pulled a book off a
19  shelf, a picture book, a kids' level book, not Harry
20  Potter, but a child's book, and he was able to point to all
21  the pictures and make all the signs.
22  Q.  When you say this time when you saw him outside his
23  class and had a conversation with him and you said that he
24  had at least a couple hundred words --
25  A.  Oh, yeah.

---

Page 52

1  Q.  -- did you observe these or --
2  A.  Yeah.
3  Q.  -- was this reported?
4  A.  No, no.  He interacted with me.  That's why it was so
5  shocking.  I'm someone that Bryan barely knows.  He sees me
6  intermittently every couple months in passing.  A lot of
7  times people with autism will learn I'll talk to you but
8  not you.  I'm sorry.  That was visual.  They'll categorize
9  people.  This is someone that I talk to; this is someone
10  that I'm not.
11    So that he would have a turn-taking conversation with
12  me using sign language vocabulary, I was floored.  I was
13  just floored.  It was very encouraging, very reinforcing
14  for me, someone who had provided assistance to his team to
15  see, you know, that it worked, that he had made such good
16  gains.
17  Q.  Did you ever come to find how he developed this
18  vocabulary?
19  A.  His team, the DOE and his folks.  At that point I
20  don't know if the class had started or not.  It must have.
21  They put together a sign language class.  I don't know if
22  they were going to adult school.  I don't recall who -- how
23  that was set up, but there was a class that they were
24  attending, his mom.  I don't know that his dad did or
25  didn't attend, but his consultants and his DOE folks.

---

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

---

Page 53

1    His speech therapist did a lovely job. I remember
2  being there at one time when she was using a Voice Master,
3  which is an old form of technology where it will have a
4  picture and then the word and then a little -- it's called
5  a cassette tape strand, and you run it through, and the
6  machine will say "boot, boot, B-O-O-T, boot." And it's
7  used for people who are learning to enunciate. She was
8  using it with Bryan for him to learn to sign. So the
9  picture would be there. You could see it. The written
10 word would be there, exposure to print. The machine would
11 say "apple," and then Bryan would make the sign, and she
12 would make the sign. So she was using this technology
13 which had both auditory output and a visual support to
14 teach him sign language vocabulary. He was picking it up.
15 He just ran with it. It was the perfect thing.
16 Q.  Do you know the name of this teacher?
17 A.  It was the speech therapist, whoever the speech
18 therapist was at that time.
19 Q.  This was about 2002?
20 A.  I don't know. I'm sorry. I don't know.
21 Q.  Okay.
22 A.  Yeah, long before I wrote this report.
23 Q.  Okay. Was he still in elementary school then?
24 A.  I honestly don't know that either.
25 Q.  Okay. Now are you trained in American Sign Language?

---

Page 54

1  A.  I took it as my second language in undergrad and
2  graduate school. I use it in my career, you know, weekly
3  if not daily; but I am not a sign language interpreter, nor
4  would I pass a fluency test. I am much better at
5  expressing myself than I am reading other people's
6  language. Probably a character flaw. I only care about
7  what I have to say. I do teach baby sign to an adoption
8  agency. And I have used sign language, you know, since the
9  eighties. But no, I'm not fluent.
10 Q.  Okay. Now for the -- for skills trainers for Bryan,
11 is it your feeling that the skills trainer has to be --
12 achieve a certain fluency in sign language?
13 A.  Absolutely -- no, it's a certain level. Fluency
14 actually means something in sign language acquisition.
15 Q.  Yes.
16 A.  So he was very fortunate to have several people who
17 were fluent in his life, and I think that was to his
18 benefit that he did make the gains he did make.
19 Q.  Who were these people?
20 A.  They were skills trainers. I don't know through what
21 agencies. We always looked for people who were, you know,
22 fluent in sign.
23    I believe at one point he had a skills trainer who was
24 deaf. We tried to recruit people that sign was, if not
25 their first, then at least their second language, because

---

Page 55

1  that model made it real to him. It's not a demand. This
2  is how we communicate. And that was -- you know, that
3  worked beautifully with him. It was the exact right thing
4  to do. So I think that his family and a variety of
5  agencies would, you know, advertise needing sign language
6  proficient or fluent or looking for deaf, hard of hearing.
7  They would advertise specifically hoping to get someone
8  with that as an area of expertise.
9  Q.  So would you say -- based on what you observed, would
10 you say that the DOE was making a very concerted effort to
11 get to Bryan skills trainers?
12 A.  Their providers were making a concerted effort.
13 Q.  Yeah.
14 A.  So the subcontractors were, you know, advertising for
15 somebody with sign in, you know, '02 or -- I don't even
16 know about '03, but early. We're still in the history
17 here.
18 Q.  Okay.
19 A.  So when I first met him, I think that people didn't
20 know what to do. Once people knew what to do -- so we'll
21 call it '01, '02 -- then yes, I think that his providers
22 were making a concerted effort and his speech therapist. I
23 think everybody was making a concerted effort to try new
24 things with him and move him along.
25 Q.  Did you ever have, in this beginning part, contact

---

Page 56

1  with the DOE's district superintendent of his school
2  district?
3  A.  You know, I ended up having more contact with the
4  superintendent in the end when things were bad. Early on I
5  would have -- who would I have been speaking with at that
6  time. I mean, certainly somebody at the district level
7  would have turned to CAMHD and DDD and ask for my help.
8  That's how that referral process went.
9  Q.  Do you know the name Judith Radwicke?
10 A.  I know who she is, but I don't recall speaking with
11 her at that time. I don't think it was this child. I
12 remember meeting with her in her office with a consultant
13 to talk about a variety of cases, but I'm not sure Bryan
14 was among them.
15 Q.  Now you mentioned things turned bad a little while
16 ago. I take it from your testimony this beginning part,
17 the providers really didn't know what to do?
18 A.  Not they didn't know what to do. They were doing the
19 best they could, and then they needed more information.
20 Then they got that information, and then they ran with it.
21 So I think I was speaking well of everybody at that time.
22 They were doing the best they could. I gave them some
23 suggestions. Some worked; some didn't. I'm not -- I don't
24 want to say I came in and saved the day or anything. I
25 just provided some expertise, and his team, and I

---

14 (Pages 53 to 56)

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

---

Page 57

1  really worked hard on it.
2      I know he had a change of teacher right around then,
3  and he got one of the Columbus teachers who kind of made it
4  her mission to make sure that Bryan learned other ways of
5  getting sensory reinforcement and to expand his sign
6  language. I think that that was like a good year, and
7  everybody was really happy. And I didn't see him. When
8  things were well, I didn't see him. So I came in. I
9  provided this expertise. I came back a couple times to
10 say, oh, gosh, sorry. That didn't work. Here, try this.
11 Oh, good, glad that worked. Now try the next thing. Then
12 I didn't -- then I was done with him because I had given my
13 piece, and they were running with it.
14      Sometime after that I ran into him. He looked great,
15 you know, every -- literally his mother and I were crying.
16 It was wonderful. Then sometime after that I got called in
17 again.
18 Q. Okay. Now when you came in and gave your initial
19 comments --
20 A. Yeah.
21 Q. -- and told them to go run with it and then the time
22 when you ran into him at the school --
23 A. Yeah.
24 Q. -- and had this conversation where you and the mother
25 cried --

---

Page 58

1  A. Yeah, yeah.
2  Q. -- because he was communicating --
3  A. It was awesome, yeah.
4  Q. -- how much time had elapsed between those two events?
5  A. I -- I don't know. I mean, it could be figured out by
6  looking at my time sheets.
7  Q. Okay.
8  A. But I was -- I would guess that I probably saw him
9  maybe two or three times over a period of maybe eight
10 months. So then so many months later, maybe even a year
11 later -- I don't know -- is when I ran into him and he was
12 doing well.
13 Q. Okay.
14 A. No, couldn't have been a year because there was not
15 that much time to play with. So some many months later,
16 some many weeks later.
17 Q. Then you said after that time when you ran into him at
18 the school and had the conversation --
19 A. Things were good.
20 Q. Mother crying.
21 A. Yeah.
22 Q. By the way, was -- the mother just happened to be
23 there?
24 A. She was picking him up. It was the end of the school
25 day. I was there providing technical assistance for

---

Page 59

1  another child. I was exiting. He was exiting. I saw him.
2  And I insist on making people communicate with me when I
3  know they were trouble. So I stopped him and said, hi,
4  Bryan. How are you? And he said fine. And I went, whoa.
5  And I asked him several more questions, and he answered me.
6  His mom pulled up, and I got into a conversation with her,
7  and it was all great. He wasn't wearing a diaper, you
8  know, at that time. We were talking about that. He had
9  made, you know -- he had made really good gains in the last
10 couple, maybe six months or --
11 Q. Now was this -- in this chance encounter when you saw
12 him, Bryan, was his signing, for lack of a better term,
13 spontaneous?
14 A. Well, no, I initiated.
15 Q. Okay.
16 A. I said, hi, Bryan. How are you?
17      I have seen him throughout the time I've known him,
18 even in the beginning when he only had a small vocabulary,
19 initiate. He initiates for his needs. I want to eat
20 something. I want crackers. He's somebody who loves
21 carbs. So he'll actually initiate to get his needs met
22 typically around food, bathroom, preferred object. He was
23 never to that point conversant, you know, and I wouldn't
24 imagine even then he would say, hey, nice shirt. He, you
25 know -- majority of his vocabulary would have been at that

---

Page 60

1  time nouns and verbs.
2  Q. Okay.
3  A. So it's red. It's a ball. We're running, that kind
4  of thing.
5  Q. Again referring back to this chance encounter you had
6  when you were arriving and his mom's picking him up and the
7  conversation you had, how long did this conversation last,
8  this interaction with Bryan?
9  A. Well, that interaction with Bryan was short, just a
10 few minutes; but because I was serving someone else at that
11 time, I saw him. I saw him in the classroom, at work with
12 the skills trainer and the speech therapist. So even
13 though I wasn't technically on his case at this time, it
14 was very gratifying to see him out of the corner of my eye
15 and see him doing some computer work or communicating with
16 the teacher or running off to the bathroom to use it. So I
17 wasn't somebody who had access to his records or
18 information at that time, but I saw him probably every
19 other week. I don't believe I was going weekly at that
20 point, although I may have been. There was a period there
21 when I went weekly to accomplish an assessment for someone
22 else.
23 Q. Okay. Now then there was a -- after this encounter
24 you said there was a period of time where you --
25 A. Hadn't heard from him. Hadn't been over there.

---

KIMBERLY SMALLEY                                           7-27-2006

CV04-00442, CV05-00247                   WILES v. DEPARTMENT OF EDUCATION

Page 61

1   Wasn't serving that island at the time, so --
2   Q.  Then what was the next contact?
3   A.  The next contact, I think, was from either the
4   school's autism person, the person who provided technical
5   expertise at that point to teachers for kids with autism,
6   or his consultant, his ISC, one of them.
7   Q.  Who was his consultant?
8   A.  His name.  Barbara Coffman contacted me at that point
9   at one point, but I don't know at that point she was
10  working with Bryan or for the DOE.  And near the end I
11  spoke with Drew.  I don't know her last name.  I want to
12  say Barrymore, but that's the actress.  Drew somebody.
13  Q.  Copeland?
14  A.  Okay.  Communicated with her sort of in the end of the
15  time I knew Bryan.  And I don't know who was his consultant
16  before then, but if you have a name, I could probably
17  recognize it or not.
18  Q.  I don't know.
19  A.  Okay.
20  Q.  Okay.  Well, let's backtrack a bit.
21  A.  Okay.
22  Q.  There was a period of time after that contact where
23  you said you had conversed with him, and things looked like
24  they were going good, and you hadn't heard from the family
25  or anyone on his behalf for some time.

Page 62

1   A.  I heard about him.  Let me clarify that.  No, I hadn't
2   heard from the family or from him or from his team or
3   anything.  So the assumption was all was going well.  When
4   things started to not go well, I -- again, if I have the
5   time right -- I understand there was a due process.  I was
6   at Developmental Disabilities at that time.  Somebody there
7   did ask me my opinion on what this child needed based on my
8   previous experience with him.  I'm sure I commented.  I
9   think Holly Shikada maybe was the -- I think I talked to
10  her about him on the phone.  So I think I heard about it in
11  my professional opinion before I heard from the team.
12  Q.  And how long is this, the time, you know -- the time
13  period between that time you had the chance encounter
14  until --
15  A.  I don't know, but I left the state department in '03,
16  so it would have had to have been sometime before then, so
17  end of '02, beginning of '03 maybe, probably end of '02.
18  Q.  And you were asked to render a professional opinion?
19  A.  Well, in my role as the MRDD behavior specialist.
20  Q.  And who requested that?
21  A.  Well, Anita Yuskaukas was my director at the time.
22  She was head of DDD.  I remember discussing it with her.  I
23  also remember discussing it with Bruce Anderson, who was
24  director of the Department of Health.  I remember talking
25  to Holly.  But to be honest, I don't remember what that

Page 63

1   particular due process was about.  I'd have to have that in
2   front of me.  It was probably skills trainer related.  It
3   was a regular issue that there weren't staff for him.
4   Q.  It was a -- I'm sorry?
5   A.  It was a regular issue that there were insufficient
6   staff for him.  There were not only people who didn't know
7   sign language, but just not enough people.  That came up
8   frequently at the time that I knew him.
9   Q.  Okay.  Is that a product of just the locale where he's
10  at, the Kona -- the resources?
11  A.  I'm sure that plays a part in it.  I mean, early on
12  when I met him, they were flying people from Oahu.
13  Q.  Yes.
14  A.  And in the end when I met him, they were using local
15  expertise.  What happened in between, I don't know.
16  Q.  Okay.  Now when you got called -- and again, I'm
17  referring to these contacts you just mentioned, one with
18  Holly Shikada.  You have contact with Bruce Anderson
19  regarding this.
20  A.  Yeah.
21  Q.  Do you know what time frame this is?  End of '03, you
22  think?
23  A.  I could figure it out because Anita left Developmental
24  Disabilities.  Maybe in summer of '02.  I'm gonna say
25  summer of '02.

Page 64

1   Q.  Okay.  Now what was the event or the circumstances
2   that prompted you being called back?
3   A.  There was a due process.
4   Q.  Ah.
5   A.  There was a hearing in place.  And like I said,
6   without it in front of me, I couldn't remember the exact
7   details of what was being asked for.  But the reoccurring
8   problem with Bryan was staffing, competent staffing, and
9   then, of course, his challenging behaviors being maybe
10  above and beyond what some of the people on his team knew
11  how to deal with.
12  Q.  Okay.  Bryan was and -- was a difficult case at the
13  time?
14  A.  Oh, yes.
15  Q.  Did you testify at this due process hearing?
16  A.  I think they settled.  No, I didn't testify.
17  Q.  Now you had mentioned that professional opinion was
18  requested of you at this time period?
19  A.  In my capacity as the MRDD specialist.
20  Q.  Do you recall rendering such an opinion?
21  A.  Oh, yes.  I have an opinion on everything.  I remember
22  giving my direct opinions to my direct supervisor, Anita
23  Yuskaukas, and then her bringing me upstairs to converse
24  with Dr. Anderson.  And then I remember, as I said, a
25  lengthy phone call from Holly.

16 (Pages 61 to 64)

CV04-00442, CV05-00247          WILES v. DEPARTMENT OF EDUCATION

Page 65

1  Q.  And this is all in connection with the due process
2  hearing?
3  A.  Yeah.
4  Q.  Now did you have any contact with Bryan's family at
5  this time?
6  A.  You know, I probably did, but I don't recall.  I mean,
7  generally whenever things were stressful or not going well
8  or something bad had happened, either his mom or his
9  consultant or his DOE person would call me and say, well,
10  now here's what happened.  He -- you know, he threw his bed
11  frame last night.  Do you have any suggestions what to do
12  about that?  Now he's taking to, you know, peeing on the
13  couch.  Do you have suggestions about that?  So I had
14  intermittent contact with the people on his team
15  throughout.
16  Q.  Okay.  Now getting back to your professional opinion,
17  do you recall what that was?
18  A.  I would have to have it in front of me.
19  Q.  Okay.
20  A.  But I'm sure I said the same thing over and over again
21  because that has been the case with Bryan where I said he
22  needs one-on-one staffing.  He's absolutely a one-on-one
23  kind of guy.  They need -- everybody in his life needs to
24  follow the behavior plan.  Everybody in his life needs to
25  know as much or more sign than he does.  His visual

Page 66

1  supports need to be everywhere with him, in his home, in
2  his car, in his school, in his community.  He needs to have
3  activities with other children where he's engaged.  Down
4  time, it's an awful thing for people with autism.  If he's
5  not engaged, he's going to be drinking or peeing.  So he
6  needed to be involved in activities.  Very active kid.
7  Very wiry kid.
8      I know I recommended gymnastics several times so you
9  could take that behavior of his jumping and climbing and
10  flailing, turn it into something more controlled.  If you
11  want to jump, you jump on the trampoline.  We're not at the
12  gym right now.  You have to go to the gym.
13      I recommended he have more direction from the kids at
14  his school and they create a buddy club, which they did at
15  some point, of regular ed kids, like "Bryan's Club."  They
16  would come and eat and play games and socialize with him
17  and get him involved in age-appropriate activities.
18      I regularly said those sorts of things over and over
19  again because his needs didn't change.  His behaviors got
20  better at first and then significantly worse, but the
21  interventions required were pretty much the same.  You
22  know, some things being accomplished and other needs
23  appearing.
24  Q.  Now in this time frame -- this is around the time of
25  the due process hearing -- did you -- you said the behavior

Page 67

1  got worse?  Is that --
2  A.  Initially when I met Bryan, he had some skills.
3  Q.  Okay.
4  A.  And he had lots of needs.
5  Q.  Yes.
6  A.  And then they were doing all the things they knew how
7  to do which were working, and they did some new things I
8  added in which also worked, and his skill level got
9  significantly better.
10  Q.  Okay.
11  A.  Then something happened.  My understanding, that would
12  be change of staff or lack of staff.  And his behaviors,
13  you know, got worse, and his language skills deteriorated,
14  and his ability to be interested in complying and working
15  with you kind of, you know, decreased.  And --
16  Q.  When -- I'm sorry.
17  A.  When -- yeah, I don't have any dates on any of this
18  stuff.  It would be really helpful if I had files in front
19  of me.
20  Q.  Yeah.
21  A.  But sometime in '02 probably -- it has to be in there
22  somewhere because I met him in '01, and I stopped knowing
23  him in '03, so this all had to take place sometime in '02.
24      For whatever reason -- you'll have a better ability to
25  look this up than I do -- his folks filed due process

Page 68

1  again.  I provided my opinion to Developmental Disabilities
2  people and the DOE people of what I thought he needed, and
3  they were gonna go check and see if those things were
4  happening.
5      Now I've lost track of your question.  I'm sorry.
6  Q.  That's okay.
7      So this is -- you're talking about there was a second
8  due process hearing?
9  A.  I believe there were several.
10  Q.  Okay.
11  A.  But I suppose it to be the same one extended.
12  Q.  Did you ever testify in a due process hearing
13  involving Bryan?
14  A.  I believe, to the best of my knowledge, they
15  continuously settled.
16  Q.  Okay.
17  A.  Again, unless it was one hearing that stretched out
18  the whole time, and I think they settled.
19      No, I did not go to a hearing and testify.
20  Q.  Okay.  Now in this time period where, you know, you
21  said that his skill level had gone down --
22  A.  Yeah.
23  Q.  -- did you observe this?
24  A.  Yeah, I was eventually brought over.  There was a
25  little bit of snag where the parents had requested me

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                WILES v. DEPARTMENT OF EDUCATION

---

Page 69

1  because it had been successful before, and they had called
2  me and asked me if I was available. Either that or his IC
3  or his AC had called and asked me if I was available, and I
4  had said yes. Then time went by, and I hadn't -- I hadn't
5  been procured. This is when I was on my own, after I left
6  the state department. And so then I would get e-mails from
7  his mom, you know. Have they procured you yet? And they
8  hadn't. So there was a little bit of a hold up.
9      Then I was brought back in by the DOE through CFS.
10  And then I saw him for the first time in many -- in many
11  months, and he was -- he was a mess. He was significantly
12  deteriorated from when I had seen him last.
13  Q.  And -- okay. And what did you observe? What did you
14  see? What did you observe?
15  A.  What did I see. There was --
16  Q.  I'm sorry. Was that at the home or the school?
17  A.  No, at school.
18  Q.  Okay.
19  A.  Well, I did see him at home as well.
20  Q.  Okay.
21  A.  But the focus of what they asked me to do was at
22  school. And I spent some time at school, couple months --
23  June, July, August maybe? July, August September? In
24  there somewhere -- observing him over time across domains,
25  at home, at school, in the community. We're getting into

Page 70

1  sort of my report now. These are the things that you do as
2  part of a functional behavior assessment.
3  Q.  Let me stop you there. Would this part be in the '04
4  time period, because your report --
5  A.  Yeah.
6  Q.  Okay.
7  A.  I'm trying -- I don't -- I may have been brought out
8  once before the '04 report. I think I -- I think I was
9  brought out, and I was asked for help; and I said, you
10  know, he really needs a real assessment. I think there was
11  another visit between when I saw him good and when I did
12  the '04 report, but I couldn't tell you the date on that.
13  But that would have been, you know, whenever he -- you
14  know, whenever things changed for the worse.
15  Q.  Okay.
16  A.  I went out. I talked to his then teacher. That would
17  have been at the middle school. I observed him in class.
18  I -- I'm sure I communicated with his mother and his
19  consultant and the district person, whoever that was at the
20  time. And I'm sure I recommended, you know, things have
21  changed, and he needs a new assessment.
22      Then there was a period of time again before I was
23  brought out for the final round, and then I was brought out
24  for the final round.
25  Q.  Okay. So let me understand this. You were brought

Page 71

1  out. You made your observations and recommended that Bryan
2  needed a functional behavior assessment; correct?
3  A.  I -- yeah.
4  Q.  And then some time lapsed again, and then you were
5  brought back in, and that's when you --
6  A.  Did the '04 report.
7  Q.  Correct.
8  A.  You know, I have a unique -- just -- I've seen Bryan
9  every couple months for two or three years, so I have sort
10  of this broad vision of who he was when I met him, who he
11  was in the middle, and who he was in the end. And then we
12  sort of missed the details in between for the several
13  months I didn't see him. But it was very beneficial to
14  have sort of the big picture to see him every couple
15  months. And each time I saw him, it was for a different
16  reason. You know, sometimes it was toileting. Sometimes
17  it was the provider who needed help. Sometimes it was the
18  DOE who brought me out. One time it was by chance. So
19  none of that was consistent service that I was applying to
20  him. In fact, it was in three separate positions that I
21  knew him. But I did see him every couple months for that
22  whole time period.
23  Q.  Okay. Now this time -- let's go back to that period
24  of before your final -- your assessment in '04. You know,
25  you were brought back out, and you said you observed him in

Page 72

1  the classroom, at home, and then you recommended that he
2  needed an assessment done.
3  A.  Yeah.
4  Q.  What was the skills trainers' situation like at that
5  time?
6  A.  I'm struggling with this. The second to last time he
7  may not even had skills trainers. He may have been short
8  staff. At some point he had skills trainers who couldn't
9  sign. At some point he had skills trainers who could sign.
10  He may have even had a deaf person at that -- no, not at
11  that point because he was already falling apart. I think
12  when things were well is when he had the person who was
13  deaf and hard of hearing. He had a couple really dynamic
14  young women who worked really hard and were very committed
15  to him.
16  Q.  Do you know what their names are?
17  A.  If you ask me, I can affirm or deny. I don't remember
18  names off the top of my head.
19      Then I think there was -- you know, there's turnover
20  in this field. I think there was a wholesale change for
21  him, a new teacher. Same peers, he had the same boys in
22  his classroom. He was in the same classroom with the same
23  children, which is why I kept seeing him. I was there for
24  someone else. He had the same peer group in his fully
25  self-contained.

18 (Pages 69 to 72)

Page 73

1    I think the last time I saw him -- second to last time
2 I saw him, he may have actually been short staff. I think
3 that was one of the issues. I know at some point I was in
4 contact with HBH -- I believe the woman's name is either
5 Lei or Leilani, but I could be mistaken on that -- about
6 training that they needed, or do they have anybody with
7 this area of expertise? Could they please advertise for
8 somebody with this area of expertise? So I know he was
9 short-staffed. I don't recall if he had no one, which
10 happened quite a bit, or if he just had, you know, a sub
11 who didn't know him.
12 Q.   When you say he had no one, and that happened quite a
13 bit, what do you base that on?
14 A.   Being there and there being no staff, coming to
15 observe and there being no staff, and then spending the
16 time observing him with his mom, which is also very useful,
17 but clearly that's not what I expected to do, and then just
18 report from the DOE, the consultant, the autism specialist,
19 his mom. Just -- you don't have enough bodies. You don't
20 have somebody hired at this time who knows what they're
21 doing, or being asked to talk to a sub, so here's a new
22 person, and temporary hires. They're going to be subbing
23 for a couple weeks. Can you please give me the rundown?
24 Q.   In this time period I'm talking about, before you came
25 out for the last time --

Page 74

1 A.   The last time.
2 Q.   -- the one before, when you recommended the
3 assessment, did you have any discussions with the mother?
4 A.   Oh, I'm sure I did. I'm sure.
5 Q.   What do you recall?
6 A.   I don't. I mean, I conversed with her quite
7 frequently. I'm sure. We had phone calls, and we probably
8 had e-mails as well.
9 Q.   Do you recall any specific concerns that stand out in
10 your mind? And I'm talking about conversations you had
11 with the mom in this second-to-the-last time.
12 A.   There were lots of concerns. His behaviors had
13 escalated pretty significantly. Bryan didn't used to be an
14 aggressive person. He would -- you know, he was big. He
15 took up all the air in a room. He would throw a tantrum
16 and throw things and make a lot of noise and flap, and he
17 would flail, and he had actually hit people by accident.
18 But he was not someone who would, you know, make a fist and
19 punch you.
20    And in the end, he had learned to be aggressive. He
21 had learned to head-butt, and he had learned to kick, and
22 he had learned to -- I think he bit someone. I know he bit
23 himself. His behaviors had deteriorated pretty -- you
24 know, I'm sure his mother was very, very upset. He was
25 self-injurious. He was aggressive. He had always done

Page 75

1 property destruction, but now it was bigger.
2    And so whenever something like that happened, she
3 would contact everybody she knew who could help. And
4 then -- so I would either converse with her or potentially
5 with Drew or potentially with Barbara or whoever else was
6 in his life at that point.
7 Q.   Do you know what his mother's background is, if she
8 has a particular background in a profession?
9 A.   She was a DOE employee. She worked at, I think, Risk
10 Youth maybe? Very, very different.
11 Q.   Now this second-to-the-last time --
12 A.   Yeah.
13 Q.   -- did you formulate an opinion as to what was causing
14 this deteriorating behavior?
15 A.   Yeah.
16 Q.   What was your opinion?
17 A.   Well, several factors, but the most important being
18 what we call behavioral drift. His plan had kind of faded
19 away, you know. I don't think it was intentional. But
20 either staff wasn't available, or trained staff wasn't
21 available, or the rules got a little lax, or it was summer
22 school. You know, for a whole variety of explanations, the
23 plan wasn't being followed and wasn't being implemented.
24 His engagement was extraordinarily low. He wasn't doing
25 anything.

Page 76

1    At one point in the classroom during my observations
2 for the FBA, I was going through the drawers pulling out
3 materials and, you know, handing his materials off to the
4 skills trainer. Here, he used to know how to do this. He
5 used to know how to do this. Here's a CD ROM, going
6 through the teacher's materials that were in bins going,
7 Bryan can do this. Bryan can do that, because he was
8 literally not engaged at all. He was literally on the
9 floor stimming and urinating all day. So that was huge.
10 And I think they also had the additional problem of his
11 becoming pubescent.
12 Q.   How much did that have to do with it?
13 A.   It was coming. He wasn't at that stage yet. He
14 wasn't a person who's sexually active or masturbating
15 publicly or anything like that, but you could see his body
16 changing. He was obviously more physical, bigger,
17 stronger, faster. And so I said to them very clearly, to
18 everybody, that these toileting issues and these
19 communication issues must be resolved before this boy hits
20 puberty or you're going to have an exponentially different
21 problem.
22 Q.   What was the response at that time?
23 A.   Everybody would agree with me. I mean, the meetings
24 weren't hostile. I think that -- I don't think anybody was
25 in disagreement with anything I ever said. In fact, people

CV04-00442, CV05-00247                WILES v. DEPARTMENT OF EDUCATION

| Page 77 | Page 79 |
|---|---|

**Page 77**

1  were often shaking my hand and going, thank you very much.
2  But the implementation was the problem.
3  Q.  And did you discuss implementation with them?  And I'm
4  still limit -- talking about the second-to-the-last time.
5  Did you discuss implementation issues?
6  A.  The second-to-the-last time I had a conversation with
7  HBH, because I -- I don't know.  That was either the
8  second-to-last time or the last time when they were pulling
9  their staff because someone had gotten hurt and they
10  weren't willing to do this anymore.
11      I know I talked to his teacher.  He had a new teacher.
12  The teacher from Columbus was gone, and the newer person
13  didn't have her skill set.  So I know I spent time with --
14  I believe it was a male teacher.  But that was -- that was
15  a brief visit.  And I don't even recall why I was flown
16  over.  I think it was maybe for a training, and then this
17  was something I did on top of it that day.
18      So I don't have a lot of recall about the specifics,
19  but I absolutely talked to school people, consultant
20  people, and family and saw Bryan and went, oh, gosh.  Okay.
21  We need to start over.  We need -- we need something bigger
22  than just me swinging in and going here, try this.
23  Q.  Did you make any specific recommendation at this time?
24  And that's the --
25  A.  At that -- I'm sure I said go back to doing everything

**Page 78**

1  that was working.  You know, re-implement the things that
2  used to work.  Get him involved.  Where are his PECS?  Put
3  up icons.  Get some visual supports here.  Get on line.
4  Learn two signs this week.  Learn more.  I'm sure I asked
5  everybody I ran into to redo the things that's worked.  And
6  I'm also sure I cautioned him and probably told his mom
7  that that would not be enough, that it might get us a
8  handle on things because it would be familiar to him, and
9  he would probably react familiarly -- I can't say it; hope
10  you can spell it -- because he'll remember how to use the
11  PECS and remember the sign, and that should help a little
12  bit.
13      But unfortunately, since I now saw him last, he's now
14  learned that aggression gets his own way.  He's now learned
15  if a little property destruction doesn't work, get
16  something really big.  He's now learned if someone's trying
17  to get you, be really quick and head-butt him.  He got
18  smarter and faster about acting out.
19  Q.  When you say "now," you're talking about when you saw
20  him in '04?
21  A.  Yeah, just before I wrote the assessment.
22  Q.  Okay.
23  A.  And I said those things we're gonna have to address.
24  So all the old techniques that worked before, we'll work on
25  the old things.  We also have the new problems.  So I or

**Page 79**

1  someone like me needs to come back, and we need to try to
2  undo this.
3      MR. USHIRODA:  Okay.  I think this is a good time for
4  a break.
5      THE WITNESS:  Okay.
6      (Whereupon, a recess was taken from 10:55 a.m. to
7      11:12 a.m.)
8      MR. USHIRODA:  Just kind of administratively, if we'll
9  mark this as 2.
10      (Deposition Exhibit Number 2 was marked for
11      identification.)
12  Q.  (By Mr. Ushiroda)  Kim, I've handed you what I've
13  marked as Exhibit 2 to your deposition.  It is a fee
14  schedule that was provided to me by Mr. Levin's office.
15  A.  Uh-huh.
16  Q.  Is this your current fee schedule?
17  A.  Yeah.
18  Q.  Okay.
19      (Deposition Exhibit Number 3 was marked for
20      identification.)
21  Q.  (By Mr. Ushiroda)  Kim, I have handed you what I've
22  marked as Exhibit 3 to your deposition.  And it is a
23  21-page document entitled Behavioral Assessment.
24  A.  Yes, it is.
25  Q.  And there is another section that starts at page --

**Page 80**

1  A.  Fourteen.
2  Q.  -- 14 called positive behavioral support plan.
3  A.  Yeah.
4  Q.  The document is dated August 18th, 2004.
5  A.  Okay.
6  Q.  And it's on Child and Family Service letterhead.  Is
7  this your report?
8  A.  Yes.
9  Q.  Okay.  And if you'd look at page 13, is that your
10  signature?
11  A.  Sort of.  They're allowed to sign for me, so yes, this
12  is my document, and my signature is probably stamped
13  though.
14  Q.  Oh.  And when you say "they," who are you referring
15  to?
16  A.  The subcontractors, the people I work under.  I'll
17  give them a stamp because I'll e-mail this report or fax
18  it -- it was faxed in this case.  You can tell by looking
19  at it -- and they stamp my name on it.
20  Q.  And this time it would be Child and Family Services?
21  A.  Correct.
22  Q.  And page 46, the last page, is that also your stamped
23  signature?
24  A.  Yes.
25  Q.  And did you prepare this report?

KIMBERLY SMALLEY                                    7-27-2006

Page 81

1  A.  I did.
2  Q.  Now when we broke the last time, we were talking about
3  the -- the second-to-the-last time period where you made
4  the recommendation for an assessment.  I think subsequent
5  to that, now I believe we're coming into the '04 where you
6  have more contact with the family; is that correct?
7  A.  Actually, I had more contact with the school because
8  part of the assessment was spending a bunch of time
9  observing.  I also observed him with his mother.  I also
10 observed him in the community.  But I spent -- for the
11 purposes of this, I did quite a bit of observation.
12 Q.  For the purposes of your report -- and when I say
13 "report," I'm gonna refer to the --
14 A.  Yeah, FBA.
15 Q.  -- yes, the August 18, '04 report, which is Exhibit 3,
16 just so we're clear for the record.
17     What did you do to prepare for this report, to prepare
18 this report?
19 A.  There's a sort of standard protocol for a functional
20 behavior assessment.
21 Q.  Okay.
22 A.  This is a nationally recognized best practice.  This
23 is what you do to figure out why someone is having some
24 behaviors, what they don't know, and what we're going to do
25 about it.  It typically includes some direct observation;

Page 82

1  some direct data collection; analyzation of any existing
2  data, both to get information from that and then to compare
3  it also to what you took, see if you're seeing the same
4  thing that they were documenting; interviews with every and
5  anybody that is pertinent to Bryan's plan, who's gonna help
6  it or hurt it or participate in it in any way.
7     There's typically in FBA lots of record review.  In
8  Bryan's case I am familiar with his records, so I didn't
9  have to spend a lot of time reviewing his history because
10 I'd seen him before, but I reviewed everything new since
11 the last time I saw him.  He had new staff, so I had to get
12 information from his new staff.
13    Record review, direct observation, interview, data
14 collection, and data analysis are the big components of the
15 functional behavior assessment.
16 Q.  So is that in a nutshell the protocol that goes into
17 preparing an FBA report?
18 A.  Functional behavior assessment.
19 Q.  Yes.
20 A.  Functional behavior analysis is a little bit more
21 involved.
22 Q.  Oh, that's right.  This document is two.
23 A.  This is two.  What I tell families is skip to the
24 second part first.  You already know everything bad about
25 your child, and it's not going to make you feel good to

Page 83

1  read it again.  Let's just look at what we're gonna do
2  about it.
3  Q.  Okay.
4  A.  I spend a great deal of time with professionals going
5  over the assessment, what I saw, what you could do
6  differently, what he needs to learn, what might be a new
7  IEP goal.  So these are two very distinct components of one
8  report.
9  Q.  Okay.
10 A.  And you shouldn't get one without the other, which
11 occasionally does happen.
12 Q.  Okay.  So what you just described for me was the
13 protocol to develop the functional behavioral assessment?
14 A.  Correct.
15 Q.  Okay.  And that's the part that is from pages 1
16 through 13 of Exhibit 3; correct?
17 A.  Though, as I said, you wouldn't get -- you shouldn't
18 get a positive support plan without the assessment.
19 Q.  They go hand in hand?
20 A.  They better.
21 Q.  At least for you they do?
22 A.  No, for national best practice they would.  Without an
23 assessment, it's hard to know what to do.  What's the point
24 of having an assessment if we're not going to fix it?  And
25 without a plan makes the likelihood of it working less.

Page 84

1  Q.  So the assessment is based on your observations;
2  correct?
3  A.  Observations, interview, data collection, record
4  review, data analysis.
5  Q.  So the assessment portion of the report just sets
6  forth like the background, what you found, what you've
7  observed?
8  A.  There's a lot more to it than that.
9  Q.  Okay.
10 A.  But it -- I don't know if you want me to read it.  I
11 don't know if you want me to explain it.  I don't know how
12 much you want.  So tell me how to explain it.
13 Q.  Well, what is the purpose of the assessment?
14 A.  Purpose is to look at each of the challenging
15 behaviors --
16 Q.  Okay.
17 A.  -- find out what function they serve -- hence the name
18 functional behavior assessment -- what purposes they
19 achieve for that child, because you wouldn't keep doing
20 them if they weren't working.  That means looking at
21 antecedents.  Antecedents are anything that come before the
22 behavior.  That means you have to watch the kid a lot so
23 you can see what all those things are.  Sometimes when you
24 interview someone, a parent, a teacher, they'll say, I
25 don't know.  It came out of the blue.  But if you're

CV04-00442, CV05-00247                WILES v. DEPARTMENT OF EDUCATION

Page 85

1  sitting there watching, you're listing all the things that
2  happened in the day preceding that behavior, and you can
3  look for patterns. The same kinds of things come up; the
4  same behavior results. So you're looking for patterns and
5  behavior to determine all the things which come before the
6  behavior.
7      There's something else -- there's other features which
8  are even farther back than that, and here in Hawai'i we
9  simply call them triggers. And that is, I'm sick, so I'm
10  less interested in eating today, so your reinforcer's not
11  cool to me so, I'm not going to pay attention to you, and
12  when you put a demand on me, I'm going to misbehave. So
13  you look for these triggers.
14      Then you watch not only the behavior, but everything
15  around the child in the behavior to see what kind of
16  instruction is being given, how they are at what they do
17  and how they do it. Do they do it? Do they implement it
18  well?
19      You look at the things that come after the behaviors
20  and look for patterns. So every time I mess up, somebody
21  comes over and talks to me. They may go, no, no, no, don't
22  do that; or honey, are you okay? But in either case, I'm
23  getting some social reinforcement. You look for patterns
24  there. If you find patterns there, you can teach the staff
25  to do something differently or to implement what happens

Page 86

1  before and whatever's before differently, hopefully then
2  affecting the behavior.
3      Functional behavior assessment also includes ruling
4  out medical issues. You never write a plan on somebody
5  who's got an earache. You want to make sure it's a
6  behavior, not something internal.
7      It also looks at skill deficits -- that's a big part
8  of Bryan's plan -- of what doesn't this kid know? If I
9  knew how to play and how to reason and how to communicate
10  and how to cope and a hundred different things, then he
11  wouldn't have to use his behaviors.
12      Then the behavior plan should give his team some
13  information about what to teach to him and how to teach it.
14  Q. So who was this report prepared for?
15  A. Department of Education.
16  Q. Okay. And was it for what purpose?
17  A. I hope to implement to effect change in Bryan's life.
18  Bryan was just an awful mess when they asked me to come do
19  this.
20  Q. You'll have to excuse my ignorance.
21  A. Yeah, yeah.
22  Q. I'm just trying to find out. So the purpose is to
23  implement?
24  A. The purpose of a functional behavior assessment is to
25  determine the functions of the behavior, find out what you

Page 87

1  need to do to modify the environment, what you need to do
2  to teach the child, what you need to do in your response to
3  those behaviors to eliminate those behaviors and accelerate
4  functional skills. So teach me good things to do in place
5  of these things that are troublesome that are getting in
6  way of me accessing benefit from my education.
7  Q. That's the assessment?
8  A. Correct.
9  Q. And then the plan is just --
10  A. The how-to.
11  Q. -- the how-to, how to effectuate this?
12  A. The plan is, this is what I found. Now here's what --
13  here's something you can do about it.
14  Q. Now was this -- do you recall how you being contacted
15  to prepare this report came about?
16  A. I know that there had been -- I know that there had
17  been an IEP and in that IEP the DOE committed me and that I
18  hadn't heard from them and that several people had asked
19  me, when are you coming? When are you coming? And I
20  hadn't heard of it. And I remember saying, hey, you know,
21  the DOE doesn't get to commit my time. Someone needs to
22  let me know about this. But then eventually I was
23  contacted. You know, I know this young man, and I had seen
24  him recently, and it was very, very disappointing, and so I
25  was more than happy to go out and help this team again.

Page 88

1  Q. Okay. Well, let's -- before we get into your report,
2  you got called over to prepare this report, do an
3  assessment, and come up with a plan. You said you were
4  very disappointed. What did you see when you came over?
5  A. It was very bad.
6  Q. Okay.
7  A. When I saw Bryan, prior to this report and during this
8  report -- he was awful. He was com -- soaked in urine all
9  the time. He was aggressive. He was self-injurious. He
10  was ignored. He was unengaged. He had no direct
11  instruction. He had no direct communication instruction.
12  His skills trainers did not know what they were doing.
13  Some of them were motivated and interested and sat down and
14  asked me questions. Some of them could care less. His
15  teacher did not know what to do with him and verbally was
16  receptive to suggestions, but then implementation appeared
17  at least to be nonexistent. Then it was either -- I think
18  it was the end of the school year, so then there was no
19  teacher.
20  Q. Was he in some kind of summer program?
21  A. Yeah. Many of the times I saw him, he was alone in a
22  room with his skills trainers sitting in his own urine
23  stimming. They had a big box of stim toys. Like Mardi
24  Gras beads, bubble wrap, stupid stuff, infants' stuff,
25  things that were much too young for him. They just let him

22 (Pages 85 to 88)

KIMBERLY SMALLEY                                      7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

---

Page 89

1  lay and play with it.
2      And I would come in, and because I wasn't perceived as
3  a person of authority, their behavior wouldn't change. And
4  I would wait and take notes. And then after a certain
5  amount of time it would be, okay, now what are you gonna
6  do? Maybe we should check the schedule -- and try to
7  provide them some technical assistance -- rather than leave
8  him there and feces and urine. The longer you get to do
9  that, the more you're going to want to do that. And then
10 they would go up to him and try to interrupt him because I
11 was here, and he would protest. I remember one girl
12 turning to me crying. See, he's too tough.
13     And I -- at that point I think he even had two-on-one,
14 two-on-one staffing. And I remember trying to work with
15 the male staff. Don't be aggressive. Don't be forceful.
16 Don't be restraining. You're not here as an enforcer.
17 You're here as an educator. Pull out his favorite CD ROM.
18     That's what -- I would literally go through the boxes
19 in the classroom trying to find things for him to do. The
20 academics that were there he had already mastered. It's a
21 ball. It's a fish. It's red. It's green. He had known
22 his colors when I first met him. He had known hundreds of
23 labels a year ago. They were working on the same four
24 words over and over again: ball, fish -- I can't think of
25 what the others were -- and his colors. I would explain to

---

Page 90

1  the skills trainers, this is material he has mastered. He
2  may be ignoring you because he's sick of seeing it.
3      They would say back to me, we don't know what to do.
4  We have no materials, no instruction. No one is helping
5  us. No one is telling us what to do. I would give them
6  some things to do, that way I could watch how Bryan
7  responded and take notes on that. That involved literally
8  like setting up the computer. The skills trainer and I
9  were trying to put the computer back together so they could
10 then work on it so I could know whether Bryan knew what he
11 was doing or not or protested doing it. It was very, very
12 unfortunate.
13     There was an ECSY, extended classroom school year,
14 going on that Bryan would typically be a part of, but due
15 to the extreme nature of his behavior, the IEP team -- I
16 don't know whose decision it was, but it was an IEP
17 decision to isolate him, so he was being educated by
18 himself one-on-one. That was even harder. He didn't have
19 any friends. He didn't have any activities. He didn't
20 have anything interesting to do. He wasn't motivated by
21 anything that there was, so it was just long periods of
22 down time.
23 Q. Did you -- let's back up. I know the report is dated
24 in August '04, and you said -- when did you first come to
25 see him?

---

Page 91

1  A.  I started the observations at the end of the school
2  year, and 'cause I had talked to the school year teacher
3  and then his summer school teacher, so I'm thinking,
4  without having my time sheets in front of me, probably
5  June, July, August.
6  Q.  Okay.
7  A.  Ideally the report would have been done in the school
8  year, you know, but there was some snag about getting me
9  started right near the end of the school year, so tail end
10 of the school year and through summer school.
11 Q.  Okay. Now I assume Bryan had an IEP in place?
12 A.  Uh-huh.
13 Q.  Were you familiar with that, the current IEP?
14 A.  At that time. I don't have it in front of me, but
15 yes.
16 Q.  And I suppose that the -- they're supposed to follow
17 this IEP?
18 A.  Yes. That would be their legal document.
19 Q.  Okay. Was it being followed?
20 A.  No.
21 Q.  Okay. In what way wasn't it being followed?
22 A.  In any way.
23 Q.  Okay.
24 A.  It was -- the implementation was very, very poor.
25 Q.  Okay. Was that the problem, the implementation?

---

Page 92

1  A.  Was that the -- there were many problems, and that was
2  certainly probably the biggest of them.
3  Q.  Okay. What were the problems -- why was the
4  implementation a problem at this point?
5  A.  Why -- well, there was no structure, no materials, no
6  teacher with expertise in Bryan's needs. The skills
7  trainers lacked the expertise to work with him, lacked the
8  training to work with him. Some of them lacked the mere
9  fortitude to work with him. There was limited to no sign
10 language. At one point there was a staff person who had
11 some sign language. I worked with her a little bit. But
12 for the most part, everything about his plan that we had
13 agreed to and done successfully sometime in the past had
14 just completely dissipated.
15 Q.  And did you come to find out why, why that happened?
16 A.  I was besides myself at the time, and I kept asking
17 why. And like I said, I called the training person at HBH,
18 and I spoke to the DOE person, and I believe the
19 explanation was just turnover. You know, people -- didn't
20 have people, and they didn't have people -- the people they
21 did have didn't have the background that the previous
22 people who served him had had.
23 Q.  In this occupation, being skills trainer, is there a
24 high turnover rate in this field?
25 A.  Yeah. For people who are challenging, I think if you

---

KIMBERLY SMALLEY                                      7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

---

Page 93

1  don't have the right training and right support, you move
2  on to someone easier.
3  Q.  Okay.  In terms of the number of skills trainers
4  available in the Kona area, is that a -- limited
5  resource?
6  A.  I don't know that myself personally.  I'm under the
7  impression that it is.  During this report, he did have
8  staffing.  He had two-on-one staffing.  There were bodies
9  there.  They just didn't know what to do and weren't doing
10  it when they were given the information to do it.
11  Q.  Do you get the sense that they were trying?
12  A.  Some of them.  Some of them no.
13  Q.  Okay.  Do you have any names of the skills trainers
14  involved?
15  A.  I remember spending a lot of time with a gentleman
16  named Sven, and I remember that because it's a Scandinavian
17  name and he had an accent.
18      There was a young woman whose name I don't know, and
19  it's horrible to identify her this way, but she had very
20  large breasts, and Bryan was very, very interested in her
21  breasts.  So I remember talking to her about what to wear
22  and how to keep distance from him and how to support him
23  without touching him.
24      There was an older woman who -- and by "older" I mean
25  that these other two people were kids -- were young.  I

Page 94

1  don't know how old she was.  She was a grown-up.  She was a
2  mom.  And I remember she had effort, you know, and she was
3  willing and interested in learning sign language, and I
4  remember coming and showing her signs when I was there.
5      But even with all that, every time I came to see
6  Bryan, he was laying on the floor, stimming, in his own
7  urine or feces.  It was -- I mean, it was neglect.
8  There's -- I was very upset, and I took it to the DOE, and
9  I called HBH, and I tried to help these individuals to do a
10  better job.  It wasn't good.
11  Q.  Okay.  Who did you speak to?
12  A.  Whoever would be down the hallway in the SSC's office.
13  Again, if you give me names, I will recognize them.
14  Q.  Kate Tolentino?
15  A.  Was she SSC?  I know that name --
16  Q.  I don't know.
17  A.  -- but I'm not sure what role.  I would -- for ESY
18  summer school, the office was three doors down.  I would go
19  down and I would say, okay, here's -- you know, he's locked
20  in the room.  He's all wet.  Nobody's doing anything with
21  him.  And, you know, I would pass that information on.  I'm
22  obligated to report.  I would pass that information on.
23  I know I called.  And again, I think the woman's name
24  is Leilani.  Hopefully that's not the new trainer versus
25  who the trainer was at that time.  I called CFS, said, your

Page 95

1  people need Problem Solver training in crisis prevention.
2  I know I recommended other names in my report.  It's a
3  different acronym, same name, but also Problem Solver
4  because those are people working with severe cognitive
5  disability.
6      CPI, the intervention the State uses, relies more with
7  people with language.  They teach you how to talk somebody
8  down.  If you're dealing with someone with a mental illness
9  or someone who's irate, you might have the ability to talk
10  them down where if you're dealing with somebody with no
11  receptive language skills or limited receptive language
12  skills, blah, blah, blah.  Doesn't matter what you're
13  saying.  That whole part of your training isn't going to
14  help you in this instance where Problem Solver focuses a
15  little bit more on developmental disabilities.
16  I recommended HBH, I can train you.  I recommended
17  other people that can come out and provide training for
18  their staff.  Actually, at that time I was in conversation
19  with HBH about providing some training for them just
20  globally as an agency, not specific to Bryan, but clearly
21  Bryan would have benefitted, and that never came to
22  fruition.
23      At some point in there, that short time frame, they
24  just -- Bryan accidentally knocked someone's tooth out, and
25  it really was accidental.  He was also aggressive at this

Page 96

1  time, but in this particular incident he was flailing, and
2  he elbowed a woman and knocked her tooth out.  And that was
3  an expensive, you know, workmen's comp claim or whatever it
4  was for HBH, and I think they -- I don't know.  This is my
5  opinion.  I think they came to the conclusion that they
6  cannot serve this child safely, and then they stopped
7  serving him.
8  Q.  Okay.  I'm sorry.  You said you came --
9  A.  I think they came to this conclusion.  I had called
10  HBH and said, you know, help.  And the person I spoke to
11  said, we're not gonna do this anymore.  So they didn't need
12  me to come train his staff because they weren't going to
13  continue serving him.
14  Q.  And you base that on?
15  A.  Known conversations.
16  Q.  And you -- okay.
17  A.  Everybody recognized that bad things were happening.
18  The DOE, the providers, the parents, everybody was very
19  upset.  They just couldn't see -- they just couldn't seem
20  to find a way out of it.  And that's where I hoped that if
21  I wrote a big assessment with all the instructions and all
22  the how-to that they would have something to work from and
23  that we could, you know, hopefully turn some of this
24  around.
25  Q.  That's why they called you; is that correct?

KIMBERLY SMALLEY                                    7-27-2006

CV04-00442, CV05-00247                  WILES v. DEPARTMENT OF EDUCATION

Page 97

1   A.  Well, I think the parents insisted they call me
2   because I had prior experience with Bryan.
3   Q.  How do you know the parents insisted that the DOE
4   called you?
5   A.  Well, because they called me if I had been procured,
6   or they sent me an e-mail probably if I had been procured.
7   Well, I don't know anything about it yet.  This was prior.
8   I wasn't in the IEP where the decision was made to purchase
9   me, if that's what you're asking.
10  Q.  Okay.  Now this report, was it meant to assist the IEP
11  team in implementing --
12  A.  The IEP?
13  Q.  -- the IEP?
14  A.  Any assessment is meant to assist the IEP team to
15  implement the IEP.  And you get all kinds of outside
16  assessments to supplement:  OT assessment, speech
17  assessment; in this case, OT assessment.
18  Q.  You were contacted in this case by who?
19  A.  Child and Family Services.
20  Q.  And they are --
21  A.  They are a prior of the Department of Education's
22  intensive services contract, autism.
23      When the Department of Ed in any state finds
24  themselves in a situation where they cannot provide
25  services, they were supposed to provide it themselves; but

Page 98

1   when they can't, they contract out to a contract service
2   provider.  ADA allows them to do that, requires them to do
3   that.  Every state procures an agency bid.  I can serve
4   autism.  Here's how our agency will do it.  Here are our
5   competent people.  The DOE grades those.  People win a
6   contract, and CFS is one of those people.  I cannot in this
7   state just hang out my shingle, Kim Smalley, Behaviors for
8   Hire.  I must be -- because this state is state-run here.
9   In Alaska, nowhere else, I must be a subcontractor of an
10  agency that already has a contract with the Department of
11  Ed.
12  Q.  And so you were subcontracted through --
13  A.  Correct.
14  Q.  Okay.  Now going back to your collecting data --
15  A.  Uh-huh.
16  Q.  -- for this report, I know you said that a big part of
17  it was observation; correct?
18  A.  Uh-huh.
19  Q.  Yes?  Just for the court reporter?
20  A.  Oh, I'm sorry.  I don't mean to say uh-huh.
21      Yes, a big part of the assessment here is observation
22  and direct data collection.  You can't rely on someone's
23  opinion.  If you got hurt -- say you're a skills trainer
24  and you got hurt.  You might describe the situation
25  different or worse than it was.  It may feel one way to you

Page 99

1   wherein what in fact I see is the information I need.  So a
2   big part of any behavior assessment is watching and
3   writing, watching and counting and writing things down.
4   There are different kinds of data collection.
5   Q.  In this case what did you do?
6   A.  Rob Horner Functional Data Assessment Collection Tool.
7   He's one of the premier people in the field.  Actually, he
8   trained here in Hawai`i.  He has a data collection tool
9   that I prefer because that's the easiest for me to use, and
10  it collects the most amount of information on one form.  I
11  also did simple ABC, antecedent, behavior, consequence, so
12  I had a narrative as well as numbers.
13      So behavior would happen.  I would have already been
14  writing.  You know, 10:10, nothing, no -- no engagement,
15  laying on the ground, laying on the ground urinating,
16  urinating, completely missing everything that was going on
17  with Bryan and in the room around him.  Then there would be
18  the behavior, and I would write hit, yell, scream, cry,
19  whatever, whatever happened, and then how many times it
20  happened.  So that would be frequency data.  And how long
21  it went on, that would be duration data.  And how long
22  between when someone asked him to do something and the
23  behavior or how long between the behavior and the next one
24  or how long between the behavior and the staff's response
25  and those types of things are called latency.

Page 100

1       So I was recording all these things 'cause I -- I have
2   a higher degree of professionalism or higher knowledge
3   base, and this is more than you would typically find.  This
4   is what you should find, but it's more than you would
5   typically find.  So frequency, duration, latency,
6   narrative, and the Rob Horner form to collect data to
7   contributed to this report on my own.
8       In addition to that, Drew provided me with copies of
9   all the data collection sheets that the one-on-ones and the
10  family were taking 'cause the family did take data at home.
11  So I had all their information for the previous several
12  months and then, of course, my own observations as well.
13  Q.  Did you have a baseline to compare?
14  A.  I had a better baseline than anybody else ever did.  I
15  had his baseline two years ago, fifteen months ago, eight
16  months ago, six months ago.  I absolutely had far more
17  information than anybody else.
18  Q.  So you had a baseline to compare his toileting?
19  A.  Do you know what baseline means?  Baseline is the
20  level, the number of times something happens, whether it's
21  using the bathroom or aggressing or something that you want
22  to see.
23  Q.  Right.
24  A.  Communication use.  You watch a child for ten days.
25  You record everything.  That's your baseline.

25 (Pages 97 to 100)

KIMBERLY SMALLEY                                7-27-2006

CV04-00442, CV05-00247                    WILES v. DEPARTMENT OF EDUCATION

Page 101

1  Q.  Okay.
2  A.  Now you add intervention, and you see if what you're
3  doing works by whether the data improves or decreases.  So
4  I'm establishing a baseline in this report for future
5  implementers.
6  Q.  Uh-huh.
7  A.  But even more so, I have information on Bryan over the
8  last two years, so what I know to have been his previous
9  baseline, because, of course, you can establish a new
10  baseline at any time.
11  Q.  Uh-huh.
12  A.  I know what it used to be.  I know what it looked like
13  when things were going really well, and, oh, my God, I know
14  what it looks like now.
15  Q.  I see.
16  A.  So what I was doing is establishing the baseline for
17  the implementers.  Here's what I saw.  The couple months I
18  was doing this, this is what it looked like.  Your job,
19  make the communication go up and the variety of behaviors
20  go down, social skills go up.  All those things they would
21  then choose to implement.
22  Q.  Okay.  Thank you.
23  A.  Yeah.  Just -- you weren't asking the question right.
24  I don't know if you knew.
25  Q.  No, no.  I -- you know, I understand the baseline.

Page 102

1  It's just that I was -- what you had compared it to
2  previously and -- but thank you for your clarification.
3  A.  Then I had all Drew's stuff, so --
4  Q.  Uh-huh.  And again, this all would be with CFS?
5  A.  No, I think Drew was another agency.
6  Q.  Whatever agency she was with?
7  A.  I mean, there were -- every agency was working with
8  Bryan.  It was very difficult to -- I mean, ideally it's
9  nice if you have one agency because then the skills
10  trainers' direct supervisor is a consultant.  But often in
11  the case of these outer island kids, some rural areas --
12  and, of course, in Bryan's case he was both -- then you end
13  up having one skills trainer from one agency, another
14  skills trainer from another agency, a consultant from
15  either or different.
16       And in Bryan's case, anybody who had staff -- I mean,
17  he was served by -- I'm sure he was served by everybody in
18  the area.  I'm sure every agency and every person there
19  served him at some point.  So I think -- but I could be
20  wrong.  But his consultant was from TIFFE, and his staff
21  were from HBH at the time I did this.  I was working with
22  CFS, and I know CSF was also providing skills trainer, but
23  Sven and the people I remember weren't, so that might have
24  been just before.
25  Q.  Do you remember at this time whether the parents had

Page 103

1  any role in the selection of skills trainers?
2  A.  Yes.  I believe that they had one as part of either a
3  settlement or due process or an agreement or an IEP
4  agreement.  They had some sort of official role that they
5  got to interview people.  I know they advertised directly,
6  and that's how we're very fortunate in the past to have
7  found the woman who was deaf or hard of hearing.
8  Q.  Who was that?
9  A.  I don't remember her name, but she was a person who
10  was deaf or hard of hearing, and so her sign language being
11  fluent -- this is way back.  Her sign language being fluent
12  really helped Bryan's come along.
13  Q.  And this particular skills trainer was found by the
14  parents?
15  A.  I -- yeah, I think so.  I could be wrong.  I know at
16  this time in the end here they had contacted an old skills
17  trainer who had worked with him who had moved off island
18  and that, you know, had somehow indicated to her that
19  things were going very badly, and they were desperate, and
20  would she be willing to come back.  I know that she was
21  willing to come back and did come back, and I don't think
22  she -- I don't think she was working when I met her.  In
23  fact, I'm not sure that she worked ever.  She was having
24  difficulty getting hired on.
25  Q.  Does the name Christie Edwards sound familiar?

Page 104

1  A.  I don't know if that was her name or not, but I met
2  with her and had her run through what she had done when she
3  was with him before, and, you know, yes, yes, yes, that's
4  right on.  Okay.  Now I need you to do this piece
5  differently because this is what's new since you were here
6  before.
7       I spent some time with her at the parents' home.  And
8  I think I spent some time with her at school.  I think I
9  must have spent some time with her at school -- I -- it
10  must have been the parents were paying her directly -- to
11  show people what to do.  And she was modeling for -- it
12  definitely the Sven period of time, but I don't know it was
13  Sven in particular.  She was coming to the school directly
14  paid.  I don't think she was employed by any agency.  She
15  was coming to school and working with Mom to show her what
16  to do in the house, because assessment is across domains.
17  To address a kid's behavior from 8:00 to 12:00 or 8:00 to
18  2:00 doesn't help in the bigger scheme of things.  I had
19  obviously gone to the house, done the same kind of
20  observation, same kind of data collection there, and
21  interviewed her and give her what I hoped to be good
22  technical assistance as well as the mom.
23  Q.  This was the -- this woman was hired by the parents?
24  A.  You know, I don't want to misspeak.  I think so.  I
25  think she was in the process -- she was trying to get hired

26  (Pages 101 to 104)

KIMBERLY SMALLEY                                    7-27-2006