by the DOE, and there was something wrong. They didn't -- they didn't want to hire her. She was having great difficulty getting hired. She had moved and come here and then got here and had no income.

Oh, you know what? I don't think they were -- I think they were like giving her lunch money or something. I don't think they were paying her paying her, but they were helping her out until she got hired on.

Q. Do you know what her qualifications were?

A. I don't recall, but her rapport with Bryan was good, and her skill set with Bryan was good. She did the things I would want people to do, and she had good sign language vocabulary, and she jumped right in, and so my observations of her at home with Bryan were very different from my observations of other people with Bryan at school.

Q. So she was with Bryan only at home?

A. She came to the school 'cause we were there together at least twice. But I don't think -- I don't think she was being paid to be there. I think she was just trying to help them out or maybe at Mom's request.

Q. And this is in the '04 period when you were preparing your report?

A. This assessment. So during that summer.

Q. Do you know where she came from?

A. Well, she had been here in Hawai`i before.

Q. But you said she had come from somewhere else?

A. She was here in Hawai`i. She worked with Bryan, and then she left. She went to an island. I don't know if it was -- I think she was working for the DoD schools maybe. She left here for something else -- I don't think it was Peace Corps. I think it was employment -- and went and did that. And then when the mom contacted her and said, you know, would you be willing to come back for whatever reason, she was willing, and she did come back. But that didn't work out for her.

You know, I remember her being offended, you know, feeling that she was being treated poorly. And she came all the way back here and changed her life and wanted to work with the kid, and for some reason she couldn't get hired on, and she hasn't been paid and frantic about, you know, like whether she was going to be able to meet her bills. I remember these things.

Q. Okay.

A. Sorry.

Q. Okay. And as part of preparing the assessment portion of the report, did that include also interviews of the parents?

A. Uh-huh. Yeah. And observation of how they're implementing the plan.

Q. And what was your observation of the parents'

implementation of plan?

A. They were doing good. They were doing all the things I'd asked them to do before. It wasn't working as well. I think this was very frustrating for them.

At one point in this assessment -- I don't know if it was the beginning or the end of the assessment -- Mom was injured. She broke her ankle or ripped a tendon or something, and so she was in a brace, and she was on the couch and -- you know, almost impossible for her to implement the plan and keep up with Bryan because she was hobbling around and had difficulty and was in pain and couldn't move.

But as far as communicating with him and sticking to the schedule and having the right things up in their house, you know, that was okay. Some of it had -- some of it had fallen apart just because there wasn't a skills trainer in the house doing the direct instruction that typically one would do because there wasn't any staff in the house at that point. They didn't have anybody. So there had definitely been some decrease in that part of his programming, the sort of after-school portion. I don't know what they were calling it, extended school year. So he obviously had less practice and less implementation and less generalization, but that was because there wasn't a body to do it.

But as far as Mom's piece making him communicate, use the visual supports and making him sign, making him clean up after he ate, just all the things that would happen in a home, she was carrying those out best of her ability. I observed her in the home. I observed her out in the community. We went to eat at Jack In the Box or Taco Bell or something. I observed him on a recreational outing. We went to the beach. Then we met his father in the community so I could see that as well. Then I also stayed at the house late a couple times so I could see him interact with his dad when his dad came home.

They were having a lot of trouble around sleeping and toileting because Bryan was bigger and stronger. He was -- I wasn't kidding earlier when I said he was throwing his bed. He was literally lifting the whole wooden bed structure and then banging it against the wall. He broke through his door. That was during this assessment. Literally kicked -- I was on the phone with her, actually, when it happened. He kicked through his door, and she started, you know -- I won't say screaming because she wasn't. She was like, oh, my God. I got to call you back. I got to call you back. He was just really very aggressive. And they were out of their league, and they were trying the best they could, and it was going from bad to worse.

Page 109

Yeah, so, you know, they got this girl to help them out, and she was doing what she could.
Q. When Bryan kicked the door down, was he locked in his room?
A. He was in his room.
Q. Was he locked in his room?
A. He probably was. I was on the phone on the other end.
Q. Oh.
A. But I would assume -- he could have chosen to kick it just as simply open the door. But very definitely the door was shut. He may have been in a time-out. He may have been napping. She would tell the truth. I wouldn't know how that story started. I only know my part of it.
Q. Okay. Did you make any home --
A. Yeah, yeah.
Q. You made home visits during this time. How many home visits did you make?
A. I would need my time sheets in front of me but, you know, several. I recall, like I said, the outing, the outing with Mom, the outing where we met Dad, being at the house when she was in a cast and also when she was not in a cast, meeting downstairs with the girl whose name may be Christie -- I don't want to commit to the wrong person if that's the wrong person -- meeting with her both upstairs and downstairs. So, you know, a handful.

Page 110

What I would typically do is go to the school in the morning, observe at the school in the morning, you know, meet with somebody, a DOE person or related service provider, interview them and then maybe go back and observe more in the after-school program. At that time I don't think there was after school going on. It was short staff. So then he would go home, and then I would see him and Christie together and then either stay with them, you know, either them first or Mom second or vice versa. So then I would end up spending a long day there so I could see him three, four environments in one day and interview, you know, people in their different roles in one day.
Q. What was -- the home was two levels?
A. Yeah.
Q. And Bryan occupied which portion of the home?
A. He had almost his own apartment downstairs. He had -- well, here's a really good example of some improvement he made early on. When I first met him, he had this room, and it was very bare. His parents had redone this room for him to accommodate his toileting, so there was tile floor, or might have been linoleum floor, but a floor that you could wash.

And then there was no decorations in the room because Bryan would tear things down and eat them. So you couldn't have typical kid toys or -- I mean, he would put things in

Page 111

his mouth that were too big for his mouth. He would try to swallow the paper towel that he washed his hands with. He could choke and die -- they don't want this to happen -- in his room if he had anything that he could choke and die from in the middle of the night.

There was nothing in the bedroom. He had a mattress, of course, with a pee cover. He would rip through those and try to sleep beneath the pee cover, which he could suffocate because it's hard plastic. They were trying to find something firm enough. They took the mattress away, had a futon, had layers and layers of blankets. He would tear those up, too, put them in his mouth.

So his father had taken -- I don't know if it was panelling or individual pieces of bamboo, but had bambooed the whole inside of the room. So it was attractive, but in no way could Bryan get that material off the wall and eat it. That was it. That was all that was in the room. The room had an attempt to look attractive, the wooden bed base. It was made. I think his father made it. It wasn't a metal base like you probably have under your bed. Over the time I knew him, a variety of kinds of bedding that -- finding something that was firm enough he couldn't eat it. He could rip canvas. Amazing, his strength.

Early in the toileting plan we talked about putting a potty in there, teaching him to urinate into the potty

Page 112

versus on the floor. When I first met him, he would pull his covers down and urinate on the floor. In the end, he was just peeing on himself because that was -- he liked being wet. When I very first met him, he would pull down the cover, pee on the floor. That's how he had ended up redoing the floors to make it tile or whatever it was.

Then we determined from some assessment that he liked the noise the urine made when it hit the floor, so we were gonna put a trash bucket in there and line it with something so it would make the same noise like the noise on the floor, but that was also a problem. You can't put a plastic bag because he'll swallow that and then choke and die. We determined if you line it with tin foil, it would make a great noise, so trying to figure out -- Super Glue it to the inside of the bucket to make it something he couldn't get, but there would still be a receptacle that still made a good noise for him.
Q. When you say the beginning --
A. The first toileting plan. '02, '01, that sort of stuff was in his room, but in the end nothing was in his room. So that was the beginning.

They also had another room downstairs that was to be his room eventually. It was full of his books and his toys, and it looked like a regular kid's room. In the time I knew him, he spent a lot of time in the empty bedroom and

Page 113

then the living room area in between where there were couches, television, his videos, and moving in -- going into the real room, the room that looks like a little boy's room, to do his work. So when he had a one-on-one skills trainer in the house, they would go in that room and sit at the desk and read books and practice some sign and come back out, use the bathroom, then watch a video as a reinforcer, then go back in. But as far as sleeping or any time he was alone or unsupervised, like in the middle of the night, he was in the empty room because you can't have him eat anything and die.

So between the time I first met him when he spent most of his time in the empty room, to the middle when he spent quite a bit of time in the nice room, a typical boy's room, though not sleeping there yet, then in the end when I met him back when he was exclusively with the empty room and the urine everywhere.

Q. What was the condition of the downstairs area at this time?

A. It stunk. You know, he -- Bryan urinates everywhere. The couches smell bad. They left the -- it had a big open door. I don't know if they were -- I don't know what they were. They were louver doors or whatever. It was open so the breeze could get in and out of there. It was cleaned regularly. They cleaned it. And they had tools to clean

Page 114

the couch. He had to clean up if he urinated, but then he's not gonna do an adequate job, so the skills trainer went right behind him and cleaned up. But even with all that, there was very definitely the smell of urine.

And it was pretty empty. Didn't look like your living room. He had his videos, his television, couple couches, a gymnastic mat that is sort of his spot, the place where he would like to be, some icons on the wall, sometimes a visual schedule on the wall, sometimes not, really not much else, a couple biggish toys. Barney and some of his interests were not age appropriate, but, hey, there was interest, so who was I gonna complain? Big rubber ball, that kind of thing.

Q. Was he -- had he --

THE WITNESS: Time.

MR. USHIRODA: Why don't we take a break.

(Whereupon, a recess was taken 12:00 p.m. to 12:13 p.m.)

MR. USHIRODA: Okay. Let's go.

THE WITNESS: Yeah.

MR. USHIRODA: Okay. What was my last question, and what was the answer?

(Whereupon, the record was read back by the reporter as follows:

"Q. What was the condition of the

Page 115

downstairs area at this time?

"A. It stunk.")

Q. (By Mr. Ushiroda) I think we were talking about the home conditions and Bryan's living area. We were -- I think we were also talking about interviews; correct?

A. Prior to that you asked me if I interviewed everybody.

Q. Yes.

A. I'm sure I said yes.

Q. Does Bryan have an older sibling?

A. Bryan has a sibling. I -- I think he's older.

Q. Did you --

A. Interview him? No.

Q. Okay.

A. I interacted with him in passing because I would see him. But he -- it's difficult to have a sibling like Bryan, and so he would avoid being around when Bryan's staff was around, go in his room.

Q. Did you -- did -- what is Bryan's -- is it brother?

A. Yeah, it's his brother.

Q. What's his name?

A. I don't recall.

Q. Okay. Is he older than Bryan?

A. I think -- I don't know. They're -- he's not much older or much younger. I think he's a little bit older.

Q. Did you observe any interaction between the brothers?

Page 116

A. Yeah, in passing. Not much.

Q. What did you see?

A. You know, eating a meal together. Might have been a meal, but not even a meal, because Bryan kind of wolfs things, but eating at the bar at the stools in the kitchen. Pretty limited, actually. He'd come in, interact with his mother, interact with his brother in a quick social way, and then go in his room.

Q. So not much you could observe interaction between the two brothers?

A. Nothing atypical of kids with autism. Bryan doesn't give any response back to him, too. And because of the cognitive differences, the things that were interesting to his brother and the things that were interesting to Bryan are not interesting to his brother and vice versa.

We had talked about sibling support for him because I think that -- I think that he was struggling with his life, you know. But there isn't organized sibling support in this state. Easter Seals had done something here on Oahu around that time, so we kind of loosely talked about what might be available on that island, but I don't think there was anything.

Q. Okay. By the time you -- this is '04.

A. Okay.

Q. When you're preparing the report and you're doing your

Page 117

investigation --
A. Yeah.
Q. -- and your data collection, had Bryan already entered puberty?
A. He was beginning. Puberty's a long process for boys. Men's bodies start changing when they start and really don't stop until their early twenties. He was bigger and stronger. He was meatier. So you could see that he was starting to get a man's body versus when I met him, he had a little boy's body. I think he did have pubic hair. I don't believe -- we were -- I know we talked about masturbation a lot, but I don't think it was -- I think we were preparing for the eventuality. Being that he likes to be wet and he likes soapy fluids, it was very important to have very blunt conversations about where this could go. He definitely, as I said, noticed that one woman in particular.
He still played very much like a child, holding hands, rolling across a ball, that kind of thing. But it was important that his staff recognized that if not currently, then very soon his body would be changing so that they needed to make sure that they were treating him like a young man and not the child they envisioned in his head. We definitely started addressing the issues of puberty at that time. But I would say he was beginning. I mean, he

Page 118

had hair under his arms.
Q. How tall is he?
A. Maybe my height.
Q. Big boy? Tall?
A. He shot up in between when I had seen him last and when I'd seen him that last time, but yeah, he was starting to do that gangly teenager thing. Probably almost my height.
Q. You are --
A. 5'8", 9".
Q. He was about 5'6"?
A. I'm making that up, but sure, somewhere around there. He definitely shot up. He was starting to look like a gangly teenager.
Q. At this point he's about 12 years old, if he was born in '91?
A. Yeah, yeah, 12.
Q. Okay.
A. I was very concerned about puberty. We spent a lot of time on that.
Q. Why were you concerned about it?
A. Well, 'cause I foresaw that if he didn't have good communication skills between now and then, the way he was going and the huge deterioration in his behavior and now he was aggressive that he was gonna hurt somebody. He was

Page 119

gonna hurt somebody, and he was gonna hurt himself. He actually did hurt a couple people, not necessarily with the intent that he might have in the future, but --
Q. So you're referring to that one woman who had her tooth knocked out.
A. Oh, he was head-butting people at this point. He would visually -- visually, your perception, hit you. He hit his dad once. His dad saw stars.
I saw him hit the staff person, the woman who came back to work with him. Christie potentially is her name. And, you know, she didn't see it coming, and she wasn't standing in the right position, and she got head-butted.
These are all things he had never done before. So I was very worried that as he got more bulk and more intent and people already didn't know how to manage him that he was gonna get more aggressive and, you know, really hurt himself or somebody else.
Q. In your position as a behavioral analysis, do you get involved with evaluating an IEP?
A. Evaluating? I've certainly been asked to do that, sure.
Q. In this case, in Bryan's case?
A. In this case I was participating in the IEP, so I had lots and lots of suggestions about what might be goals to be worked on in the future and what might be a better

Page 120

strategy or new strategy to work on the goals that were already there. That's everybody on the team, not just me.
Q. So was it your understanding at the time you got involved in '04, your callback, that you were working on developing an IEP or --
A. I was developing an assessment that led to the IEP. My previous experiences with him, then I would have been part of evaluating the IEP as the Felix Consent Decree or the student study team or a developmental disabilities, you know, looking at the ISP, which is their version, service plan. But in this particular role, I was a member of the IEP team.
Q. I see.
Who were the other members of the IEP team?
A. Oh, God. He had probably 25 people around the table. He had an OOT, occupational therapist, physical therapist, speech therapist, the consultants from the variety of agencies that provided the skills trainers, tons of district people, the district's version of an autism specialist, lots of administrators.
Q. Okay. So your report, which is marked -- which is Exhibit 3, was supposed to help to develop a new IEP for Bryan; correct?
A. That's an assessment on his behaviors and a plan to mediate those behaviors as a component of his individual

Page 121

education plan. It was presented to 25 people. We were all crammed in that little room. We went over it line by line by line. All the admin was there. I don't know if there were any legal people there at that point. I don't think so.

Q. Okay. And what was the reception?

A. Oh, excellent, yeah. People -- I mean, as I said, I think everybody was aware that what needed to happen for Bryan wasn't happening and that he was really falling apart.

Q. Okay. So this was one component of the overall IEP plan?

A. Uh-huh.

Q. Yes?

A. Yes. This is an assessment to lead to the structure of the IEP. So from this assessment the IEP team would then take goals -- as we get into the assessment, you can see there's lists and lists of things to choose from -- then say, hey, you know what? Based on this assessment, we really need to work on communication, so let's make a communication goal.

Q. Was that something for the IEP team to consider, or is this something they had to accept, had to do?

A. It was something the IEP team requested. I suppose had they found the quality less, they could have rejected

Page 122

it, but they didn't. They accepted it and were then gonna go forward there, hopefully implement it.

Q. Now at the time you became involved with this, preparing the report, were you aware of the number of hours of skills trainers services that Bryan was getting?

A. I'm sure at the time I was. I don't know what they were right now. But he'd get two-to-one at school and then additional hours at home, so it was a fairly large number.

Q. I'll represent to you at this time -- this is June '04 -- at the time it was 68 hours per week.

A. That could be.

Q. Okay.

A. I don't know if all those hours were being put in when they were short staffed, but that may very well have been what the IEP said.

Q. Yes. Okay.

Okay. All right. So the reception by the IEP team when you submitted the plan, the assessment and the plan, it was -- they were -- it was very receptive response?

A. There had been an issue just prior that there were some hard feelings over where the folks had asked -- or the IEP team had asked an individual to make a crisis plan, and that individual struggled with that process, and so there had been some acrimony over what is a crisis plan, and what should it say, and what should it look like? And I

Page 123

captured some of that in here.

Q. Yes.

A. So I was able to fix that problem. So there was definitely some discussion and some problem around there not having been a crisis plan, the one having been provided not being specific to Bryan, the things that were on there not working. It was at that time -- it was sort of the tail end of Felix, so everybody's crisis plan ended with the words "call 911." And of course, Bryan isn't somebody you would ever arrest. If he was in medical crisis, you would go call 911.

Q. I saw that was interesting.

A. So they had put that on there. So there was -- I wouldn't say poor reception, but there was an issue that had to be resolved around an individual plan versus a cookie-cutter plan and how you could take information from here and make an individual crisis plan. After that was solved, then we went through it line by line, and my perception was that nobody was opposed to anything I had to say.

Q. And to your knowledge, was this -- was your plan implemented?

A. No. To my knowledge -- I don't know.

Q. Oh, you don't know?

A. There wasn't all that much time from when this meeting

Page 124

happened to when they -- you know what? I didn't come back after this. I never came back after I presented the plan, I don't believe.

Q. Now your report is dated August 18th, '04. When did this meeting take place? I assume after that date?

A. I don't know. I don't know if it's still in my book. Perhaps we could see if there's anything. I don't think I even had this phone back then. Do you know?

Q. No.

A. I could confirm or deny. You know, sometime --

Q. I'm assuming it occurred --

A. Sometime shortly thereafter. I don't know how long thereafter. August. I don't have anything in here at all. I didn't have this phone back then. '04's blank.

Q. Well, I'm assuming --

A. Yeah, I don't know. It would be in ISPED. It would be very easy to look up what the date of this particular meeting was.

Q. Would this meeting have occurred in Honolulu?

A. No, it was in Hilo at the school. Not Hilo. It was in the Big Island at the school.

Q. After this meeting did you have any further contact with Bryan?

A. I don't believe so.

Oh, I came back -- when he got ready to leave? When

Page 125

they were moving to the mainland? I came back to participate in the transition meeting.
Q. Oh.
A. And so I did come back for one final meeting in which we went over his IEP, make sure that all the things that should be on there were on there for the receiving school district when he went to Benicia. I met with his dad a little bit before that meeting. I gave them names of people that I know in California. I gave them -- you know, told them they could give out my number. I'd be happy to talk to the receiving team if they have any questions. That was just before they left.
Q. Okay. So after this meeting --
A. Did I help implement this plan? No.
Immediately after the meeting I met with the teacher, his new -- he had a new, new -- he had a new special ed teacher. So after the meeting I met with her a little bit just to kind of operationalize some of what was said. But I don't -- I think my services ended with this document until they purchased me to come back for the transition.
Q. Okay. And what was the -- again, the purpose of the transition meeting?
A. Well, whenever you move to a new school, whether elementary to middle, middle to high, and in this case, Hawai`i to California, we have a transition meeting, review

Page 126

your plan, update anything that has to be updated so that the receiving school has everything they need to know and can hopefully pick up where you left off and there's not too much lag time in your education. We want to have as seamless transition as possible.
Q. And when you have this transition meeting, who would you meet with?
A. In order for an IEP meeting to be legal, there only has to be four people there: an administrator, the parent, a regular ed teacher, and then, of course, Bryan's case, there could be twenties of people there. The transition meeting itself was relatively small. There was the admin, the speech, Drew, Mom, myself. Might have been another person or two, but I don't recall. I think it was small. It was a small meeting.
Q. Okay. And then --
A. Whereas the meeting for this was huge. Like everybody that had ever worked with him was there, I think.
Q. Okay. Do you recall anything, any issue that was discussed in particular at this transition meeting?
A. Nothing I know. I mean, I went over the plan, made sure it was attached so that the new school would have it. We talked about probably technology, stuff he needed. Nothing salient comes to mind.
Q. Okay. How about any discussion about whether the plan

Page 127

had been implemented since you had presented it to the IEP team the prior year?
A. I don't -- I don't -- I think we were just really focused on the fact he was moving and what -- I don't know. It could have been. You'd have to look at the meeting notes. So you could easily obtain it from ISPED as well.
Q. When you said ISPED, what is that?
A. The data base for the Department of Education. And every time there's a meeting, usually the SSC, student service coordinator, will input the notes for that meeting into the computer.
Q. It's a public record?
A. No. No.
Q. Oh.
A. You can only get it in -- it's public to the DOE. I'm sure you have access to it. Any -- like my report would have been inputted in there. Anything that has to do with the child is held in that database, ISPED, I-S-P-E-D. Don't know what it stands for. I mean, special education database, I would assume, but --
Q. Who knows.
A. Could be something techie.
Q. Okay. Did you go to the Big Island for this transition meeting?
A. Uh-huh. Yeah.

Page 128

Q. Did you get to see Bryan before he left?
A. I don't remember. I think. I think I did. I think I just saw him go out to the car with his father, and then his mother and I went to the meeting, although it might have been the other way -- no, his mother was in the meeting. I didn't work with him. I didn't spend -- I don't think I spent time in the classroom. I think I was there on island seeing another child in another school, another classroom, and then transitioned from there over to his meeting. I may have seen him in passing.
Q. So the last time you really worked with Bryan, so to speak, would have been the previous summer in '04 when you were --
A. When did he move?
Q. No, no. I mean -- let's back up.
The transition meeting was because he was moving?
A. Right.
Q. The family's moving.
A. When did he move? Do you have that date? June '05.
Q. January '05.
A. January '05.
Q. So --
A. So sometime between -- yeah, I don't know.
Q. No, no. What I --
A. I'm trying to determine if I saw him in between this

and this. I don't know if I saw him. I don't -- I don't think so.
Q. Okay. So at least from what you can recall, the last time that you would have worked with Bryan and observed him, interacted with him for the purposes of working --
A. Would have been around the time we had this meeting, whenever that was, which we can assume was probably September-ish.
Q. Of '04?
A. Yeah. Yeah.
Q. Now when you came back for this -- the transition meeting, you had mentioned that you had spoken to the father before the meeting; is that correct?
A. Spoke to someone before the meeting. I'm -- I think the father was there to pick up Bryan, and the mom and I went to the meeting.
Q. Okay.
A. But I could have that backwards.
You know what? I think they were going to pay for me to help them implement the plan. So now I can't remember if I came over -- I don't think I came over. I don't think it happened. We had talked about when they need technical support to carry it out. I would -- I would really have to see the CFS records to know if I came over during that first semester, during the beginning of that school year.

Q. Oh, you're talking about subsequent to the --
A. Subsequent to the report. I have no idea. I'm sorry. You would think I would know that. It seems like if I was at the transition meeting, they must have kept me involved, but I don't -- I don't recall.
Q. Now getting back to the transmission --
A. Transition meeting.
Q. -- transition meeting -- thank you -- previously you had testified, at least what I recall, that before this meeting you had a conversation with the father, but now you're not so sure about that?
A. Well, I'm sure I had conversations with them about, you know, any -- if something came up, they would have asked me my opinion about something. I don't recall any one in particular. Is there something particular you're thinking of?
Q. I'm just trying to find out because I don't know.
A. Yeah.
Q. I mean --
A. I conversed with them on and off the whole time I knew them, whenever something came up, something bad usually.
Q. Now -- okay. Do you have a recollection of going to the transition meeting with Bryan's mother?
A. I remember her being there, absolutely.
Q. Do you recall having any conversations about --

with -- let me back up.
Do you remember having any conversations with Bryan's mother about Bryan at this meeting?
A. About how things were going?
Q. Yes.
A. I don't recall.
Q. Okay. Okay. And after this transition meeting was done, what involvement had you had with Bryan or his family?
A. Once they moved to California?
Q. Yes.
A. His dad called me to tell me he got in all right and then asked me for phone numbers of people I knew there. I'd given them -- maybe he sent an e-mail. I had given them referrals, people I knew who were competent and good and lived and worked in the Bay Area.
Then one of them was staying at a hotel. I don't remember if Bryan and his mom was at a hotel or -- I think they stayed here for a while, and then they went over. But anyway, at some point one of them was there, probably having a meeting with the school, the receiving school, and then the other one -- I think it was dad -- contacted me to ask me some questions, you know. Receiving school wants to know this. You know, explain this to me. Or what do I tell them? Or -- so I did have a couple either e-mails or

phone conversations with them after they initially moved.
I had referred them to a colleague there, and she called me, and I spoke to her a little bit. But in the end she didn't end up serving them. They ended up going to a different school system. They went to a private school -- non-public school. We don't have these here. It's the equivalent of Mehana and HMK. It's a school just for kids with autism. Where if he had been in the Benicia school, whatever it would have been, my colleague might have been able to serve them. I heard from her maybe more than once. That was a really quick transition.
Q. What is her name?
A. Karre Williams.
Q. What's her position or role?
A. She's a behavior analyst in the Bay Area. She was actually a behavior analyst here in Hawai`i for several years, the end of the Felix Consent Decree, the first two years that BCRC was an agency here. She may even know Bryan. She may have met him in passing in doing assessments. But as she worked under me for years -- she was in the masters course I taught at California Berkeley, grew up to be an outstanding behaviorist, and she was somebody I very much trusted with this case. And so I said, when you get there, you know -- and I gave them several names. I mean, not just her. I gave them other

Page 133

really competent people in the Bay Area. Contact these people figure out which one you like and they'll be able to do the same service for you that I've been able to do.
Q. These names you gave her are all behaviorists?
A. Plethora of behaviorists in the Bay Area, plenty of good, competent people.
Q. Besides the name of Karre Williams, what other names did you give to the family?
A. Off the top of my head, the other BCRC people, Iris Peters and Karen Miller. They're all still there. Other than that, I would have given them the name of an agency. Benicia is sort of in between the Berkeley/Bay Area where I worked and then Sacramento, which is the big urban area above. They have another agency that serves that geographic area. So I would have said, you know, there's ABC in Sacramento, and then there's this agency here and this agency here, and here are the people I know from this agency. I gave them -- I gave them referral. I gave them bunch of information to hopefully find teams of people that they can work with there.
Q. You mentioned the people at B --
A. BCRC.
Q. What is that?
A. It's one of the priors for the intensive service contract in Hawai`i. They also have an agency in

Page 134

California. Been in California for 30 years.
Q. What does that stand for?
A. Behavior Counseling and Research Center.
Q. Thank you.
A. They're a non-public agency. They provide behaviors to all public schools in the Bay Area.
Q. Is that kind of like the role that CFS would provide here?
A. It's the role BCRC provides here. The agencies that are contractors of DOE mainly came out of the Felix Consent Decree. So many of them have an emphasis in mental health and counseling, because as you recall -- or certainly Stan does -- Felix was really about mental health, and autism got added in on top. So the agencies that serve the population right now had a learning curve over the last 15 years to move from a counseling model to a more instructive, you know, autism-specific model. So some of them may define themselves as a family agency: The Institute for Family Enrichment. Right? Some of them may define themselves as specifically only for people with autism and not also serve people with mental health needs or AD/HD, attention deficit/hyperactivity disorder. BCRC defines itself as a behavioral agency. For these years they were the only agency that defines themselves as behavioral. There are currently two behavioral agencies in

Page 135

the state, so making headway.
Q. Okay. So just to backtrack a little bit, Kim, at the time of the transition meeting --
A. Yeah.
Q. -- and correct me if I'm wrong -- you didn't have any feedback from the IEP team on how Bryan was doing with the plan?
A. I may have, but I don't recall any.
Q. Okay.
A. I mean, I'm sure I had some contact with somebody. I always did. They were always -- there was always some intermittent contact.
Q. And you had mentioned that once -- let me backtrack.
You had throughout your involvement with Bryan contact with the parents; correct?
A. Yeah.
Q. And would that be through e-mail?
A. Phone, everything. I mean, and then I wasn't on island -- I was intermittently on island. So I might go for a period of a month or several months to see a variety of children, and then I might not have been there for several more months.
Q. I see.
A. In my role at the state department, both CAMHD and DDD, my job was to train up teams; so I had intermittent

Page 136

contact with his teams, family, as a part of my position. Once I left the state department in 2003, then it was only once somebody asked me to come and do something for Bryan.
Q. After you left the state department, if you were to communicate with Bryan's parents on e-mail, would that be through your own personal computer or --
A. Yeah. I -- I never -- I don't have a office. I didn't go to CFS and use their tools or anything.
Q. Okay.
A. Lamination, but not like computer.
Q. Okay.
A. I was asked about that, actually. I don't have any of that stuff. When you're done with a case, you shred everything.
Q. Okay. Do you have your own document retention policy?
A. I don't retain anything.
Q. Okay.
A. I erase everything, and I shred everything. And that's important because I'm a subcontractor from multiple agencies.
Q. Okay. And that's to comply with HIPAA?
A. Yes.
Q. I assume when you're doing data collection and interviews and workup for a report such as you did in this case, you take notes and --

Page 137

A. Yeah.
Q. -- and jot down your thoughts or to --
A. Yes.
Q. -- record observations; correct?
A. Yes.
Q. And are those notes -- do those stay with the CFS, or does that get shredded?
A. I would assume it gets shredded. They have a file with Bryan's name on it, and it will have in it whatever's required for their contractual obligation with the DOE. So --
Q. Nothing more; nothing less?
A. Right.
Q. Okay.
A. The raw data would still be with the DOE.
Q. From which you formulated your --
A. Yeah, I just got copies.
Q. Okay.
A. So the raw data would be wherever they store stuff.
Q. Okay. Let's see. Give me a moment here.
A. Uh-huh.
Q. Good headway.
A. You gonna go over this at some point?
Q. Okay. Let's go over your report, Kim, and then we'll be -- I think we should be done.

Page 138

A. Okay.
Q. The first section is the behavioral assessment section, and it's -- the first two pages is background.
A. Yeah.
Q. And I think that -- that's provided from your -- that's gleaned from your data collection and your interviews and such?
A. And I mean, most of it's from record review as well, how old he is and what meds he's on and interviewing people. It's a little synopsis of who he is. It's a quick picture so if someone were reading this without having met him, they would have a picture before they got into what the issues are.
Q. Now on page 2, if you could -- well, let's take a look at page 1. I'm sorry.
A. Uh-huh.
Q. In the second paragraph, the first line, it talks about how Bryan knows what he wants and has acquired some expressive --
A. Yeah.
Q. -- communication skills. In there you said he actively uses between 20 and 50 signs?
A. Yeah. So that would be me counting literally what I saw him use, because you don't take anybody's word on anything. So I -- I understand from the list that his

Page 139

teacher has provided me and what Drew has provided me and what mom has provided me that he has well over a hundred. At that time during this assessment I was able to count, you know, 20 -- between 20 and 50 signs on any given day, you know, of the observation period. And that might have been a whole day, but different signs, so that you know the breadth of his vocabulary.
Q. And at this point in time were they also using visual supplements?
A. Oh, yes, always.
Q. And that is something you also stressed should be incorporated?
A. Yes.
Q. What are -- you mentioned something earlier in the morning. Is it PECS?
A. Picture Exchange Communication System is a named brand model of teaching specifically young people with autism. There's sort of this window of opportunity to teach somebody who doesn't communicate how to communicate. Everybody communicates. If you can't communicate language, you communicate behavior. If you don't stretch these muscles by a certain time, you're very young, you're not going to. There are very few, you know, sort of Helen Kellers who learn to enunciate late in life. You really need to be able to use your voice young. If you don't, or

Page 140

even if it's not your primary means of communication, you have to have a way to talk to people.
So there's a whole variety of options available to you depending on your cognitive ability. You may have a computer that speakers for you, a picture system that you could point and touch. If you go to McDonald's right now, they have a picture menu; so if you're a non-English speaker or nonverbal people, you can go, I want a hamburger and fries. They're standardly made in restaurants right now.
People who have autism in particular tend to, as a class, not be good at auditory processing.
Q. Why is that?
A. It's a symptom of the disability. There's also, in particular, if -- you could have a central process auditory deficit and not have autism. But most people with autism also have difficulty with auditory processing. They're visual thinkers. They're visual learners.
Q. It's not that such a person would have a hearing impairment. It's just --
A. You know, in the olden days people would get misdiagnosed as having a hearing impairment. It's not that they can't hear, although I suppose anybody could also be hearing impaired.
Q. It's just not their primary --

Page 141

A. It goes in. They don't compute. They hear your volume. They don't necessarily know what you said.

Adults with autism who do not have retardation have written books and explained what this is like for them. They'll focus in on just some of the words in your conversation. Blah, blah, blah, blah, blah, white. Blah, blah, blah, blah, blah, eat. So they'll miss the whole content of what you said because the words they focus in on were not important ones.

So there are some experts in the field who have created some wonderful tools to help people understand and speak, and PECS is one of them, and it's a best practice.

Q. And was that being use? Was that being used with Bryan?

A. No. Yes and no. It had been used with him. He had been instructed into it. The materials were there. In the middle part of the time I knew him, when he had really kind of gone ahead with sign -- and in fact, in here I caution. I said, don't forget to use the visuals, too, because he was so expressive with his hands. But you still need to be able to hand the picture of the catsup bottle to the clerk at Safeway because she's not going to recognize your sign language when you ask, what aisle? Make sure you carry his visuals with him. That kind of thing you'll see in here.

But at the time he was having the most difficulty, it

Page 142

wasn't being used at all. I couldn't find them. I had to go through drawers and find the icons and find the book.

Q. Did you get an explanation as to why they weren't being used?

A. I got some excuses. I got some, hey.

Q. Well, I'm interested to hear what you --

A. Yeah, no, I got either, it's not my job, not my problem. Oh, oh, I don't know. No one told me. I don't know where they are.

And to their defense, they really weren't on the wall where they should have been. So maybe some kid pulled them down or the teacher put them away at the end of the school year where there was a change of staff or somebody moved something. But I literally went through that room and found one icon in the bottom of this drawer, one icon under the bench, you know, and pulled these materials together. Said, here, use these until we find the rest.

Q. How long had this situation been -- how long had this situation existed before you got there?

A. That I don't know. I mean, according to the family, quite some time. And they were very frantic, and that's why they were insisting that I come back.

I do know there was a lag time when they thought I was coming back until I actually got there where everyone had heard that I had been procured but me. So some time, quite

Page 143

some time.

Q. But you don't --

A. Personally, I don't have a date.

Q. It's just based on what the parents had told you?

A. No, the skills trainers, too. I don't know. I just got told to come here. I don't know what I'm supposed to be doing.

Q. Do you recall which skills trainers told you that?

A. Lots of them.

Q. I'd like some names if you do have some.

A. The chesty woman, the -- Sven definitely didn't know what he was doing, another male staff person in that time frame.

As I said, there was an older woman who had more skills herself. Like she came with a better skill set, but she also said that no one had given her any particular instruction or any particular training. She was doing what she knew to do. I think she was an EA in another school room during the school year.

I got some kind of unilateral information that they needed some instruction.

Q. Who was supposed to provide that instruction?

A. The ISE, the autism consultant from the district, and the teacher. There was no teacher at that point. The teacher I had spoken to at the end of the school year

Page 144

probably needed some help himself. He did -- he did fun things like sing songs and play games, but as far as having systematic instruction with materials around the room, they did not appear to be present just based on my observations and questions I asked him and the materials he produced.

Q. Do you recall his name?

A. No, I'm sorry. But that would also be easy to figure out.

Q. Who was the autism consultant?

A. I think -- Drew, Drew Copeland at that point.

Q. Did you talk to her?

A. I talked to Drew extensively. She told me the things she had asked them to do. She told me the things she asked of the DOE. She explained her own frustration with materials going missing, nobody having board making, the program to print it out, not being able to get to the laminator, nobody's going to pay for Velcro, foolish stuff.

But she herself was also very frustrated with the way things were standing. I said to her, this is your job. I have your job. I've sat in your shoes before. We need to find a way to get this done. She would agree with me. Yes, I agree with you. Help me.

Q. And at that time was Drew an employee of the DOE?

A. I don't know. I don't -- I think she was ISE, in which case she would have been an employee of the provider

agency the DOE was paying to do this job, if I have it right. Barbara Coffman would have been her cohort; right. Would have been the two of them responsible for making this happen. I think she was the DOE employee at the time.
Q. Did you speak with Barbara?
A. Yeah, spoke with Barbara.
Q. What did Barbara have to say?
A. People -- I don't remember particularly what she said, but everybody gave me the same impression that, yeah, it's bad.
Q. But what were they doing about it?
A. Yeah, yeah, not a lot.
Q. Well, what did Barbara say about what the DOE --
A. As I recall, Barbara was struggling with the system as it works or doesn't.
Q. Okay.
A. She was on working rapport with the family. She felt she had a good rapport with the family. I think she had worked in another capacity with them before. But, you know, she's an employee, and she can only work within the constraints of what's available to her.
Q. Okay.
A. I think every -- I won't say everybody. I think a lot of people just put it back on the skills strainers. There's a lot of passing of the buck. Well, HBH needs to

train their people. Or I told them what to do; they're just not doing it. I would say, well, then stand there in the room and show them how to do it. Then I also stood there in the room and showed them how to do it, and it didn't get done. It was --
Q. Well, whose responsibility was it to make sure that the skills trainers were doing what they were supposed to be doing?
A. Well, the ultimate responsibility is the teachers. The DOE pays other people to be responsible as well, such as Drew and such as Barbara.
Q. Okay.
A. And then of course HBH, the agency at the time -- and I don't mean to -- I'm pretty sure it was HBH providing all the people at that time, but it also could have been TIFFE and CFS staff. Those three agencies are responsible for training their people and meeting this contractual obligation. The DOE's paying for a service. They need to be provided that service. So lots of chiefs.
Q. Okay. So lot of agencies involved?
A. Yeah. It was tough. Coordination was definitely a problem.
Q. Okay. Now going back to the first page, that middle paragraph where you talked -- you said he used between 20 and 50 signs --

A. Uh-huh.
Q. -- did he use these functionally? I mean, to engage --
A. He would -- he would -- you would have to initiate. He could sign toilet. Of course, that's his favorite thing to do. It's not just like you and I would say, excuse me, may -- I need to use the bathroom. He would ask for the bathroom. He could ask for a drink of water. He could ask for a variety of foods. If he had a need, he had one or two signs he could string together to get that need met. Eat cracker. Want out. But then if you engaged him, you could get a lot more out of him.
Q. So he didn't sign -- well, did he sign spontaneously?
A. Yes. That's what I just said. He could turn to you and say --
Q. I want this?
A. -- want eat. But for the most part, for anything above and beyond meeting an immediate need, you're gonna start the conversation.
Q. And this was supposed to be coupled with the visual supports, the PECS?
A. Absolutely. Both should have been pervasive in his environment.
Q. Okay. Kind of go hand in hand?
A. I would say his receptive skills were both pictures

and sign, and his expressive skills, he chose to use sign more frequently. And if that's what works for him and that's what he wants to use, then that's what we have to go with. We can use that system once he's proficient to turn around and teach him another one. Now he's learned a sign. We can teach him to use visuals or read. This is a word. This word means that sign. But you have to be fluent in a language before you can learn a second one. But Bryan's mind-set and what he found to be easiest and most efficient was sign language, so that had to be his first language.
Q. How did you come to that conclusion?
A. Over the time I've known him and all the assessments I did and the tremendous and speedy progress he made in picking up sign language.
Q. So it's based on your observation?
A. Absolutely.
Q. Okay.
A. Not just mine. His speech therapist will tell you the same thing.
Q. Who was his speech therapist at this time?
A. I don't know. You're gonna have to look it up on the IEP. It was on the IEPs over those various meetings.
Q. Okay. That could easily be discerned from the records?
A. Yeah, it would be the last page of the IEP. It would

Page 149

be there.
Q. Okay. Now based on your last contact with Bryan, do you think he has the capability to become fluent in sign language?
MR. USHIRODA: Oh.
THE WITNESS: He can't hear you.
MR. LEVIN: I didn't hear.
THE WITNESS: Didn't hear.
MR. USHIRODA: Oh, okay. He didn't hear. I apologize. I'll speak up.
Q. (By Mr. Ushiroda) Based on your last contact with Bryan, which was, I guess --
A. Summer.
Q. -- summer of '04, and based on all your observations of him, do you think Bryan has the ability or -- to become fluent in sign language?
A. Again, fluent means something specific in sign language acquisition. Do I think he's gonna go to Gallaudet, school for the blind, deaf? No. Do I think he's gonna go to, you know, deaf pizza night at the local bar? Of course he could. He already has enough language -- or had, I should say, enough language to express himself, and he could absolutely have expanded that had he continued to be in an environment with people who used sign language proficiently or fluently, preferably

Page 150

fluently.
He's only -- I mean, he's got some serious cognitive disabilities. He's only going it learn to the degree of the people around him. So most, many skills trainers of -- I taught at HBH here in Oahu sign language as one of my trainings, so everybody in that room, all 80 of those people, could walk out with thirty signs they didn't used to have. Everybody in special ed picks up ten basic signs. In, out, eat. Bryan's vocabulary far exceeds that. In order for him to learn more, he needs to be around people who know more. That's why I recommended Karre Williams. She's fluent.
Q. Say he was placed in such an environment, structure, or plan, whatever you call it.
A. Yeah.
Q. What would you expect?
A. I would expect him to --
THE WITNESS: It's not on.
MR. LEVIN: Objection.
THE WITNESS: Objection.
MR. LEVIN: Calls for speculation.
THE WITNESS: Calls for speculation.
MR. USHIRODA: Okay.
Q. (By Mr. Ushiroda) One of the things I forgot to mention at the beginning was that objections may be made to

Page 151

my questions. If that's happens, then let the objection be made, and you can go ahead and answer the question.
A. Okay. So I would think that Bryan hopefully has not -- I mean, I haven't seen him in a long time.
Q. No, I understand.
A. But I would hope he could pick back up some of the vocabulary he lost. He learned it once. I would hope he could remember or get back in the habit of using the vocabulary he had, and I would hope that he could learn more.
Q. Okay. Are you -- you're not saying that because of the -- what happened in '04 that he's -- he can't learn or get to the level he was before or progress beyond that, are you?
A. I don't know. I mean, I haven't seen him.
Q. Okay.
A. The difference between when he was doing well and when I wrote this report was pretty huge.
Q. Understood. But my question was, it's not your opinion, is it, that he's suffered -- that he's incapable of --
A. It's not my opinion that anybody's incapable of learning. I can't -- I can't assume what -- you know, where he's at now or what the damage is or, you know, how long it will take for him to learn anything else. I don't

Page 152

know any of those things.
Q. Or if there was any damage?
A. Oh, there's definitely damage.
Q. Okay.
A. Yeah.
Q. And what was the damage caused by?
A. Lack of programming. You know --
Q. The implementation?
A. Lack of implementation, lack of communication.
Q. But what I'm trying to get at here is whether you have an opinion that that is something that is permanent, that can be made up?
A. I think he missed some valuable time. There is this notion in autism of a window of opportunity, and he was already old when I met him, and he made great gains. So I think it's really unfortunate that those were then lost and that he learned some horrible things that you never want him to learn, you know, to be aggressive and self-injurious to get his own way. And I think those things are likely to have lifelong implication.
Q. Are they irretrievably lost?
A. I hope not, but I have no way of knowing without seeing.
Q. Okay.
A. He is the population -- the way I saw him last, that's

Page 153

the population of adults I serve. When you get a behavior in your life as an adult, you have some significant challenges. And to think that this might be his future is very, very disheartening.
Q. You only know what you know based on your last contact; is that fair to say?
A. Yeah.
Q. Okay.
(Discussion off the record.)
Q. (By Mr. Ushiroda) Okay. Now Kim, on page 2 --
A. Okay.
Q. -- the bottom, this paragraph just above the heading Behavior Description, it says, Bryan -- and I'm just quoting: Bryan was referred for an FBA to do -- due to his pervasive challenging behaviors and with specific regard to his recent increase in intensity and frequency of behaviors that may be dangerous to himself and others; correct?
A. Similar statement that you'll find in all FBAs. Why am I doing this? Because so-and-so asked me to do such-and-such.
Q. This is the why?
A. This is the why. This is the why I'm doing the report. The why of each individual behavior involves volumes.
Q. Correct. And that's what I was going to ask.

Page 154

A. Okay.
Q. And then it goes on to -- that same paragraph goes on to discuss that the assessment will address his behavior excesses.
A. Uh-huh.
Q. Correct?
A. And skill deficits.
Q. And then those excesses include tantrum; right?
A. Tantrum, yeah.
Q. Aggression?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And self-stimulatory behavior?
A. Yes.
Q. And behavioral deficits such as communication?
A. Toileting.
Q. Communication?
A. Communication, yes.
Q. Toileting?
A. Yes.
Q. Daily living skills?
A. Yes.
Q. And access to his curriculum?
A. Yes.

Page 155

I have to comment. So when I turned this in, CSF turned in the non-proofread version versus the proofread version, so you'll see quite a few typos in here. It was very embarrassing at the IEP, and I apologized profusely, and everyone forgave me. Now I'm looking at it again, and there's quite a few typos in here, and I apologize.
Q. You don't have to apologize to me about this.
A. Well, that's --
Q. Okay. And then the assessment goes on to break down each --
A. Uh-huh.
Q. -- each --
A. Behavior.
Q. -- behavior and the observation and --
A. Right.
Q. And what else?
A. So --
Q. Let's --
A. What are the areas of concern? And those are the ones they asked me to check on. Obviously if I see something they haven't mentioned, I'm going to address that as well. But those are the things that I was asked to look at. You have an operational definition of each one, so someone who never saw Bryan would know exactly what we're talking about. Tantrum means a lots of things to a lot of people,

Page 156

so you want to have a good description.
Then you'll see in each little section your baseline. So he does this so many times over this period of time or with this much intensity, depending on what we're looking at. Then there will be a list of all the antecedents that were either reported or observed just the preceding behavior. We also look at every behavior and how communication may play into this, how medical or physiological issues may play into this, and how the actual education, education instruction, implementation of instruction, or the physical plan, the way the room is set up, you know, anything that's going to influence or is influencing the behavior. We look at these little areas.
Q. I see.
A. So the next area is the antecedents, the things which are -- which were seen to precede tantrum behavior.
Q. I see. Okay.
And then following the antecedent is?
A. When he's most likely and least likely to tantrum, because you also want to look at the good times.
Q. Sure.
A. Figure out what they're doing right so that other people can copy that. What are the environmental factors? Is there a time or place where he never has a problem? Unfortunately, that's not the case with Bryan.

Page 157

Any medical or physiological problems? And Bryan gets hurt a lot, has bruises a lot. So one can assume bumps, bruises. He has ear infections, eye infections a lot. Any one of those things can influence somebody's behavior. His allergies, his changing, his growing.

Next is the analysis of the teaching situation, so what I saw people do or not do in their attempt to provide instruction, on page 4.

Q. This is regarding the tantrums?
A. The what?
Q. The tantrums?
A. Right. These are all things I saw staff do specifically with regard to tantrum. You'll see the same list often with the very same information. With self-injury, aggression, the other targeted areas, often with the same information.
Q. Okay.
A. Okay.
Q. And then --
A. Analysis of his communication skills. So --
Q. Okay. Then page 5 would be the -- there's a potential functioning --
A. Right.
Q. -- slash -- what is that?
A. The previous section was all the things that lead up

Page 158

to the behavior.
Q. Correct.
A. Now this section is the things that follow tantruming. So based on the data collected, it looks like the purpose, the function of tantruming is for these -- this list: to escape from non-preferred activity, non-preferred instruction, escape from a student or staff, wanting desired item, particularly water or carbs. This is all the things that it looks like he's trying -- that's the purpose of tantruming.

So one behavior can serve many functions, or you can have many behaviors. This is how I say I want to eat. I bang my head. This is how I say I want to leave. I run out the door. You can have a lot of different behaviors that serve your communication or one response that serves everything, tantruming. It's important to parcel that out.

So the next section is currently the consequences of tantruming, the thing that happens after tantruming. He gets what he wants. He gets the thing he wants sometimes. He gets attention sometimes. He experiences the feedback he senses as pleasurable even though it wasn't intended that way. So it works for him. He keeps doing it.
Q. You repeat that for --
A. Each of the behaviors.
Q. The next was is self-stimulatory behaviors?

Page 159

A. The next one is property destruction, but property destruction only results in the context of a tantrum. So I didn't have to redo the whole thing. If you fix tantruming, you fix property destruction. I repeat the process with self-stimulatory behavior.
Q. And for the --
A. Waiting for her.
Q. -- the self-stimulatory behaviors, you have a heading, Alternative Behaviors?
A. No, there's another one yet. Noncompliance is on page 7.
Q. Oh.
A. And then -- then -- now we turn to a new section called Alternative Behaviors. And here are just a litany of things that Bryan doesn't know that we could teach him that would help these problems we've just discussed. Often an IEP team will pull from this list and write goals and say, oh, you're right. He totally needs to learn how to make choices. We're going to write a goal around turn-taking or choice-making or cooperating.
Q. And how to implement this would be in the plan section?
A. Well, there's more, but yes.
Q. Okay. Yeah. Then now we have the -- then starting on --

Page 160

A. Skill def --
Q. -- page 9 you have the Skill Deficits. That's broken down into communication, activities of living skills --
A. Daily living.
Q. -- recreation and leisure?
A. Leisure. Those are the three broad areas. Other people might have other deficits, but those are big umbrella areas that captured most of what was of concern to Bryan. You should see them in almost all assessments.
Q. Okay.
A. Then the last piece is prior interventions. You definitely -- from interviewing people and record review, you want to know what's been tried before so you don't reinvent the wheel. If something wasn't working before, you don't recommend it. You also get more information about what he may already know so you can plan creatively.
Q. I see. So this is kind of like a road map.
A. Road map. Okay.
Q. I mean, I don't know.
A. Yeah, this is a standardized assessment. These components will be found in all good FBAs.
Q. Somebody -- like they pick up this report, and they can say, okay, this is what --
A. This is the story.
Q. Yeah, this is the story. Okay. Oh, yes, definitely

Page 161

on this list of behaviors, oh, yeah, we need to work on that?
A. Yeah.
Q. That's what I meant.
A. Yeah, I hope it's as comprehensive as I can make it so that anybody could pick this up and know what I'm talking about and know what to do about it.
There's one more section, just summary.
Q. Okay.
A. Just like there's introduction, there's a summary.
Q. Sure. Okay.
And the summary is just the synthesis of your observations and your analysis of all the data you've collected?
A. Well, no, there's an analysis during each section. It's a summary. You know, some of the information you get is in bulleted format. And so this is -- so this sort of sums all that up. You know, Bryan's school materials have lost their appeal. They need to be updated, more functional, and more engaging. You're not gonna see that in the areas described before. It's just going to say, work level too low. So this clarifies that a little bit.
Q. Crystallizes it, so to speak?
A. Yeah.
THE WITNESS: You've got to -- I can't -- it's not on.

Page 162

MR. LEVIN: Where is that quote?
THE WITNESS: Where is that quote? Page 13. The summary starts on page 12, but page 13 gives just a little bit -- a little bit more text to the list that people -- someone would have previously read.
So he knows this material. He doesn't care about it any more. It's important that I said his skill level is noticeably less because if you met Bryan for the first time now, you would think he has way less skills than he's capable of. So you need to know last fall he could do X, Y, and Z. His program has clearly lost integrity and consistency.
Q. (By Mr. Ushiroda) Okay. Let's talk about that. His school materials have lost their appeal. Is this the -- those books and -- and things that he was playing --
A. Well, again, there was almost nothing. They were doing nothing with him.
Q. Okay.
A. Materials that were in there were things that he had already mastered, things I, which shouldn't have been, pulled out of the files and gave to staff.
MR. USHIRODA: I guess this is a good time for a break.
(Whereupon, a recess was taken from 1:16 p.m. to 1:22 p.m.)

Page 163

Q. (By Mr. Ushiroda) All right. Kim, we're in the end stretch.
A. I'm in.
Q. Just before we start, may I ask what you were discussing with Mr. Levin?
A. Yeah, he was saying now do I see why he never talked to me prior to this meeting so that you would clearly understand that I hadn't been prepped. And I said to him, well, yeah, I assumed it was something like that, but it was still very unnerving coming in here this morning with no knowledge of what was expected of me or what the case even was other than my report. I don't know the other details. I still don't. We're just talking about me.
Q. Well, yeah, I mean, I'm basically just here to ask you about your report.
A. Like you've mentioned Bryna. I'm thinking, what did she do? I don't know.
Q. Now I apologize. Where were we.
A. I was reading the summary.
Q. Oh.
A. I wrote a quote, and then you said, okay, let's talk about this.
Q. Okay. Oh, yes. We were talking about the -- your comment that Bryan's school materials have lost their appeal; correct?

Page 164

A. Correct. The last two paragraphs of the summary here gives text, is what I said, but gives more meat to somebody reading this about what the issues are. You know --
Q. Sure.
A. -- I can read it to you if you like, or if there's something in particular -- the last paragraph expresses my concerns.
Q. Okay. The paragraph just above that, I think the last sentence, and perhaps most importantly, he needs intervention in the quality of his life to pair him with a peer group of age mates with more --
A. With more.
Q. -- sophisticated social and communication skills.
A. At that point of his assessment, Bryan was locked in a room with two staff who were maybe not intentionally, but for the most part ignoring him as he self-stimulated on the floor with materials and/or laying in urine. It was horrible. And the nicest way I could put that is, gosh, he really needs to be with other kids.
Q. Okay. And that's what you said about having interaction with other 12-year-old, I guess -- I don't know how to put it.
A. Typically developing peers.
Q. Typically developing peers?
A. He wasn't even interacting with his atypically

Page 165

developing peers. There were two boys that had been in his class forever. They were twins. He wasn't even interacting with them. He was completely segregated on his own. I think the parties responsible maybe thought they were doing it for safety reasons.

I understand through the rumor mill that perhaps some other parents may have complained. I don't know that to be true. That's just what I heard. Obviously that one staff person had gotten hurt. Even though it was an accident, she did lose a tooth. That's a pretty big deal. But to segregate him is exact wrong approach. He has no one to interact with, lower level of engagement. They were doing the exact wrong thing. His behavior isn't going to get better in a room by himself.

Q. Did you talk about --

A. Absolutely. I talked to everybody.

Q. Let me finish the question.

Did you talk to people in charge of implementing the plan --

A. Yes.

Q. -- about what the thought was in having this situation?

A. Yes.

Q. And what was said?

A. Well, that's what I said. I heard that another parent

Page 166

complained. I heard that they were concerned about safety. I heard that they were concerned about hygiene and urine. I don't know that that's what, you know, the head of special ed or the district said to these people, but that is what I heard.

Q. And who did you hear that from?

A. From the autism specialist, so that would have been Barbara Coffman at the time, I believe. We'd have to go check. Certainly Drew, the SCC down the hall. I'd go to the room. I'd hear something. Then I'd go marching back down the hall. From the provider agencies themselves. There were a lot of people involved.

Q. Who's the SSC down the hall?

A. I don't have her name, but you must have it somewhere.

I mean, SSC is really some ways a clerk. I don't want to devalue her job, but she makes phone calls, pulls people together, manages paper. She's not a clinical person. But she would pass that information up.

Q. Okay. So basically what you're saying here with respect to having typical developing peers, having exposure to them, is that he'd be provided with an opportunity to model?

A. And to be engaged, because typically developing kids are gonna drag him by the hand and drag him around the bases or make him play a game 'cause it's important to

Page 167

them. It also, in the long run, would have helped his relationship with his brother. And I had seen him with typically developing peers prior, and he had done fine. In fact, that was some of his best performance. So it was -- it's a huge loss for his program.

Now there aren't typically developing peers in the end of summer. I mean, some schools have summer school for typically developing kids, but people like Bryan go to school every day. So there are certainly times when regular kids would not have been available, but there were also times when they would have been.

Q. Are there times when such children would have been around for Bryan?

A. When he was doing well, they were around for him. I saw that.

Q. How about in '04?

A. In '04 my understanding is he was completely segregated. And whenever I saw, he was completely segregated or having limited interaction with the other kids in his class, and they were in another room. They were all supposed to be in a room together, and they chose to put Bryan in his own room. So once or twice while I was there doing observations, like he and his staff would walk up to the picnic table, and they would be sitting at another picnic table. So there was some availability for

Page 168

crossover, but there was no group instruction, group recreation. Bryan was really doing very poorly at this point. I think people were either afraid of him or angry at him or, you know, not clear what would happen.

Q. When you say people were angry at him, what is your basis for saying that?

A. Their own, their choices.

Q. And when you say who -- I mean, these people, who are you referring to?

A. The skills trainers, the EAs, the other students. I mean, nobody wants to get hit; right?

Q. Did you perceive anger on their part?

A. I didn't -- I don't -- I -- what I would define as panic. Certainly if you were from the outside and you were listening, you'd say, hey, that's an angry tone. She's yelling at him. You shouldn't yell at him. My interpretation was frustrated. They were frustrated, didn't know what to do. They were frustrated with themselves that they couldn't make this problem better.

Q. The last paragraph is -- has kind of a summation of your concerns.

A. Yeah, he was heading the wrong direction fast, and I wanted to make sure everybody understood that. There was a timeliness here. We needed to nip these things very quickly before they became a lifelong habit.

Page 169

Q. Okay. When you say nipped quickly before it becomes a lifelong habit, you mean like a permanent --
A. Yeah.
Q. -- set of behaviors?
A. Oh, yeah. Once you -- I mean, think of what his behaviors were. Head-butting; right. You head-butt a stranger on a bus? You head-butt somebody at Wal-Mart? Bad thing. These were the kids I serve -- the adults I serve. I know what their life looks like. Bryan wasn't doing any of these things at this point, but now that we have an opportunity to, I hope we could un-teach or re-teach.
Q. At the time you wrote this report, this last paragraph, did you believe that there was an opportunity to nip this in the bud?
A. I was worried that it was too late, but I was hopeful.
Q. Okay.
A. Once you learn to use aggression, you tend to keep using it.
Q. Okay. And that's based on your --
A. Twenty years of experience and fifty years of literature.
Q. So is it your opinion that as of this time that although you had hoped that it could be nipped in the bud that there was no real --

Page 170

A. I have no idea what Bryan's doing now.
Q. But at the time, what was your opinion?
A. At the time, I was pretty desperate.
THE WITNESS: I think he wants to state an objection.
MR. LEVIN: Objection.
THE WITNESS: Objection.
MR. LEVIN: Asked and answered.
THE WITNESS: Asked and answered.
Q. (By Mr. Ushiroda) You can go ahead.
MR. USHIRODA: What was the question?
THE WITNESS: What was my opinion at the time.
MR. USHIRODA: Yes.
THE WITNESS: I was afraid it was already too late. I wanted to lay it out very clearly that this needed to be done right and immediately, and the consequences, the stakes were pretty high. And yeah, I'm always hopeful. I'm an educator. I hope people can learn new things. But, I mean, you can tell just by the tone of my writing I was worried.
Q. (By Mr. Ushiroda) I can tell you're worried.
A. Yeah.
Q. That's evident.
A. Based on my experience, based on the adults I work with -- the whole time I was in California, I was the person that if no one else would work with you, you ended

Page 171

up with me. That lawsuit I mentioned earlier was a very, very tough kid. So based on my experience working with people with lifelong severe challenging behaviors, I could see that that's where Bryan was gonna go if we didn't fix it right quick. So I was hopeful that this would help.
Q. Okay. Did you think at this time that it was more probable than not that the die was already cast?
A. It's likely Bryan -- Bryan is likely to increase the frequency --
MR. LEVIN: Objection.
THE WITNESS: Okay. Objection. Asked and answered, I think he's going to say. Asked and answered.
MR. LEVIN: Asked and answered.
MR. USHIRODA: What is the objection.
THE REPORTER: "Asked and answered."
THE WITNESS: You asked it, and I answered it.
Q. (By Mr. Ushiroda) Okay. Please --
A. I have written here, you know, Bryan is likely to increase the frequency, intensity of his aggressive behavior intermittently to test staff and family boundaries and the consistency of expectations. Now that he knows it works, it is harder to un-teach or re-teach. It is important that the components of the previous plan that were successful be reapplied and that the program materials, reinforcement, et cetera, be constantly

Page 172

reevaluated for fidelity, efficiency, and effectiveness.
Q. At this point did you have a belief that if the plan was followed that these behaviors could be nipped in the bud and corrected?
MR. LEVIN: Objection.
THE WITNESS: Objection.
MR. LEVIN: Calls --
THE WITNESS: Calls --
MR. LEVIN: -- for speculation.
THE WITNESS: Calls for speculation.
Q. (By Mr. Ushiroda) Go ahead.
A. Well, I mean, I hope I didn't write it for nothing.
Q. Well, I'm asking for your belief at the time. I mean, obviously it's a plan to correct what you saw as behaviors that had been deteriorating. I assume the purpose of this plan --
A. The purpose of this plan is to give them something to do to hopefully undo the wrongdoing.
Q. Correct.
A. I know that Bryan was capable of learning 'cause I saw him learn. I do not know what happened from here.
Q. I understand that, but that was not my question. My question was whether at the time you had a belief that if this plan was followed that this would be nipped in the bud, so to speak, and he could be put back on track?

Page 173

MR. LEVIN: Objection. Asked and answered.
THE WITNESS: Objection. Asked and answered. I think -- asked and answered.
I actually did say this earlier. I don't know if you're referring back to then. I felt that if we reapplied the things that worked before, we could get a handle on some of the things that had happened before. But there were also these new more dangerous things that I was worried about that could very easily be lifelong.
Q. (By Mr. Ushiroda) The new and dangerous things, the aggression?
A. Head-butting, biting self, bigger property destruction, using his body in an aggressive way to get his way, which he didn't do before.
I think that if we had suddenly hired all signing staff, he would have picked up some of his old vocabulary. I did not know what would happen with the aggression and the self-injury. As I said, once you learn that, it's pretty hard to un-teach it.
Q. Do you think that that would not be curbed, could not be curbed at this point?
THE WITNESS: It's not on. Stan, it's not on.
MR. LEVIN: Objection.
THE WITNESS: Objection.
MR. LEVIN: Asked and answered.

Page 174

THE WITNESS: Asked and answered.
And I continue; right?
MR. USHIRODA: Yes.
THE WITNESS: Curbed? I think we could effect change. I mean, I work with people who are 60 with the hopes of effecting change. But the reason I work with people that are 60 is because when they were 15 and 20 and 25, they learned some horrible behaviors that they're still trying to use. I always lope that I can affect change. Eliminate? Maybe not. That these things are gonna not impact the quality of his life? Oh, my God, once you learn to be aggressive, your quality of life goes straight downhill.
Prior to this, you know -- there's a whole level system of residential services in California. Prior to being an aggressive person, he could have been served at a much lower level, had, you mow, more fun things to do, more freedom, better places to be. Once you become aggressive, you move up the, you know -- level 1, level 2, level 3, level 4; and then they go into the alphabet at that point, A, B, C, D, E, F, G, H. Then you move into institutionalization.
So yeah, learning these behaviors may have dramatically changed his future.
Q. Okay. And do you have an opinion as to what -- why

Page 175

these new aggressive behaviors developed --
A. Several.
Q. -- at the time?
A. They're in here.
MR. LEVIN: What was end of that question?
THE WITNESS: What was the end of that question?
MR. LEVIN: Read the question again.
THE WITNESS: Read the question. Read the question again, please.
Read the question again, please.
MR. USHIRODA: Could you, please?
(Whereupon, the record was read back by the reporter as follows:
"Q. And do you have an opinion as to what -- why these new aggressive behaviors developed --
"A. Several
Q. -- at the time?
"A. They're in here.")
MR. LEVIN: Objection. Asked and answered.
THE WITNESS: Objection. Asked and answered.
I have an assessment why his new behaviors developed. It's very clearly my professional opinion, but it's based on an extensive assessment: lack of engagement and lack of implementation, lack of communication. I mean, all those

Page 176

things that I detailed in here are exactly why his skills deteriorated and his behaviors increased.
When your behavior increases, if the people working with you are not skilled, then they accidentally reinforce those behaviors or don't have the skill to teach a replacement behavior. Then it snowballs. Your behaviors get worse and worse because they work for you. That's exactly what happened with Bryan. He tried some new things, they worked, and he tried more. They were exactly the things we didn't want him to learn to do.
Q. (By Mr. Ushiroda) How much of this increased new levels of aggression would you attribute to Bryan undergoing puberty?
MR. LEVIN: Objection.
THE WITNESS: Objection.
MR. LEVIN: Calls --
THE WITNESS: Calls for speculation, is what I think we're doing.
MR. LEVIN: Calls for --
THE WITNESS: Something's wrong with the someone. Speculation.
I'm not a medical doctor, but no. I do think that puberty was gonna exasperate them because if a 50-pound person head-butts you and a hundred-fifty-pound person head-butts you, that's a very different experience. But he

Page 177

learned these behaviors through bad implementation. And yes, puberty will make them worse.
Q. (By Mr. Ushiroda) And when these aggressions, these new aggressive behaviors had been detected, was this, in your opinion, due to any inability on Bryan's part to communicate, to express himself?
MR. LEVIN: Objection.
THE WITNESS: Each one of -- objection.
MR. LEVIN: Asked and answered.
THE WITNESS: Asked and answered:
Okay. Yes, that's mentioned in here. If you look under each behavior, it addresses his communication deficits --
MR. USHIRODA: Okay.
THE WITNESS: -- as well as analysis of the teaching situation. So I've listed the things teachers did wrong. By teacher, I mean anybody providing instruction to him, including the home staff, his folks, the thing, as well as his communication deficits.
MR. USHIRODA: Okay.
THE WITNESS: But keep in mind he had learned to communicate better and then lost it, so that exacerbates the situation even more.
Q. (By Mr. Ushiroda) Did the parents have difficulty coping with Bryan's behavior?

Page 178

A. Oh, God, yes.
Q. Okay.
A. They were -- they were heartbroken. You know, they'd seen good work fade away. They'd seen their son make gains and then lose them. It's a horrible position to be in.
Q. What role do you see the parent -- well, what is the parents' role in all this?
A. The --
THE WITNESS: It's not on.
MR. LEVIN: Objection.
THE WITNESS: Objection.
MR. LEVIN: Vague and ambiguous.
THE WITNESS: Vague. Vague and ambiguous. Vague. You're vague and ambiguous.
MR. USHIRODA: Okay. I'm vague and ambiguous or the question?
THE WITNESS: The question. Sorry. Do I answer?
MR. USHIRODA: You can go ahead.
THE WITNESS: Parents have a huge role. And unlike many families I meet, these people were doing their part.
Q. (By Mr. Ushiroda) What were they doing?
A. They were very, very involved. They were -- they changed the whole structure of their home. They had changed the whole structure of their home life-style. They had strangers in their home, you know. At this point they

Page 179

were trying for 24/7. They were tying to get somebody who would be awake at night and run into the bathroom because we were still -- we could handle toileting during the day, but then at night we were making no gains. So they were very, very involved. They were nurturing parents.
I mean, they had the refrigerator in their bedroom locked. They had the water shut off to the bottom half of their house. They did -- if their son wanted a soda, he needed the key to the bedroom and then the key to the refrigerator to get in there. They went above and beyond to try to keep their son at home in their family. I work with lots of families that kind of opt out and feel like it's all the DOE's job. That is not this case.
Q. Okay. Now in Hawai`i were there residential care facilities for children such as Bryan?
A. There are no residential options available in the State of Hawai`i for people under 18. Developmental Disabilities operates 18 and up limited residential options. Child and Adolescent Mental Health Division has a whole system for people with mental illnesses, people with drug abuse issues, people with -- Adult Mental Health has options for adults. But if you are under 18 and you have retardation and autism, there is nothing available for you.
In my tenure at CAMHD, which I mentioned earlier, there were many children that through the process of their

Page 180

IEP had been sent to an institution on the mainland because that was the only residential option. And there were some of the children that we brought back home when we had local expertise, and they were served through the CAMHD system in what was then called therapeutic foster. Those, they were people with autism and/or retardation.
My position and those monies -- and at the time there were 12 children -- moved in 2003 or 2002 -- it was 2003. You'll have to check that -- over to DDD. There was a memorandum of understanding between CAMHD and DDD that said, well, I know DDD doesn't have residential for people under 18, but here's our service and our money for you to implement because these children have in their IEP or have in their ISP or have in their CSP, depending on what they had, residential care. So there were 12 children at this time living out of home in a variety of settings, some in a CPS home, some in what had been a CAMHD home. And there was actually a group home we formed here on Oahu for three children that had been living in Queen's and Kahi.
But a systemic service to this date, there is nothing that exists if you're under 18, retarded, autistic, and you need somewhere else to live.
Q. Is there a criteria set for these children who were placed in these homes?
A. They were formerly served by CAMHD, so they were in

Page 181

another model, and then when CAM -- when Felix, you know -- when the responsibilities went to the directions they belonged, we still had these 12 kids living out of home. To date I think -- you know, many of them were older, and they graduated out. I think there is probably still -- make a number up and say six people who live -- who are under 18 and who are served by DDD through this MOA.
Q. Was Bryan serviced by CAMHD?
A. When I initially met Bryan was through CAMHD. Initially in 2000, 2001, his related services came through CAMHD.
Q. Okay.
A. When those monies and those services went over to DOE, acronym soup, then DOE put out the RFP, and then his services came through DOE.
Q. Okay.
A. You would only get residential care if it was related to your education. So DOE doesn't want to be in the job of providing residential care. If you need to to access benefit from your education, then they write -- continue your IEP and send you to the mainland.
Q. There --
A. I was a behaviorist at DDD.
Q. Yeah.
A. We have not checked that box on our federal

Page 182

application. We don't provide residential care.
Q. So that's not an option that was discussed with the parents, Bryan's?
A. Residential? I'm sure it came up all the time.
Q. Oh.
A. I couldn't say who said what, but I'm sure many people secretly thought or verbally thought that's what was gonna happen at this point.
Q. Did you have any discussions with the parents?
A. I've had many discussions with the parents about things they could modify in the home. And they very much wanted him to stay at home and be part of the family, and they were willing to do just about anything I asked them to do, including put a pool over the spot, just about anything to make it work for him.
Q. But the residential care, that wasn't an option as opposed to --
A. No, that wasn't the intent at all.
Q. Okay.
A. I mean, I don't recall anybody offering it in IEP.
Q. The parents just -- they wanted Bryan at home?
A. Yeah.
Q. Yeah, is there a -- okay. So in Hawai`i, if you have a mental retardation or autism and you're under the age of 18, there are no residential care options?

Page 183

THE WITNESS: Objection? Asked and answered? Don't answer that? You have to type it. I'm sorry, Stan.
MR. LEVIN: Answer it. Answer it.
THE WITNESS: Answer it.
No, there are none. There are these -- I repeat myself exactly what I just mentioned.
MR. USHIRODA: No, no, you --
THE WITNESS: There is a single group home. There's a man living in Kahi for six years, six years, a person with autism. There are maybe three or four children in a home that would be paid for under DHS through respite, and then DDD provides some sort of additional expertise. But the State Department of Developmental Disabilities does not -- is not a child placement agency and does not provide residential care for people under 18.
Q. (By Mr. Ushiroda) And if they wanted -- if the parents wanted that, they'd have to go to the mainland?
A. Correct.
Q. Okay.
A. They could give up their kid to CPS, but CPS cannot serve this child either.
Q. I'm just trying to get an understanding of --
A. I'm very knowledgeable about this. This was my role at CAMHD and DDD. I don't know if you want all of this in here, but there's quite a bit of information about it.

Page 184

Q. No, no, no. I appreciate the clarification.
A. It's --
Q. Okay.
A. The plan?
Q. Plan. And I think earlier we talked about -- when we talked about your report, you said this is the portion that you discuss first; is that correct?
A. No. What I said was when I give this to parents, I tell them to read this first --
Q. Oh.
A. -- because it's, you know, very upsetting to read the assessment. It delineates in no nice way all the things your kid does wrong because it's the facts, just the facts. So I tell families, read this section first. It tells you what we're gonna do, what we're gonna try, and that will give you some ideas and maybe prompt you to give me more information. You can read the assessment after. If you read the assessment first, by the time you get to page 14, you're already really, really discouraged.
When I'm presenting this to the team, I go from beginning to end because the implementers are there, and I need them to recognize something that they may have done incorrectly or something that they can prevent or communication issues. So we go through this piece by piece, not like we've done here today, but similarly.

Page 185

Literally line by line we went through this.
Q. Did you present this report to Bryan's parents?
A. I presented it in unison to everyone. I said there were maybe 25-some-odd people around the table.
Q. No, the only reason I ask is because you said earlier if you're presenting it just to the parents, you go over the plan first rather than the --
A. No, I presented it -- anything that you make as a subcontractor belongs to DOE. And I've had the incidents where the DOE's refused to give out. They've declined to give it out. Recently I had that happen, not in Bryan's case.
Q. To the parent?
A. If they've paid for the assessment, they don't have to hand it out. In this case the parents are cooperative, obviously, so it's their job to hand it out. I give it back to CFS. They, you know, proofread it, put it on their letterhead, do whatever their official process is there. They return it to the DOE. This is something DOE bought from CFS. DOE hands it out to everyone.
In Bryan's case they provide it to everybody before the meeting. It's very long. It would be important to read it and understand what it says so you could understand it and go to the meeting and ask questions, not be hearing this information for the first time. They passed it out to

Page 186

the important parties. Then we came together. I went over it. It was a very long meeting. And as we went through, people, you know, spoke their minds or asked questions. Some little side how-to conversations cropped up.
Q. Were Bryan's parents provided this report before the meeting?
A. They're provided by the DOE probably the same stream -- yeah, before the meeting by the DOE at the same time everybody else got it. Yes, they would have to have been.
Q. Now I know you said parents or at least the mother was at the meeting.
A. I think they were both at this meeting.
Q. Okay.
A. I said the mother was at the transition meeting.
Q. Do you talk to the parents or go over the report with the parents outside the meeting at another time?
A. I'm sure I talked about components of it. They have to carry it out like a skills trainer would have to carry it out. Everybody has to get this if we're all gonna do it the same way. What I tell people is we're all gonna do it the same way. If it doesn't work, we'll all change to another way, but we all need to be consistent to see whether this application is working or not. If not line by line, I discussed large chunks of it with his folks.

Page 187

Q. To make sure they're on the same page with everybody else?
A. Yes. It also went out to all of them, everybody as a draft, so if I made a mistake, in the meeting they could correct it. I don't spell my name that way. He's not on that medication. So everybody had a time to read it, digest it before we got together.
Q. How many drafts did you go through?
A. They all just got one.
Q. Oh, okay. You just sent out one draft and came --
A. When I'm done, when I'm completely done with my report, I write "draft" at the top and hand it back. And that way if somebody needs to say, actually, now he's on such-and-such a medication, we can add it in.
Q. Do you recall if you got back any such comments, changes, or something that was not accurate?
A. I don't believe there was anything we changed in that meeting. There was lots of commentary, lots of discussion.
Q. Okay. Now earlier, Kim, I had talked to you about if you were aware of the number of skills trainer hours that Bryan was provided in '04 --
A. Uh-huh.
Q. -- that the DOE was required to provide him.
MR. USHIRODA: And 68 hours; correct, Stan?
MR. LEVIN: Uh-huh.

Page 188

Q. (By Mr. Ushiroda) Have you ever worked with a child with autism who had required that many --
A. Almost everybody in my life. Yes. When I'm working with somebody, you're probably presenting severe challenges. Unfortunately, in this state -- other states as well. I shouldn't say that. We tend to throw money at the problem. Just because there's 60 hours doesn't mean they're productive hours. You see kids with two-on-one and three-on-one, then four-on-one, five-on-one. That's insane. You don't need five-on-one because those five people don't know what they're doing. Actually, when I met Bryan was one-on-one. Then when he left, I believe it was two-on-one.
Q. Is it your understanding that the number of hours that were provided to Bryan for -- that were required to be provided to Bryan by skills trainers -- were these all educationally related?
A. Absolutely. Anything that's attached to the IEP is educationally related. Now mind you, Bryan's skill level is so low that he has goals like toileting, eating with silverware, communicating. So you as a lawyer might think of education as being geography, geometry, English. His education goals are clearly at a much lower level.
Q. I see.
A. Doing laundry is an educational goal for him.

Page 189

Q. Okay. Now Kim, you know, back up to page 2 of the report, there's some information about Bryan not taking any medication because of some adverse reaction?
A. Part of the record review and the interview -- I mean, typically a child like Bryan would be on some heavier meds.
Q. Yes.
A. And so I had asked his mom. And actually, at the time he was getting an EEG, so I looked at some of his medical records. And what was explained to me and what he -- I'm sure I read it as well. I wouldn't have just taken someone's word on it -- is that he had been on Risperdal, psychotropic medications or antipsychotics or antianxieties. He had tried some medications in the past. He had actually a life-threatening reaction to -- I believe it was the Risperdal.
Q. Where did you get that from?
A. His mom showed me something. I think it was the ER report.
Q. So the medication, it's not based on any medical opinion?
A. No, just records that I read and what his mother had told me.
Q. Just reporting what you found?
A. Correct.
If your child has a horrible reaction to a medication,

Page 190

you're going to be very unwilling to risk their life again, yeah?
Q. Oh, I'm not suggesting that they would.
A. I didn't know where that question came from.
Yeah, I think many people's first reaction to Bryan would be, quick, get this kid on meds, at that point in his life. And unfortunately, the meds that typically work for kids like Bryan did not work for him at that time in his life. I couldn't speak to what, if anything, he might be taking now.
Q. Okay. Are you aware of -- I know you had mentioned Risperdal.
A. I'm pretty sure that's the one he had a bad reaction to.
Q. Are there other classes of medications that you're familiar with --
A. Yes.
Q. -- that are used for children such as Bryan?
A. I just mentioned some, anti-epileptics, anti-seizure meds, mood enhancers. There are actually a whole variety. I'm actually quite familiar with medications, though I am not a medical professional. It's just the nature of the people I serve. They tend to be on what we call polypharmacology, which is multiple medications in a cocktail designed to impact my behavior. Often a

Page 191

medication I take may then have a side effect that also needs to be medicated.
In this state we have NCIP, the National Core Indicators Project, a nationwide -- I think there's 26 states that are part of it -- assessed the people in the DDD system here and found that 85 percent of the adults served by DDD are on polypharmacology. It's a horribly high number.
So, yeah. Yes, I'm familiar with medication for behavior.
Q. Because that comes with the territory?
A. Because it comes with the territory.
Q. Yes.
A. And automatic to the profession.
Q. Okay. Now Kim, you know, we've talked at length about staffing for Bryan, or maybe the lack thereof, in this '04 period.
A. Uh-huh.
Q. Yes?
A. Yes, we have.
Q. Okay. Now what I gleaned from your report and what you've testified to today is that many of the staff or the skills trainers in this '04 period were not qualified or not properly trained?
A. I'm sure they met whatever the DOE's requirement.

Page 192

They probably had an associates or above. They -- you know, they wouldn't have been employed if they didn't meet the letter of the law. But Bryan had specific needs. For example, very few of them knew sign. Early on I think that was okay. You know, we said, learn two new signs a week. At that point in his life he had already had the experience of working with people who were fluent, saw the exceptional improvement from that, and we really wanted everybody who worked with him to be able to communicate at or above his level, and the people who were working with him during this assessment could not.
So there were different agreements made along the way -- okay, everybody will have sign -- that for whatever reason were not able to be carried out.
Q. Okay.
A. I'm sure they went through their required trainings at their prospective agencies. That didn't necessarily prepare them to do a good job with Bryan.
Q. So was it, I guess, a lack or maybe -- a lack or a -- rephrase this.
THE WITNESS: Objection.
MR. LEVIN: Objection.
THE WITNESS: I guess he's waiting for you to rephrase it. Then he'll object.
MR. USHIRODA: Jumping the gun, huh, Stan?

Q. (By Mr. Ushiroda) Was it a case where there was just a limited resource pool of qualified skills trainers to fit Bryan's particular needs --
MR. LEVIN: Objection. Asked and answered.
Q. (By Mr. Ushiroda) -- at this point in time?
THE WITNESS: Objection. Asked and answered.
That was one component. It was a multipronged issue. There was a lack of oversight. There was lack of teacher. There was lack of plan. There was a lack of implementation. There was a lack of materials. There was some actively bad things happening. Absolutely a component of the problem was insufficient bodies. A component of the problem was that some of the bodies there didn't have the right work ethic or the right training or the right values or the right skill set. And the people above them also were not doing their job, and the things they should have had available to them also were not there. It was a really pervasive multicomponent issue.
Q. (By Mr. Ushiroda) Okay. Now at this time in '04, were you familiar with the skills trainers who were available in the Kona or the Big Island area that could have serviced Bryan?
A. I don't live in that area. I mean, I met anybody that was in that area, and I spent time with them. I spoke to what's-her-name, the person who's responsible for hiring at

CFS, and the persons responsible for training at HBH. I talked to the respective agencies saying this is what is needed. How can I help you?
Q. And the response?
A. Well, I mean, there was one woman who was a provider -- I think her name is Kim. Why can't I think of her name -- who was learning to be the behavior analyst. So I was spending time with her apart from Bryan. Yes, Kelly Stern. Thank you.
MR. LEVIN: Kelly Stern.
THE WITNESS: I was spending time with Kelly to teach her how to do a functional behavior assessment and how to identify -- how to match people to their strengths. And she was responsible at her agency for finding staff for Bryan as well, and so as a function of trying to help her in her professional development, then that gave her -- made her more informed to bring up people for Bryan. So she'd say, oh, I got this person. Here's why they won't work. I said, okay, we'll try A, B, and C. But in the end, the right people and the amount of wrong people and the kind of support that those people needed were not there.
Q. (By Mr. Ushiroda) Okay. So at this point what -- you know, given what you know about the resources in Kona at this time -- well, you know, did you have an opinion on chances of success for Bryan given the resources there were

in Kona?
MR. LEVIN: Objection.
THE WITNESS: Objection.
MR. LEVIN: Asked and answered.
THE WITNESS: Asked and answered.
MR. USHIRODA: It may well have been.
THE WITNESS: At this point?
MR. USHIRODA: Yeah.
THE WITNESS: Well, I mean, they could have flown people in from Oahu. That's what they used to do. That worked the first time around. I realize that's an expense, and it's not even the best case scenario. I wrote in myself, having me come over -- maybe it was in another plan I wrote. But one of the plans I wrote, having me come over every once in a while is not going to cure this. You need somebody who can be with him weekly --
MR. USHIRODA: Right.
THE WITNESS: -- you know, several times weekly. And maybe -- you know, maybe if they had flown people in from Oahu, that might have -- certainly it would have saved that horrible period of time and prevented some of the regression.
Q. (By Mr. Ushiroda) Now was there a reasonable chance of kind of finding staff in Kona at this time to implement your plan?

A. I -- I don't know. I don't hire in Kona. I help them word, you know, advertisements.
Like that woman -- that woman who came back from wherever, they could have hired her the second she came back. She had skill. She had experience. I don't know if she didn't meet the qualifications. I don't know why she didn't get hired. There was somebody who could have been put to work right away.
Couple of the staff were okay. They just didn't have the infrastructure and nobody telling them what and how to do things.
It could have been rescued. It wasn't.
Q. But Kelly Stern, was she a skills trainer involved with Bryan.
A. No, what was her role. I think at that point she was either a consultant or an admin at one of the agencies. She had been -- I had met her initially in my other role at the Department of Health, and she had been a Department of Health employee. She left there to go be something for the DOE and then left the DOE to go work for provider agency.
Not -- also here on Oahu -- I was going to say rural areas. But essentially everybody just trades jobs. I don't recall what her particular role was at that point, but I'm pretty sure she was at a provider agency at that time, and she was essentially the skills trainer

Page 197

supervisor. I also believe -- none of her skills trainers were employed -- her agency wasn't providing skills trainers at that point. The ones I'm referring to by name or description, those are HBH people because I remember calling HBH saying, what are we gonna do about this?
Q. Okay.
A. The behavior plan sums up everything I knew at the time. I mean, it -- line by line it tells you what's going on and what to do.
Q. Uh-huh. I think we've kind of covered that through discussing your assessments, I think.
A. Oh. I didn't know whether we were gonna go through the rest of this or not.
Q. No, no. I think we've covered your -- have we? Is there anything else?
A. You're in charge.
Talks about replacement behaviors, what to teach him, what to do differently at the end when things happen, for each behavior -- there's no need to repeat the last three toileting plans. Please pull them from the file -- communication, then, of course, another summary, and then, as I mentioned earlier, a comment on crises 'cause that --
Q. Right.
A. -- had turned into a little problem between the DOE and the family. And then some summated statements.

Page 198

Bryan had a seemingly effective program that while never actually implemented contained all the requisite parts. What to do is known. The issue is implementation, quality assurance, monitoring, and constant updating and augmenting for slow but gradual progress.
Q. I believe that's what we've discussed at length today.
A. Yeah.
Q. Kim, do you expect to do further work on this case?
A. No. I've not been asked to come to California. There are lots of people like me in California. If Bryan needed further behavioral consultation, I'm sure they could find someone locally.
Q. Okay. Is it fair to say that all the opinions you intend to render at trial, if called to testify at trial, have been covered today?
A. That would depend on what I was asked.
Q. Well, that's why I'm --
A. If --
Q. That's why --
A. That's a professional report, and the sort of gory details have been left out. If someone were to ask me in trial more detailed information, certainly I would provide it.
Q. Based on this report?
A. Based on that, yeah, based on what I saw.

Page 199

Q. Okay. Is there any other opinions then? I need to know just so I'm not surprised at trial.
A. I guess I don't know what you want to know. I'm more than happy to be forthcoming. I'll tell you whatever you need to know, but I need more structure than that.
Q. Okay. Well, are -- basically, are all your opinions contained in this report?
A. I have stronger opinions than are contained in that report, but the function and content of everything I would have to say is certainly there.
Q. Okay. I'm sorry. You have stronger opinions?
A. I don't describe what I said to you as neglect in that report.
Q. Okay.
A. Nowhere in that report do I say I saw him slipping and sliding in his own feces because it wasn't pertinent to what I was filling out. If you were to ask me that, I would answer that.
Q. Well, let's -- do you have an opinion on that?
A. Yes. I think it was --
Q. Please tell me.
A. I think it's neglect. Actually, I think it's abusive. I think he was not educated or treated effectively for a period at this time, a period of months, probably.
Q. And the basis for this opinion is that --

Page 200

A. Observation, data collection, record review, and interview.
Q. Okay. So you believe it's your opinion that in this period of time in '04 that Bryan was being neglected?
A. I believe some of what I say absolutely met the definition for neglect. Come into a classroom and the skills trainers are reading a book and the other one's on the phone and the child is dirty with fecal matter and urine, rolling around on a mat. That is not education.
Q. And have you rendered such opinions before?
A. I rendered such opinion right there at the moment, walked down the hallway and passed it on to people in power and very nicely said to the skills trainer, all right, well, let's take him off to the bathroom and get him cleaned up.
Q. Okay. Do you believe this neglect was intentional?
A. I don't know how to describe someone who thinks it's okay to read at work.
Q. I'm sorry?
A. I don't know how to describe someone who thinks it's okay to read a novel on shift.
Q. I'm not following you.
A. I don't know if it was intention or not, but if somebody chooses to read a novel when they should be working, that brings their work ethic to question.

Page 201

Q. Is this something you observed?
A. Yeah. That's the example I just gave you. Gentleman was reading, woman was on the phone, Bryan was a mess.
Q. Okay. Any other stronger opinions?
A. No.
Q. I -- now's the time to tell me. I mean, I've given you kind of my direction.
A. You know, I think the whole thing in a shame. I saw this boy with a lot of needs. I don't want you to think that he was, you know, on grade level or -- you know, with a lot of needs, with an okay team making okay gains, suddenly making better gains and sustain them and move forward, and everybody was good. Speech was good. Other DOE people were doing their job, and he was making gains. And then to come back and see him a period of time later and have him, you know, lost all those skills and really picked up some really bad ones, it's a waste. It's a shame because I think that the outcome of his life is different now. And I hope I'm wrong because I haven't talked to his mom or his dad or him in years, and I hope I'm wrong.
Q. You just don't know at this point?
A. This is the -- if -- the way I saw him, the last I saw him, that's the population of adults I serve, big boys, older men with challenging behaviors, with lifelong bad habits, limited communication skills that use behavior to

Page 202

communicate. And it didn't have to be that way for him because he was headed in the right direction. So my hope is that it didn't turn out that way, but I actually don't know the end of the story. I haven't -- I haven't heard from him.
Q. Okay. Are you aware of any other -- have you ever rendered an opinion before in other cases such as this that there was neglect?
A. I've called CPS. I've passed information, you know, up appropriate -- in my -- in my role as an obligated reporter in all my previous jobs whenever something came up. Have I used the word neglect in a deposition before? I don't think so.
Q. Okay. Any -- again, any other stronger opinions that are not contained in this report?
A. I -- I don't think so. I tried to make that as an encompassing report as possible so that people who were working with Bryan could address all the needs I saw at that time.
Q. Okay. All right. Let me just go over my notes --
A. Yes, please.
Q. -- and try to get you out of here.
A. Okay.
Q. I did ask you if you felt this neglect was intentional, yes?

Page 203

A. And I said I don't know how to answer that.
Q. Oh.
A. Different people have different work ethics.
Q. So you don't have an opinion one way or the other as to whether the neglect was intentional?
MR. LEVIN: That is not what she said.
THE WITNESS: That was not what she said.
MR. LEVIN: Misrepresents her testimony.
THE WITNESS: Misrepresents her testimony.
Q. (By Mr. Ushiroda) I'm not trying to misrepresent your testimony, but is that -- my question stands.
A. Again, I think it's a multipronged, multifacetted problem. I think that people who wanted to do things didn't know what to do and didn't have the instruction or the support, the supervision, or the monitoring to do it. I think people -- some people thought that was their job to just sit there and watch him. I think that if you were to interview all of the skills trainers, you would probably get a variety of responses from each of them. There may very well have been some people who just didn't care. In their case, it may have been intentional. In many of the other people's cases, it may have been unintentional. But the end result is a dirty -- unengaged, dirty, aggressive child.
Q. Hence your opinion that Bryan was neglected in this

Page 204

case?
A. I absolutely observed incidences that I thought were neglectful.
Q. Okay. But again, I still need a answer to my question. So you don't have an opinion one way or the other on whether this negligence was intentional?
MR. LEVIN: Objection.
THE WITNESS: I don't think I understand your question.
Objection.
MR. LEVIN: Objection. Misstates her testimony.
THE WITNESS: Misstates her testimony.
Q. (By Mr. Ushiroda) I'm not trying to misstate your testimony. I'm just trying to get an answer to the question.
A. I'm afraid I don't understand it. I mean, we kind of got off on a tangent with me using this big word. I didn't mean to get you off on a tangent. It's entirely possible for some of these people it may very well have been intentional. I'm going to read my book, and that's all you do with kids like this. It's entirely possible that other people thought that if they had the right support, the right instruction, the right training, they would have done a better job. So I don't think I can answer that question globally for each individual. So it's a yes or no. Some

Page 205

of it may have been intentional. Some of it may not have been.
Q. Okay. Okay. In other words, you don't know?
A. I cannot speak for any particular individual.
Q. Okay. Kim, I appreciate your time.
A. Okay.
Q. And I appreciate your candor. Thank you for your time. I have no further questions.
MR. USHIRODA: Is that it?
(Discussion off the record.)
MR. USHIRODA: Oh, wait.
THE WITNESS: He takes that back.
Q. (By Mr. Ushiroda) Just again, we've covered all your opinions?
A. We've covered everything that's saliently -- I sort of run at the mouth; right. I'm not holding anything back. It's everything I thought of. If you ask me something different in court, I may give more opinions. But based on everything you've said, that's what comes to my mind.
Q. I have asked you for any stronger opinions that you have which are not contained in this report.
A. I don't know what you're reaching for, and if I did, I would answer it. This is everything that's salient --
Q. I'm just trying to exhaust you, basically. And what it is, so I don't come to trial and say, well --

Page 206

A. I also don't want to give you surprises at trial. So if you have a more structured question for me, I'm right here.
Q. See, that's the problem because I don't know how else to approach this because, you know, basically you just got called out of the blue. And you've been designated as an expert, and disclosure was basically your August 18th, '04 report. So --
A. Which is based on two years of history with the young man.
Q. Correct. Yes, I understand.
So when that is disclosed to me, I have a right to expect that --
A. Yeah.
Q. -- your opinions will be limited to that report, but also, of course, the opinions you gave to me. So I need to --
A. Well, for example, you didn't ask me about anybody else's report. You mentioned other people's names. So I couldn't comment on that. I don't know what they say. I don't know. What -- if you were to show me something different, ask me about it, I might have a different opinion. Based on what you've shown me, this is everything I can think of to tell you at this time.
Q. Okay.

Page 207

A. I am -- I have no desire to hold back. I will answer anything you ask me. I'm, you know, a very opinionated person. I believe I have exceptional expertise in all of these areas, and I believe the State recognizes that given that I was recruited in the Felix Consent Decree to be the expert for the State. So I -- yeah, I don't feel that there's an area that I am lacking in expertise or knowledge related to this case.
Q. Okay. That wasn't my question, and that wasn't --
A. But that's the lead to say, yeah, I have an opinion on everything. Based on what you've asked me so far, there it is.
Q. And you've also said that you haven't been shown any other report except --
A. Yeah.
Q. -- this report?
A. I've got nothing.
Q. And you don't anticipate any further work in this case?
A. Well, I -- if you're going to trial, I assume you're going to -- I could be called to testify.
Q. No, no. Aside -- aside and apart from being called to testify, you don't --
A. Child doesn't even live in the state anymore.
Q. Okay. Thank you.

Page 208

A. Okay.
MR. LEVIN: She's not going to waive reading of the --
THE WITNESS: She's not going to waive reading -- then it shut of. Reading of the testimony? Yeah.
MR. USHIRODA: Okay.
(Whereupon, at 2:25 p.m., the deposition was concluded.)
--oOo--

I, KIMBERLY SMALLEY, Ph.D., do hereby certify that I have read the foregoing typewritten pages 1 through 208, inclusive, and corrections, if any, were noted by me; and that same is now a true and correct transcript of my testimony.

Dated:

Signed Before me this day of , 20____.

STATE OF HAWAI`I )
) SS.
)

I, Valerie Mariano Swiderski, C.S.R., a Notary Public in and for the State of Hawai`i, do hereby certify:

That on Thursday, July 27, 2006, at 9:02 a.m. appeared before me KIMBERLY SMALLEY, Ph.D., the witness whose testimony is contained herein, that prior to being examined, the witness was by me duly sworn or affirmed; that the proceedings were taken in computerized machine shorthand by me and were thereafter reduced to print under my supervision; that the foregoing represents, to the best of my ability, a correct transcript of the proceedings had in the foregoing matter;

That, if applicable, the witness was notified through counsel, by mail, or by telephone to appear and sign; that if the deposition is not signed, either the reading and signing were waived by the witness and all parties, or the witness has failed to appear and the original has been sealed unsigned;

That pursuant to HRCP 30(f)(1) the original will be forwarded to noticing counsel for retention.

I further certify that I am not counsel for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

Dated:

Valerie Mariano Swiderski, C.S.R. #353
Notary Public, State of Hawai`i
My Commission Expires: June 16, 2006