```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF HAWAII
 3                         - - -
 4
 5   ANN KIMBALL WILES and STANLEY
     BOND, individually and as next
 6   friend of their son, BRYAN
     WILES-BOND, a minor,
 7               Plaintiff,
     vs.                              Civil No. CV-05-00247 HG/BMK
 8   DEPARTMENT OF EDUCATION          No. CV-04-00442 HG/BMK
     State of Hawaii, and ALVIN          CONSOLIDATED
 9   RHO, in his official capacity   (Other Civil Action)
     as West Hawai'i District
10   Superintendent,
                 Defendants.
11   ---------------------------/
12                                      CERTIFIED COPY
13
14
15                    DEPOSITION OF
16                  ANN KIMBALL WILES
17                     VOLUME II
18              WALNUT CREEK, CALIFORNIA
19                   MAY 12, 2007
20
21
22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   (800) 288-3376
     www.depo.com
24
     REPORTED BY: DANUTA KRANTZ, CSR NO. 4782
25   FILE No.: A103D20
```

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
 3               FOR THE DISTRICT OF HAWAII
 4                        - - -
 5
 6  ANN KIMBALL WILES and STANLEY
    BOND, individually and as next
 7  friend of their son, BRYAN
    WILES-BOND, a minor,
 8              Plaintiff,
    vs.                         Civil No. CV-05-00247 HG/BMK
 9  DEPARTMENT OF EDUCATION     No. CV-04-00442 HG/BMK
    State of Hawaii, and ALVIN      CONSOLIDATED
10  RHO, in his official capacity  (Other Civil Action)
    as West Hawai'i District
11  Superintendent,
                Defendants.
12  ---------------------------/
13
14
15         Deposition of ANN KIMBALL WILES, taken on
16  behalf of Defendants, at Embassy Suites, 1345 Treat
17  Boulevard, Walnut Creek, California, commencing at
18  8:45, Saturday, May 12, 2007, before Danuta Krantz, CSR
19  No. 4782.
20
21
22
23
24
25
```

```
 1                    A P P E A R A N C E S
 2

 3  FOR THE PLAINTIFF:
 4  LAW OFFICES OF CARL. M. VARADY
    1001 Bishop Street
 5  Suite 2870
    Honolulu, HI 96813
 6  BY:  CARL M. VARADY, ESQUIRE
 7
 8

    FOR THE DEFENDANTS:
 9

    LAW OFFICES OF WATANABE, ING & KOMEIJI
10  999 Bishop Street
    23rd floor, First Hawaiian Center
11  Honolulu, HI 96813
    BY:  GREGG M. USHIRODA, ESQUIRE
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2   ANN KIMBALL WILES:
 3   EXAMINATION                                        PAGE
           BY MR. USHIRODA                               96
 4
 5   EXHIBITS
 6   DEFENDANT'S                                        PAGE
 7   5    Letter to JoAn from Kim Wiles 9-21-04         161
 8   6    Memo to Kim Wiles from
          JoAn Hill 9-21-04                             161
 9
     7    Memo to Geraldine Bill from
10        Stanley Bond 9-23-04                          197
11   8    State of Hawai'i Department of Education
          Individualized Education Program              217
12
     9    Letter to Kim Wiles from
13        Cara Entz 7-16-04                             243
14   10   Pacific Child & Family Associates
          Proposal 9-21-04                              245
15
     11   email to Kim Wiles from
16        Kate Tolentino 10-11-04                       247
17
18
19
20
21
22
23
24
25
```

```
 1                    ANN KIMBALL WILES,
 2          having first been duly sworn, was
 3          examined and testified as follows:
 4              EXAMINATION BY MR. USHIRODA
 5         MR. USHIRODA:  Q.  Good morning, Kim.
 6         A.  Good morning.
 7         Q.  We last left off on the -- I believe we
 8  were talking about the settlement agreement.  Go ahead.
 9         A.  There were several -- you know, yesterday I
10  was pretty tired, and there were some things that you
11  asked that I had forgotten to mention.
12         Q.  Okay.
13         A.  I don't know if -- how this works.  Do you
14  want to know those things?
15         Q.  Sure.
16         A.  Okay.  You know, it's like you are driving
17  home at night and you think, oh.  The first is, like
18  you were talking about medication.  I am on high blood
19  pressure medicines.  I don't know if that is important
20  or not.
21             And I started thinking about how the ABA
22  resumes were given at that meeting.  And I can't
23  remember if Ms. Hill took them at that time or if -- or
24  she probably said, We don't need them, we have these
25  Honolulu Advertiser resumes or if she took them.
```

```
 1  request?
 2       A.  No.  Dru was very frustrated over it.
 3       Q.  So that summer of '04, Bryan didn't get to
 4  participate in the community center?
 5       A.  No.
 6       Q.  Okay.
 7       A.  So there really wasn't anything going on in
 8  the summer of '04.  Special Olympics had ended.  The
 9  friendship group was not after school.  The community
10  center was not an option because it was at the same
11  time as the summer school.  His program was in such
12  disarray there was not any more introduction as to
13  specific signs that were -- you know, you could go out
14  and generalize.
15           Plus, until we knew the whereabouts of this
16  woman, we didn't -- since we didn't know what she
17  looked like and we couldn't give pictures to the people
18  that were taking him out, we didn't want him just going
19  out in the community with somebody after being stalked.
20       Q.  No other increments you are aware of?
21       A.  I am sure there are, but it's a lot to
22  remember.
23       Q.  It is.  And that's why -- I apologize, you
24  know.  Like I said, I am just trying to get -- exhaust
25  your memory for all of the salient facts.  You have
```

```
 1  been very good about providing them to me.
 2       A.  Kind of sporadically as we go.
 3       Q.  No, but it's -- it will fit.  I will put it
 4  together.
 5           I briefly went over the damages aspect --
 6  the damages that you and Stan are claiming in this
 7  case.  And I wanted to ask you a couple of questions
 8  about that.  I am trying to get as much as I can get
 9  done today.
10           I understand that you are making a wage
11  loss claim.
12       A.  Yes.
13       Q.  And I looked at your interrogatory answers,
14  and you are claiming a loss of income for a semester in
15  Hawaii of $27,000.
16           Are you familiar with that?
17       A.  Yes.
18       Q.  What is the basis of that claim?
19       A.  It was basically taking half my salary.
20       Q.  For what year?
21       A.  For the '04-'05 school year.
22       Q.  Is that because you took a leave?
23       A.  No.  I had to resign --
24       Q.  Okay.
25       A.  -- to move.
```

```
 1           Q.   You are claiming that half of your salary
 2   as damages?
 3           A.   Yes, because I -- you know, I was unable to
 4   work.  It would be very -- because of the nature of
 5   what I do, it is very unusual that you would be picked
 6   up in the mid year.
 7           Q.   What was your position at that time?
 8           A.   Vice principal.
 9           Q.   You are also claiming a semester in
10   California for the school year 2004, 2005.  You are
11   claiming $44,000?
12           A.   Basically, that is what I would have been
13   paid here if I could have gotten a job.  Basically, I
14   lost income for that strip of time.
15           Q.   For the 2004, 2005 year?
16           A.   From, really -- yes, for the second half of
17   that school year.
18           Q.   So 44,000 represents what you would have
19   earned in a semester?
20           A.   Actually, that is low.
21           Q.   I am just trying to figure it out.
22                So you are claiming $27,000 lost income for
23   Hawaii because you resigned midway through the school
24   year, correct?
25           A.   Because I had to leave because of Bryan's
```

1  case.

2        Q. I am just trying to understand.

3        A. Okay.

4        Q. And the $44,000 represents what again?

5        A. It would have been the loss of income. I
6  lost income for a semester of time, and that is what
7  the income would have been if I had been able to get
8  employed in California.

9        Q. Had you got employed in California in
10 September -- January --

11       A. Let's say December.

12       Q. December '04, you would have been -- you
13 have earned $44,000?

14       A. Most likely. Possibly more.

15       Q. What do you base that figure on?

16       A. The salaries. Actually, I believe I base
17 that on the salary I had when I started working with
18 Fairfield Unified.

19       Q. So actually, you are seeking to recover for
20 the lost income covers the same period of time, then,
21 correct?

22       A. Correct.

23       Q. I know that you are also claiming, you and
24 Stan are also claiming the difference in the cost of
25 comparable housing, correct?

```
 1        A.   Mm-hmm.
 2        Q.   Yes?
 3        A.   Can I look at this?
 4        Q.   Sure.  You want to use yours?  It's at --
 5   here you go.
 6        A.   Thank you.  This area is more expensive to
 7   live in.
 8        Q.   You are talking about?
 9        A.   California, the Bay Area.
10        Q.   Loss of income?
11        A.   You are talking about the housing?
12        Q.   Yes.  Okay.  You are basing that difference
13   on what your home in Kona sold for and the cost of
14   purchase of your home in Benicia, correct?
15        A.   Mm-hmm.
16        Q.   Yes?
17        A.   Yes, I am.
18        Q.   And then the loss of tuition of William at
19   Parker School?
20        A.   Yes.
21        Q.   Because you had to pull him out?
22        A.   Right.  And they don't refund the money.
23        Q.   And this $91,000 -- $9100 represents
24   William's tuition for the whole year?
25        A.   I believe so.
```

1   Q.  He completed half of the year?

2   A.  That's correct.

3   Q.  You also lost six years of retirement.

4   A.  No.  The way that works is, basically, I
had six years in the system.  In the State of Hawaii
you would have to have ten years before you are vested.
So I basically put in six years in the system that I
didn't get vested for.  So I will get nothing out of
that, whereas if I had been with another system, I
could have accrued years towards being vested and be
able to receive benefits, retirement benefits.  But I
intended, of course, to stay in Hawaii for the rest of
my career.  It never occurred to me that I would be
leaving on year six.

15  Q.  Are you claiming that as an item of damage?

16  A.  I think it probably is, because, I mean, I
would have been able to have retirement benefits if I
had been allowed to stay.

19  Q.  You are -- I am just trying to understand.

     Do you have any records that would quantify
that for you?

22  A.  I am going to leave that up to the
attorneys to have somebody look at it.

24  Q.  So you are saying that you are entitled to
whatever damages that result from your six years in the

1  state of Hawaii system?

2      A.  Right, because basically, you could put six
3  years in, and the retirement benefits I will get for
4  those six years will be zero.

5      Q.  Right, because it's ten years to vest,
6  right?

7      A.  That's correct. And that varies from state
8  to state.

9      Q.  What is it in California?

10     A.  It's five years in California. It was two
11 years in Maryland. And it varies. It was ten years in
12 Florida. It varies from state to state. So if you
13 really decide that you are willing to go into a state
14 that has a ten-year vested system, you are planning on
15 being there ten years.

16     Q.  Are you claiming any medical expenses that
17 you have incurred?

18     A.  No.

19     Q.  Are there any other items of damages that
20 you are claiming that we have not talked about?

21         There is a future expense damage
22 calculation of $3,719,950 that has been discounted to a
23 present value by your economist, Dr. Von Elsner, and
24 concerns future education, costs and living expenses
25 for Bryan. And I will ask Dr. Von Elsner about that.

```
 1   I know that is a claim of yours.
 2              But aside from the things we have discussed
 3   in this claim for future expenses, are there any other
 4   damages that you are claiming?
 5        A.   Yes.
 6        Q.   What?
 7        A.   I am not sure exactly how it's phrased, but
 8   the -- I don't know.  Can I ask him what it's called?
 9   Stress --
10        Q.   Emotional distress?
11        A.   Yes.
12        Q.   You are claiming --
13        A.   I am not sure if it's worded quite that
14   way.
15        Q.   Are you claiming any personal injuries in
16   this case?
17        A.   Would that be included in personal injury?
18        Q.   Emotional distress is considered a personal
19   injury.
20        A.   Yes.
21        Q.   If you look at your interrogatory answer
22   that starts at page 9, then it if you could read
23   question No. 6.  It's right at the top of page 9.
24              It says, "Describe fully each injury that
25   you believe you sustained as a result of the alleged
```

1  actions or inactions of the defendants."
2          And you list a number of things, stress and
3  frustration and what not. And I will cover this with
4  you at a later time. I don't think we can do it today.
5          A. That's kind of a way to say it, what not.
6          Q. I am not trying to trivialize it, but it is
7  a mouthful. Okay.
8          Now, so you are claiming the personal
9  injuries in this case in the form of emotional
10 distress, correct?
11         A. Yes.
12         Q. I know your interrogatory answers identify
13 a Dr. Chang Stroman. That is on page 15.
14         A. Yes. I know who he is.
15         Q. Did you see -- what did he Dr. Stroman for?
16         A. Basically, I saw him for -- I was under a
17 lot of stress. I was not sleeping. I saw him for --
18 and he was at a clinic. I forget what the clinics are
19 called, like a Sure Care. It's a walk-in kind of
20 place. And I wanted to get something to help me sleep
21 because I was just distraught. And I was prescribed
22 Ambien. And I also talked to him about -- I believe I
23 talked to him about if there is anybody he knew of that
24 would be good to be referred to, for like psychological
25 reasons, because I felt like I needed someone to talk

1  to.  I knew it was pretty situational, but it was
2  really difficult to cope with.
3          Q.  This was for stress that you were getting
4  as a result of the situation with Bryan?
5          A.  Absolutely.
6          Q.  And how many times did you see Dr. Stroman?
7          A.  I think just one.
8          Q.  And it says, July 12, '04 Dr. Stroman
9  prescribed Ambien.  Did it help?
10         A.  I am really one of those people who
11 absolutely hates taking pills.  It would do it, but it
12 would -- it felt strange.  I didn't like it.  So I
13 really tried to not do it very much.  It was just kind
14 of -- it was brief.  I don't think I was refilled the
15 prescription or anything.
16         Q.  Did Dr. Stroman refer you to anyone?
17         A.  You know, I can't remember if it was him or
18 Dru that recommended somebody.  And I called and made
19 an appointment.  It was hard to get in there, so I
20 never went.
21         Q.  Just focusing on your personal injuries,
22 your personal injuries is -- I know you have identified
23 you are claiming you sustained emotional distress as a
24 result of the DOE's actions or inactions as it relates
25 to your son Bryan; is that correct?

1    A.  Yes.

2    Q.  Any other personal injury?

3    A.  Not that I can think of right now.

4    Q.  Now, in your complaint and the one filed by Stan's office, you allege, you and Stan allege that Bryan, as well as you and Stan, had been permanently damaged. And I can show you a paragraph.

8    I am going to show you what have I marked as Exhibit 9 to Stan's deposition. It is the complaint filed on April 8, 2005 in Civil, No. CV05-00247SOM/DMK.

11   And I will direct your attention to paragraph 40 where it says, "Bryan and his parents have been and are being permanently damaged by defendant's actions and inactions."

15   My question simply is, how have you been permanently damaged in this case? Just because -- I ask you that just based on your allegation.

18   A.  Right. I think that probably the most permanent damage has been that Bryan missed a window of opportunity he had to really progress. And he --

21   Q.  This is how Bryan has been permanently damaged?

23   A.  No. But also the stress of knowing that it makes his future ability to be independent, it greatly impacts that, and that at some point in time we are

1  going to have to --

2      Q.  Kim, would you like to take a break?

3      A.  Yes.

4          MR. USHIRODA:  Off the record.

5          (Discussion off the record.)

6          THE WITNESS:  I know at some point he won't be able to live with us, and depending on when that point in time comes, and that will become -- we are not going to be able to take care of him.  He is a child that requires a lot of physical care as well as just supervision.

        And when that time comes, his options are going to be based on how independently he can function.  And so we are in a race against time, and we have lost so much ground.  And we truly -- we may never be able to get that back.  So -- I am sorry.

        So really, that is a serious source of stress, and it carries on until today.  And it's something I am sure we will be carrying with us until we die.

        I think all parents worry about what happens to their kids once they are not there.  And most people don't want to die young because their kids are vulnerable, but it doesn't matter when we die because that will be the case for Bryan.

CERTIFICATE OF REPORTER

I, DANUTA KRANTZ, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition nor in any way interested in the event of this cause and that I am not related to any of the parties thereto.

DATED: 05/30, 2007

_____
DANUTA KRANTZ, CSR 4782