**EXHIBIT "2" TO DECLARATION OF CARL M. VARADY**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

\- - -

ANN KIMBALL WILES and STANLEY BOND, individually, and as next friend of their son, BRYAN WILES-BOND, a minor,

Plaintiffs,

vs.

Civil No. CV-05-00247 HG/BMK
No. CV-04-00442 HG/BMK
CONSOLIDATED
(Other Civil Action)

DEPARTMENT OF EDUCATION State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent,

Defendants.
--------------------------------/

VOLUME II

(Pages 285 through 437)

DEPOSITION OF

STANLEY BOND

WALNUT CREEK, CALIFORNIA

SATURDAY, JUNE 30, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376

REPORTED BY: MARYANN P. COSTA RPR, RMR, CSR NO. 5820

FILE NO.: A104D03

reason he should be out.
Q. No, I did not mean that. I think the refusal to participate in a program --
A. No, we would never have refused to have Bryan participate in a community program. That would have benefitted his education.
Q. Now, going to page 29 of Exhibit 1 --
A. Is this Exhibit 1?
Q. Yes.
A. Sorry. Okay.
Q. Okay, #16 asks you to fully describe each fact, condition, act, or omission, and the legal basis upon which you base your allegations, that the defendants were deliberately indifferent and should be held liable for damages.
Do you see that?
A. Yes, I do.
Q. And I know, at the last session, we spoke at length, you know, about your -- what you felt were specific examples of the state being deliberately indifferent towards Bryan --
A. Yes.
Q. -- for this case --
A. Yes.
Q. -- and, since then, have you -- are there



anymore instances?
MR. VARADY: I'm just going to renew my objection on the basis that this would call for a legal conclusion or opinion that's beyond expertise.
MR. USHIRODA: So noted, counsel.
THE WITNESS: I think the main thing that I have to add is that, you know, in relooking at papers and things that we have, that I go back to the fact that, to me, it was beyond indifference, but -- it was intent. Bryan was harmed in many ways in an attempt to harm us.
We felt that much of what was done was retaliatory after -- you know, once we filed in Federal Court, that the denial of his program was retaliatory; that there were many instances -- we've talked about some -- there may be others that I'd have to go back and look at -- where they, intentionally, denied a program, or refused to go beyond -- go beyond, you know, the basics of what they do in terms of working with the agencies of, you know, advertising -- even though we brought to the table a number of options where Bryan's program may have been -- we may have been able to develop a good program for Bryan, and those were just dismissed out of hand by the Department of Education.
And, you know, we purely advocated for our son -- what we believed was the best thing for our son -- and we



advocated on the basis of what was in his IEP. And, ultimately, we advocated on the basis of what was signed in agreements by all the parties. And we advocated on the basis of hearing officers' orders for Bryan. And we felt like a lot of what happened was in retaliation of our attempt to advocate for his needs for services.
And Bryan was damaged in an attempt to damage us and to, ultimately, drive us from the State of Hawaii. And they did succeed in forcing us to leave the State of Hawaii to find a program for Bryan -- for the services he would require.
MR. USHIRODA: Off the record.
(Discussion off the record)
MR. USHIRODA: Back on.
Q. Well, thank you, Stan, for that answer. I appreciate your candor. I think -- I don't think I need to go back over that because I think we covered that at length in your prior session.
A. Yes.
Q. Now -- but, I did want to kind of cover this interrogatory response because what it asks for was, you know, basically, the factual bases for your allegations that the defendants, the DOE and the State of Hawaii, were deliberately indifferent towards Bryan --
A. Yes.



Q. -- and what I don't get is a statement of facts, but a list of documents.
And the first one is a May 21, 2001 Stipulated Decision signed by Richard Chun.
Do you see that?
A. Yes, I do.
Q. What does that have to do with your deliberative indifference?
A. Well, I think you can see the requirements of Bryan's program were made well aware to the DOE as early as 2001 and, here we are in 2004, still trying to have it implemented.
(Defendants' Exhibit No. 14 marked for identification)
MR. USHIRODA: Okay, Stan, I've handed you what I've marked as Exhibit 14 to your deposition. It is a Decision and Order Rendered in the matter of the Arbitration between Student and State of Hawaii Department of Education and it is signed by Richard C.F. Chun as Hearings Officer on May 21, 2001.
Q. My first question is, have you seen this document?
A. I believe I have seen this document.
Q. And is this the document that's referenced in -- is that the first document that is referenced in

Page 425

A. To be honest, no. I don't see that they really made any true effort to comply with this.
Q. Okay, so, it's your testimony, today, that the DOE did absolutely nothing to comply with this order?
A. Well, absolute is a big word.
Q. Well, you're saying nothing, so, that's why I ask.
A. Well, I think what I'm saying is that the DOE didn't make what I would think of as a reasonable attempt to comply with this order --
Q. Okay.
A. -- and, in so far in the fact that we gave the DOE information that would allow them to make a reasonable attempt to comply with this order, which they refused to acknowledge or act upon.
Q. Basically, no attempt -- no attempt -- was made in light of the information?
A. I think, in light of Bryan's needs and the information that we provided, I think that no reasonable attempt was made to provide these types of services for Bryan.
Q. Reasonable or not, was any attempt made by the state, to your knowledge -- any effort made by the state?
A. I'm sure that they did things that could be construed as an effort. But, the types of efforts that

Page 426

they put out were not going to go forward in terms of being able to comply with this -- with these needs -- even though they may want to claim that those efforts would, I don't think the types of efforts that they put out were going to be able to comply with this hearing order. And I don't think they truly thought that what they did -- that they were going to find the people necessary.
Q. Okay, can you think of any effort made by the DOE that went towards compliance with the hearing order which is Exhibit 7?
A. Well, I mean, you have, obviously, showed, and we've discussed, that they advertised in the Honolulu newspaper; but, to my knowledge, they never followed up with any of the resumes. And so, to me, putting an advertisement in a newspaper, without actually -- with no follow-up -- is not really an effort.
They continued to attempt to utilize the agencies on the big island, on the island of Hawaii, that had been a failed course of action for over three years. So, I don't see that as really a legitimate attempt at trying to provide, or a legitimate effort as trying to provide, Bryan services.
Q. Okay, any other efforts that you could see as going towards compliance with the decision rendered?

Page 427

A. The only other effort that occurred was ordered by Judge Gilmore, and that was to bring in Pacific Family and Child to, potentially, put together a program for him; but, that was so far into the process by then, it was, you know -- it was only done because it was ordered by the court.
Q. Is there a written order stating that the DOE had to bring in Pacific Child and Family Associates?
A. I would have to look at the minutes of that hearing. But, I believe that the Judge did directly tell them to bring that company in to perform a proposal.
Q. Okay, any other efforts that you can think of?
A. Well, of course, they're going to also say that --
Q. Not what they're going to say. I want to know what you saw.
A. No, I can't think of any efforts that directly related to Bryan's program.
Q. Okay, I'm not interested in what you think the state is saying --
A. Okay.
Q. -- but what you observed. Okay?
All right, okay, you also reference Second Enforcement Complaint and that's -- I assume you have it listed there because it was filed to compel compliance

Page 428

with the May 11, 2004 hearing order; correct?
A. And --
Q. The settlement?
A. -- July settlement agreement, and his IEP, and all of those other legal documents, too, that required he have a qualified teacher and skills trainer and summer school.
Q. In your words. I don't want to put words in your mouth.
Why is the July 21, 2004 second enforcement complaint listed here?
A. Well, because the DOE did not have a qualified teacher in place for the ESY -- for the extended school year program.
The individual that he put in did not even have a teaching certificate much less, you know, training in special education.
Q. That individual is who?
A. Bill Brown -- I believe -- yes.
Q. Okay.
A. And, once we realized that -- what was happening -- then we tried to, you know, get in as quickly as we could. But, of course, by the time this happened it was well past the date. But, you know, they were certainly well aware that they should have had a

qualified teacher in place for Bryan's program.
You know, I'll have to say that I would -- you know, I'm not really sure, actually, what this July 21 is, because this July 23 is the one that actually deals with the summer school issue.
MR. USHIRODA: Okay.
Q. So, you're not sure why the July 1, 2004 --
A. Except I think, you know, here it was May, June, July, you know, basically, three months out, and they still are not complying with the hearing order. And I think that's why we went forward with that one is we're still trying to get compliance with the hearing order.
Q. And that, again, is an example of deliberative indifference, according to you?
A. I think three months into -- well, now, we're like three years into the issue; but, certainly, I would think that, in three months' time, they should have been able to bring together a program that would have been appropriate for Bryan.
Q. And, again, my question was, you have July 21, 2004 second enforcement complaint listed here because it's a further instance -- it was filed because --
A. Because the DOE refused to or was not putting a --
Q. And you're saying that that's a further example



of deliberative indifference on the part of the state?
A. Yes.
Q. Okay.
A. Yes.
(Defendants' Exhibit No. 16 marked for identification)
MR. USHIRODA: Q. And then what I've handed you has been marked as Exhibit 16 to your deposition. It's a July 23, 2004 Hearing Officer Decision.
And this dealt with the summer school issue; correct?
A. Yes, this dealt with the summer school issue.
Q. And that's listed here in your response to Exhibit 16?
A. Yes.
Q. I mean Interrogatory 16?
A. Yes.
Q. And we talked at length about the present complaint, which you have listed as April 14, 2005, that was our last session.
Do you remember that?
A. Yes, I'm sure that --
Q. Now, you also have listed June 30, 2005 Motion to Consolidate and Stipulated Motion.
What was that about, Stan?



A. You know, those are all things that our lawyers have done for us, and I really don't know what that was about except -- about -- so, it was a legal issue, I'm sure.
Q. And then, can you go to page 30, talk about important facts ignored by the defendants.
What is this about?
A. I think it lists out that the defendants never made those agencies aware of what the requirements were for skills trainers, or other needs of Bryan, you know; and so they couldn't really recruit for people without knowing what they were recruiting for.
Q. So, these are like the settlement agreement, the various hearing decisions?
A. Yes.
Q. Those were not passed on to the agencies?
A. Yes.
Q. Okay, and I believe there are some citations here to support that; correct?
A. Yes.
Q. Is that another example of deliberate indifference on the part of the DOE?
A. I believe it very much is. You know, how could you expect your agents to recruit the right people if they don't know what the qualifications are that they're



recruiting for? So --
Q. Okay, do you know why, if at all, these decisions and orders were not passed on to the agencies?
A. No, I really don't know why the DOE wouldn't have done that.
Q. Okay, is there anything else you need to add in your response to Interrogatory 16?
A. No, I don't think so.
Q. That's pretty complete?
You've given me your complete answers?
A. I think I have -- well, to the best of my memory I've given you a complete answer. But, these are all very legalistic documents, as well, and so I probably don't understand all of the legal components of them.
Q. Okay, but, sitting here today, based on your best recollection, that you've given me all of the examples of deliberate indifference by the DOE?
A. I probably have not given all of the examples, but, I would have to really go back and go through my records to give, you know, more specific answers. But, I would say there probably are some more answers that are more specific about what happened, but --
Q. Can you think of anymore?
A. I can think of a few documents, right now, but, I can't think exactly what they say.

Page 433

Q. What documents are there?
A. Well, there were some documents between us and Barbara Coffman and JoAnn Hill about, basically, who was in charge of the program.
And they just basically stated, this is the way it is and, you know, it doesn't matter what the court order says. This is who you're going to get for your summer school teacher and this is who you're going to get for your aides.
Q. And that's it?
A. And that's it. You know, we don't care what they say.
Q. And that, to you, is an example of deliberate indifference?
A. Exactly. Well, it goes beyond that. It's an example of denial -- deliberate denial -- of his program.
Q. Okay.
A. You know, to me, it's beyond indifference. It's way beyond indifference. It's negligence. It's denial. It's intent to harm him, intent to harm us, retaliation against us. You know, I think it's all of those things.
Q. Well, I'm not trying to harp on this issue, but, it's just important for me because I don't want to have to re-depose you because I need to know everything

Page 434

you have to say.
A. I know. I'm trying to give you, let's say, the majority the big, high points; but, there is just a lot of correspondence between us and DOE, and there were many conversations, and it's hard -- you know, I can't remember each one, but --
Q. To the best of your knowledge, have you given me everything?
A. I've given you everything I can remember today.
MR. USHIRODA: Okay, well, on that note, then, Stan, thank you very much for your time.
(Deposition ends at 12:35 p.m.)

Page 435

REPORTER'S CERTIFICATE

I, MARYANN P. COSTA RPR, RMR, C.S.R. NO. 5820, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this day of , 2007.

______________________________

MARYANN P. COSTA RPR, RMR, C.S.R. NO. 5820

Page 436

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, MARYANN P. COSTA, RPR, RMR, CSR No. 5820, a Certified Shorthand Reporter in the State of California, certify that the foregoing pages 285 through 434, constitute a true and correct copy of the original deposition, Volume II, of STANLEY BOND, taken on Saturday, June 30, 2007.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this day of , 2007.

______________________________

MARYANN P. COSTA RPR, RMR, C.S.R. No. 5820