Of Counsel:

DAVIS LEVIN LIVINGSTON GRANDE
STANLEY E. LEVIN        1152-0
MICHAEL K. LIVINGSTON   4161-0
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813
Telephone: (808) 524-7500
Fax: (808) 545-7802
E-Mail: slevin@davislevin.com

SHELBY ANNE FLOYD     1724-0
MEI-FEI KUO           7377-0
65-1230 Mamalahoa Hwy., Suite C21
Kamuela, Hawaii 96743
Telephone:  (808) 885-6762
Fax:  (808) 885-8065
E-mail:  sfloyd@ahfi.com

LAW OFFICES OF CARL M. VARADY
CARL M. VARADY        4873-0
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawaii 96813
Telephone: (808) 523-8447
FAX:  523-8448
E-mail:  carl@varadylaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor, | CIVIL NO. CV 05-00247 HG/BMK CIVIL NO. CV 04-00442 HG/BMK Consolidated (Other Civil Action) |
| Plaintiffs, | PLAINTIFF STANLEY BOND'S RESPONSE TO DEFENDANT |

EXHIBIT E

|  | |
|---|---|
| vs.<br><br>DEPARTMENT OF EDUCATION,<br>State of Hawai'i, and ALVIN RHO, in<br>his official capacity as West Hawai'i<br>District Superintendent,<br><br>Defendants. | DEPARTMENT OF EDUCATION'S<br>REQUEST FOR ANSWERS TO<br>INTERROGATORIES TO<br>STANLEY BOND DATED MARCH<br>3, 2006 |

PLAINTIFF STANLEY BOND'S RESPONSE TO DEFENDANT
DEPARTMENT OF EDUCATION'S REQUEST FOR ANSWERS TO
INTERROGATORIES TO STANLEY BOND DATED MARCH 3, 2006

TO:   HOLLY T. SHIKADA, ESQ.
      GARY K. KAM, ESQ.
      Department of the Attorney General
      Education Section
      235 S. Beretania Street, Room 304
      Honolulu, Hawaii  96813

      Attorneys for Defendants

Plaintiff Kimberly Wiles, by and through his above named attorneys, responds to Defendant Department of Education's Request For Answers To Interrogatories To Plaintiff Stanley Bond Dated March 3, 2006.  Said response to interrogatories is attached hereto.

DATED:  Honolulu, Hawaii, April 11, 2006.

_____
STANLEY E. LEVIN
MICHAEL K. LIVINGSTON
SHELBY ANNE FLOYD
MEI-FEI KUO
CARL M. VARADY
Attorneys for Plaintiffs

2

1.    State your present full name, date of birth, place of birth, social security number and present residential address.

    Answer:

Stanley Crews Bond, Jr.
May 18, 1956
Staten Island, NY
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
510 Cooper Drive, Benicia, CA 94510

2.    List the full address of each place you have resided during the last ten years along with the corresponding dates of residence.

    Answer:

12/1990-3/1997- 6808 A Avenue, St. Augustine, FL
3/97-7/99- 69 Duck Hollow Road, Elkton, MD
8/99-1/2005- 76-6249 Kupuna Street, Kailua-Kona, HI
1/05-Present- 510 Cooper Drive, Benicia, CA

3.    Describe fully your education.  (this includes identifying each school, college, and educational institution you have attended; all occupational training you have had; special skills you have acquired, if any.  This includes the respective attendance or training dates, and each respective degree, diploma, or certificate you received.)

Answer:

Education

| Date | School | Major | Degree |
|---|---|---|---|
| 9/87-5/95 | State Univ. of N.Y.-Albany Albany, New York 12222 | Anthropology | Ph.D. |

Dissertation Title: Tradition and Change in First Spanish Period (1565-1763) St. Augustine Architecture: A Search for Colonial Identity.

| | | | |
|---|---|---|---|
| 9/81-5/84 | State Univ. of N.Y.-Albany Albany, New York 12222 | Anthropology | M.A. |

Thesis Title: The Relationship Between Soils and Settlement Patterns in the Middle Mohawk Valley.

| | | | |
|---|---|---|---|
| 6/79-8/80 | Univ. of Alabama Tuscaloosa, Alabama 35486 | Geology | B.S. |
| 8/76-5/78 | Univ. of Alabama Tuscaloosa, Alabama 35486 | Anthropology | B.A. |
| 8/74-5/76 | Wake Forest Univ. Winston-Salem, NC 27106 | Anthropology | |

Training

June 24-26, 1997. Introduction to Federal Projects and Historic Preservation Law. University of Nevada, Reno, Heritage Resource Management Program.

July 13-17, 1998. Contracting Officer Course Representative (ALMC-CL). US Army Logistics Management College.

September 14-18, 1998. Archeological Resource Protection Training. FLETC.

March 22-25, 1999. Preparing and Documenting Environmental Impact Analysis. US Army, Nicolson School of the Environment, Duke University.

October 27-29, 1999. Managing the Safety Performance Process. NPS.

July 18-20, 2000. Introduction to ArcView 3.2 GIS for Windows. NPS.

November 13-17, 2000. Supervision Fundamentals. Graduate School, USDA.

February 26-March 2, 2001. Administration for First-Line Supervisors. NPS.

July 24-26, 2001. ANCS+ Training. NPS.

May 11-15, 2001. Completed NAUI Scuba Diver and PADI Open Water Diver Certification. Jack's Diving Locker.

July 31, 2001. Completed PADI Medic First Aid (CPR/First Aid). Jack's Diving Locker.

August 1, 2001. Completed PADI Specialty Diver Oxygen First Aid and DAN Oxygen First Aid for Scuba Diving Injuries. Jack's Diving Locker.

August 28-30, 2001. NPS NEPA Training Director's Order #12. Albright Training Center.

October 30-November 1, 2001. Assistance Agreements. NPI, Inc.

May 24, 2002. USDOI Integrated Credit Card Program.

September 4-6, 2002. Orientation to NPS Performance Management Process and Government Performance and Results Act. NPS.

October 22-24, 2002. ASMIS Training. NPS.

October 28, 2002. COR/COTR Refresher Seminar. NPI, Inc.

November 13-17, 2002. OSHA 600. Rocky Mountain Education Center, OSHA Training Institute.

April 19, 2004. COR/COTR Refresher Seminar. NPI, Inc.

4.   Describe your occupation history for the last ten (10) years. (This includes military service, part time jobs, self-employment, and your recent work, if any. This includes providing for each such activity the relevant dates; names and business addresses of each employer or other entity you associated with; your status, rank or title; your rate of pay; and the reason for termination; for military service also state your branch(es), your service number, and type of discharge(s).

Answer:

I have never been terminated from a job. I do not have any military service.

Professional Experience

1/05 to Present. GS-024-12 (8) Superintendent, Juan Bautista de Anza National Historic Trail, Oakland, California. Pay Approximately $86,000 per year

1/01 to 1/05. GS-193-12 (7) Chief of Resources, Integrated Resource Manager/Archeologist and 7/99-1/01. GS-193-11 (10) Archeologist; Kaloko-Honokohau National Historical Park, Kailua-Kona, Hawaii. Ending Pay approximately $72,000 per year. Responsible for cultural and natural resources programs in the park, including the Coral Reef Initiative and park GIS database. Supervise 18 individuals in two parks; Duties include preparation of compliance documentation and permits, including "no adverse affect" under the Nationwide Programmatic Agreement, 106 compliance documents for park projects, Section 7 documents and permits under the ESA, data for Environmental Assessments, Hawaii Island Burial Council documentation, and research and specimen collecting permits, yearly curation, archeological and natural resource reports; oversight of cultural and natural resources projects including restoration of Kaloko fishpond, stabilization of Aiopio fishtrap, stabilization of archeological sites, documentation of archeological sites and petroglyph fields, alien vegetation eradication and reintroduction of native plants, enhancement of endangered waterbird nesting habitat, predator trapping, water quality assessment and monitoring, sea turtle monitoring, park participation in the Inventory and Monitoring program, coastal hazards analysis, Coral Reef Initiative programs; development of cultural and natural resource PMIS statements for park projects; management of park collections; supervise eleven employees and larger temporary work groups (fire crew, YCC, SCA); partnerships, agreements, and projects with USGS Water Resources Division-Honolulu (Dr. Gordon Tribble), USGS Pacific Science Unit (Dr. Bruce Richmond, Dr. Mike Fields), U.S. Marine Fisheries Service (George

Balazs), University of Hawaii Pacific Cooperative Studies Unit (Dr. David Duffy), University of Hawaii-Hilo Marine Science Department (Dr. Paul Haberstroh), University of Hawaii-Manoa Oceanography Department (Dr. Ed Laws), Hawaii State Emergency Environmental Work Force (Laurie Hillis), Ducks, Unlimited, Inc. (Kim Uyehara), TREE Center (Pam Davis-Lee), Amy Greenwell Ethnobotanical Garden (Peter Van Dyke); lead for intervention with Hawaii State Land Use Commission, Hawaii County Council, and Hawaii County Planning Commission over upslope and adjacent development; with superintendent negotiated with State of Hawaii and private landowners for leases, jurisdiction, or ownership of lands within authorized boundary; consultation with Hawaii Island Burial Council and local Hawaiian groups; worked closely with all park divisions, including Rangers, Interpretation, Maintenance, and Administration; serve on Board of Directors for the Kona Historical Society and Pulama Ia Kona committee for the development of a historic heritage corridor; received the 2001 Regional Director's Award for Small Park Natural Resources Manager of the Year and 2001 Director's Award, the Trish Patterson Student Conservation Association Award for Natural Resource Management in a Small Park; served on the 2002 National Natural Resource Awards selection committee. Currently serving as Acting Chief of Resources for Pu'uhonua O Honaunau NHP.

3/97-7/99. GS-193-12 (3) Archeologist. U.S. Army Environmental Center, Aberdeen Proving Grounds, Maryland. Ending Pay approximately $60,000 per year. Duties include development of Army policy for cultural resource management on Army installations; Development of model Army Integrated Cultural Resource Management Plans and review of Army installation ICRMP plans; management of Army curation standards development and development of curation partnerships for professional curation of installation collections; consulted with installations on resource issues; oversight of contracts; served as the Army representative on the Department of Defense Curation Committee; development of cultural landscape approach for Army installation cultural resource management; yearly rollup of Army cultural resource data; yearly budget review of installation funding requests for cultural resource projects; development of Cultural Resources Section public relations program; Conservation Branch WEB page manager; trained Army personnel on environmental compliance laws.

1/87- 3/97. Archaeologist I/Archaeologist II. Historic St. Augustine Preservation Board, St. Augustine, Florida. Endin Pay approximately $27,000 per year Duties include development and implementation of archaeological research projects; continuing program of site survey in St. Augustine and St. Johns County; research, excavation and report preparation on archaeological sites in St. Augustine

and St. Johns County; maintain archaeological collections (approximately 1000 cubic feet plus associated documents) and loans; train and supervise professional archaeologists, student interns, and archaeological volunteers; development of school programs and curriculum; preparation of Florida Master Site File forms; research on Spanish material culture; historical research on various ethnic groups associated with St. Augustine; maintain up to date files on archaeological sites in St. Augustine and St. Johns County; act as a liaison and resource on archaeological issues with city, county, state, and federal officials, private developers, and professional archaeologists; grant preparation and implementation; public presentations on archaeological topics; contact with the news media; archaeological exhibit preparation; placement of historic sites in GIS.

9/84-1/87. Museum Curator. Historic St. Augustine Preservation Board, St. Augustine, Florida.  Duties included supervision and maintenance of the archaeological collections and associated documents; continued program of archaeological site survey in St. Augustine and St. Johns County; archaeological excavation of endangered sites in St. Augustine and St. Johns County; development of an archaeological volunteer program; maintain up to date archaeological site files for St. Augustine and St. Johns County; act as a liaison and resource person on archaeological issues with city, county, state, and federal officials, private developers, and professional archaeologists; development of archaeological standards for the St. Augustine Comprehensive Plan; development of the Archaeological Preservation Ordinance for St. Augustine; public presentations on archaeological topics.

2/83-9/84. Research Archaeologist. Historic St. Augustine Preservation Board, St. Augustine, Florida.  Duties included coordinating a subsurface archaeological survey of St. Johns County, research, mapping, artifact analysis, and final report; archaeological excavation and monitoring of utility excavations on St. George Street, St. Augustine, Florida, research, direction of archaeological excavation, analysis of recovered data, and final report.

5/81-5/82. Archaeological Research Assistant. Research Foundation, State University of New York, Albany, New York.
Full time 5/81-8/81 and part time 9/81-5/82 on N.Y. Department of Transportation contracts; duties included archaeological survey, mapping, test excavation, artifact analysis, and research.

8/80-5/81. Project Archaeologist. Historic St. Augustine Preservation Board, St. Augustine, Florida.

Coordinated all aspects of a subsurface auger survey in various parts of the city; duties included surveying, augering, mapping, artifact analysis, research, and preparation of a final report.

7/78-8/79. Field Archaeologist. Office of Archaeological Research, University of Alabama, Tuscaloosa, Alabama. Duties included field work and laboratory analysis for two projects, Bay Springs Testing Project and Cedar Creek Above Pool Survey; laboratory analysis on other various projects; experimental thermal alteration of cherts.

9/76-12/76. Archaeological Technician. Office of Archaeological Research, University of Alabama, Tuscaloosa, Alabama.
Weekend excavation on sites in the Aliceville Lock and Dam Project, part time laboratory work.

Teaching Experience

9/96-12/96. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology.

1/96-4/96. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean and Anthropology 492, Archaeological Collections Management.

9/95-12/95. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology and Anthropology 491, Field Methods in Archaeology.

1/95-4/95. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean and Anthropology 492, Field Methods in Archaeology.

9/94-12/94. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology and Anthropology 491, Archaeological Collections Research.

1/94-4/94. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean.

9/93-12/93. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology and Anthropology 491, Archaeological Laboratory Techniques.

1/93-4/93. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean and Anthropology 492, Field Methods in Archaeology.

9/92-12/92. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology.

1/92-4/92. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, Florida Archaeology.

9/91-12/91. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology.

9/87-12/87. Graduate Assistant and Professor of Record. State University of New York, Albany, New York. Anthropology 140, Survey of World Cultures, with Dr. James Wesmann.

9/82-12/82. Teaching Assistant. State University of New York, Albany, New York. Anthropology 101, Introduction to Anthropology. Assisted instructor in preparation of classroom material, prepared tests, and taught two one-hour review classes each week.

6/82-8/82. Graduate Assistant. State University of New York, Albany, New York. Field supervisor in Anthropology 330, Archaeological Field School. Directed students in archaeological site survey and site excavation.

5.    Identify each legal proceeding, other than this suit, in which you have been
       or are a party, a witness, or an accused.  (This includes civil and criminal
       lawsuits, formal administrative proceedings, convictions indictments, arrests
       and citations, including traffic offenses.  This includes identifying your role
       in each proceeding.  This includes the dates, places, and courts of each such
       lawsuit, conviction, indictment, arrest, and citation.)

       Answer:

Florida
1994/95 (approximate) Suit against Flagler County, FL School District for physical
mistreatment of Bryan Wiles-Bond in the classroom. Part of a broader suit brought
by the classroom parents for the same reason associated with their children.
Settled. - Plaintiff

Hawaii
Hearing Request was filed on 2/27/01, a decision dated 5/21/01 was issued but has
no case number on it. Petitioner
DOE 2004-026 filed 2/26/04, decision 5/11/04 - Petitioner
DOE 2004-070 filed 6/2/04, decision 7/23/04 - Petitioner

Civil No. CV 02-000101 SOM/BMK filed 2/15/02 - Plaintiff

2004- Temporary Restraining Order against Ms. Wells due to an attempted
abduction. - Plaintiff

No other legal proceedings, including citations or traffic offenses.

11

6.    Describe fully each injury which you believe you sustained as a result of the alleged actions or inactions of the Defendants. (This includes physical and mental injuries; includes identifying which injuries, if any, you claim are permanent.)

   Answer:

The position the DOE put us in left us in a state of almost constant stress. We never knew from on day to the next if Bryan would have his educational needs met and if we were going to be required to leave our jobs that day to care for him. It is probably impossible to list every injury or situation that created this stress in our lives, but we have considerable documentation of conversations and written correspondence that point to much of it. Some of the most compelling are:

-Daily observation of the predictable regression in Bryan's behaviors that corresponded with the erosion of his educational program due to incorrect implementation of his program from staff members that did not have the appropriate training. In addition to the behavioral regression Bryan's ability to learn and progress in this "window of opportunity" was squandered away due to the indifference of the Department of Education in securing appropriate personnel to implement his program and to appropriately adhere to the educational components of his program.

-Frustration caused by the indifference of working with the school and provider agencies who would claim that the aides and teacher, who didn't know DTT's and sign (major components of his program) were appropriate. This insistence was done even after going through a due process hearings and prevailing on these points. These agencies also engaged in personal attacks on the parent's character especially Ms. Wiles claiming that she was difficult to work with when she would insist that her son's program be implemented correctly. The DOE and service agencies also discussed with prospective aides how difficult the parents were to work with since they would pursue due process hearings (even though this was done when it was felt all other avenues of resolution were exhausted). This discussion with service providers in effect punished the parents for pursuing their due process rights.

- The continuing pattern of deception and delay tactics in finding skilled individuals who could implement his program. The DOE and the service provider agencies would often times provide false information (either qualifications or

availability) Many times we would go several weeks without hearing from them then we would get calls on the day of a hearing. Since the DOE was indifferent with respect to finding aides that had the appropriate skills, the parents spent a great deal of time researching organizations to find appropriate ABA providers. When the parents found individuals that met the qualifications and shared the information ,it was disregarded. The DOE never even looked at the resumes of individuals we had contacted and that were willing to relocate. In the meantime they claimed they had a list of "appropriate" individuals they had secured from a newspaper ad placed in Honolulu. They had these names for several weeks while Bryan was without services and never mentioned they had some prospects. When the list was given to us we contacted them. No one from the DOE had ever contacted these individuals. Many of the individuals were either not appropriate or did not understand the position was in Kona.

One of the major barriers to finding qualified individuals was finding someone with a sign background. The team needed instruction in order to advance Bryan's signing skills. The parents found someone who had excellent qualifications for teaching the team sign and a knowledge of how to progress in the instruction. He was studying in Honolulu for the summer and willing to come to Kona to instruct the team. Ms. Hill, the SES at the time made a verbal contract with him but cancelled at the last minute. The parents found out about it through an e-mail that was copied to us. Signing instruction was later offered by the DOE to all employees and scheduled at a time when Bryan didn't have services so the parents could not attend. Furthermore it was taught by several different people who didn't have a clear purpose. The DOE classes had nothing to do with working on Bryan's individual program. It also combined exact sign with ASL while Bryan's program was built on ASL.


-Leaving Bryan with individuals we did not believe were capable of working with him, including property damage when he was with them.

-The inconsistent services and our fear of Bryan's safety as things fell apart also resulted in our inability to commit professionally to any training or activity. This resulted in Ms. Wiles being unable to apply for a Principal position since she was never sure if Bryan would have the services that were agreed to in the IEP. When his hours weren't covered one of the parents would have to leave work.

-There were several individuals that we were concerned about Bryan's safety when he was with them. Also as the school environment became more hostile to Bryan we were worried about his safety in this setting too. This came to a head when Ms. Wiles went by the school to deliver extra pants and found Bryan on a mat self stemming in his urine on a plastic mat and using the surface as a slip and slide. When Ms. Wiles walked into the room she was horrified to find four adults watching. The aide said to her "He looks so happy" and the teacher said "I don't know what to do". Apparently the teacher did not understand the concept of finding an appropriate replacement behavior. This was the defining event that caused Ms. Wiles to remove him from school. Not only was there a health and safety issue present but Bryan was allowed to escalate into a frenzy through self stimulation. The need to prevent him from engaging in these kinds of behaviors was well documented since self stemming behaviors increase his desire to self stimulate and other negative behaviors such as aggression. Ms. Wiles had been worried about what was occurring at school since the beginning of the school year and had been unsuccessful in getting any answers from the teacher or psychologist about the structure of his program. When she witnessed this event she knew she could no longer trust the school or the personnel involved. In fact she felt that if he continued under the current conditions she would run the risk of losing him since he was regressing so rapidly under the lack of structure.

-As Bryan's regressed due to the inappropriate implementation of his program, the DOE abandoned working on the educational aspect of his program. It was unclear to the parents who was in charge of the educational aspect of his program. Although data was being taken there were not any adjustments to his program based on performance. It was clear that the DOE had abandoned the educational aspects of his program. During this period the Autism Consultant would speak with the skill trainers about behavioral issues and about their personal lives but there was no focus on Bryan's educational progress. In fact according to one skill trainer the psychologist would try and pry into the personal lives of the parents by asking "Are you detecting any marital difficulties?" When the Autism Consultant spoke with the parents and educational progress was brought up she would discuss it but then would not follow through with discussing the changes with the skill trainers. As Bryan's behavior dramatically improved at home, Ms. Wiles had to design the educational part of his program since the DOE had abandoned this area. During the entire time he was at home the "teacher" never called and discussed his academic progress or made a visitation.

14

-The lack of confidentiality and misinformation in Bryan's case created anger and frustration. The discussion of Bryan's case was open and inappropriate. Bryan's case and the legal aspects were a central focus of the DOE personnel and apparently discussed at Tiffe skill trainer meetings. Tiffe even called Ms. Wiles workplace and discussed the securing of a skill trainer with the school's secretary (on the day of a hearing- I guess she felt desperate to get it on record when Ms. Wiles was unavailable). Ms. Wiles, working for the DOE, had gone to great lengths to separate her professional and private life. She felt it was inappropriate for Tiffe to be sharing confidential information with a secretary who did not even know Ms. Wiles had an autistic son. The parents had numerous instances of strangers or individuals barely known to the parents and not involved in Bryan's case come up to them our in the community and start discussing Bryan, sometimes with incorrect facts. This concern was discussed on a regular basis with the psychologist and it was brought up with DOE personnel. The psychologist who is supposedly bound by confidentiality standards and knew about these concerns took an aide out drinking the afternoon after Bryan's leg was injured. They drank Bloody Marys at a local bar for five hours and discussed Bryan's case in a very public venue. At this point the parents understood how deeply unprofessional the situation had become. It was frightening since there was not any support services to assist with Bryan's needs and it was obvious the intent was to not help. It was clear the family needed to leave Hawaii as soon as possible even if another position did not become available.

-Invasion of our privacy caused considerable stress. A certain amount of privacy is expected to be forfeited when there are individuals in the house. However, it is expected that those individuals will act professionally and not go out of their way to look for personal information. One of the skill trainers that they sent went out of his way to listen to phone conversations. His feet could be observed at the doorway downstairs while he was listening to phone conversations even though he felt he was safely out of view. According to another skill trainer present at the meetings he would relay the content of conversations he had overheard to the school. He also found Real Estate information from California and reported it to the school immediately. He would leave the area on almost an hourly basis to report back to the DOE. Finding out about these behaviors forced the parents to be on their guard and added considerable stress to their lives which were already stressed due to eliminating the negative behaviors that had cropped up during the regression. The fact that someone who was there to help your son was more interested in listening in on your private conversations was disconcerting. The parents were concerned about leaving the house and made sure their room which contained the computer was locked.

The aide described above also shared many things which highlighted how inappropriate, questionable, and irregular the arrangement was. He described relationships with the psychologist, Tiffe, and the DOE which far exceeded professional boundaries. He told Ms. Wiles that he and the psychologist would go out for drinks and she had offered him a condominium to stay in for free on a trip to Washington DC. The psychologist had brought him to one of the parent meetings and claimed he was on an equal footing with her at least as far as his knowledge base. Ms. Wiles was surprised to hear that she would present him professionally in such a light considering he didn't even have a BA and his AA was in business  In fact his only experience was several years serving as an aide in a non-public school in California. Ms. Wiles also heard stories from the aide involving Kelly Stern who was the Director of TIFFE.  The aide laughed one day about a meeting he attended in Waimea with Kelly and said they had intertwined legs throughout the meeting.  Apparently they both thought it was funny that everyone stared. He also described his concern to me about his professional separation with Ms. Stern when she wanted him to live in her house (as a renter). And finally he claimed that Ms. Tolentino (the SES who was on the case after Ms. Hill was removed) had offered him a higher level autism position for working with Bryan once that assignment was completed.  When the DOE hired someone else the aide was furious and relayed the story to Ms. Wiles. He had apparently discussed for an hour on the phone with the psychologist before he told Ms. Wiles. Knowing position recruitment procedures Ms. Wiles realized how serious this was. These are just a few of the examples but hearing them on a daily basis suggested that this was not a regular aide arrangement and it caused a great deal of stress having to be polite to the individual in your home when you knew his true purpose was something other than working with your child. Finally, the aide was in charge of data collection but was unwilling to share his records despite several requests. These circumstances left the parents to wonder about the accuracy of what was recorded.

Finally, the biggest act of privacy violation and the confirmation of their negative intent was the illegal tapping into our e-mails.  This was discovered when the DOE submitted a private e-mail Ms. Wiles had written to another person from her computer in her bedroom to a judge in one of the legal proceedings. The judge dismissed the e-mails stating they were private and later District's SES Ms. Hill was subpoenaed but did not show up at the deposition. There were many other collaborating pieces to suggest that we were being targeted as a family.  We were scared for our son and for ourselves.

The overriding stress throughout this entire period was the loss of time we could spend as a family and with our other son. We also felt at any moment the bottom could drop out and often it did. We were worried about Bryan and knew that the time we wasted in attempting to get his program implemented would result in a lost window of opportunity for his learning and would change the trajectory of his life. It was heartbreaking to see our child and our family being turned into an incorrect urban legend through the open discussion (often incorrect) of our situation with information that should have been confidential regarding our child's disability. It was also stressful to pursue legal recourses through due process hearings. Even more stressful was to prevail in the hearing and have the DOE act as if hearing orders were unimportant and they wouldn't be held accountable. This blatant disregard for the only avenue of recourse available to parents felt very much like a system out of control. Once again by the time the case had progressed to the Federal Level and the DOE would not follow through with the judge's request the family knew they would have to leave the State.

Our family wanted very much to make Hawaii our permanent home. In order to live in Hawaii Dr. Bond took a downgrade in his GS level (from a GS-12 to a GS-11) to move there from Maryland. Ms. Wiles initially took a sharp decrease in pay when working as a counselor but the family felt it was worth it to live in Hawaii. Ms. Wiles had worked for six years in the Department of Education as a counselor and an administrator. She was four years from being vested in the retirement system and had planned on working 20 years in Hawaii before retiring. Their oldest son was happily attending Parker and did not wish to leave. The family had planned to live in Hawaii permanently and it was with great sorrow they felt forced to give up that dream because the adversarial relationship with the DOE made it impossible to stay.

7.  Identify each psychiatrist, psychologist, psychiatric social worker, marriage counselor, or any other person providing treatment or counseling services for mental, emotional or adjustment problems, giving the inclusive dates of treatment or consultation, and describe the nature of the problem(s) for which treatment or consultation was sought.

    Answer:

    None.

8.  Itemize <u>all</u> educational, medical, and health care expenses you claim resulted from or are directly chargeable to the alleged actions or inactions of the Defendants.  (This includes the amount of each charge, identifying each charging educational and health care provider or facility, and stating the inclusive dates for each charge.)

    Answer:    All of the above are future claims.

9.  Describe fully each claim, if any, resulting from the claims alleged in the Complaint, for your past or future loss of income.  (This includes wages, earnings, or other income; identify each person or organization who would have paid you; the amount of each loss; explaining how each loss is computed; and stating the inclusive dates payment would have been made.)

    Answer:

10.   With regard to your federal income tax returns, please state the following
information for each of the five full years immediately preceding the filing
of the Complaint, Civil No. 04-00442 HG/BMK, the year of the filing of the
aforementioned Complaint, and for each full tax year since the filing of the
aforementioned Complaint:

| Year | Wages | Other Income | P/L from Business | Total Taxable Income |
|------|-------|--------------|-------------------|----------------------|
| 2001 | 91,368 | 0 | 0 | 91,368 |
| 2002 | 106,606 | 0 | 0 | 106,606 |
| 2003 | 110,157 | 0 | 0 | 110,157 |
| 2004 | 109,744 | 0 | 0 | 109,744 |
| 2005 | 131,040 | 0 | 0 | 131,040 |

11.   Identify and itemize all other losses (tangible or other) or expenses that you
claim resulted from or are directly chargeable to the alleged actions or
inactions of the Defendants other than medical expenses and loss of income
described above. (This includes identifying each bill and person or entity
submitting the bill, explaining how each loss is computed, and stating the
inclusive dates of each bill or loss.)

Answer: $67,500 cost of housing sold $582,500 had to buy in CA $650,000
Loss of tuition of other son at Parker $9,800.


12.   State fully the nature and amount of all future expenses you anticipate you
will incur as a result of the alleged actions and inactions of the Defendants
and explain the basis for those anticipated expenses.

Answer:    See Exhibit "A" attached hereto

13.   Identify the all experts whom you have consulted or expect or plan to call to
       testify in this case (including but not limited to all medical doctors),
       indicating whether or not each expert is expected to testify at trial, and
       describe fully each expert's opinions, knowledge, and work relative to this
       case. (This includes each expert's full name, complete address, and phone
       number; the field of expertise of each expert; the subject matter on which
       each expert is expected to testify; the substance of the facts and opinions to
       which each expert is expected to testify; a summary of the grounds for each
       opinion; and, if the expert has prepared any written report(s) involving any
       matter involved in this lawsuit, identify the report(s) and each person having
       present custody or control of the report(s).

Answer:      Dr. Daniel LeGoff (Expert)
             Child and Adolescent Resources for Education
             105 South Princeton Ave
             Wenonah, NJ 08090
             (856) 616-6466

             See Exhibit "B" attached hereto for a copy of Dr. LeGoff's report.

             Dr. Kimberly Smalley (Expert)
             Behavioralist
             C/o Behavioral Counseling And Research Center LLC
             575 Cooke Street, Suite A-1622
             Honolulu, HI 96813
             (808) 254-0909

             See Exhibit "C" attached hereto for a copy of Dr. Smalley's report.

             Barbara Bateman (Expert)
             DOE's responsibilities to implement IEP/Decisions
             32223 DeBerry Road
             Creswell, OR 97426
             (541) 895-3858

       Dr. Bateman will testify that the IEPs were prepared to provide for
educational gain. In other words, that the IEPs were good for Bryan. However she
will say that the plan outset by the IEPs = they require excellent coordination
between the school and the home. The first and continuing problem was staffing

of the positions. This was a constant issue. It was an issue because the DOE did not communicate the terms of these multiple settlements to the agencies in the county of Hawaii. Therefore, the agencies complained about the parents being unreasonable but they were simply exercising their contractual right to approve of the trainers. None of the trainers referred by the DOE had any training in ASL sign language. Very few of these potential trainers had any experience with autistic children.

When the battle about the qualifications of the trainers was proceeding, the home program was left rudderless and leaderless. Who was responsible for the home program was not made clear by the DOE. This home program contained some crucial elements.

Dr. Bateman will have reviewed all IEPs and all other pertinent documents to reach her conclusions about the deliberate indifference of the DOE.

Loretta M. Lukens, M.D., R.N., C.R.R.N. (Expert)
Life planning
29 West Rhea Road
Tempe, AZ 85284
(480) 839-0799

Loretta Lukens, M.D., R.N.'s report will be forthcoming.

Keynes D. Von Elsner, CPA (Expert)
Economist
50 S. Beretania Street
Suite C-113
Honolulu, HI 96813
(808) 538-6904

See Exhibit "A" for a copy of Von Elsner's calculations/report.

14.    Identify each lay witness whether or not you expect or plan to call him or her
to testify at the trial of this case, including in your description the full name
and complete address and phone number of each witness, and briefly
describe the facts to which each witness will testify.

Answer:

Ann Kimball Wiles
c/o Davis Levin Livingston Grande
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813

Stanley Bond
c/o Davis Levin Livingston Grande
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813

Alvin Rho
c/o Lono P.V. Beamer
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

Naomi Shiraishi
c/o Lono P.V. Beamer
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

Linda Price, Administrator
Child and Family Services
c/o Lono P.V. Beamer
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

Bill Bien
        Skills Trainer

Christy Bien
Cell No. 987-2787

Karen Johnson
        c/o Holly Shikada
        Deputy Attorney General
        235 S. Beretania Street, Room 304
        Honolulu, Hawaii  96813

Barbara Coffman
        c/o holly Shikada
        Deputy Attorney General
        235 S. Beretania Street, Room 304
        Honolulu, Hawaii  96813

Sheri Adams
        c/o Holly Shikada
        Deputy Attorney General
        235 S. Beretania Street, Room 304
        Honolulu, Hawaii  96813

Kelly Stern
        c/o TIFFE

Dru Copeland
        Alakai Na Keiki

JoAnn Hill (former DES)

Christie Edwards
        Therapeutic Aide

Cara Entz
        Pacific Child and Family Associates, APC
        410 Wet Arden Avenue, Suite 203
        Glendale, CA 91203

Radwick

Sven Linderman
C/o TIFFE

Katherine Cardinas – she will be a critical witness
C/o TIFFE
896-5642 (Cell)
887-0373 (HM)

Jeremy Watson
C/o TIFFE

Laura Pruitt
C/o Hawaii Behavioral Health

Bill Brown
C/o DOE
He is Bryan's ESY substitute.

Mr. Stafford (Kealakehe's VP)  Not sure of his first name.

-15. · Identify and describe each examination done for or by you for any purpose related to this lawsuit. (This includes without limitation each inspection, test, experiment, or other study made by any person, expert of not. This includes the purposes of determining or evaluating facts or arriving at an opinion or conclusion regarding the alleged claims against the Defendants. This includes identifying the date and nature of the examination; the person(s) and entities conducting the examination; and each document connected with or resulting from such examinations.

This interrogatory is not limited by whether or not the examination was conducted in preparation for trial.)

Answer:    Expert report of Dr. Daniel LeGoff
           Expert report of Van Keyes

16.    Describe fully each fact, condition, act or omission and the legal basis upon which you base your allegations that the Defendants were deliberately indifferent and should be held liable for damages in this case.

Answer:    All of the following documents were attached to Plaintiffs' Concise Statement of Fact:

May 21, 2001 Stipulated Decision, signed by Richard C.F. Chun, the Hearing Officer.

February 15, 2002 Enforcement Complaint filed (This complaint was required because the Defendants did not provide an after school aide and it refused to make up lost time).

July 1, 2002 Compromise and Settlement Agreement (This was an effort to resolve all controversies. The Defendants had ignored and disregarded its agreed obligation to provide qualified skills trainers 68 hours per month and it also agreed to provide a "pool of qualified substitutes".)

May 11, 2004 Findings of Fact, Conclusions of Law signed by Hearing Officer Alm who made devastating findings about the inability of Defendants to meet its obligation to provide FAPE and of the "regression occurring in Bryan" because of the Defendants' failures.

July 21, 2004 Second enforcement complaint filed to require compliance with the July 1, 2002 settlement agreement and the May 11, 2004 hearing decision.

July 23, 2004 Hearing Officer Decision (This decision was only on a very limited issue regarding whether Bryan was denied FAPE by having a special education teacher who was untrained in American Sign Language. After Defendants stipulated to certain facts and liability on this issue, Ms. Alm ruled that it violated Bryan's right to FAPE to have such an untrained teacher.)

April 14, 2005 Present Complaint.

June 30, 2005 Motion to Consolidate and Stipulated Motion.

## IMPORTANT FACTS IGNORED BY THE DEFENDANTS

While the Defendants were involved in making agreements and was subject to Stipulated Orders, they never communicated the content of the agreements to the agencies in the Big Island community the terms of these agreements and orders.:

The DOE made commitments regarding levels of training/experience for skills trainers that the Defendants never told the agencies tasked with recruiting skills trainers, who never knew what standards their skills trainers had to meet. See Plaintiffs' Opposition to Defendants Concise Statement of Fact filed March 10, 2006 at 1, 2 3, 5 & 6, also see Defendants' Exhibit "A" at 13.

The Settlement Agreement provided that the agency had to develop a pool of trained substitutes yet the agency had no knowledge of that requirement. See Plaintiffs' Opposition to Defendants Concise Statement of Fact filed March 10, 2006 at 1, 2 3, 5 & 6.

The Settlement Agreement of 2002 provided for respite care for the parents, but the administrators complained that skills trainers were left alone with Bryan. See Exhibit "A" at 036 of Petitioner' Concise Statement of Fact filed March 7, 2006.

The June 2004 Order provided that the skills trainers be trained and proficient in American Sign Language (ASL), but none of the skills trainers had such training. See Plaintiffs' Opposition to Defendants Concise Statement of Fact filed March 10, 2006 at 1, 2 3, 5 & 6.

After the May 2004 Hearing Officer's decision, on June 2004, the DOE agreed to the number of additional hours for training pursuant to the May 2004 Decision, to ASL training and to the hiring of an experienced person dealing with Bryan's behavior to oversee the toileting program. The Defendants failed to implement these provisions. See Exhibit "B" at 052 of Petitioner' Concise Statement of Fact filed March 7, 2006.

17.    Describe with particularity each of the detailed, specific, particular facts, conditions, acts or omissions on which you and your attorney are basing your allegations that the Defendants intentionally discriminated against you and your child and should be liable for damages in this case.

    Answer:    See answer to interrogatory 16

18.    Identify each person who helped you in answering these interrogatories.

    Answer:    Stan Bond
                     Stanley E. Levin
                     Bruce Ellis

19.    Do the answers to each and every one of these foregoing interrogatories include not only the information known to you individually or your attorney, but also all the information within the possession or control of you the party?

    Answer:    I have answered all interrogatories to the best of my ability and believe they accurately reflect information known to me and my attorney and information within possession or control.

20.    Do you understand that these are continuing interrogatories and that if you or your attorney should obtain any further information relevant to these interrogatories, you are required reasonably to supplement or amend your answers to these interrogatories pursuant to Rule 26(e) of the Rules of Civil Procedure?

    Answers: I personally am not aware of the contents of Rule 26(e) of the Rules of Civil Procedure but to the extent that my attorney understands this rule: Yes

21.    Do you understand that you are answering these interrogatories under oath and that your answers may be used as evidence in the event of a trial?

    Answer: Yes

Bryan
Present Values of Amounts

| Year | Age | Higher | Lower | PV Factor | PV Higher | PV Lower | |
|------|-----|--------|-------|-----------|-----------|----------|---|
| 2005 | 13 | 188,510 | 125,673 | 0.9891738 | 186,469 | 124,312 | Assume zero inflation |
| 2006 | 14 | 110,880 | 73,920 | 0.9694931 | 107,497 | 71,665 | |
| 2007 | 15 | 110,880 | 73,920 | 0.9502039 | 105,359 | 70,239 | Assume Bryan is 13 on 1/1/05 |
| 2008 | 16 | 110,880 | 73,920 | 0.9312986 | 103,262 | 68,842 | |
| 2009 | 17 | 110,880 | 73,920 | 0.9127694 | 101,208 | 67,472 | Used 11/28/05 yield on 10 yr |
| 2010 | 18 | 110,880 | 73,920 | 0.8946088 | 99,194 | 66,129 | Treasury Inflation-Indexed |
| 2011 | 19 | 110,880 | 73,920 | 0.8768096 | 97,221 | 64,814 | Note due 1/15/15, which |
| 2012 | 20 | 110,880 | 73,920 | 0.8593645 | 95,286 | 63,524 | was 2.03, as the present |
| 2013 | 21 | 110,880 | 73,920 | 0.8422665 | 93,391 | 62,260 | value factor |
| 2014 | 22 | 101,920 | 50,960 | 0.8255086 | 84,136 | 42,068 | |
| 2015 | 23 | 101,920 | 50,960 | 0.8090842 | 82,462 | 41,231 | Since the amounts were |
| 2016 | 24 | 101,920 | 50,960 | 0.7929866 | 80,821 | 40,411 | not increased by inflation |
| 2017 | 25 | 101,920 | 50,960 | 0.7772093 | 79,213 | 39,607 | I did not include |
| 2018 | 26 | 101,920 | 50,960 | 0.7617458 | 77,637 | 38,819 | inflation on the |
| 2019 | 27 | 101,920 | 50,960 | 0.74659 | 76,092 | 38,046 | present value factor. |
| 2020 | 28 | 101,920 | 50,960 | 0.7317358 | 74,579 | 37,289 | |
| 2021 | 29 | 101,920 | 50,960 | 0.7171771 | 73,095 | 36,547 | |
| 2022 | 30 | 101,920 | 50,960 | 0.7029081 | 71,640 | 35,820 | |
| 2023 | 31 | 101,920 | 50,960 | 0.6889229 | 70,215 | 35,108 | |
| 2024 | 32 | 101,920 | 50,960 | 0.6752161 | 68,818 | 34,409 | |
| 2025 | 33 | 101,920 | 50,960 | 0.6617819 | 67,449 | 33,724 | |
| 2026 | 34 | 101,920 | 50,960 | 0.648615 | 66,107 | 33,053 | |
| 2027 | 35 | 101,920 | 50,960 | 0.6357101 | 64,792 | 32,396 | |
| 2028 | 36 | 101,920 | 50,960 | 0.6230619 | 63,502 | 31,751 | |
| 2029 | 37 | 101,920 | 50,960 | 0.6106654 | 62,239 | 31,120 | |
| 2030 | 38 | 101,920 | 50,960 | 0.5985155 | 61,001 | 30,500 | |
| 2031 | 39 | 101,920 | 50,960 | 0.5866074 | 59,787 | 29,894 | |
| 2032 | 40 | 101,920 | 50,960 | 0.5749362 | 58,597 | 29,299 | |
| 2033 | 41 | 101,920 | 50,960 | 0.5634972 | 57,432 | 28,716 | |
| 2034 | 42 | 101,920 | 50,960 | 0.5522858 | 56,289 | 28,144 | |
| 2035 | 43 | 101,920 | 50,960 | 0.5412975 | 55,169 | 27,585 | |
| 2036 | 44 | 101,920 | 50,960 | 0.5305278 | 54,071 | 27,036 | |
| 2037 | 45 | 101,920 | 50,960 | 0.5199723 | 52,996 | 26,498 | |
| 2038 | 46 | 101,920 | 50,960 | 0.5096269 | 51,941 | 25,971 | |
| 2039 | 47 | 101,920 | 50,960 | 0.4994873 | 50,908 | 25,454 | |
| 2040 | 48 | 101,920 | 50,960 | 0.4895495 | 49,895 | 24,947 | |
| 2041 | 49 | 101,920 | 50,960 | 0.4798093 | 48,902 | 24,451 | |
| 2042 | 50 | 101,920 | 50,960 | 0.470263 | 47,929 | 23,965 | |
| 2043 | 51 | 101,920 | 50,960 | 0.4609066 | 46,976 | 23,488 | |
| 2044 | 52 | 101,920 | 50,960 | 0.4517363 | 46,041 | 23,020 | |
| 2045 | 53 | 101,920 | 50,960 | 0.4427485 | 45,125 | 22,562 | |
| 2046 | 54 | 101,920 | 50,960 | 0.4339396 | 44,227 | 22,114 | |
| 2047 | 55 | 101,920 | 50,960 | 0.4253059 | 43,347 | 21,674 | |
| 2048 | 56 | 101,920 | 50,960 | 0.4168439 | 42,485 | 21,242 | |
| 2049 | 57 | 101,920 | 50,960 | 0.4085504 | 41,639 | 20,820 | |
| 2050 | 58 | 101,920 | 50,960 | 0.4004218 | 40,811 | 20,405 | |
| 2051 | 59 | 101,920 | 50,960 | 0.392455 | 39,999 | 20,000 | |
| 2052 | 60 | 145,600 | 72,800 | 0.3846466 | 56,005 | 28,002 | |
| 2053 | 61 | 145,600 | 72,800 | 0.3769937 | 54,890 | 27,445 | |
| 2054 | 62 | 145,600 | 72,800 | 0.369493 | 53,798 | 26,899 | |
| 2055 | 63 | 145,600 | 72,800 | 0.3621415 | 52,728 | 26,364 | |
| 2056 | 64 | 145,600 | 72,800 | 0.3549363 | 51,679 | 25,839 | |
| 2057 | 65 | 145,600 | 72,800 | 0.3478744 | 50,651 | 25,325 | |
| 2058 | 66 | 145,600 | 72,800 | 0.3409531 | 49,643 | 24,821 | |
| 2059 | 67 | 145,600 | 72,800 | 0.3341694 | 48,655 | 24,328 | |
| 2060 | 68 | 145,600 | 72,800 | 0.3275208 | 47,687 | 23,844 | |
| 2061 | 69 | 145,600 | 72,800 | 0.3210044 | 46,738 | 23,369 | |



EXHIBIT A

| | | | | | | |
|---|---|---|---|---|---|---|
| 2062 | 70 | 145,600 | 300 | 0.3146176 | 45,808 | 22,904 |
| 2063 | 71 | 145,600 | 72,800 | 0.308358 | 44,897 | 22,448 |
| 2064 | 72 | 145,600 | 72,800 | 0.3022228 | 44,004 | 22,002 |
| 2065 | 73 | 145,600 | 72,800 | 0.2962098 | 43,128 | 21,564 |
| 2066 | 74 | 145,600 | 72,800 | 0.2903164 | 42,270 | 21,135 |
| 2067 | 75 | 145,600 | 72,800 | 0.2845402 | 41,429 | 20,715 |
| 2068 | 76 | 145,600 | 72,800 | 0.278879 | 40,605 | 20,302 |
| 2069 | 77 | 145,600 | 72,800 | 0.2733304 | 39,797 | 19,898 |
| 2070 | 78 | 145,600 | 72,800 | 0.2678921 | 39,005 | 19,503 |
| 2071 | | | | | | |
| | Totals | 7,714,910 | 4,036,713 | | 4,140,668 | 2,235,148 |

His 7,699,160 figure uses 172,760 instead of 188,510 (the average of 172,760 & 204,260)
However, his 4,036,713 uses 2/3 of the 188,510 instead of 2/3 of 172,760

Bryan Wiles-Bond
Damages Due to Educational Neglect

| | Costs to Be Incurred | Costs Without Educational Neglect | Damages | Present Value Factor | Present Value |
|---|---|---|---|---|---|
| 2005 | 178,150 | 74,040 | 104,110 | 0.9902443 | 103,094 |
| 2006 | 111,060 | 74,040 | 37,020 | 0.9710182 | 35,947 |
| 2007 | 111,060 | 74,040 | 37,020 | 0.9521653 | 35,249 |
| 2008 | 111,060 | 74,040 | 37,020 | 0.9336784 | 34,565 |
| 2009 | 111,060 | 74,040 | 37,020 | 0.9155505 | 33,894 |
| 2010 | 111,060 | 74,040 | 37,020 | 0.8977746 | 33,236 |
| 2011 | 111,060 | 74,040 | 37,020 | 0.8803438 | 32,590 |
| 2012 | 111,060 | 74,040 | 37,020 | 0.8632514 | 31,958 |
| 2013 | 111,060 | 74,040 | 37,020 | 0.8464909 | 31,337 |
| 2014 | 101,920 | 50,960 | 50,960 | 0.8300558 | 42,300 |
| 2015 | 101,920 | 50,960 | 50,960 | 0.8139398 | 41,478 |
| 2016 | 101,920 | 50,960 | 50,960 | 0.7981367 | 40,673 |
| 2017 | 101,920 | 50,960 | 50,960 | 0.7826404 | 39,883 |
| 2018 | 101,920 | 50,960 | 50,960 | 0.767445 | 39,109 |
| 2019 | 101,920 | 50,960 | 50,960 | 0.7525446 | 38,350 |
| 2020 | 101,920 | 50,960 | 50,960 | 0.7379335 | 37,605 |
| 2021 | 101,920 | 50,960 | 50,960 | 0.7236061 | 36,875 |
| 2022 | 101,920 | 50,960 | 50,960 | 0.7095569 | 36,159 |
| 2023 | 101,920 | 50,960 | 50,960 | 0.6957804 | 35,457 |
| 2024 | 101,920 | 50,960 | 50,960 | 0.6822715 | 34,769 |
| 2025 | 101,920 | 50,960 | 50,960 | 0.6690248 | 34,094 |
| 2026 | 101,920 | 50,960 | 50,960 | 0.6560353 | 33,432 |
| 2027 | 101,920 | 50,960 | 50,960 | 0.643298 | 32,782 |
| 2028 | 101,920 | 50,960 | 50,960 | 0.630808 | 32,146 |
| 2029 | 101,920 | 50,960 | 50,960 | 0.6185605 | 31,522 |
| 2030 | 101,920 | 50,960 | 50,960 | 0.6065508 | 30,910 |
| 2031 | 101,920 | 50,960 | 50,960 | 0.5947742 | 30,310 |
| 2032 | 101,920 | 50,960 | 50,960 | 0.5832264 | 29,721 |
| 2033 | 101,920 | 50,960 | 50,960 | 0.5719027 | 29,144 |
| 2034 | 101,920 | 50,960 | 50,960 | 0.5607989 | 28,578 |
| 2035 | 101,920 | 50,960 | 50,960 | 0.5499106 | 28,023 |
| 2036 | 101,920 | 50,960 | 50,960 | 0.5392338 | 27,479 |
| 2037 | 101,920 | 50,960 | 50,960 | 0.5287643 | 26,946 |
| 2038 | 101,920 | 50,960 | 50,960 | 0.518498 | 26,423 |
| 2039 | 101,920 | 50,960 | 50,960 | 0.5084311 | 25,910 |
| 2040 | 101,920 | 50,960 | 50,960 | 0.4985596 | 25,407 |
| 2041 | 101,920 | 50,960 | 50,960 | 0.4888798 | 24,913 |
| 2042 | 101,920 | 50,960 | 50,960 | 0.4793879 | 24,430 |
| 2043 | 101,920 | 50,960 | 50,960 | 0.4700803 | 23,955 |
| 2044 | 101,920 | 50,960 | 50,960 | 0.4609534 | 23,490 |
| 2045 | 101,920 | 50,960 | 50,960 | 0.4520038 | 23,034 |
| 2046 | 101,920 | 50,960 | 50,960 | 0.4432279 | 22,587 |
| 2047 | 101,920 | 50,960 | 50,960 | 0.4346223 | 22,148 |
| 2048 | 101,920 | 50,960 | 50,960 | 0.4261839 | 21,718 |
| 2049 | 101,920 | 50,960 | 50,960 | 0.4179093 | 21,297 |
| 2050 | 101,920 | 50,960 | 50,960 | 0.4097953 | 20,883 |
| 2051 | 101,920 | 50,960 | 50,960 | 0.4018389 | 20,478 |

Bryan Wiles-Bond
Damages Due to Educational Neglect

| | Costs to Be Incurred | Costs Without Educational Neglect | Damages | Present Value Factor | Present Value |
|---|---|---|---|---|---|
| 2052 | 145,600 | 72,800 | 72,800 | 0.394037 | 28,686 |
| 2053 | 145,600 | 72,800 | 72,800 | 0.3863865 | 28,129 |
| 2054 | 145,600 | 72,800 | 72,800 | 0.3788846 | 27,583 |
| 2055 | 145,600 | 72,800 | 72,800 | 0.3715284 | 27,047 |
| 2056 | 145,600 | 72,800 | 72,800 | 0.3643149 | 26,522 |
| 2057 | 145,600 | 72,800 | 72,800 | 0.3572415 | 26,007 |
| 2058 | 145,600 | 72,800 | 72,800 | 0.3503055 | 25,502 |
| 2059 | 145,600 | 72,800 | 72,800 | 0.3435041 | 25,007 |
| 2060 | 145,600 | 72,800 | 72,800 | 0.3368348 | 24,522 |
| 2061 | 145,600 | 72,800 | 72,800 | 0.3302949 | 24,045 |
| 2062 | 145,600 | 72,800 | 72,800 | 0.3238821 | 23,579 |
| 2063 | 145,600 | 72,800 | 72,800 | 0.3175937 | 23,121 |
| 2064 | 145,600 | 72,800 | 72,800 | 0.3114275 | 22,672 |
| 2065 | 145,600 | 72,800 | 72,800 | 0.3053809 | 22,232 |
| 2066 | 145,600 | 72,800 | 72,800 | 0.2994518 | 21,800 |
| 2067 | 145,600 | 72,800 | 72,800 | 0.2936377 | 21,377 |
| 2068 | 145,600 | 72,800 | 72,800 | 0.2879366 | 20,962 |
| 2069 | 145,600 | 72,800 | 72,800 | 0.2823461 | 20,555 |
| 2070 | 145,600 | 72,800 | 72,800 | 0.2768642 | 20,156 |
| | 7,705,990 | 3,986,040 | 3,719,950 | | 1,975,792 |

Assumptions:
   Damages are measured from 1/1/05.
   Bryan's date of birth was 1/1/92, so he was 13 on 1/1/05.
   Bryan has a life expectancy, based on Dr. LeGoff's information, of 79 years.
   Costs to Be Incurred and Costs without Education Neglect based on information from Dr. LeGoff
   The present value factor is based on the 20-Year Treasury Inflation-Indexed Security, Constant Maturity series obtained from the St. Louis Federal Reserve Bank website.  The rate on 1/1/05 was 1.98%.  Since principal on these obligations are adjusted for inflation, they provide an accurate, discount rate excluding the effects of inflation.  Accordingly, it is unnecessar to adjust the amounts in the table for the effects of future inflation.
   To the extent the damages consist of medical care, the damages are understated, because inflation in medical care has exceeded the general inflation rate.

12/13/05

Stanley E. Levin
Davis Levin Livingston Grande
851 Fort Street
Honolulu, HI 96813

RE:    Bryan Wiles-Bond

Dear Mr. Levin,

As per our previous communication, I am writing to provide a summary of my estimation of the costs of
residential, remedial and educational services for Bryan Wiles-Bond.  Please find below a summary of
both the likely actual costs of such services for Bryan, based on my assessment of his current functioning
and his needs, and an explicit estimation of the portion of those costs that have directly resulted from
previous educational neglect during Bryan's residence in the State of Hawaii.

The assessment of costs is based on data provided by both my own organization, Bancroft Neurohealth,
and that of other similar organizations.  Please note that these data are easily verifiable by contacting
these agencies (e.g. Devereux, Advoserv, Eden Institute, May Institute, Developmental Disabilities
Institute at Wayne State University).  The estimated costs of services are based on an average, or
hypothetical industry standard, for each of the services listed, and on the levels of services that would
normally be provided to a client such as Bryan, given his current level of functioning and needs.  The
"current level of functioning," is based on the assessment which was conducted in 06/05, at Bryan's
school and in his home in Benicia, CA, and on a review of all available records at the time.

The summary of costs will be divided by categories, which include the following:

1.    *Educational,* including all remedial services that would normally be included in an
       individualized education plan (IEP) such as OT, PT, Speech-Language, and behavioral
       assessment and intervention.  The types of services that are included in the summary
       are consistent with the guidelines provided by the National Research Council
       Committee on Educational Interventions for Children with Autism (NRC, 2001,
       *Educating Children with Autism,* NRC Press).  These services are summarized only for
       the years of remaining educational eligibility for Bryan (i.e. up to the end of his 21st
       year), per current IDEA law.

2.    *Compensatory education,* which includes primarily additional remedial services which
       are included in order to both remediate past educational neglect, and to improve
       Bryan's overall level of functioning and quality of life to a reasonable degree.  This
       would also decrease the long-range costs of adult residential and related services.

3.    *Residential,* which also includes related services as necessary within the residential
       setting.  The residential component includes both educationally-related placements,
       and adult and geriatric placement costs (adult and geriatric services are presented
       separately as there are differences in facility costs).  For most currently available
       settings, the costs are included in an overall batch fee based on days of residence, but
       there are some additional services which are not typically included, such as medical
       and psychiatric care visits, clothing and recreational materials, optional quality of life
       and enrichment programs.  These are considered under compensatory education.

EXHIBIT _B_

Educational and Compensatory Education Costs

In order to simplify the estimates, I will combine the core educational program with compensatory educational costs. My recent assessment of Bryan indicated three important factors relevant to his educational needs. First, that his daily adaptive and self-care skills were significantly below where they should be based on an assessment of his learning potential (i.e. consistent with functioning in the Severe to Profound range of Mental Retardation, as opposed to the Moderate range, which was the estimated level of his cognitive abilities). Second, that Bryan's communication abilities had regressed during the time in Hawaii due to inadequate implementation of educational strategies designed to facilitate language and communication skills. Third, that the number and severity of identified interfering behaviors (behaviors that were impeding ongoing educational interventions) had become worse during his years in Hawaii, and that these behaviors would now need to be intensively addressed before Bryan could make appropriate educational gains.

In order to adequately address these areas of regression and have Bryan's functioning level commensurate with his potential, he would require at least one full year (12 months) of an intensive educational program, which would include a daily regimen of functional communication training, toileting and self-care skills, occupational and speech-language therapy, and ongoing behavioral intervention. The behavioral supports would require both an initial and then ongoing behavioral assessments, provided by a qualified and experienced behavior analyst. Programs offering this level of intensive intervention and which provide all necessary and appropriate remedial services including applied behavioral analysis (ABA) technology, typically cost about $200 per day. Over a full year this comes to $50,400. (This is a relatively low estimate. Bancroft's similar program costs $90,000 per year).

Subsequent to an initial 12 months of intensive behavioral stabilization and remediation, the educational costs would be much reduced. It is likely that Bryan would require some additional ongoing behavioral and communication interventions which could be provided in a less restrictive setting, such as a regional special needs facility or developmental residential program. Current costs of educational services for Bryan after his 13th year, and up to his 22nd year, based on the average cost of specialized educational placement without the need for intensive behavioral and remedial services, would be approximately $180 per day, or $45,360 per year. The resulting total for educational costs from the present time until Bryan's end of eligibility would be approximately $50,400 for the first year, then $45,360 for each subsequent year to the end of eligibility.

Residential Costs

As with the educational costs outlined above, the cost of residential care for Bryan would also need to be at a more intensive -- and more expensive -- level given the impact of the education neglect in Hawaii. Also, similar to educational services, Bryan would need about 12 months of an initial highly intensive placement in order to make it more likely that he could be sustained later in a less intensive setting. Currently, there are a number of residential placement options for children with autistic disorders (of course, not all of these options are available in all regions, and costs vary quite a bit from state to state. The following are currently available in most states).

*Institutional settings* which provide individual 24-hour staffing and include additional remedial services in addition to living support.

*Group homes* that feature on-site, 24-hour staffing and serve the individual and several roommates.

*Supervised apartments,* where a consumer lives with a roommate and receives 24-hour help from staff living nearby.

*Supportive living,* where a consumer lives alone or with a roommate, and help is available through a 24-hour hotline and assistance is provided on an as-needed basis.

*Sponsor families,* where the individual lives as part of the family of a trained caretaker, and receives 24-hour care and assistance from that person, with other support services available as needed.

*Private homes,* are another option. By combining personal and Division funds, and/or by pooling funds with other residents, individuals can purchase or rent a house or condo.

*Full home ownership,* is an option for individuals and/or families with sufficient resources. They can tap funding from the state Housing and Mortgage Finance Agency to purchase a home.

In Bryan's case, it is very unlikely that he would be able to be sustained at a less intensive level than the institutional one, at least initially. Most institutional settings provide for all educational and remedial services, thereby combining the Educational and Residential components. With most institutional settings, however, the residential and educational program costs can be separated. A review of residential placement costs at institutions specializing in programs for children with autistic disorders indicated that the average residential costs, in addition to the educational expenses, would be $127,750 for the first year.

In years subsequent to this initial one, and up to the age of 22, Bryan's residential costs would be lower, based on his requiring less intensive staffing, and fewer hours of behavioral and psychiatric services. The estimated cost for less intensive institutional placement and with reduced rates of related services, based on the average cost of available programs, is $180 per day, or $65,700 per year.

Adult residential costs, post-educational eligibility, would be slightly higher as day-programming becomes necessary, in place of the educational placement. A review of current residential full-day programs for adults with autism and similar neurodevelopmental disorders suggests that the average costs would be $280/day. This results in an annual expense of $101,920. This cost includes related services, such as behavioral support, nursing, psychiatric and medical care.

Subsequent to age 60, approximately, Bryan would need to be placed in a geriatric residential facility. Although residential and day treatment costs are not necessarily higher, the related services costs are higher for elderly patients with developmental disabilities. Again, based on current rates offered by a number of appropriate settings, the residential costs for Bryan each year after 60 would be approximately $400 per day, or $145,600 per year, including related health care services.

In summary, the current-time (2005) costs of educational, compensatory, and residential costs for Bryan would be roughly $178,150 for the first year, and then $111,060 for each subsequent year until age 22 years, not including inflation rates. From age 22 to age 60, Bryan's residential and daycare costs would be approximately $101,920, and from age 60 on, would be $145,600.

<u>Costs of Services Based on No Educational Neglect.</u>

The costs outlined above are based on Bryan's current level of functioning, which reflects the impact of the educational neglect experienced during his residency in the State of Hawaii. Estimated costs of residential and educational services are presented below which reflect the level of care which would have

been needed if there had been no educational neglect. That is, based on an estimate of Bryan's functioning at a level commensurate with his assessed abilities, and needs. In general, the cost estimates presented here are based on what would need to be provided to an individual who suffers from moderately severe autism and moderately severe mental retardation, but who has received appropriate levels of educational and remedial interventions.

<u>Educational Costs</u>

Based on my previous developmental assessment of Bryan, it appeared that he had the potential for functioning in the moderate range of disability, both cognitively and adaptively, but that there were interfering factors such as inappropriate behaviors and communication deficits which had not been addressed during his residence in the State of Hawaii, resulting in ongoing deficits which resulted in his functioning in the severe to profound range. The educational and related services for Bryan as he might have been had he received an appropriate education while in Hawaii are less costly than those he requires now. Current average costs for educational services for children with autistic disorders and moderate mental retardation is $120 per day, or $30,240 per year. This would be the cost of residential services for both the current year and all subsequent years up to age 22 years.

<u>Residential Costs</u>

Residential services for Bryan, if he were functioning in the moderate range of mental retardation and did not require more intensive staffing and supervision, could be provided at the group home level. Current program costs average $120 per day, or $43,800 per year. This would be the residential placement cost for Bryan's years of educational eligibility.

After age 22 years, Bryan's residential program costs, including related services, based on current available programs, would be $140 per day, or $50,960 per year. Residential placement at this type of program would be appropriate until about age 60, at which time Bryan would be better served in a geriatric facility for individual with developmental disabilities. Costs for residential placement after age 60 years would be approximately $200 per day, or $72,800 per year, including all necessary health and related services.

In summary then, the combined educational, residential placement and related services costs for Bryan, had he received appropriate educational services and there had been no behavioral and functional regression, would have been $74,040 per year up to age 22 years, $50,960 from age 22 to 60 years, and then $72,800 per year thereafter.

<u>Cost Difference Based on Current Needs Versus Needs Based on No Neglect</u>

Based on the average costs of services estimated for Bryan as he is currently functioning, compared with the costs estimated for Bryan as he might have been functioning had he received an appropriate education in the State of Hawaii, the following comparison is offered:

| Years | Current Cost Estimates | Costs without Educational Neglect |
|---|---|---|
| 2005 | $178,150 | $74,040 |
| 2006 – 2013 | $111,060 | $74,040 |
| 2013 – 2051 | $101,920 | $50,960 |
| 2051 - | $145,600 | $72,800 |

Conclusion

The numbers above represent an estimate of the difference in costs for educational, related services, and residential care needed for Bryan based on his current functioning compared with the level of care and services that he might have needed had he received a consistent and appropriate education during his years in residence in Hawaii.  The costs are based on a review of current program costs of appropriate facilities serving children and adults with developmental disabilities.  Many large organizations which serve the developmentally disabled have levels of intensity of programming for clients with varying levels of need.  Based on my previous developmental and behavioral assessment of Bryan, and based on my experience as a developmental neuropsychologist and program administrator, Bryan would not be able to be served currently by other than a highly structured residential and educational setting, at least until his current levels of interfering behaviors was addressed, and his communication and independent self-care levels were improved.  As noted above, it is expected that Bryan would need about one year of intensive programming, before he could be served appropriately in less intensive institutional setting.

If Bryan had received appropriate educational services in Hawaii and had not regressed in terms of his behavioral issues and communication and self-care skills, he likely would have been able to receive much less intensive services, including being able to attend a less-restrictive educational setting, and being eligible for group home placement.  The numbers above reflect the difference in costs between these two scenarios.  Again, please note that the costs are based on current average costs of programs and services, and do not reflect the impact of future inflation.  An economist should be consulted in order to determine the influence of these factors.  Verification of the cost estimates given above can be done by contacting the billing and/or marketing and admission departments of the following agencies:

- Bancroft Neurohealth (www.bnh.org)
- Devereux (www.devereux.org)
- Advoserv (www.advoserv.com)
- Eden Institute (www.edenservices.org)
- May Institute    (www.mayinstitute.org)
- Developmental Disabilities Institute at Wayne State University (www.wayne.edu/ddi)

If you have questions about this report or require further information please feel free to contact me,


*Daniel B. LeGoff, PhD*

_____
Daniel B. LeGoff, PhD LP
Vice President
Bancroft Child and Family Services
Director, Developmental Neuropsychology

DRAFT            DRAFT            DRAFT            DRAFT

## Behavioral Assessment

Name: Brian Wiles-Bond
D.O.B. 10/28/91
Assessor: Kimberly A. Smalley, Ph.D., BCBA.
Date of report: 8/18/04
Data Collection Via: x Interview x Direct Observation x Record Review

### Background

Brian is a young man who is significantly impacted by his autism. He is active affectionate and motivated. Brian loves all things water; swimming drinking playing, stimming. He also equally loves soap shampoo and other slippery similar products. As a younger child he would bite open squishy toys to get to the gel product inside and play with the gel in his diapers. He enjoys drinking from and playing with the hose, faucets and bathtub, Brian is capable of opening his throat and swallowing all the water from an open hose or faucet. He has a long history of clogging the tub and toilet flooding the house.

Brian knows what he wants and in the last few years has acquired some expressive communication skills with which to communicate his needs. He actively uses between 20 and 50 signs and reportedly knows over 100+. Last winter Brian "read "me a picture book in sign language, demonstrating significantly more labels and nouns that I might have realized he knew based on his daily language use alone. Brian's receptive communication appears good he can follow some multiple step directions, can answer verbal questions with sign languages ("do you want to go for a walk? Sign walk), though he is clearly not consistently an auditory processor and both chooses to disregard the message, and also may not have received the message on regular basis.

Brian had made significant gains in toileting particularly around defecation and the mechanics of toileting. He still drinks and urinates almost constantly, as often as every 10 minutes. Brian urinates on himself several times day he urinates on the chair / rug where ever he sitting. He used to wake up and pee off the edge of his bed but is currently sleeping through the urge to urinate and waking with a wet comforter. A toileting plan was written and implanted in 01', augmented last winter, and again updated recently to include the provision of wake night staff



(see toileting plan). Brian is very active. He self stimulates (flapping hands making noise jumping moving) almost constantly. He picks at himself, flicks things, spits, puts his fingers in his mouth, and puts spit in his eyes and ears.

Brian's family is very involved in his life and care. They have made major accommodations to their home and way of living to set Brian up for success and prevent behavior excesses. Water and refrigerator products are kept in their bedroom, the fridge is locked, the downstairs bathroom water is shut off in the tub, etc. His bedroom is bare. The room itself was redone with regards to Brian's toileting needs a few years ago. He has a second room to use, which contains another bed, toys, and working materials. The hope is to move Brian from his bare room into his 'work' room incrementally when he has learned to toilet consistently and interact with materials appropriately. Brian goes swimming with his family; shopping, eating out, etc. participates in all aspects of family life. Brian and his brother don't currently share any interests. Brian doesn't have friends per se` or a social circle, though he has been in class with the same students for a while, knows them, greets them, and is accustomed too their company.

Brian takes no medications with the exception of Benadryl for allergies and frequent Advil for bumps bruises inflammation and general discomfort. Brian recently had EEG to rule out any medical cause for the recent and dramatic change in behavior. He also had a psychiatry appt. Brian has used medications to control his behavior in the past, unfortunately he had atypical and life threatening reactions to the medications typically used in autism. Thus it is unlikely that a bio-chemical intervention will be found or used at this time. Brian is prepubescent His body is changing and he is growing. Behavior associated with puberty in all children is or soon will be emerging.

Brian was referred for an FBA do to his pervasive challenging behaviors and with specific regard to his recent increase in intensity and frequency of behaviors that may be dangerous to himself and others. This assessment will discuss his behavior excesses: tantrum, aggression and self-stimulatory behavior as well as his behavioral deficits: communication, toileting, daily livings kills, access to his curriculum.

## Behavior Description

**Aggression:** This behavior is defined as any physical contact directed by Brian toward another individual. This typically includes: hitting, scratching, pushing, kicking, spitting, punching, or head butting.

Baseline frequencies of aggression have been measured at: 0-5 per domain (School or home). Episodes typically were discrete (single blow) and self-limiting. At home originally seen as unintentional bi-product of stimming Brian has recently begun to aggress during tantrums in a purposeful way. At school Brian has used minor aggression to protest or escape work but it has reportedly increased in frequency and intensity steadily since April.

**Tantrums:** Tantrum behavior is defined as yelling crying kicking pinching pushing, head butting, pinching, kicking or hair pulling, screeching and biting self. Tantrums can be as brief as five minutes and extend over 30. Tantrums of increased intensity and duration are new to Brian, who has a history of protesting inappropriately but who had not previously hit hurt or injured others intentionally regularly. Brian exhibits tantrum behavior 0-5 times a week. He recently experienced a severe burst where he aggressed and tantrummed repeatedly daily for approx 2 weeks. School and home staff both described Brian as out of control, having never been seen "like this" before, and as "in crisis." Brian has begun purposely aggressing against other jumping up from his "spot" to hit or grab, punch, head butting forward and backwards with enough force to draw blood.

Frequency of tantrums has been measured at: 0-5 occurrences per week with multiple occurrences in one day over many days. The intensity of the tantrums had been typically mild and usually redirectable, but may now escalate to serious levels in which property destruction self-injury and aggressions are present beyond 10 minutes

## Antecedents

The following antecedents have been observed to occur before or in the presence of the target behavior.

- Changes in schedule or routines (lack of engagement)
- When given any initiating instruction
- When given a terminating instruction
- During transition times
- When asked to wait
- When presented with novel tasks
- When presented with difficult tasks
- When given a boring or repetitive task
- While being physically prompted
- In the presence of new or substitute staff
- After interrupting a preferred activity
- Lower levels of agitated motor behavior exhibited (e.g., excessive down time or

Self-stimulatory behavior)
- When a need cannot be communicated
- While engaged in self-stimulatory behaviors
- In response to a denial of a request
- When something preferred is taken from student

Brian is most likely to tantrum following a denial or delay of a request or following an instruction.

Environmental events, which have rarely or have never been associated with the tantrum behavior include: when occupied with an interesting task or preferred activity, when demands are not being made, and if left alone.

Medical/physiological factors, which may affect the occurrence of tantrum behavior, may include:

- General pain-related complaints may be present (bumps, bruises, ears eyes inflammation, rule out any medical such as, new teeth)
- Allergies
- Physical and hormonal changes associated with growing

An analysis of the teaching situation indicates that the following educational or instructional factors play a role in the performance of the behavior.
- Lack of or low student interest in the task
- Work too easy or repetitive
- Lack of interspersed tasks
- Absence of predictable schedule
- Low rates of reinforcement for performance
- Ratio of positive to negative feedback may be too low
- Absence of or limited student choices
- Absence of potent reinforcers for performance
- Absence of appropriate student escape response
- Absence of appropriate student assistance-asking response
- Staff correction procedures are delivered poorly

**An analysis of Brian's communication skills reveals that the tantrum behavior is influenced by the following communicative deficits**
- Inability to consistently make needs known
- Inability to ask for assistance
- Inability to appropriately ask for attention/acknowledgement
- Lack of consistent indicator response to obtain others' attention
- Difficulty communicating pain
- Difficulty appropriately expressing anger

• Difficulty initiating appropriate social responses

## Potential Functions/Maintaining Consequences

Based on the data collected, it appears that the tantrum behavior functions to:
• Escape from a non-preferred activity
• Escape from a non-preferred instruction
• Escape from other students and/or staff (e.g., wanting to be left alone)
• Obtain a desired item typically water soap or carbs
• Obtain attention or a reaction from staff
• Provide the individual with sensory feedback which is pleasurable

Currently, the consequences for the performance of the tantrum behavior include:
• Escape from non-preferred situations or demands is intermittently available
• Attention received from others
• Sensory feedback is provided which may be pleasurable
• Desired items that may have been denied are obtained

Review of the data consistent with observation and interview reflects a clear cause and effect, if Brian is "edgy", aggressive "head butt" or protests otherwise inappropriately; staffs withdraw the demand or attention.

**Property Destruction:** This behavior is defined as any purposeful destruction of Brian's own property or the property of others.

Frequency of property destruction has been measured at 0-5 occurrences per episode. The intensity of property destruction typically is usually mild and self-limiting but may consist of multiple broken or damaged items. Brian will break throw or knock down items on his way to his room or spot during a tantrum. Brian may also tear paper, books, bite open toys or balls etc. as a self-stimulatory behavior with much greater frequency (staff vigilance). As property destruction reliably occurs under these conditions addressing Tantrum behavior and self-stimulation will in turn remediate property destruction

**Self-stimulatory Behavior:** Brian engages in self-stimulatory behavior, which may also be mildly self-injurious. Brian self stimulates pervasively. He is almost always in motion. Hands flapping, tapping, pulling his fingers back far enough to cause another pain, picking at himself, spitting, urinating, putting his fingers in his mouth removing saliva and then putting it in his ears or eyes. Brian has regular staph infections, bruises and scratches. Brian often takes Advil to remediate.

Brian, twirls everything, bites open, eats / tastes and grabs at and tears things. Most concerning Brian drinks everything, He will grab all water receptacles, put his mouth over the end of the hose or faucet and leave it there, drinking the stream. He has a history of biting open all squishy stim toys and drinking the fluid inside. Brian will drink non-stop to a point of urinating while drinking. Brian eats non-edibles. He grabs paper, leaves and almost anything small enough to put in his mouth with speed and swallows. He will also shove items into his mouth that are too large to swallow, such as a paper towel from the bathroom. He recently has thrown up undistinguishable plastic pieces, string, leaves and seawater. Brian enjoys deep pressure touch and any activity providing similar sensory feedback. Brian may run or "Bolt" but it is the joy of movement the compulsion to run in a self-stimulatory way rather then bolting away as escape. Self-stimulation in multiple forms is pervasive. Self-injury is intense enough to cause swelling bruises small scratches, open wounds, and Staph.

An analysis of the teaching situation indicates that the following educational or instructional factors play a role in the performance of self-stimulatory behavior.
- Lack of or low student interest in the task
- Work too easy or repetitive
- Lack of interspersed tasks
- Absence of predictable schedule
- Low rates of sensory reinforcement or feedback for performance
- Ratio of positive to negative feedback may be too low (incorrect form or R+)
- Absence of or limited student choices
- Absence of potent reinforcers for performance
- Staff correction procedures may be delivered poorly

**An analysis of communication skills reveals that the behavior is influenced by the following communicative deficits**
- Inability to gage or indicate need to self regulate
- Difficulty appropriately communicating pain, boredom or level of excitement
- Difficulty appropriately expressing emotional states
- Difficulty initiating appropriate social responses

## Potential Functions/Maintaining Consequences

Based on the data collected, it appears that the self-stimulatory and self -injurious behaviors function to provide the individual with sensory feedback, which may be pleasurable

Currently, the consequences for the performance of the self-stimulation include:
• Pleasurable sensory feedback is provided
• Escape from or delay of non-preferred situations or demands is intermittently Available
• Attention received from others
• Desired items that may have been denied are obtained.

Self-stimulation is by definition self-reinforcing, without competing incompatible or replacement behaviors will remain static at these high rates

**Non-compliance or refusal behavior.** This behavior is defined as failure to cooperative with a staff instruction or directive within a reasonable period of time. Refusal behavior may consist of any of the following responses: ignoring request; physically refusing to cooperate; running away from requester; engaging in other types of protest behavior. Brian isn't oppositional in the traditional sense, he has however begun to test his limits and boundaries in a way that is new more intense and at much higher frequencies. Not atypical of puberty, this behavior may be related to typical milestones as well as a symptom of behavioral drift. Brian's program has lost integrity and consistency; as a result his behaviors as described above have been intermittently reinforced. Brian is testing his boundaries in all environments across all persons.

An analysis of the teaching situation indicates that the following educational or instructional factors play a role in the performance of refusal behavior.

• Student has limited experience in group instructional settings
• Lack of or low student interest in the task
• Work too easy or repetitive
• Lack of interspersed tasks
• Lack of mute-modality instruction
• Absence of predictable schedule
• Low rates of reinforcement for performance
• Ratio of positive to negative feedback may be too low
• Absence of or limited student choices
• Absence of potent reinforcers for performance
• Absence of appropriate student escape response
• Absence of appropriate student assistance-asking response
• Staff correction procedures are delivered poorly

An analysis of communication skills reveals that the behavior is influenced by inability to consistently make needs known

## Potential Functions/Maintaining Consequences

Based on the data collected, it appears that the refusal behaviors function to:
• Escape from a non-preferred activity
• Escape from a non-preferred instruction
• Escape from family or staff (e.g., wanting to be left alone to self-stim)
• Obtain a desired item typically water or soap
• Provide the individual with sensory feedback which is pleasurable

Currently, the consequences for the performance of refusal include:
• Attention received from others
• Escape from non-preferred situations or demands is intermittently available
• Pleasurable sensory feedback is provided
• Desired items that may have been denied are obtained

## Alternative Behaviors

Appropriate behaviors that may be taught and/or reinforced that can replace the target behaviors include:
• Waiting for preferred activities
• Turn taking
• Making choices
• Completing assigned tasks
• Playing with toys and related items appropriately
• Playing or working appropriately with peers
• Participating in structured table tasks (indiv. dyads and small group)
• Asking for assistance
• Offering and providing assistance
• Asking to escape or avoid a task
• Asking for a break
• Accepting request denials
• Accepting corrective feedback
• Following instructions
• Following a schedule (written or pictorial)
• Cooperating with transitions
• Playing appropriately with others
• Asking for a desired change (in activities, schedule, etc.)
• Asking for permission
• Asking for tangible items (e.g., toys, food, activities)
• Developing alternative leisure activities
• Developing alternative sensory-related activities
• Developing independent work/leisure skills
• Permitting redirection in the presence of lower levels of agitation

- Managing anger or protest through pro-social means
- Expressing feelings
- Accepting termination of a preferred activity
- Maintaining appropriate interpersonal space

## Skill Deficits

### Communication

Brian has limited formal communication. He has experience with working with a PECS system and an Icon schedule. Brian knows upwards or 100- 150+ signs in ASL. When bombarded with ASL and low tech AAC by ASL speaking staff Brian uses considerably more expressive communication. Brian can name and label (chicken, bird, red, ball) many things with icons and sign but does not communicate functionally, does not participate in conversation, express his feelings, indicate discomfort or a desire for change. Brian demonstrates no pragmatic or social language skill at this time, beyond a wave and an occasional prompted greeting. Data collection revealed almost all language directed at Brian is just that, directed at him vs. with him. He receives redirection and instruction at excessive rates to reinforcement or simple communication. Often instruction or companionship is conducted in silence. The staff member fluent ASL staff just left, leaving remaining staff with limited knowledge of Brian's best formal communication system. As he knows 100's of signs the typical 10-30 that most special education staff can pick up (toilet / eat / out) are insufficient to model communication, engage in social language, or expand upon Brian's repertoire of receptive and expressive communication. Brian's SLP indicates moderate success limited behavior excesses and good participation in her sessions.

Currently (extended summer session) Brian is receiving no direct instruction in reading, word recognition, Icon or AAC or AT use. He has an Edmark pre-reading system. The current targeted nouns and descriptors in use during observation and reflected on data sheets (show me blue, show me pizza etc) were the same words he was demonstrating mastery in last Dec. His schedule (visual organizational system) is on the wall but not in use. Many of the representative icons are missing or lost. Written word should be paired with all icons and photos. This organizational system lacks a portable component. Brian should be able to make choices or change his schedule when he is outside or away from the classroom/ home work area. Brian needs to learn to consistently use an appropriate indicator response. Brian will sometimes wave his hand pointing in your general direction or the general direction of his desired item. This can be shaped into more formal sign by ASL knowledgeable staff and family. Family and staff will need to learn use and model ASL with Brian and with each other, reinforce Brian and each other in its use. Of the ten individuals I observed

interact with Brian, three initiated conversation through sign language and Brian only reciprocated with one. He appears to be out of the "habit" or conditioned to converse only with specific persons.

## Activities of Daily Living skills

Brian is not currently displaying independence in many of his activities of daily living (ADL). He requires direct instruction paired with reinforcement to learn the steps of many of the things we do unconsciously.

Brian's team and parents should highlight a few activities they would like to start with. Once the initial tasks are identified, a task analysis of the activity needs to be completed (i.e. 112 steps to a shower). Brian will need to be taught in chunks portions of the task at a time and reinforced for his participation and partial participation. I observed no direct instruction in any activities of daily living though clearly he had made progress in toileting and laundry

First and foremost Brian's toileting skills need to be continuously addressed in a systematic manner. Brian is not toilet trained. He has urinates and defecates inappropriately through out the day and night. He had been much more successful as recent as the new year but in the last few months has deteriated significantly. Brian is still habituated to urinating on himself, which is naturally reinforcing. He prefers to move his bowels and urinate outside. You have no external tangible reinforcer better then the act of urination itself. He has made good progress in moving his bowels since the initial toileting plan of 01" and it is clear that this was emphasized and worked on successfully. Continued progress is possible. The current backsliding appears to be associated with inconsistent programming, communication gaps, staff change, and of course behavior. Brian is reportedly having more accidents on specific shifts with specific staff.

Very simply put, if family or staff take Brian every ten minutes he will urinate every ten minutes (a full stream) if they don't he will try to urinate on himself and see if he can get away with it, if he can will he up the frequency. His school team is taking him to the toilet in 15-minute blocks and or when ever they see him behaving as if he needs to use the bathroom. When observed in the classroom and at home watching movies Brian urinated on average every 7 –10 minutes, when engaged in ball play on the court and when eating with his schoolmates outside Brian went 25-32 minutes between trips to the bathroom. SLP indicates no accidents or request to use the bathroom across 20-45 minutes of her sessions. Data reflects Brian signing toilet to escape staff interaction repeatedly and he does releases urine each time it is difficult to assess his actual ability to hold it. Clearly Brian is using toileting both as an escape and as a self-stimulatory behavior.

And of course access to water predicts frequency of urination. Observation reflected less trips in the morning as evidence that family was able to successfully limit water in take at home before school (or not as indicated) and more frequent trips as the school day wears on indicating even with 2:1 hyper vigilance Brian is getting drinks somewhere (boys room faucet). Data reflects no current consistent time pattern. Though may reflect increases associated with specific staff and demands.

## Recreation and leisure

In order to affect Brian's self-stimulatory behavior it is necessary to provide him with alternative activities that provide similar sensory feedback, teach him alternative incompatible and replacement activities. Brian does not have many age-appropriate leisure skills. He likes his videos (children's cartoons and music), but doesn't play with "toys", or engage with materials enough. He does not participate in team sports and does not demonstrate interactive collaborate play skills. Brian demonstrates little skill in indiv, dyad, small group or large group play. It will be necessary to expose Brian to age appropriate leisure activities and find out what his skills strengths and likes may be. Brian will need direct instruction (turn taking, shared attention) in the mechanics of a game in which he can partially participate (official bat boy, running bases, etc.), and facilitation of participation by a non-disabled adult; and of course an activity that is interesting to him. Brian would benefit from a formal "circle of friends' to provide normative data  (what do kids do at his age for fun, what's cool to wear, what do they think Brian needs to learn), to develop meaningful relationships (they may start out as a volunteer position: helper, peer tutor, etc. but with facilitation may develop into a more typical reciprocal relationship). Brian did participate in friendship club during the school year, maintaining those relationships over breaks and summer would be ideal; whether formally (club outings) or informally (invite a friend to the beach) Joining after school programs such as a latch key program (A+), gymnastics, boy scouts, etc., accompanied by his ST will provide him with more exposure to typically developing kids (and visa versa) while sampling his likes, and exposing him to other leisure options.

## Prior Interventions
A review of records indicates that prior interventions for the target behaviors include:
- Differential Reinforcement of Other Behaviors (DRO)
- Time-out
- Time away
- Redirection
- Communication skills training
- Contingency management procedures

- Token economy contingencies
- Brief physical interruption
- Geographical containment

The majority of the documentation emphasizes consequence-based strategies and emergency procedures. Brian's plan should be proactive, preventive in nature and emphasize teaching alternative and competing behaviors. I can see no reason why 911 would ever need to be called short of a medical emergency. Nor do I think he is in jeopardy of requiring a more restrictive placement. His program should be customized to meet his needs in his current home and school placements. While Brian can be destructive and injurious he is not an imminent danger to himself or others, given his high rates of sensory stim restraint is likely to increase not decrease the intensity and frequency of his behavior. Aggression and tantrum behavior should be dealt with by minimizing instances which have previously led to head butting self-biting, manipulating his environment, increasing rates of reinforcement for incompatible and replacement behavior. If the frequency of his aggressive behaviors are more serious then observed and reported then staff will require training in passive assault restraint training (PART-R) or strategies of limiting violent episodes (SOLVE) to learn how to avoid being bit or scratched. Intermittent physical reinforcement should be provided to Brian through out his day so that he receives appropriate propreoceptic feedback when he is being good not when he is exhibiting behavioral excesses.

## Summary

Brian has very little formal communication and uses his behavior excesses to express himself. If he is bored wants attention, change of setting, or activity. He will often pinch screech, push or pull you, escape to the mat, sign toilet or urinate on self in the presence of a non-preferred setting, non-proffered task (working with pre-educational materials) Brian will exhibit escape based behavior such as those listed above. Brian's behaviors are intermittently reinforced, in fact he regularly gets what he wants by urinating, being physical or threatening vs. communication. Often with the best of intentions people will read his mind and then get him what he wants or allow him to access it, without first inserting the communicative response.

Brian's school materials have lost their appeal and need to be updated to more functional more engaging activities. Brian is a very skilled young man with a strong will. He is able to effectively manipulate his environment to avoid less desired tasks. He is certainly capable with consistent instruction and salient reinforcers of learning to follow a schedule and use a formal communication

system. And perhaps most importantly he needs intervention in the quality of his life to pair him with a peer group of age mates with more sophisticated social and communication skills.

Brian's performance of skills level is noticeably less then it was as recent as last fall/ winter, as his program has clearly lost integrity and consistency my hope is his previous skill levels will be easily re-attainable, however we are now dealing with learned aggressive behavior. Brian is likely to increase the frequency and intensity of his aggressive behavior intermittently to test staff and family boundaries and consistency of expectations. Now that he knows it works it is harder to un-teach or re-teach. It is important that the components of the previous plan that were successful be reapplied and that the program materials R+ etc be constantly reevaluated for fidelity efficiency and effectiveness.

_____

Kimberly Smalley, Ph.D.
Board Certified Behavior Analyst
### Positive behavioral support plan

Aggression Tantrum behavior:

Antecedent management: It is always prudent to rule out any medical issues, ear aches toothaches, bowel issues, flu colds etc. So far Brian appears to be presenting no new medical issues that would explain his increase in aggression (EEG report pending). The slow steady escalation of Brian's protest behavior accompanied with his recent flurry or high intensity high frequency aggression typically indicates a loss in programming, which was validated during each observation. Brian has a history of active education including ABA, TEACCH methodologies, and other models of systematic instruction. Maintaining a tight schedule, rich with visual supports and communication is essential to his progress. Maintaining consistent effective programming is half your battle.

Brian needs his day organized. His activities should be at or slightly above his level in all subject areas. Review and repetition is good but remember to update your materials and curriculum based on his pace. *Curriculum drives behavior.* Brian is very physical his curriculum should be interspersed with activities that take advantage of multi-modal instruction or provide sensory feedback. In example, computer work followed by a movie followed by table work is two forms of passive work, not physically stimulating. All three tasks require sitting

and watching something as opposed to gross motor movement. Conversely singing and dancing followed by ball play and then recess is all physical, provides no direct academic instruction and is likely to make the table work less desirable. A steady diet of active activities interspersed with academic curriculum will serve Brian better. Increase his natural opportunities for physical rough play, play sports, roll around on the ball, join gymnastics. Brian was made for a trampoline. The full body pressure of bouncing on a large trampoline will meet many of Brians physical needs.

Brian's TEACCH and ABA materials were in the room, though not in use during my observations. Some of the materials were incomplete and will need to be updated or replaced. He followed no route around the room or to address his work, no start or finish, to his expected products. He was not asked to check his schedule, follow any set daily objectives or participate in any direct instruction. He engaged in self-stimulation almost pervasively. Likewise at home there were several visual supports handy, but due to intermittent staffing, no set schedule was being followed. When Brian was engaged (walk around the neighborhood, folding laundry, eating) his behavior was significantly better then when enjoying down time. Reduce down time. Plan your day. Map your daily activities out ahead of time represent them visually. Brian needs a portable written calendar no different then your PDA or weekly calendar, though his will have icons to augment and supplement written word. It may have been tempting to abandon the Icon's (PECS) when he showed such excellent progress with ASL, but remember in addition to receptive and expressive communication we all still need organizational and representational systems get through our work week.

Brian's ABC data reflects aggression and tantrum behavior is often communicative in nature, protesting a demand (often toileting related) or the interruption of self-stimulatory behavior. Brian has the ability through sign language and gesture to protest appropriately. He has clearly learned over the last 4 months or so that he can intimidate some staff. Brian's escalating behavior has intermittently resulted in the reduction of demands and subsequent increased time to self stimulate. It is important that everyone be proficient in ASL preferably more advanced then Brian so as to have the ability to model more sophisticated communication. Brian's current language use consists disproportionately of nouns or labels. While he is reportedly habituated to communicate with his SLP his generalization across staff and domains is minimal.

Brian must have staff proficient in ASL. He has chosen and demonstrated ASL as his first language of choice. We can and will use ASL to teach him written word to use high-tech computer systems (I.e. dynavox) or low-tech icons based

systems (PECS book), but we must first continue to expand his breadth of language skills (almost all labels or nouns at this time) and model and initiate pragmatic language. To do this staff must have better ASL skills then Brian and use them pervasively. Consultant staff should take data on direct staff proficiency frequency of use and breadth of ability when working with Brian to assure a consistent language rich teaching environment. Brian must learn sign is language, and language can be used and understood with any one any time if we expect him to use communication in place of aggression to protest.

Brian is used to having "his spot". He is directed to his room at home and his mat at school. It is important to maintain a place for Brian to deescalate and decompress. As Brian gets older it would be nice to shape this "spot" from a large mat on the floor to something more normalized, in part because the community lacks a mat. A slow fading will be necessary perhaps from the mat to a beanbag chair to a hammock chair to a chair for example. This will probably require an accompanying pressure device for example from the heavy weighted blanket to smaller items maybe a backpack, dive vest, sweat bands etc.

**Replacement Behaviors**

Brian needs several behaviors to replace his tantrum and aggressive behavior. First and foremost effective communication skills. Increase his ASL skills. SLP indicates Brian learn 1-2 new words each week. Make the comprehensive list available to all staff and family to learn and use. Repetition and generalization are essential as is modeling. If we want Brian to use formal communication to express himself we have to model it as language and not as a demand. Staff should sign when they speak sign to each other and sign conversationally. Brian needs to learn pragmatic language skills social as well as descriptive signs and phrases. He is proficient in the use of "no" but mad angry fed up stop, leave me alone, want break etc are not phrases he uses. He will increase his volume wave you away, while waving is a gesture an one that is understandable we want to insert a piece of formal communication here we want Brian to learn if he protests with language he gets his own way, not when he protests with behavior. As a team choose several phrases he can use to protest or refuse. Teach them to Brian under multiple circumstances, in Speech, in context (identify a person protesting in a movie on TV "he's mad mad sad no no", model to one another ("Danielle can I have some of your snack?" No no mad, stand up sven you are in my seat "No no mad") Do a set up, spill something on purpose, miss your chair, model some situation Brian himself might find upsetting and use his sign phrase emphatically.

This is teaching him what to do and say after the fact, better yet teach him how to avoid problems to begin with. Teach him to make choices, to use ASL phrases to

ask for a change or new choice, teach him to give directions. Brian needs to learn to compromise and to wait. Play the "waiting game" (board and timer versions" to learn turn taking, communication, instruction giving and following, and of course waiting his turn.

Brian tantrum behavior is also physical and cathartic in nature and given how physical and how much stimulation he does pervasively it surely provides sensory feedback which is if not pleasurable at least reinforcing. Reduce physical intervention when upset protesting or tantrumming, increase physical interaction when speaking (ASL or Icons). Teach Brian to access play with words, to sign wrestle, or big blue ball or swimming. Reward him with desired activities for spontaneous language.

## Consequences

When Brian aggresses and or tantrums continue down playing down the event. Do not OOH or AHH or yell "Brian stop" "No, don't" etc. Ignore the act as if it had not happened. Insert the appropriate communicative phrase you think he intended. Model or hand over hand sign the intended communication "break Please" Change new activity etc. Allow him escape for the communicative phrase not the act of aggression. Insert communication at every opportunity. Sending Brian to his mat or allowing him to escape to his mat for time away is a fine intervention however if the intent was to escape a task or demand he may perceive aggression as his way of saying "leave me alone". Once he has calmed make sure he always returns to the task he escaped for completion. If Brian is tantruming and wont stay is his spot or room, avoid him, block blows, run around the table, short of imminent danger do not retrain. Using clothing holds staff may move Brian to his room or mat if verbal redirection is unsuccessful but avoid giving physical deep pressure. Use clothing holds with extended arms or you will be head butted. When its over its over, hold no grudges no cost response. If Brian bites himself downplay ignore. Later clean and apply Neosporin or similar product we don't want Brian to learn biting himself gets him soapy water or slippery lotion. Thus far Brian's incidence of self-injurious behavior is infrequent and irregular, increased attention is likely to increase not decrease this behavior. Monitor closely, if Brian's frequencies become regular reassess and reevaluate plan with regards to self-biting.

Brian is not currently using and contingency management systems, token economies or self-monitoring system. Rewarding him for using communication and participating in other alternative and incompatible behaviors should be your focus. Eventually when Brian's program is consistently in place and he is demonstrating more buy-in you may be able to add more cognitive strategies.

**Self stimulation**
Antecedent management

Brian self-stimulates pervasively. He must be engaged in competing and incompatible and alternative activities. Laying on the mat playing with sensory beads only increases self-stim it neither replaces it nor decreases it. Build a tight schedule, minimize down time. Ensure speed in transitions. Keep his hands busy communicating or working or both. Schedule intermittent functional physical activities (sports, working out, gymnastics, ball play, Pilates). Schedule intermittent functional wet exercises (wash dishes, water plants). Staff vigilance is essential to the preventing ingestion of non-edibles and the excess consumption of water.

Replacement skills

Teach him actual skills that provide sensory feedback… drumming, tumbling; enroll Brian in Gymnastics. Teach Brian things to do at the beach and in the water…boogie board, snorkel, even surf, over time making his water play more functional and less stimmy. Have Brian carry things when traveling to keep his hands full and busy. Teach Brian To self-administer compression (Pilates ball therabands, etc). Teach Brian to put on deodorant, lip-gloss, and lotions to replace in a functional way his desire to be wet and play with spit. Eventually when you have stimulus control and Brian only applies appropriate liquids to appropriate places you might use more complicated replacements for more complicated stims like visine. Many individuals who experience compulsion to put things in their mouth (for example PICA) can be trained to put things first in their pockets. Staff must be vigilant to prevent redirect and otherwise engage Brian so that he isn't picking leaves or grabbing at small particles. When Brian has so quickly managed to get his hands on leaves rather then correct him or redirect him to give it to you or to put in a trash can, which makes sense but isn't always available condition Brian to putting everything in his pockets. On scheduled intervals throughout the day have Brian empty his pockets. Reinforce him heavily for putting things in his pockets and again for emptying them. This is a long shaping process that won't seem immediately successful. Start now.

Consequences

Self-stimulation is self-reinforcing. Punishing or any kind of negative commentary is irrelevant. Over correction or any kind punishment will be ineffective. Focus on prevention. Redirect in the moment to the task at hand or to a replacement skill or activity. Be sure to insert the communicative responses, i.e. "I want lotion" or "I want trampoline." HOH assist Brian when he has leaves or what not in his hands to put them in a pocket. Provide copious Reinforcement.

**Toileting**

There is no need to repeat the last 3 toileting plans here please see and apply as appropriate. In brief, continue collecting scatter plot and ABC data. Adjust data to supply slight more information (i.e. what specific demand or work task preceded toileting accident vs. "demand" or "@ work table" have staff sign with their initials don't forget the time of day). Reports at this time suggest that he urinates every time you take him. Slowly incrementally expanding the time between bathroom trips was a successful intervention before and should be revisited, however nothing will be successful without engaging instructional activities in between. All staff anecdotally report higher rates around specific tasks and specific staff but data doesn't collected enough information to validate. Clearly Brian is urinating as self-stimulatory protest and due to a lack of solid reinforced schedule training.

**Communication**

Interventions designed to affect Brian's communication skills have been embedded though out this report. Focus heavily on ASL and ensure a back up visual system at all times. Even with fluent ASL, which is essential, Brian should use an icon and written word organizational system to map plan and complete his day. Communication by definition requires communicative partners. While it is essential staff are proficient in sign language (ASL or SEE) it is equally important or more important that Brian have peers who speak his language. Teach ASL to Brian's friendship club, his classmates, and same age peers at school. Provide ASL instruction to Brian's brother, family, and any interested parties.

Collect data on how many communicative interchanges Brian has daily (frequency, duration, Turns, range of topic) with how many persons (age, relationship, social or hierarchical), and what kind of exchanges (instructions and toileting were the only exchanges witnessed during observation). Continually enhance the range and frequency of Brian's communication.

When Brian spontaneously signs anything reinforce immediately. While your biggest and best reinforcer is saved for toileting, communication is the core of Brian's program. I cannot understate the importance of signing perpetually and reinforcing all successful approximations.

**Summary**

Brian is a young man who is very impacted by his autism; his needs and behaviors are complex. His most challenging behavior is not his aggression, but

his self-stimulation that cannot be squelched but only shaped and replaced. Brian has learned he can intimidate staff, avoid work and delay demands by urinating and protesting inappropriately. It is important that sufficient consistent part trained (or similar) ASL or SEE proficient staff feel comfortable and confidant educating Brian. Care giving is not enough. He needs direct systematic instruction in communication, self help, social and leisure skills, literacy, money management, time management, academics, pragmatics, etc. Brian's needs are many, but with consistent, educated, dedicated staff they can be met in his current environments. Brian's needs can be met, with appropriate support, in the least restrictive environment, his school and his family's home. Brian is approaching puberty; some of his boundary issues are now compounded with typical behavior of adolescence. His self-stimulatory behavior will be likewise compounded by puberty. It is very important that previously established stimulus control be reestablished, that these interventions be worked on and control and structure reestablished as soon as possible. The middle school years are tough on every one and folks with autism are no exception.

Brian needs a lengthy and comprehensive crisis plan. Remember crisis is something above and beyond the behaviors expected and planned for. This crisis plan should define an emergency in specific detail and provide a phone tree of who to call under what conditions. A behavioral emergency such as a tantrum that requires back up means calling the consultant (IISC or crisis outreach worker) or the family (depending on the environment) not the police or the hospital. Brian's current emergency plan is insufficient and in all likelihood ineffective. Telling Brian stop biting himself isn't likely to be the thing which makes him start or stop. No behaviors diminish without addressing the function. Lastly with regards to crisis, CPI / PART-R/ or any non-aggressive control the emphasis is on hands off. For folks who are not auditory processors the verbal de-escalation techniques tend to be less effective. CPI etc emphasizes to avoid conflict avoid physical management unless no other options are available for safety. If you find yourself putting your hands on Brian be sure to use clothing holds minimize all physical contact. Do not hold Brian longer then absolutely necessary. Release as soon as safe. The natural human reaction when under duress is to hold and restrain. As soon as you are out of traffic, away from the imminent danger, release run around the tree, let him chase you, let him collapse on the ground and embarrass himself. Do not hold manhandle restrain use force unless in imminent danger.

Brian recently underwent a flurry of behavior. He is currently back to his old self behaviorally speaking. Brian will exhibit more flurries. The behavior associated with growing pains puberty and somatic issues will remain. The learned behaviors that have worked with subs or passing staff, he will continue to try

those on new staff.  If the behaviors continue to be successful the behaviors will be further reinforced.

Brian had a seemingly effective program that while never fully implemented contained all the requisite component parts. What to do is known. The issue is implementation, quality assurance, monitoring, and constant updating and augmenting for slow but gradual success.

_____

Kimberly Smalley, Ph.D.
Board Certified Behavior Analyst