Of Counsel:
DAVIS LEVIN LIVINGSTON GRANDE

STANLEY E. LEVIN          1152-0
MICHAEL K. LIVINGSTON  4161-0
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813
Telephone: (808) 524-7500
Fax: (808) 545-7802
E-Mail: slevin@davislevin.com

LAW OFFICES OF CARL M. VARADY
CARL M. VARADY          4873-0
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawaii 96813
Telephone: (808) 523-8447
FAX:  523-8448
E-mail:  carl@varadylaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor, | CIVIL No. CV 05-00247 HG/BMK CIVIL No. CV 04-00442 HG/BMK CONSOLIDATED (Other Civil Action) |
| Plaintiffs, vs. | |
| DEPARTMENT OF EDUCATION, State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent, | PLAINTIFF STANLEY BOND'S AMENDED RESPONSE TO DEFENDANT DEPARTMENT OF EDUCATION'S REQUEST FOR ANSWERS TO INTERROGATORIES TO STANLEY BOND DATED MARCH 3, 2006 |
| Defendants. | |

MAY 1 0 2007
EXHIBIT G

PLAINTIFF STANLEY BOND'S AMENDED RESPONSE TO DEFENDANT
DEPARTMENT OF EDUCATION'S REQUEST FOR ANSWERS TO
INTERROGATORIES TO STANLEY BOND DATED MARCH 3, 2006

TO:   HOLLY T. SHIKADA, ESQ.
      GARY K. KAM, ESQ.
      Department of the Attorney General
      Education Section
      235 S. Beretania Street, Room 304
      Honolulu, Hawaii  96813

      JOHN T. KOMEIJI, ESQ.
      GREGG M. USHIRODA, ESQ.
      Watanabe Ing & Komeiji
      First Hawaiian Center
      999 Bishop Street, 23rd Floor
      Honolulu, Hawaii 96813

      Attorneys for Defendants

Plaintiff Stanley Bond, by and through his above named attorneys, amends his April 11, 2006 response to Defendant Department of Education's Request For Answers To Interrogatories To Plaintiff Stanley Bond Dated March 3, 2006.  Said amended response to interrogatories is attached hereto.

      DATED:  Honolulu, Hawaii, May 9, 2007.

                    /S/ STANLEY E. LEVIN
                    STANLEY E. LEVIN
                    MICHAEL K. LIVINGSTON
                    CARL M. VARADY

                    Attorneys for Plaintiffs

1.    State your present full name, date of birth, place of birth, social security
      number and present residential address.

      Answer:

Stanley Crews Bond, Jr.
May 18, 1956
Staten Island, NY
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
510 Cooper Drive, Benicia, CA 94510

2.    List the full address of each place you have resided during the last ten years along with the corresponding dates of residence.

    Answer:

| | |
|---|---|
| 12/1990-3/1997: | 6808 A Avenue, St. Augustine, FL |
| 3/97-7/99: | 69 Duck Hollow Road, Elkton, MD |
| 8/99-1/2005: | 76-6249 Kupuna Street, Kailua-Kona, HI |
| 1/05-Present: | 510 Cooper Drive, Benicia, CA |

3.   Describe fully your education.  (this includes identifying each school, college, and educational institution you have attended; all occupational training you have had; special skills you have acquired, if any.  This includes the respective attendance or training dates, and each respective degree, diploma, or certificate you received.)

Answer:

Education

| Date | School | Major | Degree |
|------|--------|-------|--------|
| 9/87-5/95 | State Univ. of N.Y.-Albany Albany, New York 12222 | Anthropology | Ph.D. |

Dissertation Title: Tradition and Change in First Spanish Period (1565-1763) St. Augustine Architecture: A Search for Colonial Identity.

| 9/81-5/84 | State Univ. of N.Y.-Albany Albany, New York 12222 | Anthropology | M.A. |

Thesis Title: The Relationship Between Soils and Settlement Patterns in the Middle Mohawk Valley.

| 6/79-8/80 | Univ. of Alabama Tuscaloosa, Alabama 35486 | Geology | B.S. |

| 8/76-5/78 | Univ. of Alabama Tuscaloosa, Alabama 35486 | Anthropology | B.A. |

| 8/74-5/76 | Wake Forest Univ. Winston-Salem, NC 27106 | Anthropology | |

Training
June 24-26, 1997. Introduction to Federal Projects and Historic Preservation Law. University of Nevada, Reno, Heritage Resource Management Program.

July 13-17, 1998. Contracting Officer Course Representative (ALMC-CL). US Army Logistics Management College.

September 14-18, 1998. Archeological Resource Protection Training. FLETC.

3

March 22-25, 1999. Preparing and Documenting Environmental Impact Analysis. US Army, Nicolson School of the Environment, Duke University.

October 27-29, 1999. Managing the Safety Performance Process. NPS.

July 18-20, 2000. Introduction to ArcView 3.2 GIS for Windows. NPS.

November 13-17, 2000. Supervision Fundamentals. Graduate School, USDA.

February 26-March 2, 2001. Administration for First-Line Supervisors. NPS.

July 24-26, 2001. ANCS+ Training. NPS.

May 11-15, 2001. Completed NAUI Scuba Diver and PADI Open Water Diver Certification. Jack's Diving Locker.

July 31, 2001. Completed PADI Medic First Aid (CPR/First Aid). Jack's Diving Locker.

August 1, 2001. Completed PADI Specialty Diver Oxygen First Aid and DAN Oxygen First Aid for Scuba Diving Injuries. Jack's Diving Locker.

August 28-30, 2001. NPS NEPA Training Director's Order #12. Albright Training Center.

October 30-November 1, 2001. Assistance Agreements. NPI, Inc.

May 24, 2002. USDOI Integrated Credit Card Program.

September 4-6, 2002. Orientation to NPS Performance Management Process and Government Performance and Results Act. NPS.

October 22-24, 2002. ASMIS Training. NPS.

October 28, 2002. COR/COTR Refresher Seminar. NPI, Inc.

November 13-17, 2002. OSHA 600. Rocky Mountain Education Center, OSHA Training Institute.

April 19, 2004. COR/COTR Refresher Seminar. NPI, Inc.

4.    Describe your occupation history for the last ten (10) years. (This includes
military service, part time jobs, self-employment, and your recent work, if
any. This includes providing for each such activity the relevant dates; names
and business addresses of each employer or other entity you associated with;
your status, rank or title; your rate of pay; and the reason for termination; for
military service also state your branch(es), your service number, and type of
discharge(s).

       Answer:

I have never been terminated from a job. I do not have any military service.

Professional Experience

1/05 to Present. GS-024-12 (8) Superintendent, Juan Bautista de Anza National
Historic Trail, Oakland, California. Pay Approximately $86,000 per year

1/01 to 1/05. GS-193-12 (7) Chief of Resources, Integrated Resource
Manager/Archeologist and 7/99-1/01. GS-193-11 (10) Archeologist; Kaloko-
Honokohau National Historical Park, Kailua-Kona, Hawaii. Ending Pay
approximately $72,000 per year. Responsible for cultural and natural resources
programs in the park, including the Coral Reef Initiative and park GIS database.
Supervise 18 individuals in two parks; Duties include preparation of compliance
documentation and permits, including "no adverse affect" under the Nationwide
Programmatic Agreement, 106 compliance documents for park projects, Section 7
documents and permits under the ESA, data for Environmental Assessments,
Hawaii Island Burial Council documentation, and research and specimen collecting
permits, yearly curation, archeological and natural resource reports; oversight of
cultural and natural resources projects including restoration of Kaloko fishpond,
stabilization of Aiopio fishtrap, stabilization of archeological sites, documentation
of archeological sites and petroglyph fields, alien vegetation eradication and
reintroduction of native plants, enhancement of endangered waterbird nesting
habitat, predator trapping, water quality assessment and monitoring, sea turtle
monitoring, park participation in the Inventory and Monitoring program, coastal
hazards analysis, Coral Reef Initiative programs; development of cultural and
natural resource PMIS statements for park projects; management of park
collections; supervise eleven employees and larger temporary work groups (fire
crew, YCC, SCA); partnerships, agreements, and projects with USGS Water
Resources Division-Honolulu (Dr. Gordon Tribble), USGS Pacific Science Unit
(Dr. Bruce Richmond, Dr. Mike Fields), U.S. Marine Fisheries Service (George

5

Balazs), University of Hawaii Pacific Cooperative Studies Unit (Dr. David Duffy), University of Hawaii-Hilo Marine Science Department (Dr. Paul Haberstroh), University of Hawaii-Manoa Oceanography Department (Dr. Ed Laws), Hawaii State Emergency Environmental Work Force (Laurie Hillis), Ducks, Unlimited, Inc. (Kim Uyehara), TREE Center (Pam Davis-Lee), Amy Greenwell Ethnobotanical Garden (Peter Van Dyke); lead for intervention with Hawaii State Land Use Commission, Hawaii County Council, and Hawaii County Planning Commission over upslope and adjacent development; with superintendent negotiated with State of Hawaii and private landowners for leases, jurisdiction, or ownership of lands within authorized boundary; consultation with Hawaii Island Burial Council and local Hawaiian groups; worked closely with all park divisions, including Rangers, Interpretation, Maintenance, and Administration; serve on Board of Directors for the Kona Historical Society and Pulama Ia Kona committee for the development of a historic heritage corridor; received the 2001 Regional Director's Award for Small Park Natural Resources Manager of the Year and 2001 Director's Award, the Trish Patterson Student Conservation Association Award for Natural Resource Management in a Small Park; served on the 2002 National Natural Resource Awards selection committee. Currently serving as Acting Chief of Resources for Pu'uhonua O Honaunau NHP.

3/97-7/99. GS-193-12 (3) Archeologist. U.S. Army Environmental Center, Aberdeen Proving Grounds, Maryland. Ending Pay approximately $60,000 per year. Duties include development of Army policy for cultural resource management on Army installations; Development of model Army Integrated Cultural Resource Management Plans and review of Army installation ICRMP plans; management of Army curation standards development and development of curation partnerships for professional curation of installation collections; consulted with installations on resource issues; oversight of contracts; served as the Army representative on the Department of Defense Curation Committee; development of cultural landscape approach for Army installation cultural resource management; yearly rollup of Army cultural resource data; yearly budget review of installation funding requests for cultural resource projects; development of Cultural Resources Section public relations program; Conservation Branch WEB page manager; trained Army personnel on environmental compliance laws.

1/87- 3/97. Archaeologist I/Archaeologist II. Historic St. Augustine Preservation Board, St. Augustine, Florida. Ending Pay approximately $27,000 per year Duties include development and implementation of archaeological research projects; continuing program of site survey in St. Augustine and St. Johns County; research, excavation and report preparation on archaeological sites in St. Augustine

and St. Johns County; maintain archaeological collections (approximately 1000 cubic feet plus associated documents) and loans; train and supervise professional archaeologists, student interns, and archaeological volunteers; development of school programs and curriculum; preparation of Florida Master Site File forms; research on Spanish material culture; historical research on various ethnic groups associated with St. Augustine; maintain up to date files on archaeological sites in St. Augustine and St. Johns County; act as a liaison and resource on archaeological issues with city, county, state, and federal officials, private developers, and professional archaeologists; grant preparation and implementation; public presentations on archaeological topics; contact with the news media; archaeological exhibit preparation; placement of historic sites in GIS.

9/84-1/87. Museum Curator. Historic St. Augustine Preservation Board, St. Augustine, Florida.   Duties included supervision and maintenance of the archaeological collections and associated documents; continued program of archaeological site survey in St. Augustine and St. Johns County; archaeological excavation of endangered sites in St. Augustine and St. Johns County; development of an archaeological volunteer program; maintain up to date archaeological site files for St. Augustine and St. Johns County; act as a liaison and resource person on archaeological issues with city, county, state, and federal officials, private developers, and professional archaeologists; development of archaeological standards for the St. Augustine Comprehensive Plan; development of the Archaeological Preservation Ordinance for St. Augustine; public presentations on archaeological topics.

2/83-9/84. Research Archaeologist. Historic St. Augustine Preservation Board, St. Augustine, Florida.  Duties included coordinating a subsurface archaeological survey of St. Johns County, research, mapping, artifact analysis, and final report; archaeological excavation and monitoring of utility excavations on St. George Street, St. Augustine, Florida, research, direction of archaeological excavation, analysis of recovered data, and final report.

5/81-5/82. Archaeological Research Assistant. Research Foundation, State University of New York, Albany, New York.
Full time 5/81-8/81 and part time 9/81-5/82 on N.Y. Department of Transportation contracts; duties included archaeological survey, mapping, test excavation, artifact analysis, and research.

8/80-5/81. Project Archaeologist. Historic St. Augustine Preservation Board, St. Augustine, Florida.

7

Coordinated all aspects of a subsurface auger survey in various parts of the city; duties included surveying, auguring, mapping, artifact analysis, research, and preparation of a final report.

7/78-8/79. Field Archaeologist. Office of Archaeological Research, University of Alabama, Tuscaloosa, Alabama. Duties included field work and laboratory analysis for two projects, Bay Springs Testing Project and Cedar Creek Above Pool Survey; laboratory analysis on other various projects; experimental thermal alteration of charts.

9/76-12/76. Archaeological Technician. Office of Archaeological Research, University of Alabama, Tuscaloosa, Alabama.
Weekend excavation on sites in the Aliceville Lock and Dam Project, part time laboratory work.

Teaching Experience

9/96-12/96. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology.

1/96-4/96. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean and Anthropology 492, Archaeological Collections Management.

9/95-12/95. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology and Anthropology 491, Field Methods in Archaeology.

1/95-4/95. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean and Anthropology 492, Field Methods in Archaeology.

9/94-12/94. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology and Anthropology 491, Archaeological Collections Research.

1/94-4/94. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean.

9/93-12/93. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology and Anthropology 491, Archaeological Laboratory Techniques.

1/93-4/93. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, An Overview of the Caribbean and Anthropology 492, Field Methods in Archaeology.

9/92-12/92. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology.

1/92-4/92. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 440, Florida Archaeology.

9/91-12/91. Visiting Instructor. Flagler College, St. Augustine, Florida. Anthropology 220, Introduction to Archaeology.

9/87-12/87. Graduate Assistant and Professor of Record. State University of New York, Albany, New York. Anthropology 140, Survey of World Cultures, with Dr. James Wesmann.

9/82-12/82. Teaching Assistant. State University of New York, Albany, New York. Anthropology 101, Introduction to Anthropology. Assisted instructor in preparation of classroom material, prepared tests, and taught two one-hour review classes each week.

6/82-8/82. Graduate Assistant. State University of New York, Albany, New York. Field supervisor in Anthropology 330, Archaeological Field School. Directed students in archaeological site survey and site excavation.

5.   Identify each legal proceeding, other than this suit, in which you have been or are a party, a witness, or an accused. (This includes civil and criminal lawsuits, formal administrative proceedings, convictions indictments, arrests and citations, including traffic offenses. This includes identifying your role in each proceeding. This includes the dates, places, and courts of each such lawsuit, conviction, indictment, arrest, and citation.)

Answer:

Florida
1994/95 (approximate) Suit against Flagler County, FL School District for physical mistreatment of Bryan Wiles-Bond in the classroom. Part of a broader suit brought by the classroom parents for the same reason associated with their children. Settled. - Plaintiff

Hawaii
Hearing Request was filed on 2/27/01, a decision dated 5/21/01 was issued but has no case number on it. Petitioner
DOE 2004-026 filed 2/26/04, decision 5/11/04 - Petitioner
DOE 2004-070 filed 6/2/04, decision 7/23/04 - Petitioner

CIVIL No. CV 02-000101 SOM/BMK filed 2/15/02 - Plaintiff

2004- Temporary Restraining Order against Ms. Wells due to an attempted abduction. - Plaintiff

No other legal proceedings, including citations or traffic offenses.

10

6.    Describe fully each injury which you believe you sustained as a result of the alleged actions or inactions of the Defendants. (This includes physical and mental injuries; includes identifying which injuries, if any, you claim are permanent.)

Answer:

The position the DOE put us in left us in a state of almost constant stress. We never knew from on day to the next if Bryan would have his educational needs met and if we were going to be required to leave our jobs that day to care for him. It is probably impossible to list every injury or situation that created this stress in our lives, but we have considerable documentation of conversations and written correspondence that point to much of it. Some of the most compelling are:

-Daily observation of the predictable regression in Bryan's behaviors that corresponded with the erosion of his educational program due to incorrect implementation of his program from staff members that did not have the appropriate training. In addition to the behavioral regression Bryan's ability to learn and progress in this "window of opportunity" was squandered away due to the indifference of the Department of Education in securing appropriate personnel to implement his program and to appropriately adhere to the educational components of his program.

-Frustration caused by the indifference of working with the school and provider agencies who would claim that the aides and teacher, who didn't know DTT's and sign (major components of his program) were appropriate. This insistence was done even after going through a due process hearings and prevailing on these points. These agencies also engaged in personal attacks on the parent's character especially Ms. Wiles claiming that she was difficult to work with when she would insist that her son's program be implemented correctly. The DOE and service agencies also discussed with prospective aides how difficult the parents were to work with since they would pursue due process hearings (even though this was done when it was felt all other avenues of resolution were exhausted). This discussion with service providers in effect punished the parents for pursuing their due process rights.

- The continuing pattern of deception and delay tactics in finding skilled individuals who could implement his program. The DOE and the service provider agencies would often times provide inaccurate information (either qualifications or

11

availability) about potential skill trainers. Since the DOE was indifferent with respect to finding aides that had the appropriate skills, the parents spent a great deal of time researching organizations to find appropriate ABA providers. When the parents found individuals that met the qualifications and shared the information it was disregarded. The DOE never even looked at the resumes of individuals we had contacted and that were willing to relocate. In the meantime they claimed they had a list of "appropriate" individuals they had secured from a newspaper ad placed in Honolulu. They had these names for several weeks while Bryan was without services and never mentioned they had some prospects. When the list was given to us we contacted them. No one from the DOE had ever contacted these individuals. Many of the individuals were either not appropriate or did not understand the position was in Kona.

One of the major barriers to finding qualified individuals was finding someone with a sign background. The team needed instruction in order to advance Bryan's signing skills. The parents found someone who had excellent qualifications for teaching the team sign and a knowledge of how to progress in the sign instruction. He was studying in Honolulu for the summer and willing to come to Kona to instruct the team. Ms. Hill, the DES at the time made a verbal contract with him but cancelled at the last minute. The parents found out about it through an e-mail that was copied to us. Signing instruction was later offered by the DOE to all employees and scheduled at a time when Bryan didn't have services so the parents could not attend. Furthermore it was taught by several different people who didn't have a clear purpose. The DOE classes had nothing to do with working on Bryan's individual program. It also combined exact sign with ASL while Bryan's program was built on ASL.

-Leaving Bryan with individuals we did not believe were capable of working with him, including property damage when he was with them.

-The inconsistent services and our fear of Bryan's safety as things fell apart also resulted in our inability to commit professionally to any training or activity. This resulted in Ms. Wiles being unable to apply for a Principal position since she was never sure if Bryan would have the services that were agreed to in the IEP. When his hours weren't covered one of the parents would have to leave work.

-There were several individuals that we were concerned about Bryan's safety when he was with them. Also as the school environment became more hostile to Bryan we were worried about his safety in this setting too. This came to a head when Ms. Wiles went by the school to deliver extra pants and found Bryan on a mat self

12

stemming in his urine on a plastic mat and using the surface as a slip and slide. When Ms. Wiles walked into the room she was horrified to find four adults watching. The aide, Sven Linderman, said to her "He looks so happy" and the teacher, Jennifer Harris, said "I don't know what to do". Apparently the teacher did not understand the concept of finding an appropriate replacement behavior. This was the defining event that caused Ms. Wiles to remove him from school. Not only was there a health and safety issue present but Bryan was allowed to escalate into a frenzy through self stimulation. The need to prevent him from engaging in these kinds of behaviors was well documented since self stemming behaviors increase his desire to self stimulate and other negative behaviors such as aggression. Ms. Wiles had been worried about what was occurring at school since the beginning of the school year and had been unsuccessful in getting any answers from the teacher or psychologist about the structure of his program. When she witnessed this event she knew she could no longer trust the school or the personnel involved. In fact she felt that if he continued under the current conditions she would run the risk of losing him since he was regressing so rapidly under the lack of structure.

-As Bryan's regressed due to the inappropriate implementation of his program, the DOE abandoned working on the educational aspect of his program. It was unclear to the parents who was in charge of the educational aspect of his program. Although data was being taken there were not any adjustments to his program based on performance. It was clear that the DOE had abandoned the educational aspects of his program. During this period the Autism Consultant would speak with the skill trainers about behavioral issues and about their personal lives but there was no focus on Bryan's educational progress. In fact according to one skill trainer the psychologist would try and pry into the personal lives of the parents by asking "Are you detecting any marital difficulties?" When the Autism Consultant spoke with the parents and educational progress was brought up she would discuss it but then would not follow through with discussing the changes with the skill trainers. As Bryan's behavior dramatically improved at home, Ms. Wiles had to design the educational part of his program since the DOE had abandoned this area. During the entire time he was at home the "teacher" never called and discussed his academic progress or made a visitation.

-The lack of confidentiality and misinformation in Bryan's case created anger and frustration. The discussion of Bryan's case was open and inappropriate. Bryan's case and the legal aspects were a central focus of the DOE personnel and apparently discussed freely with skill trainers not associated with Bryan's case. Tiffe even called Ms. Wiles workplace and discussed the securing of a skill trainer

with the school's secretary (on the day of a hearing- I guess she felt desperate to get it on record when Ms. Wiles was unavailable). Ms. Wiles, working for the DOE, had gone to great lengths to separate her professional and private life. She felt it was inappropriate for Tiffe to be sharing confidential information with a secretary who did not even know Ms. Wiles had an autistic son. The parents had numerous instances of strangers or individuals barely known to the parents and not involved in Bryan's case come up to <u>us in our</u> the community and start discussing Bryan, sometimes with incorrect facts. This concern was discussed on a regular basis with the psychologist and it was brought up with DOE personnel. The psychologist who is supposedly bound by confidentiality standards and knew about these concerns took an aide out drinking the afternoon after Bryan's leg was injured. They drank Bloody Marys at a local bar for five hours and discussed Bryan's case in a very public venue. At this point the parents understood how deeply unprofessional the situation had become. It was frightening since there was not any support services to assist with Bryan's needs and it was obvious the intent was to not help. It was clear the family needed to leave Hawaii as soon as possible even if another position did not become available.

-Invasion of our privacy caused considerable stress. A certain amount of privacy is expected to be forfeited when there are individuals in the house. However, it is expected that those individuals will act professionally and not go out of their way to look for personal information. One of the skill trainers, <u>Jeremy Watson</u>, would go out of his way to listen to phone conversations. His feet could be observed at the doorway downstairs listening to phone conversations even though he felt he was safely out of view. According to another skill trainer, <u>Christy Edwards</u> present at the meetings he would relay the content of conversations he had overheard to the school. He also found Real Estate information from California and reported it to the school immediately. He would leave the area on almost an hourly basis to report back to the DOE <u>by phone</u>. Finding out about these behaviors forced the parents to be on their guard and added considerable stress to their lives which were already stressed due to eliminating the negative behaviors that had cropped up during the regression. The fact that someone who was there to help your son was more interested in listening in on your private conversations was disconcerting. The parents were concerned about leaving the house and made sure their room which contained the computer was locked.

The aide described above also shared many things which highlighted how inappropriate, questionable, and irregular the arrangement was. He described relationships with the psychologist, Tiffe, and the DOE which far exceeded professional boundaries. He told Ms. Wiles that he and the psychologist, <u>Dru</u>

14

Copeland would go out for drinks and she had offered him a condominium to stay in for free on a trip to Washington DC. The psychologist had brought him to one of the parent meetings and claimed he was on an equal footing with her at least as far as his knowledge base. Ms. Wiles was surprised to hear that she would present him professionally in such a light considering he didn't even have a BA and his AA was in business   In fact his only experience in autism prior to being in Hawaii was several years serving as an aide in a non-public school in California. Ms. Wiles also heard stories from the aide involving Kelly Stern who was the Director of TIFFE. The aide often referred to his relationship with Kelly in a familiar context. Jeremy discussed his concern to me about his professional separation with Ms. Stern when she wanted him to live in her house (as a renter). And finally he claimed that Ms. Tolentino (the DES who was on the case after Ms. Hill was removed) had offered him the ACT (Autism Consulting Teacher) position for the Hamakua Complex for working with Bryan once he had completed the assignment. When the Ms. Tolentino gave the position to the North Kona Complex the aide was furious and relayed the story to Ms. Wiles. He had apparently vented for an hour on the phone with the psychologist Dru Copeland before he told Ms. Wiles. Knowing position recruitment procedures and minimum qualifications for that type of position Ms. Wiles realized how serious this was. Finally, he shared with one of the other skill trainers "I'm the one they bring I when there is S____ to be cleaned up". He also bragged to another skills trainer they had used him in another case and he had been a good witness and was good at finding out information. These are just a few of the examples but hearing them on a daily basis suggested that this was not a regular aide arrangement and it caused a great deal of stress having to be polite to the individual in your home when you knew his true purpose was something other than working with your child. Finally, the aide was in charge of data collection but was unwilling to share his records despite several requests. These circumstances left the parents to wonder about the accuracy of what was recorded.

Finally, the biggest act of privacy violation and the confirmation of their negative intent was the illegal tapping of our private e-mails. This was discovered when the DOE submitted a private e-mail Ms. Wiles had written to another person from her computer in her bedroom to a judge in one of the legal proceedings. The judge dismissed the e-mails stating they were private and later District's DES Ms. Hill was subpoenaed but did not show up at the deposition. In addition Ms. Hill handed over several private e-mails from one of the skill trainers, Christy Edwards to the judge. Ms. Hill also corresponded with an unknown person about Christy's qualifications and pay rate. There were many other collaborating pieces to suggest

that we were being targeted as a family. We were scared for our son and for ourselves.

The overriding stress throughout this entire period was the loss of time we could spend as a family and with our other son. We also felt at any moment the bottom could drop out and often it did. We were worried about Bryan and knew that the time we wasted in attempting to get his program implemented would result in a lost window of opportunity for his learning and would change the trajectory of his life. It was heartbreaking to see our child and our family being turned into an incorrect urban legend through the open discussion (often incorrect) of our situation with information that should have been confidential regarding our child's disability. It was also stressful to pursue legal recourses through due process hearings.  Even more stressful was to prevail in the hearing and have the DOE act as if hearing orders were unimportant and they wouldn't be held accountable.  This blatant disregard for the only avenue of recourse available to parents felt very much like a system out of control. Once again by the time the case had progressed to the Federal Level and the DOE would not follow through with the judge's request the family knew they would have to leave the State.

Our family wanted very much to make Hawaii our permanent home. In order to live in Hawaii Dr. Bond took a downgrade in his GS level (from a GS-12 to a GS-11) to move there from Maryland. Ms. Wiles initially took a sharp decrease in pay when working as a counselor but the family felt it was worth it to live in Hawaii. Ms. Wiles had worked for six years in the Department of Education as a counselor and an administrator.  She was four years from being vested in the retirement system and had planned on working 20 years in Hawaii before retiring. Their oldest son was happily attending Parker and did not wish to leave. The family had planned to live in Hawaii permanently and it was with great sorrow they felt forced to give up that dream because the adversarial relationship with the DOE made it impossible to stay.

7.    Identify each psychiatrist, psychologist, psychiatric social worker, marriage counselor, or any other person providing treatment or counseling services for mental, emotional or adjustment problems, giving the inclusive dates of treatment or consultation, and describe the nature of the problem(s) for which treatment or consultation was sought.

Answer:

None.

8.    Itemize <u>all</u> educational, medical, and health care expenses you claim resulted from or are directly chargeable to the alleged actions or inactions of the Defendants. (This includes the amount of each charge, identifying each charging educational and health care provider or facility, and stating the inclusive dates for each charge.)

Answer:    All of the above are future claims.

9.    Describe fully each claim, if any, resulting from the claims alleged in the Complaint, for your past or future loss of income. (This includes wages, earnings, or other income; identify each person or organization who would have paid you; the amount of each loss; explaining how each loss is computed; and stating the inclusive dates payment would have been made.)

Answer:

<u>No Claims at this time</u>.

10. With regard to your federal income tax returns, please state the following information for each of the five full years immediately preceding the filing of the Complaint, Civil No. 04-00442 HG/BMK, the year of the filing of the aforementioned Complaint, and for each full tax year since the filing of the aforementioned Complaint:

The figures below represent our federal taxable income as represented by our jointly filed (with Ann Kimball Wiles) federal income tax returns.

| Year | Wages | Other Income | P/L | Total Taxable Income from Business |
|------|-------|--------------|-----|------------------------------------|
| 2001 | 91,368 | 0 | 0 | 91,368 |
| 2002 | 106,606 | 0 | 0 | 106,606 |
| 2003 | 110,157 | 0 | 0 | 110,157 |
| 2004 | 109,744 | 0 | 0 | 109,744 |
| 2005 | 131,040 | 0 | 0 | 131,040 |

11.   Identify and itemize all other losses (tangible or other) or expenses that you
      claim resulted from or are directly chargeable to the alleged actions or
      inactions of the Defendants other than medical expenses and loss of income
      described above. (This includes identifying each bill and person or entity
      submitting the bill, explaining how each loss is computed, and stating the
      inclusive dates of each bill or loss.)

      Answer:

      $67,500 difference in the cost of comparable housing- House in Hawaii sold
      for $582,500 and purchase price for a similar house in CA with a more than
      one hour commute from my office was $650,000

      Loss of tuition of other son at Parker $9,800.

12.   State fully the nature and amount of all future expenses you anticipate you
      will incur as a result of the alleged actions and inactions of the Defendants
      and explain the basis for those anticipated expenses.

      Answer:     See Exhibit "A" attached to April 11, 2006 filing

13.   Identify the all experts whom you have consulted or expect or plan to call to
       testify in this case (including but not limited to all medical doctors),
       indicating whether or not each expert is expected to testify at trial, and
       describe fully each expert's opinions, knowledge, and work relative to this
       case. (This includes each expert's full name, complete address, and phone
       number; the field of expertise of each expert; the subject matter on which
       each expert is expected to testify; the substance of the facts and opinions to
       which each expert is expected to testify; a summary of the grounds for each
       opinion; and, if the expert has prepared any written report(s) involving any
       matter involved in this lawsuit, identify the report(s) and each person having
       present custody or control of the report(s).

Answer:       Dr. Daniel LeGoff (Expert)
              Child and Adolescent Resources for Education
              105 South Princeton Ave
              Wenonah, NJ 08090
              (856) 616-6466

              See Exhibit "B" attached to April 11, 2006 filing.

              Dr. Kimberly Smalley (Expert)
              Behavioralist
              C/o Behavioral Counseling And Research Center LLC
              575 Cooke Street, Suite A-1622
              Honolulu, HI 96813
              (808) 254-0909

              See Exhibit "C" attached to April 11, 2006 filing.

              Loretta M. Lukens, M.D., R.N., C.R.R.N. (Expert)
              Life planning
              29 West Rhea Road
              Tempe, AZ 85284
              (480) 839-0799

              See Exhibit "E" attached to Expert Disclosure filing on May 30, 2006.

Keynes D. Von Elsner, CPA (Expert)
Certified public accountant
50 S. Beretania Street
Suite C-113
Honolulu, HI 96813
(808) 538-6904

See Exhibit "A" attached to April 11, 2006 filing.

Betty Jo Freeman, Ph.D. (Expert)
Professor Emerita of Medical Psychology
UCLA School of Medicine
3940 Mandeville Canyon Road
Los Angeles, CA 90049
(310) 440-8543

See Exhibit "L" attached to July 31, 2006 filing.

14. Identify each lay witness whether or not you expect or plan to call him or her to testify at the trial of this case, including in your description the full name and complete address and phone number of each witness, and briefly describe the facts to which each witness will testify.

Answer:

Ann Kimball Wiles
c/o Davis Levin Livingston Grande
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813

Stanley Bond
c/o Davis Levin Livingston Grande
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813

Alvin Rho
c/o Holly Shikada
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

Naomi Shiraishi
c/o Holly Shikada
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

Linda Price, Administrator
Child and Family Services
c/o Holly Shikada
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

<u>Eric Rolseth</u>
  <u>c/o The Institute for Family Enrichment</u>
  <u>615 Piikoi Street, Suite 105</u>
  <u>Honolulu, Hawaii  96814</u>

Bill Beljean
  Skills Trainer
  <u>c/o Child and Family Services</u>
  <u>94-216 Farrington Hwy Suite 208</u>
  <u>Ewa Beach, Hawaii  96707</u>

Karen Johnson
  c/o <u>Holly Shikada</u>
  Deputy Attorney General
  235 S. Beretania Street, Room 304
  Honolulu, Hawaii  96813

Barbara Coffman
  c/o <u>Holly Shikada</u>
  Deputy Attorney General
  235 S. Beretania Street, Room 304
  Honolulu, Hawaii  96813

Sheri Adams
  c/o <u>Holly Shikada</u>
  Deputy Attorney General
  235 S. Beretania Street, Room 304
  Honolulu, Hawaii  96813

Kelly Stern
  c/o <u>The Institute for Family Enrichment</u>
  <u>615 Piikoi Street, Suite 105</u>
  <u>Honolulu, Hawaii  96814</u>

Dru Copeland
  c/o Alakai Na Keiki
  <u>1100 Alakea Street, Suite 900</u>
  <u>Honolulu, Hawaii  96813</u>

JoAnn Hill (former DES)
    c/o Holly Shikada
    Deputy Attorney General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii 96813

Christie Edwards
    Therapeutic Aide
    808-987-2787

Rebecca Gavin
    c/o The Institute for Family Enrichment
    615 Piikoi Street, Suite 105
    Honolulu, Hawaii 96814

Michael Wright
    c/o Alakai Na Keiki
    1100 Alakea Street, Suite 900
    Honolulu, Hawaii 96813

Dr. Jana Ortiz
    c/o Alakai Na Keiki
    1100 Alakea Street, Suite 900
    Honolulu, Hawaii 96813

Dorian Yankee
    E-Mail-leaguesaway@tmail.com

Michael Bien
    808-987-2787

Jennifer Harris
    c/o Holly Shikada
    Deputy Attorney General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii 96813

Laurie Bolton
    c/o Holly Shikada
    Deputy Attorney General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Ken Stahlsberg
    c/o Holly Shikada
    Deputy Attorney General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Cara Entz
    Pacific Child and Family Associates, APC
    410 Wet Arden Avenue, Suite 203
    Glendale, CA 91203

Judith Radwick
    c/o Holly Shikada
    Deputy Attorney General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Sven Linderman
    c/o The Institute for Family Enrichment
    615 Piikoi Street, Suite 105
    Honolulu, Hawaii  96814

Katherine Cardinas
    c/o The Institute for Family Enrichment
    615 Piikoi Street, Suite 105
    Honolulu, Hawaii  96814

    896-5642 (Cell)
    887-0373 (HM)

25

Jeremy Watson
 c/o <u>The Institute for Family Enrichment</u>
 <u>615 Piikoi Street, Suite 105</u>
 <u>Honolulu, Hawaii  96814</u>

Laura Pruitt
 c/o <u>Hawaii Behavioral Health</u>
 <u>210 Ward Avenue, Suite 124</u>
 <u>Honolulu, Hawaii  96814</u>

Bill Brown
 c/o <u>Holly Shikada</u>
 <u>Deputy Attorney General</u>
 <u>235 S. Beretania Street, Room 304</u>
 <u>Honolulu, Hawaii  96813</u>

Mr. Stafford (Kealakehe's VP in 2004)
 c/o <u>Holly Shikada</u>
 <u>Deputy Attorney General</u>
 <u>235 S. Beretania Street, Room 304</u>
 <u>Honolulu, Hawaii  96813</u>

<u>Bernice Wilson</u>
 <u>89 Small Pond Road</u>
 <u>Cleveland, GA 30528</u>
 <u>706-865-7990</u>

<u>Jessie Mitchell</u>
 <u>Behavioralist</u>
 c/o <u>Behavioral Counseling And Research Center LLC</u>
 <u>575 Cooke Street, Suite A-1622</u>
 <u>Honolulu, HI 96813</u>

<u>Rebecca Pierson</u>
 c/o <u>Gary K.H. Kam</u>
 <u>Holly T. Shikada</u>
 <u>Deputy Attorneys General</u>
 <u>235 S. Beretania Street, Room 304</u>
 <u>Honolulu, Hawaii  96813</u>

Kate Tolentino
    c/o Gary K.H. Kam
    Holly T. Shikada
    Deputy Attorneys General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Rob Gentzel
    c/o Gary K.H. Kam
    Holly T. Shikada
    Deputy Attorneys General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Shirley Revelle
    c/o Gary K.H. Kam
    Holly T. Shikada
    Deputy Attorneys General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Rae Graber
    c/o Gary K.H. Kam
    Holly T. Shikada
    Deputy Attorneys General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Richi Stallard
    c/o Gary K.H. Kam
    Holly T. Shikada
    Deputy Attorneys General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii  96813

Danielle Doucete
    c/o Gary K.H. Kam
    Holly T. Shikada
    Deputy Attorneys General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii 96813

Wendy Clark
    c/o Gary K.H. Kam
    Holly T. Shikada
    Deputy Attorneys General
    235 S. Beretania Street, Room 304
    Honolulu, Hawaii 96813

Shelby Anne Floyd
    74-5620 Palani Rd., Suite 104
    Kailua-Kona, Hawaii 96740
    Telephone: (808) 326-7979
    Fax: (808) 326-4779

15.    Identify and describe each examination done for or by you for any purpose related to this lawsuit. (This includes without limitation each inspection, test, experiment, or other study made by any person, expert of not. This includes the purposes of determining or evaluating facts or arriving at an opinion or conclusion regarding the alleged claims against the Defendants. This includes identifying the date and nature of the examination; the person(s) and entities conducting the examination; and each document connected with or resulting from such examinations.
This interrogatory is not limited by whether or not the examination was conducted in preparation for trial.)

    Answer:    Expert report of Dr. Daniel LeGoff
              Expert report of Van Keyes
              Expert report of Dr. B.J. Freeman
              Expert report of Loretta Lukens
              Expert report of Dr. Kimberly Smalley

16.  Describe fully each fact, condition, act or omission and the legal basis upon which you base your allegations that the Defendants were deliberately indifferent and should be held liable for damages in this case.

Answer:    All of the following documents were attached to Plaintiffs' Concise Statement of Fact:

May 21, 2001 Stipulated Decision, signed by Richard C.F. Chun, the Hearing Officer.

February 15, 2002 Enforcement Complaint filed (This complaint was required because the Defendants did not provide an after school aide and it refused to make up lost time).

July 1, 2002 Compromise and Settlement Agreement (This was an effort to resolve all controversies. The Defendants had ignored and disregarded its agreed obligation to provide qualified skills trainers 68 hours per month and it also agreed to provide a "pool of qualified substitutes".)

May 11, 2004 Findings of Fact, Conclusions of Law signed by Hearing Officer Alm who made devastating findings about the inability of Defendants to meet its obligation to provide FAPE and of the "regression occurring in Bryan" because of the Defendants' failures.

July 21, 2004 Second enforcement complaint filed to require compliance with the July 1, 2002 settlement agreement and the May 11, 2004 hearing decision.

July 23, 2004 Hearing Officer Decision (This decision was only on a very limited issue regarding whether Bryan was denied FAPE by having a special education teacher who was untrained in American Sign Language. After Defendants stipulated to certain facts and liability on this issue, Ms. Alm ruled that it violated Bryan's right to FAPE to have such an untrained teacher.)

April 14, 2005 Present Complaint.

June 30, 2005 Motion to Consolidate and Stipulated Motion.

## IMPORTANT FACTS IGNORED BY THE DEFENDANTS

While the Defendants were involved in making agreements and was subject to Stipulated Orders, they never communicated the content of the agreements to the agencies in the Big Island community the terms of these agreements and orders.:

The DOE made commitments regarding levels of training/experience for skills trainers that the Defendants never told the agencies tasked with recruiting skills trainers, who never knew what standards their skills trainers had to meet. See Plaintiffs' Opposition to Defendants Concise Statement of Fact filed March 10, 2006 at 1, 2 3, 5 & 6, also see Defendants' Exhibit "A" at 13.

The Settlement Agreement provided that the agency had to develop a pool of trained substitutes yet the agency had no knowledge of that requirement. See Plaintiffs' Opposition to Defendants Concise Statement of Fact filed March 10, 2006 at 1, 2 3, 5 & 6.

The Settlement Agreement of 2002 provided for respite care for the parents, but the administrators complained that skills trainers were left alone with Bryan. See Exhibit "A" at 036 of Petitioner' Concise Statement of Fact filed March 7, 2006.

The June 2004 Order provided that the skills trainers be trained and proficient in American Sign Language (ASL), but none of the skills trainers had such training. See Plaintiffs' Opposition to Defendants Concise Statement of Fact filed March 10, 2006 at 1, 2 3, 5 & 6.

After the May 2004 Hearing Officer's decision, on June 2004, the DOE agreed to the number of additional hours for training pursuant to the May 2004 Decision, to ASL training and to the hiring of an experienced person dealing with Bryan's behavior to oversee the toileting program. The Defendants failed to implement these provisions. See Exhibit "B" at 052 of Petitioner' Concise Statement of Fact filed March 7, 2006.

17. Describe with particularity each of the detailed, specific, particular facts, conditions, acts or omissions on which you and your attorney are basing your allegations that the Defendants intentionally discriminated against you and your child and should be liable for damages in this case.

    Answer:    See answer to interrogatory 16

18. Identify each person who helped you in answering these interrogatories.

    Answer:    <u>Ann Kimball Wiles</u>
                    Stanley E. Levin
                    Bruce Ellis

19. Do the answers to each and every one of these foregoing interrogatories include not only the information known to you individually or your attorney, but also all the information within the possession or control of you the party?

    Answer:    I have answered all interrogatories to the best of my ability and believe they accurately reflect information known to me and my attorney and information within possession or control.

20. Do you understand that these are continuing interrogatories and that if you or your attorney should obtain any further information relevant to these interrogatories, you are required reasonably to supplement or amend your answers to these interrogatories pursuant to Rule 26(e) of the Rules of Civil Procedure?

    Answers:  I personally am not aware of the contents of Rule 26(e) of the Rules of Civil Procedure but to the extent that my attorney understands this rule: Yes

21. Do you understand that you are answering these interrogatories under oath and that your answers may be used as evidence in the event of a trial?

    Answer:    Yes