FILE COPY

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3    ANN KIMBALL WILES and        )

 4    STANLEY BOND, individually   )

 5    and as next friend of their  )

 6    son, BRYAN WILES-BOND, a      )

 7    minor,                        )

 8              Plaintiffs,         )

 9         vs.                      ) Civil No. CV 04-00442

10    DEPARTMENT OF EDUCATION,      ) HG/BMK

11    State of Hawai'i, and ALVIN   ) CONSOLIDATED (Other

12    RHO, in his official          ) Civil Action)

13    capacity as West Hawai'i      )

14    District Superintendent,      )

15              Defendants.         ) VIDEOTAPED DEPOSITION

16    _____)          OF

17    ANN KIMBALL WILES and         ) JOSEPHINE A. HILL

18    STANLEY BOND, individually    ) August 9, 2007

19    and as next friend of their   )

20    son, BRYAN WILES-BOND,        )

21    a minor,                      )

22              Plaintiffs,         )

23         vs.                      ) Civil No. 05-00247

24    DEPARTMENT OF EDUCATION,      ) JMS/BMK

25    State of Hawai'i,             ) CONSOLIDATED (Other
```

EXHIBIT ___B___

Page 2

1           Defendant.  ) Civil Action)
2     _____)
3     VIDEOTAPED DEPOSITION OF JOSEPHINE ANTONIA HILL,
4     Taken on behalf of Plaintiffs at 851 Fort Street,
5     Suite 400, Honolulu, Hawaii 96813, commencing at
6     9:16 a.m., on August 9, 2007, pursuant to Notice.
7
8     BEFORE:  SUE M. FLINT, RPR, CSR 274
9              Notary Public, State of Hawaii
10
11    APPEARANCES:
12
13    For Plaintiffs:   STANLEY E. LEVIN, ESQ.
14                      Davis Levin Livingston Grande
15                      851 Fort Street
16                      Suite 400
17                      Honolulu, Hawaii 96813
18
19    For Defendants:   GREGG M. USHIRODA, ESQ.
20                      Watanabe Ing & Komeiji LLP
21                      999 Bishop Street
22                      23rd Floor
23                      Honolulu, Hawaii 96813
24
25

Page 3

1     Appearances (continued):
2
3     Also Present:     BRUCE ELLIS, Paralegal
4                       CHRIS LOWENTHAL, Videographer
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                I N D E X
2
3     EXAMINATION BY:                      PAGE
4          Mr. Ellis ........................ 7
5
6     EXHIBITS FOR IDENTIFICATION          PAGE
7
8     Deposition Exhibit A -
9     Decision and Order ...................... 33
10
11    Deposition Exhibit B -
12    Excerpt from Deposition of
13    Kimberly Smalley, Ph.D. .................. 70
14
15    Deposition Exhibit C -
16    Complaint ................................ 86
17
18    Deposition Exhibit D -
19    Release and Settlement Agreement .......... 87
20
21    Deposition Exhibit E -
22    Findings of Fact, Conclusions of Law
23    and Decision ............................ 96
24
25

Page 5

1     Deposition Exhibit F -
2     Collection of documents
3     Bates-stamped 1 through 25 ............... 106
4
5     Deposition Exhibit G -
6     E-mails to JoAn Hill
7     from Michael Biehn ...................... 119
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    (Disclosure presented to Counsel.)
2    THE VIDEOGRAPHER:  This is the deposition
3  of JoAn Hill, appearing as a 30(b)(6) witness and
4  individual in the matter of Ann Kimball Wiles and
5  Stanley Bond, et al. versus the Department of
6  Education, et al.
7    We're located at Davis Levin Livingston
8  Grande, 851 Fort Street Mall, Honolulu, Hawaii.
9    My name is Chris Lowenthal, video
10  specialist for Certified Video Services.
11    Will counsel please state your names?
12    MR. ELLIS:  Stan Levin and Bruce Ellis for
13  plaintiff.
14    MR. USHIRODA:  Gregg Ushiroda for State of
15  Hawaii Department of Education and Alvin Rho, in his
16  official capacity as superintendent for the West
17  Hawaii School District.
18    THE VIDEOGRAPHER:  Today is August 9,
19  2007.  We're on the record at 9:16 a.m.  Will the
20  court reporter please swear in the deponent?
21
22    JOSEPHINE ANTONIA HILL,
23  called as a witness at the instance of Plaintiffs,
24  being first duly sworn to tell the truth, the whole
25  truth and nothing but the truth, was examined and

1  deposed as follows:
2    MR. USHIRODA:  Before we get started, I'll
3  go through my usual preamble.
4    Mr. Levin, it's my understanding that you
5  have written up questions for Mr. Ellis to read to
6  the witness and if there are any follow-up, they
7  will be follow-ups at your direction, as Mr. Ellis
8  is not an attorney.  Is that -- my understanding
9  correct?
10    MR. ELLIS:  That's correct.
11    MR. USHIRODA:  Thank you, Counsel.
12
13    E X A M I N A T I O N
14  BY MR. ELLIS:
15    Q.   Ms. Hill, could you state your name for
16  the record, please?
17    A.   Josephine Antonia Hill.  I go by the name
18  JoAn.
19    Q.   Do you understand that your testimony
20  today is under oath?
21    A.   Yes, I do.
22    Q.   And do you understand that your responses
23  to my questions today have to be verbal, so that the
24  court reporter can take them down to make a
25  transcript?

1    A.   Yes, I do.
2    Q.   You understand that your responses to my
3  questions today will be received as what you intend
4  the answers to be and that by answering the
5  questions, I will assume that you have understood my
6  questions?
7    A.   I understand.
8    Q.   That said, I don't want you to guess or
9  speculate, but I would like you to answer my
10  questions to the best of your recollection, and if
11  you can't remember, just tell me so and that will be
12  okay.
13    A.   Okay.
14    Q.   Because your answers will be considered as
15  what you intended as true and correct, should you
16  later change or -- at a later time change your
17  answer, say at a trial, the answer you give today
18  will be used to impeach your testimony.
19    Do you understand what impeaching your
20  testimony means?
21    A.   Yes, I do.
22    Q.   Only one person can talk at a time.
23  Please allow me to finish my question before you
24  start your answer and I will attempt to do the same.
25  Should one of the attorneys object to a question,

1  please allow the attorney to give -- or to voice the
2  objection.  Although the objection has been voiced,
3  you must answer the question unless instructed by
4  the attorney not to answer.
5    Do you understand what I've just explained
6  to you?
7    A.   Yes, I do.
8    Q.   Is there any reason why this deposition
9  should not proceed?
10    A.   No, there isn't.
11    Q.   Are you currently taking any medication
12  that would somehow affect your testimony today?
13    A.   No.
14    Q.   You've been called today as a 30 -- you've
15  been designated by the Department of Education as a
16  30(b)(6) witness to discuss the efforts to recruit
17  skills trainers for work on the Big Island for the
18  period 1999 through 2004.
19    Are you the person most knowledgeable to
20  provide that information?
21    A.   Not during that period of time.
22    Q.   What period of time would you be for?
23    A.   May 2004 to September 2004.
24    Q.   That's the limit?
25    A.   Well, I was DES until October 1st, but

Page 10

1 another DES took over in this particular case in
2 September '04.
3     Q.    You were a DES?
4     A.    I was an interim DES for the period of May
5 through October.
6     Q.    October 1st?
7     A.    Right within that period of time.  It
8 might have been the end of November, but it --
9 within a few days.
10     Q.    So your testimony today would be from May
11 -- as the 30(b)(6) would be May 1st, 2004 until
12 specifically what period?  You've given now --
13 you've said --
14     A.    Well, October is when I went out as
15 interim -- the end of October.  Excuse me.  End of
16 September is when I went out of interim DES and the
17 beginning part of September is when another DES from
18 the north part of Hawaii started working on this
19 case.
20     Q.    Who was that?
21     A.    Kate Tolentino.
22     Q.    When did Kate Tolentino actually assume --
23 actually start doing the duties of the DES?
24     A.    Well, she didn't do all the duties of the
25 DES.  She just worked on this particular case, and

Page 11

1 that was the first part of September, first week or
2 so of September '04.
3     Q.    So from the first week of September '04,
4 Ms. Tolentino would be the most knowledgeable person
5 from that point on about the efforts to recruit
6 skills trainers?
7     A.    Correct.
8     Q.    So yours would be May 1st, 2004 to the
9 first week of September 2004?
10     A.    Correct.
11     Q.    Who selected you as the most knowledgeable
12 person for this deposition?
13     A.    Who selected me?
14     Q.    Yes.
15     A.    I guess Gregg.  I'm not sure exactly who
16 selected me.
17     Q.    You were not involved in the decision?
18     A.    Decision to do the deposition?
19     Q.    To be the person sitting in the chair.
20     A.    I'm sorry.  Restate that.
21     Q.    You were not involved in the decision?
22     A.    No.
23     Q.    And you believe that it was Mr. Ushiroda?
24     A.    Yes.
25         MR. USHIRODA:  Let me just state for the

Page 12

1 record, I was not.
2         THE WITNESS:  It could have been our
3 current DES, also.
4 BY MR. ELLIS:
5     Q.    Who told you that you would be the
6 Department of Education'S 30(b)(6) witness for this
7 period?
8     A.    Gregg.
9     Q.    What documents have you reviewed in
10 preparation of your testimony today?
11     A.    Pretty much all the files regarding this
12 case.
13     Q.    Could you be a little more specific?
14     A.    The court orders, previous ones.  I
15 believe there's one dated back to 2001.  I reviewed
16 notes from Dr. Lori Bolton, who was the interim DES
17 for autism during that period of time.  I reviewed
18 the notes from Barbara Coffman, who was the autism
19 social worker at that time.  I reviewed the letters
20 from Michael Biehn and the letters from Dorien
21 Yankee, and the information that I was sent from
22 TIFFE.
23         There probably was some other things I
24 looked at, but that pretty much summarizes it.
25     Q.    Did you look at IEPs?

Page 13

1     A.    Yes.
2     Q.    Conference notes?
3     A.    Yes.
4     Q.    Prior written notices?
5     A.    Oh, yes.
6     Q.    IEP meeting notes?
7     A.    Yes.
8     Q.    Pleadings in this case?
9     A.    Yes.
10     Q.    Deposition transcripts of any person?
11     A.    Yes.
12     Q.    What deposition transcripts did you
13 review?
14     A.    I reviewed the one that I had given
15 previously.
16     Q.    When was that?
17     A.    It was in '04, the end of August or first
18 part of September '04.
19     Q.    Who deposed you?
20     A.    Shelby Floyd.
21     Q.    Was that related to e-mails?
22     A.    Yes.  Oh.  Wait.  No, that was not for
23 e-mails.  I believe that was for skills trainers and
24 an offer to bring in someone from the mainland.
25     Q.    Was it related to a federal court

Page 14

1 proceeding?
2    A.   Yes, it was.
3    Q.   Other depositions you reviewed?
4    A.   Yes.
5    Q.   Do you know what they were?
6    A.   Stan Bonds and Kim Wiles.
7    Q.   Were there more than one volume?
8    A.   Yes, there was.
9    Q.   Any others?
10    A.   Not that I can recall at this time.
11    Q.   When you say you don't recall, you don't
12 remember?
13    A.   I don't remember.
14    Q.   So if your memory was refreshed at a later
15 time, your answer may change?
16    A.   Yes.
17    Q.   You said you reviewed records from TIFFE.
18 Do you recall what type of records?
19    A.   E-mails that I had received from Kelly
20 Stern, who was -- I'm not sure her exact title, but
21 she was the head of TIFFE at that time in the Kona
22 area, west side of Hawaii.
23    Q.   Is that the limit of the records from
24 TIFFE?
25    A.   Well, there's more than one letter from

Page 15

1 TIFFE. So I'm not sure I understand your question.
2    Q.   Did you review more records from TIFFE?
3    A.   Yes.  I had several e-mails back and forth
4 between Kelly and myself and we talked frequently on
5 the phone regarding skills trainers.
6    Q.   When you said you reviewed records from
7 TIFFE, is the limit of the records just the e-mails?
8    A.   That's correct.
9    Q.   You didn't review any notes from them, any
10 skill trainers notes, anything like that?
11    A.   One skills trainer note I did have, and
12 that was from Rae Graber.
13    Q.   And the material covered in that note?
14    A.   The material covered in that note
15 basically was dealing with the working -- her
16 working with Bryan and with Kim, and there was an
17 incident where Bryan tried to hit someone, the
18 teacher stepped in, was holding his hands, and he
19 bit the teacher.  I believe it was Ken Stahlsberg at
20 the time.  And Rae was there and she felt like she
21 was going to be blamed for the incident and felt at
22 that time she needed to be pulled from working with
23 Bryan, and --
24    Q.   Is that the only note you reviewed?
25    A.   That I recall at this time, yes.

Page 16

1    Q.   Did you review any reports from TIFFE?
2    A.   Yes, I did.
3    Q.   What reports?
4    A.   Kelly sent me a report regarding skills
5 trainers and what was happening with the skills
6 trainers in reference to the one court order that
7 stated all skills trainers must be qualified in
8 TEACCH, DTT, American Sign Language, et cetera, and
9 American Sign Language was not required for skills
10 trainers.  It was not the mode of communication at
11 that time, and still is not the primary mode of
12 communication, and therefore, many of the skills
13 trainers that had master's degrees and experience
14 were not working.
15    Q.   Your statement about it not being -- still
16 not being the mode, is that a personal statement
17 related to what period of time?
18    A.   I'm sorry.  I didn't hear you.
19    Q.   You made a statement that Kelly Stern
20 wrote that ASL was not used, and then you went on to
21 state --
22    A.   Kelly Stern did not state ASL was not
23 used.  That was stated through some research we went
24 through and through Dr. Lori Bolton, the DES for
25 autism.

Page 17

1    Q.   Was that statement included in the report
2 that you were discussing from Kelly Stern?
3    A.   The American Sign Language was, because
4 that was part of the court order that she was
5 familiar with.
6    Q.   So that was something that Ms. Stern put
7 in the report?
8    A.   Yes, the qualifications of the skills
9 trainers.
10    Q.   Any other reports?
11    A.   I'm sure there were, but at this moment I
12 can't think of them.  I don't remember.
13    Q.   The report you remember, do you recall the
14 date of that report, or at least the time period?
15    A.   I would believe around June '04, but I'm
16 not positive.
17    Q.   Any other documents --
18    A.   Or it could be July.
19    Q.   Any other documents you reviewed from
20 TIFFE?
21    A.   Once again, you asked me that question,
22 and I believe I probably had more, but I don't
23 recall them at this point.
24    Q.   Did you review, say, skills trainer data
25 sheets?

Page 18

1    A.    Yes, I did.
2    Q.    Do you recall how many?
3    A.    I did not review as many because during
4    that period of time -- I didn't really get overly
5    involved in Bryan's case until June, because we had
6    an interim DES for autism who was working on the
7    case and we also had Barbara Coffman.
8    Q.    We're just talking about the information
9    that you reviewed, not about the time -- what
10   occurred in the time period. We just want to know
11   the information you reviewed for this deposition.
12   So if you -- did you review some skills trainer data
13   sheets?
14   A.    Yes, I did.
15   Q.    Do you recall what period of time they
16   covered?
17   A.    Well, they went up to, I believe,
18   September or so, in that vicinity. When they
19   started -- I'm sure they started before May.
20   Q.    So that was 2004?
21   A.    Yes.
22   Q.    So you reviewed skills trainer data sheets
23   from May 2004 to September 2004?
24   A.    Approximately, yes.
25   Q.    Were there any other reports or

Page 19

1    information that you reviewed from the TIFFE files?
2    A.    Like I said, I can't remember. I'm sure
3    there is, but I can't remember at this time.
4    Q.    Are there any other documents that you
5    reviewed in preparation for this case?
6    A.    Not that I can recall at this time. There
7    probably was, but --
8    Q.    In preparation of your deposition today,
9    did you speak with anyone?
10   A.    Yes.
11   Q.    Who did you speak with?
12   A.    Gregg.
13   Q.    Approximately when?
14   A.    We just met a few minutes ago.
15   Q.    Is that the limit of it?
16   A.    No. We met one other time.
17   Q.    Do you know when?
18   A.    Monday.
19   Q.    This past Monday?
20   A.    Yes. And two weeks before that.
21   Q.    So this -- the 6th?
22   A.    Someplace around there.
23   Q.    And then two weeks prior to that?
24   A.    Yes.
25   Q.    Is that the only people you talked to --

Page 20

1    only person you talked to?
2    A.    Yes.
3    Q.    Did you speak with, say, Kelly Stern
4    regarding this deposition?
5    A.    No, I haven't.
6    Q.    Did you speak to Judy Radwick regarding
7    this deposition?
8    A.    Nothing more than we have to do the
9    deposition.
10   Q.    Kate Tolentino?
11   A.    No, I haven't spoken to Kate.
12   Q.    So the only person you've spoken with
13   regarding this deposition is Mr. Ushiroda?
14   A.    Yes.
15   Q.    Have you spoken with anybody about the
16   substance of what will be discussed today related to
17   recruiting skills trainers?
18   A.    No.
19   Q.    When you were the DES from May 2004 to, I
20   guess, October 1st, 2004, were there written
21   policies and procedures at the Department of
22   Education developed regarding recruitment of skills
23   trainers?
24   A.    Yes, there was.
25   Q.    What were those?

Page 21

1    A.    We put ads in the newspaper. We also
2    contacted the recruitment office from the state, who
3    had several sessions -- I don't know if you want to
4    call them job fairs or whatever all over the
5    mainland with hopes that they could find people
6    also.
7    Q.    Okay. Is that what you did or that was
8    the policy, written policy?
9    A.    Oh. I'm sorry. Written policy? There
10   was no, that I ever saw, a written policy.
11   Q.    So was there any informal policy or
12   procedure regarding recruitment of skills trainers?
13        MR. USHIRODA: Objection. Vague and
14   ambiguous as to the term informal.
15   BY MR. ELLIS:
16   Q.    You can answer the question.
17   A.    I don't -- I'm sorry. What was the
18   question?
19        MR. ELLIS: Could you read it back,
20   please?
21        (Record was read as requested.)
22   A.    Well, they normally called the agencies
23   that we were contracted with and they were the ones
24   that were handling the skills trainers at that time.
25   And there was three agencies that we went through.

1  BY MR. ELLIS:
2      Q.    The agencies were responsible for
3  recruiting the skills trainers?
4      A.    Yes.
5      Q.    And the agencies --
6      A.    Prior to the last court order -- not the
7  last one, but the May or June court order.
8      Q.    Was there any written policy or procedure
9  put into effect because of the May court order?
10     A.    Yes, there was.
11     Q.    What was that?
12     A.    We came up with our own pay scale based on
13 certain qualifications.  We put the ads in the
14 papers and everything else.  That was written out by
15 Dr. Lori Bolton.
16     Q.    So the pay scale and the fact that --
17     A.    And the qualifications for the different
18 levels.
19     Q.    Was put in a written policy?
20     A.    Yes.
21     Q.    Was that policy specific to Bryan
22 Wiles-Bond?
23     A.    No.  It was for all skills trainers.
24     Q.    So from May of 2004 on, there was a
25 written policy regarding recruitment of skills

1  trainers?
2      A.    Yes, there was.
3          MR. USHIRODA:  Objection.  Misstates
4  testimony.
5  BY MR. ELLIS:
6      Q.    Can you answer the question?  Ma'am, you
7  have to -- even if an objection is voiced, you must
8  answer the question unless Mr. Ushiroda instructs
9  you not to.
10     A.    Okay.
11         MR. USHIRODA:  Could I take a short break?
12         MR. ELLIS:  Yes.
13         THE VIDEOGRAPHER:  The time is 9:39.
14 We're going off the record.
15         (Discussion off the record.)
16         THE VIDEOGRAPHER:  The time is 9:43.
17 We're back on the record.
18 BY MR. ELLIS:
19     Q.    Ms. Hill, I just want to make sure you do
20 understand that objections may be made, but unless
21 your attorney instructs you not to answer, you must
22 answer the question.
23     A.    I understand.  Gregg just explained that
24 to me.
25     Q.    And we would ask that you please listen to

1  the question and answer the question.
2      A.    Thank you very much.
3      Q.    Thanks.
4          MR. ELLIS:  Could you read back the last
5  question and answer before we took the break?
6          (Record was read as requested.)
7  BY MR. ELLIS:
8      Q.    So prior to May of 2004, there was no
9  written policy on recruiting skills trainers?
10     A.    That's correct.
11     Q.    After May of 2004, the DOE put in place a
12 written policy on recruiting skills trainers?
13     A.    Correct.
14     Q.    Could you again list the policy -- or what
15 was contained in the policy for skills -- recruiting
16 skills trainers as of May 4th -- May 2004?
17         MR. USHIRODA:  Objection.  Asked and
18 answered.
19     A.    Once again, it was qualifications for each
20 level of skills trainer, with their pay.  There was
21 also setting up our own TEACCH, PEC, all of the --
22 and DTT classes to train the skills trainers that
23 would be employed by DOE, and we would have our own
24 pool of skills trainers.
25 BY MR. ELLIS:

1      Q.    The last two, that's after employment?
2  The training and your own pool is after employment?
3      A.    Yes, it would be after employment, before
4  they worked with a client.
5      Q.    So the number one, qualifications, that
6  would be what the people who would be hired would
7  need in terms of, say, education and experience?
8      A.    Correct.
9      Q.    And when you said at each level, how many
10 levels were there?
11     A.    Six levels.
12     Q.    Do you know what the six levels are?
13     A.    Yes.  20, 25, 30, 35 and $40 an hour, and
14 then the qualifications went along with those
15 various wages.
16     Q.    But this was for -- all for just skills
17 trainers?
18     A.    Just skills trainers, DOE skills trainers.
19     Q.    From related -- from May of 2004, when
20 this policy went into effect, how many skills
21 trainers did the Department of Education directly
22 hire until the time you left the DES?
23     A.    None.
24         MR. USHIRODA:  This is just for the --
25         MR. ELLIS:  General.

Page 26

1      MR. USHIRODA: General, okay.
2  BY MR. ELLIS:
3      Q.   The total number. None? Zero?
4      A.   Zero.
5      Q.   So there were zero hired specifically for
6  Bryan Wiles-Bond?
7      A.   Zero hired, period.
8      Q.   So the department, even though they had
9  this written policy, still relied on the agencies to
10 provide skills trainers at least until the time that
11 you left your position as the DES?
12     A.   We were still trying to recruit skills
13 trainers and we were relying -- where there was --
14 with the agencies, also. We were working in
15 collaboration.
16     Q.   So because you didn't -- you weren't able
17 to recruit any -- you weren't able to recruit any --
18 I'm sorry.
19          Were you able to -- as opposed to hiring,
20 were you able to recruit any during that period of
21 time?
22     A.   Yes, we had.
23     Q.   How many did you recruit?
24     A.   Can I ask for a clarification on that; if
25 you're meaning recruit or receiving resumes?

Page 27

1      Q.   Okay. How many resumes did you receive?
2      A.   Thank you. In the neighborhood of 12.
3      Q.   During that period, none of the 12 were
4  hired?
5      A.   No.
6      Q.   Are you aware of after the period you --
7  the time you left as DES, if any of those 12 were
8  eventually hired by the Department of Education?
9      A.   No.
10     Q.   Were any of the 12 referred to agencies?
11     A.   Yes.
12     Q.   Were any of those hired by the agencies?
13     A.   No.
14     Q.   At any time after you left as DES, were
15 they hired by the agencies?
16     A.   Not to my knowledge.
17     Q.   Did part of the recruitment policy include
18 placing ads in newspapers?
19     A.   Correct.
20     Q.   So that was an additional item to the
21 policy, the written policy?
22     A.   I don't believe that's stated in the
23 written policy.
24     Q.   So it's not part of the written policy?
25     A.   No. But it's an ongoing procedure,

Page 28

1  unwritten policy --
2      Q.   Unwritten?
3      A.   -- that we have.
4      Q.   Did that include papers just on the Big
5  Island?
6      A.   No. Honolulu -- Honolulu Advertiser,
7  also.
8      Q.   Did the unwritten policy include nation --
9  papers on the mainland with a national -- that were
10 distributed nationally, such as USA Today?
11     A.   No. But we had recruiters on the
12 mainland, all over.
13     Q.   Okay. Who were the recruiters on the
14 mainland?
15     A.   They came from the Department of Education
16 human resource office recruitment. I do not recall
17 their names, because there was many of them
18 stationed at different parts of the United States.
19     Q.   Was this recruitment specifically for
20 skills trainers or for special education and regular
21 education teachers?
22     A.   For all. For both.
23     Q.   So this was just a general recruiting
24 office?
25     A.   Yes.

Page 29

1      Q.   And when you said they were all over the
2  mainland, what do you mean?
3      A.   They were in Virginia, Pennsylvania,
4  Florida, California, New York, Texas, many states.
5  I don't recall all the states.
6      Q.   Is this an agency or individuals?
7      A.   Can you clarify that question?
8      Q.   No.
9      A.   I don't know what you mean by agency or
10 individual.
11     Q.   Was it an individual person who's the
12 recruiter, or is it an agency like an employment
13 agency?
14     A.   It's a -- no. It's the Department of
15 Education human resource department, our own.
16     Q.   So they had employees --
17     A.   DOE.
18     Q.   -- working in Virginia?
19     A.   They would go there and set up like a job
20 fair interview and they would do advertisements that
21 they would be there.
22     Q.   So this was like --
23     A.   And this was all on the web line.
24     Q.   So this was like they went to a college
25 and had a job fair?

Page 30

1    A.    Not necessarily at a college.  Some of
2  them were, but not all of them.
3    Q.    So it was -- the agency was not placed at
4  each one of these places.  An agent -- someone from
5  the agency would go to a place?
6    A.    The places were pre-selected of where they
7  would go, and the agents there were the State
8  Department of Education.
9    Q.    So the agents lived in Hawaii?
10    A.    Correct.
11    Q.    And they would fly to, say, Virginia and
12  do it -- and go to a job fair?
13    A.    Correct.
14    Q.    Was this for the sole purpose -- was the
15  recruitment efforts related to Bryan Wiles-Bond,
16  were they specifically forwarded to this agency to
17  fill the positions required by the order of May of
18  2004?
19    A.    It was to recruit skills trainers.
20    Q.    Was it specifically to recruit skills
21  trainers for Bryan Wiles-Bond?
22    A.    They would have been used with Bryan, but
23  we were hoping to recruit many, so --
24    Q.    Is there any communication between the
25  department of -- or West Oahu -- West Hawaii DES

Page 31

1  office and this agency you're talking about to fill
2  specific positions for Bryan Wiles-Bond?
3        MR. USHIRODA:  The agency she's talking
4  about is the DOE.
5        MR. ELLIS:  Yes.
6    A.    Not at any time did we ever specify Bryan
7  Wiles-Bond.
8  BY MR. ELLIS:
9    Q.    Thank you.  So this agency, the Department
10  of Education recruitment agency, that's been doing
11  what it's been doing for prior to 2004?
12    A.    Yes.
13    Q.    And it's still ongoing?
14    A.    It's a yearly --
15    Q.    It's still ongoing?
16    A.    Yes, it is.
17    Q.    And do you know what the main thrust of
18  their recruitment practice is, such as regular ed
19  teachers, special ed teachers?
20    A.    It's the whole gamut.
21    Q.    Are you aware of anyone that this office
22  referred to West Oahu -- I'm sorry -- West Hawaii
23  for -- as a skills trainer specifically for Bryan
24  Wiles-Bond?
25    A.    No.  We did not receive any.

Page 32

1        MR. USHIRODA:  This is during your time
2  period; right?
3        THE WITNESS:  Right.
4        I might add that there was a shortage of
5  skills trainers everyplace in Hawaii, not just our
6  island.
7  BY MR. ELLIS:
8    Q.    And that's been ongoing for some time; is
9  that correct?
10    A.    Correct.
11    Q.    And that's not specific to West Hawaii;
12  it's statewide?
13    A.    Correct.
14    Q.    So it's a systemic problem?
15        MR. USHIRODA:  Objection to the term
16  systemic.  Leading the witness.
17    A.    It's a problem trying to recruit people
18  into the skills trainers job, especially with those
19  qualifications, because many of them go out and get
20  a little bit of experience and they go on to
21  advance.
22  BY MR. ELLIS:
23    Q.    That's all over the state?
24    A.    All over the state.
25    Q.    Not just regarding Bryan Wiles-Bond's

Page 33

1  situation?
2    A.    That's correct.
3        MR. ELLIS:  Exhibit A is the decision and
4  order dated May 21st, 2001.
5        (Exhibit A marked for
6        identification.)
7  BY MR. ELLIS:
8    Q.    Would you review that and let us know if
9  you've ever seen that before?
10    A.    Yes, I have seen this before.
11    Q.    Do you recall when the first time you saw
12  it?
13    A.    Right when I took over as interim DES,
14  Judy Radwick, who was the DES at the time, shared it
15  with me.
16    Q.    Regarding Ms. Radwick, did Ms. Radwick
17  consult with you on an informal basis from May 2004
18  to October 1st, 2004 regarding the job duties of a
19  DES?
20    A.    Yes.  We talked about some.  I'm sure it
21  wasn't in great length.
22    Q.    So did you go to her with questions about
23  your job duties?
24    A.    Not about my job duties.  I would ask her
25  maybe more specific questions concerning a student.

Page 34

1    Q.    That was the limit of her consultations
2  with you?
3    A.    Pretty much, yes.
4    Q.    Do you recall how often these
5  consultations occurred?
6    A.    No.  They were very informal.
7          But I also attended the state DES
8  meetings, which gave me what I was supposed to do as
9  DES.
10    Q.    Do you recall how often you met with her
11  on this informal basis?
12    A.    No.  Because we were constantly talking
13  about some student and just kind of bouncing off
14  ideas off of each other on what do you feel might be
15  a better strategy that I haven't thought about and
16  our -- that was pretty much what we were doing.
17    Q.    So these informal communications happened
18  daily, then?
19          MR. USHIRODA:  Objection.
20    A.    No, not daily.
21  BY MR. ELLIS:
22    Q.    How often?
23    A.    Like I said, I never kept track of how
24  often.  It's just one of those things.  Maybe -- I
25  would be very hesitant to even make a guess.  With

Page 35

1  Judy's new job, she was gone from the office a lot
2  and I just couldn't tell you, to be honest about it.
3    Q.    So you couldn't say once a week?
4    A.    No, I don't believe so.
5    Q.    Once every two weeks?
6    A.    As I said, I cannot say it's once a week,
7  once every two weeks.  It might have been two times
8  in one week.  It may have skipped a week.  I really
9  honestly cannot answer that question.
10    Q.    You reviewed this decision shortly after
11  taking over the role as the DES in May; is that
12  accurate?
13    A.    That's correct.
14    Q.    Had you heard of Bryan Wiles-Bond prior to
15  May of 2004?
16    A.    Yes, I had.
17    Q.    Your involvement?
18    A.    I was the RT for West Hawaii special
19  education, and I worked with the teachers and staff
20  and I visited the schools and I observed Bryan
21  previously.
22    Q.    Could you explain what an RT is?
23    A.    I'm sorry.  It's a resource teacher.
24    Q.    Was this at the school level?
25    A.    This is at the district level, and I work

Page 36

1  with the teachers and the administrators, department
2  chair, help program -- when the teachers have
3  difficulty with programming, being sure they're in
4  compliance with IDEA and Chapter 56 until it becomes
5  Chapter 60.  I do a lot of training.
6    Q.    Your reference to Chapter 60 is something
7  that has not happened yet; is that correct?
8    A.    No.  It's in the making.
9    Q.    Your job as a resource teacher, you became
10  the resource -- is it a district resource teacher?
11    A.    Yes.
12    Q.    When did you start that job?
13    A.    July 2003.
14    Q.    Prior to that?
15    A.    Prior to that what did I do?
16    Q.    Yes.
17    A.    I was a teacher in California and I
18  retired from the State of California in June 2003.
19    Q.    And I assume you moved to Hawaii in July
20  of 2003.
21    A.    July 1st, exactly.
22    Q.    Were you recruited to Hawaii?
23    A.    I came over to Hawaii several times before
24  I retired.  We had bought a place over here, and I
25  met Judy Radwick and she told me about the position

Page 37

1  and there was a position that was going to be open
2  and thought I would fit that -- fill that position
3  quite well.  So I had an interview at that time and
4  then was offered the job --
5    Q.    In --
6    A.    -- prior to my coming here, which I'd
7  already planned to do.
8    Q.    So you're going to retire in Hawaii?
9    A.    Yes.
10    Q.    On the Big Island?
11    A.    Yes.  But I didn't.
12    Q.    You said you worked in California and you
13  retired as a teacher.
14    A.    I started teaching in 1963, long before
15  IDEA became a law.  At that time there were special
16  ed students that were in every regular ed classroom.
17    Q.    Until you retired, were you considered, I
18  guess, a regular education teacher?
19    A.    No.  Well, I have a lifetime California
20  teaching credential, and I also have special ed
21  credential for K through 12 from the State of
22  California.  I have a resource specialist
23  certificate from the State of California, and I now
24  have a Hawaii special ed credential K through 12 --
25  K through adult.  Excuse me.

Page 38

1    Q.   When you retired from your teaching job in
2  California, were you a regular education teacher at
3  a school prior to retiring?
4    A.   No, I was not.
5    Q.   Could you --
6    A.   I was --
7    Q.   -- tell us what you were?
8    A.   I was a resource teacher at a middle
9  school, as well as department chair.
10    Q.   Resource teacher within that school?
11    A.   Within that school, yes.
12    Q.   And from the time -- time you retired
13  prior, how many years did you that have position?
14    A.   At that particular school?
15    Q.   Yes.
16    A.   Ten years.
17    Q.   So ten years prior to retiring, you were a
18  resource teacher and department chair within a
19  single school?
20    A.   Correct.
21    Q.   So when you became the -- you were recruit
22  -- you accepted a job as a district resource teacher
23  with West Hawaii in July 2003?
24    A.   Correct.
25    Q.   And you worked at that position until you

Page 39

1  became the interim DES in May of 2004?
2    A.   Correct.
3    Q.   Then as of October 1st, 2004, what was
4  your job?
5    A.   Resource teacher.
6    Q.   So you reverted back to your --
7    A.   Right. I was just interim.
8    Q.   And is that your current position?
9    A.   Yes, it is.
10    Q.   So when did you become aware of -- as of
11  July 2003, at what point after that did you become
12  aware of Bryan Wiles-Bond?
13    A.   I would say probably within two weeks.
14    Q.   And were you involved in his case until --
15  as a resource teacher until May of 2004?
16    A.   Can you clarify that more? By being --
17  I'm not sure I understand.
18    Q.   You worked on his case. You provided
19  resources to the teachers on his case?
20    A.   No, I did not.
21    Q.   What did you do -- you became aware of him
22  two weeks after you started employment in July of
23  2003?
24    A.   Correct.
25    Q.   What was your involvement from that point

Page 40

1  to May of 2004?
2    A.   Not a whole lot of involvement, because we
3  had an RT that had autism experience, and I was the
4  only -- when she left, I was the only RT there, and
5  there was other people that came in that had vast
6  knowledge on autism and worked more with him.
7    Q.   At the two weeks after you became -- or
8  you started employment, you became aware of Bryan.
9  Who was the district resource teacher at that time?
10    A.   Mahea Edwards.
11    Q.   Then you said that there were people with
12  vast experience in autism working on the case. Who
13  was that?
14    A.   Sherri Adams, who is an autism speech
15  specialist. Barbara Coffman, who was the social
16  worker. Dru Copeland, who was the IILC -- or the
17  sup -- supervisor.
18    Q.   Is that IISC?
19    A.   Yes. I'm sorry.
20         -- supervisor for skills trainers. And
21  they held monthly meetings.
22    Q.   Were you ever involved in any of those
23  monthly meetings?
24    A.   No, I was not.
25         MR. USHIRODA:  Just to clarify -- as an

Page 41

1  RT?
2         MR. ELLIS:  No. Just in attendance. As
3  an RT. Yes, as an RT.
4    A.   During what period of time are you
5  speaking of?
6  BY MR. ELLIS:
7    Q.   You had mentioned that Dru Copeland --
8  they had monthly meetings. Did you attend any of
9  those monthly meetings?
10    A.   Not those monthly meetings, but I did
11  attend some others when I was interim DES.
12    Q.   So your knowledge of -- your -- you did
13  not work with Bryan or with, say, the teacher or the
14  other -- the RT on the case or the IISC in your
15  position as a resource teacher until you became the
16  interim DES in May 2004?
17    A.   After Mahea left, I did observe the
18  classroom and I did talk with Dru and I did talk
19  with the teacher to kind of monitor what was
20  happening with Bryan.
21    Q.   When was that?
22    A.   I believe Mahea left sometime in the
23  neighborhood of 2004.
24    Q.   Before you became interim DES?
25    A.   Before I became -- what did I say; 2004?

11 (Pages 38 to 41)

1  I meant 2003. Excuse me. And it was before I was
2  interim DES.
3     Q.  So 2003, sometime between the second week
4  in July of 2003 and December 31st, 2003, Mahea left?
5     A.  Correct.
6     Q.  And then you became the district resource
7  teacher on the case?
8     A.  Not really, no.
9     Q.  Was there a district resource teacher on
10 the case from the period after Mahea left?
11    A.  I observed, kept in contact with what was
12 happening in the classroom, and Judy Radwick was
13 overseeing that. Sherri Adams was helping with the
14 curriculum. So I'm not sure what you're asking me.
15    Q.  Mahea Edwards?
16    A.  Mahea.
17    Q.  Mahea Edwards, she was a district resource
18 teacher?
19    A.  We were both, yes.
20    Q.  She was assigned to Bryan's case?
21    A.  Yes, she was.
22    Q.  She left?
23    A.  She left.
24    Q.  Were you assigned to his case?
25    A.  I was assigned to every student in West

1  Hawaii.
2     Q.  Okay. Was Mahea assigned to every student
3  in West Hawaii?
4     A.  No.
5     Q.  She was assigned specifically to Bryan
6  Wiles-Bond's case?
7     A.  No. No RT can be assigned to just one.
8     Q.  What was her involvement as the RT?
9     A.  What was her involvement with what?
10    Q.  With Bryan Wiles-Bond.
11    A.  Okay. With Bryan, she would meet with
12 them, the team that I previously mentioned. She
13 would help set up program.
14    Q.  Is that it?
15    A.  I really can't say, because I don't know
16 all that Mahea was doing.
17    Q.  So when she left, you were then the
18 district resource teacher for Bryan and a number of
19 others?
20    A.  Yes. All of West Hawaii.
21    Q.  Then what did you do specifically for
22 Bryan Wiles-Bond?
23    A.  I think I previously answered that
24 question.
25    Q.  Could you please do it again?

1     A.  I observed his class and observed him in
2  his classroom. I talked with Dru Copeland to see
3  how things were going. I would get e-mails from
4  Barbara Coffman, the social worker, who would let me
5  know how things were going, and Sherri Adams, until
6  Sherri left.
7     Q.  Were there any other district resource
8  teachers involved with Bryan Wiles-Bond's case
9  during that period?
10    A.  Resource teachers, no. I was the only
11 one.
12    Q.  So did they replace Ms. Edwards at some
13 point?
14    A.  About eight or nine months later.
15    Q.  Okay. During the period when -- between
16 when Ms. Edwards left and you became the interim
17 DES, was -- were you the only district resource
18 teacher for West Hawaii?
19    A.  Correct -- which handled two complexes.
20    Q.  So you took over the responsibilities of
21 Ms. Edwards?
22    A.  I took over all responsibility of RT.
23    Q.  So that's a yes, you took over --
24    A.  Yes.
25    Q.  When you stopped being the interim DES and

1  you went back to your position of district resource
2  teacher, were you the only district resource teacher
3  again?
4        MR. USHIRODA:  For West Hawaii.
5        MR. ELLIS:  For West Hawaii.
6     A.  No. There was one more, a brand new one.
7  BY MR. ELLIS:
8     Q.  During the time that you were interim DES,
9  did they have someone to fill your position?
10    A.  No.
11    Q.  So --
12    A.  Well, they did -- I take that back. July
13 1st, they hired somebody for the second position.
14 That's when they hired the one for Mahea.
15    Q.  So from the beginning of May until
16 sometime in July, there were no district resource
17 teachers?
18    A.  That's correct.
19       MR. ELLIS:  Can we take a break?
20       THE VIDEOGRAPHER:  The time is 10:15.
21 We're going off the record.
22       (Discussion off the record.)
23       THE VIDEOGRAPHER:  The time is 10:28.
24 We're back on the record.
25 BY MR. ELLIS:

1    Q.    Could you explain your experience that
2  enabled you to accept the position in July of 2003
3  as a district resource teacher?
4    A.    My number of years experience working with
5  special education. I came in on the ground floor of
6  special education. My advanced work, postgraduate
7  work in special education. My knowledge of IDEA.
8  The fact that I worked with the district in
9  California in designing the new IEP when it had to
10  be changed to come -- be more aligned to compliance
11  areas.
12    Q.    Your experience in dealing with children
13  who are classified as autistic?
14    A.    In my graduate studies, I worked with an
15  autistic child at California State University in San
16  Bernardino for four hours once a week for a quarter
17  and had training at that time.
18    Q.    So prior to coming to Hawaii, your
19  experience with an autistic child was your graduate
20  work?
21    A.    Correct.
22    Q.    And when did that occur?
23    A.    My best guess would be someplace around
24  1990 to '92, in that vicinity.
25    Q.    Your district resource teacher job in

1  Hawaii, did that require you to work directly with a
2  SPED child?
3    A.    As a rule, we do not work with a student.
4  We work with the teachers.
5    Q.    Is that also the same with Bryan
6  Wiles-Bond?
7    A.    Correct.
8    Q.    So you consulted with the special
9  education teacher --
10    A.    Correct.
11    Q.    -- for Bryan's case?
12          And you observed him roughly how many
13  times?
14    A.    During which period of time? Are we
15  talking about when I was an RT or interim --
16    Q.    Yes.
17    A.    As an RT? Maybe five or six times, my
18  best recollection.
19    Q.    And that was at Kealakehe Elementary?
20    A.    No.
21    Q.    Where was that?
22    A.    Wait a minute. I have to back up on that.
23  Because I took over in May and he just came -- no.
24  It was when I was interim. I did not observe him
25  prior to that. I didn't observe him until he went

1  to Kealakehe Intermediate for ESY.
2    Q.    So during your time as a district resource
3  teacher --
4    A.    I did not observe him. I apologize for
5  that.
6    Q.    So what qualified you to accept the
7  interim DES position?
8          MR. USHIRODA: Objection. Asked and
9  answered.
10  BY MR. ELLIS:
11    Q.    You can answer.
12    A.    Alvin Rho, I think, consulted with Judy
13  Radwick, and Judy felt that I could fill that
14  position on an interim basis, and I went ahead and
15  accepted it. Alvin Rho is the one that appointed me
16  interim DES, and he was our complex area
17  superintendent.
18    Q.    Did you receive any training to implement
19  your job as interim DES?
20    A.    Yes, I did. I attended meetings over here
21  on Oahu for monthly DES meetings, and then we also
22  had monthly DES meetings for the DESs in Hawaii --
23  on the Big Island, which was four of us.
24    Q.    Was this a training meeting or was this a
25  monthly meeting that the DESs would always attend?

1    A.    DESs always attended, but it was always --
2  training took place in these meetings, because it
3  would bring us up on the latest of what was
4  happening, new laws, new requirements, so it was
5  ongoing training.
6    Q.    So the meetings weren't specifically held
7  for training; that just happened to be one of the
8  components?
9    A.    That was the biggest part, biggest part of
10  the component.
11    Q.    So it brought you up to date on changes in
12  the law?
13    A.    Changes in the law, when that happened.
14    Q.    Changes in DOE policy?
15    A.    Yes. That, and any new things that would
16  come down from our superintendent, Pat Hamamoto.
17    Q.    And the meetings on the Big Island, same
18  type of meetings?
19    A.    Same type of meetings on how -- well, that
20  wasn't really, I wouldn't say, a training that we
21  had. That was more to get together to see how we
22  could better service the students in West Hawaii --
23  well, in all of Hawaii and how we could share.
24    Q.    Your training that you received as a --
25  what training did you receive to implement Discrete

1  Trial Training?
2      A.   I have not.
3      Q.   Do you have any training regarding
4  implementation of a TEACCH program?
5      A.   Yes.  From my work at California State
6  University, San Bernardino.
7      Q.   So that was in -- was that like your
8  graduate work --
9      A.   Yes.
10     Q.   -- in '92 or so?
11     A.   Yes.
12     Q.   Did you have any training in implementing
13  augmentative communication systems?
14     A.   Yes.
15     Q.   What was that?
16     A.   We used the PECS system.
17     Q.   What training -- what and when did you
18  receive the training?
19     A.   Same time, at California State University.
20     Q.   No other training in augmentative
21  communication but the one in 1992?
22     A.   Correct.
23     Q.   Your observations of Bryan, those were
24  just during the time you were interim DES?
25     A.   Yes, it is.  I'm sorry.  I thought I had

1  done it during RT, but I had not.
2      Q.   After you left being the interim DES in
3  October 1st, 2004, you returned to being a district
4  resource teacher?
5      A.   Correct.
6      Q.   Were you involved in Bryan's case as the
7  -- assigned to -- or the DRT assigned to Bryan's
8  case after that?
9      A.   No.
10     Q.   Who was the person assigned?
11     A.   Kate Tolentino.
12     Q.   I'm sorry.  As the district resource
13  teacher?
14     A.   There was not a district resource teacher
15  at that time assigned to Bryan.  Kate Tolentino was
16  working there with him.
17     Q.   She was the DES?
18     A.   She was a DES for North Hawaii.
19     Q.   She became the DES for West Hawaii on --
20     A.   She never became the DES for West Hawaii.
21  She was the DES for North Hawaii.
22     Q.   Then who became the DES for West Hawaii
23  when you left on October 1st, 2004?
24     A.   Linda Price, Dr. Linda Price.
25     Q.   Then you returned to being a district

1  resource teacher?
2      A.   Correct.
3      Q.   As of October 1st, 2004, who was the
4  district resource teacher assigned to Bryan?
5      A.   Dr. Linda Price was the one that was
6  working.  She had the vast experience of working
7  with autism.  Autism was not my specialty area.
8      Q.   Okay.  She at that point was the DES?
9      A.   She was the DES.
10     Q.   Who was the DRT assigned to the case?
11     A.   At that time there was not an RT assigned
12  to the case.
13     Q.   Okay.  So there was not an RT assigned to
14  the case from the time you became the interim until
15  he -- Bryan left Hawaii?
16     A.   There was a social worker and other
17  people, but there was not an RT.
18     Q.   Thank you.  Back to Exhibit A, I believe.
19  You saw it soon after you became interim DES?
20     A.   Correct.
21     Q.   What did you do to assure that the
22  decision was implemented?
23         MR. USHIRODA:  Objection.  Lacks
24  foundation, assumes facts not in evidence.
25     A.   What did I do to implement it?

1  BY MR. ELLIS:
2      Q.   To assure that it was being implemented.
3      A.   One of the things with the American Sign
4  Language, I --
5          MR. USHIRODA:  The question is pertaining
6  to this order.
7          THE WITNESS:  Oh.  I'm sorry.
8      A.   What did I do to implement this one?  I
9  hired three people that would do the DTT, TEACCH,
10  and PECS training.
11  BY MR. ELLIS:
12     Q.   Do you recall who those three people were?
13     A.   Soto -- wait.  Rebecca Pierson, Mahea
14  Edwards -- I know her name.  It's on the tip of my
15  tongue.  I think it is a Soto, S-o-t-o, and I can't
16  think of her first name.
17     Q.   Mrs. Pierson, she was a teacher at
18  Kealakehe Elementary?
19     A.   Yes, she was.
20     Q.   And you hired her from that position?
21     A.   No.  This was to teach classes which would
22  be conducted after school was out.  So she did not
23  leave her job at Kealakehe.
24     Q.   Ms. Edwards, she was -- had left her DES
25  job?

Page 54

1    A.    Her RT job.
2    Q.    RT. I'm sorry.  What was her position at
3  the -- her other, I guess, position at the time you
4  hired her?
5    A.    She was a consultant with TIFFE.
6    Q.    And there was a Ms. Soto?
7    A.    Yes.
8    Q.    Do you know what her expertise was?
9    A.    She had worked with autistic children for
10  several years.
11    Q.    What did you -- you visited, I guess,
12  Bryan, you said, four or five times in your position
13  as interim DES?
14    A.    During interim DES, it was more than --
15  yeah, it was more than that.  I went to the weekly
16  meetings, and he was there at that time.  I probably
17  went to at least a dozen.
18    Q.    Is it unusual for a DES to attend that
19  many meetings for a single student?
20        MR. USHIRODA:  Objection.  Argumentative.
21    A.    It wasn't all meetings.  Some of it was
22  observation.  There was an IEP in June of '04.
23  There was an IEP again in August '04.  And then the
24  mother wanted to have weekly meetings with the ESY
25  staff and consultant.

Page 55

1  BY MR. ELLIS:
2    Q.    Did you attend each of the weekly
3  meetings?
4    A.    I attended two of them, and then Kim
5  changed several dates and moved them to different
6  dates and neither Mahea or myself were notified.
7    Q.    Is it part of the DES's duties to sit in
8  on these type of team meetings?
9    A.    Yes, when there are concerns.
10    Q.    What were -- in this case, what were the
11  concerns?
12    A.    The concerns were regarding was his IEP
13  being carried out, was it being implemented, and
14  also, because -- due to the court order, to be sure
15  it's being implemented.
16    Q.    Fair to say a DES would get involved when
17  there are -- in tough cases?
18        MR. USHIRODA:  Objection.  Argumentative,
19  vague and ambiguous.
20    A.    In any case where we feel we are needed.
21  BY MR. ELLIS:
22    Q.    You said you got involved in Bryan's
23  because there were concerns about the implementation
24  of the IEP?
25    A.    The mother was always wanting to change

Page 56

1  different things at the monthly meeting and trying
2  new things.  We -- I wanted to streamline it better.
3    Q.    The concerns -- I mean, was the concern
4  that the IEP was not being implemented, or were
5  there other concerns?
6    A.    There was concerns over the American Sign
7  Language.
8    Q.    Anything else?
9    A.    Concerns about the behavior.
10    Q.    Anything else?
11    A.    Concerns about toileting.
12    Q.    Anything else?
13    A.    Are you referring to the Monday meetings,
14  weekly meetings, or are you talking about the IEPs,
15  also?
16    Q.    You stated concerns.  We just want to know
17  what the concerns were.
18        MR. USHIRODA:  The concerns, I think, that
19  were addressed in the monthly IEP meetings.
20        MR. ELLIS:  Whatever concerns this
21  witness --
22    A.    Okay.  It was behavior, toileting,
23  American Sign Language.  Basically, what I said.
24  BY MR. ELLIS:
25    Q.    Anything else?

Page 57

1    A.    I'm sure there was, but nothing is jumping
2  out at me right now.
3    Q.    Who expressed those concerns?
4    A.    Kim Wiles.
5    Q.    This was the time when you were the
6  interim DES?
7    A.    Yes.
8    Q.    So that was from May 1st to October 1st,
9  2004?
10    A.    Well, it wasn't exactly May 1st.  It was
11  sometime in May and -- yes, that approximate time.
12    Q.    Was there any period in that time that
13  jumps out at you where the mom expressed -- or Ms.
14  Wiles expressed more concern than others?
15    A.    Not jumping out at me right now.
16    Q.    What were the concerns about the ASL?
17    A.    She wanted all of the skills trainers to
18  be proficient in ASL.
19    Q.    Is that all?  About ASL, is that all?
20    A.    I'm not understanding your question.
21    Q.    She wanted the teachers to be proficient
22  in ASL.  Were there any --
23        MR. USHIRODA:  All skills trainers.
24        MR. ELLIS:  All skills trainers.
25    A.    And the teacher.

Page 58

1  BY MR. ELLIS:
2     Q.    Anything else about ASL?
3     A.    She wanted classes held in ASL.
4     Q.    Anything else?
5     A.    There's -- these questions are so vague,
6  I'm having difficulty with them.  I set up trainings
7  for ASL, but, I mean, that was basically her
8  concern, yes.
9     Q.    Those were -- she wanted training.  She
10 wanted classes.  She wanted the skills trainers
11 trained -- or proficient in ASL, she wanted teachers
12 who were proficient in ASL?
13    A.    Correct.
14    Q.    And those were the four concerns she
15 expressed?
16    A.    Uh-huh.
17    Q.    Did she express any other concerns related
18 to ASL?
19    A.    Not that I can think of at this time.
20    Q.    You said she expressed concerns about
21 behavior.  What were the concerns?
22    A.    His behavior.  He was wetting his pants
23 frequently.  He was hitting, biting, pulling hair,
24 spitting on a student -- or aides and students.  He
25 would knock things over.  He would run out of the

Page 59

1  classroom.  I believe that's it.
2     Q.    No other behavior that -- concerns she
3  expressed?
4     A.    Not that I can think of at this point.
5     Q.    In your position as district resource
6  teacher, were these behaviors that you said mom
7  expressed, the seven behaviors, were they present
8  prior to May of 2004?
9           MR. USHIRODA:  Objection.  Vague and
10 ambiguous, calls for speculation.
11    A.    Prior to when in 2004?
12 BY MR. ELLIS:
13    Q.    When you were the district resource
14 teacher.
15    A.    Yes.  He had been running for a long time.
16 That wasn't anything new.  He had times when he wet
17 his pants.  That wasn't new.
18    Q.    What about knocking things over?
19    A.    Prior to my being DES, I'm not sure.
20    Q.    Okay.
21    A.    I really am not sure.
22    Q.    Biting?
23    A.    I really couldn't say.
24    Q.    Spitting?
25    A.    I really couldn't say.

Page 60

1     Q.    I think you said pulling hair?
2     A.    I really couldn't say.
3     Q.    You mentioned she expressed concern about
4  toileting.  What were the concerns she expressed?
5     A.    He was having frequent accidents at school
6  and wetting his pants, and she was having to send
7  several changes of clothes with him.  He was wetting
8  the bed at night.
9     Q.    Any others?
10    A.    Any other what?
11    Q.    Concerns she expressed related to
12 toileting?
13    A.    Well, she had Dr. Kim Smalley do a
14 toileting program for Kim -- I mean for Bryan.
15    Q.    I understand.  It's the concerns that she
16 expressed at your monthly meetings.  You've listed
17 four.  Are those the only concerns she expressed?
18    A.    She expressed, also, that she did not feel
19 that the ESY teacher was certified.
20    Q.    Related to toileting.
21    A.    Oh.  Toileting.  I'm sorry.  Not that I
22 can think of.
23    Q.    Were -- you were his DES from sometime in
24 2000 and -- DRT from sometime in 2003, when Mahea
25 Edwards, left until May 1st, 2004.  Did the concerns

Page 61

1  expressed by mom, the four concerns, did those occur
2  during that time you were DRT?
3           MR. USHIRODA:  Objection.  Misstates prior
4  testimony, stating that she was his DRT.  Also,
5  calls for speculation.  Also, asked and answered.
6     A.    Repeat the question, please.
7           (Record was read as requested.)
8           MR. USHIRODA:  Same objections.
9     A.    They weren't as -- to me, because as I
10 previously testified, I did not attend those
11 meetings.  I was the consultant, the speech --
12 autism speech therapist and the social worker, and I
13 was not involved in the case.
14 BY MR. ELLIS:
15    Q.    Okay.  She expressed the quali -- the lack
16 of qualifications of the ESY teacher -- or wasn't
17 certified?
18    A.    Correct.
19    Q.    Wasn't certified as in a certified special
20 education teacher?
21    A.    No, he was not certified as a special
22 education teacher.
23    Q.    You said you have knowledge of IDEA?
24    A.    Correct.
25    Q.    Does IDEA require that a special education

Page 62

1 teacher be certified?
2      MR. USHIRODA: Objection. Calls for a
3 legal conclusion.
4      A.    Yes.
5 BY MR. ELLIS:
6      Q.    Thank you.
7      A.    But also, I offered her a special ed
8 teacher, certified, and it was turned down.
9      Q.    The teacher initially assigned was not
10 certified, correct, for summer ESY?
11      A.    Was not certified. But I hired Mahea
12 Edwards to oversee the program and as long as a
13 certified teacher is overseeing the program and
14 working with the teacher, it is in compliance.
15      Q.    So your -- Mahea Edwards was hired to
16 oversee the program or -- earlier, you testified she
17 was hired to provide training.
18      A.    She was hired in several capacities. She
19 was hired to help develop material, new material for
20 Bryan. She was hired to oversee the program and
21 work with Bill Brown, who was the ESY teacher, and
22 give him direction and guidance. And then she would
23 be doing these other classes, which was the PEC, TEC
24 -- TEACCH, rather -- excuse me -- and DTT.
25      Q.    Ms. Edwards was not -- at the time, was

Page 63

1 not an employee of the Department of Education, was
2 she?
3      A.    No, she was not. She was a consultant
4 with TIFFE.
5      Q.    Did you like do a contract with -- did the
6 Department of Education do a contract with Ms.
7 Edwards?
8      A.    We went through TIFFE and contracted her
9 through TIFFE.
10      Q.    So there should be a contract between the
11 DOE and TIFFE for that service for that period of
12 time?
13      A.    There's a procurement, yes. Thank you.
14      Q.    So we should -- if necess -- we would be
15 able to ask for that document and the Department of
16 Education would have it?
17      A.    We should, certainly.
18      Q.    So this is a separate contract from the, I
19 guess, the general contract that -- between DOE and
20 TIFFE?
21      A.    There's a general contract between the
22 Department of Education and TIFFE for certain
23 services?
24      A.    Correct.
25      Q.    Would this be a separate contract?

Page 64

1      A.    Yes, it would be, because of the rate of
2 pay.
3      Q.    In the summer of 2004, who did Bryan's
4 teacher report to?
5      A.    Who did Bryan's teacher report to?
6      Q.    Yes.
7      A.    Are we speaking of Bill Brown?
8      Q.    Whoever his teacher was.
9      A.    Okay. Bill Brown was the teacher in the
10 classroom. Mahea Edwards was overseeing him, and
11 the two of them met all the time, and he reported to
12 her and to Dru Copeland, who was a consultant, and
13 then later, I brought in Rebecca Pierson, who was
14 working with Bryan in the classroom for four hours a
15 day.
16      Q.    Was Ms. Pierson brought in as a skills
17 trainer?
18      A.    Ms. Pierson was brought in as a teacher.
19      Q.    So you're stating that the DOE teacher,
20 Mr. Brown, reported to a -- to one or both contract
21 workers who were hired by TIFFE?
22      MR. USHIRODA: Objection. Misstates
23 testimony.
24      A.    Rebecca Pierson, first of all, was not a
25 TIFFE employee. She was a DOE employee, and she was

Page 65

1 on summer vacation.
2 BY MR. ELLIS:
3      Q.    Mr. Brown, you testified that he was the
4 DOE teacher. Okay. He was a DOE employee?
5      A.    He was a DOE employee.
6      Q.    And he reported to Ms. Edwards and Dr.
7 Copeland?
8      MR. USHIRODA: I think that misstates
9 testimony. Objection.
10      A.    He met with them on a frequent basis
11 because Mahea Edwards was designing the program to
12 follow the IEP to be sure it was implemented and
13 assist Bill Brown in any areas that he needed
14 assistance with, and then Rebecca Pierson came in.
15      Q.    So Ms. Pierson came in late in the summer;
16 is that correct?
17      A.    Yes, she did.
18      Q.    Prior to that, who did Mr. Brown report
19 to?
20      A.    I believe I've answered that question.
21      Q.    Who is that?
22      A.    Mahea Edwards.
23      Q.    So Mr. Brown reported to a non-DOE
24 employee?
25      MR. USHIRODA: Objection.

Page 66

1    A.    Objection, because she's contracted --
2  BY MR. ELLIS:
3    Q.    I'm sorry.
4    A.    I'm sorry.
5        MR. USHIRODA:  Can we go off?
6        THE VIDEOGRAPHER:  The time is 11:00.
7  We're going off the record.
8        (Discussion off the record.)
9        THE VIDEOGRAPHER:  The time is 11:03.
10  We're back on the record.
11  BY MR. ELLIS:
12    Q.    Ms. Hill, who was Mr. Brown's supervisor
13  in the first part of the summer of 2004?
14    A.    Mahea Edwards.
15    Q.    And Ms. Mahea Edwards was a contracted
16  employee from TIFFE?
17    A.    Contracted through DOE to TIFFE.
18    Q.    She's a TIFFE employee?
19    A.    Correct.
20    Q.    Who was the DOE supervisor of Mr. Brown
21  during that time period?
22    A.    Myself.
23    Q.    So Mr. Brown would report directly to you?
24    A.    Mr. Brown and Mahea Edwards would either
25  by phone or when I was there at the school or by

Page 67

1  e-mail.
2    Q.    So Mr. Brown would report to you by
3  directly in person, phone or e-mail?
4    A.    Uh-huh.
5    Q.    Were you responsible for implementation of
6  the summer school program?
7    A.    Yes.  In the aspect of getting a certified
8  teacher in there.
9    Q.    So you were responsible to assure that Mr.
10  Brown implemented the IEP?
11    A.    Correct.
12    Q.    Did you visit throughout the summer of
13  2004?
14    A.    Yes, I did.
15    Q.    So could you describe some of the things
16  that you saw in the classroom?
17        MR. USHIRODA:  Objection.  Overly broad,
18  vague and ambiguous.
19  BY MR. ELLIS:
20    Q.    -- related to Bryan.
21    A.    Bryan was pretty much refusing to do any
22  type of work in the classroom.  He wanted to get to
23  water and drink water, which was a problem.  He was
24  wetting his pants, going out of the room frequently.
25  And those are pretty much most of my observations.

Page 68

1    Q.    Did he refuse to -- he refused to
2  cooperate, basically?
3    A.    Basically, yes.
4    Q.    Was he -- on top of peeing in his pants,
5  did he pee on the floor in the classroom?
6    A.    Yeah, I'm sure he did.
7        MR. USHIRODA:  Don't guess.
8    A.    Yes.
9  BY MR. ELLIS:
10    Q.    Who would have been responsible for
11  cleaning up the urination?
12    A.    During the regular school year, it would
13  be the custodian.  But during the summertime, it
14  would be the teacher or the skills trainer in the
15  classroom.
16    Q.    So it could have been Mr. Brown's
17  responsibility?
18    A.    Yes.
19    Q.    When you were in the classroom, did you
20  notice an odor of urine?
21    A.    At times.  Very rarely.
22    Q.    At any time did you see Bryan or were told
23  if Bryan defecated on the floor?
24    A.    Never.
25    Q.    Do you know who Kim Smalley is?

Page 69

1    A.    Yes, I do.
2    Q.    What do you know about Ms. Smalley -- Dr.
3  Smalley?
4    A.    Dr. Smalley, during the time I was interim
5  DES, worked for DOE and was a psychologist who had
6  previously worked with Bryan, and she, during the
7  period of time I was interim DES, did a toileting
8  program, behavior modification program for Bryan.
9    Q.    When you say she was a DOE employee, was
10  she actually employed by the department or was she
11  contracted through an agency?
12    A.    I'm pretty sure she was employed by the
13  DOE, not contracted, but I can't say positively.
14    Q.    Did you ever see the report -- reports Ms.
15  -- Dr. Smalley drafted?
16    A.    I not only saw the reports; at the one IEP
17  I attended, Dr. Kim Smalley also attended and went
18  over in great detail the entire report with all of
19  the team members there.
20    Q.    Did you believe in your meeting Dr.
21  Smalley and -- did you ever talk with her?
22    A.    Yes, I have.
23    Q.    Do you have a sense of her being an honest
24  person?
25    A.    Very.

Page 70

1    Q.    Very knowledgeable?
2    A.    Yes.
3    Q.    What was her specialty -- what was her
4  specialty, if you know?
5    A.    I really can't answer that. I don't know.
6    Q.    Did you spend any time in the classroom at
7  the -- during the period of time Dr. Smalley was in
8  the classroom?
9    A.    No.
10   Q.    Do you know how often Ms. Smalley observed
11  Bryan in the classroom?
12   A.    I believe it was -- during the period of
13  time that I was DES, I believe it was one time in
14  the classroom and then at home, also.
15       MR. ELLIS:  So Exhibit B -- Exhibit B is
16  portions of a deposition transcript of Dr. Smalley
17  dated October 11th, 2006, pages one, pages 88
18  through -- 88 through 96. There's a page out of
19  order. Page 90 is at the end.
20          (Exhibit B marked for
21          identification.)
22  BY MR. ELLIS:
23   Q.    Have you ever had an opportunity to review
24  Dr. Smalley's report prior to today?
25   A.    This one?

Page 71

1    Q.    Yes.
2    A.    No.
3       MR. USHIRODA:  That's not a report.
4  BY MR. ELLIS:
5    Q.    I'm sorry. Dr. Smalley's --
6    A.    Deposition?
7    Q.    -- deposition transcript.
8    A.    No, I have not.
9    Q.    Could you turn to page 88? Would you
10  please -- could you read out loud lines seven to 19?
11   A.    Read out loud?
12   Q.    Please.
13   A.    When I saw Bryan prior to this report and
14  during this report -- he was awful. He was com --
15  soaked in urine all the time. He was aggressive.
16  He was self-injurious. He was ignored. He was
17  unengaged. He had no direct instruction. He had no
18  direct communication instruction. His skills
19  trainers did not know what they were doing. Some of
20  them were motivated and interested and sat down and
21  asked me questions. Some of them could care less.
22  His teacher did not know what to do with him and
23  verbally was receptive to suggestions, but then
24  implementation appeared at least to be not existent.
25  Then it was either -- I think it was the end of the

Page 72

1  school year, so then there was no teacher.
2    Q.    Were you aware of any of this?
3    A.    Yes. He was getting self-injurious.
4  There were new skills trainers that were in there
5  working. There were some experienced skills
6  trainers in there working. He was very, very
7  agitated.
8       I could add a lot more, but I won't.
9    Q.    Please do. Please do. Please continue
10  your answer. Please continue your answer --
11   A.    Broke my train of thought.
12       His schedule had changed a great deal. He
13  no longer was allowed to go out in the community,
14  and that was a big part of his program, so that was
15  a big change. There was a big change from the
16  elementary school to the middle school, change that
17  he had been at the elementary for a while and
18  suddenly being in a new spot.
19   Q.    Were you aware that there was no direct
20  communication instruction?
21       MR. USHIRODA:  Objection. Lack of
22  foundation, assumes facts not in evidence.
23   A.    I know there was communication going on in
24  the morning. There was a circle time, when all the
25  students would sit with the teacher and they would

Page 73

1  sing different songs. And the one skills trainer
2  would do all the signing to the song, who knew
3  American Sign Language. So there was a lot of
4  communication that was going on. During this
5  particular time, I don't know, I wasn't there.
6  BY MR. ELLIS:
7    Q.    So the communication you're talking about
8  is not the same time frame that Dr. Smalley is
9  talking about?
10       MR. USHIRODA:  Objection. I don't think
11  you've established a time frame.
12   A.    I don't know when she went in on this.
13  BY MR. ELLIS:
14   Q.    The time period you're speaking of --
15   A.    I'm referring to the time period when I
16  became more involved in his case, which was at --
17  when I was DES -- interim DES.
18   Q.    Okay. Could you read from page 88, out
19  loud, line 20, to page 89, line 12?
20   A.    Question:  Was he in some kind of summer
21  program?
22       Answer:  Yeah. Many of the times I saw
23  him, he was alone in a room with the skills trainers
24  sitting in his own urine, stimming. They had a big
25  box of stim toys, like Mardi Gras beads, bubble

Page 74

1  wrap, stupid stuff, infants' stuff, things that were
2  much too young for him.  They just let him lay and
3  play with it.  And I would come in and because I
4  wasn't perceived as a person of authority, their
5  behavior wouldn't change, and I would wait and take
6  notes, and then after a certain amount of time, it
7  would be okay, now what are you gonna do.  Maybe we
8  should check the schedule and try to provide them
9  some technical assistance, rather than leave him
10  there and feces and urine.  The longer you get to
11  that -- the longer you get to do that, the more
12  you're going to want to do that, and then they were
13  -- I can't even see -- and then they would go up to
14  him and try to interrupt him because I was here, and
15  he would protest.  I remember one girl turning to me
16  crying, See, he's too tough.
17       How far did you want me to go?
18  Q.   That's good.  Thank you.
19       Were you aware of Dr. Smalley's
20  observations?
21  A.   No, I was not.  It was never shared with
22  me.
23  Q.   Could you read from page 89 to -- at line
24  13, to page 90, line -- 89, 13 to 90, line 12?
25  A.   91?  89 to 91?

Page 75

1  Q.   89 to 90.
2  A.   Oh.  Thank you.
3  Q.   Line 12.
4  A.   13 you mean?
5  Q.   89, line 13.
6  A.   Thank you.  I got it.
7       And I -- at that point, I think he had --
8  even had two-on-one, two-on-one staffing, and I
9  remember trying to work with the male staff; don't
10  be aggressive, don't be too forceful, don't be
11  restraining, you're not here as an enforcer, you're
12  here as an educator, pull out his favorite CD-ROM.
13  That's what -- I would literally go through the
14  boxes in the classroom, trying to find things for
15  him to do.  The academics that were there he had
16  already mastered; it's a ball, it's a fish, it's
17  red, it's green.  He had known his colors when I
18  first met him.  He had known hundreds of labels a
19  year ago.  They were working on the same four words
20  over and over again, ball, fish -- I can't think of
21  what the others were -- and his colors.  I would
22  explain to the skills trainer this is material he
23  has mastered, he may be ignoring you because he's
24  sick of seeing it.  They would say back to me, We
25  don't know what to do, we have no materials, no

Page 76

1  instruction, no one helping us, no one is telling us
2  what to do.  I would give them some things to do.
3  That way I could watch how Bryan responded and take
4  notes on that.  That involved literally like setting
5  up the computer.  The skills trainer was
6  trying to put the computer back together so they
7  could then work on it, so I could know whether Bryan
8  knew what he was doing or not or protested doing it.
9  It was very, very unfortunate.
10  Q.   Were you aware of Mr. -- Dr. Smalley's
11  comments?
12       MR. USHIRODA:  Objection.  Lacks
13  foundation, assumes facts not in evidence and calls
14  for speculation.
15  A.   I was not aware of these facts.  I do not
16  even know when this took place.  Okay.
17  BY MR. ELLIS:
18  Q.   Could you -- could you go to page 91?
19  Sorry.  Sorry.  The bottom of page 90, sorry, the
20  question starts at 23.
21  A.   Uh-huh.
22  Q.   And then go to 91, the answer down to page
23  five -- I'm sorry -- line five, not page five.
24  A.   Question.  Did you -- let's back up.  I
25  know the report is dated in August '04 and you said

Page 77

1  -- when did you first come to see him?
2       I started the observation at the end of
3  the school year, and 'cause I had talked to the
4  summer school teacher and then the summer school tea
5  -- and then his summer school teacher.  So I'm
6  thinking, without having my time sheets in front of
7  me, probably June, July, August.
8       Okay.
9  Q.   So does that tell you when Dr. Smalley's
10  observations took place?
11       MR. USHIRODA:  Objection.  Lack of
12  foundation, assumes facts not in evidence, calls for
13  speculation.
14  A.   Well, first of all, she observed him
15  during the school year -- school year teacher.  That
16  was prior to June, because that would have been at
17  the elementary school, and I wasn't part of that
18  program, so I have no knowledge of that.
19  BY MR. ELLIS:
20  Q.   Could you show us where it says she
21  observed at the school year teacher?
22  A.   She says -- on line two, because I had
23  talked to the school year teacher and then his
24  summer school teacher.
25  Q.   It said talked to.  Did it say she

1 observed?
2    A.  Oh.  Well, I started the observations the
3 end of the school year.
4    Q.    Would the end of the school year have been
5 June 2004?
6    A.  Yes.
7    Q.    So then summer school would have started
8 sometime in June 2004?
9    A.  Correct.
10    Q.    And then July 2004 and then August 2004?
11    A.  Yeah.  And August is when school would
12 have started, regular year.
13    Q.    Okay.  Could you turn to page 92, please?
14 Would you read line three to line 22?
15    A.    Question:  Okay.  What were the problems?
16 Why was the implementation a problem at this point?
17        Answer:  Why -- well, there was no
18 structure, no materials, no teacher with expertise
19 in Bryan's needs.  The skills trainers lacked the
20 expertise to work with him, lacked the training to
21 work with him.  Some of them lacked the mere
22 fortitude to work with him.  There was limited to no
23 sign language.  At one point, there was a staff
24 person who had some sign language.  I worked with
25 her a little bit.  But for the most part, everything

1 about his plan that we had agreed to and done
2 successfully sometime in the past had just
3 completely dissipated.
4        Question:  And did you come to find out
5 why, why that happened?
6        Answer:  I was beside myself at the time
7 and I kept asking why.  And like I said, I called
8 the training person at HBH and I spoke to the DOE
9 person, and I believe the explanation was just
10 turnover.  You know, people didn't have people and
11 they didn't have people.  The people they did have
12 didn't have the background that the previous people
13 who served him had had.
14    Q.    Were you aware of Dr. Smalley's comments?
15        MR. USHIRODA:  Objection.  Lack of
16 foundation, assumes facts not in evidence, calls for
17 speculation.
18    A.  No.
19        MR. USHIRODA:  Also, asked and answered.
20 BY MR. ELLIS:
21    Q.    Were these comments -- or these -- this
22 information ever brought to your attention during
23 June, July or August of 2004?
24        MR. USHIRODA:  Same objection.
25    A.  Directly to me, yes.

1 BY MR. ELLIS:
2    Q.    When were the comments reported to you?
3    A.  It wasn't by doctor -- well, it might have
4 been -- Dr. Smalley probably talked to Dr. Lori
5 Bolton, who was our interim DES for autism, and it
6 was through Dr. Bolton that I learned the problem
7 with the materials in the classroom, and that's when
8 Mahea Edwards was hired to develop the program,
9 oversee the program and make the materials.
10    Q.    It says here, I spoke to DOE -- the DOE
11 person.
12    A.  The DOE person would have been Dr. Lori
13 Bolton, who was the interim DES for autism.
14    Q.    I'm sorry.  Interim DES --
15    A.  -- DES for autism.
16    Q.    So there's more than one DES?
17    A.  At that time, yes.  There was a DES that
18 specialized in autism.  That's one of the reasons I
19 wasn't that involved in the case.
20    Q.    I'm sorry.  Dr. Bolton --
21    A.  Yes.
22    Q.    -- she was autism DES from what period of
23 time, if you know?
24    A.  She started in June '04 and I think she
25 resigned in September '04.

1    Q.    You said that she was more involved in
2 Bryan's case than you were?
3    A.  Right.  She had more expertise.
4    Q.    And you -- earlier, I believe you said you
5 attended -- observed or attended meetings 12 times?
6    A.  Meetings with who are we speaking --
7    Q.    Related to Bryan Wiles-Bond.
8    A.  With Lori?
9    Q.    No.  In general.
10        MR. USHIRODA:  I believe the testimony was
11 the 12 times was meetings and observations all mixed
12 together.
13        MR. ELLIS:  Yes.
14    A.  The question, please?
15 BY MR. ELLIS:
16    Q.    Is that accurate; 12 times, meetings and
17 observations, over the summer of 2004?
18    A.  That's an approximation.
19    Q.    So if -- Dr. Bolton, you said, was more
20 involved in Bryan's case?
21    A.  Correct.
22    Q.    So was she at the meetings that you were
23 at?
24    A.  She was at both of the IEPs I attended.
25 She was at the classroom, visiting the classroom

Page 82

1    many more times than I did.
2        Q.   Thank you.  The bottom of 93, line 24, to
3    94, to line ten.
4        MR. USHIRODA:  I'm sorry, Stan.  What were
5    those lines again?
6        MR. ELLIS:  Page 93, line 24.
7        MR. USHIRODA:  Page 93, line 24.  Okay.
8        MR. ELLIS:  94 down to ten.
9        MR. USHIRODA:  Thanks.
10       A.   There was an older woman who -- and by
11   older, I mean that these other people were kids --
12   were young.  I don't know how old she was.  She was
13   a grown-up.  She was a mom.  And I remember she had
14   effort, you know, and she was willing and interested
15   in learning sign language and I remember coming and
16   showing her signs when I was there.
17       But even with all that, every time I came
18   to see Bryan he was lying on the floor, stimming, in
19   his own urine or feces.  It was -- I mean, it was
20   neglect.  There's -- I was very upset and I took it
21   to the DOE and I called HBH and I tried to help
22   these individuals to do a better job.  It wasn't
23   good.
24   BY MR. ELLIS:
25       Q.   When she -- do you know who the older

Page 83

1    person she was talking about?
2        MR. USHIRODA:  Objection.  Calls for
3    speculation.  Also, lacks foundation, assumes facts
4    not in evidence.
5        A.   I know two older people that were in
6    there, but I don't know if they're the particular
7    people that she was referring to.
8    BY MR. ELLIS:
9        Q.   Who were those two people?
10       A.   Well, Dr. Dru Copeland is the consultant,
11   and she's much older, and there was a skills
12   trainer, worked with HBH -- Corinne or Corina, and I
13   can't remember the last name.
14       Q.   Was Ms. Pierson in the classroom at this
15   time?
16       A.   She was there during the summer.  I don't
17   know if she was there when this observation was
18   taking place.
19       Q.   Okay.  She was there starting sometime in
20   July?
21       A.   Yes.
22       Q.   Page 94, line 11, to 95, line 22.
23       A.   Okay.  Who did you speak to?
24       Answer:  Who would ever be down the
25   hallway in the SSCs office.  Again, if you give me

Page 84

1    names, I will recognize them.
2        Question:  Kate Tolentino?
3        Answer:  Was she SSC?  I know that name.
4        Question:  I don't know.
5        Answer:  But I'm not sure what role.  I
6    would -- for ESY summer school, the office was three
7    doors down.  I would go down and I would say, Okay,
8    here's -- you know, he's locked in the room, he's
9    all wet, nobody is doing anything with him, and, you
10   know, I would pass the information on.  I'm
11   obligated to report.  I would pass that information
12   on.  I know I called, and again, I think the woman's
13   name is Liliana (phonetic).  Hopefully that's not
14   the new trainer versus who the trainer was at the
15   time.  I called CFS and said, Your people need
16   problem solving training and crisis prevention.  I
17   know I recommended that in my report.  It's a
18   different acronym, same name, but also problem
19   solver, because those were people working with
20   severe cognitive disabilities.  CPI, the
21   intervention that she uses, relies more with people
22   with language.  They teach you how to talk somebody
23   down.  If you're dealing with someone with a mental
24   illness or someone who's irate, you may have the
25   ability to talk them down; where if you're dealing

Page 85

1    with somebody with no receptive language skills or
2    limited receptive language skills, blah, blah, blah,
3    blah -- doesn't matter what you're saying; the
4    whole part of your training isn't going to help you
5    in this instance, where problem solvers focus a
6    little more on developmental disability.
7        Keep going?
8        Q.   Please.
9        A.   I recommended HBH.  I can train you.  I
10   recommended other people that can come out and
11   provide training for their staff.  Actually, at that
12   time I was in conversation with HBH about providing
13   some training for them just globally as an agency,
14   not specific to Bryan, but clearly Bryan would have
15   benefitted and that never came to fruition.
16       Q.   Was this information provided to you?
17       MR. USHIRODA:  Objection.  Lack of
18   foundation.
19       A.   I never knew --
20       MR. USHIRODA:  Let me finish.  Objection.
21   Lack of foundation, assumes facts not in evidence,
22   calls for speculation, vague and ambiguous, as well.
23       A.   I was never told there was any report to
24   CPS.  I did not know anything about the CPI.  We do
25   our own CPI now.  We have two trained people.  But I

Page 86

1 knew nothing of this.
2 BY MR. ELLIS:
3    Q.   When you said CPS, did you mean CFS?
4    A.   CFS.
5    Q.   Do you know who during the summer of 2004
6 was the SSC at Kealakehe Middle School?
7    A.   Yes. Her name is Karen Johnston.
8    Q.   Would she have been working in the summer
9 of 2004?
10    A.   Yes. She's a 12-month employee.
11    Q.   She mentions on page 94 that -- I read it
12 as -- line 24 as Leilani. Do you know who that is?
13    A.   There's a Leilani that is a skills trainer
14 for another student that was in that classroom.
15 That's the only person I know of.
16    Q.   The time period June, July and August,
17 that was the time period you were interim DES?
18    A.   Correct.
19        MR. ELLIS:  Exhibit C is a complaint and
20 summons dated February 15, 2002.
21        (Exhibit C marked for
22         identification.)
23 BY MR. ELLIS:
24    Q.   Can you review the document and let us
25 know if you've ever seen it before?

Page 87

1    A.   Yes, I have.
2    Q.   When did you see that document?
3    A.   When I became interim DES.
4    Q.   Did you at any time speak with anyone
5 about the circumstances regarding the filing of that
6 complaint?
7    A.   Other than Judy Radwick, no. She
8 familiarized me with these prior documents.
9    Q.   What was the conversation regarding this
10 document?
11    A.   Just that -- at the time, the May decision
12 was coming in and it had been ongoing, so she merely
13 showed me the prior hearing notices and resolutions
14 from them, which I then read.
15    Q.   For background purposes?
16    A.   Yes.
17        MR. ELLIS:  Exhibit D is a release and
18 settlement agreement dated July 1st, 2002.
19        (Exhibit D marked for
20         identification.)
21 BY MR. ELLIS:
22    Q.   If you could, review it and let us know if
23 you've ever seen it before.
24    A.   Yes, I have.
25    Q.   What steps did you take as interim DES to

Page 88

1 assure that this -- the terms of this agreement were
2 implemented?
3        MR. USHIRODA:  Objection. Lack of
4 foundation, assumes facts not in evidence.
5    A.   Tried to hire skills trainers, continuing
6 effort. Working with the agencies that were -- we
7 were contracted with to find skills trainers.
8        In this court order, it said that there
9 would be a responsible adult in the home when the
10 EAs were there, and that was not happening. Neither
11 Kim or Stan Bond were in the home when the skills
12 trainers were there.
13 BY MR. ELLIS:
14    Q.   The responsible adult, did it state that
15 it had to be mom or dad?
16    A.   No. It says a responsible adult.
17    Q.   So that could have been any responsible
18 adult?
19        MR. USHIRODA:  Objection. Speculation.
20    A.   It had to be somebody with the skills
21 trainer.
22 BY MR. ELLIS:
23    Q.   So it could have been -- it didn't have to
24 be mom or dad?
25    A.   No. But there was nobody there -- no

Page 89

1 adult.
2    Q.   The department did not retain or hire
3 anybody to be there with the skills trainer?
4    A.   It was my understanding that we were not
5 responsible for that. The parent was either
6 supposed to be there or the parent was to have a
7 responsible adult there.
8    Q.   Did it state that in the agreement?
9    A.   It does. It says the Bonds shall be
10 responsible for ensuring that at least one of them
11 or another reasonable adult is in the home during
12 those times. It does not state the DOE is
13 responsible for that.
14    Q.   Thank you. Regarding the home program,
15 who -- during the time you were interim DES, who was
16 responsible or who was the Department of Education
17 employee responsible for the -- assure the home
18 program was implemented?
19        MR. USHIRODA:  I'm sorry. Could I get
20 that question read back?
21        (Record was read as requested.)
22        MR. USHIRODA:  Objection. Lack of
23 foundation, assumes facts not in evidence.
24    A.   Dr. Lori Bolton was overseeing that. But
25 the home program was limited to the amount of time

Page 90

1  in the home even as recommended by Dr. Smalley.
2       Bryan was, at this time, going out into
3  the community, which he loved doing, community
4  participation, and that was stopped by Kim Wiles in
5  June of '04, so that no longer was happening. So
6  even though we had that in place, it could not take
7  place due to her objections.
8       All the rest of the stuff was being
9  provided.
10 BY MR. ELLIS:
11     Q.   Do you know the reason that the Bonds
12 terminated the CBI program?
13     A.   Yes, I do.
14     Q.   What was that?
15     A.   In June of '04, Dr. Dru Copeland and
16 Danielle -- I'm sorry.  I don't remember Danielle's
17 last name.  She was a skills trainer -- took Bryan
18 to the Special Olympics at the park.  There was
19 another woman there and called Bryan by name, also
20 mentioned Kim and, I think, Stan's name, which -- so
21 everybody thought that she was somebody that knew
22 the family.  Bryan had to go to the bathroom and
23 Danielle took Bryan to the bathroom.  When he came
24 out of the bathroom, this same woman took Bryan by
25 the hand and started to walk with Bryan.  At this

Page 91

1  very moment, Danielle said, Stop.  She got either in
2  front or behind Bryan and this woman, and Barbara
3  Coffman, the social worker, was just arriving and
4  she got on the other side of the woman and walked
5  up, took Bryan's hand and took him back to the seat.
6       The report that I received from Dr. Dru
7  Copeland and from Barbara Coffman, the whole
8  incident lasted about three minutes.  But it scared
9  the Bonds, Kim and Stan, and they refused any
10 community based program after that.
11     Q.   So essentially somebody attempted to
12 abduct their son?
13         MR. USHIRODA:  Objection.  Lack of
14 foundation, facts not in evidence -- assumes facts
15 not in evidence, also argumentative.
16     A.   I do not believe that she was trying to
17 abduct Bryan.  She's a -- was picked up and she was
18 taken to a psychiatric hospital.
19 BY MR. ELLIS:
20     Q.   Did you have an opportunity to review the
21 police report?
22     A.   No, I did not.
23     Q.   So you don't know what is contained in
24 that report or what she may have told the police?
25         MR. USHIRODA:  Who may have told the

Page 92

1  police?
2         MR. ELLIS:  The suspect.
3     A.   No, I don't.
4  BY MR. ELLIS:
5     Q.   So possibly, the Bonds have additional
6  information that was not available to you?
7         MR. USHIRODA:  Objection.  Lack of
8  foundation, calls for speculation.
9     A.   I would have no idea what they have.
10 BY MR. ELLIS:
11     Q.   You stated earlier that the Bonds were
12 required to provide -- to pro -- to either be at
13 home or provide a responsible adult.
14         Could you point out in the settlement
15 agreement where that portion is located?
16     A.   Page five, last paragraph.
17     Q.   Could you look to page six?
18     A.   Yes.
19     Q.   In the middle of the page there's a
20 paragraph, the Bonds executed -- agree to execute
21 assumption of risk.
22         Have you reviewed --
23     A.   Yes.
24     Q.   -- that portion?
25     A.   The Bonds agree to execute an assumption

Page 93

1  of risk provision to permit one specific TA to be
2  alone with Bryan in the home while providing
3  services if acceptable to the specific TA's
4  contracting agency, if any; and two, an additional
5  adult to be present in the home with Bryan and his
6  TA.
7     Q.   So there are other contingents, other than
8  just the parents being home?
9         MR. USHIRODA:  Objection.  Lack of
10 foundation, assumes facts not in evidence, misstates
11 the document, and calls for a legal conclusion.
12     A.   Yes.  I knew they had executed an
13 assumption of risk, and I know we lost some skills
14 trainers due to the fact they were in the home by
15 themselves without another adult present.
16 BY MR. ELLIS:
17     Q.   And do you know if -- do you know if the
18 agencies approved of that?
19         MR. USHIRODA:  Approved of what?
20         MR. ELLIS:  The specific term that while
21 providing services, if acceptable to the specific
22 TA's contracting agency.
23         MR. USHIRODA:  Objection to the extent it
24 calls for speculation.
25     A.   Excuse me a minute.  I lost my speaker.

Page 94

1    Okay. Would you repeat that, please? I'm
2  sorry.
3  BY MR. ELLIS:
4    Q.  Did you -- it states in the paragraph
5  that, If Bryan in the home while providing services
6  if acceptable to the specific TA's contracting
7  agency.
8    Do you know if it was acceptable to the
9  contracting agency?
10    MR. USHIRODA:  Objection to the extent it
11  calls for speculation. Also, vague and ambiguous.
12    A.  I will assume, but once again, I don't
13  know --
14  BY MR. ELLIS:
15    Q.  Please don't assume.
16    MR. USHIRODA:  If you don't --
17    A.  I don't know.
18  BY MR. ELLIS:
19    Q.  Could you turn to page seven, number four?
20    A.  Uh-huh.
21    Q.  It says respite care. What is respite
22  care?
23    A.  Respite care is something that's provided
24  by the Department of Health and it's to allow the
25  parents to have some free time away from the child

Page 95

1  and give them a rest.
2    Q.  If you know, who was responsible for
3  ensuring all the provisions of this settlement
4  agreement?
5    MR. USHIRODA:  Objection. Calls for a
6  legal conclusion.
7  BY MR. ELLIS:
8    Q.  Do you know?
9    A.  There's a variety of people here. Because
10  the DOH is responsible for the part on the respite.
11  The DOE is ultimately responsible, since they were
12  the ones that were taken to court on this. But it
13  was also TIFFE -- or the agencies that also had to
14  agree.
15    Q.  TIFFE is not -- look at the last two
16  pages, 12 and 13.
17    A.  12 and 13?
18    Q.  Yes. TIFFE is not a signer on this
19  agreement, are they?
20    A.  No, they are not. Department of Education
21  is and the Department of Health is.
22    Q.  Could you -- let's see.
23    MR. ELLIS:  E is a finding of fact,
24  conclusion of law and decision dated May 11, 2004.
25

Page 96

1    (Exhibit E marked for
2    identification.)
3  BY MR. ELLIS:
4    Q.  If you could, review it and let us know if
5  you've seen it before.
6    A.  Yes, I know I've seen it before.
7    Q.  Do you recall when you received it?
8    A.  I would say probably a week or two after.
9    Q.  A week or two after the date of the
10  decision?
11    A.  Yes.
12    Q.  Who did you receive it from?
13    A.  Lono Beamer.
14    Q.  Did you discuss the contents of this
15  decision with Mr. Beamer?
16    A.  Yes, I did.
17    Q.  This decision was never appealed, was it?
18    A.  No.
19    Q.  Who is -- is it your understanding as the
20  interim DES that a hearing officer's decision -- if
21  not appealed, it's mandatory to implement the
22  decision?
23    A.  Yes, I am.
24    MR. USHIRODA:  Objection. Calls for a
25  legal conclusion.

Page 97

1  BY MR. ELLIS:
2    Q.  Who in the Department of Education would
3  be -- would have been responsible for implementing
4  this decision?
5    MR. USHIRODA:  Objection to the extent it
6  calls for speculation.
7    A.  Well, ultimately it falls back on the
8  superintendent of -- area complex superintendent and
9  the DES for special ed.
10  BY MR. ELLIS:
11    Q.  So would that have been Mr. Rho --
12    A.  Correct.
13    Q.  -- and Dr. Bolton? Or yourself?
14    A.  Dr. Bolton and myself.
15    Q.  What did you do to assure that the
16  decision was implemented?
17    A.  On the ASL, I hired Kevin Burkshire to
18  teach ASL classes, and I had him ready to start when
19  Kim Wiles said, Well, let's not start it now,
20  because I don't think there's enough people to take
21  the class, so it was dropped at that time and did
22  not proceed forward.
23    Q.  So you dropped it on the parents' say-so?
24    A.  On the parents'.
25    Q.  Did the parents have an obligation to

Page 98

1  implement the decision?
2      A.   No.
3           But I would also like to say that American
4  Sign Language -- Bryan used very little American
5  Sign Language.  He had approximations.
6      Q.   That's your opinion.
7           MR. USHIRODA:  Objection.  Argumentative.
8      A.   No.
9  BY MR. ELLIS:
10     Q.   What is it then, if it's not your opinion?
11     A.   I watched his signing and I spoke with
12 many people that worked with him.
13     Q.   Was one of those people Naomi Shiraishi?
14     A.   No.
15     Q.   Would you turn to page four of the
16 agreement -- or the decision?
17     A.   Uh-huh.
18     Q.   Bullet 12?
19     A.   Yes.  I'm aware of that.
20     Q.   Could you read that, please?
21     A.   I'm aware of that.
22     Q.   Could you read that, please?
23     A.   Naomi Shiraishi, Bryan's speech
24 pathologist, communicates with Bryan through ASL.
25 Ms. Shiraishi testified that Bryan uses ASL in

Page 99

1  single words or short phrases and never needs
2  prompting to use short phrases.  The person
3  prompting Bryan must use ASL.  Bryan understands
4  language and processes language better if a
5  combination of verbal and visual cues, ASL, are
6  used.  Bryan's skills trainer must be proficient in
7  ASL and use Bryan's vocabulary bank of ASL signs.
8      Q.   Is Ms. Shiraishi a DOE employee?
9      A.   Yes, she is.
10     Q.   His speech pathologist?
11     A.   Yes, she is.
12     Q.   She works directly with Bryan on his
13 communication?
14     A.   Yes, she does.
15     Q.   So she is -- is she the person in charge
16 in implementing Bryan's communication program?
17     A.   For implementing it?  No.
18     Q.   Then what was she there for, then?
19     A.   Naomi worked with Bryan 20 minutes twice a
20 week in communication.
21     Q.   Would you turn to page two of the
22 document, bullet three?
23     A.   Excuse me?
24     Q.   Bullet three.
25     A.   Okay.

Page 100

1      Q.   Could you read that, please?
2      A.   Bryan does not speak.  He communicates his
3  needs through signs, gestures and verbal word
4  approximations.  Bryan communicates mainly through
5  American Sign Language.  He uses approximately 20
6  signs spontaneously and has approximately 100 words
7  in his receptive/expressive vocabulary.  A person
8  needs to know ASL and Bryan's current bank of ASL
9  vocabulary words to communicate with him.
10     Q.   The heading up there, what does that say?
11     A.   Finding of fact.
12     Q.   This decision was not appealed; correct?
13     A.   Correct.
14     Q.   So the hearing officer ordered training --
15 skills trainers to be trained in ASL; correct?
16     A.   Correct.
17     Q.   And did you provide that training?
18     A.   Yes, I did.  I provided it three nights a
19 week.  I believe it was Monday, Friday, and
20 Saturday, at different times of the day, to allow
21 for the work schedule for skills trainers, for
22 parents and whoever wanted to attend.
23     Q.   You testified earlier that it was
24 cancelled because mom said not to start it now.
25     A.   That was a different class that we wanted

Page 101

1  to start immediately.
2      Q.   So when did this class that you're talking
3  about start?
4      A.   When did this one begin?  Approximately
5  July, late July.
6      Q.   Was it mandatory?
7      A.   Was it --
8           MR. USHIRODA:  Objection.  Vague and
9  ambiguous.
10     A.   It was not mandatory.  It was encouraged
11 that all skills trainers attend, and it was mainly
12 skills trainers that attended, even some skills
13 trainers from far away as Waimea.  The special ed
14 teacher also attended.  Parents never attended.
15 BY MR. ELLIS:
16     Q.   So if a skills trainer working with Bryan
17 didn't go, would there be a consequence to that
18 skills trainer?
19          MR. USHIRODA:  Objection.  Assumes facts
20 not in evidence, lack of foundation.  Also, improper
21 hypothetical.  Also, incomplete hypothetical.
22     A.   I have no idea, because they were
23 contract, TIFFE, and --
24 BY MR. ELLIS:
25     Q.   Sorry.  When you said someone came from

Page 102

1  Waimea, was this class open to everybody?
2      A.   Yes.
3      Q.   So they weren't specifically for Bryan?
4      A.   No.
5      Q.   In general, if an IEP or a decision like
6  this is not followed, do you believe that the
7  student would be harmed?
8          MR. USHIRODA:  Objection.  Lack of
9  foundation, assumes facts not in evidence,
10 incomplete hypothetical.  I'm sure there are more
11 objections to this very poor question.
12     A.   No, I do not believe that Bryan was
13 harmed, and once again, because he had limited ASL
14 knowledge.
15 BY MR. ELLIS:
16     Q.   Not specific -- this wasn't specific to
17 Bryan.  In general.
18         MR. USHIRODA:  Same objections.
19     A.   Are we -- are you referring to the ASL --
20 BY MR. ELLIS:
21     Q.   No.
22     A.   -- segment?
23          Okay.  You're talking about the --
24     Q.   A decision or an IEP in general.
25     A.   Okay.  In general.  What was the rest of

Page 103

1  the question, then?
2      Q.   Would it be harmful if they weren't
3  implemented for a student with disabilities?
4          MR. USHIRODA:  Objection.  Overly broad,
5  vague and ambiguous, impossible to answer just given
6  the nature of the question.
7      A.   Yeah.  I would also -- I feel it's too
8  subjective.
9  BY MR. ELLIS:
10     Q.   You reviewed -- we reviewed portions of
11 Dr. Smalley's deposition.
12     A.   Correct.
13     Q.   If those occurred as Dr. Smalley states
14 throughout the summer of 2004, do you believe there
15 -- or was -- do you believe an investigation into
16 the skills trainers' and teachers' conduct should
17 have been initiated?
18         MR. USHIRODA:  Objection.  Lack of
19 foundation, assumes facts not in evidence, calls for
20 speculation, improper hypothetical.  Also,
21 incomplete hypothetical.
22     A.   Yes, if it was ongoing.  But I don't feel
23 it was ongoing, because I would have heard about it.
24 BY MR. ELLIS:
25     Q.   So if it had occurred but it had stopped

Page 104

1  at some portion, no investigation would have been
2  necessary?
3          MR. USHIRODA:  Objection.  Misstates
4  testimony, lack of foundation, assumes facts not in
5  evidence.  Also, argumentative.  Also, calls for
6  speculation.
7      A.   If this was happening as she stated, then
8  most definitely it would have an investigation.
9  BY MR. ELLIS:
10     Q.   Do you know of any investigation related
11 to Bryan Wiles-Bond during the summer of 2004?
12         MR. USHIRODA:  Objection.  Overly broad,
13 vague and ambiguous.
14     A.   Investigation -- nothing that I can think
15 of at this time.
16 BY MR. ELLIS:
17     Q.   Do you know of any disciplinary action
18 taken against a DOE employee in relationship to
19 their providing services to Bryan Wiles-Bond during
20 the summer of 2004?
21         MR. USHIRODA:  Objection.  Lack of
22 foundation, assumes facts not in evidence.
23     A.   I have no knowledge of that.
24 BY MR. ELLIS:
25     Q.   From time to time, as a -- as the interim

Page 105

1  DES, would you be aware of any investigation into a
2  DOE employee?
3          MR. USHIRODA:  Objection.  Lack of
4  foundation, assumes facts not in evidence, calls for
5  speculation.
6      A.   Normally, I would be notified.
7  BY MR. ELLIS:
8      Q.   So when you were interim DES, you were not
9  notified of any investigation or disciplinary
10 action?
11         MR. USHIRODA:  As to --
12 BY MR. ELLIS:
13     Q.   Of anybody.
14     A.   No disciplinary action toward anyone.
15 Investigation, the only one that I know of is the
16 one pertaining to the Special Olympics
17 investigation.
18     Q.   That's not related to Bryan, is it?
19     A.   Yes.  The one where --
20     Q.   The --
21     A.   -- supposed woman took Bryan's hand.
22 That's the only investigation I remember.
23         MR. ELLIS:  Take lunch now and come back
24 about 12:15?
25         MR. USHIRODA:  12:15?

Page 106

1    MR. ELLIS:  Sorry.  That would be a quick
2  lunch.  1:30.
3        (Discussion off the record.)
4    THE VIDEOGRAPHER:  The time is 12:06.
5  We're going off the record.
6        (Lunch recess taken.)
7    THE VIDEOGRAPHER:  The time is 1:34.
8  We're back on the record.
9    MR. ELLIS:  Exhibit F.  Exhibit F is a set
10  of documents that were disclosed through a request
11  for production of documents.  They're Bates-stamped
12  1 through 25, starting with a letter from Shelby
13  Floyd to Lono Beamer, and they consist of a number
14  of letters and redacted e-mails.
15        (Exhibit F marked for
16        identification.)
17  BY MR. ELLIS:
18    Q.    Would you please review the documents and
19  let us know if you've seen them before?
20    A.    Yes, I have seen the e-mails.
21    Q.    Have you seen the other documents, also?
22    A.    No, I have not.  I thought you were just
23  referring to the e-mails.
24    Q.    No.  All of the documents.
25        MR. USHIRODA:  It's your testimony that

Page 107

1  you have not seen the correspondence that's attached
2  as part of Exhibit F?
3        THE WITNESS:  No, I have not.  This is the
4  first time I've seen this.
5  BY MR. ELLIS:
6    Q.    Have you reviewed all the documents?
7    A.    No, I have not.  The e-mails, yes.
8    Q.    Have you had an opportunity to look at all
9  of the documents while you're there?
10    A.    Yes.  I see them.  There are several here.
11    Q.    Go to the beginning, page number one,
12  you've not seen this letter before?
13    A.    No, I have not.
14    Q.    Number two?
15    A.    Page two?
16    Q.    Yes.  Ever seen this before?
17    A.    Page two, no.
18    Q.    Page three?
19    A.    Yes.
20    Q.    You've seen this before?
21    A.    Yes.
22        MR. USHIRODA:  This is the document that
23  goes on for about three pages?
24        MR. ELLIS:  Yes.
25  BY MR. ELLIS:

Page 108

1    Q.    Who is Michael -- is it Biehn?
2    A.    I have no knowledge or no clue as to who
3  he is.  He contacted me.
4    Q.    Did you correspond with him via e-mail?
5    A.    Yes, I did.
6    Q.    You recognize the name, but you don't know
7  who that person is?
8    A.    Correct.
9    Q.    Did you ever learn who that person --
10    A.    No.  I tried, but I could not learn the
11  identity.
12    Q.    So the content of these three pages of
13  e-mail is what you wrote to Mr. Biehn?
14    A.    This is what I wrote to Mr. Biehn -- or
15  however his name is pronounced -- following an
16  e-mail that he wrote to me.
17    Q.    So the portion where it's From, To, the
18  subject, the date, and then on the second page,
19  which is actually page four, Bates-stamped four on
20  the bottom, I went before the judge today, that's
21  your writing?
22    A.    Yes, it is.
23    Q.    And a little -- about the middle of the
24  page it says -- see To:  JoAn Hill, Subject K,
25  slash, CE?

Page 109

1    A.    Yes.
2    Q.    And then below that it says PayPal user.
3  That is something you received?
4    A.    Yes.
5    Q.    Is the remainder of that page and the next
6  page -- that's just the bottom part of the e-mail
7  -- that's what you received from Mr. Biehn?
8    A.    I don't recall this part on the bottom,
9  and my e-mail didn't come in this format.  It was a
10  complete e-mail that was all together.
11    Q.    It didn't have any of those kind of --
12    A.    No.  That and, G, T, all that stuff.
13    Q.    Okay.  Turn to page six.  You've never
14  seen this -- seen this document before?
15    A.    No, I have not.
16    Q.    Page seven?
17    A.    No, I have not.
18    Q.    Page eight, nine and ten?
19    A.    No, I have not.
20    Q.    In the e-mail prior, you said the court
21  has ordered to disclose your name.  How did you
22  learn on that -- that the court had ordered this?
23        MR. USHIRODA:  Stan, are you referring to
24  page three?  Which page are you referring to?
25        MR. ELLIS:  Bates-stamped four --

Page 110

1        MR. USHIRODA:  Thank you.
2        MR. ELLIS:  -- at the top, where it says,
3    I went before the judge today for a hearing.
4    BY MR. ELLIS:
5        Q.    Did the judge order you to disclose it?
6        A.    I don't believe so.  Shelby wanted to know
7    the name, and I merely told them I did not know the
8    name of the person, so that -- yeah.
9        Q.    At some point were you advised or were you
10   told to disclose the name?
11       A.    I was asked many times if I knew who this
12   person was.  I do not know who he is and I still, to
13   this day, do not know who he is.
14       Q.    I understand that.  Did you disclose the
15   name?
16       MR. USHIRODA:  What name?
17       MR. ELLIS:  Michael Biehn.
18   BY MR. ELLIS:
19       Q.    Have you -- you --
20       A.    Yes, I did, because they had copies of the
21   e-mails on that date that I went before the judge.
22       Q.    So when Mrs. Floyd asked -- or you went
23   before the --
24       A.    Excuse me.
25       Q.    You went before the judge the day Ms.

Page 111

1    Floyd asked -- demanded that you give her the name?
2        A.    Right, and -- correct.  I will have to
3    backtrack there, because in the versions that we
4    turned in that day, Michael Biehn's name was blacked
5    out.  So then I was asked to disclose that.  And
6    then the name was subsequently disclosed, that it
7    was Michael Biehn.
8        Q.    You disclosed it to who?
9        A.    Lono Beamer --
10       Q.    Thank you.
11       A.    -- our AG.
12       Q.    Page 11, 12 and 13.
13       A.    Yes.
14       Q.    Have you seen that before?
15       A.    Yes.
16       Q.    Do you recall when you have seen this the
17   first time?
18       A.    Just recently.
19       Q.    Was it in reviewing pleadings for this
20   deposition?
21       A.    Correct.
22       Q.    Bates-stamped page 14 and 15, have you
23   seen this before?
24       A.    15, nothing that I recognize there.
25       Q.    Strike that --

Page 112

1        A.    14 --
2        Q.    Strike that question.
3        A.    Okay.
4        Q.    Bates-stamped 18 -- it's hard to read at
5    the bottom, but at the top it's dated August 3rd, 2004,
6    and there appears to be a redaction.  Did you redact
7    -- were you the person who redacted the e-mail
8    address at the top?
9        A.    No.  It was Lono Beamer that did that.
10       Q.    When did Mr. Beamer do this?
11       MR. USHIRODA:  Objection to the extent it
12   calls for speculation.
13       A.    The morning that -- the day that I gave
14   these to him, which was the day that we went to
15   court.
16   BY MR. ELLIS:
17       Q.    So Mr. Beamer had the documents -- this
18   particular e-mail with the e-mail address listed at
19   the top and then he redacted it prior to going to
20   court?
21       A.    I believe so.
22       Q.    And was the redacted portion -- did it --
23   do you recall how the address appeared at the top?
24       A.    Do I recall how it appeared?
25       Q.    Yes.

Page 113

1        A.    I can't really tell you right now how it
2    was.  It was Michael, M-i-c-h-a-e-l, and then at one
3    point it was B-i-e-h-n, I believe, and then it
4    changed to B-e-i-h-n or something, something similar
5    to that, to my best recollection.
6        Q.    Could you go back to page three?
7        A.    Okay.
8        Q.    See in the From section?
9        A.    Yes.
10       Q.    Did it appear that way, Michael Biehn, and
11   then the e-mail address?
12       A.    Yes.
13       Q.    So prior to the hearing before Judge --
14   was it before Judge Kurren?
15       A.    I believe that was the judge.
16       Q.    So prior to the hearing, Mr. Beamer knew
17   the name of where this e-mail came from?
18       MR. USHIRODA:  Objection to the extent it
19   calls for speculation.
20       A.    I believe so.
21   BY MR. ELLIS:
22       Q.    Thank you.  Do you know why Mr. Biehn
23   contacted you?
24       A.    I have no knowledge whatsoever.  It just
25   appeared in my e-mail one day when I opened it up.

Page 114

1  Q.  Did Mr. Biehn ever attempt to use this to
2  prove that Christy Edwards was involved in illegal
3  drugs?
4      MR. USHIRODA:  Objection.  Calls for
5  speculation.
6  A.  He made reference to she was taking
7  painkillers and something else.
8      MR. USHIRODA:  I just want to put an
9  objection on the record.  When you say Mr. Biehn
10  sent it to you -- at this point, we don't know if
11  it's just -- if it is a Mr. Biehn or someone using
12  it.  That's my objection, Counsel, Stan.  That's the
13  only objection I have.
14  BY MR. ELLIS:
15  Q.  Prior to going to court, did you disclose
16  that you had received these e-mails to anyone?
17  A.  I disclosed it -- my secretary, Desiree,
18  knew about them.
19  Q.  Did you disclose them to anyone other than
20  Desiree?
21  A.  Not that I can remember at this point.
22  Q.  Turn to 19.  It's dated 8/4/2004, 10:07
23  a.m.  That first paragraph, is there -- when you
24  reviewed that, did you reach an opinion of whether
25  or not the information being disclosed was -- or the

Page 115

1  people we're talking about did not know that this
2  information was being disclosed?  Withdraw that.
3  I'm sorry.
4      It says, Please remove all headers and
5  e-mail address info, my name, et cetera, and only if
6  neither party, Kim or Christy, could possibly come
7  aware of it.
8      When you read that, did you develop an
9  opinion of whether -- who Christy and Kim -- Kim or
10  Christy -- who they were?
11  A.  Yes.  I knew, because of the subject line
12  that said regarding Kim Wiles and Christy Edwards,
13  so it was implied.
14  Q.  Is it implied here that they were unaware
15  that this information was being related to you?
16      MR. USHIRODA:  Objection.  Calls for
17  speculation.
18  A.  That's what I would tend to believe, yes.
19  BY MR. ELLIS:
20  Q.  Did you believe that was -- it was
21  appropriate for someone to provide you with
22  information that -- did you believe that the
23  information provided was confidential?
24  A.  Yes, I did.
25  Q.  Did you -- once you received it, did you

Page 116

1  report that to anyone in the Department of
2  Education, other than your secretary?
3  A.  I believe I might have mentioned it to
4  Alvin Rho, too, the superintendent.
5  Q.  Did you seek a legal opinion?
6  A.  Yes.  Lono Beamer.
7  Q.  When did you seek that?
8  A.  The day we went to court.
9  Q.  And was that August 4th?
10  A.  Yes -- or -- I don't know if it was the
11  4th or what.  It was just right after I'd gotten the
12  first e-mail.  I think -- I believe I got the e-mail
13  the day before we went to court.
14  Q.  At -- this was disclosed -- these redacted
15  documents were disclosed in court the day you went;
16  is that true?
17  A.  Correct.
18  Q.  Did Mr. Beamer attempt to use these
19  redacted documents to discredit Christy Edwards at
20  that hearing?
21      MR. USHIRODA:  Objection.  Assumes facts
22  not in evidence, lack of foundation.
23  A.  I'm not sure why Lono Beamer chose to take
24  them to court.
25  BY MR. ELLIS:

Page 117

1  Q.  You were in court and you heard what was
2  going on; correct?
3  A.  Yes.
4  Q.  Did you hear him attempt to discredit
5  Christy Edwards?
6      MR. USHIRODA:  Objection.  Lack of
7  foundation, assumes facts not in evidence.  Also,
8  asked and answered.
9      You should go ahead and answer.
10      THE WITNESS:  Read the question to me
11  again, please.
12      (Record was read as requested.)
13      MR. USHIRODA:  Same objections.
14  A.  Did I hear him -- I really can't answer
15  that question.  I don't recall.
16  BY MR. ELLIS:
17  Q.  At the hearing -- in your e-mail -- you
18  stated that Ms. Floyd demanded that the name be
19  disclosed.  Do you recall that?
20  A.  Correct.
21  Q.  Did you or Mr. Beamer disclose the name at
22  the hearing that day?
23  A.  No.  I don't believe we did.
24  Q.  Why did you not disclose the name?
25  A.  I wanted a chance to talk with Lono on

Page 118

1  whether I should or shouldn't, and Lono also knew
2  the name of the person, so --
3          MR. USHIRODA:  I'm going to caution the
4  witness to -- if you're -- I'd ask you not to
5  disclose any attorney-client communications between
6  yourself and Mr. Beamer.
7          THE WITNESS:  Excuse me.  Thank you.
8  BY MR. ELLIS:
9      Q.    May I ask why you believed that you needed
10  to talk to Mr. Beamer before disclosing the
11  information?
12     A.    Mainly because I didn't know what the
13  legality of it all was about.
14     Q.    Did you know how the person identified as
15  Michael Biehn was able to provide you with the
16  e-mail information?
17     A.    No, I don't.
18          MR. USHIRODA:  Objection.  Asked and
19  answered, lack of foundation, calls for speculation.
20     A.    No, I do not.
21          MR. ELLIS:  This will be Exhibit G.  It's
22  the list of e-mails that were disclosed by the
23  defendant this morning, one, two, three, four, five,
24  six pages of e-mails from Michael Biehn to JoAn
25  Hill.

Page 119

1          (Exhibit G marked for
2          identification.)
3          MR. USHIRODA:  Counsel, we will be
4  providing you with Bates-stamped copies of this, as
5  well.  It's just that due to this morning, I
6  couldn't get it Bates-stamped.
7          MR. ELLIS:  Thank you.
8  BY MR. ELLIS:
9      Q.    Ms. Hill, you've reviewed these prior to
10  coming here?
11     A.    Yes, I have.
12     Q.    And you reviewed the document we just
13  provided you, pages one through 25?
14     A.    Yes.
15     Q.    Do you recall if there are any other
16  e-mails from Mr. Biehn to yourself or from yourself
17  to Mr. Biehn?
18     A.    Not to my knowledge, there are no more
19  e-mails.
20     Q.    When you received these e-mails, did you
21  -- did you respond to each one of them?
22     A.    Not every one, no.
23     Q.    When you received or -- the first page --
24  it's dated 8/5/04, two a.m.
25     A.    Correct.

Page 120

1      Q.    -- what did you do with this information?
2      A.    I don't think I did anything with this.  I
3  -- I do not recall doing anything with this
4  particular letter.
5      Q.    Did you ever tell Mr. Biehn to stop
6  e-mailing you?
7      A.    No, I did not.
8      Q.    Why not?
9      A.    I was hoping to find out who his identity
10  was.
11     Q.    Even after -- you told him in one of your
12  e-mails on the 4th of August -- I'm sorry -- the
13  10th of August that you needed to disclose his name.
14  Did he continue to write to you?
15     A.    Yes.  That was the last time I wrote to
16  him, but he did -- I had two or three more e-mails
17  after that.  But I was still hoping to get
18  information from him, as far as his identity.
19     Q.    And you reported this to, you said, Lono
20  Beamer, these e-mails?
21     A.    Yes.
22     Q.    Do you know if Mr. -- if Mr. Beamer or
23  anybody from the Department of Education
24  investigated the -- these e-mails?
25          MR. USHIRODA:  Objection.  Calls for

Page 121

1  speculation.  Also, lacks foundation.
2      A.    As to who the writer was?
3  BY MR. ELLIS:
4      Q.    Yes.
5      A.    No.  No one from the Department of
6  Education determined or investigated.
7      Q.    At the time of these e-mails, do you
8  recall if there was negotiations for terms of
9  employment for Christy Edwards?
10     A.    Yes.  She had sent her resume or dropped
11  her resume off to our office and gave it to Desiree,
12  our secretary.
13     Q.    Approximately when did that occur?
14     A.    July or August of '04.
15     Q.    Did the department hire Christy?
16     A.    Christy came into our office to ask for
17  employment, and we offered her salary commensurate
18  with her experience and what I had learned from
19  reviewing her resume and calling her references, and
20  she never got back to us with an answer on whether
21  she accepted the position or not.
22     Q.    So a position was offered?
23     A.    A position was offered to her.
24     Q.    And but she was never employed by the
25  Department of Education?

Page 122

1    A.    No, she was not fully -- wait.  Yes, she
2  was employed by, I believe -- was employed by the
3  Department of Education after I went off the case.
4    Q.    So that would have been after October 1st,
5  2004?
6    A.    No.  It would have been after Kate
7  Tolentino came aboard.
8    Q.    After the first week of September 2004?
9    A.    (Witness nods.)
10        MR. USHIRODA:  Yes?
11    A.    Yes.
12  BY MR. ELLIS:
13    Q.    What was the terms you had offered her?
14    A.    Offered her $20 an hour, and she
15  counter-offered with a $25 an hour, and she was not
16  willing, I guess, to accept that.  She never did
17  reply back to us.
18    Q.    To us or to you during your time?
19    A.    To --
20        MR. USHIRODA:  When you say us --
21        MR. ELLIS:  She used the term us.
22    A.    The DOE.  To us, I'm talking about to
23  Desiree or myself, because I was out of the office
24  the day that Stan and Christy came in, so they spoke
25  with Desiree.

Page 123

1  BY MR. ELLIS:
2    Q.    But at some point --
3    A.    They were supposed to get back to me.
4    Q.    At some point she was hired, you believe?
5    A.    I do believe she was.
6    Q.    So at some point she did get back to
7  somebody in the Department of Education?
8    A.    I don't believe so.
9    Q.    Could you explain how she would have been
10  hired by the DOE if she didn't get back to somebody
11  from the DOE?
12    A.    I cannot answer that question.
13    Q.    You don't know?
14    A.    No, I do not know.
15    Q.    The policy and procedure would have been
16  that she would have had to contact the DOE to become
17  employed?
18    A.    Once again, I cannot answer that question.
19    Q.    Not specific to her.  But for someone to
20  be employed, they would have to contact the
21  Department of Education?
22        MR. USHIRODA:  Objection.  Vague and
23  ambiguous.
24    A.    Yes.  They would have to contact the DOE
25  if they wanted a job with the DOE.

Page 124

1  BY MR. ELLIS:
2    Q.    Thanks.  Would you turn to the third page?
3    A.    To the which page?
4    Q.    Third page.  It's dated 8/11.
5    A.    Uh-huh.
6    Q.    6:01 p.m.
7    A.    Uh-huh.
8    Q.    At the bottom there -- not the bottom, but
9  the bottom of the paragraph, Now aware of PayPal
10  hack as well, what is your understanding of the word
11  hack?
12    A.    Hack means, to me, getting into somebody's
13  account or into -- e-mail, whatever.
14    Q.    Does the Department of Education have a
15  policy against people hacking into an e-mail?
16    A.    Very definitely.
17    Q.    And what would be the -- do you know what
18  the consequences would be under that policy?
19    A.    No, I do not know the exact consequences.
20    Q.    Do you have an understanding of what the
21  consequences could be?
22    A.    Very severe.
23    Q.    Does the policy state that hacking into
24  somebody's account is illegal?
25    A.    Yes, it does.

Page 125

1    Q.    Do you know if there was or did you ask
2  for a criminal investigation into Mr. Biehn's
3  apparent hacking into the e-mail account that he did
4  hack into?
5    A.    No, I did not.
6    Q.    Okay.  Why not?
7    A.    Because everything was turned over to the
8  -- my lawyer, Lono Beamer, and I did not feel it was
9  something that I would do personally.
10    Q.    You wouldn't personally --
11    A.    Launch an investigation.
12    Q.    Lodge a complaint or do the investigation?
13        MR. USHIRODA:  I think she said launch.
14  BY MR. ELLIS:
15    Q.    So you would lodge a complaint, but you
16  would not be the one investigating?
17        MR. USHIRODA:  Objection.
18        MR. ELLIS:  I understand that misstates
19  it, that's not what she stated.
20  BY MR. ELLIS:
21    Q.    You would report it, but you wouldn't be
22  the person who would investigate it?
23        MR. USHIRODA:  Objection.  Misstates
24  testimony.
25    A.    No, I would not.

Page 126

BY MR. ELLIS:
1  BY MR. ELLIS:
2     Q.   Would you not report it?
3     A.   I did report it.
4     Q.   So you would report it?
5     A.   Correct.
6     Q.   But you would not investigate?
7     A.   Correct.
8     Q.   And you turned it over to Mr. Beamer.  Did
9  you expect Mr. Beamer to investigate?
10        MR. USHIRODA:  Objection.  Calls for
11 speculation.
12    A.   That, I do not know.
13 BY MR. ELLIS:
14    Q.   When you turned it over to Mr. Beamer, did
15 you have any expectation of Mr. Beamer doing
16 something?
17        MR. USHIRODA:  Objection.  Calls for
18 speculation.
19    A.   I did not know.  It pertained to the case
20 and I turned it over to him.
21 BY MR. ELLIS:
22    Q.   Did you have any expectation?
23        MR. USHIRODA:  Objection.  Asked and
24 answered.
25 BY MR. ELLIS:

Page 127

1     Q.   You don't know?
2     A.   No.  Did I have any --
3     Q.   Yes.
4     A.   -- expectation?
5         MR. USHIRODA:  Objection.  Asked and
6  answered.
7     A.   No.
8  BY MR. ELLIS:
9     Q.   Could you turn back one page?  It's dated
10 8/10/04, 12:17 p.m.
11    A.   Just a second.  Falling apart.  Okay.
12    Q.   Do you know what PayPal is?
13    A.   Only from Mr. Biehn's e-mail that said it
14 was a PayPal account.  I'd never heard of it before.
15    Q.   You have no understanding of what a PayPal
16 account is?
17    A.   No, other than what -- how he referred to
18 it in his e-mail.
19    Q.   Mr. Biehn disclosed to you a PayPal
20 account and a password?
21    A.   Correct.
22    Q.   At any time did you -- as of the 10th of
23 August, did you notify Kim Wiles or Christy Edwards
24 that Mr. Biehn may have disclosed their PayPal
25 account and their password?

Page 128

1     A.   No, I did not.
2     Q.   Why not?
3     A.   Once again, I did not feel that that was
4  my obligation.
5     Q.   Does the department have a policy on
6  someone providing the password -- if someone
7  providing a third party a password to their e-mail
8  account is a violation of DOE policy?
9         MR. USHIRODA:  Objection.  Lack of
10 foundation.
11        MR. ELLIS:  That was terrible.
12        MR. USHIRODA:  Are you withdrawing that
13 question, Counsel?
14        MR. ELLIS:  Yes.  I'll try it again.
15 BY MR. ELLIS:
16    Q.   Does the DOE have a policy against
17 disclosing another employee's password?
18    A.   If they do, I have no knowledge of it.
19    Q.   Did you report this information to the --
20 the information about the PayPal and the disclosing
21 of a password to the Attorney General?
22    A.   Yes, I did.
23    Q.   Do you know if Mr. Beamer did anything
24 with that information?
25        MR. ELLIS:  Objection.  Calls for

Page 129

1  speculation.
2     A.   I do not know.
3  BY MR. ELLIS:
4     Q.   Did you have any expectations of Mr.
5  Beamer doing anything?
6         MR. USHIRODA:  Objection.  Calls for
7  speculation.
8     A.   I have -- I turned it over to Mr. Beamer
9  and I don't know beyond that.
10 BY MR. ELLIS:
11    Q.   I know you don't know what Mr. Beamer
12 might have done or should have done or whatever.
13 We're asking you if you thought he should have done
14 something.
15        MR. USHIRODA:  Objection.  Asked and
16 answered.
17    A.   I do not know.
18 BY MR. ELLIS:
19    Q.   You don't know if you thought he should do
20 something?
21    A.   I didn't feel it was in my power to tell
22 the Attorney General what to do.
23    Q.   I understand, but did you have any --
24    A.   Expect --
25    Q.   Did you have some -- an opinion -- do you

Page 130

```
1   think he should have done something?
2         MR. USHIRODA: Objection. Asked and
3   answered.
4     A.   I don't know.
5   BY MR. ELLIS:
6     Q.   You don't know if you thought he should do
7   something?
8     A.   No. I never really thought about that.
9     Q.   Okay. Could you turn to the fourth page?
10  It's dated 8/11, and the time is 7:13. That second
11  to the last line, it says, Hopefully you will win.
12        Do you know what Mr. Biehn was referring
13  to?
14        MR. USHIRODA: Objection. Calls for
15  speculation.
16    A.   From the outset, I believed that he knew
17  there was appearance before the judge, but that is
18  only speculation on my part.
19  BY MR. ELLIS:
20    Q.   So when you went before the judge, did you
21  know what the purpose of the hearing was?
22    A.   Yes.
23    Q.   What was the purpose?
24    A.   The purpose of the hearing was dealing
25  with hiring Christy Edwards as a skills trainer for
```

Page 131

```
1   Bryan.
2     Q.   So would winning be that you wouldn't have
3   to hire her?
4     A.   That, I would assume -- I would speculate
5   he meant, but I'm not sure.
6     Q.   Okay. So not hiring Christy was the win
7   you believe he was talking about?
8         MR. ELLIS: Objection. Calls for
9   speculation. Also, misstates the testimony.
10    A.   It's what I speculate he was referring to.
11        THE WITNESS: Is it warm in here or is it
12  just me?
13        MR. ELLIS: It gets a little warmer in the
14  afternoon.
15  BY MR. ELLIS:
16    Q.   Do you believe that the Department of
17  Education should have hired Christy Edwards at the
18  rate that the parents were requesting?
19    A.   No, I do not.
20    Q.   Could you explain why?
21    A.   When I went through her resume and called
22  her references, I spoke with Ron Gambie in the
23  Marshall Islands, who was her supervisor, and I was
24  told that she was a shift operator for him for one
25  year, telephone operator. That was not listed in
```

Page 132

```
1   her resume. He referred me to the human resource
2   department, and I spoke with a Karen Campbell, and
3   she also confirmed what Ron Gambie had said.
4         Then I called a Ruby Butterworth, that was
5   another reference on Christy's resume, and Christy
6   had listed that she had taught with the Job Corps
7   for a year or whatever. Ruby Butterworth informed
8   me that she had been a substitute and had only
9   worked for her for six to eight months -- excuse me
10  -- six to eight weeks in the entire year.
11        I never had any proof that she had taken
12  American Sign Language. It was not required of her
13  job on the Marshall Islands.
14        She did not attend all of the training
15  when she previously worked with Bryan through TIFFE.
16  She only completed very little and she said she had
17  had advanced training through TIFFE.
18        All of those were reasons that I did not
19  feel like she could be hired by the DOE at a rate of
20  $40 an hour, which was our highest rate. And I felt
21  she was very untruthful on her resume.
22    Q.   Did you testify in court, at the court
23  hearing?
24    A.   Are you talking about the one that was
25  August 5th?
```

Page 133

```
1     Q.   Yes.
2     A.   No, I didn't.
3     Q.   So this information that you're disclosing
4   now was not disclosed to the court?
5     A.   No. I had not received her resume at that
6   time.
7         MR. ELLIS: I'm sorry. We're going to go
8   off the record to change the tape.
9         THE VIDEOGRAPHER: The time is 2:22.
10  We're going off the record.
11        (Discussion off the record.)
12        THE VIDEOGRAPHER: The time is 2:29.
13  We're back on the record.
14  BY MR. ELLIS:
15    Q.   Disclosing the PayPal information with a
16  password, did you believe that that could create a
17  theft problem for either Kim Wiles or Christy
18  Edwards?
19        MR. USHIRODA: Objection. What do you
20  mean -- who did the disclosing?
21        MR. ELLIS: Mr. Biehn.
22    A.   I don't know what Mr. Biehn's total
23  motives behind it was.
24  BY MR. ELLIS:
25    Q.   I'm sorry. Did you think there could have
```

Page 134

1   been some liability to Christy Edwards or Kim Wiles
2   with the disclosure of their PayPal account and
3   password?
4       MR. USHIRODA:  By Mr. Biehn.
5       MR. ELLIS:  By Mr. Biehn, yes.
6   A.  Well, I don't understand any damage that
7   could be done to Kim Wiles.  If there was any damage
8   done, it would be done to Christy Edwards.
9   BY MR. ELLIS:
10  Q.  Why do you say that?
11  A.  Well, because according to what Mr. Biehn
12  said, it was her PayPal account.
13  Q.  So could there have been some liability to
14  Christy Edwards by disclosing her PayPal account and
15  password?
16      MR. USHIRODA:  Again, by Mr. Biehn.
17      MR. ELLIS:  By Mr. Biehn.
18      MR. USHIRODA:  Objection.  Calls for
19  speculation, lack of foundation.  Also, calls for a
20  legal opinion.
21  A.  I do not know.
22  BY MR. ELLIS:
23  Q.  Did it ever -- did you ever think about
24  it?
25  A.  Well, I don't -- I wondered how he knew

Page 135

1   it.  I wondered how he knew all this information,
2   and I kept trying to find out exactly who this
3   person was, but to no avail.
4       Q.  Did it ever cross your mind that by this
5   person disclosing these -- the information from
6   either Kim Wiles' or Christy Edwards' e-mail account
7   could violate their civil rights?
8       MR. USHIRODA:  Objection.  Calls for
9   speculation, lack of foundation, assumes facts not
10  in evidence.  Also, calls for a legal opinion.
11  A.  I don't know.
12  BY MR. ELLIS:
13  Q.  You don't know if it could have violated
14  their civil rights or you just never thought about
15  it?
16      MR. USHIRODA:  That's two different
17  questions, and again, the same objections.
18  A.  I'm sure it did violate in the aspect -- I
19  know it's illegal to hack into something.
20  BY MR. ELLIS:
21  Q.  So did that cross your mind at the time?
22  A.  Yes, it did.
23  Q.  Did it ever occur to you that you -- by
24  Mr. Biehn disclosing it to you, you could be
25  involved in a conspiracy?

Page 136

1   A.  No.  It never crossed my mind.
2       MR. ELLIS:  Thank you.  That's all we
3   have.
4       Oh.  I'm sorry.  Sorry.  Excuse me.
5       MR. USHIRODA:  Do you want to take a
6   break?
7       MR. ELLIS:  No.  Just -- sorry.  We're
8   finished with this topic.  Sorry.
9   BY MR. ELLIS:
10  Q.  Are you aware that at some point in either
11  August or September of 2004, Bryan was removed from
12  class with other students and placed by himself in a
13  room with his skills trainer?
14  A.  Yes, I was.
15  Q.  Okay.  Do you know what the circumstances
16  that led up to that?
17  A.  He had, I believe, hit someone, and he
18  pulled a handful of hair from a skills trainer who
19  was working with another student.  I don't recall
20  everything that was involved.  But he had been
21  spitting and several things had taken place.
22  Q.  Was -- under the IDEA, would that -- under
23  your understanding of the IDEA, is that a change of
24  placement?
25      MR. USHIRODA:  Objection.  Calls for a

Page 137

1   legal opinion.
2   A.  It was not a change in program.  It was a
3   change in location of his class.
4   BY MR. ELLIS:
5   Q.  Was -- to your knowledge, was Bryan's LRE
6   at the time -- you're aware of what LRE is?
7   A.  Yes, I am.  Least restrictive environment.
8   Q.  Was Bryan's LRE listed as an isolated --
9   isolated in a class by himself?
10  A.  His IEP stated for the LRE small group
11  setting.
12  Q.  Is -- being isolated, is that a small
13  group setting?
14  A.  No.  But this was for a short period of
15  time.
16  Q.  How short?
17  A.  It was to be until -- and to gradually
18  phase him back into his regular class through
19  behavior modification.
20  Q.  So how short?
21  A.  That, I cannot answer, because that
22  depended on how he acted.
23  Q.  Was there an IEP meeting to discuss his
24  isolation placement?
25      MR. USHIRODA:  Objection to the term

Page 138

1    isolation.
2    BY MR. ELLIS:
3        Q.    Placement with just himself and a teacher
4    or a skills trainer in a separate room.
5        A.    There did not need to be an IEP for that.
6        Q.    Was there an IEP at some point after that?
7        A.    Yes.  I was not involved.  I believe there
8    was.  Let me rephrase that.  I am not positive.
9        Q.    Who's -- do you know who had authorized
10   the decision to place Bryan in a room by himself
11   with his skills trainer?
12       A.    I believe I did.
13       Q.    Do you recall if you authorized it on the
14   same -- or you discussed certain things that
15   happened that resulted in his being removed to a
16   room by himself?  When you testified, you said there
17   was pulling hair --
18       A.    Right.
19       Q.    -- spitting.
20             Did that all take place like on the same
21   day?
22       A.    It was on a Friday.  I can't give you the
23   exact date.  But it had been -- his behavior had
24   been increasing where for the safety of the other
25   students they would have to be all moved out of the

Page 139

1    room.
2        Q.    So this happened over time?
3        A.    It happened in the week prior to this
4    probably three times, to the best of my knowledge,
5    that the other students had to be removed out of the
6    room for their safety.
7        Q.    So you said -- did the removal -- the
8    eventual removal to a room by himself, that happened
9    on a, you believe, a Friday?
10       A.    Friday, his -- I was in Honolulu.  I was
11   not on island.  I was told -- all I can tell you is,
12   secondhand, that his parents were called because of
13   his behavior.  I believe they picked him up, and
14   then Monday, he was going to be placed in a room by
15   himself.
16       Q.    So --
17       A.    I had not had a chance to investigate what
18   was going on, because I was off island.
19       Q.    So come -- so sometime between Friday,
20   when the parents picked him up -- would that have
21   been in the afternoon?
22       A.    Yes, I believe it was.
23       Q.    -- to Monday morning, a decision was made
24   to place him in a room by himself with a skills
25   trainer?

Page 140

1        A.    And a teacher.
2        Q.    And a teacher.
3        A.    No.  That decision was finally made on
4    Monday.
5        Q.    So on Monday morning?
6        A.    I wouldn't say Monday morning.  It was
7    made sometime on Monday.
8        Q.    Did something on Monday morning, prior to
9    the decision being made, occur behavioral-wise?
10       A.    I don't believe Bryan was at school on
11   that Monday morning.
12       Q.    Okay.  Was he at school at any time during
13   -- on Monday?
14       A.    I don't believe he was.
15       Q.    So the meeting -- the decision was made on
16   Monday -- on a Monday?
17       A.    On a Monday.
18       Q.    That decision was made by you?
19       A.    I believe so.
20       Q.    Were you -- did you consult anybody in
21   making your decision?
22       A.    I believe Dr. Lori Bolton.
23       Q.    Do you recall the substance of the
24   conversation?
25       A.    No.  I couldn't give you the whole

Page 141

1    substance.
2        Q.    Okay.  So --
3        A.    She was very aware of what was going on.
4        Q.    So Monday the decision was made.  Friday
5    previously he had had some behavior issues?
6        A.    Correct.
7        Q.    So that week, starting on Monday to the
8    Friday, and then the previous week, he had escalated
9    up to that Friday?
10       A.    Well, he'd been escalating.  But I think
11   he had three incidents that particular week, three
12   big ones, where the room had to be -- all the
13   students removed for their safety.
14       Q.    Had the prior week he had any incidents
15   where the students had to be removed for their
16   safety?
17       A.    Yes.  There had been several, but I can't
18   tell you how many and over what period of time.
19       Q.    And the week before that had there been
20   any instances where the other kids had to be removed
21   from the room?
22       A.    I cannot tell you for sure.  I do not
23   remember.
24       Q.    Over the summer of 2004, had Bryan's
25   behavior escalated?

Page 142

1    A.    Yes, it had.
2    Q.    You made the decision to have Bryan in a
3  room by himself with the skills trainer and teacher?
4    A.    Correct.
5    Q.    Did you feel you needed any authorization
6  from, say, Mr. Rho?
7    A.    No.
8    Q.    Did you consult with the parents prior to
9  making this decision?
10    A.    I did not have a chance to really consult
11  with them, because I went to the school on Monday
12  morning to find out what had transpired on Friday.
13  And when I got there, the parents were there.
14    Q.    So is it no, you didn't consult with the
15  parents?
16    A.    No.  I never had a chance to.
17    Q.    Did you call an IEP meeting to discuss
18  this change from his small group setting to being
19  alone with a skills trainer and a teacher?
20    A.    No, I did not.
21    Q.    Did you provide a prior written notice of
22  this decision?
23    A.    No, I did not.  I asked to have an IEP
24  meeting at the end of the week to look at
25  alternative solutions to the problem, and I was told

Page 143

1  by Mrs. Kim Wiles that we had just had an IEP
2  meeting and she did not feel there needed to be an
3  IEP meeting.
4    Q.    At the time, who was the principal at
5  Kealakehe Intermediate?
6    A.    Robert Ginsel.  But he was out a great
7  deal due to illness.
8    Q.    Did you consult with him at all about this
9  decision?
10    A.    He was not there at that time.
11    Q.    So is that a no?
12    A.    That's a no.
13    Q.    Did you consult with, say, the vice
14  principal?
15    A.    About the decision?
16    Q.    Yes.
17    A.    No.
18    Q.    Did you consult with Dr. Copeland?
19    A.    No.
20    Q.    Did you consult with Dr. Smalley?
21    A.    Yes, I believe I did talk with Dr.
22  Smalley.
23    Q.    The substance of that conversation?
24    A.    I can't tell you at this point what the
25  substance was.  I do not recall.

Page 144

1    Q.    Dr. Smalley drafted a functional
2  behavioral assessment.  Were you aware of that?
3    A.    Yes.  She went over it in great detail at
4  our IEP meeting with all the team members present,
5  and I was there also.
6    Q.    Do you recall the date of that meeting?
7    A.    August 22nd.  We wanted it on August 16th
8  but had to change it.
9    Q.    Was that before or after the decision to
10  place Bryan in a class by himself with the skills
11  trainer and the teacher?
12    A.    That was before.
13    Q.    That meeting was before?
14    A.    Yes.
15    Q.    The meeting was before the moving?
16    A.    Correct.
17    Q.    Was the behavior -- was there a behavior
18  intervention plan drafted by Dr. Smalley?
19    A.    I remember the toilet plan, and there was
20  a behavior report that she gave, and then she was
21  going to work with Dr. Lori Bolton, who was going to
22  finalize the intervention plan.
23    Q.    Was there a behavior plan in place prior
24  to Bryan's escalating behavior?
25    A.    Yes, there was.

Page 145

1    Q.    Was it being used at the time of this
2  escalation?
3    A.    To the best of my knowledge, it was.
4    Q.    Did you reach a conclusion to whether or
5  not the plan was working when you decided to have
6  Bryan in a classroom by himself with a skills
7  trainer and teacher?
8    A.    No, the plan was not working.
9    Q.    When you -- previously we'd asked you
10  about speaking -- or consulting with Dr. Smalley
11  about the -- your decision.  Did she agree with you?
12    A.    I don't believe she did, but I'm not
13  positive.
14    Q.    Did -- prior to your decision, was there a
15  crisis plan in place?
16    A.    There was a crisis plan that was presented
17  at the August 22nd IEP meeting and everything was
18  gone over.  Kim and Stan left the meeting with all
19  of the information and we had ample time to discuss
20  it.  Once they got home, they looked at it and sent
21  an e-mail back and did not like the crisis plan and
22  wanted it all changed.
23    Q.    Was an IEP meeting held to change it?
24    A.    No, there was not an IEP meeting held to
25  change it.  She asked various questions in that

Page 146

1  letter, and a new one was going to be developed and
2  then an IEP meeting held for approval.
3      Q.    Were you involved in that -- was an IEP
4  meeting eventually held to go over the changes in
5  the crisis plan?
6      A.    Because right after that is when I went
7  off the case, so I don't know.
8      Q.    The crisis plan, was one of the -- part of
9  the plan to place him in a room with himself and a
10  skills trainer and a teacher?
11     A.    The final crisis plan, or what are we
12  talking about?
13     Q.    The draft plan that was presented at the
14  IEP meeting.
15     A.    No.
16         THE WITNESS:  You need a fan.
17  BY MR. ELLIS:
18     Q.    Why did you -- was it your decision to
19  discontinue your position as DES?
20     A.    I was still the interim DES for West
21  Hawaii.
22     Q.    Was it your decision to stop being the
23  interim DES?
24     A.    Yes, it was, when Linda Price was hired,
25  October 1st.

Page 147

1      Q.    You voluntarily stepped down from that
2  position?
3      A.    Right.  I was just an acting DES at the
4  time.
5      Q.    You didn't wish to be the permanent DES?
6      A.    No.  I retired from California.  I was not
7  taking that role on.
8      Q.    Was the Bryan Wiles-Bond case a difficult
9  case?
10         MR. USHIRODA:  Objection.  Vague and
11  ambiguous.
12     A.    I would not know what to base it on,
13  because it was the first one I had dealt with.  I
14  had never had to deal with a case before.
15  BY MR. ELLIS:
16     Q.    In your job description as interim DES or
17  as a DES, did the DES -- did the DES have authority
18  to make the type of decision you made when removing
19  Bryan to a classroom by himself with a skills
20  trainer and a teacher?
21     A.    Yes.
22     Q.    Is it a written poli -- is there a written
23  description?
24     A.    No.
25     Q.    So this is an informal --

Page 148

1      A.    Correct.
2      Q.    Was that something you believed you had or
3  something that, say, Ms. Radwick told you you had
4  the authority to do?
5      A.    Well, Ms. Radwick never told me that.  I
6  was consulting with Lori Bolton, Dr. Lori Bolton all
7  the time on this, and we both discussed this
8  placement.  It was not just totally me.  We both
9  discussed it and then I said, We need to -- we
10  decided we needed to do this.
11     Q.    So at your monthly meetings, DES meetings
12  on Oahu, was this type of subject discussed?
13     A.    Not to my recollection.
14         MR. ELLIS:  Take a break.
15         THE VIDEOGRAPHER:  The time is 2:54.
16  We're going off the record.
17         (Discussion off the record.)
18         THE VIDEOGRAPHER:  The time is 3:00.
19  We're back on the record.
20         MR. ELLIS:  Thank you.  We have no more
21  questions.
22         MR. USHIRODA:  Thank you, Stan.
23         THE VIDEOGRAPHER:  The time is 3:00.  This
24  concludes the deposition.
25         (Deposition concluded at 3:02 p.m.)

Page 149

1      I, JOSEPHINE ANTONIA HILL, hereby certify
2  that I have read the foregoing typewritten pages 1
3  through 148, inclusive, and corrections, if any,
4  were noted by me, and the same is now a true and
5  correct transcript of my testimony.
6      DATED:  Honolulu, Hawaii,_____.
7
8
9  _____
10      JOSEPHINE ANTONIA HILL
11
12
13  Signed before me this_____
14  day of _____, 2007.
15
16
17  _____
18
19
20
21  Wiles vs. DOE, 04-00442, 8/9/07
22
23
24
25

38 (Pages 146 to 149)

Page 150

```
 1              C E R T I F I C A T E
 2    STATE OF HAWAII              )
                          ) SS.
 3    CITY AND COUNTY OF HONOLULU   )
 4
 5         I, SUE M. FLINT, Notary Public, State of
 6    Hawaii, do hereby certify:
 7         That on August 9, 2007, at 9:00 a.m.,
 8    appeared before me Josephine Antonia Hill, the
 9    witness whose deposition is contained herein; that
10    prior to being examined she was by me duly sworn;
11         That the deposition was taken down by me
12    in machine shorthand and was thereafter reduced to
13    typewriting under my supervision; that the foregoing
14    represents to the best of my ability, a true and
15    correct transcript of the proceedings had in the
16    foregoing matter.
17         I further certify that I am not an
18    attorney for any of the parties hereto, nor in any
19    way concerned with the cause.
20         DATED this _____ day of _____,
21    2007, in Honolulu, Hawaii.
22
23    _____
      SUE M. FLINT, RPR, CSR 274
24    Notary Public, State of Hawaii
      My Commission Exp: July 23, 2011
25
```

**A**

abduct 91:12,17
ability 84:25 150:14
able 26:16,17,19,20
  63:15 118:15
aboard 122:7
about 11:5 16:15 18:8
  18:9 20:15 31:1,4
  33:20,22,24 34:13,15
  35:2 36:25 44:14
  47:15 55:23 56:9,11
  56:14 57:16,19 58:2
  58:20 59:18 60:3
  69:2 73:7,9 79:1 83:1
  85:12,24 87:5 91:8
  101:3 102:23 103:23
  105:24 107:23
  108:23 114:18 115:1
  118:13 122:22
  128:20 130:8 131:7
  132:24 134:23
  135:14 143:8,15
  145:10,11 146:12
academics 75:15
accept 46:2 48:6
  122:16
acceptable 93:3,21
  94:6,8
accepted 38:22 48:15
  121:21
accidents 60:5
according 134:11
account 124:13,24
  125:3 127:14,16,20
  127:25 128:8 134:2
  134:12,14 135:6
accurate 35:12 81:16
acronym 84:18
acted 137:22
acting 147:3
action 1:12 2:1 104:17
  105:10,14
actually 10:22,23 69:10
  85:11 108:19
Adams 40:14 42:13
  44:5
add 32:4 72:8
additional 27:20 92:5
  93:4
address 112:8,18,23
  113:11 115:5
addressed 56:19
administrators 36:1
ads 21:1 22:13 27:18
adult 37:25 88:9,14,16
  88:18 89:1,7,11
  92:13 93:5,15
advance 32:21
advanced 46:6 132:17
advertisements 29:20
Advertiser 28:6

advised 110:9
affect 9:12
after 24:11 25:1,2,3
  27:6,14 35:10 39:11
  39:22 40:7 41:17
  42:10 51:2,8 52:19
  53:22 74:6 91:10
  96:8,9 116:11 120:11
  120:17 122:3,4,6,8
  138:6 144:9 146:6
afternoon 131:14
  139:21
AG 111:11
again 17:21 24:14,19
  43:25 45:3 54:23
  75:20 82:5 83:25
  84:12 94:12 102:13
  117:11 123:18 128:3
  128:14 134:16
  135:17
against 104:18 124:15
  128:16
agencies 21:22,25 22:2
  22:5 26:9,14 27:10
  27:12,15 88:6 93:18
  95:13
agency 29:6,9,12,13
  30:3,5,16 31:1,3,9,10
  69:11 85:13 93:4,22
  94:7,9
agent 30:4
agents 30:7,9
aggressive 71:15 75:10
agitated 72:7
ago 19:14 75:19
agree 92:20,25 95:14
  145:11
agreed 79:1
agreement 4:19 87:18
  88:1 89:8 92:15 95:4
  95:19 98:16
ahead 48:14 117:9
aides 58:24
al 6:5,6
aligned 46:10
allow 8:23 9:1 94:24
  100:20
allowed 72:13
alone 73:23 93:2
  142:19
along 25:14
already 37:7 75:16
alternative 142:25
Although 9:2
Alvin 1:11 6:15 48:12
  48:15 116:4
always 48:25 49:1,1
  55:25
ambiguous 21:14 55:19
  59:10 67:18 85:22
  94:11 101:9 103:5

104:13 123:23
  147:11
American 16:8,9 17:3
  53:3 56:6,23 73:3
  98:3,4 100:5 132:12
amount 74:6 89:25
ample 145:19
Ann 1:3,17 6:4
another 10:1,17 86:14
  89:11 90:19 93:15
  128:17 132:5 136:19
answer 8:9,17,17,24
  9:3,4 14:15 21:16
  23:6,8,21,22 24:1,5
  35:9 48:11 70:5
  72:10,10 73:22 76:22
  78:17 79:6 83:24
  84:3,5 103:5 117:9
  117:14 121:20
  123:12,18 137:21
answered 24:18 43:23
  48:9 61:5 65:20
  79:19 117:8 118:19
  126:24 127:6 129:16
  130:3
answering 8:4
answers 8:4,14
Antonia 2:3 6:22 7:17
  149:1,10 150:8
anybody 20:15 89:3
  105:13 120:23
  140:20
anyone 19:9 31:21 87:4
  105:14 114:16,19
  116:1
anything 15:10 56:8,10
  56:12,25 58:2,4
  59:16 84:9 85:24
  120:2,3 128:23 129:5
apart 127:11
apologize 48:4
apparent 125:3
appealed 96:17,21
  100:12
appear 113:10
appearance 130:17
Appearances 2:11 3:1
appeared 71:24 112:23
  112:24 113:25 150:8
appearing 6:3
appears 112:6
appointed 48:15
appropriate 115:21
approval 146:2
approved 93:18,19
approximate 57:11
approximately 18:24
  19:13 100:5,6 101:4
  121:13
approximation 81:18
approximations 98:5

100:4
area 14:22 48:16 52:7
  97:8
areas 46:11 65:13
argumentative 54:20
  55:18 91:15 98:7
  104:5
around 17:15 19:22
  46:23
arriving 91:3
asked 17:21 24:17 48:8
  61:5 71:21 79:19
  110:11,22 111:1,5
  117:8 118:18 126:23
  127:5 129:15 130:2
  142:23 145:9,25
asking 42:14 79:7
  129:13
ASL 16:20,22 57:16,18
  57:19,22 58:2,3,7,11
  58:12,18 97:11,18
  98:24,25 99:3,5,7,7
  100:8,8,15 102:13,19
aspect 67:7 135:18
assessment 144:2
assigned 42:20,24,25
  43:2,5,7 51:7,7,10,15
  52:4,10,11,13 62:9
assist 65:13
assistance 65:14 74:9
assume 8:5 10:22 36:19
  94:12,15 131:4
assumes 52:24 72:22
  76:13 77:12 79:16
  83:3 85:21 88:4
  89:23 91:14 93:10
  101:19 102:9 103:19
  104:4,22 105:4
  116:21 117:7 135:9
assumption 92:21,25
  93:13
assure 52:21 53:2 67:9
  88:1 89:17 97:15
attached 107:1
attempt 8:24 114:1
  116:18 117:4
attempted 91:11
attend 41:8,11 48:25
  54:18 55:2 61:10
  100:22 101:11
  132:14
attendance 41:2
attended 34:7 48:20
  49:1 55:4 69:17,17
  81:5,5,24 101:12,14
  101:14
attention 79:22
attorney 7:8 9:1,4
  23:21 128:21 129:22
  150:18
attorneys 8:25

attorney-client 118:5
augmentative 50:13,20
August 1:18 2:6 6:18
  13:17 54:23 76:25
  77:7 78:10,11 79:23
  86:16 112:5 116:9
  120:12,13 121:14
  127:23 132:25
  136:11 144:7,7
  145:17 150:7
authority 74:4 147:17
  148:4
authorization 142:5
authorized 138:9,13
autism 12:17,18 16:25
  18:6 40:3,6,12,14
  52:7,7 61:12 80:5,13
  80:15,18,22
autistic 46:13,15,19
  54:9
avail 135:3
available 92:6
aware 27:6 31:21 39:10
  39:12,21 40:8 72:2
  72:19 74:19 76:10,15
  79:14 98:19,21 105:1
  115:7 124:9 136:10
  137:6 141:3 144:2
away 94:25 101:13
awful 71:14
a.m 2:6 6:19 114:23
  119:24 150:7

**B**

B 4:11 70:15,15,20
  23:17 24:4 39:6 45:1
  45:12,24 47:22 52:18
  66:10 75:24 76:6,24
  89:20 91:5 97:7
  105:23 106:8 113:6
  121:20 122:17 123:3
  123:6,10 127:9
  133:13 137:18
  145:21 148:19
background 79:12
  87:15
backtrack 111:3
ball 75:16,20
bank 99:7 100:8
Barbara 12:18 18:7
  40:15 44:4 91:2,7
base 147:12
based 22:12 91:10
basically 15:15 56:23
  58:7 68:2,3
basis 33:17 34:11 48:14
  65:10
Bates-stamped 5:3
  106:11 108:19
  109:25 111:22 112:4

119:4,6
**bathroom** 90:22,23,24
**beads** 73:25
**Beamer** 96:13,15
  106:13 111:9 112:9
  112:10,17 113:16
  116:6,18,23 117:21
  118:6,10 120:20,22
  125:8 126:8,9,14,15
  128:23 129:5,8,11
**became** 36:9 37:15
  38:21 39:1,21 40:7,8
  41:15,24,25 42:6
  44:16 51:19,20,22
  52:14,19 73:16 87:3
**become** 39:10,11
  123:16
**becomes** 36:4
**bed** 60:8
**before** 2:8 7:2 8:23
  18:19 19:20 24:5
  25:3 33:9,10 36:23
  37:14 41:24,25 42:1
  86:25 87:23 96:5,6
  106:19 107:12,16,20
  108:20 109:14 110:3
  110:21,23,25 111:14
  111:23 113:13,14
  116:13 118:10
  127:14 130:17,20
  141:19 144:9,12,13
  144:15 147:14
  149:13 150:8
**begin** 101:4
**beginning** 10:17 45:15
  107:11
**behalf** 2:4
**behavior** 56:9,22 58:21
  58:22 59:2 69:8 74:5
  137:19 138:23
  139:13 141:5,25
  144:17,17,20,23,24
**behavioral** 144:2
**behavioral-wise** 140:9
**behaviors** 59:6,7
**behind** 91:2 133:23
**being** 6:24 16:15,16
  36:3 39:16 44:25
  51:2,3,25 53:2 55:13
  55:13,15 56:4 59:19
  69:23 72:18 90:8
  93:8 114:25 115:2,15
  137:12 138:15 140:9
  142:18 145:1 146:22
  150:10
**believe** 11:23 12:15
  13:23 15:19 17:15,22
  18:17 27:22 35:4
  41:22 52:18 59:1
  65:20 69:20 70:12,13
  79:9 81:4,10 91:16

100:19 102:6,12
103:14,15 110:6
112:21 113:3,15,20
115:18,20,22 116:3
116:12 117:23 122:2
123:4,5,8 131:7,16
133:16 136:17 138:7
138:12 139:9,13,22
140:10,14,19,22
143:21 145:12
**believed** 118:9 130:16
  148:2
**below** 109:2
**benefitted** 85:15
**Bernardino** 46:16 50:6
**beside** 79:6
**best** 8:10 46:23 47:18
  113:5 139:4 145:3
  150:14
**better** 34:15 49:22 56:2
  82:22 99:4
**between** 15:4 30:24
  42:3 44:15 63:10,19
  63:21 118:5 139:19
**beyond** 129:9
**Biehn** 5:7 12:20 108:1
  108:13,14 109:7
  110:17 111:7 113:10
  113:22 114:1,9,11
  118:15,24 119:16,17
  120:5 127:19,24
  130:12 133:21 134:4
  134:5,11,16,17
  135:24
**Biehn's** 111:4 125:2
  127:13 133:22
**big** 9:17 28:4 37:10
  48:23 49:17 72:14,15
  72:15 73:24 141:12
**biggest** 49:9,9
**Bill** 62:21 64:7,9 65:13
**Bishop** 2:21
**bit** 15:19 32:20 78:25
**biting** 58:23 59:22
**blacked** 111:4
**blah** 85:2,2,2,3
**blamed** 15:21
**Bolton** 12:16 16:24
  22:15 80:5,6,13,20
  81:19 89:24 97:13,14
  140:22 144:21 148:6
  148:6
**Bond** 1:4,18 6:5 88:11
**Bonds** 14:6 89:9 90:11
  91:9 92:5,11,20,25
**both** 28:22 42:19 64:20
  81:24 148:7,8
**bottom** 76:19 82:2
  108:20 109:6,8 112:5
  124:8,8,9
**bought** 36:24

**bouncing** 34:13
**box** 73:25
**boxes** 75:14
**brand** 45:6
**break** 23:11 24:5 45:19
  136:6 148:14
**bring** 13:24 49:3
**broad** 67:17 103:4
  104:12
**Broke** 72:11
**brought** 49:11 64:13
  64:16,18 79:22
**Brown** 62:21 64:7,9,20
  65:3,13,18,23 66:20
  66:23,24 67:2,10
**Brown's** 66:12 68:16
**Bruce** 3:3 6:12
**Bryan** 1:6,20 15:16,17
  15:23 22:21 26:6
  30:15,21,22 31:2,6
  31:23 32:25 35:14,20
  39:12 40:8 41:13,20
  43:5,10,11,18,22
  44:8 47:5 50:23
  51:15 52:4,15 54:12
  60:14 62:20 64:14
  67:20,21 68:22,23
  69:6,8 70:11 71:13
  76:3,7 81:7 82:18
  85:14,14 90:2,17,19
  90:22,23,24,25 91:2
  91:17 93:2,5 94:5
  98:4,24,25 99:3,3,12
  99:19 100:2,4 101:16
  102:3,12,17 104:11
  104:19 105:18 131:1
  132:15 136:11
  138:10 140:10 142:2
  144:10 145:6 147:8
  147:19
**Bryan's** 18:5 42:20
  47:11 51:6,7 55:22
  64:3,5 78:19 81:2,20
  91:5 98:23 99:6,7,16
  100:8 105:21 137:5,8
  141:24 144:24
**bubble** 73:25
**bullet** 98:18 99:22,24
**Burkshire** 97:17
**Butterworth** 132:4,7
**B-e-i-h-n** 113:4
**B-i-e-h-n** 113:3

_____ C _____
**C** 4:15 86:19,21 150:1
  150:1
**California** 29:4 36:17
  36:18 37:12,19,22,23
  38:2 46:9,15 50:5,19
  147:6
**call** 21:4 142:17

**called** 6:23 9:14 21:22
  79:7 82:21 84:12,15
  90:19 131:21 132:4
  139:12
**calling** 121:19
**calls** 59:10 61:5 62:2
  76:13 77:12 79:16
  83:2 85:22 92:8
  93:11,24 94:11 95:5
  96:24 97:6 103:19
  104:5 105:4 112:12
  113:19 114:4 115:16
  118:19 120:25
  126:10,17 128:25
  129:6 130:14 131:8
  134:18,19 135:8,10
  136:25
**came** 22:12 28:15
  36:23 40:5 46:5
  47:23 65:14,15 82:17
  85:15 90:23 101:25
  113:17 121:16 122:7
  122:24
**Campbell** 132:2
**cancelled** 100:24
**capacities** 62:18
**capacity** 1:13 6:16
**care** 71:21 94:21,22,23
**carried** 55:13
**case** 10:1,19,25 12:12
  13:8 18:5,7 19:5
  39:14,18,19 40:12
  41:14 42:7,10,20,24
  43:6 44:8 47:11 51:6
  51:8 52:10,12,14
  55:10,20 61:13 73:16
  80:19 81:2,20 122:3
  126:19 146:7 147:8,9
  147:14
**cases** 55:17
**cause** 77:3 150:19
**caution** 118:3
**CBI** 90:12
**CD-ROM** 75:12
**CE** 108:25
**certain** 22:13 63:22
  74:6 138:14
**certainly** 63:17
**certificate** 37:23
**certified** 6:10 60:19
  61:17,19,19,21 62:1
  62:8,10,11,13 67:7
**certify** 149:1 150:6,17
**cetera** 16:8 115:5
**CFS** 84:15 86:3,4
**chair** 11:19 36:2 38:9
  38:18
**chance** 117:25 139:17
  142:10,16
**change** 8:16,16 14:15
  55:25 72:15,15,16

74:5 133:8 136:23
137:2,3 142:18 144:8
145:23,25
**changed** 46:10 55:5
  72:12 113:4 145:22
**changes** 49:11,13,14
  60:7 146:4
**Chapter** 36:4,5,6
**charge** 99:15
**check** 74:8
**child** 46:15,19 47:2
  94:25
**children** 46:12 54:9
**chose** 116:23
**Chris** 3:4 6:9
**Christy** 114:2 115:6,9
  115:10,12 116:19
  117:5 121:9,15,16
  122:24 127:23
  130:25 131:6,17
  132:5 133:17 134:1,8
  134:14 135:6
**Christy's** 132:5
**circle** 72:24
**circumstances** 87:5
  136:15
**CITY** 150:3
**civil** 1:9,12,23 2:1
  135:7,14
**clarification** 26:24
**clarify** 29:7 39:16
  40:25
**class** 44:1 97:21 100:25
  101:2 102:1 136:12
  137:3,9,18 144:10
**classes** 24:22 53:21
  58:3,10 62:23 97:18
**classified** 46:13
**classroom** 37:16 41:18
  42:12 44:2 59:1
  64:10,14 67:16,22
  68:5,15,19 70:6,8,11
  70:14 75:14 80:7
  81:25,25 83:14 86:14
  145:6 147:19
**cleaning** 68:11
**clearly** 85:14
**client** 25:4
**clothes** 60:7
**clue** 108:2
**Coffman** 12:18 18:7
  40:15 44:4 91:3,7
**cognitive** 84:20
**collaboration** 26:15
**Collection** 5:2
**college** 29:24 30:1
  colors 15:17,21
**com** 71:14
**combination** 99:5
**come** 46:10 49:16 74:3
  77:1 79:4 85:10

105:23 109:9 115:6
139:19.
coming 37:6 46:18
82:15 87:12 119:10
commencing 2:5
commensurate 121:17
comments 76:11 79:14
79:21 80:2
Commission 150:24
communicate 100:9
communicates 98:24
100:2,4
communication 16:10
16:12 30:24 50:13,21
71:18 72:20,23 73:4
73:7 99:13,16,20
communications 34:17
118:5
community 72:13 90:3
90:3 91:10
complaint 4:16 86:19
87:6 125:12,15
complete 109:10
completed 132:16
completely 79:3
complex 48:16 97:8
complexes 44:19
compliance 36:4 46:10
62:14
component 49:10
components 49:8
computer 76:5,6
concern 56:3 57:14
58:8 60:3
concerned 150:19
concerning 33:25
concerns 55:9,11,12,23
56:3,5,6,9,11,16,17
56:18,20 57:3,16
58:14,17,20,21 59:2
60:4,11,15,17,25
61:1
concluded 148:25
concludes 148:24
conclusion 62:3 93:11
95:6,24 96:25 145:4
Conclusions 4:22
conduct 103:16
conducted 53:22
Conference 13:2
confidential 115:23
confirmed 132:3
consequence 101:17
consequences 124:18
124:19,21
considered 8:14 37:17
consist 106:13
CONSOLIDATED
1:11,25
conspiracy 135:25
constantly 34:12

consult 33:17 140:20
142:8,10,14 143:8,13
143:18,20
consultant 54:5,25
61:11 63:3 64:12
83:10
consultations 34:1,5
consulted 47:8 48:12
consulting 145:10
148:6
contact 42:11 123:16
123:20,24
contacted 21:2 108:3
113:23
contained 24:15 91:23
150:9
content 108:12
contents 96:14
contingents 93:7
continue 72:9,10
120:14
continued 3:1
continuing 88:5
contract 63:5,6,10,18
63:19,21,25 64:20
101:23
contracted 21:23 63:8
66:1,15,17 69:11,13
88:7
contracting 93:4,22
94:6,9
conversation 85:12
87:9 140:24 143:23
cooperate 68:2
Copeland 40:16 41:7
44:2 64:12 65:7
83:10 90:15 91:7
143:18
copies 110:20 119:4
Corina 83:12
Corinne 83:12
Corps 132:6
correct 7:9,10 8:15
11:7,10 15:8 24:10
24:13 25:8 27:19
30:10,13 32:9,10,13
33:2 35:13 36:7
38:20,24 39:2,24
42:5 44:19 45:18
46:21 47:7,10 50:22
51:5 52:2,20 58:13
61:18,24 62:10 63:24
65:16 66:19 67:11
78:9 81:21 86:18
97:12 100:12,13,15
100:16 103:12 108:8
111:2,21 116:17
117:2,20 119:25
126:5,7 127:21 141:6
142:4 144:16 148:1
149:5 150:15

corrections 149:3
correspond 108:4
correspondence 107:1
counsel 6:1,11 7:11
114:12 119:3 128:13
counter-offered 122:15
COUNTY 150:3
court 1:1 6:20 7:24
12:14 13:25 16:6
17:4 22:6,7,9 55:14
88:8 95:12 109:20,22
112:15,20 114:15
116:8,13,15,24 117:1
132:22,22 133:4
covered 15:13,14 18:16
CPI 84:20 85:24,25
CPS 85:24 86:3
create 133:16
credential 37:20,21,24
criminal 125:2
crisis 84:16 145:15,16
145:21 146:5,8,11
cross 135:4,21
crossed 136:1
crying 74:16
cues 99:5
current 12:3 39:8
100:8
currently 9:11
curriculum 42:14
custodian 68:13
CV 1:9

D

D 4:1,18 87:17,19
dad 88:15,24
daily 34:18,20
damage 134:6,7
Danielle 90:16,23 91:1
Danielle's 90:16
data 17:24 18:12,22
date 17:14 49:11 96:9
108:18 110:21
.138:23 144:6
dated 12:15 33:4 70:17
76:25 86:20 87:18
.95:24 112:5 114:22
119:24 124:4 127:9
130:10 149:6 150:20
dates 55:5,6
days 10:9
deal 72:12 143:7
147:14

dealing 15:15 46:12
84:23,25 130:24
dealt 147:13
December 42:4
decided 145:5 148:10
decision 4:9,23 11:17
11:18,21 33:3 35:10
52:22 87:11 95:24
96:10,15,17,20,22
97:4,16 98:1,16
100:12 102:5,24
138:10 139:23 140:3
140:9,15,18,21 141:4
142:2,9,22 143:9,15
144:9 145:11,14
146:18,22 147:18
defecated 68:23
defendant 2:1 118:23
Defendants 1:15 2:19
definitely 104:8 124:16
degrees 16:13
demanded 111:1
117:18
department 1:10,24
6:5,15 9:15 12:6
20:21 25:21 26:8
27:8 28:15 29:14,15
30:8,25 31:9 36:1
38:9,18 63:1,6,15,22
69:10 89:2,16 94:24
95:20,21 97:2 116:1
120:23 121:5,15,25
122:3 123:7,21
124:14 128:5 131:16
132:2
depended 137:22
deponent 6:20
deposed 7:1 13:19
deposition 1:15 2:3 4:8
4:11,12,15,18,21 5:1
5:5 6:2 9:8 11:12,18
13:10,12 18:11 19:8
20:4,7,9,13 70:16
71:6,7 103:11 111:20
148:24,25 150:9,11
depositions 14:3
DES 9:25 10:1,3,4,16
10:17,23,25 12:3,16
16:24 18:6 20:19
25:22 26:11 27:7,14
30:25 33:13,14,19
34:7,9 35:11 39:1
41:11,16,24 42:2
44:17,25 45:8 48:7
48:16,19,21,22 50:24
51:2,17,18,19,20,21
51:22 52:8,9,19
53:24 54:13,14,18
55:16 57:6 59:19
60:23 69:5,7 70:13
73:17,17 80:5,13,14

80:15,16,17,22 86:17
87:3,25 89:15 96:20
97:9 105:1,8 146:19
146:20,23 147:3,5,16
147:17,17,17 148:11
describe 67:15
description 147:16,23
designated 9:15
designing 46:9 65:11
Desiree 114:17,20
121:11 122:23,25
DESs 48:22,25 49:1
DES's 55:7
detail 69:18 144:3
determined 121:6
develop 62:19 80:8
115:8
developed 20:22 146:1
developmental 85:6
different 22:17 28:18
55:5 56:1 73:1 84:18
100:20,25 135:16
difficult 147:8
difficulty 36:3 58:6
direct 71:17,18 72:19
direction 7:7 62:22
directly 25:21 47:1
66:23 67:3 79:25
99:12
disabilities 84:20 103:3
disability 85:6
disciplinary 104:17
105:9,14
disclose 109:21 110:5
110:10,14 111:5
114:15,19 117:21,24
118:5 120:13 .
disclosed 106:10 111:6
111:8 114:17,25
115:2 116:14,15
117:19 118:22
127:19,24 133:4
disclosing 118:10
128:17,20 133:3,15
133:20 134:14 135:5
135:24
disclosure 6:1 134:2
discontinue 146:19
discredit 116:19 117:4
Discrete 49:25
discuss 9:16 96:14
137:23 142:17
145:19
discussed 20:16 138:14
148:7,9,12
discussing 17:2
Discussion 23:15 45:22
66:8 106:3 133:11
148:17
dissipated 79:3
distributed 28:10

**district** 1:1,2,14 6:17
35:25 36:10 38:22
40:9 42:6,9,17 43:18
44:7,17 45:1,2,16
46:3,8,25 48:2 51:3
51:12,14,25 52:4
59:5,13
**doctor** 80:3
**document** 63:15 86:24
87:2,10 93:11 99:22
107:22 109:14
119:12
**documents** 5:2 12:9
17:17,19 19:4 87:8
106:10,11,18,21,24
107:6,9 112:17
116:15,19
**DOE** 24:11,23 25:18
29:17 31:4 49:14
63:11,19 64:19,25
65:4,4,5 66:17,20
69:5,9,13 79:8 80:10
80:10,12 82:21 89:12
95:11 99:8 104:18
105:2 122:22 123:10
123:11,16,24,25
128:8,16 132:19
149:21
**DOH** 95:10
**doing** 10:23 31:10,11
34:16 43:16 62:23
71:19 76:8,8 84:9
90:3 120:3 126:15
129:5
**done** 51:1 79:1 129:12
129:12,13 130:1
134:7,8,8
**doors** 84:7
**Dorien** 12:20
**down** 7:24 49:16 62:8
71:20 76:22 82:8
83:24 84:7,7,23,25
147:1 150:11
**dozen** 54:17
**Dr** 12:16 16:24 22:15
51:24 52:5 60:13
65:6 69:2,4,15,17,20
70:7,16,24 71:5 73:8
74:19 76:10 77:9
79:14 80:4,4,6,12,20
81:19 83:10 89:24
90:1,15 91:6 97:13
97:14 103:11,13
140:22 143:18,20,21
144:1,18,21 145:10
148:6
**draft** 146:13
**drafted** 69:15 144:1,18
**drink** 67:23
**dropped** 97:21,23
121:10

**DRT** 51:7 52:10 60:24
61:2,4
**Dru** 40:16 41:7,18 44:2
64:12 83:10 90:15
91:6
**drugs** 114:3
**DTT** 16:8 24:22 53:9
62:24
**due** 55:14 90:7 93:14
119:5 143:7
**duly** 6:24 150:10
**during** 9:21 12:17 18:3
26:20 27:3 32:1 41:4
44:9,15 45:8 47:14
48:2 50:24 51:1
54:14 61:2 66:21
68:12,13 69:4,6 70:7
70:12 71:14 73:4
77:15 79:22 83:16
86:5 89:11,15 104:11
104:19 122:18
140:12
**duties** 10:23,24 33:18
33:23,24 55:7

———————
         **E**
———————
**E** 2:13 4:1,21 7:13
95:23 96:1 150:1,1
**each** 24:19 25:9 30:4
34:14 55:2 119:21
**earlier** 62:16 81:4
92:11 100:23
**EAs** 88:10
**ed** 31:18,19 37:16,16
37:20,24 62:7 97:9
101:13
**education** 1:10,24 6:6
6:15 9:15 20:22 25:7
25:21 27:8 28:15,20
28:21 29:15 30:8
31:10 35:19 37:18
38:2 46:5,6,7 47:9
61:20,22,25 63:1,6
63:16,22 89:16 95:20
97:2 116:2 120:23
121:6,25 122:3 123:7
123:21 124:14
131:17
**Education'S** 12:6
**educator** 75:12
**Edwards** 40:10 42:15
42:17 44:12,16,21
53:14,24 60:25 62:12
62:15,25 63:7 64:10
65:6,11,22 66:14,15
66:24 80:8 114:2
115:12 116:19 117:5
121:9 127:23 130:25
131:17 133:18 134:1
134:8,14 135:6
**effect** 22:9 25:20

**effort** 82:14 88:6
**efforts** 9:16 11:5 30:15
**eight** 44:14 109:18
132:9,10
**either** 66:24 71:25 89:5
91:1 92:12 133:17
135:6 136:10
**elementary** 47:19
53:18 72:16,17 77:17
**Ellis** 3:3 4:4 6:12,12
7:5,7,10,14 12:4
21:15,19 22:1 23:5
23:12,18 24:4,7,25
25:25 26:2 31:5,8
32:7,22 33:3,7 34:21
41:2,6 45:5,7,19,25
48:10 53:1,11 55:1
55:21 56:20,24 57:24
58:1 59:12 61:14
62:5 65:2 66:2,11
67:19 68:9 70:15,22
71:4 73:6,13 76:17
77:19 79:20 80:1
81:13,15 82:6,8,24
83:8 86:2,19,23
87:17,21 88:13,22
90:10 91:19 92:2,4
92:10 93:16,20 94:3
94:14,18 95:7,23
96:3 97:1,10 98:9
101:15,24 102:15,20
103:9,24 104:9,16,24
105:7,12,23 106:1,9
106:17 107:5,24,25
109:25 110:2,4,17,18
112:16 113:21
114:14 115:19
116:25 117:16 118:8
118:21 119:7,8 121:3
122:12,21 123:1
124:1 125:14,18,20
126:1,13,21,25 127:8
128:11,14,15,25
129:3,10,18 130:5,19
131:8,13,15 133:7,14
133:21,24 134:5,9,17
134:22 135:5,20
136:2,7,9 137:4
138:2 146:17 147:15
148:14,20
**employed** 24:23 69:10
69:12 121:24 122:2,2
123:17,20
**employee** 63:1 64:25
64:25 65:4,5,24
66:16,18 69:9 86:10
89:17 99:8 104:18
105:2
**employees** 29:16
**employee's** 128:17
**employment** 25:1,2,3

29:12 39:22 40:8
121:9,17
**enabled** 46:2
**encouraged** 101:10
**end** 10:8,15,15 13:17
70:19 71:25 77:2
78:3,4 142:24
**enforcer** 75:11
**enough** 97:20
**ensuring** 89:10 95:3
**entire** 69:18 132:10
**environment** 137:7
**escalated** 141:8,25
**escalating** 141:10
144:24
**escalation** 145:2
**especially** 32:18
**ESQ** 2:13,19
**essentially** 91:11
**established** 73:11
**ESY** 48:1 54:24 60:19
61:16 62:10,21 84:6
et 6:5,6 16:8 115:5
**even** 23:7 26:8 34:25
74:13 75:8 76:16
82:17 90:1,6 101:12
120:11
**eventual** 139:8
**eventually** 27:8 146:4
**ever** 21:10 31:6 33:9
40:22 69:14,21 70:23
79:22 83:24 86:25
87:23 107:16 108:9
114:1 120:5 134:23
134:23 135:4,23
**every** 35:5,7 37:16
42:25 43:2 82:17
119:22
**everybody** 90:21 102:1
**everyplace** 32:5
**everything** 22:14 78:25
125:7 136:20 145:17
**evidence** 52:24 72:22
76:13 77:12 79:16
83:4 85:21 88:4
89:23 91:14,15 93:10
101:20 102:9 103:19
104:5,22 105:4
116:22 117:7 135:10
**exact** 14:20 124:19
138:23
**exactly** 11:15 36:21
57:10 135:2
**EXAMINATION** 4:3
**examined** 6:25 150:10
**Excerpt** 4:12
**excuse** 10:15 37:25
42:1 62:24 93:25
99:23 110:24 118:7
132:9 136:4
**execute** 92:20,25

**executed** 92:20 93:12
**Exhibit** 4:8,11,15,18,21
5:1,5 33:3,5 52:18
70:15,15,20 86:19,21
87:17,19 96:1 106:9
106:9,15 107:2
118:21 119:1
**EXHIBITS** 4:6
**existent** 71:24
**Exp** 150:24
**expect** 126:9 129:24
**expectation** 126:15,22
127:4
**expectations** 129:4
**experience** 16:13 25:7
32:20 40:3,12 46:1,4
46:12,19 52:6 121:18
**experienced** 72:5
**expertise** 54:8 78:18,20
81:3
**explain** 35:22 46:1
75:22 123:9 131:20
**explained** 9:5 23:23
**explanation** 79:9
**express** 58:17
**expressed** 57:3,13,14
58:15,20 59:3,7 60:3
60:4,11,16,17,18
61:1,15
**extent** 93:23 94:10 97:5
112:11 113:18
**e-mail** 4:13 108:4,13
108:16 109:6,9,10,20
112:7,18,18 113:11
113:17,25 115:5
116:12,12 117:17
118:16 124:13,15
125:3 127:13,18
128:7 135:6 145:21
**e-mailing** 120:6
**e-mails** 5:6 13:21,23
14:19 15:3,7 44:3
106:14,20,23 107:7
110:21 114:16
118:22,24 119:16,19
119:20 120:12,16,20
120:24 121:7

———————
         **F**
———————
**F** 5:1 106:9,9,15 107:2
150:1
**fact** 4:22 22:16 46:8
93:14 95:23 100:11
**facts** 52:24 72:22 76:13
76:15 77:12 79:16
83:3 85:21 88:4
89:23 91:14,14 93:10
101:19 102:9 103:19
104:4,22 105:4
116:21 117:7 135:9
**fair** 29:20,25 30:12

55:16
fairs 21:4
Falling 127:11
falls 97:7
familiar 17:5
familiarized 87:8
family 90:22
fan 146:16
far 74:17 101:13
  120:18
favorite 75:12
February 86:20
feces 74:10 82:19
federal 13:25
feel 34:14 55:20 60:18
  103:7,22 125:8 128:3
  129:21 132:19 142:5
  143:2
felt 15:20,21 48:13
  132:20
few 10:9 19:14
files 12:11 19:1
filing 87:5
fill 30:17 31:1 37:2
  45:9 48:13
final 146:11
finalize 144:22
finally 140:3
find 21:5 75:14 79:4
  88:7 120:9 135:2
  142:12
finding 95:23 100:11
Findings 4:22
finish 8:23 85:20
finished 136:8
first 6:24 11:1,1,3,9
  13:17 33:11 53:16
  64:24 66:13 75:18
  77:1,14 107:4 111:17
  114:23 116:12
  119:23 122:8 147:13
fish 75:16,20
fit 37:2
five 47:17 54:12 76:23
  76:23,23 92:16
  118:23
FLINT 2:8 150:5,23
floor 2:22 46:5 68:5,23
  82:18
Florida 29:4
Floyd 13:20 106:13
  110:22 111:1 117:18
fly 30:11
focus 85:5
follow 65:12
followed 102:6
following 108:15
follows 7:1
follow-up 7:6
follow-ups 7:7
forceful 75:10

foregoing 149:2 150:13
  150:16
format 109:9
Fort 2:4,15 6:8
forth 15:3
fortitude 78:22
forward 97:22
forwarded 30:16
foundation 52:24 72:22
  76:13 77:12 79:16
  83:3 85:18,21 88:4
  89:23 91:14 92:8
  93:10 101:20 102:9
  103:19 104:4,22
  105:4 116:22 117:7
  118:19 121:1 128:10
  134:19 135:9
four 46:16 48:23 54:12
  58:14 60:17 61:1
  64:14 75:19 94:19
  98:15 108:19,19
  109:25 118:23
fourth 130:9
frame 73:8,11
free 94:25
frequent 60:5 65:10
frequently 15:4 58:23
  67:24
Friday 100:19 138:22
  139:9,10,19 141:4,8
  141:9 142:12
friend 1:5,19
from 4:12 5:7 10:10,17
  11:3,5 12:16,18,20
  12:20,21 13:24 14:17
  14:19,23,25 15:2,6,9
  15:12,22 16:1 17:2
  17:19 18:23 19:1
  20:19 21:2 22:24
  25:19,19 28:15 30:4
  33:17 35:1 36:18
  37:21,23 38:1,12
  39:25 42:10 44:3
  45:15 49:16 50:5
  52:14 53:20 57:8
  60:23,24 63:18 66:16
  72:15 73:18 74:23
  80:22 87:14 91:6,7
  94:25 96:12 101:13
  101:25 104:25
  106:12 108:17 109:7
  113:8,17 118:24
  119:16,16 120:18,23
  121:5,18 123:11
  127:13 130:16 135:5
  136:11,18 141:21
  142:6,18 147:1,6
front 77:6 91:2
fruition 85:15
fully 122:1
functional 144:1

further 150:17

_____

G

G 5:5 109:12 118:21
  119:1
Gambie 131:22 132:3
gamut 31:20
gave 34:8 112:13
  121:11 144:20
general 25:25 26:1
  28:23 63:19,21 81:9
  102:5,17,24,25
  128:21 129:22
gestures 100:3
gets 131:13
getting 67:7 72:3
  124:12
Ginsel 143:6
girl 74:15
give 8:17 9:1 62:22
  76:2 83:25 95:1
  111:1 138:22 140:25
given 10:12 13:14
  103:5
globally 85:13
go 7:3,17 29:19 30:5,7
  30:12 32:19,20 33:22
  66:5 72:13 74:13,17
  75:13 76:18,22 84:7
  90:22 101:17 107:11
  113:6 117:9 133:7
  146:4
goes 107:23
going 15:21 23:14 37:1
  37:8 44:3,5 45:21
  66:7 67:24 72:23
  73:4 74:12 85:4,7
  90:2 106:5 112:19
  114:15 117:2 118:3
  133:7,10 139:14,18
  141:3 144:21,21
  146:1 148:16
gone 35:1 145:18
gonna 74:7
good 74:18 82:23
gotten 116:11
Graber 15:12
gradually 137:17
graduate 46:14,19 50:8
Grande 2:14 6:8
Gras 73:25
great 33:21 69:18
  72:12 143:6 144:3
green 75:17
Gregg 2:19 6:14 11:15
  12:8 19:12 23:23
ground 46:5
group 137:10,13
  142:18
grown-up 82:13
guess 8:8 11:15 20:20

34:25 37:18 46:23
  54:3,11 63:19 68:7
  122:16
guidance 62:22

_____

H

hack 124:10,11,12
  125:4 135:19
hacking 124:15,23
  125:3
hair 58:23 60:1 136:18
  138:17
hallway 83:25
Hamamoto 49:16
hand 90:25 91:5
  105:21
handful 136:18
handled 44:19
handling 21:24
hands 15:18
happened 34:17 36:7
  49:7,13 79:5 138:15
  139:2,3,8
happening 16:5 41:20
  42:12 49:4 88:10
  90:5 104:7
hard 112:4
harmed 102:7,13
harmful 103:2
having 58:6 60:5,6 77:6
  6:8,15,17 10:18
  14:22 30:9,25 31:22
  32:5,11 35:18 36:19
  36:22,23 37:8,24
  38:23 43:1,3,20
  44:18 45:4,5 46:18
  47:1 48:22 49:22,23
  51:18,19,20,21,22
  52:15 146:21 149:6
  150:2,6,21,24
Hawai'i 1:11,13,25
HBH 79:8 82:21 83:12
  85:9,12
head 14:21
headers 115:4
heading 100:10
Health 94:24 95:21
  hear 16:18 117:4,14
heard 35:14 103:23
  117:1 127:14
hearing 87:13 96:20
  100:14 110:3 113:13
  113:16 116:20
  117:17,22 130:21,24
  132:23
held 40:21 49:6 58:3
  145:23,24 146:2,4
help 36:2 43:13 62:19
  82:21 85:4
helping 42:13 76:1

her 14:20 15:15 33:22
  33:24 34:1,10 43:8,9
  53:14,16,20,23,24
  54:1,2,3,4,8 58:7
  62:7 63:8 64:12
  69:21,23 70:3,3
  78:25 82:16 86:7
  90:7 111:1 121:10,11
  121:17,18,19,19,23
  122:13,14 123:19
  131:3,21,22,23 132:1
  132:9,12,21 133:5
  134:12,14
hereto 150:18
hesitant 34:25
HG/BMK 1:10
highest 132:20
Hill 1:17 2:3 5:6 6:3,22
  7:15,17 23:19 66:12
  108:24 118:25 119:9
  149:1,10 150:8
him 39:21 40:6 44:1
  47:12,24,25 48:4
  51:16 60:7 62:22
  64:10 71:22 73:23
  74:2,2,9,14,14 75:15
  75:18 77:1,14 78:20
  78:21,22 79:13 84:9
  91:5 97:18 98:12
  100:9 108:4 112:14
  117:4,14 120:11,16
  120:18 126:20
  131:24 137:18
  139:13,20,24 143:8
  146:9
himself 136:12 137:9
  138:3,10,16 139:8,15
  139:24 142:3 144:10
  145:6 146:9 147:19
hire 25:22 88:5 89:2
  121:15 131:3
hired 25:6 26:5,7 27:4
  27:8,12,15 45:13,14
  53:9,20 54:4 62:11
  62:15,17,18,19,20
  64:21 80:8 97:17
  123:4,10 131:17
  132:19 146:24
hiring 26:19 130:25
  131:6
hit 15:17 136:17
hitting 58:23
holding 15:18
home 70:14 88:9,11
  89:11,14,17,25 90:1
  92:13 93:2,5,8,14
  94:5 145:20
honest 35:2 69:23
honestly 35:9
Honolulu 2:5,17,23 6:8
  28:6,6 139:10 149:6

150:3,21
**Hopefully** 84:13
  130:11
**hopes** 21:5
**hoping** 30:23 120:9,17
**hospital** 91:18
**hour** 25:13 122:14,15
  132:20
**hours** 46:16 64:14
**human** 28:16 29:15
  132:1
**hundreds** 75:18
**hypothetical** 101:21,21
  102:10 103:20,21

_____
        **I**
**idea** 36:4 37:15 46:7
  61:23,25 92:9 101:22
  136:22,23
**ideas** 34:14
**identification** 4:6 33:6
  70:21 86:22 87:20
  96:2 106:16 119:2
**identified** 118:14
**identity** 108:11 120:9
  120:18
**IEP** 13:6 46:9 54:22,23
  55:12,24 56:4,19
  65:12 67:10 69:16
  102:5,24 137:10,23
  138:5,6 142:17,23
  143:1,3 144:4 145:17
  145:23,24 146:2,3,14
**IEPs** 12:25 56:14 81:24
**ignored** 71:16
**ignoring** 75:23
**IILC** 40:16
**IISC** 40:18 41:14
**illegal** 114:2 124:24
  135:19
**illness** 84:24 143:7
**immediately** 101:1
**impeach** 8:18
**impeaching** 8:19
**implement** 48:18 49:25
  52:25 53:8 96:21
  98:1
**implementation** 50:4
  55:23 67:5 71:24
  78:16
**implemented** 52:22
  53:2 55:13,15 56:4
  65:12 67:10 88:2
  89:18 97:16 103:3
**implementing** 50:12
  97:3 99:16,17
**implied** 115:13,14
**impossible** 103:5
**improper** 101:20
  103:20
**incident** 15:17,21 91:8

**incidents** 141:11,14
**include** 27:17 28:4,8
**included** 17:1
**inclusive** 149:3
**incomplete** 101:21
  102:10 103:21
**increasing** 138:24
**individual** 6:4 29:10,11
**individually** 1:4,18
**individuals** 29:6 82:22
**infants** 74:1
**info** 115:5
**informal** 21:11,14
  33:17 34:6,11,17
  147:25
**information** 9:20 12:21
  18:8,11 19:1 79:22
  84:10,11 85:16 92:6
  114:25 115:2,15,22
  115:23 118:11,16
  120:1,18 128:19,20
  128:24 133:3,15
  135:1,5 145:19
**informed** 132:7
**Ing** 2:20
**initially** 62:9
**initiated** 103:17
**instance** 6:23 85:5
**instances** 141:20
**instructed** 9:3
**instruction** 71:17,18
  72:20 76:1
**instructs** 23:8,21
**intend** 8:3
**intended** 8:15
**interested** 71:20 82:14
**interim** 10:4,15,16
  12:16 18:6 33:13
  39:1,7 41:11,16,24
  42:2 44:16,25 45:8
  47:15,24 48:7,14,16
  48:19 50:24 51:2
  52:14,19 54:13,14
  57:6 69:4,7 73:17
  80:5,13,14 86:17
  87:3,25 89:15 96:20
  104:25 105:8 146:20
  146:23 147:16
**Intermediate** 48:1
  143:5
**interrupt** 74:14
**intervention** 84:21
  144:18,22
**interview** 29:20 37:3
**investigate** 125:22
  126:6,9 139:17
**investigated** 120:24
  121:6
**investigating** 125:16
**investigation** 103:15
  104:1,8,10,14 105:1

105:9,15,17,22 125:2
  125:11,12
**involved** 11:17,21 18:5
  39:14 40:22 44:8
  51:6 55:16,22 61:13
  73:16 76:4 80:19
  81:1,20 114:2 135:25
  136:20 138:7 146:3
**involvement** 35:17
  39:25 40:2 43:8,9
**irate** 84:24
**island** 9:17 28:5 32:6
  37:10 48:23 49:17
  139:11,18
**Islands** 131:23 132:13
**isolated** 137:8,9,12
**isolation** 137:24 138:1
**issues** 141:5
**item** 27:20

_____
        **J**
**JMS/BMK** 1:24
**JoAn** 5:6 6:3 7:18
  108:24 118:24
**job** 21:4 29:19,25
  30:12 32:18 33:18,23
  33:24 35:1 36:9,12
  37:4 38:1,22 39:4
  46:25 48:19 53:23,25
  54:1 82:22 123:25
  132:6,13 147:16
**Johnston** 86:7
**Josephine** 1:17 2:3
  6:22 7:17 149:1,10
  150:8
**judge** 108:20 110:3,5
  110:21,25 113:13,14
  113:15 130:17,20
**Judy** 20:6 33:14 36:25
  42:12 48:12,13 87:7
**Judy's** 35:1
**July** 17:18 36:13,19,21
  38:23 39:11,22 42:4
  45:12,16 46:2 77:7
  78:10 79:23 83:20
  86:16 87:18 101:5,5
  121:14 150:24
**jumping** 57:1,15
**jumps** 57:13
**June** 17:15 18:5 22:7
  36:18 54:22 77:7,16
  78:5,8 79:23 80:24
  86:16 90:5,15
**just** 8:11 9:5 10:25
  11:25 15:7 18:8,10
  19:14 23:19,23 25:16
  25:18,24 28:4,23
  32:5,25 34:13,24
  35:2 39:7 40:25 41:2
  43:7 47:23 49:7
  50:24 56:16 74:2

79:2,9 85:13 87:11
  91:3 93:8 103:5
  106:22 109:6 111:18
  113:24 114:8,11
  116:11 119:5,12
  127:11 131:12
  135:14 136:7 138:3
  143:1 147:3 148:8

_____
        **K**
**K** 37:21,24,25 108:24
**Karen** 86:7 132:2
**Kate** 10:21,22 20:10,11
  51:11,15 84:2 122:6
**Kealakehe** 47:19 48:1
  53:18,23 86:6 143:5
**Keep** 85:7
**Kelly** 14:19 15:4 16:4
  16:19,22 17:2 20:3
**Ken** 15:19
**kept** 34:23 42:11 79:7
  135:2
**Kevin** 97:17
**kids** 82:11 141:20
**Kim** 14:6 15:16 55:4
  57:4 60:13,14 68:25
  69:17 88:11 90:4,20
  91:9 97:19 115:6,9,9
  115:12 127:23
  133:17 134:1,7 135:6
  143:1 145:18
**Kimball** 1:3,17 6:4
**Kimberly** 4:13
**kind** 34:13 41:19 73:20
  109:11
**knew** 73:2 76:8 85:19
  86:1 90:21 93:12
  110:11 113:16
  114:18 115:11 118:1
  130:16 134:25 135:1
**knock** 58:25
**knocking** 59:18
**know** 14:5 18:10 19:17
  21:3 25:12 29:9
  31:17 33:8 43:15
  44:5 53:14 54:8
  56:16 68:25 69:2
  70:4,5,10 71:19,22
  72:23 73:5,12 75:25
  76:7,16,25 79:10
  80:23 82:12,14,25
  83:5,6,17 84:3,4,8,10
  84:12,17 85:24 86:5
  86:12,15,25 87:22
  90:11 91:23 93:13,17
  93:17 94:8,13,17
  95:2,8 96:4,6 100:8
  104:10,17 105:15
  106:19 108:6 110:6,7
  110:12,13 113:22
  114:10 115:1 116:10

118:12,14 120:22
  123:13,14 124:17,19
  125:1 126:12,19
  127:1,12 128:23
  129:2,9,11,11,17,19
  130:4,6,12,21 133:22
  134:21 135:11,13,19
  136:15 138:9 146:7
  147:12
**knowledge** 27:16 40:6
  41:12 46:7 61:23
  77:18 102:14 104:23
  108:2 113:24 119:18
  128:18 137:5 139:4
  145:3
**knowledgeable** 9:19
  11:4,11 70:1
**known** 75:17,18
**Komeiji** 2:20
**Kona** 14:21
**Kurren** 113:14

_____
        **L**
**labels** 75:18
**lack** 61:15 72:21 77:11
  79:15 85:17,21 88:3
  89:22 91:13 92:7
  93:9 101:20 102:8
  103:18 104:4,21
  105:3 116:22 117:6
  118:19 128:9 134:19
  135:9
**lacked** 78:19,20,21
**lacks** 52:23 76:12 83:3
  121:1
**language** 16:8,9 17:3
  53:4 56:7,23 73:3
  78:23,24 82:15 84:22
  85:1,2 98:4,5 99:4,4
  100:5 132:12
**last** 22:6,7 24:4 25:1
  83:13 90:17 92:16
  95:15 120:15 130:11
**lasted** 91:8
**late** 65:15 101:5
**later** 8:16,16 14:14
  44:14 64:13
**latest** 49:3
**launch** 125:11,13
**law** 4:22 37:15 49:12
  49:13 95:24
**laws** 49:4
**lawyer** 125:8
**lay** 74:2
**Leading** 32:16
**learn** 108:9,10 109:22
**learned** 80:6 121:18
**learning** 82:15
**least** 17:14 26:10 54:17
  71:24 89:10 137:7
**leave** 53:23 74:9

led 136:16
left 25:22 26:11 27:7
    27:14 40:4 41:17,22
    42:4,10,22,23 43:17
    44:6,16 51:2,23
    52:15 53:24 60:25
    145:18
legal 62:3 93:11 95:6
    96:25 116:5 134:20
    135:10 137:1
legality 118:13
Leilani 86:12,13
length 33:21
less 71:21
let 11:25 33:8 44:4 74:2
    85:20 86:24 87:22
    96:4 106:19 138:8
letter 14:25 106:12
    107:12 120:4 146:1
letters 12:19,20 106:14
let's 76:24 95:22 97:19
level 24:20 25:9 35:24
    35:25
levels 22:18 25:10,11
    25:12
Levin 2:13,14 6:7,12
    7:4
liability 134:1,13
lifetime 37:19
like 8:9 15:10,20 19:2
    29:12,19,22,24 34:23
    50:7 63:5 73:25 76:4
    79:7 98:3 102:5
    132:19 138:20
    145:21
Liliana 84:13
limit 9:24 14:23 15:7
    19:15 34:1
limited 78:22 85:2
    89:25 102:13
Linda 51:24,24 52:5
    146:24
line 29:23 73:19,19
    74:23,24,24 75:3,5
    76:23 77:22 78:14,14
    82:2,3,6,7 83:22,22
    86:12 115:11 130:11
lines 71:10 82:5
list 24:14 118:22
listed 60:16 112:18
    131:25 132:6 137:8
listen 23:25
literally 75:13 76:4
little 12:13 32:20 78:25
    85:6 98:4 108:23
    131:13 132:16
lived 30:9
Livingston 2:14 6:7
LLP 2:20
located 6:7 92:15
location 137:3

locked 84:8
lodge 125:12,15
long 37:14 59:15 62:12
    90:5
Lono 96:13 106:13
    111:9 112:9 116:6,23
    117:25 118:1 120:19
    125:8
look 12:25 92:17 95:15
    107:8 142:24
looked 12:24 145:20
Lori 12:16 16:24 22:15
    80:4,12 81:8 89:24
    140:22 144:21 148:6
    148:6
lost 93:13,25
lot 35:1 36:5 40:2 72:8
    73:3
loud 71:10,11 73:19
loved 90:3
Lowenthal 3:4 6:9
LRE 137:5,6,8,10
lunch 105:23 106:2,6
lying 82:18

——————— M ———————

M 2:8,19 7:13 150:5,23
machine 150:12
made 16:19 23:20
    114:6 139:23 140:3,7
    140:9,15,18 141:4
    142:2 147:18
Mahea 40:10 41:17,22
    42:4,10,15,16,17
    43:2,16 45:14 53:13
    55:6 60:24 62:11,15
    64:10 65:11,22 66:14
    66:15,24 80:8
main 31:17
mainland 13:24 21:5
    28:9,12,14 29:2
mainly 100:4 101:11
    118:12
make 7:24 23:19 34:25
    80:9 147:18
making 36:8 140:21
    142:9
male 75:9
Mall 6:8
mandatory 96:21
    101:6,10
many 16:12 18:2,3 25:9
    25:20 26:23 27:1
    28:17 29:4 30:23
    32:19 38:13 47:12
    54:19 73:22 82:1
    98:12 110:11 141:18
Mardi 73:25
marked 33:5 70:20
    86:21 87:19 96:1

106:15 119:1
Marshall 131:23
    132:13
mastered 75:16,23
master's 16:13
material 15:13,14
    62:19,19 75:22
materials 75:25 78:18
    80:7,9
matter 6:4 85:3 150:16
may 9:23 10:4,10,11
    11:8 14:15 18:19,23
    20:19 22:7,9,24
    23:20 24:8,11,16,16
    25:19 30:17 33:4,17
    35:8,11,15 39:1,15
    40:1 41:16 45:15
    47:23 57:8,10,11
    59:8 60:25 75:23
    84:24 87:11 91:24,25
    95:24 118:9 127:24
maybe 33:25 34:24
    47:17 74:7
Ma'am 23:6
mean 29:2,9 56:3 58:7
    60:14 75:4 82:11,19
    86:3 133:20
meaning 26:25
means 8:20 124:12
meant 42:1 131:5
medication 9:11
meet 43:11
meeting 13:6 48:24,25
    56:1 69:20 137:23
    140:15 142:17,24
    143:2,3 144:4,6,13
    144:15 145:17,18,23
    145:24 146:2,4,14
meetings 34:8 40:21,23
    41:8,9,10 48:20,21
    48:22 49:2,6,17,18
    49:19 54:16,19,21,24
    55:3,8 56:13,14,19
    60:16 61:11 81:5,6
    81:11,16,22 148:11
    148:11
members 69:19 144:4
memory 14:14
mental 84:23
mentioned 41:7 43:12
    60:3 90:20 116:3
mentions 86:11
mere 78:21
merely 87:12 110:7
met 19:14,16 34:10
    36:25 64:11 65:10
    75:18
Michael 5:7 12:20
    108:1 110:17 111:4,7
    113:2,10 118:15,24
middle 38:8 72:16 86:6

92:19 108:23
might 10:8 32:4 34:14
    35:7 80:3 116:3
    129:12
mind 135:4,21 136:1
minor 1:7,21
minute 47:22 93:25
minutes 19:14 91:8
    99:19
misstates 23:3 61:3
    64:22 65:8 93:10
    104:3 125:18,23
    131:9
mixed 81:11
mode 16:10,11,16
modification 69:8
    137:19
mom 57:13 59:6 61:1
    82:13 88:15,24
    100:24
moment 17:11 91:1
Monday 19:18,19
    56:13 100:19 139:14
    139:23 140:4,5,6,7,8
    140:11,13,16,16,17
    141:4,7 147:21
monitor 41:19
monthly 40:21,23 41:8
    41:9,10 48:21,22,25
    56:1,19 60:16 148:11
months 44:14 132:9
more 12:13 14:7,25
    15:2 17:22 20:8
    33:25 39:16 40:6
    45:6 46:10 49:21
    54:14,15 57:14 72:8
    73:16 74:11 80:16
    81:1,3,19 82:1 84:21
    85:6 102:10 119:18
    120:16 148:20
morning 72:24 112:13
    118:23 119:5 139:23
    140:5,6,8,11 142:12
most 9:19 11:4,11
    67:25 78:25 104:8
mother 54:24 55:25
motivated 71:20
motives 133:23
moved 36:19 55:5
    138:25
moving 144:15
much 12:11,24 24:2
    34:3,16 67:21,25
    74:2 83:11
must 9:3 16:7 23:7,21
    99:3,6
myself 15:4 55:6 66:22
    79:6 97:14 122:23
M-i-c-h-a-e-l 113:2

——————— N ———————

N 4:1 7:13,13
name 6:9 7:15,17 53:14
    53:16 83:13 84:3,13
    84:18 86:7 90:17,19
    90:20 108:6,15
    109:21 110:7,8,10,15
    110:16 111:1,4,6
    113:17 115:5 117:18
    117:21,24 118:2
    120:13
names 6:11 28:17 84:1
    84:17
Naomi 98:13,23 99:19
nation 28:8
national 28:9
nationally 28:10
nature 103:6
necess 63:14
necessarily 30:1
necessary 104:2
need 25:7 84:15 138:5
    146:16 148:9
needed 15:22 55:20
    65:13 118:9 120:13
    142:5 143:2 148:10
needs 78:19 99:1 100:3
    100:8
neglect 82:20
negotiations 121:8
neighborhood 27:2
    41:23
neither 55:6 88:10
    115:6
never 34:23 51:20
    68:24 74:21 85:15,19
    85:23 96:17 99:1
    101:14 109:13
    121:20,24 122:16
    127:14 130:8 132:11
    135:14 136:1 142:16
    147:14 148:5
new 29:4 35:1 45:6
    46:9 49:4,4,15 56:2
    59:16,17 62:19 72:4
    72:18 84:14 146:1
newspaper 21:1
newspapers 27:18
next 1:5,19 109:5
night 60:8
nights 100:18
nine 44:14 109:18
nobody 84:9 88:25
nods 122:9
none 25:23 26:3 27:3
non-DOE 65:23
normally 21:22 105:6
north 10:18 51:18,21
Notary 2:9 150:5,24
note 15:11,13,14,24
noted 149:4
notes 12:16,18 13:2,6

15:9,10 74:6 76:4
**nothing** 6:25 20:8 57:1
  86:1 104:14 111:24
**notice** 2:6 68:20 142:21
**notices** 13:4 87:13
**notified** 55:6 105:6,9
**notify** 127:23
**November** 10:8
**number** 25:5 26:3
  43:18 46:4 94:19
  106:13 107:11,14

**O**

**O** 7:13
**Oahu** 30:25 31:22
  48:21 148:12
**oath** 7:20
**object** 8:25
**objection** 9:2,2 21:13
  23:3,7 24:17 32:15
  34:19 48:8 52:23
  54:20 55:18 59:9
  61:3 62:2 64:22 65:9
  65:25 66:1 67:17
  72:21 73:10 76:12
  77:11 79:15,24 83:2
  85:17,20 88:3,19
  89:22 91:13 92:7
  93:9,23 94:10 95:5
  96:24 97:5 98:7
  101:8,19 102:8 103:4
  103:18 104:3,12,21
  105:3 112:11 113:18
  114:4,9,12,13 115:16
  116:21 117:6 118:18
  120:25 123:22
  125:17,23 126:10,17
  126:23 127:5 128:9
  128:25 129:6,15
  130:2,14 131:8
  133:19 134:18 135:8
  136:25 137:25
  147:10
**objections** 23:20 61:8
  90:7 102:11,18
  117:13 135:17
**obligated** 84:11
**obligation** 97:25 128:4
**observation** 54:22 77:2
  83:17
**observations** 50:23
  67:25 74:20 77:10
  78:2 81:11,17
**observe** 41:17 47:24,25
  48:4
**observed** 35:20 42:11
  44:1,1 47:12 70:10
  77:14,21 78:1 81:5
**occur** 46:22 61:1
  121:13 135:23 140:9
**occurred** 18:10 34:5

103:13,25
**October** 9:25 10:5,6,14
  10:15 20:20 33:18
  39:3 51:3,23 52:3
  57:8 70:17 122:4
  146:25
**odor** 68:20
**off** 23:14,15 34:13,14
  45:21,22 66:5,7,8
  106:3,5 121:11 122:3
  133:8,10,11 139:18
  146:7 148:16,17
**offer** 13:24
**offered** 37:4 62:7
  121:17,22,23 122:13
  122:14
**office** 21:2 28:16,24
  31:1,21 35:1 83:25
  84:6 121:11,16
  122:23
**officer** 100:14
**officer's** 96:20
**official** 1:12 6:16
**often** 34:4,10,22,24
  70:10
**Oh** 13:5,22 21:9 53:7
  60:21 75:2 78:2
  136:4
**okay** 8:12,13 21:7
  23:10 26:1 27:1
  28:13 43:2,11 44:15
  52:8,13 56:22 59:20
  61:15 64:9 65:4
  73:18 74:7 76:16
  77:8 78:13,15 82:7
  83:19,23 84:7 94:1
  99:25 102:23,25
  109:13 112:3 113:7
  125:6 127:11 130:9
  131:6 136:15 140:12
  141:2
**old** 82:12
**older** 82:10,11,25 83:5
  83:11
**Olympics** 90:18 105:16
**once** 17:21 24:19 35:3
  35:5,6,7 46:16 94:12
  102:13 115:25
  123:18 128:3 145:20
**one** 8:22,25 12:15
  13:14 14:7,25 15:11
  16:6 19:16 22:7 25:5
  30:4 34:24 35:8 43:7
  44:11 45:6,6,14
  48:15 49:7 50:21
  52:5 53:3,8 64:20
  69:16 70:13,17,25
  73:1 74:15 76:1,1
  78:23 80:16,18 89:10
  93:1 98:13 101:4
  105:15,16,19 107:11

113:2,25 118:23
  119:13,21,22 120:11
  121:5 125:16 127:9
  131:24 132:24 146:1
  146:8 147:13
**ones** 12:14 21:23 95:12
  141:12
**ongoing** 27:25 31:13,15
  32:8 49:5 87:12
  103:22,23
**only** 8:22 15:24 19:25
  20:1,12 40:4,4 44:10
  44:17 45:2 60:17
  69:16 86:15 105:15
  105:22 114:13 115:5
  127:13 130:18 132:8
  132:16
**open** 37:1 102:1
**opened** 113:25
**operator** 131:24,25
**opinion** 98:6,10 114:24
  115:9 116:5 129:25
  134:20 135:10 137:1
**opportunity** 70:23
  91:20 107:8
**opposed** 26:19
**order** 4:9 16:6 17:4
  22:6,7,9 30:17 33:4
  53:6 55:14 70:19
  88:8 110:5
**ordered** 100:14 109:21
  109:22
**orders** 12:14
**other** 1:11,25 12:23
  14:3 17:10,17,19
  18:25 19:4,16 34:14
  40:5 41:14 44:7
  50:20 52:16 54:3
  56:5 58:17 59:2
  60:10 62:23 82:11
  84:17 85:10 87:7
  91:4 93:7,7 106:21
  114:19 116:2 119:15
  127:17 136:12
  138:24 139:5 141:20
**others** 14:9 41:11
  43:19 57:14 60:9
  75:21
**out** 10:14,16 22:14
  32:19 53:22 55:13
  57:2,13,15 58:25
  67:24 70:18 71:10,11
  72:13 73:18 75:12
  79:4 85:10 90:2,24
  92:14 111:5 120:9
  122:23 135:2 138:25
  139:5 142:12 143:6
**outset** 130:16
**over** 10:1 21:4 28:12
  29:1 32:23,24 33:13
  35:11 36:23,24 44:20

44:22,23 47:23 48:20
  56:6 58:25 59:18
  69:18 75:20,20 81:17
  125:7 126:8,14,20
  128:9 139:2 141:18
  141:24 144:3 145:18
  146:4
**overly** 18:4 67:17
  103:4 104:12
**oversee** 62:12,16,20
  80:9
**overseeing** 42:13 62:13
  64:10 89:24
**own** 22:12 24:21,23
  25:2 29:15 73:24
  82:19 85:25

**P**

**page** 4:3,6 70:18,19
  71:9 73:18,19 74:23
  74:24 76:18,19,22,23
  78:13 82:6,7 83:22
  86:11 92:16,17,19
  94:19 98:15 99:21
  107:11,15,17,18
  108:18,19,24 109:5,6
  109:13,16,18,24,24
  111:11,22 113:6
  119:23 124:2,3,4
  127:9 130:9
**pages** 70:17,17 95:16
  107:23 108:12
  118:24 119:13 149:2
**painkillers** 114:7
**pants** 58:22 59:17 60:6
  67:24 68:4
**papers** 22:14 28:4,9
**paragraph** 92:16,20
  94:4 114:23 124:9
**Paralegal** 3:3
**parent** 89:5,6
**parents** 93:8 94:25
  97:23,24,25 100:22
  101:14 131:18
  139:12,20 142:8,13
  142:15
**park** 90:18
**part** 10:17,18 11:1
  13:18 17:4 27:17,24
  49:9,9 55:7 66:13
  72:14 77:17 78:25
  85:4 95:10 107:2
  109:6,8 130:18 146:8
**participation** 90:4
**particular** 10:1,25
  38:14 73:5 83:6
  112:18 120:4 141:11
**parties** 150:18
**parts** 28:18
**party** 115:6 128:7
**pass** 84:10,11

**password** 127:20,25
  128:6,7,17,21 133:16
  134:3,15
**past** 19:19 79:2
**Pat** 49:16
**pathologist** 98:24
  99:10
**pay** 22:12,16 24:20
  64:2
**PayPal** 109:2 124:9
  127:12,14,15,19,24
  128:20 133:15 134:2
  134:12,14
**PEC** 24:21 62:23
**PECS** 50:16 53:10
**pee** 68:5
**peeing** 68:4
**Pennsylvania** 29:3
**people** 19:25 21:5 25:6
  32:17 40:5,11 52:17
  53:9,12 79:10,10,11
  79:11,12 82:11 83:5
  83:7,9 84:15,19,21
  85:10,25 95:9 97:20
  98:12,13 115:1
  124:15
**perceived** 74:4
**period** 9:18,21,22 10:4
  10:7,12 12:7,17
  16:17 17:14 18:4,10
  18:15 26:7,20 27:3,6
  32:2 41:4 42:10 44:9
  44:15 47:14 57:12
  63:11 66:21 69:7
  70:7,12 73:14,15
  80:22 86:16,17
  137:14 141:18
**permanent** 147:5
**permit** 93:1
**person** 8:22 9:19 11:4
  11:12,19 13:10 20:1
  20:12 29:11 51:10
  67:3 69:24 74:4
  78:24 79:8,9 80:11
  80:12 83:1 86:15
  99:2,15 100:7 108:7
  108:9 110:8,12 112:7
  118:2,14 125:22
  135:3,5
**personal** 16:16
**personally** 125:9,10
**pertained** 126:19
**pertaining** 53:5 105:16
**phase** 137:18
**phone** 15:5 66:25 67:3
**phonetic** 84:13
**phrases** 99:1,2
**Ph.D** 4:13
**picked** 91:17 139:13,20
**Pierson** 53:13,17 64:13
  64:16,18,24 65:14,15

83:14
**place** 24:11 30:5 36:24
  49:2 76:16 77:10
  83:18 90:6,7 136:21
  138:10,20 139:24
  144:10,23 145:15
  146:9
**placed** 30:3 136:12
  139:14
**placement** 136:24
  137:24 138:3 148:8
**places** 30:4,6
**placing** 27:18
**plaintiff** 6:13
**Plaintiffs** 1:8,22 2:4,13
  6:23
**plan** 79:1 144:18,19,22
  144:23 145:5,8,15,16
  145:21 146:5,8,9,11
  146:13
**planned** 37:7
**play** 74:3
**pleadings** 13:8 111:19
**please** 6:11,20 7:16
  8:23 9:1 21:20 23:25
  43:25 61:6 71:10,12
  72:9,9,9,10 78:13
  81:14 85:8 94:1,15
  98:20,22 100:1
  106:18 115:4 117:11
**point** 11:5 17:23 39:11
  39:25 44:13 52:8
  59:4 75:7 78:16,23
  92:14 110:9 113:3
  114:10,21 123:2,4,6
  136:10 138:6 143:24
**poli** 147:22
**police** 91:21,24 92:1
**policies** 20:21
**policy** 21:8,8,9,10,11
  22:8,19,21,25 24:9
  24:12,14,15 25:20
  26:9 27:17,21,21,23
  27:24 28:1,8 49:19
  123:15 124:15,18,23
  128:5,8,16
**pool** 24:24 25:2
**poor** 102:11
**portion** 92:15,24 104:1
  108:17 112:22
**portions** 70:16 103:10
**position** 26:11 36:25
  37:1,2 38:13,25 39:8
  41:15 45:1,9,13 46:2
  48:7,14 53:20 54:2,3
  54:12 59:5 121:21,22
  121:23 146:19 147:2
**positions** 30:17 31:2
**positive** 17:16 138:8
  145:13
**positively** 69:13

**possibly** 92:5 115:6
**postgraduate** 46:6
**power** 129:21
**practice** 31:18
**preamble** 7:3
**preparation** 12:10 19:5
  19:8
**present** 3:3 59:7 93:5
  93:15 144:4
**presented** 6:1 145:16
  146:13
**pretty** 12:11,24 34:3,16
  67:21,25 69:12
**prevention** 84:16
**previous** 12:14 79:12
  141:8
**previously** 13:15 35:21
  43:12,23 61:10 69:6
  132:15 141:5 145:9
**pre-selected** 30:6
**Price** 51:24,24 52:5
  146:24
**primary** 16:11
**principal** 143:4,14
**prior** 13:4 19:23 22:6
  24:8 31:11 35:14
  36:14,15 37:6 38:3
  38:13,17 46:18 47:25
  59:8,11,19 61:3
  65:18 70:24 71:13
  77:16 87:8,13 109:20
  112:19 113:13,16
  114:15 119:9 139:3
  140:8 141:14 142:8
  142:21 144:23
  145:14 150:10
**pro** 92:12
**probably** 12:23 17:22
  19:7 39:13 54:16
  77:7 80:4 96:8 139:4
**problem** 32:14,17
  67:23 78:16 80:6
  84:16,18 85:5 133:17
  142:25
**problems** 78:15
**procedure** 21:12 22:8
  27:25 123:15
**procedures** 20:21
**proceed** 9:9 97:22
**proceeding** 14:1
**proceedings** 150:15
**processes** 99:4
**procurement** 63:13
**production** 106:11
**proficient** 57:18,21
  58:11,12 99:6
**program** 36:2 43:13
  50:4 60:14 62:12,13
  62:16,20 65:11 67:6
  69:8,8 72:14 73:21
  77:18 80:8,9 89:14

89:18,25 90:12 91:10
  99:16 137:2
**programming** 36:3
**prompting** 99:2,3
**pronounced** 108:15
**proof** 132:11
**protest** 74:15
**protested** 76:8
**prove** 114:2
**provide** 9:20 26:10
  62:17 74:8 85:11
  92:12,13 100:17
  115:21 118:15
  142:21
**provided** 39:18 85:16
  90:9 94:23 100:18
  115:23 119:13
**providing** 85:12 93:2
  93:21 94:5 104:19
  119:4 128:6,7
**provision** 93:1
**provisions** 95:3
**psychiatric** 91:18
**psychologist** 69:5
**Public** 2:9 150:5,24
**pull** 75:12
**pulled** 15:22 136:18
**pulling** 58:23 60:1
  138:17
**purpose** 30:14 130:21
  130:23,24
**purposes** 87:15
**pursuant** 2:6
**put** 17:6 21:1 22:9,13
  22:19 24:11 76:6
  114:8
**p.m** 124:6 127:10
  148:25

——————————————
**Q**
**quali** 61:15
**qualifications** 17:8
  22:13,17 24:19 25:5
  25:14 32:19 61:16
**qualified** 16:7 48:6
**quarter** 46:16
**question** 8:23,25 9:3
  15:1 17:21 21:16,18
  23:6,8,22 24:1,1,5
  29:7 35:9 43:24 53:5
  57:20 61:6 65:20
  73:20 76:20,24 78:15
  79:4 81:14 84:2,4
  89:20 102:11 103:1,6
  112:2 117:10,15
  123:12,18 128:13
**questions** 7:5,23 8:3,5
  8:6,10 33:22,25 58:5
  71:21 135:17 145:25
  148:21
**quick** 106:1

**quite** 37:3

——————————————
**R**
**Radwick** 20:6 33:14,16
  33:16 36:25 42:12
  48:13 87:7 148:3,5
**Rae** 15:12,20
**rarely** 68:21
**rate** 64:1 131:18
  132:19,20
**rather** 62:24 74:9
**reach** 114:24 145:4
**read** 7:5 21:19,21 24:4
  24:6 61:7 71:10,11
  73:18 74:23 78:14
  86:11 87:14 89:20,21
  98:20,22 100:1 112:4
  115:8 117:10,12
  149:2
**ready** 97:18
**really** 18:4 35:8 42:8
  43:15 49:20 59:21,23
  59:25 60:2 70:5
  113:1 117:14 130:8
  142:10
**reason** 9:8 90:11
**reasonable** 89:11
**reasons** 80:18 132:18
**Rebecca** 53:13 64:13
  64:24 65:14
**recall** 14:10,11,18
  15:25 17:13,23 18:2
  18:15 19:6 28:16
  29:5 33:11 34:4,10
  53:12 96:7 109:8
  111:16 112:23,24
  117:15,19 119:15
  120:3 121:8 136:19
  138:13 140:23
  143:25 144:6
**receive** 27:1 31:25
  48:18 49:25 50:18
  96:12
**received** 8:3 14:19
  49:24 91:6 96:7
  109:3,7 114:16
  115:25 119:20,23
  133:5
**receiving** 26:25
**recently** 111:18
**receptive** 71:23 85:1,2
**receptive/expressive**
  100:7
**recess** 106:6
**recognize** 84:1 108:6
  111:24
**recollection** 8:10 47:18
  113:5 148:13
**recommended** 84:17
  85:9,10 90:1
**record** 6:19 7:16 12:1

21:21 23:14,15,17
  24:6 45:21,22,24
  61:7 66:7,8,10 89:21
  106:3,5,8 114:9
  117:12 133:8,10,11
  133:13 148:16,17,19
**records** 14:17,18,23
  15:2,6,7
**recruit** 9:16 11:5 26:12
  26:17,17,20,23,25
  30:19,20,23 32:17
  38:21
**recruited** 36:22
**recruiter** 29:12
**recruiters** 28:11,13
**recruiting** 20:17 22:3
  24:9,12,15 28:23
**recruitment** 20:22 21:2
  21:12 22:25 27:17
  28:16,19 30:15 31:10
  31:18
**red** 75:17
**redact** 112:6
**redacted** 106:14 112:7
  112:19,22 116:14,19
**redaction** 112:6
**reduced** 150:12
**reference** 16:6 36:6
  114:6 132:5
**references** 121:19
  131:22
**referred** 27:10 31:22
  127:17 132:1
**referring** 56:13 73:15
  83:7 102:19 106:23
  109:23,24 130:12
  131:10
**refreshed** 14:14
**refuse** 68:1
**refused** 68:1 91:9
**refusing** 67:21
**regarding** 12:11 15:5
  16:4 20:4,6,13,22
  21:12 22:25 32:25
  33:16,18 50:3 55:12
  87:5,9 89:14 115:12
**regular** 28:20 31:18
  37:16,18 38:2 68:12
  78:12 137:18
**related** 13:21,25 16:17
  20:16 25:19 30:15
  58:17 60:11,20 67:20
  81:7 104:10 105:18
  115:15
**relationship** 104:18
**release** 4:19 87:17
**relied** 26:9
**relies** 84:21
**relying** 26:13
**remainder** 109:5
**remember** 8:11 14:12

14:13 17:12,13 19:2
19:3 74:15 75:9
82:13,15 83:13 90:16
105:22 114:21
141:23 144:19
**removal** 139:7,8
**remove** 115:4
**removed** 136:11
138:15 139:5 141:13
141:15,20
**removing** 147:18
**repeat** 61:6 94:1
**rephrase** 138:8
**replace** 44:12
**reply** 122:17
**report** 16:4 17:1,7,13
17:14 64:4,5 65:18
66:23 67:2 69:14,18
70:24 71:3,13,14
76:25 84:11,17 85:23
91:6,21,24 116:1
125:21 126:2,3,4
128:19 144:20
**reported** 64:11,20 65:6
65:23 80:2 120:19
**reporter** 6:20 7:24
**reports** 16:1,3 17:10
18:25 69:14,16
**represents** 150:14
**request** 106:10
**requested** 21:21 24:6
61:7 89:21 117:12
**requesting** 131:18
**require** 47:1 61:25
**required** 16:9 30:17
92:12 132:12
**requirements** 49:4
**research** 16:23
**resigned** 80:25
**resolutions** 87:13
**resource** 28:16 29:15
35:23 36:9,10,10
37:22 38:8,10,18,22
39:5,15 40:9 41:15
42:6,9,17 43:18 44:7
44:10,17 45:1,2,16
46:3,25 48:2 51:4,12
51:14 52:1,4 59:5,13
132:1
**resources** 39:19
**respite** 94:21,21,23
95:10
**respond** 119:21
**responded** 76:3
**responses** 7:22 8:2
**responsibilities** 44:20
**responsibility** 44:22
68:17
**responsible** 22:2 67:5,9
68:10 88:9,14,16,17
89:5,7,10,13,16,17

92:13 95:2,10,11
97:3
**rest** 90:8 95:1 102:25
**Restate** 11:20
**restraining** 75:11
**restrictive** 137:7
**resulted** 138:15
**resume** 121:10,11,19
131:21 132:1,5,21
133:5
**resumes** 26:25 27:1
**retain** 89:2
**retire** 37:8
**retired** 36:18,24 37:13
37:17 38:1,12 147:6
**retiring** 38:3,17
**returned** 51:3,25
**reverted** 39:6
**review** 13:13 15:2,9
16:1 17:24 18:3,12
33:8 70:23 86:24
87:22 91:20 96:4
106:18
**reviewed** 12:9,15,17,19
13:14 14:3,17 15:6
15:24 17:19 18:9,11
18:22 19:1,5 35:10
92:22 103:10,10
107:6 114:24 119:9
119:12
**reviewing** 111:19
121:19
**Rho** 1:12 6:15 48:12,15
97:11 116:4 142:6
**right** 10:7 32:2,3 33:13
39:7 57:2,15 81:3
111:2 113:1 116:11
138:18 146:6 147:3
**rights** 135:7,14
**risk** 92:21 93:1,13
**Robert** 143:6
**role** 35:11 84:5 147:7
**Ron** 131:22 132:3
**room** 67:24 73:23 84:8
136:13 138:4,10,16
139:1,6,8,14,24
141:12,21 142:3
146:9
**roughly** 47:12
**RPR** 2:8 150:23
**RT** 35:18,22 40:3,4
41:1,3,3,14 43:7,8
44:22 47:15,17 51:1
52:11,13,17 54:1,2
150:1
**Ruby** 132:4,7
**rule** 47:3
**run** 58:25
**running** 59:15

_____
S
_____

**safety** 138:24 139:6
141:13,16
**salary** 121:17
**same** 8:24 47:5 49:17
49:19 50:19 61:8
73:8 75:19 79:24
84:18 90:24 102:18
117:13 135:17
138:14,20 149:4
**San** 46:15 50:6
**sat** 71:20
**Saturday** 100:20
**saw** 21:10 33:11 52:19
67:16 69:16 71:13
73:22
**saying** 85:3
**says** 77:20,22 80:10
88:16 89:9 94:21
108:24 109:2 110:2
115:4 130:11
**say-so** 97:23
**scale** 22:12,16
**scared** 91:8
**schedule** 72:12 74:8
100:21
**school** 6:17 35:24 38:3
38:9,10,11,14,19
53:22 60:5 66:25
67:6 68:12 72:1,16
72:16 77:3,4,4,5,15
77:15,17,21,23,24
78:3,4,7,11 84:6 86:6
140:10,12 142:11
**schools** 35:20
**seat** 91:5
**second** 42:3 45:13
108:18 127:11
130:10
**secondhand** 139:12
**secretary** 114:17 116:2
121:12
**section** 113:8
**see** 44:2 49:21 68:22
69:14 74:13,16 77:1
82:18 87:2 95:22
107:10 108:24 113:8
**seeing** 75:24
**seek** 116:5,7
**seen** 33:9,10 86:25
87:23 96:5,6 106:19
106:20,21 107:1,4,12
107:16,20 109:14,14
111:14,16,23
**segment** 102:22
**selected** 11:11,13,16
**self-injurious** 71:16
72:3
**send** 60:6
**sense** 69:23
**sent** 12:21 16:4 114:10
121:10 145:20

**separate** 63:18,25
138:4
**September** 9:23 10:2
10:16,17 11:1,2,3,9
13:18 18:18,23 80:25
122:8 136:11
**served** 79:13
**service** 49:22 63:11
**services** 6:10 63:23
93:3,21 94:5 104:19
**sessions** 21:3
**set** 29:19 43:13 58:6
106:9
**setting** 24:21 76:4
137:11,13 142:18
**settlement** 4:19 87:18
92:14 95:3
**seven** 59:7 71:10 94:19
109:16
**several** 15:3 21:3 36:23
54:10 55:5 60:7
62:18 107:10 136:21
141:17
**severe** 84:20 124:22
**share** 49:23
**shared** 33:14 74:21
**sheets** 17:25 18:13,22
77:6
**Shelby** 13:20 106:12
110:6
**Sherri** 40:14 42:13
44:5,6
**shift** 131:24
**Shiraishi** 98:13,23,25
99:8
**short** 23:11 99:1,2
137:14,16,20
**shortage** 32:4
**shorthand** 150:12
**shortly** 35:10
**show** 77:20
**showed** 87:13
**showing** 82:16
**sick** 75:24
**side** 14:22 91:4
**sign** 16:8,9 17:3 53:3
56:6,23 73:3 78:23
78:24 82:15 98:4,5
100:5 132:12
**Signed** 149:13
**signer** 95:18
**signing** 73:2 98:11
**signs** 82:16 99:7 100:3
100:6
**similar** 113:4
**since** 95:11
**sing** 73:1
**single** 38:19 54:19 99:1
**sit** 55:7 72:25
**sitting** 11:19 73:24
**situation** 33:1

**six** 25:11,12 47:17
92:17 109:13 118:24
132:9,10
**skill** 15:10
**skills** 9:17 11:6 13:23
15:5,11 16:4,5,7,9,12
17:8,24 18:12,22
20:17,22 21:12,24
22:3,23,25 24:9,12
24:15,16,20,22,24
25:16,18,18,20 26:10
26:12 28:20 30:19,20
31:23 32:5,18 40:20
57:17,23,24 58:10
64:16 68:14 71:18
72:4,5 73:1,23 75:22
76:5 78:19 83:11
85:1,2 86:13 88:5,7
88:11,20 89:3 90:17
93:13 99:6 100:15,21
101:11,12,12,16,18
103:16 130:25
136:13,18 138:4,11
139:24 142:3,19
144:10 145:6 146:10
147:19
**skipped** 35:8
**slash** 108:25
**small** 137:10,12 142:18
**Smalley** 4:13 60:13
68:25 69:2,3,4,15,17
69:21 70:7,10,16
73:8 80:4 90:1
103:13 143:20,22
144:1,18 145:10
**Smalley's** 70:24 71:5
74:19 76:10 77:9
79:14 103:11
**soaked** 71:15
**social** 12:19 40:15 44:4
52:16 61:12 91:3
**sole** 30:14
**solutions** 142:25
**solver** 84:19
**solvers** 85:5
**solving** 84:16
**some** 12:23 16:23 18:12
30:1 32:8 33:20
34:13 41:11 44:12
54:21 67:15 71:19,21
72:5 73:20 74:9 76:2
78:21,24 85:13 93:13
94:25 101:12 104:1
110:9 123:2,4,6
129:25 134:1,13
136:10 138:6 141:5
**somebody** 45:13 84:22
85:1 88:20 90:21
91:11 123:7,10
**somebody's** 124:12,24
**somehow** 9:12

someone 13:24 15:17
  30:4 45:9 84:23,24
  101:25 114:11
  115:21 123:19 128:6
  128:6 136:17
someplace 19:22 46:23
something 17:6 36:6
  94:23 109:3 113:4,4
  114:7 125:9 126:16
  129:14,20 130:1,7
  135:19 140:8 148:2,3
sometime 41:22 42:3
  45:16 57:11 60:23,24
  78:8 79:2 83:19
  139:19 140:7
son 1:6,20 91:12
song 73:2
songs 73:1
soon 52:19
sorry 11:20 16:18 21:9
  21:17 26:18 31:22
  35:23 40:19 50:25
  51:12 53:7 54:2
  60:21 66:3,4 71:5
  76:19,19,19,23 80:14
  80:20 82:4 89:19
  90:16 94:2 101:25
  106:1 115:3 120:12
  133:7,25 136:4,4,7,8
Soto 53:13,15 54:6
speak 19:9,11 20:3,6
  83:23 87:4 100:2
speaker 93:25
speaking 41:5 64:7
  73:14 81:6 145:10
special 28:20 31:19
  35:18 37:15,20,24
  46:5,6,7 47:8 61:19
  61:21,25 62:7 90:18
  97:9 101:13 105:16
specialist 6:10 37:22
  40:15
specialized 80:18
specialty 52:7 70:3,4
specific 12:13 22:21
  31:2 32:11 33:25
  85:14 93:1,3,20,21
  94:6 102:16,16
  123:19
specifically 10:12 26:5
  28:19 30:16,20 31:23
  43:5,21 49:6 102:3
specify 31:6
speculate 8:9 131:4,10
speculation 59:10 61:5
  76:14 77:13 79:17
  83:3 85:22 88:19
  92:8 93:24 94:11
  97:6 103:20 104:6
  105:5 112:12 113:19
  114:5 115:17 118:19

121:1 126:11,18
  129:1,7 130:15,18
  131:9 134:19 135:9
SPED 47:2
speech 40:14 61:11,12
  98:23 99:10
spend 70:6
spitting 58:24 59:24
  136:21 138:19
spoke 79:8 80:10 98:11
  122:24 131:22 132:2
spoken 20:11,12,15
spontaneously 100:6
spot 72:18
SS 150:2
SSC 84:3 86:6
SSCs 83:25
staff 35:19 54:25 75:9
  78:23 85:11
staffing 75:8
Stahlsberg 15:19
Stan 6:12 14:6 82:4
  88:11 91:9 109:23
  114:12 122:24
  145:18 148:22
Stanley 1:4,18 2:13 6:5
start 8:24 10:23 36:12
  97:18,19 100:24
  101:1,3
started 7:2 10:18 18:19
  18:19 37:14 39:22
  40:8 77:2 78:2,7,12
  80:24 90:25
starting 83:19 106:12
  141:7
starts 76:20
state 1:11,25 2:9 6:11
  6:14 7:15 11:25
  16:21,22 21:2 30:7
  32:23,24 34:7 36:18
  37:21,23 46:15 50:5
  50:19 84:21 88:14
  89:8,12 124:23 150:2
  150:5,24
stated 16:7,23 27:22
  56:16 92:11 104:7
  117:18 125:19
  137:10
statement 16:15,16,19
  17:1
states 1:1 28:18 29:4,5
  94:4 103:13
statewide 32:12
stating 61:4 64:19
stationed 28:18
stepped 15:18 147:1
steps 87:25
Stern 14:20 16:19,22
  17:2,6 20:3
still 16:11,15 26:9,12

31:13,15 110:12
  120:17 146:20
stim 73:25
stimming 73:24 82:18
stop 91:1 120:5 146:22
stopped 44:25 90:4
  103:25
strategy 34:15
streamline 56:2
Street 2:4,15,21 6:8
Strike 111:25 112:2
structure 78:18
student 33:25 34:13
  42:25 43:2 47:3
  54:19 58:24 86:14
  102:7 103:3 136:19
students 37:16 49:22
  58:24 72:25 136:12
  138:25 139:5 141:13
  141:15
studies 46:14
stuff 74:1,1 90:8
  109:12
stupid 74:1
subject 108:18,24
  115:11 148:12
subjective 103:8
subsequently 14:3
substance 20:16 140:23
  141:1 143:23,25
substitute 132:8
successfully 79:2
suddenly 72:18
SUE 2:8 150:5,23
suggestions 71:23
Suite 2:5,16
summarizes 12:24
summer 62:10 64:3
  65:1,15 66:13 67:6
  67:12 73:20 77:4,4,5
  77:24 78:7 81:17
  83:16 84:6 86:5,8
  103:14 104:11,20
  141:24
summertime 68:13
summons 86:20
sup 40:17
superintendent 1:14
  6:16 48:17 49:16
  97:8,8 116:4
supervision 150:13
supervisor 40:17,20
  66:12,20 131:23
supposed 34:8 89:6
  105:21 123:3
sure 11:15 14:20 15:1
  17:11 18:19 19:2
  23:19 33:20 36:3
  39:17 42:14 55:14
  57:1 59:19,21 65:12
  68:6 69:12 84:5

102:10 116:23 131:5
  135:18 141:22
suspect 92:2
swear 6:20
sworn 6:24 150:10
system 50:16
systemic 32:14,16
systems 50:13
S-o-t-o 53:15

_____
T

T 7:13 109:12 150:1
TA 93:1,6
take 7:24 23:11 45:12
  45:19 74:5 76:3
  87:25 90:6 97:20
  105:23 116:23 136:5
  138:20 148:14
taken 2:4 91:18 95:12
  104:18 106:6 132:11
  136:21 150:11
taking 9:11 35:11
  83:18 114:6 147:7
talk 8:22 41:18,18
  69:21 84:22,25
  117:25 118:10
  143:21
talked 15:4 19:25 20:1
  33:20 44:2 77:3,23
  77:25 80:4
talking 18:8 31:1,3
  34:12 47:15 56:14
  73:7,9 83:1 101:2
  102:23 115:1 122:22
  131:7 132:24 146:12
tape 133:8
taught 132:6
TA's 93:3,22 94:6
tea 77:4
TEACCH 16:8 24:21
  50:4 53:9 62:24
teach 53:21 84:22
  97:18
teacher 15:18,19 35:23
  36:9,10,17 37:13,18
  38:2,8,10,18,22 39:5
  39:15 40:9 41:13,15
  41:19 42:7,9,18
  43:18 44:18 45:2,2
  46:3,25 47:9 48:3
  51:4,13,14 52:1,4
  53:17 57:25 59:6,14
  60:19 61:16,20,22
  62:1,8,9,13,14,21
  64:4,5,8,9,18,19 65:4
  67:8 68:14 71:22
  72:1,25 77:4,5,15,21
  77:23,24 78:18
  101:14 138:3 140:1,2
  142:3,19 144:11
  145:7 146:10 147:20

teachers 28:21 31:19
  31:19 35:19 36:1,2
  39:19 44:8,10 45:17
  47:4 57:21 58:11
  103:16
teaching 37:14,20 38:1
  team 43:12 55:8 69:19
  144:4
TEC 62:23
technical 74:9
telephone 131:25
tell 6:24 8:11 35:2 38:7
  77:9 113:1 120:5
  129:21 139:11
  141:18,22 143:24
telling 76:5
ten 38:16,17 82:3,8
  109:18
tend 115:18
term 21:14 32:15 93:20
  122:21 137:25
terminated 90:12
terms 25:7 88:1 121:8
  122:13
terrible 128:11
testified 61:10 62:16
  65:3 98:25 100:23
  138:16
testify 132:22
testimony 7:19 8:18,20
  9:12 10:10 12:10
  23:4 61:4 64:23 65:9
  81:10 104:4 106:25
  125:24 131:9 149:5
Texas 29:4
Thank 7:11 24:2 27:2
  31:9 52:18 62:6
  63:13 74:18 75:2,6
  82:2 89:14 110:1
  111:10 113:22 118:7
  119:7 136:2 148:20
  148:22
Thanks 24:3 82:9
  124:2
theft 133:17
their 1:5,19 24:20
  28:17 31:18 74:4
  85:11 91:12 104:19
  127:24,25 128:7
  134:2 135:7,14 139:6
  141:13,15
themselves 93:15
therapist 61:12
things 12:23 34:24 44:3
  44:5 49:15 53:3 56:1
  56:2 58:25 59:18
  67:15 74:11 75:14
  76:2 136:21 138:14
think 17:12 43:23
  48:12 53:15,16 56:18
  58:19 59:4 60:1,22

65:8 71:25 73:10
75:7,20 80:24 84:12
90:20 97:20 104:14
116:12 120:2 125:13
130:1 133:25 134:23
141:10
**thinking** 77:6
**third** 124:2,4 128:7
**though** 26:8 90:6
**thought** 34:15 37:2
50:25 72:11 90:21
106:22 129:13,19
130:6,8 135:14
**three** 21:25 53:9,12
78:14 84:6 91:8
99:22,24 100:18
107:18,23 108:12
109:24 113:6 118:23
120:16 139:4 141:11
141:11
**through** 5:3 7:3 9:18
10:5 16:23,24,24
21:25 37:21,24,25
63:8,9 66:17 69:11
70:18,18 75:13 80:6
98:24 100:3,4 106:10
106:12 119:13
131:21 132:15,17
137:18 149:3
**throughout** 67:12
103:14
**thrust** 31:17
**TIFFE** 12:22 14:17,21
14:24 15:1,2,7 16:11
17:20 19:1 54:5 63:4
63:8,9,11,20,22
64:21,25 66:16,17,18
95:13,15,18 101:23
132:15,17
**time** 8:16,22 9:21,22
10:7 12:17,19 14:10
14:15,21 15:20,22,25
16:11,17,17 17:14
18:4,9,10,15 19:3,6
19:16 21:24 23:13,16
25:22 26:10,21 27:7
27:14 31:6 32:1,8
33:11,14 37:3,15
38:12,12 40:9 41:4
45:8,20,23 46:17
47:14 48:2 50:19,24
51:15 52:11,14 54:3
54:16 57:5,11,12
58:19 59:15 61:2
62:25 63:12 64:11
66:6,9,21 68:22 69:4
69:7 70:6,7,13,13
71:15 72:24 73:5,8
73:11,14,15 74:6
77:6 79:6 80:17,23
82:17 83:15 84:15

85:12 86:16,17 87:4
87:11 89:15,25 90:2
94:25 97:21 104:15
104:25,25 106:4,7
107:4 111:17 120:15
121:7 122:18 127:22
130:10 133:6,9,12
135:21 137:6,15
139:2 140:12 141:18
143:4,10 145:1,19
147:4 148:7,15,18,23
**times** 35:7 36:23 47:13
47:17 54:12 59:16
68:21 73:22 81:5,11
81:16 82:1 89:12
100:20 110:11 139:4
**tip** 53:14
**title** 14:20
**today** 6:18 7:20,23 8:3
8:17 9:12,14 10:10
12:10 19:8 20:16
28:10 70:24 108:20
110:3
**together** 49:21 76:6
81:12 109:10
**toilet** 144:19
**toileting** 56:11,22 60:4
60:12,14,20,21 69:7
**told** 12:5 36:25 68:22
85:23 91:24,25 110:7
110:10 120:11
131:24 139:11
142:25 148:3,5
**Tolentino** 10:21,22
11:4 20:10 51:11,15
84:2 122:7
**tongue** 53:15
**top** 68:4 110:2 112:5,8
112:19,23
**topic** 136:8
**total** 26:3 133:22
**totally** 148:8
**tough** 55:17 74:16
**toward** 105:14
**toys** 73:25
**track** 34:23
**train** 24:22 72:11 85:9
100:15
**trained** 58:11 85:25
100:15
**trainer** 15:11 17:24
18:12,22 24:20 31:23
64:17 68:14 73:1
75:22 76:5 83:12
84:14,14 86:13 88:21
89:3 90:17 99:6
101:16,18 130:25
136:13,18 138:4,11
139:25 142:3,19
144:11 145:7 146:10
147:20
**trainers** 9:17 11:6

13:23 15:5,10 16:5,6
16:7,10,13 17:9
20:17,23 21:12,24
22:3,23 23:1 24:9,12
24:16,22,24 25:17,18
25:18,21 26:10,13
28:20 30:19,21 32:5
32:18 40:20 57:17,23
57:24 58:10 71:19
72:4,6 73:23 78:19
88:5,7,12 93:14
100:15,21 101:11,12
101:13 103:16
**training** 25:2 36:5
46:17 48:18,24 49:2
49:5,7,20,24,25 50:1
50:3,12,17,18,20
53:10 58:9 62:17
78:20 79:8 84:16
85:4,11,13 100:14,17
132:14,17
**trainings** 58:6
**transcript** 7:25 70:16
71:7 149:5 150:15
**transcripts** 13:10,12
**transpired** 142:12
**trial** 8:17 50:1
**tried** 15:17 82:21 88:5
108:10
**true** 8:15 116:16 149:4
150:14
**truth** 6:24,25,25
**try** 74:8,14 128:14
**trying** 26:12 32:17 56:1
75:9,14 76:6 91:16
135:2
**turn** 71:9 78:13 94:19
98:15 99:21 109:13
114:22 124:2 127:9
130:9
**turned** 62:8 111:4
125:7 126:8,14,20
129:8
**turning** 74:15
**turnover** 79:10
**twice** 99:19
**two** 19:20,23 25:1 35:5
35:7,7 39:13,22 40:7
44:19 55:4 64:11
77:22 83:5,9 85:25
93:4 95:15 96:8,9
99:21 107:14,15,17
118:23 119:24
120:16 135:16
**two-on-one** 75:8,8
**type** 14:18 49:18,19
55:8 67:22 147:18
148:12
**typewriting** 150:13
**typewritten** 149:2

| U |
| :---: |
**Uh-huh** 58:16 67:4
76:21 94:20 98:17
124:5,7
**ultimately** 95:11 97:7
**unaware** 115:14
**under** 7:20 124:18
136:22,22 150:13
**understand** 7:19,22 8:2
8:7,19 9:5 15:1 23:20
23:23 39:17 60:15
110:14 125:18
129:23 134:6
**understanding** 7:4,8
57:20 89:4 96:19
124:10,20 127:15
136:23
**understands** 99:3
**understood** 8:5
**unengaged** 71:17
**unfortunate** 76:9
**United** 1:1 28:18
**University** 46:15 50:6
50:19
**unless** 9:3 23:8,20
**until** 9:25 10:11 18:5
25:22 26:10 36:4
37:17 38:25 39:14,15
41:15 44:5 45:15
47:25 52:14 60:25
137:17
**untruthful** 132:21
**unusual** 54:18
**unwritten** 28:1,2,8
**upset** 82:20
**urination** 68:11
**urine** 68:20 71:15
73:24 74:10 82:19
**USA** 28:10
**use** 99:2,3,7 114:1
116:18
**used** 8:18 16:20,23
30:22 50:16 98:4
99:6 122:21 145:1
**user** 109:2
**uses** 84:21 98:25 100:5
**Ushiroda** 2:19 6:14,14
7:2,11 11:23,25
20:13 21:13 23:3,8
23:11 24:17 25:24
26:1 31:3 32:1,15
34:19 40:25 45:4
48:8 52:23 53:5
54:20 55:18 56:18
57:23 59:9 61:3,8
62:2 64:22 65:8,25
66:5 67:17 68:7 71:3
72:21 73:10 76:12
77:11 79:15,19,24
81:10 82:4,7,9 83:2
85:17,20 88:3,19

89:19,22 91:13,25
92:7 93:9,19,23
94:10,16 95:5 96:24
97:5 98:7 101:8,19
102:8,18 103:4,18
104:3,12,21 105:3,11
105:25 106:25
107:22 109:23 110:1
110:16 112:11
113:18 114:4,8
115:16 116:21 117:6
117:13 118:3,18
119:3 120:25 122:10
122:20 123:22
125:13,17,23 126:10
126:17,23 127:5
128:9,12 129:6,15
130:2,14 133:19
134:4,16,18 135:8,16
136:5,25 137:25
147:10 148:22
**using** 114:11
**usual** 7:3

| V |
| :---: |
**vacation** 65:1
**vague** 21:13 55:19 58:5
59:9 67:18 85:22
94:11 101:18 103:5
104:13 123:22
147:10
**variety** 95:9
**various** 25:15 145:25
**vast** 40:5,12 52:6
**verbal** 7:23 99:5 100:3
**verbally** 71:23
**versions** 111:3
**versus** 6:5 84:14
**very** 24:2 34:6,25
68:21 69:25 70:1
72:6,6 76:9,9 82:20
91:1 98:4 102:11
124:16,22 132:16,21
141:3
**via** 108:4
**vice** 143:13
**vicinity** 18:18 46:24
**video** 6:9,10
**Videographer** 3:4 6:2
6:18 23:13,16 45:20
45:23 66:6,9 106:4,7
133:9,12 148:15,18
148:23
**VIDEOTAPED** 1:15
2:3
**violate** 135:7,18
**violated** 135:13
**violation** 128:8
**Virginia** 29:3,18 30:11
**visit** 67:12
**visited** 35:20 54:11

visiting 81:25
visual 99:5
vocabulary 99:7 100:7
  100:9
voice 9:1
voiced 9:2 23:7
volume 14:7
voluntarily 147:1
vs 1:9,23 149:21

_____

**W**

wages 25:15
Waimea 101:13 102:1
wait 13:22 47:22 53:13
  74:5 122:1
walk 90:25
walked 91:4
want 8:8 18:10 21:3
  23:19 56:16 74:12,17
  114:8 136:5
wanted 54:24 56:2
  57:17,21 58:3,9,10
  58:10,11 67:22
  100:22,25 110:6
  117:25 123:25 144:7
  145:22
wanting 55:25
warm 131:11
warmer 131:13
wasn't 33:21 49:20
  54:21 57:10 59:16,17
  61:16,19 73:5 74:4
  77:17 80:3,19 82:22
  102:16
Watanabe 2:20
watch 76:3
watched 98:11
water 67:23,23
way 76:3 113:10
  150:19
web 29:23
week 11:1,3,9 35:3,6,8
  35:8 42:3 46:16 96:8
  96:9 99:20 100:19
  122:8 139:3 141:7,8
  141:11,14,19 142:24
weekly 54:15,24 55:2
  56:14
weeks 19:20,23 35:5,7
  39:13,22 40:7 132:10
well 9:25 10:14,24
  14:25 18:17 21:22
  37:3,19 38:9 45:12
  49:19,23 57:10 60:13
  77:14 78:2,17 80:3
  83:10 85:22 97:7,19
  119:5 124:10 134:6
  134:11,25 141:10
  148:5
went 10:14,16 16:20,23
  18:17 21:25 25:14,20

29:24 45:1 47:25
  48:14 54:15,17 63:8
  69:17 73:12 108:20
  110:3,21,22,25
  112:14 116:8,13,15
  122:3 130:20 131:21
  142:11 144:3 146:6
were 10:3 11:17,21
  14:5,7 16:14 17:2,11
  18:25 20:19,20,25
  21:23,23,24 22:2
  25:10 26:5,12,13,14
  26:19,20 27:3,7,10
  27:12,14 28:9,13
  29:1,3 30:2,6,7,16,23
  34:6,12,16 36:22
  37:15,16,17 38:2,7
  38:17,21 39:14 40:11
  40:22 42:19,24 43:17
  44:3,5,7,17 45:2,8,16
  50:23,24 51:6 53:12
  55:6,10,10,12,23
  56:4,17,19 57:5,16
  57:22 58:9,12,14,21
  59:6,7,13 60:4,23,23
  61:2 64:21 67:5,9
  68:19,22 71:19,20
  72:2,4,4,5,19 74:1,12
  74:19 75:15,19,21
  76:5,10 78:15 79:14
  79:21 80:2 81:2,22
  82:4,11,12 83:5,9
  84:19 86:17 88:1,6,7
  88:10,11,12 89:4,15
  92:11 93:14 95:11,12
  101:22 105:8,8
  106:10,22 110:9,9
  112:7 115:10,14
  116:15 117:1 118:22
  123:3 131:18 132:18
  139:12 140:20
  142:13 144:2 146:3
  149:4
weren't 26:16,17 49:6
  61:9 102:3 103:2
west 1:13 6:16 14:22
  30:25,25 31:22,22
  32:11 35:18 38:23
  42:25 43:3,20 44:18
  45:4,5 49:22 51:19
  51:20,22 146:20
wet 59:16 84:9
wetting 58:22 60:6,7
  67:24
we're 6:7,19 18:8 23:14
  23:17 45:21,24 66:7
  66:10 106:5,8 115:1
  129:13 133:7,10,13
  136:7 148:16,19
whatsoever 113:24
while 72:17 93:2,20

94:5 107:9
whole 6:24 31:20 40:2
  85:4 91:7 140:25
Wiles 1:3,17 6:4 14:6
  57:4,14 90:4 97:19
  115:12 127:23
  133:17 134:1,7 135:6
  143:1 149:21
Wiles-Bond 1:6,20
  22:22 26:6 30:15,21
  31:2,7,24 35:14
  39:12 43:10,22 47:6
  81:7 104:11,19 147:8
Wiles-Bond's 32:25
  43:6 44:8
willing 82:14 122:16
win 130:11 131:6
winning 131:2
wish 147:5
Withdraw 115:2
withdrawing 128:12
witness 6:3,23 7:6 9:16
  12:2,6 32:3,16 53:7
  56:21 107:3 117:10
  118:4,7 122:9 131:11
  146:16 150:9
woman 82:10 90:19,24
  91:2,4 105:21
woman's 84:12
wondered 134:25
  135:1
word 100:3 124:10
words 75:19 99:1 100:6
  100:9
work 9:17 35:25 41:13
  46:6,7,20 47:1,3,4
  50:5,8 62:21 67:22
  75:9 76:7 78:20,21
  78:22 100:21 144:21
worked 10:25 25:4
  35:19 37:12 38:25
  39:18 40:6 46:8,14
  54:9 69:5,6 78:24
  83:12 98:12 99:19
  132:9,15
worker 12:19 40:16
  44:4 52:16 61:12
  91:3
workers 64:21
working 10:18 15:15
  15:16,22 16:14 18:6
  26:14 29:18 40:12
  46:4 51:16 52:6,6
  62:14 64:14 72:5,6
  75:19 84:19 86:8
  88:6 101:16 136:19
  145:5,8
works 99:12
wouldn't 49:20 74:5
  125:10,21 131:2
  140:6

wrap 74:1
write 120:14
writer 121:2
writing 108:21
written 7:5 13:4 20:20
  21:8,9,10 22:8,14,19
  22:25 24:9,12 26:9
  27:21,23,24 142:21
  147:22,22
wrote 16:20 108:13,14
  108:16 120:15

_____

**X**

X 4:1 7:13

_____

**Y**

Yankee 12:21
yeah 54:15 68:6 73:22
  78:11 103:7 110:8
year 68:12 72:1 75:19
  77:3,15,15,21,23
  78:3,4,12 131:25
  132:7,10
yearly 31:14
years 38:13,16,17 46:4
  54:10
York 29:4
young 74:2 82:12

_____

**Z**

zero 26:3,4,5,7

_____

**$**

$20 122:14
$25 122:15
$40 25:13 132:20

_____

**0**

04 10:2 11:2,3 13:17,18
  17:15 54:22,23 76:25
  80:24,25 90:5,15
  121:14
04-00442 1:9 149:21
05-00247 1:23

_____

**1**

1 5:3 106:12 149:2
1st 9:25 10:6,11 11:8
  20:20 33:18 36:21
  39:3 45:13 51:3,23
  52:3 57:8,8,10 60:25
  87:18 122:4 146:25
1:30 106:2
1:34 106:7
10th 120:13 127:22
10:07 114:22
10:15 45:20
10:28 45:23
100 100:6
106 5:3
11 83:22 95:24 111:12

11th 70:17
11:00 66:6
11:03 66:9
119 5:7
12 27:2,3,7,10 37:21,24
  73:19 74:24 75:3
  81:5,11,16 95:16,17
  98:18 111:12
12-month 86:10
12:06 106:4
12:15 105:24,25
12:17 127:10
13 74:24,24 75:4,5
  95:16,17 111:12
14 111:22 112:1
148 149:3
15 86:20 111:22,24
16th 144:7
18 112:4
19 71:10 114:22
1963 37:14
1990 46:24
1992 50:21
1999 9:18

_____

**2**

2:22 133:9
2:29 133:12
2:54 148:15
20 25:13 73:19 99:19
  100:5
2000 60:24
2001 12:15 33:4
2002 86:20 87:18
2003 36:13,18,20 38:23
  39:11,23 42:1,3,4,4
  46:2 60:24
2004 9:18,23,23 10:11
  11:8,9 18:20,23,23
  20:19,20 22:24 24:8
  24:11,16 25:19 30:18
  31:11 33:17,18 35:15
  39:1,3,15 40:1 41:16
  41:23,25 51:3,23
  52:3 57:9 59:8,11
  60:25 64:3 66:13
  67:13 78:5,8,10,10
  79:23 81:17 86:5,9
  95:24 103:14 104:11
  104:20 112:5 122:5,8
  136:11 141:24
2006 70:17
2007 1:18 2:6 6:19
  149:14 150:7,21
2011 150:24
21st 33:4
22 78:14 83:22
22nd 144:7 145:17
23 76:20 150:24
23rd 2:22
24 82:2,6,7 86:12

**25** 5:3 25:13 106:12
 119:13.
**274** 2:8 150:23

---
**3**
---
**3rd** 112:5
**3:00** 148:18,23
**3:02** 148:25
**30** 9:14 25:13
**30(b)(6)** 6:3 9:16 10:11
 12:6
**31st** 42:4
**33** 4:9
**35** 25:13

---
**4**
---
**4th** 24:16 116:9,11
 120:12
**400** 2:5,16

---
**5**
---
**5th** 132:25
**56** 36:4

---
**6**
---
**6th** 19:21
**6:01** 124:6
**60** 36:5,6

---
**7**
---
**7** 4:4
**7:13** 130:10
**70** 4:13

---
**8**
---
**8/10/04** 127:10
**8/11** 124:4 130:10
**8/4/2004** 114:22
**8/5/04** 119:24
**8/9/07** 149:21
**851** 2:4,15 6:8
**86** 4:16
**87** 4:19
**88** 70:17,18 71:9 73:18
**89** 73:19 74:23,24,25
 75:1,5

---
**9**
---
**9** 1:18 2:6 6:18 150:7
**9:00** 150:7
**9:16** 2:6 6:19
**9:39** 23:13
**9:43** 23:16
**90** 70:19 74:24,24 75:1
 76:19
**91** 74:25,25 76:18,22
**92** 46:24 50:10 78:13
**93** 82:2,6,7
**94** 82:3,8 83:22 86:11
**95** 83:22
**96** 4:23 70:18

**96813** 2:5,17,23
**999** 2:21