**EXHIBIT "1" TO DECLARATION OF CARL M. VARADY**

Page 92

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
---

ANN KIMBALL WILES and STANLEY
BOND, individually and as next
friend of their son, BRYAN
WILES-BOND, a minor,
    Plaintiff,
vs.    Civil No. CV-05-00247 HG/BMK
DEPARTMENT OF EDUCATION    No. CV-04-00442 HG/BMK
State of Hawaii, and ALVIN    CONSOLIDATED
RHO, in his official capacity  (Other Civil Action)
as West Hawai'i District
Superintendent,
    Defendants.
--------------------------/

DEPOSITION OF
ANN KIMBALL WILES
VOLUME II
WALNUT CREEK, CALIFORNIA
MAY 12, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: DANUTA KRANTZ, CSR NO. 4782
FILE No.: A103D20

---

Page 93

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
---

ANN KIMBALL WILES and STANLEY
BOND, individually and as next
friend of their son, BRYAN
WILES-BOND, a minor,
    Plaintiff,
vs.    Civil No. CV-05-00247 HG/BMK
DEPARTMENT OF EDUCATION    No. CV-04-00442 HG/BMK
State of Hawaii, and ALVIN    CONSOLIDATED
RHO, in his official capacity  (Other Civil Action)
as West Hawai'i District
Superintendent,
    Defendants.
--------------------------/

    Deposition of ANN KIMBALL WILES, taken on behalf of Defendants, at Embassy Suites, 1345 Treat Boulevard, Walnut Creek, California, commencing at 8:45, Saturday, May 12, 2007, before Danuta Krantz, CSR No. 4782.

---

Page 94

APPEARANCES

FOR THE PLAINTIFF:
LAW OFFICES OF CARL. M. VARADY
1001 Bishop Street
Suite 2870
Honolulu, HI 96813
BY: CARL M. VARADY, ESQUIRE

FOR THE DEFENDANTS:

LAW OFFICES OF WATANABE, ING & KOMEIJI
999 Bishop Street
23rd floor, First Hawaiian Center
Honolulu, HI 96813
BY: GREGG M. USHIRODA, ESQUIRE

---

Page 95

INDEX
ANN KIMBALL WILES:
EXAMINATION    PAGE
  BY MR. USHIRODA    96

EXHIBITS
DEFENDANT'S    PAGE
5  Letter to JoAn from Kim Wiles 9-21-04    161
6  Memo to Kim Wiles from
    JoAn Hill 9-21-04    161

7  Memo to Geraldine Bill from
    Stanley Bond 9-23-04    197
8  State of Hawai'i Department of Education
    Individualized Education Program    217

9  Letter to Kim Wiles from
    Cara Entz 7-16-04    243
10  Pacific Child & Family Associates
    Proposal 9-21-04    245

11  email to Kim Wiles from
    Kate Tolentino 10-11-04    247

Page 236

1  written to Christy?
2      A. No. She disclosed that e-mail.
3      Q. Which e-mail? I am sorry.
4      A. The e-mail that I was kind of telling her
5  to be braced.
6      Q. Right.
7      A. And there were other e-mails that JoAn Hill
8  had collected from Christy's correspondence with other
9  people. So they submitted a packet of e-mails.
10     Q. These were private e-mails?
11     A. These were private e-mails.
12     Q. Do you know how many e-mails were in this
13 packet that was submitted by JoAn?
14     A. I don't. I was not there. Stan was at the
15 court.
16     Q. Do you know who these other e-mails
17 involved? I know you said it was e-mails between
18 Christy and other individuals.
19     A. I know of one that was a friend of
20 Christy's that lived in a Kwajelin island. And they
21 were discussing, I don't know, some boy-girl kind of
22 thing where somebody was looking at somebody and they
23 had green eyes, meaning they were jealous, or something
24 along those lines. They called somebody green-eyed
25 monster, but meaning that they had jealous eyes. But

Page 237

1  JoAn apparently had not looked at the context and
2  assumed that she was referring to Bryan. But if you --
3  it was clearly talking about some relationship.
4      Q. I don't mean to get into the substance of
5  the e-mails right now, but I am more interested in just
6  how this came about.
7          So these were disclosed to the court
8  when --
9      A. By Mr. Beamer and Ms. Hill.
10     Q. This is the time when you are talking about
11 when Stan went to Federal Court?
12     A. You know, I am not sure if it's that time.
13 I actually think it was a later time. We were going
14 regularly.
15     Q. Okay. Do you know which judge it was
16 disclosed to?
17     A. You know, you will have to ask Stan.
18     Q. Would it be woman judge?
19     A. I don't know. I have never met any of the
20 judges.
21     Q. You didn't go to this --
22     A. I didn't go. In fact, I never went -- I
23 never to the Federal Court. Stan always did.
24     Q. Now, did you ever -- was it ever determined
25 how Ms. Hill came into possession of these e-mails?

Page 238

1      A. No. That was a burning question, that we
2  wanted to know, the judge wanted to know. Basically,
3  Ms. Hill said that Michael Biehn, who she didn't know,
4  had given her these e-mails and she was corresponding
5  with him.
6      Q. That is what JoAn said?
7      A. Mm-hmm.
8      Q. Yes?
9      A. Yes, I believe. That's what Stan related
10 to me.
11     Q. Michael Biehn is B-I-E-H-N?
12     A. I am not sure of the spelling.
13     Q. Is who Michael Biehn?
14     A. Michael Biehn is -- actually, Michael Biehn
15 at that time was Christy's boyfriend, fiance. He moved
16 to Kona, and they lived together while she was working
17 with us. Then they got married the following April.
18 And they had a child and are living in Alabama now. He
19 wrote a declaration saying, It was not me. I don't
20 know who this person is. So she was actually
21 corresponding with some unknown agent and talking about
22 personnel matters, which is another issue.
23     Q. In your interrogatory answers you talk
24 about some illegal tapping of your e-mails.
25     A. That's what I am referring to.

Page 239

1      Q. If you could refer to Exhibit 1, and I will
2  get you the page number. If you could go to page 13.
3          If you look at the bottom of page 13, where
4  it starts, "Finally, the biggest act of privacy
5  violation." Maybe you if you could read that paragraph
6  to yourself.
7          Is this what we have been just discussing?
8      A. It is.
9      Q. And the reason you say that there was
10 illegal tapping of your private e-mails is because you
11 are wondering how JoAn Hill came into possession of the
12 e-mails we have just been talking about?
13     A. That's correct.
14     Q. And to this date, you have never determined
15 how JoAn Hill came into possession of these e-mails?
16     A. I do not know for sure how she did, no.
17     Q. You have a theory?
18     A. No. I know she said that, you know,
19 somebody got them from Christy. Since there were other
20 e-mails other than mine to Christy that had links with
21 Christy and other people, I mean, that may have been
22 the way it unfolded. I don't know. I don't know if
23 other e-mails I sent out to other people were also
24 looked at. I don't know. I don't know that much about
25 it, the expertise of how those things work with the

Page 240

1   Internet.
2       Q. Have you ever seen these e-mails that
3   Ms. Hill purportedly disclosed to the court?
4       A. Yes.
5       Q. And do you have possession of those
6   e-mails?
7       A. Some of them. Well, maybe not the ones to
8   the court. There was a second set that Michael Biehn
9   eventually ended up with somebody -- JoAn had forwarded
10  to him accidentally, and he ended up with some and
11  immediately forwarded them on to us.
12      Q. Do you still have those e-mails?
13      A. Yes.
14      Q. Would it be possible to, if you could,
15  provide that to your attorney to produce?
16      A. Yes.
17      Q. Any other increments? This -- is this it
18  for this one about JoAn Hill? Is there anything else?
19      A. That is it right now.
20      Q. Okay. Any other increments before I go
21  back and cover some things?
22      A. Why don't you go ahead, and if it comes
23  up --
24      Q. Let's go back to the first one about Stan
25  going to the Federal Court to explore the option of

Page 241

1   hiring Pacific Child & Family Associates. Okay?
2       A. Yes.
3       Q. Now, you said that -- I guess you are
4   getting this from Stan, correct?
5       A. Yes.
6       Q. I know Stan testified yesterday that at
7   this particular hearing JoAn Hill told the court that
8   she needed some time because she was going to
9   California to look at some schools there or what was
10  she going to look for?
11      A. My understanding is she was looking at
12  different options, agencies, schools. I am not sure
13  about the schools. You need to clarify that with Stan.
14      Q. Anything else about this hearing?
15      A. No. I think the main point was what she
16  what was supposed to bring back was never done.
17      Q. What was she supposed to bring back?
18      A. A written report about her findings.
19      Q. Of her trip to California?
20      A. Of what she had found during her trip to
21  California about the agencies.
22      Q. The so-called options?
23      A. The things she was supposed to look into,
24  yes.
25      Q. But to your knowledge, JoAn never did

Page 242

1   prepare such a report?
2       A. That's correct.
3       Q. And is it your understanding that the court
4   had ordered her to prepare such a report?
5       A. Yes, it is. Like I said, I was not there
6   firsthand. Stan was.
7       Q. Are you familiar with Pacific Child &
8   Family Associates?
9       A. Somewhat.
10      Q. How are you familiar with that outfit?
11      A. They were brought over in October. When we
12  found them, it was basically just through research.
13  They were one of the people that -- one of their
14  services was not only to bring in -- they would bring
15  in their own skilled trainers. They also would do the
16  whole supervision piece through some kind of real-time
17  video pieces.
18      Q. Is it your understanding that, and I will
19  just call it Pacific --
20      A. Thank you.
21      Q. Is it your understanding Pacific had
22  experience in servicing autistic children?
23      A. It was initially, yes.
24      Q. And who initiated this -- who started
25  looking into Pacific as an option?

Page 243

1       A. We started -- like I said, we started
2   researching a variety of options. So, yes, it came up
3   through our research.
4       Q. And how did you locate Pacific?
5       A. Mainly we did our research on the Internet.
6       Q. You located Pacific on the Internet?
7       A. Yes.
8       Q. Then what did you do once you --
9       A. Once again, we were calling a lot of
10  different resources from all over, and they were one of
11  the people we called. What was appealing is that they
12  would provide the whole package, or least that's what
13  they were stating to begin with.
14          (Document marked Defendant's
15          Exhibit No. 9 for identification.)
16          MR. USHIRODA: Q. I have handed you what I
17  have marked as Exhibit 9 to your deposition. It's a
18  letter that we have obtained from Pacific Child &
19  Family Associates. It's a letter dated July 16, 2004
20  from Cara Entz, E-N-T-Z, to yourself.
21          My first question is, have you seen this
22  letter before?
23      A. I believe so.
24      Q. And the letter sets forth a Hawaii
25  proposal, and to your knowledge, was this letter

38 (Pages 240 to 243)

Page 286

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
---
ANN KIMBALL WILES and STANLEY
BOND, individually, and as next
friend of their son, BRYAN
WILES-BOND, a minor,

    Plaintiffs,

vs.    Civil No. CV-05-00247 HG/BMK
        No. CV-04-00442 HG/BMK
DEPARTMENT OF EDUCATION   CONSOLIDATED
State of Hawai'i, and ALVIN   (Other Civil Action)
RHO, in his official capacity
as West Hawai'i District
Superintendent,

    Defendants.
------------------------------/

VOLUME III

(Pages 286 through 404)

DEPOSITION OF

ANN KIMBALL WILES

WALNUT CREEK, CALIFORNIA

SATURDAY, JUNE 30, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376
REPORTED BY: MARYANN P. COSTA RPR, RMR, CSR NO. 5820
FILE NO.: A104D03

Page 287

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
---
ANN KIMBALL WILES and STANLEY
BOND, individually, and as next
friend of their son, BRYAN
WILES-BOND, a minor,

    Plaintiffs,

vs.    Civil No. CV-05-00247 HG/BMK
        No. CV-04-00442 HG/BMK
DEPARTMENT OF EDUCATION   CONSOLIDATED
State of Hawai'i, and ALVIN   (Other Civil Action)
RHO, in his official capacity
as West Hawai'i District
Superintendent,

    Defendants.
------------------------------/

    Volume III, Deposition of ANN KIMBALL
WILES, taken on behalf of Defendants, at Embassy Suites,
1345 Treat Boulevard, Walnut Creek, California,
commencing at 1:50 p.m., Saturday, June 30, 2007, before
Maryann P. Costa RPR, RMR, CSR No. 5820.

Page 288

APPEARANCES

FOR THE PLAINTIFFS:

CARL M. VARADY, ESQ.
American Savings Bank Tower
1001 Bishop Street
Suite 2870
Honolulu, Hawaii 96813
(608) 523-8447

FOR THE DEFENDANTS:

WATANABE, ING & KOMEIJI
BY: GREGG M. USHIRODA, ESQ.
First Hawaiian Center
999 Bishop Street
23rd Floor
Honolulu, Hawaii 96813

Page 289

INDEX

WITNESS:   ANN KIMBALL WILES
EXAMINATION                PAGE
   BY MR. USHIRODA         290
EXHIBITS
        PLAINTIFFS'       PAGE
NUMBER    DESCRIPTION
       (None)
      DEFENDANTS'
NUMBER    DESCRIPTION           PAGE

12-    Letter dated October 8, 2004   399

QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:
    (None)

Page 290

1  ANN KIMBALL WILES,
2  having first been duly sworn, was
3  examined and testified as follows:
4
5           EXAMINATION
6  BY MR. USHIRODA:
7     Q. Good afternoon, Kim.
8     A. Good afternoon.
9     Q. We're here for the continuation and completion
10 of your deposition today.
11    I was going to ask you if you reviewed your
12 transcript from the last time, but I understand that you
13 never got a copy; correct?
14    A. That is correct.
15    Q. Okay, I will just proceed to my questioning.
16    You know, I first just want to go through your
17 interrogatory answers and, hopefully, you had a chance to
18 review those before today?
19    A. I did, last night.
20    Q. Okay, why don't we -- Kim, I'm showing you what
21 was previously marked as Exhibit 1 to your deposition.
22    It is a documented entitled, "Plaintiff Ann Kimball
23 Wiles' Amended Response to Defendant Department of
24 Education's Request for Answers to Interrogatories to Ann
25 Kimball Wiles dated March 3, 2006".

Page 291

1  Do you have that in front of you?
2     A. I do.
3     Q. Okay, very good.
4     Now, if you could please turn to page 9 of your
5  interrogatory answers.
6     Are you there?
7     A. I'm here.
8     Q. Okay, I'm going to be asking you some questions
9  about your response to Interrogatory #6, which I will
10 read into the record.
11    It states:
12    "Describe fully each injury which you believe you
13 sustained as a result of the alleged actions or inactions
14 of the Defendants. (This includes physical and mental
15 injuries; includes identifying which injuries, if any,
16 you claim are permanent.)"
17    And I take it your responses are in answer to
18 Interrogatory 6; correct?
19    A. That's correct.
20    Q. Okay, and, do you believe, Kim, that you have
21 sustained -- you, yourself, personally, have sustained
22 injuries as a result of defendant's actions or inactions?
23    A. I do.
24    Q. And could you, briefly, tell me what those
25 injuries are?

Page 292

1     A. You know, I'm not sure how to categorize them,
2  or how to catalog, or categorize them. But, I do know
3  that, as we proceeded to try and get Bryan's needs met,
4  and we were unsuccessful, and kind of went through doing
5  due process as a last resort, and then, eventually, in
6  Federal Court, the system began to get tighter as far as
7  being a little bit more retaliatory and more resistant to
8  providing services and his program fell apart.
9     So, how that impacted us as a family is, of course,
10 his behaviors. As program fell apart, his behavior got
11 worse. And I think, by the end, they were, eventually,
12 trying to get us to leave the state.
13    Q. Okay, and, I think we had talked about that the
14 last time; right?
15    A. Yes, we did.
16    Q. Okay, but, I guess what I'm more interested
17 here is whether you are claiming any personal injuries.
18    By that, I mean, did you suffer any kind of
19 emotional distress or --
20    A. Absolutely. Our whole family was under a lot
21 of stress.
22    Q. Okay.
23    A. Both at that time and, you know, like I told
24 you last time, just the carry-over, the knowing that
25 we've missed such a window of opportunity in what the

Page 293

1  future is going to hold.
2     Q. And how has that caused stress in you?
3     A. It causes stress in the sense that there is a
4  whole uncertainty to what's going to happen to Bryan.
5     Q. Now, in response to Interrogatory #6, you
6  state, at the very start:
7     "The position the DEO put us in left us in a state
8  of almost constant stress." and you go on to elaborate.
9     Is that what you're talking about here, the constant
10 state of stress regarding Bryan?
11    A. That was the stress that was at that time,
12 absolutely.
13    Q. How about today?
14    A. Yes. I mean, I do think there is residual
15 stress that we live with.
16    Q. Okay, and my questions will be geared as to
17 you, personally.
18    Have you seen any healthcare provider regarding this
19 stress?
20    A. I did at the time.
21    Q. Who did you see?
22    A. I just -- I couldn't sleep and so I went to
23 a -- basically, it was kind of a Sure Care place; and
24 they prescribed Ambien to help me sleep. And I, you
25 know, told them that I was really feeling distress.

Page 294

1  And, actually, I had talked to Dru, the ISC, about
2  it. You know, I said, do you know of anybody that I
3  could go see? I never, actually, pursued going; but, I
4  was under a lot of stress, yeah.
5  Q. Who is this -- who or what place did you go to
6  seek treatment at?
7  A. You know, I can't remember the name of it. I
8  can tell you where it's located.
9  Q. Okay, can you tell me where it's located?
10  A. It is on the corner of -- it's next to Borders
11  in Kona.
12  Q. I think I know the area you're talking about.
13  A. I'm sorry. I can't remember it's been a little
14  too long.
15  Q. Does the name Dr. Chang Stroman sound familiar?
16  A. Yes, that's who I saw.
17  Q. Is Dr. Stroman a medical doctor or is he a
18  psychologist?
19  A. He's a medical doctor.
20  Q. Do you know what his field is?
21  A. I don't. Basically, he was going to be like
22  the first point of contact. I mean, I went there for
23  sleep issues, mainly, due to stress, and then I spoke
24  with him about maybe someone he would recommend.
25  Q. And did Dr. Stroman recommend anybody?

Page 295

1  A. He gave me a few names, but he didn't seem to
2  really have a whole lot of expertise in this.
3  Q. And Dr. Stroman prescribed Ambien?
4  A. Yes, he did.
5  Q. And how many times did you see Dr. Stroman for
6  the sleep disorder?
7  A. I believe once.
8  Q. Okay.
9  A. I'm not someone who likes taking pills, and I
10  tried it, and I just did it when I absolutely had to; and
11  I didn't do it that much because I don't like --
12  Q. Okay, and your interrogatory answers indicate
13  that you saw him -- saw Dr. Stroman -- on July 12, 2004.
14  Does that sound about right to you?
15  A. Yes. And I think -- I could figure it out
16  because I still have the prescription.
17  Q. Okay.
18  A. So, that's the date the prescription was
19  filled, and I believe it's the same day.
20  Q. Okay, and have you seen anybody else for stress
21  or emotional distress?
22  A. No.
23  Q. Now, I want to take -- your response to
24  Interrogatory #6 is quite lengthy. It seems to be almost
25  the same as Stan's response; but, I'm going to take, you

Page 296

1  know, it in blocks, so we can address each block as we
2  go. Okay?
3  A. Sure.
4  Q. Now, the first block starts with the paragraph
5  "Daily observations of predictable regression...".
6  Do you see --
7  A. Yes, I do see that.
8  Q. Now, you talked about a predictable regression
9  in Bryan's behavior that corresponds with the educational
10  program -- or that correspond to the incorrect
11  implementation of his program?
12  A. That's correct.
13  Q. Why was that predictable?
14  A. It was predictable because we had seen the
15  pattern many times over.
16  Q. What pattern do you see?
17  A. I'm talking about many different things. An
18  example would be, for instance, if he is allowed to
19  self-stimulate, that it increases self-stimulatory
20  behavior. And, when that happens, he becomes more
21  aggressive, less focused and gets -- well, his focus
22  turns to wanting to do more self-stimulating.
23  Q. Okay, now, are you claiming that the program
24  was deficient -- that Bryan's educational program was
25  deficient?

Page 297

1  A. Yeah, basically, it eroded. You know, what
2  you're talking about is, you're talking about a span of
3  time, and it depends at what cross-section you're looking
4  at; but, yes, I would say probably from about the summer
5  of '04 all the way until we left, his program was
6  definitely eroded.
7  Q. Okay, but --
8  A. But, mainly, I was talking about the
9  implementation here.
10  Q. Okay, that's what I was trying to get a sense
11  of. I mean, is, if you are claiming that there was
12  something with the program, in and of itself, or are you
13  claiming that it was the implementation of the program
14  that was the problem?
15  A. I would have to say both, depending on the
16  point in time. I think it started off as an
17  implementation error and, by the end, it was both.
18  Q. Okay, and, the program, when you say something
19  was wrong with the program, you said it eroded, and that
20  started in the summer of '04 up until the time you left;
21  correct?
22  A. Correct.
23  Q. And what do you mean it had eroded during that
24  time period?
25  A. Basically, it was no longer a sequential

Page 370

1  that's very frightening to me.
2      Q.  I'd like to talk to you a little bit about your
3  claim and see if I can get a hold of it.
4      Now, I understand that the only claim you're
5  bringing is for violation of Section 504 of the
6  Rehabilitation Act; is that correct?
7      A.  Yes.
8      Q.  What I'd like for you to tell me, basically, is
9  if you could describe your claim -- and I'd like to know
10 what the factual bases for that claim is.
11     A.  It's, basically, that, when Bryan's program
12 wasn't being implemented, like, according to the IEP, the
13 hearing orders, etc., and we were advocating, basically,
14 to get the services that Bryan needed, the more we
15 advocated, we were unable to secure it. The more we had
16 to, actually, go into these different legal proceedings
17 and, the further we got into that, the more it seemed
18 like the system retaliated and, basically, kept things in
19 place that they knew weren't working.
20     For instance, by the Summer of '04, they were having
21 these people who the psychologist told them didn't have
22 the skill set. They just kept plugging along. They just
23 didn't go through all the avenues of getting people who
24 were qualified, who would meet those qualifications; and,
25 you know, they were not really pursuing the leads.

Page 371

1      There was time and time again that they would run
2  and just try and do things right, you know, to
3  demonstrate in court. But, the whole point was that they
4  were trying to, basically, reduce the services. They
5  knew Bryan's behavior would escalate. And I think they
6  really were ready to see us leave. They knew, if there
7  wasn't anything to support -- they also knew we wouldn't
8  just send Bryan to the mainland and stay in Hawaii.
9      Q.  Okay, now, let me see if I understand.
10 They're, basically, reducing the services so they would
11 have Bryan regress to a point such that he would leave
12 the State of Hawaii?
13     Is that what you're saying?
14     A.  Well, not providing the appropriate services.
15 It became much more adversarial. There was -- well, I
16 know you've heard this a lot of times --
17     Q.  No, go on.
18     A.  They were doing things that, certainly, put him
19 in jeopardy.
20     They weren't following the FBA;
21     They were isolating him;
22     They didn't have PAM in place;
23     They let those behaviors occur that they knew were
24 occurring, that they knew would lead to more negative
25 behaviors.

Page 372

1      Once we got him home, they really didn't provide the
2  educational support for the program. Dru was not even
3  coming in and talking about the educational program as
4  much as we'd want to. She was much more interested in
5  the personal life of the skills trainers and, you know,
6  trying to find out information about us.
7      I mean, it just turned very -- the focus changed,
8  and it really wasn't to Bryan's benefit. And it really
9  seemed punitive that there was a focus on us for trying
10 to pursue these routes.
11     Q.  Now, is there a time period within which of
12 these acts took place?
13     A.  They really started, probably, when we went to
14 federal court, like, December.
15     Q.  December '03?
16     A.  Uh-hum.
17     Q.  Up until the time you left?
18     A.  Yes.
19     Q.  Okay, now, when you say the DOE was
20 retaliatory, could you give me some instances of the DOE
21 being retaliatory?
22     MR. VARADY: Asked and answered. Go ahead.
23     THE WITNESS: Basically, knowing that the current
24 skills trainers were not working;
25     Not putting in some people who could be stable;

Page 373

1      Not getting the sign language person to come in and,
2  at least, regroup and get everybody on the same page with
3  the same signs, as per the hearing order;
4      Not really going out and trying to recruit teachers
5  with these qualifications, even though they had three
6  people, internally, that lived in Kona who would have,
7  actually, met those three qualifications.
8      Q.  Who are these three people?
9      A.  I knew of three different people that had both
10 the signing and the Special Ed background.
11     Q.  Who were those?
12     A.  One was Kevin Birkshire; and they did try and
13 recruit him, but, he was leaving. Christina Gorman and
14 Denise Thomas.
15     Q.  These were three individuals who you felt were
16 qualified teachers?
17     A.  Yes.
18     Q.  And Mr. Birkshire, you said, was not available?
19     A.  That's correct.
20     Q.  What about Ms. Gorman?
21     A.  Both of these teachers were teachers that I
22 just knew, personally, because I'd worked with them. I
23 never mentioned it to them. It wasn't my place at all.
24 But, I never saw any kind of attempts at internally
25 recruiting or externally recruiting for those skills.

Page 374

1  Q. Did you pass on the names of Ms. Gorman and Ms.
2  Thomas to anyone at the DOE --
3  A. I did.
4  Q. Let me finish -- that these are possible
5  teaching candidates. Would you please take a look at
6  them?
7  A. I did.
8  Q. To whom?
9  A. JoAnn.
10  Q. JoAnn Hill?
11  A. Uh-hum.
12  Q. And when?
13  A. I'm not sure of the time frame.
14  Q. What was Ms. Hill's response?
15  A. She said that they had contacted Kevin
16  Birkshire and that he was leaving.
17  Q. Did they say they had contacted Ms. Gorman or
18  Ms. Thomas?
19  A. No.
20  Q. To your knowledge, did they ever contact Ms.
21  Gorman or Ms. Thomas?
22  A. Not to my knowledge. I don't know.
23  But, I think the bigger point was, is that they
24  didn't attempt to even go out in and see who they already
25  had.

Page 375

1  Q. Any other instances of retaliatory action by
2  the DOE?
3  A. I think there was a whole pattern of not really
4  assisting us, and I felt it was punitive.
5  Q. Not assisting you in what way?
6  A. In really trying to secure the services. There
7  also was like, you know, we would go to -- we were in the
8  process of going through these federal -- going to
9  Federal Court, and like JoAnn was supposed to go and look
10  at different programs in California. She came back --
11  she was supposed to have a report. There was a lot of
12  delay tactics; and, the net effect is it really did have
13  a strong effect, obviously, on our family.
14  Q. You know, all the factual incidents that we
15  went over in your response to Interrogatory No. 6, you
16  recall that?
17  A. I do.
18  Q. We went over those in quite some detail.
19  Is it fair to say that those are -- you are -- those
20  are instances of where the state is being deliberately
21  indifferent towards Bryan?
22  MR. VARADY: Objection insofar as it calls for legal
23  conclusion, opinion, beyond the competence of this
24  witness.
25  You can answer.

Page 376

1  THE WITNESS: Basically, I think that some of these
2  things were very intentionally targetted towards us.
3  MR. USHIRODA: Q. Okay.
4  A. Some of them were very intentional, such as
5  calling in the skills trainers to "give the dirt".
6  To try and not disclose who the E-mails were from, I
7  mean, even in later E-mails, it was -- basically, JoAnn
8  was like corresponding with this person.
9  "How do I get out of giving your name?"
10  To have somebody in there whose goal is, you know,
11  to not focus on Bryan's program, but, actually, to find
12  out information about us.
13  Q. You're referring to JoAnn Hill?
14  A. Actually, I was referring to Dr. Copeland --
15  Dru.
16  Q. Okay.
17  A. But, Jeremy Watson, obviously, I'm not sure
18  what his role was. It was very irregular.
19  I mean, the worst part of whole thing is we,
20  actually, loved Hawaii. We really wanted to live there
21  and make it our permanent home. And I have -- I worked
22  in DOE for six years. I have, and still have, to this
23  day, many friends, and know of many people that I think
24  have more integrity than you'll ever find. A lot of them
25  are administrators. And, you know, because of the

Page 377

1  separation between what was going on with Bryan, I always
2  kept that separate, and I think many of them would have
3  been appalled to know what was going on.
4  Q. If you shared it with these people? Yes?
5  A. If I had shared it. I did not.
6  Q. Oh, okay.
7  Now, what I'm just trying to do, basically, is
8  identify the instances you believe are acts of deliberate
9  indifference which is, I understand, the basis of your
10  complaint.
11  I know we've gone through your interrogatory
12  answers, and I believe you've identified your
13  interrogatory answer to #6 where you identified a number
14  of acts within those responses.
15  Perhaps, if I could throw some things out there and
16  find out from you if these are okay or not, would that be
17  okay?
18  A. Yeah. Basically, it was a pattern. It wasn't
19  any particularly isolated thing. When the conventional
20  things that they had been doing the same way, getting the
21  same result, and they continued to do that when they knew
22  there was these extra things that they really needed to
23  find.
24  Q. You know, maybe we could turn to Interrogatory
25  No. 16 at page 30 -- page 30 on Exhibit 1. I reference