**EXHIBIT "3" TO DECLARATION OF CARL M. VARADY**

Of Counsel:
DAVIS LEVIN LIVINGSTON GRANDE
STANLEY E. LEVIN          1152-0
MICHAEL K. LIVINGSTON    4161-0
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813
Telephone: (808) 524-7500
Fax: (808) 545-7802
E-Mail: slevin@davislevin.com

SHELBY ANNE FLOYD    1724-0
MEI-FEI KUO          7377-0
65-1230 Mamalahoa Hwy., Suite C21
Kamuela, Hawaii 96743
Telephone: (808) 885-6762
Fax: (808) 885-8065
E-mail: sfloyd@ahfi.com

LAW OFFICES OF CARL M. VARADY
CARL M. VARADY       4873-0
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawaii 96813
Telephone: (808) 523-8447
FAX: 523-8448
E-mail: carl@varadylaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>Plaintiffs, | CIVIL No. CV 05-00247 HG/BMK<br>CIVIL No. CV 04-00442 HG/BMK<br>Consolidated (Other Civil Action)<br><br>PLAINTIFF KIMBERLY WILES' RESPONSE TO DEFENDANT |

|  |  |
|---|---|
| vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent,<br><br>Defendants. | DEPARTMENT OF EDUCATION'S REQUEST FOR ANSWERS TO INTERROGATORIES TO KIMBERLY WILES DATED MARCH 3, 2006 |

PLAINTIFF KIMBERLY WILES' RESPONSE TO DEFENDANT DEPARTMENT OF EDUCATION'S REQUEST FOR ANSWERS TO INTERROGATORIES TO KIMBERLY WILES DATED MARCH 3, 2006

TO: HOLLY T. SHIKADA, ESQ.
GARY K. KAM, ESQ.
Department of the Attorney General
Education Section
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

Plaintiff Kimberly Wiles, by and through his above named attorneys, responds to Defendant Department of Education's Request For Answers To Interrogatories To Plaintiff Kimberly Wiles Dated March 3, 2006. Said response to interrogatories is attached hereto.

DATED: Honolulu, Hawaii, April 11, 2006.

_____
STANLEY E. LEVIN
MICHAEL K. LIVINGSTON
SHELBY ANNE FLOYD
MEI-FEI KUO
CARL M. VARADY

Attorneys for Plaintiffs

6.  Describe fully each injury which you believe you sustained as a result of the alleged actions or inactions of the Defendants. (This includes physical and mental injuries; includes identifying which injuries, if any, you claim are permanent.)

    Answer:

The position the DOE put us in left us in a state of almost constant stress. We never knew from on day to the next if Bryan would have his educational needs met and if we were going to be required to leave our jobs that day to care for him. It is probably impossible to list every injury or situation that created this stress in our lives, but we have considerable documentation of conversations and written correspondence that point to much of it. Some of the most compelling are:

-Daily observation of the predictable regression in Bryan's behaviors that corresponded with the erosion of his educational program due to incorrect implementation of his program from staff members that did not have the appropriate training. In addition to the behavioral regression Bryan's ability to learn and progress in this "window of opportunity" was squandered away due to the indifference of the Department of Education in securing appropriate personnel to implement his program and to appropriately adhere to the educational components of his program.

-Frustration caused by the indifference of working with the school and provider agencies who would claim that the aides and teacher, who didn't know DTT's and sign (major components of his program) were appropriate. This insistence was done even after going through a due process hearings and prevailing on these points. These agencies also engaged in personal attacks on the parent's character especially Ms. Wiles claiming that she was difficult to work with when she would insist that her son's program be implemented correctly. The DOE and service agencies also discussed with prospective aides how difficult the parents were to work with since they would pursue due process hearings (even though this was done when it was felt all other avenues of resolution were exhausted). This discussion with service providers in effect punished the parents for pursuing their due process rights.

- The continuing pattern of deception and delay tactics in finding skilled individuals who could implement his program. The DOE and the service provider agencies would often times provide false information (either qualifications or

12

availability) Many times we would go several weeks without hearing from them then we would get calls on the day of a hearing. Since the DOE was indifferent with respect to finding aides that had the appropriate skills, the parents spent a great deal of time researching organizations to find appropriate ABA providers. When the parents found individuals that met the qualifications and shared the information ,it was disregarded. The DOE never even looked at the resumes of individuals we had contacted and that were willing to relocate. In the meantime they claimed they had a list of "appropriate" individuals they had secured from a newspaper ad placed in Honolulu. They had these names for several weeks while Bryan was without services and never mentioned they had some prospects. When the list was given to us we contacted them. No one from the DOE had ever contacted these individuals. Many of the individuals were either not appropriate or did not understand the position was in Kona.

One of the major barriers to finding qualified individuals was finding someone with a sign background. The team needed instruction in order to advance Bryan's signing skills. The parents found someone who had excellent qualifications for teaching the team sign and a knowledge of how to progress in the instruction. He was studying in Honolulu for the summer and willing to come to Kona to instruct the team. Ms. Hill, the SES at the time made a verbal contract with him but cancelled at the last minute. The parents found out about it through an e-mail that was copied to us. Signing instruction was later offered by the DOE to all employees and scheduled at a time when Bryan didn't have services so the parents could not attend. Furthermore it was taught by several different people who didn't have a clear purpose. The DOE classes had nothing to do with working on Bryan's individual program. It also combined exact sign with ASL while Bryan's program was built on ASL.

-Leaving Bryan with individuals we did not believe were capable of working with him, including property damage when he was with them.

-The inconsistent services and our fear of Bryan's safety as things fell apart also resulted in our inability to commit professionally to any training or activity. This resulted in Ms. Wiles being unable to apply for a Principal position since she was never sure if Bryan would have the services that were agreed to in the IEP. When his hours weren't covered one of the parents would have to leave work.

-There were several individuals that we were concerned about Bryan's safety when he was with them. Also as the school environment became more hostile to Bryan we were worried about his safety in this setting too. This came to a head when Ms. Wiles went by the school to deliver extra pants and found Bryan on a mat self stemming in his urine on a plastic mat and using the surface as a slip and slide. When Ms. Wiles walked into the room she was horrified to find four adults watching. The aide said to her "He looks so happy" and the teacher said "I don't know what to do". Apparently the teacher did not understand the concept of finding an appropriate replacement behavior. This was the defining event that caused Ms. Wiles to remove him from school. Not only was there a health and safety issue present but Bryan was allowed to escalate into a frenzy through self stimulation. The need to prevent him from engaging in these kinds of behaviors was well documented since self stemming behaviors increase his desire to self stimulate and other negative behaviors such as aggression. Ms. Wiles had been worried about what was occurring at school since the beginning of the school year and had been unsuccessful in getting any answers from the teacher or psychologist about the structure of his program. When she witnessed this event she knew she could no longer trust the school or the personnel involved. In fact she felt that if he continued under the current conditions she would run the risk of losing him since he was regressing so rapidly under the lack of structure.

-As Bryan's regressed due to the inappropriate implementation of his program, the DOE abandoned working on the educational aspect of his program. It was unclear to the parents who was in charge of the educational aspect of his program. Although data was being taken there were not any adjustments to his program based on performance. It was clear that the DOE had abandoned the educational aspects of his program. During this period the Autism Consultant would speak with the skill trainers about behavioral issues and about their personal lives but there was no focus on Bryan's educational progress. In fact according to one skill trainer the psychologist would try and pry into the personal lives of the parents by asking "Are you detecting any marital difficulties?" When the Autism Consultant spoke with the parents and educational progress was brought up she would discuss it but then would not follow through with discussing the changes with the skill trainers. As Bryan's behavior dramatically improved at home, Ms. Wiles had to design the educational part of his program since the DOE had abandoned this area. During the entire time he was at home the "teacher" never called and discussed his academic progress or made a visitation.

14

-The lack of confidentiality and misinformation in Bryan's case created anger and frustration. The discussion of Bryan's case was open and inappropriate. Bryan's case and the legal aspects were a central focus of the DOE personnel and apparently discussed at Tiffe skill trainer meetings. Tiffe even called Ms. Wiles workplace and discussed the securing of a skill trainer with the school's secretary (on the day of a hearing- I guess she felt desperate to get it on record when Ms. Wiles was unavailable). Ms. Wiles, working for the DOE, had gone to great lengths to separate her professional and private life. She felt it was inappropriate for Tiffe to be sharing confidential information with a secretary who did not even know Ms. Wiles had an autistic son. The parents had numerous instances of strangers or individuals barely known to the parents and not involved in Bryan's case come up to them our in the community and start discussing Bryan, sometimes with incorrect facts. This concern was discussed on a regular basis with the psychologist and it was brought up with DOE personnel. The psychologist who is supposedly bound by confidentiality standards and knew about these concerns took an aide out drinking the afternoon after Bryan's leg was injured. They drank Bloody Marys at a local bar for five hours and discussed Bryan's case in a very public venue. At this point the parents understood how deeply unprofessional the situation had become. It was frightening since there was not any support services to assist with Bryan's needs and it was obvious the intent was to not help. It was clear the family needed to leave Hawaii as soon as possible even if another position did not become available.

-Invasion of our privacy caused considerable stress. A certain amount of privacy is expected to be forfeited when there are individuals in the house. However, it is expected that those individuals will act professionally and not go out of their way to look for personal information. One of the skill trainers that they sent went out of his way to listen to phone conversations. His feet could be observed at the doorway downstairs while he was listening to phone conversations even though he felt he was safely out of view. According to another skill trainer present at the meetings he would relay the content of conversations he had overheard to the school. He also found Real Estate information from California and reported it to the school immediately. He would leave the area on almost an hourly basis to report back to the DOE. Finding out about these behaviors forced the parents to be on their guard and added considerable stress to their lives which were already stressed due to eliminating the negative behaviors that had cropped up during the regression. The fact that someone who was there to help your son was more interested in listening in on your private conversations was disconcerting. The parents were concerned about leaving the house and made sure their room which contained the computer was locked.

15

The aide described above also shared many things which highlighted how inappropriate, questionable, and irregular the arrangement was. He described relationships with the psychologist, Tiffe, and the DOE which far exceeded professional boundaries. He told Ms. Wiles that he and the psychologist would go out for drinks and she had offered him a condominium to stay in for free on a trip to Washington DC. The psychologist had brought him to one of the parent meetings and claimed he was on an equal footing with her at least as far as his knowledge base. Ms. Wiles was surprised to hear that she would present him professionally in such a light considering he didn't even have a BA and his AA was in business   In fact his only experience was several years serving as an aide in a non-public school in California. Ms. Wiles also heard stories from the aide involving Kelly Stern who was the Director of TIFFE. The aide laughed one day about a meeting he attended in Waimea with Kelly and said they had intertwined legs throughout the meeting. Apparently they both thought it was funny that everyone stared. He also described his concern to me about his professional separation with Ms. Stern when she wanted him to live in her house (as a renter). And finally he claimed that Ms. Tolentino (the SES who was on the case after Ms. Hill was removed) had offered him a higher level autism position for working with Bryan once that assignment was completed. When the DOE hired someone else the aide was furious and relayed the story to Ms. Wiles. He had apparently discussed for an hour on the phone with the psychologist before he told Ms. Wiles. Knowing position recruitment procedures Ms. Wiles realized how serious this was. These are just a few of the examples but hearing them on a daily basis suggested that this was not a regular aide arrangement and it caused a great deal of stress having to be polite to the individual in your home when you knew his true purpose was something other than working with your child. Finally, the aide was in charge of data collection but was unwilling to share his records despite several requests. These circumstances left the parents to wonder about the accuracy of what was recorded.

Finally, the biggest act of privacy violation and the confirmation of their negative intent was the illegal tapping into our e-mails. This was discovered when the DOE submitted a private e-mail Ms. Wiles had written to another person from her computer in her bedroom to a judge in one of the legal proceedings. The judge dismissed the e-mails stating they were private and later District's SES Ms. Hill was subpoenaed but did not show up at the deposition. There were many other collaborating pieces to suggest that we were being targeted as a family. We were scared for our son and for ourselves.

The overriding stress throughout this entire period was the loss of time we could spend as a family and with our other son. We also felt at any moment the bottom could drop out and often it did. We were worried about Bryan and knew that the time we wasted in attempting to get his program implemented would result in a lost window of opportunity for his learning and would change the trajectory of his life. It was heartbreaking to see our child and our family being turned into an incorrect urban legend through the open discussion (often incorrect) of our situation with information that should have been confidential regarding our child's disability. It was also stressful to pursue legal recourses through due process hearings. Even more stressful was to prevail in the hearing and have the DOE act as if hearing orders were unimportant and they wouldn't be held accountable. This blatant disregard for the only avenue of recourse available to parents felt very much like a system out of control. Once again by the time the case had progressed to the Federal Level and the DOE would not follow through with the judge's request the family knew they would have to leave the State.

Our family wanted very much to make Hawaii our permanent home. In order to live in Hawaii Dr. Bond took a downgrade in his GS level (from a GS-12 to a GS-11) to move there from Maryland. Ms. Wiles initially took a sharp decrease in pay when working as a counselor but the family felt it was worth it to live in Hawaii. Ms. Wiles had worked for six years in the Department of Education as a counselor and an administrator. She was four years from being vested in the retirement system and had planned on working 20 years in Hawaii before retiring. Their oldest son was happily attending Parker and did not wish to leave. The family had planned to live in Hawaii permanently and it was with great sorrow they felt forced to give up that dream because the adversarial relationship with the DOE made it impossible to stay.

17