**EXHIBIT "7" TO DECLARATION OF CARL M. VARADY**

1

***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***
IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---|---

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor, | ) CIVIL NO.CV 04-00442 HG/BMK<br>) CIVIL NO.CV 05-00247 HG/BMK<br>) CONSOLIDATED<br>) (Other Civil Action)<br>) |
| Plaintiffs, | ) |
| vs. | ) TRIAL DATE:October 11, 2006 |
| DEPARTMENT OF EDUCATION, State of Hawaii, and ALVIN RHO, in his official capacity as West Hawaii District Superintendent, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

DEPOSITION OF KIMBERLY SMALLEY, Ph.D.

Taken on behalf of the Defendants, at the law offices of

Davis Levin Livingston Grand, 400 Davis Levin Livingston

Grand Place, 851 Fort Street, Honolulu, Hawai`i 96813

commencing at 9:02 a.m., on Thursday, July 27, 2006,

pursuant to Notice.


BEFORE:
          Valerie Mariano, CSR No. 353
          Notary Public, State of Hawai`i

SMALLEY

Page 2

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    2
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  APPEARANCES:
2
3  For the Plaintiffs:
   [All colloquy of Mr. Levin is via Litewriter text.]
4        STANLEY E. LEVIN, ESQ.
         Davis Levin Livingston Grand
5        400 Davis Levin Livingston Grand Place
         851 Fort Street
6        Honolulu, Hawai`i 96813
7
8  For the Defendants:
         GREGG M. USHIRODA, ESQ.
9        Watanabe Ing & Komeiji LLP
         First Hawaiian Center, 23rd Floor
10       999 Bishop Street
         Honolulu, Hawai`i 96813
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    3
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1          I N D E X
2  EXAMINATION BY:              PAGE
   Mr. Ushiroda                 4
3
4
5  EXHIBITS FOR IDENTIFICATION:    PAGE
6  1 - Curriculum Vitae; 16 pages.    7
7  2 - Fee Schedule.                  79
8  3 - Behavioral Assessment dated
       8/18/04; 21 pages.              79
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    4
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1      (Whereupon, disclosure was made available to counsel.
2   All colloquy of Mr. Levin is via Litewriter
3   texting.)
4          KIMBERLY SMALLEY, Ph.D.,
5  called as a witness on behalf of the Defendants, being
6  first duly sworn, was examined and testified as follows:
7          EXAMINATION
8  BY MR. USHIRODA:
9  Q.  Please state your full name for the record.
10 A.  Kimberly Anne Smalley.
11 Q.  Good morning.  Would you prefer that I address you
12 Dr. Smalley?
13 A.  Kim is fine.
14 Q.  Kim is fine?  Okay.
15     Kim, my name is Gregg Ushiroda.  I represent the
16 Department of Education, State of Hawaii, in a lawsuit
17 brought by the parents of Bryan Wiles-Bond.  I'm here to
18 take your deposition today.
19     Before we start, have you had your deposition taken
20 before?
21 A.  By you in this state?  No.  I mean, generally, yes.
22 Q.  Are you familiar with the guidelines in a deposition?
23 A.  I believe I am.  But if you'd like to review them,
24 that's fine.
25 Q.  Okay.  First of all, do you understand that the

Page 5

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    5
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  testimony you give today is under oath?
2  A.  Yes.
3  Q.  Okay.  And do you also understand that your responses
4  to my questions today have to be verbal so that the court
5  reporter can take them down to make a transcript?
6  A.  Yes, I do.
7  Q.  And the only other thing I require is that one person
8  speak at a time, and that's only to make it easier for the
9  transcript -- for the court reporter so she can create a
10 clear and accurate record; okay?
11 A.  Yes.
12 Q.  Okay.  Have you ever had your deposition taken as an
13 expert witness?
14 A.  Yes, I have.
15 Q.  About how many times?
16 A.  Very recently in Hawai`i and then several times in
17 California.  So less than ten.
18 Q.  Less than ten.
19     What was this recent deposition about, kind of case?
20 A.  A special ed case with the Department of Education.
21 Q.  Were you testifying as an expert witness?
22 A.  I was testifying as an expert witness for the
23 Department of Ed.
24 Q.  And who took your deposition?
25 A.  It was in a due process hearing.

## Page 86

1  before and whatever's before differently, hopefully then
2  affecting the behavior.
3       Functional behavior assessment also includes ruling
4  out medical issues. You never write a plan on somebody
5  who's got an earache. You want to make sure it's a
6  behavior, not something internal.
7       It also looks at skill deficits -- that's a big part
8  of Bryan's plan -- of what doesn't this kid know? If I
9  knew how to play and how to reason and how to communicate
10 and how to cope and a hundred different things, then he
11 wouldn't have to use his behaviors.
12      Then the behavior plan should give his team some
13 information about what to teach to him and how to teach it.
14 Q.  So who was this report prepared for?
15 A.  Department of Education.
16 Q.  Okay. And was it for what purpose?
17 A.  I hope to implement to effect change in Bryan's life.
18 Bryan was just an awful mess when they asked me to come do
19 this.
20 Q.  You'll have to excuse my ignorance.
21 A.  Yeah, yeah.
22 Q.  I'm just trying to find out. So the purpose is to
23 implement?
24 A.  The purpose of a functional behavior assessment is to
25 determine the functions of the behavior, find out what you

## Page 87

1  need to do to modify the environment, what you need to do
2  to teach the child, what you need to do in your response to
3  those behaviors to eliminate those behaviors and accelerate
4  functional skills. So teach me good things to do in place
5  of these things that are troublesome that are getting in
6  way of me accessing benefit from my education.
7  Q.  That's the assessment?
8  A.  Correct.
9  Q.  And then the plan is just --
10 A.  The how-to.
11 Q.  -- the how-to, how to effectuate this?
12 A.  The plan is, this is what I found. Now here's what --
13 here's some things you can do about it.
14 Q.  Now was this -- do you recall how you being contacted
15 to prepare this report came about?
16 A.  I know that there had been -- I know that there had
17 been an IEP and in that IEP the DOE committed me and that I
18 hadn't heard from them and that several people had asked
19 me, when are you coming? When are you coming? And I
20 hadn't heard of it. And I remember saying, hey, you know,
21 the DOE doesn't get to commit my time. Someone needs to
22 let me know about this. But then eventually I was
23 contacted. You know, I know this young man, and I had seen
24 him recently, and it was very, very disappointing, and so I
25 was more than happy to go out and help this team again.

## Page 88

1  Q.  Okay. Well, let's -- before we get into your report,
2  you got called over to prepare this report, do an
3  assessment, and come up with a plan. You said you were
4  very disappointed. What did you see when you came over?
5  A.  It was very bad.
6  Q.  Okay.
7  A.  When I saw Bryan, prior to this report and during this
8  report -- he was awful. He was com -- soaked in urine all
9  the time. He was aggressive. He was self-injurious. He
10 was ignored. He was unengaged. He had no direct
11 instruction. He had no direct communication instruction.
12 His skills trainers did not know what they were doing.
13 Some of them were motivated and interested and sat down and
14 asked me questions. Some of them could care less. His
15 teacher did not know what to do with him and verbally was
16 receptive to suggestions, but then implementation appeared
17 at least to be nonexistent. Then it was either -- I think
18 it was the end of the school year, so then there was no
19 teacher.
20 Q.  Was he in some kind of summer program?
21 A.  Yeah. Many of the times I saw him, he was alone in a
22 room with his skills trainers sitting in his own urine
23 stimming. They had a big box of stim toys. Like Mardi
24 Gras beads, bubble wrap, stupid stuff, infants' stuff,
25 things that were much too young for him. They just let him

## Page 89

1  lay and play with it.
2       And I would come in, and because I wasn't perceived as
3  a person of authority, their behavior wouldn't change. And
4  I would wait and take notes. And then after a certain
5  amount of time it would be, okay, now what are you gonna
6  do? Maybe we should check the schedule -- and try to
7  provide them some technical assistance -- rather than leave
8  him there and feces and urine. The longer you get to do
9  that, the more you're going to want to do that. And then
10 they would go up to him and try to interrupt him because I
11 was here, and he would protest. I remember one girl
12 turning to me crying. See, he's too tough.
13      And I -- at that point I think he even had two-on-one,
14 two-on-one staffing. And I remember trying to work with
15 the male staff. Don't be aggressive. Don't be forceful.
16 Don't be restraining. You're not here as an enforcer.
17 You're here as an educator. Pull out his favorite CD ROM.
18      That's what -- I would literally go through the boxes
19 in the classroom trying to find things for him to do. The
20 academics that were there he had already mastered. It's a
21 ball. It's a fish. It's red. It's green. He had known
22 his colors when I first met him. He had known hundreds of
23 labels a year ago. They were working on the same four
24 words over and over again: ball, fish -- I can't think of
25 what the others were -- and his colors. I would explain to

### Page 90

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    90
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 the skills trainers, this is material he has mastered. He
2 may be ignoring you because he's sick of seeing it.
3     They would say back to me, we don't know what to do.
4 We have no materials, no instruction. No one is helping
5 us. No one is telling us what to do. I would give them
6 some things to do, that way I could watch how Bryan
7 responded and take notes on that. That involved literally
8 like setting up the computer. The skills trainer and I
9 were trying to put the computer back together so they could
10 then work on it so I could know whether Bryan knew what he
11 was doing or not or protested doing it. It was very, very
12 unfortunate.
13     There was an ECSY, extended classroom school year,
14 going on that Bryan would typically be a part of, but due
15 to the extreme nature of his behavior, the IEP team -- I
16 don't know whose decision it was, but it was an IEP
17 decision to isolate him, so he was being educated by
18 himself one-on-one. That was even harder. He didn't have
19 any friends. He didn't have any activities. He didn't
20 have anything interesting to do. He wasn't motivated by
21 anything that there was, so it was just long periods of
22 down time.
23 Q.  Did you -- let's back up. I know the report is dated
24 in August '04, and you said -- when did you first come to
25 see him?

### Page 91

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    91
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 A.  I started the observations at the end of the school
2 year, and 'cause I had talked to the school year teacher
3 and then his summer school teacher, so I'm thinking,
4 without having my time sheets in front of me, probably
5 June, July, August.
6 Q.  Okay.
7 A.  Ideally the report would have been done in the school
8 year, you know, but there was some snag about getting me
9 started right near the end of the school year, so tail end
10 of the school year and through summer school.
11 Q.  Okay. Now I assume Bryan had an IEP in place?
12 A.  Uh-huh.
13 Q.  Were you familiar with that, the current IEP?
14 A.  At that time. I don't have it in front of me, but
15 yes.
16 Q.  And I suppose that the -- they're supposed to follow
17 this IEP?
18 A.  Yes. That would be their legal document.
19 Q.  Okay. Was it being followed?
20 A.  No.
21 Q.  Okay. In what way wasn't it being followed?
22 A.  In any way.
23 Q.  Okay.
24 A.  It was -- the implementation was very, very poor.
25 Q.  Okay. Was that the problem, the implementation?

### Page 92

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    92
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 A.  Was that the -- there were many problems, and that was
2 certainly probably the biggest of them.
3 Q.  Okay. What were the problems -- why was the
4 implementation a problem at this point?
5 A.  Why -- well, there was no structure, no materials, no
6 teacher with expertise in Bryan's needs. The skills
7 trainers lacked the expertise to work with him, lacked the
8 training to work with him. Some of them lacked the mere
9 fortitude to work with him. There was limited to no sign
10 language. At one point there was a staff person who had
11 some sign language. I worked with her a little bit. But
12 for the most part, everything about his plan that we had
13 agreed to and done successfully sometime in the past had
14 just completely dissipated.
15 Q.  And did you come to find out why, why that happened?
16 A.  I was besides myself at the time, and I kept asking
17 why. And like I said, I called the training person at HBH,
18 and I spoke to the DOE person, and I believe the
19 explanation was just turnover. You know, people -- didn't
20 have people, and they didn't have people -- the people they
21 did have didn't have the background that the previous
22 people who served him had had.
23 Q.  In this occupation, being skills trainer, is there a
24 high turnover rate in this field?
25 A.  Yeah. For people who are challenging, I think if you

### Page 93

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    93
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 don't have the right training and right support, you move
2 on to someone easier.
3 Q.  Okay. In terms of the number of skills trainers
4 available in the Kona area, is that a -- a limited
5 resource?
6 A.  I don't know that myself personally. I'm under the
7 impression that it is. During this report, he did have
8 staffing. He had two-on-one staffing. There were bodies
9 there. They just didn't know what to do and weren't doing
10 it when they were given the information to do it.
11 Q.  Do you get the sense that they were trying?
12 A.  Some of them. Some of them no.
13 Q.  Okay. Do you have any names of the skills trainers
14 involved?
15 A.  I remember spending a lot of time with a gentleman
16 named Sven, and I remember that because it's a Scandinavian
17 name and he had an accent.
18     There was a young woman whose name I don't know, and
19 it's horrible to identify her this way, but she had very
20 large breasts, and Bryan was very, very interested in her
21 breasts. So I remember talking to her about what to wear
22 and how to keep distance from him and how to support him
23 without touching him.
24     There was an older woman who -- and by "older" I mean
25 that these other two people were kids -- were young. I

Page 94

1  don't know how old she was. She was a grown-up. She was a
2  mom. And I remember she had effort, you know, and she was
3  willing and interested in learning sign language, and I
4  remember coming and showing her signs when I was there.
5      But even with all that, every time I came to see
6  Bryan, he was laying on the floor, stimming, in his own
7  urine or feces. It was -- I mean, it was neglect.
8  There's -- I was very upset, and I took it to the DOE, and
9  I called HBH, and I tried to help these individuals to do a
10 better job. It wasn't good.
11 Q.  Okay. Who did you speak to?
12 A.  Whoever would be down the hallway in the SSC's office.
13 Again, if you give me names, I will recognize them.
14 Q.  Kate Tolentino?
15 A.  Was she SSC? I know that name --
16 Q.  I don't know.
17 A.  -- but I'm not sure what role. I would -- for ESY
18 summer school, the office was three doors down. I would go
19 down and I would say, okay, here's -- you know, he's locked
20 in the room. He's all wet. Nobody's doing anything with
21 him. And, you know, I would pass that information on. I'm
22 obligated to report. I would pass that information on.
23     I know I called. And again, I think the woman's name
24 is Leilani. Hopefully that's not the new trainer versus
25 who the trainer was at that time. I called CFS, said, your

Page 95

1  people need Problem Solver training in crisis prevention.
2  I know I recommended other names in my report. It's a
3  different acronym, same name, but also Problem Solver
4  because those are people working with severe cognitive
5  disability.
6      CPI, the intervention the State uses, relies more with
7  people with language. They teach you how to talk somebody
8  down. If you're dealing with someone with a mental illness
9  or someone who's irate, you might have the ability to talk
10 them down where if you're dealing with somebody with no
11 receptive language skills or limited receptive language
12 skills, blah, blah, blah. Doesn't matter what you're
13 saying. That whole part of your training isn't going to
14 help you in this instance where Problem Solver focuses a
15 little bit more on developmental disabilities.
16     I recommended HBH, I can train you. I recommended
17 other people that can come out and provide training for
18 their staff. Actually, at that time I was in conversation
19 with HBH about providing some training for them just
20 globally as an agency, not specific to Bryan, but clearly
21 Bryan would have benefitted, and that never came to
22 fruition.
23     At some point in there, that short time frame, they
24 just -- Bryan accidentally knocked someone's tooth out, and
25 it really was accidental. He was also aggressive at this

Page 96

1  time, but in this particular incident he was flailing, and
2  he elbowed a woman and knocked her tooth out. And that was
3  an expensive, you know, workmen's comp claim or whatever it
4  was for HBH, and I think they -- I don't know. This is my
5  opinion. I think they came to the conclusion that they
6  cannot serve this child safely, and then they stopped
7  serving him.
8  Q.  Okay. I'm sorry. You said you came --
9  A.  I think they came to this conclusion. I had called
10 HBH and said, you know, help. And the person I spoke to
11 said, we're not gonna do this anymore. So they didn't need
12 me to come train his staff because they weren't going to
13 continue serving him.
14 Q.  And you base that on?
15 A.  Known conversations.
16 Q.  And you -- okay.
17 A.  Everybody recognized that bad things were happening.
18 The DOE, the providers, the parents, everybody was very
19 upset. They just couldn't see -- they just couldn't seem
20 to find a way out of it. And that's where I hoped that if
21 I wrote a big assessment with all the instructions and all
22 the how-to that they would have something to work from and
23 that we could, you know, hopefully turn some of this
24 around.
25 Q.  That's why they called you; is that correct?

Page 97

1  A.  Well, I think the parents insisted they call me
2  because I had prior experience with Bryan.
3  Q.  How do you know the parents insisted that the DOE
4  called you?
5  A.  Well, because they called me if I had been procured,
6  or they sent me an e-mail probably if I had been procured.
7  Well, I don't know anything about it yet. This was prior.
8  I wasn't in the IEP where the decision was made to purchase
9  me, if that's what you're asking.
10 Q.  Okay. Now this report, was it meant to assist the IEP
11 team in implementing --
12 A.  The IEP?
13 Q.  -- the IEP?
14 A.  Any assessment is meant to assist the IEP team to
15 implement the IEP. And you get all kinds of outside
16 assessments to supplement: OT assessment, speech
17 assessment; in this case, OT assessment.
18 Q.  You were contacted in this case by who?
19 A.  Child and Family Services.
20 Q.  And they are --
21 A.  They are a prior of the Department of Education's
22 intensive services contract, autism.
23     When the Department of Ed in any state finds
24 themselves in a situation where they cannot provide
25 services, they were supposed to provide it themselves; but

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    98
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  when they can't, they contract out to a contract service
2  provider. ADA allows them to do that, requires them to do
3  that. Every state procures an agency bid. I can serve
4  autism. Here's how our agency will do it. Here are our
5  competent people. The DOE grades those. People win a
6  contract, and CFS is one of those people. I cannot in this
7  state just hang out my shingle, Kim Smalley, Behaviors for
8  Hire. I must be -- because this state is state-run here.
9  In Alaska, nowhere else, I must be a subcontractor of an
10 agency that already has a contract with the Department of
11 Ed.
12 Q.  And so you were subcontracted through --
13 A.  Correct.
14 Q.  Okay. Now going back to your collecting data --
15 A.  Uh-huh.
16 Q.  -- for this report, I know you said that a big part of
17 it was observation; correct?
18 A.  Uh-huh.
19 Q.  Yes? Just for the court reporter?
20 A.  Oh, I'm sorry. I don't mean to say uh-huh.
21     Yes, a big part of the assessment here is observation
22 and direct data collection. You can't rely on someone's
23 opinion. If you got hurt -- say you're a skills trainer
24 and you got hurt. You might describe the situation
25 different or worse than it was. It may feel one way to you

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    99
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  wherein what in fact I see is the information I need. So a
2  big part of any behavior assessment is watching and
3  writing, watching and counting and writing things down.
4  There are different kinds of data collection.
5  Q.  In this case what did you do?
6  A.  Rob Horner Functional Data Assessment Collection Tool.
7  He's one of the premier people in the field. Actually, he
8  trained here in Hawai`i. He has a data collection tool
9  that I prefer because that's the easiest for me to use, and
10 it collects the most amount of information on one form. I
11 also did simple ABC, antecedent, behavior, consequence, so
12 I had a narrative as well as numbers.
13     So behavior would happen. I would have already been
14 writing. You know, 10:10, nothing, no -- no engagement,
15 laying on the ground, laying on the ground urinating,
16 urinating, completely missing everything that was going on
17 with Bryan and in the room around him. Then there would be
18 the behavior, and I would write hit, yell, scream, cry,
19 whatever, whatever happened, and then how many times it
20 happened. So that would be frequency data. And how long
21 it went on, that would be duration data. And how long
22 between when someone asked him to do something and the
23 behavior or how long between the behavior and the next one
24 or how long between the behavior and the staff's response
25 and those types of things are called latency.

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    100
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  So I was recording all these things 'cause I -- I have
2  a higher degree of professionalism or higher knowledge
3  base, and this is more than you would typically find. This
4  is what you should find, but it's more than you would
5  typically find. So frequency, duration, latency,
6  narrative, and the Rob Horner form to collect data to
7  contributed to this report on my own.
8      In addition to that, Drew provided me with copies of
9  all the data collection sheets that the one-on-ones and the
10 family were taking 'cause the family did take data at home.
11 So I had all their information for the previous several
12 months and then, of course, my own observations as well.
13 Q.  Did you have a baseline to compare?
14 A.  I had a better baseline than anybody else ever did. I
15 had his baseline two years ago, fifteen months ago, eight
16 months ago, six months ago. I absolutely had far more
17 information than anybody else.
18 Q.  So you had a baseline to compare his toileting?
19 A.  Do you know what baseline means? Baseline is the
20 level, the number of times something happens, whether it's
21 using the bathroom or aggressing or something that you want
22 to see.
23 Q.  Right.
24 A.  Communication use. You watch a child for ten days.
25 You record everything. That's your baseline.

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    101
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  Q.  Okay.
2  A.  Now you add intervention, and you see if what you're
3  doing works by whether the data improves or decreases. So
4  I'm establishing a baseline in this report for future
5  implementers.
6  Q.  Uh-huh.
7  A.  But even more so, I have information on Bryan over the
8  last two years, so what I know to have been his previous
9  baseline, because, of course, you can establish a new
10 baseline at any time.
11 Q.  Uh-huh.
12 A.  I know what it used to be. I know what it looked like
13 when things were going really well, and, oh, my God, I know
14 what it looks like now.
15 Q.  I see.
16 A.  So what I was doing is establishing the baseline for
17 the implementers. Here's what I saw. The couple months I
18 was doing this, this is what it looked like. Your job,
19 make the communication go up and the variety of behaviors
20 go down, social skills go up. All those things they would
21 then choose to implement.
22 Q.  Okay. Thank you.
23 A.  Yeah. Just -- you weren't asking the question right.
24 I don't know if you knew.
25 Q.  No, no. I -- you know, I understand the baseline.

**CERTIFICATE OF SERVICE**

I certify the attached document was served electronically via CM/ECF on the date indicated below addressed to:

Gregg M. Ushiroda gushiroda@wik.com
Daniel K. Obuhanych dobuhanych@wik.com
Leighton M. Hara lhara@wik.com, rgeorge@wik.com
Watanabe Ing & Komeiji
First Hawaiian Center
999 Bishop St 23rd Flr
Honolulu  HI 96813


Holly T. Shikada holly.t.shikada@hawaii.gov,
Cheryl.H.Oeda@hawaii.gov, michael.t.burke@hawaii.gov
Deputies Attorney General
235 S. Beretania, Room 304
Honolulu HI 96813

Attorneys for Defendants

DATED: Honolulu, Hawai'i, October 2, 2007

/s/ Carl M. Varady
Carl M. Varady