FILE COPY

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3    ------------------------------------------

 4    ANN KIMBALL WILES and STANLEY BOND,

 5    individually and as next friend of their

 6    son, BRYAN WILES-BOND, a minor,

 7              Plaintiffs,

 8              vs.          Civil No. CV 04-00442 HG/BMK

 9                                   05-00247 JMS/BMK

10    DEPARTMENT OF EDUCATION, State of Hawaii,

11    and ALVIN RHO, in his official capacity

12    as West Hawaii District Superintendent,

13              Defendants.

14    ------------------------------------------

15

16

17       VIDEOTAPED DEPOSITION OF WILLIAM BELJEAN

18

19    Taken on behalf of the Plaintiffs at Ralph Rosenberg

20    Court Reporters, 75-170 Hualalai  Rd., Suite D-212,

21    Kailua-Kona, Hawaii 96740, commencing at 1:00 p.m.,

22    Thursday, July 19, 2007, pursuant to Notice.

23

24    BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

25              Notary Public, State of Hawaii
```

EXHIBIT "A"

1   APPEARANCES:

2   For Plaintiff:       STAN LEVIN, Esq.

3                        BRUCE ELLIS

4                        DAVIS LEVIN LIVINGSTON GRANDE

5                        851 Fort St., Suite 400

6                        Honolulu, Hawaii 96813

7

8   For Defendant DEPT. OF EDUCATION:

9                        GREGG USHIRODA, Esq.

10                       WATANABE ING & KOMEIJI

11                       First Hawaiian Center

12                       999 Bishop St., 23rd Floor

13                       Honolulu, Hawaii 96813

14

15

16  Also Present:        DEREK BRYANT, Videographer

17

18

19

20

21

22

23

24

25

```
                         I N D E X

EXAMINATION BY:                              PAGE

MR. LEVIN..................................5




                       E X H I B I T S

NO.        DESCRIPTION                       PAGE

1          List of skills trainers..........9

2A         Employment suitability check....11

2B         Fax cover sheet from Beljean

           to Radwick......................11

2C         Fax from Beljean to Radwick.....11

3          July 2002 release and

           settlement agreement............16

4          Declaration of Beljean..........24
```

1           THE VIDEOGRAPHER:  This is the deposition of

2    William Beljean in the matter of Ann Kimball Wiles and

3    Stanley Bond, et al. versus the Department of Education,

4    et al.  We're located at Ralph Rosenberg Court

5    Reporters, Kailua-Kona, Hawaii.  My name is Derek

6    Bryant, certified legal video specialist.  Will counsel

7    please state their names.

8           MR. ELLIS:  Stan Levin and Bruce Ellis for

9    Plaintiffs.

10          MR. USHIRODA:  Gregg Ushiroda for Defendants

11   State of Hawaii Department of Education and Alvin Rho in

12   his official capacity as superintendent for the West

13   Hawaii School District.  I'm also appearing here as

14   counsel for Mr. Beljean, specifically for this

15   deposition.

16          THE VIDEOGRAPHER:  Today's date is July 19th,

17   2007.  We're now on the record.  It is 1:01 p.m.  Will

18   the court reporter please swear in the deponent.

19          MR. ELLIS:  Can we go off the record just a

20   second.

21          THE VIDEOGRAPHER:  Off the record, it is

22   1:01 p.m.

23              (Off the record at 1:01 p.m.)

24              (Back on the record at 1:02 p.m.)

25          THE VIDEOGRAPHER:  We're back on the record.

1    It is 1:02 p.m.

2              MR. USHIRODA:  Yes, I have been -- Mr. Beljean

3    has asked me to represent him just for the purposes of

4    this deposition; is that correct, Mr. Beljean?

5              THE WITNESS:  Yes.

6              MR. ELLIS:  On the record, Mr. Levin objects to

7    Mr. Ushiroda being both counsel for the DOE and counsel

8    for this witness.

9              MR. USHIRODA:  Objection so noted.

10                        WILLIAM BELJEAN

11   called as a witness at the instance of the Plaintiffs

12   being first duly sworn to tell the truth, the whole

13   truth, and nothing but the truth testified as follows:

14                         EXAMINATION

15   BY MR. LEVIN:

16        Q.   (Mr. Ellis) Mr. Beljean, do you understand that

17   your testimony today will be under oath?

18        A.   Yes.

19        Q.   (Mr. Ellis) Okay.  Do you understand that your

20   responses to my questions today have to be verbal so

21   that the court reporter can take them down to make the

22   transcript?

23        A.   Yes.

24        Q.   (Mr. Ellis) Okay.  Do you understand that your

25   responses to my questions today will be received as what

1  you intended the answers to be and that the answer --

2  that by answering the question you will -- I will assume

3  that you understand the questions; do you understand

4  that?

5      A.   Yes.

6      Q.   (Mr. Ellis) That said, I don't want you to

7  guess or speculate, but I would like you to answer the

8  questions to the best of your recollection, and if you

9  can't remember, just say so and that will be fine; do

10 you understand that?

11     A.   Yes.

12     Q.   (Mr. Ellis) Okay.  Because your answers will be

13 considered as what you intended as true and correct,

14 should you later change your answers, say at a trial,

15 the answers you give today will be used to impeach your

16 testimony; do you understand that?

17     A.   Yes.

18     Q.   (Mr. Ellis) Do you understand what impeaching

19 your testimony means?

20     A.   Yes.

21     Q.   (Mr. Ellis) Okay.  You understand that only one

22 person at a time can talk?

23     A.   Yes.

24     Q.   (Mr. Ellis) And please allow me to finish my

25 questions before you start answering, and I'll attempt

1      to do the same.

2          A.   Yes.

3          Q.   (Mr. Ellis) And should one of the attorneys

4      object to the question, please allow the attorney to

5      voice the objection.  And although an objection has been

6      voiced, unless the attorney has instructed you not to

7      answer, you must answer the question; do you understand

8      that?

9          A.   Yes, sir, I do.

10         Q.   (Mr. Ellis) Okay.  Do you understand what's

11     been explained to you?

12         A.   Yes.

13         Q.   (Mr. Ellis) Okay.  Is there any reason why this

14     deposition cannot proceed?

15         A.   No.

16         Q.   (Mr. Ellis) Okay.  Are there -- are you taking

17     any medication that would somehow affect your deposition

18     today?

19         A.   No.

20         Q.   (Mr. Ellis) Could you provide us your work

21     history since you graduated from college.

22         A.   Since I graduated from college in 1969, I spent

23     another four years in seminary in Philadelphia earning a

24     Master of Divinity Degree.  After that, I worked from

25     1973 till mid-1975 as pastor of Bermudian Lutheran

1  parish in Gardners, Pennsylvania.  From '75 until March

2  of '80 -- sorry.  '84.  For eight and a half years as

3  pastor of Incarnation Lutheran Church, Rich Hampton, New

4  York.  And then 19-plus years as pastor of St. Paul's

5  Lutheran Church, Rye Brook, New York.

6       After that I moved here in 19 -- I'm sorry,

7  2003.  The first position I had when I came here in June

8  of 2003 was working with Child and Family Service as a

9  skills trainer, which is when I worked with Bryan.  In

10 January of 19 -- I'm sorry, 2004, I began to work as

11 a -- the title was residential specialist overseeing a

12 program in -- for foster children, also with Child and

13 Family Service.

14       In 2005, I left Child and Family Service and

15 went to the Department of Health where I worked as a

16 mental health care coordinator.  And later in 2005 in

17 September -- in August, I left the Department of Health

18 and obtained a position with the Neighborhood Place of

19 Kona as a care coordinator.  And about a year ago,

20 October of 2006, I became program manager at

21 Neighborhood Place of Kona.

22     Q.   (Mr. Ellis) The program or the place you're

23 working at now, what are your duties?

24     A.   I oversee two contracts, both with the

25 Department of Human Services.  We work with families who

1   have been called into Child Protective Services where

2   there's deemed to be a low risk of abuse or neglect and

3   try to intervene in things.

4       Q.    (Mr. Ellis) You intervene for what purpose?

5       A.    We meet with the families.  We assess what is

6   actually happening, which may or may not be what was

7   reported to Child Protective Services or Child Welfare

8   Services, and we attempt to meet whatever needs are --

9   are, in fact, happening in that family to assist the

10  family in staying out of the Child Welfare Services

11  system.

12      Q.    (Mr. Ellis) When -- in June of 2003, you were

13  hired to work with Bryan Wiles-Bond?

14      A.    Yes.

15      Q.    (Mr. Ellis) Okay.  Who hired you?

16      A.    The person directing the program at that time

17  was Linda Price who was the administrator of -- yeah,

18  the neighbor island administrator for Child and Family

19  Service West Hawaii.

20          MR. ELLIS:  Like to introduce as Exhibit 1 a

21  document that was provided by the Department of

22  Education in discovery.  It's Bates stamped DOE0843.

23          (Exhibit 1 marked for identification.)

24          THE WITNESS:  That's inaccurate.

25          MR. USHIRODA:  There's no question pending.

1  BY MR. LEVIN:

2      Q.    (Mr. Ellis) That would be you third from the

3  bottom, William Beljean?

4      A.    Correct.

5      Q.    (Mr. Ellis) Okay.  You said that's inaccurate?

6      A.    I did not work at any time for TIFFE.  I worked

7  with Child and Family Service.

8      Q.    (Mr. Ellis) Okay.  Thank you.  Does the figure

9  at the bottom, does that reflect what you believed you

10  were paid for the period of time?

11          MR. USHIRODA:  Figure at the bottom or the --

12  BY MR. LEVIN:

13      Q.    (Mr. Ellis) Sorry, that's attributed --

14      A.    Next to my name.  Sorry.  It looks -- yeah, I

15  don't know.  I don't know.

16      Q.    (Mr. Ellis) You did not work for TIFFE?

17      A.    I did not work for TIFFE.

18      Q.    (Mr. Ellis) Did you -- do you know what TIFFE

19  is?

20      A.    Yes.

21      Q.    (Mr. Ellis) Okay.  Do you know why that your --

22  the agency there would be attributable to TIFFE?

23      A.    No, I do not.

24          MR. ELLIS:  Okay.  As Exhibit 2, we'd like to

25  enter into evidence -- as 2A, B, and C.  It's a

1    employment suitability checklist for the Department of

2    Education that was provided in discovery, Bates stamped

3    DOE2907, 2908, and 2909.

4      (Exhibits 2A, 2B, & 2C marked for identification.)

5    BY MR. LEVIN:

6      Q.    (Mr. Ellis) Do you recall completing this

7    document?

8      A.    I don't recall it, but it is my handwriting.

9    I'm sure I did.

10      Q.    (Mr. Ellis) You were not an employee of the

11    Department of Education?

12      A.    No, I was -- I was an employee of Child and

13    Family Service, but people working with Bryan were paid

14    more than other skills trainers and so we were, I guess,

15    independent contractors working with the Department of

16    Education, so it was a very unusual relationship.

17      Q.    (Mr. Ellis) Why -- you stated that people who

18    worked with Bryan got paid more; do you know why?

19      A.    I understand it was because of a settlement

20    that had been made earlier with the family requiring

21    higher levels of education for people working with him.

22      Q.    (Mr. Ellis) Were you informed of the

23    qualifications that a skills trainer who worked with

24    Bryan had to have by Department of Education or by

25    people from Child and Family Service?

1      A.   By people with Child and Family Service.

2      Q.   (Mr. Ellis) What did they tell you were the

3 qualifications?

4      A.   The one that I remember was that I needed to

5 have a Master's Degree.

6      Q.   (Mr. Ellis) What else?

7      A.   I don't remember.

8      Q.   (Mr. Ellis) Do you know if that was -- if

9 having a Master's Degree was the only requirement?

10     A.   No, I know that there were other requirements.

11     Q.   (Mr. Ellis) What were the requirements?

12     A.   I don't know, sir.  I don't remember.

13     Q.   (Mr. Ellis) It was your belief you met the

14 requirements to be employed as Bryan's skills trainer?

15     A.   Yes.

16     Q.   (Mr. Ellis) Do you have -- have you, prior to

17 June of 2003, worked with children who were diagnosed as

18 autistic?

19     A.   No.

20     Q.   (Mr. Ellis) Prior to June 2003, do you know

21 what TEACCH was?

22     A.   Prior to that, no.

23     Q.   (Mr. Ellis) Prior to that did you know what

24 Discrete Trial Training was?

25     A.   No, I did not.

1    Q.    (Mr. Ellis) Did you know what applied

2 behavioral analysis was?

3    A.    No.

4    Q.    (Mr. Ellis) Were you provided with training, as

5 of June 2003, in TEACCH, DTT or ABA?

6    A.    Yes.   TEACCH and DTT.

7    Q.    (Mr. Ellis) And that training consisted of

8 what?

9    A.    That was training through Dru Copeland, who was

10 the autism consultant working with Bryan.  I believe it

11 was on-the-job training as well as a series of videos.

12 They were not DVDs.  Videos that I watched at that time.

13 Sorry.

14    Q.    (Mr. Ellis) That's okay.  The training took

15 place -- the video --

16    A.    At my home.

17    Q.    (Mr. Ellis) Okay.  You need to let me just...

18    A.    I'm sorry.

19    Q.    (Mr. Ellis) That's okay.

20         Did they take place in June of 2003?

21    A.    No, it would have been early in July.

22    Q.    (Mr. Ellis) So after you were employed?

23    A.    Yes.

24    Q.    (Mr. Ellis) The training from Dru Copeland took

25 place after you were employed?

1    A.    Yes.

2    Q.    (Mr. Ellis) Anyone else provide training?

3    A.    Yes.  Kim Smalley, I believe is her name, was

4  brought over from Honolulu and I met with her.  She had

5  worked with Bryan earlier.  I think it was a lot

6  earlier, and, yeah, I was -- spent a day with her

7  learning about Bryan.  Also learning about youngsters

8  with autism.

9    Q.    (Mr. Ellis) Do you recall when that training

10  with Ms. Smalley was?

11    A.    I believe it was in July of 2003.

12    Q.    (Mr. Ellis) Sorry, Mr. Beljean, you need to let

13  us finish so the court reporter can take down just one

14  at a time.

15    A.    I'm sorry.

16    Q.    (Mr. Ellis) What did the training that

17  Dr. Smalley provide you consist of?

18    A.    It was some hands-on training in the classroom

19  working directly with Bryan showing me, you know, how

20  she had had success working with Bryan in the past.  And

21  then discussion about helping me to understand the

22  autism spectrum disorder better.

23    Q.    (Mr. Ellis) The training, was it hands-on with

24  Bryan or was it separate away from Bryan?

25    A.    Some of it was hands-on with Bryan in the

1    morning.  That afternoon, Dr. Smalley and I continued

2    our conversation outside of the classroom.

3        Q.   (Mr. Ellis) So your training with Dr. Smalley

4    was limited to a day?

5        A.   Yes.

6        Q.   (Mr. Ellis) Was this training -- do you recall

7    if it was in July of 2003?  August of 2003?

8        A.   It would have -- I think it was sometime in

9    July or August.  It was very shortly after I had

10   started.  I don't know.

11       Q.   (Mr. Ellis) So you started work before -- prior

12   to any of this training?

13       A.   Yes.

14       Q.   (Mr. Ellis) The first day you started with

15   Bryan, what were your duties?

16       A.   The first day I observed Rebecca Gavin working

17   with Bryan and had conversation with Dru Copeland about

18   what I would be doing with Bryan.

19       Q.   (Mr. Ellis) How long was it before you actually

20   provided hands-on service to Bryan?

21       A.   The second day, I began working with Bryan for

22   part of the morning, continuing to get feedback from

23   Rebecca Gavin and Dru Copeland.

24       Q.   (Mr. Ellis) Who is Rebecca Gavin?

25       A.   Another one of the skills trainers who had been

1  working with Bryan for awhile.

2      Q.  (Mr. Ellis) When you say awhile, do you know

3  how long she'd been working?

4      A.   No, she had been there before I started.

5      Q.   (Mr. Ellis) Do you know if when you were hired,

6  other than a Master's Degree, if you met the

7  requirements pursuant to a settlement agreement?

8      A.   I don't know.  I assumed.  I don't know.

9      Q.   (Mr. Ellis) Were you ever provided with a copy

10  of the settlement agreement that you spoke of?

11      A.   No, I have not.

12      Q.   (Mr. Ellis) Did you ever see any documentation

13  related to that settlement agreement?

14      A.   I don't believe so.

15      Q.   (Mr. Ellis) Do you ever recall seeing a release

16  and settlement agreement dated July 2nd, 2001?

17      A.   I don't remember ever seeing that.

18          MR. ELLIS:  Just in an abundance of caution,

19  are we at 3?  It's a copy of a release and settlement

20  agreement dated July 1st, 2002.

21          (Exhibit 3 marked for identification.)

22  BY MR. LEVIN:

23      Q.   (Mr. Ellis) Could you please review this

24  document and see if it jogs your memory at all.

25          MR. ELLIS:  The record reflect the witness is

1    reviewing the document.

2           THE WITNESS:  I do not remember ever seeing

3    this before.

4    BY MR. LEVIN:

5        Q.   (Mr. Ellis) Thank you.  You left Bryan's case

6    in January 2004?

7        A.   Yes.

8        Q.   (Mr. Ellis) Okay.  Did you -- why did you leave

9    that -- the case?

10       A.   I -- I left to accept another position with

11   Child and Family Service.

12       Q.   (Mr. Ellis) You left voluntarily?

13       A.   Yes.

14       Q.   (Mr. Ellis) To work in -- what was the job

15   position you took after?

16       A.   I worked with the Teen Living Care Program at

17   Child and Family Service.

18       Q.   (Mr. Ellis) At any point after January 2004,

19   did you ever become involved with Bryan Wiles-Bond

20   again?

21       A.   No.

22       Q.   (Mr. Ellis) Do you have any knowledge of the

23   case after January 2004?

24       A.   The only knowledge I have is having asked about

25   how Bryan was doing from other people and...  But

1    nothing specific.

2        Q.    (Mr. Ellis) When you say asked about how Bryan

3    was doing, were you asking how Bryan was doing?

4        A.    Yes.

5        Q.    (Mr. Ellis) And do you recall who they -- who

6    you were talking with?

7        A.    I would have talked with the people who had

8    been skills trainers at the same time I was.

9        Q.    (Mr. Ellis) Do you recall who that was?

10       A.    Be Rebecca Gavin and Richie Stallard.

11            MR. USHIRODA:  The record reflect the witness

12   just referred to Exhibit 1.

13   BY MR. LEVIN:

14       Q.    (Mr. Ellis) Were you aware that there was a

15   problem with getting enough skills trainers to fill the

16   hours designated in Bryan's IEP during the period of

17   time you worked with him?

18       A.    Yes.

19            MR. USHIRODA:  Let me put objections.

20   Objection.  Lack of foundation.

21   BY MR. LEVIN:

22       Q.    (Mr. Ellis) What was the extent of your

23   knowledge?

24       A.    Just what you've said, that -- that they --

25   there was trouble getting enough people -- people to

1   fill the hours that were supposed to be filled.

2       Q.   (Mr. Ellis) Were you ever provided a copy of

3   Bryan's IEP that you were -- during the period of time

4   you worked with him?

5       A.   No, I was never given a copy.

6       Q.   (Mr. Ellis) Were you told what was -- what was

7   contained in the IEP?

8       A.   I was told what I needed to know of it so that

9   I could do my job with Bryan.

10      Q.   (Mr. Ellis) Who provided you that information?

11      A.   Mostly it was Dru Copeland.

12      Q.   (Mr. Ellis) Do you recall what Dr. Copeland

13  said about your duties related to the IEP?

14      A.   Not specifically at this point, no.

15      Q.   (Mr. Ellis) You were working with Bryan in the

16  classroom from July of -- or June of 2003 to

17  January 2004?

18      A.   Yes.

19      Q.   (Mr. Ellis) Was that Kealakehe Intermediate

20  School?

21      A.   Yes, it was.

22      Q.   (Mr. Ellis) You were -- while you were working

23  were you supervised by Dr. Copeland or by the special

24  education teacher?

25      A.   By Dr. Copeland.

1    Q.    (Mr. Ellis) So you received your instructions

2    on how to implement the IEP from Dr. Copeland?

3    A.    Yes.

4    Q.    (Mr. Ellis) What role did the special education

5    teacher, in the classroom you were in, play?

6    A.    Ken worked for a period every day with Bryan.

7    Ken specifically worked with Bryan on the computer.

8    Ken, you know, provided the general structure of the

9    classroom.

10    Q.    (Mr. Ellis) Ken was -- Ken did not supervise

11    you?

12    A.    Yes, he did, but I got much more supervision

13    from Dru.

14    Q.    (Mr. Ellis) Could you explain what your typical

15    day with Bryan was like.

16    A.    I met Bryan at the school at 7:30 when his --

17    typically his father would drop him off. At 7:30, I'd

18    bring Bryan inside and we would set up for the day

19    trying to get him into the routine of being back in

20    school. We would, I think about four times during the

21    course of the day, do series of DTTs. There'd usual be

22    a period built in of recreation of some sort. And some

23    days he'd have speech therapy. Some days different kind

24    of work.

25    Q.    (Mr. Ellis) You discussed that you do a series

1    of DTTs, could you explain that.

2        A.    We use that mostly for teaching Bryan American

3    sign language.  And we would do 10 trials of one word,

4    and then 10 trials of another word, and then 10 trials

5    of a third word, and then 10 trials of all three words.

6        Q.    (Mr. Ellis) Prior to working with Bryan in June

7    of 2003, did you have any training in ASL?

8        A.    No, I did not.

9        Q.    (Mr. Ellis) Okay.  When you came -- started

10   working, who provided the ASL training?

11       A.    I immediately learned in the classroom the

12   words that Bryan had already been taught and then picked

13   up the other words as we were teaching them to Bryan.

14       Q.    (Mr. Ellis) So you were learning right along

15   with Bryan?

16       A.    Well, I got a little bit ahead of him, but yes.

17       Q.    (Mr. Ellis) Was that the extent of what you

18   used Discrete Trial Training for?

19       A.    Yes.

20       Q.    (Mr. Ellis) When you did the DTT, did you

21   provide -- did you take data on every trial?

22       A.    Yes.

23       Q.    (Mr. Ellis) Do you know where -- did you keep

24   those data sheets?

25       A.    Not personally, but they were kept in the

1    classroom, yes.

2         Q.    (Mr. Ellis) And do you know what the class --

3    or did the classroom teacher keep them?

4         A.    No, Dru Copeland kept them.

5         Q.    (Mr. Ellis) So Dru Copeland would have had them

6    at Child and Family Service?

7         A.    No, Dru worked through a different agency.

8         Q.    (Mr. Ellis) Do you know what agency that was?

9         A.    I'm sorry, I don't remember the name of it.  I

10   know it was based in Honolulu.

11        Q.    (Mr. Ellis) Could it -- does the Ala Kai Na

12   Keiki --

13        A.    That sounds right, yes.

14        Q.    (Mr. Ellis) Did you provide any services to

15   Bryan in his home?

16        A.    On two occasions.

17        Q.    (Mr. Ellis) Like two separate days?

18        A.    Two days, yes.

19        Q.    (Mr. Ellis) Full days?

20        A.    Half days, 7:30 till 12:00.

21        Q.    (Mr. Ellis) On two occasions?

22        A.    On two occasions.

23        Q.    (Mr. Ellis) And is that the extent of it?

24        A.    Yes.

25        Q.    (Mr. Ellis) Do you recall providing the

1    Department of Education with a declaration dated

2    May 20 -- March 23rd, 2006?

3        A.   Yes.

4        Q.   (Mr. Ellis) Who asked you to provide the

5    declaration?

6        A.   The person I spoke with originally was Linda

7    Price.  I think it was she who asked for it.

8        Q.   (Mr. Ellis) Okay.  Do you know if anybody asked

9    Linda Price to get this declaration from you?

10       A.   I -- I have no idea.

11       Q.   (Mr. Ellis) Did you draft the document and

12   provide it to Ms. Price or did Ms. Price draft the

13   document and provide it to you?

14       A.   I did not draft the document.  I don't know

15   that Linda did either.

16       Q.   (Mr. Ellis) But the document was drafted by a

17   third person?

18       A.   Yes.

19       Q.   (Mr. Ellis) You reviewed it?

20       A.   Yes.

21       Q.   (Mr. Ellis) And you signed it?

22       A.   Yes.

23            MR. USHIRODA:  Could we go off the record a

24   second?

25            THE VIDEOGRAPHER:  Off the record at 1:36 p.m.

1          (Off the record at 1:36 p.m.)

2          (Back on the record at 1:39 p.m.)

3          THE VIDEOGRAPHER:  We're back on the record.

4    It's 1:39 p.m.

5    BY MR. LEVIN:

6        Q.  (Mr. Ellis) In your declaration you state that

7    Bryan was sent to school with diarrhea, vomiting, where

8    sanitary conditions presented health and safety

9    challenges for me and others in the school; do you

10   recall that?

11       A.   Yes, I do.

12          MR. USHIRODA:  Just, Mr. Levin, will you be

13   marking Mr. Beljean's declaration as an exhibit?

14          MR. ELLIS:  This is not a true and correct copy

15   because there's...

16          MR. USHIRODA:  We can take care of that on the

17   record.

18          THE VIDEOGRAPHER:  Off the record 1:40 p.m.

19          (Off the record at 1:40 p.m.)

20          (Back on the record at 1:45 p.m.)

21       (Exhibit 4 marked for identification.)

22          THE VIDEOGRAPHER:  We're back on.  It is

23   1:45 p.m.

24   BY MR. LEVIN:

25       Q.   (Mr. Ellis) Page two, number four.

1      MR. USHIRODA:  Mr. Levin, before we proceed, I

2  just want to get an understanding.  There is some

3  handwriting that is on page two of Exhibit 4 which I

4  understand is your handwriting and I believe wasn't part

5  of the original document.  I just want to put that on

6  the record, correct?

7      MR. ELLIS:  Correct.

8      MR. USHIRODA:  And that it's my understanding

9  that the court reporter will be substituting this page

10  for a clean original page; is that correct?

11      MR. ELLIS:  Yes.  That's correct.

12      MR. USHIRODA:  Okay.  Thank you, Counsel.

13  BY MR. LEVIN:

14      Q.  (Mr. Ellis) Did you make a written, formal

15  complaint to the school about this condition?

16      A.  No, I did not.

17      Q.  (Mr. Ellis) Did you talk to the parents about

18  the circumstances?

19      A.  On one occasion, on several different

20  occasions, yes.

21      Q.  (Mr. Ellis) And when were those occasions?

22      A.  One day when Bryan became quite ill or suffered

23  diarrhea quite extensively and had to ask the family to

24  come and pick him up from school.  Another time was -- I

25  guess that was -- that was the one time.  I'm sorry.

1   One time.

2       Q.   (Mr. Ellis) Did you know when those two

3   occurrences were?

4       A.   No; I corrected myself.  I'm sorry, it was one

5   occurrence.  I don't remember the date.

6       Q.   (Mr. Ellis) During the school year?

7       A.   Yes.

8       Q.   (Mr. Ellis) So sometime after June 26th?

9       A.   Yes.

10      Q.   (Mr. Ellis) Did the parents take Bryan out of

11  school?

12      A.   Yes.

13      Q.   (Mr. Ellis) Do you know what prompted the

14  diarrhea?

15      A.   No, I do not.

16      Q.   (Mr. Ellis) Did you know that Bryan liked to

17  play with hand soap?

18      A.   Oh, yes.

19      Q.   (Mr. Ellis) Do you know if hand soap ingested

20  can cause diarrhea?

21      A.   I am aware of that.

22      Q.   (Mr. Ellis) Do you know if ingesting certain

23  foods could create diarrhea?

24      A.   I understand that.

25      Q.   (Mr. Ellis) Did Bryan have a propensity to eat

1   excessively if not supervised?

2       A.   If not supervised, I -- I -- I can't answer

3   that.  He was always supervised while I was with him.

4       Q.   (Mr. Ellis) The incident you're talking about,

5   you contacted the parents?

6       A.   Yes.

7       Q.   (Mr. Ellis) And the parents took Bryan home?

8       A.   Yes.

9       Q.   (Mr. Ellis) Was that the appropriate thing for

10  the parent to do?

11      A.   I believe so.

12      Q.   (Mr. Ellis) Do you know if had -- if this one

13  incident of diarrhea had to do with Bryan eating too

14  many plums?

15      A.   I do not know.

16      Q.   (Mr. Ellis) You don't know the circumstances

17  that led up to this diarrhea?

18      A.   No.

19      Q.   (Mr. Ellis) Okay.  Number five, are these your

20  words or are these the words that were provided to you?

21      A.   They're the words that were provided to me.

22      Q.   (Mr. Ellis) okay.  Do you know what a

23  communicable staph infection looks like?

24      A.   Yes, I do.

25      Q.   (Mr. Ellis) Okay.  And is a communicable staph

1    infection a serious condition?

2         A.   I believe so.

3         Q.   (Mr. Ellis) Did you make a report to, say, the

4    Department of Health?

5         A.   Not to the Department of Health, no.

6         Q.   (Mr. Ellis) Did you make a report to the

7    Department of Education?

8         A.   No, I did not.

9         Q.   (Mr. Ellis) Did you make any written report

10   about this communicable staph infection?

11        A.   I made a verbal report to my supervisor of

12   Child and Family Service.

13        Q.   (Mr. Ellis) And who was that?

14        A.   Heidi Coop.  Heidi Marie Coop.

15        Q.   (Mr. Ellis) Do you know what happened to that

16   complaint?

17        A.   I do not.

18             MR. USHIRODA:  I think he said a verbal report.

19   BY MR. LEVIN:

20        Q.   (Mr. Ellis) Verbal report.  Okay.  How often

21   did Bryan come to school with a communicable staph

22   infection?

23        A.   There were several times when his -- the -- the

24   open sores on his legs appeared to be what I knew to be

25   staph infection.

1    Q.    (Mr. Ellis) Did you know if they were, in fact,

2    a staph infection?

3    A.    No, I'm not an M.D.

4    Q.    (Mr. Ellis) So someone -- you put the words

5    "communicable staph infection" and you just agreed with

6    them?

7    A.    I had used the word staph infection.

8    Q.    (Mr. Ellis) Did you use the word "communicable

9    staff infection?"

10    A.    No, I did not.

11    Q.    (Mr. Ellis) So the word "communicable" was

12    added by someone else?

13    A.    I believe so, yes.  I under -- sorry.

14    Q.    (Mr. Ellis) Do you know what a communicable --

15    are you in a position to diagnose that what Bryan had

16    was a communicable staph infection?

17    A.    No, sir, I am not.

18    Q.    (Mr. Ellis) Do you know if the person who

19    drafted this declaration was in a position to diagnose a

20    communicable staff infection?

21    A.    I do not know that.

22    Q.    (Mr. Ellis) You need to let us finish.

23         MR. USHIRODA:  Slow down.

24    BY MR. LEVIN:

25    Q.    (Mr. Ellis) In this declaration, or number

1     five, you state diarrhea or it's diarrhea stated again.

2         A.    Right.

3         Q.    (Mr. Ellis) Is that the same diarrhea --

4         A.    That would be the same case.

5         Q.    (Mr. Ellis) I'm sorry, Mr. Beljean, you just

6     need to let us...

7         A.    I'm sorry.

8         Q.    (Mr. Ellis) Communicable, that -- again, that's

9     not your --

10        A.    That is not my words.

11        Q.    (Mr. Ellis) Should that word be dropped from

12    your declaration?

13        A.    I would be comfortable with that.

14        Q.    (Mr. Ellis) How often did Bryan come to school

15    vomiting?

16        A.    There were only two occasions that I recall.

17        Q.    (Mr. Ellis) Do you know the circumstances that

18    led to the vomiting?

19        A.    No, I do not.

20        Q.    (Mr. Ellis) Did he come to school vomiting or

21    when he was at school he would vomit?

22        A.    It would start later in the day.

23        Q.    (Mr. Ellis) And what did you do?

24        A.    Took him to the restroom, cleaned him up,

25    calmed him down.  Both times he seemed to recuperate

1    very quickly and we went on with the day.

2        Q.   (Mr. Ellis) Did you notify the parents?

3        A.   I -- I did the next time I saw them, but not at

4    that time, no.

5        Q.   (Mr. Ellis) And on both occasions?

6        A.   I believe so.

7        Q.   (Mr. Ellis) Okay.  It states here "obvious

8    health condition;" do you see that?

9        A.   Yes.

10       Q.   (Mr. Ellis) Okay.  You testified that the

11   vomiting occurred in school.

12       A.   Yes.

13       Q.   (Mr. Ellis) Did he come to school in an obvious

14   condition that he would vomit?

15       A.   No.

16       Q.   (Mr. Ellis) So at least regarding the vomiting,

17   that obvious health condition is inaccurate?

18          MR. USHIRODA:  Objection.  Document speaks for

19   itself.  Misstates testimony.

20   BY MR. LEVIN:

21       Q.   (Mr. Ellis) You can answer the question.

22       A.   Yes.  The -- when I talked about the obvious

23   health conditions, I was specifically thinking of the

24   conjunctivitis, the eye infection Bryan had.

25       Q.   (Mr. Ellis) So except for the conjuctive (sic)

```
 1    which states varying eye infections --

 2         A.    Yeah.

 3         Q.    (Mr. Ellis) -- the rest of it were not obvious

 4    health conditions that he came to school with?

 5         A.    He did not arrive at school vomiting or with

 6    diarrhea.   That -- that occurred later.

 7         Q.    (Mr. Ellis) So they were not obvious health

 8    conditions when he arrived at school?

 9         A.    When he arrived at school.

10         Q.    (Mr. Ellis) So they may not have been obvious

11    health conditions, obvious to the parent, when he

12    sent -- when they sent Bryan to school on those days?

13              MR. USHIRODA:   Objection.   Calls for

14    speculation.

15              THE WITNESS:   I don't know what would have been

16    obvious.

17    BY MR. LEVIN:

18         Q.    (Mr. Ellis) Okay.   So obvious only -- only

19    deals with the -- the eye infection?

20         A.    The eye infection.

21         Q.    (Mr. Ellis) Now, was it a varying eye infection

22    or was it a --

23         A.    The --

24         Q.    (Mr. Ellis) Mr. Beljean, I'm sorry.   Was it a

25    varying eye infections or was it a specific eye
```

infection?

A.   There was one occasion where Bryan rubbed his eyes all day and he appeared to me to have conjunctivitis.  I called the family.  Kim came, picked him up and took him to the doctor, and he was diagnosed with conjunctivitis.

Q.   (Mr. Ellis) You said Bryan rubbed his eyes all day long.  Did he come to school rubbing his eyes?

A.   Yes.

Q.   (Mr. Ellis) Did -- was it appropriate taking him to the doctor when you called, was that appropriate of the parent?

A.   Yes, it was.

Q.   (Mr. Ellis) Do you know if Bryan was, at that incident where he came to school with the eye condition, did you know if Bryan was on medication for that eye condition?

A.   I know he was on medication after he went to the doctor.  I do not know if he was on anything before that.

Q.   (Mr. Ellis) So you don't know if the parents had medicated him prior to coming to school on that occasion?

A.   No, I do not.

Q.   (Mr. Ellis) After that, did he come to school

1    with any eye -- or was the eye condition, did it clear

2    up with the medication?

3        A.    Yes, it did.

4        Q.    (Mr. Ellis) Was that the -- was that the only

5    time he came to school with an eye infection?

6        A.    That was the only time he came to school with

7    something that had been diagnosed as a -- as

8    conjunctivitis.

9        Q.    (Mr. Ellis) Did he come to school at any other

10   time with a varying eye infection?

11       A.    He came to school with a -- the regular rubbing

12   of the eyes, with very frequent rubbing of his eyes, and

13   appearing to have issues, but that was -- there was only

14   the one occasion where he was diagnosed by a doctor.

15       Q.    (Mr. Ellis) Okay.  When you said he came

16   rubbing his eyes with various issues, what did you mean?

17       A.    He -- there would be various accumulations in

18   the corners of his eyes.

19       Q.    (Mr. Ellis) Various accumulations of what in

20   the corners of his eyes?

21       A.    Well, tears for one thing, but also things that

22   I don't know.

23       Q.    (Mr. Ellis) Would that have been the result of

24   his rubbing his eyes?

25       A.    Possibly.

1     Q.   (Mr. Ellis) Did he come to school rubbing his

2  eyes or did he start when he came to school?

3     A.   Some days he would be rubbing his eyes in the

4  car when his father would drop him off.

5     Q.   (Mr. Ellis) Drive him off or drive him to

6  school?

7     A.   Drop him off.

8     Q.   Drop him off.

9     A.   Sorry.

10     Q.   (Mr. Ellis) Did you contact -- did you talk to

11  anybody about these two incident -- or the one

12  incident -- the second incident of rubbing his eyes?

13     A.   Rubbing his eyes?  Just that I was aware of it.

14  I did mention to the dad at one point when I picked

15  Bryan up in the morning from the car that he appeared to

16  be rubbing his eyes a lot again.

17     Q.   (Mr. Ellis) And you previously testified you're

18  aware that Bryan liked to play with pump soap?

19     A.   Yes.

20     Q.   (Mr. Ellis) Could the eye condition be a result

21  of him getting soap in his eyes?

22     MR. USHIRODA:  Objection to the extent it calls

23  for speculation.

24     THE WITNESS:  Could it be?  Possibly.  Sure.

25

BY MR. LEVIN:

Q.    (Mr. Ellis) Did that ever occur in school?

A.    To the best of my knowledge, not while I was with him.

Q.    (Mr. Ellis) The last on paragraph five, "I felt this created a risk to my own health."

Did you -- again, did you file a complaint with the Department of Health?

A.    No, I did not.

Q.    (Mr. Ellis) Other than the -- other than the verbal discussion you had with your supervisor at Child and Family Service, did you talk to anybody else about your health concerns?

A.    I did on one other occasion, again with my supervisor at Child and Family Service.

Q.    (Mr. Ellis) Do you know if a written report was developed as a result?

A.    I -- I do not.

Q.    (Mr. Ellis) Oh, because of the identified health concerns in paragraph five, did that affect your own health?

A.    Only on one occasion.

Q.    (Mr. Ellis) And in what way?

A.    I had been informed early one morning that Bryan would not be coming to school that day and that I

1    should be with him at the house instead, and when I went

2    to the house, I found Bryan to -- to appear very ill.

3    He -- he appeared hot to the touch.  Seemed very subdued

4    for Bryan and, yeah, I basically took care of him that

5    day rather than being able to teach him, and I was sick

6    two days later.

7         Q.    (Mr. Ellis) A cold?

8         A.    Extensive cold, yeah.  It was a cold.

9         Q.    (Mr. Ellis) Cold symptoms, cough, runny nose.

10        Is that one of the two occasions you said you

11   went to Bryan's house?

12        A.    Yes.

13        Q.    (Mr. Ellis) Okay.  Now, you worked, you said,

14   twice.  On number seven you said, the home is unsanitary

15   and unclean, in what way?

16        A.    Not the home.  It was Bryan's apartment in the

17   home which was unclean.  The floors would have stains on

18   them.  There was, the second time I was there, a

19   mattress propped up in the kitchen with stains on it.

20   It was dirty.

21        Q.    (Mr. Ellis) Okay.  Do you know why the floor

22   was dirty?

23        A.    No, I do not.

24        Q.    (Mr. Ellis) Okay.  Was the -- was it stained,

25   was that the extent of the dirtiness?

1    A.    It was a tile floor.  So there was dirt on the

2  floor.

3    Q.    (Mr. Ellis) Was there dirt or was it a stain?

4    A.    I'm sorry, I don't understand exactly what you

5  mean.

6    Q.    (Mr. Ellis) Well, you stated that the floor was

7  stained.

8         MR. USHIRODA:  The mattress was stained.

9         THE WITNESS:  The mattress was stained.  The

10  floor had -- it appeared to have some liquid spilt on it

11  that had dropped there.

12  BY MR. LEVIN:

13    Q.    (Mr. Ellis) Okay.  So that's --

14    A.    That's what --

15    Q.    That's what you meant for being dirty?

16    A.    Yes.

17    Q.    (Mr. Ellis) So that one portion of the floor

18  had this -- looked like a liquid spilled on it that had

19  dried up?

20    A.    It was in many portions of the floor.

21    Q.    (Mr. Ellis) Could that have been from Bryan

22  peeing on the floor?

23    A.    It certainly could've.

24    Q.    (Mr. Ellis) Could the stain on the mattress

25  have been because of Bryan peeing on the floor?

1    A.    On the floor or on the mattress?

2    Q.    (Mr. Ellis) I'm sorry, on the mattress.

3    A.    Yes.

4    Q.    (Mr. Ellis) You're aware that Bryan had a

5 problem with excessive urination -- or did Bryan have a

6 problem with excessive urination during the time that

7 you were providing services to him?

8    A.    Yes, he did.

9    Q.    (Mr. Ellis) Was -- during the time you worked

10 with him, was there a toiletting program developed at

11 the school?

12    A.    Not during that period, no.

13    Q.    (Mr. Ellis) So when you met with Kim Smalley on

14 that occasion, was part of the training dealing with

15 toiletting?

16    A.    Yes.

17    Q.    (Mr. Ellis) Okay.  What did she tell you?

18    A.    At that point, it was -- the issue with Bryan

19 was basically frequent urination, and I learned through

20 Kim's suggestion and my own observation to take Bryan to

21 the bathroom frequently, especially at the beginning of

22 the day.  And anytime he signaled that he needed to use

23 the toilet, we went.

24    Q.    (Mr. Ellis) So if Bryan didn't go frequently to

25 the bathroom, to the actual, physical bathroom, would he

1  urinate on the floor?

2      A.  He only did that twice in the classroom, but

3  yes, he would.

4      Q.  (Mr. Ellis) So in the classroom at Kealakehe

5  Intermediate, he did urinate on the classroom floor?

6      A.  Two times, yes.

7      Q.  (Mr. Ellis) Two times -- were you working with

8  him full time during each school day?

9      A.  No, I was not.  Two times during the period I

10 was with him.

11     Q.  (Mr. Ellis) And that was -- did you -- the time

12 period, did you work from like 7:30 to noon?

13     A.  7:30 to noon, yes.

14     Q.  (Mr. Ellis) And then someone else --

15     A.  Someone else came in in the afternoon.

16     Q.  (Mr. Ellis) So number seven, when you say

17 unsanitary and unclean, you're referencing the stains on

18 the floor and the mattress?

19     A.  Yes.

20     Q.  (Mr. Ellis) Okay.  And that's the extent of it?

21     A.  Yes.

22     Q.  (Mr. Ellis) Did you share this concern with the

23 parents?

24     A.  No, I did not.

25     Q.  (Mr. Ellis) Number seven, these are -- are

1  these words provided to you in this declaration or are

2  these your own words?

3      A.    Those words were provided to me.

4      Q.    (Mr. Ellis) So the unsanitary and unclean are

5  only specific things at the house and not the general

6  condition?

7          MR. USHIRODA:  Objection.  Mischaracterizes

8  testimony.  Asked and answered as well.

9          THE WITNESS:  I was -- yeah.  What I had said

10  was that the -- that Bryan's apartment was dirty and had

11  given pretty much the same examples I've just given you.

12  BY MR. LEVIN:

13      Q.    (Mr. Ellis) So that's not what this declaration

14  says; is that correct?

15          MR. USHIRODA:  Objection.  Lack of foundation.

16  Document says what it says.

17          THE WITNESS:  I have no problem saying that the

18  house was unclean, and I certainly would've liked to

19  have seen it more sanitary.

20  BY MR. LEVIN:

21      Q.    (Mr. Ellis) During the time you were a skills

22  trainer for Bryan, did you have an opportunity to speak

23  with the parents on a regular basis?

24      A.    I spoke with Ken for a few moments -- I'm

25  sorry, Stan for a few moments every morning when he

1     would drop Bryan off.

2       Q.   (Mr. Ellis) Was that the extent of your

3     relationship with the family?

4       A.   For the most part.   We did take sign language

5     classes together.

6       Q.   (Mr. Ellis) And when did those classes occur?

7       A.   They were the local adult ed classes and I

8     believe they started in September of 2003 and probably

9     went on until early December, late November.

10       Q.   (Mr. Ellis) Would you consider yourself

11     proficient in American sign language?

12           MR. USHIRODA:   Currently?

13     BY MR. LEVIN:

14       Q.   (Mr. Ellis) No, at the time you were with

15     Bryan.

16       A.   At the time?   By the time I had finished the

17     class, I had an equal proficiency with the family.   So

18     am I proficient?   Would I consider myself a speaker?

19     No.

20       Q.   (Mr. Ellis) By the time you finished, how many

21     signs were you proficient at?

22       A.   Oh, gosh, probably had 4 or 500 signs.

23       Q.   (Mr. Ellis) And that was -- prior to coming to

24     work for Bryan you had no signs; is that correct?

25       A.   Correct.

1     Q.   (Mr. Ellis) Do you know how many -- by when you

2  left January 2004, how many signs Bryan had?

3     A.   No, I do not remember the number.

4     Q.   (Mr. Ellis) More than 10?

5     A.   Oh, yes.

6     Q.   (Mr. Ellis) More than 50?

7     MR. USHIRODA:  Objection to the extent it calls

8  for speculation.

9     THE WITNESS:  I don't know.  Yeah, I believe

10  so.  Probably more than 50, but not a lot more.

11  BY MR. LEVIN:

12     Q.   (Mr. Ellis) So less than 75?

13     A.   I would believe so.

14     Q.   (Mr. Ellis) Earlier you testified that you knew

15  there was a problem filling the skills trainers hours;

16  is that accurate?

17     A.   Yes.

18     Q.   (Mr. Ellis) Okay.  Did that problem get better

19  or worse from the time you started working in June of

20  2003, till the time you left on January 27, 2004?

21     A.   I don't know.

22     Q.   (Mr. Ellis) How did you know that there was a

23  problem with getting enough skills trainer -- or filling

24  the skills trainers hours?

25     A.   There were occasionally shortages.  There

1    were -- I mean, there was occasionally times when there

2    couldn't be someone found to work with Bryan for a

3    particular shift.  I knew that -- yeah, well, Linda

4    Price had asked me if I knew of anybody else who might

5    be interested in working with Bryan, as had several

6    other people.

7        Q.    (Mr. Ellis) When you said you had trouble

8    filling, would you work till noon and then there

9    wouldn't be a skills -- the skills trainer wouldn't come

10   in?

11       A.    That almost never happened.  We would know if

12   there was going to be -- if a skills trainer -- we did

13   not have people who just didn't show up.  There were

14   some times there were shifts that just were not -- had

15   not been filled.

16       Q.    (Mr. Ellis) So, like, you knew that the

17   afternoon shift on a particular day no one would be

18   there?

19       A.    We would know that, yes.

20       Q.    (Mr. Ellis) Do you recall how many times that

21   happened during the period that you worked with Bryan?

22       A.    It was not very frequent at all.  I mean, there

23   were a few very -- you know, somebody was ill or

24   something.  It did not happen often.  A few times.

25       Q.    (Mr. Ellis) Two times?

1      A.   I don't know.  I don't know.

2      Q.   (Mr. Ellis) More than five?

3      A.   No.

4           MR. ELLIS:  We just take a five-minute break?

5           MR. USHIRODA:  Sure.

6           THE VIDEOGRAPHER:  Off the record 2:12 p.m.

7           (Off the record at 2:12 p.m.)

8           (Back on the record at 2:21 p.m.)

9           THE VIDEOGRAPHER:  Back on the record.  It's

10     2:21 p.m.

11     BY MR. LEVIN:

12     Q.   (Mr. Ellis) Talked about the declaration.

13     A.   Yes.

14     Q.   (Mr. Ellis) Could you tell us how items four,

15     five, and six impacted Bryan's education or program.

16          MR. USHIRODA:  Objection to the extent it's

17     overly broad.  Vague and ambiguous.

18          THE WITNESS:  It's hard to do any kind of

19     training while you're in the restroom with a child

20     cleaning him up or when he's not there.

21     BY MR. LEVIN:

22     Q.   (Mr. Ellis) How many times did these conditions

23     in four and five lead him not to be at school?

24     A.   Very seldom was Bryan not at school.  Bryan --

25     Bryan would come to school.

1    Q.    (Mr. Ellis) So if he did not -- if he didn't

2    miss school regularly, what impact did it have on the

3    program?

4    A.    The impact was basically when we would

5    interrupt the teaching to make frequent trips to the

6    restroom or spend a long time there cleaning him up.

7    Q.    (Mr. Ellis) And these problems as described in

8    number four and five, your previous testimony, at least

9    the diarrhea and the vomiting were not conditions known

10   to the parent when they dropped him off at school; is

11   that correct?

12          MR. USHIRODA:  Objection.  Misstates prior

13   testimony.  I believe he's testified that it was not

14   obvious to him when he was dropped off to school.  He

15   did not know what the parents thought.

16          THE WITNESS:  I -- I don't know what the

17   parents knew when they dropped him off.

18   BY MR. LEVIN:

19   Q.    (Mr. Ellis) But it was not obvious to you?

20   A.    It was not always obvious to me, no.

21   Q.    (Mr. Ellis) Are you aware if other children

22   came to school who had -- who were sick and maybe should

23   have stayed at home, but didn't?

24   A.    I -- I was not aware of that at this school.

25   Q.    (Mr. Ellis) Your background is as a theologian?

1          A.    Yes.

2          Q.    (Mr. Ellis) Not in a -- as a teacher or a

3    therapeutic aide?

4          A.    No.  I have a Master's in human services.

5          Q.    (Mr. Ellis) But Bryan was the first child with

6    autism that you had ever worked with?

7          A.    Yes.

8          Q.    (Mr. Ellis) You had no background with autistic

9    children?

10              MR. USHIRODA:  Objection.  Vague and ambiguous.

11   When?  Time period.

12   BY MR. LEVIN:

13         Q.    (Mr. Ellis) Prior to working with Bryan as of

14   June 26, 2003.

15         A.    My -- no, I -- courses in college.  That's all.

16         Q.    (Mr. Ellis) Did you have a background, prior to

17   June 26, 2003, of working with children?

18         A.    Working with children, yes.

19         Q.    (Mr. Ellis) In what capacity?

20         A.    As pastor of a church, I taught classes.  I

21   taught confirmation classes.  I taught Sunday school

22   classes.  And our church operated a childcare center, so

23   I spent a good deal of time with the youngsters there.

24         Q.    (Mr. Ellis) Did the children that you -- the

25   preschool -- was it preschool?

1     A.    Childcare.  Yeah, preschool.

2     Q.    (Mr. Ellis) Childcare.  Kids under kindergarten

3  age?

4     A.    Mm-hmm.  Yes.

5     Q.    (Mr. Ellis) And the confirmation classes

6  were -- did you know if any of those children were

7  children who identified with special education needs?

8     A.    Yes, I had several students who were identified

9  as with special ed needs in my confirmation classes.

10    Q.    (Mr. Ellis) What were those needs?

11    A.    I had one youngster who had suffered brain

12 damage at birth and had very low cognitive skills and a

13 number of behavioral issues, pretty much stemming from

14 that, from his inability to concentrate on anything.

15    Q.    (Mr. Ellis) The other kids?

16    A.    And, you know, the full gambit of youngsters

17 with ADHD, you know, and ODD as well.

18    Q.    (Mr. Ellis) Were the ones who were ADHD, did

19 you know if they were identified as students who were

20 eligible for special education services?

21    A.    I don't know specifically that they were.

22    Q.    (Mr. Ellis) So the first time that you

23 worked -- or specifically worked with children who are

24 identified as children who are eligible for special

25 education services was as of June 26, 2003?

1    A.   Yes.

2    Q.   (Mr. Ellis) Okay.  In number five, the second

3  to the last sentence says, "Plaintiff refused to keep

4  Bryan home on such occasions;" do you recall that?

5    A.   Yes.

6    Q.   (Mr. Ellis) You testified that when -- on some

7  occasions when Bryan had diarrhea and vomiting, you

8  could not tell that Bryan was sick and should've stayed

9  home.

10    A.   Mm-hmm.

11        MR. USHIRODA:  That I think was -- objection.

12  Mischaracterizes testimony.  I think it was just only

13  not obvious when he first arrived at school.

14        THE WITNESS:  What I specifically have in mind

15  with that was when we would call, typically we'd make a

16  call to Kim and let her know of something that was

17  happening in the classroom and the suggestion that Bryan

18  be removed.  That we were, on the few occasions that we

19  did that, usually told no.

20  BY MR. LEVIN:

21    Q.   (Mr. Ellis) Okay.  That's not how it's

22  characterized here --

23    A.   I understand.

24    Q.   (Mr. Ellis) -- is that correct?

25    A.   Right.

1      Q.    (Mr. Ellis) Okay.  So this characterization is

2  inaccurate?

3      A.    Yes.

4            MR. ELLIS:  Thank you.  That's all we have.

5            MR. USHIRODA:  No questions.

6            THE VIDEOGRAPHER:  This concludes the

7  deposition of William Beljean.  Going off the record.

8  It's 2:29 p.m.

9                (Deposition concluded at 2:29 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I, WILLIAM BELJEAN, hereby certify that I

2  have read the foregoing typewritten pages 1

3  through 50, inclusive, and corrections, if any

4  were noted by me, and the same is now a true and

5  correct transcript of my testimony.

6    DATED:  Honolulu, Hawaii, _____

7

8

9    _____

10    WILLIAM BELJEAN

11

12  Signed before me this _____

13  day of _____, 2007.

14

15  _____

16

17

18

19

20

21

22  Case:  WILES-BOND vs. DEPT OF EDUCATION

23  Case No:  CV04-00442 HG/BMK

24  Deposition Dated:  July 19, 2007

25  Taken By: Barbara Acoba

AUG 0 6 2007

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

1                   C E R T I F I C A T E

2    STATE OF HAWAII                    )

3    CITY AND COUNTY OF HONOLULU   )

4              I, BARBARA ACOBA, Certified Shorthand

5    Reporter and Notary Public, State of Hawaii, do

6    hereby certify:

7              That on Thursday, July 19, 2007, at

8    1:00 p.m., appeared before me WILLIAM BELJEAN, the

9    witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11             That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17             I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20             Dated this 4th day of August, 2007,

21   in Honolulu, Hawaii.

22

23                             BARBARA ACOBA, CSR NO. 412

24                             Notary Public, State of Hawaii

25                             My Commission Exp: 10-22-2008

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090