***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

```
                    IN THE UNITED STATES DISTRICT COURT

                         FOR THE DISTRICT OF HAWAII

                                   ---|---

   ANN KIMBALL WILES and STANLEY  ) CIVIL NO.CV 04-00442 HG/BMK
   BOND, individually and as      ) CIVIL NO.CV 05-00247 HG/BMK
   next friends of their son,     ) CONSOLIDATED
   BRYAN WILES-BOND, a minor,     ) (Other Civil Action)
                                  )
              Plaintiffs,         )
                                  )
         vs.                      ) TRIAL DATE:October 11, 2006
                                  )
   DEPARTMENT OF EDUCATION,       )
   State of Hawaii, and ALVIN     )
   RHO, in his official capacity  )
   as West Hawaii District        )
   Superintendent,                )
                                  )
              Defendants.         )
   _____)


              DEPOSITION OF KIMBERLY SMALLEY, Ph.D.

   Taken on behalf of the Defendants, at the law offices of

   Davis Levin Livingston Grand, 400 Davis Levin Livingston

   Grand Place, 851 Fort Street, Honolulu, Hawai`i 96813

   commencing at 9:02 a.m., on Thursday, July 27, 2006,

   pursuant to Notice.


   BEFORE:
                  Valerie Mariano, CSR No. 353
                  Notary Public, State of Hawai`i
```

EXHIBIT "A"

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1   the classroom, at home, and then you recommended that he
2   needed an assessment done.
3   A.   Yeah.
4   Q.   What was the skills trainers' situation like at that
5   time?
6   A.   I'm struggling with this.  The second to last time he
7   may not even had skills trainers.  He may have been short
8   staff.  At some point he had skills trainers who couldn't
9   sign.  At some point he had skills trainers who could sign.
10  He may have even had a deaf person at that -- no, not at
11  that point because he was already falling apart.  I think
12  when things were well is when he had the person who was
13  deaf and hard of hearing.  He had a couple really dynamic
14  young women who worked really hard and were very committed
15  to him.
16  Q.   Do you know what their names are?
17  A.   If you ask me, I can affirm or deny.  I don't remember
18  names off the top of my head.
19       Then I think there was -- you know, there's turnover
20  in this field.  I think there was a wholesale change for
21  him, a new teacher.  Same peers, he had the same boys in
22  his classroom.  He was in the same classroom with the same
23  children, which is why I kept seeing him.  I was there for
24  someone else.  He had the same peer group in his fully
25  self-contained.

1    know any of those things.

2    Q.   Or if there was any damage?

3    A.   Oh, there's definitely damage.

4    Q.   Okay.

5    A.   Yeah.

6    Q.   And what was the damage caused by?

7    A.   Lack of programming.  You know --

8    Q.   The implementation?

9    A.   Lack of implementation, lack of communication.

10   Q.   But what I'm trying to get at here is whether you have an opinion that that is something that is permanent, that can be made up?

13   A.   I think he missed some valuable time.  There is this notion in autism of a window of opportunity, and he was already old when I met him, and he made great gains.  So I think it's really unfortunate that those were then lost and that he learned some horrible things that you never want him to learn, you know, to be aggressive and self-injurious to get his own way.  And I think those things are likely to have lifelong implication.

21   Q.   Are they irretrievably lost?

22   A.   I hope not, but I have no way of knowing without seeing.

24   Q.   Okay.

25   A.   He is the population -- the way I saw him last, that's

***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  Q. Okay. Is there any other opinions then? I need to
2  know just so I'm not surprised at trial.
3  A. I guess I don't know what you want to know. I'm more
4  than happy to be forthcoming. I'll tell you whatever you
5  need to know, but I need more structure than that.
6  Q. Okay. Well, are -- basically, are all your opinions
7  contained in this report?
8  A. I have stronger opinions than are contained in that
9  report, but the function and content of everything I would
10 have to say is certainly there.
11 Q. Okay. I'm sorry. You have stronger opinions?
12 A. I don't describe what I said to you as neglect in that
13 report.
14 Q. Okay.
15 A. Nowhere in that report do I say I saw him slipping and
16 sliding in his own feces because it wasn't pertinent to
17 what I was filling out. If you were to ask me that, I
18 would answer that.
19 Q. Well, let's -- do you have an opinion on that?
20 A. Yes. I think it was --
21 Q. Please tell me.
22 A. I think it's neglect. Actually, I think it's abusive.
23 I think he was not educated or treated effectively for a
24 period at this time, a period of months, probably.
25 Q. And the basis for this opinion is that --