```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3   ANN KIMBALL WILES and        )

 4   STANLEY BOND, individually   )

 5   and as next friend of their  )

 6   son, BRYAN WILES-BOND, a     )

 7   minor,                       )

 8              Plaintiffs,       )

 9         vs.                    ) Civil No. CV 04-00442

10   DEPARTMENT OF EDUCATION,     ) HG/BMK

11   State of Hawai'i, and ALVIN  ) CONSOLIDATED (Other

12   RHO, in his official         ) Civil Action)

13   as West Hawai'i District     )

14   Superintendent,              ) VIDEOTAPED DEPOSITION

15              Defendants.       )           OF

16   _____ ) RICHARD S. GOKA, M.D.

17   ANN KIMBALL WILES and        ) September 21, 2007

18   STANLEY BOND, individually   )

19   and as next friend of their  )

20   son, BRYAN WILES-BOND,       )

21   a minor,                     )

22              Plaintiffs,       )

23         vs.                    ) Civil No. 05-00247

24   DEPARTMENT OF EDUCATION,     ) JMS/BMK

25   State of Hawai'i,            ) CONSOLIDATED (Other
```

EXHIBIT B

Page 46

```
 1         MR. USHIRODA: Same objection.
 2    A.   I guess that's possible.
 3  BY MR. VARADY:
 4    Q.   And that's one of the reasons why you
 5  wouldn't want to rely on somebody who wasn't
 6  properly credentialed, because they don't have the
 7  basis for rendering that opinion?
 8         MR. USHIRODA: Also objection, vague and
 9  ambiguous, lack of foundation, assumes facts not in
10  evidence.
11  BY MR. VARADY:
12    Q.   I'll try to clarify the question. I'll
13  withdraw it.
14         My question is: You wouldn't rely on the
15  opinion of an uncredentialed expert, because it
16  would pose a risk of harm to the patient. You've
17  already said yes to that; isn't that right?
18         MR. USHIRODA: Objection. Misstates
19  testimony. Also, vague and ambiguous, lack of
20  foundation, assumes facts not in evidence, also
21  calls for speculation.
22    A.   Well, let's back up a little here on this.
23  Okay? If a person, say, hypothetically was a -- in
24  the credentialing process, in other words, part of
25  their training, internship, but yet hadn't completed
```

Page 47

```
 1  the credentialing process, they were working with
 2  you and they had good certified people, that would
 3  be the exception.
 4  BY MR. VARADY:
 5    Q.   Okay. That's fair enough. So if a person
 6  was actually attempting to complete the
 7  credentialing process and had advanced to some point
 8  in that process that would bring them close to being
 9  credentialed, that would be a basis for considering
10  their opinion; is that a fair statement of your
11  testimony?
12    A.   True.
13    Q.   But if they weren't in the process of
14  being credentialed, they wouldn't fall within your
15  exception; is that correct?
16    A.   True.
17    Q.   And you would be forced to reject the
18  opinion of someone who didn't have the proper
19  credentials in that case; isn't that correct?
20         MR. USHIRODA: Objection. Calls for
21  speculation, assumes facts not in evidence. It's
22  also argumentative.
23    A.   We're talking from a clinical aspect?
24  BY MR. VARADY:
25    Q.   Yes.
```

Page 48

```
 1    A.   Okay. If the person didn't have -- if I
 2  didn't -- if I knew the person was not validly
 3  credentialed and certified and whatever else and
 4  received all the blessings from everybody that they
 5  need to, I probably wouldn't have sent them in the
 6  first place, so therefore, that's a moot point.
 7    Q.   So you wouldn't accept -- you wouldn't
 8  have sent them to such a person if you knew the
 9  person was not properly credentialed?
10    A.   Correct.
11    Q.   And that's because of the risk that it
12  poses of getting an opinion that is not an opinion
13  that has clinical reliability?
14         MR. USHIRODA: Objection.
15  BY MR. VARADY:
16    Q.   Isn't that correct?
17         MR. USHIRODA: Objection. Lacks
18  foundation, assumes facts not in evidence. Also,
19  vague and ambiguous. It's also an incomplete
20  hypothetical.
21    A.   Clinical reliability, I think, are the
22  terms that I have a little problem with. I'm
23  thinking, you know, people can be credentialed and
24  have a credential in certain areas but yet if you
25  really kind of dissect down the health care system,
```

Page 49

```
 1  the same with the legal system, you're probably not
 2  going to utilize them then --
 3         Say hypothetically an attorney -- I like
 4  to pick on attorneys, because you can pick on
 5  doctors. You really don't want to send, say, a
 6  complex business matter to a litigator that does
 7  personal injury only, because he's not up to date on
 8  it, correct, though he's licensed and he's an
 9  attorney and theoretically he could do that;
10  correct?
11         So therefore, I'm saying, you have to look
12  at the people and know the people that you're
13  sending -- making referrals and consultations from.
14  And therefore, you would expect that what their
15  opinion is is valid or their recommendation for
16  treatment plan, that it has merit. And so if you
17  don't know those things, then no, you know, I
18  probably wouldn't send them in the first place.
19  BY MR. VARADY:
20    Q.   So, for example, you wouldn't want to rely
21  on a clinical diagnosis made by Bryna Siegel if you
22  discovered she didn't possess the proper credentials
23  to offer such a diagnosis; isn't that correct?
24         MR. USHIRODA: Objection. Lacks
25  foundation, assumes facts not in evidence, calls for
```

Page 82

```
 1    A.   No.  No.
 2    Q.   So every time you've seen her opinions,
 3  you're -- you've been on the other side of the case;
 4  is that correct?
 5    A.   I think so.
 6    Q.   Do you know how many times that's been?
 7    A.   No, but more than likely none.  I don't
 8  think I've ever worked with her.
 9    Q.   I guess I don't understand your last
10  answer.  I thought you had said that she had been
11  involved in cases in which you had also been
12  retained as an expert.
13    A.   I don't know.  There's a couple of cases
14  that have multiple defendants and she may have been
15  or may not.  I don't know.  I don't recall.
16    Q.   So your answer is:  I don't recall whether
17  I've been involved in a case in which she's rendered
18  an expert opinion other than this one?  Is that your
19  answer?
20    A.   No, no.  My answer is I've never -- I've
21  never been on the same side of the fence with her.
22    Q.   By the same side of the fence, you've
23  never been representing the same party?
24    A.   Correct.
25    Q.   You think --
```

Page 83

```
 1    A.   -- that I know of.  But there's a
 2  possibility, a remote possibility.  That's all I'm
 3  saying.
 4    Q.   Are you thinking of a specific case?
 5    A.   No.  I'm thinking of a couple that -- I
 6  know that, you know, there's several cases that I've
 7  been involved in that have had multiple defendants,
 8  so the question is I don't know if they did or if,
 9  you know, one firm retained her, you know, so
10  there's a possibility, but I'm not saying -- I don't
11  know of it and it doesn't come to mind.  That's all.
12    Q.   Now, you've identified Bryna Siegel as a
13  person who assisted you in forming your opinions; is
14  that correct?
15    A.   She was the one that -- these are her
16  opinions, other than the costs.
17    Q.   So you're expressing no opinion on the
18  need for services.  You're only expressing an
19  opinion as to cost.  Is that the substance of your
20  testimony?
21    A.   Essentially, what's reasonable and what's
22  obtainable within, you know, what Dr. Siegel felt
23  was a reasonable treatment plan.
24    Q.   Well, you're not vouching for her
25  opinions, because that's not permitted; you
```

Page 84

```
 1  understand that?
 2    A.   No.  But I'm utilizing her opinions to
 3  establish my opinions.
 4    Q.   Okay.  So you can say you relied on them;
 5  is that correct?
 6    A.   True.
 7    Q.   But your reliance on them was for one
 8  purpose only and that was to calculate the cost of
 9  specific services; is that correct?
10    A.   True.
11    Q.   You were not making an independent
12  assessment as to whether or not those particular
13  services were necessary; is that correct?
14    A.   That is true.
15    Q.   Other than Dr. Siegel's report concerning
16  Bryan, was there anything else that you looked at in
17  forming your opinions as to the cost of services?
18    A.   Ms. Leukens' report, Dr. LeGoff's report,
19  Dr. Friedman's report.
20    Q.   And you reviewed those prior to June 2006;
21  is that correct?
22    A.   Other than Dr. Friedman.  I think she came
23  on later.
24         Is it Freeman or Friedman?
25    Q.   It's Freeman, B.J. Freeman, like free man.
```

Page 85

```
 1    A.   Okay.
 2    Q.   You didn't obtain any data of your own; is
 3  that correct?
 4    A.   I obtained cost data and I talked to the
 5  Regional Center person.
 6    Q.   Now -- and I'm correct that your opinions
 7  were formed specifically for this litigation; is
 8  that correct?
 9    A.   I don't understand what you're asking.
10    Q.   Well, you weren't forming your opinions to
11  make a treatment plan for Bryan that you expected to
12  be implemented; is that correct?  They were just
13  formed for purposes of rendering an expert opinion
14  in this litigation?
15    A.   The opinions I expressed on my report,
16  yes.
17    Q.   Were any of the opinions that you
18  expressed concerning Bryan's needs subjected to
19  review by any other expert before you finalized them
20  and they were filed in this matter?
21    A.   Dr. Siegel.
22    Q.   Other than Dr. Siegel?
23    A.   No.
24    Q.   Am I correct that you did not refer to any
25  literature concerning autism in forming your
```

Page 110

example, his parents would be continuing to need respite services, for example.
A. That's true.
Q. That would affect costs?
A. That's true. And there would be some provided by the Regional Center.
Q. You're assuming that based on the fact that generally the Regional Center provides certain services to children in California?
A. And adults who qualify.
Q. What is your basis for concluding that Bryan will live in California next year or the year after?
A. I have no idea, but I think it's pretty -- as far as if he's going to stay in California this year or next year, I think these are assumptions we have to make at the time where they are and where the family is, because I don't think anyone can tell us, other than them, the parents themselves saying, Hey, we're going to move to Montana or Idaho or Maryland or -- I don't know.
      I mean, that's the assumptions I have to apply, because you're trying to put down present day what it is to project out financially where it's going to be in the future and there's no way -- I

Page 111

mean, our lives change. Your life changes. I mean, you know, you may be planning to stay here the next ten years and practice law and all of a sudden something comes dynamic or whatever for your benefit and you're off to Alaska. I don't know and you don't know that unless -- until that time comes. So these are assumptions right in this point that we all have to make.
Q. So that's an additional assumption that you've made, is that Bryan's family will remain in California?
A. Correct.
Q. And it also underlies your calculations; is that correct?
A. Correct.
Q. I just want to make sure of one thing. Are you aware of whether or not the IDEA statute -- that is, the Individuals with Disabilities Education Act -- provides for compensatory educational services beyond the age of 21?
A. I don't know, and I don't think so.
Q. If I represented to you that in certain circumstances services can be provided beyond the age of 21, are you aware of any facts that would cause you to dispute that?

Page 112

MR. USODA: Objection. It's a loaded question, misstates the law, also is an incomplete hypothetical, assumes facts not in evidence, lack of foundation. Also, calls for speculation.
      THE WITNESS: Read back the question, please.
      (Record was read as requested.)
A. No.
BY MR. VARADY:
Q. You also, in the group home paragraph, which is the third paragraph on page one of Exhibit 9, state that the funding generally comes from Social Security and the Regional Center. Do you see that?
A. Correct.
Q. That's, again, just a generalized statement of how services are ordinarily funded for the disabled in California. It's not specific to Bryan; isn't that correct?
A. Correct.
Q. Have you ever heard of the term compensatory education?
A. I have.
Q. What is it?
A. It's education beyond the education.

Page 113

That's all I know.
Q. Now, you refer to a discussion with Dr. Siegel at the beginning of paragraph number four, and it states -- that's the last paragraph on that page -- that Dr. Siegel told you that Bryan won't need the same level of services once he's been institutionalized. Do you see that? I'm summarizing. I can read it verbatim if that helps you.
      I'll just withdraw the question and ask a different question.
A. Yeah. Why don't you, because I don't see that?
Q. My question is -- you state that in reviewing Ms. Leukens' life care plan and a discussion with Dr. Siegel, many of the services would be required to a lesser extent. Do you see that?
A. Correct.
Q. Now, my question for you is: Are you saying that after Bryan's in a group home, many of the services will be needed to a lesser extent, or are you saying something else? Because that doesn't seem to be tied to anything other than the prior paragraph, which talks about him going to a group

Page 114

1  home.
2  A.  It's to the entire plan that Ms. Leukens
3  had presented by that time.
4  Q.  Okay.  So that's both before and after
5  Bryan turns 18 you think she's recommending services
6  at too high a level; is that correct?
7  A.  Correct.
8  Q.  And that's without any expertise in the
9  field of autism and without having met or assessed
10 Bryan on your own; is that correct?
11 A.  That's with feedback from Dr. Siegel.
12 Q.  So Dr. Siegel told you that and you put
13 that in your report; is that correct?
14 A.  Essentially.
15 Q.  Is that the basis of the other references
16 here regarding service levels; that she told you
17 stuff and you put it in your report?
18 A.  True.  However, a life care plan is
19 supposed to be within a reasonable medical
20 probability, and at the time -- and at this present
21 time, even -- at the time that Ms. Leukens presented
22 this first plan and her second plan, and as far as I
23 know, as of the depositions of the family, the
24 parents, that Bryan is not receiving any psychiatric
25 visits, he is not on any psychotropic medications

Page 115

1  and a life care plan has to be within reasonable
2  medical probability.  So therefore, in theory, he's
3  not on those, so therefore, how can you justifiably
4  cost them out?  And that's one of my -- that's a
5  problem I have.
6  Q.  Let me just stop you there.  You have to
7  admit that the first sentence doesn't refer
8  specifically to psychiatric care.  It speaks to Ms.
9  Leukens' plan as a whole.
10 A.  Correct.
11 Q.  So the fact that there may be a quibble
12 that you have about psychiatric care isn't reflected
13 in that first sentence.  You're saying that Bryna
14 Siegel thinks the service levels are too high?
15     MR. USHIRODA:  Objection.
16 A.  Correct.  It's a summary.
17 BY MR. VARADY:
18 Q.  And then you get to some specifics after
19 that; is that correct?
20 A.  Correct.
21 Q.  All right.  You say Ms. Leukens has
22 recommended a psychiatrist six times a year, period.
23 There are neither specifics or medical records that
24 indicate this frequency.
25     Did I read that accurately?

Page 116

1  A.  That's true.
2  Q.  Did you assess Bryan for whether or not he
3  needs psychiatric or psychotropic medications?
4  A.  No.
5  Q.  Do you know whether he's taking any
6  psychiatric or psychotropic medications at this
7  time?
8  A.  Prior to -- as of Dr. Bonds' reevaluation
9  -- not Dr. Bonds -- Dr. LeGoff's reevaluation, no,
10 he was not.
11 Q.  Is it your testimony that you are
12 competent to express an opinion to a reasonable
13 medical probability that he will never need
14 psychiatric or psychotropic medication?
15 A.  No.
16 Q.  Your answer would be you don't know
17 whether he will or not; is that correct?
18 A.  That's correct.
19 Q.  You do state that if Bryan were to be
20 placed on medications, it would be reasonable for
21 him to see a psychiatrist two to four times a year.
22 Did I read that accurately?
23 A.  That's correct.
24 Q.  You're not a psychiatrist?
25 A.  Correct.

Page 117

1  Q.  You're not capable of rendering an expert
2  opinion in psychiatry; is that correct?
3  A.  That's correct.
4  Q.  You're not aware of whether or not --
5  you're not capable of making a diagnosis as to
6  whether or not Bryan will need psychotropic or
7  psychiatric drugs in the future; is that correct?
8  A.  That's correct.
9  Q.  Are you aware of the effects of
10 psychiatric and psychotropic medications frequently
11 prescribed to children who have autism?
12 A.  I'm aware of psychotropic medications
13 prescribed to individuals, not specifically with
14 autism.
15 Q.  So you're not specifically able to testify
16 regarding drugs frequently prescribed for children
17 with autism and what their psychiatric effects might
18 be?
19 A.  That's correct.
20 Q.  You do acknowledge in the report that
21 Bryan has had an adverse reaction to medications.
22 Do you see that?
23 A.  Yes.
24 Q.  What medications?
25 A.  I think it was Risperdal and Ativan, as I

Page 126

```
 1    Q.   What types of medications are you
 2  referring to?
 3    A.   All medications, really.  Specifically
 4  more so the psychotropic type of medications you're
 5  going to use or anti-seizure medications if they
 6  came in the realm.
 7    Q.   Do you know if Bryan is currently taking
 8  anti-seizure medications?
 9    A.   No.
10    Q.   You do not know or you do not believe --
11    A.   As far as I know, he's not taking anything
12  other than over-the-counter medications.
13    Q.   Looking at the next paragraph, it refers
14  to dental care.
15    A.   Correct.
16    Q.   And Ms. Leukens suggested that it be done
17  monthly.  Do you see that?
18    A.   Correct.
19    Q.   You indicate that it could be done twice a
20  year.  Do you see that?
21    A.   Correct.
22    Q.   Is that your opinion or Dr. Siegel's
23  opinion?
24    A.   That's my opinion, I think, on that one.
25  But most dentists, basically -- under anesthesia, in
```

Page 127

```
 1  talking to my own personal dentist, they'd only do
 2  it twice a year.
 3    Q.   Are you aware of any specific problems
 4  related to dental hygiene that Bryan's case
 5  presents?
 6    A.   It presents a major problem with dental
 7  hygiene, because of the fact of his autism and his
 8  behavior and the frequency of his brushing his
 9  teeth.  Therefore, that -- you know, that he needs
10  to basically really have a twice a year exam and
11  cleaning.
12    Q.   So am I correct that the basis of your
13  opinion here is a conversation with your own
14  dentist?
15    A.   Correct.
16    Q.   Who is that?
17    A.   Tsutsui.
18    Q.   I'm sorry?
19    A.   Tsutsui.
20    Q.   Tsutsui?
21    A.   Uh-huh.
22    Q.   What is Dr. Tsutsui's first name and where
23  is he --
24    A.   Kenneth.  And he retired.
25    Q.   Where is he located?
```

Page 128

```
 1    A.   In Hilo.
 2         I just asked him hypothetically what he
 3  would do with someone.  Again, I didn't specifically
 4  use Bryan's name to any of these people I discussed
 5  it with.
 6    Q.   Now, in your next paragraph, you lump
 7  together the physical, occupational, speech and
 8  audiological therapies.  Do you see that?
 9    A.   Yes.
10    Q.   I think there must be a typo there on the
11  next sentence.  It says, Their roll -- I believe
12  that would be r-o-l-e.  Is that correct?
13    A.   Where?
14    Q.   The second sentence of the paragraph.
15    A.   Their roll would be?
16    Q.   Yeah.  R-o-l-e?
17    A.   Yeah.  It's misspelled.
18    Q.   Not r-o-l-l?
19    A.   Uh-huh.  Do you want me to correct it on
20  this?
21    Q.   No.  I just want to make sure that I'm
22  reading it correctly and I'm not missing something
23  that's beyond me --
24    A.   There's another typo, on the bottom.
25    Q.   School stat, versus state?
```

Page 129

```
 1    A.   It should have been staff.
 2    Q.   Staff.  All right.  Well, do you
 3  understand the distinction between services on a
 4  consulting versus a direct basis?
 5    A.   Yes.
 6    Q.   Do you see that what you're saying here
 7  apparently is the role of physical therapy,
 8  occupational therapists, speech and audiological
 9  therapists would be on a consulting basis, not any
10  actual activity which would be carried out by the
11  school staff?  Do you see that?
12    A.   Correct.
13    Q.   So if I understand, what you're saying is
14  that instead of receiving direct services from a
15  physical therapist, an occupational therapist, a
16  speech and language therapist and an audiological
17  therapist, Bryan doesn't need those services.  All
18  that needs to happen is that the educational staff
19  have consulting opportunities with those types of
20  experts.  Is that correct?
21         MR. USHIRODA:  Objection to the extent it
22  misstates the document and misstates prior
23  testimony.
24    A.   Generally, in -- with disabled children,
25  through the school district they receive services
```

Page 158

1    Q.   Did you identify to Mr. Ushiroda any
2    questions you had about Ms. Leukens' report?
3    A.   Such as?
4    Q.   Any.
5    A.   Well, yeah. I mean, I told him what I
6    felt was -- I mean, what I felt, you know, as I
7    documented in my supplemental and primary reports.
8    Q.   My question isn't did you tell him you
9    disagreed with it. That's not my point.
10        My point is: Were there any questions in
11   your mind about things contained within her report
12   that you wanted clarification on that you talked to
13   Mr. Ushiroda about and said, Gee, Mr. Ushiroda, I'd
14   like to get more information about why she's coming
15   to this conclusion?
16   A.   I think there's some figures I wanted
17   validated, how she came to that conclusion and how
18   she got them, and who made the recommendations of --
19   some of the recommendations, and she verified that.
20   Q.   And she did that in her deposition; is
21   that correct?
22   A.   Yes.
23   Q.   Did you assist Mr. Ushiroda in preparing
24   for Loretta Leukens' deposition by providing those
25   types of questions?

Page 159

1    A.   A couple like those. That's -- you know,
2    those are the type things. I wanted to find out
3    where she got her figures from and, you know, the
4    biggest question I had was how come she didn't --
5    what was the reason that the financial figures
6    didn't change from her two reports.
7    Q.   Well, you'd agree that yours changed only
8    in one aspect; isn't that correct?
9    A.   True. And I stated why. But she writes
10   this whole report for you guys and I'm --
11   Q.   Well, I'm --
12        MR. USHIRODA: Let him finish his answer.
13        MR. VARADY: It's not an answer. It's a
14   narrative.
15        MR. USHIRODA: It is, because -- you're
16   cutting him off.
17        MR. VARADY: It's not the question.
18        MR. USHIRODA: You're cutting him off.
19   Let him finish his answer.
20        MR. VARADY: There's no pending question.
21        MR. USHIRODA: Counsel --
22   BY MR. VARADY:
23   Q.   My question to you is: Did you provide a
24   list of questions to Mr. Ushiroda to ask Ms.
25   Leukens?

Page 160

1    A.   I gave him some questions, yes.
2    Q.   Were those in writing?
3    A.   Some were. Some were verbal.
4    Q.   Have copies of those been produced to us?
5    A.   No. I don't have them anymore. It was
6    just I wrote some notes, I thought about it and I
7    told him, and then I just got rid of it.
8    Q.   What do you mean by got rid of it? You
9    destroyed them?
10   A.   Yeah.
11   Q.   There's no copy of those remaining?
12   A.   Not that I know of.
13   Q.   Similarly, as to Dr. LeGoff, did you
14   prepare any questions for Dr. LeGoff for Mr.
15   Ushiroda's use?
16   A.   No. I talked to him about it, and I think
17   he had it pretty well figured out.
18   Q.   As to Dr. Freeman, did you prepare any
19   questions for Mr. Ushiroda's use with regard to Dr.
20   Freeman's deposition?
21   A.   No.
22   Q.   Does anyone else -- did anyone else
23   besides you have a copy of the list of questions
24   that you prepared for Dr. Leukens' deposition for
25   Mr. Ushiroda's use?

Page 161

1    A.   Ms. Leukens.
2    Q.   Sorry. I said Dr. Leukens. I'll withdraw
3    the question and ask it correctly.
4         Did anyone besides you ever have a copy of
5    the questions you prepared for Mr. Ushiroda's use in
6    Dr. -- in Ms. Leukens' deposition?
7    A.   Not that I know of.
8    Q.   Why did you destroy those?
9    A.   They were just handwritten notes and I'm
10   cleaning house. He just asked me. I said okay. We
11   talked about. I wrote some notes down. I said, I
12   need to know this, this and this. And then, you
13   know, we were done with the discussion, I figured he
14   had it, and so I just round-filed it.
15   Q.   You understand that you're disagreeing
16   with Ms. Leukens' opinions?
17   A.   Yes.
18   Q.   -- and that you are prepared to give
19   testimony in contradiction of her opinions?
20   A.   I guess that's what you'd call it, yes.
21   Q.   Do you think it's fair to prepare
22   questions like that which are used in Ms. Leukens'
23   deposition and then destroy them so that they can't
24   be used in your deposition?
25   A.   I think that's your responsibility and