
Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

ANN KIMBALL WILES and STANLEY BOND,
individually and as next friend of
their son, BRYAN WILES-BOND, a minor,

    Plaintiffs,

v.                      CV 04-00442 HG/BMK
                      CV 05-00247 HG/BMK

DEPARTMENT OF EDUCATION, State of
Hawaii, and ALVIN RHO, in his
official capacity as West Hawaii
District Superintendent,

    Defendants.

_____/

VIDEOTAPED DEPOSITION OF BRYNA SIEGEL, Ph.D.

SAN FRANCISCO, CALIFORNIA

MONDAY, OCTOBER 15, 2007

ATKINSON-BAKER
COURT REPORTERS
(800) 288-3376
www.depo.com

Reported by: Leland Batara, CSR No. 3759

File No. A10877B

1  add?
2      A.  I don't recall that there were any, but I
3  am stating it that way because I don't have any
4  records of it if it did, because what I do is, I
5  have one computer file, and if I end up adding to
6  the report, it just gets added to the report.
7      Q.  And as to the DOE, did anyone at the DOE
8  review this report before it became final?
9      A.  Not unless Mr. Ushiroda sent it to someone
10 at the DOE.  I certainly didn't.
11     Q.  And by DOE, you understand that I will be
12 using that term exclusively as to the Hawaii DOE --
13     A.  Right.
14     Q.  -- unless I specify otherwise.
15     A.  (Witness nods head.)
16     Q.  Now, who selected the records that you
17 have identified here?
18     A.  These were part of the packets sent to me
19 by Mr. Ushiroda.
20     Q.  They were selected by Mr. Ushiroda and
21 sent to you; is that correct?
22     A.  Correct.
23     Q.  Now, these opinions are formed exclusively
24 for this litigation; is that correct?
25     A.  I am sorry, could you restate that?

Page 76

1      Q.   Yeah.
2           They were formed for your work as an
3   expert witness in this litigation, and not for any
4   kind of independent research?
5      A.   My opinions?
6      Q.   Yes.
7      A.   Yes.
8      Q.   Other than the data identified in this
9   report, were there any other data that you referred
10  to in forming your report?
11     A.   I think that this is probably all the
12  documents I had in my possession at that time.
13     Q.   Was there any literature concerning autism
14  that you reviewed?
15     A.   To prepare the report?
16     Q.   Yes.
17     A.   I think just -- just in general, what my
18  basis of knowledge is for keeping up on the
19  literature in general.
20     Q.   Nothing specific, though; is that correct?
21     A.   I don't believe so.
22     Q.   Can you describe the methodology you used
23  in forming your opinions?
24     A.   Well, as it says here, what I did was, I
25  reviewed the records.  I observed Bryan at the

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 162

1  what I think happened in Hawaii. I think he was
2  held back, and he didn't get to develop any skills
3  while he was getting very inconsistent educational
4  practice, but that the capacity has been,
5  fortunately, accessed since he's been in better
6  programs in California.
7       Q. All right. You have in front of you
8  what's been identified as Exhibit No. 14.
9            (Exhibit 14 marked for identification.)
10 BY MR. VARADY:
11      Q. This is your June 25th, 2007 opinion that
12 was filed in this matter.
13           Do you see that?
14      A. Yes.
15      Q. And you prepared this like the other
16 report, for purposes of this litigation; is that
17 correct?
18      A. Correct.
19      Q. Now, the scope of the assignment is
20 described as document progress -- documenting
21 progress and assessing whether the current education
22 Bryan was receiving was providing FAPE, and to
23 compare your observations with the test results
24 obtained by Dr. LeGoff and Dr. Freeman; is that
25 correct?

1   A.  Well, that, in a way, is my proof that he
2   has -- absolutely has the capacity for recoupment
3   that I would suspect that he would have when he
4   changed his treatment practices.
5       Q.  If he'd made that progress in Hawaii,
6   wouldn't he even be further along today?
7           MR. USHIRODA: Objection.  Asked and
8   answered.
9           THE WITNESS:  I don't believe that he
10  would.
11  BY MR. VARADY:
12      Q.  So he's gone as far as he can now?
13      A.  No.
14          MR. USHIRODA: Objection.  Asked and
15  answered.
16          THE WITNESS: No.  He's continuing.  We
17  have been through this.  He's continuing to learn,
18  and he will continue to learn.
19  BY MR. VARADY:
20      Q.  Well, can you only consider him to learn
21  in California, or could he have learned in Hawaii?
22      A.  He could have learned in Hawaii.
23      Q.  So there was a period of five years where
24  he didn't learn in Hawaii; isn't that correct?
25      A.  Right.  Correct.  But I think he is caught

1  up, and he is back on track and that he has capacity
2  that wasn't accessed when he was in Hawaii and that
3  -- I don't think that the kind of gains we have seen
4  in his first two years in California are going to
5  continue at that rate for the next two years and the
6  two years after that, and so forth.
7      Q.  Can you say that with a certainty?
8      A.  I can say it with a fair degree of
9  certainty.  In other words, I don't think he will
10 have 400 signs in another year's time, for example,
11 if you were going to try to characterize it that
12 way.  I think that would be extremely unlikely.
13     Q.  Wouldn't you want to see where he is next
14 year before making predictions about where he is
15 going to end up?
16     A.  I mean, ideally, one wants to see, but I
17 can tell you that based on my experience over the
18 years with kids like Bryan, it would be unlikely.
19 It seems much more improbable than probable to me.
20     Q.  So your testimony is that even though he
21 made no progress for five years in Hawaii and, in
22 fact regressed, that he's recouped to the point he
23 would have been had he been given appropriate
24 services in Hawaii; is that correct?
25         MR. USHIRODA:  Objection.  Asked and

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 276

1  answered. Also misstates prior testimony.
2  BY MR. VARADY:
3      Q. Is that your testimony?
4      A. I think he has largely recouped.
5      Q. Well, that is a big word, "largely." Now,
6  you are qualifying it.
7      A. No.
8      Q. Did he recoup or not?
9      A. Well, I mean, as you pointed out yourself,
10 there is no way to know exactly. This is not a
11 precise science. I think that he's shown a lot of
12 improvement in the behavioral domain. And in doing
13 so, he's much more open to instruction.
14         So he is doing many more things, but he is
15 still a very severely impaired young man, and a lot
16 of what he has learned, a lot of the signs that he's
17 learned don't really have much functional use for
18 him, like labeling objects and colors and numbers
19 and animals, and so forth.
20         So as far as where he is going in life, as
21 I have said, he needs to have a much more functional
22 turn in the road for his curriculum. And typically
23 that happens at age 14, when the transition for
24 adult planning first gets talked about at an IEP
25 meeting.