

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF HAWAII

3                      - - -

4

5    ANN KIMBALL WILES and STANLEY

     BOND, individually and as next

6    friend of their son, BRYAN

     WILES-BOND, a minor,

7                 Plaintiff,

     vs.                    Civil No. CV-05-00247 HG/BMK

8    DEPARTMENT OF EDUCATION    No. CV-04-00442 HG/BMK

     State of Hawai'i, and ALVIN      CONSOLIDATED

9    RHO, in his official capacity  (Other Civil Action)

     as West Hawai'i District

10   Superintendent,

                 Defendants.

11   _____/

12

13

14

15              DEPOSITION OF

16              STANLEY BOND

17           WALNUT CREEK, CALIFORNIA

18              MAY 11, 2007

19

20

21   ATKINSON-BAKER, INC.

     COURT REPORTERS

22   (800) 288-3376

     www.depo.com

23

     REPORTED BY: DANUTA KRANTZ, CSR NO. 4782

24   FILE No.: A103D1F

25

CERTIFIED COPY



EXHIBIT 'A'

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF HAWAII
 3                          - - -
 4   ANN KIMBALL WILES and STANLEY
     BOND, individually, and as next
 5   friend of their son, BRYAN
     WILES-BOND, a minor,
 6
            Plaintiffs,
 7
     vs.                              Civil No. CV-05-00247 HG/BMK
 8                                        No. CV-04-00442 HG/BMK
     DEPARTMENT OF EDUCATION                   CONSOLIDATED
 9   State of Hawai'i, and ALVIN        (Other Civil Action)
     RHO, in his official capacity
10   as West Hawai'i District
     Superintendent,
11
            Defendants.                CERTIFIED COPY
12   ------------------------------/
13
                         VOLUME II
14
                 (Pages 285 through 437)
15
                      DEPOSITION OF
16
                      STANLEY BOND
17
                WALNUT CREEK, CALIFORNIA
18
                SATURDAY, JUNE 30, 2007
19
20
21
     ATKINSON-BAKER, INC.
22   COURT REPORTERS
     www.depo.com
23   (800) 288-3376
24   REPORTED BY:  MARYANN P. COSTA RPR, RMR, CSR NO. 5820
25   FILE NO.: A104D03
```

1  that time, only asking for implementation of the IEP.

2           There was -- there seemed to us a

3  perceptual shift in how they were treating Bryan and

4  how they were going to treat Bryan.

5           And --

6        Q.  This is after the 2004 lawsuit, correct?

7        A.  No, this is in 2003, in December of 2003,

8  when we filed our first -- well, not first, but when we

9  filed our suit in 2003 after we had been through the

10 two, you know, hearings, the two administrative

11 hearings, and we still were not getting the services

12 that were required by the hearing officer.

13          And there was definitely that perceptual

14 shift.  That was the first time when that was given to

15 us that anybody ever said anything to us about sanitary

16 conditions of our house, first time anybody ever said,

17 you know, Kim was irrational.  And the people that made

18 those declaratory statements, they had their

19 opportunities to make those same declaratory statements

20 in the administrative proceedings in 2003.  They didn't

21 make those statements back then.

22        Q.  The first time you heard any complaints

23 about -- from the DOE or skills trainers about

24 unsanitary conditions at your home was in these

25 declarations?

153

1          A.   No.   The first time I heard it was in a

2    letter from Lono Beamer that we received on Christmas

3    Eve in 2003, that was mailed in a way to come to our

4    house on Christmas Eve of 2003, stating that our house

5    conditions were unsanitary and my wife was difficult to

6    work with.   And I don't know any other way to take that

7    except to say that it was intended to come at a time,

8    you know, when it should have been a joyous time in our

9    household and make it a less joyous time in our

10   household.

11          Q.   Were there issues of sanitary conditions at

12   your home?

13          A.   I don't believe there were issues of

14   sanitary conditions at our house.   I don't -- I don't

15   believe that.   But everyone has a right to opinion, I

16   guess, in the sense of what, you know, what are their

17   standards and things, but I don't believe so.

18              We have had psychologists in our house

19   every week for three hours, you know, to go over

20   programs and to -- they were all over our house.   They

21   were downstairs in Bryan's area preparing things and

22   all.   Never one of them said, you know, It's pretty

23   nasty down here.   You guys really need to clean your

24   house up better.

25              We never had a skill trainer, supervisor,

154

1 | Ms. Kelly Stern or Dr. Price, before that letter, none
2 | of them ever came to us and said, You know, we lost a
3 | really good skill trainer because the sanitary -- your
4 | house sanitary conditions were really pretty bad and
5 | they didn't feel like they could work there.
6 | No.  And even after me made those claims,
7 | not one of those people ever came to our house to
8 | inspect our house, either prior to that, prior to
9 | making that claim or after making the claim, saying,
10 | you know, These house conditions are really bad.
11 | I mean, it was only done as soon as we
12 | filed the lawsuit.  I feel like it was done both to
13 | intimidate us in a way and to also throw -- well, it
14 | tends, you know, it's a way to blame the victim for
15 | what is happening to them, and it also, you know,
16 | pushes it off on a different -- it takes the eyes away
17 | from the real issue about service -- are the services
18 | being provided that Bryan is supposed to get, and it
19 | puts it onto a different issue, which is a nonissue,
20 | because if they truly felt that was true, there were
21 | ways to mitigate that, too.  They could have done his
22 | program in another location if they felt like hour
23 | houses was unsanitary.
24 | Skill trainers continue to work with us in
25 | our house.  Skill trainers that have worked with us

1  over a long period of time continue to work with us in

2  our house. We didn't get any complaints from them. We

3  didn't ever get a direct complaint from a skill trainer

4  saying, Your house is unsanitary.

5         And we never actually got a direct

6  complaint from anyone else saying our house was

7  unsanitary until Mr. Beamer's letter and then

8  Ms. Radwick made that statement in our February meeting

9  at the district office.

10         Q.  When was that meeting?

11         A.  I believe it was on February 17, but I am

12  not -- please don't hold me to that absolute date, but

13  sometime in February.

14         Q.  The Lono Beamer letter came to you on

15  Christmas Eve?

16         A.  On December 24, 2003, yes.  And, you know,

17  I felt that the way it was done was a direct response

18  to our filing of the lawsuit.

19         Q.  Now, you added the behavioral incident in

20  school and the calls from school for medical reasons,

21  and we have just gone over the complaints.  Anything

22  else?

23         A.  I would have to turn back and say, I am

24  sure there are a number of other incidents that I can't

25  recall right now, but we would be happy to, you know,

1      Q.    How about any response to Judy's comment that

2  your home is unsanitary?

3      A.    You know, there were comments towards that, and

4  I made comments and also -- so did our attorney -- and I

5  think that our comments went to the fact that, well, if

6  that was the issue, then it was really up to the DOE to

7  find an appropriate setting for Bryan -- for his

8  educational needs -- if the DOE didn't feel like the

9  house was the appropriate setting for him to work on his

10  life skill needs in that after school setting, then the

11  DOE needed to find -- to supply a setting that they felt

12  was appropriate.

13      Q.    Do you recall what Ms. Floyd said?

14      A.    I think that's what -- basically, her comment.

15      Q.    Do you recall any response to that retort?

16      A.    I don't recall exactly what the response was,

17  but, I'm sure that they -- I'm sure, you know, it was

18  rejected out of hand, basically, as not -- basically,

19  they weren't going to do something like that.

20      Q.    Did Alvin Rho say anything at this meeting?

21      A.    Mr. Rho said very little.  I don't really

22  recall what he said in that meeting.

23      Q.    Where did this meeting take place?

24      A.    It took place at the West Hawaii School Board

25  complex.

1        Q.    And did you take notes?

2        A.    I didn't take notes, but, Mrs. Floyd did; so, I

3   relied on her notes.

4        Q.    Okay, and, did Mr. Beamer say anything?

5        A.    Yeah, Mr. Beamer said -- yes -- I mean, he was

6   their lawyer.

7        Q.    What did he say?

8        A.    Well, you know, I don't remember everything

9   that he said.  But, I know some of his -- one of his

10  recommendations was, well, maybe we should look at

11  residential facilities.

12       At that point, it was also -- it was in this meeting

13  where we presented a variety of options for DEO, in terms

14  of how Bryan's program could be handled, such as, you

15  know, either bringing in people that could do intensive

16  training to bring skills trainers up to a standard that

17  they could work with him, to bring in -- to hire skilled

18  trainers from the outside that could come in and work

19  with Bryan --

20       Q.    Were these the options we discussed in your

21  last session?

22       A.    Yes, they are.

23       Q.    I remember you talked about bringing in an

24  outside agency to do --

25       A.    Yes.