A104D1A
CARA ENTZ        JUNE 28, 2007

**FILE**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---

ANN KIMBALL WILES AND STANLEY )
BOND, INDIVIDUALLY AND AS NEXT )
FRIENDS OF THEIR SON, BRYAN    )
WILES-BOND, A MINOR,           )
                               )
           PLAINTIFFS,         )
                               )
VS.                            )  CASE NO.
                               )  CV 04-00442 HG/BMK
DEPARTMENT OF EDUCATION, STATE OF )  CV 05-00247 HG/BMK
HAWAII, AND ALVIN RHO, IN HIS  )  CONSOLIDATED
OFFICIAL CAPACITY AS WEST HAWAII )  (OTHER CIVIL
DISTRICT SUPERINTENDENT,       )  ACTION)
                               )
           DEFENDANTS.         )
                               )

DEPOSITION OF

CARA ENTZ

GLENDALE, CALIFORNIA

THURSDAY, JUNE 28, 2007

ATKINSON-BAKER, INC
COURT REPORTERS
WWW.DEPO.COM
800-288-3376

REPORTED BY:  EDWARD G. HARRISON, CSR NO. 6530

FILE NO.:  A104D1A

Page 1

EXHIBIT A

ATKINSON-BAKER, INC. COURT REPORTERS        1 (800) 288-3376

**Page 110**

1  A. I can't tell you the exact dates.
2  Q. I was just curious because there's these
3  handwritten revisions.
4  A. Right.
5  Q. But that's your recollection sitting here
6  today?
7  A. Yes.
8  Q. All right.
9     And I'll get into the details of who was there
10 and who said what.
11    But now if you go down to October 22nd, '04,
12 Friday, it has two items, DOE/AG meeting from 9:00 to
13 12:00 and also a meeting with DOE/AG and PCFA at the
14 West Hawaii District Office. But both appear to be
15 crossed off.
16 A. Yes. It all changed and we flew to Honolulu
17 to meet with a judge. And I can't remember his name.
18 Q. Oh, okay.
19 A. So that kind of took up the whole day.
20 Q. And that went from 9:00 to 5:00?
21 A. Yes.
22 Q. Do you recall the judge's name?
23 A. I don't.
24 Q. A man?
25 A. It was a man.

**Page 111**

1  Q. Barry Kurren, does that sound familiar?
2  A. No.
3  Q. Do you know why these meetings got canceled?
4  A. I can't really tell you why. We were just
5  told that we needed to go and present our findings to
6  this judge and they wanted to do it before I left. I
7  was leaving, I think, that evening. So they wanted him
8  to hear from me before I left.
9  Q. And when you say "they," who is "they"?
10 A. Well, Kate and then there was another
11 attorney, I believe, for the district.
12 Q. Lono Beamer?
13 A. What was the name again?
14 Q. Lono?
15 A. No. It was a woman.
16 Q. Holly?
17 A. Holly, yes.
18 Q. Holly Shikada?
19 A. Yes, yes.
20 Q. Okay.
21    And then it says at the end "Gloria, Saturday
22 and Sunday, personal."
23 A. Uh-huh.
24 Q. What does that mean?
25 A. Gloria stayed over the weekend. I flew back

**Page 112**

1  Friday and she stayed over the weekend.
2  Q. Might as well make a holiday of it.
3  A. I guess. Not for me.
4  Q. Okay.
5     Sometimes it's not great being the boss.
6  Okay.
7  A. Actually, it was my preference to come home,
8  but anyway.
9  Q. So Gloria accompanied you on this site visit?
10 A. She did.
11 Q. Okay.
12    And she is the --
13    That is, Gloria is Gloria Medina?
14 A. That's right.
15 Q. And she's one of your senior therapists?
16 A. That's right.
17 Q. And what was her role during this visit?
18 A. The same thing, get to know Bryan, you know,
19 to help him with a treatment planning process. She --
20 we were thinking of Gloria as one of the main people who
21 would be working with him and so I wanted her to see if
22 she felt like she was capable of treating Bryan, to see
23 the situation and that kind of thing, you know, the home
24 and the school environment.
25 Q. After this visit, did she indicate to you one

**Page 113**

1  way or the other whether this was something that she
2  could handle?
3  A. With certain provisions.
4  Q. Okay.
5  A. Yeah.
6  Q. What were those provisions?
7  A. Well, we decided that the only possible way we
8  could do it is if we had two staff at all times
9  together. That was one of the -- that was one of the
10 main provisions.
11 Q. Okay.
12    And was that agreeable to the parties
13 involved?
14 A. Well, it was --
15    Let's see.
16    You mean like Gloria or everyone else?
17 Q. Yes.
18 A. No one really commented on that. No one said
19 great -- said anything.
20    And I believe -- I'm trying to decide if --
21    I'm sure we had conversations about it that
22 day or during our site visit. But no one, you know, was
23 for or against. Basically, no one really said anything.
24 Q. Okay.
25    Well, I'll come back to that later.

Page 214

1  thing.
2  Q. Was it in your impression that the parents
3  were not involved with Bryan on the weekends?
4  A. Well, I knew for sure that they most likely
5  had not been trained to do the particular therapy that
6  we were going to provide and that it would be important
7  for them to know how to do that. So I didn't really
8  have any information about how involved or not they were
9  on weekends, yeah.
10 Q. Okay.
11    And going to Exhibit 17, which is the
12 proposal, I just want to confirm that this was sent via
13 fax to Shelby Floyd on November 23rd, '04?
14 A. Correct.
15 Q. And it was also sent to Kate Tolentino on the
16 same date, correct?
17 A. Correct.
18 Q. Do you know why --
19    Your proposal is dated November 5th and I was
20 just wondering why the length of time between the fax
21 and the date of the proposal. Just curious, that's all.
22 A. Most likely because it takes us forever to get
23 things edited.
24 Q. Oh.
25 A. Ira is only here two days a week. And he's

Page 215

1  very, very particular about editing things like this.
2  So most likely that's what it was. It can take us two
3  weeks or longer to get things out.
4  Q. It just has to work its way through?
5  A. Yeah. And if I miss the days he's here or the
6  two days he's here, then, you know, I have to wait until
7  the next week and that sort of thing. So I'm assuming
8  that's what happened.
9  Q. Where is Ira --
10    Where does Ira work out of primarily?
11 A. Well, he is actually -- there is an office
12 next door to this one, like right over there. It's not
13 connected to this.
14 Q. Okay.
15 A. And he works out of that office.
16    And at this time he was coming here
17 Wednesdays, Thursdays, because he lives far away.
18    Actually, currently he's here four days a
19 week.
20 Q. Okay.
21    But at the time it was only two days?
22 A. Right.
23 Q. Okay.
24    And the proposal, this November 5th, 2004
25 proposal is based upon your direct observation of Bryan?

Page 216

1  A. That's right.
2  Q. And then it states in the beginning:
3     The contract with Pacific Child & Family
4     Associates will be for a three-month
5     period."
6  A. Correct.
7  Q. How is that period determined?
8  A. Good question.
9     Probably just similar to a probationary
10 period, you know, like probationary periods for staff.
11 But we wanted to try it out for three months, you know,
12 see how it went for three months and then extend from
13 there. Because we really were feeling uncomfortable.
14 Q. Why?
15 A. Well, with the concerns that I talked about
16 previously, hiring staff and whether -- how Bryan would
17 respond to a program and that kind of thing, I think we
18 were feeling uncomfortable about that. We weren't sure
19 how well it was going to go or proceed.
20 Q. Well, if the proposal was accepted, though,
21 PCFA was willing to go forward, correct?
22 A. Yes.
23 Q. Now, after this proposal was sent to Kate and
24 Shelby on November 23rd, did you receive any response,
25 feedback?

Page 217

1  A. No, I don't remember any feedback. I may have
2  followed up with phone calls to see what was going on.
3  I -- yeah, that's about all I can recall. I don't
4  remember a lot of feedback or --
5  Q. Do you have any --
6     Do you have a recollection of perhaps speaking
7  with Kate Tolentino about this proposal?
8  A. No, actually, I don't recall that. I have a
9  vague recollection, but I couldn't -- I'm not sure what
10 the conversation was about.
11 Q. A vague recollection of --
12 A. Of having a conversation with her.
13 Q. With Kate?
14 A. Following this, yes, but not remembering.
15 Q. Okay.
16    Other than this vague recollection, do you
17 have any recollection of any further work that was done
18 once this proposal was sent out?
19 A. No.
20 Q. Just never heard back?
21 A. Right.
22 Q. If you look at the fourth page, just above
23 your signature it says "Total Costs projected for one
24 year of services," and the total comes out to $191,670.
25    And that's based on a 35-hour weekly program,

**Page 218**

1 correct?
2  A. Yes.
3  Q. Okay.
4     And your proposal also has a list of caveats
5 that would need to be met before the -- starting the
6 behavioral program, correct?
7  A. Correct.
8  Q. I think we talked about those earlier?
9  A. Right.
10 Q. So at this stage upon making this proposal,
11 would it be fair to say that PCFA was willing to service
12 Bryan?
13 A. Yes.
14 Q. Did you receive any information that the DOE
15 or the school district was willing to pay for this
16 proposal?
17 A. No.
18 Q. Do you know or have any information as to
19 whether the DOE approved this proposal?
20 A. No information.
21 Q. Cara, prior to today's deposition, have you
22 been contacted by anyone who represents the plaintiffs
23 in this case?
24 A. No, I have not.
25    Oh, well, I was -- I believe I was contacted

**Page 219**

1 for a copy of the file. Yes.
2  Q. By who?
3     I know our office subpoenaed the file.
4  A. Is that your office?
5  Q. Yes.
6  A. Okay.
7  Q. This is when we subpoenaed the records.
8  A. Okay.
9     MR. VARADY: So let the record reflect that
10 Mr. Ushiroda is looking at the subpoena for the records
11 in this case.
12    THE WITNESS: Okay. That must be.
13 BY MR. USHIRODA:
14 Q. That's the only contact?
15 A. Yes.
16 Q. Okay.
17    But other than that, have you been contacted
18 by anyone who represents any plaintiffs in this case?
19 A. No.
20 Q. Cara, we have a trial in this case that is set
21 for December 4th, '07 in Honolulu District Court.
22    If you're called to testify, would you be able
23 to testify in that time period?
24 A. December what?
25 Q. December 4th.

**Page 220**

1  A. I believe so.
2  Q. Okay.
3  A. I mean, you know, I don't have anything
4 scheduled.
5  Q. Other than Christmas shopping?
6  A. Yeah.
7     MR. USHIRODA: Okay. Cara, that's all the
8 questions I have. I may have some follow-up depending
9 on Carl.
10    MR. VARADY: Let's go off the record for a
11 minute.
12    (Whereupon, at this time, there was a
13    discussion held off the record.)
14
15    EXAMINATION
16 BY MR. VARADY:
17 Q. Cara, I'm Carl Varady, as you know. I'm
18 representing the parents in this action and Bryan
19 Wiles-Bond.
20    I'm going to be doing two things.
21    One is I'm going to be following up on some of
22 the topics that Mr. Ushiroda spoke to you about this
23 morning and this afternoon, and that would include
24 covering some of the same exhibits.
25    I am also going to introduce some exhibits

**Page 221**

1 that we did not cover and maybe a couple new topics.
2     All the same ground rules and procedures
3 apply. If there's any question about a question I ask,
4 please ask me and I'll be happy to clarify it. If you
5 don't understand it, please ask me to do that because,
6 if you don't, I'm going to assume you understood the
7 question.
8     Do you understand that?
9  A. Yes, I do.
10 Q. We are grateful for your continued
11 participation after hours today. And we're trying to
12 get this done in order to avoid having to come back or
13 do this by a telephone at a later date. Our court
14 reporter Ed has agreed to stay and we'll try to continue
15 up as quickly as we can.
16    If for any reason during our time together you
17 need to take a break, stretch your legs, use the
18 restroom, what have you, punch a wall, let me know.
19 Punch an attorney, feel free.
20 A. Okay.
21 Q. You get one free punch. Let me know and I'll
22 be happy to do that.
23 A. Okay.
24 Q. Do you have any questions before we start?
25 A. No.

**Page 282**

1  Q. Did she say, well, we have an expert in DTT
2  here in West Hawaii?
3  A. No.
4  Q. Did she say that any of the skills trainers or
5  therapeutic aides or any of the other personnel working
6  with Bryan had training in DTT?
7  A. No.
8  Q. Were the behaviorists that you intended to
9  retain in West Hawaii, were they going to be employees
10 of PACF or would they be employed by some other entity?
11 A. Oh, you mean of PCFA?
12 Q. Of PCFA. I misspoke.
13 A. They would be employed by our agency.
14 Q. And at any time before or after the proposal
15 was made, did PCFA register to do business in Hawaii or
16 take other steps necessary to employ people in Hawaii?
17 A. We started looking into that and were waiting
18 for a response to the proposal, but I know that Ira had
19 been looking into what was required to do that, uh-huh.
20 Q. Am I correct, though, that you would not
21 undertake the formal measures to do that unless the
22 proposal were accepted?
23 A. Correct.
24 Q. And am I also correct that even when you
25 submitted the formal proposal in November, you were

**Page 283**

1  still pessimistic about the likelihood that the proposal
2  would be accepted based on past experience?
3      MR. USHIRODA: Objection.
4      Mischaracterizes testimony.
5      THE WITNESS: Correct.
6  BY MR. VARADY:
7  Q. Now let's assume for purposes of a continuing
8  hypothetical that the November proposal had been
9  accepted.
10     Were you able to estimate how long it would
11 take you to mobilize, have Ms. Medina move over, have
12 Ms. MacDonald available and begin retaining employees,
13 did you know about how long that would take?
14 A. Well, Gloria Medina thought that she could
15 move in a month. We had talked to her about that. Ms.
16 MacDonald was available. We were going to have her go
17 over, you know, for maybe a week at a time, one week or
18 two weeks initially and then go over periodically. So
19 she was ready to go at any time. And then we had other
20 supervisors available. And I think we thought about
21 initially sending over a therapist from here to get
22 things started.
23     So I guess in about a month's time.
24 Q. In a month's time you would be able to
25 mobilize and then you would have to begin retaining

**Page 284**

1  people and training them and making sure that they were
2  qualified, that is, they went through your training,
3  didn't wash out, met your criteria and could work with
4  Bryan?
5  A. Correct.
6  Q. So it would be sometime after the first of the
7  year, really, until a functional program by even
8  ideal -- under ideal conditions would have been able to
9  be in place; is that correct?
10 A. Correct, uh-huh.
11 Q. Other than transience, did Ms. Tolentino
12 explain to you why it was difficult to find trained
13 staff in the Kona area, that is, staff trained in ABA or
14 DTT or with experience working with children who have
15 autism?
16 A. I don't believe she explained it in detail,
17 no.
18 Q. Did you have any discussions to that effect
19 with Dr. Copeland, did she say that would be difficult
20 to find people with autism experience or DTT or ABA
21 training?
22 A. Let's see.
23     I guess I did not have that conversation with
24 her.
25 Q. Okay.

**Page 285**

1      Do you have the --
2      I'm trying to find it now, but I'm looking for
3  the Dru Copeland one page notes of your conversation
4  with her. Sorry.
5  A. You mean the exhibit?
6  Q. Yes.
7      MR. USHIRODA: I think that was 9.
8      MR. VARADY: 9?
9      MR. USHIRODA: Yes.
10 BY MR. VARADY:
11 Q. Could you look at Exhibit 9, then, please.
12     Here it is. Of course, it's the last one.
13 A. Okay, yes.
14 Q. The reason I ask you that question about Dru
15 Copeland is that, if you look down at the bottom of that
16 page, it says:
17     "Parade of skills trainers, some better
18     than others."
19     Do you see that?
20 A. Right, I do see that.
21 Q. Does that jog your memory as to what she may
22 have said to you about skills trainers who were
23 available in the Kona area?
24 A. Well, I think we didn't really talk about the
25 availability in the Kona area.

**Page 302**

1  less supervision, we would go less often, something like
2  that.
3  Q. But at the time you were writing this, you
4  weren't certain which way it was going to shake out,
5  that is, whether or not the maximum would be needed or
6  not; is that correct?
7  A. Correct.
8  Q. All right.
9  Just so we have a clear record, I'm going to
10 give you what we'll mark as Exhibit No. 25.
11     (Whereupon, at this time, the Certified
12     Shorthand Reporter marked Defendants' Exhibit
13     25 for identification.)
14 BY MR. VARADY:
15 Q. And I would just like you to flip through this
16 and confirm that this is the draft behavioral assessment
17 that Ms. Tolentino faxed to you on October 6th, 2004,
18 among other records she sent you on that date.
19 A. This is the draft faxed to me.
20 Q. All right.
21     I'm going to show you a letter dated October
22 8th.
23     MR. VARADY: I ask that this be marked as No.
24 26, please.
25 //

**Page 303**

1     (Whereupon, at this time, the Certified
2     Shorthand Reporter marked Defendants' Exhibit
3     26 for identification.)
4  BY MR. VARADY:
5  Q. This is a two-page letter from Ms. Tolentino
6  to Kim Wiles, dated October 8th, 2004.
7      And my question for you is whether you've seen
8  this already before today?
9  A. No, I have not seen it.
10 Q. And the reason I ask is, if you look at the
11 facsimile stamp, it also was faxed on -- it was faxed on
12 December 1st, 2004 from North Shore Sped Hawaii.
13     MR. USHIRODA: North Hawaii Sped.
14     MR. VARADY: North Hawaii Sped. I'm sorry.
15     North shore is where I want to be.
16 Q. And appears to have been transmitted as part
17 of the Kim Smalley transmission, which is also dated
18 that same date at about the same time. And by the Kim
19 Smalley transmission I mean the final version of the
20 behavioral assessment.
21     So my question would be:
22     Did you receive this letter and --
23 A. I did not.
24 Q. Okay. You did not. Okay. Fair enough.
25     When you were originally scheduled to go to

**Page 304**

1  the Big Island, you were going to spend Thursday making
2  observations and then had meetings on Friday.
3      How was it determined that instead of having
4  meetings on Friday you would be flying over to Honolulu
5  to meet with Judge Kurren?
6  A. I don't know how it was determined, but Holly
7  or someone said that that's what needed to happen,
8  basically, I guess. I don't -- I can't remember why.
9  Q. So was any --
10 A. Well, sorry.
11 Q. Go ahead.
12 A. Except that they wanted me to be able to
13 present my information before I left, I think.
14 Q. That's what I was going to ask you.
15 A. Yeah.
16 Q. Why were you told that you needed to go tell
17 the judge what at least the outline of your proposal was
18 going to be, what was explained to you?
19 A. It wasn't really explained to me.
20 Q. Okay.
21     You were just told this is what you're going
22 to do next?
23 A. They wanted me to present it to the judge
24 before I left Hawaii. Yeah, I mean, I don't remember
25 the reason why.

**Page 305**

1  Q. And I think what you said was Shelby was
2  already in Honolulu at that time, she was not traveling
3  with you?
4  A. No.
5  Q. And when you were told you would be meeting
6  with Judge Kurren, she was not a party to that
7  discussion; is that correct?
8  A. Correct.
9  Q. Who was a party to that discussion?
10 A. I believe Holly and what's his name?
11 Q. Lono Beamer?
12 A. No.
13     MR. USHIRODA: Stan Bond?
14     THE WITNESS: No.
15     It was just the attorney, the people and the
16 superintendent.
17 BY MR. VARADY:
18 Q. Alvin Rho?
19 A. Yes, yes.
20 Q. And that meeting must have occurred on the
21 21st; is that correct?
22 A. The meeting that, oh, guess what, change of
23 plans?
24 Q. Yes.
25 A. Yeah. And it wasn't even for sure. We kind