1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3    ANN KIMBALL WILES and        )

4    STANLEY BOND, individually  )

5    and as next friend of their )

6    son, BRYAN WILES-BOND, a    )

7    minor,                      )

8                   Plaintiffs, )

9          vs.                   ) Civil No. CV 04-00442

10   DEPARTMENT OF EDUCATION,    ) HG/BMK

11   State of Hawai'i, and ALVIN ) CONSOLIDATED (Other

12   RHO, in his official        ) Civil Action)

13   as West Hawai'i District    )

14   Superintendent,             ) VIDEOTAPED DEPOSITION

15                   Defendants. )         OF

16   _____) RICHARD S. GOKA, M.D.

17   ANN KIMBALL WILES and       ) September 21, 2007

18   STANLEY BOND, individually  )

19   and as next friend of their )

20   son, BRYAN WILES-BOND,      )

21   a minor,                    )

22                   Plaintiffs, )

23          vs.                  ) Civil No. 05-00247

24   DEPARTMENT OF EDUCATION,    ) JMS/BMK

25   State of Hawai'i,           ) CONSOLIDATED (Other

EXHIBIT B

Page 94

```
 1      A.   I assume Mr. Hom is part of the Department
 2  of Education, because that's where he's stationed
 3  now.
 4      Q.   Mr. Hom is a Deputy Attorney General.  He
 5  works in the Attorney General's office.  Do you
 6  understand that?
 7      A.   Yes.  But he's also assigned to the
 8  Department of Education, so I synonymously put them
 9  together, just to let you know.
10      Q.   Okay.  So your impression was that Mr. Hom
11  worked for the Department of Education; is that a
12  fair statement?
13      A.   He works with the Department of Education
14  for the State under the Attorney General's guidance.
15          So when you asked me about the Department
16  of Education, I assumed Mr. Hom was included in
17  there.  Okay?
18      Q.   Now, you've already testified that you
19  relied exclusively on Bryna Siegel's opinions
20  concerning Bryan's diagnosis; is that correct?
21      A.   Correct.
22      Q.   I think you referred to her credentials.
23  Do you recall seeing her curriculum vitae?
24      A.   Probably.
25      Q.   I'm just going to ask you to take a look
```

Page 96

```
 1  her Ph.D. is in child development?
 2      A.   We didn't discuss that.
 3      Q.   Did you ask?
 4      A.   No.
 5      Q.   Was that important to you?
 6      A.   No.
 7      Q.   Wasn't it important to you to know, since
 8  you were relying on her diagnosis, that she had a
 9  proper education and training to make such
10  diagnosis?
11      A.   By looking --
12          MR. USHIRODA:  Objection.  We've been down
13  this road before.  It's been covered extensively.
14  Asked and answered.
15      A.   She has -- you know, by looking at what I
16  see right now, she has a very extensive expertise
17  since she's -- like I said, if she is on as an
18  adjunct professor to UCSF, I see no reason to
19  challenge that, as I stated before.
20  BY MR. VARADY:
21      Q.   Did you contact anyone at UCSF to validate
22  the information contained in her CV?
23      A.   No.  That's not my responsibility.
24      Q.   Whose responsibility is that?
```

Page 95

```
 1  at Exhibit No. 11.  This is the first page of her
 2  vitae.  Does this look like the document that you
 3  reviewed -- the first page of the document you
 4  reviewed?  I will stipulate for the record it's much
 5  more extensive, but I just want to make sure that
 6  we're talking about the same thing.
 7      A.   It looks familiar.
 8          MR. USHIRODA:  Is this going to be marked
 9  as an exhibit?
10          MR. VARADY:  It's been marked as 11.
11  BY MR. VARADY:
12      Q.   How many times have you talked to Dr.
13  Siegel on the phone?
14      A.   Two, maybe three.
15      Q.   How many times did you speak with her
16  before filing your initial opinion?
17      A.   Two -- I mean, this one.  And then the
18  third time after the supplement.
19      Q.   So twice before June 28th, 2006?
20      A.   I think so.
21      Q.   And then once before your supplemental?
22      A.   Right.
23      Q.   How long did you speak with her before the
24  June 26th -- the June 28th, 2006 opinion was filed?
25      A.   About an hour, hour and a half total.
```

Page 97

```
 1      A.   The person who retains her.
 2      Q.   Now, you state in your opinion that the
 3  above services are generally funded by the school
 4  district or Regional Center of the State of
 5  California, Department of Developmental Services; is
 6  that correct?
 7      A.   Correct.
 8      Q.   You say they're generally funded by the
 9  school district or Regional Center.  Did you verify
10  that the school district in which Bryan is enrolled
11  would be paying for and funding those services
12  personally?
13      A.   I did actually on the Elmira campus call
14  -- I called and, you know, they said most all of our
15  funding comes from the department of -- the state
16  department -- or the school districts, and then I
17  also verified that with somebody at the Regional
18  Center.
19      Q.   Okay.  That's a general statement about
20  the source of funding.
21      A.   Right.  For anybody who's autistic or
22  disabled with mental health issues that -- because
23  they fall under whatever that federal guideline is,
24  the Department of Education supplements and pays for
25  all educational services related to education and
```