

A10877B

BRYNA SIEGEL, Ph.D. - October 15, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

ANN KIMBALL WILES and STANLEY BOND,
individually and as next friend of
their son, BRYAN WILES-BOND, a minor,

    Plaintiffs,

v.

                                    CV 04-00442 HG/BMK
                                    CV 05-00247 HG/BMK

DEPARTMENT OF EDUCATION, State of
Hawaii, and ALVIN RHO, in his
official capacity as West Hawaii
District Superintendent,

    Defendants.

_____/

VIDEOTAPED DEPOSITION OF BRYNA SIEGEL, Ph.D.

SAN FRANCISCO, CALIFORNIA

MONDAY, OCTOBER 15, 2007

ATKINSON-BAKER
COURT REPORTERS
(800) 288-3376
www.depo.com

Reported by: Leland Batara, CSR No. 3759

File No. A10877B



EXHIBIT C

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 116

1    support, I think that the parents have basically

2    pursued an alternative that obviated the need for

3    residential placement at this time.

4         Q.   Okay.  And I want to just highlight a few

5    points of agreement, then, with Dr. LeGoff.

6              You both agree, as of December 2005, that

7    Bryan had made significant progress in his current

8    program with proper instruction and the correct type

9    of support --

10        A.   Correct.

11        Q.   -- is that correct?

12             In fact, he was getting, on paper, fewer

13   hours?

14        A.   Right.

15        Q.   Because his Hawaiian IEPs had 50-plus

16   hours of various types of services, whereas in

17   California, at this time, that is, in December of

18   '05, maybe 30, or a little bit more than 30 hours,

19   but the support themselves were better.

20        A.   Well, there is two factors, actually.

21   When I -- and I don't know what was going on at this

22   time because I didn't see Bryan.  I didn't get a

23   chance to interview Bryan's dad until the spring of

24   this year.  But what Dr. Bond represented to me was

25   that, in addition to the school services, Bryan is

Page 117

1    getting regional center services, services from the

2    California Department of Developmental Services who

3    are providing home-based after-school care.

4           So he is getting a consistent home-based

5    set of treatment principles in the afternoon.  And

6    there is no interface between the school and home

7    people, which is one of the -- sort of endemic

8    problems of the California system of care, that the

9    school and regional center don't talk to each other.

10   But it's very different than Hawaii, where the

11   Department of Education often goes in and provides

12   after-school care and Saturday care and Sunday care,

13   and all sorts of stuff that has never been heard of

14   in California.

15          So it's just a matter of -- the 68 hours

16   that were in his IEP, Bryan is still getting more

17   than 30 hours of educational-related services

18   because he is getting them basically through the

19   regional center.  The California Department of

20   Developmental Services --

21          Q.   Right.

22          A.   -- is covering additional hours.

23          Q.   He gets 12 hours a week for four days and

24   three hours to the regional center --

25          A.   Correct.

A10877B

BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 142

1   hours a week, or was receiving respite care in the

2   home, before-school care was provided by the family.

3          So I don't know whether there was any

4   teaching involved in that.  And the after-school

5   care, to the extent that it is provided by the

6   family, I don't know what they were doing with him.

7   She didn't represent to me what was going on.  And

8   as far as she knew, the respite care coming in

9   through the regional center at that point didn't

10  address any educational goals, because by definition

11  the respite care worker is not mandated even to look

12  at the kid's IEP.

13         He has what is called an IPP, an

14  Individual Program Plan, that the regional center

15  has, which is a parallel structure to the IEP, but

16  it doesn't include things like going through

17  vocabulary, and so forth, which typically include,

18  you know, safety, walking across the street, and

19  things like that.

20         Q.  So with a proper program implemented

21  consistently in California, Bryan was making

22  progress?

23         A.  Absolutely.

24         Q.  Would you agree that the effect of

25  inadequate programming for Bryan in the '03-04

A10877B

BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 207

1    he doesn't have any spontaneous motivation to do it

2    just because, gee, won't they be proud of me in the

3    morning when my bed is dry.  You know, autistic

4    people don't think like that, and Bryan doesn't

5    particularly think like that.  So they are still

6    having problems with that.

7         Q.  Now, do you recall making a suggestion

8    that Bryan's parents look to the regional center for

9    help with the nighttime urination?

10        A.  Well, they are already receiving services

11   from regional center.

12        Q.  But not at night.  And in your prior

13   report, don't you recommend that they should explore

14   the possibility of getting some help at night,

15   working with Bryan on the nighttime urination?

16        A.  I don't recall that.

17            As far as I know, regional center does not

18   provide overnight respite care, you know, that

19   sometimes individuals go to a respite care

20   provider's house on very occasional basis, if the

21   parents are going off to a family event, or

22   something.  But unlike Hawaii, where I actually have

23   encountered kids who have overnight services, I have

24   never seen that in California.

25            What I might have recommended, and very

A10877B

BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 213

1          Do you see that?

2      A.   Yes.

3      Q.   So isn't that something that you are

4  agreeing with?

5      A.   Yes.  I mean, I wrote that because he says

6  that it should come -- I believe he says it should

7  come from the school, but I took that that he simply

8  isn't familiar, understandably, with the service

9  delivery system in California.  And in California,

10  such help would come from the regional center, and

11  in Bryan's case he lives in North Bay Regional

12  Center.

13      Q.   So you would agree that that would be an

14  appropriate service for Bryan?

15      A.   Correct.

16      Q.   And just getting back to his increase in

17  confidence in using his signs, wouldn't you agree

18  that it's a huge change for him not to have to

19  tantrum, or be disruptive to get something that he

20  wants and to be able to get that through signing?

21  That is an enormous change for him as a human being.

22          MR. USHIRODA:  Objection.  Vague and

23  ambiguous.

24          THE WITNESS:  I don't think he was

25  tantruming so much to get the things that he wanted.