Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUL 3 0 2004

at ___ o'clock and ___ min.___ M
WALTER A.Y.H. CHINN, CLERK

SHELBY ANNE FLOYD      1724-0
MEI-FEI KUO            7377-0
Carter Professional Center, Suite C21
65-1230 Mamalahoa Highway
Kamuela, Hawai'i 96743
Telephone:    (808) 885-6762
Facsimile:    (808) 885-8065
Email: sfloyd@ahfi.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

ANN KIMBALL WILES and         )  CIV. NO. CV04-00442 HG BMK
STANLEY BOND, individually    )
and as next friends of their son, )  NOTICE OF HEARING MOTION;
BRYAN WILES-BOND, a minor     )  PLAINTIFFS' MOTION FOR
                              )  TEMPORARY RESTRAINING
            Plaintiffs,       )  ORDER AND PRELIMINARY
                              )  INJUNCTIVE RELIEF AGAINST
      vs.                     )  DEFENDANTS; MEMORANDUM
                              )  IN SUPPORT OF MOTION;
                              )  DECLARATION OF MEI-FEI
DEPARTMENT OF EDUCATION,      )  KUO; DECLARATION OF
State of Hawai'i, and ALVIN   )  STANLEY BOND; EXHIBITS "A"
RHO, in his official capacity as )  AND "B"; DECLARATION OF
West Hawai'i District         )  SHELBY ANNE FLOYD;
Superintendent,               )  EXHIBITS "1"-"3";
                              )  CERTIFICATE OF SERVICE
            Defendants.       )
                              )  HEARING
                              )  Date: _AUG 0 5 2004_
                              )  Time: _11:00 am_
_____)  Judge: _HELEN GILLMOR_

248081-1/6515-2

**EXHIBIT**  D

## NOTICE OF HEARING MOTION

TO:    MARK W. BENNETT
Attorney General of Hawai'i
HOLLY SHIKADA
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawai'i 96813

Attorneys for Defendants

NOTICE IS HEREBY GIVEN that PLAINTIFFS' MOTION

FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY

INJUNCTIVE RELIEF AGAINST DEFENDANTS, shall come on for

hearing before the Honorable _____HELEN GILLMOR_____, Judge of the

above-entitled Court in his/her courtroom, Prince Kuhio Federal

Building, 300 Ala Moana Boulevard, at __11:00__ o'clock __a__m. on

___AUG 0 5 2004___, 2004, or as soon thereafter as counsel may

be heard.

DATED: Honolulu, Hawai'i, _July 29 2004_.

_____

SHELBY ANNE FLOYD
MEI-FEI KUO
Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor<br><br>          Plaintiffs,<br><br>     vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai‘i, and ALVIN RHO, in his official capacity as West Hawai‘i District Superintendent,<br><br>          Defendants. | CIV. NO. CV04-00442 HG BMK<br><br>**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF AGAINST DEFENDANT** |

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF AGAINST DEFENDANTS**

Plaintiffs Ann Kimball Wiles and Stanley Bond, by and through their attorneys, individually and on behalf of their son, Bryan (referred to collectively as "Plaintiffs"), hereby move this Honorable Court for an order granting Plaintiffs preliminary

248081-1/6515-2                    1

injunctive relief against Defendant the Department of Education of

the State of Hawai'i (the "DOE").  Plaintiffs seek an order:

> Preliminarily restraining and enjoining the DOE from
> failing to provide Bryan with appropriate, trained adult
> 1:1 aides ("skills trainers") to provide services in and
> after school and on the weekend as specified in Bryan's
> Individualized Education Program ("IEP") and that
> administrative Decision dated May 11, 2004 ("Decision").

Bryan will continue to suffer irreparable injury if the

DOE is not enjoined as requested above.

Plaintiffs bring this motion pursuant to Fed. R. Civ. P.

Rules 7 and 65.  The motion is supported the pleadings filed

herein, the Memorandum in Support of Motion, the declarations

and exhibits attached hereto, and such other evidence as may be

considered by

this Court upon the hearing of this motion.

DATED: Honolulu, Hawai'i, July 29, 2004

_____

SHELBY ANNE FLOYD
MEI-FEI KUO
Attorneys for Plaintiffs

# TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . .

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . .

    1.  Failure to deliver 1:1 services in
       2001-2001 school year . . . . . . . . . . . . . .

    2.  May 21, 2001 Decision and Order . . . . . . . .

    3.  Failure to deliver 1:1 services in
       2001-2002 school year . . . . . . . . . . . . . .

    4.  Release and Settlement Agreement
       of July 1, 2002 . . . . . . . . . . . . . . . . .

    5.  Failure to deliver 1:1 services specified
       in Bryan's November 2002 IEP . . . . . . . . .

    6.  Failure to deliver 1:1 services
       specified in Bryan's November 2003
       and January 2004 IEPs . . . . . . . . . . . . .

III.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . .

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . .

    A.  Because the IDEA requires the DOE to provide
       the services identified in the IEP, and because
       the DOE failed to comply with the May 11
       Decision and to implement Bryan's former and
       current IEPs, Plaintiffs are likely to prevail
       on the merits . . . . . . . . . . . . . . . . . .

B.   If the request preliminary injunctive relief is
     not granted, Bryan will suffer irreparable
     injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.   Plaintiffs Should Not be Required to Post
     a Supersedeas Bond . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.   RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AFL v. Panama S.S. Co.,*
    268 F.2d 935 (9th Cir. 1959) ............................................... 14

*Abney v. District of Columbia,* 849 F.2d 1491
    (D.C. Cir. 1988) ................................................................... 17

*Adams v. State of Oregon,* 195 F.3d 1141
    (9th Cir. 1999) ..................................................................... 18

*Amanda J. v. Clark County Sch. District,*
    267 F.3d 877 (9th Cir. 2001) ............................................. 5

*Amanda J.,* 267 F.3d at 883
    (noting need for "highly structured, specialized,
    and individualized programs.") ......................................... 21

*Borough of Palmyra, Board of Education v. F.C.,*
    2 F. Supp. 2d 637 (D.N.J. 1998) ....................................... 22

*Brenda v. Grand Lodge of the International Association
of Machinists & Aerospace Workers,*
    584 F.2d 308 (9th Cir. 1978), *cert. denied,*
    441 U.S. 937 (1979) ............................................................ 15

*Cabo Distribution Co. v. Brady,*
    821 F. Supp. 582 (N.D. Cal. 1992) ................................... 14

*County of San Diego v. California Special Education
    Hearing Office,* 93 F.3d 1458 (9th Cir. 1996) .............. 18

*Cupolo v. Bay Area Rapid Transit,*
    5 F. Supp. 2d 1078 (N.D. Cal. 1997) ............................... 22

*Metropolitan Public, Ltd. v. San Jose Mercury News,*
    987 F.2d 637 (9th Cir. 1993)
    *citing First Brands Corp. v. Fred Meyer, Inc.,*
    809 F.2d 1378 (9th Cir. 1987) ..................................... 14

*People of State of Cal. v. Tahoe Reg'l Planning Agency,*
    766 F.2d 1319 (9th Cir. 1985) ..................................... 22

*Ross v. Framingham Sch. Committee,*
    44 F. Supp. 2d 104 (D. Mass. 1999) .............................. 18

*Taylor v. Honig,* 910 F.2d 627 (9th Cir. 1990) ................................. 15

*Union Sch. District v. Smith,* 15 F.3d 1519
    (9th Cir. 1994) .................................................. 17, 19

*United States v. Odessa Union Warehouse Co-Op,*
    833 F.2d 172 (9th Cir. 1987) ..................................... 14

## FEDERAL STATUTES

20 U.S.C. § 1400(d)(1) ......................................................... 5

20 U.S.C. § 1401(25) ........................................................... 16

20 U.S.C. § 1401(3) ............................................................ 15

20 U.S.C. 1401(8) .............................................................. 16

34 C.F.R. 300 .................................................................. 17

34 C.F.R. 300.342(b)(1) ........................................................ 16

34 C.F.R. 300.7(c)(1) .......................................................... 5

Fed.R. Civ. P. Rule 65(c) ...................................................... 22

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor <br><br> Plaintiffs, <br><br> vs. <br><br> DEPARTMENT OF EDUCATION, State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent, <br><br> Defendants. | CIV. NO. CV04-00442 HG BMK <br><br> **MEMORANDUM IN SUPPORT OF MOTION** |

**MEMORANDUM IN SUPPORT OF MOTION**

## I.    INTRODUCTION

Plaintiffs Ann Kimball Wiles and Stanley Bond,

individually and as next friends of their minor son, Bryan (referred

to collectively as "Plaintiffs"), move this Court for a temporary

restraining order and preliminary injunctive relief against the

Department of Education of the State of Hawai'i (the "DOE") and

Alvin Rho ("Rho") to prevent irreparable harm to Bryan.  Bryan, a

263345-1/6515-1

12-year-old child with autism, is eligible for special education under the Individuals with Disabilities in Education Act ("IDEA"). The DOE has persistently failed to provide Bryan with a free appropriate public education ("FAPE") in accordance with his Individualized Education Program ("IEP"), with hearing order decisions and with formal agreements entered into by the parties.

This is the fifth time Plaintiffs have had to resort to the administrative or judicial process to get services that the DOE has agreed to provide. After filing a due process demand in 2001, the DOE stipulated to an order being entered against it. When the DOE did not comply with that order in 2002, Plaintiffs filed an action to enforce, which resulted in the DOE entering into a written settlement agreement which was intended to provide for some redundancy to ensure the timely provision of services. Prior to filing this motion for a temporary restraining order and preliminary injunctive relief, Plaintiffs (1) repeatedly notified the DOE of its failure to comply with Bryan's IEP and a Release and Settlement Agreement dated July 1, 2002 ("Agreement"), (2) met with Defendants to attempt to get the services required by law, and (3)

sought and prevailed in an administrative proceeding concerning the lack of services.  Despite this, the DOE's failure to comply persisted, thereby continuing to deprive Bryan of a free appropriate public education ("FAPE").

Based on the foregoing, Plaintiffs request that the Court:

(1)    Hold an immediate hearing on this motion;

(2)    Enforce the administrative hearing order by ordering the DOE to immediately provide Bryan with appropriate, trained adult aides ("skills trainers") sufficient to provide all 1:1 services mandated by Bryan's IEP, including the hiring of Christy Edwards, Bryan's former skills trainer who is available and prepared to work with him.

The administrative hearing officer has already ruled that Bryan is harmed by the failure to provide services specified in his IEP.  In the absence of prompt injunctive relief,  Bryan will continue to suffer irreparable harm.

## II.  FACTUAL BACKGROUND

Bryan was born on October 28, 1991 to Ann Kimball Wiles and Stanley Bond.  Declaration of Stanley Bond ("Bond Dec."), attached hereto, at ¶ 2.  Ms. Wiles and Dr. Bond have been married for over 23 years, and also have an older son, William.  *Id.* at ¶ 3.  Ms. Wiles has masters and specialist degrees in Counselor Education and a masters degree in Educational Administration and has worked as a middle and high school counselor in Florida, Maryland, and Hawai'i for over 14 years.  *Id.*  She is currently employed by the Department of Education as a vice principal in an elementary school.  *Id.*  Dr. Bond has a doctorate degree in anthropology and works for the National Park Service as an archeologist and resource manager for the Koloko-Honokahau National Park.  *Id.* at ¶ 3.

Bryan was diagnosed with pervasive developmental delay and hyperactivity when he was approximately two years old, and was labeled autistic at age five or six.  *Id.* at 4.  Bryan is largely non-verbal.  *Id.*  Due to his autism, Bryan has been determined to

be eligible for special education under the Individuals with

Disabilities in Education Act ("IDEA").  *Id.*

> The IDEA defines autism as:
>
> > [A] developmental disability significantly
> > affecting verbal and nonverbal communication
> > and social interaction, generally evident before
> > age 3, that adversely affects a child's
> > educational performance.  Other
> > characteristics often associated with autism
> > are engagement in repetitive activities and
> > stereotyped movements, resistance to
> > environmental change or change in daily
> > routines, and unusual responses to sensory
> > experiences.

34 CFR 300.7(c)(1)(i).  While no cure for autism exists, the condition

is best treated by early diagnosis, intervention, and education.  *See*

*Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001).

In July 1999, Bryan and his family moved to Hawai'i

from Maryland.  Bond Dec. at ¶ 5.  Bryan was enrolled in public

school.  *Id.*  The DOE had difficulty securing and retaining trained

adult aides (formerly known as "therapeutic aides" or "TAs," now

known as "skills trainers") to carry out the one-on-one programs

needed by Bryan.  *Id.* at ¶¶ 10-11.

1.    Failure to deliver 1:1 services in 2001-2001
      school year

At a September 1, 2000 meeting, the IEP team developed
an IEP for Bryan for the 2000-2001 school year.  *Id.* ¶ 6.  Despite
the DOE's obligation to provide the services identified in the IEP,
the DOE failed to do so.  *Id.*  During the 2000-2001 school year,
Bryan had more than five TAs but went many weeks without any
one-on-one services, without which he cannot learn effectively.  *Id.*
at ¶ 8.  As of October 16, 2000, Bryan's Department of Health care
coordinator stated:  "The support for client is currently not being
provided by both DOH and DOE."  *Id.*

On February 27, 2001, at a meeting at which which
Bryan's teacher and other DOE representatives were present, the
Department of Health ("DOH") care coordinator noted: "The impact
of no 1:1 has created an environment that does not create a
conducive learning environment."  *Id.* at ¶ 10.

Due to the DOE's continuing failure to provide one-on-
one TA services and speech therapy to Bryan as specified in his
IEP, on February 27, 2001, Bryan's parents filed a due process

request to obtain the services mandated by Bryan's IEPs. *Id.* at

¶ 11. After numerous delays due to the State's promises to provide

the mandated services, a hearing was set for May 7, 2001. *Id.* at

¶ 12.

### 2.    May 21, 2001 Decision and Order

At the May 7, 2001 hearing before Hearings Officer

Richard Chun, the parties presented by telephone, a stipulated

hearing decision (the "Stipulation"), which was to be effective until

October 1, 2001. *Id.* at ¶ 12. The Stipulation outlined several

requirements for the DOE related to Bryan's education. *Id.*

Pursuant to the terms of the Stipulation, the Hearing Officer issued

a Decision and Order, dated May 21, 2001, *see* Exhibit "1" to the

Declaration of Shelby Anne Floyd ("Floyd Dec.") attached hereto,

which provided, in part, as follows:

> 1.    The IEP dated January 29, 2001 and the [DOH
>       coordinated services plan] dated October 17, 2000,
>       for [Bryan] shall be followed.
>
> 2.    Notwithstanding any other provision in the IEP or
>       CSP, the Department of Education and/or the
>       Department of Health, State of Hawai'i, shall hire
>       and train an adult educational aide for [Bryan] no
>       later than May 21, 2001. The training for the adult

educational aide shall include instructions in the TEACCH, DTT, and PECS[1] methods for behavioral management and educational instruction. . . .

3.    The adult educational aide shall provide services to [Bryan] during the normal school hours. Beginning May 31, 2001, the adult educational aide shall also provide after school services to [Bryan] from 4:00 p.m. to 7:00 p.m. on all regular school days. The adult educational aide shall provide the services on a consistent basis with the goal of completing all tasks and documentation required by the TEACCH, DTT, and PECS methods of behavioral management and educational instruction. . . .

4.    The Department of Education and/or Department of Health shall provide an adult educational aide described above for [Bryan] using the TEACCH, DTT, and PECS methods for behavioral management and educational instruction until October 1, 2001. For each day that an after school educational aide is not provided for [Bryan] after May 21, 2001, the Department of Education and/or Department of Health shall be obligated to make up those days beginning after October 1, 2001.

5.    In the event the adult educational aide does not complete his/her services for [Bryan] during the time periods set forth herein, for any reasons whatsoever, the Department of Education and/or the Department of Health shall locate, secure and have in place a suitable replacement within two weeks from the date of the termination.

---

[1] "TEACCH" and discrete trial training ("DTT") are systemic teaching methods used with autistic children. "PECS" is a picture exchange system used for autistic children who are non-verbal.

Despite the May 7, 2001 hearing and Stipulation, the DOE did not provide the 1:1 aide consistently <u>and</u> failed to make up the shortfall.  Bond Dec. at ¶¶ 13-15.  Due to the DOE's failure to uphold its responsibility to provide the agreed-upon services, Bryan's parents attempted themselves to locate suitable STs to ensure Bryan's continued education.  *Id.* at ¶ 13.

During the May 7 to October 1, 2001 period covered by the Stipulation, Bryan did not have an afterschool aide as required. *Id.* ¶ 15.

3.   <u>Failure to deliver 1:1 services in 2001-2002 school year</u>

Although the Stipulation obligated the DOE to make up each day between May 7 and October 1, 2001 for which Bryan was not provided with an after-school educational aide, the DOE refused to fully make-up those days.  *Id.*  As a result, on February 15, 2002, Plaintiffs filed a complaint in the United States District Court to enforce the Stipulation and assure the provision of services specified in Bryan's IEP.  *Id.*  The Complaint alleged that the State had breached federal regulations by, among other things,

failing to implement the terms of the Stipulation, failing to provide a

free and appropriate public education to which Bryan was entitled

under the IDEA, and violating Section 504 of the Rehabilitation Act.

*See* Exhibit 2 to Floyd Dec.

> 4.   Release and Settlement Agreement of July 1, 2002

On July 1, 2002, Plaintiffs and the DOE entered into a

Release and Settlement Agreement, a copy of which is attached as

Exhibit 3 to the Floyd Dec.

The Settlement Agreement required the DOE to, inter

alia,

> a.    Hire, train and have in place the skills trainers

(formerly "therapeutic aides" or "TAs") needed to consistently

provide Bryan with not less than 95% per calendar month of the

skills trainer hours to which he is entitled;

> b.    Procure skills trainer services for Bryan

through an "expedited contract process," in which the DOE

committed to pay a minimum salary and pay the skills trainers promptly.[2]

        c.    Reimburse Plaintiffs for newspaper advertising to attract skills trainers.

        d.    Create a pool of substitute skills trainers who were qualified and trained to provide services to Bryan when there were short gaps in the provision of services by his regular STs.

        5.    <u>Failure to deliver 1:1 services specified in Bryan's November 2002 IEP</u>

On February 26, 2004, Plaintiffs submitted a request for a due process hearing under state and federal law, challenging the DOE's repeated failure to give Bryan services needed for him to receive benefit from his public education. See Verified Complaint ("Complaint") at ¶ 29. Specifically, the issues raised by the hearing request were 1) failure to provide services identified in Bryan's November 2002 IEP and November 2003 IEP; 2) failure to ensure that qualified skills trainers are hired and available for Bryan; 3) failure to hire skills trainers who are trained in American Sign

_____

[2] The DOE's extended delays in paying skills trainers resulted in several refusing to work with Bryan.

Language ('ASL"); and 4) failure to comply with the 2002 Settlement Agreement.  Complaint ¶ 29.

After a hearing, held on April 5, 2004, the administrative hearings officer ruled in favor of Bryan, finding that during October and November 2003 the DOE failed to provide Bryan with the 65.5 hours of skills trainers services per week required by his November 2002 IEP.  Complaint at ¶ 30; *see* Exhibit B to Bond Dec., Decision at n. 2 (Exhibit B).

6.  <u>Failure to deliver 1:1 services specified in Bryan's November 2003 and January 2004 IEPs</u>

Between March and May 2004, while the hearing was pending, Bryan received most of the 67.5 hours of skills trainer 1:1 services he needed, although the skills trainers were not properly qualified and most could not communicate with Bryan using ASL. Complaint at ¶¶ 27-28; Exhibit B at ¶¶ 7-8; Bond Dec. at ¶ 22.

Beginning in October 2003 and continuing until today, with brief exceptions, Bryan has not received the 1:1 ST hours to which he is entitled.  Bryan's IEP, revised on January 9, 2004, requires 1:1 instructional support during the school day for 6.5

hours (5.5 hours on Wednesday), after school for 4.5 hours (5.5 hours on Wednesday), and 6.0 hours per day on the weekend. Exhibit A to Bond Dec.; Bond Dec. at ¶¶ 17 and 25.

Beginning in June 2004, however, Bryan has received fewer and fewer services, although his IEP still provides for the same number. Bond Dec. at ¶ 19. In June, he received only 85% of the skills trainer hours; in July only 60%. Currently, Bryan is not receiving any 1:1 services in the home or community. Bond Dec. at ¶ 25. Adding to the denial of FAPE is the fact that the teacher hired by the DOE for Bryan's four week summer school class was grossly underqualified. *Id.* at ¶¶ 22 and 28. He was not licensed as a teacher, not certified to teach special education, inexperienced teaching autistic children, and unable to communicate in ASL.[3] *Id.*; Complaint at ¶ 39.

---

[3]When Plaintiffs learned that both the summer school and 2004-05 teachers were unqualified to teach Bryan, they filed another hearing request. The DOE stipulated to the lack of qualifications, and after a brief hearing, an administrative hearing officer ruled that a qualified teacher must supervise Bryan's program throughout the year–not just during the regular academic year. Complaint at ¶ 37.

## III.   STANDARD OF REVIEW

Preliminary injunctive relief is intended to prevent future harms and irreparable injury to the moving party pending a final determination of the merits. *AFL v. Panama S.S. Co.*, 268 F.2d 935, 935 (9th Cir. 1959). A motion for a preliminary injunction is addressed to the discretion of the court. *Cabo Distribution Co. v. Brady*, 821 F.Supp. 582 (N.D. Cal. 1992).

The factors for the court to consider in determining whether it should grant preliminary injunctive relief are:

> [E]ither (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in [the moving party's] favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.

*United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 174 (9th Cir. 1987) (citations omitted); *Metro Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637, 639 (9th Cir. 1993) *citing First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987). The critical element in determining where a case falls along the above-

described continuum is the relative hardship of the parties. *Brenda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978), *cert. denied*, 441 U.S. 937 (1979). Thus, "if the balance of harm tips decidedly towards plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.*

Injunctive or other prospective relief is the usual remedy under the IDEA; therefore, where a child may lose educational and related services provided by the IDEA, a preliminary injunction is particularly appropriate. *Taylor v. Honig*, 910 F.2d 627, 628 (9th Cir. 1990).

## IV.  ARGUMENT

The IDEA seeks to provide all children with disabilities[4] with "a free appropriate public education that emphasizes special education and related services to meet their unique needs." 20 USC § 1400(d)(1)(a). Special education in general is defined as "specially designed instruction, at no cost to the parents, to meet

---

[4] It is undisputed that Bryan suffers from autism and that autism is a disability under the IDEA. *See* 20 U.S.C. § 1401(3)(A)(i).

the unique needs of a child with disability, including (A) instruction

conducted in the classroom, in the home, . . . and in other

settings." 20 U.S.C. § 1401(25).  For special education and "related

services" to constitute a FAPE, it must "(a) have been provided at

public expense, under public supervision and direction, and

without charge; (b) meet the standards of the State educational

agency; (c) include an appropriate [public elementary] school

education . . . and; (d) **[be] provided in conformity with the**

**individualized education program required under 20 UCS**

**§1414(d)**." 20 USC 1401(8) (emphasis added).  Once an IEP is

developed, the law requires that "[i]t is implemented as soon as

possible following the IEP meeting."  34 CFR 300.342(b)(1)(ii).

A.    **Because the IDEA requires the DOE to provide the**
      **services identified in the IEP, and because the DOE**
      **failed to comply with the May 11 Decision and to**
      **implement Bryan's former and current IEPs,**
      **Plaintiffs are likely to prevail on the merits.**

One of the most basic components of the IDEA is the

requirement that the State provide the disabled child with the

specific supports and services identified in the IEP, as it is the

agreement of the IEP team that those supports are essential to the

child receiving educational benefit.  *See Union Sch. Dist. v. Smith*, 15

F.3d 1519, 1524 (9th Cir. 1994).  As the Federal Department of

Education explained in its commentary to the IDEA regulations:

> The public agency must ensure that all
> services set forth in the child's IEP are
> provided, consistent with the child's needs as
> identified in the IEP.  The agency may provide
> each of those services directly through its own
> staff resources; indirectly by contracting with
> another public or private agency; or through
> other arrangements.  In providing the services,
> the agency may use whatever State, local,
> federal, and private sources of support are
> available to those purposes, . . . but the
> services must be at no cost to the parents, and
> the public agency remains responsible for
> ensuring that the IEP services are provided in
> a manner that approximately meets the
> student's needs as specified in the IEP.  The
> [DOE] may not allow the failure of another
> agency to provide service(s) described in the
> child's IEP to deny or delay the provision of
> FAPE to the child.

Appendix A to 34 CFR 300.  *See Abney v. District of Columbia*, 849

F.2d 1491, 1496 n.3 (D.C. Cir. 1988) ("[T]he complete failure to

implement a child's IEP . . . would undoubtedly also result in a

failure to provide the child with a "free appropriate public

education.").

Over the last several years, the DOE has persistently failed its responsibility to provide Bryan with a FAPE by ensuring that the services mandated in his IEPs and the Agreement are provided to him in a manner that meets his needs as specified in the IEP.[5] Between October 2003 and February 2004 and since June 2004, there has been no dispute that the services are not being provided, there has just been a total lack of intent to comply with the law. Plaintiffs were forced to go through a hearing and when the hearing officer ruled the DOE was in violation of the IDEA, the DOE still did nothing.

The DOE's inability to retain skills trainers and/or to hire adequately trained skills trainers does not excuse its non-compliance with Bryan's IEP. *See Adams v. State of Oregon*, 195

---

[5] One of the claims asserted by Plaintiffs is for non-implementation of the IEP. Plaintiffs do not challenge the substance of the IEP as inappropriate. *See Ross v. Framingham Sch. Comm.*, 44 F. Supp. 2d 104, 116-19 (D. Mass. 1999) (explaining difference between claim for failure to implement IEP and claim alleging an inappropriate IEP). Plaintiffs only seek to compel the DOE to implement the existing IEP and the Decision so that Bryan can make progress toward the goals set forth in his IEP. *See County of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458, 1467 (9th Cir. 1996).

F.3d 1141, 1151 (9th Cir. 1999) (rejecting IEP reduction in hours during summer months due to staff's vacation schedule because reduction was not linked to child's unique developmental needs); *Smith,* 15 F.3d at 1525 (affirming administrative finding that IEP was inadequate, in part, because no teacher was trained to work with autistic children). Part of the DOE's obligation, as confirmed in the May 11 Decision, is to have skills trainers trained and knowledgeable to provide services.

The DOE never fully complied with the terms of Bryan's previous and current IEPs in that Bryan was not provided with skills trainers for all of the periods specified in the IEPs. Furthermore, the DOE has failed to make reasonable efforts to hire and train skills trainers as required by the IEP. Because of the DOE's inaction, Bryan's parents, who have far fewer resources than the DOE, have advertised and referred skills trainers to the DOE and the agencies with which the DOE contracts to provide skills trainers. Complaint at ¶ 26; Bond Dec. at ¶ 17; Exhibit B at ¶ 11. However, because of the lack of incentives or sufficient benefits or working conditions, there has been a frequent turn over of skills

trainers and no "pool" of trained substitutes was ever in place to provide adequate replacement services.

After repeated unsuccessful out-of-court attempts to compel the DOE to comply with the IEP, Decision and Agreement, *see* Floyd Dec. at ¶¶ 6, 8, and 9, Plaintiffs have no option other than to seek a court order enforcing the May 11 Decision. Given the DOE's repeated history of non-compliance, nothing short of an immediate court order requiring the DOE to comply with the Decision and Bryan's IEP will guarantee Bryan his FAPE.

Based on the foregoing, Plaintiffs are likely to prevail on the merits of their IDEA enforcement claim and should be granted preliminary injunctive relief.

**B.    If the request preliminary injunctive relief is not granted, Bryan will suffer irreparable injury.**

For over seven months, Bryan has been denied needed services. There has already been a finding that Bryan seriously regressed when he did not receive the consistent 1:1 services specified in his IEP. Exhibit B at ¶¶ 14-16; Bond Dec. at ¶¶ 20-21. Further delay in enforcing his rights will lead to continued

regression. Thus, the balance of hardships strongly favors parties, like Bryan, who have been found to be entitled to services, but for whom appropriate services are not being provided. Exhibit B at pp. 6-7. Unless the Court grants the requested preliminary injunction, Bryan will suffer irreparable harm.

Without skills trainers in-school, after school, and on weekends, Bryan's condition will continue to deteriorate. He has already shown evidence of the stress of constant turn over and reduction in services. Bond Dec. at ¶¶ 20. Consistency and intensity are critical to educating an autistic child. Daily one-on-one assistance from a skills trainer helps to ensure this consistency and intensity. *See Amanda J.*, 267 F.3d at 883 (noting need for "highly structured, specialized, and individualized programs."). Without a skills trainer, Bryan not only continues to lose educational opportunity, but also loses whatever gains he made with previous one-on-one assistance. Every day that the DOE denies Bryan the educational benefits described in his IEP and the May 11 Decision is another step backward for Bryan. For these reasons, preliminary injunctive relief is particularly appropriate in

this case.  The sooner the DOE fully implements the IEP and the May 11 Decision, the sooner Bryan can begin to make advances in learning the functional skills he needs to remain with his family. Because Bryan is suffering irreparable harm everyday that he is deprived of a FAPE, preliminary injunctive relief is particularly appropriate.

Based on the foregoing, the requested preliminary injunctive relief is necessary to prevent Bryan from suffering irreparable harm.

**C.    Plaintiffs Should Not be Required to Post a Supersedeas Bond.**

Fed.R. Civ. P. Rule 65(c) permits the court to issue a preliminary injunction without a supersedeas bond under circumstances such as these, where Plaintiffs seek to enforce a federal right that is non-commercial and benefits the public interest.  *See People of State of Cal. v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985); *Borough of Palmyra, Bd. of Educ. v. F.C.*, 2 F.Supp.2d 637, 646 (D.N.J. 1998); *Cupolo v. Bay Area Rapid Transit*, 5 F.Supp.2d 1078, 1086 (N.D. Cal. 1997).  The

facts of this case are appropriate for the application of Rule 65(c)

and Plaintiffs should not be required to post a supersedeas bond.

## V.    RELIEF REQUESTED

Plaintiffs request that the Court enter a preliminary

injunction against the DOE and waive the bond requirement.

DATED: Honolulu, Hawai'i, _JULY 29, 2004_____.

_____

SHELBY ANNE FLOYD
MEI-FEI KUO
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor<br><br>Plaintiffs,<br><br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i, and ALVIN RHO, in his official capacity as West Hawai'i District Superintendent,<br><br>Defendants. | CIV. NO. CV04-00442 HG BMK<br><br>**DECLARATION OF MEI-FEI KUO** |

**DECLARATION OF MEI-FEI KUO**

I, MEI-FEI KUO, do hereby declare and state under penalty of perjury that the following facts are true and correct:

1.    I am an attorney with the law firm of Alston Hunt Floyd & Ing, one of the counsel for Plaintiffs.

2.    I make this declaration based on my personal knowledge and am competent to testify as to the matters set forth herein.

3.    Attached hereto are true and correct copies of the Declaration of Shelby Anne Floyd dated July 29, 2004 and Declaration of Stan Bond dated July 29, 2004, which bear their faxed signatures.  The original, signed declarations will be submitted to the court upon receipt by our office.

Executed on July 29, 2004, at Honolulu, Hawaii.

MEI-FEI KUO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

ANN KIMBALL WILES and
STANLEY BOND, individually
and as next friend of their son,
BRYAN WILES-BOND, a minor,

       Plaintiffs,

    vs.

DEPARTMENT OF EDUCATION,
State of Hawai'i, and ALVIN
RHO, in his official capacity as
West Hawaii District
Superintendent,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIV. NO. CV04-00442 HG BMK

**DECLARATION OF STANLEY
BOND; EXHIBITS "A" AND "B"**

## DECLARATION OF STANLEY BOND

I, STANLEY BOND, declare:

1.    I am the biological and legal father of Bryan Wiles-Bond, a 12-year-old diagnosed with pervasive development delay and hyperactivity, and labeled as autistic. As such, I have personal knowledge of the matters contained in this declaration and am competent to testify to the same.

248141-1/6515-1

2.     I submit this declaration in support of a motion for temporary restraining order and preliminary injunctive relief on behalf of Bryan.

3.     I have been married to Bryan's mother, Ann Kimball Wiles, for over twenty three years.  Bryan was born on October 28, 1991.  We also have an older son, William.  I have a doctorate degree in Anthropology and work for the National Park Service as an archeologist and resource manager for Koloko-Honokahau National Park.  Ann has masters and specialist degrees in Counselor Education, and a masters in Educational Administration and has worked as a middle or high school counselor in Florida, Maryland, and Hawai'i for over fourteen years.  She is currently employed by the Department of Education as vice principal in an elementary school.

4.     At approximately age two, Bryan was diagnosed with pervasive development delay and hyperactivity.  At age five or six, he was labeled autistic, and he has since been determined eligible for special education under the Individuals with Disabilities in Education Act ("IDEA").  Bryan is non-verbal.  His primary mode of communication is through sign language.

5.     Bryan enrolled in the Hawai'i public school system when our family moved to Hawai'i from Maryland in July 1999.

6.    At a September 1, 2000 meeting, the IEP team developed an IEP for Bryan for the 2000-2001 school year. The Conference Notes for that meeting stated that Bryan "[w]ill have appropriate speech and occupational therapy service", "[f]ull day one to one services to implement IEP and insure his safety needs", "daily work on appropriate touch-screen computer", and "after school therapeutic aide", and that the TEACCH, DTT and PECS methods would be used with Bryan. The DOE failed to provide these services.

7.    A Coordinated Service Plan ("CSP") dated October 17, 2000 ("October 2000 CSP") stated that "Bryan should be receiving 1:1 service during the school day to work on D.T.T. goals & objectives. Bryan also receives weekend T.A. work on D.T.T. and is in need for after-school intervention."

8.    During the 2000-2001 school year, Bryan, who needs consistency and intensity in his training, had more than five TAs and went many weeks without any one-on-one services, without which he could not learn effectively. As of October 16, 2000, Bryan's DOH care coordinator stated: "The support for client is currently not being provided by both DOH and DOE."

248141-1/6515-1                             2

9.    Due to the continuing deficiencies in the DOE's provision of services, another IEP meeting was held on January 29, 2001.  The IEP noted that Bryan's needs included "physically & visually structured classroom," "discrete repetitous [sic] teaching to learn new skills," "1:1 instruction," and "1:1 supervision."  Bryan was determined to need "1:1 instruction and an individualized program to meet his needs" and was deemed to meet the standard for requiring an extended school year as part of his free appropriate public education.

10.    Because of the lack of sufficient, trained aides, at a February 27, 2001 meeting, at which Bryan's teacher and others were present, his  care coordinator noted: "The impact of no 1:1 has created an environment that does not create a conducive learning environment."  Two weeks later, the care coordinator spoke to Bryan's teacher and noted that the teacher ". . . expressed her concerns and frustrations with the unavailability of TA services."  In the interim, Bryan continued to be without a TA during the school day and after school.

11.    Due to the DOE's continuing failure to provide one-on-one TA services and speech therapy to Bryan as specified in the IEP and the Coordinated Service Plan, on February 27, 2001, Ann and I filed a due process request to obtain the services mandated by Bryan's

IEPs.  After numerous delays due to the State's promises to provide the mandated services, a hearing was set for May 7, 2001.

      12.   At the May 7, 2001 hearing before Hearings Officer Richard Chun by telephone, the parties presented a stipulated hearing decision (the "Stipulation"), which was to be effective until October 1, 2001.  The Stipulation outlined several requirements for the DOE related to Bryan's education.  The Hearing Officer issued a  Decision and Order, dated May 21, 2001.

      13.   After the May 7, 2001 hearing and Stipulation, the DOE continued to fail to comply with the Stipulation regarding Bryan's education, and Ann and I attempted to locate suitable STs for Bryan's continued education.

      14.   During the May 7 to October 1, 2001 period covered by the Stipulation, Bryan did not have an in-school TA for at least 53 days, did not have an after-school TA (from 4 to 7 p.m.) for all but three days, and had a weekend TA on an irregular schedule.

      15.   Although the Stipulation obligated the DOE to make up each day between May 7 and October 1, 2001 for which Bryan was not provided with an after-school educational aide, since October 1, 2001, the DOE refused to fully make-up those days.  As a result, on February 15, 2002, my wife and I filed a complaint in the United States District

Court seeking to enforce the Stipulation. We also filed a motion for a preliminary injunction, seeking immediate relief to prevent further delay in the provision of services to Bryan.

16.    After settlement conferences with Magistrate Judge Barry M. Kurren, the DOE agreed to enter into a written settlement agreement in which it promised not only to provide the majority (95%) of the 1:1 services specified in Bryan's IEP, but to create a pool of trained and ready therapeutic aides to provide substitute services if one of Bryan's regular aides could not provide the services. The Release and Settlement Agreement was dated July 1, 2002.

17.    Again, the DOE failed to live up to its promises. Although the DOE provided most of the 1:1 services initially, it never appeared to have in place a pool of trained substitutes. By October 2003, the DOE was only providing 90% of the 1:1 services; in November 75%; in December 81% and in January 2004 only 71%. On November 5, 2003, my wife contacted all the agencies which contract with the DOE to provide skills trainers to request additional applicants, but she heard nothing for three weeks. In addition to the loss of hours, there was constant turn over of skills trainers (formerly called "therapeutic aides"). Because some of the services are provided in our home after school and on weekends, we would never know if someone

would show up or how long they would stay. We attempted to work with the DOE, and the agencies, but there were few referrals. In fact, on several occasions, we referred potential skills trainers to the DOE or the agencies. In addition, we ran newspaper advertisements to attract new applicants, which were referred to the agencies.

18.   In January 2004, an IEP meeting was held for Bryan. Again, it was agreed by the IEP team that Bryan needed intensive in-school, after-school and weekend 1:1 services. A true and correct copy of the IEP is attached as Exhibit A. Despite the DOE's agreement that Bryan needed intensive services, it did not provide all those services in January and February 2004.

19.   Beginning in June 2004, Bryan has received fewer and fewer services. In June he received about 85 % of the services specified for his home and community program. In July that is down to 60 %. Currently, he only has six hours of the approximately 30 hours specified for home and community programs.

20.   Recently, Bryan has shown increased aggressive behavior. He has hit and bit both his parents and skills trainers in the home and in the classroom. He has kicked through his bedroom door, poured ammonia over the family clothes, and destroyed his books and other property at home. Recently, at an outing at the beach we were

248141-1/6515-1                                6

unable to stop him from drinking large amounts of ocean water and eating sand, after which he became sick.

21.    My wife and I are very concerned about his behaviors. Although the Department of Education has agreed to have a functional behavioral assessment conducted by a qualified person, it has been slow in actually authorizing the hiring of that person.  In the meantime, because Bryan has no services at all on Sunday (except an occasional substitute whose role is merely to keep Bryan out of trouble), and only a portion of the services to which he is entitled at home for the rest of the week, his program is not being delivered and he is losing skills that he once demonstrated.  In addition, the toileting program which was identified in January 2004, and ordered in mid-May 2004, has not been implemented, and my family continues to struggle to keep his room and surroundings clean and habitable.

22.    Although the DOE agreed as early as January 2004 that Bryan's primary mode of communication was sign language, and although we filed for a due process hearing in February 2004 because, among other reasons, Bryan's skills trainers were not qualified to train or communicate with him, the skills trainers have not yet received American Sign Language training despite an order requiring that on May 11, 2004.

248141-1/6515-1                            7

23.  There are numerous other ways in which Bryan's IEP, and the orders which have resulted from two due process hearings thus far this year, are not being carried out. However, our primary concern at this time is to get the 1:1 services specified in his IEPs delivered consistently by people who are properly trained in autism methodology and adequately supervised. To that end we have run newspaper ads ourselves and have referred potential skills trainers to the DOE. We have located persons qualified to conduct ASL training and referred them to the DOE. I have contacted potential service providers on Oahu, and my wife has contacted established autism program providers on the mainland to explore hiring persons who can deliver the program in his IEP. We have identified qualified persons who could be hired to provide the services.

24.  My wife and I have met with Defendant Alvin Rho, the Kona Complex Area Superintendent, and with other DOE representatives on numerous occasions, to discuss solutions to these problems, but they have never firmly committed to providing Bryan's services. At one point, the attorney for the DOE suggested that Bryan might have to be placed in a residential program because the DOE couldn't find qualified service providers.

248141-1/6515-1                          8

25.   Currently, Bryan is not receiving any 1:1 services in the home or community, which is where those portions of his program that deal with daily living skills are supposed to be delivered.  Of the 67 hours required by his IEP, Bryan is receiving only 6 hours of services by a permanent skills trainer with any other services provided only by substitutes.  He has no structured afternoon program at school.  No one can tell us from week to week whether a skills trainer will come to our house, or who that person will be.

26.   On July 21, 2004, I met with the DOE to discuss Bryan's IEP.  At that time the DOE gave me a packet of resumes from potential skills trainers.  Although Bryan has been without a substantial percentage of his skills trainer hours since June and these resumes were submitted as early as July 7, 2004, they had never been mentioned to my wife and I before.  The DOE told me then they had not contacted any of these people.  So we called each one who looked promising and discovered that only one of them was still interested in the job, and that person would not be available for a month.

27.   In early July 2004, my wife spoke to Christy Edwards, a skills trainer who had previously provided services to Bryan for 8 months in 2002-2003.  Christy was willing to return to Hawaii to work with Bryan for 30.5 hours a week at a salary of $40 per hour.  Because

the DOE had not provided qualified skills trainers, we offered the job to Christy. On July 28, 2004, I accompanied Christy to the DOE's District Office to have her fill out any necessary forms to begin work. The DOE said it would not pay her $40 per hour, that it would not hire her directly, and, in fact, offered her $25 per hour to begin work after the scheduled skills trainers had left. I have told Christy that I will pay her $40 an hour until I am able to recover it from the DOE.

28. The lack of qualified skills trainers is made worse by the fact that Bryan has no qualified teacher to deliver the special education specified in his current IEP. Because the DOE hired a summer school teacher who was not qualified or licensed to teach Bryan, I filed yet another due process request in June 2004. The DOE then stipulated that the teacher was not qualified, but did not replace him during the four weeks of summer school. Now, that teacher has left and there is no teacher in Bryan's classroom, and no qualified, certified or licensed special education teacher to deliver instruction or to supervise the skills trainers. On July 23, 2004, a decision was rendered in the latest due process proceeding which requires the DOE to have a certified teacher, proficient in American Sign Language, to deliver special education to Bryan during all of his extended school year, but as of today, no one has been placed in Bryan's classroom and

I have had no contact from anyone.  A true and correct copy of the July 23, 2004 Decision is attached hereto as Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Kailua-Kona, Hawai'i on July 29, 2004.

_____
STANLEY BOND