68

1  A    Yes, I did.

2  Q    Did you rely on any particular part of these
3  records in formulating your opinion?

4  A    Well, I relied on those records to give me an
5  idea, a better idea what the case was about and what were
6  the findings in the due process hearings.

7  Q    And finally, there is a manilla file about an
8  inch thick labeled Their Experts, and I take it that
9  pertains to Dr. Siegel and Dr. Richard Goka?

10  A    That's correct.

11  Q    And there's some handwritten notes of -- I'll
12  mark this as an exhibit later.  I'm just going to show it
13  to you; is this your handwriting?

14  A    That is correct.

15  Q    And these notes, do they contain your
16  observations and thoughts on the reports by Dr. Goka and
17  Dr. Siegel?

18  A    There's the notes I made in reading those
19  reports, the same as the ones in the green file.

20  Q    Have you been asked to render an opinion on the
21  reports authored by Dr. Goka and Dr. Siegel?

22  A    Yes.

23  Q    And what are those opinions?

24  A    What are the opinions I have now about those
25  reports?

Freeman

1   Q   Yes.

2   A   Well, I thought that -- well, Dr. Goka's report
3   was -- as I said in my report, that's his opinion and
4   his -- as near as I could tell, very little background in
5   autism. He relied on only Dr. Siegel's report and the
6   records, and did not see Bryan or talk to the family or
7   talk to the school. It was just an opinion he formed.
8   It was a paper opinion. So to me that's not very
9   meaningful.

10          Dr. Siegel's report, on the other hand, was
11  very well written, and I felt that I agreed with most of
12  it. What I did not agree with was I do not understand
13  how she reached the conclusion she reached given what --
14  the rest of her report.

15  Q   And you don't understand the conclusion she
16  reached in light of what she wrote in the report?

17  A   Right. Because her conclusion is inconsistent
18  with what she writes in her report. It doesn't follow
19  logically. And there's some information in her report
20  that's not correct in terms of her information on the
21  Leiter, for example.

22  Q   I just wanted to get a general idea, and then
23  we'll go over it.

24  A   That's fine.

25  Q   Doctor, you were kind enough to bring your

```
 1    files with you today, and I thank you very much.  I
 2    notice that's it's not your complete file, correct?
 3         A    It's my complete file other than the --
 4         Q    The records listed on Exhibit 3?
 5         A    Right, other than volumes, this top part, this
 6    is an explanation of these things.  And I didn't bring
 7    the depositions that I did not have time to read, and
 8    I've listed them separately from the depositions that I
 9    did read.
10         Q    There are a number of depositions you were sent
11    that you did not read.  Do you intend to read them?
12         A    In all likelihood if it comes to trial, yes,
13    because I always insist on reading everything.  I just
14    ran out of time.  To be honest, I didn't quite finish
15    Dr. Smalley's last night.
16         Q    Was there anything in Dr. Smalley's report --
17    deposition that you relied upon when formulating
18    your opinions?
19         A    Yes.  There was information in her report --
20    and as I said, I didn't complete her deposition -- about
21    whether or not Bryan's program was carried out
22    consistently, whether or not there was training of the
23    staff, what the nature of his behavior problems were, and
24    why she thought her -- his behavior had gotten to that
25    point.  Her functional analysis is certainly a part of my
```

Freeman

1  opinion.

2  Q    Now, aside from the material that you've
3  brought here today, and then the records that are in the
4  purple suitcase at home, do you have any other records
5  pertaining to this case?

6  A    No.

7  Q    Now, I notice in your assessment reports that
8  you interviewed a number of people at the Keystone, then
9  subsequently at Benicia, correct?

10 A    That's correct.

11 Q    You also interviewed the parents?

12 A    That's correct.

13 Q    Have you interviewed anybody from the State of
14 Hawaii?

15 A    No.

16 MR. VARADY:  Excuse me, Counsel, just for
17 clarification.  I'm assuming that question is have you
18 interviewed any employees, anyone employed by the State
19 of Hawaii; is that correct?

20 MR. USHIRODA:  Yes.

21 THE WITNESS:  But prior to testimony, I would
22 like to have an opportunity to talk to Dr. Smalley
23 because I feel her report is very important to the entire
24 case, and just I hadn't even thought about that until I
25 started really reviewing the documents.

Freeman

1          I did speak with Dr. LeGoff.

2  BY MR. USHIRODA:

3      Q    Did you speak with Loretta Leukens?

4      A    Yes.

5      Q    And when did you talk to -- before I get there,

6  do you anticipate speaking with Dr. Smalley in the near

7  future?

8      A    I hadn't even thought about it until I sat here

9  today.  Yes, I really would like to speak to her, just to

10 finish out the -- you know, my information base.

11         MR. VARADY:  Counsel, just by way of disclosure,

12 I think in 2002 Dr. Freeman came to Hawaii and did a

13 seminar, presented a seminar there or forum there with

14 Dr. Leaf, and I think --

15         THE WITNESS:  And Mr. Weatherly.

16         MR. VARADY:  An attorney.  And I believe there

17 were at least representatives of the Attorney General's

18 Office there.  I don't know if there were representatives

19 of the Department of Education.

20         THE WITNESS:  There were a number of people from

21 different agencies.

22         MR. VARADY:  With whom Dr. Freeman may have

23 discussed whatever at that particular seminar.

24         So to the degree that the question was, have

25 you ever talked to anybody generally who was employed by

1   the State of Hawaii or the Department of Education, she
2   may have actually have done that in the course and scope
3   of that presentation.
4           THE WITNESS:  And I have been contacted by the
5   Attorney General's Office on at least two occasions to
6   serve as an expert witness.
7   BY MR. USHIRODA:
8       Q    In Hawaii?
9       A    In Hawaii, yes.
10      Q    And have you accepted?
11      A    No.
12      Q    Why not?
13      A    Because of my knowledge of programs in Hawaii,
14  and I don't accept cases where I feel there's not
15  adequate programming going on for a child.
16      Q    What is it about the programs in Hawaii that
17  caused you not to take the assignment?
18      A    It's been my understanding from people who have
19  been there that the programs are not adequate for the
20  majority of children with autism.  I was also brought to
21  Hawaii in, I believe, 1994 or '5, after the Felix Decree,
22  by the Autism Society of America, the Hawaiian, and I did
23  workshops at that time and I did some presentations at
24  different schools.  I don't remember where they were, but
25  at that time I would have spoken with people that were

1  employed by DOE.

2     Q   Do you recall who you spoke with at the DOE?

3     A   I have no idea. I was presenting and I just
4  have no memory of -- it was a huge group of people. And
5  then we went to schools to present, and I don't remember.
6  I never even knew who the people were.

7     Q   Do you know who it was that contacted you from
8  the Attorney General's Office?

9     A   I don't remember. It's been several years.

10    Q   Two, three years ago?

11    A   Or longer.

12    Q   You said it's your understanding that the
13 programs in Hawaii are not adequate with respect to
14 autistic children?

15    A   That's correct.

16    Q   Where do you get that understanding from?

17    A   From patients that come -- that came to UCLA
18 from Hawaii. When I ran the outpatient clinic at UCLA,
19 we had a number of patients -- I don't know how many --
20 that came from Hawaii, some for inpatient, adolescents.
21 Some came for early childhood programs, and some people
22 came for assessments only. And the IEPs that I reviewed
23 on those cases did not meet what I thought were the
24 standards for providing services for children with
25 autism. So my information came from patients that I had

Freeman

```
 1   seen and IEPs I had reviewed.
 2        Q    How many IEPs did you review?
 3        A    I don't remember.  We would have to go back and
 4   check the files at UCLA to see how many people we saw.  I
 5   don't even remember.  At one point we were seeing like
 6   five kids a year from this.
 7        Q    Did you go to Hawaii to observe any of the
 8   programs --
 9        A    No.
10        Q    -- to make an assessment?
11        A    No.
12        Q    Did you conduct an independent assessment of
13   the programs in Hawaii?
14        A    No.
15        Q    So it's just based basically on what you heard
16   from patients who came to UCLA from Hawaii?
17        A    That's correct.  And reviewing IEPs.
18        Q    You don't recall how many IEPs you reviewed?
19        A    No, I don't remember.
20             Let me -- and the information I learned in 1994
21   or '5 when I was there.
22        Q    What information did you learn in 1995 when you
23   were there?
24        A    Well, as part of the Felix whatever -- I don't
25   truly understand exactly what happened then -- but from
```

Freeman

Page 174

1  skills commensurate with his level of function -- I mean
2  with his cognitive function?
3      A   I would refer you to the Volkmar book, the
4  Handbook of Autism, because there was, I think, more than
5  one chapter on outcome in there, and it talks a little
6  bit about that issue with references. That's where I
7  would go.
8      Q   Anything else?
9      A   In terms of -- the question was what? I forgot
10 the question.
11     Q   You offered the opinion that as direct result
12 of the failure to implement a consistent behavioral and
13 sign language program, Bryan failed to develop social
14 skills and functional communication skills commensurate
15 with his level of cognitive functions.
16         Now, we've already gone through the point of
17 the tests where you've conducted, such as the Vineland,
18 which is still a very low level; but according to your
19 research, it should be something that should progress
20 with appropriate intervention.
21         And you pointed me to the study about the 200
22 children using the Vineland test. I think you also
23 referred me to the Volkmar handbook. You referred me to
24 specific references -- you said there should be
25 references on that issue. I'm just trying to find out

Page 175

1  what else.
2      A   The other thing that was really -- that's
3  really striking with Bryan starting back when he was in
4  Hawaii, when intervention was consistent, he showed
5  improvements. When there was someone there that signs,
6  he's better behaviorally than if there isn't someone that
7  signs. I even saw that myself in my observation of him;
8  he recoups, he will regress.
9          And I believe there was a period of time in
10 Hawaii at the end where he was very regressed. I saw
11 those in the records.
12         He had another major regression in California
13 when -- last year when the -- or maybe this year, when
14 the person assigned quit. And then he comes back.
15         So when getting the intervention, he has less
16 behavior problems and is able to sign more spontaneously,
17 is more social than when he's not getting the
18 intervention. So that's where -- the other source of my
19 opinion.
20     Q   I think when you said that he was receiving the
21 consistent services, there was -- was able to recoup,
22 you're talking about that period -- I think you referred
23 to 2003. Is that the period we're talking about?
24     A   There was one period in the records where I saw
25 information that Bryan was doing much better. And

Page 176

1  Dr. Smalley referred to it either in her report or her
2  deposition. But I don't remember the exact dates, to be
3  honest. But I do believe it's around '03 sometime, in
4  that school year.
5      Q   Do you know if it was the whole school year?
6      A   I don't remember.
7      Q   Then you also cited the example of Keystone
8  where I believe -- I just want to make sure we're on the
9  same page -- is this the incident where Obi had her
10 dentist appointment, and there was a substitute, and then
11 when she came back, he was able to get back?
12     A   Right.
13     Q   Any other sources?
14     A   Not as I'm sitting here that I can remember,
15 okay.
16     Q   In terms of scientific corroboration for these
17 conclusions, would you rely on that study you performed
18 in 200 children by the Vineland?
19     A   I would rely on the literature in general on
20 outcome in children with autism.
21     Q   That's Volkmar?
22     A   Well, it's Volkmar and a lot of other people.
23 If you look at the Lovaas study and the outcome study
24 that was done, we find that, again, with intervention the
25 children are doing better when they have consistent

Page 177

1  intervention.
2          A lot of the literature Dr. Siegel attached to
3  her last report, I believe, some list of -- some
4  summaries of articles, the abstracts, and the majority of
5  those have -- those studies were retrospective. And
6  if -- I actually have looked at those and marked some of
7  the problems with some of those research studies.
8      Q   Do you have them with you?
9      A   Yes. That would be in one of the -- it would
10 be in the other white file. All right. Let me find it.
11         I've got about three copies; so let me find the
12 one I wrote on.
13     Q   Okay.
14     A   Looks like it's this one, if you want to see
15 it.
16     Q   It's the one entitled Longitudinal Examination
17 of Behavioral, Language, and Social Changes in a
18 Population of Adolescents and Young Adult with Autism
19 Disorder.
20     A   There are a number of studies attached. She
21 attached abstracts in attempt to support her conclusion
22 from several publications, and I reviewed them.
23     Q   Then the handwriting there is yours?
24     A   Yes. That's my handwriting.
25     Q   Do you mind if I keep this on the side?

Page 178

1  A  Absolutely not. That's why I brought it.
2  Q  Thank you.
3     Anything else, Doctor, that you have not
4  disclosed to me today regarding this opinion about the --
5  I'll just call it the one about the result of the failure
6  to implement consistent behavioral and sign language
7  programs?
8  A  Not that I can say. I think that's it.
9  Q  Now, going back to page 17, Doctor, about
10 midway through, you state, "In addition, Bryan showed
11 significant deterioration prior to leaving the school
12 district in Hawaii, and that this deterioration occurred
13 in his communication skills. And as a result, he
14 developed severe behavioral disturbance;" do you see
15 that?
16 A  Yes.
17 Q  I kind of just summarized it. Where did you
18 get that from?
19 A  From the records and from interviewing the
20 parents. And I believe there was a period of time in
21 '04 -- I believe the parents moved to the States in --
22 Q  January '05.
23 A  -- January '05. He was out of school because
24 there wasn't anyone to teach him. And, I believe, that
25 was if -- I think that was the time that Dr. Smalley did

Page 179

1  her report.
2  Q  I believe she did her report sometime in August
3  of '05.
4  A  That was when she did the report, but I think
5  the observations were made earlier.
6     And she talks about that. So that information
7  seemed to be in the documents that I had. And I was
8  having trouble figuring out -- I saw something about
9  Bryan being at school part of the day and not part of the
10 day; and so I don't know what happened there, okay.
11    But there was clearly reports of his
12 deterioration in terms of his communications, his
13 toileting, and his disruptive behavior.
14 Q  When you say you got that from the records, is
15 there a specific record in that time period you're
16 talking about?
17 A  It would be in whatever I have. I can't tell
18 you a specific -- like some of these, I have pieces of
19 paper about, right.
20    I would have to go back and look to see exactly
21 were I found that other than Dr. Smalley's report.
22 Q  Her behavior assessment?
23 A  Her functional behavior assessment.
24 Q  I notice that when we subpoenaed your records,
25 you also produced a copy of Dr. Smalley's deposition

Page 180

1  transcript.
2  A  Yes.
3  Q  Did you review that transcript?
4  A  Well, I started, but I didn't complete it.
5  Whatever page you saw me on this morning was where I
6  was.
7  Q  Did you review Dr. Smalley's deposition before
8  you prepared your 2006 assessment?
9  A  I would have to look at the list here. I know
10 I saw her report, but I don't believe I had the
11 deposition at that point. I didn't list it; so I didn't
12 have it.
13 Q  The records that are listed on page 1 of your
14 '06 assessment, which is Exhibit 2, those are all the
15 records that you reviewed prior to preparing Exhibit 2?
16 A  That's correct.
17 Q  Is Dr. Smalley's deposition on there?
18 A  No.
19 Q  Like you said, you have not yet finished
20 reviewing Dr. Smalley's deposition, correct?
21 A  That's correct.
22 Q  When did you start reviewing it?
23 A  Yesterday. It's been in the plan, but I've
24 been doing them sort of systematically. And as I
25 indicated on the list, there's some I read, some I

Page 181

1  haven't read. That's why I broke it up for you.
2  Q  Thanks.
3     Now, you state that, "Bryan's deterioration
4  occurred in his communication skills, and as a result,
5  he's developed severe behavioral disturbances;" do you
6  see that?
7  A  Yes.
8  Q  What severe behavioral disturbances did he
9  develop?
10 A  The urination and sitting in the urine,
11 aggression. I don't know if the property destruction was
12 at that time. I believe it was. Biting his hand. And
13 if I could refer to Dr. Smalley's report, I can give you
14 the whole list.
15 Q  If you want to.
16 A  Let me see. Let me try to get organized and
17 figure out where I put it. That's it. You probably want
18 the one I reviewed, right?
19 Q  Well --
20 A  Here it is. I have it.
21 Q  Did you mark it up, Doctor?
22 A  Let me see. There was so many copies of it.
23    There's handwriting on here, but I'm not
24 sure -- this is not my handwriting so --
25    It looks like I did make notes on it. But

Page 262

1 qualified to be critical of individuals who have
2 extensive experience, work with children with autism
3 spectrum disorder and/or observed Bryan for an extended
4 period of time?
5   A   That's correct. And no background in autism
6 according to the information I have. And he never saw
7 the child. It's very hard to compare that with someone
8 who spends hours observing a child, doing assessments, in
9 terms of opinions.
10   Q   Now, how about with respect to Dr. Siegel?
11   A   Dr. Siegel's report was very interesting. In
12 contrast to Dr. Goka.
13   Q   Before we go on, do you have anything else to
14 add about Dr. Goka?
15   A   No. If I can -- Dr. Siegel did a -- if I can
16 turn to this copy of Dr. Siegel's report which is marked
17 here Exhibit C from somebody.
18   Q   What's the date?
19   A   The date is June 25, '07. And there's an
20 earlier report --
21   Q   Would it be easier, Doctor, if I just gave you
22 a copy?
23   A   Well, except I have notes on this one.
24       MR. USHIRODA: Can I mark it as an exhibit,
25 Carl?

Page 263

1       (Whereupon the document referred to was marked
2 by the reporter as Defendant Exhibit 12 for
3 identification.)
4 BY MR. USHIRODA:
5   Q   Dr. Freeman, I've handed you what I've marked
6 as Exhibit 12 to your deposition. Can you please
7 identify that for the record.
8   A   This is the report of Dr. Bryna Siegel, and I'm
9 just looking to see if her first report was attached. I
10 think her first report was attached, correct?
11   Q   Yes.
12   A   And some references to literature that she
13 thinks supports her opinion.
14   Q   I do have the original report. Is that one
15 that you're critiquing?
16   A   It's both. This has both the original report
17 attached to a more recent report.
18   Q   And the original report is one dated
19 June 22, '06, correct?
20   A   June 16, 2006, yeah.
21       Dr. Siegel observed the same things that I
22 observed and Dr. LeGoff observed, and she reached a
23 different conclusion. And I don't understand how she
24 relates the conclusion she does with the information that
25 she's got.

Page 264

1       You know, she reports that Bryan is doing
2 better, but yet she opines that he would have always
3 been -- you know, it didn't make any difference that he
4 didn't get consistent information -- intervention.
5       And yet when he gets intervention, he does
6 better; so, to me, that's not logical.
7       And may I look at where my notes are?
8   Q   Sure.
9   A   Because I did mark this up.
10   Q   You know, why don't we mark that as an exhibit.
11   A   The marked copy?
12   Q   Yeah. I'll just mark the whole thing here.
13   A   That's got a stamp on it already, but --
14       (Whereupon the document referred to was marked
15 by the reporter as Defendant Exhibit 13 for
16 identification.)
17 BY MR. USHIRODA:
18   Q   Doctor, I've just handed you Exhibit 13 which
19 is Defendant's Expert Disclosure.
20   A   That's correct.
21       The -- I guess the first comment I have is on
22 page 2.
23   Q   Of?
24   A   Dr. Siegel's initial report.
25   Q   Of the June '06 report?

Page 265

1   A   The June of '06 report.
2   Q   Page? I'm sorry.
3   A   Page 2. Again, this is to backup my idea -- my
4 opinion that her conclusions don't follow from the data
5 that she presented. She is reviewing Dr. Smalley's
6 report and says, It was the state of the art in terms
7 functional behavioral assessment, which is correct, but
8 as will be seen below, the supports were in place for
9 Bryan.
10       Well, the hearing officer ruled those supports
11 weren't in place; so that was what this was all about.
12 So I don't know where that came from. This is sort of
13 the last thing that's in the critique of Dr. Smalley's
14 report.
15       With regard to Dr. LeGoff's report, she has
16 some misinformation about the use of the Leiter-R. She
17 opines that it only measures splinter skills. Again, I
18 went in and looked it up, and she's absolutely correct
19 about the original Leiter. And there was several
20 research studies done that showed that autistic children
21 scored higher on the original version of the Leiter.
22       I looked in the Handbook of Autism and
23 Developmental -- well, first I looked at Sattler to see
24 what the statistical properties of the Leiter-R were.
25       And then I looked into the Handbook of Autism

Page 266

and Development Disability, the chapter on assessments, because I remembered that there was a table in there in terms of what tests are recommended for children, and the Wechsler tests are always recommended first. And then Dr. Cohen a list. The Leiter-R is good for nonverbal children. And he contrasts it in his chapter between the Leiter-R and the original Leiter and the differences.

So that the -- I thought from reading, she seemed a little bit confused about -- she seemed to be talking about the original Leiter-R. And that was how I interpreted what she says, okay.

Q  Anything else?

A  Okay. And this is the part that was kind of concerning to me: "His current functioning after another year of good quality special education placement shows a number of these problems greatly reduced."

Well, if you get good quality education, and it reduces the problem, how can you possibly say that had you had that education earlier it -- you know -- it would not have reduced the problems then? And, to me, that's not logical.

Q  And what page are you referring to?

A  That was on page 3.

Q  What part of?

A  It was under -- it came with Dr. LeGoff's

Page 267

report. It's right at the bottom of page 3 where she makes that statement.

Q  Bottom of page 3?

A  Okay.

Q  And this is the '06 report?

A  Right. On page 4, the end of that paragraph when Dr. LeGoff's statement --

Q  Yes.

A  -- "that he should be able to function to his potential in a group home residence which in California is available at no or very low sliding scale cost to any family requesting it."

And that's true on paper. Whether or not you're able to get those services is extremely difficult because they don't exist.

Q  And where are you referring to, Doctor?

A  That's in the last sentence on page 4 under the critique of Dr. LeGoff's paper.

Q  Okay.

A  Okay. And then on page 6, the last paragraph, she talks a lot about the number of hours Bryan was receiving in Hawaii versus currently.

Q  Yes.

A  And she doesn't address the issue of the quality of those hours.

Page 268

Q  The quality of the hours in Hawaii?

A  Right. Or here.

The other thing is I -- I would disagree with the last statement that -- let me see where this sentence starts. It's the last: "Indeed this finding highlights the likelihood that the quality of programming implementation in Hawaii was probably inadequate" -- which I couldn't agree with more -- "much of time, and it may have been made worse by the large number of different service providers required to cover 68 hours a week of programing before, during, and after school, and on weekends, compared to a single excellently trained high consist one-to-one support paraprofessional he has now."

My disagreement with that statement has to do with you're not going to be able to cover those hours with one person, and that, you know, you need a pool of people as was ordered to cover it to prevent the issues that arose. The other thing is you don't want a child's programing to be person dependant, which happens in autism, so --

Q  What do you mean by "person dependant"?

A  If you see autistic children, they will do anything their one-on-one tells them. Somebody else comes in, and they don't do it. I saw that with Bryan. So --

Page 269

Q  With Obi?

A  With Obi. He didn't exhibit the same level of behaviors. And for skills to be mastered, you really want children to be able to exhibit those skills with a variety of people in a variety of situations.

So you know, I just disagree with the way that that's worded there.

I agree with the rest of what she says. I couldn't agree more. And yet it doesn't follow -- her conclusion didn't follow from what she's opining, is the way I look at it.

Q  Okay. Anything else?

A  Yeah. With the next paragraph has to do with the difficulty of obtaining staff who are, you know, fluent in ASL as well as having behavior training. And I agree that's true. But what she doesn't talk about is how to remedy that problem. Do you just not look for those people, or do you set a program up to provide training for those people so that you can get people doing it. And if you're expecting one person to do everything, that's a setup for failure.

Q  In other words, you're just saying she doesn't say, Well, how did you fix this problem of there being a shortage of qualified school staff?

A  Right. Yeah.

Page 270

1   Q   Okay.
2   A   Then I thought that there was some
3 misunderstanding of where we are in terms of
4 understanding the literature in the next paragraph.
5   Q   That's page 7?
6   A   That's page 7.
7   Q   And is it the literature -- what paragraph are
8 you referring to?
9   A   Okay. It's the paragraph that -- it's the
10 second. It says, Finally, there is the issue of whether
11 Bryan either lost so much ground that his outcome is
12 different.
13      All right. She opines -- and this was
14 consistent with the literature for a long period of time,
15 but no longer is -- that if you don't talk by age five
16 you're going to be nonverbal. And right. And all of
17 that data is before we began current types of treatment
18 programs. There's no current data about that.
19      And the point of that is the current assumption
20 is that children will talk.
21   Q   When you say "there is no current data
22 available here," what is that pertaining to?
23   A   There haven't been any long-term studies that
24 say this percentage of -- if this child is not talking at
25 age 6, they're not going to be talking at age 10. We

Page 271

1 don't have that data yet. And in the old literature, it
2 was pretty well accepted if you don't talk by age 5 --
3 that was a truism in autism. And it's one of those
4 things that got passed down, like the concept of mental
5 retardation in autism. Whether or not there was
6 literature to support that, I don't know.
7      So it was one of the -- as Bryna says, the
8 truisms that we learned about this. Now the assumptions
9 are different because we've changed how we think about
10 autism. And she doesn't address that.
11      And she discusses the splinter skills that he
12 has and considers his IQ to be a result of a splinter
13 skill. And that's where I think that she was confusing
14 the Leiter with the Leiter-R. I mean, he does have some
15 skills that are higher than others, but -- and she's
16 acquainting his level of functioning with Vineland
17 scores, which is one aspect of his functioning, as I
18 indicated.
19      And so she's also focusing -- it's the way I
20 interpreted her focusing was that Bryan's IQ wasn't going
21 to improve.
22   Q   That's the way you interpret --
23   A   That's how I interpreted what she said. And
24 I'm not -- she didn't seem to be -- she's predicting
25 outcome. And in the studies that she attached to this

Page 272

1 report talked about cognitive skills in terms of how
2 they're measured on the IQ test and -- because we used to
3 use that a lot to measure outcome. We don't do that
4 anymore.
5      We had a long discussion today about why we
6 don't use that measure anymore as much. It's there. It
7 gives you some information about a child, but it's not
8 the be-all and end-all as we used to say.
9      And she seems to be, as I read it, focusing on
10 his -- did his cognitive skills change? In other words,
11 did he move -- she talks about it in this report or the
12 other one -- did he change groups? People talk about
13 changing groups. It means, well, did he go from being
14 severely retarded to moderately retarded, or did he go
15 from moderately retarded to mildly retarded? We don't
16 know the answer to any of that.
17      And that's the focus on cognitive skills. It's
18 not a focus on the social adaptive part of it.
19      So the outcome is much more than a test score.
20 There aren't really tests that measure quality of life,
21 and they don't measure how behaviors are interfering.
22 That's where a functional assessment comes in..
23      So there's so many things that go into outcomes
24 that aren't on tests. And clearly his test scores, you
25 know, over the past year haven't changed very much. But

Page 273

1 I -- that's correct.
2   Q   Did I hear you correctly that there is no test
3 to measure the quality of life issue?
4   A   Well, there are some tests, but we typically
5 don't use them. But there are some that have been used
6 with adults. They're observation tests to measure
7 what -- in the mental retardation population. I don't
8 mean to say there's none. I meant in reference to what's
9 been happening with Bryan.
10      The IQ test doesn't measure quality of life.
11 The Vineland doesn't measure quality of life.
12   Q   The Vineland measures the adaptive --
13   A   Adaptive skills. But there may be more to it
14 than that.
15   Q   Your critique with Dr. Siegel's point on the
16 splinter issue is that she's not addressing those
17 adaptive functions?
18   A   Right. And if you look at her last
19 paragraph --
20   Q   Where is it?
21   A   On page 7.
22   Q   Where are you?
23   A   Page 7, the last paragraph, and I just want to
24 read it.
25   Q   Sure.

Page 274

1  A  "Bryan Wiles-Bond is a significantly impaired
2  young man who fortunately has shown good improvements
3  with appropriate education."
4       Now, I agree with that. Now, again, if you're
5  showing improvement with appropriate education, how can
6  you say there weren't going to be improvements if he had
7  appropriate education earlier?
8       She goes on to say, "He can be expected to
9  continue to learn, adapt, and function with increasing
10 levels of independence with continued similar educational
11 supports."
12      I couldn't agree more. He's going to learn.
13      "He will never live independently, but this is
14 not because of the education he did not receive in
15 Hawaii; though, likely much of the intervention was poor
16 quality and/or inconsistent."
17      So, I mean, I agree with her completely.
18      "But there is no strong support for the idea
19 that he would have been more independent had he never
20 been educated in Hawaii."
21 Q  Had he never been educated?
22 A  That's her sentence. Those are her words.
23 Q  Ever?
24 A  He had never been educated in Hawaii. That is
25 what it says.

Page 275

1       Now, to me -- I don't know what she's talking
2  about. She's just said this is a child who makes good
3  improvements when treatment is there. Then she says, but
4  it wasn't done in Hawaii, but it doesn't matter because
5  it wouldn't have mattered anyway because he was always
6  going to be -- require some type of support.
7       Well, yeah, he probably was, given the severity
8  of his behavioral difficulty. But to say that the fact
9  that he didn't get consistent treatment, which she agrees
10 is not in dispute, didn't have an effect on his outcome
11 makes no sense. It's just not logical. It doesn't
12 follow.
13      And, I mean, even -- she's says, you know, a
14 child can -- is going to continue to grow and learn. So
15 this is my big problem with her report. I mean, she does
16 and excellent job of summarizing and telling us what has
17 been going on, and she agrees with everything that we've
18 been talking about today. Except then she concludes it
19 doesn't matter if you educate children or not. It's not
20 going to change.
21      And it makes me wonder why are we doing this
22 then? If we can't ever make an impact on the child, why
23 are we bothering with consistent -- and recommending
24 consistent programming for a child with autism? Because
25 to her way of thinking, a child like Bryan was never

Page 276

1  going to change, on the one hand; on the other hand,
2  she's says he's going to grow and learn and be more
3  independent. So it's -- it doesn't follow. It makes no
4  sense to me. And that's my main criticism of her report.
5  Q  Anything else?
6  A  Well, the literature that she gives attached to
7  it to support her claim is dated and out of touch, okay.
8       As I said earlier, the majority of the studies
9  are retrospective. So we're taking adults now that for
10 whatever reasons have been diagnosed with autism, but
11 they probably got very little, if any, intervention, and
12 say what's the outcome? So you're not talking about the
13 effect of intervention of people; you're talking about
14 the effect of no intervention or minimal intervention.
15      And the other problem, they're all dated. The
16 first study is 1996. That's 11 years ago. The next one
17 is Howlin 2004 study, which I'm very familiar with, and
18 that was a study that was published in the Journal of
19 Autism -- or maybe -- this one, the Journal of Child
20 Psychology and Psychiatry.
21      And, again, it was retrospective. It was adults
22 who were already identified as autistic. All right. And
23 she concludes that -- she takes a sample and makes
24 conclusions about poor outcome for the majority of them.
25 But there's no documentation of what type of intervention

Page 277

1  they had, if any, was it different for different
2  groups.
3  Q  You're talking about the Howlin study?
4  A  The Howlin study, yes. She's concerned with
5  diagnosis and the persistence of certain symptoms, and
6  what they are doing now, which give us some information
7  about lack of treatment, but doesn't tell us anything
8  about outcome when children get consistent intervention.
9       And in the -- the next study is again by
10 Howlin, okay.
11 Q  What is that one called?
12 A  This one is called Can Early Intervention Alter
13 the Course of Autism. And she says that, Interventions
14 have focused on enhancing developmental skills in ways of
15 eliminating behavior difficulties. And that's -- this is
16 the focus and that it does result in improvement. I
17 haven't read the entire article. The fact that -- she
18 goes on to conclude -- and this is 2003 -- "There is
19 little evidence that very early intensive intervention
20 can significantly alter the long-term course."
21 Q  What are you reading from?
22 A  I'm reading from the abstract from Dr. Howlin's
23 study.
24      That's counter to everything, you know, that
25 people think today in terms of Educating Children With

Page 278

1 Autism and in terms of any paper you read about early
2 intervention. It doesn't follow.
3    Q    That's not accepted today?
4    A    That's not accepted. And why are we doing it?
5 If we can't change, why are we doing it? If kids can't
6 learn, why do we have an education system?
7         The next study is 1986, okay. And there's a
8 conclusion in 1986 that 50 percent of children require
9 institutional care. That was true in those days, there's
10 no question. It's just dated. There are lots of
11 reasons. There aren't even institutions anymore; so I
12 mean, that just is not relevant. In addition to being
13 retrospective, in addition to not having any treatment.
14        And there's a study in here by Sherer and
15 Schreibman, Behavioral Profile and Predictors of
16 Treatment Effectiveness. And I believe it's a study of
17 two children. I have no idea why that's in there. It's
18 an interesting study, but I don't know how it relates to
19 Bryan.
20    Q    Which article is this?
21    A    This is by Sherer, S-H-E-R-E-R, and Schreibman,
22 S-C-H-R-E-I-B-M-A-N, who does a lot of research in
23 autism. And I really don't know -- what she's talking
24 about is beginning to be able to -- she had six children.
25 She's trying to identify profiles of learning to see

Page 279

1 which techniques might be more appropriate for some
2 children in this case, Pivotal Response Training. It's
3 called, PRT. But I don't know what that has to do with
4 Bryan.
5    Q    Okay.
6    A    Okay. And the next study is the same. This is
7 a study by Marian Sigman at UCLA, and Dr. Sigman
8 concludes: "These results suggest that improvement in
9 early communication and play skills may have long-term
10 consequences for later language and social competence.".
11        And she goes on to compare autism children to
12 Down syndrome children. So, if anything, that doesn't
13 support Doctor -- it's just the opposite of Dr. Siegel's
14 opinion that it wouldn't have made any difference.
15    Q    Okay.
16    A    The next one, again, is dated 1986, which is --
17 given how quickly the field changes, is just not
18 relevant.
19    Q    I'm sorry, what was that?
20    A    It's 1986.
21    Q    What is the author?
22    A    It's Schacter, S-C-H-A-C-T-E-R. And he looks
23 at he calls kannerian precocious autism --
24 K-A-N-N-E-R-I-A-N -- and concludes that if they didn't
25 have linguist competence by age five, they weren't going

Page 280

1 to get it.
2         But, again, that's even before Dr. Lovaas' study
3 came out that showed the effectiveness of early
4 intervention, and it certainly contradicts the findings
5 of Educating Children With Autism. It was probably true
6 in what we knew in 1986, but we're in 2007 now.
7         This is the -- the next study is about -- is
8 Gillberg, G-I-L-L-B-E-R-G, and talks about the frequency
9 of seizures of developing. I don't know what that has to
10 do with it, but we know a certain number of children with
11 autism develop seizures in late adolescence or early
12 adulthood. No one knows exactly which children develop
13 seizures, which don't develop seizures in terms of
14 there's been no specific profile identified for that.
15        So I don't know what this has to do with it.
16 Bryan doesn't have seizures; so I have no idea why that
17 is in there.
18        And the next one, 1984, and it's a study of 13
19 children with autism. And that's meaningless. I mean,
20 autism is a very wide spectrum of disability. And we now
21 talk about one of the big problems in past research has
22 been findings -- making sure that you have everybody who
23 represents the whole spectrum if we're making
24 conclusions.
25        And so you need large numbers of children,

Page 281

1 particularly when you're looking at taking a study like
2 this. You basically need an epidemiological study that
3 looks at the general population. And there was only one
4 that was done in the -- it's called the Isle of Wight
5 study by Michael Rutter, R-U-T-T-E-R. And that was done
6 in the '70's, again, before intervention.
7         So if these are the articles that she's using
8 to support her opinion, they don't support her opinion.
9 And she's certainly not referenced the more recent
10 studies. This is -- this is, you know -- some are
11 irrelevant. And she doesn't reference Educating Children
12 With Autism or the studies that are in Volkmar at all, or
13 the consistency in the literature that children with
14 autism improve with intervention.
15        In the one study that says that, she gives us a
16 reference, but that doesn't support her conclusions; so I
17 don't know what the conclusion is based on. That's been
18 my problem with her evaluations.
19    Q    This is it?
20    A    Yeah. And the second one is pretty much the
21 same. She goes through and does an excellent job of
22 describing the 2007 evaluation, what she saw, what Bryan
23 was doing. And then the -- I have no quarrel with any of
24 that.
25        But then it says that the fact that he didn't

Page 282

1  get intervention appropriately -- and she admits he
2  didn't -- that it doesn't make any difference; so it
3  doesn't follow, and I don't understand it. All right.
4      So that's my big concern about her. I don't
5  know where her opinions come from.
6   Q  Anything else in your report?
7   A  Let me make sure I didn't miss something. She
8  made some mistakes in her critique of my report, but
9  that's no big deal. She said that Obi wasn't there
10 when -- and she was. I was there for two days, and one
11 day she left and I do remember seeing that somewhere.
12 But -- okay --
13     And, again, she stresses -- she make a nice
14 chart on assessments that have been done. I didn't see
15 this chart as I was trying to make my own. I wouldn't
16 have reinvented the wheel here.
17     But if you look, it's all been about tests that
18 measure either language or social adaptive skills, okay.
19 And, again, she's focusing on whether or not this is a
20 child who is significantly impaired or severely impaired
21 versus not being severely impaired. And she uses tests
22 scores to buttress that argument, and that's not what you
23 use to buttress your argument.
24  Q  What do you use?
25  A  You use changes in behavior there. And,

Page 283

1  clearly, scores on tests are one piece of the puzzle.
2  But remember back when I started this morning, I talked
3  about making sure you have multiple sources of
4  information?
5   Q  Right.
6   A  So when you say "test scores," that's only one
7  piece of the puzzle. There so much more that goes in to
8  determining outcome. And here, again, this report on
9  page 4 --
10  Q  You're talking about the '07 report?
11  A  Yes. The 07' report, okay. I'm just looking
12 at what I wrote.
13     Next in line I put not true, but those were
14 like -- it was things that she misread into my report,
15 okay. And I don't -- again, she opines that he's making
16 progress with 30 hours a week versus 68 hours a week in
17 Hawaii and doesn't talk about why that is. It has to do
18 with the level of training of staff. That's never
19 addressed.
20     And, again, as I said, quality of life is never
21 addressed and what kind of improvements he made. And
22 again, you're stuck on the opinion doesn't follow from
23 the observations, because you can read the report up
24 until about page 7 when she talks about Bryan making
25 progress, recouping skills, the fact that the education

Page 284

1  in Hawaii was inappropriate or inconsistent. And then
2  she concludes it wouldn't have made a difference.
3   Q  We talked about that?
4   A  Yeah. It's the same thing. I don't understand
5  how that can be. All right. I just don't understand
6  that. That's my main criticism of the report. And I
7  think there's some misunderstanding on her part in terms
8  of what the scientific literature said if these are the
9  references that she shows.
10  Q  If you could point Dr. Siegel to the specific
11 literature now which would be more relevant, which would
12 that be?
13  A  I would point her to Educating Children With
14 Autism, take a look and see what it says. They
15 reviewed -- that was a panel put together by the National
16 Academy of Science to say when we take a look at all the
17 scientific literature that's there, and in summary, what
18 does it show. And that's considered the authority --
19 authoritative work at this time.
20     So, as I said -- and her opinions are not
21 consistent with Educating Children With Autism, and it's
22 not consistent with what we know about autism today in
23 2007. It might have been true in 1986 and '87, but not
24 today.
25  Q  Anything else?

Page 285

1   A  No. That is it.
2   Q  Do you have any other opinions?
3   A  No. I think I'm fresh out of opinions, to be
4  honest with you.
5   Q  I'm trying to wind up here.
6      Did you have any opinions that you considered
7  making, but changed your mind and said no?
8   A  No. I usually say what I think. I have no --
9  no. I have not had opinions, I didn't --
10  Q  And these are your final opinions?
11  A  Yes. Unless new information comes in.
12  Q  Do you anticipate --
13  A  No, I don't anticipate new information coming
14 out.
15  Q  And if asked about these same opinions, are you
16 going to testify the same way about them?
17  A  Yes, I am.
18     MR. USHIRODA: Let me just take a look at my
19 notes.
20     (Whereupon the document referred to was marked
21 by the reporter as Defendant Exhibit 14 for
22 identification.)
23 BY MR. USHIRODA:
24  Q  I don't believe I've seen a lot of these
25 records here because it's your notes and --

Page 286

1  A  That's why I had given you that file earlier.
2  Q  I'm not going to sit here and question you on
3 them.
4  A  Thank you.
5  Q  But I was just wondering if this could be part
6 of the deposition?
7  A  Yes, of course. Those are my notes I took when
8 reviewing the files. And to be honest, some of the
9 things I pulled out when I was reviewing it last night, I
10 don't know why I pulled it out, but there it is.
11  Q  Doctor, I'm going to mark some of the files
12 that you were kind enough to bring today, and the first
13 one is going to be the green file. I don't know if you
14 have a name for this file other than it's the bright
15 green file?
16  A  It's BJ's notes, and it was from the records.
17 That's what that file was.
18  Q  It's --
19  A  It's my notes from reviewing these. You have
20 already taken some of those material from that into
21 evidence. things that I was using to -- I was looking
22 for information in the records to support my opinions.
23      MR. VARADY: The Al Kai notes?
24      THE WITNESS: Yes, those. I don't know what
25 else was in there. But that was why I have that file,

Page 287

1 okay.
2 BY MR. USHIRODA:
3  Q  The next file that I'm going to mark as Exhibit
4 15 is the file that's just "Their Experts"?
5  A  That's correct.
6      (Whereupon the document referred to was marked by
7 the reporter as Defendant Exhibit 15 for
8 identification.)
9 BY MR. USHIRODA:
10  Q  One -- I guess the label "Their Experts" refers
11 to the DOE's experts?
12  A  DOE's experts probably would have been a better
13 title, yes.
14  Q  That would be Dr. Goka and Dr. Siegel?
15  A  Right. Dr. Goka and Dr. Siegel.
16  Q  This is the file in question, Doctor?
17  A  Yes, that's it. And, again, you've taken
18 some -- this exhibit that we marked with my notes on it
19 here as Exhibit 13 was in that file.
20  Q  Doctor, are you also going to be testifying as
21 to your recommendations for Bryan?
22  A  I've not been asked to testify to
23 recommendations. Those were in there to help the
24 parents. We still have Bryan that needs services.
25  Q  So you're not going to be offering any

Page 288

1 testimony at trial regarding recommendations?
2  A  No. No one has asked me about that.
3  Q  That cut that one short.
4     Is there any other information or materials
5 that you want to have?
6  A  As I said, I would like to talk to Dr. Smalley.
7 And, you know, I even thought about that as I started
8 reading her deposition last night.
9  Q  Anything else?
10  A  No.
11  Q  I think we talking about that earlier?
12  A  Yes.
13      MR. USHIRODA: Well, Doctor, thank you very much
14 for your time.
15      MR. VARADY: I have just one question to try to
16 clarify something, if I could, Dr. Freeman.
17          -EXAMINATION-
18 BY MR. VARADY:
19  Q  You referred to the Regional Center several
20 times both this morning and this afternoon in regards to
21 Dr. Siegel's opinion. You mentioned that she made
22 reference to certain services being available at the
23 Regional Center; do you recall that testimony?
24  A  Yes.
25  Q  And do you recall reviewing Dr. Goka's opinion

Page 289

1 in preparation for your written opinions and for your
2 deposition today?
3  A  I believe he said that all services that Bryan
4 needs are available.
5  Q  And available through the Regional Center?
6  A  Through the Regional Center.
7  Q  Do you agree with that assumption?
8  A  No. I agree that on paper it's possible there.
9 But I spend a lot of time in my practice when I'm working
10 with adults trying to obtain those services, and they
11 just don't exist.
12      MR. VARADY: That's all I have.
13          -EXAMINATION-
14 BY MR. USHIRODA:
15  Q  Is that opinion expressed in your report,
16 Doctor, that's it's on paper, yes, but in your
17 experience, no?
18  A  No, I don't think it is.
19      MR. USHIRODA: Thank you very much.
20     I'd like an e-tran and condensed.
21      MR. VARADY: I'd like a copy
22     (The proceedings concluded at 5:58 p.m.)
23     (Continued on following page.)

Page 290

1  DECLARATION
2
3
4
5    I hereby declare I am the deponent in the within
6  matter; that I have read the foregoing deposition and
7  know the contents thereof, and I declare that the same is
8  true of my knowledge except as to the matters which are
9  therein stated upon my information or belief, and as to
10 those matters, I believe it to be true.
11    I declare under the penalties of perjury of the
12 State of California that the foregoing is true and
13 correct.
14
15    Executed at _____, California,
16 on _____.
17
18
19    _____
         BETTY JO FREEMAN, PH.D.
20
21
22
23
24
25

Page 291

1 STATE OF CALIFORNIA  )
                      ) ss
2 COUNTY OF LOS ANGELES )
3
4    I, TONI COHEN, CSR 9871, a Certified Shorthand
5 Reporter, do hereby certify:
6    That, prior to being examined, the witness in the
7 foregoing proceedings was by me duly sworn to testify to
8 the truth, the whole truth, and nothing but the truth;
9    That said proceedings were taken before me at the
10 time and place therein set forth and were taken down by
11 me in shorthand and thereafter transcribed into
12 typewriting under my direction and supervision;
13    I further certify that I am neither counsel for, nor
14 related to, any party to said proceedings, nor in anywise
15 interested in the outcome thereof.
16
17    In witness whereof, I have hereunto subscribed my
18 name.
19
20    Dated:_____
21
22    _____
         Toni Cohen, CSR 9871, CCR 793
23
24
25

**CERTIFICATE OF SERVICE**

I certify the attached document was served electronically via CM/ECF on the date indicated below addressed to:

Gregg M. Ushiroda gushiroda@wik.com
Daniel K. Obuhanych dobuhanych@wik.com
Leighton M. Hara lhara@wik.com, rgeorge@wik.com
Watanabe Ing & Komeiji First Hawaiian Center 999
Bishop St 23rd Flr Honolulu  HI 96813

Holly T. Shikada holly.t.shikada@hawaii.gov,
Cheryl.H.Oeda@hawaii.gov,
michael.t.burke@hawaii.gov
Deputies Attorney General
235 S. Beretania, Room 304
Honolulu HI 96813

Attorneys for Defendants

DATED: Honolulu, Hawai'i, January 14, 2008.

/s/ Carl M. Varady
Carl M. Varady