Page 66

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    66
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  supports need to be everywhere with him, in his home, in
2  his car, in his school, in his community. He needs to have
3  activities with other children where he's engaged. Down
4  time, it's an awful thing for people with autism. If he's
5  not engaged, he's going to be drinking or peeing. So he
6  needed to be involved in activities. Very active kid.
7  Very wiry kid.
8       I know I recommended gymnastics several times so you
9  could take that behavior of his jumping and climbing and
10 flailing, turn it into something more controlled. If you
11 want to jump, you jump on the trampoline. We're not at the
12 gym right now. You have to go to the gym.
13      I recommended he have more direction from the kids at
14 his school and they create a buddy club, which they did at
15 some point, of regular ed kids, like "Bryan's Club." They
16 would come and eat and play games and socialize with him
17 and get him involved in age-appropriate activities.
18      I regularly said those sorts of things over and over
19 again because his needs didn't change. His behaviors got
20 better at first and then significantly worse, but the
21 interventions required were pretty much the same. You
22 know, some things being accomplished and other needs
23 appearing.
24 Q.  Now in this time frame -- this is around the time of
25 the due process hearing -- did you -- you said the behavior

Page 67

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    67
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  got worse? Is that --
2  A.  Initially when I met Bryan, he had some skills.
3  Q.  Okay.
4  A.  And he had lots of needs.
5  Q.  Yes.
6  A.  And then they were doing all the things they knew how
7  to do which were working, and they did some new things I
8  added in which also worked, and his skill level got
9  significantly better.
10 Q.  Okay.
11 A.  Then something happened. My understanding, that would
12 be change of staff or lack of staff. And his behaviors,
13 you know, got worse, and his language skills deteriorated,
14 and his ability to be interested in complying and working
15 with you kind of, you know, decreased. And --
16 Q.  When -- I'm sorry.
17 A.  When -- yeah, I don't have any dates on any of this
18 stuff. It would be really helpful if I had files in front
19 of me.
20 Q.  Yeah.
21 A.  But sometime in '02 probably -- it has to be in there
22 somewhere because I met him in '01, and I stopped knowing
23 him in '03, so this all had to take place sometime in '02.
24      For whatever reason -- you'll have a better ability to
25 look this up than I do -- his folks filed due process

Page 68

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    68
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  again. I provided my opinion to Developmental Disabilities
2  people and the DOE people of what I thought he needed, and
3  they were gonna go check and see if those things were
4  happening.
5       Now I've lost track of your question. I'm sorry.
6  Q.  That's okay.
7       So this is -- you're talking about there was a second
8  due process hearing?
9  A.  I believe there were several.
10 Q.  Okay.
11 A.  But I suppose it to be the same one extended.
12 Q.  Did you ever testify in a due process hearing
13 involving Bryan?
14 A.  I believe, to the best of my knowledge, they
15 continuously settled.
16 Q.  Okay.
17 A.  Again, unless it was one hearing that stretched out
18 the whole time, and I think they settled.
19      No, I did not go to a hearing and testify.
20 Q.  Okay. Now in this time period where, you know, you
21 said that his skill level had gone down --
22 A.  Yeah.
23 Q.  -- did you observe this?
24 A.  Yeah, I was eventually brought over. There was a
25 little bit of snag where the parents had requested me

Page 69

Deposition of Kimberly Smalley, Ph.D.; 7/27/06    69
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  because it had been successful before, and they had called
2  me and asked me if I was available. Either that or his IC
3  or his AC had called and asked me if I was available, and I
4  had said yes. Then time went by, and I hadn't -- I hadn't
5  been procured. This is when I was on my own, after I left
6  the state department. And so then I would get e-mails from
7  his mom, you know. Have they procured you yet? And they
8  hadn't. So there was a little bit of a hold up.
9       Then I was brought back in by the DOE through CFS.
10 And then I saw him for the first time in many -- in many
11 months, and he was -- he was a mess. He was significantly
12 deteriorated from when I had seen him last.
13 Q.  And -- okay. And what did you observe? What did you
14 see? What did you observe?
15 A.  What did I see. There was --
16 Q.  I'm sorry. Was that at the home or the school?
17 A.  No, at school.
18 Q.  Okay.
19 A.  Well, I did see him at home as well.
20 Q.  Okay.
21 A.  But the focus of what they asked me to do was at
22 school. And I spent some time at school, couple months --
23 June, July, August maybe? July, August September? In
24 there somewhere -- observing him over time across domains,
25 at home, at school, in the community. We're getting into

Page 70
Deposition of Kimberly Smalley, Ph.D.; 7/27/06    70
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  sort of my report now. These are the things that you do as
2  part of a functional behavior assessment.
3  Q. Let me stop you there. Would this part be in the '04
4  time period, because your report --
5  A. Yeah.
6  Q. Okay.
7  A. I'm trying -- I don't -- I may have been brought out
8  once before the '04 report. I think I -- I think I was
9  brought out, and I was asked for help; and I said, you
10 know, he really needs a real assessment. I think there was
11 another visit between when I saw him good and when I did
12 the '04 report, but I couldn't tell you the date on that.
13 But that would have been, you know, whenever he -- you
14 know, whenever things changed for the worse.
15 Q. Okay.
16 A. I went out. I talked to his then teacher. That would
17 have been at the middle school. I observed him in class.
18 I -- I'm sure I communicated with his mother and his
19 consultant and the district person, whoever that was at the
20 time. And I'm sure I recommended, you know, things have
21 changed, and he needs a new assessment.
22    Then there was a period of time again before I was
23 brought out for the final round, and then I was brought out
24 for the final round.
25 Q. Okay. So let me understand this. You were brought

Page 71
Deposition of Kimberly Smalley, Ph.D.; 7/27/06    71
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  out. You made your observations and recommended that Bryan
2  needed a functional behavior assessment; correct?
3  A. I -- yeah.
4  Q. And then some time lapsed again, and then you were
5  brought back in, and that's when you --
6  A. Did the '04 report.
7  Q. Correct.
8  A. You know, I have a unique -- just -- I've seen Bryan
9  every couple months for two or three years, so I have sort
10 of this broad vision of who he was when I met him, who he
11 was in the middle, and who he was in the end. And then we
12 sort of missed the details in between for the several
13 months I didn't see him. But it was very beneficial to
14 have sort of the big picture to see him every couple
15 months. And each time I saw him, it was for a different
16 reason. You know, sometimes it was toileting. Sometimes
17 it was the provider who needed help. Sometimes it was the
18 DOE who brought me out. One time it was by chance. So
19 none of that was consistent service that I was applying to
20 him. In fact, it was in three separate positions that I
21 knew him. But I did see him every couple months for that
22 whole time period.
23 Q. Okay. Now this time -- let's go back to that period
24 of before your final -- your assessment in '04. You know,
25 you were brought back out, and you said you observed him in

Page 72
Deposition of Kimberly Smalley, Ph.D.; 7/27/06    72
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  the classroom, at home, and then you recommended that he
2  needed an assessment done.
3  A. Yeah.
4  Q. What was the skills trainers' situation like at that
5  time?
6  A. I'm struggling with this. The second to last time he
7  may not even had skills trainers. He may have been short
8  staff. At some point he had skills trainers who couldn't
9  sign. At some point he had skills trainers who could sign.
10 He may have even had a deaf person at that -- no, not at
11 that point because he was already falling apart. I think
12 when things were well is when he had the person who was
13 deaf and hard of hearing. He had a couple really dynamic
14 young women who worked really hard and were very committed
15 to him.
16 Q. Do you know what their names are?
17 A. If you ask me, I can affirm or deny. I don't remember
18 names off the top of my head.
19    Then I think there was -- you know, there's turnover
20 in this field. I think there was a wholesale change for
21 him, a new teacher. Same peers, he had the same boys in
22 his classroom. He was in the same classroom with the same
23 children, which is why I kept seeing him. I was there for
24 someone else. He had the same peer group in his fully
25 self-contained.

Page 73
Deposition of Kimberly Smalley, Ph.D.; 7/27/06    73
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1     I think the last time I saw him -- second to last time
2  I saw him, he may have actually been short staff. I think
3  that was one of the issues. I know at some point I was in
4  contact with HBH -- I believe the woman's name is either
5  Lei or Leilani, but I could be mistaken on that -- about
6  training that they needed, or do they have anybody with
7  this area of expertise? Could they please advertise for
8  somebody with this area of expertise? So I know he was
9  short-staffed. I don't recall if he had no one, which
10 happened quite a bit, or if he just had, you know, a sub
11 who didn't know him.
12 Q. When you say he had no one, and that happened quite a
13 bit, what do you base that on?
14 A. Being there and there being no staff, coming to
15 observe and there being no staff, and then spending the
16 time observing him with his mom, which is also very useful,
17 but clearly that's not what I expected to do, and then just
18 report from the DOE, the consultant, the autism specialist,
19 his mom. Just -- you don't have enough bodies. You don't
20 have somebody hired at this time who knows what they're
21 doing, or being asked to talk to a sub, so here's a new
22 person, and temporary hires. They're going to be subbing
23 for a couple weeks. Can you please give me the rundown?
24 Q. In this time period I'm talking about, before you came
25 out for the last time --

Page 74

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   74
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  A.  The last time.
2  Q.  -- the one before, when you recommended the
3  assessment, did you have any discussions with the mother?
4  A.  Oh, I'm sure I did. I'm sure.
5  Q.  What do you recall?
6  A.  I don't. I mean, I conversed with her quite
7  frequently. I'm sure. We had phone calls, and we probably
8  had e-mails as well.
9  Q.  Do you recall any specific concerns that stand out in
10 your mind? And I'm talking about conversations you had
11 with the mom in this second-to-the-last time.
12 A.  There were lots of concerns. His behaviors had
13 escalated pretty significantly. Bryan didn't used to be an
14 aggressive person. He would -- you know, he was big. He
15 took up all the air in a room. He would throw a tantrum
16 and throw things and make a lot of noise and flap, and he
17 would flail, and he had actually hit people by accident.
18 But he was not someone who would, you know, make a fist and
19 punch you.
20     And in the end, he had learned to be aggressive. He
21 had learned to head-butt, and he had learned to kick, and
22 he had learned to -- I think he bit someone. I know he bit
23 himself. His behaviors had deteriorated pretty -- you
24 know, I'm sure his mother was very, very upset. He was
25 self-injurious. He was aggressive. He had always done

Page 75

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   75
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  property destruction, but now it was bigger.
2     And so whenever something like that happened, she
3  would contact everybody she knew who could help. And
4  then -- so I would either converse with her or potentially
5  with Drew or potentially with Barbara or whoever else was
6  in his life at that point.
7  Q.  Do you know what his mother's background is, if she
8  has a particular background in a profession?
9  A.  She was a DOE employee. She worked at, I think, Risk
10 Youth maybe? Very, very different.
11 Q.  Now this second-to-the-last time --
12 A.  Yeah.
13 Q.  -- did you formulate an opinion as to what was causing
14 this deteriorating behavior?
15 A.  Yeah.
16 Q.  What was your opinion?
17 A.  Well, several factors, but the most important being
18 what we call behavioral drift. His plan had kind of faded
19 away, you know. I don't think it was intentional. But
20 either staff wasn't available, or trained staff wasn't
21 available, or the rules got a little lax, or it was summer
22 school. You know, for a whole variety of explanations, the
23 plan wasn't being followed and wasn't being implemented.
24 His engagement was extraordinarily low. He wasn't doing
25 anything.

Page 76

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   76
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1     At one point in the classroom during my observations
2  for the FBA, I was going through the drawers pulling out
3  materials and, you know, handing his materials off to the
4  skills trainer. Here, he used to know how to do this. He
5  used to know how to do this. Here's a CD ROM, going
6  through the teacher's materials that were in bins going,
7  Bryan can do this. Bryan can do that, because he was
8  literally not engaged at all. He was literally on the
9  floor stimming and urinating all day. So that was huge.
10 And I think they also had the additional problem of his
11 becoming pubescent.
12 Q.  How much did that have to do with it?
13 A.  It was coming. He wasn't at that stage yet. He
14 wasn't a person who's sexually active or masturbating
15 publicly or anything like that, but you could see his body
16 changing. He was obviously more physical, bigger,
17 stronger, faster. And so I said to them very clearly, to
18 everybody, that these toileting issues and these
19 communication issues must be resolved before this boy hits
20 puberty or you're going to have an exponentially different
21 problem.
22 Q.  What was the response at that time?
23 A.  Everybody would agree with me. I mean, the meetings
24 weren't hostile. I think that -- I don't think anybody was
25 in disagreement with anything I ever said. In fact, people

Page 77

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   77
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  were often shaking my hand and going, thank you very much.
2  But the implementation was the problem.
3  Q.  And did you discuss implementation with them? And I'm
4  still limit -- talking about the second-to-the-last time.
5  Did you discuss implementation issues?
6  A.  The second-to-the-last time I had a conversation with
7  HBH, because I -- I don't know. That was either the
8  second-to-last time or the last time when they were pulling
9  their staff because someone had gotten hurt and they
10 weren't willing to do this anymore.
11    I know I talked to his teacher. He had a new teacher.
12 The teacher from Columbus was gone, and the newer person
13 didn't have her skill set. So I know I spent time with --
14 I believe it was a male teacher. But that was -- that was
15 a brief visit. And I don't even recall why I was flown
16 over. I think it was maybe for a training, and then this
17 was something I did on top of it that day.
18    So I don't have a lot of recall about the specifics,
19 but I absolutely talked to school people, consultant
20 people, and family and saw Bryan and went, oh, gosh. Okay.
21 We need to start over. We need -- we need something bigger
22 than just me swinging in and going here, try this.
23 Q.  Did you make any specific recommendation at this time?
24 And that's the --
25 A.  At that -- I'm sure I said go back to doing everything

Page 78

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   78
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 that was working. You know, re-implement the things that
2 used to work. Get him involved. Where are his PECS? Put
3 up icons. Get some visual supports here. Get on line.
4 Learn two signs this week. Learn more. I'm sure I asked
5 everybody I ran into to redo the things that's worked. And
6 I'm also sure I cautioned him and probably told his mom
7 that that would not be enough, that it might get us a
8 handle on things because it would be familiar to him, and
9 he would probably react familiarly -- I can't say it; hope
10 you can spell it -- because he'll remember how to use the
11 PECS and remember the sign, and that should help a little
12 bit.
13     But unfortunately, since I now saw him last, he's now
14 learned that aggression gets his own way. He's now learned
15 if a little property destruction doesn't work, get
16 something really big. He's now learned if someone's trying
17 to get you, be really quick and head-butt him. He got
18 smarter and faster about acting out.
19 Q. When you say "now," you're talking about when you saw
20 him in '04?
21 A. Yeah, just before I wrote the assessment.
22 Q. Okay.
23 A. And I said those things we're gonna have to address.
24 So all the old techniques that worked before, we'll work on
25 the old things. We also have the new problems. So I or

Page 79

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   79
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 someone like me needs to come back, and we need to try to
2 undo this.
3     MR. USHIRODA: Okay. I think this is a good time for
4 a break.
5     THE WITNESS: Okay.
6     (Whereupon, a recess was taken from 10:55 a.m. to
7     11:12 a.m.)
8     MR. USHIRODA: Just kind of administratively, if we'll
9 mark this as 2.
10    (Deposition Exhibit Number 2 was marked for
11    identification.)
12 Q. (By Mr. Ushiroda) Kim, I've handed you what I've
13 marked as Exhibit 2 to your deposition. It is a fee
14 schedule that was provided to me by Mr. Levin's office.
15 A. Uh-huh.
16 Q. Is this your current fee schedule?
17 A. Yeah.
18 Q. Okay.
19    (Deposition Exhibit Number 3 was marked for
20    identification.)
21 Q. (By Mr. Ushiroda) Kim, I have handed you what I've
22 marked as Exhibit 3 to your deposition. And it is a
23 21-page document entitled Behavioral Assessment.
24 A. Yes, it is.
25 Q. And there is another section that starts at page --

Page 80

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   80
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 A. Fourteen.
2 Q. -- 14 called positive behavioral support plan.
3 A. Yeah.
4 Q. The document is dated August 18th, 2004.
5 A. Okay.
6 Q. And it's on Child and Family Service letterhead. Is
7 this your report?
8 A. Yes.
9 Q. Okay. And if you'd look at page 13, is that your
10 signature?
11 A. Sort of. They're allowed to sign for me, so yes, this
12 is my document, and my signature is probably stamped
13 though.
14 Q. Oh. And when you say "they," who are you referring
15 to?
16 A. The subcontractors, the people I work under. I'll
17 give them a stamp because I'll e-mail this report or fax
18 it -- it was faxed in this case. You can tell by looking
19 at it -- and they stamp my name on it.
20 Q. And this time it would be Child and Family Services?
21 A. Correct.
22 Q. And page 46, the last page, is that also your stamped
23 signature?
24 A. Yes.
25 Q. And did you prepare this report?

Page 81

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   81
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1 A. I did.
2 Q. Now when we broke the last time, we were talking about
3 the -- the second-to-the-last time period where you made
4 the recommendation for an assessment. I think subsequent
5 to that, now I believe we're coming into the '04 where you
6 have more contact with the family; is that correct?
7 A. Actually, I had more contact with the school because
8 part of the assessment is spending a bunch of time
9 observing. I also observed him with his mother. I also
10 observed him in the community. But I spent -- for the
11 purposes of this, I did quite a bit of observation.
12 Q. For the purposes of your report -- and when I say
13 "report," I'm gonna refer to the --
14 A. Yeah, FBA.
15 Q. -- yes, the August 18, '04 report, which is Exhibit 3,
16 just so we're clear for the record.
17    What did you do to prepare for this report, to prepare
18 this report?
19 A. There's a sort of standard protocol for a functional
20 behavior assessment.
21 Q. Okay.
22 A. This is a nationally recognized best practice. This
23 is what you do to figure out why someone is having some
24 behaviors, what they don't know, and what we're going to do
25 about it. It typically includes some direct observation;

Page 90

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   90
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  the skills trainers, this is material he has mastered. He
2  may be ignoring you because he's sick of seeing it.
3      They would say back to me, we don't know what to do.
4  We have no materials, no instruction. No one is helping
5  us. No one is telling us what to do. I would give them
6  some things to do, that way I could watch how Bryan
7  responded and take notes on that. That involved literally
8  like setting up the computer. The skills trainer and I
9  were trying to put the computer back together so they could
10 then work on it so I could know whether Bryan knew what he
11 was doing or not or protested doing it. It was very, very
12 unfortunate.
13     There was an ECSY, extended classroom school year,
14 going on that Bryan would typically be a part of, but due
15 to the extreme nature of his behavior, the IEP team -- I
16 don't know whose decision it was, but it was an IEP
17 decision to isolate him, so he was being educated by
18 himself one-on-one. That was even harder. He didn't have
19 any friends. He didn't have any activities. He didn't
20 have anything interesting to do. He wasn't motivated by
21 anything that there was, so it was just long periods of
22 down time.
23 Q. Did you -- let's back up. I know the report is dated
24 in August '04, and you said -- when did you first come to
25 see him?

Page 91

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   91
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  A. I started the observations at the end of the school
2  year, and 'cause I had talked to the school year teacher
3  and then his summer school teacher, so I'm thinking,
4  without having my time sheets in front of me, probably
5  June, July, August.
6  Q. Okay.
7  A. Ideally the report would have been done in the school
8  year, you know, but there was some snag about getting me
9  started right near the end of the school year, so tail end
10 of the school year and through summer school.
11 Q. Okay. Now I assume Bryan had an IEP in place?
12 A. Uh-huh.
13 Q. Were you familiar with that, the current IEP?
14 A. At that time. I don't have it in front of me, but
15 yes.
16 Q. And I suppose that the -- they're supposed to follow
17 this IEP?
18 A. Yes. That would be their legal document.
19 Q. Okay. Was it being followed?
20 A. No.
21 Q. Okay. In what way wasn't it being followed?
22 A. In any way.
23 Q. Okay.
24 A. It was -- the implementation was very, very poor.
25 Q. Okay. Was that the problem, the implementation?

Page 92

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   92
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  A. Was that the -- there were many problems, and that was
2  certainly probably the biggest of them.
3  Q. Okay. What were the problems -- why was the
4  implementation a problem at this point?
5  A. Why -- well, there was no structure, no materials, no
6  teacher with expertise in Bryan's needs. The skills
7  trainers lacked the expertise to work with him, lacked the
8  training to work with him. Some of them lacked the mere
9  fortitude to work with him. There was limited to no sign
10 language. At one point there was a staff person who had
11 some sign language. I worked with her a little bit. But
12 for the most part, everything about his plan that we had
13 agreed to and done successfully sometime in the past had
14 just completely dissipated.
15 Q. And did you come to find out why, why that happened?
16 A. I was besides myself at the time, and I kept asking
17 why. And like I said, I called the training person at HBH,
18 and I spoke to the DOE person, and I believe the
19 explanation was just turnover. You know, people -- didn't
20 have people, and they didn't have people -- the people they
21 did have didn't have the background that the previous
22 people who served him had had.
23 Q. In this occupation, being skills trainer, is there a
24 high turnover rate in this field?
25 A. Yeah. For people who are challenging, I think if you

Page 93

Deposition of Kimberly Smalley, Ph.D.; 7/27/06   93
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  don't have the right training and right support, you move
2  on to someone easier.
3  Q. Okay. In terms of the number of skills trainers
4  available in the Kona area, is that a -- a limited
5  resource?
6  A. I don't know that myself personally. I'm under the
7  impression that it is. During this report, he did have
8  staffing. He had two-on-one staffing. There were bodies
9  there. They just didn't know what to do and weren't doing
10 it when they were given the information to do it.
11 Q. Do you get the sense that they were trying?
12 A. Some of them. Some of them no.
13 Q. Okay. Do you have any names of the skills trainers
14 involved?
15 A. I remember spending a lot of time with a gentleman
16 named Sven, and I remember that because it's a Scandinavian
17 name and he had an accent.
18     There was a young woman whose name I don't know, and
19 it's horrible to identify her this way, but she had very
20 large breasts, and Bryan was very, very interested in her
21 breasts. So I remember talking to her about what to wear
22 and how to keep distance from him and how to support him
23 without touching him.
24     There was an older woman who -- and by "older" I mean
25 that these other two people were kids -- were young. I

1 don't know how old she was. She was a grown-up. She was a
2 mom. And I remember she had effort, you know, and she was
3 willing and interested in learning sign language, and I
4 remember coming and showing her signs when I was there.
5    But even with all that, every time I came to see
6 Bryan, he was laying on the floor, stimming, in his own
7 urine or feces. It was -- I mean, it was neglect.
8 There's -- I was very upset, and I took it to the DOE, and
9 I called HBH, and I tried to help these individuals to do a
10 better job. It wasn't good.
11 Q. Okay. Who did you speak to?
12 A. Whoever would be down the hallway in the SSC's office.
13 Again, if you give me names, I will recognize them.
14 Q. Kate Tolentino?
15 A. Was she SSC? I know that name --
16 Q. I don't know.
17 A. -- but I'm not sure what role. I would -- for ESY
18 summer school, the office was three doors down. I would go
19 down and I would say, okay, here's -- you know, he's locked
20 in the room. He's all wet. Nobody's doing anything with
21 him. And, you know, I would pass that information on. I'm
22 obligated to report. I would pass that information on.
23    I know I called. And again, I think the woman's name
24 is Leilani. Hopefully that's not the new trainer versus
25 who the trainer was at that time. I called CFS, said, your

1 people need Problem Solver training in crisis prevention.
2 I know I recommended other names in my report. It's a
3 different acronym, same name, but also Problem Solver
4 because those are people working with severe cognitive
5 disability.
6    CPI, the intervention the State uses, relies more with
7 people with language. They teach you how to talk somebody
8 down. If you're dealing with someone with a mental illness
9 or someone who's irate, you might have the ability to talk
10 them down where if you're dealing with somebody with no
11 receptive language skills or limited receptive language
12 skills, blah, blah, blah. Doesn't matter what you're
13 saying. That whole part of your training isn't going to
14 help you in this instance where Problem Solver focuses a
15 little bit more on developmental disabilities.
16    I recommended HBH, I can train you. I recommended
17 other people that can come out and provide training for
18 their staff. Actually, at that time I was in conversation
19 with HBH about providing some training for them just
20 globally as an agency, not specific to Bryan, but clearly
21 Bryan would have benefitted, and that never came to
22 fruition.
23    At some point in there, that short time frame, they
24 just -- Bryan accidentally knocked someone's tooth out, and
25 it really was accidental. He was also aggressive at this

1 time, but in this particular incident he was flailing, and
2 he elbowed a woman and knocked her tooth out. And that was
3 an expensive, you know, workmen's comp claim or whatever it
4 was for HBH, and I think they -- I don't know. This is my
5 opinion. I think they came to the conclusion that they
6 cannot serve this child safely, and then they stopped
7 serving him.
8 Q. Okay. I'm sorry. You said you came --
9 A. I think they came to this conclusion. I had called
10 HBH and said, you know, help. And the person I spoke to
11 said, we're not gonna do this anymore. So they didn't need
12 me to come train his staff because they weren't going to
13 continue serving him.
14 Q. And you base that on?
15 A. Known conversations.
16 Q. And you -- okay.
17 A. Everybody recognized that bad things were happening.
18 The DOE, the providers, the parents, everybody was very
19 upset. They just couldn't see -- they just couldn't seem
20 to find a way out of it. And that's where I hoped that if
21 I wrote a big assessment with all the instructions and all
22 the how-to that they would have something to work from and
23 that we could, you know, hopefully turn some of this
24 around.
25 Q. That's why they called you; is that correct?

1 A. Well, I think the parents insisted they call me
2 because I had prior experience with Bryan.
3 Q. How do you know the parents insisted that the DOE
4 called you?
5 A. Well, because they called me if I had been procured,
6 or they sent me an e-mail probably if I had been procured.
7 Well, I don't know anything about it yet. This was prior.
8 I wasn't in the IEP where the decision was made to purchase
9 me, if that's what you're asking.
10 Q. Okay. Now this report, was it meant to assist the IEP
11 team in implementing --
12 A. The IEP?
13 Q. -- the IEP?
14 A. Any assessment is meant to assist the IEP team to
15 implement the IEP. And you get all kinds of outside
16 assessments to supplement: OT assessment, speech
17 assessment; in this case, OT assessment.
18 Q. You were contacted in this case by who?
19 A. Child and Family Services.
20 Q. And they are --
21 A. They are a prior of the Department of Education's
22 intensive services contract, autism.
23    When the Department of Ed in any state finds
24 themselves in a situation where they cannot provide
25 services, they were supposed to provide it themselves; but

Page 138
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   138
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  A. Okay.
2  Q. The first section is the behavioral assessment
3  section, and it's -- the first two pages is background.
4  A. Yeah.
5  Q. And I think that -- that's provided from your --
6  that's gleaned from your data collection and your
7  interviews and such?
8  A. And I mean, most of it's from record review as well,
9  how old he is and what meds he's on and interviewing
10 people. It's a little synopsis of who he is. It's a quick
11 picture so if someone were reading this without having met
12 him, they would have a picture before they got into what
13 the issues are.
14 Q. Now on page 2, if you could -- well, let's take a look
15 at page 1. I'm sorry.
16 A. Uh-huh.
17 Q. In the second paragraph, the first line, it talks
18 about how Bryan knows what he wants and has acquired some
19 expressive --
20 A. Yeah.
21 Q. -- communication skills. In there you said he
22 actively uses between 20 and 50 signs?
23 A. Yeah. So that would be me counting literally what I
24 saw him use, because you don't take anybody's word on
25 anything. So I -- I understand from the list that his

Page 139
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   139
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  teacher has provided me and what Drew has provided me and
2  what mom has provided me that he has well over a hundred.
3  At that time during this assessment I was able to count,
4  you know, 20 -- between 20 and 50 signs on any given day,
5  you know, of the observation period. And that might have
6  been a whole day, but different signs, so that you know the
7  breadth of his vocabulary.
8  Q. And at this point in time were they also using visual
9  supplements?
10 A. Oh, yes, always.
11 Q. And that is something you also stressed should be
12 incorporated?
13 A. Yes.
14 Q. What are -- you mentioned something earlier in the
15 morning. Is it PECS?
16 A. Picture Exchange Communication System is a named brand
17 model of teaching specifically young people with autism.
18 There's sort of this window of opportunity to teach
19 somebody who doesn't communicate how to communicate.
20 Everybody communicates. If you can't communicate language,
21 you communicate behavior. If you don't stretch these
22 muscles by a certain time, you're very young, you're not
23 going to. There are very few, you know, sort of Helen
24 Kellers who learn to enunciate late in life. You really
25 need to be able to use your voice young. If you don't, or

Page 140
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   140
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  even if it's not your primary means of communication, you
2  have to have a way to talk to people.
3      So there's a whole variety of options available to you
4  depending on your cognitive ability. You may have a
5  computer that speakers for you, a picture system that you
6  could point and touch. If you go to McDonald's right now,
7  they have a picture menu; so if you're a non-English
8  speaker or nonverbal people, you can go, I want a hamburger
9  and fries. They're standardly made in restaurants right
10 now.
11     People who have autism in particular tend to, as a
12 class, not be good at auditory processing.
13 Q. Why is that?
14 A. It's a symptom of the disability. There's also, in
15 particular, if -- you could have a central process auditory
16 deficit and not have autism. But most people with autism
17 also have difficulty with auditory processing. They're
18 visual thinkers. They're visual learners.
19 Q. It's not that such a person would have a hearing
20 impairment. It's just --
21 A. You know, in the olden days people would get
22 misdiagnosed as having a hearing impairment. It's not that
23 they can't hear, although I suppose anybody could also be
24 hearing impaired.
25 Q. It's just not their primary --

Page 141
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   141
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  A. It goes in. They don't compute. They hear your
2  volume. They don't necessarily know what you said.
3      Adults with autism who do not have retardation have
4  written books and explained what this is like for them.
5  They'll focus in on just some of the words in your
6  conversation. Blah, blah, blah, blah, blah, white. Blah,
7  blah, blah, blah, blah, eat. So they'll miss the whole
8  content of what you said because the words they focus in on
9  were not important ones.
10     So there are some experts in the field who have
11 created some wonderful tools to help people understand and
12 speak, and PECS is one of them, and it's a best practice.
13 Q. And was that being use? Was that being used with
14 Bryan?
15 A. No. Yes and no. It had been used with him. He had
16 been instructed into it. The materials were there. In the
17 middle part of the time I knew him, when he had really kind
18 of gone ahead with sign -- and in fact, in here I caution.
19 I said, don't forget to use the visuals, too, because he
20 was so expressive with his hands. But you still need to be
21 able to hand the picture of the catsup bottle to the clerk
22 at Safeway because she's not going to recognize your sign
23 language when you ask, what aisle? Make sure you carry his
24 visuals with him. That kind of thing you'll see in here.
25     But at the time he was having the most difficulty, it

Page 142
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   142
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***
1  wasn't being used at all. I couldn't find them. I had to
2  go through drawers and find the icons and find the book.
3  Q.  Did you get an explanation as to why they weren't
4  being used?
5  A.  I got some excuses. I got some, hey.
6  Q.  Well, I'm interested to hear what you --
7  A.  Yeah, no, I got either, it's not my job, not my
8  problem. Oh, oh, I don't know. No one told me. I don't
9  know where they are.
10      And to their defense, they really weren't on the wall
11  where they should have been. So maybe some kid pulled them
12  down or the teacher put them away at the end of the school
13  year where there was a change of staff or somebody moved
14  something. But I literally went through that room and
15  found one icon in the bottom of this drawer, one icon under
16  the bench, you know, and pulled these materials together.
17  Said, here, use these until we find the rest.
18  Q.  How long had this situation been -- how long had this
19  situation existed before you got there?
20  A.  That I don't know. I mean, according to the family,
21  quite some time. And they were very frantic, and that's
22  why they were insisting that I come back.
23      I do know there was a lag time when they thought I was
24  coming back until I actually got there where everyone had
25  heard that I had been procured but me. So some time, quite

Page 143
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   143
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***
1  some time.
2  Q.  But you don't --
3  A.  Personally, I don't have a date.
4  Q.  It's just based on what the parents had told you?
5  A.  No, the skills trainers, too. I don't know. I just
6  got told to come here. I don't know what I'm supposed to
7  be doing.
8  Q.  Do you recall which skills trainers told you that?
9  A.  Lots of them.
10 Q.  I'd like some names if you do have some.
11 A.  The chesty woman, the -- Sven definitely didn't know
12 what he was doing, another male staff person in that time
13 frame.
14     As I said, there was an older woman who had more
15 skills herself. Like she came with a better skill set, but
16 she also said that no one had given her any particular
17 instruction or any particular training. She was doing what
18 she knew to do. I think she was an EA in another school
19 room during the school year.
20     I got some kind of unilateral information that they
21 needed some instruction.
22 Q.  Who was supposed to provide that instruction?
23 A.  The ISE, the autism consultant from the district, and
24 the teacher. There was no teacher at that point. The
25 teacher I had spoken to at the end of the school year

Page 144
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   144
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***
1  probably needed some help himself. He did -- he did fun
2  things like sing songs and play games, but as far as having
3  systematic instruction with materials around the room, they
4  did not appear to be present just based on my observations
5  and questions I asked him and the materials he produced.
6  Q.  Do you recall his name?
7  A.  No, I'm sorry. But that would also be easy to figure
8  out.
9  Q.  Who was the autism consultant?
10 A.  I think -- Drew, Drew Copeland at that point.
11 Q.  Did you talk to her?
12 A.  I talked to Drew extensively. She told me the things
13 she had asked them to do. She told me the things she asked
14 of the DOE. She explained her own frustration with
15 materials going missing, nobody having board making, the
16 program to print it out, not being able to get to the
17 laminator, nobody's going to pay for Velcro, foolish stuff.
18     But she herself was also very frustrated with the way
19 things were standing. I said to her, this is your job. I
20 have your job. I've sat in your shoes before. We need to
21 find a way to get this done. She would agree with me.
22 Yes, I agree with you. Help me.
23 Q.  And at that time was Drew an employee of the DOE?
24 A.  I don't know. I don't -- I think she was ISE, in
25 which case she would have been an employee of the provider

Page 145
Deposition of Kimberly Smalley, Ph.D.; 7/27/06   145
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***
1  agency the DOE was paying to do this job, if I have it
2  right. Barbara Coffman would have been her cohort; right.
3  Would have been the two of them responsible for making this
4  happen. I think she was the DOE employee at the time.
5  Q.  Did you speak with Barbara?
6  A.  Yeah, spoke with Barbara.
7  Q.  What did Barbara have to say?
8  A.  People -- I don't remember particularly what she said,
9  but everybody gave me the same impression that, yeah, it's
10 bad.
11 Q.  But what were they doing about it?
12 A.  Yeah, yeah, not a lot.
13 Q.  Well, what did Barbara say about what the DOE --
14 A.  As I recall, Barbara was struggling with the system as
15 it works or doesn't.
16 Q.  Okay.
17 A.  She was on working rapport with the family. She felt
18 she had a good rapport with the family. I think she had
19 worked in another capacity with them before. But, you
20 know, she's an employee, and she can only work within the
21 constraints of what's available to her.
22 Q.  Okay.
23 A.  I think every -- I won't say everybody. I think a lot
24 of people just put it back on the skills strainers.
25 There's a lot of passing of the buck. Well, HBH needs to

## Page 146

1  train their people. Or I told them what to do; they're
2  just not doing it. I would say, well, then stand there in
3  the room and show them how to do it. Then I also stood
4  there in the room and showed them how to do it, and it
5  didn't get done. It was --
6  Q.  Well, whose responsibility was it to make sure that
7  the skills trainers were doing what they were supposed to
8  be doing?
9  A.  Well, the ultimate responsibility is the teachers.
10 The DOE pays other people to be responsible as well, such
11 as Drew and such as Barbara.
12 Q.  Okay.
13 A.  And then of course HBH, the agency at the time -- and
14 I don't mean to -- I'm pretty sure it was HBH providing all
15 the people at that time, but it also could have been TIFFE
16 and CFS staff. Those three agencies are responsible for
17 training their people and meeting this contractual
18 obligation. The DOE's paying for a service. They need to
19 be provided that service. So lots of chiefs.
20 Q.  Okay. So lot of agencies involved?
21 A.  Yeah. It was tough. Coordination was definitely a
22 problem.
23 Q.  Okay. Now going back to the first page, that middle
24 paragraph where you talked -- you said he used between 20
25 and 50 signs --

## Page 147

1  A.  Uh-huh.
2  Q.  -- did he use these functionally? I mean, to
3  engage --
4  A.  He would -- he would -- you would have to initiate.
5  He could sign toilet. Of course, that's his favorite thing
6  to do. It's not just like you and I would say, excuse me,
7  may -- I need to use the bathroom. He would ask for the
8  bathroom. He could ask for a drink of water. He could ask
9  for a variety of foods. If he had a need, he had one or
10 two signs he could string together to get that need met.
11 Eat cracker. Want out. But then if you engaged him, you
12 could get a lot more out of him.
13 Q.  So he didn't sign -- well, did he sign spontaneously?
14 A.  Yes. That's what I just said. He could turn to you
15 and say --
16 Q.  I want this?
17 A.  -- want eat. But for the most part, for anything
18 above and beyond meeting an immediate need, you're gonna
19 start the conversation.
20 Q.  And this was supposed to be coupled with the visual
21 supports, the PECS?
22 A.  Absolutely. Both should have been pervasive in his
23 environment.
24 Q.  Okay. Kind of go hand in hand?
25 A.  I would say his receptive skills were both pictures

## Page 148

1  and sign, and his expressive skills, he chose to use sign
2  more frequently. And if that's what works for him and
3  that's what he wants to use, then that's what we have to go
4  with. We can use that system once he's proficient to turn
5  around and teach him another one. Now he's learned a sign.
6  We can teach him to use visuals or read. This is a word.
7  This word means that sign. But you have to be fluent in a
8  language before you can learn a second one. But Bryan's
9  mind-set and what he found to be easiest and most efficient
10 was sign language, so that had to be his first language.
11 Q.  How did you come to that conclusion?
12 A.  Over the time I've known him and all the assessments I
13 did and the tremendous and speedy progress he made in
14 picking up sign language.
15 Q.  So it's based on your observation?
16 A.  Absolutely.
17 Q.  Okay.
18 A.  Not just mine. His speech therapist will tell you the
19 same thing.
20 Q.  Who was his speech therapist at this time?
21 A.  I don't know. You're gonna have to look it up on the
22 IEP. It was on the IEPs over those various meetings.
23 Q.  Okay. That could easily be discerned from the
24 records?
25 A.  Yeah, it would be the last page of the IEP. It would

## Page 149

1  be there.
2  Q.  Okay. Now based on your last contact with Bryan, do
3  you think he has the capability to become fluent in sign
4  language?
5     MR. USHIRODA: Oh.
6     THE WITNESS: He can't hear you.
7     MR. LEVIN: I didn't hear.
8     THE WITNESS: Didn't hear.
9     MR. USHIRODA: Oh, okay. He didn't hear.
10    I apologize. I'll speak up.
11 Q.  (By Mr. Ushiroda) Based on your last contact with
12 Bryan, which was, I guess --
13 A.  Summer.
14 Q.  -- summer of '04, and based on all your observations
15 of him, do you think Bryan has the ability or -- to become
16 fluent in sign language?
17 A.  Again, fluent means something specific in sign
18 language acquisition. Do I think he's gonna go to
19 Gallaudet, school for the blind, deaf? No. Do I think
20 he's gonna go to, you know, deaf pizza night at the local
21 bar? Of course he could. He already has enough
22 language -- or had, I should say, enough language to
23 express himself, and he could absolutely have expanded that
24 had he continued to be in an environment with people who
25 used sign language proficiently or fluently, preferably

**CERTIFICATE OF SERVICE**

      I certify the attached document was served electronically via CM/ECF on the date indicated below addressed to:

Gregg M. Ushiroda gushiroda@wik.com
Daniel K. Obuhanych dobuhanych@wik.com
Leighton M. Hara lhara@wik.com, rgeorge@wik.com
Watanabe Ing & Komeiji First Hawaiian Center 999
Bishop St 23rd Flr Honolulu  HI 96813

Holly T. Shikada holly.t.shikada@hawaii.gov,
Cheryl.H.Oeda@hawaii.gov,
michael.t.burke@hawaii.gov
Deputies Attorney General
235 S. Beretania, Room 304
Honolulu HI 96813

Attorneys for Defendants

DATED: Honolulu, Hawai'i, January 14, 2008.

                                            /s/ Carl M. Varady
                                            Carl M. Varady