ORIGINAL

ROBERT A. MARKS
Attorney General of Hawaii
State of Hawaii

CHARLEEN M. AINA
RUSSELL A. SUZUKI
A. SONIA FAUST
STEVEN CHANG
BLAIR GOTO
HEIDI RIAN
Deputy Attorneys General
State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Telephone:  (808) 586-1500

Attorneys for Defendants

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 2 5 1994

at 9 o'clock and 20 min. A.M.
WALTER A. Y. H. CHINN, CLERK

LODGED

OCT 2 4 1994

CLERK, U. S. DISTRICT COURT
DISTRICT OF HAWAII

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

JENNIFER FELIX, by her
Mother and Next Friend,
FRANKIE SERVETTI-COLEMAN;
et al.,

          Plaintiffs,

    vs.

JOHN WAIHEE, in his official
capacity as Governor of the
State of Hawaii, et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO. 93-00367-DAE
(Class Action)

ORDER GRANTING JOINT
MOTION FOR APPROVAL
OF SETTLEMENT AND
CONSENT DECREE, AND
APPOINTING SPECIAL
MASTER; EXHIBIT "A"

ATTEST: A True Copy
WALTER A.Y.H. CHINN
Clerk, United States District
Court, District of Hawaii

By _Barbara Y. Yamada_
                Deputy

## ORDER GRANTING JOINT MOTION FOR APPROVAL OF SETTLEMENT AND CONSENT DECREE, AND APPOINTING SPECIAL MASTER

On July 27, 1994, the parties filed a Joint Motion for Preliminary Approval of Settlement and Consent Decree and For Order Approving Notice to Plaintiff Class and Allowing Initial Development of Implementation Plan.  A proposed consent decree (7/27/94 Draft) was attached to the motion as Exhibit "A."

B

By an order filed herein on August 4, 1994, Defendants were required to publish a court-approved notice to the class in certain specified publications, informing class members of their right to file objections to the settlement which the named parties proposed under Fed. R. Civ. Proc. 23(e), and of the hearing on the joint motion.

The hearing for which notice was given was held on October 11, 1994 at 2:15 p.m., before the Honorable David A. Ezra. Shelby Anne Floyd, Eric Seitz, Jennifer Schember-Lang, Susan Cooper, and Carl Varady appeared on behalf of their respective named plaintiff clients and the plaintiff class, and Charleen M. Aina and Russell A. Suzuki, deputy attorneys general, State of Hawaii, appeared on behalf of the Defendants.

By their Memorandum Re Final Approval of Consent Decree, Plaintiffs urged the Court to immediately approve the proposed consent decree and the amounts of attorneys' fees the Defendants and four of the five firms representing plaintiffs agreed were reasonable for work performed through May 31, 1994.

By supplemental memorandum and accompanying declarations, the Attorney General confirmed that the notices Defendants were required to publish had been published, and that only one untimely response from an individual who did not appear to be a member of the plaintiff class had been received.

By Exhibit "C" to the Defendants' supplemental memorandum and the declarations of Shelby Anne Floyd, Jennifer Schember-Lang, Susan Cooper, and Carl M. Varady, the Court was informed

that the amounts of reasonable attorneys' fees payable by Defendants to four of the five firms for work performed on behalf of the plaintiffs and the plaintiff class through May 31, 1994, had been jointly agreed upon as follows:

| | |
|---|---|
| Alston Hunt Floyd & Ing | $192,096.03 |
| Protection & Advocacy/Schember-Lang, Esq. | $27,937.50 |
| Eric Seitz, Esq. | $43,575.00 |
| Disabled Rights Legal Project/Cooper, Esq. | $14,812.50 |

Based upon the Court's review of the proposed consent decree, the memoranda and exhibits accompanying the joint motion and the memoranda, declarations, affidavits and exhibits filed since the joint motion's filing, the pleadings on file in this case, and the Court's discussions with counsel for the parties at hearings and in chambers on various occasions,

IT IS HEREBY ORDERED that

1.  The settlement of this class action as set forth in the consent decree attached hereto as Exhibit "A," is approved; in addition, the provisions of the consent decree are incorporated herein and made a part of this order, and they shall be effective as of the date of this order;

2.  Within twelve (12) days of entry of this order, the Defendants shall pay the following amounts to the following law firms/attorneys as the balance of reasonable attorneys' fees payable to them for their representation of the plaintiffs and the plaintiff class through May 31, 1994:

| | |
|---|---|
| Alston Hunt Floyd & Ing | $46,724.07 |

Protection & Advocacy/Schember-Lang, Esq.     $3,000.00

Eric Seitz, Esq.                               $15,930.00

Disabled Rights Legal Project/Cooper, Esq.     $3,562.50

There being no further agreement between Defendants and Carl M. Varady, Esq., other than that manifest by the Defendants' June 30, 1994 payment of $18,963.00, Mr. Varady may file a motion for the payment of reasonable attorneys' fees accrued for that same period within thirty (30) days of the filing of this order.

3.    Pursuant to Fed. R. Civ. Proc. 53, Jeffrey S. Portnoy, Esq., is appointed to serve as special master during this Court's retention of jurisdiction over this matter.  The special master shall be compensated at no more than $200 per hour and actual costs disbursed, for work performed pursuant to this appointment. The special master shall submit an invoice to the Court, and serve one copy each upon the Superintendent of Education and Director of Health, or their respective designees, after the last day of any month in which services are provided.  The Defendants shall have 10 days after service of the invoices to pay the invoice in full or to file a motion in the Court objecting to all or any portion of the compensation for which the special master seeks payment.

4.    The special master shall perform those tasks which are designated in the consent decree to be performed by the Court, including receiving the recommendations of the Monitor concerning enforcement or compliance (paragraphs 44 f and h), ex parte communications from the Monitor (paragraph 46), appeals from the

parties from decisions of the Monitor (paragraph 47), and petitions from a party requesting the dismissal of the Monitor (paragraph 48); determining the amount Defendants shall be required to pay for all necessary expenses of the Monitor, Technical Assistance Panel, and their staff, during each fiscal year that the consent decree is in effect (paragraph 50); determining a party's compliance with the provisions of the consent decree (paragraph 51); and resolving matters which the parties are unable to resolve by mutual consent (paragraph 55). From time to time, the Court may also require the special master to review requests for payments of attorneys' fees and costs and determine their reasonableness (paragraph 54). Every determination or resolution of a matter which the special master makes pursuant to this order shall be conveyed as a recommendation to the Court, in a report submitted to the Court, with copies served upon all parties. Within ten (10) days after being served with a copy of the special master's report, a party may serve and file objections to the report, and the Court shall

consider such objections de novo and may set aside or modify any portion of the special master's report.

DATED:    Honolulu, Hawaii, _____ OCT 2 5 1994 _____.

_____
JUDGE OF THE ABOVE-ENTITLED COURT

APPROVED AS TO FORM:

_____
Shelby Anne Floyd
Mary Martin
Susan Cooper
Eric Seitz
Carl M. Varady
Jennifer Schember-Lang

Attorneys for Plaintiffs and Plaintiff Class

Order Granting Joint Motion for Approval of Settlement and Consent Decree, and Appointing Special Master; Exhibit "A"; Felix et al., v. Waihee, et al., Civil No. 93-0367DAE

<u>CONSENT DECREE</u>

I.    <u>Introduction</u>

1.    Plaintiffs, and Defendant Waihee, Defendant Sybinsky in his capacity as Acting Director, Department of Health ("DOH"), and Defendant Aizawa in his capacity as Superintendent of the Department of Education ("DOE") (hereinafter "the parties") have consented to the entry of this Decree as an order and judgment of the Court.

2.    The parties' agreement to entry of this Decree is the outcome of negotiations and bargaining.  Both the Plaintiffs and the Defendants have made concessions that they believed were unnecessary in light of prevailing law and the facts of this case.  Likewise, both Plaintiffs and the Defendants have obtained concessions they might not have obtained from this Court.

3.    In agreeing to the entry of this Decree, the parties intend to ensure that the Plaintiff Class has available to them the free appropriate public education they are entitled to under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401, et seq., and Section 504 of the Vocational Rehabilitation Act, 29 U.S.C. § 729, and that a system of care which includes a continuum of services, placements, and programs following the principles of the Hawaii Child and Adolescent Service System Program ("CASSP") is created for the Plaintiff Class.  At minimum, the DOE shall provide all educational services the members of the Plaintiff Class require, and the DOH shall provide all the mental health services members of the Plaintiff Class may require to benefit from those

EXHIBIT A

educational services.  The Decree emphasizes (1) the affirmative obligations of the DOE and DOH to seek out children who are having emotional or behavioral difficulties in the school setting or who may be eligible for services under Part H of the IDEA to determine their eligibility under IDEA or Section 504, and (2) the creation of partnerships (a) between the DOE and DOH, (b) between the DOE/DOH and other state and private agencies and individuals who provide related services to class members, and (c) between the families of class members and their schools, including alternative placements in programs, facilities and institutions away from their schools.  It also emphasizes coordination of services between responsible agencies, timely and adequate intervention, delivery of services in home- and community-based settings and in a culturally-relevant manner. Its implementation requires initiatives in the areas of service development, training, and quality assurance.  This Decree contemplates that fundamental change will occur wherever necessary to establish a system of care that satisfies the law and the principles embodied herein.  The planning process must be careful and complete.  There may need to be structural change and the assistance of all branches of state government may be called for.

   4. Instead of specifying the precise means for accomplishing these ends, the Decree lays out a set of "operating principles" or "standards" and requires that these principles or standards be incorporated into the new system of care which

Defendants will design and implement by the intermediate and final dates set out in or to be established under this Decree.

     5.   The Decree requires that, by seven months after the effective date of this Decree, Defendants deliver an Implementation Plan to Plaintiffs' counsel for review and approval and subsequent submission to the Court for its approval. The Implementation Plan shall identify the agencies and resources, including funding, which will be required to establish the new system of care.  It shall also describe tasks which must be completed, including rulemaking and the establishment of an interagency computerized data base and information system, and identify steps that must be taken and by whom to complete the plan and establish the new system.  Because this Decree sets in motion a process involving complex and fundamental reforms, this Decree allows the Defendants a period of six years within which to complete the Implementation Plan and make the new system of care fully operational.

## II.  Liability

     6.   On May 24, 1994, the Court entered an Order Granting In Part and Denying In Part Plaintiffs' Motion For Summary Judgment and Granting In Part and Denying In Part Defendants' Motion For Dismissal Or For Summary Judgement, holding that Defendants "have systematically failed to provide required and necessary educational and mental health services to qualified handicapped children of the State of Hawaii in

3

violation of the Individuals with Disabilities Education Act and the Rehabilitation Act of 1973." This holding was based, in part, on the acknowledgement of Defendants of deficiencies in the system of care.

7. The parties acknowledge that the persons currently named in their official capacities will leave those positions, and be replaced by other persons. However, it is understood and agreed that the State of Hawaii, through its elected and appointed representatives in the executive branch, has the continuing obligation to carry out the terms of this Decree, including timetables, irrespective of changes in officials and personnel.

## III. **The Plaintiff Class**

8. The "Plaintiff Class" is "all children and adolescents with disabilities residing in Hawaii, from birth to 20 years of age, who are eligible for and in need of education and mental health services but for whom programs, services, and placements are either unavailable, inadequate, or inappropriate because of lack of a continuum of services, programs, and placements."

9. The parties agree that the Plaintiff Class is currently larger than the numbers currently identified as eligible under IDEA or Section 504, but that all members of the Plaintiff Class cannot be identified or served until there is reform of the system currently in place to serve them.

## IV.  Definitions

10.  For the purpose of this Decree and related documents, the terms are defined as follows and shall be construed as they are used in Section 504 and IDEA, as amended:

a.  assessment - performance of a holistic evaluation of a class member's levels of functioning and a resulting identification of needs, if any.

b.  case management - assuming primary responsibility for coordinating all aspects of the delivery of services under IDEA or Section 504:  identification, diagnosis, assessment, program planning, placement, monitoring, and follow-up.

c.  community-based - services or programs provided in reasonable geographic proximity to a child's residence and in community settings in which children without disabilities may participate.

d.  culturally relevant - services which are planned and delivered in a setting and a manner which recognize and are consistent with the cultural values of the class member and his family.

e.  early intervention services - as defined in 34 C.F.R. § 303.12.

f.  educational services - regular, adapted regular, or special education.

g.  foster home - a family home into which a class member may be placed which provides 24-hour care and

supervision on a short or long term basis for the class member.

h.    guardian - a person or agency appointed under state law.

i.    individualized education program ("IEP") - a written statement which is developed and implemented in accordance with 34 C.F.R. § 300.41 - § 300.350 which includes statements of present levels of performance, annual goals, including short-term instructional objectives, and the specific special education and related services to be provided, including transition services as defined in 34 C.F.R. § 300.18; the projected beginning dates and duration that services will be provided; and objective criteria and evaluation procedures and schedules for determining whether stated instructional objectives are met.

j.    individualized family service plan ("IFSP") - as defined in 34 C.F.R. § 303.340(b).

k.    individualized transition plan ("ITP") - as defined in 34 C.F.R. § 300.346, that portion of an IEP for a class member age 16, or younger when appropriate, which anticipates the class member's movement from school to post-school activities, and describes the types and forms of delivery of transition services to facilitate that move; as defined in 34 C.F.R. § 303.344, that portion of an IFSP for a class member under the age of 4 which describes the types and delivery of transition services a class member needs to facilitate transition into school activities, including preschool.

6

l.    modification plan ("MP") - a written statement describing the specific regular or adapted regular education and related services to be provided a class member who does not require special education, including long- and short-term instructional goals and objectives, and identifying who will provide the services described.

m.    normal - as close as reasonably possible to conditions or circumstances faced by a child who is not disabled.

n.    parent - as defined in 34 C.F.R. § 300.13 and 34 C.F.R. § 303.18.

o.    parent counseling and training - as defined in 34 C.F.R. § 300.16(b)(6).

p.    partnership - a relationship in which the parties work together toward the common goal of enhancing the provision of appropriate services to a child.

q.    recreation - as defined in 34 C.F.R. § 300.16(b)(9).

r.    related services - those services as are required to assist a child with a disability to benefit from special education (34 C.F.R. § 300.16), or that are required by 34 C.F.R. § 104.33, including aids.

s.    residential placement - placement in an alternative residential setting outside the class member's home to provide 24-hour care, supervision and treatment on short or long term basis, including wilderness camps, addiction treatment facilities, etc. See also 34 C.F.R. § 104.33(c)(3).

7

t.    respite - provision of assistance or relief for caregivers of class members.

u.    services - educational and related services, or early intervention services.

v.    special education - specially designed instruction as defined in 34 C.F.R. § 300.17 which is provided in accordance with 20 U.S.C. §§ 1401 et seq., and its implementing regulations and 29 U.S.C. § 794 and its implementing regulations.

w.    surrogate parent - as defined in 34 C.F.R. § 300.514 and 34 C.F.R. § 303.406.

x.    therapeutic foster home - a foster home which is supported by professional therapists and relief personnel.

y.    timely - in accordance with the applicable time requirements of the IDEA and Section 504.

z.    transition services - as defined in 34 C.F.R. § 300.18 for a class member age 16, or younger when appropriate, and as defined in 34 C.F.R. § 303.344 for a class member under the age of 4.

aa.    vocational education - as defined in 34 C.F.R. § 300.17(b)(3).

## V.    Obligations of Defendants

11.    Defendants shall, pursuant to the timetable in this Decree and the Implementation Plan:

a.    Establish a system of care which consists of (1) a system of care of programs, placements and services, and

8

(2) organizational and managerial infrastructure capable of supporting the system, and which, at minimum, ensures that the requirements of the IDEA and Section 504 and the principles and standards of this Decree are satisfied.

b. Develop an Implementation Plan, i.e., a plan of operations with specific goals and a timetable, for establishing the system of care and implementing the requirements of this Decree.

12. Subject to the timetable and other specific requirements in the Implementation Plan, each and every member of the Plaintiff Class is entitled to be treated in accordance with the "principles" or "standards" in Section VI below.

13. Irrespective of the timetable in the Implementation Plan, Defendants shall not decrease the quality or quantity of programs or services available to the class members. The benchmark for measuring compliance with this maintenance of effort requirement is those programs, placements and services in place or for which legislative appropriation had been made as of May 2, 1994. In addition, Defendants shall continue at all times prior to the termination of this Decree to develop additional services, programs and placements as the needs of the Plaintiff Class require.

## VI. Principles and Standards

14. The new system of care which Defendants design and establish shall be designed and shall operate in conformity with the following "principles" and "standards."

      a.   Class members will be provided prompt access to a continuum of programs, placements and services that provides educational, related services or early intervention services appropriate to their age and needs.

      b.   Class members will be served in the least restrictive environment appropriate to their needs.  No class member will be placed on the mainland for services unless it is not possible, through the timely provision of services (including intensive and flexible home-based services and family support), to provide an appropriate program in Hawaii.

      c.   Programs and planning will anticipate the special developmental needs of each class member.

      d.   Programs and planning will be integrated to ensure a seamless delivery of services.

      e.   Where possible, the system's programs, placements, and services will be linked with other service systems in the community, so that planning, financing and service delivery for overlapping services such as education, health, mental health, child welfare, juvenile justice, vocational rehabilitation, etc. are integrated.

      f.   Services will be child and family centered, involving and consulting families in planning, evaluation, training, treatment, and support functions.

      g.   Services should provide as "normal" an environment for children and youth as possible.

      h.   Class members and their families may refuse

10

services to the extent permitted under law.

      i.   Class members and their families will be encouraged and assisted to access services. When class members or their families refuse or fail to access services, the reasons for their doing so shall be assessed and the services that have been offered shall be modified or alternative services will be offered to encourage acceptance of services.

      j.   Class members will be provided individualized services based on each one's unique strengths and needs.

## VII. <u>The System of Care to be Designed and Implemented</u>

      15.   The system will be capable of recognizing the strengths and needs of each class member. Those strengths and needs shall dictate the type and mix of services provided; the type and mix of services provided will not be dictated by the availability of services. Services must be adapted to class members. Services will be developed when they are needed but unavailable.

      16.   Services to class members will be delivered pursuant to an IEP, IFSP or MP which contains a detailed description of all educational, related, or early intervention services to be provided.

      17.   There must be a reasonable prospect that the services provided in response to a class member's needs will achieve their purpose. The services must be of a type and mix likely to be effective in meeting the class member's needs.

      18.   Each IEP, IFSP, or MP will be based on a

comprehensive, individualized assessment of the strengths and needs of each class member, and recognize the environment in which the class member lives.

19.    Each IEP, IFSP, or MP will identify the specific steps to be taken by service providers toward meeting the short-term and long-term objectives stated in the program or plan and will include objective criteria to measure a class member's progress toward the goals and objectives of the program or plan.

20.    The system's infrastructure shall include mechanisms to monitor and shall monitor implementation of each IEP, IFSP or MP, and to immediately update and modify the types and forms of delivery of services identified in them to meet their goals and objectives or to prevent and address deterioration in functioning.

21.    The presence of at-risk factors such as failure to realize social, emotional, or developmental milestones; lack of success or marked change in functioning in social or intervention programs, at home or at school; repeated absences from school; or significant behavioral problems in any of the above environments at home or at school shall be considered indicators of the need for an assessment to determine whether a class member is eligible for special education services, adapted regular education services,  related services, or early intervention services, or whether the educational, related, or early intervention services identified and being delivered in an IEP, IFSP or MP are appropriate in type or quantity.

22.  Class members, parents, and surrogate parents shall be accurately and timely informed, in language understandable to them, concerning:  their rights under the IDEA and Section 504; the contents of an IEP, IFSP or MP, including objectives, the services to be provided, placements, and options.

23.  Provisions will be made for class members, parents, and surrogate parents to be involved in the planning and delivery of services, in accordance with paragraphs a, b and c below.

a.  Each class member shall be treated as a partner in the planning, delivery and evaluation of services if the class member is age 10 or older and, if the class member is under the age of 10, when possible.

b.  Each class member's parents shall be treated as partners in the planning, delivery and evaluation of services if the class member is living with his or her parents, or if his parents' rights have not been terminated.

c.  When necessary, services shall be provided class members and parents to enable them to participate as partners.  Such services shall include advance discussions, scheduling consideration, interpreter's services, assistance with understanding written materials, and other accommodations as needed.

24.  The system shall be sensitive to cultural differences and the special needs of ethnic and racial groups. Services shall be provided in a manner that respects these

13

differences and attends to these special needs.  These differences and special needs shall not be used as an excuse for failing to provide services.

25.  Special education shall be recognized as a service, not a place, and shall be delivered in school-based, home-based, and community-based settings.

a.  Written policies of the system shall reinforce the principle common to the IDEA, Section 504, and CASSP that placements outside a class member's school, community, or the State are the exception not the rule, and must include provisions for maintaining a class member's ties with and facilitating a class member's return to school, community or the State if placement is outside the school, community or State.

b.  Stability in class members' living situations should be promoted.  Written policies will describe when and how class members placed outside their family or community are to be returned to their family and community in the shortest possible time.

c.  The system shall be designed to minimize multiple placements, including educational placements.  Short-term placements shall be used only when they are specifically required to meet the needs of the class member.

26.  The system shall be designed to and shall provide for IEPs, IFSPs, MPs, and programs, placements, and services which minimize regression resulting from gaps or transitions in educational programs or related services, such as spring breaks,

summer vacation, changes in service providers and similar events.

27.    The system shall ensure that services are delivered in a coordinated manner, consistent with the class member's strengths and needs.

28.    Services shall be provided by competent staff, including professionals who meet all relevant professional standards, who are adequately trained and supervised and who have appropriate caseloads.

29.    The system's infrastructure must include quality assurance and monitoring processes to be used by the DOE/DOH to regularly evaluate the system's effectiveness; regular assessments of the system's programs, services and placements shall be made to determine whether they are effective.    It must also include an interagency computerized data base and information system to support the system of care which is implemented.

30.    Any behavior modification program employed in the treatment or management of a class member shall be individualized and meet generally accepted professional standards, including that:

a.    The program rely primarily on rewards for appropriate behavior, instead of punishments;

b.    The program be based on a careful assessment of the antecedents of the behavior that the program is designed to change; and

c.    The program be consistently implemented in

15

school, and out-of-school to the extent possible.

31.   The system shall be designed to inform and train
and shall inform and train persons appointed to serve as
surrogate parents about their obligations and the provisions of
the IDEA, Section 504 and CASSP to enable them to effectively
serve as surrogate parents.   Caseloads of surrogate parents
appointed for class members shall be small enough to permit them
to be actively and effectively involved in the planning and
monitoring of the delivery of educational and related services,
or early intervention services.

32.   Appropriate representatives of the DOE and DOH
shall participate in meetings and similar efforts to plan
appropriate educational, related or early intervention services
for class members.   The system shall be designed to maximize
interfaces with and class members' participation in programs,
services, and placements of other public and private agencies,
and to facilitate cooperation between the DOE/DOH and these other
agencies.

33.   The IEPs, IFSPs, or MPs of class members who are
in foster care shall be coordinated with their foster care
individual service plans.

34.   The system will include programs, placements and
services to promote smooth transitions for class members through
the Part H programs and 3-20 special education programs, and into
post-school activities.

35.   The system shall promote development of skills

16

necessary for the smooth transition of class members to independent living, including, where appropriate, the provisions of vocational education and supportive independent living programs.

36.  Class members shall be provided effective assistance and support in applying for SSI benefits.  Where it is necessary that a class members' parents apply for benefits, such assistance and support shall be provided to the parents.

37.  Early identification and timely intervention in order to enhance the likelihood of positive outcomes shall be promoted.  The system will include processes to ensure that all referrals and requests for an assessment of mental health needs are timely and appropriately responded to.

38.  DOE and DOH staff and the departments' service providers will be given information and training about state-of-the-art methods, strategies, and materials for serving class members and their families.

39.  The system will include and foster strategies to promote the utilization of services by class members and their families, to evaluate the services, their utilization levels and their effectiveness, and to permit ready adjustments to and alternatives for services offered.

## VIII.  Implementation

40.  An Implementation Plan (i.e., a plan of operation which describes the specific design for the new system of care, and includes a specific schedule with critical milestones for

implementing the design) shall be delivered to Plaintiffs'
counsel within seven months after the effective date of this
Decree for review and approval. Plaintiffs shall present the
plan to the Court for its review and approval or, if Plaintiffs
believe changes are required, with a motion to amend the proposed
implementation plan.

41. The system of care required to be established
under this Decree shall be fully implemented and operational by
June 30, 2000. The Implementation Plan shall be developed to
assure compliance with this requirement, and include intermediate
deadlines for this purpose.

42. Defendants shall prepare and submit to the
Legislature such legislation Defendants deem necessary to assure
compliance with this Decree and completion of the Implementation
Plan in accordance with its timetable.

43. Throughout the pendency of this Decree, class
members and their parents, including surrogate parents, shall be
timely and accurately informed in language understandable to them
of their rights under this Decree.

## IX. Monitor, Technical Assistance Panel and Staff

A. Monitor

44. Dr. Ivor Groves shall serve as Monitor of this
Consent Decree. The Monitor shall:

a. Monitor Defendants' efforts to implement the
provisions of this Decree and the Implementation Plan, pursuant
to the Monitoring Plan;

18

b.    Issue semiannual reports concerning Defendants' progress in implementing this Decree and the Implementation Plan;

c.    Otherwise keep the parties apprised of Defendants' implementation of and compliance with this Decree;

d.    Upon request of a party, meet with the party to discuss progress and further measures needed to achieve compliance;

e.    Timely respond to written inquiries from the parties;

f.    Make recommendations to the Court concerning enforcement of compliance;

g.    Develop the Monitoring Plan, with review by and input from DOE, DOH, the technical assistance panel, and necessary design consultants, to measure the Defendants' progress in establishing the new system of care in accordance with this Decree and the Implementation Plan, and the effectiveness of the new system of care as it is being implemented; and

h.    Review complaints or concerns brought to his attention and, if in his professional judgment they raise concerns of a systemic nature that may have an impact on the Defendants' compliance with this Decree, make appropriate recommendations to Defendants so that they may address the situation and, if necessary under subparagraph f of this paragraph or under paragraph 46, to the Court.  Consistent with the class action status of this case, individual complaints shall

19

not be acted upon in this action by the Monitor or the Court.

45.    The Monitor shall have access to all information and documents in the possession of or available to the DOE and DOH which the Monitor may require to perform his job.  Access shall include access to:  DOE and DOH personnel at all levels, class members, service providers at placements in which class members receive educational or related services, and educational or mental health case records concerning class members and their families, as permitted by any further order of this Court.

46.    The parties may have ex parte communications with the Monitor; however, the Monitor shall disclose all communications to both sides if requested.  If the Monitor and the Court so agree, the Monitor may communicate ex parte with the Court on any matter at any time.

47.    Any party who disagrees with a decision of the Monitor which is material to the rights of the parties hereto may appeal that decision to the Court, and the Court's decision on the matter shall be final.

48.    The Monitor may be dismissed and replaced (a) by agreement of the parties or (b) by the Court upon petition of either party when exceptional circumstances are shown.

B.    Technical Assistance Panel

49.    The DOE and DOH shall utilize a technical assistance panel consisting of at minimum Dr. Ivor Groves, Dr. Lenore Behar, and Dr. Judith Schrag to assist the DOE and DOH to design the new system of care and to formulate the Implementation

opened.   Quarterly reports of the expenditures from the account shall be distributed to counsel for all parties within thirty days of the closing of a fiscal quarter.

## X.    Primacy of this Decree and Deadlines

51.   Only this Court shall have the authority to determine compliance with this Decree.

52.   Nothing in this Decree supersedes, or diminishes or qualifies the provisions of the IDEA and Section 504 or their implementing regulations.

## XI.    Attorneys Fees and Costs

53.   Plaintiffs are "prevailing parties" in this litigation and shall recover (a) the expenses of their counsel, (b) reasonable attorneys fees, and (c) the fees and expenses of expert witnesses.

54.   Plaintiffs have represented through billing information submitted by counsel's letter dated June 7, 1994 that attorney fees in the following amounts have been accrued by their respective counsel to date:

| | |
|---|---|
| Alston Hunt Floyd & Ing | $242,288.28 |
| Susan A. Cooper | $18,750.00 |
| Jennifer Schember-Lang | $41,562.50 |
| Eric Seitz | $46,075.00 |
| Carl M. Varady | $31,605.00 |

and that the expenses incurred, including experts fees and costs, are in the range of $90,000 to $110,000.  On the basis of such information, Defendants agree to reimburse Plaintiffs' counsel

22

that there is a reasonable prospect that they will remain in substantial compliance.  If a motion is not brought pursuant to this paragraph to sooner terminate this Decree, and there are no motions pending before the Court concerning compliance or to extend the time for full compliance with this Decree beyond June 30, 2000, then this Decree shall terminate and the Court shall relinquish jurisdiction over this matter on June 30, 2000.

59.  References to the IDEA and section 504 shall be construed to include subsequent amendments to those laws.  Either or both parties may bring motions to amend this Decree if amendments to the IDEA or Section 504 are made.  Provisions of this Decree which are not contrary to any amendment to the IDEA or Section 504 and not incorporated in the Decree by motion of a party or the parties, shall continue to have full force and effect notwithstanding the amendments to the two federal laws. Motions shall be filed with the Court within sixty days of the effective date of the amendments to the two laws.

24

```
1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3    ANN KIMBALL WILES and        )   Civil No. CV 04-00442
     STANLEY BOND, individually   )   Civil No. 05-00247
4    and as next friend of their  )   Consolidated
     son, BRYAN WILES-BOND, a     )
5    minor,                       )
                                  )
6          Plaintiffs,            )
                                  )
7       v.                        )
                                  )
8    DEPARTMENT OF EDUCATION,     )
     State of Hawai'i, and ALVIN  )
9    RHO, in his official         )
     capacity as West Hawai'i     )
10   District Supervisor,         )
                                  )
11         Defendants.            )
                                  )
12   _____)

13

14

15              DEPOSITION OF ALVIN RHO

16      Taken on behalf of the Plaintiff at the offices of

17   Davis Levin Livingston Grande, 851 Fort Street Mall,

18   Honolulu, Hawaii, commencing at 9:07 a.m. on September

19   14, 2007, pursuant to Notice.

20

21

22

23

24   BEFORE:      JESSICA R. PERRY, CSR NO. 404

25               Certified Shorthand Reporter
```

Page 34

1   have been the superintendent over all the island and
2   then reported to the superintendent?
3       A. Dan Sakai would have reported to Pat Hamamoto.
4           MR. ELLIS: At this time we'd like to
5   enter into evidence exhibit -- not in evidence,
6   Exhibit A is a series of emails. They're identified
7   by Bates stamp DOE 1743 to DOE 1754. And they're
8   collectively Exhibit A. That's for you. That's for
9   the witness.
10          (Exhibit A marked.)
11  BY MR. ELLIS:
12      Q. Could you review these emails, please.
13          MR. ELLIS: Let the record reflect that
14  the witness is reviewing Exhibit A.
15  BY MR. ELLIS:
16      Q. You've had an opportunity to review them all?
17      A. Yes.
18      Q. Thank you.
19          Do you recall, other than reviewing them, do
20  you recall them at all?
21      A. No.
22      Q. Look at the last page of the exhibit, the last
23  page, DOE 1754. This was dated October 6th, 2000.
24  Were you -- you were a deputy superintendent at that
25  time?

Page 35

1       A. I believe so.
2       Q. And that was for the west side?
3       A. Yes.
4       Q. So it would -- having -- providing TA's would
5   be information that would be relevant to your job?
6           MR. USHIRODA: Objection. Vague and
7   ambiguous.
8           THE WITNESS: I believe so.
9   BY MR. ELLIS:
10      Q. Do you know if this was the first time Bryan
11  Wiles-Bond's case was brought to your attention?
12      A. No.
13      Q. Was it before this date?
14      A. I believe so.
15      Q. Do you know when Bryan Wiles-Bond was enrolled
16  in the Department of Education schools on the Big
17  Island?
18      A. No.
19      Q. Are you aware that it was in the school year
20  starting 1999-2000?
21      A. No.
22      Q. Do you know if -- how long it was prior to
23  October 6th, 2000 that you became aware of Bryan
24  Wiles-Bond's case?
25      A. No.

Page 36

1       Q. Could it have been in the school year
2   1999-2000?
3           MR. USHIRODA: Objection to the extent it
4   calls for speculation.
5           THE WITNESS: I'm not sure.
6   BY MR. ELLIS:
7       Q. Page 1754, do you know why you received this
8   email?
9       A. No.
10      Q. In October of 2000, was having -- getting
11  TA's, enough TA's to service all the kids who needed
12  them difficult on the west side of the Big Island?
13      A. My recollection is that it was always
14  difficult.
15      Q. What do you mean by that?
16      A. It was difficult to hire, recruit, staffing on
17  the west side of Hawaii.
18      Q. Was it difficult to recruit and hire
19  therapeutic aides with training in autism?
20      A. I think -- I think it was all the areas, just
21  TA's in general.
22      Q. Was it just getting a person, just getting a
23  person hired, trained, untrained, just getting enough
24  people?
25      A. I don't understand your question.

Page 37

1       Q. You said you had difficulty getting TA's in
2   all areas.
3       A. Yes.
4       Q. Was it a problem of just getting -- it was
5   also difficult just to get warm bodies?
6       A. Yes.
7       Q. Could you turn to page DOE 1750. I'm sorry,
8   actually it started on 1749. I'm sorry. It starts at
9   the bottom there, May 24th, 2001. Where it says
10  "Alvin Rho," does this indicate that this was printed
11  out of your email, say, inbox?
12      A. I don't know.
13      Q. So you see at the left-hand side of the page
14  there's kind of a circle and then a square and it says
15  Alvin Rho?
16      A. Yes.
17      Q. Would that -- is that something you put on
18  your emails?
19      A. I don't know.
20      Q. No, go ahead.
21      A. Well, to be honest, I can't tell where one
22  email begins and the other ends, so.
23          MR. USHIRODA: Let the record reflect
24  that the witness is referring to Exhibit A.
25  BY MR. ELLIS:

10 (Pages 34 to 37)

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3   ANN KIMBALL WILES and        )

 4   STANLEY BOND, individually   )

 5   and as next friend of their  )

 6   son, BRYAN WILES-BOND, a     )

 7   minor,                       )

 8                 Plaintiffs,    )

 9          vs.                   ) Civil No. CV 04-00442

10   DEPARTMENT OF EDUCATION,     ) HG/BMK

11   State of Hawai'i, and ALVIN  ) CONSOLIDATED (Other

12   RHO, in his official         ) Civil Action)

13   capacity as West Hawai'i     )

14   District Superintendent,     )

15                 Defendants.    ) VIDEOTAPED DEPOSITION

16   _____ )          OF

17   ANN KIMBALL WILES and        ) JUDITH ANNE RADWICK

18   STANLEY BOND, individually   ) August 8, 2007

19   and as next friend of their  )

20   son, BRYAN WILES-BOND,       )

21   a minor,                     )

22                 Plaintiffs,    )

23          vs.                   ) Civil No. 05-00247

24   DEPARTMENT OF EDUCATION,     ) JMS/BMK

25   State of Hawai'i,            ) CONSOLIDATED (Other
```

Page 134

1 that. I remember that it was an issue, because at
2 that time we had lost the speech pathologist at
3 Kahakai, that was taking care of the Kahakai case
4 load, and we were hiring -- we were in the process
5 of replacing that person. But we did have speech
6 services covered there. We had other speech
7 pathologists in the district and we brought them in
8 to service the other children that were in that
9 school. So the services would have been provided.
10    Q.   At Kahakai?
11    A.   At Kahakai, uh-huh.
12    Q.   May 30th, 2000, there's an indication that
13 Kealakehe had an unqualified teacher. Do you have
14 any recollection of that?
15    A.   I don't remember the specific incident.
16 But I do remember, as I stated earlier, that it was
17 difficult to get teachers, qualified teachers of any
18 kind for summer school. But I don't remember
19 specifically who was in this position or what the
20 qualifications of the person were.
21    Q.   Do you recall if the teacher for the
22 summer program at Kealakehe was an aide?
23    A.   I don't recall that. I don't know.
24    Q.   Do you recall what Bryan's program for the
25 2000/2001 school year?

Page 135

1       MR. USHIRODA: I'm sorry? Could you
2 repeat that question?
3       (Record was read as requested.)
4 BY MR. ELLIS:
5    Q.   What the program was for the 2000/2001
6 school year?
7    A.   Can I get more clarification on that? Do
8 you want to know specific methods? Do you want to
9 know where it was held, what was -- I'm not sure I
10 can answer that.
11 BY MR. ELLIS:
12    Q.   Yes, those details. Yes, please.
13       MR. USHIRODA: Objection. Overly broad.
14 Also, I think it was asked and answered.
15    A.   We have -- the program consisted of
16 elements that were in the IEP. The methods were not
17 -- not in -- usually -- I can't remember whether
18 Bryan's specific IEP does, but we usually don't
19 detail methodology in IEPs. Usually what we put is
20 that he would work on communication skills, which
21 was a real -- really big issue for all autistic
22 children. He would be working on life skills to
23 become more independent, and he would be working on
24 social skills. Those are usually the three elements
25 that we instilled in all the programs that we used.

Page 136

1 BY MR. ELLIS:
2    Q.   During -- were you aware during the
3 2003/2004 school year that Bryan did not receive the
4 full amount of skills trainer hours?
5       MR. USHIRODA: Objection. Lack of
6 foundation, assumes facts not in evidence.
7    A.   I was aware that we were struggling and
8 that we had multiple meetings about trying to
9 fulfill the requirements for all of the kids in our
10 district, not just Bryan. But we were having a
11 difficult time getting skills trainers.
12       The agencies were having a difficult time
13 supplying our needs, so that whole -- the whole time
14 that I was involved in that -- my old position, it
15 was a continuous struggle, once those services came
16 over to us, to get enough skills trainers to fill
17 all the positions. So yes, I was aware that we were
18 having problems.
19 BY MR. ELLIS:
20    Q.   So when you said when you were at your
21 position you were aware, do you mean that from 1999
22 to 2004, you were aware that there was a, I guess,
23 an overall problem of not having enough skills
24 trainers to fit the hours in -- overall?
25       MR. USHIRODA: Objection. Overly broad.

Page 137

1    A.   From 2000, when I -- when the DOE took
2 over the position -- the responsibility, until 2004,
3 I was aware of it.
4 BY MR. ELLIS:
5    Q.   This was a systemic problem?
6    A.   Yes.
7       MR. ELLIS: D is a copy of a decision and
8 order dated May 21st, 2001.
9       (Exhibit D marked for
10       identification.)
11 BY MR. ELLIS:
12    Q.   Have you seen this document before?
13    A.   Yes.
14    Q.   Do you recall the first time you saw this
15 document?
16    A.   It must have been soon after it was
17 issued.
18    Q.   Who would be responsible for implementing
19 this decision?
20    A.   It's a combi --
21       MR. USHIRODA: Objection. Vague and
22 ambiguous, assumes facts not in evidence, lack of
23 foundation.
24    A.   This would have been, to my best of my
25 knowledge, a combination of the Department of

F I L E    Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3    ANN KIMBALL WILES and        )

 4    STANLEY BOND, individually   )

 5    and as next friend of their  )

 6    son, BRYAN WILES-BOND, a     )

 7    minor,                       )

 8                  Plaintiffs,    )

 9           vs.                   ) Civil No. CV 04-00442

10    DEPARTMENT OF EDUCATION,     ) HG/BMK

11    State of Hawai'i, and ALVIN  ) CONSOLIDATED (Other

12    RHO, in his official         ) Civil Action)

13    capacity as West Hawai'i     )

14    District Superintendent,     )

15                  Defendants.    ) VIDEOTAPED DEPOSITION

16    _____ )            OF

17    ANN KIMBALL WILES and        ) JOSEPHINE A. HILL

18    STANLEY BOND, individually   ) August 9, 2007

19    and as next friend of their  )

20    son, BRYAN WILES-BOND,       )

21    a minor,                     )

22                  Plaintiffs,    )

23           vs.                   ) Civil No. 05-00247

24    DEPARTMENT OF EDUCATION,     ) JMS/BMK

25    State of Hawai'i,            ) CONSOLIDATED (Other
```

Page 30

1  Not necessarily at a college. Some of
2  were, but not all of them.
3      Q.   So it was -- the agency was not placed at
4  each one of these places. An agent -- someone from
5  the agency would go to a place?
6      A.   The places were pre-selected of where they
7  would go, and the agents there were the State
8  Department of Education.
9      Q.   So the agents lived in Hawaii?
10     A.   Correct.
11     Q.   And they would fly to, say, Virginia and
12  do it -- and go to a job fair?
13     A.   Correct.
14     Q.   Was this for the sole purpose -- was the
15  recruitment efforts related to Bryan Wiles-Bond,
16  were they specifically forwarded to this agency to
17  fill the positions required by the order of May of
18  2004?
19     A.   It was to recruit skills trainers.
20     Q.   Was it specifically to recruit skills
21  trainers for Bryan Wiles-Bond?
22     A.   They would have been used with Bryan, but
23  we were hoping to recruit many, so --
24     Q.   Is there any communication between the
25  department of -- or West Oahu -- West Hawaii DES

Page 31

1  office and this agency you're talking about to fill
2  specific positions for Bryan Wiles-Bond?
3      MR. USHIRODA: The agency she's talking
4  about is the DOE.
5      MR. ELLIS: Yes.
6      A.   Not at any time did we ever specify Bryan
7  Wiles-Bond.
8  BY MR. ELLIS:
9      Q.   Thank you. So this agency, the Department
10  of Education recruitment agency, that's been doing
11  what it's been doing for prior to 2004?
12     A.   Yes.
13     Q.   And it's still ongoing?
14     A.   It's a yearly --
15     Q.   It's still ongoing?
16     A.   Yes, it is.
17     Q.   And do you know what the main thrust of
18  their recruitment practice is, such as regular ed
19  teachers, special ed teachers?
20     A.   It's the whole gamut.
21     Q.   Are you aware of anyone that this office
22  referred to West Oahu -- I'm sorry -- West Hawaii
23  for -- as a skills trainer specifically for Bryan
24  Wiles-Bond?
25     A.   No. We did not receive any.

Page 32

1      MR. USHIRODA: This is during your time
2  period; right?
3      THE WITNESS: Right.
4      I might add that there was a shortage of
5  skills trainers everyplace in Hawaii, not just our
6  island.
7  BY MR. ELLIS:
8      Q.   And that's been ongoing for some time; is
9  that correct?
10     A.   Correct.
11     Q.   And that's not specific to West Hawaii;
12  it's statewide?
13     A.   Correct.
14     Q.   So it's a systemic problem?
15     MR. USHIRODA: Objection to the term
16  systemic. Leading the witness.
17     A.   It's a problem trying to recruit people
18  into the skills trainers job, especially with those
19  qualifications, because many of them go out and get
20  a little bit of experience and they go on to
21  advance.
22  BY MR. ELLIS:
23     Q.   That's all over the state?
24     A.   All over the state.
25     Q.   Not just regarding Bryan Wiles-Bond's

Page 33

1  situation?
2      A.   That's correct.
3      MR. ELLIS: Exhibit A is the decision and
4  order dated May 21st, 2001.
5      (Exhibit A marked for
6      identification.)
7  BY MR. ELLIS:
8      Q.   Would you review that and let us know if
9  you've ever seen that before?
10     A.   Yes, I have seen this before.
11     Q.   Do you recall when the first time you saw
12  it?
13     A.   Right when I took over as interim DES,
14  Judy Radwick, who was the DES at the time, shared it
15  with me.
16     Q.   Regarding Ms. Radwick, did Ms. Radwick
17  consult with you on an informal basis from May 2004
18  to October 1st, 2004 regarding the job duties of a
19  DES?
20     A.   Yes. We talked about some. I'm sure it
21  wasn't in great length.
22     Q.   So did you go to her with questions about
23  your job duties?
24     A.   Not about my job duties. I would ask her
25  maybe more specific questions concerning a student.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3    ANN KIMBALL WILES and        )

 4    STANLEY BOND, individually   )

 5    and as next friend of their  )

 6    son, BRYAN WILES-BOND, a      )

 7    minor,                        )

 8                    Plaintiffs,   )

 9          vs.                     ) Civil No. CV 04-00442

10    DEPARTMENT OF EDUCATION,      ) HG/BMK

11    State of Hawai'i, and ALVIN   ) CONSOLIDATED (Other

12    RHO, in his official          ) Civil Action)

13    capacity as West Hawai'i      )

14    District Superintendent,      )

15                    Defendants.   ) VIDEOTAPED DEPOSITION

16    _____ )          OF

17    ANN KIMBALL WILES and         )  LINDA PRICE, Ph.D.

18    STANLEY BOND, individually    )   August 10, 2007

19    and as next friend of their   )

20    son, BRYAN WILES-BOND,        )

21    a minor,                      )

22                    Plaintiffs,   )

23          vs.                     ) Civil No. 05-00247

24    DEPARTMENT OF EDUCATION,      ) JMS/BMK

25    State of Hawai'i,             ) CONSOLIDATED (Other
```

Page 54

1    Q.   You don't understand the question or --
2    A.   Yeah.  I don't understand.
3    Q.   When you became the DES sometime in
4  October 2004, for West Hawaii --
5    A.   Correct.
6    Q.   -- did anybody from the Department of
7  Education tell you that they had difficulty getting
8  enough skills trainers for West Hawaii?
9         MR. USHIRODA:  Objection.  Vague and
10  ambiguous.
11   A.   No.
12  BY MR. ELLIS:
13   Q.   Did you have a report that you may have --
14  that you read when you became DES that the DOE had
15  trouble getting skills trainers in West Hawaii?
16   A.   No.
17   Q.   At any time after you became DES at West
18  Hawaii, did anybody from the Department of Education
19  ever tell you that, up until today?
20   A.   I told myself that.  After I assumed the
21  responsibility for getting skills trainers, I
22  realized that there's a huge shortage in West Hawaii
23  of skills trainers.  I have a shortage to this day
24  of skills trainers in West Hawaii.  I have had a
25  shortage of skills trainers in West Hawaii for the

Page 55

1  last two and a half years.
2    Q.   At what point after you became DES did you
3  become aware of this?
4    A.   I don't have an exact date.  It became
5  very obvious very quickly.
6    Q.   So it became obvious, you would say,
7  within the first month of your taking on the duties
8  of DES?
9    A.   Yes.
10   Q.   How did it become obvious to you?
11   A.   I had procurements that could not be
12  filled.
13   Q.   This was for all cases for special ed
14  children who needed skills trainers?
15   A.   Yes.
16   Q.   So it was a systemic problem?
17        MR. USHIRODA:  Objection to the term
18  systemic.  I think that's vague and ambiguous.  Lack
19  of foundation.
20        Go ahead.
21   A.   There's a shortage of skills trainers in
22  West Hawaii.
23  BY MR. ELLIS:
24   Q.   So is that a yes or a no to the question?
25        MR. USHIRODA:  Answer the question.

Page 56

1    A.   System does not seem to be the right
2  word to me.
3  BY MR. ELLIS:
4    Q.   Why not?
5    A.   Because it talks about it being a system
6  issue, and I don't think this is a system issue.
7    Q.   What kind of issue is it?
8    A.   Lack of employees.
9         MR. USHIRODA:  Stan, could we take a
10  break?  We've been going about an hour and a half.
11        MR. ELLIS:  Not yet.
12  BY MR. ELLIS:
13   Q.   Could you read from page 94, line five to
14  line ten?
15   A.   But even with all that, every time I came
16  to see Bryan he was lying on the floor, stimming, in
17  his own feces or urine.  It was -- I mean, it was
18  neglect.  There's -- I was very upset.  I took it to
19  the DOE and I called HBH and I tried to help these
20  individuals do a better job.  It wasn't good.
21   Q.   You were -- as the DES, did you at any
22  point become aware of Dr. Smalley's comments --
23   A.   No.
24   Q.   -- about this?
25        MR. USHIRODA:  Objection.  Lack of

Page 57

1  foundation, assumes facts not in evidence.
2    A.   No.
3  BY MR. ELLIS:
4    Q.   As the DES, if this came to your attention
5  -- not related to this case, but if something like
6  this came to your attention, what was the DOE's
7  policies and procedures to respond to such a
8  situation?
9         MR. USHIRODA:  Objection.  Lack of
10  foundation, incomplete hypothetical, assumes facts
11  not in evidence.  Also, calls for speculation --
12   A.   I don't think the DOE has policies and
13  procedures that would describe what we would do.
14  BY MR. ELLIS:
15   Q.   As the DES, if this situation came up,
16  what would you do?
17   A.   I'd investigate it.
18   Q.   Does the department have -- the Department
19  of Education have policies and procedures to
20  investigate incidents such as this?
21        MR. USHIRODA:  Objection.  Vague and
22  ambiguous.
23   A.   When you say policies and procedures, I
24  think of a group of regulations, descriptions, and I
25  do not believe that we have that.

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF HAWAII
 2
      ANN KIMBALL WILES and          )
 3    STANLEY BOND, individually     )
      and as next friend of their    )
 4    son, BRYAN WILES-BOND, a       )
      minor,                         )   Civil No. CV 04-00442
 5                                   )   Civil No. 05-00247
              Plaintiffs,            )   Consolidated
 6                                   )
         v.                          )
 7                                   )
      DEPARTMENT OF EDUCATION,       )
 8    State of Hawai'i, and KATE     )
      TOLENTINO, in his official     )
 9    capacity as West Hawai'i       )
      District Supervisor,           )
10                                   )
              Defendants.            )
11                                   )
      _____ )
12
13
14
15
16            DEPOSITION OF KATE TOLENTINO
17      Taken on behalf of the Plaintiff at the offices of
18   Davis Levin Livingston Grande, 851 Fort Street Mall,
19   Honolulu, Hawaii, commencing at 9:12 a.m. on September
20   21, 2007, pursuant to Notice.
21
22
23
24   BEFORE:      JESSICA R. PERRY, CSR NO. 404
25                Certified Shorthand Reporter
```

Page 30

```
 1  Island?
 2      A.  Yes.
 3      Q.  Okay, would you consider yourself very
 4  familiar with the education system on the Big Island?
 5      A.  Yes.
 6      Q.  At the time you became the DES in 2002, was
 7  it -- was it known to you or did it become known to
 8  you that there was difficulty in hiring enough skills
 9  trainers to meet the requirements of the special
10  education students on the Big Island?
11      A.  Yes.  Yes.
12      Q.  Did that continue till the time that you left
13  the DES position in 2005?
14      A.  It was not an issue in my particular district,
15  but island-wide, yes.
16      Q.  Your district was north?
17      A.  North Hawaii.
18      Q.  And what does that consist of?
19      A.  Pa'auilo, Honokaa High School, Honokaa
20  Elementary School, Waimea Elementary School, Waimea
21  Middle, Waikoloa, and then the three Kohala schools.
22      Q.  So the top half of the island?
23      A.  Yeah.
24      Q.  And then was the west Hawaii, that was
25  basically from Kona to South Point?
```

Page 31

```
 1      A.  Keala -- no.  Kealakehe to Honaunau.
 2      Q.  Where -- okay, base -- just so I have some
 3  bearing, South Point --
 4      A.  South Point, Ka'u is Hilo is actually Keaau.
 5      Q.  So west of that?
 6      A.  Yes.
 7      Q.  And to Kealakehe?
 8      A.  Yes.
 9      Q.  Which is kind of in Kona town?
10      A.  Yes.
11      Q.  And then there's Konawaena?
12      A.  Yes.
13      Q.  And then Hilo is the rest of it, the east
14  side?
15      A.  Hilo and then there's Keaau, Pahoa, Ka'u.
16      Q.  You're saying that skills trainer, getting
17  enough skills trainers was not an issue in the north
18  Hawaii district?
19          MR. HARA:  Objection.  Misstates her
20  testimony.
21  BY MR. ELLIS:
22      Q.  Could you clarify it, then?
23      A.  Getting skills trainers was -- we were able to
24  fulfill the needs of the kids in north Hawaii.
25      Q.  Did all the skills trainers in north Hawaii
```

Page 32

```
 1  have the required training during the period of time
 2  from October 2002 to the time you left the DES?
 3      A.  I'm not able to address that.
 4      Q.  You don't know?
 5      A.  I don't know.
 6      Q.  You said that it was a problem on the rest of
 7  the island, that would include -- it's west Hawaii and
 8  east Hawaii?
 9      A.  And south Hawaii.
10      Q.  South Hawaii.  So there's three districts --
11  or three complexes on the Big Island?
12      A.  South Hawaii, Hilo, north Hawaii and west
13  Hawaii, four.
14      Q.  There's four, okay.
15          And so on the other three, that was a issue,
16  to your understanding?
17      A.  Yes.
18      Q.  And that remained an issue from October 2002
19  to the time you left as a DES in 2005?
20      A.  I believe so, yes.
21      Q.  Do you know whether it was a issue of enough
22  people, just enough people, or was it an issue of
23  enough people and enough skilled people?
24          MR. HARA:  Compound.
25          THE WITNESS:  I don't know.
```

Page 33

```
 1  BY MR. ELLIS:
 2      Q.  Okay.  At the period of time of September 2004
 3  to December 2004, were you aware if it was an issue in
 4  west Hawaii to -- that they didn't have enough skills
 5  trainers?
 6      A.  Yes, it was an issue.
 7      Q.  Was that an issue with -- specifically to
 8  Bryan Wiles-Bond's case?
 9      A.  I don't know.
10      Q.  During the period of time that you have -- you
11  have testified that you're the most knowledgeable, was
12  there a problem getting enough skills trainers for
13  Bryan Wiles-Bond?
14      A.  Yes.
15      Q.  Was there a problem with getting enough skills
16  trainers that had the requisite training to service
17  Bryan Wiles-Bond?
18      A.  Yes.
19      Q.  During that period, what did you as the DES do
20  to assure that there were enough skills trainers?
21      A.  I worked very closely with both Marvin
22  Sinclair and Kelly Stern from TIFFE and Dru Copeland
23  from Alaka'i Na Keiki, to not only find skills
24  trainers but schedule them in a manner that allowed us
25  to cover the most time possible.
```

9 (Pages 30 to 33)