IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---|---

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawaii, and ALVIN RHO, in his official capacity as West Hawaii District Superintendent,<br><br>Defendants. | CIVIL NO. CV 04-00442 HG/BMK<br>CIVIL NO. CV 05-00247 HG/BMK<br>CONSOLIDATED<br>(Other Civil Action)<br><br><br>TRIAL DATE: October 11, 2006 |

DEPOSITION OF KIMBERLY SMALLEY, Ph.D.

Taken on behalf of the Defendants, at the law offices of Davis Levin Livingston Grand, 400 Davis Levin Livingston Grand Place, 851 Fort Street, Honolulu, Hawai`i 96813 commencing at 9:02 a.m., on Thursday, July 27, 2006, pursuant to Notice.

BEFORE:
    Valerie Mariano, CSR No. 353
    Notary Public, State of Hawai`i

EXHIBIT "C"

1  Q.  I see.

2      And the other several times in California, what were
3  those in?

4  A.  Those were also court cases with a school district and
5  a parent, typically, where I was brought over or when I
6  still lived there and provided expert testimony in the area
7  of behavior.

8  Q.  Dr. -- Kim, what do you consider your areas of
9  expertise to be?

10 A.  My areas of expertise include -- I'm a board certified
11 behavior analyst.  I have a specialty in transitions,
12 school-to-work issues for individuals with developmental
13 disabilities.  I am an inclusionist.  I'm an integrated
14 service specialist, so someone who has a broad knowledge in
15 multiple fields related to disability.  You get a
16 credential in that which sort of brings nursing, mental
17 health, social work, education, rehab all together.  I am
18 an expert in networks of social support, sort of a
19 generalist in DDD.  I have many hats that I wear.

20 Q.  Okay.  Sounds like it.

21 A.  Yeah.

22 Q.  Do you have any expertise in or training in working
23 with children with autism?

24 A.  Extensive expertise and training working with children
25 with autism.

***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  to speed on what's going on.
2  A.  Thank you.
3  Q.  In the federal court system, if a party is going to
4  use an expert to render expert opinions in a case, they
5  have to make what is called a disclosure. So in your
6  case -- well, in this case, the plaintiffs, who are Bryan's
7  parents, disclosed several expert witnesses along with
8  their expert reports. This was earlier this year. Your
9  report was disclosed, and a report by a Daniel LeGoff, and
10  a report by am economist named Keynes von Elsner.
11  A.  I don't know the person.
12  Q.  Okay. Anyway, so with those disclosures, that told us
13  that the plaintiffs, Bryan's family, were going to be using
14  you as an expert witness to render expert opinions for
15  them, and that is why we subpoenaed your records.
16  A.  That's fine.
17  Q.  Okay. Did you understand that to be your role?
18  A.  As an expert witness, yes.
19  Q.  And your contact regarding that role was, I guess, the
20  e-mails you received from --
21  A.  Couple e-mails from Bruce.
22  Q.  What were the sum and substance of those e-mails?
23  A.  Just as I said, asking me for a copy of my vitae,
24  asking me if this was a true and accurate copy of the
25  report I had submitted. I sent an e-mail to him after I

***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  Q. Oh, fix that right now.

2  What is your home address then?

3  A. 45-009 Mahalani Circle, Kaneohe, Hawai`i 96744.

4  Q. Okay. Now as part of your retention as an expert

5  witness in this case from the plaintiffs, were you asked

6  specifically -- what were you specifically -- were you --

7  strike that.

8  Were you specifically asked to do anything in

9  particular?

10 A. No.

11 Q. Okay. So Mr. Levin, or Bruce on behalf of Mr. Levin,

12 hasn't told you, we want you to testify on --

13 A. No. It was actually a little unnerving walking in

14 here today because I had no prep. I don't even know what

15 the Bonds are asking for.

16 Q. And part of my query, too, is to find that out.

17 A. Right.

18 Q. So that's why the reasons for my question is.

19 A. No, I mean, I assume I'm here to speak about my report

20 and my experiences with Bryan.

21 Q. Okay. How long did you meet with Mr. Levin and Bruce

22 this morning?

23 A. I don't know, five minutes tops. I walked in with the

24 court reporter.

25 Q. Okay. And what did you discuss?

1   A.   Just -- actually, just what you asked me here.  I said
2   I've had no prep.  I don't know what I'm -- what the Bonds
3   are even asking for.  And what am I supposed to be doing
4   here?  And Stan said, you know, you're gonna talk about
5   your report.
6   Q.   Your August 18th report?
7   A.   The '04 report.
8   Q.   Yes.  Okay.
9        Now since the time you were initially contacted by
10  Bruce, has Mr. Levin's office provided you with any
11  materials?
12  A.   Very recently, three days ago, I sent an e-mail to
13  Bruce and said, I don't even have a full copy of my report.
14  You know, in order for me to speak to it, I would really
15  need to reread it.  I -- you know, I haven't seen this kid
16  in a while.  And he e-mailed me maybe two, three nights ago
17  the original copy presuming he gave you.  And so I was able
18  to review that last night and this morning.  But that's it.
19  Q.   Okay.  When -- I take it you've read the report?
20  A.   Yes, I read it last light and again this morning when
21  I walked in so I'd be fresh.
22  Q.   So you refamiliarized yourself with your '04 report?
23  A.   Yes.
24  Q.   Any other materials provided to you by Mr. Levin's
25  office other than your '04 report?