1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF HAWAII
2

3    ANN KIMBALL WILES and         )  Civil No. CV 04-00442
     STANLEY BOND, individually    )  Civil No. 05-00247
     and as next friend of their   )  Consolidated
4    son, BRYAN WILES-BOND, a      )
     minor,                        )
5                                  )
             Plaintiffs,           )
6                                  )
         v.                        )
7                                  )
     DEPARTMENT OF EDUCATION,      )
8    State of Hawai'i, and KATE    )
     TOLENTINO, in his official    )
9    capacity as West Hawai'i      )
     District Supervisor,          )
10                                 )
             Defendants.           )
11                                 )
     _____ )
12

13

14

15

16              DEPOSITION OF DRU COPELAND

17      Taken on behalf of the Plaintiff at the offices of

18   Davis Levin Livingston Grande, 851 Fort Street Mall,

19   Honolulu, Hawaii, commencing at 9:10 a.m. on September

20   28, 2007, pursuant to Notice.

21

22

23

24   BEFORE:      JESSICA R. PERRY, CSR NO. 404

25               Certified Shorthand Reporter

              RALPH ROSENBERG COURT REPORTERS, INC.
                      (808) 524-2090


EXHIBIT "K"

1        Q.  Now, what was your position with Alaka'i?

2        A.  At that time we were called autism

3    consultants.

4        Q.  All right.  And then the title changed at some

5    point; is that correct?

6        A.  Yes.

7        Q.  And what was the new title?

8        A.  IISC.

9        Q.  And that is intensive --

10       A.  Instructional service consultant.

11       Q.  We'll just call it IISC for purposes of your

12   deposition, all right?

13       A.  Thank you.

14       Q.  Were the duties the same after the name

15   change?

16       A.  Yes.

17       Q.  And can you describe what the duties of an

18   autism consultant or IISC were during the period of

19   2002 to 2004?

20       A.  To assist the school in implementing a

21   treatment plan which was outlined in the student's

22   IEP.  This involved supervising, coaching, training

23   the skills trainers primarily.  It -- it also involved

24   working with the teacher and working with families as

25   needed.

1        A.  Yes, I do.

2        Q.  And then it explains that the adult

3   educational aide shall provide the services on a

4   consistent basis with the goal of completing all tasks

5   and documentation required by the TEACCH, DTT and PECS

6   methods of behavioral management and educational

7   instruction.  Did I read that accurately?

8        A.  You did.

9        Q.  Now, this particular decision, I understand

10  from your testimony, is not something that you were

11  made aware of when you came to the Big Island in 2002;

12  is that correct?

13       A.  That is correct.

14       Q.  You mentioned that you were aware of Dr. Ortiz

15  having worked with Bryan in 2002?

16       A.  Yes.

17       Q.  Did the DOE ever arrange for you to confer

18  with her or provide hours for you and her to consult

19  regarding Bryan's treatment plan or individual

20  educational program?

21       A.  When I came to the Big Island, Michael Wright

22  was the person that was working with him, and so I

23  talked with him.

24       Q.  Okay.

25       A.  I met Dr. Ortiz through the process of being

1    cetera.  Do you see that?

2        A.  Yes.

3        Q.  Were you aware that that was an agreement

4    between the state and the Bonds at this time, that is

5    August 2002?

6        A.  I didn't start working with Bryan in August.

7    I believe it was September.  However, I was aware that

8    Kim's mother -- I mean, Bryan's mother did that, had

9    those advertisements.  I was not aware that it was

10   part of some agreement.

11       Q.  All right.  Looking at sub C, it states that

12   by August 2002, the state shall create a pool of

13   substitute TA's who are qualified and trained to

14   provide services to Bryan.  Do you see that?

15       A.  Yes.

16       Q.  Were you aware, when you began working with

17   Bryan in September of '02, that this was a requirement

18   that the state was required to meet?

19       A.  No.

20       Q.  Looking at sub paragraph F, which is where I

21   initially directed you to, at the bottom of the page

22   it states that the above-described TA services shall

23   be provided by qualified TA's who meet the standards

24   for a level 3 TA and are trained in DTT, TEACCH, and

25   PECS methods for autistic children.  Did I read that

1      Q.  And there's a footnote that refers to the

2   specific hours, but would you agree that that is an

3   accurate statement?

4                    MR. USHIRODA:  Objection.  Lack of

5   foundation.  Assumes facts not in evidence.  Overly

6   broad.

7                    THE WITNESS:  What I recall is that we

8   had difficulty finding appropriate skills trainers, I

9   guess it started that fall, and that there were some

10  gaps.

11  BY MR. VARADY:

12     Q.  Now, looking at the next page, paragraph 8,

13  the hearing officer found that the six skills trainers

14  that the DOE provided to Bryan in the fall of 2003

15  through February of 2004 did not have prior experience

16  working with autistic children.  Do you see that?

17     A.  Yes.

18     Q.  Do you disagree with that?

19     A.  You know, I really don't remember exactly.  I

20  don't even remember who they were.  You know, I don't

21  remember if they had experience or not.  I do know

22  that it was exceedingly difficult to find people on

23  the Big Island who met those requirements as -- as

24  outlined.

25     Q.  Now, do you think it would be important for

1     skills trainers working with Bryan during that period,

2     that is fall of '03 through the '03-'04 school year,

3     to have experience working with autistic children?

4                    MR. USHIRODA:  Objection.  Vague,

5     ambiguous.

6                    THE WITNESS:  It would be advantageous.

7     Some skills trainers are quite trainable and it is

8     less important that they have that exact kind of

9     experience, or they may have experience with children

10    that easily translates to working with autistic

11    children.

12    BY MR. VARADY:

13       Q.  And that was actually going to be my next

14    question.  And that would be that if an otherwise

15    qualified skills trainer did not have such experience,

16    would you have been able to train that person as to

17    how to work with Bryan as an autistic child at this

18    time?

19       A.  It depends totally on the person.  Some people

20    are quite trainable and some are not.

21       Q.  But just as a general matter, there's nothing

22    inherently that would prevent you -- would have

23    prevented you from training a person who was otherwise

24    trainable in how to work with an autistic child at

25    that time; is that correct?

1                    MR. USHIRODA:  Objection.  Argumentative

2    and asked and answered.

3                    THE WITNESS:  There's nothing that would

4    have prevented that to happen.  I would have

5    reluctance to try to do that if they had not had any

6    experience working with children.

7    BY MR. VARADY:

8        Q.  All right.  That's -- were you aware of

9    whether or not there had been a shortage of qualified

10   skills trainers who had experience working with

11   autistic children on the Big Island as a chronic

12   condition, that is, it was difficult to find them?

13       A.  My recollection, it was always difficult to

14   find skills trainers across the board, and to have a

15   skills trainer who actually had experience working

16   with autistic children prior to their arrival,

17   usually, their arrival on the Big Island, was not at

18   all common.  That was very uncommon.

19       Q.  You had the skills necessary to train someone

20   how -- who was otherwise trainable to work with an

21   autistic child like Bryan, though; isn't that correct?

22       A.  Yes.

23       Q.  And in fact that was one of your job duties?

24       A.  That is correct.

25       Q.  The second sentence says that five of the six

1     skills trainers had no prior experience with American

2     Sign Language.  Do you see that?

3          A.  Nine?

4          Q.  Eight?

5          A.  Oh, I'm sorry.  I beg your pardon.

6               Yes, I see that, okay.

7          Q.  Does that accurately state the facts during

8     this period of time, that is, fall of '03 through

9     February of '04?

10                    MR. USHIRODA:  Objection.  Lack of

11     foundation.  Assumes facts not in evidence.  Calls for

12     speculation.

13                    THE WITNESS:  As I said previously, I

14     don't even remember who these people are.  Probably

15     that's correct, because, again, we just didn't have

16     people who had those kind -- that kind of training.

17     BY MR. VARADY:

18          Q.  Dr. Copeland, do you have training in American

19     Sign Language?

20          A.  No.

21          Q.  At any time during this period, that is, the

22     period of -- that we've been talking about so far,

23     from September of '02 when you first started working

24     with Bryan up through this date, which we -- we'll

25     just call May of '04, did DOE offer you any training

62

1    in American Sign Language?

2        A.  Yes, I took -- I took a course they had in the

3    evening, but probably what was more apropos was the

4    second semester of his 5th grade year, so that would

5    have been, what, 2003, the DOE was very active in

6    putting together a dictionary.  So I would say that --

7    that probably Sheri Adams, who was the speech

8    pathologist, who was the one who trained me at that

9    point in time, and then in the fall, the DOE had a

10   class and I took their class.

11       Q.  Did anyone from the DOE during the period of

12   time from September of '02 through May of '04 discuss

13   with you the chronic shortage of qualified skills

14   trainers on the Big Island?

15                   MR. USHIRODA:  Objection to the term

16       "chronic."  Vague and ambiguous.

17                   THE WITNESS:  I do not recall having any

18   particular discussion, but I lived with it.  I was

19   very aware of it.

20   BY MR. VARADY:

21       Q.  Yes, I understand that.  As the person who was

22   responsible for supervising people with certain skills

23   and being faced with the fact that you couldn't find

24   them in many instances, I understand that.

25                   But my question is, for example, did Mr. Rho

```
 1    ever say to you, you know, we can't find qualified

 2    people and that's a chronic problem on the Big Island?

 3                    MR. USHIRODA:  Objection.  Lack of

 4    foundation.  Assumes facts not in evidence.

 5                    THE WITNESS:  No.

 6    BY MR. VARADY:

 7        Q.  Any --

 8        A.  He did not.  He did not.  I'm not even sure I

 9    know who -- I mean, I know what his role is, but I'm

10    not sure I would recognize him.

11        Q.  Did any other people assigned to Bryan's case

12    or working at the DOE discuss it with you?  People

13    such as Kate Tolentino, Judith Radwick, and I could go

14    down the entire list, but I --

15        A.  Well, I was never called in for an appointment

16    in which we sat down and discussed this problem.

17    However, we discussed many things, and frequently, you

18    know, as a kind of tail end to some discussion there

19    might be a comment like it's really difficult to find

20    qualified people on this island.  It would be in that

21    type of format.

22        Q.  Now, looking at paragraph number 12, it -- it

23    refers to Naomi Shiraishi, Bryan's speech pathologist

24    and describes her as communicating with him through

25    American Sign Language.  Did you have direct
```

1        A.   Cafeteria worker, peer, anybody.

2        Q.   At this time did Bryan's teacher know American

3    Sign Language?

4        A.   You know, I really don't recall.  I don't

5    recall.

6        Q.   Looking at paragraph 14, it says that when

7    Bryan did not receive the number of skills trainer

8    hours specified in his IEPs from October 2003 through

9    February 2004, he regressed in a number of areas.  Did

10   I read that accurately?

11       A.   Yes.

12       Q.   Do you agree with that statement?

13                 MR. USHIRODA:  Objection.  Lack of

14   foundation.  Assumes facts not in evidence.

15                 THE WITNESS:  I agree that both those

16   things are true, whether they're causative or not, I

17   don't know that part, but he did not have the skills

18   trainer hours that he needed and there was notable

19   regression also in that period of time.

20   BY MR. VARADY:

21       Q.   Do you recall describing January of 2004 as

22   being chaotic in terms of --

23       A.   Yes, I do.  Yes, I do.

24       Q.   When you say you kept meticulous records on

25   the number of signs -- meticulous is probably my word,

1      A.   Yeah, Bryan's mom.

2      Q.   And did she actually give you a copy of it?

3      A.   You know, I'm trying to remember that.  I just

4   don't remember.  I just don't remember.  I do remember

5   talking about it and I kind of think she did, but I

6   don't really remember.

7      Q.   Would you agree that a toileting plan that was

8   implemented both in school, at the home, would be

9   helpful to Bryan at this time?

10     A.   Yes.

11     Q.   And would you agree that the lack of such a

12   plan would affect the ability of people to respond and

13   train him -- respond to and train him consistently in

14   that area?

15              MR. USHIRODA:  Objection.  Lack of

16   foundation.  Assumes facts not in evidence.  Calls for

17   speculation.

18              THE WITNESS:  Well, I thought we tried to

19   put together a plan, first of all, but that's my

20   recollection.  And yes, a consistent approach by

21   everybody would indeed be helpful.

22   BY MR. VARADY:

23     Q.   Now, looking at paragraph 16, and I'll give

24   you some time to look that over, because it's fairly

25   lengthy and I just want to ask you a couple questions

1    about it.

2              Have you had an opportunity to --

3    A.  Yes.

4    Q.  -- read that?

5    A.  I'm sorry.

6    Q.  Have you had an opportunity to read that?

7    A.  Yes.

8    Q.  Okay.  This describes regression in Bryan's

9    ability to understand and respect personal space

10   during the time period of fall '03 through the first

11   part of '04; is that correct?

12   A.  Yes.

13   Q.  Do you agree with the observations that are

14   made in this paragraph that describe Bryan's problems

15   in that area?

16              MR. USHIRODA:  Objection to the extent it

17   calls for speculation, lack of foundation.  Assumes

18   facts not in evidence.  Also overly broad.

19              THE WITNESS:  Bryan always had personal

20   space, personal property boundary issues.  It waxed

21   and waned.  It appeared to be getting better, and then

22   in this period of time that you're discussing, it went

23   downhill again.  And, you know, what I really remember

24   about that is putting together a plan for his home

25   especially, that's the one I remember, you know, where

1    structured environment, the whole environment is more

2    regulated.

3         At home, when one goes home, Bryan, like

4    everybody else, likes to kick back and, you know, not

5    have to function in such a structured environment.  So

6    it was more of a challenge, you know, at home.  And,

7    you know, there were more things for him to get into,

8    I mean because, you know, there are things in your

9    home that are not in school.  It was -- it was more of

10   a challenge at home.  It seemed to me that was where

11   the larger issue was.

12        Q.  And that was because of the reasons you've

13   identified, which is it's a different type of

14   environment, there are different stimuli, there's more

15   going on?

16        A.  There's more good stuff.

17        Q.  And -- and, you know, conversely, less --

18   because of that, less ability to control --

19        A.  To set up a structure, yes.

20        Q.  Could I ask you to turn to page 7, please.

21   Looking at page 7, the hearing officer on that page

22   concludes that Bryan, again, did not get the promised

23   skills trainer hours.  Would you agree with that

24   conclusion?

25                   MR. USHIRODA:  Objection.  Lack of

1    foundation.  Assumes facts not in evidence.  Calls for

2    speculation.

3                    THE WITNESS:  My knowledge of the IEP and

4    what was there and what he got were not the same.  He

5    did not get the hours that were procured from the IEP.

6    BY MR. VARADY:

7        Q.  So there was a deficit?

8        A.  Yes.

9        Q.  Just going back to the home aspect of Bryan's

10   program for a minute, although it is more challenging,

11   I guess, would be the way of putting it, to

12   standardize procedures in the home because there are

13   more variables, that's not an impossible task, is it?

14       A.  I didn't believe so.  That's why I put

15   together a plan.

16       Q.  Okay.  And just as in the school consistency

17   across providers and environments would be important,

18   the same is true at home, the providers would have to

19   consistently implement the program that you put

20   together in order to make it more effective; isn't

21   that correct?

22       A.  That -- yes, that is correct.  The consistency

23   is, of course, very important in any of these plans

24   and is enormously challenging when you have so many

25   people involved to get everybody responding in the

74

1     same way, because it's not just the skills trainer.

2     Like I said, it's the cafeteria worker, it's, you

3     know, the principal, you know, it's the speech

4     therapist, it's the occupational therapist, it's --

5     it's his peers, it's the other skills trainers in the

6     classroom.  It's just a big cast.

7          Q.  And it's also complicated by turnover rates in

8     the skills trainer positions as well; is that correct?

9          A.  Yes, it certainly complicates it.

10          Q.  Now, looking on the same page, which is page 7

11     of the agreement, it states that the skills trainers,

12     the CFS, and that would be Child & Family Services,

13     nor TIFFE skills trainers had experience working with

14     autistic children; do you see that?

15          A.  No, where are you?

16          Q.  I'm sorry, it's the next to the last

17     paragraph, the sentence --

18          A.  Okay.

19          Q.  -- begins "neither -- neither the CFS nor

20     TIFFE skills trainers, TIFFE skills trainers had any

21     experience working with autistic children.  Do you see

22     that?

23          A.  Yes.

24          Q.  Do you recall that being the case during this

25     period of time?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1                    MR. USHIRODA:  Objection.  Vague and

2    ambiguous.  Overly broad.  Lack of foundation.

3    Assumes facts not in evidence.

4    BY MR. VARADY:

5         Q.  Do you understand my question?

6         A.  I do understand your question.  I didn't hire.

7    I didn't -- I didn't go over resumés, so, you know, I

8    took what was given me, and so if they had experience

9    or not, probably would have come from my conversation

10   with them, and, you know, one person that I'm thinking

11   of did not have that experience, but she -- she taught

12   American Sign Language, and I think that was kind of a

13   tradeoff.  So I don't know from my own personal

14   experience that that was -- because I can't remember.

15        Q.  Do you remember that generally being a

16   problem, that is, finding skills trainers who had

17   experience working with autistic children?

18        A.  As I said before, it was always a problem.

19   That type of individual does not frequently move to

20   the Big Island.

21        Q.  You'll -- if I could just call your attention

22   up the page for one more point, it's numbered clause 3

23   in the first full paragraph.  It states that the DOE

24   failed to provide skills trainers who could

25   communicate with Bryan using American Sign Language.

1    Do you see that?

2                    MR. USHIRODA:  I'm sorry, counsel, where

3    are you?

4                    THE WITNESS:  Yes, say that again.

5    BY MR. VARADY:

6        Q.  On the top of page 7.

7        A.  Yes.  Number 2?

8        Q.  Number 3.

9        A.  Okay.  The skills trainers that came on during

10   that period of time, as I'm recalling this, did not

11   walk in the door knowing American Sign Language.  They

12   did, however, walk -- they were given some instruction

13   in that so they could communicate with Bryan using the

14   signs that Bryan used and trying to do select

15   frequency.  So -- so they could learn the signs

16   like -- that he used mostly at school, because he

17   didn't use them all equally.

18       Q.  All right.  I wanted to go back, though, to

19   what you had said just prior to that, which was the

20   skills trainers -- only one of the six skills trainers

21   working with Bryan had training prior to working with

22   him in American Sign Language, and she had no

23   experience working with autistic children; is that

24   correct?

25       A.  That is my recollection, but I don't -- I

79

1    methods, and ASL.  Do you see that?

2        A.  Yes.

3        Q.  Do you know if those criteria that the hearing

4    officer ordered were fulfilled by the DOE during the

5    period of the '0 -- you know, the '04 extended school

6    year?

7        A.  I don't recall that.  What I recall is that

8    we -- and we, I mean his team, kept on doing what we

9    were doing, and we kept on looking for people, we kept

10   on training people.  You know, exactly if that was

11   fulfilled, I do not recall.

12       Q.  Would your answer be the same for the order

13   that the hearing officer made in paragraph 2?

14       A.  Yes.

15       Q.  You understand that these criteria that the

16   hearing officer was ordering, that is the DTT, TEACCH

17   and ASL were methods designed to help Bryan meet his

18   goals and objectives?

19       A.  Yes.

20       Q.  And you understand that these were criteria

21   that were deemed important in that regard; is that

22   correct?

23       A.  Yes, yes.

24       Q.  Did the other team members understand that?

25   By other team members I mean the members of the IEP

87

1       A.  Just what you said.  She had a stroke.  She

2    had some kind of chronic something, yes, I do recall

3    that now.

4       Q.  And she had a stroke and withdrew immediately

5    without being able to give notice for obvious reasons?

6       A.  She couldn't be there for obvious reasons.  I

7    don't remember any of the other particulars.

8       Q.  Then looking at page 67 of the testimony, this

9    is where it says someone became immediately ill, a

10   replacement was apparently found in December for that

11   particular skills trainer, but she stayed only two

12   weeks.  Do you recall that?

13      A.  Yes, I do.

14      Q.  And so there was a gap as a result of that; is

15   that correct?

16      A.  Yes.

17      Q.  Why did the replacement skills trainer leave,

18   do you recall?

19      A.  No.

20      Q.  And I believe your testimony is that you --

21   your testimony in the hearing was to the effect that

22   you were not able to find another skills trainer until

23   February; is that correct?

24      A.  Is that what I said?

25      Q.  And I'll point it out to you as we get to it,

1        A.  At that point in time.

2        Q.  Were those children also assigned skills

3    trainers?

4        A.  Yes.

5        Q.  And were those assignments filled, that is,

6    those positions filled during this period of time?

7        A.  I don't know.

8        Q.  Yeah, I would just call you back to page 67,

9    line -- lines 4 through 9.  This is how you can figure

10   out that you didn't find another skills trainer until

11   February, because you lost a replacement in December,

12   you're testifying in April, and you say that -- the

13   one who left in December did not really get replaced

14   till about six weeks ago.

15       A.  Okay.

16       Q.  Do you see that?

17       A.  Yes, I do.

18       Q.  Oh, Dr. Copeland --

19       A.  Oh, I'm sorry.

20       Q.  -- I'm being prompted to ask you to not put

21   that up too high, because it interferes with the

22   videography.

23            Now, when you say the things were chaotic, you

24   mean that -- can you describe what you mean, please.

25       A.  Well, really I can't remember exactly what I

1    meant.

2        Q.  Okay.  Didn't you mean that Bryan was having a

3    lot of problems?

4        A.  I -- I would assume, knowing how I use that

5    word, that there were many irregularities in

6    scheduling and that this didn't extend just to his

7    program -- or irregularities in scheduling and in

8    behavior maybe of other children in that classroom,

9    chaotic in the big sense of the classroom, is I think

10   what I meant.

11       Q.  And that was -- that chaos was affecting Bryan

12   in --

13       A.  It affected every child in the classroom.

14       Q.  So your answer would be yes it did affect him;

15   is that correct?

16       A.  Yes.

17       Q.  Now, on page 67 you talk about your work with

18   the skills trainers, and you say that you would train

19   them in managing Bryan's behavior and in doing DTT and

20   TEACCH tasks, that curriculum, and his academic work.

21   Is that an accurate statement?

22       A.  Yes.

23       Q.  Now, are you certified to train people in the

24   TEACCH methodologies?

25       A.  No.

91

1        Q.  Does TEACCH require certification in order to

2    conduct trainings in TEACCH methodologies?

3        A.  You can be -- you can go the certification

4    route.  In reality, that's a methodology that's used a

5    lot, I think on the Big Island especially, where

6    people train each other.

7        Q.  If I understand what you're saying, TEACCH

8    does offer certification?

9        A.  Yes, it does.

10        Q.  But there are people who are familiar with

11    TEACCH methodologies, including yourself, who are --

12    who were using it on the Big Island at that time, but

13    who were not so certified?

14        A.  Right.  I should say, actually, Bryan didn't

15    use TEACCH very much.  It just wasn't as applicable to

16    him as some other things.  What was more customary is

17    that, you know, the DOE sends someone to a TEACCH

18    certification program and then they come back and

19    share what they've learned.

20        Q.  Now, on page 68, after you describe having six

21    children that you were working with at that time who

22    were more difficult than Bryan, you were asked by Ms.

23    Kam about the turnover of skills trainers in the past

24    eight to nine months.  Do you see that?  That's at

25    line 13 -- beginning on line 13 on page 68.

92

1        A.  Yes.

2        Q.  And you told her that you had been working

3    with Bryan for 18 months and during that period of

4    time you had 12 different skills trainers and one

5    educational aide.  Do you see that?

6        A.  Yes.

7        Q.  An educational aide is not someone with

8    paraprofessional skills; is that correct?

9        A.  It's an employee of the DOE that has some

10   skills.  I don't know what they do to train that

11   person.

12       Q.  Would you agree that as a result of having 12

13   different skills trainers and one EA in an 18-month

14   period, that that created problems of consistency in

15   implementing Bryan's program?

16               MR. USHIRODA:  Objection to the extent

17   it's overly broad --

18               THE VIDEOGRAPHER:  Your microphone.

19               MR. USHIRODA:  Objection to the extent

20   that it's overly broad, vague, ambiguous, assumes

21   facts not in evidence and lacks foundation.

22               MR. VARADY:  Do you understand the

23   question?

24               THE WITNESS:  Would you repeat it.

25   BY MR. VARADY:

93

1        Q.  Yeah.  That having 12 different skills

2    trainers and an -- and an EA in 18 months presented

3    problems for you in consistently implementing Bryan's

4    program?

5                    MR. USHIRODA:  Same objections.

6                    THE WITNESS:  Yes.

7    BY MR. VARADY:

8        Q.  And you point out, in fact, on page 69 that

9    pages -- I'm sorry, lines 6 through 9 that only two

10    skills trainers out the 12 had some experience working

11    with autistic -- an autistic child; do you see that?

12        A.  Yes.

13        Q.  Did that also present problems for you as the

14    person who was responsible for implementing Bryan's

15    educational program?

16                    MR. USHIRODA:  Objection.  Vague and

17    ambiguous as to "problems."  Lack of foundation.

18    Assumes facts not in evidence and lacks -- calls for

19    speculation.

20                    THE WITNESS:  Not necessarily.  As I said

21    before, some people are quite trainable and what

22    experience they bring easily transfers, you know, to

23    working with autistic children.

24    BY MR. VARADY:

25        Q.  And so would you agree with the statement,

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

94

1    then, that you can train people to work with Bryan if

2    given adequate time and the proper supports?

3         A.  And the proper person.

4         Q.  Right.  Your answer would be yes.

5         A.  With the proper person.

6         Q.  Now, were all of these 12 people the proper

7    person?

8         A.  Sir, my problem is I don't remember the 12

9    people.  This is a number to me, and I don't remember

10   who they are, so it's very hard for me to answer that

11   question.

12        Q.  Okay.  Would you agree that as a general

13   matter that this was a high level of turnover, that

14   is, 12 different skills trainers, in an 18-month

15   period?

16                  MR. USHIRODA:  Objection.  Lack of

17   foundation.  Assumes facts not in evidence.  Calls for

18   speculation.  Also vague and ambiguous.

19                  THE WITNESS:  It is a high level,

20   probably not the only child.  There were a couple

21   others that also had -- I don't know if it was this

22   high, but they did have some turnover because there

23   are other variables involved, you know, if they're

24   aggressive and where do they live is actually also an

25   important variable, how far someone has to travel to

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    get to them, so there is -- there's always turnover

2    with high needs child.  There just is, there just is.

3    Is this excessive?  12 did seem like a lot to me.

4    BY MR. VARADY:

5        Q.  And that's based on your experience?

6        A.  That's based on my experience.  It did seem

7    like a lot, although, again, any child with the kind

8    of needs that Bryan presented, you can pretty much

9    expect there's going to be a fair level of -- a higher

10   level of turnover than with other children, and you

11   can expect that it will be difficult to find

12   replacements because they are challenge -- especially

13   challenging children, and because we live in a place

14   where the resources was quite limited.

15       Q.  Now, this is the point at which where I think

16   you actually identify that significant progress you

17   talked about in -- in Bryan's signing, and you state

18   that when you started working with him, and I assume

19   that that means when you started working with him in

20   September of '02, he had about six signs, and by the

21   time you were testifying here in April of '04 he had

22   about 140 signs.

23       A.  That's right.  That's what I said.

24       Q.  And so you would consider that -- I think you

25   described that as a significant progress?

102

1    looking at about him working on sight reading and

2    other skills during the same period of time, it wasn't

3    just signing or the functional skills that we were

4    talking about before, he was working on other things

5    like sight reading and some simple math and -- in the

6    form of counting and identifying numbers and what not;

7    is that correct?

8        A.  That is correct.

9        Q.  And I think you've confirmed on page 77 again

10   that he did in fact develop a sight vocabulary; do you

11   recall that?

12       A.  Do I recall that he did?

13       Q.  Yes.

14       A.  Or do I recall that I said that.  He did, he

15   did.  It wasn't extensive, but he did.

16       Q.  Do you believe that these skills would have

17   developed more if he had had consistent skills trainer

18   hours over that period of time from September of '02

19   to May of '04?

20              MR. USHIRODA:  Objection to the extent it

21   calls for speculation.  Also lacks foundation.

22   Assumes facts not in evidence.

23              THE WITNESS:  Having appropriate

24   teachers, and in a sense a skills trainer is a

25   teacher, always strengthens a child's opportunity and

1            And that was something that you found worth

2    remarking on at this hearing?

3        A.  It was, I repeat, it was very exciting.

4        Q.  And my question is with the -- with a more

5    consistent approach during that period of time, do you

6    have an opinion as to whether or not it would have

7    been possible for him to make more progress?

8                MR. USHIRODA:  Again objection to the

9    extent it calls for speculation.  Lack of foundation.

10   Also assumes facts not in evidence.

11               THE WITNESS:  I am not comfortable making

12   a causal relationship.  I have to remember that in all

13   of this change, it's really when he began developing

14   those 20 words.  However, with that inconsistency it

15   certainly is the first thing you see, and the first

16   thing I would want to address so that we can organize

17   and direct, tighten, you know, his program.

18   BY MR. VARADY:

19       Q.  And you've already testified about the fact

20   that the program, his program, that is Bryan's

21   particular program needs to be highly structured; is

22   that correct?

23       A.  Yes.

24       Q.  And that there needs to be consistency from

25   person to person in implementing that structure?

1       A.  It works best, yes.

2       Q.  And it requires the use of the same

3   techniques, the same prompts?

4       A.  As nearly as you can, and I ask you,

5   counselor, to keep in mind we are dealing with a cast

6   of characters and it was very challenging to have that

7   consistency.

8       Q.  And -- and wouldn't it also require ongoing

9   training and ongoing --

10      A.  Yes.

11      Q.  -- feedback amongst the set of people who are

12  implementing the program?

13      A.  Yes, and to that end, we met weekly so that we

14  reviewed -- during this particular year, we met weekly

15  on Monday at noon, I remember that well, and reviewed

16  his -- his entire program, and I believe there were

17  usually two skills trainers there, the teacher, me, I

18  can't -- maybe the speech therapist, or whoever could

19  show up, and we went through his program, and it's,

20  you know, this worked, that didn't work, let's try

21  using colored numbers instead of black, whatever we

22  needed to do to kind of tweak his program for the very

23  reason you said, because sort of all being on the same

24  page was an important thing.  And a difficult

25  challenge.

1               MR. USHIRODA:  Objection.  Lack of

2    foundation.  Assumes facts not in evidence.  Also

3    misstates prior testimony.

4               THE WITNESS:  I don't know about that.  I

5    know Dr. Bolton did some, and the thing with a

6    functional behavioral analysis, particularly with a

7    child like Bryan, is it changes.  You know, the one

8    you did in April, unfortunately doesn't apply in July

9    because he has changed and the environment has

10   changed.  So, you know, I can't really tell you like

11   when the most recent formal functional behavioral

12   analysis was done.

13   BY MR. VARADY:

14      Q.  Do you know -- are you aware -- I guess my --

15   just to ask you a couple more questions on that, are

16   you aware of seeing one before Dr. Smalley's?

17      A.  I don't -- I don't really remember.  I

18   remember that my whole work with him was doing small

19   ones.

20      Q.  So my question, though, is do you recall

21   seeing a formal detailed written plan like Dr.

22   Smalley's August 2004 plan before that, in between the

23   time you started working with Bryan in September of

24   '02 up to August of '04?

25      A.  I don't remember seeing one, but I also don't

1    toileting skills."  Do you see that?

2       A.  Yes.

3       Q.  Then you go on to say:  "If he cannot be

4    someplace in public because of his behavior, he does

5    not have toileting skills, his life will be very

6    narrow."  Do you see that?

7       A.  Yes, I do.

8       Q.  So -- and then you go on to say:  "Those two

9    things will eliminate a lot of activities for him, so

10    that's what we keep in mind."  Do you see that?

11       A.  Yes.

12       Q.  So those -- those two issues, and that is

13    negative behaviors and in particular the toileting

14    skills, were significant concerns at that time that

15    you believed, if they were not addressed properly,

16    would limit Bryan's ability to function in the

17    community?

18       A.  Yes.

19       Q.  And that's why you were testifying about this

20    at the hearing and making a point that those issues

21    needed to be addressed in order for him to reach a

22    level of functionality that you believed he could; is

23    that correct?

24              MR. USHIRODA:  Objection.  Leading.

25              THE WITNESS:  I believed that in order

1      Q.  Do you disagree that this was reasonable -- a

2  reasonable accommodation for Bryan?

3           MR. USHIRODA:  Objection to the extent it

4  calls for speculation.  Also vague and ambiguous as to

5  accommodation.

6  BY MR. VARADY:

7      Q.  Do you understand my question?

8      A.  Yes, I do.  And it -- it may be -- well,

9  they've used the word "proficiency," that bothers me.

10  I'm not sure that they needed to be proficient in

11  American Sign Language.  I didn't feel that.  That's

12  not a word I would use.

13      Q.  What word would you use?

14      A.  What word would I use?  I would say and can

15  accommodate the use of American Sign Language in his

16  instruction.

17      Q.  With that qualification, do you believe that

18  this was a reasonable --

19      A.  Certified special ed teacher, experienced

20  teaching autistic children, yeah, I would --

21           MR. USHIRODA:  Let me just place an

22  objection to the extent it calls for a legal

23  conclusion.  Go ahead.

24           THE WITNESS:  It seems to me that it's a

25  kind of typical requirement.  Certified special ed

130

1                    MR. USHIRODA:  Same objections.

2                    THE WITNESS:  The need to meaning we need

3    to?

4    BY MR. VARADY:

5        Q.  Yes.

6        A.  Yes, we need to implement a consistent program

7    that crosses his day.

8        Q.  Right.  And across his platform, so in school,

9    in the community, in the home, the program needs to be

10   consistent?

11       A.  Seamless, as they say.

12       Q.  So to the degree that it was not, Bryan's

13   parents' concerns about that would be legitimate

14   concerns; isn't that correct?

15                   MR. USHIRODA:  Objection.  Same

16   objection.  Calls for speculation.  Looking into the

17   minds of other people, lack of foundation, assumes

18   facts not in evidence.  Also calls for a legal

19   conclusion.

20   BY MR. VARADY:

21       Q.  Do you understand my question, Dr. Copeland?

22       A.  Yes, yes.

23           Any time a program isn't being implemented in

24   the way it was intended or agreed upon, a strong

25   advocate parent of course is going to be concerned

134

1          A.  Please.

2          Q.  I'm sorry.

3                    MR. USHIRODA:  Let me just put in an

4     objection.  Lack of foundation.  Assumes facts not in

5     evidence.  I don't think it's been established that

6     this witness has seen this letter before.

7     BY MR. VARADY:

8          Q.  Have you had sufficient opportunity to read

9     the letter?

10         A.  Yes.  Yes.

11         Q.  Do you recall these incidents that are

12    described in here in which Bryan was attacked by a

13    student in his class?

14                   MR. USHIRODA:  Again, lack of foundation,

15    assumes facts not in evidence.

16                   THE WITNESS:  Vaguely.

17    BY MR. VARADY:

18         Q.  Would you agree that by being attacked on more

19    than one occasion in class it might cause Bryan to

20    become more aggressive?

21                   MR. USHIRODA:  Objection.  Lack of

22    foundation.  Assumes facts not in evidence.  Improper

23    hypothetical.  Also calls for speculation.

24                   THE WITNESS:  That is possible.

25    BY MR. VARADY:

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1       A.  Okay.  So we were kind of on our own trying to

2    put this together.  Okay.

3       Q.  All right.  But it seems clear to me from this

4    letter that the experience at that time was that the

5    parents were trying to do -- whatever the plan was,

6    good, bad or indifferent, the parents were trying to

7    do it and were concerned about the fact that whatever

8    the plan was, wasn't being followed in school.

9                    MR. USHIRODA:  Objection to the extent it

10   calls for speculation.

11   BY MR. VARADY:

12      Q.  Do you recall that?

13      A.  I don't recall the not following in school

14   part.  What I really recall more is this particular

15   skills trainer and her difficulty in getting it.  That

16   I -- that I recall.  The school, it may have been.  I

17   just don't remember.

18      Q.  I'm not trying to assign to the school the

19   fact that it wasn't being implemented.  I'm saying

20   while he was at school, whether it was the skills

21   trainer or the teacher or both of them or, you know, a

22   combination of other people who were responsible, the

23   concern was that it wasn't being -- whatever the plan

24   was it was not being implemented at school.

25                   MR. USHIRODA:  Objection.  Asked and

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

```
 1    answered, lacks foundation, assumes facts not in

 2    evidence.  Argumentative.

 3              THE WITNESS:  It was not being equally

 4    implemented.  Implementation was always a huge

 5    problem, and, yes, getting plans that were implemented

 6    at home and were implemented at school, you know, on

 7    the same -- was always hard, and I really don't

 8    remember that, but it was not -- it would fit.  It was

 9    usually a problem.

10    BY MR. VARADY:

11        Q.  And --

12              MR. USHIRODA:  I'd ask the witness not to

13    speculate or guess.

14    BY MR. VARADY:

15        Q.  Now, looking at paragraph 3, Kim actually

16    refers to Dr. Smalley in that paragraph, do you see

17    that?

18        A.  Uh-huh.

19        Q.  Did you contact Dr. Smalley after receiving

20    this letter?

21        A.  No.

22        Q.  Did --

23        A.  I don't -- I don't remember that I did.

24        Q.  Okay.  Did anyone from the DOE represent to

25    you that after this letter was written, Dr. Smalley
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

147

1    parents' concerns that Richi, the skills trainer, had

2    not been honest with them or direct about wanting

3    Bryan to come home?

4                    MR. USHIRODA:  Objection.  Misstates

5    document.  Also lacks foundation.

6                    THE WITNESS:  Would you repeat your

7    statement, please.

8                    MR. VARADY:  Could you read it back.

9                    (Record read.)

10                   MR. USHIRODA:  Same objections.  Also

11   assumes facts not in evidence.  Lacks foundation.

12   Also calls for speculation.

13                   THE WITNESS:  I would agree that there

14   was very poor communication between Richi and these

15   parents and that was long standing and this is a

16   pretty good example of it.

17   BY MR. VARADY:

18       Q.  And would you also agree that good

19   communication between the skills trainers and parents

20   is more likely to produce a successful outcome in

21   Bryan's program than bad communication?

22                   MR. USHIRODA:  Objection.  Lack of

23   foundation.  Assumes facts not in evidence.  Taking

24   one isolated incident out of context.  Also calls for

25   speculation.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1        A.  Not that I recall.

2        Q.  This letter expresses certain concerns about

3    the implementation of Bryan's program at a time when

4    you've already testified there were some difficulties

5    in obtaining and maintaining skills trainers; is that

6    correct?

7        A.  Yes.

8            MR. VARADY:  Go ahead, counsel, do you

9    have a late objection?

10            MR. USHIRODA:  No objection now, just on

11    the lack of foundation regarding this document.

12    BY MR. VARADY:

13        Q.  Did -- at any time did you consult with the

14    parents regarding content of any advertisements that

15    they might put in paper; in other words, did they say,

16    gee, what should we ask for?  How do we word this?

17        A.  No.

18        Q.  Anything to that effect?

19            This will be Exhibit Number 13.

20                (Exhibit No. 13 marked.)

21    BY MR. VARADY:

22        Q.  This document appears to be an email dated

23    September 27, 2004, an exchange of emails between

24    Kelly Stern and Kate Tolentino.

25            Have you seen this email before?

151

1      A.  No.

2      Q.  This email discusses someone named Danielle

3  and someone named Sven; do you see that?

4      A.  Yes.

5      Q.  Do you know who they are?

6      A.  Yes.

7      Q.  Who are they?

8      A.  They were two skills trainers.

9      Q.  And they were skills trainers assigned to

10  Bryan's case in September of 2004; is that correct?

11     A.  They were assigned to his case.  I guess it

12  was September, I don't know.

13     Q.  Now, do you recall Sven's last name?

14     A.  No.

15     Q.  Do you recall Danielle's last name?

16     A.  No.

17     Q.  Do you recall training either of them?

18     A.  I recall coaching them.

19     Q.  Okay.  Could you distinguish for me between

20  coaching and training?

21     A.  Training, for me, is when you have time away

22  from the child so you can talk and go over maybe the

23  theory behind this and demonstrate how you do it, like

24  with DTT, for example.

25          Coaching is more we're on the scene and they

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1     friend, you know, can he jump over the wall, those

2     kinds of questions, and then it's scored based on

3     that.

4          Q.  Now, would you turn to the second page where

5     the summary and educational implications are listed,

6     that would be page DOE 1231.

7          A.  Yes.

8          Q.  Now, mid paragraph where it says summary and

9     educational implications, the sentence begins "he

10     manages," do you see that, "he manages all clothing

11     including most fasteners with prompting for

12     orientation."  Do you see that?

13          A.  Yes.

14          Q.  That was true in September of 2002; is that

15     correct?

16          A.  Yes.

17          Q.  It states:  "He is toilet regulated, sometimes

18     going independently between time schedule with

19     infrequent accidents."  Do you see that?

20          A.  Yes.

21          Q.  Was that true in September of 2002?

22          A.  My recollection for that period of time was I

23     think he came to school with a diaper, since it was a

24     long bus ride, which was removed when he got to

25     school, and he -- I remember him going by himself,

1    honestly don't remember what happened to that thought.

2    BY MR. VARADY:

3         Q.  DD would be developmental --

4         A.  Developmental Disabilities.

5         Q.  That's a different department than the

6    Department of Education?

7         A.  Yes, that's from the Department of Health.

8         Q.  All right.  And so both you and Dr. Smalley

9    were aware that the Developmental Disabilities

10   division might be able to provide a night monitor

11   under certain circumstances?

12        A.  That was what we thought.

13        Q.  You -- you knew at that time that both Kim and

14   Stan were working full time; is that correct?

15        A.  That's right.

16        Q.  And they had to sleep at some time during the

17   day; is that correct?

18        A.  That's right.

19        Q.  Or night, I guess, is the point.  And -- and

20   that what was needed, according to her, was someone

21   who could be a night monitor to cover this toileting

22   plan 24 hours a day so that Bryan could really

23   self-regulate at night, which was his biggest

24   problems; is that right?

25        A.  Yes.

1    is it's not just as easy as it may sound where you

2    just sign up for those services, but it was discussed.

3    BY MR. VARADY:

4        Q.  Do you disagree with Dr. Smalley's assertion

5    in here that Kim and Stan were not doing anything

6    wrong regarding Bryan's toileting program?

7                    MR. USHIRODA:  Objection.  Argumentative.

8    Lack of foundation.  Assumes facts not in evidence.

9    Also calls for speculation.

10                    THE WITNESS:  I was not aware of anything

11    they were not doing that they could have been doing.

12    BY MR. VARADY:

13        Q.  All right.  She concludes with stating:  "Once

14    data is collected or nighttime personal assistance

15    identified, I would be happy to provide any further

16    consultation that might be useful."  Do you see that?

17        A.  Yes.

18        Q.  Do you know if there was any further

19    consultation with Dr. Smalley by the DOE or anyone

20    else regarding the toileting program?

21        A.  I'm a little confused as to the time, because

22    this would suggest that Dr. Smalley came at the first

23    part of the year, like March or February or something,

24    and that little addendum that I had would also suggest

25    that she was here because we saw two students, and

```
 1    April 7th, 2004.  That would have been after the March

 2    24th, 2004 date on the prior copy.

 3        A.  Yes, uh-huh.

 4        Q.  Do you recognize that received stamp?

 5        A.  No.

 6        Q.  Who got copies of this toileting plan?

 7                MR. USHIRODA:  Objection.  Calls for

 8    speculation.

 9    BY MR. VARADY:

10        Q.  I don't want you to speculate.  I just want

11    to --

12        A.  I really don't remember.

13        Q.  Would -- would the skills trainer have had a

14    copy?

15        A.  No, no, the skills trainer would most likely

16    not have had a copy.  What they would have had from me

17    would be step one, two and three, and this is what

18    we're doing and this is why we are going to do it.

19    Skills trainers did not usually have this type of

20    document.

21        Q.  You'd agree that in order for Bryan to

22    function in the community, he has -- he has to learn

23    to self-regulate generally; is that correct?

24                MR. USHIRODA:  Objection to the extent it

25    calls for speculation.  Lack of foundation.  And
```

1    but that would be it.

2    BY MR. VARADY:

3        Q.  So this was never formally discussed, that's

4    what you're saying?

5        A.  With me.

6                    (Exhibit No. 18 marked.)

7    BY MR. VARADY:

8        Q.  Let me show you Exhibit Number 18 now.  This

9    is a memo from The Institute for Family Enrichment

10   dated Wednesday, September 15th, 2004 addressed to

11   Mr. Rho.  Do you see that?

12       A.  Yes.

13       Q.  And it's unsigned, but bears the signature

14   block of Kelly Stern.  Do you see that?

15       A.  Yes.

16       Q.  Who's Kelly Stern?

17       A.  Kelly was the program director, I think was

18   her title, for TIFFE, and it was her job to recruit

19   and assign the skills trainers to different students,

20   and she took care of all of the administrative

21   portions of their employment.

22       Q.  By this time you were also working for TIFFE;

23   is that correct?

24       A.  What was it?  What was the date here?  Yes.

25       Q.  So was Kelly Stern also your supervisor or

184

1    the school wasn't open?

2         A.  Well, they --

3                   MR. USHIRODA:  Objection.  Lack of

4    foundation.

5                   THE WITNESS:  -- the weekend, we had kind

6    of a different plan for the weekend.  I'm talking

7    about like a federal holiday when the school isn't

8    open.

9    BY MR. VARADY:

10        Q.  Okay.

11        A.  But I believe he had services, and so then

12   that would become more problematic.

13        Q.  So it was more problematic on those types of

14   days because Bryan was supposed to be getting services

15   even though they were on a holiday?

16        A.  Even though the school was closed, yeah.

17        Q.  Now, this is another TIFFE memo.  It's Exhibit

18   Number 19.

19                   (Exhibit No. 19 marked.)

20   BY MR. VARADY:

21        Q.  Now, the first -- first of all, have you seen

22   this memo before today?

23        A.  No, I have not.

24        Q.  All right.  Again, it's on TIFFE letterhead,

25   September 15th, 2004, addressed to JoAn Hill regarding

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    community.  Were you aware of that at this time?

2        A.  I -- I was aware.  That was her whole

3    philosophical kind of base.  She liked taking children

4    out into the community.  That's what they did in New

5    York, that's what she wanted to do here.  That, again,

6    was her philosophical approach.

7        Q.  And if she was taking Bryan out into the

8    community, she wouldn't be working on the goals that

9    you had described and that Kim Smalley had identified,

10   both with regard to toileting and the functional

11   in-home skills such as cleaning, laundry, food

12   preparation; isn't that correct?

13              MR. USHIRODA:  Objection.  Lack of

14   foundation.  Assumes facts not in evidence.  Misstates

15   prior testimony.

16              THE WITNESS:  If she was in the

17   community, she could have been working on the

18   toileting, not exactly like that plan, but being able

19   to let someone -- to be able to -- for Bryan to state

20   that he needed to use the bathroom.  The goals in the

21   community were different.  I mean, we had a different

22   set of goals for the community, so if she was in the

23   community, she would be expected to address some

24   safety issues, you know, being able to be in a store

25   without grabbing things off the shelf, that sort of

1   thing.  It's a different set of goals.

2   BY MR. VARADY:

3     Q.  But wouldn't you agree that to the degree that

4   she doesn't want to be in the home and that she has

5   this philosophical bent for being out in the

6   community, not collecting data, but doing other things

7   that she thinks are appropriate, that she's not acting

8   in a manner that's consistent with the goals and

9   objectives that have been identified or the specific

10   plans that have been identified for reaching those

11   goals and objectives?

12           MR. USHIRODA:  Objection.  Lack of

13   foundation.  Assumes facts not in evidence.  Misstates

14   prior testimony.  Overly broad.  Also constitutes

15   testimony my counsel.

16           THE WITNESS:  If Danielle was in the

17   community and she was addressing -- she would be

18   addressing community goals.  Obviously if she's in the

19   community, we're not addressing the home functional

20   goals.

21   BY MR. VARADY:

22     Q.  Well --

23     A.  There were -- we did have some community

24   goals.  She became a better data taker, but she was

25   not especially consistent with that.

188

1        Q.  Well, you saw the prior email in which Kelly

2    Stern is talking about whether or not she is going to

3    have continued employment, that is Ms. Doucette.

4                    MR. USHIRODA:  Well --

5                    MR. VARADY:  Gregg, let's go off the

6    record for just a minute, please.

7                    THE VIDEOGRAPHER:  Off the record.  3:37

8    p.m.

9                    (Off the record.)

10                   THE VIDEOGRAPHER:  Back on the record.

11   It's 3:38 p.m.

12                   MR. USHIRODA:  I just want to put on the

13   record that while we were on the break counsel used

14   profanity towards me and accused me of interrupting

15   his deposition.  You know, that kind of behavior is

16   just not tolerated, counsel.  There's no call for

17   swearing at me or using profane language.

18                   I'm make -- stating my objections for the

19   record.  I don't believe I'm engaging in any speaking

20   objections.  I've stated my objections.  Once they're

21   done, I haven't told her not to answer.  I mean,

22   you're free to conduct your deposition.  I'm here to

23   pro -- state my objections.

24                   MR. VARADY:  Okay.  Let's just go for it.

25   You keep coaching the witness and interfering with my

194

1    BY MR. VARADY:

2        Q.  Now, even with Ms. Doucette accusing the

3    parents of having an unsanitary home, the parents

4    still permitted her to serve as a skills trainer in

5    the school; is that correct?

6        A.  Yes.

7        Q.  How long did she do that?

8        A.  I don't know.

9        Q.  How long did you continue to serve as the

10    IISC?

11        A.  Until Bryan left.

12        Q.  Okay.  Did Ms. Doucette serve a similar time,

13    that is, from the beginning of the school year,

14    '04-'05 school year until January when Bryan left?

15        A.  My recollection is that she was not working

16    with him that, maybe, December, January, although,

17    again, I could be mistaken.

18        Q.  I'm just -- again, Dr. Copeland, only your

19    best recollection.

20        A.  My best recollection is that she was not

21    involved at the end of that.

22        Q.  I'm only asking you for the probabilities, the

23    best recollection you have --

24        A.  Thank you.

25        Q.  -- not certitude.

197

1              (Exhibit No. 20 marked.)

2    BY MR. VARADY:

3        Q.   This is Exhibit Number 20.   It's a chart.

4    It's addressed to Mr. Rho, again on TIFFE letterhead.

5    And it looks like a chart of skills trainers from May

6    to September serving Bryan Wiles-Bond.   Do you see

7    that?

8        A.   Yes.

9        Q.   Have you ever seen this document?

10       A.   I believe it was among those that I saw with

11   Mr. Ushiroda.

12       Q.   Now, if you look at the summary statement at

13   the bottom of the second page.

14       A.   Uh-huh.

15       Q.   It says:   "All these skills trainers except

16   Lee Mitchell have received direct supervision and

17   support from Dru Copeland on the days she is in the

18   classroom."   Do you see that?

19       A.   Yes.

20       Q.   All right.   First of all, is that an accurate

21   statement, that you provided direct supervision to all

22   of these skills trainers on days when you were in the

23   classroom?

24       A.   On days I was in the classroom, yes.

25       Q.   Okay.   How many days would that be per month?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

199

1     Q.  Okay.

2     A.  -- coaching, observing, if there's an

3     opportunity to talk with them a little privately,

4     going over, asking to see their data, checking to see

5     that they've taken it.

6     Q.  Now, looking at the next sentence where it

7     says each skills trainer must attend group supervision

8     one time a month for two hours; do you see that?

9     A.  Yes.

10    Q.  What does that refer to?

11    A.  Each skills -- there's a group -- there was a

12    group supervision for all of the skills trainers once

13    a month that lasted two hours.

14    Q.  But, I'm sorry, what is a group supervision?

15    A.  Oh, I beg your pardon.  Group supervision is

16    when all of the skills trainers come together in a

17    group and have supervision in a group setting.

18    Q.  All right.  And who is providing the

19    supervision?

20    A.  Kelly provided the first hour, which dealt

21    with the administrative kind of issues.  I dealt with

22    the last hour, which dealt with what we call clinical

23    issues.  And we might address such things as working

24    with other personnel in the school.  We might --

25    global things that applied to everybody:  collecting

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    data, super -- responding to supervision, we -- we

2    would do some kind of case scenarios, sometimes a lot

3    of ethical kinds of things, confidentiality,

4    boundaries, having appropriate boundaries between

5    themselves and the family, and, you know, themselves

6    and the school and themselves and other skills

7    trainers in the room.  Those more general clinical

8    issues were addressed in the group, where it applied

9    to everybody.

10         Q.  Am I correct that it was you and the skills

11    trainers in that particular type of group?  It did not

12    include their students?

13         A.  No, no students.

14         Q.  So you and the skills trainers would be

15    participating --

16         A.  Yes.

17         Q.  -- in that kind of group activity; is that

18    correct?

19         A.  Yes.

20         Q.  Where was that conducted?

21         A.  At the TIFFE office.

22         Q.  All right.  Did Ms. Stern consult with you

23    before preparing this chart, do you know?

24         A.  No.

25         Q.  And do you recall seeing it before

1      Mr. Ushiroda showed it to you?

2          A.  No, I have not seen it.

3          Q.  This indicates that Mr. Lindermann, for

4      example, watched DTT, TEACCH, and PECS videos before

5      hire.  Do you see that?

6          A.  Yes.

7          Q.  Was that the extent of his training in those

8      areas before he was retained; do you know?

9          A.  I do not.

10                     MR. USHIRODA:  Objection.  Calls for

11     speculation.

12                     THE WITNESS:  I do not know.

13                     (Exhibit No. 21 marked.)

14     BY MR. VARADY:

15         Q.  This is Exhibit Number 21.  This is a

16     four-page letter to JoAn Hill and bearing the

17     signature block of Kelly Stern.  Do you see that?

18         A.  Yes.

19         Q.  Do you recognize her signature?

20         A.  Yes.

21         Q.  Have you seen this document before today?

22         A.  I saw it in Mr. Ushiroda's office.

23         Q.  Okay.  Do you recall ever seeing it prior to

24     that?

25         A.  I did not see it prior to that.

1    as sick when he didn't -- when he was miserable and

2    not feeling well enough to do his work?

3         A.  Would you restate that, please.

4              MR. VARADY:  Could you read it back,

5    please.

6              (Record read.)

7    BY MR. VARADY:

8         Q.  Was it your understanding that it was -- I'll

9    restate the question, because it's -- it's confusing.

10             My question is:  Was it your understanding

11   that Ms. Stern was suggesting that Bryan should go

12   home as sick on days when he was miserable and

13   refusing to work?

14        A.  I do not --

15             MR. USHIRODA:  Objection to the extent it

16   calls for speculation.

17             THE WITNESS:  I don't know what Ms. Stern

18   meant, but it does sounds like that's what she's

19   saying in this letter, in this document.

20   BY MR. VARADY:

21        Q.  She didn't -- after sending you a copy of it,

22   she did not talk to you about it?

23        A.  I don't remember getting a copy of this.

24        Q.  Is it possible that you're shown as receiving

25   a copy but you did not get a copy?

1          Q.  As to the functional behavioral analysis or

2     the behavioral support plan, do you recall seeing

3     either of those in January of '03?

4          A.  No.

5          Q.  It says each of the activities of the skills

6     trainers would be tied to Bryan's IEP.  Had that been

7     a problem before January of '03?

8                    MR. USHIRODA:  Objection.  Assumes facts

9     not in evidence.  Lack of foundation.

10                   THE WITNESS:  I do not know if it had

11    been a problem or not, but what I do know is that I

12    felt very strongly about his after school time being

13    used effectively, and that we shouldn't just go

14    wander, you know, that if -- if one of his goals was,

15    you know, that he would interact with another child,

16    we must make sure that he's interacting with another

17    child.  I think that's what that reflects.

18    BY MR. VARADY:

19         Q.  Who are Sheri Adams and Mahea Edwards?

20         A.  Sheri Adams was the speech pathologist hired

21    by the district -- at the direct level, and Mahea

22    Edwards was the, what do they call her, classroom

23    consultant, classroom resource teacher at the district

24    level.

25         Q.  Had there been instances prior to January '03

1       Q.  So were the particulars of this behavioral

2   assessment discussed at that meeting?

3       A.  She went over it pretty much line by line.

4       Q.  And was the origin of this assessment

5   discussed?  In other words, why she had done it?

6       A.  No.

7       Q.  Was there anything in this assessment with

8   which you did not agree when you heard it presented by

9   Dr. Smalley?

10                  MR. USHIRODA:  Objection.  Overly broad.

11                  THE WITNESS:  The part I didn't agree

12  with, it wasn't particularly anything that she said.

13  There's so much there that it didn't give me, or, I

14  thought, the team, the kind of precise direction that

15  we needed.  And I was just looking at page 8, where

16  under alternative behaviors, you know, appropriate

17  behaviors that may be taught or reinforced that can

18  replace those, those behaviors were a problem.  I

19  mean, he didn't really quite understand choice, and if

20  you look at some of the things, you know, I guess you

21  have all those documents, we set up a little program

22  to just understand if you take this, that means you

23  don't get that.  You know, all of these were kind of

24  problems, so you couldn't just take this and use it as

25  a replacement behavior.

222

```
 1        Q.  So it was used by the team in working with

 2   Bryan, that is, the information set forth in this

 3   behavioral assessment?

 4        A.  Yes.  Pieces and parts of it were used.

 5        Q.  Now, looking at page DOE 1945, it says that

 6   Bryan needs a lengthy and comprehensive crisis plan.

 7        A.  Yes.

 8        Q.  Who was to develop that?

 9        A.  I don't know who was.  The team did.  There

10   was a crisis plan developed.

11        Q.  When was that?

12        A.  In that time period someplace, I can't really

13   remember exactly when it was.

14        Q.  At -- at any time during the period when you

15   first started working with Bryan in September of 2002

16   up through this August '04 period, did you think that

17   he should be institutionalized and not -- and that he

18   required institutionalization rather than working with

19   him in school and in the home?

20        A.  I never thought that as a foregone conclusion.

21   What I did begin to wonder at the end, after he was

22   removed from school, that that should -- should be

23   explored or thought about because essentially what we

24   were trying to do is to replicate that, you know, he

25   had 70 hours a week of skills trainers we were trying
```

1    to replicate, and we were not being especially

2    successful at that.  I -- that -- that is not a

3    recommendation I would have made.

4        Q.  And you did not make it?

5        A.  I did not make that.  I might recommend let's

6    talk about it, let's see what the pros are, let's see

7    what the cons are, let's see -- again, because my

8    experience is that when teams and families have

9    explored every possibility, even if -- and saying no

10   is very important, then you know why you said no.  You

11   know, you've thought that through, you can check it

12   off your list, we walked down that road, no.  Now we

13   can more comfortably walk down this road.  So

14   that's -- that kind of exploration, I think, benefits

15   everybody.

16       Q.  Are you familiar with therapeutic day

17   treatment centers from your work on the mainland?

18       A.  Yes.

19       Q.  Can you describe what they're -- what they're

20   like.

21       A.  The ones that I'm familiar with is --

22       Q.  Yes.

23       A.  -- is where the student goes to the center,

24   which resembles a school in many ways, although there

25   are like maybe kind of apartments in which they can

1    practice functional living skills and their day is

2    longer.  They may go as early as 7:00 and they may

3    even stay as late as 7:00, and some of the more

4    advanced students may spend the night in this

5    apartment, you know, that is part of the school.  And

6    then -- so it's a very controlled environment,

7    basically.  And, you know, they do really much of what

8    we did, you know, similar things.

9          They have -- one of the things they don't do

10    is they don't have this exclusive one-on-one like we

11    did.  The student may have one-on-one, but it's not an

12    exclusive person.  So as they move from one project or

13    one subject to another, it will be a different person,

14    which has some distinct advantages because they learn

15    to relate to more people, they learn to take

16    directions from more people.

17          It's comprehensive.  They usually do, you

18    know, a lot of community things, going out into the

19    community.  Some of them, again depending on the level

20    of the students, they may even venture into some

21    economic things, more like a sheltered workshop.  One

22    I knew, you know, made those little packages that you

23    have your fork and knife in and you find on airplanes

24    and things.  And those are for older students than

25    Bryan was, but that would be the comprehensive, the

1     and you might start on something you think is going to

2     take 20 minutes and it takes him three, and so she did

3     make that be comment.

4          Q.  Now, you continued working on Bryan's case

5     until he left; is that correct?

6          A.  That is correct.

7          Q.  And that was in January, January of 2005; is

8     that correct?

9          A.  Yes.

10         Q.  Did you continue working for TIFFE after that

11    time?

12         A.  Yes.

13         Q.  And how long did you continue working at

14    TIFFE?

15         A.  Till March 15th, 2007.

16         Q.  All right.  And then did you return to the

17    mainland?

18         A.  I returned to the mainland.

19         Q.  Now, would you agree that one of the problems

20    with Bryan's case and specifically implementing his

21    program in the home was the lack of continuity in the

22    skills trainers who were working with him in the home?

23              MR. USHIRODA:  Objection.  Calls for

24    speculation.  Lack of foundation.  Assumes facts not

25    in evidence.

234

```
1        A.  Yes.

2        Q.  -- were destructive to the home?

3        A.  Yes.

4        Q.  He might do things that would cause a threat

5    of safety to himself or to others?

6        A.  Yes.

7        Q.  And that's why at night his room was locked?

8        A.  Yes.

9        Q.  Now, are you aware of the fact that Bryan was

10   isolated in a portable classroom in September of 2004?

11                   MR. USHIRODA:  Objection.  Lack of

12   foundation.  Calls for speculation.  Assumes facts not

13   in evidence.

14                   THE WITNESS:  The portable classroom, was

15   it a portable?  He did have a half a classroom, and I

16   guess it was a portable.

17   BY MR. VARADY:

18       Q.  Are you aware of an incident in which his

19   mother came to school to meet the teacher and observe

20   his new program and found him self-stimulating,

21   sliding in his own urine on the mat on the floor?

22                   MR. USHIRODA:  Objection.  Lack of

23   foundation.  Assumes facts not in evidence.

24                   THE WITNESS:  I was told that.  I wasn't

25   there.
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    BY MR. VARADY:

2        Q.  Were you ever told what the teacher or skills

3    trainer said when Kim asked them what was happening?

4        A.  You know, I probably was, but I don't

5    remember.

6        Q.  Do you recall the teacher saying words to the

7    effect that I don't know what to do with him?

8                    MR. USHIRODA:  Objection.  Lack of

9    foundation.  Assumes facts not in evidence.

10                   THE WITNESS:  I'm sorry, I don't

11   remember.

12                   MR. USHIRODA:  Could you let me finish my

13   objection first.

14                   THE WITNESS:  I'm sorry.

15   BY MR. VARADY:

16       Q.  Assuming that the skills trainer, when asked

17   what was happening, said words to the effect of he

18   looks so happy during an incident like that, do you

19   think the parents would be justified in removing him

20   from that situation and taking him home?

21       A.  Not at --

22                   MR. USHIRODA:  Objection.  Lack of

23   foundation.  Assumes facts not in evidence.  Calls for

24   speculation.  Also improper hypothetical.

25                   THE WITNESS:  Not on the basis of that

1    comment, and, you know, I really don't remember too

2    much about that, but I seriously doubt his removal was

3    the result of one incidents.  I suspect it was a

4    result of a build up and there was then an incident.

5    BY MR. VARADY:

6        Q.  I -- I understand what you're saying, and if I

7    can just rephrase it and have you confirm that what

8    you're saying is that it was the culmination of a

9    series of -- of problems that led to the parents

10   removing him from school after finding him sliding in

11   his own urine?

12                    MR. USHIRODA:  Objection.  Lack of

13   foundation.  Assumes facts not in evidence.  Again,

14   misstates testimony.

15                    THE WITNESS:  The culmination of a series

16   of events, yes.

17   BY MR. VARADY:

18       Q.  Now, do you know, did you meet Cara Entz when

19   she came to the Big Island?  Cara Entz, she was

20   employed by Pacific Child & Family?

21       A.  Yes, I met -- I don't know if that's who I

22   met.  I met a couple of those people.

23       Q.  Were you involved in any of the meetings that

24   she attended to discuss Bryan's program or participate

25   in any observations or assessments that she conducted?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    the trenches, I'm in the classroom, so my contact was

2    with all of those people who are delivering services

3    kind of at that ground level.  I didn't really have --

4    I had very little contact, really, with that upper

5    echelon.

6        Q.  Among the documents that you reviewed for your

7    deposition today, did Mr. Ushiroda provide you a copy

8    of Dr. Smalley's deposition?

9        A.  No.

10       Q.  Do you have any reason to believe, based on

11   your experience with Bryan, that he can't continue to

12   learn and grow and move toward the goals and

13   objectives that have been identified for him?

14                  MR. USHIRODA:  Is that presently,

15   counsel?

16                  MR. VARADY:  Yes.

17                  MR. USHIRODA:  Okay, then I object on the

18   ground it calls for speculation.  Lack of foundation.

19   And assumes facts not in evidence.

20                  THE WITNESS:  I have not seen Bryan for

21   three years, and I just do not feel comfortable trying

22   to make that kind of judgment.

23   BY MR. VARADY:

24       Q.  During the time you were working with him, was

25   there anything -- any facts you're aware of that would

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    though, I can mark and then --

2                    MR. VARADY:  You'll have correction

3    sheets and you'll have an opportunity to do that.

4                    THE WITNESS:  Thank you.

5                    MR. USHIRODA:  I have some questions.

6                    THE VIDEOGRAPHER:  Can I actually change

7    tape.  End of tape 4.  We're going off the record at

8    5:07 p.m.

9                    (Off the record.)

10                    THE VIDEOGRAPHER:  This will be the start

11   of tape 5.  Back on the record.  It's 5:08 p.m.

12                            EXAMINATION

13   BY MR. USHIRODA:

14        Q.  Good afternoon.  Gregg Ushiroda.  I represent

15   the Department of Education and Alvin Rho, and I just

16   wanted to follow up on some questions that Mr. Varady

17   asked you and perhaps get some clarification.  I'm

18   probably going to work backwards since that's how my

19   notes are.

20                You know, Mr. Varady discussed with you a -- I

21   believe he identified a woman named Cara Entz who was

22   with Pacific Child and Family Service who came down to

23   observe Bryan at school, correct?

24        A.  Yes.

25        Q.  Okay.  And you said you met with

1    representatives from that company at the school?

2         A.  Yes.

3         Q.  Okay.  Do you know if the -- do you know why

4    they came to the school?

5         A.  Yes.  Bryan's mom was exploring alternative

6    ways of having his services provided, and she learned

7    of this company and she contacted them.  I think she

8    had several phone conversations anyway, as she related

9    it to me, and the DOE, my understanding is, agreed to

10   bring them over -- they wanted to evaluate the

11   situation.

12        Q.  So having the -- so the DOE brought Pacific

13   Child and Family Services over at the parents'

14   request?

15        A.  That was my understanding.

16        Q.  Okay.  And where did you get this

17   understanding?

18        A.  Well, mom told me that, you know, that she had

19   contacted them, and yes, they were coming over.  And I

20   can't remember who told me that DOE brought them over.

21   I don't remember that part.

22        Q.  When you're referring to the mom, you're

23   referring to Ann Kimball Wiles?

24        A.  Yes.  Yes, I am.

25        Q.  Now, Mr. Varady also asked you if you had

1    Mr. Varady said sometime in August of 2004 she came

2    back?

3        A.  Yes.

4        Q.  And "she" being Christy Edwards?

5        A.  Yes.

6        Q.  And did Ms. Edwards work in the home portion

7    of the program?

8        A.  She was in the home.  And -- and then when he

9    went to school, when he was more in the home and going

10   to school, she was the one that took him to the school

11   for those two hours twice a week.

12       Q.  Okay.  You know, about this time while Ms.

13   Edwards was working the home portion of the program,

14   was there also a skills trainer named Jeremy Watson?

15       A.  Jeremy, I think, didn't start until maybe

16   November perhaps.  He wasn't there initially.  He came

17   on a little later.

18       Q.  Can you tell me what agency Mr. Watson was

19   with?

20       A.  Jeremy was with TIFFE.

21       Q.  Okay.  And do you know anything about Mr. --

22   prior to Mr. Watson coming on board to work with

23   Bryan, did you know anything about his background and

24   qualifications?

25       A.  Yes.  Jeremy --