1      Q.  Could you tell me what those were?

2      A.  Yes.  Jeremy had been a skills trainer with

3   TIFFE for a while.  Prior to that he had worked in

4   some autism day centers in California or one or two,

5   for a year, maybe it was longer than that.  And he was

6   quite good.  He was a very skillful skills trainer,

7   and was one of those that was sought after, you know,

8   parents would hear that he might be available, they

9   would want him to work with their child.

10         And so I guess what TIFFE did was sort of move

11   him up to a position of troubleshooting and going into

12   the school where a skills trainer might be having some

13   difficulty and, you know, making suggestions, perhaps,

14   or supporting that person.  And he agreed to work

15   with -- with Bryan whenever it was, November,

16   December, until he left.

17      Q.  Okay.  And did you supervise Jeremy?

18      A.  Yes, I did.

19      Q.  And when Jeremy started working with Bryan,

20   was he -- did he -- did he have a background in DTT?

21      A.  Yes.

22      Q.  Did he have background in TEACCH?

23      A.  Yes.

24      Q.  How was his ASL?

25      A.  I'm trying to remember.  He had -- oh, yeah,

1    his -- the child he worked with before, he had enough

2    signs.  He wasn't proficient, but, yes, he had some

3    signs.

4        Q.  Was he proficient enough to carry out Bryan's

5    program?

6        A.  My recollection is that he could accommodate

7    his instruction, you know.

8        Q.  You feel that Jeremy was an asset to Bryan's

9    team?

10        A.  Yes.

11                MR. VARADY:  Objection.  Leading.  Go

12    ahead.

13                THE WITNESS:  Jeremy was an asset,

14    definitely.

15    BY MR. USHIRODA:

16        Q.  Okay.  And did Jeremy work with Bryan at the

17    home from the time he started in around November up

18    until the parents left, the family left?

19        A.  My recollection is that is true.

20        Q.  Did -- did Bryan's mother have any comments

21    about Jeremy?

22        A.  She never made any comments to me about --

23    about Jeremy.  Jeremy commented to me that she had

24    made comments to him, you know.

25        Q.  What did Jeremy say?  What were those

1    comments?

2        A.  Well --

3                MR. VARADY:  Objection.  Hearsay.

4                THE WITNESS:  -- the -- the comment

5    that -- what Jeremy reported to me is that he had been

6    taking some pictures to -- to make a visual schedule,

7    which is common, that's what we do, and that the

8    parents had objected to that and they wanted his film

9    or -- and he was upset.

10   BY MR. USHIRODA:

11       Q.  Did you see anything wrong with Jeremy taking

12   pictures for the visual --

13       A.  That's common.  We do that all the time.

14       Q.  Okay.  It was part of Bryan's program?

15       A.  Part of what we do.

16       Q.  Part of Bryan's program?

17       A.  Part of Bryan's program, part of what is

18   typical in establishing visual schedules.

19       Q.  Did Bryan's mother ever express to you any

20   complaints about Jeremy?

21       A.  She never -- that I can recall, she never

22   complained to me about Jeremy.

23       Q.  Okay.  Now, you also talked about skills

24   trainers who had very good rapport with Bryan; do you

25   recall that?

1      A.  Yes.

2      Q.  And I believe you testified that Christy

3   Edwards had a very good rapport with Bryan?

4      A.  Yes.

5      Q.  And as did Rebecca Gavin?

6      A.  Yes.

7      Q.  And you also mentioned a woman named Sandy?

8      A.  Yes.

9      Q.  Okay.  Would this be Sandy Harrington?

10     A.  Yes.

11     Q.  Okay.  And do you know about what --

12  approximately what time periods that Sandy Harrington

13  worked with Bryan?

14     A.  During his elementary year.  She was working

15  with him when I came, and I -- but she did not go down

16  to the middle school with him, to intermediate school.

17     Q.  Do you know why?

18     A.  You know, she worked with him for a while and

19  I think it was just time for a change.  And there may

20  have been the driving also.  She lived pretty far

21  south.

22     Q.  Okay.  Do you know what agency she came from?

23     A.  TIFFE.

24     Q.  Did TIFFE -- while you were the IISC from, I

25  believe, September 2002 up until the time, you know,

1    the family -- Bryan's family left in January of '05,

2    did TIFFE supply the bulk of the skills trainers?

3        A.  Yes.

4        Q.  Okay.  And do you have an opinion of what

5    TIFFE's training program was like?

6                MR. VARADY:  Objection.  Vague.

7    BY MR. USHIRODA:

8        Q.  During that time period?

9        A.  During --

10               MR. VARADY:  Same objection.

11               THE WITNESS:  Well, the state required

12   that you have, you know, 24 hours, I think it was, or

13   20 before you began to -- to work, and so -- and it

14   was actually fairly prescribed what you had to do.

15   And, you know, their's was fine.

16   BY MR. USHIRODA:

17       Q.  Okay.  Now, do you know what -- when you

18   worked with Sandy Harrington, was she in the school

19   portion of the program or the home program?

20       A.  In the school.

21       Q.  Okay.

22       A.  Oh, correction.  She did occasionally, I

23   think, go to his home, but school was the primary

24   focus.

25       Q.  Did -- when -- so when you started as the IISC

```
 1    for -- for Bryan's case in September of '02, Ms.

 2    Harrington was already on board?

 3         A.  She was already on board.

 4         Q.  When she was on board, did you have an idea of

 5    what her training was in terms of background?  Let me

 6    rephrase.

 7              Was Ms. Harrington trained in DTT?

 8         A.  I believe she was.  She was pretty good at it.

 9         Q.  Okay.

10         A.  In fact, I would say she was quite good at it.

11         Q.  How about TEACCH?

12         A.  She -- that -- she could do that.  The

13    classroom teacher, Becky Pearson, was extremely good

14    with TEACCH.

15         Q.  She was a very good teacher?

16         A.  She was a very good teacher and she was very

17    good with that particular methodology.

18         Q.  Do you believe that Ms. Pearson was very

19    responsive to Bryan's needs?

20                   MR. VARADY:  Objection.  Leading.

21                   THE WITNESS:  Yes.  Becky's a very good

22    teacher, you know.

23    BY MR. USHIRODA:

24         Q.  Did --

25         A.  She did what he needed.
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1      Q.  You know, the whole time that you were

2    involved with Bryan's program, did you ever come

3    across anybody who was affiliated with Bryan's

4    program, whether it was a skills trainer or such, that

5    did not care about Bryan's program?

6                    MR. VARADY:  Objection.  Calls for

7    speculation.  Vague.

8                    THE WITNESS:  I never came across anybody

9    that I felt was detrimental to him because of their

10    inattention to his program.  That certainly -- there

11    certainly were varying degrees of competency.

12    BY MR. USHIRODA:

13      Q.  Well, my question is, did you ever come across

14    a person who just did not care about Bryan?

15                    MR. VARADY:  Asked and answered.

16                    THE WITNESS:  I -- I -- I guess I'm

17    thinking that is the inattentive to and not caring

18    equally inattentive, and I didn't see anybody that was

19    sitting there doing nothing.

20    BY MR. VARADY:

21      Q.  Okay.  Everybody was trying their best?

22      A.  We --

23                    MR. VARADY:  Objection.  Misstates the

24    within's testimony.

25    BY MR. USHIRODA:

259

1      Q.  Would you agree with that?

2      A.  Yes, we worked hard.

3      Q.  Everybody worked hard?

4      A.  Everybody worked hard.

5      Q.  From the DOE down to the service providers?

6      A.  Everybody worked hard.

7      Q.  Now, you know, do you know who Jennifer Harris

8   is?

9      A.  Yes.

10     Q.  And do you have an opinion about her as a --

11   her qualifications as a teacher?

12     A.  Jennifer is a very good teacher, and she was

13   with Columbia, special ed teacher, brought over by

14   that agency.  I think she told me once she had 14

15   years experience.  She had worked with really a wide

16   variety of students.  She was -- really carefully

17   planned the day.  She worked individually with every

18   student in her classroom.  Did she -- you know, I

19   can't really remember if she knew signs.  I think she

20   did, but I don't -- I don't remember that part.

21     Q.  Okay.  Based on you -- did you have any

22   interaction with Ms. Harris?

23     A.  Frequent.

24     Q.  Based on your interaction, did you ever get to

25   observe Ms. Harris in the classroom?

260

1        A.  Oh, yes.

2        Q.  Did you observe her in the classroom, "her"

3    being Ms. Harris, with Bryan?

4        A.  Yes.

5        Q.  Okay.  And what was your impression based on

6    those interactions?

7        A.  As I said, she's a good teacher.  She's --

8    again, her manner is kind of very matter of factly,

9    this is what we're going to do.  She's -- she is a --

10   she had a good relationship, I thought, with him, but,

11   you know, each person had a different -- wasn't like

12   Christy's relationship and it wasn't like Rebecca's.

13   She's -- she's very straight forward and has clear

14   expectations of what she wants from a student.

15       Q.  Do you believe that she carried out Bryan's

16   program?

17       A.  Well, I think, you know, he was out of school

18   most of the time, you know, when she was there.

19       Q.  Okay.

20       A.  And she made lots of materials for him.  I

21   know because I took them to his house, and, you know,

22   materials to be used by Christy and Jeremy.  But she

23   didn't go to his home, you know, she was at school.

24   It was rather strange.

25       Q.  At that time --

261

1        A.  Bryan was out of school.

2        Q.  The parents had chose to pull him out of

3    school, correct?

4        A.  She was there --

5        Q.  Is that correct?

6        A.  Yes.

7        Q.  Yeah, okay.

8        A.  They chose to pull him out, and she was -- he

9    came two hours for -- two hours, twice a week.  He was

10    there for that period of time and the rest of the time

11    she made materials and that kind of thing.

12        Q.  You -- you -- can you describe these materials

13    that she made for Bryan?

14        A.  They were quite good.  Jennifer is a

15    scrapbooker, and so they were extremely well made.

16    She took pictures of the materials that she made.

17    They were very, very good.  Very creative and just

18    very well done.

19        Q.  Were they geared towards the implementation of

20    her IEP program?

21        A.  Yes, because I would tell her what we needed

22    sometimes, we need pictures to work on, whatever we

23    needed.

24        Q.  So she did this despite the fact that Bryan's

25    parents had pulled him out of school?

1              MR. VARADY:  Objection.  Leading.

2              THE WITNESS:  Well, I don't know despite.

3     She did it.  That's what she did.


4     BY MR. USHIRODA:

5         Q.  Okay.  Well, she's a good teacher?

6         A.  She's a good teacher.  That's what she did.

7     He was her student.

8         Q.  Did -- did Ms. Wiles-Bond ever review these

9     materials that -- that you brought over from Ms.

10    Harris?

11             MR. VARADY:  Objection.  Foundation.

12             THE WITNESS:  When I took them, you know,

13    she wasn't there because I was usually there in the

14    day when Christy was there, but I would assume she saw

15    them.  You know, they were in the home so I would

16    assume she saw them.

17    BY MR. USHIRODA:

18        Q.  Okay.  Did Bryan's mother ever comment to you

19    about the materials that Ms. Harris sent home with

20    you?

21        A.  No.

22        Q.  You know, Dr. Copeland, Mr. Varady asked you

23    at length about some of the community programs that

24    you -- you had established for Bryan.  Do you recall

25    that?

```
1        A.  Yes.

2        Q.  One of them was the Special Olympics?

3        A.  Yes.

4        Q.  And the other was the Friendship Club?

5        A.  Yes.

6        Q.  Tell me how that came about.

7        A.  Special Olympics came about when Bryan's

8   mother went to a meeting, I believe, that talked about

9   Special Olympics and getting it started.  She passed

10  the information on to me, and then we did bowling, I

11  remember that, first.

12          And then what I wanted to do was to set up an

13  after school program that was structured and regular.

14  So I recruited one of the EAs to serve as the coach

15  for our Special Olympics team, so not only Bryan but

16  his peers would have an organized activity by someone

17  who was somewhat aware, you know, I think he had been

18  an EA in that classroom.

19          So they had Special Olympics twice a week,

20  field and track, my recollection, and then I put

21  together a Friendship Club, in which it was part of

22  the after school program for the intermediate school,

23  and I asked the DOE to pay for a teacher because we

24  had to have a DOE employee there, and we paired

25  typical children with our class.
```

264

1         Q.  And did the DOE pay for the teacher to be

2    there?

3         A.  Yes, yes.

4         Q.  Did they object?

5         A.  Not to me.

6         Q.  Okay, continue.

7         A.  And so then that meant we had Friendship Club

8    twice a week and we had Special Olympics twice a week

9    and then for Bryan, Friday, then that was his into the

10   community day where he might go to a store or whatever

11   we were -- we had decided.

12        Q.  When did the Special Olympics start?  At

13   least --

14        A.  We did bowling in the fall and then we

15   discovered we had to have a coach or they wouldn't let

16   us be, so then we had to get a little more formalized

17   in --

18        Q.  In the fall of?

19        A.  2003, I think.

20        Q.  Okay, I'm sorry.

21        A.  So it got a little more formalized in 2004

22   because we needed a coach.  I'm trying to think when

23   they got their shirts.  They may have gotten their

24   shirts in the fall.  It worked -- it worked well.

25        Q.  How about the Friendship Club, when did that

265

```
1    start?

2         A.  The Friendship Club started that fall, I mean

3    that -- in 2004, is that intermediate school?  It was

4    the second semester of intermediate school.

5         Q.  Do you know when in 2004?

6         A.  Pardon?

7         Q.  Do you know when in 2004 you started this

8    Friendship Club?

9              MR. VARADY:  Asked and answered.  She

10   said second semester.

11             THE WITNESS:  It was the second semester

12   and it was -- we wanted to tie up with the school's

13   after school program.  They had kind of a menu of

14   kids -- that kids could choose from for after school,

15   so whenever that started was when we started.  It was

16   not the first week, I'm sure.

17   BY MR. USHIRODA:

18        Q.  Would it have been towards the beginning part

19   of the second semester, the middle part?

20        A.  It was by the end of January, I would think,

21   or first of February, perhaps.

22        Q.  Okay.  So fairly early on?

23        A.  Yeah, yeah.

24        Q.  Okay.  And then Bryan participated in this,

25   right?
```

1      A. Bryan participated in that.

2      Q. Is that an important part of his program?

3      A. I thought it was.

4      Q. Why?

5      A. Because he had experience with being around

6    typical kids, which are always a good model for him.

7    And because it was fairly structured.  For example, we

8    did a lot of functional skills.  We did snack, but

9    instead of everybody having their own, we sat around a

10    table, we passed the crackers or whatever they had.

11    So it was a much more social -- snack was a social

12    functional kind of activity.  That -- that was

13    different.

14      Q. At some point did Bryan stop participating in

15    these after -- these community-based programs?

16      A. Gosh.  To my recollection he never quit coming

17    to Special Olympics and Friendship Club.  Going out

18    into the community on that Friday, Kim -- that would

19    have been in May where he stopped doing that.  Kim did

20    not feel comfortable having him out in the community.

21      Q. Why was that?

22      A. That was because during our final Special

23    Olympics celebration, a woman who is mentally ill had

24    taken Bryan by the arm and was attempting to lead him

25    away, and Kim was very fearful.  She felt perhaps

1    someone had been stalking this child and that he was

2    in danger and she just did not feel comfortable having

3    him in the community.

4        Q.  Do you recall if you received criticism from

5    her about that incident?

6        A.  Yes.

7        Q.  What was the criticism --

8        A.  She felt I should have called the police, and

9    she was critical that I did not return her call the

10   day that it happened until 9:00.

11       Q.  Now, do you believe those criticisms were

12   justified?

13       A.  I'm sure it was a very frightening experience

14   for her, but I never felt this child was in danger.

15   We were in a totally public place, and that it was so

16   brief.  The woman disappeared.  I mean she was gone.

17   There was no way to find her.

18       She was -- I guess Kim was also critical that

19   my description of her to the police, when they finally

20   contacted me, was vague, although -- which it probably

21   was.  There was not too much distinctive about this

22   woman, although I did describe the clothing she was

23   wearing.  And the next day the woman was seen walking

24   down the street, and she was injured and taken to the

25   hospital.  And the same policeman was called and

```
 1    recognized the clothing, called me, brought a picture,

 2    asked me to identify this person.

 3         Q.  Who took Bryan to this event?

 4         A.  Skills trainer.

 5         Q.  How come the parents didn't take him?

 6         A.  I have no idea.

 7         Q.  Was this a -- was this an event that was meant

 8    to be with the parents and the children?

 9         A.  This was on a Sunday.  It was an event for,

10    yeah, parents, for families.  It was an event for the

11    families.

12         Q.  But instead they sent Bryan with a skills

13    trainer?

14         A.  Bryan came with his skills trainer, yes.

15         Q.  What did you think of that?

16         A.  Well --

17              MR. VARADY:  Objection.  Calls for

18    speculation.  Vague.  Foundation.

19              THE WITNESS:  I wished his parents had

20    come.  It was kind of a big deal.  And, you know, and

21    he had participated and, you know, we were wanting to

22    show off a little bit.

23    BY MR. USHIRODA:

24         Q.  Were there any other instances of, you know,

25    events that Bryan was sent with just his skills
```

269

```
1    trainer and the parents didn't come?

2         A.  I don't recall any.

3         Q.  Okay.  You know, getting back to this incident

4    with the mentally unstable woman, who was the skills

5    trainer that was there?

6         A.  Danielle.

7         Q.  Doucette?

8         A.  Yes.

9         Q.  Okay.  Do you feel that you and Danielle had

10   the situation under control?

11        A.  Yes.

12                   MR. VARADY:  Objection.  Vague.

13                   THE WITNESS:  I felt the situation was

14   under control.  I felt Bryan was not in danger nor had

15   he ever been in danger.

16   BY MR. USHIRODA:

17        Q.  Okay, you mentioned the mother told you that

18   she believed this woman was stalking Bryan?

19        A.  Yes.

20        Q.  What was her basis for telling you that?

21        A.  I don't know.

22        Q.  Do you think that's a bit of paranoia?

23                   MR. VARADY:  Objection.  Argumentative.

24   Calls for speculation.  Vague.  Leading.

25                   THE WITNESS:  I didn't -- I don't know
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    winding down and we were at more, you know, going into

2    the community for recreational activities or learning

3    activities in the community.

4         Q.  Now, Dr. Copeland, did you have any

5    interaction with the DES's -- well, first of all, let

6    me ask, do you know what a DES is?

7         A.  Yes.

8         Q.  What is it?

9         A.  What does it stand for?  I don't know that.

10   District educational specialist, how about that.

11        Q.  When you first -- did you have any interaction

12   with any of the DES's?

13        A.  I had interaction with Judi Radwick and some

14   with Linda Price, had more interaction with her,

15   actually, before she went into that position, and

16   Laurie Bolton.

17        Q.  Okay.  Well, tell me what your interaction was

18   like with Ms. Radwick.

19        A.  She -- as I said, she called me into the

20   office, and, you know, wanted to look at -- wanted to

21   look at data, and I can't remember, I think, actually,

22   I think it had to do with the toileting.  I can't

23   remember what it was about.  But she asked me to come.

24   She asked me to bring out the data.  In that meeting

25   was Barbara Kaufman, Sheri Adams, and I really can't

1    remember exactly what we discussed, but Judi was the

2    sort of administrator who wanted to know what was

3    going on.  That was always my impression.  She wanted,

4    you know, she wanted to see where you were, she wanted

5    to know.  She's the only one at that level that ever

6    called me in and she did.

7         Q.  About how many times did she call you?

8         A.  Well, she called me in this one time I

9    remember especially and somehow going over this data,

10   but I would get phone calls from her.  And she -- she

11   was -- she wanted those reports in when they were

12   supposed to be in, and, you know, she wanted copies of

13   the data.  I can't really remember all the things, but

14   I do remember she would call and say she needed

15   whatever she needed and she didn't take many excuses.

16        Q.  Okay.  Do you believe she was attentive to

17   Bryan's program?

18        A.  She was attentive.

19        Q.  Was she -- do you believe -- working with Ms.

20   Radwick, do you believe that she was responsive to the

21   parents' needs?

22        A.  Well, you know, I really don't know about

23   that --

24        Q.  Okay.

25        A.  -- but I do know that she -- that she came to

RALPH ROSENBERG COURT REPORTERS, INC.

1    remember exactly what we discussed, but Judi was the

2    sort of administrator who wanted to know what was

3    going on.  That was always my impression.  She wanted,

4    you know, she wanted to see where you were, she wanted

5    to know.  She's the only one at that level that ever

6    called me in and she did.

7         Q.  About how many times did she call you?

8         A.  Well, she called me in this one time I

9    remember especially and somehow going over this data,

10   but I would get phone calls from her.  And she -- she

11   was -- she wanted those reports in when they were

12   supposed to be in, and, you know, she wanted copies of

13   the data.  I can't really remember all the things, but

14   I do remember she would call and say she needed

15   whatever she needed and she didn't take many excuses.

16        Q.  Okay.  Do you believe she was attentive to

17   Bryan's program?

18        A.  She was attentive.

19        Q.  Was she -- do you believe -- working with Ms.

20   Radwick, do you believe that she was responsive to the

21   parents' needs?

22        A.  Well, you know, I really don't know about

23   that --

24        Q.  Okay.

25        A.  -- but I do know that she -- that she came to

274

```
1    me for information, you know, either by the phone or
2    talking to me in person, you know, on a fairly regular
3    basis.
4       Q.  What was the purpose for these conversations?
5       A.  You know, I don't -- I don't know.  Well, I
6    just believe she wanted to be informed.  She wanted to
7    know, you know, what was happening.
8       Q.  Okay.
9       A.  And she may have used that information, you
10   know, I suppose she did in some way for any of her
11   decision making, but, again, I was never privy to
12   that.
13      Q.  Okay.  How about with Laurie Bolton, what was
14   your interaction?
15      A.  I liked Laurie.  Laurie and I, in the brief
16   time she was there, had many conversations.  She
17   didn't work very long, so I don't know how many
18   meetings we had, but I do remember we talked on the
19   phone.  And I remember calling her once and telling
20   her we needed -- it was that summer of 2004, and I was
21   concerned about the safety issues and Bryan in the
22   classroom, and I called her and said, you know, we
23   have to have somebody there.  You know, after school
24   because what the students did, those who had after
25   school services, they would go to summer school in the
```

```
 1    morning and they would remain in the classroom.  The

 2    DOE allowed them to use the classroom for that after

 3    school portion, but they didn't have -- had not had a

 4    DOE employee actually in the room.  The DOE person

 5    might be in the room next door or down, and I told her

 6    that we needed to have someone there in the room, and

 7    so she got someone.

 8         Q.  So --

 9         A.  I think it was Becky Pearson that came.

10         Q.  So in other words, Dr. Bolton responded to

11    your concern?

12         A.  Oh, she -- she -- Dr. Bolton had her --

13    respected safety concerns.

14         Q.  In your interaction with Dr. Bolton, did you

15    form the opinion that she was committed to seeing that

16    Bryan's IEP was implemented?

17              MR. VARADY:  Objection.  Leading.

18              THE WITNESS:  She -- she was very -- yes,

19    she was very committed, and as I said, she only worked

20    there three or four months.  So, you know, there's no

21    kind of long-term result of that.

22    BY MR. USHIRODA:

23         Q.  Was -- was Ms. Radwick -- did you believe

24    Ms. Radwick was committed to seeing that Bryan's IEP

25    was --
```

276

```
1        A.  I thought --

2              MR. VARADY:  I'll just wave my hand, so

3    objection, leading.  Go ahead.

4              THE WITNESS:  I thought everybody was

5    committed to seeing that -- that the IEP goals were

6    met as best we could.  We just were.

7    BY MR. USHIRODA:

8        Q.  And when you say "we," does that include the

9    DOE?

10       A.  Yeah, I'm talking about the team.

11       Q.  The IEP team?

12       A.  The -- the speech path, the OT, teacher, you

13   know, the district-level people.  We were.

14       Q.  Okay.  Now, you know, earlier during

15   Mr. Varady's examination he showed to you the

16   functional behavioral assessment that was prepared by

17   Kim Smalley in August of '04; do you recall that?

18       A.  Is that the big one?

19       Q.  Yes.  Oh, no, actually, it was the shorter

20   one.  There was a smaller one that was a series of

21   emails?

22              MR. VARADY:  That's actually the

23   toileting plan.

24              THE WITNESS:  The toileting plan.

25   BY MR. USHIRODA:
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

```
 1      Q.  Yeah, toileting plan.

 2      A.  Okay, yeah, I remember that.

 3      Q.  Yes, Exhibit 16.  And -- and there was some

 4   discussion about the DD, is that department of --

 5      A.  Oh, Developmental Disabilities, yes.

 6      Q.  What -- what -- what branch of the state

 7   government is that with?

 8      A.  Department of Health.  I think Kim talks about

 9   it in her report, about needing the night person.

10      Q.  Okay.  And I believe you testified that you

11   could not recall what happened to the idea of -- of

12   getting DD services, correct?

13      A.  Yes.

14      Q.  Is that something that the DOE prevented?

15      A.  No.

16              MR. VARADY:  Objection.  Calls for

17   speculation.

18              THE WITNESS:  The DOE cannot do that.

19   BY MR. USHIRODA:

20      Q.  Right.

21      A.  We've tried, not with Bryan, but with other

22   students.  The parent -- they have -- they have to do

23   it.  You know, we can suggest, we can urge, but they

24   have to do it.  And then even if they make those

25   contacts, it's not assured because they have their own
```

1   sets of requirements before you are eligible to

2   receive services.

3        Q.  And you say "they," you're talking about DD?

4        A.  Yes.

5        Q.  Okay.  And do you know if -- if -- do you know

6   if Bryan's mother made any efforts to get DD services?

7        A.  Yeah, I really don't remember if she did or

8   not.

9        Q.  Do you know if the father made any efforts to

10  get DD services?

11       A.  I -- I don't remember that either.

12       Q.  Do you know if they met the requirements for

13  DD services?

14       A.  That I don't know, but they may not have.

15       Q.  Do you know what the requirements for DD

16  services are?

17       A.  You know, they vary, but there is, I think,

18  some income requirement, like you can't make too much

19  money.

20       Q.  Do you know what Mr. Bond's occupation was at

21  the time you were the IISC?

22       A.  He worked at -- for the National Forest

23  Service.

24       Q.  And what was Ms. Wiles-Bond --

25       A.  She was a vice principal at an elementary

279

1     school.

2          Q.  I would like to show you a document that

3     Mr. Varady marked as Exhibit 15 to your deposition.

4     And it -- first page is a meeting announcement.

5          A.  Yes.

6                    MR. USHIRODA:  Counsel, do you have your

7     copy?

8                    MR. VARADY:  I do, thank you.

9                    MR. USHIRODA:  Okay.  Just wanted to

10    check.

11    BY MR. USHIRODA:

12         Q.  Now, if you go to the page that's marked DOE

13    1231, are you there?

14         A.  Yes.

15         Q.  Okay, and, you know, there's -- if you go down

16    to the bottom third of that, there's a discussion

17    about the Vineland Adaptive Behavior Scales?

18         A.  Yes.

19         Q.  And it says it was administered with Bryan's

20    parents, Stan Bond and Kim Wiles, do you see that?

21         A.  Yes, as respondents, yeah.

22         Q.  Okay.  Now -- and you already briefly told

23    Mr. Varady what the Vineland is, correct?

24         A.  Yes.

25         Q.  Okay.  And what it -- what does it measure?

280

```
 1    Adaptive skills?

 2         A.  Adaptive skills, yes.

 3         Q.  As opposed to?

 4         A.  Functional or adaptive skills.

 5         Q.  As opposed to cognitive?

 6         A.  As opposed to cognitive skills.

 7         Q.  Is that a widely accepted test in the field?

 8         A.  Yes.

 9         Q.  Okay.  Now, you see the -- there's a woman by

10    the name of Judy Volquardsen, and that's spelled

11    V-O-L-Q-U-A-R-D-S-E-N, do you see that?

12         A.  Yes.

13         Q.  Do you know who that is?

14         A.  You know, I don't.

15         Q.  Okay.

16         A.  I think she's a social worker, but I don't

17    recall her.

18         Q.  And do you know who administered the Vineland

19    test?

20         A.  I would assume she did.

21         Q.  Okay.  Are you qualified to administer the

22    Vineland test?

23         A.  Oh, yes.

24         Q.  Now, if you go to the next page, DOE 1232 of

25    Exhibit 15, it -- it shows what I assume is the
```

1    results of that test?

2        A.  Yes.

3        Q.  Okay.  Now, do you recall reviewing the

4    results?

5        A.  No.

6        Q.  Okay.  Now, this was administered, I believe,

7    as of October 7, 2002?

8        A.  Yes.

9        Q.  Is that correct?

10       A.  Yes.

11       Q.  Okay, if you look at page DOE 1232, it says

12    that the -- at the top right under the, you know, the

13    scores it gives the results.  It says, quote, Both the

14    adaptive behavior composite of 24 on the parents'

15    survey and the 35 on the classroom edition classify

16    Bryan's overall adaptive functioning as low and

17    indicate a severe deficit in adaptive functioning,

18    close quote.

19            Did I read that correctly?

20       A.  Yes.


21       Q.  What does that mean to you?

22       A.  Well, that means that if you know how old he

23    is and you see those kind of scores, this would say to

24    me that we have a significantly disabled child.

25       Q.  Are you able to correlate within that score a

1    developmental age?

2        A.  I think they have -- I think there are charts

3    for that.

4        Q.  Are you -- have you done that before?

5        A.  Yes.


6        Q.  Gathering from just the information set forth

7    in Exhibit 15, which shows the results of this

8    Vineland score, are you able to state that?

9        A.  This is all statistically worked out and there

10   are charts.  I believe there's an age -- there may not

11   be, but I think there's an age level.

12           The other thing it says to me, though, which

13   is really a little more significant to me as a

14   psychologist, is that there's not a great deal of

15   difference between home and family -- I mean, home and

16   school.  Because they did both -- they interviewed

17   both the classroom -- they did the teacher and they

18   did the home --

19       Q.  Okay.

20       A.  -- and they both are scoring in that same

21   range.

22       Q.  Okay, so why is that significant?

23       A.  Well, because that means that his behavior

24   is -- or these performances are pretty stable across

25   the environment.  It would be different, for example,

1     if at school he scored in the low range and at home he

2     scored in the average range.

3          Q.  Why would --

4          A.  You would wonder about what kind of

5     environmental differences are at play.

6          Q.  Okay.

7          A.  But this says to me that that's more or less

8     stable across environment at this point in time.

9          Q.  You know, based on your -- up until that time

10    you had worked with Bryan about how many, a couple

11    months?

12         A.  Yes.

13         Q.  Okay.  Were you in a position at that point in

14    time, as of October 7, 2002, to, you know, agree or

15    disagree with these results?

16         A.  I would have agreed with them.

17         Q.  Okay.  Now, there is also in Exhibit 15 there

18    is mention of a Wendi Clark?

19         A.  Yes.

20         Q.  Do you know who Wendi Clark is?

21         A.  Yes.

22         Q.  And what was Wendi Clark's role with respect

23    to Bryan?

24         A.  She's an occupational therapist, and she's

25    worked with Bryan, I think, since he was in Hawaii.  I

286

1     Q.  Okay.  How long -- how long was Bryan --

2   Danielle involved with Bryan's program?

3     A.  I really don't remember.  She always seemed to

4   be a kind of in-and-out person.  She worked with him

5   and then it seemed like she didn't and then she was

6   going to be a substitute, and I don't remember how

7   long it was.

8     Q.  Okay.  Did you have an opportunity to observe

9   her working with Bryan?

10    A.  Yes.

11    Q.  Did she work with Bryan in the classroom?

12    A.  Sometimes.

13    Q.  Okay.

14    A.  I did see her work with him in the classroom.

15    Q.  Okay.  And who was the teacher at that time?

16    A.  Oh, dear, who was -- well, it was in the

17  elementary school.

18    Q.  Oh.

19    A.  I mean, not the elementary school.  It was in

20  the intermediate school, and I can't remember if it

21  was during the summer or during the school year.

22    Q.  If it was the summer of '04, would it have

23  been with Bill Brown?

24    A.  I believe so, yes.

25    Q.  Do you know who Bill Brown is?

```
 1          A.  Yes.

 2          Q.  Who is Bill Brown?

 3          A.  Bill Brown is a teacher, a substitute --

 4     substitute teacher at the intermediate school who's

 5     been there for some time and who plays the guitar, and

 6     we sometimes describe him as a Pied Piper.  Kids like

 7     him a lot.

 8          Q.  Do you know if Mr. Brown was hired to be

 9     the -- Bryan's ESY teacher as well as several other

10     special needs children during the summer of 2004?

11                    MR. VARADY:  Objection.  Leading.

12                    THE WITNESS:  He took -- he was in the

13     role of teacher, so I assume that the DOE hired him.

14     BY MR. USHIRODA:

15          Q.  Did you have an opinion about Mr. Brown's

16     qualifications as a teacher?

17          A.  Well --

18                    MR. VARADY:  Objection.  Foundation.

19                    THE WITNESS:  He was a good -- he was a

20     good teacher.  He was a good teacher.  He was -- you

21     know, kids liked him.  He was a very, very likeable

22     person.  He didn't really have a special education

23     background, and so he might respond differently to a

24     behavioral incident than would have been my choice.

25     BY MR. USHIRODA:
```

288

1    Q.  Okay.

2    A.  Like he might say just leave him alone, and

3    I'm saying, no, what we need to do is make sure that

4    he's sitting in his chair or something, I don't know,

5    those kind of differences.

6    Q.  Were those major differences?

7    A.  No.

8    Q.  Okay.  More stylistic?

9    A.  Just stylistic and -- and that he just didn't

10   have special education background.

11   Q.  Okay.  Well, do you think he was qualified to

12   teach the class?

13   A.  I think it was a successful summer with him as

14   a teacher.

15   Q.  Okay.  Do you feel that he carried out the IEP

16   program during that summer?

17   A.  Yes.

18   Q.  Okay.

19   A.  Because much of it is carried out after -- ESY

20   is short.  It's just part of the day.  You know, you

21   almost -- we almost kind of flip it so that an ESY is

22   a more laid back, kind of recreational time anyway,

23   and so we would tend to do more of the harder work, if

24   you will, in the afternoon when the DOE was, you know,

25   letting us use the classroom.

RALPH ROSENBERG COURT REPORTERS, INC.

1       Q.  Okay.  Do you know if you had -- well, did you

2    have any conversations with Bryan's mother about Bill

3    Brown serving as the teacher for ESY?

4       A.  Well, I remember at first she was quite --

5    quite excited because, you know, he did music, because

6    he played the guitar and they had music class every

7    day and Bryan tried to sing, I believe, you know, and

8    was involved in that, and it was -- she liked that.

9    We all liked that.

10       Q.  Did she -- did Bryan's mother ever express to

11    you any concerns about having Bill Brown serve as the

12    ESY teacher for the summer 2004?

13       A.  I don't recall any concerns that she expressed

14    to me, other than she was aware that he wasn't a

15    special education teacher, and I think, just on

16    principle, that was problematic for her.

17       Q.  Did she ever say that to you?

18       A.  I can't really remember that she did.

19       Q.  Did Mrs. -- did Bryan's mother ever say, you

20    know, I really don't think Bill Brown should be the

21    teacher for summer?

22       A.  I never heard anything that strong, no.

23       Q.  Okay.  How about the father?

24       A.  No.

25       Q.  Did you have any interaction with the father?

290

```
 1        A.  I did.  Certainly not as much as I did with

 2    Bryan's mother.


 3        Q.  Okay.  Do you believe that the -- based on

 4    what you know, I believe you testified that you were

 5    involved with Bryan's summer program, correct?

 6        A.  Yes.

 7        Q.  For the summer 2004?

 8        A.  The summer 2004, let me just think for a

 9    minute.

10        Q.  That's Bill Brown.

11        A.  That's Bill Brown, and I wasn't there for all

12    of it, I don't think.  I think I came back to the

13    mainland for maybe the last half of it --

14        Q.  Okay.

15        A.  -- or something, but I do remember being in

16    the classroom when Bill was there, so I know I was

17    there for part of it anyway.

18        Q.  But you testified earlier that Bryan's mother

19    told you that -- well, she was excited about having

20    Bill serve as teacher?

21        A.  Because -- because Bryan was so responsive to

22    the music.  He was a good musician.

23        Q.  And based on -- did you ever observe Bill

24    Brown in the class?

25        A.  Yes.
```

1      Q.  And based on your observations, did you feel

2   that he had a good rapport -- that he had established

3   a good rapport with Bryan?

4      A.  Yes, yeah.

5      Q.  And was he able to communicate with Bryan?

6      A.  He didn't really have signs, as I recall,

7   but -- but, you know, you can talk to Bryan.  He

8   understands, you know, what you're saying.  So, you

9   know, he was responsive in that way to what he said.

10     Q.  And now, also were there any -- do you know

11  who Bryan's skills trainer was during that time?

12     A.  You know, I don't remember.

13     Q.  That's quite all right.

14     A.  Lot of them.

15     Q.  Now, getting back to Danielle Doucette, do you

16  know -- she subsequent -- she eventually stopped being

17  Bryan's skills trainer, correct?

18     A.  Yes.

19     Q.  Do you know why?

20     A.  I really -- I really don't know.

21     Q.  Okay.  I think you testified earlier that

22  Danielle had experience with autistic kids in New

23  York?

24     A.  I believe it was New York, yes.

25     Q.  And you testified that they had a -- they a

292

1    different approach towards, I guess, giving skills

2    trainer services to their autistic kids?

3        A.  Yes, it was much more a relational,

4    recreational sort approach than it was a data-based

5    approach.

6        Q.  Is there anything wrong with that?

7        A.  I mean, there's a whole school of people that

8    subscribe to that.

9        Q.  It's just a different approach?

10       A.  It's a different way of doing it.  It wasn't

11   the way that was set up for Bryan.

12       Q.  Okay.  But do you know -- did you -- do you

13   know if Danielle had established a rapport with Bryan?

14       A.  I think she had a good rapport with Bryan,

15   because that was very much core to her approach was

16   having a really good rapport.

17       Q.  And that goes to the very heart of it?

18       A.  Yes.

19       Q.  And -- and from what you observed, she had a

20   good rapport with Bryan, correct?

21       A.  She would take some pride that she could get

22   him to do things that maybe other people couldn't do.

23       Q.  And did you find that to be the case?

24       A.  Well, I didn't ever see it particularly, but

25   I'm sure she was right.

293

1      Q.  Did you have any reason to doubt it?

2      A.  I didn't have any reason to disbelieve her.

3      Q.  Okay.  Now, you were also shown an exhibit, I

4   believe it is Exhibit 13, and I believe it was stated

5   that you told Kelly Stern that Danielle didn't collect

6   data?

7      A.  That's right.

8      Q.  Was that always the case?  I mean, did she

9   always not collect data?

10     A.  I believe she got better, but she was kind of

11   the person you had to sort of stay on top of that with

12   her.

13     Q.  But she did improve?

14     A.  She got better, yeah, I told her she had to.

15     Q.  And she did?

16     A.  And she -- and she did, but with a little

17   slippage there if you didn't go back and check on her

18   again.

19     Q.  Based on what you observed and your

20   interactions with Danielle, do you believe that she

21   was committed to seeing that Bryan's program was

22   implemented?

23     A.  Oh, yes.  There was nobody that was not

24   wanting this to be a success.

25     Q.  Now, let's talk about Kelly Stern for a

```
 1      minute.  She was the program administrator for TIFFE,
 2      correct?
 3           A.  Correct.
 4           Q.  And did you have a lot of interaction with
 5      Kelly?
 6           A.  Yes.
 7           Q.  And --
 8           A.  I had -- may I?
 9           Q.  Sure.
10           A.  I had a lot of interaction with her, not
11      necessarily around Bryan, but because I had 18
12      students and because TIFFE had the market share on the
13      Big Island, all of these -- the skills trainers for
14      all of these other students were mostly all TIFFE, so
15      there was a big caseload, many occasions that I would
16      need to talk to her about something.
17           Q.  Now, you were -- you told Mr. Varady that you
18      were -- you stayed away from -- or were not involved
19      in recruiting efforts and hiring efforts -- regarding
20      skills trainers, right?
21           A.  That's right.
22           Q.  Did you ever discuss those issues with Ms.
23      Stern?
24           A.  Discuss?
25           Q.  The recruiting and training and hiring of
```

```
 1    skills trainers?

 2        A.  Oh, yes, we would discuss that at length.  You

 3    know, this whole issue of training people and how

 4    could we ever learn to tell which of these candidates

 5    were trainable versus those that were not trainable.

 6        Q.  Were these in general or was it -- or was it

 7    specific to Bryan's case?

 8        A.  Well, it was in general.  However, any time

 9    you have -- Bryan was not the only student for whom we

10    had difficulty finding a skills trainer, so in that

11    sense it was general, but it was also specific to

12    Bryan.

13                MR. USHIRODA:  You know, Derek has to

14    change the tape and I just have a few more.

15                THE WITNESS:  Okay.

16                MR. USHIRODA:  So why don't we let him

17    change the tape.  I'm sure Mr. Varady may have some

18    follow-up.

19                THE VIDEOGRAPHER:  Off the record at 6:11

20    p.m.

21                (Off the record.)

22                THE VIDEOGRAPHER:  We're back on the

23    record.  It is 6:14 p.m.

24    BY MR. USHIRODA:

25        Q.  Did you have any discussion -- well, do you
```

296

1    know who Kate Tolentino is?

2         A.   Yes.

3         Q.   Who is Kate Tolentino?

4         A.   She's presently principal at the elementary

5    school at Honokaa.

6         Q.   Do you know if Ms. Tolentino was involved with

7    Bryan's education program?

8         A.   She was.  I can't remember exactly how.

9    She -- see, I met her, what school, Waimea, and then

10   she made some kind of promotion to where she was an

11   assistant of some sort, and I don't know, she got

12   involved in that in some way.  She was an

13   administrator, kind of on the district level.

14        Q.   Did you have any meetings with Ms. Tolentino

15   with respect to this case?

16        A.   Let's see.  There was a meeting at Kealakehe

17   Intermediate and she was there.  I think she was

18   there.  That's the one I remember.

19        Q.   Okay.  And what was that meeting about?

20        A.   I'm not sure.

21        Q.   If you can recall.

22        A.   I'm not sure what it was about.  There were a

23   lot of attorneys there, I remember that.  You know,

24   some dispute or some something.

25        Q.   Okay.  You know, earlier when we started the

1      deposition Mr. Varady showed you some agreements, like

2      some court orders and a settlement agreement; do you

3      recall that?

4          A.  Yes.

5          Q.  He asked you if you were aware of some of the

6      requirements set forth in there, correct?

7          A.  Yes.

8          Q.  Like the settlement agreement, do you recall

9      that?

10         A.  Yes.

11         Q.  And you stated that -- I believe that the --

12     you were not shown the settlement agreement, correct?

13         A.  That is correct.

14         Q.  But you were subsequently made aware of what

15     the requirements that the DOE needed to be fulfilled

16     with respect to the IEP, correct?

17         A.  Yes, particularly those things that showed up

18     in the IEP.

19         Q.  Okay.

20         A.  Because some of those got translated to the

21     IEP.

22         Q.  And to the best of your knowledge, did the DOE

23     try to implement those, those things?

24              MR. VARADY:  Objection.  Calls for

25     speculation.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

298

```
 1    BY MR. USHIRODA:

 2        Q.  Or to at least see to it?

 3        A.  I never heard anyone say they weren't going to

 4    do it.  I know in terms of the skills trainers and

 5    trying to fill, you know, those gaps, recruiting and

 6    looking for that right person or those several right

 7    person was on everybody's mind all of the time.  Just

 8    this was always there.

 9            And I remember very well telling Kim once, you

10    know, even when we have everybody here, we still need

11    to be looking for the next person, because they tend

12    to leave, you know, you couldn't kind of rest.  I

13    remember when we started we had five, and we met at

14    her house, and I think by January we had three.

15            It just was so difficult because -- when you

16    have a high needs child and you have, you know,

17    specific requirements, as you might imagine, with a

18    high needs child, it just gets hard to find that

19    person particularly on the Big Island in Hawaii where

20    our resources are not great.

21        Q.  Now, you said that you told Kim that, you

22    know, we're always on the lookout?

23        A.  That was my feeling.  We should always be

24    looking, even when we think we don't need to.

25        Q.  Was that Kelly Stern's feeling?
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

299

1          A.  Pardon?

2          Q.  Was that Kelly Stern's feeling?

3          A.  No, that was my feeling.

4          Q.  Do you know if she always was on the lookout

5     for a skills trainer?

6          A.  Well, we always had a gap, so I'm sure we

7     always were.  We always -- you know, it just seemed

8     like we could never kind of get it all filled up.  So

9     that's my recollection of working with Bryan and the

10    skills trainers, is that we were kind of always

11    looking for somebody.

12         Q.  Are you aware of any facts to suggest that

13    these gaps were caused by any intentional act by the

14    Department of Education?

15              MR. VARADY:  Objection.  Speculation.

16    Legal conclusion.

17              THE WITNESS:  Well, I think the gaps were

18    caused because people quit, and they quit for a wide

19    variety of reasons, some of which Kelly listed in one

20    of those documents and then there would be others.

21    BY MR. USHIRODA:

22         Q.  But that's not due to the actions of the DOE?

23         A.  No.

24              MR. VARADY:  Objection.  Leading.

25              THE WITNESS:  They quit because people

1    quit, because -- for just a variety of reasons.

2    BY MR. USHIRODA:

3        Q.  All right.  In your entire time serving as an

4    IISC for Bryan, did you come across anyone from the

5    DOE who discriminated against Bryan because of his

6    autism?

7                    MR. VARADY:  Objection.  Speculation.

8    Legal conclusion.

9    BY MR. USHIRODA:

10       Q.  And I ask that because it's one of the claims

11   the parents are raising.

12                   MR. VARADY:  Renew the objection.

13                   THE WITNESS:  No.

14   BY MR. USHIRODA:

15       Q.  And -- and based on what you know and based on

16   your involvement with Bryan's program, do you feel

17   that the DOE was anything but responsive to the

18   parents' needs with respect to Bryan's --

19                   MR. VARADY:  Objection.

20   BY MR. USHIRODA:

21       Q.  -- program?

22                   MR. VARADY:  Objection as to the word

23   "feel," vague.

24                   THE WITNESS:  I think that when the

25   parents wanted something, when there was a problem,

1      the DOE made that effort to meet that need, and not

2      successfully all the time.  But when we needed the

3      toileting plan, we got Kim.  When we needed someone to

4      teach sign language, they did that class.  And I think

5      there was even someone maybe hired, you know, to -- to

6      teach the -- the skills trainers and the teacher.

7      When we needed to have someone pay for that Friendship

8      Club, to pay for the teacher for the Friendship Club,

9      they did that.  You know, I can't think when they

10      didn't try to respond.  They didn't or were not always

11      able to respond successfully.

12      BY MR. USHIRODA:

13          Q.  Okay.  That wasn't because they -- that you

14      felt the DOE was discriminating against Bryan because

15      of his autism, right?

16                  MR. VARADY:  Objection.  Speculation.

17      Vague.  Legal conclusion.

18      BY MR. USHIRODA:

19          Q.  At least based on what you know?

20                  MR. VARADY:  Same objection.  Foundation.

21                  THE WITNESS:  I was not aware of any

22      discrimination.

23      BY MR. USHIRODA:

24          Q.  Based on Bryan's autism?

25          A.  Base on Bryan's autism.

```
 1       Q.  In fact, the DOE put its whole effort into
 2    trying to see that Bryan's implement -- Bryan's IEP
 3    was implemented, correct?
 4                 MR. VARADY:  Objection.  Leading.
 5                 THE WITNESS:  The DOE made every effort
 6    to be responsive, I thought.  Again, I repeat, not
 7    always successfully, but they pulled in consultants
 8    when we needed consultants.  Not always as quickly as
 9    I would have desired, but in an area with very limited
10    resources, they were always working at it.  And this
11    -- this was the kind of situation which you were
12    always working at it.  Always working at it.
13    BY MR. USHIRODA:
14       Q.  Okay.  Dr. Copeland, I want to show you what
15    Mr. Varady marked as Exhibit 3 to your deposition.  It
16    is a May 11th, 2004 findings of fact, conclusion of
17    law and decision.  You recall that Mr. Varady went
18    over this document at length, correct?
19       A.  Yes.
20       Q.  Okay.  And I believe you testified that you --
21    you had not seen this document before I showed it to
22    you, correct?
23       A.  That is correct.
24       Q.  But that you were familiar with the findings
25    and conclusions in this --
```

```
1          A.  Yes.

2          Q.  -- document, correct?

3          A.  Yes.

4          Q.  Now, if you could -- now, if you could go to

5      paragraph -- paragraph 14 at page 4.

6          A.  Yes.

7          Q.  Do you see that?  It says:  "When Bryan did

8      not receive the number of skills trainers hours

9      specified in his IEPs from October 2003 to -- through

10     February 2004, he -- he regressed in a number of

11     areas."  Did I read that correctly?

12         A.  Yes.

13         Q.  Okay.  Now, as I recall your testimony, you

14     agreed with that statement in two parts, correct?

15         A.  Yes.

16         Q.  And could you tell me what -- what you meant?

17         A.  What I said was that both of those things

18     happened.

19         Q.  What you're saying then that --

20         A.  He did not receive skills trainers and -- fact

21     one.  Fact two, he regressed.  I'm reluctant to say it

22     is an exclusive causal relationship.

23         Q.  So you -- you disagree with this paragraph 14

24     in that respect?

25                    MR. VARADY:  Objection.  Misstates her
```

```
 1    testimony.  Leading.  Argumentative.  Foundation.

 2    BY MR. USHIRODA:

 3        Q.  Well, the way I read it is says --

 4                MR. VARADY:  Can she give her answer?

 5                MR. USHIRODA:  Oh, I'm sorry.

 6                THE WITNESS:  Upon reading this, it

 7    certainly implies that that was a causal relationship,

 8    and I guess I sensed that.  So I want to say there are

 9    two things, they both happened at the same time, so

10    one might wonder if there's a causal relationship;

11    however, there -- there's so many variables that I

12    wouldn't want to, on the basis -- just on the basis of

13    this, say it was a causal relationship.  Definitely

14    it's something you're going to explore and try to get

15    settled.

16    BY MR. USHIRODA:

17        Q.  Okay.  What are the other variables?

18        A.  Well, environmental change, you know, so we

19    have more or less in this same time he's getting --

20    he's been in this new classroom, he has a relatively

21    new teacher whose style is different, and -- and with

22    autistic children you -- you know, you don't always

23    know what is impacting them.  So, you know, I know

24    with -- if Bryan is in a -- not a good mood, sometimes

25    he just kind of got up in the morning and it wasn't a
```

1    good mood and it would be a tough day, if he's in any

2    kind of pain.  You don't know how many of those

3    variables may be interacting.

4         But indeed those two things did happen at the

5    same time, which would suggest exploration of a causal

6    relationship.  Does not say there is a causal

7    relationship.

8         Q.  Did you explore if it was a causal

9    relationship?

10        A.  Of course.

11        Q.  And what was --

12        A.  Well, I mean, we never got -- the way you'd

13   explore is to get all the skills trainers in place and

14   sort of see what happens.  And we -- we had a very

15   difficult time getting the skills trainers in place.

16        Q.  But you could not come to a definitive

17   conclusion?

18        A.  Well, it was -- it was so obvious that that

19   would be your first move, you know, is to make -- to

20   try to get that in place, but you can't forget there

21   are other things that impact a child's behavior.

22        Q.  Okay.  Now, on paragraph 15 of Exhibit 3, you

23   know, talks about regression involving toileting

24   skills; do you see that?

25        A.  Yes.

1  Q. Do you recall who this person was?

2  A. Yeah, Sven was one of them.

3  Q. Okay.  Did --

4  A. And wasn't there a Carina or something?

5  Q. Carina Sera?

6  A. I think.  I don't know their last name.

7 That -- you know, they just didn't really have any

8 experience with this at all.  And they were well

9 meaning, but they were more challenging to teach.

10  Q. Do you recall trainings that --

11  A. Well, what I recall is being in the classroom,

12 and I'm going to call it coaching him, because he had

13 already had whatever training he'd had, meaning --

14 training meaning not having a child you need to --

15  Q. Right.

16  A. -- also be attending to.

17  Q. Okay.

18  A. And that you would sit down and focus on

19 whatever the skill is.

20  Q. Was Sven responsive to your coaching?

21  A. Yes.

22  Q. You think that he was listening?

23  A. Yes.

24  Q. How about Carina?

25  A. Yes, but they just weren't very good.

312

1        A.  Uh-huh.

2        Q.  How about Danielle, was she selected by the

3   parents?

4        A.  I think -- well, I think, as I recall, she

5   actually got hired through the agency and then talked

6   to the parents.  I think.  I don't believe she was the

7   one who responded to Kim's ad.  I think she came to

8   the agency.

9        Q.  You know, Dr. Copeland, you served as an IISC

10  not only just for Bryan's case but for other cases for

11  at least several years, correct?

12       A.  Yes.

13       Q.  Around three years or so.  At first with

14  Alaka`i Na Keiki and then with TIFFE, correct?

15       A.  Yes.

16       Q.  And in all that time you worked with skills

17  trainers, correct?

18       A.  Yes.

19       Q.  What is the role of a skills trainer?

20       A.  The role of the skills trainer is to do the

21  one-on-one implementation of a child's program.

22  Whatever that may be.  To be doing DTTs, to be

23  teaching him to play catch, it's that one-on-one

24  person that is going to do the teaching, if you will,

25  that will implement his program.  The kind of rule of

1    thumb where we always said where teachers teach, skill

2    trainers reteach.  So that would be it.

3        Q.  And your role with respect to the skills

4    trainers is to supervise?

5        A.  To supervise them.

6        Q.  To provide training?

7        A.  To train, coach them, to make sure they're

8    doing what we said we were going to do, to make sure

9    they're collecting the data so that we can see, you

10   know, where we're going.

11       Q.  And skills trainers come to, you know, a

12   variety of levels of skills, correct?

13       A.  Yes.

14       Q.  And that was true with other cases you worked

15   on?

16       A.  Yes.

17       Q.  So the -- the gap -- problems in gap, the

18   problem in skill level was just not unique to Bryan's

19   case only?

20       A.  That is true.

21       Q.  Now, with respect to the skills trainers that

22   you supervised throughout your tenure as the IISC

23   assigned to Bryan's case, do you believe that each of

24   the skills trainers you supervised carried out their

25   responsibilities to the best of their abilities?

1                    MR. VARADY:  Objection.  Vague.

2      Speculative.  Leading.  Foundation.

3                    THE WITNESS:  Yes, with -- I mean,

4      keeping in mind their abilities varied some.

5      BY MR. USHIRODA:

6           Q.  Yes.

7           A.  But, yes.

8           Q.  Some were better than others?

9           A.  Some were better than others.

10          Q.  Right.  Now, I believe we already talked at

11     length about the community plan you had for Bryan,

12     correct?

13          A.  Yes.

14          Q.  And that was the Special Olympics, the

15     Friendship Club and the -- the day out in the

16     community, correct?

17          A.  Yes.

18          Q.  Okay, I'm going to show you Exhibit 9.  Okay,

19     doctor, I've handed you what Mr. Varady marked as

20     Exhibit 9 to your deposition, and excuse me while I

21     try to locate it, mine.

22               Now, this -- you testified that -- now, let me

23     ask you this.  It's a letter dated -- Exhibit 9 is a

24     letter dated September 19th, 2003 from Stanley C. Bond

25     to Mr. Stalsberg.  It's unsigned.  Who is

```
 1          Q.  Okay.  Now, let's get back to Jennifer Harris.

 2          A.  Yeah.

 3          Q.  I believe you testified that in your opinion

 4     that she was a very good teacher?

 5          A.  She was a good teacher.

 6          Q.  Based on what you know about Ms. Harris,

 7     would -- would she be the kind of teacher who just

 8     allow a child to self-stim in own urine and just do

 9     nothing about it?

10               MR. VARADY:  Objection.  Calls for

11     speculation.

12               THE WITNESS:  You know, I -- I don't

13     know, and I don't really feel I can comment on that

14     incident because all I know is what people reported to

15     me, and I just feel like I don't really have the whole

16     big picture with that.  Jennifer is very responsible,

17     attentive teacher, and I just can't comment on that

18     incident when they're -- you know.

19     BY MR. USHIRODA:

20          Q.  Right, you don't have -- you didn't do

21     anything to verify the facts?

22          A.  I would say for her to be flippant about this

23     would be very much out of character.

24          Q.  As far as you know, she -- based on your

25     experience with her, with Ms. Harris, was she a caring
```

1    person?

2    A.  Oh, yes.

3    Q.  Did she care about her students?

4    A.  She did care about her students.

5    Q.  Okay.  Did she put their needs up as a high

6    priorities?

7    A.  She put -- she was a good teacher.  She was

8    attentive to her students.  She cared that they met

9    their IEP goals, and, you know, I felt we were

10    fortunate to have her.

11    That particular incident, may I repeat, I

12    wasn't there.  I just heard about it.  So I really

13    don't feel like I can comment on it, and I can barely

14    remember hearing about it.

15    Q.  You just don't know what happened?

16    A.  You know, I wasn't -- yeah --

17    Q.  You just --

18    A.  -- it was three years ago, you know, three

19    years ago an incident that I wasn't there that someone

20    told me about and I don't really remember.

21    MR. USHIRODA:  Thank you, Doctor, that's

22    all the questions I have.

23    MR. VARADY:  Okay, Dr. Copeland, do you

24    need a break?  If not --

25    THE WITNESS:  No, let's just do this.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1      A.  Yes.

2      Q.  And if what she described to you had occurred,

3   you would agree that it was a significant and serious

4   event, isn't that --

5      A.  If she --

6           MR. USHIRODA:  Objection.  Leading.

7   Calls for speculation.  Lack of foundation.  Assumes

8   facts not in evidence.

9           THE WITNESS:  If a teacher had been

10   disregarding of a student, I would consider that a

11   serious problem.

12   BY MR. VARADY:

13      Q.  Dr. Copeland, it's late and I just want to get

14   to the heart of the matter here.

15      A.  I do too.  I agree.

16      Q.  Okay.  If a student were stimming in his own

17   urine, slipping and laying in it on the floor and the

18   teacher was merely watching it saying I don't know

19   what to do, you would consider that serious, wouldn't

20   you?

21      A.  I would --

22           MR. USHIRODA:  Objection.  Lack of

23   foundation.  Assumes facts not in evidence.  Improper

24   hypothetical.  Calls for speculation.  Assumes facts

25   not in evidence.

323

1      Q.  -- that's all.

2          And you wouldn't -- you wouldn't characterize,

3  for example, your earlier description as -- of the --

4  of the July -- I'm sorry, the January '04 program as

5  chaotic as a little thing, that wasn't a small thing,

6  was it?

7                    MR. USHIRODA:  Objection.  Leading.

8                    THE WITNESS:  Yeah, that -- that was not

9  a medium thing.  I mean, the chaos you hoped you were

10 going to pass through.  That will end and it got

11 better.  Some of the others, you know, the not being

12 able to get skills trainers went on.  It didn't.  So

13 it wasn't as big as the others, but it was very

14 frustrating for her, there was no doubt.

15 BY MR. VARADY:

16     Q.  And you observed that frustration building

17 over a two-year period through these various

18 settlement agreements, decisions, IEP meetings and

19 what not; isn't that --

20                    MR. USHIRODA:  Objection.

21 BY MR. VARADY:

22     Q.  Isn't that correct?

23     A.  The --

24                    MR. USHIRODA:  Objection.  Leading.  Lack

25 of foundation.  Vague and ambiguous.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1      Q.  And you would understand, given those

2      circumstances, why the parents might be willing to

3      compromise and accept people who they thought might do

4      a good job even if they didn't meet the criteria and

5      just try it, because having someone working with Bryan

6      in the program was important?

7                    MR. USHIRODA:  Objection.  Leading.

8      Misstates testimony.  Lack of foundation.  Assumes

9      facts not in evidence.

10                   THE WITNESS:  Yes, I think.

11     BY MR. VARADY:

12     Q.  Now, again, with Mr. Ushiroda you were careful

13     to distinguish between training and coaching; do you

14     recall that?

15     A.  Yes.

16     Q.  That's an -- because you've maintained that

17     distinction throughout your testimony today and it's

18     been lengthy, I assume that's an important distinction

19     for you personally to make?

20     A.  Yes.

21     Q.  Can you explain why.

22     A.  Because training is a more formal educational

23     process.  And coaching is you're on the spot coaching

24     a person through a task, and maybe it's just my own

25     educational background that makes that a distinction

352

1    would -- I remember once just seeing her doing some

2    things with him outside.  It was kind of a little play

3    area out there.

4              MR. VARADY:  Okay, again, I thank you for

5    your time and apologies from me and from my clients

6    for going so long.  I want to thank you for being so

7    thorough and sticking with our deposition today.

8              MR. USHIRODA:  I just have one follow-up

9    question.

10             THE WITNESS:  Oh, sorry.

11                        EXAMINATION

12   BY MR. USHIRODA:

13       Q.  Doctor, you talked about, I guess, recent

14   reexamination by Mr. Varady, about there needed to be

15   ongoing training for skills trainers, correct?

16       A.  Yes.

17       Q.  Now would that be in connection, like, with a

18   training university?

19       A.  Yes, we needed -- I felt, you know, on the

20   island some organization, some institution that would

21   set up an on -- just a little curriculum, a little

22   program that would train people to be skills trainers,

23   and, yes, you're most likely to find those in

24   universities.  I think probably where they -- this is

25   one of our problems, we just don't have a big

353

1    educational center on, you know, the Big Island like

2    even here, like you do in Honolulu, because one good

3    supply source are students, graduate students, you

4    know, who plan on going into this field or planning on

5    going into special education and that just isn't there

6    so you have to purposefully plant it there.

7                    MR. USHIRODA:  Okay, thank you.

8                    THE WITNESS:  Okay.

9                    THE VIDEOGRAPHER:  Is that it?  This

10    concludes the deposition of Dr. Dru Copeland.  Off the

11    record at 7:28 p.m.

12                    (The deposition concluded at 7:28 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25