***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---|---

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawaii, and ALVIN RHO, in his official capacity as West Hawaii District Superintendent,<br><br>Defendants. | CIVIL NO.CV 04-00442 HG/BMK<br>CIVIL NO.CV 05-00247 HG/BMK<br>CONSOLIDATED<br>(Other Civil Action)<br><br><br><br>TRIAL DATE: October 11, 2006 |

DEPOSITION OF KIMBERLY SMALLEY, Ph.D.

Taken on behalf of the Defendants, at the law offices of Davis Levin Livingston Grand, 400 Davis Levin Livingston Grand Place, 851 Fort Street, Honolulu, Hawai`i 96813 commencing at 9:02 a.m., on Thursday, July 27, 2006, pursuant to Notice.

BEFORE:
Valerie Mariano, CSR No. 353
Notary Public, State of Hawai`i

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

EXHIBIT "A"

1   A.   Not specifically.  I have several publications related
2   to working with people with autism and developmental
3   disabilities in employment, transition to school to work,
4   community-based instruction areas.  Typically a
5   10-to-12-year-old would still be focusing on academics.
6   Bryan's particular case, his class did CBI instruction.  I
7   wouldn't say they're not relevant to his instruction, but I
8   would say they're relevant to his age group.
9        THE WITNESS:  You got to type it for me Stan.
10       MR. LEVIN:  Bryan was seven years old when --
11       THE WITNESS:  Bryan was seven years old when I worked
12  with him?  Is that what you're --
13       MR. LEVIN:  When he first --
14       THE WITNESS:  When he first --
15       MR. LEVIN:  -- went to the DOE.
16       THE WITNESS:  When he went to the DOE?  I don't think
17  I met him at seven.  I met him in 2000, 2001.
18       I -- so, you know, I have no records, right, when I
19  worked for the State Department of Health.  When I left
20  there, clearly, no records came with me.  I worked again
21  with Bryan's family when I was at Developmental
22  Disabilities, CAMHD being the first time, Child and
23  Adolescent Mental Health Division.  So I have none of those
24  records.  Then when I moved over to Developmental
25  Disabilities, I have none of those records.  And then when

1  It's just that I was -- what you had compared it to
2  previously and -- but thank you for your clarification.
3  A.  Then I had all Drew's stuff, so --
4  Q.  Uh-huh.  And again, this all would be with CFS?
5  A.  No, I think Drew was another agency.
6  Q.  Whatever agency she was with?
7  A.  I mean, there were -- every agency was working with
8  Bryan.  It was very difficult to -- I mean, ideally it's
9  nice if you have one agency because then the skills
10 trainers' direct supervisor is a consultant.  But often in
11 the case of these outer island kids, some rural areas --
12 and, of course, in Bryan's case he was both -- then you end
13 up having one skills trainer from one agency, another
14 skills trainer from another agency, a consultant from
15 either or different.
16      And in Bryan's case, anybody who had staff -- I mean,
17 he was served by -- I'm sure he was served by everybody in
18 the area.  I'm sure every agency and every person there
19 served him at some point.  So I think -- but I could be
20 wrong.  But his consultant was from TIFFE, and his staff
21 were from HBH at the time I did this.  I was working with
22 CFS, and I know CSF was also providing skills trainer, but
23 Sven and the people I remember weren't, so that might have
24 been just before.
25 Q.  Do you remember at this time whether the parents had

1    any role in the selection of skills trainers?
2    A.  Yes.  I believe that they had one as part of either a
3    settlement or due process or an agreement or an IEP
4    agreement.  They had some sort of official role that they
5    got to interview people.  I know they advertised directly,
6    and that's how we're very fortunate in the past to have
7    found the woman who was deaf or hard of hearing.
8    Q.  Who was that?
9    A.  I don't remember her name, but she was a person who
10   was deaf or hard of hearing, and so her sign language being
11   fluent -- this is way back.  Her sign language being fluent
12   really helped Bryan's come along.
13   Q.  And this particular skills trainer was found by the
14   parents?
15   A.  I -- yeah, I think so.  I could be wrong.  I know at
16   this time in the end here they had contacted an old skills
17   trainer who had worked with him who had moved off island
18   and that, you know, had somehow indicated to her that
19   things were going very badly, and they were desperate, and
20   would she be willing to come back.  I know that she was
21   willing to come back and did come back, and I don't think
22   she -- I don't think she was working when I met her.  In
23   fact, I'm not sure that she worked ever.  She was having
24   difficulty getting hired on.
25   Q.  Does the name Christie Edwards sound familiar?

1    then the living room area in between where there were

2    couches, television, his videos, and moving in -- going

3    into the real room, the room that looks like a little boy's

4    room, to do his work.  So when he had a one-on-one skills

5    trainer in the house, they would go in that room and sit at

6    the desk and read books and practice some sign and come

7    back out, use the bathroom, then watch a video as a

8    reinforcer, then go back in.  But as far as sleeping or any

9    time he was alone or unsupervised, like in the middle of

10   the night, he was in the empty room because you can't have

11   him eat anything and die.

12       So between the time I first met him when he spent most

13   of his time in the empty room, to the middle when he spent

14   quite a bit of time in the nice room, a typical boy's room,

15   though not sleeping there yet, then in the end when I met

16   him back when he was exclusively with the empty room and

17   the urine everywhere.

18   Q.  What was the condition of the downstairs area at this

19   time?

20   A.  It stunk.  You know, he -- Bryan urinates everywhere.

21   The couches smell bad.  They left the -- it had a big open

22   door.  I don't know if they were -- I don't know what they

23   were.  They were louver doors or whatever.  It was open so

24   the breeze could get in and out of there.  It was cleaned

25   regularly.  They cleaned it.  And they had tools to clean

1   the couch.  He had to clean up if he urinated, but then

2   he's not gonna do an adequate job, so the skills trainer

3   went right behind him and cleaned up.  But even with all

4   that, there was very definitely the smell of urine.

5        And it was pretty empty.  Didn't look like your living

6   room.  He had his videos, his television, couple couches, a

7   gymnastic mat that is sort of his spot, the place where he

8   would like to be, some icons on the wall, sometimes a

9   visual schedule on the wall, sometimes not, really not much

10  else, a couple biggish toys.  Barney and some of his

11  interests were not age appropriate, but, hey, there was

12  interest, so who was I gonna complain?  Big rubber ball,

13  that kind of thing.

14  Q.   Was he -- had he --

15       THE WITNESS:  Time.

16       MR. USHIRODA:  Why don't we take a break.

17       (Whereupon, a recess was taken 12:00 p.m. to

18       12:13 p.m.)

19       MR. USHIRODA:  Okay.  Let's go.

20       THE WITNESS:  Yeah.

21       MR. USHIRODA:  Okay.  What was my last question, and

22  what was the answer?

23       (Whereupon, the record was read back by the reporter

24       as follows:

25       "Q.      What was the condition of the

```
 1    of it may have been intentional.  Some of it may not have
 2    been.
 3    Q.   Okay.  Okay.  In other words, you don't know?
 4    A.   I cannot speak for any particular individual.
 5    Q.   Okay.  Kim, I appreciate your time.
 6    A.   Okay.
 7    Q.   And I appreciate your candor.  Thank you for your
 8    time.  I have no further questions.
 9         MR. USHIRODA:  Is that it?
10                        (Discussion off the record.)
11         MR. USHIRODA:  Oh, wait.
12         THE WITNESS:  He takes that back.
13    Q.   (By Mr. Ushiroda)  Just again, we've covered all your
14    opinions?
15    A.   We've covered everything that's saliently -- I sort of
16    run at the mouth; right.  I'm not holding anything back.
17    It's everything I thought of.  If you ask me something
18    different in court, I may give more opinions.  But based on
19    everything you've said, that's what comes to my mind.
20    Q.   I have asked you for any stronger opinions that you
21    have which are not contained in this report.
22    A.   I don't know what you're reaching for, and if I did, I
23    would answer it.  This is everything that's salient --
24    Q.   I'm just trying to exhaust you, basically.  And what
25    it is, so I don't come to trial and say, well --
```