```
 1              IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3                              ---

 4
     ANN KIMBALL WILES AND STANLEY    )
 5   BOND, INDIVIDUALLY AND AS NEXT   )
     FRIENDS OF THEIR SON, BRYAN      )
 6   WILES-BOND, A MINOR,             )
                                      )
 7                       PLAINTIFFS,  )
                                      )
 8           VS.                      )  CASE NO.
                                      )  CV 04-00442 HG/BMK
 9   DEPARTMENT OF EDUCATION, STATE OF)  CV 05-00247 HG/BMK
     HAWAII, AND ALVIN RHO, IN HIS    )  CONSOLIDATED
10   OFFICIAL CAPACITY AS WEST HAWAII )  (OTHER CIVIL
     DISTRICT SUPERINTENDENT,         )  ACTION)
11                                    )
                         DEFENDANTS.  )
12                                    )

13

14

15
                          DEPOSITION OF
16
                            CARA ENTZ
17
                       GLENDALE, CALIFORNIA
18
                     THURSDAY, JUNE 28, 2007
19

20

21
     ATKINSON-BAKER, INC
22   COURT REPORTERS
     WWW.DEPO.COM
23   800-288-3376

24   REPORTED BY:  EDWARD G. HARRISON, CSR NO. 6530

25   FILE NO.:  A104D1A
```

1

EXHIBIT "A"

1  before that?
2      A.   I -- well, once for sure. I don't recall how
3  many other times I spoke with her.
4      Q.   And had you done any work with any families in
5  Hawaii prior to this?
6      A.   No.
7      Q.   And prior to this, I mean the date on the
8  letter.
9           Do you understand that?
10     A.   Right.
11          No.
12     Q.   Now, in the course of this proposal --
13          I'm trying to locate it specifically. Sorry,
14  I need to look at my copy.
15          I'm looking for a reference to ASL training,
16  but I don't see it in this particular proposal; is that
17  correct?
18     A.   That's correct.
19     Q.   Were you --
20          When do you believe you became aware of the
21  importance for a American Sign Language trained
22  therapist to be working with Bryan?
23     A.   Probably after I spoke with Kate Tolentino.
24     Q.   Okay.
25          And that would have been sometime in October

```
 1   or around that time?
 2       A.    September --
 3       Q.    Okay.
 4       A.    -- ish.  Yeah.
 5       Q.    All right.
 6             Now, in looking at Exhibit No. 1, which is a
 7   two-page exhibit that appears to be the precursor to
 8   this Exhibit No. 2, there's some handwriting that says
 9   "Attention:  Cara, Urgent, Robin send" on the second
10   page.  That's Bates stamped 90.
11             Do you see that?
12       A.    I do.
13       Q.    Who wrote that?
14       A.    I wrote "Robin send."
15       Q.    Okay.
16       A.    I have no idea who wrote "Attention:  Cara,
17   Urgent."
18       Q.    Was this response in July of '04 considered an
19   urgent response or was the request considered urgent?
20       A.    Good question.  I'm thinking of our response.
21             You know, I honestly can't say.
22       Q.    In speaking with Kim, do you recall her
23   expressing urgency in needing a response from your
24   agency?
25       A.    I remember her expressing urgency.  And it's
```

```
 1        A.   Yeah, I don't know.  It's a mystery, really.
 2             Let's see.
 3             What was the date?  August.
 4             I'm not really sure why.  I mean, I did not
 5   direct her.
 6        Q.   Sometime, though, in between July and August
 7   of -- August 9th of '04, which is the date of this
 8   e-mail, she must have spoken both to you and to Dr.
 9   Heilveil, that would be my impression from looking at
10   this.
11             Do you have any reason to disagree with that
12   impression?
13        A.   No.
14        Q.   Did Dr. Heilveil ever mention to you that he
15   had spoken to Shelby or to Kim, Bryan's mom?
16        A.   No, he never mentioned that.
17        Q.   Do you know if he did have conversations with
18   either of them?
19        A.   I do not -- I'm not aware of any conversations
20   he had with either one of them.
21        Q.   Now, in this particular e-mail it does mention
22   ASL, ongoing training in ASL signs used by Bryan.
23             Do you see that?
24        A.   I do.
25        Q.   And initial training in ASL, if needed, to
```

229

```
 1   learn Bryan's signs.
 2              Do you see that?
 3       A.    I do.
 4       Q.    And for whom was that training being sought,
 5   do you know?
 6       A.    I believe for staff working with Bryan.
 7       Q.    Would that include all staff?
 8       A.    That would include all staff.
 9       Q.    Now, in terms of staffing this particular
10   proposal, this particular project, am I correct that the
11   PCFA was going to be providing --
12              MR. VARADY:  Off the record.
13              (Whereupon, at this time, there was a
14              discussion held off the record.)
15   BY MR. VARADY:
16       Q.    For this particular proposal, am I correct
17   that PCFA was going to be providing two things
18   principally, which were training, in the first instance,
19   for everyone who was going to be working with Bryan, and
20   then supervision for the people who were going to be
21   providing -- supervision of people who were going to be
22   providing direct services?
23       A.    Well, and the people -- we were going to
24   provide the people who provided the direct services as
25   well.
```

```
 1     Q.    Okay.
 2           But those people were not going to be people
 3   who would be hired here in California and then sent to
 4   the Big Island, they would be people who your supervisor
 5   Gloria or whomever met, interviewed and retained from
 6   Hawaii?
 7     A.    That's correct.
 8     Q.    So what I was getting at was the structure of
 9   the initial program would be that you would have
10   yourself, Ms. Medina working in a supervisory capacity
11   and Ms. Medina would be providing training, but the
12   people who were going to be working as behavioral
13   therapists under her with Bryan would be retained
14   somewhere in Hawaii?
15     A.    Correct.
16     Q.    And as of the date of this proposal, you had
17   not advertised for are or solicited people for those
18   positions in Hawaii?
19     A.    Correct.
20     Q.    Do you know how many people would have been
21   necessary to perform the functions in Bryan's program
22   that you were going to seek to provide?
23     A.    I would say at least five.
24     Q.    And do you know what positions they would be
25   filling, that is, what would the name of their position
```

1  and what would the function be?

2  A.  The name of the position would be behavior
3  therapist and it's our general requirements of
4  Bachelor's level person, hopefully with some experience
5  providing behavior intervention or some experience with
6  autism or some experience with children.  And their
7  duties are to work directly one-on-one with Bryan either
8  in school or the home setting.

9  Q.  And by working directly with him, that would
10 be working directly with him to implement his IEP; is
11 that correct?

12 A.  That's correct.

13 Q.  And the behavioral program and any subsets of
14 that, like toileting or what have you, would all be
15 included within the general umbrella of his IEP?

16 A.  Correct.

17 Q.  In your visit to Hawaii or any discussions
18 before or after that, other than Christy Edwards, did
19 you have any direct communications with any of the other
20 people who were working with Bryan at the time that you
21 were making these proposals?

22 A.  Well, Dru Copeland.

23 Q.  Okay.

24 A.  I guess she was working with him at the time.

25 Q.  Right.  Let me just stop you there.

232

```
 1              Do you understand what function she was
 2   working in?
 3        A.    I believe she was a supervisor at the program.
 4        Q.    In Hawaii that person is referred to as an
 5   IISC.
 6        A.    Okay.
 7        Q.    Are you aware of that?
 8        A.    No, I'm not.
 9        Q.    And I'm going to try to recall from memory
10   what that stands for.  I think it's Intensive --
11   Intensive Individualized Intervention Coordinator,
12   something like that.
13        A.    Okay.
14        Q.    Or Intention -- Intention Intervention
15   Services Coordinator.  It's usually a psychologist that
16   fulfills that function, although not always.
17        A.    Okay.
18        Q.    So if I'm using IISC.
19              And my understanding of Dr. Copeland's
20   function would be analogous to that that Ms. Medina
21   would be providing had she been actually retained and
22   moved over to work on the program; is that correct?
23        A.    Well, actually, Dru Copeland would have been
24   more in line with our M.A. level supervisors.
25        Q.    Okay.
```

```
 1      A.   Which I think the plan was to, in addition to
 2 Gloria, have an M.A. level supervisor also supervise the
 3 case.
 4      Q.   All right.

 5           And would that person be retained in Hawaii or
 6 would that be someone that PCFA would be retaining and
 7 providing from California?
 8      A.   It would be someone we retained and provided
 9 from California initially.
10      Q.   Had that person been identified or retained at
11 any time from July of '04 to November of '04?
12      A.   We had a number of staff in mind to do that,
13 but we hadn't sort of -- you know, we didn't designate
14 that duty or anything like that yet.
15      Q.   Did Ms. Medina have training in American Sign
16 Language?
17      A.   No.
18      Q.   Did any of your Master's level people whom you
19 had in mind for that position that would be working
20 directly under her have training in American Sign
21 Language?
22      A.   Yes.  One of our M.A. level supervisors was
23 fluent in signing language.
24      Q.   Was that Sinead?
25      A.   Yes.
```

 1      Q.   But my understanding from your earlier
 2 testimony today was that although she was fluent,
 3 because of her then current assignments, she was not
 4 available to work directly on Bryan's case; is that
 5 correct?
 6      A.   No, she would have been able to.
 7      Q.   Would she have been doing that while she
 8 resided here or would she have been required to move to
 9 Hawaii for that purpose?
10      A.   We probably would have had her travel back and
11 forth.
12      Q.   Had she --
13           Had you discussed that with her and had she
14 agreed to do it, in other words, make the commitment to
15 make that travel?
16      A.   Yeah, I had mentioned it to her and she was
17 willing to do that.
18      Q.   We're following along fairly closely with the
19 exhibits that you've looked at already.
20           If you look at the next exhibit, which I
21 believe is Exhibit No. 4.
22           Now, this also is a -- it appears to be just a
23 markup of the prior proposal from July.
24           Would you agree with that characterization?
25      A.   I would.

1    Q.    And do you know if there was a revised

2    typewritten form of this particular proposal or was this

3    more in the order of notes that were made to yourself?

4    A.    This looks like notes made to myself.  I

5    don't -- I haven't been able to find a typed -- you

6    know, sort of an updated proposal.

7    Q.    Okay.

8          Where would this information have come from

9    that's handwritten on here?

10   A.    I believe --

11         I'm not sure what you're asking.

12   Q.    Who wrote this information on there?

13   A.    Oh, I'm sure I wrote the information.

14   Q.    Okay.

15         And then the second part of the question is:

16         Who gave you the data that's -- or the other

17   information that's contained within what you wrote here?

18   A.    I believe that came from Shelby.  So she

19   wanted us to consider more hours.

20   Q.    Now, at this time, which was August 10th,

21   2004, my understanding from your prior testimony is that

22   you were aware -- well, strike that.  I'll get back to

23   that in a minute.

24         I wanted to show you what will now be Exhibit

25   No. 18 to your deposition.

236

```
 1            First of all, on the first page it refers in
 2   handwritten notes up at the top to J. Harris and B.
 3   Coffman.
 4            Do you see that?
 5       A.   I do.
 6       Q.   Do you know who those people are?
 7       A.   I do not.
 8       Q.   Okay.
 9            Would J. Harris possibly be Bryan's teacher at
10   this time, that is on December 1st, 2004?
11       A.   I'm not sure.
12       Q.   Okay.
13            Do you recall testifying that you observed
14   Bryan in class when you were there in October, that is
15   on the Big Island in October?
16       A.   Yes.
17       Q.   Do you recall his teacher's name?
18       A.   I don't.
19       Q.   Now, looking at the second paragraph in the
20   background section on the first page of Exhibit 18, it
21   indicates that Bryan actively uses between 20 and 50
22   signs and purportedly knows over a hundred plus.
23            "Last winter Bryan read me a picture
24        book in sign language, demonstrating
25        significantly more labels and nouns that I
```

                                                              241

```
 1            might have realized he knew based on his
 2            daily language use alone."
 3            Do you see that?
 4       A.   I do.
 5       Q.   Now, when you observed Bryan in October, was
 6  he signing at the level indicated in this report?
 7       A.   No.
 8       Q.   Were people who were working with him signing
 9  to him?
10       A.   No.
11       Q.   Could that explain why it was that his -- he
12  was not actively signing, that is, he didn't have an
13  audience for him to sign to?
14            MR. USHIRODA:  Objection.
15            Speculation, lack of foundation.
16            THE WITNESS:  That's possible.
17  BY MR. VARADY:
18       Q.   You indicated that you understood why training
19  in American Sign Language for the behavioral team
20  working with Bryan would be necessary in making your
21  proposal.
22            Do you recall that?
23       A.   I do.
24       Q.   And wouldn't it be true that they would need
25  not only to be able to sign to him expressively, but be
```

242

```
 1   concern, etcetera, high priority for them?
 2        A.   You know, I don't know if I actually talked to
 3   her about that or if I just assumed that that would be a
 4   high priority.  I can't recall having that conversation
 5   with mom, honestly.
 6        Q.   Would you agree that was something that your
 7   team would have focused on if PCFA had -- if its
 8   proposal had been accepted and you began working with
 9   Bryan?
10        A.   Yes.
11             MR. USHIRODA:  Objection.
12             The plan was very multifaceted, so I don't
13   know if it focused on just one thing.
14   BY MR. VARADY:
15        Q.   Do you understand my question?
16        A.   Yes.
17        Q.   Would that have been something that you would
18   want to have addressed as a high priority going in
19   working with Bryan?
20        A.   Yes.
21        Q.   And why is that?
22        A.   Well, it's a sanitary problem, for one thing.
23   And -- or hygiene problem.  And it really sort of
24   impedes his ability to be out in the community and be in
25   school settings without a hardship, basically, I guess.
```

```
 1   five-day program that you spoke about; is that correct?
 2        A.   Actually, she does the new staff training and
 3   she does the PART training.
 4        Q.   All right.
 5        A.   Yes, so that's how she was going to be
 6   involved, yeah.
 7        Q.   All right.
 8             Now, the proposal was for a period of --
 9             The proposal that you made and throughout all
10   its various drafts up until the final draft in November
11   was for a three-month contract; is that right, to begin?
12        A.   Correct.
13        Q.   And can you tell me why that three-month
14   interval was chosen, is there something specific about
15   that that was important to PCFA?
16        A.   Nothing really in particular.  I'm thinking
17   that -- I don't know.  Three months seems to be a
18   standard probationary period and maybe that's what we
19   were thinking.  I can't remember exactly how we came up
20   with three months.
21             Let's see here.  Hold on.
22             Yeah, I can't remember how we came up with
23   three months, honestly.
24        Q.   So that's not something that you typically do;
25   is that correct?
```

```
 1      A.    That's correct.
 2      Q.    That a specific child of family, would not
 3   typically do that?
 4      A.    Correct.
 5      Q.    Would you look at Exhibit 7, please.
 6            Now, looking at your response to Shelby
 7   Floyd's questions, the last sentence, you say, and this
 8   is as of -- in response to her September 14th, 2004
 9   e-mail:
10            "The supervision is only" for a
11            proposal -- "is only a proposal for the
12            maximum possible, but can be adjusted as
13            needed."
14            Do you see that?
15      A.    I do.
16      Q.    Can you tell me what was meant by that
17   statement?
18      A.    I think that what we sort of spelled out,
19   number one, is the -- our maximum requirement for
20   supervision and that it could be, I think, adjusted
21   based on need or what have you.
22            So we said M.A. level supervision in person
23   every other month for 16 hours two full days depending
24   on the need that could be adjusted up or down.  So if we
25   needed more supervision, it would be more.  If we needed
```

```
 1   less supervision, we would go less often, something like
 2   that.
 3        Q.   But at the time you were writing this, you
 4   weren't certain which way it was going to shake out,
 5   that is, whether or not the maximum would be needed or
 6   not; is that correct?
 7        A.   Correct.
 8        Q.   All right.
 9             Just so we have a clear record, I'm going to
10   give you what we'll mark as Exhibit No. 25.
11             (Whereupon, at this time, the Certified
12             Shorthand Reporter marked Defendants' Exhibit
13             25 for identification.)
14   BY MR. VARADY:
15        Q.   And I would just like you to flip through this
16   and confirm that this is the draft behavioral assessment
17   that Ms. Tolentino faxed to you on October 6th, 2004,
18   among other records she sent you on that date.
19        A.   This is the draft faxed to me.
20        Q.   All right.
21             I'm going to show you a letter dated October
22   8th.
23             MR. VARADY:  I ask that this be marked as No.
24   26, please.
25   //
```

```
 1      A.      -- would that include teachers and --
 2      Q.      Yeah, sure.
 3      A.      Well, there was that classroom teacher and
 4   then those two people.
 5      Q.      In the module?
 6      A.      Yes, in the module.
 7      Q.      You did meet with Alvin Rho also, correct?
 8      A.      That's right.  But that -- yeah.
 9              Not that I can recall.
10      Q.      But your primary contact with the DOE was with
11   Kate Tolentino?
12      A.      Correct.
13      Q.      In fact, she was really your only contact?
14      A.      Correct.
15      Q.      Now, from your conversations with Kate
16   Tolentino, did it appear to you that, you know, she
17   wanted to make sure that Bryan's needs were met?
18              MR. VARADY:  Objection.
19              Leading, calls for speculation.
20   BY MR. USHIRODA:
21      Q.      Educational needs.
22      A.      Yes, it appeared that way.
23      Q.      It's not like he was being put in a box and
24   shoved away, they wanted to make sure he was getting
25   services, correct?
```

344

```
 1              MR. VARADY:  Objection.
 2              Leading.
 3              THE WITNESS:  It appeared that way, yes.
 4    BY MR. USHIRODA:
 5         Q.   How about your discussions with Alvin Rho, do
 6    you recall anything from Mr. Rho about what he felt
 7    should be done about Bryan's educational program?
 8         A.   No, I never sought his opinion or thoughts.
 9    Mainly he listened to what I had to say.
10         Q.   Did Kate ever share with you what her thoughts
11    on Bryan's educational program, what should be done,
12    what needs should be met?
13         A.   No.
14              MR. USHIRODA:  I think that's all the
15    questions I have.  Thank you for your time.
16              THE WITNESS:  You're welcome.
17              MR. USHIRODA:  Are we done?
18              MR. VARADY:  We're done.  Thank you so much.
19              (Whereupon, the deposition proceedings were
20              concluded at:  9:00 p.m.)
21
22
23
24
25
```