```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF HAWAII

 3        -----------------------------------------

 4    ANN KIMBALL WILES and STANLEY BOND,

 5    individually and as next friend of their

 6    son, BRYAN WILES-BOND, a minor,

 7              Plaintiffs,

 8              vs.         Civil No. CV 04-00442 HG/BMK

 9                                  05-00247 JMS/BMK

10    DEPARTMENT OF EDUCATION, State of Hawaii,

11    and ALVIN RHO, in his official capacity

12    as West Hawaii District Superintendent,

13              Defendants.

14        -----------------------------------------

15

16

17          VIDEOTAPED DEPOSITION OF REBECCA GAVIN

18

19    Taken on behalf of the Plaintiffs at Ralph Rosenberg

20    Court Reporters, 75-170 Hualalai  Rd., Suite D-212,

21    Kailua-Kona, Hawaii 96740, commencing at 1:06 p.m.,

22    Friday, July 20, 2007, pursuant to Notice.

23

24    BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

25              Notary Public, State of Hawaii
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090



EXHIBIT "A"

1    And any follow-up questions will be at the direction of

2    Mr. Levin; is that understood, Counsel?

3              MR. LEVIN:  Yes.

4              MR. ELLIS:  Yes.

5              THE WITNESS:  Okay.

6              MR. USHIRODA:  That's it.

7                        EXAMINATION

8    BY MR. LEVIN:

9        Q.   (Mr. Ellis) Ms. Gavin, do you understand you're

10   under -- your testimony today is under oath?

11       A.   Yes.

12       Q.   (Mr. Ellis) Okay.  Do you understand that your

13   responses today have to be verbal so the court reporter

14   can take them down to make a transcript?

15       A.   Yes.

16       Q.   (Mr. Ellis) Do you understand that your

17   responses to my questions today will be received as what

18   you intended the answers to be and that by answering the

19   question, I will assume that you understand the

20   questions?

21       A.   Yes.

22       Q.   (Mr. Ellis) That said, I do not want you to

23   guess or speculate, but I want you -- I would like you

24   to answer my questions to the best of your recollection,

25   and if you can't remember, please just tell me so and

```
 1   objection.  Although the objection has been voiced, you

 2   must answer the question unless instructed by the

 3   attorney not to.

 4       A.   Okay.

 5       Q.   (Mr. Ellis) Okay.  Do you understand what's

 6   just been explained?

 7       A.   Yes.

 8       Q.   (Mr. Ellis) Is there any reason why this

 9   deposition should not proceed?

10       A.   No.

11       Q.   (Mr. Ellis) Okay.  Are you taking any

12   medication that would somehow affect your testimony

13   today?

14       A.   No.

15       Q.   (Mr. Ellis) Tell me about your employment

16   history since college.

17       A.   I -- during college I worked for my dad, so the

18   year following college I was the office manager for my

19   dad's private practice as an OB/GYN.  He retired and I

20   moved to Hawaii, and I worked for Dr. Carol Brown, a

21   psychiatrist, as the receptionist.  And then moved to

22   TIFFE and worked for -- as a skills trainer for the

23   Bonds.  And then transitioned in TIFFE to an IISC role.

24   And now I'm currently with the Department of Health as a

25   mental health care coordinator.
```

```
 1      Q.   (Mr. Ellis) When did you first start working

 2   for TIFFE?

 3      A.   In March '03.

 4      Q.   (Mr. Ellis) And your -- when did you leave

 5   TIFFE's employment?

 6      A.   April '05.

 7      Q.   (Mr. Ellis) Okay.  And during that time you

 8   stopped working as a skills trainer, was that when you

 9   stopped working with Bryan Wiles-Bond?

10      A.   No.  I was a skills trainer throughout my

11   entire time with TIFFE, however, I split it between

12   skills training and IISC.

13      Q.   (Mr. Ellis) When did you stop working directly

14   with Bryan Wiles-Bond or did you ever?

15      A.   I did.

16      Q.   (Mr. Ellis) When was that?

17      A.   I recall July '05.

18           MR. USHIRODA:  No, if you worked --

19           THE WITNESS:  I mean, '04, I'm sorry.

20   BY MR. LEVIN:

21      Q.   (Mr. Ellis) July '04?

22      A.   Mm-hmm.

23      Q.   (Mr. Ellis) After July '04, you still worked

24   for TIFFE --

25      A.   Yes.
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

```
 1      Q.   (Mr. Ellis) -- in a different capacity?

 2      A.   As a skills trainer and IISC, but with a

 3   different youth.

 4      Q.   (Mr. Ellis) And from July on, you had no more

 5   contact with Bryan Wiles-Bond?

 6      A.   If that end date that I recall was July '04,

 7   yes, that is correct.

 8      Q.   (Mr. Ellis) okay.  After that period of time,

 9   did you have any opportunity to speak with the parent or

10   speak with anybody else, say, at TIFFE, regarding Bryan

11   Wiles-Bond?

12      A.   Not that I recall.

13      Q.   (Mr. Ellis) Why did you stop working as Bryan's

14   skills trainer in July of 2004?

15      A.   I was burnt out and ready to increase my IISC

16   hours and have another student for skills training.

17      Q.   (Mr. Ellis) When you say burned out, was there

18   any particular reason for your burning out or was Bryan,

19   say, like, a difficult case?

20      A.   He was a difficult case, and I had been with

21   him for an extended period of time.

22      Q.   (Mr. Ellis) Could you explain what you mean by

23   "difficult?"

24      A.   I think his needs were very high.

25      Q.   (Mr. Ellis) Could you explain what those needs
```

1    were?

2        A.    The structure and monitoring that he needed and

3    his behaviors.

4        Q.    (Mr. Ellis) Could you explain the behaviors?

5        A.    He did show some aggressive behaviors.  Keeping

6    him on task was challenging.  And his issues with

7    urinating.

8        Q.    (Mr. Ellis) Could you explain the issues with

9    urinating?

10       A.    He did not always use the toilet.  It was in

11   his -- done in his pants.  It was done while working on

12   tasks.  It was an issue with him and it -- it was an

13   issue with him.

14       Q.    (Mr. Ellis) Okay.  Is there a reason why Bryan

15   would urinate excessively?

16       A.    He did like water and drink a lot of water.

17       Q.    (Mr. Ellis) Did this occur -- or where did you

18   work at Bryan?

19       A.    At home and in the school.

20       Q.    (Mr. Ellis) Did the excessive urinating occur

21   both at school and at home?

22       A.    Yes.

23       Q.    (Mr. Ellis) At any point during your working

24   with Bryan, did you have an opportunity to speak with a

25   Dr. Kim Smalley?

```
1        A.    I don't recall.

2        Q.    (Mr. Ellis) Did you recall ever meeting

3   Dr. Smalley?

4        A.    I don't recall.

5        Q.    (Mr. Ellis) Do you know who Dr. Smalley is?

6        A.    The name is familiar.

7        Q.    (Mr. Ellis) Okay.  What -- what do you know

8   about Dr. Smalley?

9        A.    I've heard her name, but that's all I know.

10       Q.    (Mr. Ellis) That's all?

11       A.    Mm-hmm.

12       Q.    (Mr. Ellis) Okay.  Did you work -- do you know

13   who Dru Copeland is?

14       A.    Yes.

15       Q.    (Mr. Ellis) Okay.  Did you work with

16   Dr. Copeland?

17       A.    Yes.

18       Q.    (Mr. Ellis) In what capacity?

19       A.    She was the IISC.

20       Q.    (Mr. Ellis) And in that capacity, what did that

21   mean to you?

22       A.    That she was in charge -- basically in charge

23   of the case in terms of looking at and monitoring his

24   progress and what would be helpful and teaching us what

25   to implement and skills to work with him.
```

```
 1    Q.   (Mr. Ellis) Was she in charge of -- she was,

 2  like, your supervisor?

 3    A.   I think more a supervisor of the case and Kelly

 4  Stern was my supervisor.

 5    Q.   (Mr. Ellis) Okay.  Did Dr. Copeland, was she in

 6  charge of implementing how the skills trainers, such as

 7  yourself, implemented the program at home and at school?

 8    A.   Yes.

 9    Q.   (Mr. Ellis) So you understood she was in charge

10  of implementing the program at home?

11    A.   Yes.

12    Q.   (Mr. Ellis) So Bryan's program had both

13  components?

14    A.   Yes.

15    Q.   (Mr. Ellis) Okay.  There have been allegations

16  placed in declarations filed by Defendant that Bryan was

17  sent to school with diarrhea and vomiting; are you aware

18  of that?

19    A.   When you say Defendant, who are you referring

20  to?

21    Q.   (Mr. Ellis) The Department of Education.

22    A.   Okay.  I don't recall.

23    Q.   (Mr. Ellis) You don't recall during the time

24  that you worked with him that he made diarrhea at

25  school?
```

```
 1              (Reporter read back)

 2              THE WITNESS:  I faintly remember something

 3      about it, him coming to school, but I don't recall.

 4      BY MR. LEVIN:

 5          Q.  (Mr. Ellis) So you have no recollection of

 6      these occurrences, other than maybe an eye infection?

 7          A.  Yes.

 8          Q.  (Mr. Ellis) There have been allegations that at

 9      the family home, the home was unsanitary and unclean; do

10      you know anything about that?

11              MR. USHIRODA:  Objection.  Vague and ambiguous.

12      Are you referring to the allegation made or the

13      condition?

14              MR. ELLIS:  The allegation made.

15              MR. USHIRODA:  Objection.  So he's asking you

16      if you're aware of any allegations that have been made

17      about the condition of the home.

18              THE WITNESS:  I believe skills trainers

19      complained about the conditions in the home.

20      BY MR. LEVIN:

21          Q.  (Mr. Ellis) Okay.  Do you know if -- do you --

22      did you work at the home?

23          A.  Yes.

24          Q.  (Mr. Ellis) Okay.  Did you make any allegations

25      yourself that the home was unsanitary or unclean?
```

```
 1        A.   I did say that it was unclean.

 2        Q.   (Mr. Ellis) Okay.  And who did you say this to?

 3        A.   Kelly Stern.

 4        Q.   (Mr. Ellis) Okay.  Did you put -- in what -- or

 5   when did you make that allegation?

 6        A.   I don't recall.

 7        Q.   (Mr. Ellis) What was the unclean condition at

 8   the home?

 9        A.   It had to do with urine around the home.

10        Q.   (Mr. Ellis) Okay.  Is this the same condition

11   that you talked about earlier with excessive urination?

12        A.   Yes.

13        Q.   (Mr. Ellis) Okay.  Do you recall, was it in the

14   entire home or just that area where Bryan lived?

15        A.   I recall it most -- I recall it specifically in

16   the downstairs where he lived.

17        Q.   (Mr. Ellis) So the unclean was that he urinated

18   and -- that he urinated?

19             MR. USHIRODA:  Objection.  Mischaracterizes

20   testimony.

21   BY MR. LEVIN:

22        Q.   (Mr. Ellis) The unclean condition was that he

23   was urinating?

24        A.   Yes.

25        Q.   (Mr. Ellis) Okay.  Do you know if the parents
```

1   mopped up the urination?

2       A.  I did see them clean the bedroom, but the other

3   part I do not know.

4       Q.  (Mr. Ellis) I'm sorry, what other part?

5       A.  He lived -- there was -- it was like a studio,

6   like a living area with a bathroom and then he had a

7   bedroom off of the living area.

8       Q.  (Mr. Ellis) Okay.  So what part did they mop

9   up?

10      A.  The bedroom.

11      Q.  (Mr. Ellis) The bedroom.  Did you -- you don't

12  recall seeing them mop the rest of it or you don't know?

13      A.  I -- I guess I don't know since I didn't see

14  them do it.

15      Q.  (Mr. Ellis) Okay.  When he urinated at school,

16  was it just urination or was there -- did he have other

17  types of accidents, such as diarrhea?

18          MR. USHIRODA:  Objection.  Vague and ambiguous.

19          THE WITNESS:  I don't recall.

20  BY MR. LEVIN:

21      Q.  (Mr. Ellis) Okay.  When he had the urination

22  accidents at school, they happened in the classroom?

23          MR. USHIRODA:  Objection.  Vague and ambiguous.

24          THE WITNESS:  Yes.

25

```
 1   BY MR. LEVIN:

 2       Q.   (Mr. Ellis) Okay.  And were they where he would

 3   actually pee on the floor as opposed to peeing in his

 4   pants?

 5       A.   I don't understand the question.

 6       Q.   (Mr. Ellis) Okay.  When you go to the bathroom

 7   you take your pants off and you urinate.

 8       A.   Yes.

 9       Q.   (Mr. Ellis) In the classroom, did he do that?

10       A.   No.

11       Q.   (Mr. Ellis) No.  They were accidents in his

12   pants?

13       A.   Yes.

14       Q.   (Mr. Ellis) Okay.  Do you recall if the

15   accidents caused the classroom floor to get wet with the

16   urine?

17       A.   Yes.

18       Q.   (Mr. Ellis) Okay.  Was that condition mopped

19   up?

20       A.   Yes.

21       Q.   (Mr. Ellis) Immediately?

22       A.   I recall.  That's what I recall, it was cleaned

23   up.

24       Q.   (Mr. Ellis) Who would do the mopping, do you

25   recall?
```

1      A.    Various people.

2      Q.    (Mr. Ellis) Could you be a little more

3  specific?

4      A.    Myself, the teacher, the janitor.

5      Q.    (Mr. Ellis) Okay.  Do you recall the teacher,

6  who that was?

7      A.    No.

8      Q.    (Mr. Ellis) Could it have been -- was this at

9  Kealakehe Elementary or Kealakehe Middle School?

10      A.    I -- I know it was at Kealakehe Middle School.

11  I don't recall Kealakehe Elementary.

12      Q.    (Mr. Ellis) Did you have an opportunity to talk

13  to the parents about the issue of urinating and the

14  unclean condition at the house?

15      A.    No, I didn't talk with them about that.

16      Q.    (Mr. Ellis) Did you make a report to the

17  Department of Health about the unclean condition of the

18  house?

19      A.    No, I don't recall doing that.

20      Q.    (Mr. Ellis) Okay.  Did you ever put this -- did

21  you ever put this in a written report or a written

22  complaint about the unclean condition at the house?

23      A.    I don't recall doing that.

24      Q.    (Mr. Ellis) Okay.  Oh, did you ask Kelly Stern

25  to put it in a written complaint?

```
 1   foundation.

 2           THE WITNESS:  That's my recollection of it.

 3   BY MR. LEVIN:

 4       Q.   (Mr. Ellis) I'm sorry, just to -- so we

 5   understand, your recollection is what I state -- what

 6   was stated in the question?

 7       A.   Which was that Kelly asked me?

 8       Q.   (Mr. Ellis) Yes.  And it wasn't -- it wasn't

 9   you went to her and voluntarily told her about the

10   unclean condition?

11       A.   I believe so.

12       Q.   (Mr. Ellis) Okay.  Thank you.

13           You left in July of 2004?

14       A.   I believe so.

15       Q.   (Mr. Ellis) Okay.  That was in the summer.

16   Were you part of Bryan's summer program at Kealakehe

17   Intermediate School?

18       A.   I don't recall.

19       Q.   (Mr. Ellis) Okay.  There has been an allegation

20   by the parents and by Dr. Smalley that Bryan was self

21   stimulating by slipping and sliding in his own urine in

22   the classroom; are you aware of the allegation and are

23   you aware if that did or did not happen?

24           MR. USHIRODA:  Objection.  Assumes facts not in

25   evidence.  Lack of foundation.
```

```
 1   BY MR. LEVIN:

 2       Q.   (Mr. Ellis) You can answer the question.

 3       A.   No.

 4       Q.   (Mr. Ellis) Not aware of either?

 5       A.   No.

 6       Q.   (Mr. Ellis) Okay.

 7       A.   Well, I should say I don't recall that, being

 8   aware of any of that.

 9       Q.   (Mr. Ellis) You don't recall it or you just

10   don't know anything about it?

11       A.   I don't know.  I -- I don't know anything about

12   it.

13       Q.   (Mr. Ellis) Okay.  Do you know a skills trainer

14   named Sven?

15       A.   Yes.

16       Q.   (Mr. Ellis) Okay.  And how do you know Sven?

17       A.   Through TIFFE, I believe he was a skills

18   trainer there.

19       Q.   (Mr. Ellis) Okay.  Did he work on Bryan's case?

20       A.   I believe so.

21       Q.   (Mr. Ellis) Okay.  Was he working on Bryan's

22   case at the same time you were working on Bryan's case?

23       A.   I don't recall.

24       Q.   (Mr. Ellis) You don't recall or you don't

25   remember?
```

1    A.   I don't remember.  I don't -- yeah, I don't

2    remember.

3    Q.   (Mr. Ellis) In the summer of '04, do you recall

4    any other skills trainer who was working on Bryan's

5    case?

6    A.   No.

7    Q.   (Mr. Ellis) Did you work, in the summer of

8    2004, did you work during the morning or the afternoon?

9    A.   The morning.

10   Q.   (Mr. Ellis) Okay.  And from March of 2003, did

11   you work, like, full time with Bryan during this --

12   during the week or was it, like, you know, four hours a

13   day?  Was it eight hours a day?

14   A.   I recall the shift being 12:00 to 7:00 and

15   Sundays it was 12:00 to 6:00, and it wasn't every day of

16   the week, I don't think.  Like not Monday through

17   Friday.  Sunday was one of my days, 12:00 to 6:00, and

18   then there were days during the week.

19   Q.   (Mr. Ellis) So like, as an example, Monday,

20   Wednesday, Friday?

21   A.   Yeah.  I don't recall the exact amount of hours

22   I worked each week with him.

23   Q.   (Mr. Ellis) Okay.  Do you recall it being a

24   full time, 40-hour a week?

25        MR. USHIRODA:  For her?

```
 1           MR. ELLIS:  For her.

 2           MR. USHIRODA:  Objection.

 3           THE WITNESS:  I don't recall if I worked 40

 4   hours specifically.

 5   BY MR. LEVIN:

 6       Q.   (Mr. Ellis) Was it more than 30?

 7       A.   I believe so.

 8       Q.   (Mr. Ellis) So it could be in that range?

 9       A.   Yes.

10       Q.   (Mr. Ellis) Did you develop a relationship with

11   the parents?

12       A.   Yes.

13           MR. USHIRODA:  Objection.  Vague and ambiguous.

14   BY MR. LEVIN:

15       Q.   (Mr. Ellis) Would you consider it a

16   professional relationship?

17       A.   Yes.

18       Q.   (Mr. Ellis) So it didn't become, like, a

19   friendship?

20       A.   No.

21       Q.   (Mr. Ellis) Were you at any time questioned

22   about things that occurred at the home that were not

23   related to Bryan's program, by either Kelly Stern or an

24   employee of the Department of Education?

25       A.   I'm sorry, can you repeat the question.
```

1            MR. ELLIS:  If you could read it back, please.

2            (Reporter read back)

3            THE WITNESS:  Questions about the home that

4    were not related to his program?

5            MR. ELLIS:  Yes.

6            THE WITNESS:  Not that I recall.

7    BY MR. LEVIN:

8        Q.   (Mr. Ellis) Was it you don't recall it or there

9    were no questions?

10           MR. USHIRODA:  Objection.  She does not recall.

11    I believe if there were no questions, she would have

12    said that.

13    BY MR. LEVIN:

14        Q.   (Mr. Ellis) You can answer the question.

15        A.   I'm sorry, what did you just say?

16        Q.   (Mr. Ellis) Do you just not recall it or did --

17    were there no questions?

18        A.   I don't believe there were any questions.

19        Q.   (Mr. Ellis) Did you have a positive impression

20    about -- of Bryan's parents?

21           MR. USHIRODA:  Objection.  Vague and ambiguous.

22           THE WITNESS:  I don't understand what you mean

23    by "positive."

24    BY MR. LEVIN:

25        Q.   (Mr. Ellis) Well, were they likable?

```
 1              MR. USHIRODA:  Objection.  Vague and ambiguous.

 2              THE WITNESS:  I don't know.

 3    BY MR. LEVIN:

 4         Q.   (Mr. Ellis) Were they rude?

 5         A.   No.

 6         Q.   (Mr. Ellis) Were they polite?

 7         A.   Yes.

 8         Q.   (Mr. Ellis) Okay.  Were they knowledgeable

 9    about their son?

10         A.   I don't know.

11         Q.   (Mr. Ellis) Were they cooperative with you?

12         A.   Yes.  But -- I found mom nice.  Not that I

13    didn't find dad nice, but I found mom nice.

14         Q.   (Mr. Ellis) Did you interact more with mom than

15    with dad?

16         A.   Yes.

17         Q.   (Mr. Ellis) So your impression of dad could

18    be -- the fact that you didn't interact with him often

19    could lead you to not form an impression?

20         A.   Yes.

21              MR. USHIRODA:  Late objection.  Leading.

22              MR. ELLIS:  Exhibit 1 is a letter dated

23    January 28, 2003, signed by Rebecca Gavin along with a

24    copy of what appears to be her one-page CV.  That's for

25    you.  This is the exhibit.
```

1            (Exhibit 1 marked for identification.)

2      BY MR. LEVIN:

3          Q.   (Mr. Ellis) Could you review that document and

4      tell me if you recall the document and if that's a true

5      and correct copy of both the letter and your resume as

6      of January 2003.

7            Is that a true and correct copy of your letter?

8          A.   Yes.

9          Q.   (Mr. Ellis) And a true and correct copy of your

10     resume?

11         A.   Yes.

12         Q.   (Mr. Ellis) Okay.  The paragraph one indicates

13     that you heard about the job from the Wiles-Bonds,

14     correct?

15         A.   I saw it in the newspaper, yes.

16         Q.   (Mr. Ellis) And that was an ad placed by the

17     Wiles-Bonds?

18         A.   Yes.

19         Q.   (Mr. Ellis) And you contacted them?

20         A.   Yes.

21         Q.   (Mr. Ellis) And then they told you to contact

22     TIFFE?

23         A.   Then I believe I met with them and then they

24     told me to contact TIFFE.

25         Q.   (Mr. Ellis) You saw the ad in where?

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

```
 1      A.   The -- I believe it's the West Hawaii Today,

 2   the newspaper here.

 3      Q.   (Mr. Ellis) Okay.  During the period when you

 4   worked with Bryan in the classroom, okay, did you -- did

 5   your -- the program for Bryan include Discrete Trial

 6   Training?

 7      A.   Yes.

 8      Q.   (Mr. Ellis) Okay.  In that discrete trials, was

 9   data collected on each trial?

10      A.   Yes.

11      Q.   (Mr. Ellis) Okay.  The form -- did you use a

12   particular form?

13      A.   Yes.

14      Q.   (Mr. Ellis) And who provided that form?

15      A.   I don't recall.

16      Q.   (Mr. Ellis) Do you recall if it was the school

17   who provided the form?

18      A.   Yeah, it was the school.  Yeah.

19      Q.   (Mr. Ellis) So when you completed that form,

20   who did you give the form to?

21      A.   It was kept in a binder.  I believe Dru looked

22   at it.

23      Q.   (Mr. Ellis) Okay.  Was the binder kept at

24   school?

25      A.   I don't recall.
```

1    Q.    (Mr. Ellis) Okay.  Do you not know or you don't

2    recall?

3    A.    There were DTT trials done at home also and

4    there was a binder at home, and I don't recall if it was

5    transferred back and forth or if there were two separate

6    binders.

7    Q.    (Mr. Ellis) Okay.  Did -- were you in charge of

8    keeping those records?

9    A.    No.

10    Q.    (Mr. Ellis) Okay.  Do you know if those records

11    were kept by your agency, TIFFE?

12    A.    I don't know.  I left them in the classroom.

13    Q.    (Mr. Ellis) Okay.  In the -- do you recall the

14    name of the teacher would kept those records or the

15    teacher in the classroom?

16    A.    There were different teachers.

17    Q.    (Mr. Ellis) Okay.  Do you recall any of the

18    teachers' names?

19    A.    Becky Pierson, Ken Stalzberg, Bill Brown, and

20    Jennifer.  I don't recall her last name.  I don't recall

21    her last name.

22    Q.    (Mr. Ellis) Could have been Harris?

23    A.    Yes.

24    Q.    (Mr. Ellis) And did each of those -- was

25    some -- like Rebecca Pierson, was she at Kealakehe

1    Elementary or Kealakehe Intermediate?

2         A.   She was at the elementary school.

3         Q.   (Mr. Ellis) So she kept -- so there were

4    Discrete Trial Training logs kept while Bryan was at

5    Kealakehe Elementary?

6         A.   I believe so.

7         Q.   (Mr. Ellis) You don't know what happened to

8    those records?

9         A.   No.

10        Q.   (Mr. Ellis) And then when -- in the summer of

11   2003, he went to Kealakehe Middle School?

12        A.   Yes.

13        Q.   (Mr. Ellis) Okay.  And you --

14        A.   Intermediate.

15        Q.   (Mr. Ellis) -- went with him?

16        A.   Yes.

17        Q.   (Mr. Ellis) And they kept data sheets on the

18   Discrete Trial Training?

19        A.   Yes.

20        Q.   (Mr. Ellis) Were they the same type of data

21   sheet?

22        A.   I don't remember.

23        Q.   (Mr. Ellis) Okay.  And they were -- again, they

24   were kept in a binder or folder at school?

25        A.   Yes.

1      Q.   (Mr. Ellis) Okay.  Do you know what happened to

2   those logs?

3      A.   No.

4      Q.   (Mr. Ellis) Do you know if they were kept by,

5   say, Dru Copeland?

6      A.   I don't know.

7      Q.   (Mr. Ellis) Do you know if they were, the ones

8   from Kealakehe Intermediate, were kept by TIFFE?

9      A.   No, I don't know.

10          MR. ELLIS:  Okay.  Like to enter as Exhibit 2,

11   it's titled The Institute for Family Enrichment Employee

12   Training Log, FY2003 to 2004 and 2002 to 2003.  They're

13   Bates stamped DOE1647, 1648, 1649, 1650, 1651, and 1652

14   and for Rebecca Gavin.  That's yours.

15          (Exhibit 2 marked for identification.)

16   BY MR. LEVIN:

17      Q.   (Mr. Ellis) Have you ever seen these document

18   before?

19      A.   Yes.

20      Q.   (Mr. Ellis) What are -- what is this -- are

21   these documents?

22      A.   They document the hours I received training in

23   these areas.

24      Q.   (Mr. Ellis) Okay.  Are the hours and the

25   categories that are listed and the dates and the people

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

```
 1    who provided the training, are those accurate,

 2    accurately reflected on this document?

 3         A.   I believe so.

 4         Q.   (Mr. Ellis) And these include -- could you turn

 5    to page 1649.

 6         A.   Yes.

 7         Q.   (Mr. Ellis) Okay.  Holley Weeks, is she --

 8         A.   He.

 9         Q.   (Mr. Ellis) I'm sorry?

10         A.   He.

11         Q.   (Mr. Ellis) It says, "required by TIFFE."  Is

12    that -- does that mean that this person is an employee

13    of TIFFE?

14         A.   I don't know.

15         Q.   (Mr. Ellis) Do you -- down at the bottom Future

16    Horizon is not a person, it doesn't appear, or is it a

17    person?

18         A.   No, I don't think so.

19         Q.   (Mr. Ellis) Okay.  The two names, are they

20    TIFFE employees?

21         A.   I don't know.

22         Q.   (Mr. Ellis) Okay.  And then CAMHD, that's -- do

23    you know what CAMHD is?

24         A.   Child and Adolescent Mental Health Division.

25         Q.   (Mr. Ellis) Okay.  So that's not TIFFE, is it?
```

```
 1      A.   No.

 2      Q.   (Mr. Ellis) So at least -- or is Future

 3  Horizons, do you know what that is?

 4      A.   I don't recall.

 5      Q.   (Mr. Ellis) Okay.  But at least CAMHD is not an

 6  employee of TIFFE?

 7      A.   CAMHD is Department of Health, where I work

 8  now.

 9      Q.   (Mr. Ellis) Okay.  So outside agencies, at

10  least in this case, provided training to you?

11      A.   Yes.

12      Q.   (Mr. Ellis) Okay.  To the right it's listed,

13  again at 1649, it's listed the type of training

14  received; is that accurate for those four entries?

15  1649 -- I'm sorry, to the left.

16      A.   Oh, the training topic.

17      Q.   (Mr. Ellis) Yeah.

18      A.   And I'm sorry, what was the question?

19      Q.   (Mr. Ellis) Is that accurate?

20      A.   Yes.  I believe so.

21      Q.   (Mr. Ellis) 1650, page six, DOE1650?

22      A.   Okay.

23      Q.   (Mr. Ellis) Up at the top, do you know who

24  Bobby --

25      A.   Puente.
```

```
1    columns there are hours, like at the top.  Says

2    preventative early intervention supervisor, and it says

3    six hours.  There's no one listed; do you see that?

4         A.   Mm-hmm.

5         Q.   (Mr. Ellis) Okay.  Was this like -- do you know

6    who might've provided this training?

7         A.   I don't recall.

8         Q.   (Mr. Ellis) Okay.  But the -- you're sure the

9    training was provided?

10        A.   I believe so.

11        Q.   (Mr. Ellis) Okay.  And then later on, I'm

12   sorry, Holley Weeks, you don't know who that is?

13        A.   I don't know where he worked.

14        Q.   (Mr. Ellis) Okay.  Then at the bottom S.

15   Paleka?

16        A.   I don't remember that person.

17        Q.   (Mr. Ellis) And Pat Wright?

18        A.   I -- I'm not sure.  I think she might have been

19   a specialist from Oahu.

20        Q.   (Mr. Ellis) Okay.  And then on 1647 and 1648

21   there's no person listed.

22        A.   Mm-hmm.

23        Q.   (Mr. Ellis) Okay.  Did the Department -- I'm

24   sorry, did TIFFE provide you with training in American

25   sign language, if you recall?
```

1    A.   I don't believe so.  I believe there was a

2    class offered.

3         Q.   (Mr. Ellis) Offered by?

4    A.   I don't know.

5         Q.   (Mr. Ellis) Okay.  Did you attend that class?

6    A.   No, I did not.

7         Q.   (Mr. Ellis) At TIFFE, did they have monthly

8    meetings with the staff?

9    A.   Yes.

10        Q.   (Mr. Ellis) Okay.  At those meetings, did all

11   the cases involving TIFFE employees discussed at the

12   meetings?

13        A.   Not that I recall.

14        Q.   (Mr. Ellis) Okay.  What were the subject of the

15   monthly meetings?

16        A.   What I recall are, like, upcoming trainings.

17   Issues that may arise as a skills trainer, and I don't

18   really remember other things that were talked about.

19        Q.   (Mr. Ellis) When you -- when you say issues

20   that arise as a skills trainer, what do you mean?

21        A.   Like...  I don't recall specifically what was

22   discussed.

23        Q.   (Mr. Ellis) At these monthly meetings did you

24   talk about anything related to individual cases?

25             MR. USHIRODA:  Objection.  Asked and answered.

```
 1              THE WITNESS:  I don't recall.

 2   BY MR. LEVIN:

 3      Q.   (Mr. Ellis) When you state that you don't

 4   recall, is it something that at a later time you may be

 5   able to review documents to refresh your memory or that

 6   you just don't know if it occurred?

 7              MR. USHIRODA:  Objection.  Asked and answered.

 8              THE WITNESS:  I don't recall and so if you

 9   showed me documents, yes, I could.

10              MR. ELLIS:  Take a break, five minutes.

11              THE VIDEOGRAPHER:  Off the record at 1:56 p.m.

12               (Off the record at 1:56 p.m.)

13               (Back on the record at 2:03 p.m.)

14              THE VIDEOGRAPHER:  Back on the record.  It is

15   2:03 p.m.

16   BY MR. LEVIN:

17      Q.   (Mr. Ellis) Okay.  Could you please describe a

18   typical day at school with you and Bryan.

19              MR. USHIRODA:  Objection.  Vague and ambiguous.

20              THE WITNESS:  I don't understand the question.

21   BY MR. LEVIN:

22      Q.   (Mr. Ellis) You start at usually, you said,

23   12:00 to 7:00.

24      A.   Mm-hmm.

25      Q.   (Mr. Ellis) Okay. What did you do at noon?
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

1      A.   I don't recall.

2      Q.   (Mr. Ellis) Did you -- do you have any

3    recollection of your day with Bryan from noon to

4    7:00 p.m.?

5      A.   It would consist of working on different tasks

6    throughout the day.

7      Q.   (Mr. Ellis) Such as?

8      A.   Such as teaching sign language, the DTT tasks.

9      Q.   (Mr. Ellis) At some point did you leave the

10    school?

11      A.   Yes, when school was out.

12      Q.   (Mr. Ellis) And what would occur at that point?

13      A.   We would -- he would ride the bus home -- I

14    don't recall exactly.  We would both go to his house.

15      Q.   (Mr. Ellis) And how would you get there?

16      A.   I would drive.

17      Q.   (Mr. Ellis) How would he get there?

18      A.   He would ride the bus.

19      Q.   (Mr. Ellis) When you both arrived at his house,

20    what would you do?

21      A.   He would have a snack -- or he would put away

22    his backpack, have a snack, and we would do other tasks.

23      Q.   (Mr. Ellis) Tasks such as?

24      A.   Such as the DTT tasks and laundry -- like the

25    living skills tasks, which consisted of laundry and

```
 1    cleaning up his area downstairs.

 2        Q.    (Mr. Ellis) Was there -- was that the typical

 3    day that you would work with Bryan, what you just

 4    explained?

 5        A.    Yes.

 6        Q.    (Mr. Ellis) So doing laundry at home was part

 7    of his program?

 8        A.    It was implemented towards the end of me

 9    working there.

10        Q.    (Mr. Ellis) So June-July of 2004?

11        A.    I would say longer than that, but I don't

12    recall the exact date.

13        Q.    (Mr. Ellis) From January 2004 to July 2004?

14            MR. USHIRODA:  Objection.  Calls for

15    speculation.  She already testified she can't recall.

16            THE WITNESS:  I don't recall.

17    BY MR. LEVIN:

18        Q.    (Mr. Ellis) Do you know why -- was there other

19    life skills that were included in his program, such as

20    laundry?

21        A.    The one I recall is him cleaning up his area,

22    such as putting his books away, sweeping, and taking out

23    the garbage.

24        Q.    (Mr. Ellis) Any other chores or any other

25    program such as that?
```

```
 1      A.   Not that I -- I don't recall other ones.

 2      Q.   (Mr. Ellis) So laundry, sweeping, cleaning his

 3   room, putting his books away.

 4      A.   I would say cleaning his area, not his room,

 5   yeah.

 6      Q.   (Mr. Ellis) So the area consisted of his room,

 7   the bathroom?

 8      A.   Not his room.  His room was not really occupied

 9   except for sleeping.

10      Q.   (Mr. Ellis) Okay.  What room did he clean?

11      A.   The living area downstairs.

12      Q.   (Mr. Ellis) His living area?

13      A.   Yes.

14      Q.   (Mr. Ellis) And then he took -- once he cleaned

15   up that living area, he took out just the trash from

16   that area --

17      A.   Yes.

18      Q.   (Mr. Ellis) -- or the trash from all of his

19   living area?

20      A.   It was one trash for that living area.

21      Q.   (Mr. Ellis) Do you know why the cleaning

22   component was included in his program?

23      A.   My understanding was it was functional living

24   skills.

25      Q.   (Mr. Ellis) And you as a skills trainer were
```

1    responsible for implementing that program?

2        A.   Yes.

3        Q.   (Mr. Ellis) Okay.  Were there other skills

4    trainers who would do the same program when you were not

5    there?

6        A.   From my understanding, that's what -- that was

7    the program.

8        Q.   (Mr. Ellis) Okay.  So, like, the days you

9    weren't there, if you were there Monday, Wednesday,

10   Friday, there was somebody else doing the same thing on

11   Tuesday and Thursday?

12       A.   Yes.  Yes.  Working those hours.

13       Q.   (Mr. Ellis) These services that you just

14   described or the program that you just described, you

15   understood that those were part of Bryan's IEP?

16            MR. USHIRODA:  Objection.  Lack of foundation.

17   BY MR. LEVIN:

18       Q.   (Mr. Ellis) Can you answer the question?

19       A.   Can you repeat the question.

20            MR. ELLIS:  Could you repeat it.

21            (Reporter read back)

22            THE WITNESS:  Yes.

23   BY MR. LEVIN:

24       Q.   (Mr. Ellis) Did you ever see a copy of Bryan's

25   IEP?

```
 1        A.   I don't recall.

 2        Q.   (Mr. Ellis) Do you recall ever seeing -- have

 3   you seen IEPs for other students that you've worked

 4   with?

 5        A.   Yes.

 6        Q.   (Mr. Ellis) So you know what an IEP looks like?

 7        A.   Yes.

 8        Q.   (Mr. Ellis) Okay.  So you just don't know if

 9   you received -- if you saw Bryan's IEP?

10        A.   I believe I saw his IEP because I had his goals

11   written on my progress notes for TIFFE.

12        Q.   (Mr. Ellis) Okay.  Thank you.

13             Did you use those, what you just testified to,

14   is that what you used to implement the program --

15             MR. USHIRODA:  Objection.

16   BY MR. LEVIN:

17        Q.   (Mr. Ellis) -- as a skills trainer?

18             MR. USHIRODA:  Objection.  Lack of foundation.

19             THE WITNESS:  The program was designed by Dru.

20   BY MR. LEVIN:

21        Q.   (Mr. Ellis) Was the program that was designed

22   by Dru different from the goals and objectives that you

23   saw in Bryan's IEP?

24        A.   No.

25        Q.   (Mr. Ellis) Okay.  The -- what Dru gave you,
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090