CARL M. VARADY                4873-0
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawai'i  96813
Telephone:  (808) 523-8447
Fax:  (808) 523-8448
Email: carl@varadylaw.com

Of Counsel:
DAVIS LEVIN LIVINGSTON

STANLEY E. LEVIN              1152-0
MICHAEL K. LIVINGSTON        4161-0
851 Fort Street, Suite 400
Honolulu, Hawai'i  96813
Telephone:  (808) 524-7500
Fax:  (808) 545-7802
Email: slevin@davislevin.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>Plaintiffs,<br>vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i,<br><br>Defendant. | CIVIL NO. CV 04-00442 ACK/BMK<br>CIVIL NO. CV 05-00247 ACK/BMK<br>Consolidated (Other Civil Action)<br><br>**PLAINTIFFS' MEMORANDUM TO THE COURT REGARDING *MARK H. v. LEMAHIEU* AND CERTIFICATE OF SERVICE**<br>Date: January 24, 2008<br>Time: 10:00 a.m.<br>Judge: Hon. Alan C. Kay<br>**TRIAL DATE:  February 26, 2008** |

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| TABLE OF AUTHORITIES……………………………………….. | | ii-iv |

| I. | INTRODUCTION…………………………………… | 2 |
|---|---|---|
| II. | ANALYSIS………………………………………… | 2 |
| | A. History and Purpose of Section 504…………….. | 2 |
| | B. The History and Purpose of IDEA…………….. | 6 |
| | C. The Regulatory Framework of Section 504…… | 7 |
| | 1. Section 504's regulations provide broader mandates for FAPE……………. | 10 |
| | 2. For children receiving special education DOE must implement an IEP……………………………………….. | 10 |
| | 3. "Design" alone is not enough to provide FAPE under Section 504………. | 12 |
| | 4. "Equivalence" is only one measure of FAPE under the Statute……………… | 15 |
| | D. Deliberate Indifference Continues as the Standard…………………………………… | 17 |
| | E. Hawaii's Regulatory Framework Provides an Independent Basis for Liability…………………………………… | 18 |
| | F. Further Exhaustion Is not Required………….. | 20 |
| III. | CONCLUSION……………………………………… | 26 |

# TABLE OF AUTHORITIES

                                                                    **PAGE**

*Armstrong v. Wilson,* 124 F.3d 1019 (9th Cir. 1997)……………………    20

*Bd. of Educ. v. Rowley*, 458 U.S. 176 (U.S. 1982)……………………..    7

*Blanchard v. Morton School Dist.* 420 F.3d 918 (9th Cir. 2005)………    24,25

*Boxall v. Sequoia Union High School Dist.*,
    464 F. Supp. 1104 (N.D. Cal. 1979)…………………………….    4

*Deal v. Hamilton County Bd. of Educ.*,
    392 F.3d 840 (6th Cir. 2004)…………………………………….    13

*Department of Education v. Carrie Rae S.*,
    158 F. Supp. 2d 1190, 1196 (D. Haw. 2000)……………………    14,21

*Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001)…………….    17

*Florence County Sch. Dist. v. Carter*, 510 U.S. 7 (1993)………………    13

*Harrison v. Michigan*, 350 F. Supp. 846 (E.D. Mich. 1972)……………    3

*Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)…….    13

*Kruse v. Campbell,* 431 F. Supp. 180 (E.D. Va. 1977)…………………    3

*Lovell v. Chandler,* 303 F.3d 1039 (9th Cir. 2002)……………………...    14

*Mark H. v. LeMahieu,* No. 05-16236 (9th Cir., Jan. 17, 2008)……………    2

*Mills v. Board of Education of the District of Columbia*,
    348 F. Supp. 866 (D.D.C. 1972)……………………………………    3,6

*New York Association for Retarded Children v. Rockefeller*,
    357 F. Supp. 752 (E.D.N.Y. 1973)…………………………………    3

*Pennsylvania Association for Retarded Children v. Pennsylvania*,
    343 F. Supp. 279 (E.D.Pa.1972)……………………………………    3,6

# TABLE OF AUTHORITIES

                                                                    **PAGE**

*Porter v. Manhattan Beach Unified School Dist.,*
     307 F.3d 1064 (9th Cir. 2002)……………………………………….    22,25

*Robb v. Bethel School Board #403*, 308 F.3d 1047 (9th Cir. 2002)……..    23

*San Antonio School District v. Rodriguez,*
     411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973)……………….    3

*Seattle School District v. B.S.*, 82 F.3d 1493 (9th Cir. 1996)……………    13

*Snow v. Standard Ins. Co.,* 87 F.3d 327 (9th Cir. 1996)…………………    21

*Witte v. Clark County School Dist.*, 197 F.3d 1271 (9th Cir. 1999)………    24,25

## STATUTES:

20 U.S.C. § 1414(d)……………………………………………………    7

20 U.S.C. § 1415(l)…………………………………………………..    22

29 U.S.C. § 705 (20) (B) …………………………………………........    5

29 U.S.C. § 794(a)…………………………………………………    16

34 C.F.R. §§ 300.1 through .756 (2004)…………………………………...    8

34 C.F.R. § 104.33(b)(1)…………………………………………………    10

34 C.F.R. § 104.33(b)(1)(2)………………………………………………    11,12

34 C.F.R. §104.36………………………………………………………..    18

Title 8, chapter 56, of the Hawaii Admin. Rules § 8-53-2…………………..    19

Title VI of the Civil Rights Act of 1964……………………………………..    4

# TABLE OF AUTHORITIES

**PAGE**

1974 U.S.CODE CONG. & AD.NEWS, p. 6390…………………………………  4

1974 U.S.CODE CONG. & AD.NEWS, p. 6407…………………………………  4

1975 U.S. CODE CONG. & ADMIN. NEWS, p. 1430…………………………  6

1990 U.S. CODE CONG. & ADMIN. NEWS 303, 381…………………………  5

H.R. REP. NO. 485(II), at 98 (1990)……………………………………….  5

## PLAINTIFFS' MEMORANDUM TO THE COURT REGARDING *MARK H. v. LEMAHIEU*

### I.    INTRODUCTION.

After four years of litigation, following five years in which they continuously fought for appropriate services for their autistic son Bryan, Bryan's parents now are one month from having their claims assessed by a jury.  They have prepared for this date for four years.  They now face a new hurdle posited by the Defendant:  the assertion that their claims under Section 504 of the Rehabilitation Act now are limited or even barred by the Ninth Circuit's opinion in *Mark H. v. LeMahieu,* No. 05-16236 (9th Cir., Jan. 17, 2008).   For reasons set forth below, Plaintiffs assert that their claims should proceed to trial.  Defendant has had notice of the factual basis of those claims since the inception of this case and nothing in the Court's legal analysis of *Mark H.,* should bar or affect those claims.

### II. ANALYSIS.

A. History and Purpose of Section 504.

Before turning directly to the *Mark H.* analysis, it is important to note the history of Section 504, which was a precursor to the Individuals with Disabilities Education Act ("IDEA").  Section 504 provides that:

> No otherwise qualified individual with a disability shall, solely by reasons of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

2

As the appellants in *Mark H.*, explained to the Ninth Circuit, Section 504 was Congress's initial attempt at providing education to disabled children, many of whom up until the enactment of Section 504, had been excluded by law from attending public schools.

Prior to its adoption, federal courts began to recognize the rights of the handicapped persons in education in the early 1970's, under the federal constitutional protections of due process and equal protection. *See, e.g., Mills v. Board of Education of the District of Columbia*, 348 F. Supp. 866 (D.D.C.1972) (due process and equal protection rights of emotionally disturbed to appropriate education), *Pennsylvania Association for Retarded Children v. Pennsylvania,* 343 F. Supp. 279 (E.D.Pa.1972), *modifying,* 334 F. Supp. 1257 (E.D. Pa. 1971)(consent decree entered on due process and equal protection claims); *New York Association for Retarded Children v. Rockefelle*r, 357 F. Supp. 752 (E.D.N.Y.1973); *Harrison v. Michigan*, 350 F. Supp. 846 (E.D.Mich.1972); *Kruse v. Campbell,* 431 F. Supp. 180 (E.D.Va.1977), *judgment vacated and remanded sub nom. Campbell v. Kruse*, 434 U.S. 808, 98 S. Ct. 38, 54 L. Ed. 2d 65 (1977)(vacated by the Supreme Court and remanded with instructions to resolve the case according to the recently adopted Section 504 rather than constitutional grounds).

In the Supreme Court's decision in *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973), the equal protection standard of

review in education cases was clarified, and accordingly some of the specific holdings requiring services to disabled children on that basis were no loner viable.

The conscience of Congress, however, responded to the problems of the disabled by prohibiting discrimination in federal agencies, federal contracts and programs receiving federal monies.  Congress did so passing the Rehabilitation Act of 1973.  This statute provided rights and remedies analogous to the rights of minorities under Title VI of the Civil Rights Act of 1964, for the disabled who are denied equal participation in federally funded programs.  *See, Boxall v. Sequoia Union High School Dist.*, 464 F. Supp. 1104, 1108 (N.D. Cal. 1979)(reiterating the analysis above).

Section 504 "constitutes the establishment of broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap." 1974 U.S.CODE CONG. & AD.NEWS, p. 6390.  The congressional report on the 1974 amendments to the statute, which strengthened and broadened the Act's coverage, recognized the crucial role of educational opportunity for the handicapped:

> Without adequate education, individuals with handicaps are doomed to a continued life as second class citizens. Today our country is only educating forty percent of those individuals with handicaps. Sixty percent of these individuals are receiving a substandard education.

1974 U.S.CODE CONG. & AD.NEWS, p. 6407.

4

In addition, the legislative history of Title II of the ADA makes clear that both the ADA and the Rehabilitation Act authorize a private right of action to enforce the law.  The report of the House Committee on Education and Labor affirms that:

> "[A]s with section 504, there is also a private right of action for persons with disabilities which includes the full panoply of remedies. Again, consistent with section 504, it is not the Committee's intent that persons with disabilities need to exhaust Federal administrative remedies before exercising the private right of action."

H.R. REP. NO. 485(II), at 98 (1990), reprinted in 1990 U.S. CODE CONG. & ADMIN. NEWS 303, 381.  *Mark H.,* reaffirmed the availability of the existence of a private right of action under Section 504.  Slip Op. at 605.

The individuals to whom such relief is available are more broadly defined than under IDEA.  Section 504 defines an "individual with a disability" as a person who:

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
>
> (ii) has a record of such an impairment; or
>
> (iii) is regarded as having such an impairment.

29 U.S.C. § 705(20)(B).

Therefore, in the context of the present case, Section 504 creates a private right of action for children like Bryan who are disabled and allege they are excluded, denied benefits of or discriminated against in federally funded education

programs, including public education in Hawaii. These points are reaffirmed by *Mark H. See,* Slip Op. at 605.

      B.    <u>The History and Purpose of IDEA</u>.

      Section 504's private right of action, and implementing regulations did not end Congress's attempts to provide effective participation and programs for disabled children in public schools. The year after Section 504 was enacted, Congress passed the Education of All Handicapped Children Act, which later became amended as the Individuals with Disabilities Education Act (both statues referred to herein as "IDEA").

      As the Senate Report states, like passage of the Act "followed a series of landmark court cases establishing the right to education for all handicapped children." S. Rep., at 6, U.S. CODE CONG. & ADMIN. NEWS 1975, p. 1430. These are the same cases from which Section 504's FAPE provision originated that excluded disabled children from attending public school or receiving education there. *E.g., Mills v. Board of Education of District of Columbia*, 348 F. upp. 866 (D.C.1972); *Pennsylvania Assn. for Retarded Children v. Commonwealth*, 334 F. Supp. 1257 (E.D. Pa. 1971), *amended by* 343 F. Supp. 279 (E.D. Pa. 1972)("PARC").

      Neither case purported to require any particular substantive level of education. Rather, like the language of IDEA ultimately adopted by Congress, the

cases set forth extensive procedures to be followed in formulating personalized educational programs for disabled children. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 194 (U.S. 1982).

> According to the definitions contained in the Act, a "free appropriate public education" consists of educational instruction specially designed to meet the unique needs of the handicapped  child, supported by such services as are necessary to permit the child "to benefit" from the instruction. Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a "free appropriate public education" as defined by the Act.

*Rowley*, 458 U.S. at 188-189.

### H. The Regulatory Framework of Section 504.

Section 504 and its implementing regulations, require FAPE for any "individual with a disability."  IDEA, on the other hand, mandates FAPE on a much narrower avenue, driven by the needs of the disabled child for "personalized instruction" in the form of special education and related services, provided in accordance with the child's IEP.  20 U.S.C. § 1414(d).  Thus, the FAPE requirement of IDEA can only be met by providing such specialized instruction, and provides only prospective relief if such instruction is not provided.  Slip Op. at

605. By contrast, "Section 504 can be privately enforced to provide, in addition to prospective relief, compensatory, but not punitive damages for past violations." *Id.*

The implementing regulations for Section 504 are not as detailed as those of IDEA, which identify specific disabilities and provide for extensive methods of remediation as well as for due process hearings if either the parents of DOE believe that the proposed program will not provide a FAPE. *See,* 34 C.F.R. §§ 300.1 through .756 (2004). The Section 504 regulations are more general, and state:

§ 104.33 Free appropriate public education.

   (a) General. A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.

 (b) Appropriate education. (1) For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36.

 (2) Implementation of an Individualized Education Program developed in accordance with the Education of the Handicapped Act is one means of meeting the standard established in paragraph (b)(1)(i) of this section.

 (3) A recipient may place a handicapped person or refer such a person for aid, benefits, or services other than those that it operates or provides as its means of carrying out the requirements of this subpart. If so, the recipient remains responsible for ensuring that the

requirements of this subpart are met with respect to any handicapped person so placed or referred.

* * * *

(d) Compliance. A recipient may not exclude any qualified handicapped person from a public elementary or secondary education after the effective date of this part. . . .

Section 504 is much broader than IDEA, insofar as it protects all public school children in Hawaii who: (1) have a physical or mental impairment which substantially limits one or more major life activities; (2) have a record of such an impairment; or (3) are regarded as having such an impairment, and requires that all of them receive FAPE, irrespective of their need for specialized instruction. Thus, while under the IDEA, students must be "eligible" under certain specified disability categories,[1] Section 504's definition of "disability" is much broader than the definition under the IDEA. Therefore, in addition to the statute's language, which prohibits, (1) exclusion from educational programs, (2) denial of benefits in educational programs and (3) discrimination within educational programs, FAPE under Section 504's regulations must be construed more broadly, based on the broader definition of "disability." Consequently, the *Mark H.* Court held that the State's obligations are not limited merely to creation and implementation of an

---

[1] (a) General. (1) Child with a disability means a child . . . having mental retardation, a hearing impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), a serious emotional disturbance (referred to in this part as "emotional disturbance"), an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.

34 C.F.R. § 300.8.

appropriate IEP. Slip Op. at 610-11 (noting that implementation of an IEP is one means of meeting Section 504's mandate).

1.    <u>Section 504's regulations provide broader mandates for FAPE</u>.

"Appropriate" education under Section 504's regulations is defined as:

> [t]he provision of regular or special education and related aids and services that … are designed to meet individual educational needs of persons with disabilities as adequately as the needs of persons without disabilities are met and … are based upon adherence to specified procedures.

34 C.F.R. § 104.33(b)(1).

This same section of the regulations gives express measures by which a recipient of federal funds can establish that it has met Section's 504 FAPE requirements, by meeting Bryan's needs as adequately "as it has met the needs of nonhandicapped persons."   In other words, as the statute requires, children like Bryan must not be excluded, denied the benefits of or discriminated against in public education on account of their disabilities.   His needs must be met in the same manner as non-disabled children, according to Section 504.

2.    <u>For children receiving special education DOE must implement an IEP</u>.

Some disabled children do not need special education, but will need other accommodations to enjoy equal access to public education under Section 504.   For children like Bryan, who do need special education and related services, DOE can establish that it has fulfilled its substantive duties under Section 504 by

demonstrating implementation of an IEP developed in accordance with IDEA. 34 C.F.R. § 104.33(b)(1)(2).[2]  This defense, then, is available to DOE in the present case, under the regulations.  Slip Op. at 610.

Although the Ninth Circuit referred to "adopting a valid IEP," when it discussed this provision, the regulation must be read as written: it describes compliance in terms of "implementation" not merely "adoption."   Permitting DOE to fulfill it obligation on the mere basis of "adoption" would render the FAPE requirement meaningless.   As the present case clearly demonstrates, an IEP on paper means nothing; it is implementation that matters. If this were not the case, a file cabinet full of well-written IEPs would be all the State needs to fulfill its obligations; it could fire or reassign its entire special education staff as soon as the IEPs were written.  This cannot be what Congress intended when commanded the State to fulfill Bryan's substantive needs[3] as adequately "as it has met the needs of nonhandicapped persons."

Bryan's parents, since the inception of this case [CV05-0279 ACK/BMK, Docket No. 1], have asserted that DOE failed for five years to implement Bryan's IEP, leading to serious and permanent damage to him and his ability to access and

---

[2]    "Implementation" is the effectuation of the IEP properly an Individualized Education Program "designed" in accordance with IDEA. 34 C.F.R. § 104.33(b)(2).
[3]    Plaintiffs understand that *Mark H.* also referred to 34 C.F.R. § 104.36 as confirming that the procedural requirements of Section 504 could be satisfied by compliance with the procedural safeguards of IDEA.  Plaintiffs' claims are based on substance of the DOE's failure to implement Bryan's IEP over a five-year period; they are not seeking relief for violations of procedure if any.  Thus, they do not address the procedural requires of Section 504 or IDEA.

enjoy public education like non-disabled students.  Clearly, they have stated claims that can be addressed under Section 504 and its regulations that require substantive equality of access and content.  Defendant may assert that it implemented a IEP for Bryan that fulfilled its requirements under 34 C.F.R. § 104.33(b)(1)(2), which provides DOE with a defense.  A jury then can decide if this is so.

   3.    <u>"Design" alone is not enough to provide FAPE under Section 504</u>.

   The Ninth Circuit, in its *Sandoval*, discussion, reiterated the statutory provisions, stating:

> [T]he § 504 FAPE regulations encompass several provisions, the central requirement being that disabled children must be provided an "education and related aids and services that are (i) designed to meet individual educational needs of handicapped persons as adequately as the needs of handicapped as adequately as the needs of nonhandicapped persons are met.

Slip Op. at 616.

   "Providing" an "education and related aids and services" by definition means what the Section 504 regulations say: DOE discharges it duty by implementing an IEP.  However, the Ninth Circuit chose language not found in the regulations or statutes to further distinguish the two statutory schemes.  The Court stated:

> The plain language of this first, overarching FAPE regulation is not violated by a mere difference in educational outcomes or "effects." Rather, it is violated only if a state fails to "design" educational plans so as to meet the needs of both disabled and nondisabled children comparably. To "design" something to produce a certain, equal outcome involves some measure of intentionality. And an obligation

to "design" something in a certain way is not violated simply because the actual impact of the design turns out otherwise than intended.

The distinction made by the Court, is this:  FAPE under IDEA is measured by the effects of the child's program on the child's progress.  In *Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-189 (1982)("*Rowley*"), the Supreme Court established that the IEP must be reasonably calculated to enable the child to receive educational benefits.  458 U.S. at 206-07.

> At the very least, the intent of Congress appears to have been to require a program providing a meaningful educational benefit towards the goal of self-sufficiency, especially where self-sufficiency is a realistic goal for a particular child.  . . . In evaluating whether an educational benefit is meaningful, logic dictates that the benefit "must be gauged in relation to a child's potential." . . . Only by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement. In conducting this inquiry, courts should heed the congressional admonishment not to set unduly low expectations for disabled children.

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 863-864 (6th Cir. 2004)(some internal citations omitted). Where IEP has not produced educational benefit, FAPE has been denied and the parents are entitled to the prospective relief provided under IDEA, without regard to the state's knowledge about the child or lack thereof.  *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 15 (1993); *Seattle School District v. B.S.*, 82 F.3d 1493, 1501-02 (9th Cir. 1996).

Thus, liability is strict under IDEA and not determined by the state's knowledge or mental culpability.  As Judge King has succinctly said, "No IEP; No

13

FAPE." *Department of Education v. Carrie Rae S.*, 158 F. Supp. 2d 1190, 1196 (D. Haw. 2000).

When discussing Section 504's prohibition of "discrimination," and without regard to the other statutory concepts of exclusion or denial of benefits, the *Mark H.* Court focused on the comparisons to non-disabled students. The Court stated discrimination is proved and, consequently, FAPE is denied under Section 504, when a state fails to produce a comparable educational program. This comparability for purposes of determining "discrimination," is achieved by comparing the quality of the educational program for a disabled student to that of non-disabled students. A disparity between the level of meaningful access to education between a disabled student and the student's non-disabled peers demonstrates some measure of "discrimination." Slip Op. at 616.

While the Court discusses "comparison" on the one hand, it rejects the notion that the state can proffer comparisons of groups, rather than individuals, when determining if equivalence is met. *Id.*¸ at 617-18, *citing Lovell v. Chandler,* 303 F.3d 1039, 1054 (9th Cir. 2002). The nature of the comparison required is described by the Court in terms of the problem the Court sought to address by highlighting this language—"the district court's apparent concerns that the § 504 regulations create free-floating 'affirmative obligations.'" Slip Op. at 617. In other words, the appellate court was attempting to address the district court's

14

assertion that Section 504's regulations were not tied to any standards and, unlike

IDEA's "floor of opportunity," appeared open-ended and potentially unlimited. *Id.*

In response to this concern, the appellate court turned to the comparison language

of the regulations, noting:

> [C]ontrary to the district court's apparent concern that the § 504
> regulations create free-floating "affirmative obligations," in fact the
> obligation created is a comparative one. In other words, school
> districts need only design education programs for disabled persons
> that are intended to meet their educational needs to the same degree
> that the needs of nondisabled students are met, not more.

Slip Op. at 617.  This means, simply, that disabled students are to receive a FAPE

that meets their needs to the same degree as non-disabled students.  Plaintiffs here

allege that this did not occur and their claims clearly are within the core of Section

504's protections.

      4.    <u>"Equivalence" is only one measure of FAPE under the Statute</u>.

      Finally, careful reading of the text confirms an extremely important point:

the entirety of the Court's analysis discussing "design" and "comparison" are

directed at only one of the three categories of conduct prohibited by Section 504—

discrimination.  At the conclusion of the discussion of the need to analyze "design"

and to utilize "comparison," the appellate court emphasized the distinction:

> [R]egardless of whether or not the § 504 FAPE regulations can be
> characterized as to some degree prohibiting "disparate impacts" or
> imposing "affirmative obligations," the district court gave the
> prohibition contained in § 504 itself too cramped a reading. <u>The text
> of § 504 prohibits not only "discrimination" against the disabled, but</u>

also "exclu[sion] from . . . participation in" and "deni[al] [of] the benefits of" state programs solely by reason of a disability. 29 U.S.C. § 794(a).

Slip Op. at 617.

The Ninth Circuit then focused on cases explaining the functional bases for measuring Section 504 compliance, quoting numerous prior cases, all of which employed "meaningful access" or "reasonable accommodation" as measures of the agency's compliance:

> This court has recognized that the focus of the prohibition in § 504 is "whether disabled persons were denied 'meaningful access' to state-provided services." *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (*quoting Choate*, 469 U.S. at 302); *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1020 (9th Cir. 2002). Thus, although § 504 does not require "substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals," it, like the ADA, does require reasonable modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying " 'meaningful access' to a benefit because of their disability." . . . Moreover, contrary to the Agency's contentions at oral argument, evidence that appropriate services were provided to some disabled individuals does not demonstrate that others were not denied meaningful access "solely on the basis of their disability." *See Lovell v. Chandle*r, 303 F.3d 1039, 1054 (9th Cir. 2002).

> The district court and the Agency appear to have forgotten the established § 504 "reasonable accommodation" and "meaningful access" requirements in evaluating whether the § 504 FAPE regulations come within § 504's substantive scope.

Slip Op. at 618-19 (some internal quotations omitted).

*Mark H.* confirms that "meaningful access," and "reasonable accommod-ation," continue to serve as the touchstones for evaluating whether FAPE has been provided under Section 504. *Id.* There can be no dispute that from the inception of this case Bryan's parents have argued that he was denied FAPE for five years and that his program was not implemented in a manner that provided him meaningful access to education.[4] Plaintiffs' claims, therefore, provide sufficient notice to Defendant and are directly within the core concepts for assessing liability set forth in *Mark H.*[5]

### D.     Deliberate Indifference Continues as the Standard.

*Mark H.* concluded its analysis by explaining the difference between interpreting the scope of the prohibition contained in § 504 and determining the state of mind with which a violation of § 504 must be committed so as to give rise to a damages remedy. Slip Op. at 619-20. Unlike IDEA's strict liability standard, a plaintiff asserting violation of Section 504's FAPE requirement must meet a state of mind requirement. That standard remains unchanged, however, as the *Mark H.* Court explained; state agencies are liable where the act with "deliberate indifference in failing to provide "meaningful access" or "reasonable accommodation." Slip Op. at 20, *citing Duvall v. County of Kitsap*, 260 F.3d 1124,

---

[4] *See,* CV05-0279 ACK/BMK, Docket No. 1 (Complaint), Docket No. 92 (Plaintiffs' Motion To Enforce The Doctrine Of Issue Preclusion Regarding All Administrative Hearing Decisions And The Settlement Agreement); CV04-0442 ACK/BMK, Docket No. 1 (Complaint), Docket No. 303, (Plaintiffs Ann Kimball Wiles' and Stanley Bond's Motion to Amend Their Complaint to Include an Express Claim for Non-Economic Damages for Retaliation), Docket No. 331 (Plaintiffs' First Amended Complaint).

[5] By separate Declaration of Stanley E. Levin, we are attaching relevant requests for hearing as Exhibit A.

1138-39 (9th Cir. 2001). Thus, consistent with the jury instructions proposed by Plaintiffs, the *mens rea* required for liability under Section 504 is not "intentional discrimination," but deliberate indifference. *Id.* To prove deliberate indifference Plaintiffs accept that, as *Duvall* explains, they must demonstrate knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood. *Duvall,* 260 F.3d at 1138-39.

Plaintiffs have repeatedly alleged and are prepared to prove that Defendant's five-year knowing failure to provide Bryan the services he needed constitutes deliberate indifference to his need for accommodation.[6] These claims clearly meet the standards explained in *Duvall* and *Lovell* and reiterated in *Mark H.*

     E.     <u>Hawaii's Regulatory Framework Provides an Independent Basis for Liability</u>.

Much of the analysis of the appellate court was, no doubt, directed at avoid Eleventh Amendment problems arising from the *Sandoval* case. There are independent bases for liability based on state law, in addition to liability under Section 504 and its regulations. Procedural safeguards are required of recipients operating public schools, like the State of Hawaii, and compliance with the procedural safeguards of IDEA is one means of meeting this requirement. 34 C.F.R. § 104.36. The State of Hawaii was required to provide procedural

---

[6]   Plaintiffs' retaliation claims are not discussed as these are covered by a different regulation are based on retaliatory motives, not deliberate indifference.

safeguards under Section 504, and did so by adopting the regulations of Title 8, Chapter 53. Contrary to the Court's conclusion after comparing the federal statute and regulations for IDEA and Section 504, the Hawaii Administrative Rules expressly adopt IDEA as the standard for measuring Section 504 compliance:

> §8-53-2  Applicability.  In public schools operated by the department, students with a disability who are protected by Section 504 shall be provided a free appropriate public education as required by Section 504, Subpart D, as follows:
>
> (1)  Students with a disability who are eligible for special education and related services under the Individuals with Disabilities Education Act (20 U.S.C. §1400 et seq.) shall be provided a free appropriate public education under chapter 8-56;

Haw. Admin. R. § 8-53-2.

Title 8, chapter 56, of the Hawaii Admin. Rules, are the rules adopted to implement IDEA.[7]

---

[7] § 8-56-1 Purpose and scope. (a) The purposes of this chapter are:
(1) To ensure that all students with a disability have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for post-school activities, including post-secondary education, employment and independent living;
(2) To strengthen the role of parents, and to ensure that the rights of students with a disability and their parents are protected;
(3) To encourage the participation of students with a disability in all school improvement efforts;
(4) To encourage whole-school approaches and pre-referral intervention to reduce the need to label students as disabled in order to address their learning needs;
(5) To encourage high expectations for students with a disability and to improve and increase educational achievement; and
(6) To encourage all students with a disability to develop skills needed to lead a self determined life.
(b) Provisions of this chapter shall be construed as supplemental to, and in the context of, federal laws and regulations relating to the provision of a free appropriate public education to a student with a disability. A student with a disability under this chapter shall also be eligible as a student with a disability under chapter 8-53, relating to the Provision of a Free Appropriate Public Education For Students with a Disability Under Section 504, Subpart D. [Eff MAR 16 2000] (Auth: HRS § 302A-1112) (Imp: HRS § § 302A-1112, 302A-436; 34 C.F.R. § 300.1)

Thus, for IDEA eligible children in Hawaii, they must be provided the same FAPE under Section 504 that is mandated under IDEA.  The FAPE standards are congruent in Hawaii.  Therefore, as Plaintiffs have argued from the outset, administrative findings of a denial of FAPE under IDEA would establish denial of FAPE under Section 504 in Hawaii, pursuant to the express terms of Hawaii's Chapter 53 regulations.[8]  What remains in such a case is what remains here: to prove that the lack of a FAPE was the result of the state's deliberate indifference.

F.    Further Exhaustion Is not Required.

Addressing the issue of exhaustion, the Court in *Mark H.* stated:

Because the § 504 FAPE requirement differs from the IDEA FAPE requirement, it is not clear how the exhaustion provision of § 1415(l) applies to suits for damages for failure to provide a § 504 FAPE. We need not reach this issue, because the H. family did exhaust the IDEA administrative remedies.

Slip Op. at 613, n.11.

The *Mark H.* family did so, in the same manner as the parents here: by pursuing their prospective remedies under IDEA, in administrative hearings convened pursuant to 20 U.S.C. § 1415.  Therefore, there is no further exhaustion requirement applicable in the present case.    Like *Mark H.,* the record

---

[8]  The duty of agencies receiving federal funds to promulgate rules is set for in the statute itself.  "The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978." 29 U.S.C. § 794.  The statute further defines "program or activity" to include "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b). This language applies broadly to all aspects of state and local governance. The Ninth Circuit has interpreted this precise language as evincing Congress's intent to apply the RA to "'any program or activity receiving Federal financial assistance.'" *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997).

unequivocally demonstrates that the Wiles Bond "family did exhaust the IDEA administrative remedies." If sufficient for purposes of *Mark H.*, such exhaustion is sufficient in the present case, as well.

Secondly, as any appeal from a due process hearing is considered *de novo,* by this Court, and the Court may even consider new evidence, the concept of exhaustion is less important than in administrative review where the Court is strictly limited to the administrative record and bound by the findings below unless "clearly erroneous." As Judge King explained:

> The district court is to "read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of the evidence and giving due weight to the hearing officer's determination." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). A reviewing court must consider the administrative findings carefully and seek to respond to the hearing officer's resolution of each material issue. *See Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 587-88 (9th Cir. 1992) (citation omitted). After such consideration, the court is free to accept or reject the administrative findings in part or in whole. *Id.* The party challenging the administrative decision bears the burden of proof. *See Clyde K. v. Puyallup School District, No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

*Carrie Rae S.*, 158 F. Supp. 2d at 1195. As the Court is free to consider additional evidence and assess the findings *de novo*, exhaustion in this context is significantly less important that it might otherwise be in other administrative appeals. *Cf., Snow v. Standard Ins. Co.,* 87 F.3d 327 (9th Cir. 1996)(in an ERISA case, the policy vested discretion in itself as the administrator, so district court review was limited to abuse of discretion).

Thirdly, as the *Mark H.* Court noted, 20 U.S.C. § 1415(l), provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that <u>before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted</u> to the same extent as would be required had the action been brought under this subchapter.

Therefore, by its terms, IDEA requires exhaustion, prior to filing a case in this Court, when plaintiffs seek the same relief under Section 504 that is available under IDEA—*i.e.,* prospective relief.[9]  IDEA does not require that the Section 504 claims be presented in a due process hearing pursuant to 20 U.S.C. § 1415; it merely requires that plaintiffs seeking the same remedy under Section 504 that they seek under IDEA complete the due process hearing before filing an appeal of the IDEA decision or enforcement action,[10] or a Section 504 complaint in federal court.  There can be no question that Plaintiffs have met this requirement.  Nor does Section 504 contain any requirement to exhaust administrative remedies.

Over a nearly five year period, Plaintiffs took full advantage of the IDEA-mandated administrative procedures in order to seek the remedies available there, including remedial and compensatory education and services.  The Exhibits to

---

[9] Hawaii's Section 504 regulations, Title 8, Chapter 53, Haw. Admin. Rules, also provide only for prospective relief. There is no remedy that would provide for damages.

[10] *Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1069-1070 (9th Cir. 2002)(state hearing offices lack jurisdiction to enforce their own orders).

Plaintiffs' Complaint and First Amended Complaint confirm Plaintiffs fully exhausted their IDEA claims not less than three times over this period in addition to the settlement agreements reached to enforce those Orders.

If any exhaustion requirement is applicable,[11] Plaintiffs fully exhausted their IDEA claims and obtained decisions, stipulations and agreement in their favor mandating, *inter alia*, **v**ery specific levels of skills trainers services, specially trained teachers knowledgeable in autism and American Sign Language, vocational and behavioral modification programs provided by appropriately trained professionals and extended school year services, relief available under the IDEA. *See, Robb v. Bethel School Board #403*, 308 F.3d 1047, 1050 (9th Cir. 2002). Those decisions were never appealed by the State. Therefore, Plaintiffs have fully exhausted all of their claims and obtained those remedies that could be redressed under the IDEA's administrative procedures.

Plaintiffs now are seeking money damages in the present action, a remedy not available under the IDEA. All educational issues have been resolved through the IEP process, the administrative decisions and orders, stipulations and the settlement agreement.[12] Plaintiffs, therefore, are not "seeking relief that is also available" under the IDEA. 20 U.S.C. § 1415(l). The Ninth Circuit recognizes that

---

[11]   Based on the *Mark H.* Court's holding that under the federal statutes and regulations FAPE is not identical under IDEA and Section 504, the Court correctly recognized that exhaustion no longer meant what the parties had assumed under the old scheme where the two FAPE's were congruent. Slip Op. 613, n.11.

[12]   This is doubly true here, where the child now resides in another state.

parents and disabled children may seek relief for education-related injuries under federal laws other than the IDEA.  *See Blanchard v. Morton School Dist.* 420 F.3d 918, 920 (9th Cir. 2005).

Plaintiffs' 504 claims fall outside of § 1415(l)'s rubric and exhaustion is unnecessary.  *See Robb*, 308 F.3d at 1050.  Because Plaintiffs at this stage are seeking only money damages, which is not available under the IDEA, for violations of Section 504 and its implementing regulations (federal and state), Plaintiffs are not seeking relief that is also available under the IDEA, 20 U.S.C. § 1415 (l).   Under a plain reading of the statute, exhaustion of administrative remedies is not required.  *Witte v. Clark County School Dist.*, 197 F.3d 1271, 1275 (9th Cir. 1999) (citing *W.B. v. Matula*, 67 F.3d 484, 495 (3rd Cir. 1995)).

Plaintiffs have taken "full advantage of the IDEA administrative procedures to secure the remedies available thereunder" over the course of nearly five years and successfully obtained not less than three favorable decisions where the hearing officers have made extensive findings of fact and conclusions of law.  *Robb*, 308 F.3d at 1052.

This conclusion is underscore by the holding that findings and conclusions from the administrative hearing cannot be re-litigated.  *Mark H.,* Slip Op. at 611 n.9.

Finally, any further attempt to exhaust is unnecessary, as it would be futile. "The [IDEA's] exhaustion requirement is not a rigid one." *Porter v. Manhattan Beach Unified School Dist.* 307 F.3d 1064 (9th Cir. 2002). In *Witte v. Clark County School Dist.*, 197 F.3d at 1272-73, the Plaintiff sought money damages, a remedy which is not available under the IDEA, *see id.*, at 1275. The Ninth Circuit held that because the Plaintiff sought only monetary damages and because all of the educational issues had been resolved through the IEP process, the plaintiff was not "seeking relief that is also available" under the IDEA. *Id.* Similarly, in *Blanchard v. Morton Sch. Dist.*, 420 F.3d 918 (9th Cir. 2005), a mother of a disabled child, sought money damages for her emotional damages caused by defendant's conduct, including "deliberate indifference and violation of rights." *Id.* at 920. The Ninth Circuit concluded that exhaustion was not required because her "emotional distress injuries and lost income could not be remedied through the educational remedies available under the IDEA." *Id.* at 921-22.

Here, Plaintiffs have taken full advantage of all IDEA administrative procedures and successfully secured all of the remedies available for those claims under the IDEA. Further administrative exhaustion is not required.

# I.  **CONCLUSION**.

For the reasons stated herein, Plaintiffs respectfully request that this matter be set for trial, after any adjustments to jury instructions necessary to reflect the language of *Mark H.* are made.

DATED:  Honolulu, Hawaiʻi, January 22, 2008.


/S/  STANLEY E. LEVIN
STANLEY E. LEVIN
CARL M. VARADY
MICHAEL K. LIVINGSTON

Attorneys for Plaintiffs