CARL M. VARADY                   4873-0
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawai'i  96813
Telephone:  (808) 523-8447
Fax:  (808) 523-8448
Email: carl@varadylaw.com

Of Counsel:
DAVIS LEVIN LIVINGSTON

STANLEY E. LEVIN                 1152-0
MICHAEL K. LIVINGSTON            4161-0
851 Fort Street, Suite 400
Honolulu, Hawai'i  96813
Telephone:  (808) 524-7500
Fax:  (808) 545-7802
Email: slevin@davislevin.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>          Plaintiffs,<br>   vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i,<br><br>          Defendant. | CIVIL NO. CV 04-00442 ACK/BMK<br>CIVIL NO. CV 05-00247 ACK/BMK<br>Consolidated (Other Civil Action)<br><br>**PLAINTIFFS' RESOPONSE TO DEFENDANT DEPARTMENT OF EDUCATION'S BRIEF RE: DISCOVERY PLAN; DECLARATION OF CARL M. VARADY; EXHIBITS 1-2; CERTIFICATE OF SERVICE**<br><br><br>**TRIAL DATE:  June 17, 2008** |

## PLAINTIFFS' RESOPONSE TO DEFENDANT DEPARTMENT OF EDUCATION'S BRIEF RE: DISCOVERY PLAN

A.    Plaintiffs Have Purposely Chosen one of the Alternate Paths Set by the Appellate Court; Defendant Cannot Force Them to Take Another.

After the Ninth Circuit's ruling, following the trial Court's directive, Plaintiffs have filed an amended complaint.  This amended complaint does not rely on either IDEA or the concept of free appropriate public education ("FAPE") as bases for their claims.  The essence of the *Mark H.* opinion, and the only point of interest here, is that the plaintiffs "cannot rely on the administrative hearing officer's decision with regard to an IDEA FAPE as dispositive of whether a FAPE was denied under § 504."  *Mark H. v. Lemahieu*, 2008 U.S. App. LEXIS 987, *28 (9th Cir. 2008).  Plaintiffs do not seek to do so.  Instead, Plaintiffs propose to rely on evidence developed to date through depositions and written discovery, and cited throughout its Second Amended Complaint, to pursue viable claims under Section 504 as described in *Mark H.*, which stated: "It has long been established that § 504 contains an implied private right of action for damages to enforce its provisions." *Id.* at 33*, citing, Greater L.A. Council on Deafness v. Zolin, Inc.* 812 F.2d 1103, 1107 (9th Cir. 1987).  The appellate court left open the question of whether the "family can bring an action to enforce the § 504 regulations will depend on whether those regulations come within the § 504 implied right of action." *Id.*  The court remanded *Mark H.* for an opportunity to develop facts and arguments that Section 504's regulations come within the § 504 implied right of action.

The court explained, however, that the right of action under Section 504 provides a remedy that should be broadly construed:

> Regardless of whether or not the § 504 FAPE regulations can be characterized as to some degree prohibiting "disparate impacts" or imposing "affirmative obligations," the district court gave the prohibition contained in § 504 itself too cramped a reading. The text of § 504 prohibits not only "discrimination" against the disabled, but also "exclu[sion] from . . . participation in" and "deni[al] [of] the benefits of" state programs solely by reason of a disability. 29 U.S.C. § 794(a). This language is nearly identical to the language in Title VI, and, in general, the remedies available under both § 504 and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132, 13 are "linked" to Title VI. Ferguson v. City of Phoenix, 157 F.3d 668, 673 (9th Cir. 1998).

*Id.* at 39-39.

> Thus, the appellate court reaffirmed prior Ninth Circuit cases that:

> [R]ecognized that the focus of the prohibition in § 504 is "whether disabled persons were denied 'meaningful access' to state-provided services." *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) Thus, although § 504 does not require "substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals," it, like the ADA, does require <u>reasonable modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying " 'meaningful access' to a benefit because of their disability</u>."

*Id* at 40-41 (some internal citations and quotations omitted). Thus, Defendant must reluctantly accept that the standard for liability under Section, relied upon by Plaintiffs in this case, was established long before *Mark H.* was decided and well before the present case was filed, nearly 10 years after *Crowder* was decided in 1996 and more that 20 years after

*Alexander v. Choate*, 469 U.S. 287, 302, 83 L. Ed. 2d 661, 105 S. Ct. 712 (1985), the case upon which *Crowder* relies, issued.

Defendant, fully appreciating the nature of Second Amended Complaint, asserts that "Plaintiffs disingenuously attempt to circumvent § 504's FAPE provision by eliminating any mention of the term FAPE. . . . Plaintiffs' attempt, however is clearly misguided as § 504's FAPE provision invariably plays a role in the present case." Defendant's Memorandum at 5, n.1. This statement is wishful thinking on Defendant's part. The appellate court's opinion clearly provides Section 504 litigants the option of invoking the regulations or relying exclusively on the statute. To paraphrase the appellate court's admonition against forgetting the statutory basis of liability and focusing only on the regulations, Defendant "appear[s] to have forgotten the established § 504 "reasonable accommodation" and "meaningful access" requirements in evaluating whether the § 504 FAPE regulations come within § 504's substantive scope. *Mark. H.*, at \*42. Plaintiffs, here, have taken the appellate court's admonition to heart and have eschewed reliance on the regulations and Section 504's FAPE requirement, by design.

The *Mark H.* court left open the question of whether the regulations are privately enforceable, stating:

> We do not here decide whether the H. family has alleged a privately enforceable cause of action for damages against the state. To this point, both parties have proceeded on the

> assumption that the IDEA and the § 504 FAPE requirements
> are identical, and have not litigated whether any of the § 504
> FAPE regulations, as opposed to the IDEA FAPE requirements,
> can support a private cause of action. We therefore remand to
> the district court for further proceedings.

*Id.* at *46.

One assumes that answer will be in the affirmative; but Plaintiffs do not take that path.  Rather than engage in further debate about (1) the precise distinctions between IDEA FAPE and Section 504 FAPE, and (2) whether the Section 504 regulations are authoritative or privately enforceable, Plaintiffs choose to stand on the *terra cognita* of Section 504's express language, which, as the appellate went to great lengths to note  "prohibits not only 'discrimination' against the disabled, but also 'exclu[sion] from . . . participation in' and 'deni[al] [of] the benefits of' state programs,"  (*id.* at *38), and measures compliance with these mandates in terms of "meaningful access" providing "reasonable accommodation."  *Id.* at *42.

In the face of the appellate court's pronouncements, Defendant's assertion that "§ 504's FAPE provision is the applicable legal standard," (Defendant's Memorandum at 5, n.1), clearly is false.  Should the Court believe otherwise, however, the appropriate result would be to invite Defendant to file a motion to dismiss for failure to state a claim under Rule 12(b), not to grant the Defendant additional discovery or, even more extreme, additional experts.  As discussed below, Plaintiffs believe Defendant is trying to force them to employ theories they

do not wish to pursue for two reasons: (1) delay; and (2) to avoid their current expert's opinions, by ameliorating them with others.

    B.    <u>Defendant Seeks Discovery for Improper Purposes</u>.

Plaintiffs do not dispute that Bryan's IEP was properly designed; their claims are based on the disastrous consequences of Defendant's continuous refusal to implement it. Thus, the house of cards Defendant attempts to construct from the *Mark H.* discussion of issues of "design" and comparison to non-disabled persons that might arise if Plaintiffs were relying on the cited regulation, have no bearing on this case. Defendant's Memorandum at 3. Plaintiffs repeatedly have argued that the IEP was appropriate and should have been implemented. The notion that an expert is needed to address issues related to the IEP's design, therefore, is false.

Secondly, unless Defendant refuses to concede that its program for non-disabled students is effective public education, there is no factual dispute that Bryan's program provided less education than theirs. Their programs were effective.

Defendant knows this and is requesting a new expert for one reason: Defendant's current substantive expert, Dr. Siegel gave substantial testimony that supported Plaintiffs' claims:

For example, when asked about Bryan's progress in Hawaii, Dr. Siegel testified:

274:19  BY MR. VARADY:

274:20        Q.  Well, can you only consider him to learn

274:21   in California, or could he have learned in Hawaii?

274:22        A.  He could have learned in Hawaii.

274:23        Q.  So there was a period of five years where

274:24   he didn't learn in Hawaii; isn't that correct?

274:25        A.  Right.  Correct.

Exhibit 1 to Declaration of Carl M. Varady.

At the same time, Dr. Siegel, like Plaintiffs' own experts, stated that Bryan

could learn when he received appropriate services.

275:20  Q.  So your testimony is that even though he

275:21   made no progress for five years in Hawaii and, in

275:22   fact regressed, that he's recouped to the point he

275:23   would have been had he been given appropriate

275:24   services in Hawaii; is that correct?

275:25        MR. USHIRODA:  Objection.  Asked and

276:1   answered.  Also misstates prior testimony.

276:2   BY MR. VARADY:

276:3        Q.  Is that your testimony?

276:4        A.  I think he has largely recouped.

*Id.*

8

Dr. Siegel reiterated:

277:9   Q.  So doors are now open to him that were not

277:10   open when he was in Hawaii because of the program

277:11   that he has received here?

277:12         A.  The program.  In other words, Bryan is the

277:13   same Bryan.  What I said earlier that the way I

277:14   typically see it, and I see it in Bryan's case, is

277:15   that 50 percent of what happens is the child's

277:16   neurology, the child's neuropathology, his wiring.

277:17   50 percent is the treatment.

277:18         And in Hawaii, the treatment was not doing

277:19   -- carrying its weight in moving him forward, and

277:20   now the treatment is doing its weight in moving him,

277:21   carrying his weight and moving him forward.  But

277:22   Bryan's still the same Bryan.

277:23         Q.  So had those doors been open in Hawaii,

277:24   wouldn't you agree that he would be further along

277:25   than he is today?

278:1         MR. USHIRODA:  Objection.  Asked and

278:2   answered.

278:3         THE WITNESS:  Yeah.  I think I have -- I

9

278:4   think that is the case

Finally, Dr. Siegel expressly stated that, had she be advising Bryan's parents, she would have told them to leave Hawaii because they could not get appropriate services here:

132:10  And in terms of what I know about the need

132:11   for a stable program and what I know about Hawaii

132:12   and the instability of paraprofessional aides there,

132:13   and what I know about what trainers can accomplish

132:14   by going in and doing intensive work for a week, I

132:15   would not think it would be the best approach to

132:16   getting appropriate services if it was my child.

132:17      Q.  Well, what are people who live on the Big

132:18   Island supposed to do in that case if they need

132:19   those kinds of services?  Are they all supposed to

132:20   move?

132:21      A.  Yes.  I mean, I think that it depends what

132:22   perspective you look at it from.  Usually I am

132:23   approached by parents who say to me:  Dr. Siegel,

132:24   just tell us where we should go to get the best we

132:25   can possibly get for our kid.  I would not tell

133:1   anybody to move to Kona, or to any rural area.  You

133:2    know, I would mention urban centers, just as you did

133:3    earlier, where there are known good programs, a

133:4    critical mass, if you will, of services.

133:5        But in general, if you are trying to do

133:6    the best you can for your child and want to assure

133:7    good quality, consistent stable services for your

133:8    child, going to the Big Island is not exactly

133:9    hedging your bets.

*Id.*

Dr. Siegel commented from her experience that skills trainers were often unmotivated or unskilled:

124:22  I think that there are -- I think that my

124:23    experience in general in Hawaii is that the

124:24    paraprofessional aide [p]ool is not that -- their

124:25    baseline level of education and training in child

125:1    development and education is low, and that many of

125:2    them are not particularly careerists, if you will.

125:3    A lot of them are surfer dudes who can earn a living

125:4    while still getting to the water between 6:00 and

125:5    9:00, and 3:00 and 6:00, but can work a shift in

125:6    between.  So they are not like really looking at it

11

125:7    as trying out whether they want to become a special

125:8    education teacher someday.

125:9        So I think it is very hard to get a high

125:10   quality stable paraprofessional pool in Hawaii.  And

125:11   I don't know about the Big Island, but I will assume

125:12   it's at least as much an operative principle as it

125:13   is in Oahu.

*Id.*

It is apparent from even this cursory review that Defendant would benefit from additional expert opinions, irrespective of Plaintiffs' legal claims.  Defendant should not be permitted to use *Mark H.* as an excuse to remediate Dr. Siegel's criticisms, by employing another expert under the purported need to address claims or arguments that Plaintiffs have not and will not make.

Plaintiffs Section 504 claims have been part of this case since the beginning and Dr. Siegel's opinions addressed these claims fully.   Should Defendant seek to supplement Dr. Siegel's opinions and testimony with the interrogatories proposed by Plaintiffs—(1)   Did the DOE's actions as alleged in the complaint deny Bryan meaningful access to public education?  (2) Explain why or why not—Plaintiffs would not object to them doing so.

C.     Defendant's Other Requested Discovery is Unnecessary.

Other than for purposes of delay and driving up costs,[1]  Defendant's other proposals are burdensome and unnecessary.  They will be discussed in order

Defendant's (2), (3), (4) and (5).  Plaintiffs have stipulated on the record that they do not contest that Bryan's IEPs were appropriate.  There is no need for discovery on this matter.  Ann Kimball Wiles had been deposed on 4 occasions form approximately 14 hours; Stanley Bond has been deposes on three occasions for approximately 10 hours.

Defendant's (6) is addressed by Plaintiffs' proposed additional discovery.

Defendant's (7): Defendant has played hardball throughout the scheduling of depositions.  Some examples are: (1) forcing Plaintiffs to proceed by motion to schedule the deposition of Dr. Siegel, and arguing that she could not be deposed because her available dates were after the discovery cut off; (2) not deposing Shelby Floyd, attempting to have her struck as a witness and, when the Court refused, moving to take her deposition, which the Court then denied; and (3) when asked to accommodate the schedule of Dr. Smalley, who is a practicing clinician with daily client appointments and a single mother, by permitting her to testify at

---

[1]  Plaintiffs have incurred in excess of $100,000.00 in costs to date.  In December 2007, Plaintiffs' Hawaii Information Practices Act request disclosed that, even before the near-trial deadline work had been done in January 2008, Defendant had paid nearly $200,000.00 in attorneys' fees, alone, to Defendant's private counsel.

trial via video conferencing at trial, after Defendant had deposed her, Defendant refused this request.  Exhibit 2 to Declaration of Carl M. Varady.

Defendant sought and was granted relief from the Court in the form of a lengthy continuance that Plaintiffs opposed.  Defendant, like Plaintiff should be required to live with the results of its request and get ready for trial.  As it was Defendant's motion to continue the case, Defendant should be required to accept the consequences of its request being granted.  Otherwise, the extraordinary costs already incurred in this matter are likely to double; a result that would be devastating to Plaintiffs, whether or not Defendant is affected by the additional expense.

The amended complaint added no new regulatory bases for liability and added facts previously known to the parties and their experts through discovery. There is no need to open up the discovery floodgates and absolutely no need for additional experts.  Plaintiffs assert that any need for further discovery can be addressed by written interrogatories asking witnesses, including experts:

(1)     Did the DOE's actions as alleged in the complaint deny Bryan meaningful access to public education?

(2)     Explain why or why not.

There is no reason that this very limited inquiry cannot reasonably be accomplished in the next two months.

DATED:  Honolulu, Hawai‘i, February 27, 2008.

/S/  CARL M. VARADY
STANLEY E. LEVIN
CARL M. VARADY
MICHAEL K. LIVINGSTON

Attorneys for Plaintiffs