**EXHIBIT "1"TO DECLARATION OF CARL M. VARADY**

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 122

which I think Bryan had come to understand that he could physically intimidate people. So he also -- so there was many qualifications of this person that made it unlikely that they would be able to find someone exactly like that in the Big Island.

**Q. Now, are you aware that Bryan actually had a skills trainers who was fluent in American Sign Language when he was on the Big Island?**

A. I think I read something about one having been there for a while, but my impression was that it wasn't someone that stayed with him for very long.

**Q. And you are aware that the most signs, at least that are documented in any of the reports that Bryan has, would be about 200 signs; is that correct?**

A. Correct.

**Q. Most of those are for nouns, not verbs?**

A. Right. He knows the names of lots of animals, and things like that.

**Q. All right. And his teacher at this time, that is, when you observed him in 2006, Trina had learned the signs that he knew; is that correct?**

A. That's correct.

**Q. She was not fluent, but able to**

Page 123

**communicate with him because she understood his signs, even when he was signing in a sloppy fashion; is that correct?**

A. Correct. And she was also -- to just emphasize, she was communicating with him mainly with a subset of those signs. So she wasn't signing turtle and giraffe to him, but she was signing sit down, or line up, or time for lunch, things that really had to do beyond the direct teachings that the paraprofessional aide was doing.

**Q. And you understand that in Hawaii, the skills trainers were offered classes in ASL so they could learn his basic sign set?**

A. I don't know that I have heard that before.

**Q. And that one of his skills trainers, although she didn't have autism training, was fluent in American Sign Language.**

**Did you know that?**

A. I think I might have read that somewhere.

**Q. Is there any reason why you couldn't take someone like Obi, or anyone else who is fluent in American Sign Language, and in a manner of, say an eight-hour training, or two four-hour trainings, or two eight-hour trainings provide them with**

Page 124

**sufficient training to work with Bryan?**

A. I think it would take a lot more than that.

**Q. So you would need some ongoing support in addition to that. Would that be a fair statement?**

A. The person would need ongoing support for a long time. I think Obi had ongoing support. I mean, she had Trina that she could talk to about some of the behavioral issues, about -- did Trina think that he was comprehending or not comprehending, complying or not understanding, so forth.

I think that, you know, by definition, all paraprofessional aides need a support person. They are not supposed to be functioning as independent teachers.

So even if you looked at having, and I have seen it happen sometimes, people have two aides, two one-to-one aides, one that signs, and one that knows about autism, let's say, it would be very hard to integrate the efforts of those people.

I think that there are -- I think that my experience in general in Hawaii is that the paraprofessional aide tool is not that -- their baseline level of education and training in child

Page 125

development and education is low, and that many of them are not particularly careerists, if you will. A lot of them are surfer dudes who can earn a living while still getting to the water between 6:00 and 9:00, and 3:00 and 6:00, but can work a shift in between. So they are not like really looking at it as trying out whether they want to become a special education teacher someday.

So I think it is very hard to get a high quality stable paraprofessional pool in Hawaii. And I don't know about the Big Island, but I will assume it's at least as much an operative principle as it is in Oahu.

**Q. Do you know what Obi's professional training was at the time, in June of '06?**

A. I talked with her, and I -- I don't recall now. It might be -- if I can refer to my report, it might be in there.

**Q. I can tell you that in reviewing it, the only qualifications that I was able to observe that you had documented was that she was fluent in American Sign Language.**

A. Yeah, I am looking, and I see that, too. I believe that I recall that she had worked in a program for emotionally disturbed children, or some

Page 130

A. Excuse me. I think, just to go back to your previous question, I now recall that the information about bringing in people from this agency to train people, or hire people from this agency, bringing them to West Hawaii was provided to me by Dr. Bond. I think when I interviewed him he told me that.

So I hadn't heard that before, but that is something that he told me. So I didn't gather further data on it.

**Q. It's a very simple question, though. My question is there is nothing about Hawaii that would prevent properly trained and supervised people from implementing Bryan's program?**

MR. USHIRODA: Objection. Over --

BY MR. VARADY:

**Q. Isn't that correct?**

MR. USHIRODA: Objection. Overly broad, vague and ambiguous.

THE WITNESS: I actually disagree with that. I think the problem is, and I think the problem is all over Hawaii, but it's most acute in the more rural islands, is that people who have a higher level of expertise, by and large, want to be somewhere where there is a lot of variety and job

Page 131

opportunity that -- for example, someone like Kim Smalley with her skills is kept busy in Oahu consulting on, I would guess, maybe 50 or 60 different cases in a year, maybe more.

And so you are not going to get people with that level of qualification living on the Big Island to provide that kind of oversight, because there is just not that much going on and that -- the problem is that you can bring trainers in to do training, you can bring them in for periodic check-ups, but it's just -- it's just sort of endemic to being in a rural area, especially a rural area you can only get to by airplane.

The same thing would be true of kids who live in the Sierra Nevada mountains here I have seen living in McKinleyville or, you know, someplace that is very isolated. It's very, very hard to put together the critical mass of people to provide an overall program.

BY MR. VARADY:

**Q. So in your conversations with Bryan's father, didn't Dr. Bond tell you that, contrary to what you have just surmised, that Pacific Child and Family had actually someone on their staff who was going to do just that, which is move to Hawaii to**

Page 132

**serve as the ISC?**

A. That was my understanding. As I said, I didn't follow that up by checking that assertion out with anybody. But my experience is that there are people who come and go from Hawaii, and that whether that person would have been a long-term solution, well nobody knows. Right? But I wouldn't have thought that the odds were good, in my professional opinion.

And in terms of what I know about the need for a stable program and what I know about Hawaii and the instability of paraprofessional aides there, and what I know about what trainers can accomplish by going in and doing intensive work for a week, I would not think it would be the best approach to getting appropriate services if it was my child.

**Q. Well, what are people who live on the Big Island supposed to do in that case if they need those kinds of services? Are they all supposed to move?**

A. Yes. I mean, I think that it depends what perspective you look at it from. Usually I am approached by parents who say to me: Dr. Siegel, just tell us where we should go to get the best we can possibly get for our kid. I would not tell

Page 133

anybody to move to Kona, or to any rural area. You know, I would mention urban centers, just as you did earlier, where there are known good programs, a critical mass, if you will, of services.

But in general, if you are trying to do the best you can for your child and want to assure good quality, consistent stable services for your child, going to the Big Island is not exactly hedging your bets.

**Q. I would just like to talk about some of the other observations that you made when you saw Bryan and just have you confirm those.**

**You saw that the teacher, and her name is Trina Meader, could sign all of Bryan's signs; is that right?**

A. Or, as I said earlier, the ones, the main ones which, as the teacher, she needed to use to regulate his transitions from activities back to these regulated behaviors. I don't know that she necessarily knew all of the -- you know, there is a reference to him having maybe 200 noun labels. My guess would be that she doesn't know all of those, but she was really pretty good with him.

But Obi was better at picking up the signing errors, and I think if you have not just

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

A. Well, that, in a way, is my proof that he has -- absolutely has the capacity for recoupment that I would suspect that he would have when he changed his treatment practices.

**Q. If he'd made that progress in Hawaii, wouldn't he even be further along today?**

MR. USHIRODA: Objection. Asked and answered.

THE WITNESS: I don't believe that he would.

BY MR. VARADY:

**Q. So he's gone as far as he can now?**

A. No.

MR. USHIRODA: Objection. Asked and answered.

THE WITNESS: No. He's continuing. We have been through this. He's continuing to learn, and he will continue to learn.

BY MR. VARADY:

**Q. Well, can you only consider him to learn in California, or could he have learned in Hawaii?**

A. He could have learned in Hawaii.

**Q. So there was a period of five years where he didn't learn in Hawaii; isn't that correct?**

A. Right. Correct. But I think he is caught

up, and he is back on track and that he has capacity that wasn't accessed when he was in Hawaii and that -- I don't think that the kind of gains we have seen in his first two years in California are going to continue at that rate for the next two years and the two years after that, and so forth.

**Q. Can you say that with a certainty?**

A. I can say it with a fair degree of certainty. In other words, I don't think he will have 400 signs in another year's time, for example, if you were going to try to characterize it that way. I think that would be extremely unlikely.

**Q. Wouldn't you want to see where he is next year before making predictions about where he is going to end up?**

A. I mean, ideally, one wants to see, but I can tell you that based on my experience over the years with kids like Bryan, it would be unlikely. It seems much more improbable than probable to me.

**Q. So your testimony is that even though he made no progress for five years in Hawaii and, in fact regressed, that he's recouped to the point he would have been had he been given appropriate services in Hawaii; is that correct?**

MR. USHIRODA: Objection. Asked and

answered. Also misstates prior testimony.

BY MR. VARADY:

**Q. Is that your testimony?**

A. I think he has largely recouped.

**Q. Well, that is a big word, "largely." Now, you are qualifying it.**

A. No.

**Q. Did he recoup or not?**

A. Well, I mean, as you pointed out yourself, there is no way to know exactly. This is not a precise science. I think that he's shown a lot of improvement in the behavioral domain. And in doing so, he's much more open to instruction.

So he is doing many more things, but he is still a very severely impaired young man, and a lot of what he has learned, a lot of the signs that he's learned don't really have much functional use for him, like labeling objects and colors and numbers and animals, and so forth.

So as far as where he is going in life, as I have said, he needs to have a much more functional turn in the road for his curriculum. And typically that happens at age 14, when the transition for adult planning first gets talked about at an IEP meeting.

I think in Bryan's case, he was still -- the primary focus was still on behavioral management, but I think that as that becomes more of a consolidated gain, hopefully his curriculum will move into more functional skills development, which I anticipate he will be able to master to the degree that moderate to severely retarded nonverbal autistic individuals master such things.

**Q. So doors are now open to him that were not open when he was in Hawaii because of the program that he has received here?**

A. The program. In other words, Bryan is the same Bryan. What I said earlier that the way I typically see it, and I see it in Bryan's case, is that 50 percent of what happens is the child's neurology, the child's neuropathology, his wiring. 50 percent is the treatment.

And in Hawaii, the treatment was not doing -- carrying its weight in moving him forward, and now the treatment is doing its weight in moving him, carrying his weight and moving him forward. But Bryan's still the same Bryan.

**Q. So had those doors been open in Hawaii, wouldn't you agree that he would be further along than he is today?**

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 278

MR. USHIRODA: Objection. Asked and answered.

THE WITNESS: Yeah. I think I have -- I think that is the case, but I think -- no, I think he's -- he's recouped, he's caught up. Just the way when kids go to kindergarten, or go to first grade, the first month of kindergarten is relearning first grade, and they relearn first grade -- relearn kindergarten in a month, because the recruitment process is not as difficult for them, because cognitively some of the structures they need to make sense of the information are already latent. They are already in place. And that was the case with Bryan.

BY MR. VARADY:

**Q. Just asking it a different way, even if Bryan had received appropriate programming in Hawaii that was properly implemented, he would be no further along than where he is today. Is that your testimony?**

A. I think he would be at a very similar place. I think he would be at a very similar place.

**Q. Do you have anything that you want to add, change, correct or supplement to the testimony you have given today?**

Page 279

A. No.

**Q. Are the answers you have given today the same as those you will give to a Hawaii jury when you testify at trial in December?**

A. Yes.

**Q. All right. I have nothing further. Thank you very much.**

A. Okay. Thank you.

THE VIDEOGRAPHER: This is the end of tape No. 4 and the end of this deposition of Bryna Siegel, Ph.D. on October 15th, 2007. We are off the record at 4:47 p.m.

(Time noted 4:47 p.m.)

--oOo--

Page 280

I, BRYNA SIEGEL, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

Executed this ______ day of ____________, 2007, at ____________________, ____________________.

______________________________
BRYNA SIEGEL

Page 281

STATE OF CALIFORNIA )
COUNTY OF SAN FRANCISCO )

I, Leland Batara, CSR No. 3759, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, stated that they would tell the truth under penalty of perjury; that a verbatim record of the proceedings was made by me using machine shorthand, which was thereafter transcribed by me; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor am I a relative or employee of any attorney or of any parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: October 24, 2007.

______________________________
Leland Batara, CSR No. 3759