**EXHIBIT "1"TO DECLARATION OF CARL M. VARADY**

Of Counsel:
DAVIS LEVIN LIVINGSTON

STANLEY E. LEVIN          1152-0
MICHAEL K. LIVINGSTON   4161-0
ANNE L. WILLIAMS          1662-0
400 Davis Levin Livingston  Place
851 Fort Street
Honolulu, Hawaii 96813
Telephone: (808) 524-7500
Fax: (808) 545-7802
E-Mail: slevin@davislevin.com

CARL M. VARADY          4873
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawaii 96813
Telephone: (808) 523-8447
Fax: (808) 523-8448

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>    Plaintiffs,<br> vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i<br>    Defendant. | CIVIL NO. 04-00442 HG/BMK<br>CIVIL NO. 05-00247 HG/BMK<br>(Other Civil Action)<br><br>SECOND AMENDED COMPLAINT; EXHIBITS "A"–"D"; CONTINUED DEMAND FOR JURY TRIAL |

**SECOND AMENDED COMPLAINT**

## I.    INTRODUCTION

1.    This action is brought by Plaintiffs ANN KIMBALL WILES and STANLEY BOND ("Plaintiffs"), who are the parents of Bryan Wiles-Bond, an autistic 16-year-old boy, on behalf of themselves and as next friend for their son Bryan.

2.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 729 ("Section 504"), prohibits exclusion from participation in, denial of the benefits of, or discrimination against people with disabilities, in any program or activity receiving Federal financial assistance.

3.    Section 504 provides a cause of action for money damages and other relief, where an entity operating a program or activity receiving Federal financial assistance, acting with deliberate indifference, fails to provide or otherwise prohibits meaningful access to such program of activity. Section 504 applies to all public schools that receive federal financial assistance, as 29 U.S.C. § 794(b)(2)(B) defines "program or activity" to include the operations of "local educational agenc[ies]".

4.    Defendant, the DEPARTMENT OF EDUCATION, STATE OF HAWAI'I ("DOE"), acting with deliberate indifference, failed to provide or otherwise prohibited Bryan from having meaningful access to public education in Hawaii.  In doing so, DOE excluded Bryan from participation in, denied him the

benefits of, and discriminated against him, in his public education, which is a program or activity receiving Federal financial assistance. The DOE acted with deliberate indifference Bryan's need for accommodation and denied him meaningful access to public education as set out more fully below.

## II.    JURISDICTION

5.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 which afford original jurisdiction of actions arising from federal questions under the Constitution or laws of the United States, including the Rehabilitation Act of 1973, 29 U.S.C. § 729 ("Section 504").

6.    Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201-02.

7.    Plaintiffs have fulfilled their obligation to exhaust administrative remedies, if any.

## III.    PARTIES

8.    Bryan Wiles-Bond is a minor who currently attends a public school in the State of California.

9.    Ann Kimball Wiles and Stanley Bond are Bryan's natural parents, and, as next friends of Bryan, have standing to assert claims on his behalf as well as on behalf of themselves.

10.    From 1999 to 2005, Plaintiffs were citizens of and resided in the State of Hawai'i when the events giving rise to this action took place. Plaintiffs lived in

Hawaii until they were forced to relocate to California to obtain meaningful access to public education for their son Bryan.

11.    The DOE is the state educational agency responsible for the providing public education in Hawaii.  The DOE receives federal funds for its education programs.

## IV.    FACTUAL ALLEGATIONS

12.    Bryan, who was born on October 28, 1991, is the youngest child of Ann Kimball Wiles and Stanley Bond.  At age 2, Bryan was diagnosed with pervasive developmental delay and hyperactivity and, later, he was diagnosed as having autism.

13.    Autism is a developmental disability that significantly affects verbal and non-verbal communication and social interaction as well as a child's educational performance.  Although no cure for autism exists, the condition is best treated with early diagnosis, and appropriate intervention, and education.

14.    Bryan was enrolled in the Hawai'i public school system from the time his family moved to Hawai'i in 1999.  Bryan was partially toilet-trained, and had severe developmental delays in cognition, speech and social abilities.  Prior to his arrival in Hawaii, he had gained certain skills and progressed to a point that his parents were pleased with his progress.    Bryan's preferred means of communication is American Sign Language ("ASL").

4

15.    Bryan was making progress in some academic areas when he left Maryland in 1999.  However, he was not fully toilet trained and had delays in social behavior.  Both were major issues that affected his ability to access public education in a meaningful way.  Defendant was required  to provide him with one-on-one  instructional  services  in  the  class  and  after  school,  and  other accommodations, so that Bryan could enjoy meaningful access to public education.

16.    Bryan needed, among other accommodations, one-on-one assistance from a trained aide ("skills trainer") during the entire school day, after school, and on weekends, so that he could enjoy meaningful access to public education.

17.    At all relevant times, Defendant knew Bryan needed skills trainers every day for at least ten hours per day trained in specific behavior modification methods, ASL and experienced working with children with autism to have meaningful access to public education.

18.    On February 27, 2001, Bryan's parents submitted a request to the DOE for a due process hearing pursuant to 20 U.S.C. § 1415(e), identifying several issues to be decided concerning special education provided to Bryan and his need for accommodation.  They included, among other matters:

a.    Failure to provide a trained aide for one-to-one services specified in the IEP, and as a result;

b.    Failure to provide speech services as identified in the IEP; and

c.      Failure to implement the autism programs specified in the IEP. All of the aforementioned services were necessary to provide Bryan meaningful access to public education.

19.    At a scheduled May 7, 2001 due process hearing before hearing officer Richard Chun, no hearing was held.  Instead, Plaintiffs and the DOE placed their stipulated hearing decision on the record.  The terms of the stipulation were to be in effect from May 7 through October 1, 2001.

20.    Hearing Officer Richard Chun set forth the terms of the parties' stipulation in a Decision and Order dated May 21, 2001 ("Order").  Among other things, the Order mandated:

a.      The IEP dated January 29, 2001 was to be followed;

b.      The DOE was to hire and train an adult aide for Bryan. Training for the aide was to include behavioral modification including TEACCH, DTT and PECS, and be provided by Dr. Jana Ortiz or Kim Smalley ;

c.      The aide was to provide services to Bryan during normal school hours and after school;

d.      If these services were not provided at levels specified by Bryan's IEP during the period May 7 through October 21, 2001, the DOE was required to make up those services after October 21, 2001.

e.     If the aide did not completer his/her services during this time period, Defendant was required to find a replacement within two weeks of termination; and

f.     In addition to the TEACCH, DTT and PECS methods, the Defendant was allowed to implement other methodologies or services they deemed appropriate.

All of the aforementioned services were necessary to provide Bryan meaningful access to public education.

21.     The DOE knowingly failed to comply with the Order's terms.  Among other matters, it did not provide the mandated services during the specified period, and did not make up the missing services thereafter.  As a result, Bryan was denied meaningful access to public education.  Plaintiffs filed a Complaint in the United States District Court on February 15, 2002 against the DOE, to enforce the Order, and to have the DOE comply with Bryan's then-current IEP.

22.     The Complaint alleged that the State had breached federal law and regulations by, among other things, failing to implement the terms of the Order, failing to provide a free and appropriate public education to Bryan under the IDEA, and violating Section 504 of the Rehabilitation Act.

23.    On July 1, 2002, in resolution of the federal action, Plaintiffs and the DOE entered into a Release and Settlement Agreement ("Settlement Agreement"), a true and correct copy of which is attached as Exhibit "A".

24.    To provide Bryan meaningful access to public education, the Settlement Agreement required the Defendant to:

a.    Hire, train and have in place the skills trainers (aka "therapeutic aides" or "TAs") needed to consistently provide Bryan with not less than ninety-five percent (95%) per calendar month of the skills trainer hours to which he was entitled under his IEP;

b.    By August 1, 2002, procure skills trainer services for Bryan through an "expedited contract process," in which the DOE committed to pay a minimum salary and pay the skills trainers promptly;

c.    Reimburse Plaintiffs for newspaper advertising to attract skills trainers;

d.    By August 1, 2002, create a pool of substitute skills trainers, trained in the behavioral methods and knowledgeable about Bryan's IEP, who would be available when his regular skills trainers were not;

e.    Procure skills trainers trained in specific DTT, TEACCH and PECS behavior modification methods for autistic children;

8

   f. Have the skills trainers complete Bryan's daily behavioral logs and daily log sheets to document the amount of DTT and TEACCH trials utilized;

   g. Continue to exercise oversight monitoring of the skills trainers by the then current autism consultants or similarly qualified personnel;

   h. Provide skills trainer services to Bryan when school is not in session in Bryan's home;

   i. Provide additional occupational therapy and speech therapy;

   j. Provide respite care to Bryan's parents for 32 hours per month; and

   k. Provide the specified services for a period of two years, until and including July 1, 2004.

All of the aforementioned services were necessary to provide Bryan meaningful access to public education.

  25. Between October 2003 and February 2004, despite the requirements of Bryan's IEP and the Settlement Agreement, the DOE knowingly failed to provide skills trainers to deliver 95 percent of the services in Bryan's IEP. The skills trainers that were provided lacked the qualifications set out in the Settlement Agreement. Defendant never created a pool of qualified substitutes to provide interim services during periods when fully trained and permanent skills trainers

were not available, even though the DOE knew, from as early as 1999, that there was a chronic shortage of such skills trainers on the Big Island.

26.    DOE knowingly failed to fulfill the terms of the Settlement Agreement or implement Bryan's educational program.  On February 26, 2004, Plaintiffs submitted a request for a due process hearing under Hawaii Administrative Rules ("H.A.R.") Title 8, Chapter 56.  The issues raised by the request for hearing were:

a.  the DOE's repeated failure to provide the services required by Bryan's IEP and necessary to provide him meaningful access to public education;

b.  the DOE's failure to ensure that trained skills trainers are hired and available to provide services for children like Bryan;

c.   the DOE's failure to provide skills trainers who were trained in DTT, TEACCH, PECS, had experience working with autistic children and who could communicate with Bryan, through ASL; and

d.  the failure of the DOE to comply with the Settlement Agreement. All of the aforementioned services were necessary to provide Bryan meaningful access to public education.

27.    After a hearing held on April 5, 2004, the administrative hearings officer issued Findings of Fact, Conclusions of Law and Decision on May 11, 2004

10

("May 2004 Decision"). The May 2004 Decision held that from October 2003 to February 2004: "1) The DOE repeatedly failed to provide the skills trainer services required by Bryan's November 18, 2002, November 25, 2003 and January 9, 2004 IEPs, 2) The DOE failed to ensure that trained skills trainers were hired and available to provide services to Bryan, and 3) The DOE failed to provide skills trainers who could communicate with Bryan using ASL, resulted in a loss of educational benefit to Bryan". All of the aforementioned services were necessary to provide Bryan meaningful access to public education.

28.    In the May 2004 Decision, the Defendant was ordered to:

a.    Hire, train and have in place the skills trainers needed to consistently provide Bryan with not less than 95 percent per calendar months of the skills trainer hours to which he is entitled to in his IEP. If Defendant failed to do so, Bryan's parents could hire skills trainers;

b.    Any skills trainers hired by Bryan's parents or Defendant were required to be trained in DTT and TEACCH methods and ASL, to sufficiently implement Bryan's program as determined by Bryan's IISC;

c. Provide additional authorization of hours to Bryan's autism consultant to train new skills trainers; and

d. Provide additional hours of service from a knowledgeable consultant to design, implement and monitor a toileting program for Bryan.

All of the aforementioned services were necessary to provide Bryan meaningful access to public education.

29.    The May 2004 Decision was not appealed by the DOE and is now res judicata.  A true and correct copy of the May 2004 Decision is attached as Exhibit "B".

30.    Pursuant to the May 2004 Decision, Defendant informed Plaintiffs it would implement ASL training, and hire an experienced behaviorialst to devise and oversee implementation of Bryan's toileting program.

31.    On June 11, 2004, Plaintiffs submitted a request for a due process hearing under Hawaii Administrative Rules ("H.A.R.") Title 8, Chapter 56.  The issues raised by the request for hearing were: 1) the failure of the DOE to hire and have in place a trained, certified and qualified special education teacher to deliver Bryan's special education program during his "extended school year", e.g., the period he received services outside of the regular academic year; and 2) the DOE's hiring of an unqualified special education teacher for Bryan for the 2004-2005 school year.  All of the aforementioned services were necessary to provide Bryan meaningful access to public education.


32.    On July 6, 2004, the Defendant stipulated to the facts alleged in the hearing request and to liability.  A Stipulated Partial Decision and Order ("July

2004 Order") was approved by the Defendant and the administrative hearings officer.  A true and correct copy of the July 2004 Order approved by DOE's counsel is attached as Exhibit "C".

33.    The July 2004 Order mandated that Defendant:

a.    Prepare for Bryan "a written structured social skills curriculum for implementation beginning no later than the end of the first week of the 2004-2005 school year;"

b.    Hire and have in place by the beginning of the 2004-2005 school year a licensed, certified special education teacher with experience teaching autistic children and proficiency with ASL; and

c.    Cause a functional behavioral assessment to be completed for Bryan and delivered to his parents no later than August 7, 2004.

All of the aforementioned services were necessary to provide Bryan meaningful access to public education.

34.    On July 6, 2004, a hearing was held on the remaining issue—the need for a qualified special education teacher during all portions of Bryan's extended school year—in the June due process hearing request.  These services were necessary to provide Bryan meaningful access to public education.

35.    On July 23, 2004, the administrative hearings officer ruled in favor of Bryan.  See Exhibit "D".  The hearings officer ruled that Defendant was

required to deliver Bryan's educational program under the supervision of a qualified special education teacher during the extended school year who was experienced in teaching autistic children and proficient in ASL. These services were necessary to provide Bryan meaningful access to public education.

36.    In 2004, despite the Settlement Agreement and May 2004 Decision, there was no pool of trained substitute skills trainers in place, and Bryan was not receiving and did not receive 95 percent of the hours of services from skills trainers identified in the May 11, 2004 Decision. The toileting program ordered was created but had not been implemented. No ASL training has been conducted and none of the skills trainers hired were trained in ASL or behavioral modification methods as required by the Decision. These services were necessary to provide Bryan meaningful access to public education.

37.    Bryan's teacher in the 2004-2005 school year was not licensed or certified under state law to deliver special education services. Bryan's teacher did not know ASL and was not familiar with the behavior modification methods used with Bryan. Bryan's ESY teacher also was not certified as a teacher or special education teacher.

38.    Defendant's knowing failures to provide appropriate accommodation forced Bryan to regress in his toileting to a level at which was at or below the level that he was at when he arrived in Hawaii.

39.    The DOE acted with deliberate indifference Bryan's need for accommodation and denied him meaningful access to public education.

40.    Bryan and his parents have suffered economic, psychological and physical damages as a result of Defendant's deliberate indifference in an amount to be proved at trial.

41.    Section 504 of the Rehabilitation Act, prohibits Defendant from excluding Bryan from the participation in, denying Bryan the benefits of, or subjecting Bryan to discrimination in public education. Defendant has violated these provisions and acted with deliberate indifference by failing to provide or otherwise prohibiting meaningful access for Bryan to public education, without limitation.

a.    Not hiring and training sufficient numbers of skills trainers, even though District Superintendent Alvin Rho testified that he was aware of a chronic shortage of skills trainers on West Hawaii in 1999, which continues to the present.  Dr. Dru Copeland, Bryan's autism consultant testified that many skills trainers work only because they want to obtain health insurance, rather than because of interest in the work, thereby contributing to an ongoing and chronic shortage in properly trained skills trainers. Defendant's own expert Dr. Bryna Siegel testified that she would have advised Bryan's parents to move rather than seek services there because of the shortage and her impression that many skills

trainers were just "surfer dudes" who were looking for work between morning and afternoon surfing;

       b.    Not hiring and training skills trainers and teachers who had experience working with children who have autism;

       c.    Not hiring and training skills trainers and teachers who had training in or could use ASL;

       d.    Not hiring and training certified special education teachers;

       e.    Not providing Bryan with a functional behavioral analysis or behavior support plan, when Defendant knew that Bryan's behaviors were escalating, he was becoming aggressive, self-injurious and damaging property;

       f.    Not providing Bryan with an effective toileting plan at a time when Defendant knew that Bryan was urinating on himself multiple times a day, as a means of self-stimulation and disruption of his educational program;

       g.    Permitting Bryan play in his own urine and feces, while his teacher and skills trainers sat by watching;

       h.    Not providing information to the agencies from which it hired skills trainers that would permit them to locate or train personnel qualified to work with Bryan.  This included not informing the agencies that Bryan's skills trainers needed to be experienced working with autism, trained in DTT, TEACCH and PECS behavioral modification methods, record data necessary to successfully

implement those behavior modification programs, be proficient in ASL, and be knowledgeable regarding the terms of Bryan's educational program;

  i. Not hiring certified teachers proficient in ASL and working with children who have autism;

  j. Not providing the number of skills trainer hours Defendant was required to provide Bryan meaningful access to public education and required by the hearing officers' decisions, settlement agreement and stipulations;

  k. Forcing Bryan's parents to advertise and conduct their own searches for personnel who met the qualifications necessary to provide Bryan meaningful access to public education and required by the hearing officers' decisions, settlement agreement and stipulations;

  l. Refusing to obey the hearing officers' decisions, settlement agreement and stipulations, thereby forcing Bryan's parents repeatedly to hearing and litigation to attempt to obtain the services that would provide Bryan meaningful access to public education;

  i. Isolating Bryan in a room with no other students as he regressed from the lack of services and program as a way of dealing with his negative behaviors;

j.      Refusing to implement the home component of Bryan's program, that was to teach him functional skills and provide a way of generalizing the behavioral program that Bryan was supposed to be receiving in school;

k.      Permitting Bryan to be abducted by a mentally unstable woman during a community outing;

l.      Permitting Bryan to drink water incessantly while at school, leading to frequent urination and soiling of his clothes to the point where he often was at school in urine-soaked clothing;

m.      Exhibiting hostility and retaliatory behavior to Bryan and his parents, directly and through its agents;

n.      Not providing crisis prevention training to Bryan's teachers or skills trainers at a time when Defendant knew that Bryan's behaviors were posing a greater risk of harm to himself, others and property;

o.      Suspending Bryan from school without a determination as to whether his behavior was a manifestation of his disability;

p.      On one occasion, with four adults present, watching Bryan slip and slide on a mat on the floor in a pool of his own urine;

r.      Employing skills trainers to eavesdrop on telephone conversations and spy on Bryan's parents while in Bryan's home;

s.    Requesting the autism consultant Dr. Dru Copeland falsify her quarterly report;

t.    Disseminating confidential information regarding Bryan's program and his family in the community;

u.    Falsely accusing Bryan's home program was being used to have the skills trainers perform housework, when it was Bryan, not them, who was supposed to be learning these self-care tasks;

v.    Not accepting offers from Dr. Copeland or Dr. Kim Smalley to start a training program or train additional skills trainers even though Defendant was aware from 1999 to the present of a chronic shortage of skills trainers;

w.    Not creating a functional behavioral analysis, behavior support plan or toileting plan until after Bryan's program became "chaotic," according to the testimony of his autism consultant, Dr. Dru Copeland;

x.    Permitting Bryan to be assaulted by a larger classmate, thereby contributing to Bryan's own aggressive behaviors;

y.    Employing teachers and skills trainers that Dr. Copeland testified were not able to and did not implement Bryan's toileting program;

z.    Employing skills trainers who did not properly record data necessary to implement Bryan's behavior modification programs effectively;

aa.    Knowingly retaining a skills trainer who had pled guilty to public lewdness without informing Bryan's parents of this fact;

bb.    Knowing that the constant turnover and failure to implement consistent programming directly prevented Bryan from developing his social communication skills at a time when those skills were emerging;

cc.    Did not ask Dr. Bryna Siegel for assistance with Bryan's program, or training skills trainers, even though Defendant had retained her on a $150,000.00 contract during the 2004-05 school year;

dd.    According to Dr. Siegel, Bryan's program was made worse by the turnover in skills trainers during the 2003-04 school year;

ee.    Defendant was made aware by Dr. Kimberly Smalley, another of its consultants, of the danger to Bryan's progress posed by inadequate staffing;

ff.    Defendant was informed by Dr. Smalley that Bryan's behaviors were escalating because he had mastered the material he was being presented with, but told Dr. Smalley that Defendant did not have a teacher or materials to implement a proper program;

gg.    As confirmed by Dr. Smalley, Bryan's behavior deteriorated and his ability to communicate through ASL was damaged as a result of Defendant's failure to implement appropriate programming;

hh.    As confirmed by Kelly Stern from TIFFE, skills trainers assigned to Bryan did not have skills commensurate with this need or the requirements of the hearing officers' decisions and settlement agreement;

ii.    Although after being threatened with a TRO in August 2004, Defendant asked Pacific Child and Family, to send a representative to Hawaii from California to prepare a proposal for Bryan's program, and Pacific Child and Family did so, Defendant never responded to that proposal;

jj.    Defendants repeatedly represented to Bryan's parents that teachers and skills trainers met all the criteria for his program, such representations were false, as they did not have ASL and DTT training;

kk.    Defendant ignored the resumes of individuals who Bryan's parents located and who met the criteria for his program;

ll.    Defendant repeatedly instructed Bryan's parents to remove him from school based on asserted illnesses or conditions that were either exaggerated, the result of behaviors that were not being addressed correctly by Defendant or caused by Defendant's refusal to give Bryan needed medication; and

mm.    Defendant repeatedly rejected Bryan's parents' request that Defendant search beyond the island of Hawaii for personnel adequately trained to implement their son's program.

The aforementioned actions deprived Bryan meaningful access to public education.

42.    Section 504 additionally, prohibits DOE from retaliating against Bryan's parents for advocating for services on Bryan's behalf.

43.    As a direct result of their advocacy for their son's special education and related services over the period from 1999 until 2005, Bryan's parents Ann Kimball Wiles and Stanley Bond have been subjected to retaliatory conduct by Defendants that has caused them economic, psychological and physical harm for which they are eligible for compensation under Section 504 of the Rehabilitation Act.

44.    Section 504's implementing regulation, 28 C.F.R. § 42.503(b)(1)(vii), authoritatively construes Section 504 of the Rehabilitation Act's prohibition of retaliation against any individual, whether handicapped or not, for the purpose of interfering with the exercise of any right secured by Section 504.

45.    Defendants retaliated against Ann Kimball Wiles and Stanley Bond in violation of Section 504 and its implementing regulation, 28 C.F.R. § 42.503(b)(1)(vii), which authoritatively construes the retaliation prohibition found in the Rehabilitation Act, causing them economic, psychological and physical harm, in response to the parents' advocacy for their son's special education and related services, with the intent of forcing the family to move to the Mainland, over the period from 1999 until 2005 including, without limitations:

a.  Refusing for a period of five years to comply with due process orders/decisions, settlement agreements and IEPs, which refusal culminated in DOE refusing to provide any of the services mandated during the Summer of 2004;

b.  Instructing persons sent to the family's home to work in Bryan's home program to obtain confidential information surreptitiously about the family—"getting the dirt"—that could be used against the family by Defendants to withdraw services from Bryan;

c.  Illicitly and unlawfully obtaining confidential e-mail written by Bryan's parents and Christy Edwards, one of Bryan's preferred and most effective skills trainers, without either party's consents;

d.  Illicitly and unlawfully obtaining confidential financial information regarding Christy Edwards in the form of her *Paypal* account and password, without her consent;

e.  Engaging in e-mail correspondence with an as-of-yet undisclosed source who was making false accusations of illegal and/or improper activity involving purchase and use of prescription medications by Christy Edwards and asserted she was being investigated by the Provost Marshall on Kwajalein;

f.  Using the confidential, illicit and false information described in subparagraphs c., d. and e. above as grounds for resisting rehiring Christy

23

Edwards, even though Defendants knew she was especially  skilled in working with Bryan;

g.      Using the confidential, illicit and false information described in subparagraphs c., d. and e. above in the United States District Court to oppose a temporary restraining order and being forced to retain Christy Edwards, without disclosing the source of the e-mail;

h.      Isolating Bryan at Kealekehe Intermediate and refusing to provide properly trained staff to work with him in the Fall of 2004, following the August 2004 TRO hearing;

i.      Forcing Bryan's parents to withdraw him from isolation at Kealakehe Intermediate by allowing him to slide around the floor and play in his own urine while in the care of two adults—a teacher and a skills trainer;

j.      Changing Bryan's education placement into an "isolation" environment at Kealakehe Intermediate without the parents' permission or procedures required by law for such isolation;

k.      Refusing to procure available and appropriate services from Mainland services providers timely and only doing so on the order of the United States District Court even though those services were known to Defendants;

l.      Refusing repeatedly to provide services to Bryan, asserting that he was "ill" when he was not, and forcing his parents to take time off work and pick him up from school on the basis of these assertions;

m.      Repeatedly employing unqualified and inexperienced skills trainers in Bryan's program, leading to high turnover, repeated gaps that his parents were forced to cover and regression in Bryan's communication and functional abilities;

n.      Falsely blaming Bryan's parents for problems maintaining the cleanliness of his living area, at a time when Bryan frequently urinated in that area, which Defendants knew was due to the regression in toileting he experienced in 2003-04 as a result of being denied appropriate services by Defendants;

o.      Accusing Bryan's parents of housing Bryan improperly in a locked room during the night, even though Defendants knew Bryan frequently would leave his room and urinate in the house or pose a risk of harm to himself or property, which was due to the regression he experienced in 2003-04 as a result of being denied appropriate services by Defendants;

p.      Falsely accusing Bryan's parents of asking skills trainers to do laundry, cooking or cleaning tasks, when Defendants knew that they were required by Bryan's program to teach Bryan how to perform these and other functional life-care skills;

q.    Forcing Bryan's parents to quit their jobs, sell their home and move their family back to the Mainland, thereby suffering economic losses; and

r.    Engaging in numerous other retaliatory, combative, accusatory and humiliating attacks on Bryan's parents and his program in a direct response to Bryan's parents' advocacy for him and his rights under Section 504 of the Rehabilitation Act and its implementing regulations.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare that Defendant DOE are liable to the Plaintiffs;

B.    Enter judgment against Defendant and in favor of Plaintiffs for an amount of money that will properly and justly recompense Plaintiffs for the losses experienced and the economic and non-economic damages caused by the Defendant's conduct herein;

C.    Enter a declaratory judgment in favor of Plaintiffs and against Defendant that Defendant has exacerbated Bryan's condition to such an extent as to make institutionalization or an assisted living setting which are the only real alternatives for Plaintiffs;

D.    Award the costs of prosecuting this case to the Plaintiffs, including but not limited to an award of attorneys' fees; and

E.    Grant Plaintiffs such other relief as may be just and proper.

26

DATED:  Honolulu, Hawaii, February 13, 2008.


/s/ Carl M. Varady
STANLEY E. LEVIN
CARL M. VARADY
MICHAEL K. LIVINGSTON


Attorneys for Plaintiffs

## <u>CONTINUED JURY DEMAND</u>

Plaintiffs hereby continue their demand for trial by jury on all issues so

triable in this matter.

DATED:  Honolulu, Hawaii, February 13, 2008.

/s/ Carl M. Varady
CARL M. VARADY
STANLEY E. LEVIN
MICHAEL K. LIVINGSTON

Attorneys for Plaintiffs

Feb-03-04  03:17pm   From-EDUCATION DIVISION              8085861488        T-414   P.72/88   F-031



## RELEASE AND SETTLEMENT AGREEMENT

THIS RELEASE AND SETTLEMENT AGREEMENT ("Agreement") is made and entered into this _1_ day of _July_ , 2002, by and between:

**RELEASORS:**   ANN KIMBALL WILES and STANLEY BOND (the "Bonds"), by and on behalf of their son, BRYAN WILES-BOND ("Bryan"), a minor

**RELEASEES:**   DEPARTMENT OF EDUCATION ("DOE"), STATE OF HAWAI'I; DEPARTMENT OF HEALTH ("DOH"), STATE OF HAWAI'I (collectively, the "State")

### I. RECITALS

A.     On or about February 27, 2001, the Bonds, on behalf of Bryan, filed a request for a due process hearing with the DOE, pursuant to Section 8-56-72, Hawai'i Administrative Rules, due to the State's alleged failure to provide all of the services to Bryan as specified in his Individualized Education Program ("IEP") and Coordinated Service Plan ("CSP").

B.     At a May 7, 2001 due process hearing, the parties presented a stipulated hearing decision (the "Stipulation") by which the State agreed to provide Bryan with the services specified in the Stipulation during the period from May 7 until October 1, 2001 (the "Stipulation Period"), with any hours of adult educational aide services that were not provided during that period to be made up beginning after October 1, 2001.

200547-1/6515-1/FINAL



DOE2123

C.    During the Stipulation Period, Bryan did not receive the full number of hours of adult educational aide services required under the Stipulation, with the parties disputing whether the State made up such hours.

D.    On or about February 15, 2002, the Bonds filed a civil case, Civil No. 02-00101 SOM/BMK, and a Motion for Preliminary Injunctive Relief against the State in the U.S. District Court for the District of Hawai'i.

E.    The Bonds alleged that the State had breached federal regulations by, among other things, failing to implement the terms of the Stipulation, failing to provide a free and appropriate public education to Bryan under the Individuals with Disabilities Education Act ("IDEA"), and violating Section 504 of the Rehabilitation Act.

F.    The parties hereto desire to enter into this Agreement in order to provide for the full and final settlement and discharge of all claims which have been made, or might be made, by reason of the claims described in the Recitals above, upon the terms and conditions set forth below.

## II. RELEASE AND AGREEMENT

WHEREAS, the parties have engaged in full and complete discussions of the issues raised by each side and the parties having reached an agreement on the disposition of this case without further court or administrative hearings, the parties agree to the following:

DOE2124

A.     The Individualized Education Program ("IEP") dated May 24, 2002, as it may hereafter be revised in accordance with Chapter 56, Hawai'i Administrative Rules, shall be implemented as follows:

    1.     Therapeutic Aide ("TA") Services

        a.     By August 1, 2002, the State shall hire, train, and have in place the TAs needed to consistently provide Bryan with not less than ninety-five percent (95%) per calendar month of the TA hours to which he is entitled.[1]

        b.     The State shall continue to provide TA services through its contract with the current service provider and/or its successor.

        c.     By August 1, 2002, the State shall procure TA services for Bryan to be provided by qualified individuals through an "expedited contract process". Under this expedited contract process, the State shall pay qualified individuals a minimum of $20.00 per hour, and may offer effective bonus/incentive payments to encourage retention of the TAs for three (3) months or longer. The State shall pay these TAs within 30 days of the TAs' submittal of properly verified time sheets to the State.

---

    [1] Under his current IEP, Bryan is entitled to 68.25 hours of TA services per week, consisting of the following:

        Seven and one-fourth (7.25) hours of in-school TA services every
            weekday;
        Four (4) hours of after-school TA services every weekday; and
        Six (6) hours of weekend TA services every Saturday and Sunday.

DOE2125

d.    To assist the State in meeting the requirements of Paragraph II.c. above, the Bonds shall be authorized to advertise for TAs in State and national newspapers and other publications, with the cost of said advertising to be paid by the State, up to a total of $1,000.00 per year. The Bonds may refer potential TAs identified through advertising or other means to the State. The State shall determine the individuals' qualifications and pay level, conduct criminal background checks, and require that the individuals undergo and pass physical examinations prior to being hired.

e.    By August 1, 2002, the State shall create a pool of substitute TAs who are qualified and trained to provide services to Bryan. This pool of substitutes shall consist of a maximum of three individuals, who shall be subject to the Bonds' reasonable approval as to these individuals' presence in the home (but not as to their qualifications). Before providing services to Bryan, each substitute TA shall have reviewed Bryan's IEP, shall be trained to implement Bryan's IEP, and shall have observed Bryan receiving TA services for a minimum of two (2) hours in school and a minimum of two (2) hours in the home. These substitute TAs shall be available to provide services to Bryan on an occasional basis when his regular TAs are unavailable.

f.    The above-described TA services shall be provided by qualified TAs who meet the standards for a Level III TA, and are trained in DTT, TEACCH, and PECs methods for autistic children.

DOE2126

Feb-03-04  03:17pm  From-EDUCATION DIVISION                     8085861488              T-414  P.76/88  F-031
By: Alston Hunt Floyd & Ing                    808 585 8085;          June 2  12  4:17 PM;

g.    The TAs shall complete Bryan's daily behavioral logs and daily log sheets showing the number and completion percentage of DTT and TEACCH trials utilized, and shall complete the DTT log for each trial. Each TA shall sign and date the entries in the daily behavioral logs and daily log sheets.

h.    Oversight and monitoring services for the TAs shall continue to be provided by the current autism consultants contracted by the State, or equally trained personnel. The State is not precluded from removing the current autism consultants and/or their successors for malfeasance, misfeasance, or nonfeasance of their duties.

i.    When school is not in session, either during the regular or extended school year, the State shall provide TA services to Bryan at his home or at another setting deemed appropriate by the IEP team, including a school classroom. The State shall provide Bryan with curb-to-curb transportation to the school or other setting.

On weekends and on State and/or national holidays, when TA services are to be provided in the home, if required by the TAs' contracting agency or the State (under Paragraphs II.A.1.c. and II.A.1.e. above), the Bonds shall be responsible for ensuring that at least one of them or another responsible adult is in the home during those times. On weekdays, other than State and/or national holidays, when TA services are to be provided in the home, if required by the TAs' contracting agency or the State (under

DOE2127

Paragraphs II.A.1.c and II.A.1.e above), the State shall be responsible for providing and paying for an additional adult to be present when either of the parents is unable to be in the home during those times; contingent upon the Bonds providing the State with at least two (2) business days' prior notice of the need for an additional adult to be in the home with Bryan and his TA. Any such individuals shall be subject to the Bonds' reasonable approval as to those individuals' presence in the home. The State shall conduct criminal background checks on these individuals, and shall pay these individuals within 30 days of the individuals' submittal of properly verified time sheets to the State.

The Bonds agree to execute an "assumption of risk" provision to permit: (1) specific TAs to be alone with Bryan in the home while providing services, if acceptable to the specific TA's contracting agency, if any; and (2) an additional adult to be present in the home with Bryan and his TA.

    2.    <u>Additional Occupational and Speech/Language Therapy.</u>

    a.    Pursuant to his IEP, Bryan currently receives two half-hour sessions per week of occupational therapy and two half-hour sessions per week of speech/language therapy.

    b.    For an eight-week period, starting as of July 15, 2002, Bryan shall receive two additional half-hour sessions per week of occupational therapy and two additional half-hour sessions per week of speech/language therapy. After this eight-week period, if deemed appropriate by Bryan's IEP

DOE2128

Feb-03-04  03:17pm    From-EDUCATION DIVISION          8085861488          T-414  P.79/88  F-031
Jul-12-02  02:09pm    From-EDUCATION DIV....N          8085861488          T-718  P.08/14  F-910

team, with input from Bryan's current autism consultants or their successors,
the additional therapy sessions shall be included in Bryan's IEP.

     3.    <u>Curb-to-Curb Transportation and Supervision of Bryan.</u>

The State shall ensure that Bryan is individually escorted from the bus
which transports him from Kealakehe Elementary to the A+ Program at
Kahakai Elementary, and shall be turned over to an A+ staff member. He shall
not be dropped off in the parking lot and/or left unattended after being
escorted to the A+ program.

     4.    <u>Respite Care.</u>

The Bonds shall be entitled to 32 hours of respite care per month,
subject to adjustment ~~through Bryan's IEP~~. <u>by the Department of Health, Developmental Disabilities Section or its successor.</u>

   B.    <u>Stipulation Regarding Need for Intensive Support and Consistent Services.</u>

The parties hereby stipulate that the Bonds currently maintain Bryan in
the home environment with intensive support and consistent services from
qualified providers. If the required level of support and services are not
provided, a higher level of placement, as determined by the IEP team, may be
necessary.

   C.    <u>Term of Agreement</u>

The parties agree that Paragraphs II.A.1.a., b., c., d., e., f., and i. of this
Agreement shall remain in effect for a period of two (2) years from the date of
this Agreement. All other provisions shall remain in effect for a period of one

DOE2129

Feb-03-04   03:17pm   From-EDUCATION DIVISION   8085861488   T-414   P.79/96   F-031
By: Alston Hunt Floyd & Ing.   808 885 8065;   Jun-27 '2   9:11 m;

(1) year from the date of this Agreement, except where an effective date is otherwise specified.

    D.   Continuing Jurisdiction of the Court/Future Disputes

       1.   The parties agree to submit to the continuing jurisdiction of the U.S. District Court for purposes of enforcing this Agreement for a period of one (1) year from the date of this Agreement.

       2.   Disputes relating to issues raised by future IEPs, if any, will be decided through the procedures of Chapter 56.

    E.   Reimbursement/Fees and Costs

The State will pay reasonable attorneys' fees and costs to the Bonds as prevailing parties. The Bonds' counsel shall provide the State with copies of invoices for legal fees and costs within ten (10) days of the execution of this Agreement, and the State shall respond within ten (10) days of receipt of said invoices. If the parties cannot resolve the amount of fees and costs to be paid, the Bonds' counsel shall file a fee application in federal court within twenty (20) days of receipt of the State's response.

    F.   Release and Dismissal

       1.   Upon execution of this Agreement, all pending proceedings and all claims asserted in Civil No. 02-00101 SOM/BMK shall be dismissed.

       2.   The Bonds will prepare and the State will execute a stipulation to dismiss with prejudice the claims and proceedings in Civil No.

DOE2130

02-00101 SOM/BMK. The stipulation shall incorporate by reference the terms of this Agreement and be subject to approval of the Court.

3.    In consideration of the provisions set forth above, the Bonds hereby completely waive, and release, and forever discharge the State from any and all past, present, or future claims or demands, obligations, actions, causes of actions, rights, damages, costs, expenses, attorneys fees, and any compensation of any nature whatsoever, arising out of the claims described in the Recitals above.

4.    It is specifically understood and agreed that the provisions set forth and recited herein are intended to compensate the Bonds for loss of income, attorneys' fees, and any element of special damages arising out of the claims described in the Recitals above.

5.    The obligations in this Agreement shall apply to the State's past, present, and future attorneys, agents, servants, representatives, employees, predecessors, and successors in interest.

6.    This Agreement, on the part of the Bonds, shall be a fully binding, and complete settlement between the Bonds, and the State, and their respective representatives, heirs, assigns, and successors as to the claims described in the Recitals above. It is understood and agreed to by the parties that this Agreement is a compromise of disputed claims, and that any payments are not to be construed as an admission of liability on the part of the State, by whom liability and obligation is expressly denied.

DOE2131

Feb-03-04 03:18pm    From-EDUCATION DIVISION                8085861488              T-414   P.81/88   F-031
By: Alston Hunt Floyd & Ing              808 885 8065;       Jun-2' '2  3:11PM;           Page 1/14

7.    The State denies liability, negligence, breach of duty, breach of any assignment, misconduct, violation of federal and state statutes and laws, and/or wrongdoing of any kind, character or nature whatsoever, and any consideration paid by the State to the Bonds is solely in compromise of disputed claims.

### III. INDEMNITY

The Bonds hereby stipulate and agree, for the foregoing consideration, to indemnify and forever hold harmless, and defend the State and its respective officers, directors, attorneys, agents, servants, representatives, employees, subsidiaries, agencies, affiliates, predecessors and successors in interest, against loss and liability from any and all claims, services, liens, judgments, costs, expenses, attorneys fees, demands or actions, claims or actions for contribution, indemnity or reimbursement (contractual or otherwise), cross-claim and third-party claims, whether such claims or actions have merit or not, that may have or may be hereafter at any time be made or brought against the State by the Bonds or by anyone acting on their behalf, or holding by or through them, against the parties herein released which may be sustained in consequences of the claims described the Recitals above.  It is understood and agreed that the Bonds are not indemnifying the State against claims arising in the future for payment of obligations created by this Agreement.

DOE2132

Feb-03-04  03:18pm   From-EDUCATION DIVISION          8085861488          T-414   P.02/08   F-031
By: Alston Hunt Floyd & Ing.         808 885 8008;

## IV. WARRANTY OF CAPACITY TO EXECUTE AGREEMENT

The Bonds represent and warrant that no other person or entity has, or has had, any interest in the claims, demands, obligations, or causes of action referred to in this Agreement, except as otherwise set forth herein; that the Bonds have the sole right and exclusive authority to execute this Agreement and receive the sums specific in it; and that the Bonds have not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Agreement.

## V. GOVERNING LAW

This Agreement shall be construed and interpreted in accordance with the laws of the State of Hawai'i.

## VI. FULL COOPERATION; ADDITIONAL DOCUMENTS

Each of the Parties agrees to cooperate fully and act in good faith by taking all necessary steps to give full force and effect to the basic terms and intent of this Agreement, including but not limited to executing any and all supplementary documents.

## VII. NO RELIANCE BY RELEASORS

The Bonds and their counsel have not relied upon any express or implied representation of the State, or any of their agents as to the tax consequences of this Agreement, and the Bonds release the State from any and all liabilities in connection with such tax consequences.

200347-1/65 15-1/FINAL

11

DOE2133

Feb-03-04  03:18pm  From-EDUCATION DIVISION            8085861488        T-414  P.63/88  F-031
By: Alston Hunt Floyd & Ing              808 685 0005;

## VIII. ENTIRE AGREEMENT AND SUCCESSORS IN INTEREST

This Agreement contains the entire agreement between the Bonds and the State with regard to the matters set forth in it and shall be binding upon, and inure to the representatives, heirs, successors and assigns of each.

## IX. EFFECTIVENESS

This Agreement shall become effective immediately following execution by each of the parties.

_____
ANN KIMBALL WILES

Date: 7/1/02

_____
STANLEY BOND

Date: July 1, 2002

"RELEASORS"

_____
DEPARTMENT OF EDUCATION,
STATE OF HAWAI'I

Date: 7/3/02

200347-1/6515-1/FINAL

12

DOE2134

DEPARTMENT OF HEALTH,
STATE OF HAWAI'I

Date: JUL 12 2002

"RELEASEES"

APPROVED AS TO FORM:

SHELBY ANNE FLOYD, ESQ.
JERILYNN ONO HALL, ESQ.
Attorneys for Releasors


EARL I. ANZAI, ESQ.
Attorney General
PAMELA A. TOGUCHI, ESQ.
Deputy Attorney General
Attorneys for Releasees

I HEREBY CERTIFY THAT THIS IS A
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN THE DEPARTMENT
OF COMMERCE & CONSUMER AFFAIRS.

DEPT. OF COMMERCE
AND CONSUMER AFFAIRS

2004 MAY 11  P 3: 35

HEARINGS OFFICE

## OFFICE OF ADMINISTRATIVE HEARINGS
## DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
## STATE OF HAWAI'I

| | |
|---|---|
| In the Matter of | DOE-2004-026 |
| BRYAN WILES-BOND, by and through his Parents, DR. and MRS. STAN BOND, | FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION |
| Petitioners, vs. | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAI'I, | |
| Respondent. | |

### FINDINGS OF FACT,
### CONCLUSIONS OF LAW AND DECISION

I.    INTRODUCTION

On February 26, 2004, the Department of Education, State of Hawai'i ("Respondent") received a request for a due process hearing under Hawaii Administrative Rules ("HAR") Title 8, Chapter 56 from Bryan Wiles-Bond, by and through his parents, Dr. and Mrs. Stan Bond (hereafter collectively referred to as "Petitioners"). A pre-hearing conference was held on March 9, 2004 and attended by Shelby Anne Floyd, Esq., attorney for Petitioners, via telephone and Lono P.V. Beamer, Esq., attorney for Respondent.

On April 5, 2004, the hearing was convened by the undersigned Hearings Officer. Dr. Stan Bond and Mrs. Bond, also known as Ann Kimball Wiles and Kim Wiles, were present and were represented by Ms. Floyd. Respondent was represented by Stella M.L. Kam, Esq.


EXHIBIT B

DOE1323

At the close of the hearing, the Hearings Officer requested that the parties file written closing arguments by April 23, 2004. By agreement of the parties, the decision deadline was extended from April 11, 2004 to May 3, 2004. On April 23, 2004, the parties requested an extension to file written closing arguments. On April 24, 2004, the Hearings Officer granted an extension of the briefing deadline from April 23, 2004 to April 28, 2004. On April 29, 2004, the Hearings Officer granted an extension of the decision deadline from May 3, 2004 to May 11, 2004.

Having reviewed and considered the evidence and arguments presented, together with the entire record of this proceeding, the Hearings Officer renders the following findings of fact, conclusions of law and decision.

## II.    FINDINGS OF FACT

1.      Bryan Wiles-Bond is 12 years old (dob 10/28/91) and severely autistic.

2.      Bryan's disability requires that he be placed in a fully self-contained special education classroom for children with autism. Bryan is moderately toilet regulated in school with accidents still occurring. Appropriate toileting skills continue to be a strong need for Bryan at home and in the community.

3.      Bryan does not speak. He communicates his needs through signs, gestures, and verbal word approximations. Bryan communicates mainly through American Sign Language ("ASL"). He uses approximately 20 signs spontaneously and has approximately 100 words in his receptive/expressive vocabulary. A person needs to know ASL and Bryan's current bank of ASL vocabulary words to communicate with him.

4.      Bryan seeks interaction with the key adults in his program. Direct adult supervision is needed for Bryan while on campus due to the severity of his disability. 1:1 adult instructional support ("skills trainer") is necessary for Bryan to progress through the objectives on his Individualized Education Program ("IEP"). Bryan's most recent IEP[1] requires that he have the services of a skills trainer at the following times:

---

[1] Bryan's most recent IEP was developed on January 9, 2004. The previous IEP is dated November 25, 2003. The only IEP Team ("Team") members who could attend that meeting were David Stanley (principal), Dayle Yokoyama (special education teacher), and Dr. and Mrs. Bond. This meeting was to be

DOE1324

a)     During the school day, Monday through Friday, for 6.5 hours (from approximately 7:30 a.m. to 2:00 p.m.);

b)     During after school hours, Monday, Tuesday, Thursday, Friday, for 4.5 hours (from approximately 2:00 p.m. to 6:30 p.m.) and Wednesday for 5.5 hours (from approximately 2:00 p.m. to 7:30 p.m.); and

c)     On Saturday and Sunday for 6 hours per day (from approximately 12:30 p.m. to 6:30 p.m.).

A total of 68 hours of skills trainer services per week.

5.     According to the January 9, 2004 IEP, among his other needs, Bryan should (1) increase his signing vocabulary and continue spontaneous use of sign language; (2) learn appropriate toileting skills in the school, home, and community settings; and (3) learn to respect the personal space and the personal property of others (boundaries).

6.     Dr. Dru Copeland, Bryan's Intensive Instructional Services Consultant ("IISC"), testified that her goal for Bryan is that he be as functional in the world as he can possibly be. This includes having some means of communication, including signing, written words and more verbal approximations, and necessary functional skills. Necessary functional skills include social skills, appropriate behaviors in public, and toileting skills. Without necessary functional skills, Bryan's life will be very narrow and confined.

7.     From October 2003 to February 2004, the Department of Education ("DOE") failed to provide Bryan with the required number of skills trainer service hours per week as required in his relevant IEPs.[2]

---

Bryan's annual IEP review. The Team decided that the November 25, 2003 IEP was complete and a new meeting would be held in the near future. The next IEP meeting was held on January 9, 2004.

[2] Bryan's November 18, 2002 IEP is also relevant because it covers the period from November 18, 2002 to November 18, 2003. The November 18, 2002 IEP required Bryan to have 30 hours of skills trainer services during the school day, 23.5 hours of skills trainer services after school, and 12 hours of skills trainer services on the weekend days for a total of 65.5 skills trainer hours per week. From October 2003 through November 2003, the DOE failed to provide Bryan with 65.5 hours of skills trainer services per week as required by his IEP.

DOE1325

8.    The six skills trainers Respondent provided to Bryan in the Fall of 2003 through February 2004 did not have prior experience working with autistic children. Five of the six skills trainers had no prior experience with ASL.

9.    Neither of the two agencies, Child and Family Services ("CFS") and The Institute for Family Enrichment ("TIFFE"), who provided skills trainers to Bryan during that period were able to locate individuals who had experience working with autistic children or who were proficient in ASL.

10.    Since Bryan's skills trainers had no experience in working with autistic children, Dr. Copeland had to train them. During the 18 months she worked with Bryan Dr. Copeland trained 12 skills trainers. Training included instruction in two basic programs[3] used to teach autistic children, managing Bryan's behavior, developing Bryan's social skills, and data collection. Dr. Copeland works with Bryan for 6 hours each week. Training his skills trainers leaves little time for her other related duties such as coordinating matters with Petitioners and working on and expanding Bryan's program.

11.    Petitioners, on their own, placed advertisements in newspapers to locate skills trainers for Bryan. Over time, Petitioners located 8 skills trainers for Bryan who were hired by Respondent.

12.    Naomi Shiraishi, Bryan's speech pathologist, communicates with Bryan through ASL. Ms. Shiraishi testified that Bryan uses ASL in single words or short phrases and needs prompting to use short phrases. The person prompting Bryan must use ASL. Bryan understands language and processes language better if a combination of verbal and visual cues (ASL) are used. Bryan's skills trainers must be proficient in ASL and use Bryan's vocabulary bank of ASL signs.

13.    Mrs. Bond testified that Bryan's teacher does not know ASL and does not use ASL to communicate with Bryan and two other children in his class who use signs as their primary mode of communication. It is frustrating for Bryan to communicate with someone who does not know ASL and he does not progress.

14.    When Bryan did not receive the number of skills trainer hours specified in his IEPs from October 2003 through February 2004, he regressed in a number of areas.

---

[3] This included the Treatment and Education of Autistic and Related Communications Handicapped Children ("TEACCH") program and Discreet Trial Training ("DTT").

4

DOE1326

15.     One significant area of regression involved toileting skills. Petitioners testified that Bryan does better with toileting when his skills trainer services are in place. With more people around, Bryan can be monitored frequently and will use ASL to express his need to use the toilet. When services were not in place, Petitioners noticed an increase in toileting problems. Bryan started doing things he hadn't done for several months to a year and a half. This included urinating on the sofa, developing a self-stimulating pattern of drinking and urinating, and a preference for urinating outdoors, instead of in the toilet.

16.     A second significant area of regression involved learning to behave independently and respecting the personal space and personal property of others (boundaries). Bryan has no concept of respecting the personal space or the personal property of others. Skills trainers are required to monitor Bryan's behavior and provide consistent feedback to him regarding his actions and behaviors in these areas. For example, each door in Petitioners' house has a lock on it. Without locks Bryan might engage in activities that would jeopardize his safety or cause damage to property. Bryan must be taught what is and is not acceptable behavior. The goal is to have Bryan learn appropriate behavior and eventually remove the locks from all of Petitioners' doors. Petitioners testified that before the gap in service, Bryan could remain in the downstairs room alone for an hour without any boundary problems. At that point, Petitioners were almost ready to remove the lock from the downstairs room. As a result of the gap in service, Bryan must now relearn appropriate boundary behaviors.

17.     Bryan must learn appropriate boundary behaviors in order to function at school and in the community. Petitioners testified to two incidents where Bryan acted inappropriately in the community. In the first incident, he took a man's sunglasses while he was at the beach. In the second incident, Bryan went back to his old habits of randomly pulling items off of shelves, touching people in the grocery store and taking items out of their carts. Bryan had not acted this way for quite a while. Before the gap in service, Bryan could go to the grocery store and act appropriately.

18.     In the Fall of 2003 through February 2004, Respondent attempted to locate skills trainers for Bryan through CFS and TIFFE. Respondent, however, was unable to

5

DOE1327

provide Bryan with the number of skills trainer hours required by his January 9, 2004 IEP until March 2004.

## III.    CONCLUSIONS OF LAW

It is not disputed that Bryan is a student with a disability and entitled to special education services pursuant to HAR Title 8, Chapter 56. There is also no dispute that he is entitled to 65.5 hours of skills trainer services per week according to his November 18, 2002 IEP and 68 hours of skills trainer services per week according to his November 25, 2003 and January 9, 2004 IEPs. Petitioners' February 26, 2004 request for impartial hearing raises the following issues with regard to Bryan's services from October 2003 through February 2004:

1) The DOE's repeated failure to provide the services required by Bryan's IEP;

2) The DOE's failure to ensure that trained skills trainers are hired and available to provide services for children like Bryan;

3) The DOE's failure to provide skills trainers who can communicate with Bryan, who communicates with American Sign Language;

4) The DOE's failure to comply with the Settlement Agreement;[4]

5) The DOE's failure to provide Bryan's parents with prompt and complete information about complaints which the DOE now states prevented it from providing skills trainers;[5] and

6) The DOE's failure to promptly address Bryan's needs for additional expertise to provide effective toilet training, after acknowledging the need in October 2003. Hawaii Administrative Regulations [sic] provide that if "the IEP team determines that a student needs a particular device or

_____

[4] The settlement agreement contained in Petitioners' Exhibit "P4" does not specifically relate to the issues raised in Petitioners' February 26, 2004 request for hearing. Therefore, the Hearings Officer does not have jurisdiction and will not rule on this matter.

[5] There was insufficient evidence for the Hearings Officer to determine whether the DOE failed to provide Bryan's parents with prompt complete information about complaints which the DOE now states prevented it from providing skills trainers.

6

DOE1328

service (including an intervention, accommodation, or other program modification) in order for this student to receive a free appropriate public education, the IEP team shall include a statement to that effect in the student's IEP."[6]

Based on the evidence presented at the hearing, the Hearings Officer concludes that Petitioners proved by a preponderance of the evidence that from October 2003 through February 2004 1) The DOE repeatedly failed to provide the skills trainer services required by Bryan's November 18, 2002, November 25, 2003, and January 9, 2004 IEPs; 2) The DOE failed to ensure that trained skills trainers were hired and available to provide services to Bryan; and 3) The DOE failed to provide skills trainers who could communicate with Bryan using ASL.

From October 2003 to November 18, 2003 Bryan's IEP required that he receive 65.5 hours of skills trainer services per week. From November 25, 2003 to January 9, 2005, Bryan's IEPs require that he receive 68 hours of skills trainer services per week. Neither party disputes the number of skills trainer service hours Bryan should have received during October 2003 through February 2004. Nor is it disputed that Bryan failed to receive the number of skills trainer service hours specified by his IEPS. Respondent's failure to provide Bryan with the number of skills trainer service hours specified in his November 18, 2002, November 25, 2003, and January 4, 2004 IEPs is a denial of FAPE.

Respondent agreed to provide skills trainers for Bryan who had experience working with autistic children. Respondent worked with CFS and TIFFE to provide skills trainers to Bryan. CFS provided one skills trainer to Bryan from Fall 2003 to January 2004. TIFFE provided one skills trainer for Bryan during this time and was not able to provide any others. Neither the CFS nor TIFFE skills trainers had experience in working with autistic children. Respondent's failure to hire trained skills trainers to work with Bryan during October 2003 through February 2004 for Bryan is a denial of FAPE.

Respondent failed to provide Bryan with skills trainers who could communicate with him using ASL. Bryan's January 9, 2004 IEP specifically states that skills trainers

---

[6] During the hearing Ms. Floyd stated that Petitioners did not intend to introduce evidence relating to the toilet training issue and requested a decision on the other stated issues. Ms. Floyd did, however, present evidence on the need for a night time toilet monitor for Bryan as part of Petitioners' request for compensatory relief.

DOE1329

are necessary for Bryan to progress through the objectives of his IEP and his 1:1 instructional support need to know and respond to Bryan's ASL vocabulary. During October 2003 through February 2004, Bryan had six skills trainers. Of those six skills trainers, five did not know ASL.[7] Dr. Copeland testified that when she first worked with Bryan he knew 6 signs. Now Bryan knows 140 signs and any person working with him must already know ASL or be able to jump in, learn Bryan's 140 signs and become proficient in ASL. According to Dr. Copeland, the skills trainers know the 140 signs, but don't always use them with Bryan. If Bryan's skills trainers are not proficient in ASL, they cannot work with him on the goals and objectives of his IEP and his learning opportunities will be severely curtailed. Respondent submitted no evidence to the contrary. Respondent's failure to provide Bryan with skills trainers who can communicate with Bryan using ASL during October 2003 through February 2004 is a denial of FAPE.

Having determined that Petitioners have been denied FAPE, the Hearings Officer must now consider whether Bryan is entitled to compensatory education. A court may "grant such relief as [it] determines is appropriate" and "Equitable considerations are relevant in fashioning relief". *School Comm. of Burlington v. Department of Education, 471 U.S. 359 (1985)*. The testimony of Dr. Copeland and Petitioners was very compelling. During the five month gap in services Bryan seriously regressed in the areas of toileting skills and respecting the personal space and personal property of others (boundaries). In addition to being part of his IEP, these are basic skills Bryan needs to function in school, at home, and in the community. Except for "Rae", Bryan's skills trainers are not proficient in ASL and do not consistently use his 140 signs to communicate with him. Although trained by Dr. Copeland, Bryan's skills trainers had no prior experience working with autistic children. Respondent provided no evidence to the contrary.

The Hearings Officer finds that Bryan's November 18, 2002, November 25, 2003, and January 9, 2004 IEPs were reasonably calculated to enable Bryan to receive educational benefit. Respondent's failures to provide Bryan with 1) the required number of skills trainer service hours as specified in his IEPs, 2) trained skills trainers capable of

---

[7] "Rae", the only skills trainer proficient in ASL, was hired in January 2004.

8

DOE1330

providing services to Bryan, and 3) skills trainers who can communicate with Bryan using ASL, resulted in a loss of educational benefit to Bryan. As such, Bryan is entitled to the following relief:

1)    Respondent shall hire, train, and have in place the skills trainers needed to consistently provide Bryan with not less than 95% per calendar months of the skills trainer hours to which he is entitled to in his IEP. If Respondent fails to provide Bryan with qualified skills trainers, Petitioners shall be authorized to hire directly at Respondent's expense. Any skills trainer hired by Petitioners shall meet DOE standards and shall be trained in a) DTT and TEACCH methods and b) ASL, to sufficiently implement Bryan's IEP program as determined by Bryan's IISC;

2)    Skills trainers hired by Respondent for Bryan shall meet DOE standards and shall be trained in a) DTT and TEACCH methods and b) ASL, to sufficiently implement Bryan's IEP program as determined by Bryan's IISC;

3)    Bryan's IISC shall be given an extra allotment of hours to train new skills trainers who do not meet the requirements set forth in numbers 1) and 2) above. The number of additional hours shall be determined by Bryan's IEP team; and

4)    Respondent will provide additional hours of service from a knowledgeable consultant to design, implement, and monitor a toileting program for Bryan. The number of additional hours shall be determined by Bryan's IEP team.

## IV.    DECISION

For the reasons stated above, the Hearings Officer finds that Petitioners proved by a preponderance of the evidence that from October 2003 through February 2004 1) The DOE repeatedly failed to provide the skills trainer services required by Bryan's

9

November 18, 2002, November 25, 2003, and January 9, 2004 IEPs; 2) The DOE failed to ensure that trained skills trainers were hired and available to provide services to Bryan; and 3) The DOE failed to provide skills trainers who could communicate with Bryan using ASL. As a result, Bryan was denied FAPE.

Based upon the foregoing, IT IS HEREBY ORDERED:

1.      Respondent shall hire, train, and have in place the skills trainers needed to consistently provide Bryan with not less than 95% per calendar months of the skills trainer hours to which he is entitled to in his IEP.  If Respondent fails to provide Bryan with qualified skills trainers, Petitioners shall be authorized to hire directly at Respondent's Expense.  Any skills trainer hired by Petitioners shall meet DOE standards and shall be trained in a) DTT and TEACCH methods and b) ASL, to sufficiently implement Bryan's IEP program as determined by Bryan's IISC;

2.      Skills trainers hired by Respondent for Bryan shall meet DOE standards and shall be trained in a) DTT and TEACCH and b) ASL, to sufficiently implement Bryan's IEP program as determined by Bryan's IISC;

3.      Bryan's IISC shall be given an extra allotment of hours to train new skills trainers who do not meet the requirements set forth in numbers 1) and 2) above.  The number of additional hours shall be determined by Bryan's IEP team; and

4.      Respondent will provide additional hours of service from a knowledgeable consultant to design, implement, and monitor a toileting program for Bryan.  The number of additional hours shall be determined by Bryan's IEP team.

## RIGHT TO APPEAL

The parties to this case have the right to appeal this decision to a court of competent jurisdiction.  The appeal must be made within thirty (30) days after receipt of this decision.

DATED: Honolulu, Hawaii, _____ May 11, 2004

HAUNANI H. ALM
Administrative Hearings Officer
Department of Commerce
and Consumer Affairs

DOE1332

Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

SHELBY ANNE FLOYD
65-1230 Mamalahoa Hwy, C21
Kamuela, Hawai'i 96743
Telephone: (808) 885-6762
Fax: (808) 885-8065
E-mail: sfloyd@ahfi.com

Attorneys for Petitioners

DEPT. OF COMMERCE
AND CONSUMER AFFAIRS

2004 JUL 23 P 2: 01

HEARINGS OFFICE

OFFICE OF ADMINISTRATIVE HEARINGS
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
STATE OF HAWAI'I

In the Matter of

BRYAN WILES-BOND,
by and through his parent,
Dr. Stan Bond,

   Petitioner,

   v.

DEPARTMENT OF EDUCATION,
STATE OF HAWAI'I,

   Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DOE - 2004-070

STIPULATED PARTIAL DECISION
AND ORDER

## STIPULATED PARTIAL DECISION AND ORDER

Whereas, on June 2, 2004, the Department of Education, State of

Hawai'i ("Respondent") received a request for a due process hearing under

Hawai'i Administrative Rules ('HAR') Title 8, Chapter 56 from Bryan Wiles-

Bond, by and through his father, Dr. Stanley Bond ("Petitioner").

261341-1/6515-2

1


EXHIBIT C

Whereas, on June 25, 2004, by telephone conference with the Hearings Officer Haunani H. Alm, the Respondent, represented by Lono K. Beamer, Esq., stipulated to the facts alleged in the Request and to Respondent's liability under the law,

Whereas, a hearing on relief was scheduled on July 6, 2004 before Hearings Officer Alm, and

Whereas, the parties have partially agreed to the relief to be ordered by the Hearing Officer, and have submitted one issue of relief to the Hearing Officer after submission of testimony,

NOW IT IS THEREFORE STIPULATED as follows:

1.  Respondent shall cause to be prepared for Bryan a written structured social skills curriculum for implementation beginning no later than the end of the first week of the 2004-2005 school year.

2.  Respondent shall hire and have in place by the beginning of the 2004-2005 school year a licensed, certified special education teacher with experience teaching autistic children and proficiency with American Sign Language.

3.  Respondent shall cause a functional behavioral assessment to be completed for Bryan and delivered to his parents no later than August 7, 2004.

261341-1/6515-2                              2

IT IS FURTHER STIPULATED that the Hearing Officer shall render a decision on the relief requested concerning Bryan's entitlement to a licensed and certified special education teacher for the provision of special education outside the standard academic school year.

DATED this 21st day of July, 2004.

_____
Lono A. Beamer, Esq.
Deputy Attorney General
Counsel for Respondent

_____
Shelby Anne Floyd, Esq.
Counsel for Petitioner


APPROVED AND SO ORDERED:

_____
HAUNANI H. ALM
Administrative Hearings Officer
Department of Commerce
  and Consumer Affairs


261341-1/6515-2                    3



DEPT. OF COMMERCE
AND CONSUMER AFFAIRS

2004 JUL 23 P 3: 44

HEARINGS OFFICE

OFFICE OF ADMINISTRATIVE HEARINGS
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
STATE OF HAWAI'I

In the Matter of

BRYAN WILES-BOND, by and through his
Father, DR. STANLEY BOND,

               Petitioners,

    vs.

DEPARTMENT OF EDUCATION,
STATE OF HAWAI'I,

               Respondent.

DOE-2004-070

LEGEND; FINDINGS OF FACT,
CONCLUSIONS OF LAW AND
DECISION

## LEGEND

**Bryan Wiles-Bond** = "Student"

**Dr. Stanley Bond** = "Father"

**Ann Kimbell Wiles** = "Mother"

**Kealakehe Intermediate School** = "Home School"

I HEREBY CERTIFY THAT THIS IS A
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN THE DEPARTMENT
OF COMMERCE & CONSUMER AFFAIRS.

EXHIBIT D



OFFICE OF ADMINISTRATIVE HEARINGS
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
STATE OF HAWAI'I

| | |
|---|---|
| In the Matter of | DOE-2004-070 |
| STUDENT, by and through his FATHER, | FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION |
| Petitioners, | |
| vs. | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAI'I, | |
| Respondent. | |

## FINDINGS OF FACT,
## CONCLUSIONS OF LAW AND DECISION

## I.    CHRONOLOGY OF CASE

On June 13, 2004, Shelby Anne Floyd, Esq., filed a Request for Impartial Hearing on behalf of Father and Student (collectively "Petitioners").

Petitioners' request for a due process hearing was duly transmitted by the Department of Education, State of Hawai'i ("Respondent") to the Office of Administrative Hearings, Department of Commerce and Consumer Affairs.

On June 21, 2004, the pre-hearing conference in the above-captioned matter was conducted by the undersigned Hearings Officer.  Shelby Anne Floyd, Esq., appeared via telephone on behalf of Petitioners, and Lono P.V. Beamer, Esq., appeared on behalf of Respondent.  The parties agreed to the scheduled hearing date of June 25, 2004.

On June 24, 2004, via telephone conference, the parties stipulated to the facts alleged in Petitioners' Request for Impartial Hearing and to liability under the law.  The parties requested that the hearing be rescheduled from June 25, 2004 to July 6, 2004.

On July 6, 2004, the hearing in the above-captioned matter was convened by the undersigned Hearings Officer. Petitioners were present and represented by their attorney, Shelby Anne Floyd, Esq. Mother was also present on behalf of Petitioners. Respondent was represented by its attorney Lono P.V. Beamer, Esq.

At the hearing, the parties partially stipulated to relief and only presented evidence on the narrow issue of whether Respondent was required to provide a qualified special education teacher to implement Student's Extended School Year ("ESY") program.[1] At the close of the hearing, the parties agreed to brief the single issue that was presented at the hearing. Briefs were due on July 8, 2004. The Hearings Officer also requested that the prevailing party draft proposed findings of fact and conclusions of law. Respondent's brief was received on July 8, 2004. Petitioners' brief was received on July 9, 2004. On July 14, 2004, the Hearings Officer informed counsel that Petitioners were the prevailing party. Petitioners' proposed findings of fact and conclusions of law were received on July 20, 2004. The decision in this matter is due on July 26, 2004.

## II.    FINDINGS OF FACT

1.    Student is 12 years old (DOB 10/28/91) and attends the Home School.

2.    Student has previously been qualified as a student with a disability under the category of autism.

3.    Student's primary means of communication is through signs, specifically American Sign Language ("ASL").

4.    Student's Individualized Education Program ("IEP") requires that he receive special education services every day of the year except on five holidays: Thanksgiving, Christmas, New Year's Day, Easter, and the Fourth of July.

5.    Student's IEP provides that he is to receive approximately seventy hours of services a week, in school, at home, and in the community.

6.    Respondent provides Student with four weeks of ESY special education in a classroom under the supervision of a teacher ("summer school"). During the rest of the ESY period, there is no trained, certified, and/or qualified teacher who provides special education to Student.

---

[1] A Stipulated Partial Decision and Order has been entered.

- 3 -

7.    The teacher hired for 2004 summer school session is not a qualified special education teacher, has no experience teaching autistic children, and does not know ASL.

8.    Student's IEP makes no distinction between the special education to be provided to Student during the four week summer school period, the remaining ESY periods, or the regular academic year.

9.    The proper delivery of Student's program requires the coordination of special education and related services under the supervision of a special education teacher who is trained and qualified to deliver services to an autistic child and is proficient in ASL.

## III.    CONCLUSIONS OF LAW

It is not disputed that Student is a student with a disability and entitled to special education and related services pursuant to HAR Title 8, Chapter 56. The parties also do not dispute that Student is entitled to an ESY program, consisting of special education, for three hundred and sixty days a year. Therefore, the issue to be determined is whether Respondent made a free appropriate public education ("FAPE") available to Student.

34 C.F.R. Sec. 300.309 states:

**Extended school year services.**

(a)    General.

(1)    Each public agency shall ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.

(2)    Extended school year services must be provided only if a child's IEP team determines, on an individual basis, in accordance with Secs. 300.340-300.350, that the services are necessary for the provision of FAPE to the child.

(3)    In implementing the requirements of this section, a public agency may not —

(i) Limit extended school year services to particular categories of disabilities; or

(ii) Unilaterally limit the type, amount, or duration of these services.

- 4 -

(b) Definition.

As used in this section, the term extended school year services means special education and related services that —

(1) Are provided to a child with a disability —

　(i)　Beyond the normal school year of the public agency;  In accordance with the child's IEP; and

　(ii)　At no cost to the parents of the child; and

(2) Meet the standards of the SEA.

Hawai'i Administrative Rules ("HAR") §8-56-6 states in relevant part:

"Special education" means specially designed instruction, at no cost to the parents, to meet the unique needs of a student with a disability.  Specially designed instruction means adapting, as appropriate to the needs of a student with a disability, the content, methodology, or delivery of the instruction to address the unique needs of the student that result from the student's disability[;] and

"Special education teacher" means a person assigned by the department who is qualified under state standards to provide the specially designed instruction that meets the definition of special education in this section.

Based upon the stipulations entered into by Respondent, the evidence presented, and the applicable rules and regulations, the Hearings Officer finds that Petitioners proved by a preponderance of the evidence that the delivery of Student's special education program during all portions of ESY is required to be under the supervision of a qualified special education teacher who has experience teaching autistic children, and who is proficient in ASL. As such, Student was denied a FAPE.

Having determined that Student has been denied a FAPE, the court may "grant such relief as [it] determines is appropriate." *School Comm. of Burlington v. Department of Education 471 U.S. 359 (1985)*. Respondent's failure to provide Student with a qualified

- 5 -

special education teacher who has experience teaching autistic children and is proficient in ASL during the ESY period, results in a loss of educational benefit to Student. Therefore, Respondent shall immediately hire a qualified special education teacher with experience in teaching autistic children and who is proficient in ASL, and can deliver the special education services specified in Student's IEP during ESY periods.

## IV.  DECISION

IT IS HEREBY ORDERED that Respondent shall hire and have in place, a qualified special education teacher with experience in teaching autistic children and who is proficient in ASL to provide special education and coordination of services to Student during ESY periods.

## V.  RIGHT TO APPEAL

The parties have the right to appeal to a court of competent jurisdiction within thirty (30) days of receipt of this Decision.

DATED: Honolulu, Hawai`i,_____July 23, 2004_____.

HAUNANI H. ALM
Administrative Hearings Officer
Department of Commerce
  and Consumer Affairs

- 6 -