395367.7

**MARK J. BENNETT**    #2672-0
Attorney General, State of Hawaii
**GARY K.H. KAM**      #4391-0
**GEORGE S. S. HOM**   #2487-0
**HOLLY T. M. SHIKADA** #4017-0
Deputy Attorneys General
Department of the Attorney
 General, State of Hawaii
235 S. Beretania Street, Suite 304
Honolulu, Hawaii 96813
Telephone No. (808)586-1255
Facsimile No. (808)586-1488
E-Mail: Gary.K.Kam@hawaii.gov

WATANABE ING LLP
A Limited Liability Law Partnership
**MELVYN M. MIYAGI**   #1624-0
**GREGG M. USHIRODA**  #5868-0
**LEIGHTON M. HARA**   #7826-0
**ROSS T. SHINYAMA**   #8830-0
First Hawaiian Center
999 Bishop Street, 23rd Floor
Honolulu, Hawaii  96813
Telephone No. (808) 544-8300
Facsimile No. (808) 544-8399
E-Mail: gushiroda@wik.com

Attorneys for Defendant
DEPARTMENT OF EDUCATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor,<br><br>                Plaintiffs,<br><br>        vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawaii,<br><br>                Defendant.<br>_____ | CIVIL NO. CV 04-00442 ACK/BMK<br>CIVIL NO. CV 05-00247 ACK/BMK<br>CONSOLIDATED<br>(Other Civil Action)<br><br>**DEFENDANT DEPARTMENT OF EDUCATION'S TRIAL BRIEF; CERTIFICATE OF SERVICE**<br><br>**TRIAL: September 9, 2008**<br>**JUDGE: Hon. Alan C. Kay** |

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . 2

     A.   The DOE acted in good faith and went to great lengths
          to provide Bryan with "meaningful access." . . . . . 3

     B.   There were significant challenges facing the DOE . . 9

          1.   Limited amount of available skills
               trainers located in or willing to relocate to
               Kona, Hawaii . . . . . . . . . . . . . . . . 10

          2.   Numerous skills trainers asked to be removed from
               Bryan's case . . . . . . . . . . . . . . . . 11

          3.   Parent Plaintiffs' uncooperative attitude and
               unreasonable behavior . . . . . . . . . . . 13

     C.   Despite the significant challenges it faced, the DOE
          still provided Bryan with a significant amount of the
          skills trainer services he was entitled to . . . . 14

III. PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . 15

     A.   December 19, 2006 Court Order . . . . . . . . . . 15

     B.   November 13, 2007 Court Order . . . . . . . . . . 17

     C.   April 29, 2008 Court Order . . . . . . . . . . . 18

IV.  PLAINTIFFS' REMAINING CLAIMS AGAINST DEFENDANTS . . . . 19

     A.   Section 504 . . . . . . . . . . . . . . . . . . . 19

          1.   Section 504 is an anti-discrimination
               statute . . . . . . . . . . . . . . . . . . 19

          2.   Section 504 requires disabled individuals be
               provided "meaningful access" to a federally
               funded benefit available to non-disabled
               individuals . . . . . . . . . . . . . . . . 20

3.   The federally funded program or benefit at issue here is a regular public education . . . . . . 26

4.   Section 504 does not prescribe the content of a program . . . . . . . . . . . . . . . . 27

5.   IDEA, and any denial of an IDEA FAPE, is irrelevant to whether "meaningful access" was denied under Section 504 . . . . . . . . . . 28

6.   Compensatory damages under Section 504 carries an extraordinarily high burden . . . . . . . . 30

B.   Section 504 Retaliation Claim . . . . . . . . . . 35

1.   Alleged improper action must be taken "because of" retaliation . . . . . . . . . . . . . . . 36

2.   A Section 504 retaliation claim for money damages requires proof of deliberate indifference . . . . . . . . . . . . . . . . 39

C.   Section 504 Damages . . . . . . . . . . . . . . 41

1.   Punitive damages are not recoverable for violation of Section 504 . . . . . . . . . . . . . . . 41

2.   Parent Plaintiffs are not entitled to damages for their own personal injuries allegedly arising from the DOE's alleged intentional discrimination against Bryan . . . . . . . . . . . . . . . 41

## DEFENDANT DEPARTMENT OF EDUCATION'S TRIAL BRIEF

COMES NOW Defendant DEPARTMENT OF EDUCATION ("DOE"), by and through its counsel, WATANABE ING LLP, and hereby respectfully submits its Trial Brief in the above-captioned matter.

## I.     INTRODUCTION

On February 13, 2008, Plaintiffs ANN KIMBALL-WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor (collectively "Plaintiffs") filed their Second Amended Complaint.  Plaintiffs allege that the DOE violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") by denying Bryan Wiles-Bond ("Bryan")[1] "meaningful access" solely on the basis of his disability by failing to provide Bryan "reasonable accommodations."  Plaintiffs further allege that the DOE violated Section 504 by retaliating against Plaintiffs Ann Kimball-Wiles and Stanley Bond (collectively "Parent Plaintiffs") by, inter alia, intentionally denying Bryan "meaningful access" to a regular public school education.  Parent Plaintiffs claim that they were retaliated against because they advocated for Bryan's special education needs.

---

[1]     Bryan is a severely autistic child who was diagnosed with autism spectrum disorder at age 2.  In 1999, Bryan and his family moved from Maryland to the Big Island of Hawaii.  From 1999 until January 2005, when Plaintiffs moved to California, Bryan was enrolled in the Hawaii public school system.

The DOE denies Plaintiffs' allegations of wrongdoing. Plaintiffs present no evidence, short of their own hyperbole and supposition, to support their allegations of denial of "meaningful access," intentional discrimination/deliberate indifference, and/or retaliation.  The facts of the case, as set forth _infra_, invariably show that the DOE acted in good faith and went to great lengths to provide Bryan with "meaningful access" to a regular public school education.

## II.  **FACTUAL BACKGROUND**

Despite the significant challenges facing the DOE, and despite the contentions of Plaintiffs, the DOE did provide Bryan with "meaningful access" to a regular public school education. Indeed, the DOE, in a good faith effort to provide Bryan with "meaningful access," expended hundreds and thousands of dollars on Bryan; placed Bryan with numerous approved skills trainers that provided one-on-one instruction; ran numerous advertisements to further recruit skills trainers; held multiple hours of training sessions in Discrete Trial Training ("DTT"), Treatment and Education of Autistic and related Communication Handicapped Children ("TEACCH"), Picture Exchange Communication System ("PECS"), and American Sign Language ("ASL"); entered into contract negotiations with a mainland provider agency to provide services for Bryan; and worked extensively with outside provider agencies in a concerted effort to provide for Bryan's specific

needs.  Clearly, these efforts go above and beyond merely making "reasonable accommodations."

Further, to the extent that the educational and related services to which Bryan was entitled to under the IDEA are "reasonable accommodations," which the DOE contends is not the case, any alleged failure to provide such services was not a result of "deliberate indifference," but rather was solely and directly attributable to the significant challenges facing the DOE, e.g. lack of available skills trainers in or willing to relocate to Kona, Hawaii skills trainers asking to be removed from Bryan's case; and Plaintiffs' unreasonable refusal of certain skills trainers.  In reality, the DOE, at all times, acted in good faith in providing Bryan with "meaningful access" to a regular public school education.

**A.    The DOE acted in good faith and went to great lengths to provide Bryan with "meaningful access."**

Evidence of the DOE acting in good faith and going to great lengths to provide Bryan with "meaningful access" include, but are not limited to, the following:

- While Bryan was enrolled in Hawaii's public school system, the DOE expended $333,087.09 on Bryan. Moreover, in addition to the amount expended by the DOE, the State of Hawaii, through the Department of Health, also spent $167,562.36 on Bryan.

- In an effort to recruit qualified skills trainers for Bryan, the DOE advertised in newspapers with local and statewide distribution; posted signs on numerous bulletin boards throughout the Kona and Waimea communities; posted job listings at various conventions; left business cards at various conventions; passed out business cards at various workshops; placed advertisements on provider agency websites; and provided funding to Plaintiffs to do their own, independent advertising. See December 2006 Order at 52.

- The DOE ran advertisements and flyers specifically offering part-time, on-call shift positions in hopes of forming a substitute pool of skills trainers to work with several special needs students, including Bryan.

- The DOE expended approximately $3,668.79 in advertising to recruit personnel to provide Bryan skills trainers.

- In 2004, the DOE ran an advertisement in the Honolulu Advertiser seeking applications for skills trainer positions. The advertisement resulted in seven prospects for the position. The names and resumes of these prospects were given to Plaintiffs. Plaintiffs instead hired Christy Edwards ("Ms. Edwards"), who lived with Plaintiffs, despite the fact that all seven prospects had far more experience than Ms.

Edwards.[2]  <u>See</u> Declaration of Judith Anne Radwick
dated March 10, 2006 at p. 2, ¶ 3-6.

- The DOE hired Ms. Edwards at the pay level of
  $40/hour despite the fact that she was not
  qualified under the DOE's pay scale to receive
  such a high hourly wage.

- In a concerted effort to recruit qualified skills
  trainers, the DOE worked extensively with the
  following outside provider agencies: (1) Child and
  Family Services ("CFS"); Hawaii Behavioral Health
  ("HBH"); and The Institute For Family Enrichment
  ("TIFFE").

- CFS placed ads on its website, as well as in
  newspapers.  On one occasion, CFS sent four (4)
  skills trainers to interview with Plaintiffs: Bill
  Beljean, Jamie Straley, Duncan Galland, and
  Heather Schwob.  Beljean was approved. Straley was
  also approved, however, she was expected to work
  in Plaintiffs' home without a parent present.
  Galland and Schwob were not approved.

- Between April 2003 and January 2004, TIFFE sent
  three (3) potential skills trainers to interview
  with the parents.  Mark Weaver was deemed too
  religious.  A prospective skills trainer named

---

[2]    Ms. Edwards had a bachelor's degree in an unrelated
field (anthropology) and had no autism or ASL training.  <u>See</u>
Declaration of Judith Anne Radwick dated March 10, 2006 at 2, ¶
6.

John was deemed unsuitable by Plaintiffs despite
the fact that he was a substitute teacher with a
masters in business and health.  A Special
Education ("SPED") teacher that was sent to
interview was approved by the parents, however she
had an impending marriage and thus was planning to
be away during the summer of 2004.

- The DOE continuously trained skills trainers in
  Discrete Trial Training ("DTT"), Treatment and
  Education of Autistic and related Communication
  Handicapped Children ("TEACCH"); and ASL to help
  build capacity.

- ASL sessions began in August 2004 and were
  conducted by trained ASL instructors (Jennifer
  Olsen, Jeannie Kutsunai, and Winona Elarionoff).
  Indeed, in 2004, the DOE spent approximately
  $4,437.36 for one hundred fifty-five (155) hours
  of ASL training.

- The DOE hired Jennifer Harris ("Ms. Harris"), a
  certified Columbus SPED teacher that was very
  familiar with DTT and TEACCH, as Bryan's SPED
  teacher at Kealekehe Intermediate School for the
  2004-2005 school year.  Ms. Harris was extremely
  qualified.  Her qualifications included: nine (9)
  years of teaching SPED (as of 9/14/04), in which
  she had worked with many autistic children; a
  teacher at Pahoa Elementary for three years in
  which she worked with autistic children in
  preschool, 5th, and 6th grades; and she attended

autism workshops given by Bert Bibilone.[3]  Ms.
Harris also took weekly sign language classes to
increase her ASL vocabulary.

- Ms. Harris also worked with Dru Copeland, Ph.D.
  ("Dr. Copeland"), the Intensive Instructional
  Services Consultant ("IISC") from September 2002
  to January 2005, to create and implement written
  curricula for Bryan concerning social skills,
  signing, math, and reading.  In fact, Ms. Harris
  continued to create materials for Bryan even after
  Bryan was pulled from school by Plaintiffs.

- The DOE contracted with Mahea Edwards of TIFFE to
  design a program to meet Bryan's needs.  Ms.
  Edwards also was contracted to prepare classroom
  materials for Bryan's substitute teacher, Bill
  Brown ("Mr. Brown"), to use.  Ms. Edwards also
  provided consultation and worked with Mr. Brown
  concerning Bryan's case.

- When Plaintiffs complained to Ms. Hill that Mr.
  Brown was not a certified teacher,[4] the DOE
  offered to bus Bryan to Waimea Middle School where
  a certified SPED teacher with autism and ASL
  background was located.  Plaintiffs, however,
  rejected the offer.

---

[3]     Mr. Bibilone is a Autism Consulting Teacher for the
DOE.

[4]     Bill Brown is a certified substitute teacher.  No
special certification is required to substitute teach SPED.  As a
result, Plaintiffs' allegations are baseless.

- The DOE, through CFS, contracted with Kimberly Smalley ("Ms. Smalley"), a behavioral analyst, to design a toileting program for Bryan. Her contract was for ten (10) hours, which included two (2) trips of four (4) hours each to train skills trainers working with Bryan. Ms. Smalley completed her toileting plan for Bryan, which included provisions for school and home settings, on August 4, 2004. On August 25, 2004, Ms. Smalley reviewed her toileting plan with Bryan's IEP team. By August of 2004, this toileting plan was being implemented by Bryan's skills trainers and being monitored by Ms. Harris and Dr. Copeland. Per JoAnn Hill ("Ms. Hill"), who was the temporary District Education Specialist ("DES") for the West Hawaii school district from May 2004 to October 2004, the toileting plan developed by Ms. Smalley was being implemented in school.

    Subsequently, Bryan's skills trainers again reviewed this toileting plan with Kate Tolentino ("Ms. Tolentino"), the DES from late September 2004 to January 2005. According to Ms. Tolentino, the toileting plan was being implemented to the best of the skills trainers' ability. While their implementation was not perfect, they were doing their best.

- The DOE also went far beyond its legal obligations by entering into contract negotiations with Pacific Child and Family Associates ("PCFA"), a mainland company with expertise in servicing

autistic children.  As part of the contract
negotiations, the DOE paid $6,112.50 for two PCFA
employees to fly to Hawaii to assess Bryan and the
Plaintiffs.  On November 5, 2004, PCFA sent the
DOE its revised proposal to service Bryan.  The
DOE was ready, willing, and able to pay PCFA
$191,670.00 per year to provide Bryan with a
structured autism program.  However, upon being
informed of this contract, Plaintiffs curiously
balked at the idea and in January of 2005 moved to
California.

It cannot reasonably be doubted that the DOE acted in good faith
and went to great lengths to provide Bryan with "meaningful
access."

B.    **There were significant challenges facing the DOE.**

While the DOE provided Bryan with "meaningful access"
to a regular public school education, it did face significant
challenges in fulfilling its legal requirements.  The significant
challenges facing the DOE were as follows: (1) the inescapable
reality facing the DOE of a limited number of available skills
trainers located in, or willing to re-locate to, Kona, Hawaii, a
rural area with a high cost of living; (2) the fact that skills
trainers asked to be removed from Bryan's case because of the
unsanitary conditions of the Plaintiffs' home; and (3) Parent
Plaintiffs' uncooperative attitude and unreasonable behavior.
This Court has already recognized the validity of·these

significant challenges.  See December 2006 Order at 52.

>    **1.    Limited amount of available skills trainers located in or willing to relocate to Kona, Hawaii.**

Witnesses for the DOE will testify that the reality facing the DOE is that there was, and still remains, a shortage of available, qualified skills trainers located in or willing to relocate to Kona, Hawaii, a rural area with a high cost of living.  In the present case, this reality was further complicated by the fact that Bryan's IEP required skills trainers to be trained in a host of methodologies that included the following: (1) DTT; (2) TEACCH; (3) PECS; and (4) ASL.  See May 11, 2004 Decision at 10, ¶ 3; see also Settlement Agreement at 4, ¶¶ 1(e)-1(f).  The ASL requirement proved extremely troublesome because most skills trainers trained in DTT, TEACCH, and other methodologies used in servicing autistic children lack any training in ASL.  This is because best practice literature indicates that ASL is not the best communication system for children with autism.  As a result, it was highly unusual to find those trained in autism to also be proficient in ASL.[5]

The Settlement Agreement also required the DOE to create a pool of qualified and trained substitute skills trainers.  See Settlement Agreement at 4 ¶¶ 1(e)-1(f).  Substitute skills trainers had to meet the standards for a Level

---

[5]    As stated supra, the DOE was continually training skills trainers that it hired in DTT, TEACCH, and ASL.

-10-

III TA, and had to be trained in DTT, TEACCH, and PECS.  See id.
While the DOE made great efforts to establish such a pool, it was
extremely difficult to find individuals who were willing to be on
"stand-by" in the event their services were needed.  Being on
"stand-by," severely impacted the ability of any potential
substitute skills trainers to accept other assignments and/or job
opportunities because they would have needed to be available to
the DOE, and Plaintiffs, "just in case."  As a result, the DOE
was unable to form a formal pool of skills trainers.

Nonetheless, the DOE did satisfy the purpose of the
pool, which was to ensure that any break in services would be
minimal or non-existent.  For example, when Richi Stallard, a
skills trainer, became ill in October 2003, the coverage of her
shift was addressed expeditiously and referrals of three skills
trainers (i.e., Duncan Galland, Jamie Straley, and Heather
Schwob) were timely made.  See November 28, 2003 Letter from
Holly Shikada to Shelby Floyd.

### 2.    Numerous skills trainers asked to be removed from Bryan's case.

Numerous skills trainers also asked to be removed from
Bryan's case.  Skills trainers pointed to the unsanitary
conditions of the Plaintiffs' home, (e.g., smelled of urine and
fecal matter), and the unreasonable demands placed on them by
Parent Plaintiffs as among the reasons for their requests to be
removed.  Indeed, at least two skills trainers were concerned

enough about the unsanitary condition of Plaintiffs' home that they felt compelled to file a report with Child Protective Services ("CPS"). While the DOE does not express an opinion as to whether Plaintiffs' home was in fact unsanitary, the fact remains that skills trainers did ask to be removed from Bryan's case because of the unsanitary conditions.

Skills trainers also cited the unreasonable demands of Parent Plaintiffs as a reason for their request to be removed from Bryan's case. According to skills trainers, Parent Plaintiffs would leave them alone with Bryan for significant periods of time as Parent Plaintiffs went to, among other things, view the sunset. Moreover, on at least one occasion, a skills trainer was locked in the same room with Bryan for over four (4) hours. Skills trainers would also be expected to do household chores, e.g. do the family's laundry, when working with Bryan on life skills.

As a result, the already limited pool of available skills trainers through whom the DOE could provide Bryan services from was further reduced. This reduction was not a result of any action or inaction by the DOE. It did, however, invariably interfere with the DOE's ability to provide Bryan with **all** the educational and related services he was entitled to as a disabled individual **under the IDEA.**

### 3.    Parent Plaintiffs' uncooperative attitude and unreasonable behavior.

Parent Plaintiffs' insistence on approving every skills trainer hired by the DOE further reduced the number of available skills trainers.  The Settlement Agreement entered into by the DOE and Plaintiffs did provide that hired individuals were "subject to Bonds' **reasonable** approval as to these individual's **presence in the home**."  <u>See</u> Settlement Agreement at 4, § IIA, ¶ 1(e) (emphasis added).  The Settlement Agreement, however, did not provide Plaintiffs with "reasonable approval" as to the **qualifications** of hired individuals.  <u>See</u> <u>generally</u> Settlement Agreement.

Despite the absence of any explicit authority providing Plaintiffs with "reasonable approval" of the qualifications of hired individuals, the DOE did allow Plaintiffs to approve the skills trainers assigned to Bryan's case.  As a result, any skills trainer that worked with Bryan was approved by the Plaintiffs.

In any event, Plaintiffs' refusal of skills trainers was utterly unreasonable.  For example, one skills trainer referred to the Plaintiffs by TIFFE was deemed by Plaintiffs to be "too religious."  Another skills trainer referred to Plaintiffs by the DOE was refused by Plaintiffs because she was pregnant; this, despite the fact that this same skills trainer

was currently working with another child similarly situated as Bryan.  These are not reasonable bases upon which to refuse a skills trainer.

      **C.    Despite the significant challenges it faced, the DOE still provided Bryan with a significant amount of the skills trainer services he was entitled to.**

      Despite these significant challenges, the DOE still provided Bryan with a majority of the skills trainers hours he was entitled to **under the IDEA**.  In fact, Plaintiffs even acknowledge, and this Court has taken notice, that the DOE "provided approximately 75 percent of the services mandated [under his IEP]."  <u>See</u> Complaint at ¶ 25; Verified Amended Complaint at ¶ 27; December 2006 Order at 52.  Moreover, in the Complaint, Plaintiffs allege that, "[b]eginning in June 2004, despite the Settlement Agreement and the May 2004 decision . . . Bryan was not receiving and did not receive 95 percent of the hours of services from skills trainers identified in the May 11, 2004 Decision."  <u>See</u> Complaint at ¶ 36.  Plaintiffs allegation, however, is not entirely true.  During the time period from May through August 2004, records indicate that Bryan in fact received one thousand, one hundred and eight (1,108) hours of skills trainer services out of the one thousand, one hundred and sixty-two (1,162) hours of services that the DOE was required to

-14-

provide.[6]  This equates to the DOE providing **95.35%** of the skills-trainers hours that Bryan was entitled to, and is in full compliance with the May 11, 2004 Decision and the July 1, 2002 Release and Settlement Agreement.  See May-September 2004 Calendar of Skills Trainer Hours prepared by Desiree Kaiawe [DOE 0316-0321].

In sum, the evidence unequivocally shows that the DOE provided Bryan with "meaningful access" to a regular public school education.  Further, in providing Bryan "meaningful access," the DOE, at all times, acted in good faith and made great efforts.  As a result, Plaintiffs' claims of intentional discrimination and retaliation under Section 504 are simply unfounded.  Even if Plaintiffs could prove that Bryan was denied "meaningful access," any denial was solely and directly attributable to the significant challenges facing the DOE, not to the alleged intentional discrimination and/or retaliation of the DOE.

## III.  PROCEDURAL HISTORY

### A.    December 19, 2006 Court Order.

On December 19, 2006, the Honorable Helen Gillmor entered her Order Denying Defendants' Motion for Summary

---

[6]    These figures include hours that- but for the refusal of the Plaintiffs to accept such services- would have been provided to Bryan (i.e., a skills trainer was offered by the DOE and was available to work with Bryan).

Judgment, construed as a Motion for Judgment on the Pleadings; Denying Plaintiffs' Motion for Partial Summary Judgment; Granting in Part and Denying in Part Plaintiffs' Motion to Enforce the Doctrine of Issue Preclusion Regarding All Administrative Hearing Decisions and the Settlement Agreement; Denying Plaintiffs' Motion to Strike Declarations for Non-Compliance with Rule 56(e); and Denying Plaintiffs' Motion to Amend and/or Supplement the Record ("December 2006 Order").

In the December 2006 Order, Judge Gillmor held that "[t]here is a material factual dispute as to whether Defendants acted in bad faith and with deliberate indifference in failing to provide the services to Bryan." See December 2006 Order at 51. Indeed, while this Court found that it is undisputed that the DOE failed to provide Bryan a FAPE, "it is also undisputed that the DOE made some effort to comply with its obligation to provide skills trainers and other services to Bryan." See December 2006 Order at 49-50. As a result, the ultimate issue in this case was whether the DOE's alleged failures "rise to the level of intentional discrimination."[7] See December 2006 Order at 54. As

_____

[7] This Court found that "intentional discrimination" in a Section 504 case required a showing of "deliberate indifference." See December 2006 Order at 29. This Court further found that Plaintiffs must prove the DOE acted in "bad faith" or with "gross misjudgment." See id. at 32. As this Court noted, this requires the Plaintiffs to show more than the "mere denial of a FAPE." See id. at 28-31. The legal framework applicable to this case is set forth infra.

this Court noted, this alleged discrimination must be based
"*solely* on [Bryan's] disability." See December 2006 Order at 36
(emphasis in original).

This Court further held that Parent Plaintiffs lacked
standing to bring an action for their own personal injuries
allegedly arising from the DOE's alleged intentional
discrimination against Bryan. This Court reasoned that Parent
Plaintiffs were not entitled to recover such damages because they
were not disabled, and they were not participants in, or
beneficiaries of, a program receiving federal funds.

In the December 2006 Order, Judge Gillmor also held
that certain issues previously determined by Hearings Officers
were entitled to preclusive effect. See December 2006 Order at
25-26. However, the numerous factual findings, underlying these
issues (e.g. that Bryan communicates using ASL, appropriate
toileting skills continued to be a strong need for Bryan at home
and in the community) were not given preclusive effect. See
December 2006 Order at 26-27.

B.    **November 13, 2007 Court Order.**

On November 13, 2007, Judge Gillmor entered her Order
Granting Plaintiffs Ann Kimball Wiles' and Stanley Bond's Motion
to Amend their Complaint to Include an Express Claim for Non-
Economic Damages for Retaliation ("November 2007 Order"). In the
November 2007 Order, Judge Gillmor allowed Parent Plaintiffs to

amend their Complaint to include an express claim for retaliation
under Section 504.  Judge Gillmor stated:

> Parent Plaintiffs may recover non-economic
> damages suffered by them as a result of
> Defendants' alleged retaliatory conduct to
> the extent proven at trial.  As discussed in
> the Court's December 2006 Order, the
> Plaintiffs must prove that school officials
> acted with *deliberate indifference* in order
> to recover such damages.

Pursuant to the November 2007 Order, on November 20,
2007, Plaintiffs filed their First Amended Complaint (the
"Amended Complaint").  On November 21, 2007, Defendants filed
their Answer to First Amended Complaint filed November 20, 2007.

### C.    **April 29, 2008 Court Order.**

On April 29, 2008, this Honorable Court entered its
Order Denying in Part and Granting in Part Defendant's Amended
Motion to Dismiss or in the Alternative for Summary Judgment on
Second Amended Complaint Filed on February 13, 2008 ("April 2008
Order").  In the April 2008 Order, Judge Kay held that the DOE
was entitled to summary judgment on the design phase of Bryan's
FAPE.  As Judge Kay noted, "the parties agree that Bryan's IEP
was properly designed."  Id. at 32.

Judge Kay, however, denied the DOE's request for
summary judgment on Plaintiffs' underlying Section 504
"meaningful access" claim.  Specifically, Judge Kay held that
Mark H. v. Lemahieu, 513 F.3d 922 (9th Cir. 2008) did not require
Plaintiffs to specifically assert violations of the Section 504

-18-

FAPE regulations to properly state a claim upon which relief can be granted.  Rather, Plaintiffs can state a claim on Section 504's implied private cause of action requiring "meaningful access" to federally funded programs.

IV.  **PLAINTIFFS' REMAINING CLAIMS AGAINST DEFENDANTS**

As of the filing of this trial brief, Plaintiffs have two remaining claims against the DOE.  First, Plaintiffs seek money damages under Section 504 of the Rehabilitation Act ("Section 504") for the DOE's alleged failure to provide Bryan with "meaningful access" to a regular public education.  Second, Plaintiffs seek non-economic damages for retaliation under Section 504.

A.  **Section 504**

1.  **Section 504 is an anti-discrimination statute.**

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The central purpose of Section 504 is to ensure the "evenhanded treatment" of disabled individuals in relation to non-disabled individuals.  See P.C. v. McLaughlin, 913 F.2d 1033, 1041 (2d Cir. 1990)(citing Traynor v. Turnage, 485 U.S. 535, 548 (1988)); Alexander v.

-19-

Choate, 469 U.S. 287, 304 (1985).  Accordingly, Section 504 is

merely an anti-discrimination statute that simply prevents

discrimination on the basis of disability.  See Sch. Bd. of

Nassau County, Florida v. Arline, 480 U.S. 273, 277-78

(1987)("Congress . . . addressed the broader problem of

discrimination against the handicapped by including § 504, an

antidiscrimination provision"); Alexander v. Choate, 469 U.S. at

293 n. 7; Smith v. Robinson, 468 U.S. 992, 1017 (1984)(superseded

by statute on an alternative point of law).[8]

### 2. Section 504 requires disabled individuals be provided "meaningful access" to a federally funded benefit available to non-disabled individuals.

Under Section 504, a plaintiff must prove that he is a

"qualified individual with a disability" as defined by the

Rehabilitation Act; that he was denied "meaningful access" to a

federally funded benefit available to non-disabled individuals;

and that the denial of "meaningful access" was "solely by reason

of" his disability.  See id.; Lovell v. Chandler, 303 F.3d 1039,

1052 (9th Cir. 2002); Duvall v. County of Kitsap, 260 F.3d 1124,

---

[8]     The Ninth Circuit in Mark. H. v. Lemahieu, 513 F.3d 922
(9th Cir. 2008) highlighted that Section 504 prohibits not only
discrimination against the disabled, but also exclusion from
participation in and denial of benefits of programs solely by
reason of a disability.  Id. at 937.  The Ninth Circuit's
clarification on the prohibitions under Section 504, however,
does not take away from the fact that Section 504 is an anti-
discrimination statute.  As the court stated, the language of
Section 504, and its legislative history, simply evidences that
the nature of discrimination under Section 504 is construed more
broadly.  Id.

1135-36 (9th Cir. 2001); <u>Weinreich v. Los Angeles Metro. Transp.</u>
<u>Auth.</u>, 114 F.3d 976, 978 (9th Cir. 1997).

Before discussing Section 504's "meaningful access"
standard, it is helpful to explain the difference in the type of
obligations imposed on school districts under the IDEA and
Section 504. "The [IDEA] . . . , because of its focus on
appropriate education, imposes **affirmative duties regarding the**
**content of the programs that must be provided to the**
**handicapped.**" <u>Timms v. Metro. Sch. Dist. Of Wabash County</u>, 722
F.2d 1310, 1318 (7th Cir. 1983)(discussing the predecessor to the
IDEA, the Education for All Handicapped Children Act)(emphasis
added); <u>Sch. Dist. of Wisconsin Dells v. Z.S.</u>, 184 F.Supp.2d 860,
884 (W.D. Wis. 2001)(citing <u>Timms</u>). On the other hand, Section
504 is merely "prohibitory, forbidding exclusions from federally-
funded programs on the basis of handicap." <u>Timms</u>, 722 F.2d at
1317; <u>see also</u> <u>Sellers v. Sch. Bd. of the City of Manassas,</u>
<u>Virginia</u>, 960 F.Supp. 1006, 1010 (E.D. Va. 1997 (quoting <u>W.B. v.</u>
<u>Matula</u>, 67 F.3d 484, 492 (3d Cir. 1995)). As a result, "'[w]hile
the IDEA is phrased in terms of a state's affirmative duty to
provide a free appropriate public education, § 504 is worded as a
negative prohibition against disability discrimination in
federally funded programs.'" <u>Sellers v. Sch. Bd. of the City of</u>
<u>Manassas, Virginia</u>, 960 F.Supp. 1006, 1010 (E.D. Va. 1997
(quoting <u>W.B. v. Matula</u>, 67 F.3d 484, 492 (3d Cir. 1995)).

-21-

A line of cases in the late 1970's and mid 1980's
further clarified the type of obligations imposed on recipients
of federal funds under Section 504.  In the seminal case,
Southeastern Cmty. Coll. v. Davis, 442 U.S. 397 (1979), the
United States Supreme Court held that "neither the language,
purpose, nor history of § 504 reveals an intent to impose an
affirmative-action obligation on all recipients of federal
funds."  Id. at 411-12.  Post-Davis cases, however, severely
criticized the Court's use of "affirmative action" stating that
the Court's choice of words failed to appreciate the difference
between "affirmative action" and reasonable accommodation.
See Alexander v. Choate, 469 U.S. 287, 300 n. 20.  Consequently,
in Alexander v. Choate, the Court clarified that its use of
"affirmative action" in Davis "referred to those 'changes,'
'adjustments,' or 'modifications' to existing programs that would
be 'substantial,' or that would constitute 'fundamental
alteration[s] in the nature of a program,' rather than to those
changes that would be reasonable accommodations."  Id. (internal
citations omitted); see also Mark H. v. Lemahieu, 513 F.3d 922,
937 (9th Cir. 2008)(stating that Section 504 does not require
"substantial adjustment in existing programs").  As a result, the
IDEA and Section 504 each impose different obligations on school
districts.  While the IDEA imposes affirmative duties on school

-22-

districts, Section 504 merely imposes an obligation to provide "reasonable accommodations" to federally funded programs.

The United States Supreme Court and the Ninth Circuit Court of Appeals have adopted this standard of "reasonable accommodations" in determining whether "meaningful access" has been provided under Section 504.  See Alexander v. Choate, 469 U.S. at 301; Bird v. Lewis & Clark College, 303 F.3d 1015 (9th Cir. 2002).  To provide "meaningful access," a school district "may be required to make reasonable, but not fundamental or substantial, modifications to its programs."  Bird, 303 F.3d at 1020.  "Reasonableness depends on the circumstances of each case, and requires a 'fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards.'"  Id. (citations omitted).[9]

---

[9]    Plaintiffs have relied on Lovell v. Chandler, 303 F.3d 1039 (9th Cir. 2002) throughout the instant action.  In Lovell, the State of Hawaii argued that plaintiffs' motion for summary judgment should not be granted because the accommodation in question would have been a fundamental alteration of the federally funded program.  Id. at 1054.  The Ninth Circuit, however, refused to apply the fundamental alteration test.  Id. As the Ninth Circuit aptly observed, the fundamental alteration test did not apply to cases of facial discrimination.  Id. Lovell, however, is inapposite.  The federally-funded program in question here is not facially discriminatory.  As a result, the fundamental alteration test is applicable.  If the accommodation requested is substantial, or fundamentally alters the federally funded program or benefit, there is no liability under Section 504.

-23-

In the April 2008 Order, this Court directed both parties' attention to the Ninth Circuit's decision in Bird.  In Bird, plaintiff, a paraplegic student, sued a college for disability discrimination under Section 504 and the ADA for failing to provide her with wheelchair access on certain occasions during the college's overseas program in Australia.[10] Id. at 1019.  Before the trip, the student was informed that she may not be able to participate in certain activities but that the program could otherwise accommodate her by making available "adequate facilities."  Id. at 1017.  Once there, however, the student did not have full wheel-chair access at approximately 22 locations.[11]  Id. at 1017-18.  She also was precluded from participating in a number of outdoor activities as a result of her disability.  Id. at 1018.  The Bird court, however, held that this was insufficient to prevail on her Section 504 claim.  As the court articulated, plaintiff "does not prevail on the ADA or Rehab claim simply because the College failed to provide her with wheelchair access on a number of occasions . . . [rather] the central inquiry is whether the program, 'when viewed in its

_____

[10]     Courts apply the same analysis under the Rehabilitation Act and the ADA.  See Zukle v. Regents of the Univ. of Cal., 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999).

[11]     For example, at Stradbroke Island, despite being assured that her lodgings would be wheelchair-accessible, plaintiff found the access to her bedroom involved a stairway, and the doorway for the stalls in the bathroom were too narrow for her wheelchair.  Id. at 1018.

-24-

entirety,' is readily accessible and usable by individuals with disabilities." Id. at 1021 (quoting Barden v. City of Sacramento, 292 F.3d 1073, 1075-76 (9th Cir. 2002)). Indeed, the court found that the college had offered "ample evidence" of accommodating the student's disability and that the student had enjoyed many benefits offered by the program.[12] Id. at 1021. As a result, the district court did not err in denying plaintiff equitable relief. Id.

In Davis, supra, another case concerning the issue of reasonable accommodations, respondent, a licensed practical nurse with a hearing disability, brought a Section 504 claim against a college because she was denied admission to the college's nursing program. Respondent argued that Section 504 compelled the college to undertake affirmative actions to accommodate for her disability. Id. at 407. As a result, respondent argued that the nursing program should be modified to provide her with full-time, one-on-one supervision. Id. Moreover, respondent argued that certain required courses be dispensed with altogether. Id. The Davis Court, however, held that this would be a "fundamental

---

[12] The Ninth Circuit found that the college provided the student with alternative modes of transportation, e.g., paid for her use of taxis in Sydney, and for her flight to Brisbane, while others used buses and trains; arranged for a wheelchair accessible van; compensated two students enrolled in the program to be her helpers; purchased a sleeping cot manufactured to her specifications; purchased a special showerhead for her use; and provided her with a smaller, narrower wheelchair. Id. at 1018.

alteration in the nature of the program" above and beyond what is required by Section 504.  Id. at 410.

### 3.  The federally funded program or benefit at issue here is a regular public education.

Section 504 mandates that a disabled individual not be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any federally funded program "solely on the basis of his or her disability."  29 U.S.C. § 794(a).  The federally funded program or benefit in question here is a regular public education afforded to all children, disabled and non-disabled, not an education that has been tailored to the disabled individual's needs.  Indeed, if the program or benefit in question is one that is only offered to that particular disabled student, or a program offered only to disabled students, it is impossible to deny "meaningful access" solely on the basis of that student's disability.  Therefore, by Section 504's plain language, the federally funded program or benefit must be one that is afforded to all children, regardless of disability.  Indeed, such a practical analysis is in line with the central purpose of Section 504 to ensure "evenhanded" treatment of disabled individuals in relation to non-disabled individuals.  See supra.

Plaintiffs appear to argue that the "program or benefit" in question is the services that are set forth in Bryan's IEPs.  Bryan's IEP, however, sets forth services and

-26-

accommodations that are **tailored to his disability.**  It accounts for the reality that students with disabilities have greater needs than non-disabled students.  In Alexander v. Choate, however, the United States Supreme Court stated, "Section 504 does not require the [recipient of federal funds] to alter this definition of the benefit being offered **simply to meet the reality that the handicapped have greater medical needs.**"  Id. at 303.  As a result, the services and accommodations set forth in Bryan's IEPs are not the federally funded benefit in question. Instead, the benefit or program in question here is the same public education that is provided to non-disabled individuals.

> **4.    Section 504 does not prescribe the content of a program.**

Section 504 involves issues of access; it does not encompass the content of the federally-funded program.  See Timms v. Metro. Sch. Dist. Of Wabash County, 722 F.2d 1310, 1318 (7th Cir. 1983)(Section 504 merely "forbids exclusion from programs rather than **prescribing the program's content.**") (emphasis added).  In other words, the question here is merely whether the DOE provided Bryan with "reasonable accommodations" and modifications to its regular public education to provide Bryan with the opportunity to realize a meaningful benefit.  It does not encompass what services, curriculum, etc. are actually provided under a regular public education.

It is also important to clarify that Section 504 only requires a recipient of federal funds to provide a disabled student the **opportunity** to realize a meaningful benefit. Section 504 does not require that the disabled individual gain equal results. See Alexander v. Choate, 469 U.S. 287, 304 (1985). The reality that the disabled individual did not gain equal results does not mean the benefit itself was not meaningful. As a result, the relevant question is simply whether by expending thousands of dollars on Bryan, by providing Bryan with hundreds of skills trainers hours, etc., the DOE provided Bryan with "reasonable accommodations" that gave him the opportunity to realize a meaningful benefit.

> 5.    **IDEA, and any denial of an IDEA FAPE, is irrelevant to whether "meaningful access" was denied under Section 504.**

As stated supra, the federally funded program or benefit in question here is a regular public education, not a disabled student's FAPE or corresponding IEP. This fact alone highlights the irrelevance of the IDEA, and any denial of an IDEA FAPE, to the instant action. Moreover, a further inquiry into Section 504 law, and the actions of Plaintiffs in the present case, further reveals that the IDEA, and its requirements, are irrelevant to Plaintiffs' present Section 504 claim.

Prior to Mark H. v. Lemahieu, 513 F.3d 922, 937 (9th Cir. 2008), it was well-settled that the mere denial of a FAPE

was insufficient to impose Section 504 liability for compensatory damages. <u>See</u> Order Denying Defendants' Motion for Summary Judgment, construed as a Motion for Judgment on the Pleadings; Denying Plaintiffs' Motion for Partial Summary Judgment; Granting in Part and Denying in Part Plaintiffs' Motion to Enforce the Doctrine of Issue Preclusion Regarding All Administrative Hearing Decisions and the Settlement Agreement; Denying Plaintiffs' Motion to Strike Declarations for Non-Compliance with Rule 56(e); and Denying Plaintiffs' Motion to Amend and/or Supplement the Record ("December 2006 Order") at 31; <u>see also</u> <u>M.S. S. Ex rel. G. v. Vashon Island Sch. Dist.</u>, 337 F.3d 1115, 1125 n. 14 (9th Cir. 2003); <u>N.L. v. Knox County</u>, 315 F.3d 688, 695 (6th Cir. 2003); <u>Sellers v. Sch. Bd. of the City of Manassas</u>, 141 F.3d 524 (4th Cir. 1998); <u>Monahan v. State of Nebraska</u>, 687 F.2d 1164 (8th Cir. 1982). Post-<u>Mark H.</u>, it is also now clear that the requirements under an IDEA FAPE and a Section 504 FAPE "contain significant differences." <u>Mark H.</u>, 513 F.3d at 933. Further, Plaintiffs, by their own choice, disregarded the recommendation of the <u>Mark H.</u> court and carefully extracted any mention of FAPE, Section 504 or otherwise, from their Second Amended Complaint, effectively nullifying the utility of FAPE in the instant action. <u>See</u> Plaintiffs' Second Amended Complaint filed February 13, 2008. Thus, the appropriate standard of law applicable to the instant action is whether Bryan was denied "meaningful access" to a

public education.  Indeed, there is no authority equating
"meaningful access" with the denial of an IDEA FAPE.  In fact,
there is no authority even equating "meaningful access" with any
of the separate requirements created under the IDEA.  As a
result, the IDEA, and what is required under the IDEA, is simply
irrelevant to the instant action.

Similarly, Bryan's "Individualized Education Program"
or "IEP" is equally irrelevant to the instant action.  An IDEA
FAPE is provided through the creation of an IEP.  See Aquirre v.
Los Angeles Unified Sch. Dist., 461 F.3d 1114, 1115-16 (9th Cir.
2006).  An IEP, however, is not created to comply with Section
504's "meaningful access" standard.  Indeed, an IEP provides
services that are above and beyond "reasonable accommodations."
There is absolutely no authority stating that each and every
service, or even half of the services, designated in an IEP must
be provided in order to provide a disabled student "meaningful
access" under Section 504.  As a result, evidence of Bryan's IEP
is simply irrelevant to the instant action.

6.  **Compensatory damages under Section 504 carries an
extraordinarily high burden.**

The standard of proving a Section 504 claim is
"extraordinarily high."  Doe v. Arlington County Sch. Bd., 41
F.Supp.2d 599, 608 (E.D. Va. 1999).  Indeed, compensatory damages
under Section 504 are only available if a plaintiff proves that
the defendant intentionally discriminated against the plaintiff

-30-

"solely by reason of his disability." 29 U.S.C. § 794(a); <u>Duvall v. County of Kitsap</u>, 260 F.3d 1124, 1138 (9th Cir. 2001); <u>see also</u> December 2006 Order at 36. "Solely by reason of his disability" is defined to mean that "if the alleged discrimination was motivated by factors other than the disability, even if the disability was, in part, a motivating factor, no claim under § 504 lies." <u>Doe v. Arlington County Sch. Bd.</u>, 41 F. Supp.2d 599, 608 (E.D. Va. 1999).

Intentional discrimination, and, in turn, an award of compensatory damages, requires a plaintiff to prove by a preponderance of the evidence that the defendant acted with "deliberate indifference." <u>Duvall v. County of Kitsap</u>, 260 F.3d 1124, 1138 (9th Cir. 2001). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that [] likelihood." <u>Id.</u> at 1139. The first element is satisfied only upon a showing that the public entity had notice that an accommodation was required. <u>Id.</u> The second element is satisfied if a plaintiff proves that the entity's failure to act was "a result of conduct that is more than negligent, and **involves an element of deliberateness**." <u>Id.</u> Further, "deliberate indifference" requires more than a showing of mere recklessness or negligent behavior. It "does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably

-31-

have been deemed to result from events taking their normal course." <u>Id.</u>  It does not occur where the failure to act "may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction."  <u>Id.</u>

In addition, in <u>Midgett v. Tri-County Metro. Trans. Dist. of Oregon</u>, 254 F.3d 846(9th Cir. 2001), another case where the plaintiff failed to prove "deliberate indifference," the Ninth Circuit Court of Appeals held that a defendant's good faith intent to comply with a disability discrimination law precluded the finding of "deliberate indifference" as a matter of law.  <u>Id.</u> at 851.  As a result, the majority of courts have also required proof of "bad faith" or "gross misjudgment" before finding a Section 504 violation.  <u>See</u> <u>Sellers v. Sch. Bd. Of the City of Manassas, Virginia</u>, 141 F.3d 524, 529 (4th Cir. 1998)(plaintiffs "allege no facts which would suggest the defendants discriminated, <u>i.e.</u>, that they acted with bad faith or gross misjudgment"); <u>Monahan v. State of Nebraska</u>, 687 F.2d 1164, 1171 (8th Cir. 1982)("either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children"); <u>Alex G. ex rel. Dr. Steven G. v. Bd. of Trustees of Davis Joint Unified Sch. Dist.</u>, 387 F.Supp.2d 1119, 1124 (E.D. Cal. 2005)(same); <u>Zayas v. Commonwealth of Puerto Rico</u>, 378 F.Supp.2d 13, 21 (D. P.R. 2005)(dismissing plaintiffs' Section 504 claim with prejudice

-32-

where "[p]laintiffs presented no evidence of deliberate indifference or bad faith"); Brantley v. Indep. Sch. Dist. No. 625, 936 F.Supp. 649 (D. Minn. 1996)(showing of bad faith or gross misjudgment required for Section 504 claim).

As the Monahan court aptly observed, a bad faith or gross misjudgment standard of liability

> reflects what we believe to be a proper
> balance between the rights of handicapped
> children, the responsibilities of state
> educational officials, and the competence of
> courts to make judgments in technical fields.
> **So long as the state officials involved have**
> **exercised professional judgment, in such a**
> **way as not to depart grossly from accepted**
> **standards among educational professionals,** we
> cannot believe that Congress intended to
> create liability under § 504.

Monahan, 687 F.2d at 1171 (emphasis added).

The Monahan court's observations undeniably coincides with the inclination of courts to give great deference to the professional judgment of educators. See Regents of the Univ of Michigan v. Ewing, 474 U.S. 214, 225 (1985)(stating that courts "should show great respect for the faculty's professional judgment"); Zukle v. Regents of the Univ. Of California, 166 F.3d 1041-1047-48 (9th Cir. 1999)(agreeing with the First, Second, and Fifth Circuits that an "educational institution's academic decisions are entitled to deference."); Brantley v. Indep. Sch. Dist. No. 625, 936 F.Supp. 649, 657 (D. Minn. 1996)(rejecting plaintiffs' claim of disability discrimination stemming from IDEA

type educational decisions because any inappropriate decisions made by the defendant school district were, at most, errors in professional judgment).

Plaintiffs must also specifically prove "bad faith" or "gross misjudgment"; it is insufficient for Plaintiffs to simply couch their allegations in these legal catchphrases.  For example, in <u>Sellers</u>, <u>supra</u>, the plaintiffs claimed that the complete failure by the school board to provide **any** special education services to their child for over ten years, despite persistent and repeated requests by the mother to do so, was a total failure of its responsibilities and exhibited "gross misjudgment" sufficient to at least raise an issue of material fact on their Section 504 claim.  <u>See</u> Appellants' Opening Brief, 1997 WL 33492433 at *7-10 and *18-21.  Similarly, in <u>Petaluma Joint Union High Sch. Dist.</u>, 2000 WL 1229059 at *1 (N.D. Cal. 2000), the plaintiffs argued that the school district's failure to provide special education services, despite its knowledge that the child needed such services, amounted to "bad faith, gross misjudgment or deliberate indifference."  In both of these cases, the courts dismissed the plaintiffs' claims as a matter of law. These courts found that these types of allegations, despite the legal catchphrases used, basically consisted of "mere denials of a FAPE" that were insufficient to create liability under Section 504.

In the present case, Plaintiffs present no evidence that the DOE intentionally discriminated and/or acted with "deliberate indifference."  Clearly, any failure to provide Bryan with "meaningful access" and "reasonable accommodations" was not a result of deliberate action or inaction.  Indeed, the DOE made a good faith effort to provide Bryan with services that he was entitled to under the IDEA as articulated in his IEP, services that are above and beyond "reasonable accommodations."  Any failure of the DOE to provide such services are directly and solely attributable to, <u>inter alia</u>, the shortage of available skills trainers in Kona and the action of Plaintiffs themselves.

It is clear that the alleged actions of the DOE that Plaintiffs complains of fails to rise even to the level of reckless or negligent behavior, let alone "deliberate indifference."  Rather, the DOE, at all times, acted in good faith and made great efforts to provide Bryan with "meaningful access."  As the Ninth Circuit held in <u>Midgett</u>, <u>supra</u>, the DOE's good faith efforts precludes any finding of "deliberate indifference" as a matter of law.

**B.    <u>Section 504 Retaliation Claim</u>**

Parent Plaintiffs' retaliation claim is based on Section 504's implementing regulation, which provides:

> (b) Discriminatory actions prohibited.
>
> > (1) A recipient may not discriminate on the basis of handicap in the following

ways directly or through contractual,
licensing, or other arrangements under
any program or activity receiving
Federal financial assistance.

\*     \*     \*

(vii) Intimidate or retaliate against
any individual, whether handicapped or
not, for the purpose of interfering with
any right secured by section 504 or this
subpart.

28 C.F.R. § 42.503(b)(1)(vii); see also 29 C.F.R. §

1614.101(b) ("No person shall be subject to retaliation for

opposing any practice made unlawful by . . . the Rehabilitation

Act . . . or for participating in any stage of administrative or

judicial proceedings under those statutes.").

1.    **Alleged improper action must be taken "because of"
      retaliation.**

At trial[13], Parent Plaintiffs must "show by a

preponderance of the evidence that the challenged [action] was

'because of' [retaliation]." See Costa v. Desert Palace, Inc.,

299 F.3d 838, 856-57 (9th Cir. 2002)(en banc), aff'd 539 U.S. 90

(2003)(Title VII disparate treatment case); Stegell v. Citadel

Broad. Co., 350 F.3d 1061, 1068 (9th Cir. 2003)(retaliation case

---

[13]    The McDonnell Douglas burden-shifting test commonly
used to evaluate Title VII retaliation claims, as well as Section
504 claims, generally is limited to determining motions for
summary judgment.   See Kendrick v. Penske Transp. Svcs., Inc.,
220 F.3d 1220, 1226 (10th Cir. 2000); see also Costa v. Desert
Palace, Inc., 299 F.3d 838, 856-57 (9th Cir. 2002) (en banc),
aff'd 539 U.S. 90 (2003) ("[r]egardless of the method chosen to
arrive at trial, it is not normally appropriate to introduce the
McDonnell Douglas burden-shifting framework to the jury).

citing <u>Costa</u> for preceding statement of law).  In other words,
Plaintiffs must prove by a preponderance of the evidence the
following:

> (1)  Plaintiffs engaged in a protected
>      activity under the Rehabilitation Act;
>
> (2)  Plaintiffs were subjected to an adverse
>      action at the time, or after, the
>      protected activity occurred; and
>
> (3)  Plaintiffs were subjected to the adverse
>      action because of their participation in
>      a protected activity.

Under the first element, Parent Plaintiffs must prove
that they were engaged in a "protected activity."  A "protected
activity" is "an informal or formal complaint about, or other
opposition to, [a federal funding recipient's] practice or act .
. . if the [complainant] reasonabl[y] believes such an act to be
in violation of the [Rehabilitation Act]."  <u>Jeseritz v. Potter</u>,
282 F.3d 542, 548 (8th Cir. 2002).

Under the second element, Parent Plaintiffs must prove
that they were subjected to an adverse action.  In <u>Burlington
Northern and Santa Fe Railway Co. v. White</u>, 126 S.Ct. 2405
(2006), a Title VII retaliation case, the United States Supreme
Court, recognizing a split among circuits, set forth a uniform
standard in determining an "adverse employment action."  The
purpose of Title VII's anti-retaliation provision is to prohibit
employer actions that are likely "to deter victims of
discrimination from complaining . . . ."  <u>Id.</u> at 2415 (citation

-37-

omitted).  This is a purpose similar to that of the
Rehabilitation Act's anti-retaliation provision.  See 28 C.F.R. §
42.503(b)(1)(vii); 29 C.F.R. § 1614.101(b).  As a result, while
the instant case is not an employment or Title VII case, the DOE
submits that the Burlington decision is, at the very least,
instructive in analyzing Parent Plaintiffs' retaliation clam.

In Burlington, the Court held that to establish an
"adverse employment action," "a plaintiff must show that a
reasonable employee would have found the [ ] action materially
adverse."  Id. at 2415.  "Materially adverse" is defined to mean
an action that would have likely "dissuaded a reasonable worker
from making or supporting a charge of discrimination."  Id.
(citation omitted).  The Court stated that the significance of
the "materially adverse" standard was to "separate significant
from trivial harms."  Id.  Trivial harms such as petty slights or
minor annoyances do not create a deterrence sufficient to
constitute an "adverse employment action."

Finally, the third element requires Parent Plaintiffs
to establish a causal connection between the protected activity
and the adverse action.  This means that Parent Plaintiffs must
prove by a preponderance of the evidence that they were subjected
to the adverse action "because of" their participation in the
protected activity.

In the present case, none of the acts Parent Plaintiffs complain of amount to "adverse actions" as set forth in Burlington. Furthermore, even assuming, arguendo, that Plaintiffs are able to prove adverse action(s), Parent Plaintiffs present no evidence to suggest that they were subjected to these actions "because of" their participation in a protected activity. In reality, retaliatory animus was not a factor in any actions or inactions of the DOE. Rather, at all times, the DOE acted in good faith, and made great efforts to provide Bryan with "meaningful access" and "reasonable accommodations." As a result, Parent Plaintiffs cannot carry their burden of proving unlawful retaliation under Section 504.

### 2. A Section 504 retaliation claim for money damages requires proof of deliberate indifference.

The Ninth Circuit has recognized that "[t]o recover monetary damages under . . . the Rehabilitation Act, a plaintiff must prove intentional discrimination." Duvall v. County of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001). Similarly, in Sheely v. MRI Radiology Network, P.A., 2007 WL 3087215 at *18 (11th Cir. Oct. 24, 2007), the Eleventh Circuit held that non-economic compensatory damages are available under Section 504 only upon a showing of intentional discrimination. Indeed, the Honorable Helen Gillmor recognized this required proof as it relates to Parent Plaintiffs' Section 504 retaliation claim, stating:

-39-

Plaintiff parents may recover non-economic
damages suffered by them as a result of [the
DOE's] allegedly retaliatory conduct to the
extent proven at trial. . . . [T]he
Plaintiffs must prove that [the DOE] acted
with <u>deliberate indifference</u> in order to
recover such damages.

<u>See</u> Order Granting Plaintiffs Ann Kimball Wiles' and Stanley
Bond's Motion to Amend their Complaint to Include an Express
Claim for Non-Economic Damages for Retaliation ("November 2007
Order") at 17 (citation omitted)(emphasis added).

In the instant case, Parent Plaintiffs present no
evidence that the DOE's actions were retaliatory, let alone made
with "deliberate indifference."  In fact, the allegations set
forth by Parent Plaintiffs in support of their claim of
retaliation are mere regurgitations of the allegations they
asserted in support of their Section 504 "meaningful access"
claim.  As set forth <u>supra</u>, Plaintiffs' allegations in support of
their claim that the DOE acted with "deliberate indifference" in
allegedly failing to provide Bryan with "meaningful access" fail
to rise to a level of "deliberate indifference."  As a result,
Plaintiffs cannot carry their burden of proving "deliberate
indifference" under their retaliation claim.[14]

_____

[14]    Parent Plaintiffs' retaliation claim should not be
confused with a claim for parents' own personal injuries
allegedly arising from the DOE's alleged intentional
discrimination against Bryan.  As this Court has already
concluded, Parent Plaintiffs lack standing to bring the latter
claim because they are not disabled, and are not participants in,
or a beneficiary of, a program receiving federal funds.  <u>See</u>
December 2006 Order at 39.

C.    **Section 504 Damages.**

In addition to the above analyses on Section 504
damages, and assuming, <u>arguendo</u>, that Plaintiffs prevail on their
Section 504 claims, the damages Plaintiffs may recover are
limited.

1.    **Punitive damages are not recoverable for violation
of Section 504.**

In a properly pled Section 504 case, compensatory
damages are available under Section 504 upon a showing of
intentional discrimination (<u>i.e.</u>, deliberate indifference).  <u>See</u>
<u>Lovell</u>, 303 F.3d at 1056; <u>see</u> <u>also</u> December 2006 Order at 38.
Punitive damages, however, are not recoverable for a violation of
Section 504.  <u>See</u> <u>Barnes v. Gorman</u>, 536 U.S. 181, 185-189 (2002);
<u>Moreno v. Consol. Rail Corp.</u>, 99 F.3d 782; <u>see</u> <u>also</u> December 2006
Order at 38.

2.    **Parent Plaintiffs are not entitled to damages for
their own personal injuries allegedly arising from
the DOE's alleged intentional discrimination
against Bryan.**

In the December 2006 Order, Judge Gillmor held that
Parent Plaintiffs lack standing to bring an action for their own
personal injuries allegedly arising from the DOE's alleged
intentional discrimination against Bryan.  <u>See</u> December 2006
Order at 39.  This is because Parent Plaintiffs are not disabled,
and are not participants in, or beneficiaries of, a program
receiving federal funds.  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Sanders by Sanders v.</u>

-41-

Marquette Pub. Schs., 561 F. Supp. 1361, 1368-1370 (W.D. Mich. 1983).

To the extent that Plaintiffs are able to show intentional discrimination, however, Parent Plaintiffs may be able to recover economic damages reasonably and foreseeably incurred. See December 2006 Order at 39. To recover such damages, Plaintiffs must establish: (1) expenses were incurred for Bryan's benefit; (2) the relationship between Plaintiff Parents and Bryan made the expenditures foreseeable and appropriate; and (3) Plaintiff Parents are suitable persons to enforce the rights of Bryan. See Greater Los Angeles Council on Deafness, Inc. v. Zolin, 812 F.2d 1103, 1115 (9th Cir. 1987).

DATED: Honolulu, Hawaii, August 4, 2008.

/s/ Gregg M. Ushiroda
MELVYN M. MIYAGI
GREGG M. USHIRODA
LEIGHTON M. HARA
ROSS T. SHINYAMA

GARY K.H. KAM
GEORGE S.S. HOM
HOLLY T. SHIKADA

Attorneys for Defendant
DEPARTMENT OF EDUCATION

---

Ann Kimball Wiles, et al., Plaintiffs vs. Department of Education, et al., Defendants; Civil Nos.: CV04-00442 ACK/BMK and CV 05-00247 ACK/BMK Consolidated; Defendant Department of Education's Trial Brief