Of Counsel:
DAVIS LEVIN LIVINGSTON

STANLEY E. LEVIN                    1152-0
MICHAEL K. LIVINGSTON          4161-0
851 Fort Street, Suite 400
Honolulu, Hawaii 96813
Telephone: (808) 524-7500/Fax: (808) 545-7802
Email: slevin@davislevin.com

CARL M. VARADY                    4873-0
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawaii 96813
Telephone: (808) 523-8447/Fax: (808) 523-8448
Email: carl@varadylaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>            Plaintiffs,<br>    vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawai'i,<br><br>            Defendant. | CIVIL NO. CV 04-00442 ACK/BMK<br>CIVIL NO. CV 05-00247 ACK/BMK<br>Consolidated (Other Civil Action)<br><br>PLAINTIFFS' TRIAL BRIEF; DECLARATION OF STANLEY E. LEVIN; EXHIBIT 1; AND CERTIFICATE OF SERVICE<br><br>TRIAL:    September 9, 2008<br>TIME:    9:00 a.m.<br>JUDGE:   Honorable Alan C. Kay |

## TABLE OF CONTENTS

PAGE

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . .    2

      A.    AN OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

      B.    THE EDUCATIONAL EXPERIENCE
            FROM 1999-2001 . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

      C.    THE FIRST HEARING DECISION OF MAY
            21, 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

      D.    THE DOE DID NOT COMPLY WITH THE
            STIPULATED DECISION OF MAY, 2001 . . . . . . . . . .   10

      E.    THE SETTLEMENT AGREEMENT OF
            JULY 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

      F.    THE DOE IGNORED THE SETTLEMENT
            AGREEMENT OF JULY 1, 2002, AND
            BRYAN'S PROGRAM DEGENERATED
            INTO "CHAOS." . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

III.  PLAINTIFFS' THEORIES OF LIABILITY . . . . . . . . . . .   26

      A.    DELIBERATE INDIFFERENCE. . . . . . . . . . . . . . .   26

      B.    ANTICIPATED DEFENSES BY DOE. . . . . . . . . . . .   35

            1.    BLAMING BRYAN'S PARENTS. . . . . . . . . . .   35
            2.    DENIAL OF FAPE IS NOT DELIBERATE
                  INDIFFERENCE PER SE . . . . . . . . . . . . . . . . . . . .36
            3.    "GOOD FAITH" IS NOT A DEFENSE. . . . . .   37
            4.    BRYAN'S FAMILY WAS FORCED TO LEAVE
                  HAWAII. . . . . . . .                                          38

IV.   DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

TABLE OF AUTHORITIES

PAGE

*Alex G. v. Bd. of Trs.*, 387 F. Supp. 2d 1119 (D. Cal. 2005). . . . .     34

*Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197,
  103 L. Ed. 2d 412 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

*Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001). . . . .     29

*K.S. v. Fremont Unified Sch. Dist.*, 2007 U.S. Dist.
  LEXIS 24860 (D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . .     34

*Stephen L. v. LeMahieu*, Civ. No. 00338. . . . . . . . . . . . . . . . . . .     26

*Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002) . . . . . . . . . . .     29

*Patricia N. v. LeMahieu*, 141 F. Supp. 2d 1243
  (D. Haw. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     32

*Settlegoode v. Portland Public Schools,* 371 F.3d 503
  (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     33

*Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138
  (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     33

*Whitehead v. School Bd. for Hillsborough County*,
  918 F. Supp. 1515 (M.D. Fla 1996). . . . . . . . . . . . . . . . . . .     34

*Wiles Bond, et al. v. State*, CV-02-00101 SOM/BMK. . . . . . . . . .     11

*Wong v. Regents of University of California*,
  192 F.3d 807 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . .     28

STATUTE:

28 C.F.R. §35.160(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     28

PLAINTIFFS' TRIAL BRIEF

I.     INTRODUCTION

This case is brought on behalf of Bryan Wiles-Bond ("Bryan"), a severely autistic boy who is 16 years old.  Bryan was born on October 28, 1991.  He is the youngest child of Ann Kimball Wiles ("Kim") and Dr. Stanley Bond ("Stan").  At age two, Bryan was diagnosed with pervasive developmental delay and hyperactivity and, at age five or six, he was labeled autistic.

Bryan and his family came to Hawaii in 1999 with the intent of making this their permanent home.  At that time, Bryan was seven years old.  Bryan's mother, Kim, worked as a vice-principal for the Hawaii Department of Education.  Bryan's father, Stan, was employed by the United States Department of the Interior managing Kaloko-Honokohau National Historic Park, where, among other efforts to develop and preserve the park, he worked to restore stone structures, including a fish pond, with traditional Hawaiian building methods.

In this case, Bryan and his parents seek compensation commensurate with the services needed to repair harm caused to Bryan as a result of years in which DOE: (1) knew precisely was services Bryan needed; and (2) repeatedly and knowingly failed to provide those services.  They will also seek compensation for the pain and suffering Bryan and they experienced as a result of the DOE's knowing refusal to do what Congress, this Court, Hearings Officers and the DOE's own promises

mandated.  The DOE's failure to provide services that would meet Bryan's needs and avoid the awful consequences – regression to a state that brought Bryan to the brink of early institutionalization – is undisputed and well documented.

The undisputed record in this case demonstrates that for five years, the DOE knew it was obligated to provide Bryan very specific services at very specific levels, pursuant to IEPs, hearing officer's decisions, settlement agreements and court orders. Yet the DOE chose to do nothing to create an adequate supply of properly trained teachers, skills trainers, and other service providers who could provide those services at appropriate levels.  For five years, Bryan and his family suffered the consequences of this decision daily and are living with those consequences today.

II.     STATEMENT OF FACTS

A.     AN OVERVIEW

Although he met expected developmental milestones until he was 18 months old, soon after Bryan began to lose ground and, ultimately, became uncommunicative.  He was diagnosed with pervasive developmental delay, and, subsequently, autism.  Bryan attended school in Maryland where he was provided a Free Appropriate Public Education (FAPE) as was required under the Individuals with Disabilities Education Act (IDEA).  Moving to Hawaii, while initially a dream for Bryan's parents, quickly turned into a five-year nightmare of trying to obtain services consistent with Bryan's needs.  Bryan's parents do not dispute that his

individualized educational program (IEP) as written, inclusive of the several due process hearing orders and settlement agreements, could have produced a satisfactory result. Bryan's parents contend, however, that the Hawaii Department of Education (DOE) never implemented Byran's program as described in the IEP, orders, and settlement agreement and that they were all damaged as a consequence of the DOE's conscious, knowing actions. For five years, the DOE failed to provide Bryan a FAPE that fulfilled the standards in the IEP. Therefore, he regressed, severely, rather than making progress toward the goals and objectives in his comprehensive treatment plan. Bryan lost communication, lost toileting skills, became non-compliant and aggressive.

By 2004, Bryan's program was characterized as "neglect" and "abusive" by Dr. Kim Smalley, one of the experts the DOE retained to provide a badly-needed behavioral support program, five years after Bryan was in the DOE system. When Dr. Smalley was retained by the DOE and observed Bryan's program to write a behavioral plan, she was appalled to find that none of the IEP was being implemented and that the staff was untrained. They were completely ignoring the IEP, terms of prior settlement agreements, and Hearings Officer's Decisions and Orders with disastrous results for Bryan. Dr. Dru Copeland, the supervising psychologist retained by DOE during this same period, characterized Bryan's program in testimony as "chaotic."

From the time Bryan's family first moved to Hawaii, his parents knew that these services provided by the DOE did not meet Bryan's needs as required by federal law and his IEP. They tried in vain to work with the DOE and Department of Health ("DOH") to find alternative methods that could work. Even the most basic attempts to provide parental input or obtain meaningful information from the DOE were met with resistance, resentment and, ultimately, retaliation.

Bryan's parents faced problems with the DOE and its refusal to listen to them caused them to file for an administrative hearing for help in 2000, which resulted in an informal mediation agreement. The DOE as a whole, and its contracted service providers, knew what IEP services they were supposed to provide to this non-verbal autistic boy. Most importantly for Bryan, his parents and this case, even though the DOE knew the services mandated throughout Bryan's stay in Hawaii were chronically unavailable, and that turnover of Skills Trainers was a constant problem, the DOE did not institute a training program that would assure a supply of sufficient qualified Skills Trainers to account for the turnover that the DOE knew existed. The turnover that caused this chronic shortage was not just for Bryan but for the entire Big Island. DOE knew of the shortage in 1999, according to District Superintendent Alvin Rho.

There is no dispute that the DOE knew what services were contained in Bryan's IEPs, the due process orders and what the settlement agreements required. It

is equally undisputed that, in the face of the DOE's continued and knowing failure to train an adequate number of skills trainers on the Big Island, Bryan regressed from a child who was partially toilet-trained and beginning to communicate, to a child who could no longer use the toilet properly or communicate with his family and teachers. He became aggressive and began to use his toileting "accidents" to self-stimulate and express his frustration.   Bryan became aggressive and harmful to himself, as well.

Numerous IEP meetings, hearings, stipulations and three federal cases ensued. None produced the desired result – properly trained service providers who would implement Bryan's program.

The final straw for the family was when Bryan began middle school in the Fall of 2004.  The DOE had promised Judge Gillmor, at a TRO hearing in August 2004, that it would implement Bryan's program and retain a consultant on the Mainland to assist with this implementation.  When Bryan's mother went to his school to observe the new-and-improved middle school program, she found him sliding around on the floor in a puddle of his own urine, self-stimulating and isolated in a portable classroom.  The teacher told Kim: "We just don't know what to do."  The Skills Trainer assigned to Bryan commented: "He looks so happy."  That day, his parents took Bryan out of school for obvious safety and other concerns.

Even though promising Judge Gillmor they would do so, the DOE never provided Bryan with the services that were mandated and which it repeatedly and

specifically promised to provide.  Ultimately, Bryan and his family had to move to California where he now receives services that, while not ideal, are permitting him to make progress toward a more independent and self-regulated life.  Nevertheless, there is no dispute that Bryan has lost time and opportunities to develop language, social and self-care skills that will be costly and time consuming to attain and he will never be able to overcome the time lost in Hawaii.

B.    THE EDUCATIONAL EXPERIENCE FROM 1999-2001

From the time Bryan's family moved to Hawaii in 1999, until they left in 2005, Bryan and his parents were trapped in a system that indisputably and repeatedly failed to provide the services that everyone knew were required by federal and state, statute, decision and agreement.  Bryan first attended Kahakai Elementary (Kahakai) in 1999.  It was clear from the outset that Kahakai staff were not willing or able to implement Bryan's program.  An early example of the DOE's unilateral approach was the manner in which the DOE sought to make this important placement decision, after convening only one IEP meeting to discuss Bryan's needs.

Bryan's parents were forced by the DOE to place their son in another inappropriate program, at a different school unilaterally chosen by the DOE that only worsened with the passing of time.  Bryan's parents were hopeful that a more willing staff would implement his program there with greater success.  Their optimism evaporated soon after, when, because of their lack of experience and knowledge,

Waikoloa personnel proposed a unilateral move back to Kahakai after Bryan had been at Waikoloa for only two months.  As a result of the DOE's unwillingness and inability to implement his program at Waikoloa, Bryan moved back to Kahakai for a few months at the start of the 2000-01 school year.  Subsequently, as a result of Kahakai's continued inability and unwillingness to implement his program, Bryan's parents enrolled him at a third elementary school, Kealakekua Elementary (Kealakekua) for the next several years. By October 6, 2000, Bryan's parents had noted the many deficits in Bryan's program, including a lack of Therapeutic Aides trained in autism.  The DOE's response to that memo was: "We really can't do much about [the fact that TA's are not trained is autism]."  DOE did not even suggest that TAs might be trained by the DOE or some third party.  Kim also noted what were to also become chronic problems for Bryan's program – the failure to implement structured work for Bryan that was properly sequenced for his developmental needs.

Finally, it is also the first, but not last, instance in which the DOE  expressed resentment at the parental involvement and observation. The DOE never treated the parents like true partners in  the IEP process as required by federal law.  Because of the DOE's failure to adopt these simple measures and apply them to Bryan's program, Bryan's parents to file a request for due process hearing.

C.     THE FIRST HEARING DECISION OF MAY 21, 2001

The first due process hearing decision, dated May 21, 2001, (the "First Decision") mandated that the DOE follow Bryan's recent IEP, which included most of his parents' suggestions, and that:

1) the DOE and/or the DOH[1] shall train and hire an educational aide in the areas of DTT[2], TEACCH[3], and PECS[4] methods for behavioral management

---

[1] At this time, DOH was still providing services to children with autism, utilizing a medical model required by Felix.  DOE took over autism services from DOH in 2002, utilizing a behavioral model.

[2] Discrete trial training (DTT) is a method of providing intervention. According to Anderson et al. (1996), the discrete trial method has four distinct parts: (1) the trainer's presentation, (2) the child's response, (3) the consequence, and (4) a short pause between the consequence and the next instruction (between interval trials).

[3] Founded in the early 1970s by the late Eric Schopler, Ph.D., Treatment and Education of Communication-Handicapped Children (TEACCH) developed the concept of the "Culture of Autism" as a way of thinking about the characteristic patterns of thinking and behavior seen in individuals with this diagnosis.  The long-term goals of the TEACCH approach are both skill development and fulfillment of fundamental human needs such as dignity, engagement in productive and personally meaningful activities, and feelings of security, self-efficacy, and self-confidence.  To accomplish these goals, TEACCH developed the intervention approach called "Structured Teaching."
    The principles of Structured Teaching include:
        * Understanding the culture of autism.
        * Developing an individualized person- and family-centered plan for each client or student, rather than using a standard curriculum.
        * Structuring the physical environment.
        * Using visual supports to make the sequence of daily activities predictable and understandable .
        * Using visual supports to make individual tasks understandable.
[4] The Picture Exchange Communication System (PECS) is an augmentative communication system developed to help individuals quickly acquire a functional

and educational instruction.  Drs. Ortiz and Smalley were identified as the trainers or someone with similar qualifications and experience;

2) beginning May 21, 2001 the educational aide must provide services from 4:00 p.m. to 7:00 p.m. on all regular school days.  The aide was required to do all the documentation required by these methodologies;

3) the aide was to be provided until October 1, 2001.  The State was required to make up any days lost after October 1, 2001; and

4) if the aide did not complete his/her tasks then the State was responsible for having a suitable replacement within two weeks.

The due process hearing was initiated because important provisions of the September, 2000 IEP and the Coordinated Service Plan of October 2000 were not being fulfilled, and the DOE had taken no steps to train sufficient personnel to provide mandated services to Bryan.  For example, between September, 2000 and December, 2000, Bryan had three different Therapeutic Aides (TA)[5], and from December 5, 2000 to January 9, 2001, Bryan did not have any TAs.  The IEP team met again in January, 2001 and certified his needs for a full day of one-on-one services and activities using the TEACCH, DTT, and PECs.  On February 27, 2001, Bryan's DOH care coordinator observed that the impact of Bryan not having

means of communication through the use of a set of pictures.  (Bondy and Frost, 1994).

[5] Though the nomenclature changed over time, the Therapeutic Aides were to provide mental health services identical to those provided by Skills Trainers.

a one-on-one TA created an environment that was not conducive to learning for him.

### D.    THE DOE DID NOT COMPLY WITH THE STIPULATED DECISION OF MAY, 2001

The DOE did not do what was necessary to fulfill the First Decision's requirements. From May 29, 2001 through August 2, 2001 Bryan had three different in-school TAs, an after-school TA for only three days, and no weekend TA.  Two of the three in-school TAs were located by Plaintiffs rather than the DOE.  The DOE located the third TA, who worked for only three days in June 2001.

During the May 7 to October 1, 2001 period covered by the Stipulation, Bryan did not have an in-school TA for at least 53[6] days, did not have an after-school TA (from 4 to 7 p.m.) for all but three days,[7] and had a weekend TA on a irregular schedule.  A full-time in-school TA started on September 28, 2001 and continued to work with Bryan.  Beginning October 15, 2001, Bryan had an after-school TA, who started on September 28, 2001 and worked with Bryan from that date until February 15, 2002.  Beginning October 15, 2001, Bryan had had an after-school TA for two hours on Mondays, Wednesdays, and Fridays.

---

[6] This figure does not include days on which the TAs were absent from school.

[7] Cheryl Mark, who was Bryan's TA during the summer of 2001, worked from 8 a.m. to 4 p.m.; however, Bryan did not have a TA from 4 – 7 p.m., as provided in the Stipulation.

Subsequently, an after-school TA was added for two hours each on Tuesdays and Thursdays. These conditions were not compliant with Bryan's IEP. Bryan's parents feared that it was sure to lead to regression in the portion of Bryan's program designed to help develop functional skills – toileting, food preparation, clean up and household chores.

Although the First Decision obligated the DOE and/or the DOH to make up each day between May 7 and October 1, 2001 for which Bryan was not provided with an after-school educational aide, the DOE and/or the DOH refused to fully make-up those days. Bryan was stagnating and beginning to exhibit additional problems, especially in the areas of social functioning and communication. To enforce the First Decision and obtain mandated services, Bryan's parents had to resort to an enforcement action in federal court invoking the provisions of the Felix consent decree, the IDEA, and Section 504. *See, Wiles Bond, et al. v. State*, CV-02-00101 SOM/BMK. The complaint was filed because the DOE did not comply with the First Decision.

> E.     THE SETTLEMENT AGREEMENT OF JULY 1, 2002

The DOE exhibited continuous non-compliance between May, 2001 and July, 2002, failing to provide properly trained TAs or implement the functional portion of Bryan's home program, now, for two school years. The DOE's continued non-compliance and refusal to fulfill its obligations forced Bryan's

parents to seek to enforce the First Decision of May, 2001 by filing complaint in federal court on February 15, 2002. After the complaint was filed, the parties engaged in discussions to settle the disputes and an agreement was reached.

The Settlement Agreement of July 2002 is remarkable, insofar as it addresses and confirms, all of the parents' concerns expressed since 1999. Furthermore, it expressly describes the DOE's obligations toward Bryan in exacting detail:

1) by August 1, 2002, provide, hire and have in place ninety-five percent (95%) per calendar month of the TA hours to which Bryan is entitled.

2) continue to provide TA services through its contract with the current service provider and/or its successor.

3) by August 1, 2002, procure TA services for Bryan to be provided by qualified individuals through an "expedited contract process";

4) by August 1, 2002, <u>create a pool of substitute TAs</u> who are qualified and trained to provide services to Bryan;

5) TA services shall be provided by qualified TAs who meet the standards for a Level III TA, and are trained in DTT, TEACCH, and PECs methods for autistic children;

6) complete Bryan's daily behavioral logs and daily log sheets showing the number and completion percentage of DTT and TEACCH trials utilized, and shall complete the DTT log for each trial; and

7) during the regular or extended school year, the State shall provide TA services to Bryan at his home or at another setting deemed appropriate by the IEP team, including a school classroom.

Thus, the DOE acknowledged its obligation to provide training of TAs. The identity of the person who signed the settlement agreement for the DOE is also important. It was signed by Alvin Rho. Mr. Rho was the highest DOE official on the island of Hawaii during the period Bryan was in school. At his deposition, Mr. Rho freely admitted that he knew there was a chronic, systemic shortage of skills trainers on the Big Island, reaching back to at least 1999. Mr. Rho testified he and Judith Radwick the District Educational Specialist (DES) had known about the shortage for years. When asked what he did to address this critical and chronic need, Mr. Rho replied that he merely called the service agencies and met with the service providers.

What the DOE did not do was to address the situation in a manner similar to the special education teacher shortage – starting accelerated training programs locally and recruiting qualified applicants from the Mainland. By not taking control of the training and certification of skills trainers in house, by not recruiting

13

from the Mainland, the DOE made decisions that insured that its promises to Bryan and children like him on the Big Island would go unfulfilled.

F.    THE DOE IGNORED THE SETTLEMENT AGREEMENT OF JULY 1, 2002, AND BRYAN'S PROGRAM DEGENERATED INTO "CHAOS."

Unfortunately for Bryan, the DOE did not comply with the Settlement Agreement of 2002.    Bryan's education began to suffer dramatically as the implementation became progressively more erratic.    By the Fall of 2003 and the winter of 2004 large gaps existed in the skills trainer hours each week.    Stated simply, skills trainer services were not provided and the DOE did nothing to train an adequate pool of skills trainers to address the chronic shortage and turnover it had been aware of since Bryan arrived in Hawaii.    There was no pool of trained substitutes or replacements and there were no adjustments to Bryan's educational program because of this shortage.

By the 2003-2004 school year, the DOE was also taking a more hostile approach to Bryan and his parents.    The DOE began blaming Bryan's parents for his regression and the behavioral consequences of its own failure to provide qualified Skills Trainers who would implement his IEP and fulfill the DOE's many promises.

It was during this period that Dr. Copeland described Bryan's program as "chaotic."    Although there was a great need for skills trainers services to fulfill

Bryan's IEP and the DOE's promises, Bryan regularly was going without skills trainers services.  The DOE is likely to assert that Bryan's needs were extreme and far beyond any other child, as an excuse for this particular lack of skills trainers.  This assertion is false, as Dr. Copeland testified that even among the 18 or so children whose cases had been assigned to her, six were more difficult to deal with than Bryan.  None of the skills trainers assigned to Bryan met the qualifications of the settlement agreement or IEP and some of them lacked even the most basic training or qualifications.  Knowing this and knowing Bryan's needs, the DOE, nevertheless, did not institute a training program on the Big Island or recruit from the Mainland, as it had done for special education teachers.

The DOE knew that Bryan was regressing severely in all areas, especially toileting and functional skills, and often presented a danger to himself.  Without any program in place, the DOE nevertheless took its well worn path – blaming Bryan's parents for having an "unclean" home and accusing them of confining Bryan improperly.  In fact, on one occasion, a skills trainer reported to Kim that she had been asked by the DOE to "get the dirt" on the family while she was working in their home.  Faced with this kind of retaliatory behavior at a time when their son had regressed to a point worse than he had been in when they moved to Hawaii, Bryan's parents again filed for due process hearing in February 2004, which convened in April, 2004.

Bryan's parents continued to try to work with the DOE and engaged in another series of meetings with the DOE officials from the Big Island (including Mr. Rho and Ms. Radwick) in 2004.  The DOE did not present any plan to train appropriate people who could work with Bryan and possessed the skills necessary to implement his IEPs and the DOE's agreements.  By this time, though Bryan's language was emerging and he had over 140 signs, only one skills trainer trained in American Sign Language (ASL) qualified.  None of the others knew ASL, yet the DOE knew this was Bryan's preferred mode of communication, and crucial to his ability to express himself.  While Bryan understands and can respond to social language and cues, he communicates primarily through sign language.  In addition not being trained in American Sign Language, none of Bryan's skills trainers had training in how to work with autistic children.

Kelly Stern (a private agency representative providing skills trainers to DOE), and Linda Price (another private agency representative) testified at their depositions that appropriate services by properly trained skills trainers had not been provided.  By this time, Bryan had gotten worse, his program was in disarray and that, after five years, the DOE was doing the same thing it had always done to find skills trainers, asking other entities to do it for them while Bryan was deteriorating in front of them.

After the testimony from the DOE and its agencies, and the parents, the Hearings Officer issued her ruling in May 11, 2004 that:

1)   Bryan is severely autistic.

2)   Bryan's disability requires that he be placed in a fully self-contained special education classroom for children with autism.

3)   Bryan does not speak.  He communicates his needs through signs, gestures, and verbal approximations, mainly through American sign Language (ASL).

4)   Bryan's IEP requires 68 hours of skills trainer services per week.

5)   According to the January 9, 2004 IEP, among his other needs, Bryan should (1) increase his signing vocabulary and continue spontaneous use of sign language; (2) learn appropriate toileting skills in the school, home, and community settings; and (3) learn to respect the personal space and the personal property of others (boundaries).

6)   Dr. Dru Copeland, Bryan's Intensive Instructional Services Consultant (IISC), testified that her goal for Bryan is that he be as functional in the world as he can possibly be.

7)   From October 2003 to February 2004, the DOE failed to provide Bryan with required number of skills trainer service hours per week as required in his relevant IEPs.

8)     The six skills trainers Respondent provided to Bryan in the Fall of 2003 through February 2004 did not have prior experience in working with autistic children.  Five of the six had no prior experience with ASL.

9)     Neither of the two agencies, Child and Family Services (CFS) and The Institute for Family Enrichment (TIFFE), who provided skills trainers to Bryan during that period were able to locate individuals who had experience working with autistic children or who were proficient in ASL.

10)     Since Bryan's trainers had no experience in working with autistic children, Dr. Copeland had to train them.  During the 18 months she worked with Bryan, Dr. Copeland trained 12 skills trainers.

11)     Petitioners, on their own, placed advertisements in newspapers to locate skills trainers for Bryan.  Over time, they located eight skills trainers for Bryan who were hired by Respondent.

12)     Bryan's skills trainers must be proficient in ASL and use Bryan's vocabulary bank of ASL signs.

13)     Bryan's teacher does not know ASL and does not use ASL to communicate with Bryan and two other children in his class who use signs as their primary mode of communication.  It is frustrating for

Bryan to communicate with someone who does not know ASL and he does not progress.

14)     When Bryan did not receive the number of skills trainer hours specified in his IEPs from October 2003 through February 2004, he regressed in a number of areas.

15)     One significant area of regression involved toileting skills.

16)     A second significant area of regression involved learning to behave independently and respecting the personal space and personal property of others (boundaries).

17)     Bryan must learn appropriate boundary behaviors in order to function at school and in the community.

18)     In the Fall of 2003 to February 2004, Respondent attempted to locate skills trainers for Bryan through CFS and TIFFE.  Respondent, however, was unable to provide Bryan with the number of skills trainer hours required by his January 9, 2004 IEP until March 2004.

On the heels of this decision, the same Hearings Officer decided on July 23, 2004 that the DOE had a duty under the IDEA to provide a special education teacher for Bryan's ESY program, who had training in ASL and could

communicate with Bryan.[8]  DOE argued that it was not obligated to do so in the

Extended School Year, even though Bryan's IEP required those services.   The

Hearings Officer determined in her decision of July 23, 2004 that:

> Student (Bryan) has been denied a FAPE.  Respondent's failure
> to provide Bryan with a qualified special education teacher who has
> experience teaching autistic children and is proficient in ASL during
> the ESY period, results in a loss of educational benefit to Bryan.
> Therefore, Respondent shall immediately hire a qualified special
> education teacher with experience in teaching autistic children and
> who is proficient in ASL, and can deliver the special education
> services specified in Bryan's IEP during ESY periods.

It was at this same time that Kim Smalley, Ph.D. had almost completed the

behavioral report in August of 2004.  The DOE had retained Dr. Smalley to prepare

her report.  Surprisingly, up until this time, no functional behavioral analysis[9] had

---

[8] While the meetings were occurring, in August 2003 DOE employees banded
together and tried to defame and discredit Christy Edwards, one of the few skills
trainers who had a very close and long-term relationship with Bryan.

[9] Failure to base the intervention on the specific cause (function) very often results in

ineffective and unnecessarily restrictive procedures.   The antecedents and

consequences of behavior are analyzed to see which function(s) the behavior fulfills.

Problem behavior can also serve more than one function, further complicating the

matter.   An interview, combined with direct observation of the behavior most

frequently used in determining the function of the behavior.   This is what Dr.

Smalley did: interviews and direct observation.

been completed for Bryan, even though all the experts who will testify in this case, including Defendant's agree such an analysis of Bryan's behaviors was needed.  To complete an accurate and effective report, Dr. Smalley spent a great deal of time at school observing Bryan daily, throughout the 2004 ESY session.  Her observations were significant.

In her deposition, Dr. Smalley described the abuse and neglect she saw Bryan subjected to on almost a daily basis.  Dr. Smalley expressed her outrage at this situation which was caused by the untrained and inexperienced skills trainers.  Dr. Smalley also told of all of her efforts to alert and motivate the DOE staff and administrative personnel who were on campus, and how her efforts had totally failed.  Furthermore, like Dr. Copeland, Dr. Smalley offered to train the DOE personnel and teach them how to work with Bryan as skills trainers, implementing his program appropriately.  The DOE never responded to those offers.

Meanwhile, Bryan's parents knew something had changed for the worse because at home they were seeing more disturbing behaviors, either emerging or reasserting themselves in Bryan.  He was aggressive, unruly, demanding, and overall very difficult to endure.  There was no doubt that these negative behaviors had been created or exacerbated by the DOE's failure to implement Bryan's[10] program, and

---

[10] Dr. Smalley was very upset to see that Bryan had learned to be aggressive – something she saw at the beginning of the summer of 2004.  She said how difficult it

that his educational and functional progress were delayed as a result.  Likewise, there was no doubt that Bryan's escalating behaviors prevented him from making any educational progress.  Bryan's devolving condition drove his parents to look out of state for help they could not find here.

Because of the efforts of Bryan's grandmother and parents, a California non-profit company called Pacific Child and Family Associates (PCFA) with experience working with autistic children had expressed interest in May and June of 2004, in making a proposal aimed at implementing Bryan's IEP.  The possibility of PCFA working on the Big Island with Bryan was discussed by Bryan's parents in meetings with the DOE during the winter and summer of 2004.  Key administrative personnel, especially JoAn Hill, attacked the idea.  Ms. Hill insisted that the DOE "could resolve this without the need to bring in mainland people."  This oppositional attitude prevailed and Bryan's 2004-2005 program was disputed until the federal court (Judge Gillmor), in August 2004, scheduled a hearing on the parents' request for a temporary injunction  within the context of the second enforcement lawsuit filed by Bryan's parents in July, 2004, the first of these two consolidated cases.  After the initial hearing, to create t the appearance it was working toward a solution and not just stonewalling, the DOE knew it would have to propose a solution to avoid an

---

would be to eradicate that aggression how this learned behavior was a life-changing event.

adverse order from the judge. Thus, the DOE finally contacted Cara Entz at PCFA, and arranged for her to make a two-day visit in October.

Unbeknownst to the parents, during the summer of 2004, DOE employee JoAn Hill, who had been very antagonistic to the family's request for services, joined forces with her attorney, Lono Beamer, to contact a third party and obtain highly confidential information including the actual e-mails exchanged between Bryan's mother and Christy Edwards (an existing skills trainer from the mainland who was very close to the mother). The third party even sent Ms. Hill Ms. Edwards' Paypal account number to show her that the third party could hack into the e-mails.

DOE's attorney, Mr. Beamer became involved in this effort after Ms. Hill received the Paypal account number, which he brought to Judge Gillmor's attention by attempting to have the Court consider them at the time Bryan's parents were seeking an order to have Ms. Edwards hired to work with Bryan. DOE asserted the surreptitiously obtained e-mail constituted "proof" of Christy Edwards's bad character. Bryan's parents' attorney, Shelby Floyd, was shocked and wanted an opportunity to investigate the matter. Judge Gillmor reacted strongly, rejecting the suggestion that she consider these documents.

Bryan's parents continued to work within the DOE system and Bryan began Middle School in the Fall of 2004. Bryan's program got worse, however. After Bryan accidentally struck one the school personnel with his elbow, he was isolated in

a room not much bigger than a large closet.  When his mother went to observe his "new" program, she found Bryan sliding around on the floor in a puddle of his own urine, self-stimulating, while isolated in a portable classroom.  The teacher told Kim: "We just don't know what to do."  The Skills Trainer assigned to Bryan commented: "He looks so happy."  There were four adults watching him do this without doing anything to stop him.  In fact, the adults were enabling his behavior.  Dr. Smalley observed the DOE employees during the summer of 2004 engaged in identical conduct and this was reported in her deposition.[11]  Out of concerns for his safety and health, Bryan's parents withdrew him from this classroom, though he continued to go to school for his speech and language work.[12]

Ms. Entz and PCFA were not scheduled to arrive until the end of October and, because it was their initial visit, were expected to observe Bryan, consult with his parents, the DOE and the providers and make a proposal.  Although on her second day of work, Ms. Entz was scheduled to meet with the DOE to discuss program options, she was instead taken without prior planning to federal court to create the impression that PCFA had a firm proposal.  The DOE did not tell Ms. Entz about

---

[11] Dr. Smalley reported that the skills trainers were lost and useless and JoAn Hill admitted in her deposition that she was aware of  the incidents reported by Dr. Smalley, but did nothing about it.

[12] These actions or lack thereof clearly added to Byran's regression caused by the DOE's failure to meet the IEP requirements.

appearing at a court hearing. Upon promises to the Judge at the August hearing that it would bring in PCFA, the court continued the hearing until the October visit. Essentially, Ms. Entz told the court that she was seriously investigating the situation and that she would not have made a formal proposal without a site visit and that she would be submitting a proposal within 30 days.

In November 2004, while it was also investigating residential placement for Bryan at various Mainland facilities without Bryan's parents' participation or knowledge, the DOE received the PCFA proposal. It included sending an ASL trained psychologist to Hawaii, who would then hire skills trainers from the same high-turnover untrained applicant pool. While a two-page budget was submitted, PCFA had concerns about what the DOE had represented regarding the high level of Bryan's needs, versus what Ms. Entz actually had observed of Bryan. PCFA, therefore, made alternative proposals based on how Bryan had been described, versus what Ms. Entz observed. The DOE never responded to the November proposal.

Ms. Entz testified that even under ideal conditions the proposal could not be implemented until some time in January (that is if there were no negotiations over money and personnel.) By the time that the DOE could have the PCFA services, Bryan would have missed another half-year of school without services he desperately needed, putting him further at risk of regression and permanent damage.

After Bryan's parents saw the DOE's use of surreptitiously obtained e-mail regarding the only skills trainer left who had any rapport with Bryan, used against them in court, after five years of uphill struggle, they, too, began to look at Mainland options. While certainly interested in PCFA's expertise, Bryan's parents recognized that it would be at least another half of a school year before the program could be up and running. They began exploring a move and Dr. Bond was fortunate to be able to obtain employment in the San Francisco area. The family moved to California, in January 2005, and Bryan has been receiving services there since that time. He has made great progress in his behaviors, especially toileting and social functioning; his academic and language development continue to lag as a result of the time lost in Hawaii.

## IV.    PLAINTIFFS' THEORIES OF LIABILITY.

### A.    DELIBERATE INDIFFERENCE

Approximately one month before the parties were prepared to go to trial, on January 17, 2008, the United States Court of Appeals for the Ninth Circuit issued its decision in *Mark h. v. Lemahieu*, 513 F.3d 922 (9th Cir. 2008). The Ninth Circuit held that the availability of injunctive relief under the IDEA did not preclude lawsuits for monetary damages under the Rehabilitation Act of 1973 § 504. *Mark H.*, 513 F.3d at 925. In *Mark H.*, the court unambiguously confirmed the existence of a private right of action under § 504. The court reaffirmed its own prior precedent and

acknowledged United States Supreme Court precedent that permits a direct right of action under § 504 itself for individuals who are denied "meaningful access" through "reasonable accommodation" to federally funded programs.  513 F.3d at 935.  The *Mark H*. court emphasized that the statute not only prohibits discrimination against the disabled, but explicitly prohibits exclusion from and denial of the benefits of state programs solely based on disability. *Id*. at 937.  The court explicated that the focus of the prohibition in § 504 remains on "'whether disabled persons were denied 'meaningful access' to state-provided services.'"  *Id*. (quoting *Crowder v. Kitigawa*, 81 F.3d 1480, 1484 (9th Cir. 1996).

Under § 504, a plaintiff seeking monetary damages must show that defendants acted with "deliberate indifference" to known risks of harm.  *Mark H.*, at 938; *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).  Deliberate indifference requires "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall*, 260 F.3d at 1139 (*citing City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1988)).
In their Second Amended Complaint, Plaintiffs asserted that Defendant acted with deliberate indifference in failing to provide Bryan with "meaningful access to public education" under § 504 itself..  As affirmed by this court's denial of Defendant's motion to dismiss or in the alternative for summary judgment on the underlying § 504 claim, Plaintiffs correctly read *Mark H*. as offering the option of invoking the §

504 regulations while leaving intact the implied right of action under the statute. *Wiles v. Dep't of Educ.*, Civ. Nos. 04-00442; 05-00247 ACK-BMK, Order Denying in Part and Granting in Part Defendant's Amended Motion to Dismiss or in the Alternative for Summary Judgment on Second Amended Complaint Filed on February 13, 2008.

The public entity "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation." *Id.* Section 504 creates "a duty to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." *Id., citing Wong v. Regents of University of California*, 192 F.3d 807, 818 (9th Cir. 1999). The DOE cannot discharge its legal duty to "act" on Bryan's behalf, by merely proffering just any accommodation. *Id.* Rather, it must consider Bryan's particular needs when investigating what accommodations are reasonable. *Id. see also* 28 C.F.R. §35.160(b)(2) (establishing a regulatory mandate to "give primary consideration to the requests of the individual with disabilities").

In this case, there is no question that the: (1) DOE had full knowledge of Bryan's needs and federally protected rights from 1999 through 2004; and (2) DOE did not fulfill its known obligations to provide Bryan the particularized services required to fulfill his individual needs, as set forth in his IEPs, this court's Orders and the DOE's own settlement agreements and its own hearing officers' decisions.

Since there has been a definitive ruling by Judge Gillmor that DOE's actions and inactions were the cause of a denial of FAPE, the DOE now will attempt to avoid liability by arguing to the jury it "tried" to fulfill the federal mandate, the hearing officer decisions, the stipulations and settlement agreement. In other words, the DOE will claim that it acted in "good faith." However, as noted in *Duvall*, providing just "any" services is not enough; DOE must provide accommodations that meet Bryan's needs. And, DOE cannot avoid liability by arguing that it acted in "good faith," when it chose not to develop the pool of substitute skills trainers it agreed to provide in the 2002 settlement agreement. *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002). Furthermore, as demonstrated by the DOE's Prior Written Notice dated June 7, 2004, at Pet. Exh. 75, even the DOE recognized that it must implement Hearing Officer Alm's May 11, 2004 Decision and Order (pertaining to Autism Consultant Training Hours, Toileting Expert and ASL Training) without excuse. Additionally, Patricia Hamamoto's September 2, 2004 letter (dated *six weeks* after the July 23, 2004 Stipulated Decision and July 23, 2004 Decision and Order) to Kealakehe Principal Robert Gentzel, District Education Specialist JoAn Hill and Complex Area Superintendent Alvin Rho at Pet. Exh. 125 demonstrates the DOE's recognition that responsible persons from the DOE "must fulfill the required actions within specified timelines," in order to "ensure the DOE's good faith effort in providing a FAPE." This letter begs the question of the necessity

of Pat Hamamoto sending a letter to the Principal, District Education Specialist and Complex Area Superintendent six weeks after they were ordered to comply with a lawful Order. Not only are these people knowledgeable about the law, they are very familiar with this case in particular and were represented by counsel. However, they still did not comply with the Order. What is more telling perhaps, is the fact that Ms Hamamoto sent no further memos or written inquiries regarding compliance; and she would testify the intention was to require compliance by the first memorandum—but her employees ignored the decision and her memorandum.Despite the fact that there is no statutory or legislative basis for carving out such exceptions, there appears a probability that the DOE will take that trial position and claim this notion of the well-intentioned bureaucrat is applicable. However the Ninth Circuit has been faced with the identical claim of a self manufactured "good faith defense" and rejected it. Indeed, in the <u>Duvall</u> case, the Ninth Circuit rejected the assumption that the county officials were held to have acted properly and on remand the district court was to make a specific determination about these county official, all of whom had the authority to require the immediate availability of the Real-time transcription sought by the plaintiffs. It is also noteworthy the state tried the same defense in Burns v Vidlack litigation , and it failed there , as it should here. Moreover, the "good faith" defense has already been rebuffed in the *Felix* case, and in *Lovell* the State argued

that it had not discriminated because it had acted with "good intentions." In rejecting

this defense in the Ninth Circuit in *Lovell* states that:

> Applying the *Duvall* standard in this context, we find that the State acted with "deliberate indifference," and therefore engaged in "intentional discrimination." First, when a state facially discriminates against the disabled, it is chargeable with notice that federal rights are implicated by such discrimination. Thus, Hawaii had notice that a modification was required. Second, by choosing categorically to exclude disabled persons from QUEST, despite knowing that some of those excluded would remain without any coverage, the State has failed to act with the requisite care to protect the rights of the disabled.

*Lovell v. Chandler,* 303 F.3d 1039, 1057 (9th Cir. 2002).

Likewise, this District Court, through Judge Ezra granted partial summary

judgment as to liability in a 504 suit brought against the DOE for permitting

personnel shortages on the island of Molokai. The DOE had lost the administrative

hearing when the Hearings Officer had found that the Plaintiff boy was not provided

FAPE because of the personnel were not hired to give this Plaintiff the services that

would allow the Plaintiff to sustain a level of progress. Judge Ezra ruled in the

*Stephen L.* case that:

> Plaintiffs have provided evidence which shows that the Molokai High principals, officials in the Maui District Office, and state officials in the Honolulu offices were aware of the personnel shortages on Molokai. These personnel shortages were primarily responsible for the denial of Aaron's FAPE. All failed to take action to remedy the situation. This knowledge, coupled with the lack of action, resulted in the receipt of inadequate services for Aaron. This lack of services led to Aaron's inability to be mainstreamed, and led to his lack of progress during the last four years of his education.

> Defendants argue in their Opposition, of course, that they acted in good faith. The court, however, sees only specific evidence before it that they [sic] DOE knew that special education children on Molokai, including Aaron L. were not receiving the services necessary to provide them with the FAPE to which they were entitled. Inspite of this awareness, the DOE did nothing. This amounts to deliberate indifference.

*See Stephen L. v. LeMahieu*, Civ. No. 00-338 (attached as Exhibit "A".)

The judicial reluctance to accept this proffered "good faith" defense is understandable – it would make the deliberate indifference standard swiss cheese and every governmental or private provider would claim "good faith" in the involvement in the facts giving rise to the Section 504 claim and the federal courts will not participate in this wholesale changing of section 504.

The case at bar presents a situation that is very analogous to the facts in *Patricia N. v. LeMahieu*, 141 F.Supp.2d 1243 (D. Haw. 2001), where the State claimed they reasonably thought that the young plaintiff, who was autistic was receiving sufficient services to provide the DOE a defense to liability. The Court rejected the argument that providing some services, no matter how faulty or lacking, provided a legal defense to liability under Section 504, where the DOE knew what the child in question needed and had not met those needs.[13] *Id.* at 1255.

---

[13] Plaintiffs also alleged direct violations of Section 504 of the Rehabilitation Act. Section 504's remedial provision states: The remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 [42 U.S.C. §§ 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of [the Rehabilitation Act].29 U.S.C. § 794a(a)(2). Plaintiffs have argued that the "any

In addition to the deliberate indifference claims, Bryan's parents seek judgment that the DOE improperly retaliated against them for their legitimate advocacy of for his educational needs. "Although Congress could have limited the remedial provisions of the Rehabilitation Act to claims brought by or on behalf of disabled individuals, it did not do so in apparent recognition of the fact that disabled individuals may need assistance in vindicating their rights from individuals who may have their own claim to relief under the Act." Id. at 1254, citing, *Whitehead v. School Bd. for Hillsborough County,* 918 F. Supp. 1515, 1522 (M.D. Fla. 1996) (holding that parents of disabled child could recover under section 504 for retaliation claims). Thus, Courts have found in favor and awarded damages to advocates for the disabled who are targets of retaliation. *See, e.g., Settlegoode v. Portland Public Schools,* 371 F.3d 503 (9th Cir. 2004)(sustaining award of $500,000 in non-economic damages for retaliation against teacher who advocated for disabled students); a*ccord  Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138 (2d Cir. 2002)(and cases cited therein acknowledging cause of action on behalf of parents claiming retaliation for seeking educational services for disabled child);

---

person aggrieved" language brings non-disabled individuals like Plaintiffs within the zone of interests of the Rehabilitation Act's remedial provision. See Greater Los Angeles Council on Deafness v. Zolin, 812 F.2d 1103, 1115 (9th Cir. 1987); *Patricia N. v. LeMahieu*, 141 F. Supp. 2d 1243 (D. Haw. 2001) (holding that the "aggrieved by" language of 29 U.S.C. § 794a(a)(2) gave parents of autistic child a cause of action under section 504 of the Rehabilitation Act). The Court previously dismissed direct claims by Bryan's parents for damages as "aggrieved persons" under Section 504, but ruled that they have claims for retaliation.

*Alex G. v. Bd. of Trs.*, 387 F. Supp. 2d 1119 (D. Cal. 2005)(adopting *Weixel's* analytical framework); *K.S. v. Fremont Unified Sch. Dist.*, 2007 U.S. Dist. LEXIS 24860 (D. Cal. 2007)(same).[14]

Plaintiffs will prove at trial that the DOE was recalcitrant to providing Bryan with all of the services set forth in his IEP and when his program spiraled into "chaos" and his parents began pursuing remedies more vigorously, the DOE's attitude and conduct turned from resistance to a more punitive approach. Testimony will also establish that Bryan's parents had to overcome significant obstacles placed in their way by DOE and were expected to compromise more and more, as they watched their son's program deteriorate. Whether the DOE had enough appropriately trained skills trainers was never really a question—DOE did not. What

---

[14] There is no question that parents enjoy a direct right of action for economic and psychological harm suffered as a result of retaliation against them for opposing prohibited discrimination directed at their children under Section 504's anti-retaliation provisions. See, e.g., Weber v. Cranston Sch. Comm., 212 F.3d 41 (1st Cir. 2000); (Section 504, with lengthy explanation); Weixel, 287 F.3d at 149 (ADA and Section 504); Whitehead v. School Board of Hillsborough County, 918 F. Supp. 1515 (M.D. FL 1996), (Section 504); Sturm v. Rocky Hill Bd of Ed, 2005 U.S. Dist. LEXIS 4954 (D. Conn. Mar. 29, 2005) (Section 504).

This is consistent with the EEOC's Guidance, which states:
> The anti-retaliation provisions make it unlawful to discriminate against an individual because s/he has opposed any practice made unlawful under the employment discrimination statutes. This protection applies if an individual explicitly or implicitly communicates to his or her employer or other covered entity a belief that its activity constitutes a form of employment discrimination that is covered by any of the statutes enforced by the EEOC.
> EEOC Guidance No. 915.003 (5/20/98) ¶ 8-II B.

was at issue was whether DOE would take measures to develop a pool of skills trainers for Bryan, or wait and opposed his parents until Bryan's condition deteriorated to the point where they would have to leave the place their home in Hawaii, or risk the consequences of never finding appropriate programming. To permit DOE to avoid the consequences of its decisions would invite the DOE to avoid its federal obligations in similar cases by stonewalling and saying "We tried."

B.     ANTICIPATED DEFENDSES BY DOE.

1.     BLAMING BRYAN'S PARENTS

In addition to claiming it acted without the requisite deliberate indifference, DOE undoubtedly will attempt to place blame for Bryan's deterioration on his parents. While both irrelevant and false DOE already attempted to attack Bryan's parents' character and mis-direct the jury from its misconduct.

The DOE will undoubtedly assert Bryan's home was "dirty" as a result of his escalating behaviors, and that he was "locked up." Bryan was confined to his room at night because he would wake up at night, wander, destroy things, injure himself and frequently urinate in his room after losing his toileting skills in 2003-2004 when he received no appropriate services. Confining him in an environment without objects except a bed and a bucket was designed to avoid harm to himself, his home, and others. His parents tried to implement his behavioral program at home, even though it was not implemented at school during the day. Most importantly, it was

not until the parents began seeking relief from court that Bryan's "confinement" or "home conditions" were raised. Danielle Doucette, who made such complaints, did not want to implement Bryan's life skills program in the home and refused to comply with the program's requirement that she record data, even after multiple instructions by Dr. Copeland that she do so. The "home conditions" argument is further contradicted by the fact that Shelby Floyd offered to allow the skills trainers who objected to work with Bryan outside the home. In any even, whatever Bryan's behaviors at home in 2003-2004, they were directly attributable to the total lack of appropriate programming and services he was receiving each day—programming and services DOE knew he needed.

### 2. DENIAL OF FAPE IS NOT DELIBERATE INDIFFERENCE PER SE

In addition to blaming the parents, Defendants also will assert that not providing Bryan with FAPE does not constitute deliberate indifference. Plaintiffs are not arguing the denial of FAPE is deliberate indifference per se. Plaintiffs argue that the actions that constitute the denial of meaningful access or that exclude Bryan from or deny him the benefits of meaningful public education are evidence of the DOE's deliberate indifference which the jury must consider.

### 3.     "GOOD FAITH" IS NOT A DEFENSE

Defendants will also claim that they tried to serve Bryan in the best way they could and that the third parties DOE contracted with had a difficult time fining skills trainers on the Big Island. DOE will claim that they cannot be liable under Section 504, even though DOE never fulfilled its July 1, 2002, agreement to develop a pool of skills trainers to cover turn over and absences.

The DOE must explain how Alvin Rho could, in good faith, sign that agreement when he knew that there was a huge and critical shortage of available skills trainers, but not take action to establish a training program.  The shortage of skills trainers was attributable to one decision: not instituting training programs to create more properly trained skills trainers.  To train skills trainers properly to work with autistic children is not difficult, but what the DOE actually offered as skills trainers were simply (untrained) warm bodies.  Bryan's parents worked with a host of skills trainers who did not have qualifications, hoping they could be trained on the job.

Three of DOE's experts, Dr. Smalley, Dr. Copeland and their testifying expert Dr. Bryan Siegel offered to train skills trainers; their offers were not accepted. Although the system had not worked in the five years Bryan was in Hawaii, DOE's sole and exclusive response was to ask other entities to find more skilled trainers. The DOE's position that it did nothing wrong because it "tried" was specifically

rejected by the Hearings Officer in the May 11, 2004 decision (which was not appealed by the DOE.)  The DOE knew of Bryan's needs.  The DOE did not institute a training program to produce skills trainers to meet those needs or the DOE's federal mandate.  Knowing its obligation and Bryan's needs, *Duvall*, does not permit the DOE to simply throw whatever services are available at Bryan, ignoring that the "system" it is using has never worked to produce sufficient numbers of trained skills trainers.  The DOE's conduct is the epitome of deliberate indifference to Bryan's known needs and the DOE's known obligations — it would do considerable violence to section 504 were any of the state's excuses for non-compliance with the known rights of  Bryan.

### 4.   BRYAN'S FAMILY WAS FORCED  TO \LEAVE  HAWAII

The fact that Bryan's parents withdrew him from his school after finding him, at the end of their five-year struggle with the DOE, sliding around the floor in his own urine in the presence of four adults is readily understandable.  It is also understandable for the family to move away from Hawaii after no program was in place in January 2005.  The DOE cannot argue Bryan's parents had to wait until matters got worse.  The DOE cannot argue that there was any mechanism in place to make Bryan's program better.  Also, the DOE cannot argue that they protected the parents from being targets of spying and retaliation that jeopardized their privacy and mental and physical well-being.

In Dr. Smalley's deposition taken by the DOE in July,2006, she tried to make the State's attorneys understand what she observed Bryan had to endure at the summer school ESY of 2004. Dr. Smalley had no doubts about whether Bryan was "abused" or "neglected" from what she saw in 2001 Bryan's school life in Hawaii. The DOE simply cannot "get it" without the assistance of a jury.

IV.    DAMAGES

Plaintiffs will ask the jury to award special damages to compensate for Bryan's additional future needs resulting from DOE's deliberate indifference, as well as special damages incurred by his parents in their move from Hawaii. Plaintiffs will ask the jury to award general damages to Bryan and to his parents.

DATED:  Honolulu, Hawaii, August 4, 2008.

/S/ STANLEY E. LEVIN
CARL M. VARADY
STANLEY E. LEVIN
MICHAEL K. LIVINGSTON
Attorneys for Plaintiffs