1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3    ANN KIMBALL WILES and       )

 4    STANLEY BOND, individually  )

 5    and as next friend of their )

 6    son, BRYAN WILES-BOND, a     )

 7    minor,                       )

 8                 Plaintiffs,  )

 9          vs.                 ) Civil No. CV 04-00442

10    DEPARTMENT OF EDUCATION,    ) HG/BMK

11    State of Hawai'i, and ALVIN ) CONSOLIDATED (Other

12    RHO, in his official        ) Civil Action)

13    as West Hawai'i District     )

14    Superintendent,             ) VIDEOTAPED DEPOSITION

15                 Defendants.  )         OF

16    _____) RICHARD S. GOKA, M.D.

17    ANN KIMBALL WILES and       ) September 21, 2007

18    STANLEY BOND, individually  )

19    and as next friend of their )

20    son, BRYAN WILES-BOND,       )

21    a minor,                     )

22                 Plaintiffs,  )

23          vs.                 ) Civil No. 05-00247

24    DEPARTMENT OF EDUCATION,    ) JMS/BMK

25    State of Hawai'i,            ) CONSOLIDATED (Other
```

EXHIBIT 1

Page 2

1        Defendant.   ) Civil Action)
2 _____ )
3
4 VIDEOTAPED DEPOSITION OF RICHARD S. GOKA, M.D.,
5 Taken on behalf of Plaintiffs at 400 Davis Levin
6 Livingston Grande Place, 851 Fort Street, Honolulu,
7 Hawaii  96813, commencing at 9:00 a.m., on September
8 21, 2007, pursuant to Notice.
9
10 BEFORE:  SUE M. FLINT, RPR, CSR 274
11        Notary Public, State of Hawaii
12
13 APPEARANCES:
14
15 For Plaintiffs:   CARL M. VARADY, ESQ.
16        Law Offices of Carl M. Varady
17        American Savings Bank Tower
18        1001 Bishop Street
19        Suite 2870
20        Honolulu, Hawaii  96813
21
22
23
24
25

Page 3

1 Appearances (continued):
2
3 For Defendants:   GREGG M. USHIRODA, ESQ.
4        JEFFREY LAU, ESQ.
5        Watanabe Ing & Komeiji LLP
6        First Hawaiian Center
7        999 Bishop Street 23rd Floor
8        Honolulu, Hawaii  96813
9
10 Also Present:   CHRIS LOWENTHAL, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                I N D E X
2
3 EXAMINATION BY:               PAGE
4   Mr. Varady ........................... 8
5
6 EXHIBITS FOR IDENTIFICATION        PAGE
7
8 Deposition Exhibit No. 1 -
9 9/20/07 letter from Ushiroda to Varady .... 27
10
11 Deposition Exhibit No. 2 -
12 Decision and Order ........................ 58
13
14 Deposition Exhibit No. 3 -
15 Release and Settlement Agreement .......... 58
16
17 Deposition Exhibit No. 4 -
18 Finds of Fact, Conclusions of Law
19 and Decision .............................. 58
20
21 Deposition Exhibit No. 5 -
22 Stipulated Partial Decision
23 and Order ................................. 58
24
25

Page 5

1 Deposition Exhibit No. 6 -
2 Legend; Findings of Fact, Conclusions
3 of Law and Decision ....................... 58
4
5 Deposition Exhibit No. 7 -
6 Curriculum Vitae and Fee Schedule ......... 58
7
8 Deposition Exhibit No. 7A -
9 Updated Curriculum Vitae .................. 58
10
11 Deposition Exhibit No. 8 -
12 Rule 26 Testimony Report .................. 58
13
14 Deposition Exhibit No. 8A -
15 Updated Rule 26 Testimony Report .......... 58
16
17 Deposition Exhibit No. 9 -
18 6/28/06 letter from Goka to Ushiroda ...... 58
19
20 Deposition Exhibit No. 10 -
21 Supplemental Report Following
22 Rule 26 Guidelines ........................ 58
23
24 Deposition Exhibit No. 11 -
25 Curriculum Vitae of Bryna Siegel .......... 58

Page 6

1  Deposition Exhibit No. 12 -
2  Department of Developmental Services
3  Parental Financial Responsibility
4  Monthly Parental Fee ..................... 101
5
6  Deposition Exhibit No. 13 -
7  Supplemental Report (Preliminary) ........ 131
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        (Disclosure presented to Counsel.)
2        THE VIDEOGRAPHER:  This is the deposition
3  of Richard Gota, M.D., in the matter of Ann Kimball
4  Wiles and Stanley Bond, et al. versus the Department
5  of Education, et al.
6        We're located at Davis Levin Livingston
7  Grande, 851 Fort Street Mall, Honolulu, Hawaii.  My
8  name is Chris Lowenthal, video specialist for
9  Certified Legal Video Services.
10       Will counsel please state your names?
11       MR. VARADY: Carl Varady for the
12  plaintiffs, Ann Kimball Wiles, Stan Bond and Bryan
13  Wiles-Bond.
14       MR. USHIRODA:  Gregg Ushiroda appearing for
15  defendants, Department of Education, State of
16  Hawaii, and Alvin Rho in his official capacity as
17  West Hawaii District Superintendent.
18       Also present is Jeff Lau, who is an
19  associate from my office.
20       THE VIDEOGRAPHER:  Today is September
21  21st, 2007.  We're on the record at 9:17 a.m.
22       Will the court reporter please swear in
23  the deponent?
24
25

Page 8

1            RICHARD S. GOKA, M.D.,
2  called as a witness at the instance of Plaintiffs,
3  being first duly sworn to tell the truth, the whole
4  truth and nothing but the truth, was examined and
5  deposed as follows:
6
7            E X A M I N A T I O N
8  BY MR. VARADY:
9    Q.    Please state your name for the record.
10   A.    Richard Goka.
11   Q.    Dr. Goka, you're a medical doctor; is that
12  correct?
13   A.    That's correct.
14   Q.    Your last name is spelled G-o-k-a; is that
15  correct?
16   A.    That's correct.
17   Q.    I believe the videographer called you Dr.
18  Gota in calling us to order here today, but it's
19  G-o-k-a.
20        Now, I'm going to give you some cautions.
21  You've had your deposition taken before?
22   A.    Yes, I have.
23   Q.    One of the first cautions I'm going to
24  give to you is -- I know you're fatigued today.  I
25  know you want to get out of here, as do we all, but

Page 9

1  please, even though you're smart and know what the
2  question is before I finish it, please let me finish
3  the question before you give your answer.  Can you
4  do that?
5    A.    Yes, I can.
6    Q.    Great.  Now, the general cautions of the
7  deposition are that if you answer a question, I'm
8  going to assume that you've understood it.  Is that
9  fair?
10   A.    Fair.
11   Q.    If you have any questions about a question
12  that I've asked, I'll be happy to clarify it for
13  you.  Do you understand that?
14   A.    Great.
15   Q.    You can take a break at any time that you
16  need to do that.  The only thing I ask is that you
17  not take a break when there's a question pending.
18  If a question is pending, I'll ask you to answer the
19  question before you take a break.  All right?
20   A.    Great.
21   Q.    We'll try to break every hour.  If for
22  some reason you need a break before the hour is
23  past, let me know and I'll be happy to accommodate
24  you.
25   A.    Thank you.

1    Q.    Have you looked at these -- the documents
2  that you put into storage since that time?
3    A.    No.
4    Q.    Now, you referred to Mr. Hom, Mr. Ushiroda
5  and Mr. Hara. Ms. Shikada is also counsel of record
6  in this case. Did you have any conversations with
7  her?
8    A.    What's her first name?
9    Q.    Holly Shikada.
10   A.    No.
11   Q.    Any other deputy attorneys general that
12 you spoke to about this case, other than the ones
13 I've named?
14   A.    No.
15   Q.    So you've not spoken to Gary Kam, for
16 example?
17   A.    No.
18   Q.    Any other private attorneys retained by
19 the State to defend this case that you've spoken to
20 besides Mr. Ushiroda, Mr. Hara --
21   A.    No.
22   Q.    Have you spoken to Mr. Komeiji?
23   A.    No.
24   Q.    Have you ever met with Mr. Komeiji?
25   A.    Maybe.

1    Q.    Do you know who Mr. Komeiji is?
2    A.    I don't recall. I may have met him once.
3    Q.    Where do you think that meeting might have
4  taken place?
5    A.    A long time ago, before the firm broke up.
6    Q.    Had you been retained by Mr. Komeiji's
7  firm in other matters?
8    A.    I've been retained by Watanabe, Ing and
9  Kawashima before in other matters. I don't know if
10 Komeiji was in the firm or before his name got on
11 there.
12   Q.    Okay. Were those personal injury matters
13 or medical malpractice defense matters?
14   A.    Yes.
15   Q.    Were you retained as a defense expert in
16 all those cases?
17   A.    From them, yes.
18   Q.    Who at Mr. Ushiroda's firm do you have the
19 closest working relationship on this case? Is it
20 Mr. Ushiroda or someone else?
21   A.    Mr. Ushiroda.
22   Q.    Prior to working on this case, you said
23 you worked as a defense witness for the Kawashima
24 firm. Who was the lawyer there who you worked most
25 closely with?

1    A.    Mr. Kawashima or Mr. Harada.
2    Q.    I'm sorry. The last name?
3    A.    Harada. Lyle Harada.
4    Q.    Lyle Harada. All right. Now, other than
5  the lawyers that I've mentioned, have you had
6  discussions with anyone from the Hawaii Department
7  of Education regarding this case?
8    A.    No.
9    Q.    Did you consider interviewing anyone from
10 the Department of Education in forming your opinions
11 in this case?
12   A.    No.
13   Q.    Wouldn't you want to know if the
14 Department of Education believed it had fulfilled
15 its obligations to Bryan in forming your opinions on
16 this case?
17        MR. USHIRODA: Objection. Relevance and
18 foundation.
19   A.    That's not my expertise.
20 BY MR. VARADY:
21   Q.    You've never met the parents in this case;
22 is that correct?
23   A.    That's correct.
24   Q.    Did you consider interviewing them in
25 forming your opinions?

1    A.    I didn't think it would change -- I mean,
2  I didn't think it would change anything as far as
3  the opinions, so therefore -- like I said, I'm
4  depending on Dr. Siegel.
5    Q.    So your answer would be, No, I did not
6  consider interviewing the parents important; is that
7  correct?
8        MR. USHIRODA: Misstates the testimony.
9    A.    I didn't feel it would be beneficial to
10 interview the parents in this matter.
11 BY MR. VARADY:
12   Q.    So your answer would be, No, I did not
13 feel interviewing the parents would be beneficial in
14 this matter; is that correct?
15   A.    Correct.
16        MR. USHIRODA: Asked and answered.
17 BY MR. VARADY:
18   Q.    And you've never met Bryan, the child in
19 this case; is that correct?
20   A.    That's correct.
21   Q.    Did you consider meeting him or observing
22 him?
23   A.    Same answer.
24   Q.    Your answer would be, No, I didn't think
25 it would be beneficial to my opinions in this case;

1 expert that would not be reflected on the list?
2    A.    They're in my supplement that was
3 supplemented in June of '07.
4    Q.    Have there been cases you've been retained
5 for since then?
6    A.    I've only had one testimony since then and
7 it was a case I was deposed on and I testified in
8 court earlier this week.
9    Q.    Where was that?
10    A.    Sacramento.
11    Q.    Was that in a civil case?
12    A.    Yes.
13    Q.    Were you testifying for plaintiff or
14 defendant?
15    A.    Plaintiff.
16    Q.    I indicated, I think, in one of my
17 questions that it appears that most of the cases
18 you've testified in involved issues of personal
19 injury or issues of -- well, issues of personal
20 injury arising either from motor vehicle accidents,
21 industrial accidents and whatnot.
22        Would that be a fair characterization of
23 the bulk of your testimony?
24    A.    True.
25    Q.    And what I wanted to know was although

1 there are none listed, because you're only required
2 to disclose the prior four years of testimony, have
3 you ever testified in a case involving an autistic
4 child prior to this case?
5    A.    No.
6    Q.    You indicated that in forming your
7 opinions you relied on the information provided by
8 Bryna Siegel; is that correct?
9    A.    Correct.
10    Q.    Have you ever met Bryna Siegel?
11    A.    Only on the telephone.
12    Q.    Have you ever worked with her before on
13 any other types of cases?
14    A.    Maybe. I'm not sure. There's another
15 case that she's involved in, but -- that's kind of
16 pending.
17    Q.    And whose -- which side of the case are
18 you on in that case?
19    A.    It's a defense case.
20    Q.    Who is the defendant in that case?
21    A.    Department of Education.
22    Q.    Of the State of Hawaii?
23    A.    Correct.
24    Q.    Without disclosing the personal
25 identifiers for that child or that family, which are

1 probably covered by FERPA --
2    A.    Who?
3    Q.    It's the privacy act that applies to
4 educational records.
5        -- or HIPAA, which I'm sure you're
6 familiar with, can you describe the case
7 sufficiently that we could find some way of
8 identifying it?
9        Is it a case that's currently in
10 litigation, for example?
11    A.    I don't know the status. I think there
12 was a summary judgment and it's on appeal. It's
13 coming out of this law firm.
14    Q.    And would that be the Mark H. case?
15    A.    That doesn't ring a bell.
16    Q.    Did you render an expert opinion in that
17 case?
18    A.    Mark H.?
19    Q.    Well, there are three cases that I'm aware
20 of that have come out of this firm that deal with
21 autistic children involving Dr. Siegel. The one I
22 believe you're talking about is Mark H., and that
23 involves two siblings.
24    A.    The twins?
25    Q.    Yes.

1    A.    That one, yes.
2    Q.    That's the Mark H. case.
3    A.    I didn't know that was what it was called.
4    Q.    Did you render an expert opinion in that
5 case?
6    A.    No. I think I got started. I looked at
7 stuff and it was just -- you know, told there was --
8 they had a summary judgment or whatever and just sit
9 on it.
10    Q.    Did you actually bill any time for that
11 case?
12    A.    To review records, I think I did.
13    Q.    Do you know about how much your bill was
14 for doing that record review?
15    A.    I have no idea.
16    Q.    Now, am I correct that in forming your
17 opinions you relied on Bryna Siegel's diagnosis of
18 Bryan?
19    A.    Correct.
20    Q.    You made no independent diagnosis; is that
21 correct?
22    A.    That's correct.
23    Q.    And you didn't perform any independent
24 testing of your own; is that correct?
25    A.    That's correct.

Page 42

1   Q.   You never observed Bryan; is that correct?
2   A.   That's correct.
3   Q.   You're not claiming to be an expert in
4 clinical psychology or autism; is that correct?
5   A.   That is correct.
6   Q.   You relied on Bryna Siegel's diagnosis of
7 Bryan's condition; is that correct?
8   A.   Correct.
9   Q.   Do you believe that her diagnosis is based
10 on her clinical expertise and qualifications?
11   A.   You'd have to ask her.
12   Q.   You have no idea?
13   A.   No. I know she's known as an autism
14 expert at the University of California, San
15 Francisco, and as a psychologist.
16   Q.   Do you know if she's a licensed clinician?
17   A.   It would only be an assumption.
18   Q.   Your answer would be, I don't know?
19   A.   Correct.
20   Q.   So you don't know if she's licensed in
21 California as a clinical psychologist; is that
22 correct?
23   A.   That's correct. It would be an assumption
24 only.
25   Q.   Are you familiar with California Business

Page 43

1 and Professional Code Section 2903?
2   A.   Specifically, no. I'd have to look it up.
3   Q.   Would you dispute the fact that in order
4 to make a psychological diagnosis in California, Dr.
5 Siegel would have to be a licensed clinical
6 psychologist?
7       MR. USHIRODA: Objection. Lacks
8 foundation, assumes facts not in evidence.
9 BY MR. VARADY:
10   Q.   I'm asking if you're aware of any facts to
11 dispute that assertion?
12   A.   I have no idea what the code says, so I
13 couldn't tell you.
14   Q.   So your answer would be, I don't know; is
15 that correct?
16   A.   Correct.
17   Q.   Do you know if she's licensed in Hawaii as
18 a clinical psychologist?
19   A.   I don't have any idea.
20   Q.   Do you know whether she would be required
21 to have a Hawaii license in order to render a
22 diagnosis in Hawaii?
23   A.   I don't know that code either, if it
24 exists.
25   Q.   Would you typically rely on clinical

Page 44

1 opinions if a person rendering an opinion did not
2 have a clinical license?
3   A.   I don't think that's my responsibility, to
4 validate their licensure or their professional
5 abilities. I think that's the area of the attorneys
6 that retained the people. So I would take it on
7 face value that that person had the abilities and
8 skills and qualifications to do so.
9   Q.   So you've assumed that Dr. Siegel has the
10 qualifications to make diagnoses in California; is
11 that correct?
12   A.   Correct.
13   Q.   And my question for you is: Have you ever
14 had occasion to refer patients out, when you did
15 have a clinical practice, to other clinicians?
16   A.   Yes.
17   Q.   Would you agree that it would be important
18 not to refer a patient out for treatment or
19 diagnosis to a clinician who's not properly
20 credentialed?
21   A.   I agree.
22       MR. USHIRODA: Objection to the extent
23 that it lacks foundation, calls for speculation,
24 also is an improper hypothetical -- incomplete
25 hypothetical.

Page 45

1 BY MR. VARADY:
2   Q.   I believe your answer was, I agree; is
3 that --
4   A.   I agree with that.
5   Q.   And would you agree that it would be wrong
6 to rely on a clinical opinion from somebody who was
7 offering such opinion without proper credentialing?
8       MR. USHIRODA: Again, objection. That
9 assumes facts not in evidence.
10   A.   I'd agree.
11 BY MR. VARADY:
12   Q.   And that it would -- such reliance on your
13 part in the field of physical medicine might pose a
14 risk of harm to the patient?
15   A.   Restate it.
16       MR. USHIRODA: Objection to the extent it
17 calls for speculation, assumes facts not in
18 evidence.
19   A.   Restate that, please.
20 BY MR. VARADY:
21   Q.   Sure. Relying on a clinical opinion from
22 somebody who's not properly credentialed to render
23 such an opinion in the field of physical medicine
24 and rehabilitation could pose a risk of harm to the
25 patient?

1     MR. USHIRODA:  Same objection.

2    A.    I guess that's possible.

3 BY MR. VARADY:

4    Q.    And that's one of the reasons why you

5 wouldn't want to rely on somebody who wasn't

6 properly credentialed, because they don't have the

7 basis for rendering that opinion?

8     MR. USHIRODA:  Also objection, vague and

9 ambiguous, lack of foundation, assumes facts not in

10 evidence.

11 BY MR. VARADY:

12    Q.    I'll try to clarify the question.  I'll

13 withdraw it.

14     My question is:  You wouldn't rely on the

15 opinion of an uncredentialed expert, because it

16 would pose a risk of harm to the patient.  You've

17 already said yes to that; isn't that right?

18     MR. USHIRODA:  Objection.  Misstates

19 testimony.  Also, vague and ambiguous, lack of

20 foundation, assumes facts not in evidence, also

21 calls for speculation.

22    A.    Well, let's back up a little here on this.

23 Okay?  If a person, say, hypothetically was a -- in

24 the credentialing process, in other words, part of

25 their training, internship, but yet hadn't completed

1 the credentialing process, they were working with

2 you and they had good certified people, that would

3 be the exception.

4 BY MR. VARADY:

5    Q.    Okay.  That's fair enough.  So if a person

6 was actually attempting to complete the

7 credentialing process and had advanced to some point

8 in that process that would bring them close to being

9 credentialed, that would be a basis for considering

10 their opinion; is that a fair statement of your

11 testimony?

12    A.    True.

13    Q.    But if they weren't in the process of

14 being credentialed, they wouldn't fall within your

15 exception; is that correct?

16    A.    True.

17    Q.    And you would be forced to reject the

18 opinion of someone who didn't have the proper

19 credentials in that case; isn't that correct?

20     MR. USHIRODA:  Objection.  Calls for

21 speculation, assumes facts not in evidence.  It's

22 also argumentative.

23    A.    We're talking from a clinical aspect?

24 BY MR. VARADY:

25    Q.    Yes.

1    A.    Okay.  If the person didn't have -- if I

2 didn't -- if I knew the person was not validly

3 credentialed and certified and whatever else and

4 received all the blessings from everybody that they

5 need to, I probably wouldn't have sent them in the

6 first place, so therefore, that's a moot point.

7    Q.    So you wouldn't accept -- you wouldn't

8 have sent them to such a person if you knew the

9 person was not properly credentialed?

10    A.    Correct.

11    Q.    And that's because of the risk that it

12 poses of getting an opinion that is not an opinion

13 that has clinical reliability?

14     MR. USHIRODA:  Objection.

15 BY MR. VARADY:

16    Q.    Isn't that correct?

17     MR. USHIRODA:  Objection.  Lacks

18 foundation, assumes facts not in evidence.  Also,

19 vague and ambiguous.  It's also an incomplete

20 hypothetical.

21    A.    Clinical reliability, I think, are the

22 terms that I have a little problem with.  I'm

23 thinking, you know, people can be credentialed and

24 have a credential in certain areas but yet if you

25 really kind of dissect down the health care system,

1 the same with the legal system, you're probably not

2 going to utilize them then --

3     Say hypothetically an attorney -- I like

4 to pick on attorneys, because you can pick on

5 doctors.  You really don't want to send, say, a

6 complex business matter to a litigator that does

7 personal injury only, because he's not up to date on

8 it, correct, though he's licensed and he's an

9 attorney and theoretically he could do that;

10 correct?

11     So therefore, I'm saying, you have to look

12 at the people and know the people that you're

13 sending -- making referrals and consultations from.

14 And therefore, you would expect that what their

15 opinion is is valid or their recommendation for

16 treatment plan, that it has merit.  And so if you

17 don't know those things, then no, you know, I

18 probably wouldn't send them in the first place.

19 BY MR. VARADY:

20    Q.    So, for example, you wouldn't want to rely

21 on a clinical diagnosis made by Bryna Siegel if you

22 discovered she didn't possess the proper credentials

23 to offer such a diagnosis; isn't that correct?

24     MR. USHIRODA:  Objection.  Lacks

25 foundation, assumes facts not in evidence, calls for

Page 50

1  speculation, argumentative.
2    A.    If doctor --
3        MR. USHIRODA:  Vague and ambiguous, as
4  well.
5    A.    If doctor -- if I'm -- from a clinical
6  practice standpoint, if I had a person that I felt
7  could be beneficially evaluated by Dr. Siegel and
8  knew what was going on, I would do that.
9        But in this role, in a medical/legal
10  perspective that we have here, I have to depend on
11  Mr. Hom and Mr. Ushiroda to verify the credentials.
12  BY MR. VARADY:
13    Q.    So you didn't verify her credentials
14  yourself?
15    A.    Right.  I don't think that's my role in
16  this matter, to have to do those things.
17    Q.    So my question, just going back to your
18  earlier statement about -- and the example you used
19  about a complex business transaction not being
20  referred to a lawyer who didn't have proper
21  credentials and training to deal with that --
22  wouldn't that also apply to Dr. Siegel?  I mean, you
23  wouldn't want to rely on a clinical diagnosis made
24  by her if she wasn't properly credentialed to make
25  such a diagnosis?

Page 51

1        MR. USHIRODA:  Objection.  Assumes facts
2  not in evidence, lack of foundation, vague and
3  ambiguous, speculation, improper hypothetical.
4  Also, waste of time.
5  BY MR. VARADY:
6    Q.    Do you understand my question, Dr. Goka?
7    A.    I understand the question, and I think
8  we're splitting hairs here and apples and oranges,
9  mixing them up.
10        From a clinical perspective, as a
11  practitioner, then I would verify Dr. Siegel's
12  abilities some way or another.  I may not, you know
13  -- I think her status with UC San Francisco as a
14  whatever -- as a clinical professor or full
15  professor --
16    Q.    She's an adjunct professor.
17    A.    -- as an adjunct professor would have a
18  lot of merit, because UC San Francisco has a very
19  diligent screening process.  So therefore, I feel
20  that that in itself tells me that she has all the
21  buzzers and whistles that she needs in the area of
22  the clinic she runs.
23        Therefore, from a clinical standpoint, I
24  would probably not be afraid to make a referral to
25  her, if I had someone that could fit in her clinical

Page 52

1  practice, to make the assessment and to adequately
2  come up with a treatment plan.
3    Q.    That's even if the state law of California
4  prohibited her from making those kinds of diagnoses;
5  is that your answer?
6        MR. USHIRODA:  Objection.
7  BY MR. VARADY:
8    Q.    -- because she's not properly
9  credentialed?
10        MR. USHIRODA:  Again, Counsel is assuming
11  facts not in evidence.  Also lacks foundation, also
12  calls for speculation, also incomplete hypothetical.
13  BY MR. VARADY:
14    Q.    Do you understand my question, Dr. Goka?
15        MR. USHIRODA:  Also, vague and ambiguous.
16    A.    I understand your question.  I don't know
17  what business code or whatever that code was you
18  cited was specifically.  I don't know what the rules
19  and regulations are for psychologists in the State
20  of California.  I don't think in theory -- no, I
21  can't even go there, because I don't even know what
22  the law says.
23  BY MR. VARADY:
24    Q.    My question is very similar.  If you knew
25  that she -- if the law said she had to have a

Page 53

1  clinical license to make a diagnosis and she didn't
2  have such a license, you wouldn't refer somebody to
3  her; isn't that correct?
4        MR. USHIRODA:  Now you're getting
5  argumentative, Counsel.  And asked and answered and
6  also not a complete statement of the law.  Misstates
7  testimony and lack of foundation.
8    A.    If she didn't have a clinical license, I
9  wouldn't make a referral, is the question?
10  BY MR. VARADY:
11    Q.    Yes.
12    A.    That's true.  But I assume she has a
13  clinical license.
14    Q.    All right.  That's fine.  And that
15  wouldn't apply just to Dr. Siegel.  Any clinician
16  who's not properly credentialed, you're not going to
17  refer somebody to them for a clinical opinion if
18  that clinician is not properly credentialed; isn't
19  that correct?
20    A.    Most likely, yes.
21    Q.    And such diagnoses would be inherently
22  unreliable; isn't that correct?
23        MR. USHIRODA:  Objection.  Lack of
24  foundation, assumes facts not in evidence.
25    A.    Not necessarily.  I think, again -- I

1 mean, first of all, I probably wouldn't go there, so
2 therefore I couldn't tell you if the diagnosis is
3 reliable or not.
4       But there's probably some people out there
5 that were trained in some other country that have
6 not been adequately credentialed in the United
7 States or the states where they are that probably
8 could do a good job with a diagnoses that never went
9 through the hoops and stuff like that. So I'm
10 saying not necessarily. But, you know, I don't use
11 those people, because they can't practice.
12 BY MR. VARADY:
13    Q.    Wouldn't you agree that in some instances
14 not having the proper credentials poses a threat of
15 harm to the patient in a clinical setting like that?
16       MR. USHIRODA: Objection. Asked and
17 answered.
18    A.    Not necessarily. It all depends on what
19 their opinions are and what they're requested. I
20 mean, if it's a thought process, you know, sometimes
21 input is -- on an analytical basis can be very
22 useful to making a thinking process that will be
23 implemented properly, but if you don't feel it has
24 valid -- a valid approach to the problem, then that
25 could be a problem, yes.

1 BY MR. VARADY:
2    Q.    You understand I'm talking about
3 diagnosis, diagnosis and treatment?
4    A.    I'm talking about treatment specifically,
5 because I think, you know, what you're looking at
6 when you refer someone out from a clinical point,
7 more than a -- sometimes -- most of the time a
8 diagnosis, because you have an idea, often to
9 confirm a diagnosis, is what are suggestions of
10 treatment.
11    Q.    Can you make a suggestion for treatment
12 without having a diagnosis?
13    A.    Well, the thing is, depending on what
14 you're doing -- I don't know if psychologists make a
15 diagnosis. I think it's an assessment, by language.
16 Their assessment would say what they think a
17 situation is. Therefore, yeah, it can be.
18    Q.    Are you familiar with the DSM-IV?
19    A.    I know the book, but I don't know the
20 codes.
21    Q.    What is it?
22    A.    It's the mental health book that deals
23 with mental health diagnoses and it's got four or
24 five subcategories. One is the mental health issue.
25 There's a physical issue. There's -- what's three?

1 I can't remember what three is right now.
2    Q.    The DSM-IV is the Diagnostic and
3 Statistical Manual used to make diagnoses of
4 psychiatric and psychological impairments; isn't
5 that correct?
6    A.    That's true.
7    Q.    And isn't that what a clinician does that
8 is a clinical psychologist; they make diagnoses and
9 recommend treatment?
10    A.    Under the DMS, yes.
11    Q.    DSM.
12    A.    Is it DSM?
13    Q.    Diagnostic --
14    A.    Yes. DSM, right, IV or whatever. It used
15 to be II.
16    Q.    And before they can recommend treatment,
17 they would have to make a diagnosis?
18    A.    That's the rules they live by, yes.
19    Q.    Do you have any idea why the law requires
20 licensure for clinicians and psychologists and
21 whatnot?
22    A.    I think to protect the public.
23    Q.    From what?
24    A.    Scams, frauds.
25    Q.    And the practice of medicine and

1 psychology by people who aren't credentialed or
2 qualified to practice in those fields; isn't that
3 correct?
4    A.    True. But in psychology, there's a lot of
5 people that are practicing, including ministers that
6 are -- you know, they're licensed as ministers, and
7 probably the bartender in certain bars.
8    Q.    Do you know why the State didn't pick a
9 bartender in a bar rather than picking Dr. Siegel?
10    A.    I have no idea. You'd need to talk to the
11 State. I was just trying to be facetious here.
12    Q.    Well, you understand that although you're
13 sitting through your 500th and something deposition,
14 that this is a case that's very important to my
15 clients and their child?
16    A.    True. And I think we're getting to a
17 point that we've kind of gone through this situation
18 right here and discussed it quite extensively about
19 I don't know what Dr. Siegel's total credentials
20 are, her licensing, I don't know the laws. I think
21 we need to move forward and get down to the
22 nitty-gritty.
23    Q.    Well, you understand that it's my clients
24 who are deposing you and not vice versa; is that
25 correct?

1    A.    No.  No.

2    Q.    So every time you've seen her opinions,
3 you're -- you've been on the other side of the case;
4 is that correct?

5    A.    I think so.

6    Q.    Do you know how many times that's been?

7    A.    No, but more than likely none.  I don't
8 think I've ever worked with her.

9    Q.    I guess I don't understand your last
10 answer.  I thought you had said that she had been
11 involved in cases in which you had also been
12 retained as an expert.

13    A.    I don't know.  There's a couple of cases
14 that have multiple defendants and she may have been
15 or may not.  I don't know.  I don't recall.

16    Q.    So your answer is:  I don't recall whether
17 I've been involved in a case in which she's rendered
18 an expert opinion other than this one?  Is that your
19 answer?

20    A.    No, no.  My answer is I've never -- I've
21 never been on the same side of the fence with her.

22    Q.    By the same side of the fence, you've
23 never been representing the same party?

24    A.    Correct.

25    Q.    You think --

1    A.    -- that I know of.  But there's a
2 possibility, a remote possibility.  That's all I'm
3 saying.

4    Q.    Are you thinking of a specific case?

5    A.    No.  I'm thinking of a couple that -- I
6 know that, you know, there's several cases that I've
7 been involved in that have had multiple defendants,
8 so the question is I don't know if they did or if,
9 you know, one firm retained her, you know, so
10 there's a possibility, but I'm not saying -- I don't
11 know of it and it doesn't come to mind.  That's all.

12    Q.    Now, you've identified Bryna Siegel as a
13 person who assisted you in forming your opinions; is
14 that correct?

15    A.    She was the one that -- these are her
16 opinions, other than the costs.

17    Q.    So you're expressing no opinion on the
18 need for services.  You're only expressing an
19 opinion as to cost.  Is that the substance of your
20 testimony?

21    A.    Essentially, what's reasonable and what's
22 obtainable within, you know, what Dr. Siegel felt
23 was a reasonable treatment plan.

24    Q.    Well, you're not vouching for her
25 opinions, because that's not permitted; you

1 understand that?

2    A.    No.  But I'm utilizing her opinions to
3 establish my opinions.

4    Q.    Okay.  So you can say you relied on them;
5 is that correct?

6    A.    True.

7    Q.    But your reliance on them was for one
8 purpose only and that was to calculate the cost of
9 specific services; is that correct?

10    A.    True.

11    Q.    You were not making an independent
12 assessment as to whether or not those particular
13 services were necessary; is that correct?

14    A.    That is true.

15    Q.    Other than Dr. Siegel's report concerning
16 Bryan, was there anything else that you looked at in
17 forming your opinions as to the cost of services?

18    A.    Ms. Leukens' report, Dr. LeGoff's report,
19 Dr. Friedman's report.

20    Q.    And you reviewed those prior to June 2006;
21 is that correct?

22    A.    Other than Dr. Friedman.  I think she came
23 on later.

24          Is it Freeman or Friedman?

25    Q.    It's Freeman, B.J. Freeman, like free man.

1    A.    Okay.

2    Q.    You didn't obtain any data of your own; is
3 that correct?

4    A.    I obtained cost data and I talked to the
5 Regional Center person.

6    Q.    Now -- and I'm correct that your opinions
7 were formed specifically for this litigation; is
8 that correct?

9    A.    I don't understand what you're asking.

10    Q.    Well, you weren't forming your opinions to
11 make a treatment plan for Bryan that you expected to
12 be implemented; is that correct?  They were just
13 formed for purposes of rendering an expert opinion
14 in this litigation?

15    A.    The opinions I expressed on my report,
16 yes.

17    Q.    Were any of the opinions that you
18 expressed concerning Bryan's needs subjected to
19 review by any other expert before you finalized them
20 and they were filed in this matter?

21    A.    Dr. Siegel.

22    Q.    Other than Dr. Siegel?

23    A.    No.

24    Q.    Am I correct that you did not refer to any
25 literature concerning autism in forming your

Page 94

1    A.    I assume Mr. Hom is part of the Department
2  of Education, because that's where he's stationed
3  now.
4    Q.    Mr. Hom is a Deputy Attorney General.  He
5  works in the Attorney General's office.  Do you
6  understand that?
7    A.    Yes.  But he's also assigned to the
8  Department of Education, so I synonymously put them
9  together, just to let you know.
10    Q.    Okay.  So your impression was that Mr. Hom
11  worked for the Department of Education; is that a
12  fair statement?
13    A.    He works with the Department of Education
14  for the State under the Attorney General's guidance.
15        So when you asked me about the Department
16  of Education, I assumed Mr. Hom was included in
17  there.  Okay?
18    Q.    Now, you've already testified that you
19  relied exclusively on Bryna Siegel's opinions
20  concerning Bryan's diagnosis; is that correct?
21    A.    Correct.
22    Q.    I think you referred to her credentials.
23  Do you recall seeing her curriculum vitae?
24    A.    Probably.
25    Q.    I'm just going to ask you to take a look

Page 95

1  at Exhibit No. 11.  This is the first page of her
2  vitae.  Does this look like the document that you
3  reviewed -- the first page of the document you
4  reviewed?  I will stipulate for the record it's much
5  more extensive, but I just want to make sure that
6  we're talking about the same thing.
7    A.    It looks familiar.
8        MR. USHIRODA:  Is this going to be marked
9  as an exhibit?
10        MR. VARADY:  It's been marked as 11.
11  BY MR. VARADY:
12    Q.    How many times have you talked to Dr.
13  Siegel on the phone?
14    A.    Two, maybe three.
15    Q.    How many times did you speak with her
16  before filing your initial opinion?
17    A.    Two -- I mean, this one.  And then the
18  third time after the supplement.
19    Q.    So twice before June 28th, 2006?
20    A.    I think so.
21    Q.    And then once before your supplemental?
22    A.    Right.
23    Q.    How long did you speak with her before the
24  June 26th -- the June 28th, 2006 opinion was filed?
25    A.    About an hour, hour and a half total.

Page 96

1    Q.    Did she disclose to you at that time that
2  her Ph.D. is in child development?
3    A.    We didn't discuss that.
4    Q.    Did you ask?
5    A.    No.
6    Q.    Was that important to you?
7    A.    No.
8    Q.    Wasn't it important to you to know, since
9  you were relying on her diagnosis, that she had a
10  proper education and training to make such
11  diagnosis?
12    A.    By looking --
13        MR. USHIRODA:  Objection.  We've been down
14  this road before.  It's been covered extensively.
15  Asked and answered.
16    A.    She has -- you know, by looking at what I
17  see right now, she has a very extensive expertise
18  since she's -- like I said, if she is on as an
19  adjunct professor to UCSF, I see no reason to
20  challenge that, as I stated before.
21  BY MR. VARADY:
22    Q.    Did you contact anyone at UCSF to validate
23  the information contained in her CV?
24    A.    No.  That's not my responsibility.
25    Q.    Whose responsibility is that?

Page 97

1    A.    The person who retains her.
2    Q.    Now, you state in your opinion that the
3  above services are generally funded by the school
4  district or Regional Center of the State of
5  California, Department of Developmental Services; is
6  that correct?
7    A.    Correct.
8    Q.    You say they're generally funded by the
9  school district or Regional Center.  Did you verify
10  that the school district in which Bryan is enrolled
11  would be paying for and funding those services
12  personally?
13    A.    I did actually on the Elmira campus call
14  -- I called and, you know, they said most all of our
15  funding comes from the department of the state
16  department -- or the school districts, and then I
17  also verified that with somebody at the Regional
18  Center.
19    Q.    Okay.  That's a general statement about
20  the source of funding.
21    A.    Right.  For anybody who's autistic or
22  disabled with mental health issues that -- because
23  they fall under whatever that federal guideline is,
24  the Department of Education supplements and pays for
25  all educational services related to education and

1 then local Regional Centers pick up the difference,
2 as in this case, as well as the Department of
3 Education and the -- whatever the documents were
4 that they had that were filed, or the hearings
5 documents.
6    Q.   At the Elmira school, who was the person
7 that you spoke to?
8    A.   I don't remember.  I talked to someone
9 there and I was trying to get information and they
10 told me, I can't tell you that, I don't know that,
11 and that all our funding is -- you know, comes
12 directly from the department of -- the school
13 district.
14    Q.   Okay.  But you were not specifically
15 asking a question about Bryan Wiles-Bond?  That
16 would have required a release for the Elmira school
17 to have given you that information; is that --
18    A.   That is true.
19    Q.   And you didn't have such a release?
20    A.   That is true.
21    Q.   And to have discussed Bryan's condition,
22 needs, records, whatnot without such a release would
23 have been a violation of HIPAA and probably some
24 California state regulations?
25    A.   I agree.  I don't think HIPAA was in

1 effect then, but, you know --
2    Q.   And you didn't have such a release?
3    A.   Correct.
4    Q.   So you didn't specifically discuss Bryan
5 Wiles-Bond with the unidentified person with whom
6 you spoke at the Elmira school?
7    A.   No.  Usually when I do this, I discuss --
8 I have this -- and nonspecific, whatever, and, you
9 know, ask about what they charge, what their
10 treatment plan -- you know, how can I get
11 information, all this stuff.  But I don't give a
12 specific name or request specific information up
13 front.
14         And I get, you know, an answer, Well, I
15 don't know, the department of -- the school district
16 pays us and sends -- our clients.
17    Q.   Do you know what services Bryan's
18 receiving today?
19    A.   He's in a different school -- I forget the
20 name of it, if it's a high school or middle school.
21 But he's been moved from the Elmira school to
22 another school in the same school district.  Plus
23 he's got a Regional Center attendant or aide
24 part-time.
25    Q.   You don't know what school he's attending?

1    A.   It's in the record.  I can't recall
2 specifically.  I know I read it in Dr. LeGoff's
3 report, as well as Ms. Leukens' report.
4    Q.   And you're unable to testify from
5 recollection as to what specific services he's being
6 provided at this time?
7    A.   He's being provided as a disabled student
8 under the State of California.
9    Q.   Your answer would be, No, I don't know
10 what specific services he's getting, but I
11 understand that he's receiving special education out
12 of the State of California; is that a fair summary
13 of your statement?
14         MR. USHIRODA:  Objection.  Misstates the
15 testimony.  It's all in the records.
16 BY MR. VARADY:
17    Q.   Did I misstate your testimony, Doctor?
18    A.   No.  You didn't say what I said, but I
19 said essentially what your assumption is is correct.
20    Q.   The way I summarized it was correct; is
21 that true?
22    A.   True.
23    Q.   You didn't visit the Elmira school; is
24 that correct?
25    A.   That's correct.

1    Q.   And you did not visit the Regional Center?
2    A.   That's correct.
3    Q.   What Regional Center would the Elmira
4 school fall under?
5    A.   I'd have to look that up, how the county
6 is.  It's either under Marin or it's under the --
7 out of Vallejo County.
8    Q.   You made some -- a web search regarding
9 the Regional Centers; is that correct?
10    A.   That's correct.
11    Q.   That's reflected in your opinion.  You
12 said you spoke to someone at the Regional Center?
13    A.   Yes, I did.
14    Q.   But similarly to your conversation with
15 the people at the school, you didn't identify Bryan
16 specifically or ask anything about his specific
17 program; isn't that correct?
18    A.   That's correct.
19         (Exhibit 12 marked for identification.)
20 BY MR. VARADY:
21    Q.   And I'd ask you to take a look at Exhibit
22 No. 12.  Now, after reading that you had gone to the
23 web to determine information regarding the costs of
24 various services at the Regional Center and the
25 Regional Center web site, I went there and

1 downloaded this document and printed it out.
2       Do you recognize this document?
3   A.   Not specifically.
4   Q.   Is this the kind of information you looked
5 at when you went to the Regional Center web site?
6   A.   I'd have to look at the web site.  It
7 looks like it.  I mean, this is just more of -- it
8 looks like it, but I'm not sure.  I mean,
9 unfortunately, you don't have your web headings on
10 it.
11  Q.   Well, this is how it prints out.  That's
12 all I can tell you.  It's loaded as a PDF file on
13 their web site and this is how it prints out.  You
14 can verify that for yourself.  But you'll see that
15 there's an income and cost chart on page three.
16  A.   Correct.
17  Q.   Is this the kind of information that you
18 looked at when you were forming your opinions?
19  A.   Yes.
20  Q.   Do you see on page one of this document
21 where it refers to children under the age of 18 who
22 receive 24-hour out-of-home services provided by the
23 state?
24  A.   Yes.
25  Q.   Is Bryan receiving 24-hour out-of-home

1 services?
2   A.   24-hour out-of-home services, no.  He's
3 receiving -- I don't think so, because he's
4 receiving home services at home.
5   Q.   He's not institutionalized at this time.
6 He's living at home.  Isn't that correct?
7   A.   Correct.
8   Q.   Now, you make a statement that according
9 to the web site, the maximum out-of-pocket expenses
10 for services is $7,900 annually from ages 13 to 17.
11 Do you see that?
12  A.   Yes.
13  Q.   That's for children who are
14 institutionalized; isn't that correct?
15  A.   No.  It's my understanding that all -- I'm
16 not -- I'd have to look up the web site again, but
17 it was my understanding that it was all people that
18 were receiving services from the Regional Center
19 that the max amount of out-of-pocket expenses was
20 $7,900, no matter if it was part-time home aides or
21 -- what do you call it -- that's it; just part-time,
22 you know, aides, as long as it was a child under the
23 age of 18.
24  Q.   But that information isn't included in
25 your report.  I mean, you pointed out that the web

1 heading isn't on the document I showed you.  I'm
2 asking you:  But isn't it true that you didn't
3 include that document in your report?
4   A.   Correct.  Because I validated it with a
5 call to a person at the Regional Center.
6   Q.   Who was that?
7   A.   Tina Fujino (phonetic).
8   Q.   What are her qualifications and what is
9 her position?
10  A.   She's a caseworker that's been working for
11 the Regional Center for years that referred me
12 patients for years that I treated.  So I got
13 information from her.  I know her personally from
14 all the work I've done with the Regional Center, so
15 I got the facts from her.
16  Q.   She's not working with Bryan Wiles-Bond at
17 this time?
18  A.   No.  She never has.
19  Q.   And you didn't indicate to her that Bryan
20 Wiles-Bond was the person you were speaking about;
21 is that correct?
22  A.   That's correct.
23  Q.   And you didn't verify with her that he was
24 even going to be within the jurisdiction of her
25 Regional Center; isn't that correct?

1   A.   That's correct.  But it's statewide rules.
2   Q.   It's a statewide system, but there are --
3 I mean, the fact that there are Regional Centers
4 means they serve different regions; isn't that
5 correct?
6   A.   Correct.
7   Q.   And her region is the region near Fresno;
8 isn't that correct?
9   A.   Correct.
10  Q.   Does Bryan live near Fresno?  Is he under
11 the jurisdiction of the Fresno Regional Center?
12  A.   No.
13  Q.   What Regional Center would apply and could
14 be providing services to him?
15  A.   As I said, probably it's either Vallejo or
16 -- I think it's Vallejo or --
17  Q.   Or Alameda?
18  A.   Could be Alameda County or Contra Costa
19 County.  However, everybody in the state is
20 synchronized throughout the State of California.
21  Q.   So your testimony would be that you don't
22 need to verify the specific services that Bryan is
23 receiving or discuss his specific case with a
24 caseworker from a Regional Center to which he's not
25 assigned in order to determine what the costs would

1 be; is that correct?

2     A.    No, I'm not saying that, because I can't

3 do that under the HIPAA rules.  However, as I

4 recall, in Dr. Bonds' deposition, he said he's not

5 paying any money out.

6     Q.    I'm sorry.  Whose deposition?

7     A.    Dr. Bonds' deposition, as I recall -- that

8 there was no money going out, or he wasn't paying

9 anything out.

10     Q.    I see.  You're talking about his father --

11     A.    Correct.

12     Q.    -- Stan Bond, Bryan's father?

13     A.    Right.  He's a Ph.D.; correct?

14     Q.    That is correct.  I just couldn't hear

15 what you were saying because you were speaking so

16 fast.

17     A.    I'm sorry.

18     Q.    When did you read Stan Bonds' deposition?

19     A.    Whenever.

20     Q.    Well, I'll just represent to you that he

21 wasn't deposed until this year, so you could not

22 have considered it in forming your June 2006

23 opinions.

24     A.    Okay.  But he verified it, then.  I know I

25 read it, his and his wife's.

1     Q.    What you're saying is, I read their

2 depositions after I rendered this June 28, 2006

3 opinion; isn't that correct?

4     A.    I'd have to look up the dates.  I trust

5 you on your word.  If the depositions were done

6 after this June 26th date, then yes, it was after.

7     Q.    Now, looking forward in your -- to the

8 next paragraph of this Exhibit No. 9, you state that

9 -- and I assume this means after Bryan is 18, he

10 would most likely need a level four group home.  Is

11 that a correct assumption on my part?  Because the

12 last paragraph ends with the statement, Once he is

13 18 years old, he'll be considered an adult.  And

14 then you go on to speak about group homes.  Do you

15 see that?

16     A.    After -- well, into his adult life, yes.

17 After 18 or 21, depending on the school district, or

18 22.

19     Q.    Okay.  So if I understand your most recent

20 answer, what you're saying is that he might go into

21 a group home at the age of 18 or he might go into a

22 group home at the age of 21 or he might go into a

23 group home at the age of 22, depending on what

24 school district he's living in.

25     A.    No.  It depends on what the school

1 district deems is the completion of their

2 responsibility.

3     Q.    Okay.  Could you be specific about that?

4     A.    Federal -- I don't know the law number,

5 federal law or whatever it is, that deals with

6 disabled individuals, requires education pursued to

7 the age of 21 or completion at 21, so therefore, at

8 21.364 days or something like that, that 65th day,

9 when he becomes 22, he's no longer eligible for said

10 services.  So therefore, sometimes the school

11 district will keep handicapped or disabled

12 individuals until through the age of 21.

13     Q.    You don't know right now whether or not

14 that would apply to Bryan; is that correct?

15     A.    Correct.

16     Q.    Wouldn't that affect your calculations?

17     A.    No.  Because the thing is, eventually the

18 question is, When do you put it into play, and then

19 do you put it in at age 18 for the economist or do

20 you put it in at age 22?

21     Q.    Couldn't it be the case that Bryan does

22 not enter a group home and live in a group home?

23     A.    That's a possibility.

24     Q.    Wouldn't that affect your calculations?

25     A.    It wouldn't be there.  It would be a zero.

1     Q.    What if he was receiving in-home services?

2     A.    He could receive in-home services for a

3 period of time through the Regional Center and they

4 would pay for it.  But this is the group home

5 calculations, hypothetically, if he no longer lived

6 at home.

7     Q.    Right.  You assumed he would no longer be

8 living at home?

9     A.    Correct.

10     Q.    Did his parents ever tell you that that's

11 what they had planned?

12     A.    No.

13     Q.    Did they ever tell anyone else who then

14 told you that that's what they planned?

15     A.    No.

16     Q.    That's an assumption on your part?

17     A.    Correct.

18     Q.    Aren't you really saying with your opinion

19 that your calculations are based on an assumption

20 that Bryan would be placed in a group home by his

21 parents?

22     A.    That's true.

23     Q.    You've not verified that assumption?

24     A.    That's true.

25     Q.    If he doesn't move to a group home, for

Page 110

1 example, his parents would be continuing to need
2 respite services, for example.
3    A.   That's true.
4    Q.   That would affect costs?
5    A.   That's true.  And there would be some
6 provided by the Regional Center.
7    Q.   You're assuming that based on the fact
8 that generally the Regional Center provides certain
9 services to children in California?
10    A.   And adults who qualify.
11    Q.   What is your basis for concluding that
12 Bryan will live in California next year or the year
13 after?
14    A.   I have no idea, but I think it's pretty --
15 as far as if he's going to stay in California this
16 year or next year, I think these are assumptions we
17 have to make at the time where they are and where
18 the family is, because I don't think anyone can tell
19 us, other than them, the parents themselves saying,
20 Hey, we're going to move to Montana or Idaho or
21 Maryland or -- I don't know.
22        I mean, that's the assumptions I have to
23 apply, because you're trying to put down present day
24 what it is to project out financially where it's
25 going to be in the future and there's no way -- I

Page 111

1 mean, our lives change.  Your life changes.  I mean,
2 you know, you may be planning to stay here the next
3 ten years and practice law and all of a sudden
4 something comes dynamic or whatever for your benefit
5 and you're off to Alaska.  I don't know and you
6 don't know that unless -- until that time comes.  So
7 these are assumptions right in this point that we
8 all have to make.
9    Q.   So that's an additional assumption that
10 you've made, is that Bryan's family will remain in
11 California?
12    A.   Correct.
13    Q.   And it also underlies your calculations;
14 is that correct?
15    A.   Correct.
16    Q.   I just want to make sure of one thing.
17 Are you aware of whether or not the IDEA statute --
18 that is, the Individuals with Disabilities Education
19 Act -- provides for compensatory educational
20 services beyond the age of 21?
21    A.   I don't know, and I don't think so.
22    Q.   If I represented to you that in certain
23 circumstances services can be provided beyond the
24 age of 21, are you aware of any facts that would
25 cause you to dispute that?

Page 112

1        MR. USHIRODA:  Objection.  It's a loaded
2 question, misstates the law, also is an incomplete
3 hypothetical, assumes facts not in evidence, lack of
4 foundation.  Also, calls for speculation.
5        THE WITNESS:  Read back the question,
6 please.
7        (Record was read as requested.)
8    A.   No.
9 BY MR. VARADY:
10    Q.   You also, in the group home paragraph,
11 which is the third paragraph on page one of Exhibit
12 9, state that the funding generally comes from
13 Social Security and the Regional Center.  Do you see
14 that?
15    A.   Correct.
16    Q.   That's, again, just a generalized
17 statement of how services are ordinarily funded for
18 the disabled in California.  It's not specific to
19 Bryan; isn't that correct?
20    A.   Correct.
21    Q.   Have you ever heard of the term
22 compensatory education?
23    A.   I have.
24    Q.   What is it?
25    A.   It's education beyond the education.

Page 113

1 That's all I know.
2    Q.   Now, you refer to a discussion with Dr.
3 Siegel at the beginning of paragraph number four,
4 and it states -- that's the last paragraph on that
5 page -- that Dr. Siegel told you that Bryan won't
6 need the same level of services once he's been
7 institutionalized.  Do you see that?  I'm
8 summarizing.  I can read it verbatim if that helps
9 you.
10        I'll just withdraw the question and ask a
11 different question.
12    A.   Yeah.  Why don't you, because I don't see
13 that?
14    Q.   My question is -- you state that in
15 reviewing Ms. Leukens' life care plan and a
16 discussion with Dr. Siegel, many of the services
17 would be required to a lesser extent.  Do you see
18 that?
19    A.   Correct.
20    Q.   Now, my question for you is:  Are you
21 saying that after Bryan's in a group home, many of
22 the services will be needed to a lesser extent, or
23 are you saying something else?  Because that doesn't
24 seem to be tied to anything other than him going to a
25 paragraph, which talks about him going to a group

Page 114

1 home.
2    A.   It's to the entire plan that Ms. Leukens
3 had presented by that time.
4    Q.   Okay. So that's both before and after
5 Bryan turns 18 you think she's recommending services
6 at too high a level; is that correct?
7    A.   Correct.
8    Q.   And that's without any expertise in the
9 field of autism and without having met or assessed
10 Bryan on your own; is that correct?
11    A.   That's with feedback from Dr. Siegel.
12    Q.   So Dr. Siegel told you that and you put
13 that in your report; is that correct?
14    A.   Essentially.
15    Q.   Is that the basis of the other references
16 here regarding service levels; that she told you
17 stuff and you put it in your report?
18    A.   True. However, a life care plan is
19 supposed to be within a reasonable medical
20 probability, and at the time -- and at this present
21 time, even -- at the time that Ms. Leukens presented
22 this first plan and her second plan, and as far as I
23 know, as of the depositions of the family, the
24 parents, that Bryan is not receiving any psychiatric
25 visits, he is not on any psychotropic medications

Page 115

1 and a life care plan has to be within reasonable
2 medical probability. So therefore, in theory, he's
3 not on those, so therefore, how can you justifiably
4 cost them out? And that's one of my -- that's a
5 problem I have.
6    Q.   Let me just stop you there. You have to
7 admit that the first sentence doesn't refer
8 specifically to psychiatric care. It speaks to Ms.
9 Leukens' plan as a whole.
10    A.   Correct.
11    Q.   So the fact that there may be a quibble
12 that you have about psychiatric care isn't reflected
13 in that first sentence. You're saying that Bryna
14 Siegel thinks the service levels are too high?
15        MR. USHIRODA: Objection.
16    A.   Correct. It's a summary.
17 BY MR. VARADY:
18    Q.   And then you get to some specifics after
19 that; is that correct?
20    A.   Correct.
21    Q.   All right. You say Ms. Leukens has
22 recommended a psychiatrist six times a year, period.
23 There are neither specifics or medical records that
24 indicate this frequency.
25        Did I read that accurately?

Page 116

1    A.   That's true.
2    Q.   Did you assess Bryan for whether or not he
3 needs psychiatric or psychotropic medications?
4    A.   No.
5    Q.   Do you know whether he's taking any
6 psychiatric or psychotropic medications at this
7 time?
8    A.   Prior to -- as of Dr. Bonds' reevaluation
9 -- not Dr. Bonds -- Dr. LeGoff's reevaluation, no,
10 he was not.
11    Q.   Is it your testimony that you are
12 competent to express an opinion to a reasonable
13 medical probability that he will never need
14 psychiatric or psychotropic medication?
15    A.   No.
16    Q.   Your answer would be you don't know
17 whether he will or not; is that correct?
18    A.   That's correct.
19    Q.   You do state that if Bryan were to be
20 placed on medications, it would be reasonable for
21 him to see a psychiatrist two to four times a year.
22 Did I read that accurately?
23    A.   That's correct.
24    Q.   You're not a psychiatrist?
25    A.   Correct.

Page 117

1    Q.   You're not capable of rendering an expert
2 opinion in psychiatry; is that correct?
3    A.   That's correct.
4    Q.   You're not aware of whether or not --
5 you're not capable of making a diagnosis as to
6 whether or not Bryan will need psychotropic or
7 psychiatric drugs in the future; is that correct?
8    A.   That's correct.
9    Q.   Are you aware of the effects of
10 psychiatric and psychotropic medications frequently
11 prescribed to children who have autism?
12    A.   I'm aware of psychotropic medications
13 prescribed to individuals, not specifically with
14 autism.
15    Q.   So you're not specifically able to testify
16 regarding drugs frequently prescribed for children
17 with autism and what their psychiatric effects might
18 be?
19    A.   That's correct.
20    Q.   You do acknowledge in the report that
21 Bryan has had an adverse reaction to medications.
22 Do you see that?
23    A.   Yes.
24    Q.   What medications?
25    A.   I think it was Risperdal and Ativan, as I

Page 118

1  recall.
2     Q.    Those are psychiatric medications; is that
3  correct?
4     A.    They can be used as psychiatric
5  medications, yes.
6     Q.    And given that he has had these adverse
7  reactions, wouldn't that require additional caution
8  if he were prescribed psychiatric medications in the
9  future?  If you're a clinician looking at his chart,
10  isn't that something you would consider?
11     A.    I think so.  I would.
12     Q.    So wouldn't you want to err on the side of
13  caution in such a case and see the patient
14  frequently to make sure that such adverse
15  consequences were not occurring?
16     A.    If I was a mental health professional with
17  an expertise in autism, okay, and a patient similar
18  to Bryan came to me and his mother stated, I don't
19  want him on any medications, I would not put him on
20  any medications, even though I knew the medications
21  were out that may help.  It would be my job to
22  educate her, give her the option.  If she saw fit to
23  do so, that would be her option, not my option, as
24  his guardian and caregiver, or his father -- his
25  parents.  And if I did -- yeah, in the beginning I

Page 119

1  would.  But if it was stability, I wouldn't -- you
2  know, then I would -- once it's stabilized, you
3  don't need to do that.  You just watch it and watch
4  it -- like I said, two to four times a year.  And
5  that's if you've found the right treatment plan.
6     Q.    But your opinion doesn't say that.  It
7  doesn't say, If you found the right treatment plan
8  and the patient had reached medical stability, then
9  he would only be -- need to see a psychiatrist two
10  to four times a year.  Your opinion doesn't say
11  that, does it?
12     A.    That's why we're here today.
13     Q.    To correct some of the omissions of your
14  opinions; is that correct?
15     MR. USHIRODA:  Objection to the
16  characterization of correcting omissions.  Assumes
17  facts not in evidence.  Lack of foundation.
18     A.    I wouldn't call it correcting.  I think to
19  clarify and enumerate on it would be a more
20  appropriate statement.
21  BY MR. VARADY:
22     Q.    And that's the answer you would give a
23  Hawaii jury when you are going to be testifying in
24  this case today?
25     A.    Sure.

Page 120

1     Q.    Now, you referred to a behavioral
2  psychologist on page two of your opinion.
3     A.    Correct.
4     Q.    To whom are you referring?
5     A.    What do you mean to whom?
6     Q.    You say a behavioral psychologist is
7  indicated to work with the treatment team.  Okay?
8  I'm asking you:  A behavioral psychologist where, in
9  what circumstance?  I'm asking you for context.
10     A.    This is in conjunction with Ms. -- this is
11  criticism of Ms. Leukens' plan.  She has a
12  behavioral psychologist there for a frequency of --
13     Q.    Three times a week, just to save you the
14  time.
15     A.    Okay.  She said three times a week a
16  behavioral psychologist is needed, he's usually part
17  of the treatment team, usually retained by the
18  educational institution as a -- while he's in
19  school.
20          After that time, yes, someone would be
21  needed to oversee the treatment plan as needed
22  periodically, but not at a frequency of three times
23  a week.
24     Q.    So if I understand your answer, you're
25  referring to a behavioral psychologist working with

Page 121

1  the treatment team, including educators and
2  caregivers.  Is that a fair statement?
3     A.    That's fair.
4     Q.    Would that person also be working with the
5  parents?
6     A.    No.  They would -- they would be teaching
7  them tricks and techniques.  You maybe wouldn't call
8  that working with them.  But to implement -- so the
9  plan is implemented properly and if behavior
10  changes.  So I guess it would be right to say that
11  they would be to a point at times.
12     Q.    So when you're saying they would be
13  talking about tips and tricks, you're talking about
14  working with the parents to help them create a
15  continuity in Bryan's behavioral program; is that
16  correct?
17     A.    True.  And with the caregivers, whoever
18  the caregivers are at that point in time.
19     Q.    Right.  And to carry across platforms;
20  that is, the care-giving scenarios, potential
21  educational or vocational scenarios and home
22  scenario, the same behavioral program, the same
23  behavioral supports for the potential of an
24  increased positive outcome; isn't that correct?
25     MR. USHIRODA:  Objection.  Compound, vague

Page 122

1 and ambiguous, confusing.
2 BY MR. VARADY:
3    Q.    Do you understand my question, Dr. Goka?
4    A.    Kind of.  It's basically --
5    Q.    Well, if it's kind of, let me just -- I'll
6 ask a question you can understand then.
7    A.    Thank you.
8    Q.    I'll try to do better.  The behavioral --
9 are you familiar with the behavioral plan for --
10 that's implemented for kids?  Have you ever looked
11 at one?
12    A.    I have worked with behavioral issues in
13 adolescents.
14    Q.    Have you ever seen a document that's been
15 referred to as a functional behavioral analysis or a
16 behavioral support plan for Bryan?
17    A.    I don't recall.  There may have been one
18 or may not have been one.
19    Q.    Are you familiar with Discrete Trial
20 Training or applied behavioral analysis, those types
21 of techniques?
22    A.    I know the names, yes, but that's all.  I
23 couldn't give you the details of what they do.
24    Q.    So are you aware of any facts that would
25 cause you to dispute the assertion that in

Page 123

1 behavioral programs implemented with autistic
2 children it's important that everyone working with
3 the child or the adult, be they parents, educators,
4 therapists, whatnot, are using the same behavioral
5 techniques in order to increase the possibility for
6 potentially improved behaviors?  Do you understand
7 my question now?
8        MR. USHIRODA:  Objection.  Compound, vague
9 and ambiguous, incomplete hypothetical, lack of
10 foundation, assumes facts not in evidence.  Also,
11 confusing.
12    A.    I understand your question.  If you took
13 the word autism out for behavior and just made it a
14 behavioral program, yes, I understand that you want
15 continuity of care carried over when you have issues
16 of behavior in adolescents for what -- other reasons
17 that I've worked with.  I'm not an autistic expert,
18 but I would assume that it's very similar in every
19 aspect when we're looking at adverse behavior to
20 have standardizations.
21 BY MR. VARADY:
22    Q.    But your qualification is, Don't ask me to
23 be specific as to autistic children, because I don't
24 have that expertise; is that correct?
25    A.    Correct.

Page 124

1    Q.    So your opinion is based not on an
2 understanding of autism or how these techniques work
3 with autistic children, but a more general
4 understanding of behavioral programs; would that be
5 a fair statement?
6    A.    That, and also the input from Dr. Siegel.
7    Q.    That's what Dr. Siegel told you; is that
8 correct?
9    A.    She agreed to.
10    Q.    Can you tell me what you relied on in
11 reaching the conclusion that a behavioral
12 psychologist would only be required four to six
13 times a year to assist the caregivers?
14    A.    That's when stability is reached.  And
15 again, Dr. Siegel's -- as time goes on, there is
16 stability and things don't change as much, so
17 therefore, if you have consistent caregivers and
18 things like that, the dynamics aren't as much of an
19 issue.
20        If you have change, yes, you may need more
21 frequency, or if you lose a caregiver for whatever
22 reason and you have to train someone new.  But
23 basically, that's what I got from her.
24    Q.    Okay.  That's basically her opinion that
25 you've got there; is that correct?

Page 125

1    A.    Correct.
2    Q.    Now, the next paragraph deals with family
3 counseling, counseling.
4    A.    Correct.
5    Q.    And again, it appears as if you're
6 adopting Dr. Siegel's opinion that although
7 intensive therapy might be needed for the first
8 three to six months, it would not be weekly from age
9 14 to 22, as Ms. Leukens indicated; is that correct?
10    A.    That's correct.  And it's also -- I think
11 there was a change in the supplemental report, that
12 we increased it slightly.
13    Q.    But again, you're relying on Dr. Siegel's
14 -- that's her opinion; is that correct?
15    A.    True.
16    Q.    Now, the third paragraph acknowledges that
17 Bryan might start on medications.  Do you see that?
18    A.    Yes.
19    Q.    And it would be necessary to monitor
20 hepatic and renal functions.  That would be liver
21 and kidney functions; is that correct?
22    A.    Correct.
23    Q.    And that would be because the medications
24 can be toxic; is that correct?
25    A.    Right.

1    Q.   What types of medications are you
2  referring to?
3    A.   All medications, really.  Specifically
4  more so the psychotropic type of medications you're
5  going to use or anti-seizure medications if they
6  came in the realm.
7    Q.   Do you know if Bryan is currently taking
8  anti-seizure medications?
9    A.   No.
10   Q.   You do not know or you do not believe --
11   A.   As far as I know, he's not taking anything
12  other than over-the-counter medications.
13   Q.   Looking at the next paragraph, it refers
14  to dental care.
15   A.   Correct.
16   Q.   And Ms. Leukens suggested that it be done
17  monthly.  Do you see that?
18   A.   Correct.
19   Q.   You indicate that it could be done twice a
20  year.  Do you see that?
21   A.   Correct.
22   Q.   Is that your opinion or Dr. Siegel's
23  opinion?
24   A.   That's my opinion, I think, on that one.
25  But most dentists, basically -- under anesthesia, in

1  talking to my own personal dentist, they'd only do
2  it twice a year.
3    Q.   Are you aware of any specific problems
4  related to dental hygiene that Bryan's case
5  presents?
6    A.   It presents a major problem with dental
7  hygiene, because of the fact of his autism and his
8  behavior and the frequency of his brushing his
9  teeth.  Therefore, that -- you know, that he needs
10  to basically really have a twice a year exam and
11  cleaning.
12   Q.   So am I correct that the basis of your
13  opinion here is a conversation with your own
14  dentist?
15   A.   Correct.
16   Q.   Who is that?
17   A.   Tsutsui.
18   Q.   I'm sorry?
19   A.   Tsutsui.
20   Q.   Tsutsui?
21   A.   Uh-huh.
22   Q.   What is Dr. Tsutsui's first name and where
23  is he --
24   A.   Kenneth.  And he retired.
25   Q.   Where is he located?

1    A.   In Fresno.
2         I just asked him hypothetically what he
3  would do with someone.  Again, I didn't specifically
4  use Bryan's name to any of these people I discussed
5  it with.
6    Q.   Now, in your next paragraph, you lump
7  together the physical, occupational, speech and
8  audiological therapies.  Do you see that?
9    A.   Yes.
10   Q.   I think there must be a typo there on the
11  next sentence.  It says, Their roll -- I believe
12  that would be r-o-l-e.  Is that correct?
13   A.   Where?
14   Q.   The second sentence of the paragraph.
15   A.   Their roll would be?
16   Q.   Yeah.  R-o-l-e?
17   A.   Yeah.  It's misspelled.
18   Q.   Not r-o-l-l?
19   A.   Uh-huh.  Do you want me to correct it on
20  this?
21   Q.   No.  I just want to make sure that I'm
22  reading it correctly and I'm not missing something
23  that's beyond me --
24   A.   There's another typo, on the bottom.
25   Q.   School stat, versus state?

1    A.   It should have been staff.
2    Q.   Staff.  All right.  Well, do you
3  understand the distinction between services on a
4  consulting versus a direct basis?
5    A.   Yes.
6    Q.   Do you see that what you're saying here
7  apparently is the role of physical therapy,
8  occupational therapists, speech and audiological
9  therapists would be on a consulting basis, not any
10  actual activity which would be carried out by the
11  school staff?  Do you see that?
12   A.   Correct.
13   Q.   So if I understand, what you're saying is
14  that instead of receiving direct services from a
15  physical therapist, an occupational therapist, a
16  speech and language therapist and an audiological
17  therapist, Bryan doesn't need those services.  All
18  that needs to happen is that the educational staff
19  have consulting opportunities with those types of
20  experts.  Is that correct?
21        MR. USHIRODA:  Objection to the extent it
22  misstates the document and misstates prior
23  testimony.
24   A.   Generally, in -- with disabled children,
25  through the school district they receive services

1 for -- in physical therapy and occupational therapy,
2 speech and language, et cetera, if needed or
3 indicated. A majority of the time, the physical
4 therapist may not be doing hands-on therapies daily
5 but will be supervising an aide of some nature or
6 another in that premise and maybe from time to time
7 would be doing therapy, but generally, are mostly
8 doing evaluations, reevaluation, reevaluating and
9 updating programs, working with the aide to actually
10 do the actual therapies under the guidance of that
11 therapist.
12      So therefore, yeah, they're consultants,
13 in my opinion, but they're not really providing the
14 day-in and day-out therapy as much as the attendant
15 is. Because if you don't do it daily, you don't get
16 the carry-over.
17  Q.   Do you know if Bryan is currently
18 receiving physical therapy services?
19  A.   I don't think so. I think he's just
20 receiving occupational therapy services.
21  Q.   Those are direct services; is that
22 correct?
23  A.   Correct.
24  Q.   Do you know if he's receiving any speech
25 services, speech and language training?

1  A.   He's receiving sign language services. I
2 don't think he's receiving from a licensed speech
3 pathologist, no.
4  Q.   Is it your opinion that sign language
5 instruction would not qualify as direct speech and
6 language therapy?
7  A.   I define it differently. Even though, you
8 know, sign language is a formal language, I think a
9 speech language pathologist and a certified whatever
10 -- American Sign Language person are two different
11 people. They could be the same person, granted,
12 okay, but I don't think -- I think they can be two
13 independent people, as well.
14  Q.   You list review of Bryan's IEP documents
15 -- that is, his Individual Educational Program
16 documents -- as being documents that you were
17 provided by Mr. Ushiroda.
18  A.   Yes.
19  Q.   Did you review those documents?
20  A.   Whatever is in my outline, I did. I
21 didn't review the most recent ones, no.
22  Q.   Are you aware of whether or not Bryan was
23 receiving ASL -- that is, American Sign Language --
24 instruction from a speech and language therapist
25 while he was in Hawaii?

1  A.   I don't recall.
2  Q.   Does the name Naomi Shiraishi ring a bell?
3  A.   No.
4      MR. VARADY:  Just for the record, we're
5 coming up on noon. My plan is to just get through
6 this exhibit with a few more questions. We'll take
7 a break for noon, and then I anticipate that we'll
8 be able to finish in about an hour and a half after
9 our noon break.
10      THE WITNESS:  Can I request that the noon
11 break be brief?
12      MR. VARADY:  Let's talk about that off the
13 record, but I'm sure we can accommodate you.
14      THE WITNESS:  Okay.
15      MR. USHIRODA:  Let's let Mr. Varady finish
16 up his --
17      THE WITNESS:  Okay.
18 BY MR. VARADY:
19  Q.   You say that there's no apparent need for
20 audiological services and training. Do you see
21 that?
22  A.   Correct.
23  Q.   Is that based on what Dr. Siegel told you?
24  A.   Correct.
25  Q.   You say that sign language would be

1 carried out by a qualified speech and language
2 pathologist and interacting with school staff. Do
3 you see that?
4  A.   Wait a second. Yeah. So I guess that's
5 what I put in there. Okay.
6  Q.   Is that your opinion or Dr. Siegel's
7 opinion?
8  A.   It would be carried out by a qualified
9 person that's basically -- it should be not --- it
10 shouldn't be speech language pathologist --
11 qualified person in sign language.
12  Q.   It says speech and language pathologist.
13 Are you saying now that you want to retract that
14 opinion and change it to qualified person instead of
15 speech and language pathologist?
16      MR. USHIRODA:  Objection.
17  A.   Correct. I'm going to correct it.
18 BY MR. VARADY:
19  Q.   So you're going to change that to speech
20 language qualified person, rather than speech
21 language pathologist?
22  A.   Right. Just take the speech language
23 pathologist out.
24  Q.   Is there some reason you've waited until
25 now to make that change, since you've had an

Page 134

1  opportunity to supplement your opinion again this
2  year?
3      A.   Never thought about it until just now.
4      Q.   You weren't thinking about it when you
5  wrote this?
6      A.   I was probably then, but I've not been
7  thinking about it since I wrote this in the period
8  until now.
9      Q.   Well, didn't you consider these opinions
10 when you were making your amendment in June of this
11 year?
12     A.   I don't recall.
13     Q.   So you don't remember what you were
14 thinking about at that time?
15     A.   No, I don't.
16     Q.   Did you review these opinions when you
17 were making that amendment?
18     A.   Probably -- I usually do.
19     Q.   Do you recall doing that?
20     A.   I recall doing it, but I don't recall what
21 I was thinking at the time.
22     Q.   So in neither instance did you think about
23 changing -- making the change that you just
24 indicated that you want to make?
25     A.   That's correct.

Page 135

1      Q.   And just to make sure the record is
2  correct on another correction, that typographical
3  error in the next to the last sentence in this
4  paragraph is supposed to read school staff, not
5  school stat; is that correct?
6      A.   That's correct.
7      Q.   Now, you indicate in your last paragraph,
8  As per Dr. Siegel, Bryan could live in a group home
9  setting.  Do you see that?
10     A.   Yes.
11     Q.   You've made no independent assessment of
12 whether or not that would be appropriate.  You're
13 relying exclusively on Dr. Siegel's opinion for that
14 point; is that correct?
15     A.   That's correct.
16     Q.   He'll need this the rest of his life.
17 That's also -- that statement is also based on what
18 Dr. Siegel told you; isn't that correct?
19     A.   Correct.
20     Q.   Medi-cal, SDI and the Regional Center
21 would fund it -- that conclusion is based on your
22 general understanding of the Social Security and
23 Regional Center systems; is that correct?
24     A.   Correct, in the state of California.
25     Q.   It's not specific to Bryan; is that

Page 136

1  correct?
2      A.   Correct.
3      Q.   And then you refer to a spreadsheet with
4  estimated costs.  Would you turn to that now,
5  please?
6           Now, looking at the first column -- or
7  first two columns, reading from the top to the
8  bottom of the page, the left hand -- do you see
9  that?
10     A.   Yes.
11     Q.   It describes things like professional
12 health care, psychiatrists, behavioral psychologists
13 and whatnot.  Do you see that?
14     A.   Yes.
15     Q.   What is the sources of that service array?
16 Where did you get those services from?
17     A.   Leukens' plan.
18     Q.   Okay.
19     A.   Basically, the format she used.
20     Q.   You made no independent evaluation as to
21 whether or not any of these services was needed or
22 appropriate for Bryan; is that correct?
23     A.   Correct.  I left it up to Dr. Siegel.  But
24 the format was Dr. Leukens -- I mean, Ms. Leukens'
25 plan.

Page 137

1      Q.   Now, looking down at the column that has
2  -- that appears directly to the right of numbered
3  paragraph four in the column that we're looking at,
4  you have some daily figures there.  Do you see that?
5      A.   It says costs?
6      Q.   Actually, there's nothing at the top of
7  this particular column.  This says Keystone School,
8  Academic --
9      A.   Okay.
10     Q.   -- and then there's Transportation and
11 one-to-one Aide.  Do you see that?
12     A.   Yes.
13     Q.   Where did those figures come from?
14     A.   Keystone School.
15     Q.   And what do they represent?
16     A.   They represent how much they charge per
17 day for academic services, transportation and a
18 one-on-one aide.
19     Q.   As a general matter?
20     A.   Correct.
21     Q.   Not specific to Bryan?
22     A.   Correct.
23     Q.   Looking at the Frequency column, which is
24 the next column to the right -- do you see that?
25     A.   Yes.

Page 138

1    Q.    Those are frequencies that Dr. Siegel
2  described as being necessary for Bryan; is that
3  correct?
4    A.    Right.  And trying to annualize or, you
5  know, whatever the period of time is.
6    Q.    And that's the source of that, is what Dr.
7  Siegel recommended; is that correct?
8    A.    Correct.
9    Q.    Looking at costs -- do you see those --
10   A.    Yes.
11   Q.    -- figures?
12       Those are based on your conversations with
13  the Regional Center; is that correct?
14   A.    Some are.
15   Q.    What is the source -- identify which ones
16  are not and tell me what the source of those is,
17  please.
18   A.    Please state that again?
19   Q.    You said some of these figures are -- that
20  are in the cost column are the result of your
21  communications with your colleague at the Regional
22  Center.  Do you recall?
23   A.    Right.
24   Q.    And then you said some are not.
25   A.    Right.

Page 139

1    Q.    Can you tell me what the source --
2  identify the ones that are not a result of that
3  consultation and -- excuse me.  Just to save time --
4  and tell me what the source is if it's not the
5  communications you had with the Regional Center?
6    A.    The professional health care services
7  costs are basically from within the range of what
8  health care services are in the state of California,
9  by research, and that's what's going on at this
10  time.
11       The $5,000, under two, Residential Care,
12  is Regional Center.
13       Communication therapies are -- there's no
14  figures there.
15       Four, the Keystone School figures are a
16  total of the Keystone School services.
17       And the CVRC or the respite co-pay was
18  from the Regional Centers.
19   Q.    What is the Keystone School?
20   A.    Pardon me?  That was the Elmira school
21  that he was at previous.
22   Q.    It's not the school he's attending now?
23   A.    Correct.
24   Q.    Did you make any attempt to obtain current
25  figures from the school Bryan's attending now?

Page 140

1    A.    No, because I just got that information
2  recently.
3    Q.    The annualized costs, that's just
4  multiplying these numbers times the frequency of the
5  services over 12 months; is that correct?
6    A.    Correct -- other than the one-time.
7    Q.    And then the annual cost for the life span
8  cost is simply making a calculation based on the
9  number of years that are indicated; is that correct?
10   A.    Correct.
11   Q.    What did you use for a figure for Bryan's
12  life expectancy?
13   A.    I didn't.
14   Q.    So what we have here is a yearly cost; is
15  that correct?
16   A.    Correct.
17   Q.    Do you have any idea what Bryan's life
18  expectancy is?
19   A.    I've got a rough idea, but not totally.  I
20  haven't been asked to look that up and analyze that.
21   Q.    Well, you would agree that the current
22  figure for average life expectancy of men in the
23  United States is what?
24   A.    78, 79.
25       MR. VARADY:  All right.  That concludes my

Page 141

1  questions on Exhibit No. 9, and this would be a good
2  time to go off the record and we can discuss our
3  break.
4       THE VIDEOGRAPHER:  The time is 12:06.
5  We're going off the record.
6       (Discussion off the record.)
7       (Lunch recess.)
8       (Exhibit 13 marked for
9       identification.)
10      THE VIDEOGRAPHER:  The time is 12:52.
11  We're back on the record.
12  BY MR. VARADY:
13   Q.    Dr. Goka, we've taken a short break.  One
14  of the things that I wanted to confirm is that in
15  references earlier in your deposition today you've
16  been referring to your June '07 supplemental report.
17  Before I ask you questions about that, I'd just hand
18  you what's been marked as Exhibit No. 13 and confirm
19  that that is, in fact, your report that you're
20  referring to.
21   A.    It looks to be.
22   Q.    Okay.  Great.  We're not going to work on
23  that one yet.  We're going to work our way through
24  Exhibit No. 10.  You can keep this in front of you,
25  though, for future reference, please.

1    Q.    My point is that the reason for disclosure
2 is because we don't have trial by ambush.  We give
3 the other side a fair opportunity to find out what
4 the expert is going to say and to test the expert.
5 Do you understand that?
6    A.    I hear -- understand what you're saying,
7 but I just -- the word --
8    Q.    You don't like the word test?
9    A.    Test.
10    Q.    I understand that.  Let's set that aside
11 for a minute and just see if you could answer my
12 question.  You understand my question; right?
13    A.    Yeah, I understand your question, and I
14 agree with what you're saying.  Change the word test
15 and I would be more comfortable.
16    Q.    So -- and that's why your opinions are
17 your final opinions.  These are the opinions you're
18 going to testify to at trial?
19    A.    Correct.
20    Q.    So, for example, when you say you've
21 reviewed documents you sent, in that first paragraph
22 to Mr. Ushiroda --
23    A.    Correct.
24    Q.    -- I'm going to ask you what documents did
25 he send you.

1    A.    Dr. Freeman, Dr. Bond's -- Mister -- Dr.
2 Bond's deposition, Mrs. Wiles' deposition, Dr.
3 LeGoff's reevaluation and Ms. Leukens' reevaluation.
4    Q.    And you left out Dr. Freeman's?
5    A.    Right.  Dr. Freeman again.  He's listed on
6 the second page.
7    Q.    So all of those things were provided for
8 you for your review; is that correct?
9    A.    Correct.
10    Q.    And you also had a telephone conversation
11 with Dr. Siegel on June 21st, the day before this
12 supplemental report was made; is that correct?
13    A.    That's correct.
14    Q.    Tell me everything you discussed with her.
15    A.    We went back over the plan and it's --
16 basically of Ms. Leukens, and she basically had --
17 Dr. Siegel had reviewed similar documents and felt
18 that there may be a greater need for, as I recall,
19 for the family counseling, so we changed that.
20    Q.    Well, the first thing you say is that
21 essentially Dr. Siegel has no changes in her
22 previous opinions.  Do you see that?
23    A.    Yes.
24    Q.    That's not entirely true, however, because
25 the next thing you say is that, Based on my

1 discussions with Dr. Siegel and the review of the
2 parents' depositions, it is apparent that some
3 additional counseling for the parents and Bryan's
4 brother are indicated.  Do you see that?
5    A.    Yes.
6    Q.    Did I read that accurately?
7    A.    Yes.
8    Q.    So that's a change that Dr. Siegel had
9 made in her prior opinion; isn't that correct?
10    A.    True.
11    Q.    And you adopted that as your own opinion,
12 as well, based on her revision; isn't that correct?
13    A.    No.  The only opinion I had was the
14 economics of it.  As far as the number of counseling
15 hours go or how much is appropriate, that was up to
16 her.
17    Q.    All right.  I'm saying you adopted her
18 revised position as your own; is that correct?
19    A.    In some respects, yes.
20    Q.    In what respects did you not adopt it as
21 your own?
22    A.    The quantity of counseling.
23    Q.    So Dr. Siegel revised her opinion as to
24 the need for additional counseling?
25    A.    Correct.

1    Q.    Did you not also adopt that same opinion?
2    A.    Well, no.  It's not my opinion.  It's her
3 opinion.  I put the figure in -- I put the numbers
4 in that calculated the cost.  So therefore, the
5 opinion as to the amount of family counseling
6 necessary was Dr. Siegel's opinion.  I'm just the
7 messenger here and put the extrapolation with the
8 cost.
9    Q.    So if I understand what you're saying, you
10 changed the cost based on her revised opinion.
11    A.    Correct.
12    Q.    You didn't take any measures to validate
13 or determine whether or not her changed opinion was
14 valid; is that correct?
15    A.    That's correct.
16    Q.    You accepted it?
17    A.    Yes.
18    Q.    And you revised the figure for additional
19 counseling exclusively based on her opinion?
20    A.    Yes.
21    Q.    You state that the counseling would be
22 limited and more essential when Bryan went to a
23 group home.  Do you see that?
24    A.    Yes.
25    Q.    Had you made any independent determination

Page 154

1  at this time as to whether or not Bryan's parents
2  had decided to put him in a group home?
3      A.   No.
4      Q.   Other than the change for additional
5  counseling, there are no other changes in your
6  calculations or opinions; is that correct?
7      A.   That's correct.
8      Q.   Now, looking at the pages following page
9  two -- that is, pages -- page three, that is the
10 revised spread sheet; is that correct?
11     A.   That's correct.
12     Q.   All right.  Now, can you tell me what the
13 increase in the cost for family counseling would be
14 between this exhibit and Exhibit No. 9?
15          THE WITNESS:  Hand me nine back.
16     A.   It's just a one-time cost, on the right
17 column.  It went from -- the increase is about 12,
18 $13,000.  It went from $2,250 to $15,624.
19 BY MR. VARADY:
20     Q.   How many sessions did it increase?
21     A.   It went from a weekly session for three to
22 six months -- so that's three to six sessions -- no.
23 That's wrong.  Three to six months worth of weekly
24 sessions.  So six months is -- 24.
25     Q.   12 to 24; is that correct?

Page 155

1      A.   I told you I'm tired.  Yes.  Okay.  So
2  into 100 to 150 sessions.
3      Q.   So would you consider that a substantial
4  increase?
5      A.   Yes.
6      Q.   And you would consider that a significant
7  difference from your original calculation; is that
8  correct?
9      A.   That's true.
10     Q.   And the original calculation was
11 inaccurate in that respect; is that correct?
12     A.   No.  It was -- it was an opinion at the
13 time of Dr. Siegel, whereas opinion changed after
14 reading the depositions and the reports.
15     Q.   Right.  What you're saying is the math was
16 right based on what Dr. Siegel told you.
17     A.   Correct.
18     Q.   There is no mistake in the math.
19     A.   Right.
20     Q.   The mistake was in the amount of
21 counseling that would be needed?
22          MR. USHIRODA:  Objection.  Lack of
23 foundation, misstates testimony.
24     A.   I think you'd have to ask Dr. Siegel what
25 changed her mind.  I don't think it's a mistake as

Page 156

1  much as a change of her opinion.
2  BY MR. VARADY:
3      Q.   There's a significant difference in her
4  opinion between the report in Exhibit 9 versus the
5  report in Exhibit 13; is that correct?
6      A.   That's what I would call it.
7      Q.   You would call it --
8      A.   That way.  I would say it's a significant
9  amount of money, yes.
10     Q.   And a significant difference being 12 to
11 24 versus 100 to 150 sessions; that would be
12 significant, wouldn't it?
13     A.   Yes.
14     Q.   You're not willing to say that Dr. Siegel
15 was mistaken in her first assessment, but what you
16 will say is that she changed her opinion in a
17 significant way; is that correct?
18     A.   That's true.
19          MR. USHIRODA:  Objection.  Lack of
20 foundation, assumes facts not in evidence, misstates
21 testimony.
22     A.   She changed her opinion and it had a
23 significant outcome, is what I would say.
24 BY MR. VARADY:
25     Q.   The change in her opinion had a

Page 157

1  significant outcome; is that what you're saying?
2      A.   Yes.
3      Q.   And that outcome is significantly
4  different from the prior outcome, isn't it?
5      A.   Economically, yes.
6      Q.   Did you, in reaching your opinion, your
7  final opinion, consult with Loretta Leukens at all?
8      A.   No.
9      Q.   Did you consult with Dr. LeGoff at all?
10     A.   No.
11     Q.   Did you consult with Dr. Freeman at all?
12     A.   No.
13     Q.   Did you attempt to do so?
14     A.   I'm not allowed to.
15     Q.   Why is that?
16     A.   Because of the opposing sides, rule of
17 thumb.
18     Q.   Your belief is that you could not call Ms.
19 Leukens, for example, and say, You know, there's
20 something in your report that I don't understand,
21 I'd like to ask you to clarify it for me?
22     A.   I think there's an ethical problem with
23 that, as well as there may be a legal problem with
24 that.  I don't know.  But I would think there's an
25 ethical problem with that.

1    Q.   Did you identify to Mr. Ushiroda any
2  questions you had about Ms. Leukens' report?
3    A.   Such as?
4    Q.   Any.
5    A.   Well, yeah.  I mean, I told him what I
6  felt was -- I mean, what I felt, you know, as I
7  documented in my supplemental and primary reports.
8    Q.   My question isn't did you tell him you
9  disagreed with it.  That's not my point.
10      My point is:  Were there any questions in
11 your mind about things contained within her report
12 that you wanted clarification on that you talked to
13 Mr. Ushiroda about and said, Gee, Mr. Ushiroda, I'd
14 like to get more information about why she's coming
15 to this conclusion?
16    A.   I think there's some figures I wanted
17 validated, how she came to that conclusion and how
18 she got them, and who made the recommendations of --
19 some of the recommendations, and she verified that.
20    Q.   And she did that in her deposition; is
21 that correct?
22    A.   Yes.
23    Q.   Did you assist Mr. Ushiroda in preparing
24 for Loretta Leukens' deposition by providing those
25 types of questions?

1    A.   A couple like those.  That's -- you know,
2  those are the type things.  I wanted to find out
3  where she got her figures from and, you know, the
4  biggest question I had was how come she didn't --
5  what was the reason that the financial figures
6  didn't change from her two reports.
7    Q.   Well, you'd agree that yours changed only
8  in one aspect; isn't that correct?
9    A.   True.  And I stated why.  But she writes
10 this whole report for you guys and I'm --
11   Q.   Well, I'm --
12      MR. USHIRODA:  Let him finish his answer.
13      MR. VARADY:  It's not an answer.  It's a
14 narrative.
15      MR. USHIRODA:  It is, because -- you're
16 cutting him off.
17      MR. VARADY:  It's not the question.
18      MR. USHIRODA:  You're cutting him off.
19 Let him finish his answer.
20      MR. VARADY:  There's no pending question.
21      MR. USHIRODA:  Counsel --
22 BY MR. VARADY:
23   Q.   My question to you is:  Did you provide a
24 list of questions to Mr. Ushiroda to ask Ms.
25 Leukens?

1    A.   I gave him some questions, yes.
2    Q.   Were those in writing?
3    A.   Some were.  Some were verbal.
4    Q.   Have copies of those been produced to us?
5    A.   No.  I don't have them anymore.  It was
6  just I wrote some notes, I thought about it and I
7  told him, and then I just got rid of it.
8    Q.   What do you mean by got rid of it?  You
9  destroyed them?
10    A.   Yeah.
11    Q.   There's no copy of those remaining?
12    A.   Not that I know of.
13    Q.   Similarly, as to Dr. LeGoff, did you
14 prepare any questions for Dr. LeGoff for Mr.
15 Ushiroda's use?
16    A.   No.  I talked to him about it, and I think
17 he had it pretty well figured out.
18    Q.   As to Dr. Freeman, did you prepare any
19 questions for Mr. Ushiroda's use with regard to Dr.
20 Freeman's deposition?
21    A.   No.
22    Q.   Does anyone else -- did anyone else
23 besides you have a copy of the list of questions
24 that you prepared for Dr. Leukens' deposition for
25 Mr. Ushiroda's use?

1    A.   Ms. Leukens.
2    Q.   Sorry.  I said Dr. Leukens.  I'll withdraw
3  the question and ask it correctly.
4       Did anyone besides you ever have a copy of
5  the questions you prepared for Mr. Ushiroda's use in
6  Dr. -- in Ms. Leukens' deposition?
7    A.   Not that I know of.
8    Q.   Why did you destroy those?
9    A.   They were just handwritten notes and I'm
10 cleaning house.  He just asked me.  I said okay.  We
11 talked about.  I wrote some notes down.  I said, I
12 need to know this, this and this.  And then, you
13 know, we were done with the discussion, I figured he
14 had it, and so I just round-filed it.
15    Q.   You understand that you're disagreeing
16 with Ms. Leukens' opinions?
17    A.   Yes.
18    Q.   -- and that you are prepared to give
19 testimony in contradiction of her opinions?
20    A.   I guess that's what you'd call it, yes.
21    Q.   Do you think it's fair to prepare
22 questions like that which are used in Ms. Leukens'
23 deposition and then destroy them so that they can't
24 be used in your deposition?
25    A.   I think that's your responsibility and

**Richard S. Goka, M.D.**
5740 North Palm, Ste 103
Fresno, California 93704-1800
(559) 261-3090        Fax (559) 261-3085

June 28, 2006

Gregg M. Ushiroda, Esq.
Watanabe, Ing & Komejii
999 Bishop St, 23rd Floor
Honolulu HI 96813

      Ref:    Bryan Wiles-Bond (DOB: Oct. 28, 1991)
              Wiles, et.al. Vs. Dept. of Education,
              Civil NOS: CV 04-00442 & CV 05-00247

Dear Mr. Ushiroda,

At your request I have reviewed the documents you have sent to me, see attached record review. I have reviewed the report of Bryna Siegel, Ph.D., from the University of California, San Francisco. I have had a telephone conference with Doctor Siegel as well. As of this date, it is apparent that there are additional records that are not in your possession. Especially, the records before coming to Hawaii. Therefore, this is a preliminary report and may need to be revisited once additional information is obtained.

Bryan Wiles-Bond is a 15-year-old with Autism. He currently is living at home with his parents in Northern California and attends the Keystone School in Elmira, California. According to Dr. Siegel he is severely disabled and doing quite well in the current program. It is our understanding that he is also receiving some respite services from the Regional Center. The above services are generally funded by either the school district or Regional Center, State of California, Department of Developmental Services. According to the web site, the maximum out of pocket expense for services is $7,900.00 annually from ages 13 to 17. This is a sliding scale as to the parent's income. Once he is 18-years-old he will be considered an adult.

Furthermore, in a discussion with a representative from the Regional Center, Bryan would most likely need a "Level 4" group home, which would cost approximately $5,000.00 per month. The funding generally comes from Social Security and the Regional Center. There is no out of pocket expense. If Bryan has any excess money, it would be placed in a trust. Once he moves into a group home, he will no longer be in need of the Respite services that are being provided.

In reviewing Ms. Lukens' life care plan and a discussion with Dr. Siegel many of the services would be required to a lesser extent. Ms. Lukens has recommended a Psychiartist six times a year. There are neither specifics nor medical records that indicate this frequency. However, if Bryan was to be placed on medications, it would be reasonable for him to see a Psychiatrist two to four times a year. It has been noted that Bryan has had an adverse reaction to medications and as far as we know is currently on none.

**EXHIBIT   2**

9   DATE 9/21/07
WITNESS *Richard Goka* M.D
SUBMAFILING

Bryan Wiles-Bond
Page 2 of 2.

A behavioral psychologist is indicated to work with the treatment team, educators and caregivers. This psychologist would give strategies to those to minimize adverse behavior. Ms. Lukens has recommended three times a week for the rest of Bryan's life. Generally, the behavioral psychologist would be required four to six time a year to assist the caregivers.

Family counseling would be needed to help the family adjust, especially when he is placed in a group home. Doctor Siegel felt that some intense therapy for the first three to six months would be indicated, not weekly from age 14 to 22 as Ms. Lukens as indicated.

If Bryan is started on medications, then it would be appropriate to monitor hepatic and renal functions, since the medications can be toxic. However, it is not known nor can anyone specifically state what medication he would be using.

Dental work will be challenging and should be done twice a year. It will require sedation. Ms. Lukens has made it monthly.

Physical, Occupational, Speech and Audiological therapies are part of the school program and covered under they daily charges. Their roll would be, as consultants and any actually activity would be carried out by the school staff. There is no apparent need for audiological services and training. Sign language would be carried out by a qualified speech-language pathologist and interacting with the school staff. After age 22 Bryan would have plateau his ability and therefore no further language intervention would be necessary. He is currently using a form of augmentative communication with his sign language and the current teaching method. This is being handled by the school stat that are knowledgeable. An electronic communication device is not indicated in this case.

As per Dr. Siegel, Bryan could live in a group home setting. He will need this the rest of his life. Medi-cal, SDI and the Regional Center would fund it. Attached is a spreadsheet with the estimated costs.

Sincerely,

Richard S. Goka, M.D.
Diplomat, American Board of Physical Medicine & Rehabilitation.
Diplomat, American Board of Pain Management.

rsg/

# Richard S. Goka, M.D.
5740 North Palm, Ste 103
Fresno, California 93704-1800
(559) 261-3090     Fax (559) 261-3085

June 28, 2006

Gregg M. Ushiroda
Watanabe, Ing & Lomeiji, LLP
999 Bishop Street, 23rd Floor
Honolulu Hawaii 96813

   Ref: Bryan Wiles-Bond
      DOB: Oct. 28, 1991

RECORD REVIEW:

| | |
|---|---|
| 1/28/97 | Leukens' File: Occupational Therapy note (bates 203): Speech and OT are citrating. |
| Feb. 1997 | Leukens' File: Speech/Language Progress note (bates 202): encourage him to use pictures and entourage vocalization. |
| 9/18/99 | Leukens' File: DuPont Hosp., Wilmington DE. Augmentative Communication eval. (bates 192): Stress the continue use of picture communication symbols. |
| 9/14/99 | Leukens' File: Vineland Adaptive Behavioral Scales (Bates 38): [scores are documented] |
| 10/06/99 | Leukens' File: Occupational therapy evaluation (bates41): had moved to Hawaii form Maryland over the summer. He had history of ear infections and sensitivity to medications. Based on his IEP from Maryland, an interim IEP was developed at Kahakai School on September 8, 1999. the interim IEP note significant pervasive developmental delays and autistic behaviors at age 2.5 years. He takes Melatonin to help him sleep and had Pseudo-tumor cerebri. Recommendations were made. |
| 10/07/99 | Leukens' File: Educational Eval. Waikoloa elementary (Bates 36): Woodcock-Johnson attempted, Brigance Inventory of Early Development (check list), Teacher reports, and classroom observations. Noted his skills were scattered between 2 and 5 year-old range (approximate). Two factors might have contributed, he made little attempt to attend to task and he had a sore foot. |
| 10/19/99 | Richard H. Mesco, D.O., School Psychiatric Report: Onset occurred at 1 1/2 to 2 years of age. Diagnosed with Autism, R/O mental retardation, R/O osteomyelitis of right Calcaneus, |
| 10/19/99 | IEP Conference: Attention in one on one or small group max. 10 min. doesn't occur all the time. Can match pictures, colors, shapes and simple puzzles. He can follow some single step commands. Fine motor: can assemble simple 6-10 piece puzzles. Vineland adaptive behavior scales: communications 30; daily living skills 29; socialization 49; motor skills est. 51; all in the low range. Toddler language scale: receptive language 3-6 months; expressive language 3-6 months. Hearing appears adequate, oral structures and functions appear adequate for speech production. He is nonverbal with vocalization and gestural abilities. Behavior is busy in the classroom and sometimes hyperactive. When agitated he will scream, pinch, scratch, kick, headgut, hit, spit, pull hair, and through objects. Calming techniques to deescalate usually work, these include jumping on trampoline, wrapping him in a blanket and sooting light music. |
| 11/03/99 | Wesley Sugai, M.D., chart; Kaiser Permanente, Discharge Summary: Date of admission October 29, 1999. Had a three-week history of limping, seen by orthopedist in Maui on October 13, 1999 for possible fracture. The x-ray was essentially normal. |

Repeat x-ray  October 20, 1999 showed possible lucent  .. Referred for CT scan which though to be Osteomyelitis.  A biopsy and antibiotic were started.

[Kaiser records from Oct to Dec. 1999 were reviewed]

| | |
|---|---|
| 1/17/00 | <u>Wesley Sugai, M.D., chart; Kona Community Hosp. ER:</u>  Possible ingestion of Boric Acid.  Felt it was unlikely and told to give milk. |
| 1/29/00 | <u>Wesley Sugai, M.D., records:</u>  Developmental growth chart, 85 percentile for weight and 75 percentile for height. |
| 1/29/00 | <u>Wesley Sugai, M.D., records:</u>  Finished six weeks antibiotics for infection right foot bone.  Post surgery 10/28/1999.  Has begun to limp again.  Jumping and walking OK now.  Get lab, discuss with parents. |
| 3/13/00 | <u>Wesley Sugai, M.D., chart; Robert Durkin M.D.:</u>  He had taken care of Bryan in Oct. 1999 and had reviewed the recent x-rays and lab.  He had debrided a lesion.  He was back at full activity without pain or limp on December 16, 1999 visit.  Felt that the osteomyelitis had been treated and the bone was heeling. |
| 3/03/00 | <u>Wesley Sugai, M.D., chart; Kona Community Hosp., X-ray Right calcaneus:</u>  Lytic lesion calcaneus with may represent osteomyelitis recommend bone scan. |
| 3/06/00 | <u>Wesley Sugai, M.D., records:</u>  Discussion with Dr. M.. 1 cm benign lucent lesion at heel.  Sent x-rays to Dr. Derkin. |
| 3/07/00 | <u>Wesley Sugai, M.D., records:</u>  review x-ray and lab. |
| 3/08/00 | <u>Wesley Sugai, M.D., records:</u>  Discussion with teacher.  He may normally be a hot kid, temp 99-100 and that 100.5.  ?  and not worried unit greater than 101. |
| 8/25/00 | <u>Wesley Sugai, M.D., records:</u>  Earache, temp 100 at school today.  RX Tylenol. s |
| 11/27/00 | <u>Wesley Sugai, M.D., records:</u>  URI last week.  ?? Dimatabb, Chap Stick. |
| 7/10/01 | <u>Wesley Sugai, M.D., records:</u>  Possible Right ear infection.  Melatonin helps with sleep.  Risperdal, pseudo-tumor cerebri.  Cortisporin Otic.  OTC wax removal. |
| 9/11/01 | <u>Wesley Sugai, M.D., records:</u>  Right earache, pick and pulls on it.  Cortisporin Otic. |
| 10/08/01 | <u>Wesley Sugai, M.D., records:</u>  Very frequent large amount vomiting.  Pokes end often.  Bites on stomach, open sore.  ? Cortisporin otic. |
| 11/02/01 | <u>Wesley Sugai, M.D., records; Hawaii Radiology, Right Ankle:</u>  Possible Slater I FX, non-displaced. |
| 12/20/01 | <u>Wesley Sugai, M.D., records:</u>  Limping on Left foot for 2 days.  Had an infection in right foot two years ago.  Limping in same manner.  Ice, wrap, F/U as needed. |
| 1/29/02 | IEP Conference: |
| 2/28/02 | <u>Wesley Sugai, M.D., records:</u>  foot, limping again. |
| 3/01/02 | <u>Wesley Sugai, M.D., records:</u>  Right foot seems sore.  One week now, limping and not putting weight on right heel.  History of Osteo right heel.  Get lab.  Note lab normal. |
| 8/10/02 | <u>Wesley Sugai, M.D., records:</u>  Ear drops prescribed. |
| 8/29/02 | <u>Wesley Sugai, M.D., records:</u>  complains of sore ears.  Still coughs.  Cipro otic drops. |
| 9/05/02 | <u>Wesley Sugai, M.D., records:</u>  Ear ache, still holds ears.  Refer to Dr. Cervantes. |

| 9/16/02 | Wesley Sugai __.D.. records: being scheduled for Dental __oration 9/20/02 under general. Consult with Dr. Cervantes who will examine ears while under anesthesia. Allergies to Penicillin, Sulfa, Risperdal. Current meds. Note (melatonin 2 at bed time.) Notes he failed Risperdal – hydrocephalus; failed Clonidine – increased headaches. Melatonin helps with sleep. No meds now. OK for general anesthesia. |
|---|---|
| 9/20/02 | Wesley Sugai, M.D., chart; Kona Community Hosp., Operative Report, William Cervantes, M.D: Cerumen impaction with otitis externa right. |
| 10/11/02 | Wesley Sugai, M.D., records: ? drops prescribed. |
| 11/06/02 | Leukens' File; Psychoeducational Profile – Revised (bates 48): He had developmental age scores of 22 months. Weakness areas were imitation, cognitive performance and cognitive verbal. Notes that not all portions were given since timed items were missing from the kit. |
| 11/12/02 | Wesley Sugai, M.D., records: Tired 2 days. Sleepy, decreased urination, vomiting today X3. C/O headache. Gastritis with ?. Dehydrations. Phenergan, ?, Advil. |
| 1/28/03 | IEP Conference: chronological age 4th grade. He had the psychoeducational Profile Revised and the Developmental Profile II in January 2002. He was able to do gross motor skills; kicking a ball, throwing a ball, using a scooter board to push himself, alternate feet going up and down stairs. Classroom performance can utilize an indoor trapeze appropriately and support his weight, use a small trampoline and jump with feet together for approximately 2-3 minutes. Academic/pre-vocational able to sort objects, match letters of the alphabet, follow some simple one-step directions and imitate some behaviors demonstrated by instructor. Demonstrate a preference for certain books. Able to point to certain objects in a book is emerging. His behavior impacts his ability to perform these skills. He can copy a circle, show he use of some basic objects; cup, fork; toothbrush and stack 9 blocks independently. He is able to toilet independently on school campus. He puts on his own shoes, with verbal prompts. He is able to use a spoon and fork in the cafeteria and throws away his own trash.

Present performance level: he can produce vowel sounds and give two repetitions of the same sound. He can discriminate between picture/objects in a set of two to five and pint to one when cued to do so. He has been choosing activities and expressing wants using a picture choice board with 15+ pictures. He has begun pairing some combinations of 2 signs or vocalizations when cued. Weakness: communication abilities vary depending on the context, location and person he is interacting with. He continues to need improvement in competing oral motor activities, pairing consistent verbalization with presented pictures, using new signs, following directions with minimal cueing and independently communicating to express his wants and needs.

Behavior: is very inconsistent and effects his performance in many areas. Severe acting out behavior occurs when given a task or period of work he does not want to do. He is not able to follow two-step directions, nor does he follow all simple directions. Fine motor skills are a weak area. Can do simple cutting, snipping a marking, does not exhibit appropriate focus and concentration to demonstrate basic pre-writing skills. |
| 4/21/03 | Wesley Sugai, M.D., records: Sores on legs. Excoriated inflammation on bites on legs. RX Erythromycin. |
| Jul. 2003 | Dept. of Ed. Quarterly Report. |
| 7/07/03 | Wesley Sugai, M.D., records: Allergic reaction ? itchy ? one week. DX 1. ? rash; 2. chest pain? Holds chest for 15 min. RX Lortalin. To ER if continues for EKG. |
| 9/11/03 | Wesley Sugai, M.D., records: Chews hands, ? red. 1. Autism; 2. bite marks on hands. RX Keflex and ?. |
| 10/20/03 | Wesley Sugai, M.D., records: Exam for Special Olympics. |

| | |
|---|---|
| 11/18/03 | <u>IEP Confere</u>.  Chronological age puts him in the 5th g.  .. He is toilet regulated, he indicates the need to use the toilet, eats appropriate with fork and spoon, drinks from an open cup, sits in the cafeteria to eat lunch with younger, quieter students, zips/unzips, unsnaps, laces, crosses the laces and pulls tight. He is able to put on/take off tee-shirt, elastic-waist shorts, and shoes. He is utilizes some sign language, picture exchange communication system or gestures to communicate needs and desires; obeys the stop command. He has emerging writing skills using a template; like the computer, reading/looking at books and magazines. He has good imitation and matching skills. |

Speech-Language:  Communicates his need by a variety of methods -- gestures, vocalization and signs. He uses six signs spontaneously and will imitate others after a model is given. He uses hand over hand attempts to get his needs met with caregivers. He will sit and attend to tasks for short periods of time successfully. At times his behavior impacts his ability to perform known skills, which makes it difficult to display his skills consistently. Currently receiving extended services including weekends.

Vineland Adaptive Behavior Scales, administered with parents. Motor skill domain are an estimate and not used when computing overall adaptive functioning for children 6 y/o and older. Communication 20; Daily living >20; Socialization 38; motor skills 68. Classroom Vineland administered October 2002. Communication 24; Daily Living Skills 42; Socialization 42; motor skills 70. Both Adaptive Behaviors Scores 24 and 35 classify overall adaptive functioning as low and indicate a sever deficit in adaptive functioning. Activities involving daily living skills and communication appear to be the most challenging for Bryan, although both teacher and parents indicate he is gaining skills in alternative forms of communication.

| | |
|---|---|
| Dec. 2003 | <u>Dept. of Ed. Quarterly Report.</u> |
| 1/08/04 | <u>Wesley Sugai, M.D., records:</u>  Left eye swollen, irritated. Conjunctival and peri-orbital redness. ? with sudden flare up. Will DC meds and see Ophthalmologist to R/O corneal abrasion. |
| 3/11/04 | <u>Wesley Sugai, M.D., records:</u>  Facial rash, allergy, itching. DX. Contact dermatitis. |
| 3/12/04 | <u>Wesley Sugai, M.D., records:</u>  School felt hives worse, mom feel's look better today, some exemia. Zyrtec prescribed. |
| 6/04/04 | <u>Wesley Sugai, M.D., records:</u>  Right eye injury today. Conjunctival ?., mild edema and ?. RX. ? and Tobramycin eye drops. |
| 7/15/04 | <u>Wesley Sugai, M.D., records:</u>  F/U violent episodes, doing OK today. Reported caused pseudo-tumor cerebri. Difficulty flying. Advil three tabs help. Exam ? right ear, RX Donnicef, Colace, ?, and Claritin. |
| 7/31/04 | <u>Wesley Sugai, M.D., records: No. Hawaii Comm. Hosp. EEG:</u>  Normal awake, drowsy and slight sleep EEG. |
| 8/18/04 | <u>Kimberly Smalley, Ph.D., Child & Family Services, HI. Behavioral Assessment:</u>  He actively uses 20 and 50 signs and reportedly knows over 100+. Receptive communication appears good, he can follows some multiple step directions, can answer verbal questions with sign language, though clearly not consistently an auditory processor. Made gains in toileting, particularly defecation. Urinates on himself several times a day. He takes no medications except Benadryl or Claritin for allergies. Advil for bumps, bruise, inflammation, etc. Melatonin as a sleep aid. Recent EEG to rule out any medical causes for recent and dramatic change in behavior. He has used medication in the past to control his behavior but has atypical and life threatening reactions to the medications. |

Behaviors: Aggression, 0-5 per domain, episodes typically were discrete (single blows) and self-limiting. At school he has used minor aggression to protest or escape work, but it has reportedly increased in frequency and intensity seedily since April.

Tantrums, 5 to 30 minutes, the increased intensity are new. 0-5 times a week.

A support plan was attached.

| | |
|---|---|
| 9/02/04 | Wesley Sugai, M.D., records:  School Authorization for mediations storage; ibuprofen 400 mg., every 6 hours as needed. |
| 11/21/04 | Leukens' File: Pacific Child & Family Associates Proposal (Bates 75):  this is a clarification of the previous proposal with costs. |
| 9/23/04 | Wesley Sugai, M.D., records:  Hepatitis B #2. |
| 9/27/04 | Wesley Sugai, M.D., records:  Hardship California, ? to parents, ? and behavior help is needed. |
| 10/19/04 | Wesley Sugai, M.D., records:  Day says he's crying non-stop.  Eating dry wall, paper, sucking on ?.  Advised to go to BR R/O ?. |
| 10/19/04 | Wesley Sugai, M.D., chart: Kona Community Hosp. ER:  Increased agitation, eating things.  Sedation given. |
| 10/19/04 | Wesley Sugai, M.D., chart: Kona Community Hosp. Chest X-ray:  normal. |
| 10/19/04 | Wesley Sugai, M.D., chart: Kona Community Hosp., Abdomen X-ray:  Probable radio-opaque body in region of rectum. |
| 10/20/04 | Wesley Sugai, M.D., chart: Kona Community Hosp., Abdomen X-ray:  Previous (10/19) opaque density in rectal area, no longer present. |
| 11/21/04 | Leukens' File: Pacific Child & Family Associates Report: (bates 71):  Evaluation of Bryan on October 21, 2004 in his home and school. The report goes over a treatment plan and costs. |
| 11/07/04 | Wesley Sugai, M.D., chart: Kona Community Hosp., ER:  Kicked right leg through a window.  1/2 cm laceration .  Sutures had to be removed. |
| 11/08/04 | Wesley Sugai, M.D., records:  Went through a window this weekend.  Multiple laceration on arms, legs.  Ty0lenol #3, two every 4 hours.  #20. |
| 11/09/04 | Wesley Sugai, M.D., records:  RX Tylenol #3, 1-2 every 4 hours as needed pain. #72. |
| 11/12/04 | Wesley Sugai, M.D., chart: Kona Community Hosp.,ER:  attempting to pull out staples and fell.  4-point restraints. |
| 11/13/04 | Wesley Sugai, M.D., chart: Kona Community Hosp.,ER:  He was throwing furniture at home.  Sedation given. |
| 11/13/04 | Wesley Sugai, M.D., records: Kona Community Hosp. Abdomen Series:  Metallic foreign body within right lower quadrant, probably within the cecum. Appears as two stacked coins.  No obstruction. |
| 11/13/04 | Wesley Sugai, M.D., records: Kona Community Hosp. Right Tib/Fib X-ray:  Normal. |
| 11/13/04 | Wesley Sugai, M.D., records: Kona Community Hosp. CT of Head:  Normal CT of Brain. |
| 11/15/04 | Wesley Sugai, M.D., records:  Parents for consult.  Kahi ? /QMC would not accept. Zyprexa ± help.  2 ER visits.  CT was WNL.  Urine & blood all negative.  Staples removed & patient did better.  Yesterday was back to normal despite being off meds. Treatment just with ? and Band-Aids.  Parents are moving to CA in 6 weeks.  Can use Ativan 1 mg., 1-2 PO every 6 hours as needed #20 for flight but use prophlaxix dose. |
| 11/25/04 | IEP Conference:  Chronological age into the 5th grade. He is toilet regulated, usually indicates the need to use the toilet; eats appropriately with fork and spoon; drinks form an open cut; sits in the cafeteria to eat lunch, with younger, quieter students; zips/unzips, unsnaps, laces, crosses the laces and pulls tight. He is able to put on/take |

off tee-shirt, ⸺ .ic-waist shorts, take off/put on shoes. H̲ ⸺ .ually utilizes some sign language, picture exchange communication systems or gestures to communicate needs and desires. Obeys the stop command.

Speech: he uses six signs spontaneously and will imitate others after a model is given. He uses hand over hand attempts to get his needs met with caregivers.

| | |
|---|---|
| 11/29/04 | <u>Wesley Sugai, M.D., records:</u> refill Ativan, 1 mg., 1-2 PO every 6 hours as needed, #20. |
| 11/29/04 | <u>IEP Conference:</u> 7th grade student. He is non-verbal and uses American Sign Language to communicate. Due to an increase in aggressive/tantrum behaviors, toileting accidents and deterioration of work behaviors he is receiving instruction from two aides off campus since September 23, 2004. He attends school two times a week for up to two hours each time. He receives thirty minutes of speech services each of those days. |

Pre-academic skills: Uses American Sign Language and is able to tell an adult when he is happy, hungry, thirsty and has to use the restroom. He is able to sign these basic needs in addition to preferences and wants. He has a list of 150 signs and uses about 20-30 of these signs spontaneously. When a DTT format is used with environmentally engineered "basket" for tasks, he has been very successful in learning new vocabulary. When interested he will focus on a task for a range of five to thirty minutes. Able to identify numbers one through five but has difficulty with sequencing and one-on-one correspondence. He understands one-on-one correspondence up to the number three. He does not do any writing, as tasks are too frustrating for him due to lack of fine motor coordination.

Behavior: most tantrums are non-aggressive. Usually de-escalate in two to twenty minutes. Needs close supervision during tantrums. He is most likely to put things into his mouth and if not asked will swallow them. Occasionally, even with an adult asking, he will still swallow the object. He had a recent accident in swallow non-food items, washers and wall mounts, as well as a transmuting accident when his leg went through a window, requiring stitches.

Self: he is able to sign for food or beverage. He is able to utilize a fork and spoon when eating and can eat and drink independently. He signs when he had to use the bathroom but has frequent accidents. Previously he had mastered toileting at school and would rarely have an accident. Currently in his off campus setting and in the community his accidents range from 0-18 a day. Since he enjoys the fell of wet things and constantly spits on materials to dampen them all of his paper activities must be laminated.

Motor skills: when interested he will initiate the actions of others. He is able to copy simple gross motor movements. He can throw, roll and catch a ball. He is able to walk in a straight line and run. He loves to swim and be in the water, complicated by his drinking of ocean water and toileting accidents. When using the computer he is able to move and click the mouse, although he clicks repeatedly an become frustrated when the computer "freezes." He had previously mastered using the computer as a learning tool but has regressed in this area.

Daily Living: with prompting he is able to stand in line, for a short time, and wait his turn. He can put on slippers but requires assistance with sandals and tennis shoes. He frequently confused right and left, but will correct when prompted. He can dress himself but does not know front/back or the positioning of his clothes. Brushing his teen need to be addressed.

| | |
|---|---|
| 12/20/04 | <u>Wesley Sugai, M.D., records:</u> Mom notes Ativan 1 mg., every 6 hours as needed helps a lot behavior but notes "panting" but with hives, edema, wheeze or cough. Also gives him Advil --?. Maybe it was Advil with gastritis not allergic reactions. Continue Ativan @ 1/2 tab test dose will follow up 1/14/05 . |
| 1/07/05 | <u>Wesley Sugai, M.D., records:</u> Refill opgthalmic drops.. |

| 1/09/05 | IEP Conference.  Chronological age 6th grade. Moderately ...et regulated in school setting, with accidents still occurring. At home and in the community consistent appropriate toileting skills occurring to be a strong need. Eats in cafeteria appropriately with fork and spoon. Able to dress himself but confuses front and back, which shoe goes on which foot. Communicates need through signs, gestures, and verbal word approximations. Use approximately 20 signs spontaneously and has approximately 110 words in his receptive/expressive vocabulary. He is able to recognize sight words approximately 25% of the words in his signing vocabulary. He is able to sit and attend to tasks for 20-40 minutes. He participates in community based activities with one to one instruction. He needs to learn to respect the personal space of others. |

2/06/05    Wesley Sugai, M.D., records:  North Bak Regional Center, request for records.

3/14/05    Leukens' File: Alicante School at Emiara, 30 day IEP report (bates 209):  This is a 5 page report and quite positive.

3/14/05    Leukens' File: Alicante at Elmara, Positive Behavioral Intervention Plan (bates 27): Behavioral targets:  Elopement. Work on functional behavior, and strategies were documented.

8/20/05    Leukens' File: On Our Own, Inc., Functional analysis and behavioral intervention plan (bates 216):

9/12/05    Leukens' File: On Our Own, Inc., Functional analysis and behavioral intervention plan Addendum (bates 222):

12/13/05   Daniel LeGoff, Ph.D., evaluation.

5/06/06    Loretta M. Lukens, RN., Life Care Plan.

Note:    in Ms. Lukens' subpoenaed file there were many photos and some brochures.  The above record review is not to duplicate he records, only to give the reader an idea as to what records were reviewed and some generalities found in the files.  For the exact text, the reader is referred to the actual reports, etc.


Sincerely,

Richard S. Goka, M.D.
Diplomat, American Board of Physical Medicine & Rehabilitation.
Diplomat, American Board of Pain Management.

rsg/

**Bryan Wiles-Bond**
**June-06**

| | Rate | Frequency | Cost | Annual cost to age 18 | Annual cost Age 18-22 | Annual cost Age 23 to life | One time |
|---|---|---|---|---|---|---|---|
| **1. Professional Health Care** | | | | | | | |
| Psychiatrist | | 2-4 per year | 65.00-85.00 | 225.00 | 225.00 | 225.00 | |
| Behavorial Psy. | | 4-6 per year | 125.00 | 625.00 | 625.00 | 625.00 | |
| Family Counseling | | weekly 3-6 months | 125.00 | | | | 2,250.00 |
| DX lab to monitor meds | | twice a year | 250.00 | | | | Unknown |
| Dental Ex. & TX | | Twice year | 600.00 | 1,200.00 | 1,200.00 | 1,200.00 | |
| Physical Therapy | | 2-4 per year | Included in ed | | | 0.00 | |
| Occupational Therapy | | 2-4 per year | Included in ed | | | 0.00 | |
| Medications (not specified) | | Unknown | | | | | Unknown |
| | | | | | | | |
| **2 Residential Care, Level 4** | | Monthly | 5,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | |
| | | | | | | | |
| **3. Communication Therapies** | | | | | | | |
| Speech Eval & Tx | | 2-4 per year | Included in ed | | | 0.00 | |
| Auditory Eval | | once per year | Included in ed | | | 0.00 | |
| Auditory training | | | Not likely | | | 0.00 | |
| Augmentative commu Eval | | (part of speech) | Included in ed | | | 0.00 | |
| Augmentative Devices | | | Not likely | | | 0.00 | |
| | | | | | | | |
| **4. Keystone School** | | | | | | | |
| Academic | 154.01/day | 252 days a year | | | | | |
| Transportation | 19.21/ day | | | | | | |
| 1:1 Aide | 15.75/hr | 6 hr per day | 267.72 | 67,465.44 | 67,465.44 | | |
| | | | | | | | |
| **5. CVRC Respite CoPay** | | annual | Max 7,900.00 | 7,900.00 | | | |
| | | | | | | | |
| **TOTAL** | | | | 77,415.44 | 129,515.44 | 62,050.00 | 2,250.00 |