```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF HAWAII
 3   ANN KIMBALL WILES and        )
 4   STANLEY BOND, individually   )
 5   and as next friend of their  )
 6   son, BRYAN WILES-BOND, a     )
 7   minor,                       )
 8              Plaintiffs,       )
 9         vs.                    ) Civil No. CV 04-00442
10   DEPARTMENT OF EDUCATION,     ) HG/BMK
11   State of Hawai'i, and ALVIN  ) CONSOLIDATED (Other
12   RHO, in his official         ) Civil Action)
13   as West Hawai'i District     )
14   Superintendent,              ) VIDEOTAPED DEPOSITION
15              Defendants.       )            OF
16   _____ ) RICHARD S. GOKA, M.D.
17   ANN KIMBALL WILES and        ) September 21, 2007
18   STANLEY BOND, individually   )
19   and as next friend of their  )
20   son, BRYAN WILES-BOND,       )
21   a minor,                     )
22              Plaintiffs,       )
23         vs.                    ) Civil No. 05-00247
24   DEPARTMENT OF EDUCATION,     ) JMS/BMK
25   State of Hawai'i,            ) CONSOLIDATED (Other
```

EXHIBIT 5

Page 94

1  I assume Mr. Hom is from the Department
2  of Education, because that's where he's stationed
3  now.
4     Q.  Mr. Hom is a Deputy Attorney General. He
5  works in the Attorney General's office. Do you
6  understand that?
7     A.  Yes. But he's also assigned to the
8  Department of Education, so I synonymously put them
9  together, just to let you know.
10    Q.  Okay. So your impression was that Mr. Hom
11 worked for the Department of Education; is that a
12 fair statement?
13    A.  He works with the Department of Education
14 for the State under the Attorney General's guidance.
15        So when you asked me about the Department
16 of Education, I assumed Mr. Hom was included in
17 there. Okay?
18    Q.  Now, you've already testified that you
19 relied exclusively on Bryna Siegel's opinions
20 concerning Bryan's diagnosis; is that correct?
21    A.  Correct.
22    Q.  I think you referred to her credentials.
23 Do you recall seeing her curriculum vitae?
24    A.  Probably.
25    Q.  I'm just going to ask you to take a look

Page 95

1  at Exhibit No. 11. This is the first page of her
2  vitae. Does this look like the document that you
3  reviewed -- the first page of the document you
4  reviewed? I will stipulate for the record it's much
5  more extensive, but I just want to make sure that
6  we're talking about the same thing.
7     A.  It looks familiar.
8        MR. USHIRODA: Is this going to be marked
9  as an exhibit?
10       MR. VARADY: It's been marked as 11.
11 BY MR. VARADY:
12    Q.  How many times have you talked to Dr.
13 Siegel on the phone?
14    A.  Two, maybe three.
15    Q.  How many times did you speak with her
16 before filing your initial opinion?
17    A.  Two -- I mean, this one. And then the
18 third time after the supplement.
19    Q.  So twice before June 28th, 2006?
20    A.  I think so.
21    Q.  And then once before your supplemental?
22    A.  Right.
23    Q.  How long did you speak with her before the
24 June 26th -- the June 28th, 2006 opinion was filed?
25    A.  About an hour, hour and a half total.

Page 96

1     Q.  Did she disclose to you at that time that
2  her Ph.D. is child development?
3     A.  We didn't discuss that.
4     Q.  Did you ask?
5     A.  No.
6     Q.  Was that important to you?
7     A.  No.
8     Q.  Wasn't it important to you to know, since
9  you were relying on her diagnosis, that she had a
10 proper education and training to make such
11 diagnosis?
12    A.  By looking --
13       MR. USHIRODA: Objection. We've been down
14 this road before. It's been covered extensively.
15 Asked and answered.
16    A.  She has -- you know, by looking at what I
17 see right now, she has a very extensive expertise
18 since she's -- like I said, if she is on as an
19 adjunct professor to UCSF, I see no reason to
20 challenge that, as I stated before.
21 BY MR. VARADY:
22    Q.  Did you contact anyone at UCSF to validate
23 the information contained in her CV?
24    A.  No. That's not my responsibility.
25    Q.  Whose responsibility is that?

Page 97

1     A.  The person who retains her.
2     Q.  Now, you state in your opinion that the
3  above services are generally funded by the school
4  district or Regional Center of the State of
5  California, Department of Developmental Services; is
6  that correct?
7     A.  Correct.
8     Q.  You say they're generally funded by the
9  school district or Regional Center. Did you verify
10 that the school district in which Bryan is enrolled
11 would be paying for and funding those services
12 personally?
13    A.  I did actually on the Elmira campus call
14 -- I called and, you know, they said most all of our
15 funding comes from the department of -- the state
16 department -- or the school districts, and then I
17 also verified that with somebody at the Regional
18 Center.
19    Q.  Okay. That's a general statement about
20 the source of funding.
21    A.  Right. For anybody who's autistic or
22 disabled with mental health issues that -- because
23 they fall under whatever that federal guideline is,
24 the Department of Education supplements and pays for
25 all educational services related to education and