A10877B 
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

ANN KIMBALL WILES and STANLEY BOND,
individually and as next friend of
their son, BRYAN WILES-BOND, a minor,

    Plaintiffs,

v.
                    CV 04-00442 HG/BMK
                    CV 05-00247 HG/BMK

DEPARTMENT OF EDUCATION, State of
Hawaii, and ALVIN RHO, in his
official capacity as West Hawaii
District Superintendent,

    Defendants.
_____/

VIDEOTAPED DEPOSITION OF BRYNA SIEGEL, Ph.D.

SAN FRANCISCO, CALIFORNIA

MONDAY, OCTOBER 15, 2007

ATKINSON-BAKER
COURT REPORTERS
(800) 288-3376
www.depo.com

Reported by: Leland Batara, CSR No. 3759

File No. A10877B

EXHIBIT 6

Atkinson-Baker, Inc., Court Reporters
800-2
c89496c8-8b6a-4a98-b1a7-0

Page 116

1  support, I think that the parents have basically
2  pursued an alternative that obviated the need for
3  residential placement at this time.
4      Q.  Okay.  And I want to just highlight a few
5  points of agreement, then, with Dr. LeGoff.
6      You both agree, as of December 2005, that
7  Bryan had made significant progress in his current
8  program with proper instruction and the correct type
9  of support --
10     A.  Correct.
11     Q.  -- is that correct?
12     In fact, he was getting, on paper, fewer
13  hours?
14     A.  Right.
15     Q.  Because his Hawaiian IEPs had 50-plus
16  hours of various types of services, whereas in
17  California, at this time, that is, in December of
18  '05, maybe 30, or a little bit more than 30 hours,
19  but the support themselves were better.
20     A.  Well, there is two factors, actually.
21  When I -- and I don't know what was going on at this
22  time because I didn't see Bryan.  I didn't get a
23  chance to interview Bryan's dad until the spring of
24  this year.  But what Dr. Bond represented to me was
25  that, in addition to the school services, Bryan is

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 117

getting regional center services, services from the California Department of Developmental Services who are providing home-based after-school care.

So he is getting a consistent home-based set of treatment principles in the afternoon. And there is no interface between the school and home people, which is one of the -- sort of endemic problems of the California system of care, that the school and regional center don't talk to each other. But it's very different than Hawaii, where the Department of Education often goes in and provides after-school care and Saturday care and Sunday care, and all sorts of stuff that has never been heard of in California.

So it's just a matter of -- the 68 hours that were in his IEP, Bryan is still getting more than 30 hours of educational-related services because he is getting them basically through the regional center. The California Department of Developmental Services --

Q. Right.

A. -- is covering additional hours.

Q. He gets 12 hours a week for four days and three hours to the regional center --

A. Correct.

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 142

1  hours a week, or was receiving respite care in the
2  home, before-school care was provided by the family.
3      So I don't know whether there was any
4  teaching involved in that.  And the after-school
5  care, to the extent that it is provided by the
6  family, I don't know what they were doing with him.
7  She didn't represent to me what was going on.  And
8  as far as she knew, the respite care coming in
9  through the regional center at that point didn't
10 address any educational goals, because by definition
11 the respite care worker is not mandated even to look
12 at the kid's IEP.
13     He has what is called an IPP, an
14 Individual Program Plan, that the regional center
15 has, which is a parallel structure to the IEP, but
16 it doesn't include things like going through
17 vocabulary, and so forth, which typically include,
18 you know, safety, walking across the street, and
19 things like that.
20     Q.  So with a proper program implemented
21 consistently in California, Bryan was making
22 progress?
23     A.  Absolutely.
24     Q.  Would you agree that the effect of
25 inadequate programming for Bryan in the '03-04

1  he doesn't have any spontaneous motivation to do it
2  just because, gee, won't they be proud of me in the
3  morning when my bed is dry. You know, autistic
4  people don't think like that, and Bryan doesn't
5  particularly think like that. So they are still
6  having problems with that.
7      Q. Now, do you recall making a suggestion
8  that Bryan's parents look to the regional center for
9  help with the nighttime urination?
10     A. Well, they are already receiving services
11 from regional center.
12     Q. But not at night. And in your prior
13 report, don't you recommend that they should explore
14 the possibility of getting some help at night,
15 working with Bryan on the nighttime urination?
16     A. I don't recall that.
17         As far as I know, regional center does not
18 provide overnight respite care, you know, that
19 sometimes individuals go to a respite care
20 provider's house on very occasional basis, if the
21 parents are going off to a family event, or
22 something. But unlike Hawaii, where I actually have
23 encountered kids who have overnight services, I have
24 never seen that in California.
25         What I might have recommended, and very

A10877B
BRYNA SIEGEL, Ph.D. - October 15, 2007

Page 213

1    Do you see that?
2    A.  Yes.
3    Q.  So isn't that something that you are
4    agreeing with?
5    A.  Yes.  I mean, I wrote that because he says
6    that it should come -- I believe he says it should
7    come from the school, but I took that that he simply
8    isn't familiar, understandably, with the service
9    delivery system in California.  And in California,
10   such help would come from the regional center, and
11   in Bryan's case he lives in North Bay Regional
12   Center.
13   Q.  So you would agree that that would be an
14   appropriate service for Bryan?
15   A.  Correct.
16   Q.  And just getting back to his increase in
17   confidence in using his signs, wouldn't you agree
18   that it's a huge change for him not to have to
19   tantrum, or be disruptive to get something that he
20   wants and to be able to get that through signing?
21   That is an enormous change for him as a human being.
22   MR. USHIRODA:  Objection.  Vague and
23   ambiguous.
24   THE WITNESS:  I don't think he was
25   tantruming so much to get the things that he wanted.