FILE COPY

1    IN THE UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF HAWAII

3      **CERTIFIED COPY**

4 ANN KIMBALL WILES and STANLEY  )
 BOND, individually and as next )
5 friends of their son, BRYAN  )
 WILES-BOND, a minor,   )
6         )
     Plaintiffs, ) CIVIL No.
7        ) CV-04-00442 HG/BMK
 vs.      ) CV 05-00247 HG/BMK
8         )
 DEPARTMENT OF EDUCATION,  ) CONSOLIDATED
9 State of Hawaii, and ALVIN RHO, ) (Other Civil Action)
 in his official capacity as West )
10 Hawaii District Superintendent, )
11     Defendants. )
 _____)

12

13

14      DEPOSITION OF

15    BETTY JO FREEMAN, PH.D.

16    LOS ANGELES, CALIFORNIA

17    SEPTEMBER 24, 2007

18

19 ATKINSON-BAKER, INC.
 COURT REPORTERS
20 (800) 288-3376
 WWW.DEPO.COM

21

22 REPORTED BY: TONI COHEN, CSR. NO. 9871

23 FILE NO.: A107854

24

25     **EXHIBIT** "X"

              1

1    doubt that he could function better had he had

2    intervention.

3        Q    Any other opinions expressed in that telephone

4    conversation?

5        A    I just simply went over the results of my

6    assessment with Bryan.

7        Q    Now, how long did that telephone conversation

8    last with Mr. Varady and Mr. Levin?

9        A    I don't -- I remember it wasn't long.  It was

10   in the evening, but that's all I remember, okay.  But I

11   don't think it was even a half-hour, I'm sure.

12       Q    Did you take notes of those conversations?

13       A    No.

14       Q    Did you receive any directions from Mr. Varady

15   in that conversation?

16       A    No.

17       Q    By the time of this conversation, had you

18   already prepared your written assessment?

19       A    I don't remember, but probably because I try to

20   dictate -- I dictate; so I do them pretty immediately

21   after I see someone.

22       Q    Now, getting back to your first conversation

23   with Mr. Varady when you were first retained, you said

24   that he gave you an outline of the case and you asked him

25   to send you records?

1          A     That's correct.

2          Q     Did he send records?

3          A     Yes.

4          Q     What kind of records do you recall being

5    sent?

6          A     Well, I don't recall, but I have them listed in

7    my report; so that would be the better place to look.

8          Q     Now, Doctor, this -- it's a Psychologic

9    Assessment for Bryan Wiles-Bond, and it says Draft; is

10   this a draft or a final?

11         A     That's the final.  That's just the only copy I

12   had.  That was -- I think this one may have typos that

13   that one doesn't.  But hopefully you don't have the draft

14   copy.  But the only changes that would be different would

15   be typos.  You could compare them for content.  There

16   wouldn't be any content changes.  And I don't know why

17   the other one says Draft.  It's the only one I have in my

18   file.

19         Q     The reason I ask is that it's a signed report,

20   the one that you've just handed me, but the ones that I

21   have from Counsel, it appears to be the same context, but

22   the pagination is a little different.

23         A     That's probably from -- yeah, in this one, I'll

24   show you.  In this -- I was going through it last night.

25   If you look on page 3 here, it was done -- it didn't

53

1    the State of Hawaii or the Department of Education, she

2    may have actually have done that in the course and scope

3    of that presentation.

4            THE WITNESS:  And I have been contacted by the

5    Attorney General's Office on at least two occasions to

6    serve as an expert witness.

7    BY MR. USHIRODA:

8        Q    In Hawaii?

9        A    In Hawaii, yes.

10       Q    And have you accepted?

11       A    No.

12       Q    Why not?

13       A    Because of my knowledge of programs in Hawaii,

14   and I don't accept cases where I feel there's not

15   adequate programming going on for a child.

16       Q    What is it about the programs in Hawaii that

17   caused you not to take the assignment?

18       A    It's been my understanding from people who have

19   been there that the programs are not adequate for the

20   majority of children with autism.  I was also brought to

21   Hawaii in, I believe, 1994 or '5, after the Felix Decree,

22   by the Autism Society of America, the Hawaiian, and I did

23   workshops at that time and I did some presentations at

24   different schools.  I don't remember where they were, but

25   at that time I would have spoken with people that were

73

1    employed by DOE.

2         Q    Do you recall who you spoke with at the DOE?

3         A    I have no idea.  I was presenting and I just

4    have no memory of -- it was a huge group of people.  And

5    then we went to schools to present, and I don't remember.

6    I never even knew who the people were.

7         Q    Do you know who it was that contacted you from

8    the Attorney General's Office?

9         A    I don't remember.  It's been several years.

10        Q    Two, three years ago?

11        A    Or longer.

12        Q    You said it's your understanding that the

13   programs in Hawaii are not adequate with respect to

14   autistic children?

15        A    That's correct.

16        Q    Where do you get that understanding from?

17        A    From patients that come -- that came to UCLA

18   from Hawaii.  When I ran the outpatient clinic at UCLA,

19   we had a number of patients -- I don't know how many --

20   that came from Hawaii, some for inpatient, adolescents.

21   Some came for early childhood programs, and some people

22   came for assessments only.  And the IEPs that I reviewed

23   on those cases did not meet what I thought were the

24   standards for providing services for children with

25   autism.  So my information came from patients that I had

74

1    seen and IEPs I had reviewed.

2        Q    How many IEPs did you review?

3        A    I don't remember.  We would have to go back and

4    check the files at UCLA to see how many people we saw.  I

5    don't even remember.  At one point we were seeing like

6    five kids a year from this.

7        Q    Did you go to Hawaii to observe any of the

8    programs --

9        A    No.

10       Q    -- to make an assessment?

11       A    No.

12       Q    Did you conduct an independent assessment of

13   the programs in Hawaii?

14       A    No.

15       Q    So it's just based basically on what you heard

16   from patients who came to UCLA from Hawaii?

17       A    That's correct.  And reviewing IEPs.

18       Q    You don't recall how many IEPs you reviewed?

19       A    No, I don't remember.

20            Let me -- and the information I learned in 1994

21   or '5 when I was there.

22       Q    What information did you learn in 1995 when you

23   were there?

24       A    Well, as part of the Felix whatever -- I don't

25   truly understand exactly what happened then -- but from

1    the people I talked to at that point, they were very

2    concerned about the programming for their autistic

3    children in Hawaii.  And they were having difficulty

4    getting services for the children and getting adequate

5    behavioral services for the majority of the children.

6         Q    But you don't recall their names?

7         A    No.  It's been almost 15 years.  I'm sorry.

8         Q    Do you recall speaking to anyone from the

9    DOE?

10        A    Laurie Sperry, Dr. Laurie Sperry.  I do recall

11   speaking with her when we were there in 2002.

12        Q    I'm talking about in '94, '95?

13        A    I don't remember.

14        Q    When you were here in 2002, you do recall

15   speaking with Dr. Laurie Sperry?

16        A    Yes.

17        Q    What did you talk about?

18        A    We talked about the difficulties she was

19   encountering in attempting to get programs set up for

20   children with autism.

21        Q    What kind of difficulties was she having?

22        A    Just getting people to understand -- and this

23   is very common.  It's a common problem in school

24   districts to get people to come to the -- what I call the

25   new way of thinking about children with autism, that we

1    need to have higher expectations.  We need to do training

2    and those types of things.  And it's a very common

3    problem, as opposed to the old school where we just kind

4    of take care of them and don't have a lot of

5    expectations.

6           MR. VARADY:  I'm sorry to interrupt, Gregg, but

7    I'm just -- before you move on.  When you're asking about

8    DOE people, are you thinking exclusively of employees or

9    third-party contract providers, because Dr. Freeman knows

10   Dr. Leaf, who was a third-party contract provider with

11   whom she did that seminar.  I don't know if -- he was

12   providing services there, that's why I'm mentioning it,

13   because I don't want to move off this without giving you

14   a fair opportunity to ask her about that.

15   BY MR. USHIRODA:

16      Q    When I say "DOE employees," I mean, DOE

17   personnel, do you include such persons such as Dr. Leaf?

18      A    I hadn't, but I did -- I've had numerous

19   conversations with Dr. Leaf regarding the quality of

20   services and his attempt -- I know he had a demonstration

21   classroom on Maui for one or two years.  And I believe he

22   had a contract with -- to do some training in one of the

23   districts on Oahu.  I don't remember which one it was.

24   But he's been -- we've had long discussions about the

25   need for further training, and as I said, that's true of

1    many school districts.  It's not just Hawaii.

2            But that's where my opinions came from.

3       Q    Dr. Leaf?

4       A    Part of them, yeah.

5       Q    When you say that's where your opinions came

6    from, you're talking about your opinions on -- well, the

7    fact -- when you say your opinions, you're referring to

8    your opinions on programs for autistic children in

9    Hawaii?

10      A    Given the amount of time over a ten-year

11   period -- I've been to Hawaii twice to do some training.

12   I have had patients coming from Hawaii with, you know,

13   IEPs that were not appropriate, and I've spoken with

14   Dr. Leaf, Dr. Sperry.

15           Now, over that time period, I've formed an

16   opinion from all of those multiple sources, all of which

17   were consistent with there was difficulty getting

18   programs for children with autism in Hawaii.  That's how

19   I came to my opinion.

20      Q    Did you have an opinion why it was difficult to

21   get these programs?

22      A    No.  It's very common in school districts, and

23   I didn't have any particular opinion why.  It was just

24   the way it was.

25      Q    Was it through the faculty of the DOE?

1      A    I had no fault to blame on anyone, but,

2    apparently, it was difficult to institute changes there.

3      Q    Your conversations with Dr. Leaf regarding the

4    state of programs for autistic children in Hawaii, when

5    did those conversations take place?

6      A    It must have been around 2002 when we went to

7    put on the seminar on what constitutes a legally

8    defensible program for children with autism.  It was my

9    understanding that -- this is all secondhand -- that the

10   Department of Hawaii was involved in a number of due

11   process cases for children with autism.

12     Q    I'm sorry.  The seminar was on what?

13     A    On what constitute a legally defensible

14   program.  And it was myself to talk about the assessment

15   piece, Dr. Leaf to talk about the treatment part, and

16   Charlie Weatherly to talk about from a legal point of

17   view, legally what was necessary to have a program that

18   would be appropriate for children with autism.

19     Q    Was there anything specific that Dr. Leaf said

20   to you about why it was difficult to get programs?

21     A    I don't remember that, you know.

22     Q    And you also spoke with Dr. Laurie Sperry?

23     A    That's correct, in 2002.

24     Q    She was with the DOE at the time?

25     A    I think she was.  I don't know what her

79

1      position was.

2          Q    And you recall just discussing with her --

3      "her" meaning Dr. Sperry's -- difficulties in getting

4      programs for autistic children set up?

5          A    That's right.

6          Q    Did she say why it was difficult?

7          A    We didn't talk about why.  That's usually --

8      usually, it's because of people becoming entrenched in

9      different ways of thinking in school districts.  That's

10     just pretty classic.

11         Q    That's an assumption on your part?

12         A    That's an assumption on my part.

13         Q    Any other third-party contractors or persons

14     with DOE you spoke to with in this ten-year time

15     period --

16         A    As I said --

17         Q    -- your opinion about the adequacy of the

18     programs of autistic children?

19         A    The only time I can remember, and I don't know

20     when it was, I spoke with somebody from the Attorney

21     General's Office who sent me some records to review, and

22     I didn't feel that the case was defensible.  It was two

23     autistic children who had not -- didn't get early

24     intervention.  I didn't know the names or anything.  And

25     I did not want to be an expert after reviewing the

1    records.    And I have no idea who called to me.

2        Q    That was the only time that you've been

3    contacted by the Attorney General's Office?

4        A    I think I was contacted one time later.    I know

5    it was -- I don't remember who was the patient that I had

6    seen at UCLA.    There had been a due process case.    And I

7    actually was assisting the Attorney General's Office in

8    helping the mother come to a settlement agreement with

9    them regarding this particular severely handicapped

10   child.

11        And as I said, I don't remember the child's

12   name, but I do remember that happening.

13        MR. USHIRODA:    Now, we've been going a little

14   over an hour.    Let's take a short break

15        (Whereupon, a short recess took place.)

16   BY MR. USHIRODA:

17        Q    Doctor, did you bring a billing file with you

18   today?

19        A    Yes, I did.    And --

20        MR. VARADY:    I'm sorry.    Before you start there,

21   I just -- I didn't want -- I wanted to clarify something.

22        I didn't want to represent that I'm sure that

23   Dr. Leaf was a contractor for the DOE in '02.    I know he

24   was at some time running a pilot program on Maui for a

25   couple of years and something over, I think, in Pearl.    I

1    are set forth in your report?

2         A    So far as I'm able to tell you right now, yes,

3    that's what's in the report, and I think you've covered

4    it.

5         Q    Now, one of the opinions that you had told me

6    earlier was that you have an opinion on what the DOE did

7    in terms of attempting to implement the due process

8    hearing findings and what impact that had on Bryan

9    Wiles-Bond; do you recall that?

10        A    Yes.

11        Q    Did I state that correctly?

12        A    Well, yeah.  My opinion is very simple.   I

13   think in implementing the orders, had the DOE, or whoever

14   was responsible, provided ongoing training and support

15   for the staff -- then I think the lack of training and

16   the lack of that component and, then, the lack of ongoing

17   supervision is what led to the difficulties with keeping

18   staff.

19             And my experience is if you provide the right

20   amount of training -- you're always going to lose staff.

21   It's always very difficult.  But they were trying to find

22   people who are already trained, which they were not going

23   to do.

24        Q    They were ordered to, correct?

25        A    That was -- No.  It said -- As I understood the

1    order, you were -- they were supposed to provide the

2    training.

3         Q    Okay.

4         A    Because everybody needs training. And, so, if

5    you can't find the people who already have a unique

6    combination of skills -- and even if someone came that

7    had supposedly all these skills, they would still need

8    ongoing support and supervision to be able to maintain

9    that type of job.

10        Also, the way it was structured in terms of,

11   like -- I don't know -- there was two people. That's

12   asking too much of people. And so it was, like, there

13   was no thought put into, How can I make this work? It

14   seems they just found people, at times provided some

15   training, at other times -- from their record -- very

16   little, or as someone testified in this due process

17   hearing, they didn't do training. I don't remember which

18   person that was.

19        But when I was reading those -- the testimony of

20   those three people that I read:  Linda Price now I'm

21   drawing a blank.

22        Q    Naomi?

23        A    And there was someone else.

24        Q    Kelly Stern?

25        A    Kelly Stern. I believe it was Ms. Stern. I

1    would have to go back and confirm that.  But we don't do

2    any training, there was one of them that said that.

3           So there was no thought out plan of how to

4    implement the program.  And because there wasn't a

5    thought out plan with ongoing training, ongoing support,

6    we ended up with inconsistent staffing, which is not

7    surprising.  That's exactly what you would predict from

8    the way it was done.

9        Q    When you say that -- you refer to due process

10   hearing findings, is there a particular one you're

11   referring to?

12       A    I mean, I believe, in -- I don't know which one

13   it was because there was so many --

14       Q    There were.

15       A    -- but there was an order to provide skills

16   trainers for up to 60-something hours a week with -- they

17   need to provide at least 95 percent of the hours and make

18   them up.  And it was my understanding that they were to

19   provide ongoing training for those people.  That's what I

20   remember, but that's what I'm referring to.

21       Q    In your view, it's not so much the hours that

22   were not provided, but the training of the staff who were

23   supposed to implement the program?

24       A    Right.  If you had trained staff implementing

25   the program, you wouldn't need that many hours.  So you

1   got a child who's not toilet trained; you send people

2   there without a toileting program.  Got a child who

3   communicates with sign, and you don't provide sign

4   language classes.  Or as one of the people who was

5   providing the skills trainers said, We gave them the

6   opportunity, we told them about a sign language class,

7   but it wasn't a requirement.  So, you know, they should

8   have --

9       Q    Should have made it a requirement?

10      A    Well, that was his way of communicating, yes.

11  And they should have provided the support necessary so

12  people can attend a class like that.  I think a lot of

13  these people really tried to learn things to help Bryan.

14  I don't think there was anybody who didn't want to help

15  Bryan.  But the issue was the way it was -- people went

16  about it is what created the problems.  And that's what

17  created the inconsistency in the programming.

18           So it wasn't about number of hours.  It was

19  about how those -- what went on during those hours.  You

20  could have, like, 24-hour-a-day care and people don't

21  know what they're doing.  It's not going to help.

22      Q    You mentioned that the people who were

23  implementing Bryan's program cared?

24      A    I think -- I can't imagine -- that's an

25  assumption on my part.  Maybe I shouldn't make it.  But I

1    can't imagine why you would take this job --

2        Q    If you didn't care.

3        A    -- if you didn't care about kids.  Although --

4    I should take that back -- I have some people who don't

5    care.  But I don't think people were any -- the people

6    doing the day-to-day work, why would you take the job if

7    you didn't care?  Maybe they do exist.  I don't know.

8    But that's an assumption on my part, and I may be wrong.

9        Q    Do you see anything in the records to indicate

10    otherwise?

11        A    No.

12        Q    Doctor, was this opinion expressed in your

13    report?

14        A    No.

15        Q    When did you arrive at this opinion?

16        A    When I began to read additional information

17    about the case.

18        Q    And when did this occur?

19        A    This was, I believe, in the last two weeks when

20    I began to really look at the documents in depth and

21    started to take notes.  And it struck me when I was

22    reading testimony of -- I believe at the March '04

23    hearing.  Was there a was March '04 hearing?

24        Q    Yes.  About that time, right.

25        A    And that was when there was -- I had not

1    bothered with this.  I thought it was just more legal

2    stuff.  But there was some testimony -- and I can give

3    you the reference.  It should be in the red file.  Okay.

4    And I put this in order, but -- it should be in this --

5    you know, I moved it to this pile because it was

6    testimony and not at court.  This was my legal file of

7    legal decisions.  But it's here.  But it's the testimony

8    that was given, okay.

9              MR. USHIRODA:  You know, Doctor, why don't we

10   take a short break.  Toni can take a break as well.

11             THE WITNESS:  I will locate it.

12             (Whereupon, a short recess took place.)

13   BY MR. USHIRODA:

14      Q    We were last talking, Dr. Freeman, about your

15   opinion on what -- on efforts -- let me strike that.

16             Let me start.  We were last talking about what

17   your opinion was on what the DOE did in terms of

18   attempting to implement the due process hearing findings,

19   and what effect it had on Bryan.

20             And I think that second part is -- we've already

21   covered.  It's, basically, the failure to implement --

22   consistently implement the IEP.

23      A    Correct.

24      Q    Detriment to Bryan?

25      A    Right, correct.

1          Q     We've covered all that.

2                But what I wanted to do was to get to the first

3     part.  We already talked about that at some length.

4     Basically, it's a -- I think in terms of what the DOE did

5     in terms to trying to implement the due process findings,

6     that they did not provide the requisite training and

7     support for the staff?

8          A     They didn't have a plan.

9          Q     They didn't have a plan.

10         A     They didn't have a plan.  They were just hiring

11    bodies.  And what happens was without training and

12    support, people don't last long in the job.  It's pretty

13    typical because it's hard work.  It's hard work.

14               And so you need to think about how you're going

15    to support them, how you're going to train them, who can

16    I go to if I have a question.  And so it's similar to

17    what happens in supportive living.  And I've had friends

18    who are in -- had to teach staff and support staff, so --

19               And so Gary Lavigne -- L-A-V-I-G-N-E -- who

20    does supported living for people for autism -- he does

21    all levels of care, does workshops on how do you keep

22    staff, and how do you ensure consistency, how do you do

23    these types of things so that you can -- there's always

24    going to be staff turnover.  How do you minimize it, and

25    he talked a lot about that.  And how do you evaluate

1    staff.  And how do you provide the support they need?

2           We had some issue when I met him at UCLA, and

3    we had to make a decision of what kind of staff person we

4    wanted.  Did we want someone who was interested in

5    wanting to learn about children?  And most of the time we

6    would take a graduate -- you know, a graduate student.

7           We want someone that's going to do this the rest

8    of their life with no interest in training, knowing that

9    if we go with a graduate student as a person who's in

10   school, we were going to have to train more people.  And

11   that was the option we went to.

12          And when someone was asking what is your

13   criteria, it has to do with wanting to and learn

14   providing that support for those people.  We were very

15   successful in keeping staff in that program.

16          And as I said, Lavigne talks about it a lot in

17   his five-day workshop he does on behavior analysis.

18      Q    His name is Gary Lavigne?

19      A    Gary Lavigne.  I don't know if he's published

20   about it or not, but he has a whole system in place.  And

21   I know -- I'm familiar with a number of agencies that

22   provide behavioral services for children, and the

23   agencies that are the most successful have this

24   supervision built in.  There are other agencies that the

25   quality of care is very poor because no supervision is

245

1   provided; so people get, you know, two days of training

2   and that's it.

3          Places like Autism Spectrum Therapies, Autism

4   Partnership, they have a layer of training.  There's

5   always supervision.  And there's always ongoing training

6   in the agencies that are successful and provide quality

7   care.  The others, it's hit and miss a lot of times.

8          Q    What is Mr. Lavigne's specialty?

9          A    It's autism.  He runs the Institute of Applied

10  Behavior Analysis, IABA.  Just for the record, his office

11  is right down the street.

12         Q    And have you attended his -- Mr. Lavigne's

13  workshop?

14         A    Yes.  And his agency provides the support for

15  my stepson; that's how I'm familiar with what goes on.

16         Q    How old is your stepson?

17         A    He's going to be 50.

18         Q    Dr. Freeman, you said -- in support of this

19  opinion, you said that, "DOE had no plan to train staff

20  and keep staff"?

21         A    Maybe I should say I didn't see a plan how to

22  train and keep staff.  And as I alluded to, in the

23  testimony I read, one of the people said we don't do

24  training.  So I don't remember which one it was.  I don't

25  have any notes.  But it was kind of, you know, shocking

246

1    to me.  Then I think there were other -- if you read the

2    notes that I gave you earlier -- we're back to 2000.

3    Those were Janet Ortiz's notes.  I think you marked them

4    as an exhibit.

5        Q    Yes.  They're right there.  Number 8.

6        A    Which one is that?  Yes, this one, okay.  I

7    started -- that's how I became aware that that was an

8    issue.  I started to look in the case notes about how did

9    the people who were supposed to be doing it see it.  And

10   I stopped pulling them out because it was just example

11   after example of this, you know, things like the way --

12        If you look on this page here that I had

13   underlined, she's talking about the other teacher is much

14   easier, better to work with overall, way too much time is

15   being focused on just creating stability, that there's

16   very little time to work with the child.

17        And so they were identifying problems along the

18   way with keeping staff, okay.  Early on, it's not

19   consistent across people that are working with the child.

20        So even in the times that the staff -- I mean

21   the clients were being provided -- the staff was being

22   provided, it wasn't being consistent across -- across

23   people.

24        And as I said, I stopped pulling these notes

25   because there was just so many examples I would have

247

1    pulled the whole file.

2            And there was no -- I could find no formal

3    functional assessment.  It was not in the records that I

4    reviewed until Kim Smalley.  And in her deposition she

5    talks about having had some contact with Bryan in her

6    position for the DOE, but that she was not brought into

7    to do the functional assessment until 2004.

8        Q    Are there any other facts or -- that you rely

9    upon in forming your opinion regarding the -- what the

10   DOE did in terms of attempting to implement the due

11   process hearing findings?

12       A    No.  There were a lot of ads for recruitment.

13   I have no idea how hard is to recruit these people.  My

14   guess is it would be very hard.  And that's why the

15   training becomes absolutely the most important variable

16   in the industry.

17       Q    You say you arrived at this opinion two weeks

18   ago?

19       A    As I started reading the records.

20       Q    Which is about two weeks ago?

21       A    Yeah.  I had skimmed them before, but I started

22   preparing for this deposition.  I'm kind of a document

23   freak.  So I started going through the documents -- as

24   you can see, I'm a document freak.  I don't want to be

25   caught out surprising.  And it just was something that

1    came to me that this is absolutely part of the problem

2    that no one seemed to be talking a lot about in that, and

3    had that been in place, perhaps we wouldn't have had the

4    issues that we had.

5         Q    Did Mr. Varady ask you to look at this

6    opinion?

7         A    Absolutely not.  I think he was surprised when

8    I told him that that's what -- that was an opinion that I

9    had formed, okay.

10        Q    This was just --

11        A    That was the first time there was any

12   discussion of that.  And I don't think anyone had really

13   talked about that previously because the focus was on --

14   was the program:  Were the skill trainers there or not

15   there.  And, to me, that didn't seem to be the major

16   issue.

17        Q    Do you believe, Doctor, that this opinion that

18   there was no plan in place, you think that's an opinion

19   that requires an expert testimony?

20        A    In --

21        Q    Just to say that it's your opinion that the DOE

22   had no plan in place regarding keeping staff and training

23   staff?

24        A    I don't understand the question.

25        Q    We believe that experts are retained because

1    there are certain opinions they reach.  Such as in a case

2    of a medical malpractice case, you need an expert to

3    render an opinion on what the standard of care is

4    vis-a-vis a particular form of treatment, and whether

5    that standard of care was breached.  And we think that's

6    not common knowledge within the jury pool.

7            I'm just wondering if this is the same instance

8    here, what you're opining on, the DOE efforts to

9    implement findings, due process hearings findings?

10   A    I don't know how to answer that question.  To

11   me, it was very obvious in reading the files.  And I

12   think anybody who reads them will see that there was just

13   no plan in place and no training.  The plan was to put

14   bodies in there and not to have a systematic way of

15   looking.

16           And as I indicated earlier, I couldn't find

17   data.  All right.  So what you would have expected is

18   that there is a systematic plan in place on what we're

19   going to train and how we are going to evaluate whether

20   it's working.  How are people evaluated, I don't know.

21           So I don't know if I'm missing that information,

22   but it was not in the record.  And it's my understanding

23   I had everything.

24           And, again, when I looked at notes made by the

25   staff, it was attempting to do it.  I found all these

1   references to the lack of training.

2        Q    Is there anything else that I missed, Doctor?

3        A    No.

4        Q    You also say that you were going to express an

5   opinion regarding efforts that the DOE made to implement

6   the IEP.

7        A    That was what I meant.  I'm not going -- it's

8   the same thing to me, and maybe I misstated that.  But it

9   had -- my opinion was to do with whether or not there was

10  a plan in place to not only recruit aides, but to provide

11  the training and support that was needed to keep them

12  employed.  And as I said, I never thought about what was

13  going on until I started reading the records.

14       Q    So --

15       A    I thought it was as straightforward as they

16  didn't have the aides.  But when I looked at it, it seems

17  to be much more than that.

18       Q    Just so I have it clear --

19       A    Yes.

20       Q    -- the issue to you that you're opining on is

21  that whether there was a plan in place to recruit skills

22  trainers and --

23       A    Provide training and support.

24       Q    -- and provide training and support.

25       A    Yes.  Again, how they were going to evaluate

1    what was happening.  And where there incentives in place

2    to keep staff.

3        Q    And did you see any evidence of incentives in

4    place to keep staff?

5        A    I think there was one about pay that was

6    different.  That I believe the pay -- I saw someone was

7    going to be $20 an hour, which I think is more than

8    typically.  But that's the only thing I saw.

9        Q    And getting back to the issue of whether there

10   was a plan in place to keep skills trainers and provide

11   them training and support, you also mentioned something

12   about plans to evaluate --

13       A    What I was talking about was the effectiveness

14   of what you're doing with data.  And that's -- if I can

15   be really clear -- usually part of a plan, again, for

16   recruiting people and keeping them is how am I going to

17   evaluate them, you know, what data am I going to be

18   using.  And I didn't -- I'm sure there must have been

19   some systematic evaluation.  I didn't see anything in the

20   records.

21       Q    Anything else regarding this opinion?

22       A    No.

23       Q    And have I covered the factual basis for the

24   opinions --

25       A    Yes.

1      Q    Let me finish.

2      A    I'm sorry.  I apologize.

3      Q    Do you have any other factual basis for this

4  opinion other than what we've just discussed?

5      A    No.  Only what was in the records, and what I

6  saw in the records regarding the notes and the

7  testimony.

8      Q    In the due process hearings?

9      A    Right.  In the due process hearings.  And in

10  the Kim Smalley's report.

11           And let me correct that.  There is one other

12  source of information.

13      Q    Surely.

14      A    That in terms of arriving at that fact that

15  that was an important part of what was happening, I'm

16  back to Educating Children with Autism, who identifies

17  very clearly that the biggest -- one of the biggest

18  problems in the field of autism is the lack of training

19  of staff.  And -- did -- that was one of our major

20  problems.

21           And they even go to the point of saying that

22  staff learn the same way as our children do.  And so that

23  started more thinking about training.  And having had

24  that personal experience with supervising staff, also.

25           So that became -- just -- it leaped out at me

253

1    when I was reading it.

2         Q    Anything else?

3         A    No.

4         Q    You also expressed an opinion, what -- let me

5    rephrase that.  You also said you had an opinion on what

6    the DOE could have done to implement the IEP; is that

7    correct?  That's what I have in mind.

8         A    That's the same thing.  Again, that they could

9    have had a plan in place to train people and provide

10   support.  That was all part of the same thing the way I

11   conceptualized it in my mind.

12        Q    Maybe I just broke it down -- overly broke it

13   down, but it's part of the same opinion?

14        A    It's all about the same, about training and

15   having a plan in place.

16        Q    So it terms of what the DOE could have done to

17   implement the IEP, they could have had a plan in place to

18   train and support their staff --

19        A    That's correct.

20        Q    -- and to evaluate the work that was being

21   done?

22        A    Right.  And it was ongoing evaluation and

23   support.  You can see where the problems might arise, or

24   if a person is starting to have problems, what would you

25   do.  And without that kind of support, it gets to the

1    point when somebody says, I quit -- you know -- because

2    they can't do it anymore.

3         Q    Now, Dr. Freeman, in some of the documents you

4    were shown regarding the lack of services that Bryan was

5    supposed to receive, do you recall a number of hours --

6    skills trainer service hours -- he was supposed to

7    receive during the week?

8         A    I haven't pulled it out.  I believe at one

9    point it was 67 hours, and then the hearing -- 67 hours.

10        And one of the hearing decisions was that

11   he was -- there was a hearing that said he was entitled

12   to these services in the IEP.  And I believe there was

13   another hearing about failure to implement that part of

14   it.

15        And the next time around, the -- part of the

16   decision was that at least 95 percent of those services

17   be provided.  That's my understanding.

18        Q    It's about 68 hours or something like that?

19        A    Something like that as a result.

20        Q    Is that a lot of hours?

21        A    Yes, it is.

22        Q    You feel that was indicated here?

23        A    Well, it depends on the level of training

24   again.  That's the other thing that got me thinking,

25   because that's a lot of hours.  Why did he require that?