1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF HAWAII

3

4   ANN KIMBALL WILES and STANLEY BOND,
    individually and as next friend of
5   their son, BRYAN WILES-BOND, a minor,

6        Plaintiffs,

7   v.                          CV 04-00442 HG/BMK
                                CV 05-00247 HG/BMK
8

    DEPARTMENT OF EDUCATION, State of
9   Hawaii, and ALVIN RHO, in his
    official capacity as West Hawaii
10  District Superintendent,

11       Defendants.

12  _____/

13

14

15

16       VIDEOTAPED DEPOSITION OF BRYNA SIEGEL, Ph.D.

17            SAN FRANCISCO, CALIFORNIA

18            MONDAY, OCTOBER 15, 2007

19

20

21  ATKINSON-BAKER
    COURT REPORTERS
22  (800) 288-3376
    www.depo.com

23

24  Reported by:  Leland Batara, CSR No. 3759

25  File No. A10877B

EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

4    ANN KIMBALL WILES and STANLEY BOND,
     individually and as next friend of
5    their son, BRYAN WILES-BOND, a minor,

6         Plaintiffs,

7    v.                          CV 04-00442 HG/BMK
                                 CV 05-00247 HG/BMK
8
     DEPARTMENT OF EDUCATION, State of
9    Hawaii, and ALVIN RHO, in his
     official capacity as West Hawaii
10   District Superintendent,

11        Defendants.

12   _____/

13

14

15

16

17        Videotaped deposition of BRYNA SIEGEL, Ph.D.

18   taken on behalf of Plaintiffs, at 180 Montgomery

19   Street, Suite 800, San Francisco, California,

20   commencing at 9:07 a.m., and ending at 4:47 p.m.,

21   on Monday, October 15, 2007, before Leland

22   Batara, CSR No. 3759.

23

24

25

3

```
 1                    A P P E A R A N C E

 2     FOR PLAINTIFFS:

 3

 4        LAW OFFICES OF CARL. M. VARADY

 5        BY:  CARL M. VARADY, ESQ.

 6        1001 Bishop Street, Suite 2870

 7        Honolulu, Hawaii 96813

 8        Telephone:  (808) 523-8447

 9

10     FOR DEFENDANTS:

11

12        WATANABE, ING & KOMEIJI

13        BY:  GREGG M. USHIRODA, ESQ.

14        999 Bishop Street, 23rd Floor

15        Honolulu, Hawaii 96813

16        Telephone:  (808) 544-8300

17

18

19     ALSO PRESENT:

20        PETER MATTESON, Videographer

21

22

23

24

25
```

1          Q.   Now, why did Mr. Hom tell you that you

2     were being retained?

3          A.   He told me that Bryan was a young man in

4     West Hawaii School District who had had some

5     difficulty with his IEP and that the DOE had been

6     found at fault for not implementing the IEP, that

7     the IEP had 68 hours a week of service in it, which

8     was a new record for me to encounter, and that in a

9     way, not surprisingly, it had been hard to provide

10    the needed quality of services to implement what was

11    promised in that IEP, and that the family had

12    subsequently actually left the Islands and had moved

13    to California, I assumed seeking further services,

14    and that the matter at hand was, I believe, more one

15    of how much -- how much damage there had been to

16    this child, if any.

17         In other words, I initially understood

18    this case to be something having to do more with

19    maybe compensatory damages, was there, you know, a

20    loss of his window of opportunity, or however you

21    want to put it, but loss of an ability to achieve a

22    good prognosis based on what he had experienced in

23    Hawaii.

24         Q.   All right.  Now, how soon after you spoke

25    to Mr. Hom did you first speak to someone from

1    all of my discussions have been with Mr. Ushiroda,

2    or one of his associates, I believe.

3        Q.  Okay.  Now, you have testified that you

4    don't believe that you had received a written

5    description of your assignment prior to your

6    June 22nd 2006 report; is that correct?

7        A.  I don't believe I had, no.

8        Q.  Okay.  Did you receive written assignment

9    prior to your June 25, 2007 report?

10       A.  Again, I believe we talked on the

11   telephone, and I was told he was at a different

12   school and that B.J. Freeman and Dan LeGoff had gone

13   out and seen him at his new program, and would I

14   also go out and see him at his new program.  And so

15   I did.

16       Q.  Anything more than that?

17       A.  I was asked to, you know, make an

18   appraisal of how he was doing there and whether he

19   was getting an appropriate program and whether I

20   thought he was making expectable progress, and so

21   on.

22       Q.  More or less the same as you were asked to

23   do in your prior report for 2006; is that correct?

24       A.  Correct.

25       Q.  And you did that in both instances; is

1    that correct?  You did what you thought you had been

2    asked to do?

3         A.   Right.

4         Q.   Right.

5         A.   Including reviewing records that had been

6    generated by other people who had assessed him at

7    different points and time.

8         Q.   Okay.  We will get to the specifics of

9    your opinions in a little while, but I just wanted

10   to sort of shape what you understood going into

11   the -- the purpose of your observations and why you

12   were writing these reports.

13        You did understand at the time that those

14   reports were going to be filed as your expert

15   opinions in this case?

16        A.   Correct.

17        Q.   And you knew that before you wrote the

18   reports and before they were so filed; is that

19   correct?

20        A.   Correct.

21        Q.   Now, has Mr. Ushiroda ever communicated

22   with you regarding a case called the Daubert case,

23   D-A-U-B-E-R-T?

24        A.   I don't believe I have ever heard that

25   name.

1          A.   It's a sort of a psychological

2    developmental science.  It's in a firm called

3    psychological studies and education.

4          Q.   You are not licensed to practice as a

5    clinical psychologist; is that correct?

6          A.   Correct.

7          Q.   And you are not licensed to make diagnoses

8    in California as a clinical psychologist; is that

9    correct?

10         A.   Not as a clinical psychologist.

11              MR. VARADY:  I am going to ask that this

12   be marked Exhibit No. 5, please.

13              (Exhibit 5 marked for identification.)

14   BY MR. VARADY:

15         Q.   You have before you now Exhibit No. 5 to

16   your deposition.  This is the licensure requirement

17   for the practice of psychology under the California

18   Business and Professional Code.

19              Do you see that?

20         A.   Yes.

21         Q.   So my question is, you do not hold a

22   license under this licensure code; is that correct?

23              MR. USHIRODA:  Objection to the extent it

24   calls for a legal opinion, or legal conclusion.

25              THE WITNESS:  I -- the work that I do,

1    that is, clinical work, is done under another aspect

2    of this code which has to do with academic

3    professionals practicing only in the context of the

4    university.

5              And that's how I have practiced, along

6    with a license clinician, as an attending physician

7    in my clinic for the last 18 years.

8    BY MR. VARADY:

9         Q.  Would your answer be no, I do not hold

10   clinical licensure under this code?

11        A.  I don't hold a clinical license under any

12   code.

13             MR. VARADY:  Now, you have referred to a

14   portion of the code that provides for a certain type

15   of work without a clinical license.  I will ask that

16   this be marked Exhibit No. 6.

17             (Exhibit 6 marked for identification.)

18             MR. VARADY:  This is Section 2910 of the

19   California Business and Professional Code.

20        Q.  Is this the section you are referring to

21   that permits you to do work within the context of an

22   approved academic institution?

23        A.  Well, as you can see, this document is

24   noted that it's the annotated version.  I have seen

25   the full code, so I am not sure if I recognize

58

```
 1    whether this is the same section.  It looks like it

 2    is, but I haven't -- I have not seen it in this form

 3    before.

 4         Q.  Dr. Siegel, can you hold the exhibit down

 5    so the camera can see your face, please.

 6             That is your signature at the top?

 7         A.  Yes.  This is from another matter, yeah.

 8         Q.  Okay.  So --

 9         A.  This is a different version of it.

10         Q.  So you do recall seeing this before; is

11    that correct?

12         A.  Correct.

13         Q.  You misspoke when you said you hadn't seen

14    it?

15         A.  Right.  I meant that it's not the version

16    that is -- the full version that's in the -- in

17    other words, if you go to the Web, and you go to the

18    California Board of Psychology and you download

19    their manual, you will get a more expanded version

20    of this.

21         Q.  Have you made a diagnosis of Bryan

22    Wiles-Bond?

23         A.  Not per se, no.  I mean, I have concurred

24    with other people's diagnoses of him.

25         Q.  So you have accepted the diagnoses made by
```

1    others; is that correct?

2        A.   Well, and comment on them.

3        Q.   Your answer would be, yes, I have; is that

4    correct?

5        A.   Yes, I have commented on the diagnoses

6    that have been given to Bryan.

7        Q.   Have you made a diagnosis of Bryan

8    Wiles-Bond independent of the diagnoses that you

9    have reviewed?

10       A.   No, because, to me, a diagnostic

11   assessment involves several steps that I have not

12   carried out.

13       Q.   So your answer --

14       A.   No.

15       Q.   Your answer would be, no; is that correct?

16       A.   Correct.

17           MR. USHIRODA:   Counsel, will you please

18   let her finish the answer to the question.  And I

19   ask that you give the witness time to finish her

20   answer before cutting her off.

21           MR. VARADY:   I would like this now to be

22   marked as Exhibit No. 7, please.

23           (Exhibit 7 marked for identification.)

24   BY MR. VARADY:

25       Q.   Now, you are not licensed as a clinical

60

1    psychologist in Hawaii; is that correct?

2        A.  Correct.

3        Q.  Do you recognize this as Hawaii's

4    statutory provision governing the practice of

5    clinical psychology in Hawaii?

6        A.  Yes.  I believe you showed this to me in

7    an earlier matter.

8        Q.  Do you recognize that as your signature up

9    at the top?

10       A.  Correct.

11       Q.  Did you perform a clinical diagnosis of

12   Bryan Wiles-Bond in Hawaii?

13       A.  No.

14       Q.  Does your expert report, filed June 22nd

15   of 2006, list all your publications of the past 10

16   years?

17       A.  I don't believe that my expert report

18   lists any of my publications.  I provided my CV,

19   when asked, as a separate document.

20       Q.  That was an exhibit to your report; is

21   that correct?

22       A.  That's quite possible.  I might have

23   provided them at the same time.

24       Q.  Does it include all your publications for

25   the past 10 years?

162

1    what I think happened in Hawaii.  I think he was

2    held back, and he didn't get to develop any skills

3    while he was getting very inconsistent educational

4    practice, but that the capacity has been,

5    fortunately, accessed since he's been in better

6    programs in California.

7         Q.  All right.  You have in front of you

8    what's been identified as Exhibit No. 14.

9              (Exhibit 14 marked for identification.)

10   BY MR. VARADY:

11        Q.  This is your June 25th, 2007 opinion that

12   was filed in this matter.

13              Do you see that?

14        A.  Yes.

15        Q.  And you prepared this like the other

16   report, for purposes of this litigation; is that

17   correct?

18        A.  Correct.

19        Q.  Now, the scope of the assignment is

20   described as document progress -- documenting

21   progress and assessing whether the current education

22   Bryan was receiving was providing FAPE, and to

23   compare your observations with the test results

24   obtained by Dr. LeGoff and Dr. Freeman; is that

25   correct?

163

```
 1        A.   Correct.

 2        Q.   That is what you understood the scope of

 3   your assignment to be?

 4        A.   Right.

 5        Q.   And that was your understanding at the

 6   time you wrote this report; is that correct?

 7        A.   Correct.

 8        Q.   And your report is written to address

 9   those concerns; is that correct?

10        A.   Correct.

11        Q.   Now, looking at the Table 1, which are the

12   additional documents that you reviewed.

13        A.   Yes.

14        Q.   These include an additional

15   neuro-developmental re-evaluation by Dr. LeGoff, and

16   a psychological assessment by Dr. Freeman.

17             Do you see that?

18        A.   Yes.

19        Q.   When you say 10-29-99, "Individualized

20   Educational Program IEP Team," where was that IEP

21   written; do you know?

22        A.   I believe that was written in Maryland.

23        Q.   And --

24        A.   I think that was the IEP that he brought

25   from Maryland to Hawaii.  So it might have been
```

1    it.  And I think the discussion was something like,

2    I thought I had seen something that was what level

3    he was functioning at before he came to Hawaii.  And

4    I think in response I was told, well, we have this

5    10-99 IEP.  So I was given it.

6            If you go through the documents that I

7    have given you, it might be in there or not or --

8    and I spent a lot of time looking for documents last

9    night.  And as Mr. Ushiroda could tell you, the

10   state of my office is not such that I would swear to

11   you there aren't more documents that, after 20

12   minutes, I didn't find.

13       Q.  It appears that you did not read any

14   depositions in preparing this report; is that

15   correct?

16       A.  I don't think any depositions were done at

17   that point.

18       Q.  Now, you indicate that the purpose of your

19   report was to prove the hypothesis that Bryan

20   Wiles-Bond's current level of functions could have

21   been predicted from his low level of functioning

22   when he came to Hawaii, and is no worse off or

23   better than would be expected; is that correct?

24       A.  Correct.

25       Q.  Who gave you that assignment?

1    A.   No.   That was basically what I felt -- as

2    we discussed before lunch, that's where I had left

3    off last year with Bryan, and so the question was:

4    Would I still feel that way if I went and saw him

5    again.   And given that the experts on the

6    plaintiff's side had gone to see him again, if they

7    were to see something that was inconsistent with

8    what I had seen earlier, let's say his cover had

9    fallen apart in Benicia when he moved from Keystone

10   to Benicia Middle School, that that would be an

11   important data point.

12          And so I was asked if I would go out and

13   see it again.   And I said, well, you know, this is

14   where I left things.   And certainly if I go out, I

15   can collect further data to support the hypothesis

16   that I formulated after my last assessment.

17   Q.   Do you claim to have proof that Bryan is

18   no better off than he would have been otherwise and

19   that no permanent damage resulted from the problems

20   with his program in Hawaii?

21   A.   Well, I don't think anybody could prove

22   it.   I think that that is my working hypothesis,

23   that I think that the preponderance of the data

24   support that.

25   Q.   Okay.   What data?

1    studies.

2    BY MR. VARADY:

3        Q.   So your answer to my question, in short,

4    would be, no, I do not think it is a qualitative

5    measure?

6        A.   Right.  I think it's a quantitative.   The

7    word "significant" refers to a quantitative

8    definition of significant.

9        Q.   And she is not saying that it doesn't make

10   a big enough difference?

11       A.   The statistically significant across the

12   board in all the measures she examined.

13       Q.   Looking at the next article.   The title,

14   "Autism children grow up:  An eight to

15   twenty-four-year follow-up study."

16       A.   Right.

17       Q.   Is this also an article that you read?

18       A.   Yeah, this is like a classic article in

19   the literature.   This is like -- there are a whole

20   lot of longitudinal studies of autism outcomes, and

21   this is one of the early ones.   So it's not very

22   detailed, but it is longitudinal.

23       Q.   This is a study of autistic people

24   diagnosed between the years 1960 and 1973?

25       A.   Right.

176

1          Q.  Haven't the criteria for diagnosis changed

2     since that time?

3          A.  Absolutely.

4          Q.  And this article was written in 1986.

5     Would you agree that it's somewhat dated?

6          A.  Oh, it definitely is dated.

7          Q.  When it says that 50 percent of the

8     long-term subjects studied require

9     institutionalization or institutional care --

10         A.  Right.

11         Q.  -- does that mean they have no functional

12    capacity?

13         A.  No, it doesn't mean that, but I mean

14    obviously what -- what was institutional care in '86

15    is different from now.  There is fewer institutions,

16    first of all.

17              The other thing to notice is that this was

18    in the Canadian Journal of Psychiatry.  And so these

19    folks are in Ontario province, if I recall

20    correctly, and so they are talking about systems of

21    care also in the Canadian health system, which is

22    different from ours.

23         Q.  Turning to the next article.  This one is

24    "Individual behavioral profiles and predictors of

25    treatment effectiveness for children with autism."

1    Okay.

2    BY MR. VARADY:

3        Q.  We are on the June 25, 2007 report.

4        A.  Oh, okay.  I think because they were both

5    June, I was getting mixed up.

6            Sorry.  Please continue.  Would you repeat

7    the question?

8        Q.  Yeah.

9            My question is, you observed that from

10   year to year, Bryan was making progress.

11       A.  Correct.

12       Q.  He is showing gains from year to year; is

13   that correct?

14       A.  Correct.

15       Q.  And then you cite the material you

16   reviewed and assessments, and then the narrative

17   picks up on page 4 with a critique of Dr. Freeman's

18   report.

19           Do you see that?

20       A.  Yes.

21       Q.  Okay.  Now, did you know Dr. Freeman prior

22   to writing this opinion?

23       A.  Definitely.

24       Q.  Who is she?

25       A.  She is an emeritus professor of psychiatry

263

1      A.  Well, it's that and, as I said earlier,

2   the other point about -- that I am not trying to say

3   that his learning is going to stop at some point,

4   that he is going to continue to learn the way all of

5   us, retarded or not, verbal or not, continue to

6   learn, using the capacities that we have to make

7   sense of new information.

8      Q.  So if I understand what you are saying,

9   irrespective of what category he sits in, he is

10  going to continue to learn, in your opinion; isn't

11  that correct?

12     A.  Correct.

13     Q.  Now, one of the revisions Dr. Goka made

14  from his first report to his second report was in

15  making a care plan for Bryan to increase the family

16  therapy that would be required.  And he said he had

17  consulted with you about that, and that was based on

18  a change in your own assessment in your second

19  report.  Is that accurate?

20     A.  Yes, I think that is accurate.  I sort of

21  remember that conversation with him.  I think

22  that -- what I was struck by, I think, both by my

23  home visit and talking to Dr. Bond is that I think

24  that it has been extremely stressful, obviously, on

25  Bryan's parents to have to undergo all of what they

1    have undergone and that -- and, actually, subsequent

2    to that, I have become aware through Mr. Ushiroda

3    that it looks like there had been some CPS actions

4    questioned with the family while they were in

5    Hawaii, which would suggest to me that it was hard

6    to cope with having this kid in the home.

7           So I was concerned with, and I alluded to

8    it earlier today, you know, how consistent is what

9    the family is able to do at home, either because

10   both parents are working, or because Bryan's very

11   challenging, or because it's -- it's easier for

12   someone who isn't as emotionally involved with him

13   to provide a high degree of consistency.

14          So I was wondering with how well they

15   actually cope with being parents of such a severely

16   disabled child.

17          And the other reason that I recommended

18   that more family counseling be considered was that

19   Dr. Bond had told me that Bryan's brother spends

20   most of his time at home in his bedroom with the

21   door closed and does not have any real interest in

22   interacting with Bryan.  And I got the feeling that

23   the other typically developing brother is a real

24   second fiddle in the household.  And, in fact, I've

25   done a whole book on siblings of developmentally

1    disabled kids, and I know that literature fairly

2    well, and the siblings are at really high risk to

3    develop all kinds of things from depression, anxiety

4    to -- older brothers tend to develop acting out

5    disorders and aggression and alienation from the

6    family, and so on.  And I thought that while the

7    brother was still in the home, it might be important

8    to try to improve -- improve family relations.

9         Q.  Did you make any notes of your

10   conversations with Dr. Goka?

11        A.  I don't believe I did.  I just -- this was

12   all on the phone.

13        Q.  You don't refer to any conversations with

14   Dr. Goka in either of your reports; is that correct?

15        A.  No.  I was asked to just talk with him.

16   Mr. Ushiroda asked that I have a phone conference,

17   and the three of us talked together.  I believe

18   Mr. Ushiroda was on the phone when we talked,

19   because I think that Dr. Goka is, by no means, an

20   expert in autism.  So he wanted to have access to

21   asking me a few questions so that he would

22   understand a little more, or maybe just get

23   affirmation about his understanding of the

24   development of people with autism and severe

25   handicaps.

1      Q.   Is it your opinion that even though

2   Bryan's program may have been inappropriate and

3   chaotic in Hawaii, that it doesn't matter to Bryan's

4   long-term development.   Is that your opinion?

5      A.   That is basically my opinion, yes.

6      Q.   And that opinion would be the same even if

7   his Hawaii program resulted in instances where he

8   was in an environment that was harmful to him?

9          MR. USHIRODA:   Objection.   Lack of

10   foundation, vague and ambiguous as to "harmful."

11          THE WITNESS:   If he had been in an

12   environment where he had been physically endangered

13   or physically injured, I think we would be dealing

14   with another set of variables.

15          I think if he had been in Hawaii for ten

16   years instead of the length of time that he was, the

17   steps needed to unlearn ten years of maladaptive

18   behavior would be much more difficult to accomplish.

19   And given the age at which he left Hawaii and the

20   relatively short time that he was in school there, I

21   think militates against an outcome of permanent lag,

22   if you will, due to that.

23          And the proof to me is in the pudding,

24   that I have seen him twice now, and he has, you

25   know, fortunately shown the capacity to

274

1      A.  Well, that, in a way, is my proof that he

2    has -- absolutely has the capacity for recoupment

3    that I would suspect that he would have when he

4    changed his treatment practices.

5      Q.  If he'd made that progress in Hawaii,

6    wouldn't he even be further along today?

7          MR. USHIRODA:  Objection.  Asked and

8    answered.

9          THE WITNESS:  I don't believe that he

10    would.

11    BY MR. VARADY:

12      Q.  So he's gone as far as he can now?

13      A.  No.

14          MR. USHIRODA:  Objection.  Asked and

15    answered.

16          THE WITNESS:  No.  He's continuing.  We

17    have been through this.  He's continuing to learn,

18    and he will continue to learn.

19    BY MR. VARADY:

20      Q.  Well, can you only consider him to learn

21    in California, or could he have learned in Hawaii?

22      A.  He could have learned in Hawaii.

23      Q.  So there was a period of five years where

24    he didn't learn in Hawaii; isn't that correct?

25      A.  Right.  Correct.  But I think he is caught

Siegel

1     up, and he is back on track and that he has capacity

2     that wasn't accessed when he was in Hawaii and that

3     -- I don't think that the kind of gains we have seen

4     in his first two years in California are going to

5     continue at that rate for the next two years and the

6     two years after that, and so forth.

7          Q.   Can you say that with a certainty?

8          A.   I can say it with a fair degree of

9     certainty.  In other words, I don't think he will

10    have 400 signs in another year's time, for example,

11    if you were going to try to characterize it that

12    way.  I think that would be extremely unlikely.

13         Q.   Wouldn't you want to see where he is next

14    year before making predictions about where he is

15    going to end up?

16         A.   I mean, ideally, one wants to see, but I

17    can tell you that based on my experience over the

18    years with kids like Bryan, it would be unlikely.

19    It seems much more improbable than probable to me.

20         Q.   So your testimony is that even though he

21    made no progress for five years in Hawaii and, in

22    fact regressed, that he's recouped to the point he

23    would have been had he been given appropriate

24    services in Hawaii; is that correct?

25              MR. USHIRODA:  Objection.  Asked and

1    answered.  Also misstates prior testimony.

2    BY MR. VARADY:

3        Q.  Is that your testimony?

4        A.  I think he has largely recouped.

5        Q.  Well, that is a big word, "largely."  Now,

6    you are qualifying it.

7        A.  No.

8        Q.  Did he recoup or not?

9        A.  Well, I mean, as you pointed out yourself,

10   there is no way to know exactly.  This is not a

11   precise science.  I think that he's shown a lot of

12   improvement in the behavioral domain.  And in doing

13   so, he's much more open to instruction.

14           So he is doing many more things, but he is

15   still a very severely impaired young man, and a lot

16   of what he has learned, a lot of the signs that he's

17   learned don't really have much functional use for

18   him, like labeling objects and colors and numbers

19   and animals, and so forth.

20           So as far as where he is going in life, as

21   I have said, he needs to have a much more functional

22   turn in the road for his curriculum.  And typically

23   that happens at age 14, when the transition for

24   adult planning first gets talked about at an IEP

25   meeting.