1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF HAWAII

3       ----------------------------------------

4       ANN KIMBALL WILES and STANLEY BOND,

5       individually and as next friend of their

6       son, BRYAN WILES-BOND, a minor,

7                    Plaintiffs,

8                    vs.          Civil No. CV 04-00442 HG/BMK

9                                 05-00247 JMS/BMK

10      DEPARTMENT OF EDUCATION, State of Hawaii,

11      and ALVIN RHO, in his official capacity

12      as West Hawaii District Superintendent,

13                    Defendants.

14      ----------------------------------------

15

16

17          VIDEOTAPED DEPOSITION OF REBECCA GAVIN

18

19      Taken on behalf of the Plaintiffs at Ralph Rosenberg

20      Court Reporters, 75-170 Hualalai  Rd., Suite D-212,

21      Kailua-Kona, Hawaii 96740, commencing at 1:06 p.m.,

22      Friday, July 20, 2007, pursuant to Notice.

23

24      BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

25                   Notary Public, State of Hawaii

Exhibit 1

1     Q.   (Mr. Ellis) When did you first start working

2  for TIFFE?

3     A.   In March '03.

4     Q.   (Mr. Ellis) And your -- when did you leave

5  TIFFE's employment?

6     A.   April '05.

7     Q.   (Mr. Ellis) Okay.  And during that time you

8  stopped working as a skills trainer, was that when you

9  stopped working with Bryan Wiles-Bond?

10     A.   No.  I was a skills trainer throughout my

11  entire time with TIFFE, however, I split it between

12  skills training and IISC.

13     Q.   (Mr. Ellis) When did you stop working directly

14  with Bryan Wiles-Bond or did you ever?

15     A.   I did.

16     Q.   (Mr. Ellis) When was that?

17     A.   I recall July '05.

18     MR. USHIRODA:  No, if you worked --

19     THE WITNESS:  I mean, '04, I'm sorry.

20  BY MR. LEVIN:

21     Q.   (Mr. Ellis) July '04?

22     A.   Mm-hmm.

23     Q.   (Mr. Ellis) After July '04, you still worked

24  for TIFFE --

25     A.   Yes.

Exhibit 1

1    Q.    (Mr. Ellis) -- in a different capacity?

2    A.    As a skills trainer and IISC, but with a

3    different youth.

4    Q.    (Mr. Ellis) And from July on, you had no more

5    contact with Bryan Wiles-Bond?

6    A.    If that end date that I recall was July '04,

7    yes, that is correct.

8    Q.    (Mr. Ellis) okay.  After that period of time,

9    did you have any opportunity to speak with the parent or

10   speak with anybody else, say, at TIFFE, regarding Bryan

11   Wiles-Bond?

12   A.    Not that I recall.

13   Q.    (Mr. Ellis) Why did you stop working as Bryan's

14   skills trainer in July of 2004?

15   A.    I was burnt out and ready to increase my IISC

16   hours and have another student for skills training.

17   Q.    (Mr. Ellis) When you say burned out, was there

18   any particular reason for your burning out or was Bryan,

19   say, like, a difficult case?

20   A.    He was a difficult case, and I had been with

21   him for an extended period of time.

22   Q.    (Mr. Ellis) Could you explain what you mean by

23   "difficult?"

24   A.    I think his needs were very high.

25   Q.    (Mr. Ellis) Could you explain what those needs

1    were?

2        A.    The structure and monitoring that he needed and

3    his behaviors.

4        Q.    (Mr. Ellis) Could you explain the behaviors?

5        A.    He did show some aggressive behaviors.  Keeping

6    him on task was challenging.  And his issues with

7    urinating.

8        Q.    (Mr. Ellis) Could you explain the issues with

9    urinating?

10       A.    He did not always use the toilet.  It was in

11   his -- done in his pants.  It was done while working on

12   tasks.  It was an issue with him and it -- it was an

13   issue with him.

14       Q.    (Mr. Ellis) Okay.  Is there a reason why Bryan

15   would urinate excessively?

16       A.    He did like water and drink a lot of water.

17       Q.    (Mr. Ellis) Did this occur -- or where did you

18   work at Bryan?

19       A.    At home and in the school.

20       Q.    (Mr. Ellis) Did the excessive urinating occur

21   both at school and at home?

22       A.    Yes.

23       Q.    (Mr. Ellis) At any point during your working

24   with Bryan, did you have an opportunity to speak with a

25   Dr. Kim Smalley?

Exhibit 1

1    A.   I don't recall.

2    Q.   (Mr. Ellis) Did you recall ever meeting

3 Dr. Smalley?

4    A.   I don't recall.

5    Q.   (Mr. Ellis) Do you know who Dr. Smalley is?

6    A.   The name is familiar.

7    Q.   (Mr. Ellis) Okay.  What -- what do you know

8 about Dr. Smalley?

9    A.   I've heard her name, but that's all I know.

10    Q.   (Mr. Ellis) That's all?

11    A.   Mm-hmm.

12    Q.   (Mr. Ellis) Okay.  Did you work -- do you know

13 who Dru Copeland is?

14    A.   Yes.

15    Q.   (Mr. Ellis) Okay.  Did you work with

16 Dr. Copeland?

17    A.   Yes.

18    Q.   (Mr. Ellis) In what capacity?

19    A.   She was the IISC.

20    Q.   (Mr. Ellis) And in that capacity, what did that

21 mean to you?

22    A.   That she was in charge -- basically in charge

23 of the case in terms of looking at and monitoring his

24 progress and what would be helpful and teaching us what

25 to implement and skills to work with him.

Exhibit 1

1    Q.   (Mr. Ellis) Was she in charge of -- she was,
2    like, your supervisor?

3    A.   I think more a supervisor of the case and Kelly
4    Stern was my supervisor.

5    Q.   (Mr. Ellis) Okay.  Did Dr. Copeland, was she in
6    charge of implementing how the skills trainers, such as
7    yourself, implemented the program at home and at school?

8    A.   Yes.

9    Q.   (Mr. Ellis) So you understood she was in charge
10   of implementing the program at home?

11   A.   Yes.

12   Q.   (Mr. Ellis) So Bryan's program had both
13   components?

14   A.   Yes.

15   Q.   (Mr. Ellis) Okay.  There have been allegations
16   placed in declarations filed by Defendant that Bryan was
17   sent to school with diarrhea and vomiting; are you aware
18   of that?

19   A.   When you say Defendant, who are you referring
20   to?

21   Q.   (Mr. Ellis) The Department of Education.

22   A.   Okay.  I don't recall.

23   Q.   (Mr. Ellis) You don't recall during the time
24   that you worked with him that he made diarrhea at
25   school?

1    A.    I don't remember.

2    Q.    (Mr. Ellis) Okay.  Do you recall him vomiting

3    in school?

4    A.    I don't remember.

5    Q.    (Mr. Ellis) Do you recall him coming to school

6    with a communicable staph infection?

7    A.    What is communicable?  What does that mean?

8    Q.    (Mr. Ellis) A staph infection that could be

9    passed on from one person to another.

10    A.    Oh, I don't recall.

11    Q.    (Mr. Ellis) Okay.  Various -- varying eye

12    infections?

13    A.    I faintly remember something with his eye.

14    Q.    (Mr. Ellis) Do you know what the circumstances

15    were?

16    A.    I remember it being red and appearing to bother

17    him.

18    Q.    (Mr. Ellis) Do you know if he came to school

19    with the condition or the condition occurred at school?

20    A.    I don't recall.

21    Q.    (Mr. Ellis) Do you recall if the parents

22    refused to keep Bryan home on such occasion that he had

23    this eye infection?

24    A.    I recall -- can you repeat the question.

25    MR. ELLIS:  Could you read it back, please.

Exhibit 1

1       (Reporter read back)

2       THE WITNESS:  I faintly remember something

3  about it, him coming to school, but I don't recall.

4  BY MR. LEVIN:

5       Q.   (Mr. Ellis) So you have no recollection of

6  these occurrences, other than maybe an eye infection?

7       A.   Yes.

8       Q.   (Mr. Ellis) There have been allegations that at

9  the family home, the home was unsanitary and unclean; do

10  you know anything about that?

11       MR. USHIRODA:  Objection.  Vague and ambiguous.

12  Are you referring to the allegation made or the

13  condition?

14       MR. ELLIS:  The allegation made.

15       MR. USHIRODA:  Objection.  So he's asking you

16  if you're aware of any allegations that have been made

17  about the condition of the home.

18       THE WITNESS:  I believe skills trainers

19  complained about the conditions in the home.

20  BY MR. LEVIN:

21       Q.   (Mr. Ellis) Okay.  Do you know if -- do you --

22  did you work at the home?

23       A.   Yes.

24       Q.   (Mr. Ellis) Okay.  Did you make any allegations

25  yourself that the home was unsanitary or unclean?

Exhibit 1

1      A.   I did say that it was unclean.

2      Q.   (Mr. Ellis) Okay.  And who did you say this to?

3      A.   Kelly Stern.

4      Q.   (Mr. Ellis) Okay.  Did you put -- in what -- or

5   when did you make that allegation?

6      A.   I don't recall.

7      Q.   (Mr. Ellis) What was the unclean condition at

8   the home?

9      A.   It had to do with urine around the home.

10     Q.   (Mr. Ellis) Okay.  Is this the same condition

11   that you talked about earlier with excessive urination?

12     A.   Yes.

13     Q.   (Mr. Ellis) Okay.  Do you recall, was it in the

14   entire home or just that area where Bryan lived?

15     A.   I recall it most -- I recall it specifically in

16   the downstairs where he lived.

17     Q.   (Mr. Ellis) So the unclean was that he urinated

18   and -- that he urinated?

19          MR. USHIRODA:  Objection.  Mischaracterizes

20   testimony.

21   BY MR. LEVIN:

22     Q.   (Mr. Ellis) The unclean condition was that he

23   was urinating?

24     A.   Yes.

25     Q.   (Mr. Ellis) Okay.  Do you know if the parents

Exhibit 1

16

1    mopped up the urination?

2        A.    I did see them clean the bedroom, but the other

3    part I do not know.

4        Q.    (Mr. Ellis) I'm sorry, what other part?

5        A.    He lived -- there was -- it was like a studio,

6    like a living area with a bathroom and then he had a

7    bedroom off of the living area.

8        Q.    (Mr. Ellis) Okay.  So what part did they mop

9    up?

10       A.    The bedroom.

11       Q.    (Mr. Ellis) The bedroom.  Did you -- you don't

12   recall seeing them mop the rest of it or you don't know?

13       A.    I -- I guess I don't know since I didn't see

14   them do it.

15       Q.    (Mr. Ellis) Okay.  When he urinated at school,

16   was it just urination or was there -- did he have other

17   types of accidents, such as diarrhea?

18           MR. USHIRODA:  Objection.  Vague and ambiguous.

19           THE WITNESS:  I don't recall.

20   BY MR. LEVIN:

21       Q.    (Mr. Ellis) Okay.  When he had the urination

22   accidents at school, they happened in the classroom?

23           MR. USHIRODA:  Objection.  Vague and ambiguous.

24           THE WITNESS:  Yes.

25

1      A.    Various people.

2      Q.    (Mr. Ellis) Could you be a little more

3  specific?

4      A.    Myself, the teacher, the janitor.

5      Q.    (Mr. Ellis) Okay.  Do you recall the teacher,

6  who that was?

7      A.    No.

8      Q.    (Mr. Ellis) Could it have been -- was this at

9  Kealakehe Elementary or Kealakehe Middle School?

10     A.    I -- I know it was at Kealakehe Middle School.

11 I don't recall Kealakehe Elementary.

12     Q.    (Mr. Ellis) Did you have an opportunity to talk

13 to the parents about the issue of urinating and the

14 unclean condition at the house?

15     A.    No, I didn't talk with them about that.

16     Q.    (Mr. Ellis) Did you make a report to the

17 Department of Health about the unclean condition of the

18 house?

19     A.    No, I don't recall doing that.

20     Q.    (Mr. Ellis) Okay.  Did you ever put this -- did

21 you ever put this in a written report or a written

22 complaint about the unclean condition at the house?

23     A.    I don't recall doing that.

24     Q.    (Mr. Ellis) Okay.  Oh, did you ask Kelly Stern

25 to put it in a written complaint?

Exhibit 1

1    A.   I don't recall asking her to do that.

2    Q.   (Mr. Ellis) Okay.  Do you know if she did?

3    A.   No, I don't know.

4    Q.   (Mr. Ellis) Okay.  Oh, why did you tell Kelly

5    Stern?

6         MR. USHIRODA:  Objection.  Lack of foundation.

7    Assumes facts not in evidence.

8    BY MR. LEVIN:

9    Q.   (Mr. Ellis) Okay.  You can answer the question.

10   A.   From my understanding, it was an issue being

11   discussed among skills trainers and so I was asked about

12   it, is what I recall.

13   Q.   (Mr. Ellis) Who asked -- you were asked about

14   this unclean condition?

15   A.   (No audible response).

16   Q.   (Mr. Ellis) And who asked you about it?

17   A.   Kelly.

18   Q.   (Mr. Ellis) Okay.  So did you volunteer the

19   information to Kelly or Kelly had to ask you about it?

20   A.   I recall it being a discussion, and I believe I

21   was asked.

22   Q.   (Mr. Ellis) So you didn't bring it to her

23   attention voluntarily, you had to be asked about it?

24        MR. USHIRODA:  Objection to the term.  Vague

25   and ambiguous.  Assumes facts not in evidence.  Lack of

Exhibit 1

1    foundation.

2           THE WITNESS:   That's my recollection of it.

3    BY MR. LEVIN:

4       Q.   (Mr. Ellis) I'm sorry, just to -- so we

5    understand, your recollection is what I state -- what

6    was stated in the question?

7       A.   Which was that Kelly asked me?

8       Q.   (Mr. Ellis) Yes.  And it wasn't -- it wasn't

9    you went to her and voluntarily told her about the

10   unclean condition?

11      A.   I believe so.

12      Q.   (Mr. Ellis) Okay.  Thank you.

13           You left in July of 2004?

14      A.   I believe so.

15      Q.   (Mr. Ellis) Okay.  That was in the summer.

16   Were you part of Bryan's summer program at Kealakehe

17   Intermediate School?

18      A.   I don't recall.

19      Q.   (Mr. Ellis) Okay.  There has been an allegation

20   by the parents and by Dr. Smalley that Bryan was self

21   stimulating by slipping and sliding in his own urine in

22   the classroom; are you aware of the allegation and are

23   you aware if that did or did not happen?

24           MR. USHIRODA:   Objection.  Assumes facts not in

25   evidence.  Lack of foundation.

Exhibit 1

24

1          MR. ELLIS:  If you could read it back, please.

2              (Reporter read back)

3          THE WITNESS:  Questions about the home that

4    were not related to his program?

5          MR. ELLIS:  Yes.

6          THE WITNESS:  Not that I recall.

7    BY MR. LEVIN:

8      Q.    (Mr. Ellis) Was it you don't recall it or there

9    were no questions?

10         MR. USHIRODA:  Objection.  She does not recall.

11   I believe if there were no questions, she would have

12   said that.

13   BY MR. LEVIN:

14     Q.    (Mr. Ellis) You can answer the question.

15     A.    I'm sorry, what did you just say?

16     Q.    (Mr. Ellis) Do you just not recall it or did --

17   were there no questions?

18     A.    I don't believe there were any questions.

19     Q.    (Mr. Ellis) Did you have a positive impression

20   about -- of Bryan's parents?

21         MR. USHIRODA:  Objection.  Vague and ambiguous.

22         THE WITNESS:  I don't understand what you mean

23   by "positive."

24   BY MR. LEVIN:

25     Q.    (Mr. Ellis) Well, were they likable?

Exhibit 1

1    MR. USHIRODA:  Objection.  Vague and ambiguous.

2    THE WITNESS:  I don't know.

3 BY MR. LEVIN:

4  Q.   (Mr. Ellis) Were they rude?

5  A.   No.

6  Q.   (Mr. Ellis) Were they polite?

7  A.   Yes.

8  Q.   (Mr. Ellis) Okay.  Were they knowledgeable

9 about their son?

10  A.   I don't know.

11  Q.   (Mr. Ellis) Were they cooperative with you?

12  A.   Yes.  But -- I found mom nice.  Not that I

13 didn't find dad nice, but I found mom nice.

14  Q.   (Mr. Ellis) Did you interact more with mom than

15 with dad?

16  A.   Yes.

17  Q.   (Mr. Ellis) So your impression of dad could

18 be -- the fact that you didn't interact with him often

19 could lead you to not form an impression?

20  A.   Yes.

21    MR. USHIRODA:  Late objection.  Leading.

22    MR. ELLIS:  Exhibit 1 is a letter dated

23 January 28, 2003, signed by Rebecca Gavin along with a

24 copy of what appears to be her one-page CV.  That's for

25 you.  This is the exhibit.

Exhibit 1

1    Q.    (Mr. Ellis) -- Puente is?

2    A.    She was the, I guess, receptionist you would

3    call her or secretary of TIFFE.

4    Q.    (Mr. Ellis) And she provided training?

5    A.    Yeah.

6    Q.    (Mr. Ellis) Okay.

7    A.    Looks like the administrative part.

8    Q.    (Mr. Ellis) This is training you received after

9    you were hired?

10   A.    Yes, I believe so.

11   Q.    (Mr. Ellis) Okay.  And then on -- we've already

12   covered 16.  1651.  At the top there, who's Jeff

13   Bergbauer?

14   A.    He is a TIFFE employee.  I don't know his

15   role --

16   Q.    (Mr. Ellis) Okay.  And then --

17   A.    -- or title.

18   Q.    (Mr. Ellis) And then health and safety, is that

19   the topic that was covered?

20   A.    I believe so.

21   Q.    (Mr. Ellis) Okay.  Marvin St. Clair, who is

22   that?

23   A.    He's also an employee of TIFFE. I believe he

24   was the director or higher up there.  I'm not sure.

25   Q.    (Mr. Ellis) On page 1652, says -- under certain

Exhibit 1

1    A.    I don't believe so.    I believe there was a

2  class offered.

3    Q.    (Mr. Ellis) Offered by?

4    A.    I don't know.

5    Q.    (Mr. Ellis) Okay.    Did you attend that class?

6    A.    No, I did not.

7    Q.    (Mr. Ellis) At TIFFE, did they have monthly

8  meetings with the staff?

9    A.    Yes.

10    Q.    (Mr. Ellis) Okay.    At those meetings, did all

11  the cases involving TIFFE employees discussed at the

12  meetings?

13    A.    Not that I recall.

14    Q.    (Mr. Ellis) Okay.    What were the subject of the

15  monthly meetings?

16    A.    What I recall are, like, upcoming trainings.

17  Issues that may arise as a skills trainer, and I don't

18  really remember other things that were talked about.

19    Q.    (Mr. Ellis) When you -- when you say issues

20  that arise as a skills trainer, what do you mean?

21    A.    Like...  I don't recall specifically what was

22  discussed.

23    Q.    (Mr. Ellis) At these monthly meetings did you

24  talk about anything related to individual cases?

25    MR. USHIRODA:  Objection.  Asked and answered.

Exhibit 1

1          THE WITNESS:  I don't recall.

2     BY MR. LEVIN:

3          Q.   (Mr. Ellis) When you state that you don't

4     recall, is it something that at a later time you may be

5     able to review documents to refresh your memory or that

6     you just don't know if it occurred?

7          MR. USHIRODA:  Objection.  Asked and answered.

8          THE WITNESS:  I don't recall and so if you

9     showed me documents, yes, I could.

10         MR. ELLIS:  Take a break, five minutes.

11         THE VIDEOGRAPHER:  Off the record at 1:56 p.m.

12         (Off the record at 1:56 p.m.)

13         (Back on the record at 2:03 p.m.)

14         THE VIDEOGRAPHER:  Back on the record.  It is

15     2:03 p.m.

16     BY MR. LEVIN:

17         Q.   (Mr. Ellis) Okay.  Could you please describe a

18     typical day at school with you and Bryan.

19         MR. USHIRODA:  Objection.  Vague and ambiguous.

20         THE WITNESS:  I don't understand the question.

21     BY MR. LEVIN:

22         Q.   (Mr. Ellis) You start at usually, you said,

23     12:00 to 7:00.

24         A.   Mm-hmm.

25         Q.   (Mr. Ellis) Okay.  What did you do at noon?

Exhibit 1

1     A.    Not that I -- I don't recall other ones.

2     Q.    (Mr. Ellis) So laundry, sweeping, cleaning his

3    room, putting his books away.

4     A.    I would say cleaning his area, not his room,

5    yeah.

6     Q.    (Mr. Ellis) So the area consisted of his room,

7    the bathroom?

8     A.    Not his room.  His room was not really occupied

9    except for sleeping.

10     Q.    (Mr. Ellis) Okay.  What room did he clean?

11     A.    The living area downstairs.

12     Q.    (Mr. Ellis) His living area?

13     A.    Yes.

14     Q.    (Mr. Ellis) And then he took -- once he cleaned

15    up that living area, he took out just the trash from

16    that area --

17     A.    Yes.

18     Q.    (Mr. Ellis) -- or the trash from all of his

19    living area?

20     A.    It was one trash for that living area.

21     Q.    (Mr. Ellis) Do you know why the cleaning

22    component was included in his program?

23     A.    My understanding was it was functional living

24    skills.

25     Q.    (Mr. Ellis) And you as a skills trainer were

Exhibit 1

1      A.   I don't recall.

2      Q.   (Mr. Ellis) Do you recall ever seeing -- have

3  you seen IEPs for other students that you've worked

4  with?

5      A.   Yes.

6      Q.   (Mr. Ellis) So you know what an IEP looks like?

7      A.   Yes.

8      Q.   (Mr. Ellis) Okay.  So you just don't know if

9  you received -- if you saw Bryan's IEP?

10     A.   I believe I saw his IEP because I had his goals

11 written on my progress notes for TIFFE.

12     Q.   (Mr. Ellis) Okay.  Thank you.

13          Did you use those, what you just testified to,

14 is that what you used to implement the program --

15          MR. USHIRODA:  Objection.

16 BY MR. LEVIN:

17     Q.   (Mr. Ellis) -- as a skills trainer?

18          MR. USHIRODA:  Objection.  Lack of foundation.

19          THE WITNESS:  The program was designed by Dru.

20 BY MR. LEVIN:

21     Q.   (Mr. Ellis) Was the program that was designed

22 by Dru different from the goals and objectives that you

23 saw in Bryan's IEP?

24     A.   No.

25     Q.   (Mr. Ellis) Okay.  The -- what Dru gave you,

Exhibit 1

1    did she put it in a written form?

2        A.    I don't recall.

3        Q.    (Mr. Ellis) Ms. Gavin, prior to this

4    deposition, did anybody from the Department of Education

5    contact you to ask you to testify at trial for Bryan

6    Wiles-Bond?

7        A.    I received an e-mail approximately a year ago,

8    I believe it was from Linda Price.

9        Q.    (Mr. Ellis) What did Linda Price tell you?

10       A.    I don't recall what the e-mail said.

11       Q.    (Mr. Ellis) Do you recall the, you know, the

12   gist of the e-mail?

13       A.    Something along the lines of my involvement in

14   this process, which I declined.

15       Q.    (Mr. Ellis) You declined to testify?

16       A.    I --

17       Q.    (Mr. Ellis) Or declined to give her information

18   about the process?

19       A.    Mm-hmm.

20       Q.    (Mr. Ellis) Is that the limit of the contact

21   you had?

22       A.    Yes.

23       Q.    (Mr. Ellis) Okay.  Other than the deposition

24   today that you were contacted to attend?

25       A.    Yes.

Exhibit 1