1

1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF HAWAII
2

ANN KIMBALL WILES and        )   Civil No. CV 04-00442
3   STANLEY BOND, individually    )   Civil No. 05-00247
    and as next friend of their   )   Consolidated
4   son, BRYAN WILES-BOND, a      )
    minor,                        )
5                                 )
            Plaintiffs,           )
6                                 )
        v.                        )
7                                 )
DEPARTMENT OF EDUCATION,          )
8   State of Hawai'i, and KATE    )
    TOLENTINO, in his official    )
9   capacity as West Hawai'i      )
    District Supervisor,          )
10                                )
            Defendants.           )
11                                )
    _____ )
12

13

14

15

16              DEPOSITION OF DRU COPELAND

17      Taken on behalf of the Plaintiff at the offices of

18   Davis Levin Livingston Grande, 851 Fort Street Mall,

19   Honolulu, Hawaii, commencing at 9:10 a.m. on September

20   28, 2007, pursuant to Notice.

21

22

23

24   BEFORE:     JESSICA R. PERRY, CSR NO. 404

25               Certified Shorthand Reporter


            RALPH ROSENBERG COURT REPORTERS, INC.
                     (808) 524-2090



```
 1        Q.  Now, what was your position with Alaka'i?

 2        A.  At that time we were called autism

 3   consultants.

 4        Q.  All right.  And then the title changed at some

 5   point; is that correct?

 6        A.  Yes.

 7        Q.  And what was the new title?

 8        A.  IISC.

 9        Q.  And that is intensive --

10        A.  Instructional service consultant.

11        Q.  We'll just call it IISC for purposes of your

12   deposition, all right?

13        A.  Thank you.

14        Q.  Were the duties the same after the name

15   change?

16        A.  Yes.

17        Q.  And can you describe what the duties of an

18   autism consultant or IISC were during the period of

19   2002 to 2004?

20        A.  To assist the school in implementing a

21   treatment plan which was outlined in the student's

22   IEP.  This involved supervising, coaching, training

23   the skills trainers primarily.  It -- it also involved

24   working with the teacher and working with families as

25   needed.
```

1          A.  Yes, I do.

2          Q.  And then it explains that the adult

3     educational aide shall provide the services on a

4     consistent basis with the goal of completing all tasks

5     and documentation required by the TEACCH, DTT and PECS

6     methods of behavioral management and educational

7     instruction.  Did I read that accurately?

8          A.  You did.

9          Q.  Now, this particular decision, I understand

10    from your testimony, is not something that you were

11    made aware of when you came to the Big Island in 2002;

12    is that correct?

13         A.  That is correct.

14         Q.  You mentioned that you were aware of Dr. Ortiz

15    having worked with Bryan in 2002?

16         A.  Yes.

17         Q.  Did the DOE ever arrange for you to confer

18    with her or provide hours for you and her to consult

19    regarding Bryan's treatment plan or individual

20    educational program?

21         A.  When I came to the Big Island, Michael Wright

22    was the person that was working with him, and so I

23    talked with him.

24         Q.  Okay.

25         A.  I met Dr. Ortiz through the process of being

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    cetera.  Do you see that?

2        A.  Yes.

3        Q.  Were you aware that that was an agreement

4    between the state and the Bonds at this time, that is

5    August 2002?

6        A.  I didn't start working with Bryan in August.

7    I believe it was September.  However, I was aware that

8    Kim's mother -- I mean, Bryan's mother did that, had

9    those advertisements.  I was not aware that it was

10   part of some agreement.

11       Q.  All right.  Looking at sub C, it states that

12   by August 2002, the state shall create a pool of

13   substitute TA's who are qualified and trained to

14   provide services to Bryan.  Do you see that?

15       A.  Yes.

16       Q.  Were you aware, when you began working with

17   Bryan in September of '02, that this was a requirement

18   that the state was required to meet?

19       A.  No.

20       Q.  Looking at sub paragraph F, which is where I

21   initially directed you to, at the bottom of the page

22   it states that the above-described TA services shall

23   be provided by qualified TA's who meet the standards

24   for a level 3 TA and are trained in DTT, TEACCH, and

25   PECS methods for autistic children.  Did I read that

1     Q.  And there's a footnote that refers to the

2   specific hours, but would you agree that that is an

3   accurate statement?

4             MR. USHIRODA:  Objection.  Lack of

5   foundation.  Assumes facts not in evidence.  Overly

6   broad.

7             THE WITNESS:  What I recall is that we

8   had difficulty finding appropriate skills trainers, I

9   guess it started that fall, and that there were some

10   gaps.

11   BY MR. VARADY:

12     Q.  Now, looking at the next page, paragraph 8,

13   the hearing officer found that the six skills trainers

14   that the DOE provided to Bryan in the fall of 2003

15   through February of 2004 did not have prior experience

16   working with autistic children.  Do you see that?

17     A.  Yes.

18     Q.  Do you disagree with that?

19     A.  You know, I really don't remember exactly.  I

20   don't even remember who they were.  You know, I don't

21   remember if they had experience or not.  I do know

22   that it was exceedingly difficult to find people on

23   the Big Island who met those requirements as -- as

24   outlined.

25     Q.  Now, do you think it would be important for

1    skills trainers working with Bryan during that period,

2    that is fall of '03 through the '03-'04 school year,

3    to have experience working with autistic children?

4                    MR. USHIRODA:  Objection.  Vague,

5    ambiguous.

6                    THE WITNESS:  It would be advantageous.

7    Some skills trainers are quite trainable and it is

8    less important that they have that exact kind of

9    experience, or they may have experience with children

10   that easily translates to working with autistic

11   children.

12   BY MR. VARADY:

13       Q.  And that was actually going to be my next

14   question.  And that would be that if an otherwise

15   qualified skills trainer did not have such experience,

16   would you have been able to train that person as to

17   how to work with Bryan as an autistic child at this

18   time?

19       A.  It depends totally on the person.  Some people

20   are quite trainable and some are not.

21       Q.  But just as a general matter, there's nothing

22   inherently that would prevent you -- would have

23   prevented you from training a person who was otherwise

24   trainable in how to work with an autistic child at

25   that time; is that correct?

 1                    MR. USHIRODA:  Objection.  Argumentative

 2     and asked and answered.

 3                    THE WITNESS:  There's nothing that would

 4     have prevented that to happen.  I would have

 5     reluctance to try to do that if they had not had any

 6     experience working with children.

 7     BY MR. VARADY:

 8         Q.  All right.  That's -- were you aware of

 9     whether or not there had been a shortage of qualified

10     skills trainers who had experience working with

11     autistic children on the Big Island as a chronic

12     condition, that is, it was difficult to find them?

13         A.  My recollection, it was always difficult to

14     find skills trainers across the board, and to have a

15     skills trainer who actually had experience working

16     with autistic children prior to their arrival,

17     usually, their arrival on the Big Island, was not at

18     all common.  That was very uncommon.

19         Q.  You had the skills necessary to train someone

20     how -- who was otherwise trainable to work with an

21     autistic child like Bryan, though; isn't that correct?

22         A.  Yes.

23         Q.  And in fact that was one of your job duties?

24         A.  That is correct.

25         Q.  The second sentence says that five of the six

1    skills trainers had no prior experience with American

2    Sign Language.  Do you see that?

3        A.  Nine?

4        Q.  Eight?

5        A.  Oh, I'm sorry.  I beg your pardon.

6            Yes, I see that, okay.

7        Q.  Does that accurately state the facts during

8    this period of time, that is, fall of '03 through

9    February of '04?

10            MR. USHIRODA:  Objection.  Lack of

11   foundation.  Assumes facts not in evidence.  Calls for

12   speculation.

13            THE WITNESS:  As I said previously, I

14   don't even remember who these people are.  Probably

15   that's correct, because, again, we just didn't have

16   people who had those kind -- that kind of training.

17   BY MR. VARADY:

18       Q.  Dr. Copeland, do you have training in American

19   Sign Language?

20       A.  No.

21       Q.  At any time during this period, that is, the

22   period of -- that we've been talking about so far,

23   from September of '02 when you first started working

24   with Bryan up through this date, which we -- we'll

25   just call May of '04, did DOE offer you any training

1       in American Sign Language?

2           A.  Yes, I took -- I took a course they had in the

3       evening, but probably what was more apropos was the

4       second semester of his 5th grade year, so that would

5       have been, what, 2003, the DOE was very active in

6       putting together a dictionary.  So I would say that --

7       that probably Sheri Adams, who was the speech

8       pathologist, who was the one who trained me at that

9       point in time, and then in the fall, the DOE had a

10      class and I took their class.

11          Q.  Did anyone from the DOE during the period of

12      time from September of '02 through May of '04 discuss

13      with you the chronic shortage of qualified skills

14      trainers on the Big Island?

15                  MR. USHIRODA:  Objection to the term

16      "chronic."  Vague and ambiguous.

17                  THE WITNESS:  I do not recall having any

18      particular discussion, but I lived with it.  I was

19      very aware of it.

20      BY MR. VARADY:

21          Q.  Yes, I understand that.  As the person who was

22      responsible for supervising people with certain skills

23      and being faced with the fact that you couldn't find

24      them in many instances, I understand that.

25                  But my question is, for example, did Mr. Rho

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1  ever say to you, you know, we can't find qualified

2  people and that's a chronic problem on the Big Island?

3              MR. USHIRODA:  Objection.  Lack of

4  foundation.  Assumes facts not in evidence.

5              THE WITNESS:  No.

6  BY MR. VARADY:

7      Q.  Any --

8      A.  He did not.  He did not.  I'm not even sure I

9  know who -- I mean, I know what his role is, but I'm

10  not sure I would recognize him.

11      Q.  Did any other people assigned to Bryan's case

12  or working at the DOE discuss it with you?  People

13  such as Kate Tolentino, Judith Radwick, and I could go

14  down the entire list, but I --

15      A.  Well, I was never called in for an appointment

16  in which we sat down and discussed this problem.

17  However, we discussed many things, and frequently, you

18  know, as a kind of tail end to some discussion there

19  might be a comment like it's really difficult to find

20  qualified people on this island.  It would be in that

21  type of format.

22      Q.  Now, looking at paragraph number 12, it -- it

23  refers to Naomi Shiraishi, Bryan's speech pathologist

24  and describes her as communicating with him through

25  American Sign Language.  Did you have direct

1        A.   Cafeteria worker, peer, anybody.

2        Q.   At this time did Bryan's teacher know American

3   Sign Language?

4        A.   You know, I really don't recall.  I don't

5   recall.

6        Q.   Looking at paragraph 14, it says that when

7   Bryan did not receive the number of skills trainer

8   hours specified in his IEPs from October 2003 through

9   February 2004, he regressed in a number of areas.  Did

10  I read that accurately?

11       A.   Yes.

12       Q.   Do you agree with that statement?

13                  MR. USHIRODA:  Objection.  Lack of

14  foundation.  Assumes facts not in evidence.

15                  THE WITNESS:  I agree that both those

16  things are true, whether they're causative or not, I

17  don't know that part, but he did not have the skills

18  trainer hours that he needed and there was notable

19  regression also in that period of time.

20  BY MR. VARADY:

21       Q.   Do you recall describing January of 2004 as

22  being chaotic in terms of --

23       A.   Yes, I do.  Yes, I do.

24       Q.   When you say you kept meticulous records on

25  the number of signs -- meticulous is probably my word,

1    I'm sorry, but I think you said accurate --

2        A.  Accurate.

3        Q.  -- accurate records on the number of signs

4    Bryan was -- was using at this time, do you know about

5    how many he was using in the period of, you know, '03

6    up through May of '04?

7        A.  That school year, '03-'04 school year?

8        Q.  Yeah, that school year.

9        A.  What I recall is that he really learned those

10   signs rapidly, I mean, and these are single words, but

11   he learned those signs rather rapidly, and I remember

12   that -- during that hearing, I think that was May, he

13   had well over a hundred, to be on the safe side.  It

14   was at least a hundred and maybe more than that, a

15   hundred-plus, which was quite good.

16       Q.  And has it been your experience, either with

17   sign -- children who are autistic who sign or who use

18   other alternative means of communication like the PECS

19   system, that that can lead to attempts at verbal

20   speech once they become more fluent in an alternative

21   mode of communication?

22              MR. USHIRODA:  Objection to the extent it

23   calls for speculation.  Lack of foundation and assumes

24   facts not in evidence.

25              THE WITNESS:  Sometimes it does, but

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1       A.  Yeah, Bryan's mom.

2       Q.  And did she actually give you a copy of it?

3       A.  You know, I'm trying to remember that.  I just

4   don't remember.  I just don't remember.  I do remember

5   talking about it and I kind of think she did, but I

6   don't really remember.

7       Q.  Would you agree that a toileting plan that was

8   implemented both in school, at the home, would be

9   helpful to Bryan at this time?

10      A.  Yes.

11      Q.  And would you agree that the lack of such a

12  plan would affect the ability of people to respond and

13  train him -- respond to and train him consistently in

14  that area?

15              MR. USHIRODA:  Objection.  Lack of

16  foundation.  Assumes facts not in evidence.  Calls for

17  speculation.

18              THE WITNESS:  Well, I thought we tried to

19  put together a plan, first of all, but that's my

20  recollection.  And yes, a consistent approach by

21  everybody would indeed be helpful.

22  BY MR. VARADY:

23      Q.  Now, looking at paragraph 16, and I'll give

24  you some time to look that over, because it's fairly

25  lengthy and I just want to ask you a couple questions

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    about it.

2            Have you had an opportunity to --

3        A.  Yes.

4        Q.  -- read that?

5        A.  I'm sorry.

6        Q.  Have you had an opportunity to read that?

7        A.  Yes.

8        Q.  Okay.  This describes regression in Bryan's

9    ability to understand and respect personal space

10    during the time period of fall '03 through the first

11    part of '04; is that correct?

12        A.  Yes.

13        Q.  Do you agree with the observations that are

14    made in this paragraph that describe Bryan's problems

15    in that area?

16            MR. USHIRODA:  Objection to the extent it

17    calls for speculation, lack of foundation.  Assumes

18    facts not in evidence.  Also overly broad.

19            THE WITNESS:  Bryan always had personal

20    space, personal property boundary issues.  It waxed

21    and waned.  It appeared to be getting better, and then

22    in this period of time that you're discussing, it went

23    downhill again.  And, you know, what I really remember

24    about that is putting together a plan for his home

25    especially, that's the one I remember, you know, where

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    structured environment, the whole environment is more

2    regulated.

3          At home, when one goes home, Bryan, like

4    everybody else, likes to kick back and, you know, not

5    have to function in such a structured environment.  So

6    it was more of a challenge, you know, at home.  And,

7    you know, there were more things for him to get into,

8    I mean because, you know, there are things in your

9    home that are not in school.  It was -- it was more of

10   a challenge at home.  It seemed to me that was where

11   the larger issue was.

12        Q.  And that was because of the reasons you've

13   identified, which is it's a different type of

14   environment, there are different stimuli, there's more

15   going on?

16        A.  There's more good stuff.

17        Q.  And -- and, you know, conversely, less --

18   because of that, less ability to control --

19        A.  To set up a structure, yes.

20        Q.  Could I ask you to turn to page 7, please.

21   Looking at page 7, the hearing officer on that page

22   concludes that Bryan, again, did not get the promised

23   skills trainer hours.  Would you agree with that

24   conclusion?

25                    MR. USHIRODA:  Objection.  Lack of

```
1    foundation.  Assumes facts not in evidence.  Calls for
2    speculation.
3                THE WITNESS:  My knowledge of the IEP and
4    what was there and what he got were not the same.  He
5    did not get the hours that were procured from the IEP.
6    BY MR. VARADY:
7         Q.  So there was a deficit?
8         A.  Yes.
9         Q.  Just going back to the home aspect of Bryan's
10   program for a minute, although it is more challenging,
11   I guess, would be the way of putting it, to
12   standardize procedures in the home because there are
13   more variables, that's not an impossible task, is it?
14        A.  I didn't believe so.  That's why I put
15   together a plan.
16        Q.  Okay.  And just as in the school consistency
17   across providers and environments would be important,
18   the same is true at home, the providers would have to
19   consistently implement the program that you put
20   together in order to make it more effective; isn't
21   that correct?
22        A.  That -- yes, that is correct.  The consistency
23   is, of course, very important in any of these plans
24   and is enormously challenging when you have so many
25   people involved to get everybody responding in the
```

1     same way, because it's not just the skills trainer.

2     Like I said, it's the cafeteria worker, it's, you

3     know, the principal, you know, it's the speech

4     therapist, it's the occupational therapist, it's --

5     it's his peers, it's the other skills trainers in the

6     classroom.  It's just a big cast.

7         Q.  And it's also complicated by turnover rates in

8     the skills trainer positions as well; is that correct?

9         A.  Yes, it certainly complicates it.

10     Q.  Now, looking on the same page, which is page 7

11    of the agreement, it states that the skills trainers,

12    the CFS, and that would be Child & Family Services,

13    nor TIFFE skills trainers had experience working with

14    autistic children; do you see that?

15     A.  No, where are you?

16     Q.  I'm sorry, it's the next to the last

17    paragraph, the sentence --

18     A.  Okay.

19     Q.  -- begins "neither -- neither the CFS nor

20    TIFFE skills trainers, TIFFE skills trainers had any

21    experience working with autistic children.  Do you see

22    that?

23     A.  Yes.

24     Q.  Do you recall that being the case during this

25    period of time?

1           MR. USHIRODA:  Objection.  Vague and

2    ambiguous.  Overly broad.  Lack of foundation.

3    Assumes facts not in evidence.

4    BY MR. VARADY:

5       Q.  Do you understand my question?

6       A.  I do understand your question.  I didn't hire.

7    I didn't -- I didn't go over resumés, so, you know, I

8    took what was given me, and so if they had experience

9    or not, probably would have come from my conversation

10   with them, and, you know, one person that I'm thinking

11   of did not have that experience, but she -- she taught

12   American Sign Language, and I think that was kind of a

13   tradeoff.  So I don't know from my own personal

14   experience that that was -- because I can't remember.

15      Q.  Do you remember that generally being a

16   problem, that is, finding skills trainers who had

17   experience working with autistic children?

18      A.  As I said before, it was always a problem.

19   That type of individual does not frequently move to

20   the Big Island.

21      Q.  You'll -- if I could just call your attention

22   up the page for one more point, it's numbered clause 3

23   in the first full paragraph.  It states that the DOE

24   failed to provide skills trainers who could

25   communicate with Bryan using American Sign Language.

1    Do you see that?

2            MR. USHIRODA:  I'm sorry, counsel, where

3    are you?

4            THE WITNESS:  Yes, say that again.

5    BY MR. VARADY:

6        Q.  On the top of page 7.

7        A.  Yes.  Number 2?

8        Q.  Number 3.

9        A.  Okay.  The skills trainers that came on during

10    that period of time, as I'm recalling this, did not

11    walk in the door knowing American Sign Language.  They

12    did, however, walk -- they were given some instruction

13    in that so they could communicate with Bryan using the

14    signs that Bryan used and trying to do select

15    frequency.  So -- so they could learn the signs

16    like -- that he used mostly at school, because he

17    didn't use them all equally.

18        Q.  All right.  I wanted to go back, though, to

19    what you had said just prior to that, which was the

20    skills trainers -- only one of the six skills trainers

21    working with Bryan had training prior to working with

22    him in American Sign Language, and she had no

23    experience working with autistic children; is that

24    correct?

25        A.  That is my recollection, but I don't -- I

79

1    methods, and ASL.  Do you see that?

2        A.  Yes.

3        Q.  Do you know if those criteria that the hearing

4    officer ordered were fulfilled by the DOE during the

5    period of the '0 -- you know, the '04 extended school

6    year?

7        A.  I don't recall that.  What I recall is that

8    we -- and we, I mean his team, kept on doing what we

9    were doing, and we kept on looking for people, we kept

10   on training people.  You know, exactly if that was

11   fulfilled, I do not recall.

12       Q.  Would your answer be the same for the order

13   that the hearing officer made in paragraph 2?

14       A.  Yes.

15       Q.  You understand that these criteria that the

16   hearing officer was ordering, that is the DTT, TEACCH

17   and ASL were methods designed to help Bryan meet his

18   goals and objectives?

19       A.  Yes.

20       Q.  And you understand that these were criteria

21   that were deemed important in that regard; is that

22   correct?

23       A.  Yes, yes.

24       Q.  Did the other team members understand that?

25   By other team members I mean the members of the IEP

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1      A.  Just what you said.  She had a stroke.  She

2    had some kind of chronic something, yes, I do recall

3    that now.

4      Q.  And she had a stroke and withdrew immediately

5    without being able to give notice for obvious reasons?

6      A.  She couldn't be there for obvious reasons.  I

7    don't remember any of the other particulars.

8      Q.  Then looking at page 67 of the testimony, this

9    is where it says someone became immediately ill, a

10   replacement was apparently found in December for that

11   particular skills trainer, but she stayed only two

12   weeks.  Do you recall that?

13     A.  Yes, I do.

14     Q.  And so there was a gap as a result of that; is

15   that correct?

16     A.  Yes.

17     Q.  Why did the replacement skills trainer leave,

18   do you recall?

19     A.  No.

20     Q.  And I believe your testimony is that you --

21   your testimony in the hearing was to the effect that

22   you were not able to find another skills trainer until

23   February; is that correct?

24     A.  Is that what I said?

25     Q.  And I'll point it out to you as we get to it,

89

1        A.  At that point in time.

2        Q.  Were those children also assigned skills

3    trainers?

4        A.  Yes.

5        Q.  And were those assignments filled, that is,

6    those positions filled during this period of time?

7        A.  I don't know.

8        Q.  Yeah, I would just call you back to page 67,

9    line -- lines 4 through 9.  This is how you can figure

10   out that you didn't find another skills trainer until

11   February, because you lost a replacement in December,

12   you're testifying in April, and you say that -- the

13   one who left in December did not really get replaced

14   till about six weeks ago.

15       A.  Okay.

16       Q.  Do you see that?

17       A.  Yes, I do.

18       Q.  Oh, Dr. Copeland --

19       A.  Oh, I'm sorry.

20       Q.  -- I'm being prompted to ask you to not put

21   that up too high, because it interferes with the

22   videography.

23           Now, when you say the things were chaotic, you

24   mean that -- can you describe what you mean, please.

25       A.  Well, really I can't remember exactly what I

1    meant.

2        Q.   Okay.  Didn't you mean that Bryan was having a

3    lot of problems?

4        A.   I -- I would assume, knowing how I use that

5    word, that there were many irregularities in

6    scheduling and that this didn't extend just to his

7    program -- or irregularities in scheduling and in

8    behavior maybe of other children in that classroom,

9    chaotic in the big sense of the classroom, is I think

10   what I meant.

11       Q.   And that was -- that chaos was affecting Bryan

12   in --

13       A.   It affected every child in the classroom.

14       Q.   So your answer would be yes it did affect him;

15   is that correct?

16       A.   Yes.

17       Q.   Now, on page 67 you talk about your work with

18   the skills trainers, and you say that you would train

19   them in managing Bryan's behavior and in doing DTT and

20   TEACCH tasks, that curriculum, and his academic work.

21   Is that an accurate statement?

22       A.   Yes.

23       Q.   Now, are you certified to train people in the

24   TEACCH methodologies?

25       A.   No.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

91

1      Q.  Does TEACCH require certification in order to

2   conduct trainings in TEACCH methodologies?

3      A.  You can be -- you can go the certification

4   route.  In reality, that's a methodology that's used a

5   lot, I think on the Big Island especially, where

6   people train each other.

7      Q.  If I understand what you're saying, TEACCH

8   does offer certification?

9      A.  Yes, it does.

10      Q.  But there are people who are familiar with

11   TEACCH methodologies, including yourself, who are --

12   who were using it on the Big Island at that time, but

13   who were not so certified?

14      A.  Right.  I should say, actually, Bryan didn't

15   use TEACCH very much.  It just wasn't as applicable to

16   him as some other things.  What was more customary is

17   that, you know, the DOE sends someone to a TEACCH

18   certification program and then they come back and

19   share what they've learned.

20      Q.  Now, on page 68, after you describe having six

21   children that you were working with at that time who

22   were more difficult than Bryan, you were asked by Ms.

23   Kam about the turnover of skills trainers in the past

24   eight to nine months.  Do you see that?  That's at

25   line 13 -- beginning on line 13 on page 68.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1        A.  Yes.

2        Q.  And you told her that you had been working

3   with Bryan for 18 months and during that period of

4   time you had 12 different skills trainers and one

5   educational aide.  Do you see that?

6        A.  Yes.

7        Q.  An educational aide is not someone with

8   paraprofessional skills; is that correct?

9        A.  It's an employee of the DOE that has some

10  skills.  I don't know what they do to train that

11  person.

12       Q.  Would you agree that as a result of having 12

13  different skills trainers and one EA in an 18-month

14  period, that that created problems of consistency in

15  implementing Bryan's program?

16            MR. USHIRODA:  Objection to the extent

17  it's overly broad --

18            THE VIDEOGRAPHER:  Your microphone.

19            MR. USHIRODA:  Objection to the extent

20  that it's overly broad, vague, ambiguous, assumes

21  facts not in evidence and lacks foundation.

22            MR. VARADY:  Do you understand the

23  question?

24            THE WITNESS:  Would you repeat it.

25  BY MR. VARADY:

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1     Q.  Yeah.  That having 12 different skills

2    trainers and an -- and an EA in 18 months presented

3    problems for you in consistently implementing Bryan's

4    program?

5               MR. USHIRODA:  Same objections.

6               THE WITNESS:  Yes.

7    BY MR. VARADY:

8     Q.  And you point out, in fact, on page 69 that

9    pages -- I'm sorry, lines 6 through 9 that only two

10   skills trainers out the 12 had some experience working

11   with autistic -- an autistic child; do you see that?

12    A.  Yes.

13    Q.  Did that also present problems for you as the

14   person who was responsible for implementing Bryan's

15   educational program?

16              MR. USHIRODA:  Objection.  Vague and

17   ambiguous as to "problems."  Lack of foundation.

18   Assumes facts not in evidence and lacks -- calls for

19   speculation.

20             THE WITNESS:  Not necessarily.  As I said

21   before, some people are quite trainable and what

22   experience they bring easily transfers, you know, to

23   working with autistic children.

24   BY MR. VARADY:

25     Q.  And so would you agree with the statement,

```
 1    then, that you can train people to work with Bryan if

 2    given adequate time and the proper supports?

 3        A.  And the proper person.

 4        Q.  Right.  Your answer would be yes.

 5        A.  With the proper person.

 6        Q.  Now, were all of these 12 people the proper

 7    person?

 8        A.  Sir, my problem is I don't remember the 12

 9    people.  This is a number to me, and I don't remember

10    who they are, so it's very hard for me to answer that

11    question.

12        Q.  Okay.  Would you agree that as a general

13    matter that this was a high level of turnover, that

14    is, 12 different skills trainers, in an 18-month

15    period?

16                MR. USHIRODA:  Objection.  Lack of

17    foundation.  Assumes facts not in evidence.  Calls for

18    speculation.  Also vague and ambiguous.

19                THE WITNESS:  It is a high level,

20    probably not the only child.  There were a couple

21    others that also had -- I don't know if it was this

22    high, but they did have some turnover because there

23    are other variables involved, you know, if they're

24    aggressive and where do they live is actually also an

25    important variable, how far someone has to travel to
```

1    get to them, so there is -- there's always turnover

2    with high needs child.  There just is, there just is.

3    Is this excessive?  12 did seem like a lot to me.

4    BY MR. VARADY:

5        Q.  And that's based on your experience?

6        A.  That's based on my experience.  It did seem

7    like a lot, although, again, any child with the kind

8    of needs that Bryan presented, you can pretty much

9    expect there's going to be a fair level of -- a higher

10   level of turnover than with other children, and you

11   can expect that it will be difficult to find

12   replacements because they are challenge -- especially

13   challenging children, and because we live in a place

14   where the resources was quite limited.

15       Q.  Now, this is the point at which where I think

16   you actually identify that significant progress you

17   talked about in -- in Bryan's signing, and you state

18   that when you started working with him, and I assume

19   that that means when you started working with him in

20   September of '02, he had about six signs, and by the

21   time you were testifying here in April of '04 he had

22   about 140 signs.

23       A.  That's right.  That's what I said.

24       Q.  And so you would consider that -- I think you

25   described that as a significant progress?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    looking at about him working on sight reading and

2    other skills during the same period of time, it wasn't

3    just signing or the functional skills that we were

4    talking about before, he was working on other things

5    like sight reading and some simple math and -- in the

6    form of counting and identifying numbers and what not;

7    is that correct?

8        A.   That is correct.

9        Q.   And I think you've confirmed on page 77 again

10   that he did in fact develop a sight vocabulary; do you

11   recall that?

12       A.   Do I recall that he did?

13       Q.   Yes.

14       A.   Or do I recall that I said that.  He did, he

15   did.  It wasn't extensive, but he did.

16       Q.   Do you believe that these skills would have

17   developed more if he had had consistent skills trainer

18   hours over that period of time from September of '02

19   to May of '04?

20                   MR. USHIRODA:  Objection to the extent it

21   calls for speculation.  Also lacks foundation.

22   Assumes facts not in evidence.

23                   THE WITNESS:  Having appropriate

24   teachers, and in a sense a skills trainer is a

25   teacher, always strengthens a child's opportunity and

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1          And that was something that you found worth

2     remarking on at this hearing?

3          A.  It was, I repeat, it was very exciting.

4          Q.  And my question is with the -- with a more

5     consistent approach during that period of time, do you

6     have an opinion as to whether or not it would have

7     been possible for him to make more progress?

8                    MR. USHIRODA:  Again objection to the

9     extent it calls for speculation.  Lack of foundation.

10    Also assumes facts not in evidence.

11                    THE WITNESS:  I am not comfortable making

12    a causal relationship.  I have to remember that in all

13    of this change, it's really when he began developing

14    those 20 words.  However, with that inconsistency it

15    certainly is the first thing you see, and the first

16    thing I would want to address so that we can organize

17    and direct, tighten, you know, his program.

18    BY MR. VARADY:

19         Q.  And you've already testified about the fact

20    that the program, his program, that is Bryan's

21    particular program needs to be highly structured; is

22    that correct?

23         A.  Yes.

24         Q.  And that there needs to be consistency from

25    person to person in implementing that structure?

```
 1        A.   It works best, yes.

 2        Q.   And it requires the use of the same

 3   techniques, the same prompts?

 4        A.   As nearly as you can, and I ask you,

 5   counselor, to keep in mind we are dealing with a cast

 6   of characters and it was very challenging to have that

 7   consistency.

 8        Q.   And -- and wouldn't it also require ongoing

 9   training and ongoing --

10        A.   Yes.

11        Q.   -- feedback amongst the set of people who are

12   implementing the program?

13        A.   Yes, and to that end, we met weekly so that we

14   reviewed -- during this particular year, we met weekly

15   on Monday at noon, I remember that well, and reviewed

16   his -- his entire program, and I believe there were

17   usually two skills trainers there, the teacher, me, I

18   can't -- maybe the speech therapist, or whoever could

19   show up, and we went through his program, and it's,

20   you know, this worked, that didn't work, let's try

21   using colored numbers instead of black, whatever we

22   needed to do to kind of tweak his program for the very

23   reason you said, because sort of all being on the same

24   page was an important thing.  And a difficult

25   challenge.
```

1              MR. USHIRODA:  Objection.  Lack of

2    foundation.  Assumes facts not in evidence.  Also

3    misstates prior testimony.

4              THE WITNESS:  I don't know about that.  I

5    know Dr. Bolton did some, and the thing with a

6    functional behavioral analysis, particularly with a

7    child like Bryan, is it changes.  You know, the one

8    you did in April, unfortunately doesn't apply in July

9    because he has changed and the environment has

10   changed.  So, you know, I can't really tell you like

11   when the most recent formal functional behavioral

12   analysis was done.

13   BY MR. VARADY:

14       Q.  Do you know -- are you aware -- I guess my --

15   just to ask you a couple more questions on that, are

16   you aware of seeing one before Dr. Smalley's?

17       A.  I don't -- I don't really remember.  I

18   remember that my whole work with him was doing small

19   ones.

20       Q.  So my question, though, is do you recall

21   seeing a formal detailed written plan like Dr.

22   Smalley's August 2004 plan before that, in between the

23   time you started working with Bryan in September of

24   '02 up to August of '04?

25       A.  I don't remember seeing one, but I also don't

1    toileting skills."  Do you see that?

2       A.  Yes.

3       Q.  Then you go on to say:  "If he cannot be

4    someplace in public because of his behavior, he does

5    not have toileting skills, his life will be very

6    narrow."  Do you see that?

7       A.  Yes, I do.

8       Q.  So -- and then you go on to say:  "Those two

9    things will eliminate a lot of activities for him, so

10   that's what we keep in mind."  Do you see that?

11      A.  Yes.

12      Q.  So those -- those two issues, and that is

13   negative behaviors and in particular the toileting

14   skills, were significant concerns at that time that

15   you believed, if they were not addressed properly,

16   would limit Bryan's ability to function in the

17   community?

18      A.  Yes.

19      Q.  And that's why you were testifying about this

20   at the hearing and making a point that those issues

21   needed to be addressed in order for him to reach a

22   level of functionality that you believed he could; is

23   that correct?

24              MR. USHIRODA:  Objection.  Leading.

25              THE WITNESS:  I believed that in order

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1          Q.  Do you disagree that this was reasonable -- a

2     reasonable accommodation for Bryan?

3               MR. USHIRODA:  Objection to the extent it

4     calls for speculation.  Also vague and ambiguous as to

5     accommodation.

6     BY MR. VARADY:

7          Q.  Do you understand my question?

8          A.  Yes, I do.  And it -- it may be -- well,

9     they've used the word "proficiency," that bothers me.

10    I'm not sure that they needed to be proficient in

11    American Sign Language.  I didn't feel that.  That's

12    not a word I would use.

13         Q.  What word would you use?

14         A.  What word would I use?  I would say and can

15    accommodate the use of American Sign Language in his

16    instruction.

17         Q.  With that qualification, do you believe that

18    this was a reasonable --

19         A.  Certified special ed teacher, experienced

20    teaching autistic children, yeah, I would --

21               MR. USHIRODA:  Let me just place an

22    objection to the extent it calls for a legal

23    conclusion.  Go ahead.

24               THE WITNESS:  It seems to me that it's a

25    kind of typical requirement.  Certified special ed

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1                    MR. USHIRODA:  Same objections.

2                    THE WITNESS:  The need to meaning we need

3        to?

4        BY MR. VARADY:

5            Q.  Yes.

6            A.  Yes, we need to implement a consistent program

7        that crosses his day.

8            Q.  Right.  And across his platform, so in school,

9        in the community, in the home, the program needs to be

10       consistent?

11           A.  Seamless, as they say.

12           Q.  So to the degree that it was not, Bryan's

13       parents' concerns about that would be legitimate

14       concerns; isn't that correct?

15                   MR. USHIRODA:  Objection.  Same

16       objection.  Calls for speculation.  Looking into the

17       minds of other people, lack of foundation, assumes

18       facts not in evidence.  Also calls for a legal

19       conclusion.

20       BY MR. VARADY:

21           Q.  Do you understand my question, Dr. Copeland?

22           A.  Yes, yes.

23               Any time a program isn't being implemented in

24       the way it was intended or agreed upon, a strong

25       advocate parent of course is going to be concerned

134

1          A.  Please.

2          Q.  I'm sorry.

3                    MR. USHIRODA:  Let me just put in an

4     objection.  Lack of foundation.  Assumes facts not in

5     evidence.  I don't think it's been established that

6     this witness has seen this letter before.

7     BY MR. VARADY:

8          Q.  Have you had sufficient opportunity to read

9     the letter?

10         A.  Yes.  Yes.

11         Q.  Do you recall these incidents that are

12    described in here in which Bryan was attacked by a

13    student in his class?

14                    MR. USHIRODA:  Again, lack of foundation,

15    assumes facts not in evidence.

16                    THE WITNESS:  Vaguely.

17    BY MR. VARADY:

18         Q.  Would you agree that by being attacked on more

19    than one occasion in class it might cause Bryan to

20    become more aggressive?

21                    MR. USHIRODA:  Objection.  Lack of

22    foundation.  Assumes facts not in evidence.  Improper

23    hypothetical.  Also calls for speculation.

24                    THE WITNESS:  That is possible.

25    BY MR. VARADY:

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

139

1      A.  Okay.  So we were kind of on our own trying to

2   put this together.  Okay.

3      Q.  All right.  But it seems clear to me from this

4   letter that the experience at that time was that the

5   parents were trying to do -- whatever the plan was,

6   good, bad or indifferent, the parents were trying to

7   do it and were concerned about the fact that whatever

8   the plan was, wasn't being followed in school.

9                  MR. USHIRODA:  Objection to the extent it

10   calls for speculation.

11   BY MR. VARADY:

12      Q.  Do you recall that?

13      A.  I don't recall the not following in school

14   part.  What I really recall more is this particular

15   skills trainer and her difficulty in getting it.  That

16   I -- that I recall.  The school, it may have been.  I

17   just don't remember.

18      Q.  I'm not trying to assign to the school the

19   fact that it wasn't being implemented.  I'm saying

20   while he was at school, whether it was the skills

21   trainer or the teacher or both of them or, you know, a

22   combination of other people who were responsible, the

23   concern was that it wasn't being -- whatever the plan

24   was it was not being implemented at school.

25                  MR. USHIRODA:  Objection.  Asked and

1    answered, lacks foundation, assumes facts not in

2    evidence.  Argumentative.

3                    THE WITNESS:  It was not being equally

4    implemented.  Implementation was always a huge

5    problem, and, yes, getting plans that were implemented

6    at home and were implemented at school, you know, on

7    the same -- was always hard, and I really don't

8    remember that, but it was not -- it would fit.  It was

9    usually a problem.

10   BY MR. VARADY:

11       Q.  And --

12                   MR. USHIRODA:  I'd ask the witness not to

13   speculate or guess.

14   BY MR. VARADY:

15       Q.  Now, looking at paragraph 3, Kim actually

16   refers to Dr. Smalley in that paragraph, do you see

17   that?

18       A.  Uh-huh.

19       Q.  Did you contact Dr. Smalley after receiving

20   this letter?

21       A.  No.

22       Q.  Did --

23       A.  I don't -- I don't remember that I did.

24       Q.  Okay.  Did anyone from the DOE represent to

25   you that after this letter was written, Dr. Smalley

```
1    parents' concerns that Richi, the skills trainer, had

2    not been honest with them or direct about wanting

3    Bryan to come home?

4                    MR. USHIRODA:  Objection.  Misstates

5    document.  Also lacks foundation.

6                    THE WITNESS:  Would you repeat your

7    statement, please.

8                    MR. VARADY:  Could you read it back.

9                    (Record read.)

10                   MR. USHIRODA:  Same objections.  Also

11   assumes facts not in evidence.  Lacks foundation.

12   Also calls for speculation.

13                   THE WITNESS:  I would agree that there

14   was very poor communication between Richi and these

15   parents and that was long standing and this is a

16   pretty good example of it.

17   BY MR. VARADY:

18       Q.  And would you also agree that good

19   communication between the skills trainers and parents

20   is more likely to produce a successful outcome in

21   Bryan's program than bad communication?

22                   MR. USHIRODA:  Objection.  Lack of

23   foundation.  Assumes facts not in evidence.  Taking

24   one isolated incident out of context.  Also calls for

25   speculation.
```

1      A.  Not that I recall.

2      Q.  This letter expresses certain concerns about

3  the implementation of Bryan's program at a time when

4  you've already testified there were some difficulties

5  in obtaining and maintaining skills trainers; is that

6  correct?

7      A.  Yes.

8              MR. VARADY:  Go ahead, counsel, do you

9  have a late objection?

10             MR. USHIRODA:  No objection now, just on

11  the lack of foundation regarding this document.

12  BY MR. VARADY:

13     Q.  Did -- at any time did you consult with the

14  parents regarding content of any advertisements that

15  they might put in paper; in other words, did they say,

16  gee, what should we ask for?  How do we word this?

17     A.  No.

18     Q.  Anything to that effect?

19         This will be Exhibit Number 13.

20             (Exhibit No. 13 marked.)

21  BY MR. VARADY:

22     Q.  This document appears to be an email dated

23  September 27, 2004, an exchange of emails between

24  Kelly Stern and Kate Tolentino.

25         Have you seen this email before?

1      A.  No.

2      Q.  This email discusses someone named Danielle

3  and someone named Sven; do you see that?

4      A.  Yes.

5      Q.  Do you know who they are?

6      A.  Yes.

7      Q.  Who are they?

8      A.  They were two skills trainers.

9      Q.  And they were skills trainers assigned to

10  Bryan's case in September of 2004; is that correct?

11      A.  They were assigned to his case.  I guess it

12  was September, I don't know.

13      Q.  Now, do you recall Sven's last name?

14      A.  No.

15      Q.  Do you recall Danielle's last name?

16      A.  No.

17      Q.  Do you recall training either of them?

18      A.  I recall coaching them.

19      Q.  Okay.  Could you distinguish for me between

20  coaching and training?

21      A.  Training, for me, is when you have time away

22  from the child so you can talk and go over maybe the

23  theory behind this and demonstrate how you do it, like

24  with DTT, for example.

25          Coaching is more we're on the scene and they

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    friend, you know, can he jump over the wall, those

2    kinds of questions, and then it's scored based on

3    that.

4        Q.  Now, would you turn to the second page where

5    the summary and educational implications are listed,

6    that would be page DOE 1231.

7        A.  Yes.

8        Q.  Now, mid paragraph where it says summary and

9    educational implications, the sentence begins "he

10   manages," do you see that, "he manages all clothing

11   including most fasteners with prompting for

12   orientation."  Do you see that?

13       A.  Yes.

14       Q.  That was true in September of 2002; is that

15   correct?

16       A.  Yes.

17       Q.  It states:  "He is toilet regulated, sometimes

18   going independently between time schedule with

19   infrequent accidents."  Do you see that?

20       A.  Yes.

21       Q.  Was that true in September of 2002?

22       A.  My recollection for that period of time was I

23   think he came to school with a diaper, since it was a

24   long bus ride, which was removed when he got to

25   school, and he -- I remember him going by himself,

1    honestly don't remember what happened to that thought.

2    BY MR. VARADY:

3        Q.  DD would be developmental --

4        A.  Developmental Disabilities.

5        Q.  That's a different department than the

6    Department of Education?

7        A.  Yes, that's from the Department of Health.

8        Q.  All right.  And so both you and Dr. Smalley

9    were aware that the Developmental Disabilities

10   division might be able to provide a night monitor

11   under certain circumstances?

12       A.  That was what we thought.

13       Q.  You -- you knew at that time that both Kim and

14   Stan were working full time; is that correct?

15       A.  That's right.

16       Q.  And they had to sleep at some time during the

17   day; is that correct?

18       A.  That's right.

19       Q.  Or night, I guess, is the point.  And -- and

20   that what was needed, according to her, was someone

21   who could be a night monitor to cover this toileting

22   plan 24 hours a day so that Bryan could really

23   self-regulate at night, which was his biggest

24   problems; is that right?

25       A.  Yes.

1      is it's not just as easy as it may sound where you

2      just sign up for those services, but it was discussed.

3      BY MR. VARADY:

4          Q.  Do you disagree with Dr. Smalley's assertion

5      in here that Kim and Stan were not doing anything

6      wrong regarding Bryan's toileting program?

7                    MR. USHIRODA:  Objection.  Argumentative.

8      Lack of foundation.  Assumes facts not in evidence.

9      Also calls for speculation.

10                   THE WITNESS:  I was not aware of anything

11     they were not doing that they could have been doing.

12     BY MR. VARADY:

13         Q.  All right.  She concludes with stating:  "Once

14     data is collected or nighttime personal assistance

15     identified, I would be happy to provide any further

16     consultation that might be useful."  Do you see that?

17         A.  Yes.

18         Q.  Do you know if there was any further

19     consultation with Dr. Smalley by the DOE or anyone

20     else regarding the toileting program?

21         A.  I'm a little confused as to the time, because

22     this would suggest that Dr. Smalley came at the first

23     part of the year, like March or February or something,

24     and that little addendum that I had would also suggest

25     that she was here because we saw two students, and

1    April 7th, 2004.  That would have been after the March

2    24th, 2004 date on the prior copy.

3       A.  Yes, uh-huh.

4       Q.  Do you recognize that received stamp?

5       A.  No.

6       Q.  Who got copies of this toileting plan?

7           MR. USHIRODA:  Objection.  Calls for

8    speculation.

9    BY MR. VARADY:

10       Q.  I don't want you to speculate.  I just want

11    to --

12       A.  I really don't remember.

13       Q.  Would -- would the skills trainer have had a

14    copy?

15       A.  No, no, the skills trainer would most likely

16    not have had a copy.  What they would have had from me

17    would be step one, two and three, and this is what

18    we're doing and this is why we are going to do it.

19    Skills trainers did not usually have this type of

20    document.

21       Q.  You'd agree that in order for Bryan to

22    function in the community, he has -- he has to learn

23    to self-regulate generally; is that correct?

24           MR. USHIRODA:  Objection to the extent it

25    calls for speculation.  Lack of foundation.  And

1    but that would be it.

2    BY MR. VARADY:

3         Q.  So this was never formally discussed, that's

4    what you're saying?

5         A.  With me.

6                   (Exhibit No. 18 marked.)

7    BY MR. VARADY:

8         Q.  Let me show you Exhibit Number 18 now.  This

9    is a memo from The Institute for Family Enrichment

10   dated Wednesday, September 15th, 2004 addressed to

11   Mr. Rho.  Do you see that?

12        A.  Yes.

13        Q.  And it's unsigned, but bears the signature

14   block of Kelly Stern.  Do you see that?

15        A.  Yes.

16        Q.  Who's Kelly Stern?

17        A.  Kelly was the program director, I think was

18   her title, for TIFFE, and it was her job to recruit

19   and assign the skills trainers to different students,

20   and she took care of all of the administrative

21   portions of their employment.

22        Q.  By this time you were also working for TIFFE;

23   is that correct?

24        A.  What was it?  What was the date here?  Yes.

25        Q.  So was Kelly Stern also your supervisor or

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    the school wasn't open?

2         A.  Well, they --

3                  MR. USHIRODA:  Objection.  Lack of

4    foundation.

5                  THE WITNESS:  -- the weekend, we had kind

6    of a different plan for the weekend.  I'm talking

7    about like a federal holiday when the school isn't

8    open.

9    BY MR. VARADY:

10        Q.  Okay.

11        A.  But I believe he had services, and so then

12   that would become more problematic.

13        Q.  So it was more problematic on those types of

14   days because Bryan was supposed to be getting services

15   even though they were on a holiday?

16        A.  Even though the school was closed, yeah.

17        Q.  Now, this is another TIFFE memo.  It's Exhibit

18   Number 19.

19                  (Exhibit No. 19 marked.)

20   BY MR. VARADY:

21        Q.  Now, the first -- first of all, have you seen

22   this memo before today?

23        A.  No, I have not.

24        Q.  All right.  Again, it's on TIFFE letterhead,

25   September 15th, 2004, addressed to JoAn Hill regarding

1    community.  Were you aware of that at this time?

2        A.  I -- I was aware.  That was her whole

3    philosophical kind of base.  She liked taking children

4    out into the community.  That's what they did in New

5    York, that's what she wanted to do here.  That, again,

6    was her philosophical approach.

7        Q.  And if she was taking Bryan out into the

8    community, she wouldn't be working on the goals that

9    you had described and that Kim Smalley had identified,

10   both with regard to toileting and the functional

11   in-home skills such as cleaning, laundry, food

12   preparation; isn't that correct?

13            MR. USHIRODA:  Objection.  Lack of

14   foundation.  Assumes facts not in evidence.  Misstates

15   prior testimony.

16            THE WITNESS:  If she was in the

17   community, she could have been working on the

18   toileting, not exactly like that plan, but being able

19   to let someone -- to be able to -- for Bryan to state

20   that he needed to use the bathroom.  The goals in the

21   community were different.  I mean, we had a different

22   set of goals for the community, so if she was in the

23   community, she would be expected to address some

24   safety issues, you know, being able to be in a store

25   without grabbing things off the shelf, that sort of

1    thing.  It's a different set of goals.

2    BY MR. VARADY:

3        Q.  But wouldn't you agree that to the degree that

4    she doesn't want to be in the home and that she has

5    this philosophical bent for being out in the

6    community, not collecting data, but doing other things

7    that she thinks are appropriate, that she's not acting

8    in a manner that's consistent with the goals and

9    objectives that have been identified or the specific

10   plans that have been identified for reaching those

11   goals and objectives?

12              MR. USHIRODA:  Objection.  Lack of

13   foundation.  Assumes facts not in evidence.  Misstates

14   prior testimony.  Overly broad.  Also constitutes

15   testimony my counsel.

16              THE WITNESS:  If Danielle was in the

17   community and she was addressing -- she would be

18   addressing community goals.  Obviously if she's in the

19   community, we're not addressing the home functional

20   goals.

21   BY MR. VARADY:

22       Q.  Well --

23       A.  There were -- we did have some community

24   goals.  She became a better data taker, but she was

25   not especially consistent with that.

1      Q.  Well, you saw the prior email in which Kelly

2  Stern is talking about whether or not she is going to

3  have continued employment, that is Ms. Doucette.

4              MR. USHIRODA:  Well --

5              MR. VARADY:  Gregg, let's go off the

6  record for just a minute, please.

7              THE VIDEOGRAPHER:  Off the record.  3:37

8  p.m.

9                 (Off the record.)

10            THE VIDEOGRAPHER:  Back on the record.

11  It's 3:38 p.m.

12            MR. USHIRODA:  I just want to put on the

13  record that while we were on the break counsel used

14  profanity towards me and accused me of interrupting

15  his deposition.  You know, that kind of behavior is

16  just not tolerated, counsel.  There's no call for

17  swearing at me or using profane language.

18           I'm make -- stating my objections for the

19  record.  I don't believe I'm engaging in any speaking

20  objections.  I've stated my objections.  Once they're

21  done, I haven't told her not to answer.  I mean,

22  you're free to conduct your deposition.  I'm here to

23  pro -- state my objections.

24            MR. VARADY:  Okay.  Let's just go for it.

25  You keep coaching the witness and interfering with my

1    BY MR. VARADY:

2        Q.  Now, even with Ms. Doucette accusing the

3    parents of having an unsanitary home, the parents

4    still permitted her to serve as a skills trainer in

5    the school; is that correct?

6        A.  Yes.

7        Q.  How long did she do that?

8        A.  I don't know.

9        Q.  How long did you continue to serve as the

10    IISC?

11       A.  Until Bryan left.

12       Q.  Okay.  Did Ms. Doucette serve a similar time,

13    that is, from the beginning of the school year,

14    '04-'05 school year until January when Bryan left?

15       A.  My recollection is that she was not working

16    with him that, maybe, December, January, although,

17    again, I could be mistaken.

18       Q.  I'm just -- again, Dr. Copeland, only your

19    best recollection.

20       A.  My best recollection is that she was not

21    involved at the end of that.

22       Q.  I'm only asking you for the probabilities, the

23    best recollection you have --

24       A.  Thank you.

25       Q.  -- not certitude.

197

```
 1                (Exhibit No. 20 marked.)

 2     BY MR. VARADY:

 3          Q.  This is Exhibit Number 20.  It's a chart.

 4     It's addressed to Mr. Rho, again on TIFFE letterhead.

 5     And it looks like a chart of skills trainers from May

 6     to September serving Bryan Wiles-Bond.  Do you see

 7     that?

 8          A.  Yes.

 9          Q.  Have you ever seen this document?

10          A.  I believe it was among those that I saw with

11     Mr. Ushiroda.

12          Q.  Now, if you look at the summary statement at

13     the bottom of the second page.

14          A.  Uh-huh.

15          Q.  It says:  "All these skills trainers except

16     Lee Mitchell have received direct supervision and

17     support from Dru Copeland on the days she is in the

18     classroom."  Do you see that?

19          A.  Yes.

20          Q.  All right.  First of all, is that an accurate

21     statement, that you provided direct supervision to all

22     of these skills trainers on days when you were in the

23     classroom?

24          A.  On days I was in the classroom, yes.

25          Q.  Okay.  How many days would that be per month?
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1        Q.  Okay.

2        A.  -- coaching, observing, if there's an

3    opportunity to talk with them a little privately,

4    going over, asking to see their data, checking to see

5    that they've taken it.

6        Q.  Now, looking at the next sentence where it

7    says each skills trainer must attend group supervision

8    one time a month for two hours; do you see that?

9        A.  Yes.

10       Q.  What does that refer to?

11       A.  Each skills -- there's a group -- there was a

12   group supervision for all of the skills trainers once

13   a month that lasted two hours.

14       Q.  But, I'm sorry, what is a group supervision?

15       A.  Oh, I beg your pardon.  Group supervision is

16   when all of the skills trainers come together in a

17   group and have supervision in a group setting.

18       Q.  All right.  And who is providing the

19   supervision?

20       A.  Kelly provided the first hour, which dealt

21   with the administrative kind of issues.  I dealt with

22   the last hour, which dealt with what we call clinical

23   issues.  And we might address such things as working

24   with other personnel in the school.  We might --

25   global things that applied to everybody:  collecting

1    data, super -- responding to supervision, we -- we

2    would do some kind of case scenarios, sometimes a lot

3    of ethical kinds of things, confidentiality,

4    boundaries, having appropriate boundaries between

5    themselves and the family, and, you know, themselves

6    and the school and themselves and other skills

7    trainers in the room.  Those more general clinical

8    issues were addressed in the group, where it applied

9    to everybody.

10        Q.  Am I correct that it was you and the skills

11   trainers in that particular type of group?  It did not

12   include their students?

13        A.  No, no students.

14        Q.  So you and the skills trainers would be

15   participating --

16        A.  Yes.

17        Q.  -- in that kind of group activity; is that

18   correct?

19        A.  Yes.

20        Q.  Where was that conducted?

21        A.  At the TIFFE office.

22        Q.  All right.  Did Ms. Stern consult with you

23   before preparing this chart, do you know?

24        A.  No.

25        Q.  And do you recall seeing it before

1    Mr. Ushiroda showed it to you?

2        A.  No, I have not seen it.

3        Q.  This indicates that Mr. Lindermann, for

4    example, watched DTT, TEACCH, and PECS videos before

5    hire.  Do you see that?

6        A.  Yes.

7        Q.  Was that the extent of his training in those

8    areas before he was retained; do you know?

9        A.  I do not.

10                   MR. USHIRODA:  Objection.  Calls for

11    speculation.

12                   THE WITNESS:  I do not know.

13                   (Exhibit No. 21 marked.)

14    BY MR. VARADY:

15        Q.  This is Exhibit Number 21.  This is a

16    four-page letter to JoAn Hill and bearing the

17    signature block of Kelly Stern.  Do you see that?

18        A.  Yes.

19        Q.  Do you recognize her signature?

20        A.  Yes.

21        Q.  Have you seen this document before today?

22        A.  I saw it in Mr. Ushiroda's office.

23        Q.  Okay.  Do you recall ever seeing it prior to

24    that?

25        A.  I did not see it prior to that.

1    as sick when he didn't -- when he was miserable and

2    not feeling well enough to do his work?

3        A.  Would you restate that, please.

4            MR. VARADY:  Could you read it back,

5    please.

6            (Record read.)

7    BY MR. VARADY:

8        Q.  Was it your understanding that it was -- I'll

9    restate the question, because it's -- it's confusing.

10           My question is:  Was it your understanding

11   that Ms. Stern was suggesting that Bryan should go

12   home as sick on days when he was miserable and

13   refusing to work?

14       A.  I do not --

15           MR. USHIRODA:  Objection to the extent it

16   calls for speculation.

17           THE WITNESS:  I don't know what Ms. Stern

18   meant, but it does sounds like that's what she's

19   saying in this letter, in this document.

20   BY MR. VARADY:

21       Q.  She didn't -- after sending you a copy of it,

22   she did not talk to you about it?

23       A.  I don't remember getting a copy of this.

24       Q.  Is it possible that you're shown as receiving

25   a copy but you did not get a copy?

                RALPH ROSENBERG COURT REPORTERS, INC.

1    Q. As to the functional behavioral analysis or

2    the behavioral support plan, do you recall seeing

3    either of those in January of '03?

4    A. No.

5    Q. It says each of the activities of the skills

6    trainers would be tied to Bryan's IEP. Had that been

7    a problem before January of '03?

8                    MR. USHIRODA: Objection. Assumes facts

9    not in evidence. Lack of foundation.

10                   THE WITNESS: I do not know if it had

11   been a problem or not, but what I do know is that I

12   felt very strongly about his after school time being

13   used effectively, and that we shouldn't just go

14   wander, you know, that if -- if one of his goals was,

15   you know, that he would interact with another child,

16   we must make sure that he's interacting with another

17   child. I think that's what that reflects.

18   BY MR. VARADY:

19   Q. Who are Sheri Adams and Mahea Edwards?

20   A. Sheri Adams was the speech pathologist hired

21   by the district -- at the direct level, and Mahea

22   Edwards was the, what do they call her, classroom

23   consultant, classroom resource teacher at the district

24   level.

25   Q. Had there been instances prior to January '03

1      Q.  So were the particulars of this behavioral

2   assessment discussed at that meeting?

3      A.  She went over it pretty much line by line.

4      Q.  And was the origin of this assessment

5   discussed?  In other words, why she had done it?

6      A.  No.

7      Q.  Was there anything in this assessment with

8   which you did not agree when you heard it presented by

9   Dr. Smalley?

10              MR. USHIRODA:  Objection.  Overly broad.

11              THE WITNESS:  The part I didn't agree

12   with, it wasn't particularly anything that she said.

13   There's so much there that it didn't give me, or, I

14   thought, the team, the kind of precise direction that

15   we needed.  And I was just looking at page 8, where

16   under alternative behaviors, you know, appropriate

17   behaviors that may be taught or reinforced that can

18   replace those, those behaviors were a problem.  I

19   mean, he didn't really quite understand choice, and if

20   you look at some of the things, you know, I guess you

21   have all those documents, we set up a little program

22   to just understand if you take this, that means you

23   don't get that.  You know, all of these were kind of

24   problems, so you couldn't just take this and use it as

25   a replacement behavior.

```
 1      Q.  So it was used by the team in working with

 2   Bryan, that is, the information set forth in this

 3   behavioral assessment?

 4      A.  Yes.  Pieces and parts of it were used.

 5      Q.  Now, looking at page DOE 1945, it says that

 6   Bryan needs a lengthy and comprehensive crisis plan.

 7      A.  Yes.

 8      Q.  Who was to develop that?

 9      A.  I don't know who was.  The team did.  There

10   was a crisis plan developed.

11      Q.  When was that?

12      A.  In that time period someplace, I can't really

13   remember exactly when it was.

14      Q.  At -- at any time during the period when you

15   first started working with Bryan in September of 2002

16   up through this August '04 period, did you think that

17   he should be institutionalized and not -- and that he

18   required institutionalization rather than working with

19   him in school and in the home?

20      A.  I never thought that as a foregone conclusion.

21   What I did begin to wonder at the end, after he was

22   removed from school, that that should -- should be

23   explored or thought about because essentially what we

24   were trying to do is to replicate that, you know, he

25   had 70 hours a week of skills trainers we were trying
```

1   to replicate, and we were not being especially

2   successful at that.  I -- that -- that is not a

3   recommendation I would have made.

4        Q.  And you did not make it?

5        A.  I did not make that.  I might recommend let's

6   talk about it, let's see what the pros are, let's see

7   what the cons are, let's see -- again, because my

8   experience is that when teams and families have

9   explored every possibility, even if -- and saying no

10  is very important, then you know why you said no.  You

11  know, you've thought that through, you can check it

12  off your list, we walked down that road, no.  Now we

13  can more comfortably walk down this road.  So

14  that's -- that kind of exploration, I think, benefits

15  everybody.

16        Q.  Are you familiar with therapeutic day

17  treatment centers from your work on the mainland?

18        A.  Yes.

19        Q.  Can you describe what they're -- what they're

20  like.

21        A.  The ones that I'm familiar with is --

22        Q.  Yes.

23        A.  -- is where the student goes to the center,

24  which resembles a school in many ways, although there

25  are like maybe kind of apartments in which they can

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    practice functional living skills and their day is

2    longer.  They may go as early as 7:00 and they may

3    even stay as late as 7:00, and some of the more

4    advanced students may spend the night in this

5    apartment, you know, that is part of the school.  And

6    then -- so it's a very controlled environment,

7    basically.  And, you know, they do really much of what

8    we did, you know, similar things.

9         They have -- one of the things they don't do

10   is they don't have this exclusive one-on-one like we

11   did.  The student may have one-on-one, but it's not an

12   exclusive person.  So as they move from one project or

13   one subject to another, it will be a different person,

14   which has some distinct advantages because they learn

15   to relate to more people, they learn to take

16   directions from more people.

17        It's comprehensive.  They usually do, you

18   know, a lot of community things, going out into the

19   community.  Some of them, again depending on the level

20   of the students, they may even venture into some

21   economic things, more like a sheltered workshop.  One

22   I knew, you know, made those little packages that you

23   have your fork and knife in and you find on airplanes

24   and things.  And those are for older students than

25   Bryan was, but that would be the comprehensive, the

1    and you might start on something you think is going to

2    take 20 minutes and it takes him three, and so she did

3    make that be comment.

4        Q.  Now, you continued working on Bryan's case

5    until he left; is that correct?

6        A.  That is correct.

7        Q.  And that was in January, January of 2005; is

8    that correct?

9        A.  Yes.

10        Q.  Did you continue working for TIFFE after that

11    time?

12        A.  Yes.

13        Q.  And how long did you continue working at

14    TIFFE?

15        A.  Till March 15th, 2007.

16        Q.  All right.  And then did you return to the

17    mainland?

18        A.  I returned to the mainland.

19        Q.  Now, would you agree that one of the problems

20    with Bryan's case and specifically implementing his

21    program in the home was the lack of continuity in the

22    skills trainers who were working with him in the home?

23            MR. USHIRODA:  Objection.  Calls for

24    speculation.  Lack of foundation.  Assumes facts not

25    in evidence.

1     A.  Yes.

2     Q.  -- were destructive to the home?

3     A.  Yes.

4     Q.  He might do things that would cause a threat

5  of safety to himself or to others?

6     A.  Yes.

7     Q.  And that's why at night his room was locked?

8     A.  Yes.

9     Q.  Now, are you aware of the fact that Bryan was

10  isolated in a portable classroom in September of 2004?

11                  MR. USHIRODA:  Objection.  Lack of

12  foundation.  Calls for speculation.  Assumes facts not

13  in evidence.

14                  THE WITNESS:  The portable classroom, was

15  it a portable?  He did have a half a classroom, and I

16  guess it was a portable.

17  BY MR. VARADY:

18     Q.  Are you aware of an incident in which his

19  mother came to school to meet the teacher and observe

20  his new program and found him self-stimulating,

21  sliding in his own urine on the mat on the floor?

22                  MR. USHIRODA:  Objection.  Lack of

23  foundation.  Assumes facts not in evidence.

24                  THE WITNESS:  I was told that.  I wasn't

25  there.

```
 1    BY MR. VARADY:

 2        Q.  Were you ever told what the teacher or skills

 3    trainer said when Kim asked them what was happening?

 4        A.  You know, I probably was, but I don't

 5    remember.

 6        Q.  Do you recall the teacher saying words to the

 7    effect that I don't know what to do with him?

 8                    MR. USHIRODA:  Objection.  Lack of

 9    foundation.  Assumes facts not in evidence.

10                    THE WITNESS:  I'm sorry, I don't

11    remember.

12                    MR. USHIRODA:  Could you let me finish my

13    objection first.

14                    THE WITNESS:  I'm sorry.

15    BY MR. VARADY:

16        Q.  Assuming that the skills trainer, when asked

17    what was happening, said words to the effect of he

18    looks so happy during an incident like that, do you

19    think the parents would be justified in removing him

20    from that situation and taking him home?

21        A.  Not at --

22                    MR. USHIRODA:  Objection.  Lack of

23    foundation.  Assumes facts not in evidence.  Calls for

24    speculation.  Also improper hypothetical.

25                    THE WITNESS:  Not on the basis of that
```

1    comment, and, you know, I really don't remember too

2    much about that, but I seriously doubt his removal was

3    the result of one incidents.  I suspect it was a

4    result of a build up and there was then an incident.

5    BY MR. VARADY:

6        Q.  I -- I understand what you're saying, and if I

7    can just rephrase it and have you confirm that what

8    you're saying is that it was the culmination of a

9    series of -- of problems that led to the parents

10    removing him from school after finding him sliding in

11    his own urine?

12             MR. USHIRODA:  Objection.  Lack of

13    foundation.  Assumes facts not in evidence.  Again,

14    misstates testimony.

15             THE WITNESS:  The culmination of a series

16    of events, yes.

17    BY MR. VARADY:

18        Q.  Now, do you know, did you meet Cara Entz when

19    she came to the Big Island?  Cara Entz, she was

20    employed by Pacific Child & Family?

21        A.  Yes, I met -- I don't know if that's who I

22    met.  I met a couple of those people.

23        Q.  Were you involved in any of the meetings that

24    she attended to discuss Bryan's program or participate

25    in any observations or assessments that she conducted?

1    the trenches, I'm in the classroom, so my contact was

2    with all of those people who are delivering services

3    kind of at that ground level.  I didn't really have --

4    I had very little contact, really, with that upper

5    echelon.

6        Q.  Among the documents that you reviewed for your

7    deposition today, did Mr. Ushiroda provide you a copy

8    of Dr. Smalley's deposition?

9        A.  No.

10       Q.  Do you have any reason to believe, based on

11   your experience with Bryan, that he can't continue to

12   learn and grow and move toward the goals and

13   objectives that have been identified for him?

14                  MR. USHIRODA:  Is that presently,

15   counsel?

16                  MR. VARADY:  Yes.

17                  MR. USHIRODA:  Okay, then I object on the

18   ground it calls for speculation.  Lack of foundation.

19   And assumes facts not in evidence.

20                  THE WITNESS:  I have not seen Bryan for

21   three years, and I just do not feel comfortable trying

22   to make that kind of judgment.

23   BY MR. VARADY:

24       Q.  During the time you were working with him, was

25   there anything -- any facts you're aware of that would

1    though, I can mark and then --

2                    MR. VARADY:  You'll have correction

3    sheets and you'll have an opportunity to do that.

4                    THE WITNESS:  Thank you.

5                    MR. USHIRODA:  I have some questions.

6                    THE VIDEOGRAPHER:  Can I actually change

7    tape.  End of tape 4.  We're going off the record at

8    5:07 p.m.

9                        (Off the record.)

10                    THE VIDEOGRAPHER:  This will be the start

11   of tape 5.  Back on the record.  It's 5:08 p.m.

12                        EXAMINATION

13   BY MR. USHIRODA:

14        Q.  Good afternoon.  Gregg Ushiroda.  I represent

15   the Department of Education and Alvin Rho, and I just

16   wanted to follow up on some questions that Mr. Varady

17   asked you and perhaps get some clarification.  I'm

18   probably going to work backwards since that's how my

19   notes are.

20             You know, Mr. Varady discussed with you a -- I

21   believe he identified a woman named Cara Entz who was

22   with Pacific Child and Family Service who came down to

23   observe Bryan at school, correct?

24        A.  Yes.

25        Q.  Okay.  And you said you met with

1    representatives from that company at the school?

2        A.  Yes.

3        Q.  Okay.  Do you know if the -- do you know why

4    they came to the school?

5        A.  Yes.  Bryan's mom was exploring alternative

6    ways of having his services provided, and she learned

7    of this company and she contacted them.  I think she

8    had several phone conversations anyway, as she related

9    it to me, and the DOE, my understanding is, agreed to

10   bring them over -- they wanted to evaluate the

11   situation.

12       Q.  So having the -- so the DOE brought Pacific

13   Child and Family Services over at the parents'

14   request?

15       A.  That was my understanding.

16       Q.  Okay.  And where did you get this

17   understanding?

18       A.  Well, mom told me that, you know, that she had

19   contacted them, and yes, they were coming over.  And I

20   can't remember who told me that DOE brought them over.

21   I don't remember that part.

22       Q.  When you're referring to the mom, you're

23   referring to Ann Kimball Wiles?

24       A.  Yes.  Yes, I am.

25       Q.  Now, Mr. Varady also asked you if you had

1    Mr. Varady said sometime in August of 2004 she came

2    back?

3        A.  Yes.

4        Q.  And "she" being Christy Edwards?

5        A.  Yes.

6        Q.  And did Ms. Edwards work in the home portion

7    of the program?

8        A.  She was in the home.  And -- and then when he

9    went to school, when he was more in the home and going

10   to school, she was the one that took him to the school

11   for those two hours twice a week.

12       Q.  Okay.  You know, about this time while Ms.

13   Edwards was working the home portion of the program,

14   was there also a skills trainer named Jeremy Watson?

15       A.  Jeremy, I think, didn't start until maybe

16   November perhaps.  He wasn't there initially.  He came

17   on a little later.

18       Q.  Can you tell me what agency Mr. Watson was

19   with?

20       A.  Jeremy was with TIFFE.

21       Q.  Okay.  And do you know anything about Mr. --

22   prior to Mr. Watson coming on board to work with

23   Bryan, did you know anything about his background and

24   qualifications?

25       A.  Yes.  Jeremy --

1        Q.  Could you tell me what those were?

2        A.  Yes.  Jeremy had been a skills trainer with

3    TIFFE for a while.  Prior to that he had worked in

4    some autism day centers in California or one or two,

5    for a year, maybe it was longer than that.  And he was

6    quite good.  He was a very skillful skills trainer,

7    and was one of those that was sought after, you know,

8    parents would hear that he might be available, they

9    would want him to work with their child.

10           And so I guess what TIFFE did was sort of move

11    him up to a position of troubleshooting and going into

12    the school where a skills trainer might be having some

13    difficulty and, you know, making suggestions, perhaps,

14    or supporting that person.  And he agreed to work

15    with -- with Bryan whenever it was, November,

16    December, until he left.

17        Q.  Okay.  And did you supervise Jeremy?

18        A.  Yes, I did.

19        Q.  And when Jeremy started working with Bryan,

20    was he -- did he -- did he have a background in DTT?

21        A.  Yes.

22        Q.  Did he have background in TEACCH?

23        A.  Yes.

24        Q.  How was his ASL?

25        A.  I'm trying to remember.  He had -- oh, yeah,

1    his -- the child he worked with before, he had enough

2    signs.  He wasn't proficient, but, yes, he had some

3    signs.

4        Q.  Was he proficient enough to carry out Bryan's

5    program?

6        A.  My recollection is that he could accommodate

7    his instruction, you know.

8        Q.  You feel that Jeremy was an asset to Bryan's

9    team?

10       A.  Yes.

11             MR. VARADY:  Objection.  Leading.  Go

12   ahead.

13             THE WITNESS:  Jeremy was an asset,

14   definitely.

15   BY MR. USHIRODA:

16       Q.  Okay.  And did Jeremy work with Bryan at the

17   home from the time he started in around November up

18   until the parents left, the family left?

19       A.  My recollection is that is true.

20       Q.  Did -- did Bryan's mother have any comments

21   about Jeremy?

22       A.  She never made any comments to me about --

23   about Jeremy.  Jeremy commented to me that she had

24   made comments to him, you know.

25       Q.  What did Jeremy say?  What were those

254

1    comments?

2         A.  Well --

3              MR. VARADY:  Objection.  Hearsay.

4              THE WITNESS:  -- the -- the comment

5    that -- what Jeremy reported to me is that he had been

6    taking some pictures to -- to make a visual schedule,

7    which is common, that's what we do, and that the

8    parents had objected to that and they wanted his film

9    or -- and he was upset.

10   BY MR. USHIRODA:

11        Q.  Did you see anything wrong with Jeremy taking

12   pictures for the visual --

13        A.  That's common.  We do that all the time.

14        Q.  Okay.  It was part of Bryan's program?

15        A.  Part of what we do.

16        Q.  Part of Bryan's program?

17        A.  Part of Bryan's program, part of what is

18   typical in establishing visual schedules.

19        Q.  Did Bryan's mother ever express to you any

20   complaints about Jeremy?

21        A.  She never -- that I can recall, she never

22   complained to me about Jeremy.

23        Q.  Okay.  Now, you also talked about skills

24   trainers who had very good rapport with Bryan; do you

25   recall that?

1      A.  Yes.

2      Q.  And I believe you testified that Christy

3  Edwards had a very good rapport with Bryan?

4      A.  Yes.

5      Q.  And as did Rebecca Gavin?

6      A.  Yes.

7      Q.  And you also mentioned a woman named Sandy?

8      A.  Yes.

9      Q.  Okay.  Would this be Sandy Harrington?

10     A.  Yes.

11     Q.  Okay.  And do you know about what --

12  approximately what time periods that Sandy Harrington

13  worked with Bryan?

14     A.  During his elementary year.  She was working

15  with him when I came, and I -- but she did not go down

16  to the middle school with him, to intermediate school.

17     Q.  Do you know why?

18     A.  You know, she worked with him for a while and

19  I think it was just time for a change.  And there may

20  have been the driving also.  She lived pretty far

21  south.

22     Q.  Okay.  Do you know what agency she came from?

23     A.  TIFFE.

24     Q.  Did TIFFE -- while you were the IISC from, I

25  believe, September 2002 up until the time, you know,

256

```
 1    the family -- Bryan's family left in January of '05,
 2    did TIFFE supply the bulk of the skills trainers?
 3         A.  Yes.
 4         Q.  Okay.  And do you have an opinion of what
 5    TIFFE's training program was like?
 6                    MR. VARADY:  Objection.  Vague.
 7    BY MR. USHIRODA:
 8         Q.  During that time period?
 9         A.  During --
10                    MR. VARADY:  Same objection.
11                    THE WITNESS:  Well, the state required
12    that you have, you know, 24 hours, I think it was, or
13    20 before you began to -- to work, and so -- and it
14    was actually fairly prescribed what you had to do.
15    And, you know, their's was fine.
16    BY MR. USHIRODA:
17         Q.  Okay.  Now, do you know what -- when you
18    worked with Sandy Harrington, was she in the school
19    portion of the program or the home program?
20         A.  In the school.
21         Q.  Okay.
22         A.  Oh, correction.  She did occasionally, I
23    think, go to his home, but school was the primary
24    focus.
25         Q.  Did -- when -- so when you started as the IISC
```

1    for -- for Bryan's case in September of '02, Ms.

2    Harrington was already on board?

3        A.  She was already on board.

4        Q.  When she was on board, did you have an idea of

5    what her training was in terms of background?  Let me

6    rephrase.

7            Was Ms. Harrington trained in DTT?

8        A.  I believe she was.  She was pretty good at it.

9        Q.  Okay.

10       A.  In fact, I would say she was quite good at it.

11       Q.  How about TEACCH?

12       A.  She -- that -- she could do that.  The

13   classroom teacher, Becky Pearson, was extremely good

14   with TEACCH.

15       Q.  She was a very good teacher?

16       A.  She was a very good teacher and she was very

17   good with that particular methodology.

18       Q.  Do you believe that Ms. Pearson was very

19   responsive to Bryan's needs?

20           MR. VARADY:  Objection.  Leading.

21           THE WITNESS:  Yes.  Becky's a very good

22   teacher, you know.

23   BY MR. USHIRODA:

24       Q.  Did --

25       A.  She did what he needed.

1          Q.  You know, the whole time that you were

2    involved with Bryan's program, did you ever come

3    across anybody who was affiliated with Bryan's

4    program, whether it was a skills trainer or such, that

5    did not care about Bryan's program?

6                    MR. VARADY:  Objection.  Calls for

7    speculation.  Vague.

8                    THE WITNESS:  I never came across anybody

9    that I felt was detrimental to him because of their

10   inattention to his program.  That certainly -- there

11   certainly were varying degrees of competency.

12   BY MR. USHIRODA:

13         Q.  Well, my question is, did you ever come across

14   a person who just did not care about Bryan?

15                   MR. VARADY:  Asked and answered.

16                   THE WITNESS:  I -- I -- I guess I'm

17   thinking that is the inattentive to and not caring

18   equally inattentive, and I didn't see anybody that was

19   sitting there doing nothing.

20   BY MR. VARADY:

21         Q.  Okay.  Everybody was trying their best?

22         A.  We --

23                   MR. VARADY:  Objection.  Misstates the

24   within's testimony.

25   BY MR. USHIRODA:

1    Q.  Would you agree with that?

2    A.  Yes, we worked hard.

3    Q.  Everybody worked hard?

4    A.  Everybody worked hard.

5    Q.  From the DOE down to the service providers?

6    A.  Everybody worked hard.

7    Q.  Now, you know, do you know who Jennifer Harris

8    is?

9    A.  Yes.

10    Q.  And do you have an opinion about her as a --

11    her qualifications as a teacher?

12    A.  Jennifer is a very good teacher, and she was

13    with Columbia, special ed teacher, brought over by

14    that agency.  I think she told me once she had 14

15    years experience.  She had worked with really a wide

16    variety of students.  She was -- really carefully

17    planned the day.  She worked individually with every

18    student in her classroom.  Did she -- you know, I

19    can't really remember if she knew signs.  I think she

20    did, but I don't -- I don't remember that part.

21    Q.  Okay.  Based on you -- did you have any

22    interaction with Ms. Harris?

23    A.  Frequent.

24    Q.  Based on your interaction, did you ever get to

25    observe Ms. Harris in the classroom?

1        A.  Oh, yes.

2        Q.  Did you observe her in the classroom, "her"

3    being Ms. Harris, with Bryan?

4        A.  Yes.

5        Q.  Okay.  And what was your impression based on

6    those interactions?

7        A.  As I said, she's a good teacher.  She's --

8    again, her manner is kind of very matter of factly,

9    this is what we're going to do.  She's -- she is a --

10   she had a good relationship, I thought, with him, but,

11   you know, each person had a different -- wasn't like

12   Christy's relationship and it wasn't like Rebecca's.

13   She's -- she's very straight forward and has clear

14   expectations of what she wants from a student.

15       Q.  Do you believe that she carried out Bryan's

16   program?

17       A.  Well, I think, you know, he was out of school

18   most of the time, you know, when she was there.

19       Q.  Okay.

20       A.  And she made lots of materials for him.  I

21   know because I took them to his house, and, you know,

22   materials to be used by Christy and Jeremy.  But she

23   didn't go to his home, you know, she was at school.

24   It was rather strange.

25       Q.  At that time --

```
 1       A.  Bryan was out of school.

 2       Q.  The parents had chose to pull him out of

 3   school, correct?

 4       A.  She was there --

 5       Q.  Is that correct?

 6       A.  Yes.

 7       Q.  Yeah, okay.

 8       A.  They chose to pull him out, and she was -- he

 9   came two hours for -- two hours, twice a week.  He was

10   there for that period of time and the rest of the time

11   she made materials and that kind of thing.

12       Q.  You -- you -- can you describe these materials

13   that she made for Bryan?

14       A.  They were quite good.  Jennifer is a

15   scrapbooker, and so they were extremely well made.

16   She took pictures of the materials that she made.

17   They were very, very good.  Very creative and just

18   very well done.

19       Q.  Were they geared towards the implementation of

20   her IEP program?

21       A.  Yes, because I would tell her what we needed

22   sometimes, we need pictures to work on, whatever we

23   needed.

24       Q.  So she did this despite the fact that Bryan's

25   parents had pulled him out of school?
```

```
 1                  MR. VARADY:  Objection.  Leading.
 2                  THE WITNESS:  Well, I don't know despite.
 3      She did it.  That's what she did.

 4      BY MR. USHIRODA:
 5          Q.  Okay.  Well, she's a good teacher?
 6          A.  She's a good teacher.  That's what she did.
 7      He was her student.
 8          Q.  Did -- did Ms. Wiles-Bond ever review these
 9      materials that -- that you brought over from Ms.
10      Harris?
11                  MR. VARADY:  Objection.  Foundation.
12                  THE WITNESS:  When I took them, you know,
13      she wasn't there because I was usually there in the
14      day when Christy was there, but I would assume she saw
15      them.  You know, they were in the home so I would
16      assume she saw them.
17      BY MR. USHIRODA:
18          Q.  Okay.  Did Bryan's mother ever comment to you
19      about the materials that Ms. Harris sent home with
20      you?
21          A.  No.
22          Q.  You know, Dr. Copeland, Mr. Varady asked you
23      at length about some of the community programs that
24      you -- you had established for Bryan.  Do you recall
25      that?
```

1        A.  Yes.

2        Q.  One of them was the Special Olympics?

3        A.  Yes.

4        Q.  And the other was the Friendship Club?

5        A.  Yes.

6        Q.  Tell me how that came about.

7        A.  Special Olympics came about when Bryan's

8    mother went to a meeting, I believe, that talked about

9    Special Olympics and getting it started.  She passed

10   the information on to me, and then we did bowling, I

11   remember that, first.

12          And then what I wanted to do was to set up an

13   after school program that was structured and regular.

14   So I recruited one of the EAs to serve as the coach

15   for our Special Olympics team, so not only Bryan but

16   his peers would have an organized activity by someone

17   who was somewhat aware, you know, I think he had been

18   an EA in that classroom.

19          So they had Special Olympics twice a week,

20   field and track, my recollection, and then I put

21   together a Friendship Club, in which it was part of

22   the after school program for the intermediate school,

23   and I asked the DOE to pay for a teacher because we

24   had to have a DOE employee there, and we paired

25   typical children with our class.

264

1    Q. And did the DOE pay for the teacher to be

2    there?

3    A. Yes, yes.

4    Q. Did they object?

5    A. Not to me.

6    Q. Okay, continue.

7    A. And so then that meant we had Friendship Club

8    twice a week and we had Special Olympics twice a week

9    and then for Bryan, Friday, then that was his into the

10   community day where he might go to a store or whatever

11   we were -- we had decided.

12   Q. When did the Special Olympics start? At

13   least --

14   A. We did bowling in the fall and then we

15   discovered we had to have a coach or they wouldn't let

16   us be, so then we had to get a little more formalized

17   in --

18   Q. In the fall of?

19   A. 2003, I think.

20   Q. Okay, I'm sorry.

21   A. So it got a little more formalized in 2004

22   because we needed a coach. I'm trying to think when

23   they got their shirts. They may have gotten their

24   shirts in the fall. It worked -- it worked well.

25   Q. How about the Friendship Club, when did that

```
 1    start?

 2        A.  The Friendship Club started that fall, I mean

 3    that -- in 2004, is that intermediate school?  It was

 4    the second semester of intermediate school.

 5        Q.  Do you know when in 2004?

 6        A.  Pardon?

 7        Q.  Do you know when in 2004 you started this

 8    Friendship Club?

 9                MR. VARADY:  Asked and answered.  She

10    said second semester.

11                THE WITNESS:  It was the second semester

12    and it was -- we wanted to tie up with the school's

13    after school program.  They had kind of a menu of

14    kids -- that kids could choose from for after school,

15    so whenever that started was when we started.  It was

16    not the first week, I'm sure.

17    BY MR. USHIRODA:

18        Q.  Would it have been towards the beginning part

19    of the second semester, the middle part?

20        A.  It was by the end of January, I would think,

21    or first of February, perhaps.

22        Q.  Okay.  So fairly early on?

23        A.  Yeah, yeah.

24        Q.  Okay.  And then Bryan participated in this,

25    right?
```

1      A.  Bryan participated in that.

2      Q.  Is that an important part of his program?

3      A.  I thought it was.

4      Q.  Why?

5      A.  Because he had experience with being around

6   typical kids, which are always a good model for him.

7   And because it was fairly structured.  For example, we

8   did a lot of functional skills.  We did snack, but

9   instead of everybody having their own, we sat around a

10   table, we passed the crackers or whatever they had.

11   So it was a much more social -- snack was a social

12   functional kind of activity.  That -- that was

13   different.

14      Q.  At some point did Bryan stop participating in

15   these after -- these community-based programs?

16      A.  Gosh.  To my recollection he never quit coming

17   to Special Olympics and Friendship Club.  Going out

18   into the community on that Friday, Kim -- that would

19   have been in May where he stopped doing that.  Kim did

20   not feel comfortable having him out in the community.

21      Q.  Why was that?

22      A.  That was because during our final Special

23   Olympics celebration, a woman who is mentally ill had

24   taken Bryan by the arm and was attempting to lead him

25   away, and Kim was very fearful.  She felt perhaps

1   someone had been stalking this child and that he was

2   in danger and she just did not feel comfortable having

3   him in the community.

4        Q.  Do you recall if you received criticism from

5   her about that incident?

6        A.  Yes.

7        Q.  What was the criticism --

8        A.  She felt I should have called the police, and

9   she was critical that I did not return her call the

10  day that it happened until 9:00.

11       Q.  Now, do you believe those criticisms were

12  justified?

13       A.  I'm sure it was a very frightening experience

14  for her, but I never felt this child was in danger.

15  We were in a totally public place, and that it was so

16  brief.  The woman disappeared.  I mean she was gone.

17  There was no way to find her.

18       She was -- I guess Kim was also critical that

19  my description of her to the police, when they finally

20  contacted me, was vague, although -- which it probably

21  was.  There was not too much distinctive about this

22  woman, although I did describe the clothing she was

23  wearing.  And the next day the woman was seen walking

24  down the street, and she was injured and taken to the

25  hospital.  And the same policeman was called and

```
 1     recognized the clothing, called me, brought a picture,

 2     asked me to identify this person.

 3        Q.  Who took Bryan to this event?

 4        A.  Skills trainer.

 5        Q.  How come the parents didn't take him?

 6        A.  I have no idea.

 7        Q.  Was this a -- was this an event that was meant

 8     to be with the parents and the children?

 9        A.  This was on a Sunday.  It was an event for,

10     yeah, parents, for families.  It was an event for the

11     families.

12        Q.  But instead they sent Bryan with a skills

13     trainer?

14        A.  Bryan came with his skills trainer, yes.

15        Q.  What did you think of that?

16        A.  Well --

17                  MR. VARADY:  Objection.  Calls for

18     speculation.  Vague.  Foundation.

19                  THE WITNESS:  I wished his parents had

20     come.  It was kind of a big deal.  And, you know, and

21     he had participated and, you know, we were wanting to

22     show off a little bit.

23     BY MR. USHIRODA:

24        Q.  Were there any other instances of, you know,

25     events that Bryan was sent with just his skills
```

```
 1    trainer and the parents didn't come?

 2        A.  I don't recall any.

 3        Q.  Okay.  You know, getting back to this incident

 4    with the mentally unstable woman, who was the skills

 5    trainer that was there?

 6        A.  Danielle.

 7        Q.  Doucette?

 8        A.  Yes.

 9        Q.  Okay.  Do you feel that you and Danielle had

10    the situation under control?

11        A.  Yes.

12                    MR. VARADY:  Objection.  Vague.

13                    THE WITNESS:  I felt the situation was

14    under control.  I felt Bryan was not in danger nor had

15    he ever been in danger.

16    BY MR. USHIRODA:

17        Q.  Okay, you mentioned the mother told you that

18    she believed this woman was stalking Bryan?

19        A.  Yes.

20        Q.  What was her basis for telling you that?

21        A.  I don't know.

22        Q.  Do you think that's a bit of paranoia?

23                    MR. VARADY:  Objection.  Argumentative.

24    Calls for speculation.  Vague.  Leading.

25                    THE WITNESS:  I didn't -- I don't know
```

272

1    winding down and we were at more, you know, going into

2    the community for recreational activities or learning

3    activities in the community.

4        Q.  Now, Dr. Copeland, did you have any

5    interaction with the DES's -- well, first of all, let

6    me ask, do you know what a DES is?

7        A.  Yes.

8        Q.  What is it?

9        A.  What does it stand for?  I don't know that.

10   District educational specialist, how about that.

11       Q.  When you first -- did you have any interaction

12   with any of the DES's?

13       A.  I had interaction with Judi Radwick and some

14   with Linda Price, had more interaction with her,

15   actually, before she went into that position, and

16   Laurie Bolton.

17       Q.  Okay.  Well, tell me what your interaction was

18   like with Ms. Radwick.

19       A.  She -- as I said, she called me into the

20   office, and, you know, wanted to look at -- wanted to

21   look at data, and I can't remember, I think, actually,

22   I think it had to do with the toileting.  I can't

23   remember what it was about.  But she asked me to come.

24   She asked me to bring out the data.  In that meeting

25   was Barbara Kaufman, Sheri Adams, and I really can't

273

1    remember exactly what we discussed, but Judi was the

2    sort of administrator who wanted to know what was

3    going on.  That was always my impression.  She wanted,

4    you know, she wanted to see where you were, she wanted

5    to know.  She's the only one at that level that ever

6    called me in and she did.

7       Q.  About how many times did she call you?

8       A.  Well, she called me in this one time I

9    remember especially and somehow going over this data,

10    but I would get phone calls from her.  And she -- she

11    was -- she wanted those reports in when they were

12    supposed to be in, and, you know, she wanted copies of

13    the data.  I can't really remember all the things, but

14    I do remember she would call and say she needed

15    whatever she needed and she didn't take many excuses.

16       Q.  Okay.  Do you believe she was attentive to

17    Bryan's program?

18       A.  She was attentive.

19       Q.  Was she -- do you believe -- working with Ms.

20    Radwick, do you believe that she was responsive to the

21    parents' needs?

22       A.  Well, you know, I really don't know about

23    that --

24       Q.  Okay.

25       A.  -- but I do know that she -- that she came to

RALPH ROSENBERG COURT REPORTERS, INC.

274

1    me for information, you know, either by the phone or

2    talking to me in person, you know, on a fairly regular

3    basis.

4        Q.   What was the purpose for these conversations?

5        A.   You know, I don't -- I don't know.  Well, I

6    just believe she wanted to be informed.  She wanted to

7    know, you know, what was happening.

8        Q.   Okay.

9        A.   And she may have used that information, you

10   know, I suppose she did in some way for any of her

11   decision making, but, again, I was never privy to

12   that.

13       Q.   Okay.  How about with Laurie Bolton, what was

14   your interaction?

15       A.   I liked Laurie.  Laurie and I, in the brief

16   time she was there, had many conversations.  She

17   didn't work very long, so I don't know how many

18   meetings we had, but I do remember we talked on the

19   phone.  And I remember calling her once and telling

20   her we needed -- it was that summer of 2004, and I was

21   concerned about the safety issues and Bryan in the

22   classroom, and I called her and said, you know, we

23   have to have somebody there.  You know, after school

24   because what the students did, those who had after

25   school services, they would go to summer school in the

275

```
 1    morning and they would remain in the classroom.  The

 2    DOE allowed them to use the classroom for that after

 3    school portion, but they didn't have -- had not had a

 4    DOE employee actually in the room.  The DOE person

 5    might be in the room next door or down, and I told her

 6    that we needed to have someone there in the room, and

 7    so she got someone.

 8        Q.  So --

 9        A.  I think it was Becky Pearson that came.

10        Q.  So in other words, Dr. Bolton responded to

11    your concern?

12        A.  Oh, she -- she -- Dr. Bolton had her --

13    respected safety concerns.

14        Q.  In your interaction with Dr. Bolton, did you

15    form the opinion that she was committed to seeing that

16    Bryan's IEP was implemented?

17             MR. VARADY:  Objection.  Leading.

18             THE WITNESS:  She -- she was very -- yes,

19    she was very committed, and as I said, she only worked

20    there three or four months.  So, you know, there's no

21    kind of long-term result of that.

22    BY MR. USHIRODA:

23        Q.  Was -- was Ms. Radwick -- did you believe

24    Ms. Radwick was committed to seeing that Bryan's IEP

25    was --
```

276

1          A.  I thought --

2                    MR. VARADY:  I'll just wave my hand, so

3      objection, leading.  Go ahead.

4                    THE WITNESS:  I thought everybody was

5      committed to seeing that -- that the IEP goals were

6      met as best we could.  We just were.

7      BY MR. USHIRODA:

8          Q.  And when you say "we," does that include the

9      DOE?

10         A.  Yeah, I'm talking about the team.

11         Q.  The IEP team?

12         A.  The -- the speech path, the OT, teacher, you

13     know, the district-level people.  We were.

14         Q.  Okay.  Now, you know, earlier during

15     Mr. Varady's examination he showed to you the

16     functional behavioral assessment that was prepared by

17     Kim Smalley in August of '04; do you recall that?

18         A.  Is that the big one?

19         Q.  Yes.  Oh, no, actually, it was the shorter

20     one.  There was a smaller one that was a series of

21     emails?

22                    MR. VARADY:  That's actually the

23     toileting plan.

24                    THE WITNESS:  The toileting plan.

25     BY MR. USHIRODA:

```
 1      Q.  Yeah, toileting plan.

 2      A.  Okay, yeah, I remember that.

 3      Q.  Yes, Exhibit 16.  And -- and there was some

 4   discussion about the DD, is that department of --

 5      A.  Oh, Developmental Disabilities, yes.

 6      Q.  What -- what -- what branch of the state

 7   government is that with?

 8      A.  Department of Health.  I think Kim talks about

 9   it in her report, about needing the night person.

10      Q.  Okay.  And I believe you testified that you

11   could not recall what happened to the idea of -- of

12   getting DD services, correct?

13      A.  Yes.

14      Q.  Is that something that the DOE prevented?

15      A.  No.

16              MR. VARADY:  Objection.  Calls for

17   speculation.

18              THE WITNESS:  The DOE cannot do that.

19   BY MR. USHIRODA:

20      Q.  Right.

21      A.  We've tried, not with Bryan, but with other

22   students.  The parent -- they have -- they have to do

23   it.  You know, we can suggest, we can urge, but they

24   have to do it.  And then even if they make those

25   contacts, it's not assured because they have their own
```

1    sets of requirements before you are eligible to

2    receive services.

3        Q.  And you say "they," you're talking about DD?

4        A.  Yes.

5        Q.  Okay.  And do you know if -- if -- do you know

6    if Bryan's mother made any efforts to get DD services?

7        A.  Yeah, I really don't remember if she did or

8    not.

9        Q.  Do you know if the father made any efforts to

10   get DD services?

11       A.  I -- I don't remember that either.

12       Q.  Do you know if they met the requirements for

13   DD services?

14       A.  That I don't know, but they may not have.

15       Q.  Do you know what the requirements for DD

16   services are?

17       A.  You know, they vary, but there is, I think,

18   some income requirement, like you can't make too much

19   money.

20       Q.  Do you know what Mr. Bond's occupation was at

21   the time you were the IISC?

22       A.  He worked at -- for the National Forest

23   Service.

24       Q.  And what was Ms. Wiles-Bond --

25       A.  She was a vice principal at an elementary

```
 1    school.

 2        Q.  I would like to show you a document that

 3    Mr. Varady marked as Exhibit 15 to your deposition.

 4    And it -- first page is a meeting announcement.

 5        A.  Yes.

 6                MR. USHIRODA:  Counsel, do you have your

 7    copy?

 8                MR. VARADY:  I do, thank you.

 9                MR. USHIRODA:  Okay.  Just wanted to

10    check.

11    BY MR. USHIRODA:

12        Q.  Now, if you go to the page that's marked DOE

13    1231, are you there?

14        A.  Yes.

15        Q.  Okay, and, you know, there's -- if you go down

16    to the bottom third of that, there's a discussion

17    about the Vineland Adaptive Behavior Scales?

18        A.  Yes.

19        Q.  And it says it was administered with Bryan's

20    parents, Stan Bond and Kim Wiles, do you see that?

21        A.  Yes, as respondents, yeah.

22        Q.  Okay.  Now -- and you already briefly told

23    Mr. Varady what the Vineland is, correct?

24        A.  Yes.

25        Q.  Okay.  And what it -- what does it measure?
```

280

```
 1     Adaptive skills?

 2         A.  Adaptive skills, yes.

 3         Q.  As opposed to?

 4         A.  Functional or adaptive skills.

 5         Q.  As opposed to cognitive?

 6         A.  As opposed to cognitive skills.

 7         Q.  Is that a widely accepted test in the field?

 8         A.  Yes.

 9         Q.  Okay.  Now, you see the -- there's a woman by

10     the name of Judy Volquardsen, and that's spelled

11     V-O-L-Q-U-A-R-D-S-E-N, do you see that?

12         A.  Yes.

13         Q.  Do you know who that is?

14         A.  You know, I don't.

15         Q.  Okay.

16         A.  I think she's a social worker, but I don't

17     recall her.

18         Q.  And do you know who administered the Vineland

19     test?

20         A.  I would assume she did.

21         Q.  Okay.  Are you qualified to administer the

22     Vineland test?

23         A.  Oh, yes.

24         Q.  Now, if you go to the next page, DOE 1232 of

25     Exhibit 15, it -- it shows what I assume is the
```

1    results of that test?

2         A.  Yes.

3         Q.  Okay.  Now, do you recall reviewing the

4    results?

5         A.  No.

6         Q.  Okay.  Now, this was administered, I believe,

7    as of October 7, 2002?

8         A.  Yes.

9         Q.  Is that correct?

10        A.  Yes.

11        Q.  Okay, if you look at page DOE 1232, it says

12   that the -- at the top right under the, you know, the

13   scores it gives the results.  It says, quote, Both the

14   adaptive behavior composite of 24 on the parents'

15   survey and the 35 on the classroom edition classify

16   Bryan's overall adaptive functioning as low and

17   indicate a severe deficit in adaptive functioning,

18   close quote.

19              Did I read that correctly?

20        A.  Yes.

21        Q.  What does that mean to you?

22        A.  Well, that means that if you know how old he

23   is and you see those kind of scores, this would say to

24   me that we have a significantly disabled child.

25        Q.  Are you able to correlate within that score a

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    developmental age?

2        A.  I think they have -- I think there are charts

3    for that.

4        Q.  Are you -- have you done that before?

5        A.  Yes.

6        Q.  Gathering from just the information set forth

7    in Exhibit 15, which shows the results of this

8    Vineland score, are you able to state that?

9        A.  This is all statistically worked out and there

10   are charts.  I believe there's an age -- there may not

11   be, but I think there's an age level.

12            The other thing it says to me, though, which

13   is really a little more significant to me as a

14   psychologist, is that there's not a great deal of

15   difference between home and family -- I mean, home and

16   school.  Because they did both -- they interviewed

17   both the classroom -- they did the teacher and they

18   did the home --

19       Q.  Okay.

20       A.  -- and they both are scoring in that same

21   range.

22       Q.  Okay, so why is that significant?

23       A.  Well, because that means that his behavior

24   is -- or these performances are pretty stable across

25   the environment.  It would be different, for example,

1    if at school he scored in the low range and at home he

2    scored in the average range.

3         Q.  Why would --

4         A.  You would wonder about what kind of

5    environmental differences are at play.

6         Q.  Okay.

7         A.  But this says to me that that's more or less

8    stable across environment at this point in time.

9         Q.  You know, based on your -- up until that time

10   you had worked with Bryan about how many, a couple

11   months?

12        A.  Yes.

13        Q.  Okay.  Were you in a position at that point in

14   time, as of October 7, 2002, to, you know, agree or

15   disagree with these results?

16        A.  I would have agreed with them.

17        Q.  Okay.  Now, there is also in Exhibit 15 there

18   is mention of a Wendi Clark?

19        A.  Yes.

20        Q.  Do you know who Wendi Clark is?

21        A.  Yes.

22        Q.  And what was Wendi Clark's role with respect

23   to Bryan?

24        A.  She's an occupational therapist, and she's

25   worked with Bryan, I think, since he was in Hawaii.  I

1      Q.  Okay.  How long -- how long was Bryan --

2      Danielle involved with Bryan's program?

3      A.  I really don't remember.  She always seemed to

4      be a kind of in-and-out person.  She worked with him

5      and then it seemed like she didn't and then she was

6      going to be a substitute, and I don't remember how

7      long it was.

8      Q.  Okay.  Did you have an opportunity to observe

9      her working with Bryan?

10      A.  Yes.

11      Q.  Did she work with Bryan in the classroom?

12      A.  Sometimes.

13      Q.  Okay.

14      A.  I did see her work with him in the classroom.

15      Q.  Okay.  And who was the teacher at that time?

16      A.  Oh, dear, who was -- well, it was in the

17      elementary school.

18      Q.  Oh.

19      A.  I mean, not the elementary school.  It was in

20      the intermediate school, and I can't remember if it

21      was during the summer or during the school year.

22      Q.  If it was the summer of '04, would it have

23      been with Bill Brown?

24      A.  I believe so, yes.

25      Q.  Do you know who Bill Brown is?

```
 1        A.  Yes.

 2        Q.  Who is Bill Brown?

 3        A.  Bill Brown is a teacher, a substitute --

 4   substitute teacher at the intermediate school who's

 5   been there for some time and who plays the guitar, and

 6   we sometimes describe him as a Pied Piper.  Kids like

 7   him a lot.

 8        Q.  Do you know if Mr. Brown was hired to be

 9   the -- Bryan's ESY teacher as well as several other

10   special needs children during the summer of 2004?

11              MR. VARADY:  Objection.  Leading.

12              THE WITNESS:  He took -- he was in the

13   role of teacher, so I assume that the DOE hired him.

14   BY MR. USHIRODA:

15        Q.  Did you have an opinion about Mr. Brown's

16   qualifications as a teacher?

17        A.  Well --

18              MR. VARADY:  Objection.  Foundation.

19              THE WITNESS:  He was a good -- he was a

20   good teacher.  He was a good teacher.  He was -- you

21   know, kids liked him.  He was a very, very likeable

22   person.  He didn't really have a special education

23   background, and so he might respond differently to a

24   behavioral incident than would have been my choice.

25   BY MR. USHIRODA:
```

1       Q.  Okay.

2       A.  Like he might say just leave him alone, and

3  I'm saying, no, what we need to do is make sure that

4  he's sitting in his chair or something, I don't know,

5  those kind of differences.

6       Q.  Were those major differences?

7       A.  No.

8       Q.  Okay.  More stylistic?

9       A.  Just stylistic and -- and that he just didn't

10  have special education background.

11      Q.  Okay.  Well, do you think he was qualified to

12  teach the class?

13      A.  I think it was a successful summer with him as

14  a teacher.

15      Q.  Okay.  Do you feel that he carried out the IEP

16  program during that summer?

17      A.  Yes.

18      Q.  Okay.

19      A.  Because much of it is carried out after -- ESY

20  is short.  It's just part of the day.  You know, you

21  almost -- we almost kind of flip it so that an ESY is

22  a more laid back, kind of recreational time anyway,

23  and so we would tend to do more of the harder work, if

24  you will, in the afternoon when the DOE was, you know,

25  letting us use the classroom.

1        Q.  Okay.  Do you know if you had -- well, did you

2    have any conversations with Bryan's mother about Bill

3    Brown serving as the teacher for ESY?

4        A.  Well, I remember at first she was quite --

5    quite excited because, you know, he did music, because

6    he played the guitar and they had music class every

7    day and Bryan tried to sing, I believe, you know, and

8    was involved in that, and it was -- she liked that.

9    We all liked that.

10       Q.  Did she -- did Bryan's mother ever express to

11   you any concerns about having Bill Brown serve as the

12   ESY teacher for the summer 2004?

13       A.  I don't recall any concerns that she expressed

14   to me, other than she was aware that he wasn't a

15   special education teacher, and I think, just on

16   principle, that was problematic for her.

17       Q.  Did she ever say that to you?

18       A.  I can't really remember that she did.

19       Q.  Did Mrs. -- did Bryan's mother ever say, you

20   know, I really don't think Bill Brown should be the

21   teacher for summer?

22       A.  I never heard anything that strong, no.

23       Q.  Okay.  How about the father?

24       A.  No.

25       Q.  Did you have any interaction with the father?

290

1        A.  I did.  Certainly not as much as I did with

2    Bryan's mother.

3        Q.  Okay.  Do you believe that the -- based on

4    what you know, I believe you testified that you were

5    involved with Bryan's summer program, correct?

6        A.  Yes.

7        Q.  For the summer 2004?

8        A.  The summer 2004, let me just think for a

9    minute.

10        Q.  That's Bill Brown.

11        A.  That's Bill Brown, and I wasn't there for all

12    of it, I don't think.  I think I came back to the

13    mainland for maybe the last half of it --

14        Q.  Okay.

15        A.  -- or something, but I do remember being in

16    the classroom when Bill was there, so I know I was

17    there for part of it anyway.

18        Q.  But you testified earlier that Bryan's mother

19    told you that -- well, she was excited about having

20    Bill serve as teacher?

21        A.  Because -- because Bryan was so responsive to

22    the music.  He was a good musician.

23        Q.  And based on -- did you ever observe Bill

24    Brown in the class?

25        A.  Yes.

1      Q.  And based on your observations, did you feel

2  that he had a good rapport -- that he had established

3  a good rapport with Bryan?

4      A.  Yes, yeah.

5      Q.  And was he able to communicate with Bryan?

6      A.  He didn't really have signs, as I recall,

7  but -- but, you know, you can talk to Bryan.  He

8  understands, you know, what you're saying.  So, you

9  know, he was responsive in that way to what he said.

10     Q.  And now, also were there any -- do you know

11  who Bryan's skills trainer was during that time?

12     A.  You know, I don't remember.

13     Q.  That's quite all right.

14     A.  Lot of them.

15     Q.  Now, getting back to Danielle Doucette, do you

16  know -- she subsequent -- she eventually stopped being

17  Bryan's skills trainer, correct?

18     A.  Yes.

19     Q.  Do you know why?

20     A.  I really -- I really don't know.

21     Q.  Okay.  I think you testified earlier that

22  Danielle had experience with autistic kids in New

23  York?

24     A.  I believe it was New York, yes.

25     Q.  And you testified that they had a -- they a

1    different approach towards, I guess, giving skills

2    trainer services to their autistic kids?

3        A.  Yes, it was much more a relational,

4    recreational sort approach than it was a data-based

5    approach.

6        Q.  Is there anything wrong with that?

7        A.  I mean, there's a whole school of people that

8    subscribe to that.

9        Q.  It's just a different approach?

10       A.  It's a different way of doing it.  It wasn't

11    the way that was set up for Bryan.

12       Q.  Okay.  But do you know -- did you -- do you

13    know if Danielle had established a rapport with Bryan?

14       A.  I think she had a good rapport with Bryan,

15    because that was very much core to her approach was

16    having a really good rapport.

17       Q.  And that goes to the very heart of it?

18       A.  Yes.

19       Q.  And -- and from what you observed, she had a

20    good rapport with Bryan, correct?

21       A.  She would take some pride that she could get

22    him to do things that maybe other people couldn't do.

23       Q.  And did you find that to be the case?

24       A.  Well, I didn't ever see it particularly, but

25    I'm sure she was right.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1     Q.  Did you have any reason to doubt it?

2     A.  I didn't have any reason to disbelieve her.

3     Q.  Okay.  Now, you were also shown an exhibit, I

4  believe it is Exhibit 13, and I believe it was stated

5  that you told Kelly Stern that Danielle didn't collect

6  data?

7     A.  That's right.

8     Q.  Was that always the case?  I mean, did she

9  always not collect data?

10     A.  I believe she got better, but she was kind of

11  the person you had to sort of stay on top of that with

12  her.

13     Q.  But she did improve?

14     A.  She got better, yeah, I told her she had to.

15     Q.  And she did?

16     A.  And she -- and she did, but with a little

17  slippage there if you didn't go back and check on her

18  again.

19     Q.  Based on what you observed and your

20  interactions with Danielle, do you believe that she

21  was committed to seeing that Bryan's program was

22  implemented?

23     A.  Oh, yes.  There was nobody that was not

24  wanting this to be a success.

25     Q.  Now, let's talk about Kelly Stern for a

    1    minute.  She was the program administrator for TIFFE,

    2    correct?

    3        A.  Correct.

    4        Q.  And did you have a lot of interaction with

    5    Kelly?

    6        A.  Yes.

    7        Q.  And --

    8        A.  I had -- may I?

    9        Q.  Sure.

   10        A.  I had a lot of interaction with her, not

   11    necessarily around Bryan, but because I had 18

   12    students and because TIFFE had the market share on the

   13    Big Island, all of these -- the skills trainers for

   14    all of these other students were mostly all TIFFE, so

   15    there was a big caseload, many occasions that I would

   16    need to talk to her about something.

   17        Q.  Now, you were -- you told Mr. Varady that you

   18    were -- you stayed away from -- or were not involved

   19    in recruiting efforts and hiring efforts -- regarding

   20    skills trainers, right?

   21        A.  That's right.

   22        Q.  Did you ever discuss those issues with Ms.

   23    Stern?

   24        A.  Discuss?

   25        Q.  The recruiting and training and hiring of

```
 1    skills trainers?

 2         A.  Oh, yes, we would discuss that at length.  You

 3    know, this whole issue of training people and how

 4    could we ever learn to tell which of these candidates

 5    were trainable versus those that were not trainable.

 6         Q.  Were these in general or was it -- or was it

 7    specific to Bryan's case?

 8         A.  Well, it was in general.  However, any time

 9    you have -- Bryan was not the only student for whom we

10    had difficulty finding a skills trainer, so in that

11    sense it was general, but it was also specific to

12    Bryan.

13              MR. USHIRODA:  You know, Derek has to

14    change the tape and I just have a few more.

15              THE WITNESS:  Okay.

16              MR. USHIRODA:  So why don't we let him

17    change the tape.  I'm sure Mr. Varady may have some

18    follow-up.

19              THE VIDEOGRAPHER:  Off the record at 6:11

20    p.m.

21              (Off the record.)

22              THE VIDEOGRAPHER:  We're back on the

23    record.  It is 6:14 p.m.

24    BY MR. USHIRODA:

25         Q.  Did you have any discussion -- well, do you
```

1     know who Kate Tolentino is?

2          A.  Yes.

3          Q.  Who is Kate Tolentino?

4          A.  She's presently principal at the elementary

5     school at Honokaa.

6          Q.  Do you know if Ms. Tolentino was involved with

7     Bryan's education program?

8          A.  She was.  I can't remember exactly how.

9     She -- see, I met her, what school, Waimea, and then

10    she made some kind of promotion to where she was an

11    assistant of some sort, and I don't know, she got

12    involved in that in some way.  She was an

13    administrator, kind of on the district level.

14         Q.  Did you have any meetings with Ms. Tolentino

15    with respect to this case?

16         A.  Let's see.  There was a meeting at Kealakehe

17    Intermediate and she was there.  I think she was

18    there.  That's the one I remember.

19         Q.  Okay.  And what was that meeting about?

20         A.  I'm not sure.

21         Q.  If you can recall.

22         A.  I'm not sure what it was about.  There were a

23    lot of attorneys there, I remember that.  You know,

24    some dispute or some something.

25         Q.  Okay.  You know, earlier when we started the

1    deposition Mr. Varady showed you some agreements, like

2    some court orders and a settlement agreement; do you

3    recall that?

4        A.  Yes.

5        Q.  He asked you if you were aware of some of the

6    requirements set forth in there, correct?

7        A.  Yes.

8        Q.  Like the settlement agreement, do you recall

9    that?

10       A.  Yes.

11       Q.  And you stated that -- I believe that the --

12    you were not shown the settlement agreement, correct?

13       A.  That is correct.


14       Q.  But you were subsequently made aware of what

15    the requirements that the DOE needed to be fulfilled

16    with respect to the IEP, correct?

17       A.  Yes, particularly those things that showed up

18    in the IEP.

19       Q.  Okay.

20       A.  Because some of those got translated to the

21    IEP.

22       Q.  And to the best of your knowledge, did the DOE

23    try to implement those, those things?

24                MR. VARADY:  Objection.  Calls for

25    speculation.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    BY MR. USHIRODA:

2        Q.  Or to at least see to it?

3        A.  I never heard anyone say they weren't going to

4    do it.  I know in terms of the skills trainers and

5    trying to fill, you know, those gaps, recruiting and

6    looking for that right person or those several right

7    person was on everybody's mind all of the time.  Just

8    this was always there.

9            And I remember very well telling Kim once, you

10   know, even when we have everybody here, we still need

11   to be looking for the next person, because they tend

12   to leave, you know, you couldn't kind of rest.  I

13   remember when we started we had five, and we met at

14   her house, and I think by January we had three.

15           It just was so difficult because -- when you

16   have a high needs child and you have, you know,

17   specific requirements, as you might imagine, with a

18   high needs child, it just gets hard to find that

19   person particularly on the Big Island in Hawaii where

20   our resources are not great.

21       Q.  Now, you said that you told Kim that, you

22   know, we're always on the lookout?

23       A.  That was my feeling.  We should always be

24   looking, even when we think we don't need to.

25       Q.  Was that Kelly Stern's feeling?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

```
 1        A.  Pardon?

 2        Q.  Was that Kelly Stern's feeling?

 3        A.  No, that was my feeling.

 4        Q.  Do you know if she always was on the lookout

 5    for a skills trainer?

 6        A.  Well, we always had a gap, so I'm sure we

 7    always were.  We always -- you know, it just seemed

 8    like we could never kind of get it all filled up.  So

 9    that's my recollection of working with Bryan and the

10    skills trainers, is that we were kind of always

11    looking for somebody.

12        Q.  Are you aware of any facts to suggest that

13    these gaps were caused by any intentional act by the

14    Department of Education?

15                MR. VARADY:  Objection.  Speculation.

16    Legal conclusion.

17                THE WITNESS:  Well, I think the gaps were

18    caused because people quit, and they quit for a wide

19    variety of reasons, some of which Kelly listed in one

20    of those documents and then there would be others.

21    BY MR. USHIRODA:

22        Q.  But that's not due to the actions of the DOE?

23        A.  No.

24                MR. VARADY:  Objection.  Leading.

25                THE WITNESS:  They quit because people
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

```
 1    quit, because -- for just a variety of reasons.

 2    BY MR. USHIRODA:

 3        Q.  All right.  In your entire time serving as an

 4    IISC for Bryan, did you come across anyone from the

 5    DOE who discriminated against Bryan because of his

 6    autism?

 7                  MR. VARADY:  Objection.  Speculation.

 8    Legal conclusion.

 9    BY MR. USHIRODA:

10        Q.  And I ask that because it's one of the claims

11    the parents are raising.

12                  MR. VARADY:  Renew the objection.

13                  THE WITNESS:  No.

14    BY MR. USHIRODA:

15        Q.  And -- and based on what you know and based on

16    your involvement with Bryan's program, do you feel

17    that the DOE was anything but responsive to the

18    parents' needs with respect to Bryan's --

19                  MR. VARADY:  Objection.

20    BY MR. USHIRODA:

21        Q.  -- program?

22                  MR. VARADY:  Objection as to the word

23    "feel," vague.

24                  THE WITNESS:  I think that when the

25    parents wanted something, when there was a problem,
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    the DOE made that effort to meet that need, and not

2    successfully all the time.  But when we needed the

3    toileting plan, we got Kim.  When we needed someone to

4    teach sign language, they did that class.  And I think

5    there was even someone maybe hired, you know, to -- to

6    teach the -- the skills trainers and the teacher.

7    When we needed to have someone pay for that Friendship

8    Club, to pay for the teacher for the Friendship Club,

9    they did that.  You know, I can't think when they

10   didn't try to respond.  They didn't or were not always

11   able to respond successfully.

12   BY MR. USHIRODA:

13        Q.  Okay.  That wasn't because they -- that you

14   felt the DOE was discriminating against Bryan because

15   of his autism, right?

16              MR. VARADY:  Objection.  Speculation.

17   Vague.  Legal conclusion.

18   BY MR. USHIRODA:

19        Q.  At least based on what you know?

20              MR. VARADY:  Same objection.  Foundation.

21              THE WITNESS:  I was not aware of any

22   discrimination.

23   BY MR. USHIRODA:

24        Q.  Based on Bryan's autism?

25        A.  Base on Bryan's autism.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

302

1        Q.  In fact, the DOE put its whole effort into

2    trying to see that Bryan's implement -- Bryan's IEP

3    was implemented, correct?

4                    MR. VARADY:  Objection.  Leading.

5                    THE WITNESS:  The DOE made every effort

6    to be responsive, I thought.  Again, I repeat, not

7    always successfully, but they pulled in consultants

8    when we needed consultants.  Not always as quickly as

9    I would have desired, but in an area with very limited

10   resources, they were always working at it.  And this

11   -- this was the kind of situation which you were

12   always working at it.  Always working at it.

13   BY MR. USHIRODA:

14       Q.  Okay.  Dr. Copeland, I want to show you what

15   Mr. Varady marked as Exhibit 3 to your deposition.  It

16   is a May 11th, 2004 findings of fact, conclusion of

17   law and decision.  You recall that Mr. Varady went

18   over this document at length, correct?

19       A.  Yes.

20       Q.  Okay.  And I believe you testified that you --

21   you had not seen this document before I showed it to

22   you, correct?

23       A.  That is correct.

24       Q.  But that you were familiar with the findings

25   and conclusions in this --

1          A.  Yes.

2          Q.  -- document, correct?

3          A.  Yes.

4          Q.  Now, if you could -- now, if you could go to

5     paragraph -- paragraph 14 at page 4.

6          A.  Yes.

7          Q.  Do you see that?  It says:  "When Bryan did

8     not receive the number of skills trainers hours

9     specified in his IEPs from October 2003 to -- through

10    February 2004, he -- he regressed in a number of

11    areas."  Did I read that correctly?

12         A.  Yes.

13         Q.  Okay.  Now, as I recall your testimony, you

14    agreed with that statement in two parts, correct?

15         A.  Yes.

16         Q.  And could you tell me what -- what you meant?

17         A.  What I said was that both of those things

18    happened.

19         Q.  What you're saying then that --

20         A.  He did not receive skills trainers and -- fact

21    one.  Fact two, he regressed.  I'm reluctant to say it

22    is an exclusive causal relationship.

23         Q.  So you -- you disagree with this paragraph 14

24    in that respect?

25                   MR. VARADY:  Objection.  Misstates her

```
1    testimony.  Leading.  Argumentative.  Foundation.

2    BY MR. USHIRODA:

3        Q.  Well, the way I read it is says --

4                MR. VARADY:  Can she give her answer?

5                MR. USHIRODA:  Oh, I'm sorry.

6                THE WITNESS:  Upon reading this, it

7    certainly implies that that was a causal relationship,

8    and I guess I sensed that.  So I want to say there are

9    two things, they both happened at the same time, so

10   one might wonder if there's a causal relationship;

11   however, there -- there's so many variables that I

12   wouldn't want to, on the basis -- just on the basis of

13   this, say it was a causal relationship.  Definitely

14   it's something you're going to explore and try to get

15   settled.

16   BY MR. USHIRODA:

17       Q.  Okay.  What are the other variables?

18       A.  Well, environmental change, you know, so we

19   have more or less in this same time he's getting --

20   he's been in this new classroom, he has a relatively

21   new teacher whose style is different, and -- and with

22   autistic children you -- you know, you don't always

23   know what is impacting them.  So, you know, I know

24   with -- if Bryan is in a -- not a good mood, sometimes

25   he just kind of got up in the morning and it wasn't a
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    good mood and it would be a tough day, if he's in any

2    kind of pain.  You don't know how many of those

3    variables may be interacting.

4         But indeed those two things did happen at the

5    same time, which would suggest exploration of a causal

6    relationship.  Does not say there is a causal

7    relationship.

8         Q.  Did you explore if it was a causal

9    relationship?

10        A.  Of course.

11        Q.  And what was --

12        A.  Well, I mean, we never got -- the way you'd

13   explore is to get all the skills trainers in place and

14   sort of see what happens.  And we -- we had a very

15   difficult time getting the skills trainers in place.

16        Q.  But you could not come to a definitive

17   conclusion?

18        A.  Well, it was -- it was so obvious that that

19   would be your first move, you know, is to make -- to

20   try to get that in place, but you can't forget there

21   are other things that impact a child's behavior.

22        Q.  Okay.  Now, on paragraph 15 of Exhibit 3, you

23   know, talks about regression involving toileting

24   skills; do you see that?

25        A.  Yes.

310

1      Q.  Do you recall who this person was?

2      A.  Yeah, Sven was one of them.

3      Q.  Okay.  Did --

4      A.  And wasn't there a Carina or something?

5      Q.  Carina Sera?

6      A.  I think.  I don't know their last name.

7  That -- you know, they just didn't really have any

8  experience with this at all.  And they were well

9  meaning, but they were more challenging to teach.

10      Q.  Do you recall trainings that --

11      A.  Well, what I recall is being in the classroom,

12  and I'm going to call it coaching him, because he had

13  already had whatever training he'd had, meaning --

14  training meaning not having a child you need to --

15      Q.  Right.

16      A.  -- also be attending to.

17      Q.  Okay.

18      A.  And that you would sit down and focus on

19  whatever the skill is.

20      Q.  Was Sven responsive to your coaching?

21      A.  Yes.

22      Q.  You think that he was listening?

23      A.  Yes.

24      Q.  How about Carina?

25      A.  Yes, but they just weren't very good.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1      A.  Uh-huh.

2      Q.  How about Danielle, was she selected by the

3  parents?

4      A.  I think -- well, I think, as I recall, she

5  actually got hired through the agency and then talked

6  to the parents.  I think.  I don't believe she was the

7  one who responded to Kim's ad.  I think she came to

8  the agency.

9      Q.  You know, Dr. Copeland, you served as an IISC

10  not only just for Bryan's case but for other cases for

11  at least several years, correct?

12      A.  Yes.

13      Q.  Around three years or so.  At first with

14  Alaka`i Na Keiki and then with TIFFE, correct?

15      A.  Yes.

16      Q.  And in all that time you worked with skills

17  trainers, correct?

18      A.  Yes.

19      Q.  What is the role of a skills trainer?

20      A.  The role of the skills trainer is to do the

21  one-on-one implementation of a child's program.

22  Whatever that may be.  To be doing DTTs, to be

23  teaching him to play catch, it's that one-on-one

24  person that is going to do the teaching, if you will,

25  that will implement his program.  The kind of rule of

1    thumb where we always said where teachers teach, skill

2    trainers reteach.  So that would be it.

3        Q.  And your role with respect to the skills

4    trainers is to supervise?

5        A.  To supervise them.

6        Q.  To provide training?

7        A.  To train, coach them, to make sure they're

8    doing what we said we were going to do, to make sure

9    they're collecting the data so that we can see, you

10    know, where we're going.

11        Q.  And skills trainers come to, you know, a

12    variety of levels of skills, correct?

13        A.  Yes.

14        Q.  And that was true with other cases you worked

15    on?

16        A.  Yes.

17        Q.  So the -- the gap -- problems in gap, the

18    problem in skill level was just not unique to Bryan's

19    case only?

20        A.  That is true.

21        Q.  Now, with respect to the skills trainers that

22    you supervised throughout your tenure as the IISC

23    assigned to Bryan's case, do you believe that each of

24    the skills trainers you supervised carried out their

25    responsibilities to the best of their abilities?

314

```
1                    MR. VARADY:  Objection.  Vague.

2        Speculative.  Leading.  Foundation.

3                    THE WITNESS:  Yes, with -- I mean,

4        keeping in mind their abilities varied some.

5        BY MR. USHIRODA:

6             Q.  Yes.

7             A.  But, yes.

8             Q.  Some were better than others?

9             A.  Some were better than others.

10            Q.  Right.  Now, I believe we already talked at

11       length about the community plan you had for Bryan,

12       correct?

13            A.  Yes.

14            Q.  And that was the Special Olympics, the

15       Friendship Club and the -- the day out in the

16       community, correct?

17            A.  Yes.

18            Q.  Okay, I'm going to show you Exhibit 9.  Okay,

19       doctor, I've handed you what Mr. Varady marked as

20       Exhibit 9 to your deposition, and excuse me while I

21       try to locate it, mine.

22                 Now, this -- you testified that -- now, let me

23       ask you this.  It's a letter dated -- Exhibit 9 is a

24       letter dated September 19th, 2003 from Stanley C. Bond

25       to Mr. Stalsberg.  It's unsigned.  Who is
```

1        Q.  Okay.  Now, let's get back to Jennifer Harris.

2        A.  Yeah.

3        Q.  I believe you testified that in your opinion

4    that she was a very good teacher?

5        A.  She was a good teacher.

6        Q.  Based on what you know about Ms. Harris,

7    would -- would she be the kind of teacher who just

8    allow a child to self-stim in own urine and just do

9    nothing about it?

10              MR. VARADY:  Objection.  Calls for

11    speculation.

12              THE WITNESS:  You know, I -- I don't

13    know, and I don't really feel I can comment on that

14    incident because all I know is what people reported to

15    me, and I just feel like I don't really have the whole

16    big picture with that.  Jennifer is very responsible,

17    attentive teacher, and I just can't comment on that

18    incident when they're -- you know.

19    BY MR. USHIRODA:

20        Q.  Right, you don't have -- you didn't do

21    anything to verify the facts?

22        A.  I would say for her to be flippant about this

23    would be very much out of character.

24        Q.  As far as you know, she -- based on your

25    experience with her, with Ms. Harris, was she a caring

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

```
 1   person?

 2       A.  Oh, yes.

 3       Q.  Did she care about her students?

 4       A.  She did care about her students.

 5       Q.  Okay.  Did she put their needs up as a high

 6   priorities?

 7       A.  She put -- she was a good teacher.  She was

 8   attentive to her students.  She cared that they met

 9   their IEP goals, and, you know, I felt we were

10   fortunate to have her.

11           That particular incident, may I repeat, I

12   wasn't there.  I just heard about it.  So I really

13   don't feel like I can comment on it, and I can barely

14   remember hearing about it.

15       Q.  You just don't know what happened?

16       A.  You know, I wasn't -- yeah --

17       Q.  You just --

18       A.  -- it was three years ago, you know, three

19   years ago an incident that I wasn't there that someone

20   told me about and I don't really remember.

21           MR. USHIRODA:  Thank you, Doctor, that's

22   all the questions I have.

23           MR. VARADY:  Okay, Dr. Copeland, do you

24   need a break?  If not --

25           THE WITNESS:  No, let's just do this.
```

1     A.  Yes.

2     Q.  And if what she described to you had occurred,

3  you would agree that it was a significant and serious

4  event, isn't that --

5     A.  If she --

6           MR. USHIRODA:  Objection.  Leading.

7  Calls for speculation.  Lack of foundation.  Assumes

8  facts not in evidence.

9           THE WITNESS:  If a teacher had been

10  disregarding of a student, I would consider that a

11  serious problem.

12  BY MR. VARADY:

13     Q.  Dr. Copeland, it's late and I just want to get

14  to the heart of the matter here.

15     A.  I do too.  I agree.

16     Q.  Okay.  If a student were stimming in his own

17  urine, slipping and laying in it on the floor and the

18  teacher was merely watching it saying I don't know

19  what to do, you would consider that serious, wouldn't

20  you?

21     A.  I would --

22           MR. USHIRODA:  Objection.  Lack of

23  foundation.  Assumes facts not in evidence.  Improper

24  hypothetical.  Calls for speculation.  Assumes facts

25  not in evidence.

1      Q.  -- that's all.

2           And you wouldn't -- you wouldn't characterize,

3      for example, your earlier description as -- of the --

4      of the July -- I'm sorry, the January '04 program as

5      chaotic as a little thing, that wasn't a small thing,

6      was it?

7                     MR. USHIRODA:  Objection.  Leading.

8                     THE WITNESS:  Yeah, that -- that was not

9      a medium thing.  I mean, the chaos you hoped you were

10     going to pass through.  That will end and it got

11     better.  Some of the others, you know, the not being

12     able to get skills trainers went on.  It didn't.  So

13     it wasn't as big as the others, but it was very

14     frustrating for her, there was no doubt.

15     BY MR. VARADY:

16         Q.  And you observed that frustration building

17     over a two-year period through these various

18     settlement agreements, decisions, IEP meetings and

19     what not; isn't that --

20                    MR. USHIRODA:  Objection.

21     BY MR. VARADY:

22         Q.  Isn't that correct?

23         A.  The --

24                    MR. USHIRODA:  Objection.  Leading.  Lack

25     of foundation.  Vague and ambiguous.

                    RALPH ROSENBERG COURT REPORTERS, INC.
                           (808) 524-2090

1       Q.  And you would understand, given those

2   circumstances, why the parents might be willing to

3   compromise and accept people who they thought might do

4   a good job even if they didn't meet the criteria and

5   just try it, because having someone working with Bryan

6   in the program was important?

7                   MR. USHIRODA:  Objection.  Leading.

8   Misstates testimony.  Lack of foundation.  Assumes

9   facts not in evidence.

10                  THE WITNESS:  Yes, I think.

11  BY MR. VARADY:

12      Q.  Now, again, with Mr. Ushiroda you were careful

13  to distinguish between training and coaching; do you

14  recall that?

15      A.  Yes.

16      Q.  That's an -- because you've maintained that

17  distinction throughout your testimony today and it's

18  been lengthy, I assume that's an important distinction

19  for you personally to make?

20      A.  Yes.

21      Q.  Can you explain why.

22      A.  Because training is a more formal educational

23  process.  And coaching is you're on the spot coaching

24  a person through a task, and maybe it's just my own

25  educational background that makes that a distinction

1    would -- I remember once just seeing her doing some

2    things with him outside.  It was kind of a little play

3    area out there.

4              MR. VARADY:  Okay, again, I thank you for

5    your time and apologies from me and from my clients

6    for going so long.  I want to thank you for being so

7    thorough and sticking with our deposition today.

8              MR. USHIRODA:  I just have one follow-up

9    question.

10              THE WITNESS:  Oh, sorry.

11                        EXAMINATION

12    BY MR. USHIRODA:

13        Q.  Doctor, you talked about, I guess, recent

14    reexamination by Mr. Varady, about there needed to be

15    ongoing training for skills trainers, correct?

16        A.  Yes.

17        Q.  Now would that be in connection, like, with a

18    training university?

19        A.  Yes, we needed -- I felt, you know, on the

20    island some organization, some institution that would

21    set up an on -- just a little curriculum, a little

22    program that would train people to be skills trainers,

23    and, yes, you're most likely to find those in

24    universities.  I think probably where they -- this is

25    one of our problems, we just don't have a big

353

1    educational center on, you know, the Big Island like

2    even here, like you do in Honolulu, because one good

3    supply source are students, graduate students, you

4    know, who plan on going into this field or planning on

5    going into special education and that just isn't there

6    so you have to purposefully plant it there.

7                    MR. USHIRODA:  Okay, thank you.

8                    THE WITNESS:  Okay.

9                    THE VIDEOGRAPHER:  Is that it?  This

10   concludes the deposition of Dr. Dru Copeland.  Off the

11   record at 7:28 p.m.

12                    (The deposition concluded at 7:28 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25