1         IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF HAWAII

3                  ---

4

5  ANN KIMBALL WILES AND STANLEY    )
    BOND, INDIVIDUALLY AND AS NEXT    )
    FRIENDS OF THEIR SON, BRYAN       )

6  WILES-BOND, A MINOR,            )
                              )

7              PLAINTIFFS,    )
                              )

8      VS.                  )  CASE NO.
                              )  CV 04-00442 HG/BMK

9  DEPARTMENT OF EDUCATION, STATE OF )  CV 05-00247 HG/BMK
    HAWAII, AND ALVIN RHO, IN HIS     )  CONSOLIDATED

10  OFFICIAL CAPACITY AS WEST HAWAII  )  (OTHER CIVIL
    DISTRICT SUPERINTENDENT,        )  ACTION)

11                              )
               DEFENDANTS.    )

12                              )

13

14

15

16                DEPOSITION OF

17                  CARA ENTZ

18           GLENDALE, CALIFORNIA

19         THURSDAY, JUNE 28, 2007

20

21

22  ATKINSON-BAKER, INC
    COURT REPORTERS

23  WWW.DEPO.COM
    800-288-3376

24  REPORTED BY:  EDWARD G. HARRISON, CSR NO. 6530

25  FILE NO.:  A104D1A

EXHIBIT "A"

1   before that?

2         A.    I -- well, once for sure.  I don't recall how

3   many other times I spoke with her.

4         Q.    And had you done any work with any families in

5   Hawaii prior to this?

6         A.    No.

7         Q.    And prior to this, I mean the date on the

8   letter.

9               Do you understand that?

10        A.    Right.

11              No.

12        Q.    Now, in the course of this proposal --

13              I'm trying to locate it specifically.  Sorry,

14   I need to look at my copy.

15              I'm looking for a reference to ASL training,

16   but I don't see it in this particular proposal; is that

17   correct?

18        A.    That's correct.

19        Q.    Were you --

20              When do you believe you became aware of the

21   importance for a American Sign Language trained

22   therapist to be working with Bryan?

23        A.    Probably after I spoke with Kate Tolentino.

24        Q.    Okay.

25              And that would have been sometime in October

226

1   or around that time?

2        A.    September --

3        Q.    Okay.

4        A.    -- ish.  Yeah.

5        Q.    All right.

6              Now, in looking at Exhibit No. 1, which is a

7   two-page exhibit that appears to be the precursor to

8   this Exhibit No. 2, there's some handwriting that says

9   "Attention:  Cara, Urgent, Robin send" on the second

10  page.  That's Bates stamped 90.

11             Do you see that?

12       A.    I do.

13       Q.    Who wrote that?

14       A.    I wrote "Robin send."

15       Q.    Okay.

16       A.    I have no idea who wrote "Attention:  Cara,

17  Urgent."

18       Q.    Was this response in July of '04 considered an

19  urgent response or was the request considered urgent?

20       A.    Good question.  I'm thinking of our response.

21             You know, I honestly can't say.

22       Q.    In speaking with Kim, do you recall her

23  expressing urgency in needing a response from your

24  agency?

25       A.    I remember her expressing urgency.  And it's

227

1      A.     Yeah, I don't know.  It's a mystery, really.

2             Let's see.

3             What was the date?  August.

4             I'm not really sure why.  I mean, I did not

5      direct her.

6      Q.     Sometime, though, in between July and August

7      of -- August 9th of '04, which is the date of this

8      e-mail, she must have spoken both to you and to Dr.

9      Heilveil, that would be my impression from looking at

10     this.

11            Do you have any reason to disagree with that

12     impression?

13     A.     No.

14     Q.     Did Dr. Heilveil ever mention to you that he

15     had spoken to Shelby or to Kim, Bryan's mom?

16     A.     No, he never mentioned that.

17     Q.     Do you know if he did have conversations with

18     either of them?

19     A.     I do not -- I'm not aware of any conversations

20     he had with either one of them.

21     Q.     Now, in this particular e-mail it does mention

22     ASL, ongoing training in ASL signs used by Bryan.

23            Do you see that?

24     A.     I do.

25     Q.     And initial training in ASL, if needed, to

                                                      229

```
 1    learn Bryan's signs.

 2                     Do you see that?

 3         A.    I do.

 4         Q.    And for whom was that training being sought,

 5    do you know?

 6         A.    I believe for staff working with Bryan.

 7         Q.    Would that include all staff?

 8         A.    That would include all staff.

 9         Q.    Now, in terms of staffing this particular

10    proposal, this particular project, am I correct that the

11    PCFA was going to be providing --

12                     MR. VARADY:  Off the record.

13                     (Whereupon, at this time, there was a

14                     discussion held off the record.)

15    BY MR. VARADY:

16         Q.    For this particular proposal, am I correct

17    that PCFA was going to be providing two things

18    principally, which were training, in the first instance,

19    for everyone who was going to be working with Bryan, and

20    then supervision for the people who were going to be

21    providing -- supervision of people who were going to be

22    providing direct services?

23         A.    Well, and the people -- we were going to

24    provide the people who provided the direct services as

25    well.
```

230

1         Q.    Okay.

2               But those people were not going to be people

3    who would be hired here in California and then sent to

4    the Big Island, they would be people who your supervisor

5    Gloria or whomever met, interviewed and retained from

6    Hawaii?

7         A.    That's correct.

8         Q.    So what I was getting at was the structure of

9    the initial program would be that you would have

10   yourself, Ms. Medina working in a supervisory capacity

11   and Ms. Medina would be providing training, but the

12   people who were going to be working as behavioral

13   therapists under her with Bryan would be retained

14   somewhere in Hawaii?

15        A.    Correct.

16        Q.    And as of the date of this proposal, you had

17   not advertised for are or solicited people for those

18   positions in Hawaii?

19        A.    Correct.

20        Q.    Do you know how many people would have been

21   necessary to perform the functions in Bryan's program

22   that you were going to seek to provide?

23        A.    I would say at least five.

24        Q.    And do you know what positions they would be

25   filling, that is, what would the name of their position

                                                        231

1    and what would the function be?

2        A.    The name of the position would be behavior

3    therapist and it's our general requirements of

4    Bachelor's level person, hopefully with some experience

5    providing behavior intervention or some experience with

6    autism or some experience with children.  And their

7    duties are to work directly one-on-one with Bryan either

8    in school or the home setting.

9        Q.    And by working directly with him, that would

10    be working directly with him to implement his IEP; is

11    that correct?

12        A.    That's correct.

13        Q.    And the behavioral program and any subsets of

14    that, like toileting or what have you, would all be

15    included within the general umbrella of his IEP?

16        A.    Correct.

17        Q.    In your visit to Hawaii or any discussions

18    before or after that, other than Christy Edwards, did

19    you have any direct communications with any of the other

20    people who were working with Bryan at the time that you

21    were making these proposals?

22        A.    Well, Dru Copeland.

23        Q.    Okay.

24        A.    I guess she was working with him at the time.

25        Q.    Right.  Let me just stop you there.

232

1              Do you understand what function she was

2     working in?

3        A.    I believe she was a supervisor at the program.

4        Q.    In Hawaii that person is referred to as an

5     IISC.

6        A.    Okay.

7        Q.    Are you aware of that?

8        A.    No, I'm not.

9        Q.    And I'm going to try to recall from memory

10    what that stands for.  I think it's Intensive --

11    Intensive Individualized Intervention Coordinator,

12    something like that.

13       A.    Okay.

14       Q.    Or Intention -- Intention Intervention

15    Services Coordinator.  It's usually a psychologist that

16    fulfills that function, although not always.

17       A.    Okay.

18       Q.    So if I'm using IISC.

19              And my understanding of Dr. Copeland's

20    function would be analogous to that that Ms. Medina

21    would be providing had she been actually retained and

22    moved over to work on the program; is that correct?

23       A.    Well, actually, Dru Copeland would have been

24    more in line with our M.A. level supervisors.

25       Q.    Okay.

233

1          A.     Which I think the plan was to, in addition to

2     Gloria, have an M.A. level supervisor also supervise the

3     case.

4          Q.    All right.

5                And would that person be retained in Hawaii or

6     would that be someone that PCFA would be retaining and

7     providing from California?

8          A.    It would be someone we retained and provided

9     from California initially.

10         Q.    Had that person been identified or retained at

11    any time from July of '04 to November of '04?

12         A.    We had a number of staff in mind to do that,

13    but we hadn't sort of -- you know, we didn't designate

14    that duty or anything like that yet.

15         Q.    Did Ms. Medina have training in American Sign

16    Language?

17         A.    No.

18         Q.    Did any of your Master's level people whom you

19    had in mind for that position that would be working

20    directly under her have training in American Sign

21    Language?

22         A.    Yes.  One of our M.A. level supervisors was

23    fluent in signing language.

24         Q.    Was that Sinead?

25         A.    Yes.

1        Q.    But my understanding from your earlier

2    testimony today was that although she was fluent,

3    because of her then current assignments, she was not

4    available to work directly on Bryan's case; is that

5    correct?

6        A.    No, she would have been able to.

7        Q.    Would she have been doing that while she

8    resided here or would she have been required to move to

9    Hawaii for that purpose?

10       A.    We probably would have had her travel back and

11   forth.

12       Q.    Had she --

13             Had you discussed that with her and had she

14   agreed to do it, in other words, make the commitment to

15   make that travel?

16       A.    Yeah, I had mentioned it to her and she was

17   willing to do that.

18       Q.    We're following along fairly closely with the

19   exhibits that you've looked at already.

20             If you look at the next exhibit, which I

21   believe is Exhibit No. 4.

22             Now, this also is a -- it appears to be just a

23   markup of the prior proposal from July.

24             Would you agree with that characterization?

25       A.    I would.

```
 1        Q.    And do you know if there was a revised
 2   typewritten form of this particular proposal or was this
 3   more in the order of notes that were made to yourself?
 4        A.    This looks like notes made to myself.  I
 5   don't -- I haven't been able to find a typed -- you
 6   know, sort of an updated proposal.
 7        Q.    Okay.
 8              Where would this information have come from
 9   that's handwritten on here?
10        A.    I believe --
11              I'm not sure what you're asking.
12        Q.    Who wrote this information on there?
13        A.    Oh, I'm sure I wrote the information.
14        Q.    Okay.
15              And then the second part of the question is:
16              Who gave you the data that's -- or the other
17   information that's contained within what you wrote here?
18        A.    I believe that came from Shelby.  So she
19   wanted us to consider more hours.
20        Q.    Now, at this time, which was August 10th,
21   2004, my understanding from your prior testimony is that
22   you were aware -- well, strike that.  I'll get back to
23   that in a minute.
24              I wanted to show you what will now be Exhibit
25   No. 18 to your deposition.
```

1              First of all, on the first page it refers in

2      handwritten notes up at the top to J. Harris and B.

3      Coffman.

4              Do you see that?

5      A.    I do.

6      Q.    Do you know who those people are?

7      A.    I do not.

8      Q.    Okay.

9              Would J. Harris possibly be Bryan's teacher at

10     this time, that is on December 1st, 2004?

11     A.    I'm not sure.

12     Q.    Okay.

13             Do you recall testifying that you observed

14     Bryan in class when you were there in October, that is

15     on the Big Island in October?

16     A.    Yes.

17     Q.    Do you recall his teacher's name?

18     A.    I don't.

19     Q.    Now, looking at the second paragraph in the

20     background section on the first page of Exhibit 18, it

21     indicates that Bryan actively uses between 20 and 50

22     signs and purportedly knows over a hundred plus.

23             "Last winter Bryan read me a picture

24             book in sign language, demonstrating

25             significantly more labels and nouns that I

241

1          might have realized he knew based on his

2          daily language use alone."

3          Do you see that?

4     A.    I do.

5     Q.    Now, when you observed Bryan in October, was

6   he signing at the level indicated in this report?

7     A.    No.

8     Q.    Were people who were working with him signing

9   to him?

10     A.    No.

11     Q.    Could that explain why it was that his -- he

12   was not actively signing, that is, he didn't have an

13   audience for him to sign to?

14          MR. USHIRODA:  Objection.

15          Speculation, lack of foundation.

16          THE WITNESS:  That's possible.

17   BY MR. VARADY:

18     Q.    You indicated that you understood why training

19   in American Sign Language for the behavioral team

20   working with Bryan would be necessary in making your

21   proposal.

22          Do you recall that?

23     A.    I do.

24     Q.    And wouldn't it be true that they would need

25   not only to be able to sign to him expressively, but be

242

1   concern, etcetera, high priority for them?

2       A.    You know, I don't know if I actually talked to

3   her about that or if I just assumed that that would be a

4   high priority.  I can't recall having that conversation

5   with mom, honestly.

6       Q.    Would you agree that was something that your

7   team would have focused on if PCFA had -- if its

8   proposal had been accepted and you began working with

9   Bryan?

10      A.    Yes.

11                  MR. USHIRODA:  Objection.

12                  The plan was very multifaceted, so I don't

13  know if it focused on just one thing.

14  BY MR. VARADY:

15      Q.    Do you understand my question?

16      A.    Yes.

17      Q.    Would that have been something that you would

18  want to have addressed as a high priority going in

19  working with Bryan?

20      A.    Yes.

21      Q.    And why is that?

22      A.    Well, it's a sanitary problem, for one thing.

23  And -- or hygiene problem.  And it really sort of

24  impedes his ability to be out in the community and be in

25  school settings without a hardship, basically, I guess.

298

1    five-day program that you spoke about; is that correct?

2          A.    Actually, she does the new staff training and

3    she does the PART training.

4          Q.    All right.

5          A.    Yes, so that's how she was going to be

6    involved, yeah.

7          Q.    All right.

8                Now, the proposal was for a period of --

9                The proposal that you made and throughout all

10   its various drafts up until the final draft in November

11   was for a three-month contract; is that right, to begin?

12         A.    Correct.

13         Q.    And can you tell me why that three-month

14   interval was chosen, is there something specific about

15   that that was important to PCFA?

16         A.    Nothing really in particular.  I'm thinking

17   that -- I don't know.  Three months seems to be a

18   standard probationary period and maybe that's what we

19   were thinking.  I can't remember exactly how we came up

20   with three months.

21               Let's see here.  Hold on.

22               Yeah, I can't remember how we came up with

23   three months, honestly.

24         Q.    So that's not something that you typically do;

25   is that correct?

300

1          A.     That's correct.

2          Q.     That a specific child of family, would not

3     typically do that?

4          A.     Correct.

5          Q.     Would you look at Exhibit 7, please.

6                 Now, looking at your response to Shelby

7     Floyd's questions, the last sentence, you say, and this

8     is as of -- in response to her September 14th, 2004

9     e-mail:

10                "The supervision is only" for a

11                proposal -- "is only a proposal for the

12                maximum possible, but can be adjusted as

13                needed."

14                Do you see that?

15         A.     I do.

16         Q.     Can you tell me what was meant by that

17    statement?

18         A.     I think that what we sort of spelled out,

19    number one, is the -- our maximum requirement for

20    supervision and that it could be, I think, adjusted

21    based on need or what have you.

22                So we said M.A. level supervision in person

23    every other month for 16 hours two full days depending

24    on the need that could be adjusted up or down.  So if we

25    needed more supervision, it would be more.  If we needed

1    less supervision, we would go less often, something like

2    that.

3        Q.    But at the time you were writing this, you

4    weren't certain which way it was going to shake out,

5    that is, whether or not the maximum would be needed or

6    not; is that correct?

7        A.    Correct.

8        Q.    All right.

9              Just so we have a clear record, I'm going to

10   give you what we'll mark as Exhibit No. 25.

11             (Whereupon, at this time, the Certified

12             Shorthand Reporter marked Defendants' Exhibit

13             25 for identification.)

14   BY MR. VARADY:

15       Q.    And I would just like you to flip through this

16   and confirm that this is the draft behavioral assessment

17   that Ms. Tolentino faxed to you on October 6th, 2004,

18   among other records she sent you on that date.

19       A.    This is the draft faxed to me.

20       Q.    All right.

21             I'm going to show you a letter dated October

22   8th.

23             MR. VARADY:  I ask that this be marked as No.

24   26, please.

25   //

                                                          302

1    A.    -- would that include teachers and --

2    Q.    Yeah, sure.

3    A.    Well, there was that classroom teacher and

4    then those two people.

5    Q.    In the module?

6    A.    Yes, in the module.

7    Q.    You did meet with Alvin Rho also, correct?

8    A.    That's right.  But that -- yeah.

9          Not that I can recall.

10    Q.    But your primary contact with the DOE was with

11    Kate Tolentino?

12    A.    Correct.

13    Q.    In fact, she was really your only contact?

14    A.    Correct.

15    Q.    Now, from your conversations with Kate

16    Tolentino, did it appear to you that, you know, she

17    wanted to make sure that Bryan's needs were met?

18          MR. VARADY:  Objection.

19          Leading, calls for speculation.

20    BY MR. USHIRODA:

21    Q.    Educational needs.

22    A.    Yes, it appeared that way.

23    Q.    It's not like he was being put in a box and

24    shoved away, they wanted to make sure he was getting

25    services, correct?

344

1                 MR. VARADY:  Objection.

2                 Leading.

3                 THE WITNESS:  It appeared that way, yes.

4    BY MR. USHIRODA:

5         Q.    How about your discussions with Alvin Rho, do

6    you recall anything from Mr. Rho about what he felt

7    should be done about Bryan's educational program?

8         A.    No, I never sought his opinion or thoughts.

9    Mainly he listened to what I had to say.

10        Q.    Did Kate ever share with you what her thoughts

11   on Bryan's educational program, what should be done,

12   what needs should be met?

13        A.    No.

14                MR. USHIRODA:  I think that's all the

15   questions I have.  Thank you for your time.

16                THE WITNESS:  You're welcome.

17                MR. USHIRODA:  Are we done?

18                MR. VARADY:  We're done.  Thank you so much.

19                (Whereupon, the deposition proceedings were

20                concluded at:  9:00 p.m.)

21

22

23

24

25

345