IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 1 2000

367

at _____ o'clock and _____ min. ___ M.
WALTER A. Y. H. CHINN, CLERK

JENNIFER FELIX, by her Mother ) CV. NO. 93-00367
and Next Friend, FRANKIE )
SERVIETTI-COLEMAN,  ET AL., )
)
Plaintiffs, )
)
vs. )
)
BENJAMIN CAYETANO, in his )
official capacity as )
Governor of the State of )
Hawaii, et al., )
)
Defendants. )
_____ )

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE FOUND IN CIVIL
CONTEMPT OF CONSENT DECREE AND FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs' Motion was heard before this court on May

30, 2000.  Shelby Anne Floyd, Esq., David A. Fisher, Esq.,

Matthew Charles Bassett, Esq., Susan A. Cooper, Esq., and Eric

Seitz, Esq., appeared on behalf of Plaintiffs;  Deputy Attorneys

General Russell Suzuki and Holly T. Shikada appeared on behalf of

Defendants.  After reviewing the motion and the supporting and

opposing memoranda, and hearing oral argument from counsel, the

court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion.


BACKGROUND

In this civil case, Plaintiffs brought this case in

1993, alleging that the State of Hawaii did not adequately comply

with the provisions of the Individuals with Disabilities Act

("IDEA") and Section 504 of the Rehabilitation Act in its

dealings with children with mental health needs.  Then, after the

Exhibit 3

court awarded Plaintiffs partial summary judgment, the parties
entered into a Consent Decree in 1994, which the court approved
on October 31, 1994.  In the Decree, the State of Hawaii was
ordered to design and implement a seamless system of care which
"consists of (1) a system of care of programs, placements and
services, and (2) organizational and managerial infrastructure
capable of supporting the system, and which, at minimum, ensures
that the requirements of the IDEA and Section 504 and the
principles and standards of this Decree are satisfied." See
"Consent Decree" at ¶11.

While the Consent Decree itself did not lay out the
"precise means of accomplishing [its] ends," it provided a set of
"operating principles" or "standards" governing the State's
development of an Implementation Plan which would "operationalize
the goals" of the decree and provide the required tasks that the
State would have to perform to ensure compliance.  The State was
required to design and implement this plan "by the intermediate
and final dates set out in or to be established under [the]
Decree."  Also, the parties agreed that Dr. Ivor Groves, the
Court Monitor, would develop a Monitoring Plan by which the
State's progress would be tracked and measured.

An initial Implementation Plan was approved by the
court on October 17, 1996, and because it has needed changes to
ensure full compliance, the parties have made stipulated and
court-approved modifications of the Plan since that time.  A key
step in the compliance process made by the parties was the

2

Monitor's identification of one-hundred and forty-one benchmarks for court tracking extracted from the modified plans. The court approved these benchmarks in March of 1999.

Since they claim that Defendants have failed to comply with the Decree and meet the benchmarks, Plaintiffs filed this Motion on March 6, 2000. Defendants filed their Opposition on April 14, 2000 and Plaintiffs filed their Reply on May 18, 2000.

STANDARD OF REVIEW

A federal court has inherent power to enforce its orders by way of civil contempt. Spallone v. United States, 493 U.S. 265, 276 (1990). Civil contempt occurs when a party disobeys a specific and definite court order by failing to take all reasonable steps in its power to ensure compliance with the order. Go-Video, Inc. v. Motion Picture Association of America, 10 F.3d 693, 695 (9th Cir. 1993); Sekaquaptewa v. MacDonald, 544 F.2d 396, 404 (9th Cir. 1976). Since the purpose of civil contempt is remedial and not punitive, the failure to comply need not be wilful or intentional. General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986); Donovan v. Mazzola, 716 F.2d 1226, 1240 (9th Cir. 1983), cert. denied, 104 S. Ct. 704 (1984) ("Intent is not an issue in civil contempt proceedings. . . . The sole question is whether a party complied with the district court's order"). Also, there is no "good faith" exception to the requirement of obedience to a court order. Go-Video, 10 F.3d at 695.

However, civil contempt does not occur if the party's action "appears to be based on a good faith and reasonable interpretation" of the decree. Id.; Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 889 (9th Cir. 1982) (quoting Rinehart v. Brewer, 483 F. Supp. 165, 171 (S.D. Iowa 1980)). Also, "substantial compliance," or taking all reasonable steps to comply with the decree is a defense to a contempt finding, even if "technical or inadvertent violations of the order" are present. General Signal, 787 F.2d at 1379; Vertex, 689 F.2d at 891-92.

Therefore, to show that a party's activity constitutes civil contempt, the party alleging civil contempt must show that the "alleged contemnor violated the court's order by `clear and convincing evidence,' not merely a preponderance of the evidence." Go-Video, 10 F.3d at 695 (quoting Vertex, 689 F.2d at 889). Then, if the moving party makes this prima facie showing, the alleged contemnor bears the burden of showing "why [it] was unable to comply after taking every reasonable step." United States v. State of Hawaii, 885 F. Supp. 212 (D. Haw. 1995); Donovan, 716 F.2d at 1240. Further, it must make this showing with categorical and detailed evidence of reasons why it was unable to comply. Id. In making this showing, "financial constraints do not allow states to deprive persons of their constitutional rights." State of Hawaii, 885 F. Supp. at 215.

Additionally, "a finding of contempt must [] be based upon an examination of past behavior as well as present

4

intentions." Id. at 216.  Thus, while a court will not ignore an alleged contemnor's recent efforts to comply with the decree, the court will also not ignore the party's history of unexcused non-compliance or otherwise unsatisfactory progress.  Id.  As this court stated in State of Hawaii, even if "'new and improved' conduct and plans offered by [a party] are laudable," they will not excuse a party from non-compliance, especially since "they are also evidence of previous reasonable steps that should have been taken."  Id.

Finally, sanctions for civil contempt may be imposed to serve two purposes: (1) to coerce obedience with the court order; or (2) to compensate the moving party for injuries resulting from the contemptuous behavior.  General Signal, 787 F.2d at 1380.  If the sanction is imposed to coerce obedience, the court must consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." United Mine Workers of America v. United States, 330 U.S. 258, 304. Also, if a court sanctions a party, for coercion purposes, with a fine, it should be payable to the court.  General Signal, 787 F.2d at 1380.  However, when the sanction is imposed for compensation purposes, any fine imposed against the contemnor must be based on evidence of the moving party's actual loss. United Mine Workers, 330 U.S. at 304.

DISCUSSION

Specifically, Plaintiffs argue in their Motion that Defendants should receive civil contempt sanctions for violating the Consent Decree and Court Orders in the following manner:

(1) failing to establish a fully implemented and operational system of care and an organizational and managerial infrastructure capable of supporting the system, which ensures, at a minimum, that the requirements of the IDEA and Section 504 and the principles of the Consent Decree are met;

(2) failing to provide sufficient appropriate programs and services for the Plaintiff class so that at least 16 school complexes would be in compliance with the requirements of federal law and the Consent Decree by December 1999, and 32 by March 2000;

(3) failing and refusing to deliver minimally appropriate services to members of the Plaintiff class in all school complexes with the possible exception of Kauai complexes and Nanakuli;

(4) failing to provide sufficient resources to prevent a growing number of class members who do not receive services which are identified in their service plans, but who instead are placed on waiting lists and/or are provided with temporary, inadequate and inappropriate services, including residential placements both in Hawaii and on the mainland;

(5) failing to implement sufficient procedures and refusing to take appropriate actions to establish and enforce the accountability of persons in leadership positions for their consistent failure to meet the requirements of the Decree and Court's Orders;

(6) failing to adequately train and support special education teachers, educational aides, care coordinators, and others whose services are necessary to the provision of an appropriate education to class members;

6

(7)   failing to provide sufficient trained and qualified special education teachers, speech pathologists, occupational therapists, therapeutic aides, educational aides, school counselors, psychiatrists, psychologists, and other personnel necessary for the provision of an appropriate education to class members;

(8)   failing to remove barriers such as civil service requirements, procurement laws, and provisions in collective bargaining agreements which impede the prompt and appropriate provision of services to class members;

(9)   failing to carry out the Implementation Plans and work plans approved by the Court and to meet the benchmarks for performance;

(10)  failing to require the coordination of services and/or service plans between the DOE, DOH, DHS and the Family Court;

(11)  failing to comply with specific provisions of the Consent Decree regarding assistance in applying for Supplemental Security Income ("SSI") benefits;

(12)  failing to support the Community Children's Councils ("CCC") such that they can effectively work in partnership with the State to ensure compliance with the Decree;

(13)  failing to comply with every obligation of the Consent Decree and implementation plans.

See "Plaintiffs' Motion," at 2-4.  As a result of these alleged violations, Plaintiffs seek the imposition of the following relief from the court:

(1)   Issue an order holding Defendants in contempt of court for their violations of the Consent Decree and implementation plans;

(2)   Order that each member of the Plaintiff class is entitled to be treated in accordance with each of the principles and standards set forth in the Consent Decree;

(3)  Appoint a receiver to take control of the system of care in certain school complexes, with all the powers necessary to carry out the requirements of federal law and the Consent Decree;

(4)  Order the DOE to select a standardized reading instrument suitable for each grade and comparable between grades which will be used to measure baseline reading scores for each Felix classmember no later than May 30, 2000, and used to measure reading progress no less than annually thereafter;

(5)  Provide the Directors of the DHHS and the Superintendent of Education with the power to override state personnel and licensing laws, collective bargaining agreements, procurement laws, and any other laws that impede sufficient progress to bring the State in compliance with the Consent Decree, and order them to exercise such power to obtain any resource needed to secure appropriate programs, placements and services for the Plaintiff class;

(6)  Order the creation of substance abuse programs with sufficient capacity to meet the identified need of Felix class members on each island;

(7)  Order that the name of every class member who is waiting over 30 days for the provision of identified services be provided to the Monitor and Plaintiffs' counsel;

(8)  Order that Plaintiffs' fees and costs for the bringing of this motion be reimbursed; and

(9)  Order any other further relief as the Court finds just and proper.

See "Plaintiffs' Motion," at 34-35.  In response to these allegations and requests in Plaintiffs' Motion, Defendants claim that they "have taken all reasonable steps within their power and acted reasonably and with professional judgment in their endeavor to develop the self-sustaining system of care necessary" to satisfy the Consent Decree and benchmarks established by the court and the Special Master.

As stated above, in determining whether civil contempt sanctions are necessary, the court must first examine whether Plaintiffs have shown that the Defendants have "violated the court's order by 'clear and convincing evidence.'" Go-Video, 10 F.3d at 695 (quoting Vertex, 689 F.2d at 889). Then, if the court finds that Plaintiffs have made this prima facie showing, then Defendants bear the burden of showing, with categorical and detailed evidence, why they were unable to comply after taking every reasonable step. Donovan, 716 F.2d at 1240. Also, financial constraints do not excuse non-compliance. State of Hawaii, 885 F. Supp. at 215. Thus, the court will first consider whether Plaintiffs have satisfied their burden of making a prima facie showing of non-compliance with the Consent Decree.

A.  **Plaintiffs' Prima Facie Case of Non-Compliance**

1.  *General Background of the State's Non-Compliance*

Initially, Plaintiffs argue that Defendants violated the Decree by failing to provide the proper training, human and monetary resources necessary for timely compliance. Further, they offer evidence of events over the past five years that show a "pattern of partial [compliance] or non-compliance accompanied by repeated offers of remedial 'plans' which themselves were not complied with."

First, in 1996, within six months of the initial Implementation Plan's approval, the State conceded that it failed to meet all of its obligations under the Decree and that it also

9

missed some of the deadlines imposed by the Order.  As a result,
the court ordered the State to modify the Plan, with approval
from the court and Plaintiffs.  Then, no further changes to the
Plan were permitted without court approval.  At that time, the
court also ordered the State to develop and implement a process
to screen and identify class members, which included any
necessary tracking and reporting, by August 15, 1996.

After these modifications and court orders, the Court
Monitor's October 1996 Implementation Status Report stated that,
at that early stage of the process, while the Department of
Education ("DOE") and Department of Health ("DOH") were
"significantly in compliance with the maintenance of effort
requirements," they failed to comply with many other obligations.
For instance, he stated that the "implementation process is a
year behind where it needs to be to achieve full implementation
schedule [and] the delay could increase if the rate of
implementation is not accelerated."  Also, he found that "as many
as 50% of the children served [were] not served according to the
agreed-on principles," there were many "systemic difficulties"
such as lack of needed services, too many children in residential
placements on the mainland, lack of adequate space and "fear of
intimidation from administrators when teachers and staff advocate
on behalf of children's needs for services."  Further, the Report
stated that there were not enough properly trained and
experienced staff to comply with the Decree, and the management
systems were insufficient to ensure accountability or obtain

adequate productivity from all staff resources.  In sum, there were major problems that the State needed to address and correct to ensure compliance by the Decree deadline.

Then, in 1997, after Plaintiffs moved the court to hold Defendants in contempt for failure to comply with the revised Plan's deadlines and the court held a Status Conference, the Special Master ordered the State to comply with nine obligations, including the appointment of an Operational Manager and the submission of a final Autism Training Plan.  According to the Court Monitor's Second Year Implementation Final Report, Defendants fully complied with seven of them, partially complied with one and failed to comply with only one of the requirements.  However, in late 1997, the DOE's budget request lacked many services that were necessary for an effective plan for recruitment and retention of special education teachers.

Next, at the beginning of 1998, Defendants were in non-compliance with many obligations in the Decree, and the data collection system for the evaluation timeliness were recognized to be inoperative.  Then, in May, after a February court order revised portions of the Implementation Plan and required Defendants to immediately meet all established deadlines, the State filed a motion to vacate the existing deadlines and make new ones, since it had missed some of the deadlines set in the Plan.

Further, in September 1998, the Monitor's Third Annual Monitoring Report stated that "if a contempt hearing were held

11

today, a broad and compelling argument could be made that the state has not responsibly exercised its obligation[s]" under some of the Consent Decree requirements. Additionally, he found that "the most significant problem with implementing the orders of the Court is in the state's inability to meet the timeliness and intent of the agreed-on implementation plans." Also, the Monitor asserted that "significant numbers of children are still not consistently getting the appropriate education and related services necessary to achieve reasonable educational and therapeutic progress." He specifically found that the State failed to provide enough adequately trained persons and the staff did not understand their obligations, among other problems. Importantly, he determined that major changes were needed to bring the State into full compliance with the Decree and that, at the rate they were going, the State would not comply with its obligations by the Decree's June 2000 deadline. Finally, he stated that while the State had complied with many obligations, much of the "implementation progress" that they had made was a result of outside pressures brought by the plaintiffs, the Monitor, the Technical Assistance Panel's efforts and the Court, and that "the state's overall pattern of performance is insufficient to make the progress necessary to achieve full compliance . . . by the June 2000 deadline."

In response to this Report, the Court, on November 5, 1998, ordered the State to develop a new plan to accomplish every outstanding task that was keeping it from full compliance with

the Decree.  In so doing, the court informed the State that the pace of implementation needed to quicken and that the court would not allow the State to further delay the implementation process beyond the June 2000 deadline.  Responding to this court order, a revised Plan was finished and approved by the court in December 1998.

On February 26, 1999, the Special Master told the parties that all benchmarks stand independently of each other and that no deadlines would be extended.  Then, in March, the Monitor asserted that there were two primary barriers to successful implementation of the Plan, namely constraints on the DOE's management obligation to utilize human resources in the most effective manner possible and additional funding for teacher allocation.

Then, at the court's request, the Monitor organized the Implementation Plan into 141 benchmarks, which were intended to allow the court to assess the State's progress towards compliance.  Within the report containing the benchmarks, the Monitor made the primary method for tracking compliance "the number of school complexes that have achieved substantial compliance status" by the benchmark deadline dates.  As a result, service testing schedules were established in every complex in the State.

Moreover, in the Fourth Annual Monitoring Report for the period September 1998 to August 1999, the Monitor again found that the number of trained and qualified personnel available in

13

the special education system was inadequate to provide effective services. Additionally, the State acknowledged in mid-1999 that it had met just 82% of the benchmarks in the Revised Implementation Plan and set forth no plans of additional efforts to achieve compliance by the June 2000 deadline.

In November 1999, the Molokai Complex service testing results showed that the educational and mental health programs for the Molokai class members under the Decree were extremely deficient. Then, in December, the Monitor's Report stated that "the State will not be able to demonstrate reasonable compliance . . . by June 2000." Finally, in late December, the State committed to several obligations intended to address the need to comply with the Decree, such as the development of written agreements between the DHS and the DOE and DOH which would commit to DHS participation in joint and coordinated service planning. However, these commitments have not been met.

2.    *The State's Failure to Meet Benchmark Deadlines*

As stated above, the benchmarks established by the Monitor are the measure the court uses to assess whether the State is in compliance with the Decree. Of the 141 benchmarks, Plaintiffs have shown that the State has completely failed to comply with eight and has only partially completed six. Several of the uncompleted benchmarks deal with critical implementation issues.

First, the State failed to comply with Benchmark 114, which required sixteen school complexes to be in compliance under

14

the Monitor's service testing substantial compliance indicator by December 15, 1999.  The service testing shows that only four complexes were in compliance by that date.  Related to this benchmark, Benchmark 121 required that thirty-two complexes be in compliance with the standard by March 2000.  However, by that date, the State had still only brought four complexes in compliance.

Additionally, Plaintiffs have provided evidence that the State has failed to meet Benchmark 99, which required the State to implement staff accountability procedures to ensure compliance with the Decree by September 1999.  Specifically, the benchmark ordered the following:

> Beginning SY 1999-2000, SOE/administration/ school staff will use staff accountability procedures and ongoing to assure implementation of IDEA/Consent Decree, evidenced by specification of accountability procedures/ documentation of their utilization.

However, according to the Monitor's 1999 Interim Report and the February 21, 2000 Status of Benchmarks Report to the Special Master, the Monitor concluded that the State has not completed this requirement even though it was supposed to be implemented by the 1999-2000 school year.

Further, while Benchmark 117 required that all school districts be able "to access mental health evaluations and services as required by the IEP/MP/CSP . . . beginning in December 1999," Plaintiffs have shown, via Gap Analysis Reports and recent service testing, that the State has failed to meet

this benchmark as well. Defendants claim that this is near
substantial completion, but even if it is, the fact remains that
it is not completed and was not even partially completed by the
benchmark deadline. Also, while Benchmark 97 is now completed,
it was completed four months late.

Moreover, as the Monitor confirmed in his January 2000
letter to the Special Master, Benchmark 84, requiring the
adoption of licensing processes for community based residential
programs, has not been complied with, and Benchmark 90, which
requires the implementation of "training and a career ladder for
classroom assistants by August 1999" remained "not completed" in
January 2000. Benchmark 52, which was set for completion in
April 1999 was completed, but not until February 2000.
Additionally, Benchmarks 102 and 37, relating to the FIMIS
informational system and its accountability, were supposed to be
completed in September and March 1999, respectively, but both
remain "not completed." Finally, a number of other benchmarks
covering various areas of the Decree, namely Benchmarks 68
(requiring data to be reported to the DOE beginning June 1999),
96 (relating to hiring autism consulting teachers), 99 (regarding
accountability procedures and 101 (regarding monitoring
procedures), are only partially completed.

Therefore, Plaintiffs have clearly shown that the State
has failed to comply with a number of the most significant
benchmarks which were put in place to monitor its compliance with
the Consent Decree. While Defendants claim that they are

16

continuing to work on complying with these benchmarks, the fact remains that they have failed to meet the deadlines, which were firm but manageable. Further, as of May 2000, most of these benchmark deadlines have still not been met by the State.

### 3. *Service Testing Results*

Under the Consent Decree, the parties agreed that the results would be measured by service testing of the complexes under the Decree. In their Motion, Plaintiffs offer evidence alleging that the service testing shows that many of the Consent Decree's mandates have not been met.

First, they offer results from various Monitoring Reports showing that since October 1999, no complexes, out of the seventeen tested, have scored within the "acceptable" range of the testing on their "adequacy of the system of care" coordinated service reviews. This failure to comply violates paragraph 14 of the Consent Decree, which requires the State to design a "new system of care . . . in conformity with [established] 'principles' and 'standards.'"

For instance, the Kealakehe Complex in Kona reported results showing that the system of care "performed adequately only 45% of the time for low end children and 44% of the time for more involved children." Further, only 60% of the low-end children were adequately participating in class, only 30% were conveying responsible behavior and only 60% were showing adequate learning progress. Also, less than 50% of the more involved children were showing adequate learning progress, according to

the service reports. Importantly, the Monitor found the prospects for improvement of these numbers within the following six months to be limited.

Moreover, other complexes have obtained similar scores. The Kohala Complex on Hawaii recently received a score showing that only 50% of the children were adequately served. The learning progress of the low-end students was at 42% for low-end students and 58% for more involved students. Also, the Molokai Complex, which is the worst in the State, was tested in November 1999 and only 55% of its children were functioning adequately. Only 54% of its more involved students were showing adequate learning progress. Lastly, the testing at the Kaimuki Complex in Honolulu resulted in a 56% acceptable learning progress rating for low-end students, and the system was functioning adequately for only 56% of the students. Interestingly, the comparisons of these 1999 results with the complexes' 1996 results shows that they have made little improvement on their "effectiveness" ratings over that time despite the Decree. Thus, as these examples convey and the other service reports show, the State has failed to comply with the Decree in terms of the overall effectiveness of the complexes throughout the State, with the exception of four complexes.

Second, Plaintiffs offer service testing evidence of the State's failure to comply with the Decree's requirements to consistently identify children's needs, ensure that they get prompt and individualized services, monitor the results and

18

modify the services when the they are not appropriate in type or quantity. Basically, this is the "accountability" obligation of the Consent Decree. The above overall effectiveness testing results show that there is a lack of accountability measures in place since the learning progress results have generally not improved since the Decree has been in place. Further, the number of certified teachers in the state remains low and classroom sizes are growing rather than shrinking. Thus, it is clear that the state has failed to respond to the apparent needs in the system and that its accountability system in place fails to comply with the Decree of the court.

Third, the Consent Decree requires the State to develop services for the needy children "when they are needed but unavailable." Plaintiffs argue that the State has failed to meet this requirement since there "are multiple sources of information concerning children waiting for appropriate services." See "Plaintiffs' Motion," at 28. For example, the Child and Adolescent Mental Health Division ("CAMHD") reports show that in October 1999, 113 children had unmet service needs, 85 had unmet needs in November, and 181 had unmet needs in December. These "unmet needs" vary from the need for community based residential programs, individual therapy or therapeutic aides. Further, there are many children who are currently placed on the mainland awaiting placement here in the State, but there is not enough space in the residential programs.

Also, there has been a shortage of special education teachers and speech pathologists for a number of years and the State has not remedied the situation. The service testing reports show that many students with speech problems are often kept on waiting lists for months because there are not enough speech therapists. While the State has attempted to recruit more qualified teachers and speech pathologists, its techniques are inadequate and it has failed to meet the requirements set out in the Decree and Benchmarks. Lastly, though the status reports show a need for substance abuse treatment programs for class members, the State has not developed plans to provide these programs. Thus, it is clear that the State has not met the Decree requirement to provide services where they are needed.

Fourth, the Decree requires that the State's service plans "contain a detailed description of all educational, related or early intervention services to be provided, . . . and be based on a comprehensive assessment of the strengths and needs of each class member." Further, it adds that "the presence of at-risk factors such as significant behavioral problems will be indicators of the need for assessments as to the quality of services provided." However, Plaintiffs have presented service reports showing that only 27% of Molokai's, 40% of Kapolei's, 65% of Waianae's, 73% of Baldwin's, 75% of Roosevelt's, 67% of King Kekaulike's, and 86% of Pearl City's school-based plans were consistent with the children's needs. Again, this is actual evidence of the State's failure to comply with the Decree.

20

Lastly, Plaintiffs have provided service testing reports showing that the system is not sensitive to cultural differences and foster care service plans are rarely used, both of which violate the requirements of the Consent Decree. In sum, Plaintiffs have clearly shown, via the service testing reports, that the State has failed to comply with the individual requirements of the Consent Decree.

### 4.   *Other Evidence of Non-Compliance*

In addition to the failure to meet benchmarks and the evidence obtained from the service testing results, Plaintiffs have shown that the State has failed to comply with the Decree in other respects. Initially, the Decree requires that the system's infrastructure "include an interagency computerized database and information system to support the system of care which is implemented. However, the State has failed to do so, but has developed independent systems not capable of interacting with each other. Also, Plaintiffs have produced evidence showing that the State has failed to create service plans promoting transitions to independent living and post-school activities. For instance, complexes on the Island of Hawaii have completed only 65% of their plans despite the requirement of 100% of completed plans by September 1999.

In light of all this evidence provided by Plaintiffs, the court concludes that Plaintiffs have clearly and convincingly satisfied their burden of showing prima facie evidence of non-compliance with the Consent Decree on the part of the State, as

they have shown that the State has not met many of the benchmark deadlines, has known about the need for services and has failed to remedy the situation. As a result, the burden shifts to the Defendants to show "substantial compliance" with the Decree, or "why [it] was unable to comply after taking every reasonable step." State of Hawaii, 885 F. Supp. at 212; Donovan, 716 F.2d at 1240. The court will now consider Defendants' defenses to their non-compliance.

### B.    Defendants' Reasons for Non-Compliance

As stated above, when making its showing of "substantial compliance," the State must make this showing with categorical and detailed evidence of reasons why it was unable to comply, id. and financial constraint is not a valid excuse for non-compliance. State of Hawaii, 885 F. Supp. at 215. Additionally, the court must consider past behavior as well as present intentions. Id. at 216. While the court will not ignore the State's recent efforts to comply with the decree, the court will also not ignore its history of unexcused non-compliance or otherwise unsatisfactory progress. Id. As this court stated in State of Hawaii, even if "'new and improved' conduct and plans offered by [the State] are laudable," they will not excuse it from non-compliance, especially since the new plans "are also evidence of previous reasonable steps that should have been taken." Id.

Defendants initially argue that they should be excused from their non-compliance because of the array of services now available to mentally challenged children under the service plan and the continuing development of the plan without coercion from the court. They focus on the plans that are now in place that were not available in 1995. Additionally, they discuss the new initiatives that have been recently undertaken by the state, such as the development of an empirically supported treatment services task group and continued development of the service and support system for youth with Autism spectrum disorders. However, they do not provide any categorical and detailed evidence of reasons why it was unable to comply with the Decree. They simply make a conclusory statement that they have "taken all reasonable steps within their power to develop the array of services necessary to meet the needs of the children," but offer no hard evidence of barriers keeping them from fully complying with the benchmarks set out by the Monitor.

Further, Defendants claim that the information system that is now in place will serve the children better than the information system set out in the Consent Decree. Also, they claim that they "used their best efforts to implement the Felix Integrated Management Information System" ("FIMIS"), but it was not successful. As a result, they concluded after numerous tests that the system of care would be better served by separate information systems for the DOE and DOH. Since Plaintiffs do not offer evidence to rebut this, the court concludes that Defendants

"substantially complied" with this provision on information or systems of the Consent Decree because they took "every reasonable step" necessary for compliance.  However, since Defendants did not come to this conclusion until after the benchmark deadline, they were still in non-compliance for a substantial period of time.

Next, Defendants contend that the State has taken "every reasonable step" in its recruitment and retention plans for special education teachers and service providers, but external problems out of its control have caused the shortage of qualified teachers.  In support of this contention, Defendants set out the State's numerous recruitment programs and partnerships with universities, such as the University of Hawaii, Gonzaga University, Chaminade University of Honolulu and Brigham Young University of Hawaii, intended to provide qualified special education teachers for Hawaii's children with special needs. However, "the total number of actual graduates has been less than the projected number of graduates."  To approach this problem, the State added another "Elementary dual licensure cohort group" at the UH College of Education and "special efforts are also being made to recruit students from the rich pool of candidates available within the UH College of Arts and Sciences."

In addition to the partnerships with the universities, the State instituted a Respecialization in Special Education ("RISE") program to increase the number of special education teachers.  It is a one-year program that prepared individuals for

24

teaching in special education arenas.  Also, where the State has had to use regular education teachers to teach the special education students, it provides the teachers with support services and training to assist them.

Defendants further justified the shortage of teachers with the statistic that there is a national shortage of special education teachers "which has drastically affected the supply and demand."  Further, Defendants argue that this shortage is "beyond the control of the DOE and where it can be demonstrated that the DOE is unable to comply, civil contempt is not appropriate."  Finally, Defendants set forth two initiatives awaiting approval in the legislature that approach the teacher shortage in support of the assertion that they have, and are, taken every reasonable step necessary to comply with the Decree.

However, though Defendants have taken many steps to comply with the Decree, the court concludes that they have not taken "every reasonable step necessary" since there is no evidence that they have offered special incentives, higher salaries or better working conditions in an attempt to recruit qualified special education teachers for the schools.  This is clearly a reasonable step that should have been taken by Defendants in their recruitment efforts.[1]  Thus, Defendants'

---

[1]  While the court understands that school administrators may have been concerned with the teacher union reaction to the implementation of special incentives for special education teachers, this court, the Special Master and the Court Monitor made it clear that the law must be complied with regardless of these concerns.

25

noncompliance in their efforts relating to recruitment of qualified teachers is not justified.

Also, Defendants argue that their foster care provisions are adequate and they comply with the Decree by collaborating with the DOE and DOH to place children in the program when it is necessary. Further, the State contends that it is meeting the "accountability" requirement since the DOE has implemented "an accountability procedure that requires all districts to submit school by school accountability reports on a monthly basis. The DOE has also recently proposed legislation introducing accountability for department personnel and their job performance. However, despite these recent developments, Defendants do not offer any reasons why they have failed to comply with these requirements over the past five years of the Decree, and as a result, are not excused from their non-compliance.

As for the service testing and the State's failure to bring most of the complexes into full compliance, the State does not offer any justification for its failure to comply with the Decree. Rather, it simply contends that "petitioner failed to make a sufficient showing that coercion was necessary to make [the State] comply" with the Decree since the State is now making plans to comply without a court order. More specifically, they argue that "the Defendants' systems monitoring plan demonstrates the Defendants' ability and commitment to achieve full compliance in service testing and confirms that the Defendants do not need

to be coerced into complying with the Consent Decree." Unfortunately for the State, however, this recent activity in pursuit of compliance is not sufficient to overcome the past five years of non-compliance with the Decree and present lack of compliance.

Similarly, Defendants do not offer reasons for their failure to meet the aforementioned benchmark deadlines set by the Monitor, but only offer evidence of benchmarks that are now completed or partially completed and further assert that they are continuing to "make progress in achieving task completion."  They then contend that since "the DOE and the DOH are committed to completing the tasks identified by the benchmarks and are not in need of coercion to comply with the benchmarks, there is no basis to hold the Defendants in contempt."  Again, however, this argument is misplaced because the fact remains that the State failed to meet the deadlines without any proper justification.

Further, Defendants further argue that their present efforts in making structural changes and proposals to the ongoing systems monitoring/sustainability activity, such as the Complaints Resolution Office, the Community Children's Council Office, the Community Children's Council and the Felix Staff Service, should immunize them from a contempt finding because it shows that they are committed to complying with the Consent Decree without any coercion from the court.  Once again, though, these recent plans and proposals do not overcome the years of noncompliance with the Decree, especially since they provide the

court with evidence of ways the State could have been complying with the Decree over the past five years.

As a result, since the State has simply argued that it need not be coerced to comply because it has developed new plans that are currently being instituted into the system to approach some of the problems, it has failed to show that its non-compliance was justified and that it took "every reasonable step" to comply with the Decree over the past five years. While the State is correct in stating that a broad array of services are now available that were not previously available at the inception of this case and the State has made some progress in the area of services to children with mental health problems, the fact remains that the State failed to comply with many significant benchmark deadlines and the Decree itself without excuse.

In addition to their argument that they should not be found in contempt because they need not be coerced into compliance, Defendants also argue that they should not be held in contempt because they have shown "good faith in their endeavor to comply with the Consent Decree." However, even if they were to be found to have acted in "good faith," that finding would be irrelevant since "[i]ntent is not an issue in civil contempt proceedings. . . . The sole question is whether a party complied with the district court's order" Donovan, 716 F.2d at 1240.

Thus, the court concludes that Defendants are in civil contempt of the 1995 Consent Decree. To ensure that the necessary and appropriate relief is ordered, the court also

28

ORDERS that separate hearings be held to allow the parties to present testimony and evidence regarding relief that should be granted because of Defendants' failure to comply with the Decree's obligations.

## CONCLUSION

For the reasons stated above, the court finds Defendants in civil contempt of the Consent Decree and ORDERS that hearings on appropriate sanction and other relief will be held at a date to be set by the court.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, _____ JUN  1 2009 _____.

_____
DAVID ALAN EZRA
CHIEF UNITED STATES DISTRICT JUDGE

Jennifer Felix, et al. vs. John Waihee, et al., Civil No. 93-00367 DAE; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE FOUND IN CIVIL CONTEMPT OF CONSENT DECREE AND FOR INJUNCTIVE AND OTHER RELIEF