EXHIBIT 1 TO DECLARATION OF LORETTA M. LUKENS

A106C37
**LORETTA M. LUKENS, MN, RN, CRRN     AUGUST 21, 2007**

*FILE* [handwritten: Calvarady 1001 Bishop # 2870]

```
          IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF HAWAII


ANN KIMBALL WILES and STANLEY  )
BOND, individually and as next )
friends of their son, BRYAN    )
WILES-BOND, a minor,           )
                               )
              Plaintiffs,      )
                               ) Case Nos.
      vs.                      ) CV 04-00442 HG/BMK
                               ) CV 05-00247 HG/BMK
DEPARTMENT OF EDUCATION, State )
of Hawaii, and ALVIN RHO, in   )
his official capacity as West  )
Hawaii District Superintendent.)
                               )
              Defendants.      )
_____)




              DEPOSITION OF

   LORETTA M. LUKENS, MN, RN, CRRN

           Tempe, Arizona

         August 21, 2007

         9:00 o'clock a.m.



ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com


REPORTED BY:
LISA A. NANCE, RPR, CR (AZ)
Registered Professional Reporter
Certified Reporter
Certificate No. 50349

FILE NO. A106C37
```

Page 1

A106C37

## LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

**Page 2**

```
 2
 3
 4
 5              A P P E A R A N C E S:
 6
 7
 8    FOR PLAINTIFFS:
 9    DAVIS, LEVIN, LIVINGSTON, GRANDE
      BY: STANLEY E. LEVIN, ESQ.
10    400 Davis Levin Livingston Grand Place
      851 Fort Street
11    Honolulu, Hawaii 96813
12    Also Present: Paralegal Bruce Ellis
      assisting Mr. Stanley E. Levin
13
14
15    FOR DEFENDANTS:
16    WATANABE, ING & KOMEIJI
      BY: GREGG M. USHIRODA, ESQ.
17    999 Bishop Street
      23rd Floor
18    Honolulu, Hawaii 96813
19
20
21
22
23
24
25
```

**Page 4**

```
 1        DEPOSITION OF LORETTA M. LUKENS, MN, RN, CRRN
 2    began at 9:00 a.m. on August 21, 2007, at the home
 3    of Loretta M. Lukens, 29 West Rhea Road, Tempe,
 4    Arizona, before Lisa A. Nance, RPR, CR, Certified
 5    Reporter, Certificate Number 50349, in and for the
 6    State of Arizona, pursuant to the Rules of Civil
 7    Procedure.
 8            The plaintiffs were represented by
 9    their attorneys, Davis, Levin, Livingston, Grande,
10    by Mr. Stanley E. Levin, 400 Davis Levin Livingston
11    Grand Place, 851 Fort Street, Honolulu, Hawaii,
12    96813. Paralegal Bruce Ellis was also present
13    assisting Mr. Levin.
14            The defendants were represented by
15    their attorneys, Watanabe, Ing & Komeiji, by
16    Mr. Gregg M. Ushiroda, 999 Bishop Street, 23rd
17    Floor, Honolulu.
18
19            The following proceedings were had:
20
21
22
23
24
25
```

**Page 3**

```
 1            I N D E X
 2    WITNESS: LORETTA M. LUKENS, MN, RN, CRRN
 3    EXAMINATION                    PAGE
 4      By Mr. Ushiroda              5
 5      By Mr. Levin                --
 6
 7            E X H I B I T S
 8    NO.  DESCRIPTION              MARKED
 9    1    CV of Loretta Lukens, MN, RN, CRRN   16
10    2    2007 Updated Life Care Plan.     59
11    3    Communication File.         73
12    4    Assessments, 4-8-06, File.      73
13    5    Written Questions Interrogatories File. 74
14    6    Initial Letter and Communication File.  75
15    7    Communication File with E-Mails.   75
16    8    Defense File.            76
17    9    2006 Initial Life Care Plan.     79
18    10   Description of the May Institute.   174
19    11   Report by Mr. Von Elsner.      238
20
21    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
22    None.
23
24    INFORMATION TO BE SUPPLIED:
 5    None.
```

**Page 5**

```
 1                Tempe, Arizona
                   August 21, 2007
 2                9:00 o'clock a.m.
 3
 4        LORETTA M. LUKENS, MN, RN, CRRN,
 5    called as a witness herein, having been first duly
 6    sworn, was examined and testified as follows:
 7
 8            E X A M I N A T I O N
 9    BY MR. USHIRODA:
10       Q.  Could you please state your name for the
11    record.
12       A.  Loretta Lukens.
13       Q.  Good afternoon, Ms. Lukens. My name is
14    Greg Ushiroda. Today I'll be taking your
15    deposition.
16            Before we start, I understand that you
17    have been retained as an expert witness on behalf of
18    the plaintiffs to provide a life care plan for the
19    parents of son Bryan Wiles-Bond; is that correct?
20       A.  Yes.
21       Q.  Have you ever had your deposition taken
22    before?
23       A.  Yes.
24       Q.  How many times?
25       A.  A number of times over 15 years.
```

2 (Pages 2 to 5)

A106C37

LORETTA M. LUKENS, MN, RN, CRRN     AUGUST 21, 2007

1   Q. And how much of this is -- if you are able
2 to apportion this part of your practice as opposed
3 to your whole practice?
4   A. Over what period of time?
5   Q. Well, when did you start?
6   A. Well, I've had pediatric children in my
7 practice for the past 15 years.
8   Q. Okay. Let's say the last five years, then.
9   A. Somewhere between 10, 15 percent of my life
10 care plans have been pediatric.
11   Q. And when you say --
12   A. Presently I believe it's a little higher
13 than that, in the last month or two.
14   Q. And the last month or two, how much would
15 that be?
16   A. At least 20 percent.
17   Q. And when you do life care plans for
18 pediatric cases, it encompasses all these
19 developmentally delayed children that we've just
20 discussed?
21   A. Yes.
22   Q. What is a life care plan?
23   A. A life care plan is a rehabilitation plan
24 that looks at the present and the future
25 rehabilitation needs. And it identifies services

Page 10

1 that will meet those needs including the cost of
2 those services.
3   Q. Okay. Now, do the -- how do you go about
4 preparing a life care plan? Take me through your
5 methodology, if you could.
6   A. When I am first contacted by the attorney,
7 or physician, or wherever the referral comes from, I
8 request medical records, because not all children
9 with autism have all the same issues nor do all
10 children with developmental disabilities have the
11 same issues.
12   After I review the medical records,
13 and I'm looking for medical diagnoses, that tells me
14 complications, such as seizures, self-injurious
15 behavior, emotional issues, psychological
16 evaluations, psychiatric evaluations, medications
17 that are used. So I'm reviewing the medical records
18 and looking at trying to obtain a picture of the
19 child. Okay? Once I review the medical records,
20 then I schedule a home visit. And the home visit
21 will usually take at least a couple hours.
22   I have an assessment tool that I go
23 through, a 24-hour period with the family. If the
24 child is -- depending on the age of the child, I may
25 interview the child. I may not. I talk with the

Page 11

1 parents. I will make observations in the home. I
2 will talk with family members, sometimes brothers
3 and sisters. I also try to make school visits
4 because I'm wanting to get a sampling of a picture
5 of this child not only at home but in a school
6 setting. Or I may take a child to a park or observe
7 a child outside the home. For instance, with Bryan,
8 his family went to Burger King, so I came along and
9 made some observations at Burger King.
10   Once I've done that, then I certainly
11 want to review the expert reports, like Dr. LeGoff,
12 and Dr. Freeman, and any records, school records.
13 IEPs are important for me to look at to see what the
14 school is identifying, therapy reports.
15   Then I categorize into professional
16 health care, in terms of rehab needs, so
17 professional health care; if personal care is needed
18 or residential care; communications category;
19 transportation. So that depending on the needs, I
20 will categorize those and I will also break them
21 down by age group so that, as I did with Bryan,
22 pre-young adult, so like 15 to 22, and then 23
23 throughout the life span.
24   Once you are 23 or 25, it depends on
25 the child and the young adult, but I try to group

Page 12

1 the adolescents together, because those needs may be
2 different than the needs of a young adult or a
3 30-year-old or 40-year-old.
4   But once you are in your thirties,
5 forties, fifties, I try to also look at the needs
6 with overlaying the aging process so that the
7 picture I have of this adolescent, I need to picture
8 when this person is 50 or 60 years old and visualize
9 how those needs can be met.
10   Q. How do you do these projections? When you
11 say -- you gave, for an example, your client is a
12 child, say in the 10- to 15-year-old range, and you
13 are trying to project what these child's needs would
14 be at age 40 or age 50, how do you determine that?
15   A. Well, I know from my education, training,
16 and experience what aging is going to do
17 physiologically, physically, as well as some of the
18 issues emotionally and mentally. Because we have
19 autistic people who are in their thirties, forties,
20 fifties, and we have experts who are caring for
21 these people. And there are studies, you know, that
22 talk about autism. I also consult, because I do not
23 see myself singly, I have consulted with Dan LeGoff
24 who is a specialist and expert. I have reviewed all
25 his psychiatric and Dr. Freeman's report. So I'm

Page 13

4 (Pages 10 to 13)

A106C37

LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

**Page 14**

1  not just trying to be out here saying I have all the
2  answers. I am consulting with these experts in the
3  field and asking very specific questions which I did
4  with Dr. LeGoff in terms of any item that I have put
5  in the life care plan. I have agreement with
6  Dr. LeGoff in terms of need and recommendations.
7        This report reflects recommendations
8  of Dr. LeGoff and support of Dr. Freeman in the
9  report she's written. So there can be a best case
10  and a worst case scenario.
11        We always want best case. That
12  doesn't always happen. So I try to evaluate based
13  on the experts I consult with.
14    Q.  So in order to reach these, your
15  recommendations and projections in your life care
16  plans, by necessity you have to consult with someone
17  who has expertise in the field, say like psychology
18  or medicine?
19    A.  Yes. I would consult.
20    Q.  So a life care plan needs to be based on a
21  medical diagnosis?
22    A.  I include the medical diagnosis --
23    Q.  On --
24    A.  -- on the early -- because it needs to be
25  compatible with, yes, medical diagnosis and with the

**Page 15**

1  recommendations of experts in the field, yes.
2    Q.  We'll get to that. Right now I'm just
3  asking some preliminary things. And to the
4  extent --
5        Strike that.
6        And I take it if a child has -- is
7  developmentally delayed in terms of mental capacity,
8  or there's any kind of psychiatric issues with the
9  child, the life care plan would have to be based on
10  psychological diagnoses, correct?
11    A.  Yes.
12    Q.  Are you qualified to render a medical
13  diagnosis?
14    A.  No.
15    Q.  Are you qualified to render psychological
16  diagnoses?
17    A.  No.
18    Q.  Now, Ms. Lukens, what does --
19        You mentioned some initial, "CRRN."
20  What does that stand for?
21    A.  It's a certified rehabilitation registered
22  nurse. It's a national certification. So you sit
23  for an examination -- you are recommended to sit for
24  an examination. Then you have to recertify every
25  five years with 60 hours of continuing education.

**Page 16**

1  And I've been recertified two or three times.
2    Q.  When was the last time you were
3  recertified?
4    A.  Just a year ago, so '06.
5    Q.  So the next one will be --
6    A.  11, 2011, yes.
7        (Deposition Exhibit Number 1 was
8        marked for identification by the
9        reporter.)
10    Q.  BY MR. USHIRODA:  Ms. Lukens, I'm handing
11  you what has been marked as Exhibit 1 to your
12  deposition. Okay?
13    A.  Okay.
14    Q.  Can you please identify that for the
15  record?
16    A.  This is my most current curriculum vitae.
17  On the last page it is updated March of '07.
18    Q.  On the first page of your --
19    A.  Sorry, okay.
20    Q.  -- CV, under education, it says MN.
21    A.  Yes.
22    Q.  What does that stand for?
23    A.  Master's in nursing.
24    Q.  Below that is BSN?
25    A.  Baccal -- Bachelor of Science in Nursing.

**Page 17**

1    Q.  Below that is postgraduate in education
2  from Virginia Polytechnic Institute. Do you see
3  that?
4    A.  Yes.
5    Q.  What was that in?
6    A.  Well, I was head of a two-year associate
7  degree nursing program in Virginia and obtained some
8  postgraduate work in education, at that time.
9    Q.  Now, to be a certified rehabilitation
10  registered nurse, do you have -- are there licensing
11  requirements to be that?
12    A.  No. You are licensed by state. So once
13  you are licensed in Arizona, you can transfer your
14  licensure to any of the 50 states. That's
15  licensure. To sit for the exam -- or to sit for the
16  exam, you have to have a recommendation of two
17  rehabilitation nurses and you have to have at least
18  two years' experience in rehabilitation.
19    Q.  So you are a licensed CRRN?
20    A.  I'm licensed as a professional nurse in the
21  State of Arizona as a registered nurse. I am
22  nationally certified as a CRRN, which is a certified
23  rehabilitation registered nurse. Those are
24  different designations.
25    Q.  So there's no licensure requirement to be a

5 (Pages 14 to 17)

A106C37

LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

1  record we had a discussion about the -- I guess the
2  spectrum of autistic disorders. And I understand
3  your grandson has been diagnosed with Asperger's.
4    A. Yes.
5    Q. While we were off the record we discussed
6  the spectrum of autistic disorders. Could you kind
7  of take -- tell me where Asperger's is on one side
8  of the scale and where Bryan Wiles-Bond would be on
9  the other?
10    A. Asperger's is a mild form of autism on the
11  spectrum. And the reports I've reviewed on Bryan,
12  he has severe autism. So he is at the severe end of
13  that scale.
14    Q. How many of the autistic patients that
15  you've worked with in the course of your career,
16  which I understand is about three or four, how many
17  were in Bryan's category?
18    A. Four.
19    Q. All four?
20    A. Yes.
21    Q. Okay. In Bryan's case, you reviewed his
22  records and gave the autistic diagnosis; is that
23  correct?
24    A. That is correct.
25    Q. I believe you also conferred with

Page 42

1  Dr. LeGoff?
2    A. Yes.
3    Q. He has confirmed that diagnosis?
4    A. Yes.
5    Q. Is there any discussion about whether Bryan
6  is mentally retarded?
7    A. There has been testing. There has been
8  testing in terms of mental retardation. But I would
9  defer to the testers in terms of Dr. Freeman,
10  Dr. LeGoff. I'm not qualified to render an opinion.
11    Q. Okay. Did you see anything in any of the
12  records that you have in this case that mentioned or
13  discussed mental retardation -- mental retardation
14  regarding Bryan?
15    A. Yes. There -- it has -- again, I would
16  defer to Dr. Freeman and Dr. LeGoff. That's where I
17  think the assessments of Bryan's educational
18  performance --
19        I have seen discussions.
20    Q. Okay. And do you know what those
21  discussions are?
22    A. The discussions is the functional level
23  when he was 10, he was functionally at a much lower
24  level. And they have given standardized testing for
25  mental retardation. And I would defer to Dr. LeGoff

Page 43

1  or Dr. Freeman.
2    Q. Okay. I don't believe I put -- I don't
3  think I have a very specific, let me check,
4  diagnosis in my report of mental retardation.
5        He has not been diagnosed, in my
6  report, in the records I reviewed, as a medical
7  diagnosis of mental retardation.
8    Q. Ms. Lukens, have you published any articles
9  on life care planning?
10    A. I have authored an article on life care
11  planning. I'd have to go back. I don't think I
12  listed it in my CV.
13    Q. That's the reason I ask.
14    A. Just locally on life care planning and then
15  I'm in the middle of a research project on
16  evaluating life care plans.
17    Q. On page six of your CV it lists -- there's
18  a heading called professional organizations.
19    A. Yes.
20    Q. Are there any other organizations or
21  societies that you belong to that are not listed
22  there?
23    A. No.
24    Q. Okay. So that is a complete listing of all
25  the professional organizations that you belong to or

Page 44

1  you had belonged to?
2    A. Yes.
3    Q. And at this time you can only, in terms of
4  publications, you can only recall that one
5  publication that was on general life care planning;
6  is that correct?
7    A. Yes.
8    Q. When was that published?
9    A. It was locally in one of the newsletters
10  for, I think, the Brain Injury Association, or
11  somewhere, on life care planning. It was just a
12  local.
13    Q. Do you know in order to do a --
14        You mentioned that when you've been
15  retained by the defense your assignment has been for
16  the most part to critique life care plans, correct?
17    A. Correct.
18    Q. And I asked you some questions about how
19  you go about critiquing life care plans, correct?
20    A. Correct.
21    Q. Is it necessary as part of the critique of
22  a life care plan to make a direct observation of the
23  person in question?
24    A. It depends how you define "direct
25  observation." I've done a life care plan recently

Page 45

12 (Pages 42 to 45)

A106C37
LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

1   answered.
2           THE WITNESS: I don't recall.
3       Q.  BY MR. USHIRODA: How about with Exhibit 2,
4   which is your updated life care plan?
5       A.  Right. This is it right here.
6       Q.  Right.
7       A.  Yeah. Probably, as I worked with the
8   secretary. I added to the introduction. I may
9   have. I don't believe there were changes in the
10  cost summary or any of the costs, that I recall.
11      Q.  If you can compare Exhibit 9, your earlier
12  one, to Exhibit 2, the only difference I noticed was
13  inclusion of a summary of Dr. B.J. Freeman's
14  recommendations. I just want to make sure that I'm
15  correct.
16      A.  No. I included in Exhibit 2 my
17  observations and assessments of the June '07 visit
18  to the school.
19      Q.  Right.
20      A.  I believe. And then Dr. Freeman's report,
21  yes.
22      Q.  Just to clear it up, the only difference
23  between Exhibit 2, which is your 2007 report, and
24  Exhibit 9, which is your 2006 report, is that in the
25  2007 report you, one, include a June '07 observation

Page 82

1   of Bryan?
2       A.  Yes.
3           MR. ELLIS: Objection, misstates the
4   record.
5           Objection, misstates the record using
6   the term "only."
7       Q.  BY MR. USHIRODA: Yes.
8       A.  You are not correct. The medical records
9   obtained at Benicia Middle School highlights all of
10  those in addition to Dr. Freeman's report.
11      Q.  I want to get it -- your report, I want to
12  get what else --
13      A.  No. And the individual plan for July of
14  '06 I would not have had in May of '06. So the IEP
15  that goes through 6 of '07, I have added that
16  document.
17      Q.  And that was from the Salano Acuity?
18      A.  That is correct.
19          Then I've added the conversations that
20  I had from -- with Dr. LeGoff, and the home visit.
21      Q.  Okay. You also have a telephone conference
22  listed in Exhibit 2 with Dr. Freeman. But you've
23  indicated that it's your recollection you did not
24  have a telephone conversation?
25      A.  Yes. I contacted and I believe left a

Page 83

1   message. I do not find that I did have actual
2   conversation with her.
3       Q.  Now after you submitted Exhibit 2 to
4   Mr. Levin on June 4th, 2007.
5           Let me strike that.
6           Did you submit any drafts of this
7   report to Mr. Levin prior to submitting it to him on
8   June 4th '07?
9       A.  No. I -- no.
10      Q.  So the only thing that you submitted
11  regarding Exhibit 2 was in its final form, correct?
12      A.  I believe, yes.
13      Q.  Okay. And do you have any recollections in
14  the course of preparing Exhibit 2 if you had made
15  any revisions or modifications along the way?
16          MR. ELLIS: Objection, asked and
17  answered.
18          THE WITNESS: Only what we've talked
19  about.
20      Q.  BY MR. USHIRODA: Okay. And that was to
21  add in the new information you had gotten, correct?
22          MR. ELLIS: Objection, asked and
23  answered.
24          THE WITNESS: Yes.
25      Q.  BY MR. USHIRODA: And --

Page 84

1           Okay.
2           Now, Ms. Lukens, what were you
3   specifically asked to do in this case?
4       A.  Mr. Levin asked me to prepare a life care
5   plan.
6       Q.  Okay. And that's it?
7       A.  Yes.
8       Q.  Were you asked to render any specific
9   opinions?
10      A.  No.
11      Q.  Okay. So basically your opinions are to --
12  maybe you can tell me what your specific opinions
13  are.
14      A.  That Bryan Wiles-Bond has specific
15  rehabilitation needs; that I've developed a life
16  care plan to address those needs and costed out
17  those services.
18      Q.  And that is your understanding of what you
19  will be testifying to, if this matter proceeds to
20  trial?
21      A.  Yes.
22      Q.  Do you have --
23          Are you --
24          Do you intend to render any opinions
25  today that are not contained in your life care plan

Page 85

22 (Pages 82 to 85)

A106C37
LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

1   notes that you discarded?
2       A.  No.
3       Q.  So anything you wrote down is part of your
4   file which has been brought here today?
5       A.  Yes.
6       Q.  Is there any work product that you
7   generated for this case that you discarded?
8       A.  Not that I'm aware of.
9       Q.  Now, were any restrictions placed on you by
10  Mr. Levin or his office in terms of how much time
11  you were allowed to spend on this report?
12      A.  No.
13          MR. ELLIS:  Objection, asked and
14  answered.
15      Q.  BY MR. USHIRODA:  Were there any
16  restrictions placed on you by Mr. Levin or his
17  office in terms of what sources you could consult
18  for the purposes of preparing a life care plan?
19          MR. ELLIS:  Objection, asked and
20  answered.
21          THE WITNESS:  No.
22          Could we take just a quick break?
23          MR. USHIRODA:  Sure.
24          THE WITNESS:  I'd appreciate a quick
25  break.

Page 98

1           (Discussion off the record.)
2       Q.  BY MR. USHIRODA:  Ms. Lukens, earlier in
3   the deposition I asked you what opinions you intend
4   to render in this case.  And I take it that your
5   basic opinion is providing -- rendering an opinion
6   on what Bryan's current and future rehabilitation
7   needs are and costing out those needs, correct?
8       A.  Yes.
9       Q.  Are there any other opinions besides that
10  one primary opinion you intend to give in this case?
11      A.  No.
12      Q.  Did you reach any opinions or conclusions
13  that you decided not to use in this case?
14      A.  No.
15      Q.  Okay.  And with respect to your opinion
16  regarding Bryan's current and future rehabilitation
17  needs based on his condition, what is the basis for
18  your opinion?
19          MR. ELLIS:  Objection, vague and
20  ambiguous.
21      Q.  BY MR. USHIRODA:  What do you base those
22  opinions on?
23      A.  The life care plan is based on review of
24  medical records.  It's based on assessments of Bryan
25  in a variety of settings and consultation with his

Page 99

1   parents, and consultation with Dr. LeGoff, expert
2   reports like Dr. Freeman and Dr. Smally's report,
3   and school reports, IEPs that are done.  And that's
4   what the life care plan is based on.
5       Q.  Okay.  And in terms of medical
6   records, what medical records did you rely upon?  I
7   didn't see any listed, that's why.
8       A.  A medical record is a DSM classification
9   diagnosis, that is a medical diagnosis.
10      Q.  I understand it's a medical diagnosis.
11  What I'm talking about is when -- what I'm talking
12  about when I think of a record is a paper document,
13  or something to that effect.  I'm wondering if you
14  saw Bryan's medical records from other health care
15  facilities.
16      A.  No, I did not, only what I've listed here.
17      Q.  Okay.
18          And I know you've listed a number of
19  types of information in your report, your 2007
20  report, but -- and I know you reviewed a lot of
21  materials.  That said, was there anything, or any
22  particular record that you relied on in reaching
23  your opinion regarding Bryan's rehabilitation needs?
24  Experts, I understand, are given records to review.
25  Some are pertinent to their opinion, some aren't.  I

Page 100

1   want to know what you specifically relied on in
2   formulating your life care plan for Bryan.
3       A.  Dr. LeGoff's reports and assessments, and
4   conversations with him, Dr. Smally's report,
5   Dr. Freeman's report.
6       Q.  How about did you rely upon any of your
7   observations in creating the life care plan?
8           MR. ELLIS:  Objection, asked and
9   answered.
10          THE WITNESS:  Yes.  Yes.  Of course.
11  Reports do not give you the actual picture.  They
12  give you documentation.  But I needed to see Bryan
13  and his level of functioning, yes.
14      Q.  BY MR. USHIRODA:  Okay.  And your life care
15  plan is designed to meet Bryan's current level of
16  functioning?
17      A.  Meet his present needs as well as in the
18  future.
19      Q.  So you have to have an idea of what his
20  level of function will be in the future?
21      A.  You have to have an idea of what his
22  present needs are and then you project them in the
23  future considering the aging issues.
24      Q.  Okay.  Now, what did you observe in Bryan,
25  observe of Bryan that helped you form an opinion on

Page 101

26 (Pages 98 to 101)

ATKINSON-BAKER, INC. COURT REPORTERS                    1 (800) 288-3376

A106C37
## LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

1 what his present rehabilitation needs are?
2     A.  I think first and foremost he has no
3 commun -- interactive communication.  He can respond
4 in sign to objects.  He can name objects.  But he
5 doesn't have interaction with peers.  He doesn't
6 have interaction with teachers or aides.  He names
7 and gives them their request.
8     Q.  Okay.
9     A.  So he has, through sign, a long way to go.
10         There is a lot of need.  He has to be
11 able to function in any environment.  And some of
12 the frustration I see with him in the school setting
13 is that people come in and they sit around the table
14 and have lunch with him, and no one speaks to him.
15         He's a very lonely young man because
16 he can't communicate functionally with anybody in
17 his environment.  I think that's number one.
18         That is a --
19         Second of all, he is six foot one,
20 weighs 200 pounds, and people are afraid of him.  He
21 can have -- there are safety issues not only for
22 Bryan, but when he gets frustrated, he's a big man,
23 for teachers, and therapists, and other people.  And
24 his frustration and behaviors, if not managed, he
25 can hurt himself and hurt other people.  And people

Page 102

1 are aware of that.  I'm aware of that.  And I am not
2 a small woman.  But I am a little -- I stand back
3 from Bryan when he's frustrated.
4     Q.  Anything else you glean from these
5 observations?
6     A.  There has been a real impact on the family.
7 His brother cannot bring friends into the home
8 because of Bryan and his behavior.  The downstairs
9 bedroom has been stripped.  There's nothing in there
10 but a bed for safety.  And you can smell urine
11 because he can't be allowed to go to the bathroom
12 because he goes up and he perseverates and will
13 constantly drink and constantly go to the bathroom,
14 so that better bowel and bladder management is still
15 being worked on.
16     Q.  Let me stop you.  What is "perseverate"?
17     A.  Perseverate in autism means you repeat --
18         Perseveration is one of the key
19 symptoms of a person with autism.  And he shows --
20 he shows not only perseveration, but this is called
21 flapping.  He does some flapping behavior.  He does
22 some oral sound behavior.  And he does
23 self-stimulation behavior.  When he flaps, this
24 gives him self-stimulating behavior.
25         The impact on his parents who now live

Page 103

1 upstairs, have had to turn over the entire lower
2 level of the house for safety reasons to Bryan to
3 have a safe room for him to watch TV and a bedroom,
4 the impact on this family is tremendous.  I mean the
5 mother, the father, and the brother --
6     Q.  Have you been asked to render an opinion on
7 the impact of Bryan's condition on the family?
8     A.  No.  But I have talked with Dr. LeGoff.
9         You asked me what observations.
10     Q.  This is a different question.
11     A.  No.  I have not been asked.  But you don't
12 have one patient with a life care plan.  You have a
13 family, often.  You have impact on everyone around
14 the patient.
15     Q.  Were you --
16         Do you have any information of how
17 Bryan's --
18         Well, do you understand that Bryan
19 used to live in Hawaii?
20     A.  Yes.
21     Q.  And you understand that he lived in a home
22 with his parents and brother, correct?
23     A.  Yes.
24     Q.  In Hawaii.
25     A.  Yes.

Page 104

1     Q.  Do you have an understanding of what the
2 living arrangements were in Hawaii for the
3 Wiles-Bond family?
4     A.  No.  I did not see the home in Hawaii, and
5 I have not seen any documentation of how the home
6 was set up in Hawaii.
7     Q.  Okay.  Did the parents describe to you how
8 the home in Hawaii was set up?
9     A.  No, they have not.
10     Q.  Okay.
11     A.  But those observations lead me to, you
12 know, these are tremendous needs when you can't
13 communicate and interact with people.
14     Q.  Let me stop you right there.
15     A.  Yes.
16     Q.  That's exactly what I'm trying to find out,
17 Ms. Lukens, is you render an opinion and all I'm
18 here to do today is to find out how you got to those
19 opinions.
20     A.  Sure.
21     Q.  Part of finding out how you got to those
22 opinions, we need to know what things you relied
23 upon in reaching those opinions.
24         So far you identify Dr. LeGoff's
25 reports and your conference with him, correct?

Page 105

27 (Pages 102 to 105)

A106C37
LORETTA M. LUKENS, MN, RN, CRRN       AUGUST 21, 2007

1    A.  Yes.
2    Q.  Dr. Smally did a report --
3    A.  Report.
4    Q.  -- back in August of '04, correct?
5    A.  Yes.
6    Q.  And a report by Dr. Freeman.
7    A.  Correct.
8    Q.  By the way, did you speak with Dr. Smally?
9    A.  No.  I did not speak.  She's a
10   behavioralist.
11        No, I did not speak with her.
12   Q.  Do you know Dr. Smally?
13   A.  No, I do not know her.
14   Q.  You also relied on Dr. Freeman's report.
15   A.  Yes.
16   Q.  And then the things you've been able to
17   glean from the observation which I take it you are
18   relying upon for your report, correct?
19   A.  Yes.
20   Q.  And those are the things that -- one of
21   the --
22        So far you've talked about three
23   things that you gleaned from your observation.  One
24   was that he's isolated because he has no
25   communication skills, correct?

Page 106

1    him?
2    A.  I perceived it as being cautious with him.
3    Q.  The aide.
4    A.  And maybe --
5        The other students, I observed some
6    degree of uncomfortableness, whether that is being
7    afraid.  But they are very concerned about his size
8    and behaviors.
9    Q.  When you say "they" --
10   A.  "They" meaning other students as he went to
11   the line.
12   Q.  Okay.  Did you speak with any of these
13   students?
14   A.  No.  No.  I made observations.
15   Q.  Okay.
16   A.  The other behavior is he will do
17   self-injurious behavior.  He has bitten his wrists.
18   He has taken saliva and rubbed it in his eye to
19   where he has eye problems.
20       He has -- wants to swing, and he'll
21   perseverate in the classroom wanting to get him to
22   the swing.  And they have to limit how much he is
23   allowed to swing on the platform.  And he doesn't
24   always want to come off that platform when cued to
25   do so, and so it takes repetitive cues.

Page 108

1    A.  Correct.
2    Q.  Second was that given his size and his
3    behavior you observed that people were afraid of
4    him.
5    A.  Yes.
6    Q.  Did you observe people afraid of Bryan in
7    this --
8    A.  Yes.
9    Q.  -- observations.
10       I know you did one in '06 and one in
11   '07.
12   A.  Yes.
13   Q.  Who are the people you observed that are
14   afraid of Bryan?
15   A.  When he went to the lunch room, he went
16   down to order lunch, other students were out there.
17   They sort of made way for him.  There was a sense
18   that they needed to move back from him a little bit,
19   that he's different.
20       He went to the front of the line to
21   order food.
22       When his aide at school cues him and
23   corrects behavior, she does stand back a little
24   because he is very big.
25   Q.  Did you perceive that as being afraid of

Page 107

1        All those observations have to do with
2    where is Bryan now with his behavior, with his
3    ability to communicate, with -- how he's
4    functioning.  And I discuss these observations with
5    Dr. LeGoff and with recommendations.
6    Q.  Okay.  Can you tell me the substance of --
7        How many conversations did you have
8    with Dr. LeGoff?
9        MR. ELLIS:  Objection, asked and
10   answered.
11       THE WITNESS:  I've had probably
12   several.  Probably four, five, or more.
13   Q.  BY MR. USHIRODA:  And in those
14   conversations, do you recall any specific
15   recommendations made by Dr. LeGoff?
16   A.  Yes.  The May Institute.  The
17   communication.  The life care plan is developed with
18   Dr. LeGoff, the behavioral aspect of it, the
19   psychiatric aspect.  So Dr. LeGoff and I, in
20   professional health care, Dr. LeGoff made very
21   specific recommendations as we discussed together --
22   Q.  Based on --
23   A.  -- based on his observations, the reports,
24   and my observations, yes.
25   Q.  What did Dr. Freeman have?

Page 109

28 (Pages 106 to 109)

A106C37
## LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

1    A.  Just to further support the recommendations
2  of Dr. LeGoff.  I believe that's how I saw her
3  report.
4    Q.  Okay.
5        Did you --
6        Oh, you saw her report as being
7  supportive of Dr. LeGoff's observations and reports?
8    A.  Yes, and life care plan.
9    Q.  Do you know if Dr. Freeman reviewed a copy
10  of your life care plan?
11        MR. ELLIS:  Objection, calls for
12  speculation.
13        THE WITNESS:  I don't know.
14    Q.  BY MR. USHIRODA:  To this day, have you had
15  any conversations with Dr. Freeman regarding your
16  life care plan?
17    A.  No.
18    Q.  Or any conversations at all regarding this
19  case with Dr. Freeman?
20    A.  No.
21    Q.  You listed for me a number of sources of
22  information you relied on in preparing this report.
23  Anything else?  Anything from your observations or
24  reports that you read?
25    A.  No.  I believe that's it.

Page 110

1    Q.  Okay.
2        Did you review any articles or
3  publications in preparing for your -- in preparation
4  for the creation of a life care plan for Bryan?
5    A.  No.
6    Q.  Was there any information that you were
7  provided with that you considered but for whatever
8  reason did not choose to use in preparing your
9  report?
10        MR. ELLIS:  Objection, asked and
11  answered.
12    Q.  BY MR. USHIRODA:  You are given some
13  material, look at it:  I don't think this is
14  relevant?
15    A.  I -- no, no.
16    Q.  Okay.
17        Okay.  Could you go to page -- Exhibit
18  9.
19    A.  Uh-huh.
20    Q.  Is this the first life care plan you
21  created for Bryan?
22    A.  Yes, that I sent, to my recollection, yes.
23    Q.  Okay.  And you know previously we talked
24  about the reports and records you received.  That's
25  on page -- described on page four.

Page 111

1    A.  Yes.
2    Q.  Did you have all the information listed on
3  page four before you prepared your -- before you
4  prepared Exhibit 9?
5        MR. ELLIS:  Objection, asked and
6  answered.
7        THE WITNESS:  Yes.
8    Q.  BY MR. USHIRODA:  And the next page, five,
9  of Exhibit 9, and all the conferences and interviews
10  listed here, this all took place before you prepared
11  your first life care plan?
12    A.  Yes.
13        MR. ELLIS:  Objection, asked and
14  answered.
15    Q.  BY MR. USHIRODA:  You know, under
16  subsection B, interviews and conferences, you list
17  two telephone conferences with the May Institute.
18    A.  Yes.
19    Q.  Did you initiate those calls?
20    A.  Yes.
21    Q.  Do you recall who you spoke with at the May
22  Institute?
23    A.  Let me look under my notes.
24        No.  I don't see anything written
25  down.

Page 112

1        I talked with Dr. LeGoff.  He probably
2  gave me some names of somebody to call there.  I
3  didn't list it there.  I usually do.  I didn't list
4  who I talked to.  He's visited, knows several people
5  there.
6    Q.  Did you speak to more than one person at
7  the May Institute?
8    A.  I spoke one day, had requested after I
9  printed off the web page, had additional questions,
10  called back again.
11    Q.  Spoke to the same person?
12    A.  I don't think so.  I don't recall who I
13  spoke to.  I should have written it down.
14    Q.  Was it a man or woman who you spoke with on
15  both occasions?
16    A.  I don't recall.  I really don't.
17    Q.  Okay.  And do you recall the kinds of
18  questions you had from the May Institute person?
19    A.  Well, yes.  The web page talks about their
20  residential program, and I needed to know if the
21  professional health care would be required in
22  addition to that, which it typically is.
23  Transportation is provided, field trips, and
24  outtings.  Their web page is very specific about
25  their program.  But I had those kinds of questions,

Page 113

29 (Pages 110 to 113)

A106C37

LORETTA M. LUKENS, MN, RN, CRRN · AUGUST 21, 2007

1  to make a recommendation for the level of
2  augmentative communication function.
3    Q.  So the type of augmentation communication
4  device recommended for Bryan, that's beyond your
5  scope of expertise?
6    A.  Minimal cost is $2,000, and that's just --
7  I had put that in as a beginning point hoping he'd
8  get an evaluation.  When he gets an evaluation
9  they'll recommend the device.
10    Q.  I want to understand how two grand to 10
11  grand must be based on Bryan's level of function.
12    A.  No.  It's based on what the devices cost
13  presently.  You really can't buy a device that
14  would -- you'd be able to have him interact in his
15  environment for $2,000 right now.
16    Q.  Okay.  It's just based on what you know?
17    A.  I deal with what I know.  I've been dealing
18  with augmentation devices for 10 years.
19    Q.  Have you seen one for --
20      Well, have you ever worked with a
21  child that has, based on your understanding of what
22  his current function is, a similar autistic child
23  that also had a communication, argumentative
24  communication device?
25    A.  I don't think I've worked with an autistic

Page 194

1  child.  I've worked with brain injured children that
2  have one.  I don't think I've worked with an
3  autistic child that has had one.
4    Q.  Okay.  You know, getting back to the
5  residential facility.
6    A.  Uh-huh.
7    Q.  Do you know if there are --
8      Bryan currently lives in Benicia,
9  California.
10    A.  Correct.
11    Q.  Are there any such facilities in the State
12  of California?
13    A.  No.  Not according to Dr. LeGoff.  I asked
14  him.  I thought it would be more convenient for his
15  family.
16    Q.  Are there any other alternatives to the May
17  Institute?
18    A.  Dr. LeGoff, I defer to him.  He mentioned
19  Bancroft.  He would be able to describe --
20      Again, he suggested May Institute as
21  meeting Bryan's needs.
22    Q.  You didn't consider any other alternatives
23  based on Dr. LeGoff's recommendation?
24      MR. ELLIS:  Objection, asked and
25  answered.

Page 195

1      THE WITNESS:  That is correct.
2    Q.  BY MR. USHIRODA:  And I take it you did not
3  investigate other alternatives for Bryan's long-term
4  living arrangements?
5      MR. ELLIS:  Objection, asked and
6  answered.
7    Q.  BY MR. USHIRODA:  Aside from the May
8  Institute.
9      MR. ELLIS:  Objection, asked and
10  answered.
11      THE WITNESS:  No, I did not.
12    Q.  BY MR. USHIRODA:  Do you know who would pay
13  for like a May Institute?  Is that picked up by the
14  state or what --
15    A.  You'd have to check with them.  I'm sure
16  they have -- you have to check with them.  I'm not
17  their -- I don't know.  I do not include
18  reimbursement.  I'm costing out the care.
19    Q.  Okay.  Why don't we go to June 4, 2007,
20  Exhibit 2.
21      Do you have that?
22    A.  Yes.
23    Q.  We've already discussed your cover letter
24  in some detail.  I just want to get to your life
25  care plan.

Page 196

1      This is --
2      You know, when I looked at the -- your
3  cost summaries, and the itemized estimate of health
4  care costs, and even cost of equipment and services
5  that is on pages 13 through 17, I did not notice any
6  change.
7    A.  Correct.
8    Q.  Am I correct?
9    A.  Yes.
10    Q.  Okay.  Do you know why you didn't have to
11  make any changes?
12    A.  Because the information, and the
13  assessments, and the conversations with Dr. LeGoff
14  continued to support the life care plan that I
15  developed in '06.  It just further confirms that
16  these are the services that he requires.
17    Q.  Okay.  And that's based on, again,
18  Dr. LeGoff's recommendations?
19      MR. ELLIS:  Objection, asked and
20  answered.
21      THE WITNESS:  Yes.
22      MR. USHIRODA:  Can I just break for a
23  minute?  I need to grab some water.
24      (Recess taken.)
25    Q.  BY MR. USHIRODA:  Okay, Loretta --

Page 197

50 (Pages 194 to 197)

A106C37
## LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

1  Ms. Lukens, on pages three to five of Exhibit 2,
2  starting at the top of three, is this a quote from
3  Dr. Freeman's report?
4      **A. Yes, it is.**
5      Q. Okay. Do you know why you took this
6  particular portion of the report and included it in
7  your June 4th updated life plan -- life care plan?
8      **A. She quotes the publication Educating**
9  **Children With Autism, the National Research Council.**
10     Q. Yes.
11     **A. Talks about the instructional program, that**
12  **it should be a full school day with a reduced**
13  **teacher-to-student ratio, which is what the May**
14  **Institute has; about there should be a family**
15  **component, including parent training, which I**
16  **believe supports family counseling and family**
17  **involvement. She talks about ongoing evaluation,**
18  **which can occur when we talk about, again, the May**
19  **Institute.**
20      **I believe her report supports the life**
21  **care plan and the services that I've put in the life**
22  **care plan. So that's why I included it, because not**
23  **only national studies and data, but also her**
24  **recommendations for -- and the therapies, the IEP**
25  **that they have, there has to be some outside speech**

Page 198

1  **therapy which she talks about, the need for that**
2  **kind of therapy.**
3      Q. Okay. You last saw Bryan in May of 2007?
4      **A. In June. No, the end of May. End of May.**
5  **Sorry. On May 25th.**
6      Q. At that time, did -- was Bryan capable of
7  speech?
8      **A. He's having no functional speech. He has**
9  **words that he signs, but he does not have -- there's**
10  **a difference between speech and language. He**
11  **utters -- he has utterances but he does not have --**
12      **He signs words. He matches words. He**
13  **acknowledges some words. He does not have**
14  **functional speech. He doesn't have expressive**
15  **speech.**
16      Q. Okay. The publication you reference, or
17  that -- which is referenced by Dr. Freeman in her
18  report, have you ever read that book?
19      **A. No, I haven't. I haven't.**
20      Q. Have you --
21      Has Dr. Freeman been provided with a
22  copy of your life care plan?
23      **A. I don't know.**
24      Q. Again, you've never discussed it with her?
25      **A. No. I tried to contact her.**

Page 199

1      Q. Right. Okay.
2          So the reason you have this portion of
3  Dr. Freeman's report in your updated life care plan
4  is that it -- you believe, after reading it, it
5  supports your life care plan?
6          MR. ELLIS: Objection, asked and
7  answered.
8          THE WITNESS: That's not the only
9  reason. It also describes Bryan's difficulties and
10  the kinds of services she feels he should have.
11  It's not just a matter of supporting the life care
12  plan, but it is, I think, a very comprehensive
13  overview.
14     Q. BY MR. USHIRODA: I don't want to put words
15  in your mouth, but is it to provide context for your
16  life care plan?
17          MR. ELLIS: Objection, asked and
18  answered.
19          THE WITNESS: No.
20          I talked to Dr. LeGoff who assessed
21  him. I just felt it was a very comprehensive report
22  and identified his strengths and weaknesses and the
23  need for services that I've put in the life care
24  plan.
25     Q. BY MR. USHIRODA: Did you discuss

Page 200

1  Dr. Freeman's report with Dr. LeGoff?
2          MR. ELLIS: Objection, asked and
3  answered.
4          THE WITNESS: I don't know that I did.
5  I may have.
6      Q. BY MR. USHIRODA: Okay.
7          Now, pages five through seven, at
8  least starting at the middle of page five, you have
9  a summary, I take it, of your reassessment visit in
10  May of 2007, right?
11     **A. Yes.**
12     Q. At whose request did you make this
13  reassessment?
14     **A. I requested that I do a reevaluation of**
15  **Bryan before my report was submitted for the -- I**
16  **think there was a June 1st deadline. So I called**
17  **and requested to do a reevaluation.**
18     Q. Who did you call?
19     **A. I called Stan Levin's office.**
20     Q. So it was your idea to do a reassessment?
21     **A. Yes. It had been a year since I had seen**
22  **him.**
23     Q. And why did you request the reassessment?
24     **A. Because I wanted to have up-to-date**
25  **observations and assessment of Bryan to be sure that**

Page 201

51 (Pages 198 to 201)

A106C37
LORETTA M. LUKENS, MN, RN, CRRN    AUGUST 21, 2007

1    Q.  You reiterate Will is not able to deal with
2  his brother's behaviors?
3    A.  That's right.
4    Q.  Did you see Will on this visit, 2007?
5    A.  No, I did not.  This comes from his father.
6    Q.  He told you that Bryan is not left with
7  Will?
8    A.  Yes.
9    Q.  And for that very reason, because he's not
10  able to deal with Bryan's behaviors?
11    A.  That is correct.
12    Q.  Anything else?
13    A.  No.
14    Q.  Do you know who --
15         Did Dr. Bond tell you who Bryan's
16  dentist is?
17    A.  I don't believe so.  There should be dental
18  records because he is unable to get his teeth
19  cleaned and with the abscessed tooth.
20         I don't believe I have it.  I don't
21  have records.
22    Q.  Now, the second to last paragraph on page
23  seven says Dr. Dan LeGoff will be reevaluating Bryan
24  at school on June 1st, 2007, and the same for
25  Dr. Freeman.

Page 226

1    A.  Uh-huh.
2    Q.  How did you get this information?
3    A.  I knew that Dr. LeGoff was scheduled.  When
4  he couldn't meet me at the time I was there on the
5  25th, I knew that he would be coming on June 1st.
6  Then when I was at the school, they told me that
7  Dr. Freeman had canceled one scheduled visit and
8  that she was to reevaluate Bryan on the 1st.
9    Q.  The same time Dr. LeGoff was there?
10    A.  Yes.  I don't know that that happened.
11  That's what I was told.
12    Q.  Told by Dr. LeGoff?
13    A.  Dr. LeGoff told me when he was coming on
14  the 1st, and school told me Dr. Freeman would be
15  coming.
16    Q.  Oh.  Thanks.
17         Okay.  Then, again, you have the
18  diagnoses listed.  You have Dr. LeGoff's diagnosis
19  from -- that was from your previous report, correct?
20    A.  Correct.
21    Q.  And you've just added the diagnosis 7-24 to
22  7-25-07.  And that was from Dr. Freeman?
23    A.  Yes.
24    Q.  Now, is this taken from -- is the words for
25  the diagnosis, is this taken from Dr. Freeman's

Page 227

1  report?
2    A.  Yes.
3    Q.  So it's word for word?
4    A.  Word for word.
5    Q.  Okay.  So if I want to find out what, on
6  the last sentence of her diagnosis, where it says
7  relative to treatment planning and intervention, it
8  is most important to focus on Axis I through III.
9    A.  Correct.  That will be in her report.
10    Q.  Okay.  Do you have any understanding what
11  she means by that?
12    A.  Yes.
13    Q.  What?
14    A.  Well, what she's saying is she's trying to
15  say Axis V, the global assessment functioning, the
16  closer you are to a hundred, the more normal
17  behavior there is.  And she is saying at a 45 this
18  really is not -- it is the least reliable for
19  children with autism.  So it doesn't really reflect
20  the lower level of functioning that Bryan is at,
21  even though a 45, because he's functioning below
22  that, with autism.  That's why she's making that
23  statement.  But I defer to her on what level he's
24  at.  This is her diagnosis.
25    Q.  Oh.  So she's just saying despite the fact

Page 228

1  that it's listed at 45, his global assessment of
2  functioning, he's functioning at a lower level?
3    A.  No.  She's saying it's important to note
4  the global assessment functioning measure is the
5  least reliable indicator of functioning for
6  children.  Axis V is a gross measure of adaptive
7  functioning.  And it is important to focus on Axis I
8  through III.  Axis I is the diagnosis of autism; II,
9  any physical diagnosis; III, he's had ear
10  infections.  Those are signs and symptoms.  Axis IV
11  is the language and all of the problems he's having.
12    Q.  Do you ever have --
13         Do you have any understanding as to
14  why the global assessment of functioning measure is
15  the least reliable indicator of functioning for
16  children?
17    A.  No, I don't.  I'm not an expert.  That's up
18  to her.
19    Q.  Okay.
20         You know, I noticed on Axis II, for
21  Dr. Freeman, she says, "diagnosis deferred."  Do you
22  see that?
23    A.  Yes.
24    Q.  Do you have any understanding as to why the
25  diagnosis is deferred?

Page 229

58 (Pages 226 to 229)