IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friends of their son, BRYAN WILES-BOND, a minor, | ) CIVIL NO. CV 04-00442 HG/BMK<br>) CIVIL NO. CV 05-00247 HG/BMK<br>) CONSOLIDATED<br>) (Other Civil Action)<br>) |
| Plaintiffs, | ) NOTICE OF TAKING DEPOSITION<br>) UPON WRITTEN QUESTIONS; |
| vs. | ) WRITTEN QUESTIONS; EXHIBIT<br>) "A"; and ATTACHMENT "1" |
| DEPARTMENT OF EDUCATION, State of Hawaii, and ALVIN RHO, in his official capacity as West Hawaii District Superintendent, | )<br>)<br>) (Re: Custodian of Records<br>) for Daniel LeGoff, Ph.D.)<br>)<br>) TRIAL: December 4, 2007 |
| Defendants, | ) |

DEPOSITION OF

DANIEL B. LEGOFF, PH.D.

FOR THE OFFICES OF WATANABE, ING & KOMEIJI, LLP

VOORHEES, NEW JERSEY

AUGUST 23, 2007


ATKINSON-BAKER, INC.
500 North Brand Boulevard, Third Floor
Glendale, California 91203
(818) 551-7300


REPORTED BY: ANGELA M. KING, RPR, CSR

FILE NO.: A106C36

1   A.  Bryan's probably in the lower third.

2   MR. LEVIN:  Objection.  Time frame.  Vague

3 as to time frame.

4   THE WITNESS:  I would say his current

5 functioning would place him in the lower third

6 if you roughly take autistic pathology and

7 divide it up into thirds.  That is, high

8 functioning, moderately impaired, severely

9 impaired.  I would say he's more severely

10 impaired.

11   Q.  Okay.  That's his current level?

12   A.  Yes.

13   Q.  Okay.  Do you have any opinions as what

14 his level of function was given that spectrum

15 you just identified when he was in Hawaii?

16   A.  I didn't see him when he was in Hawaii.

17   Q.  So you have no opinion?

18   A.  No.

19   Q.  Okay.  I know you saw Bryan on a number

20 of occasions.  I think the first time you saw

21 him was in June of '05, correct?

22   A.  Yes.

23   Q.  Okay.  And then you saw him most

24 recently, I believe, in June of this year,

25 correct?

1  brain chooses path ways based on repeated
2  associations so that the brain gets more
3  specific over time in its functions as opposed
4  to very general.
5         We know one of the features of the
6  neurobiology of autism is deficits this
7  dendritic pruning process.  Children with
8  autistic disorders tend to have larger brains
9  and larger skulls.  And part of the reason for
10 that we know is that their brains don't develop
11 specialized functions as well as typically
12 developing brains do.
13     Q.  Okay.  What is meant by that term
14 "window of opportunity"?
15     A.  Well, it suggests that the impact of
16 educational and remedial interventions on
17 functioning is best between, you know, certain
18 ages.
19     Q.  Between two to three and six to eight
20 years?
21     A.  Yes.
22     Q.  Is that something -- a concept that you
23 subscribe to?
24     A.  Yes.
25     Q.  You said education in terms of

1 functioning, correct?
2      A.   Yes.
3      Q.   Okay.  Is that -- I just want to know
4 if you're qualifying that on anything because
5 education can encompass other things, too,
6 correct?
7      A.   Right.  The areas that are most
8 critical in terms of education for children with
9 autistic disorder are those areas where they
10 have identified deficits with regard to
11 communication and language acquisition, social
12 behavior and playing.  And then adaptability,
13 independent self care, that kind of thing.
14     Q.   And that window of opportunity for
15 those aspects are between those ages two to
16 three and six to eight years old?
17     A.   Yes.  Especially with regard to
18 language.
19     Q.   Now, do you know how old Bryan
20 Wiles-Bond was when he came to Hawaii?
21     A.   If I recall from the record, he was
22 seven.
23     Q.   Okay.  Did Bryan have at the time that
24 you came -- well, let's see.
25          Have you seen any records pertaining to

1    Q.   When was this?
2    A.   That would have been probably the
3 summer of '05.
4    Q.   Okay.  And was that the only
5 conversation you had with Dr. Freeman?
6    A.   Yes.
7    Q.   And what was basically the substance of
8 your discussion with Dr. Freeman on that one
9 occasion?
10   A.   We were talking about Bryan's current
11 functioning and his programming.
12   Q.   What about his current function do you
13 recall discussing with Dr. Freeman?
14   A.   Just a clinical issues that were
15 affecting him at the time.  Different strategies
16 that were being used to help him visually and
17 with regard to communication abilities.
18   Q.   Can you get into that a little bit more
19 specific for me, as best you can recall?
20   A.   I remember we both agreed that we
21 thought it was problematic that they were
22 emphasizing American Sign Language and that
23 there was inconsistencies in terms of the
24 behavioral care he was getting outside the
25 school as opposed to in school.  None of us were

1  particularly happy with the level of
2  coordination services in California at the time.
3      Q.  Anything else?
4      A.  No.
5      Q.  Now, you said both you and Dr. Freeman
6  in this conversation agreed it was problematic
7  that they were emphasizing ASL.  My question is,
8  who do you refer to when you say "they"?
9      A.  The educational staff at Keystone
10 School.
11     Q.  Why was it problematic?
12     A.  Probably because they were having
13 difficulty getting qualified staff who were
14 fluent in ASL who were working with Bryan.  Also
15 limited because Bryan is not deaf and doesn't
16 interact with other deaf people who use ASL in a
17 frequent and often basis.  So his signing, which
18 is sometimes difficult to read, was a
19 limitation.  Could have supplemented with other
20 communication strategies.
21     Q.  Such as?
22     A.  PECS.
23     Q.  Have you observed --
24     A.  Another communications device.
25     Q.  You and Dr. Freeman also discussed

1  inconsistencies.  I forget what --
2       A.   In the provision care there was
3  staffing changes.  And he just started a new
4  school.  And the program was being put together
5  with gaps in services, you know, lack of
6  provision services.
7       Q.   Okay.  When you're saying the gaps in
8  provision of service and these inconsistencies
9  you're talking about, the education services
10 Bryan was receiving at that Keystone School?
11      A.   Yes.
12      Q.   You talked about this coordination
13 issue that you discussed with Dr. Freeman.  What
14 was that about?
15      A.   Just with regard to the staffing in the
16 school and home.  They weren't all following the
17 same plan.
18      Q.   Okay.
19      MR. USHIRODA:  Why don't we take a short
20 break.
21      (Discussion held off the record.)
22 BY MR. USHIRODA:
23      Q.   Dr. LeGoff, thank you for providing
24 your file today.  I just had the opportunity
25 during the break to go through some of your

1           You notice that in the Leiter-R the
2  second time, I actually got him through the full
3  set of subtesting.  The first one, he was
4  difficult to test and he kept getting up.  And
5  he was behaviorally difficult to test.  It's
6  big.  Making him do something like this was
7  difficult to keep him cheerful while he's doing
8  it.
9           So the second testing he just seemed
10 happier.  He was better adjusted.
11      Q.   Now, in 2005, you found that there was
12 some inconsistency in the implementation of his
13 educational program at the school, right?
14      A.   Yes.  There were some adjustments.  I
15 think the school was just to assign him -- he
16 had gone through a couple of behavior
17 consultants.  There was some inconsistencies
18 there.
19      Q.   In your observation, was that similar
20 to the situation in Hawaii based on your review
21 of the educational records in Hawaii?
22      A.   As a snapshot, yeah.  It was a similar
23 situation.
24      Q.   Okay.  Now, how did the classroom in
25 2005 compare -- well, how did the classroom in

1  issues. You know, rating the degree of

2  severity, tough to say.

3  BY MR. USHIRODA:

4       Q.  Because you weren't there?

5       A.  Right.

6       Q.  Okay. Now, if you go down to your

7  second to last full paragraph on Page 7 where it

8  says, "it appears to be unavoidable conclusion."

9       A.  Yes.

10      Q.  Okay. Now, about midway through that

11 paragraph you state, "that Bryan's parents are

12 currently not able to provide an adequate level

13 of supervision or behavioral intervention."

14          Do you see that?

15      A.  Yes.

16      Q.  In 2005, why were they not able to

17 provide those adequate level of supervision or

18 behavioral intervention?

19      A.  Well, they weren't -- they didn't have

20 an adequate home-based behavioral strategy or

21 programming. And his behaviors were fairly out

22 of control.

23      Q.  Like what kind of behaviors were out of

24 control that you observed in the home?

25      A.  Pacing, making a mess. I just

1  described his eating style.  It was pretty
2  dramatic.
3      Q.  Is that the one where he dumped the
4  cereal on the table?
5      A.  Yeah.  Disrobing, pacing, you know,
6  trying to leave the house.  He had repetitive
7  behaviors too.  If they didn't watch him
8  carefully, he would rub soap in his eyes and
9  things like that.
10     Q.  Okay.  Now, you also state in that same
11 sentence that the parents have resorted to
12 overly restrictive methods to ensure his safety.
13 Do you see that?
14     A.  Yes.
15     Q.  I think you mentioned one is locking
16 Bryan in his room at night, correct?
17     A.  Right.
18     Q.  Were there other overly restrictive
19 methods that were employed by the parent that
20 you observed in 2005?
21     A.  No.  Probably not overly restrictive as
22 much as overly permissive.  I mean, allowing him
23 to make a huge mess and eat with his hands and
24 getting it all over the place.  It was basically
25 because mom admitted if she tried to stop him,

1  he would get aggressive.

2      Q.  At the end you say, "it seems unlikely

3  that Bryan will be able to improve his adaptive

4  and communicative skills to a level commensurate

5  with his potential without significant increase

6  in the intensity of his current educational

7  services and program," correct.  I mean, you see

8  that?

9      A.  Yes.

10     Q.  Okay.  Again, we've already talked

11 about what his potential is.  It's basically

12 that the adaptive communicative skills catch up

13 with his -- be at least close to his cognitive

14 ability, correct?

15     MR. LEVIN:  Objection:  Asked and answered.

16     THE WITNESS:  Right.

17 BY MR. USHIRODA:

18     Q.  What kind of things are you talking

19 about in terms of significant increase in

20 intensity of his current educational --

21     A.  Well --

22     Q.  -- program?

23     A.  Increase in the level of staffing, you

24 know.  I mean, he has one-on-one all the time,

25 but would increase amount of time, behavioral

1  analyst more input, plus would be more, you
2  know, extended time of individuality home.  And
3  direct observation and intervention by the
4  behavioralist in the home.  In addition to that,
5  possibly if those things wouldn't have a big
6  enough impact, I think he probably would be
7  appropriate for residential placement.
8       Q.  Okay.  I think you covered that in some
9  detail in the summary of your cost, correct?
10      A.  Yes.
11      Q.  Do you have anything else to add with
12 respect to your opinion that as a result of
13 inconsistent services and interventions in
14 Hawaii resulted in Bryan's current functioning
15 being much lower than it might be?
16      MR. LEVIN:  Objection:  Asked and answered.
17 BY MR. USHIRODA:
18      Q.  Anything else to add?
19      A.  No.  I think all my opinions are
20 well-expressed in the reports I've written.
21      Q.  Along with that opinion comes your
22 opinion that -- well, I think it's related, is
23 that Bryan's function would have been higher had
24 he received all education and interventions in
25 Hawaii?

1    Q.  And it's your opinion that Bryan would
2 be placed in a residential program and
3 institutional setting even if he did receive all
4 of this education and intervention in Hawaii,
5 correct?
6    MR. LEVIN:  Objection:  Asked and answered.
7    THE WITNESS:  Yes.
8 BY MR. USHIRODA:
9    Q.  It's just that particular institutional
10 setting may not require the degree of intensity
11 as it would given his current level of function?
12    MR. LEVIN:  Objection:  Asked and answered.
13    THE WITNESS:  Right.
14 BY MR. USHIRODA:
15    Q.  In the State of New Jersey, who pays
16 for these institutional costs, the cost for
17 placing a child with autism in a, you know,
18 institution setting?
19    MR. LEVIN:  Objection:  Relevance.
20    THE WITNESS:  It's mostly the district, the
21 school districts.  Some are funded by the
22 division of developmental disability.  Some are
23 privately funded.  Some are placed by the
24 Division of Youth and Family Services, which I
25 think in Hawaii is called Child Protective