IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANN KIMBALL WILES and STANLEY BOND, individually and as next friend of their son, BRYAN WILES-BOND, a minor,<br><br>            Plaintiffs,<br><br>            vs.<br><br>DEPARTMENT OF EDUCATION, State of Hawaii,<br><br>            Defendant. | )  Civ. No. 04-00442 ACK-BMK<br>)  Civ. No. 05-00247 ACK-BMK<br>)  (Consolidated)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ORDER DENYING PLAINTIFFS' MOTION FOR A NEW TRIAL OR,
ALTERNATIVELY, FOR JUDGMENT AS A MATTER OF LAW

I.   BACKGROUND

Ann Kimball Wiles and Stanley Bond, individually and as next friend of their minor son, Bryan Wiles-Bond,[1] brought this action against the Hawaii Department of Education ("Defendant" or "DOE") for violations of the Rehabilitation Act of 1974.[2]  Trial commenced on September 9, 2008 on two claims: (1) Plaintiffs'

_____

[1] Ann Kimball Wiles and Stanley Bond may be referred to herein as "parents" or "Parent Plaintiffs."  Bryan Wiles-Bond may be referred to herein as "Bryan."  Collectively, Ann Kimball Wiles, Stanley Bond, and Bryan may be referred to herein as "Plaintiffs."

[2] For a detailed discussion of the factual and procedural background of this case, see this Court's April 29, 2008 Order Denying in Part and Granting in Part Defendant's Amended Motion to Dismiss or in the Alternative for Summary Judgment on Second Amended Complaint Filed on February 13, 2008.  Additional background information can be found in the Court's Orders dated December 19, 2006 and November 13, 2007.

1

disability claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"); and (2) Parent Plaintiffs' claim of retaliation under the anti-retaliation regulation of Section 504, 28 C.F.R. § 42.503(b)(1)(vii).  After a seventeen-day jury trial, the jury returned a verdict for Defendant on both claims.

As to Plaintiffs' disability claim under Section 504, the jury found that Plaintiffs had not proved by a preponderance of the evidence that Bryan Wiles-Bond was excluded from participation in, denied the benefits of, or subjected to discrimination under - that is, denied meaningful access to - public education.  See Special Verdict Form at 2 (Oct. 9, 2008). As to the Parent Plaintiffs' retaliation claim, the jury found that Plaintiffs had proved by a preponderance of the evidence that Ann Kimball Wiles and Stanley Bond engaged in a "protected activity" under the Rehabilitation Act.  Id. at 4, 5-6.  However, the jury further found that Plaintiffs had not proved by a preponderance of the evidence that Defendant subjected Ann Kimball Wiles or Stanley Bond to an adverse action at the time, or after, the "protected activity" occurred.  Id. at 4, 6.  The jury was instructed not to answer any additional questions relating to any of the claims since, based on their responses, Defendant could not be held liable under either claim.

Pursuant to the jury's verdict, judgment was entered in favor of Defendant on October 10, 2008.

Plaintiffs filed a Motion for a New Trial or, Alternatively, for Judgment as a Matter of Law ("Motion") on

2

October 27, 2008.[3/]  Defendant filed an Opposition on November 7,
2008.  On November 18, 2008, Plaintiffs filed a Reply.  The Court
finds this Motion suitable for disposition without a hearing.
<u>See</u> L.R. 7.2(d).

## II.  MOTION FOR NEW TRIAL

### A.   STANDARD

A motion for new trial is governed by Federal Rule of
Civil Procedure 59 ("Rule 59"), which provides in relevant part:

> The court may, on motion, grant a new trial on all or
> some of the issues - and to any party - as follows: (A)
> after a jury trial, for any reason for which a new trial
> has heretofore been granted in an action at law in
> federal court . . . .

Fed. R. Civ. P. 59(a).

The U.S. Court of Appeals for the Ninth Circuit has
consistently held that a district court's finding that there is
substantial evidence to uphold the verdict on a motion for
judgment as a matter of law will not necessarily prevent the
Court from ordering a new trial.  However, Ninth Circuit case law
has been less consistent in articulating the circumstances that
warrant a new trial based on insufficiency of the evidence,
stating variously that district courts have discretion to grant
Rule 59 motions when the verdict is "against the clear [or

---

[3/] Plaintiffs' Motion was timely.  <u>See</u> Fed. R. Civ. P. 59(b)
("A motion for a new trial must be filed no later than 10 days
after the entry of judgment."); Fed. R. Civ. P. 6(a)(2) ("Exclude
intermediate Saturdays, Sundays, and legal holidays when the
period is less than 11 days.").

'great'] weight of the evidence," when the evidence shows that

the jury has reached a "seriously erroneous result," and/or when

the evidence shows that acceptance of the verdict would cause a

"miscarriage of justice."   See EEOC v. Pape Lift, Inc., 115 F.3d

676, 680 (9th Cir. 1997) (internal quotations and citations

omitted) ("Although the court's ruling on an alternative motion

for a new trial involves the exercise of some discretion, a

stringent standard applies when the motion is based on

insufficiency of the evidence.  A motion will be granted on this

ground only if the verdict is against the great weight of the

evidence, or it is quite clear that the jury has reached a

seriously erroneous result."); Roy v. Volkswagen of Am., 896 F.2d

1174, 1176 (9th Cir. 1990) ("The trial court may grant a new

trial, even though the verdict is supported by substantial

evidence, if the verdict is contrary to the clear weight of the

evidence, or is based upon evidence which is false, or to

prevent, in the sound discretion of the trial court, a

miscarriage of justice.") (citing Hanson v. Shell Oil Co., 541

F.2d 1352, 1359 (9th Cir. 1976)) (internal quotation omitted);

Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371

(9th Cir. 1987) ("If there is substantial evidence presented at

trial to create an issue for the jury, a trial court may not

grant a motion for a directed verdict or for judgment

notwithstanding the verdict.  The existence of substantial

4

evidence does not, however, prevent the court from granting a motion for a new trial pursuant to Fed. R. Civ. P. 59 if the verdict is against the clear weight of the evidence.").

While the Court has discretion to assess the evidence within these frameworks ("against the clear weight of the evidence," "seriously erroneous result," "miscarriage of justice"), the standard for finding insufficient evidence warranting a new trial remains high.  See Roy, 896 F.2d at 1176 ("While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.'") (quoting Wilhelm v. Associated Container Transp. (Australia) Ltd., 648 F.2d 1197, 1198 (9th Cir. 1981)).

In most cases, the judge should accept the findings of the jury; however, if the judge is left with the definite and firm conviction that a mistake has been committed, he may grant a new trial:

> On the one hand, the trial judge does not sit to approve miscarriages of justice.  His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it.  On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter . . . .  If, having given full respect to the jury's findings, the judge on the entire evidence is left

>     with the definite and firm conviction that a mistake has
>     been committed, it is to be expected that he will grant
>     a new trial.

Landes, 833 F.2d at 1371-72 (internal quotation and citations

omitted).  "The judge can weigh evidence and assess the

credibility of witnesses, and need not view the evidence from the

perspective most favorable to the prevailing party."  Id.

Although the Court will apply each of the above

considerations in deciding Plaintiffs' motion for new trial, for

the sake of clarity the Court will hereinafter refer to the

"against the clear weight of the evidence" standard, which is

most commonly used by the courts.

**B.   DISCUSSION**

Plaintiffs argue that a new trial is warranted because

(1) the verdict on the disability claim under Section 504 was

against the clear weight of the evidence; (2) the verdict on the

retaliation claim was against the clear weight of the evidence;

and (3) the Court's evidentiary rulings with respect to two

categories of evidence were erroneous and substantially

prejudicial.  See Motion at 20-28.  Each argument will be

addressed in turn.

**1.   Disability Claim under Section 504**

With respect to Plaintiffs' disability claim under

Section 504, the jury found that Plaintiffs did not prove by a

preponderance of the evidence that Bryan Wiles-Bond was denied

meaningful access to public education.  See Special Verdict Form

at 2 (Oct. 9, 2008).  Jury Instructions No. 18 and 21, which were

agreed upon by the parties, provided the definition of

"meaningful access."  See Court's Jury Instructions Nos. 18 and

21, at 23, 26 (Oct. 8, 2008).  Jury Instruction No. 18 stated in

relevant part:

> That is, the DOE is required to provide disabled students
> in Hawaii with "meaningful access" to "public education"
> through reasonable accommodation of their disabilities
> necessary to provide such access, assuring that disabled
> students receive evenhanded treatment in relation to non-
> disabled students.

Id. at 23.

Jury Instruction No. 21 provided in relevant part:

> In determining whether Plaintiffs have satisfied the
> fourth element of a Section 504 claim - that is, whether
> Bryan was excluded from participating in, denied the
> benefits of, or subject to discrimination at the school
> solely by reason of his disability - the focus is on
> whether Bryan was denied meaningful access to public
> education.  Under Section 504, a school may have to make
> reasonable accommodations to ensure that a disabled child
> has meaningful access to public education.  The
> accommodations must only be reasonable.  Reasonableness
> depends on the circumstances of each case, and requires
> a fact-specific, individualized analysis of the disabled
> individual's needs and the accommodations that might
> allow him meaningful access to public education.

Id. at 26.

The Court finds that the jury's verdict that Defendant

did not deny Bryan meaningful access to public education was

supported by the clear weight of the evidence.  Defendant

presented significant evidence that it did, in fact, make

reasonable accommodations to ensure that Bryan had meaningful

access to public education while in Hawaii.  See Mark H. v.

Lemahieu, 513 F.3d 922, 938 (9th Cir. 2008).  In other words,

Defendant successfully demonstrated that the special education

services that were provided to Bryan from 1999-2005 gave him

meaningful access to public education, even though on some

occasions Defendant failed to fulfill certain aspects of Bryan's

IEP, the settlement agreement dated July 1, 2002 ("Settlement

Agreement"), or the administrative decisions.[4/]

---

[4/] This case has presented the Court, the parties, and the
jury with the challenging task of applying Section 504's
"meaningful access" standard to an action alleging a failure to
implement a disabled child's IEP.  Because much of the evidence
in this Section 504 lawsuit referenced the Individuals with
Disabilities Education Act ("IDEA"), the Court developed, and the
parties agreed upon, the language in a limiting instruction.  See
Court's Jury Instruction No. 18, at 21-23 (Oct. 8, 2008).  The
instruction highlighted the different obligations under each
statute and emphasized that Plaintiffs were only alleging
violations of Section 504, not the IDEA.  Id.  With the agreement
of the parties, the jury was given this instruction no fewer than
three times.
     Despite the clear language of the limiting instruction,
Plaintiffs appear to have premised their case, as well as the
instant Motion, on an interpretation of "meaningful access" that
the Court has rejected on a number of occasions.  Plaintiffs
essentially argue that the services required by Bryan's IEP, the
Settlement Agreement, and the administrative decisions are
synonymous with "meaningful access," and therefore Defendant's
failure to provide particular services on certain occasions
constituted automatic liability under Section 504, although they
simultaneously deny that they are making this point.  See Reply
at 11-12 ("The services [Bryan] needed to meaningfully access his
education were clearly established by the settlement agreement of
2002. . . . Plaintiffs do not propose that failure to fulfill
Bryan's IEP constitutes a denial of meaningful access per se. . .
. Plaintiffs simply point out that the word 'meaningful' can only
be given life if it is viewed in the context of Bryan's needs -
needs that were undisputed and that were undisputedly not met.").
Plaintiffs primarily support their Motion with citations to the
record wherein DOE witnesses agreed that Bryan needed certain
services set out in his IEP, the Settlement Agreement, and the
administrative decisions and acknowledged that Bryan did not

receive those services.  See Motion at 2-18, 22; Reply at 2-3, 11-12.  Because such evidence was "undisputed," Plaintiffs contend that the jury's verdict in favor of Defendant was contrary to "all of the evidence presented."  See Motion at 22.

In essence, despite their protests to the contrary, Plaintiffs would like Section 504 to be an enforcement statute for the IDEA.  It is not.  Although the services in Bryan's IEP were part of Defendant's offer of a "reasonable accommodation," see J.D. v. Paulette Sch. Dist., 224 F.3d 60, 71 (2d Cir. 2000), Plaintiffs have not provided – and the Court has not found – any authority suggesting that each and every service designated in an IEP, or even some fraction of the services, must be provided in order for a disabled child to receive "meaningful access" to public education under Section 504.  Rather, the case law suggests that the "meaningful access" inquiry under Section 504 is more general.  See Traynor v. Turnage, 485 U.S. 535, 548 (1988) (quoting Alexander v. Choate, 469 U.S. 287, 304 (1985)) (observing that the "central purpose of § 504" is to "assure that handicapped individuals receive 'evenhanded treatment' in relation to nonhandicapped individuals"); Mark H., 513 at 929, 938 ("While the IDEA focuses on the provision of appropriate public education to disabled children, the Rehabilitation Act of 1973 more broadly addresses the provision of state services to disabled individuals. . . . [A] public entity can be liable for damages under § 504 if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons."); P.C. v. McLaughlin, 913 F.2d 1033, 1041 (2d Cir. 1990) (quoting Traynor, 485 U.S. at 548) (stating that it is "clearly established law" that the purpose of Section 504 is to ensure that disabled individuals receive "evenhanded treatment" in relation to non-disabled individuals).  The Court notes that Plaintiffs presented virtually no evidence of the educational opportunities afforded to non-disabled students in Hawaii.  See Traynor, 485 U.S. at 548 (quoting Choate, 469 U.S. at 304).

The Court notes the Ninth Circuit's analysis in Bird v. Lewis & Clark College.  See 303 F.3d 1015 (9th Cir. 2002).  In Bird, a paraplegic student sued a college for disability discrimination under Section 504 and the ADA for failing to provide her with wheelchair access on certain occasions during the college's overseas program in Australia.  Id. at 1019.  Before the trip, the student was informed that she could not participate in several activities due to her disability, but that the program would otherwise be able to accommodate her disability and "adequate facilities would be available in most of the outdoor trips."  Id. at 1017.  Once in Australia, however, the

student did not have full wheelchair access at approximately 22 locations.  Id.  In determining that the student's Section 504 claim was insufficient, the Bird court explained:

> Contrary to her assertion, Bird does not prevail on the ADA or Rehab claim simply because the College failed to provide her with wheelchair access on a number of occasions. . . . [rather] the central inquiry is whether the program, 'when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.'

Id. at 1021 (quoting Barden v. City of Sacramento, 292 F.3d 1073, 1075-76 (9th Cir. 2002)).

The Bird court later upheld the district court's denial of the student's motion for a new trial, noting:

> There was ample evidence to support the jury verdict. Because failure to provide wheelchair access does not automatically establish liability under the Rehab Act, the jury was not required to find against the College even though some aspects of the program were not fully wheelchair-accessible.  The College countered Bird's evidence that she was denied access at 22 locations with evidence that it accommodated her disability on numerous occasions.  That the jury found against Bird in spite of her claims of discrimination is not against the 'clear weight of the evidence' and does not entitle her to a new trial.

Id. at 1023 (quoting Fairley v. Luman, 281 F.3d 913, 918 (9th Cir.  2002).  Following the logic in Bird, the failure to provide IEP-required special education services on some occasions does not automatically give rise to liability under Section 504.  Cf. Mark H., 513 F.3d at 929.  In the instant case, like in Bird, Defendant countered Plaintiffs' evidence that Bryan did not receive certain services required by his IEP, the Settlement Agreement, and the administrative decisions, with solid, credible evidence that it accommodated Bryan's disability on numerous occasions.  See infra.  Notably, Defendant introduced evidence that Bryan enjoyed the benefits of public education; and, indeed, Plaintiffs admit that Defendant provided 75 percent of the services in Bryan's IEP, see Plaintiffs' Trial Exhibit 300 at 8, while Defendant asserts that it furnished a higher percentage of services which afforded Bryan meaningful access to public education.  The Court finds that Defendant provided services to Bryan sufficient to afford him meaningful access to public education.  The jury had ample justification for finding against Plaintiffs on their disability claim under Section 504.

(Bird is not, as Plaintiffs assert, inapposite simply

because it involved a post-secondary educational institution.
The Court reminds Plaintiffs that the "meaningful access"
language in <u>Bird</u> was cited with approval in <u>Mark H.</u>, which
involved an elementary school.  <u>See</u> <u>Mark H.</u>, 513 F.3d at 937-38.
Although Plaintiffs are correct that the Court ruled in their
favor in omitting certain language from <u>Bird</u> from the jury
instructions, <u>see</u> Pretrial Conference Transcript at 4 (Sept. 5,
2008), the Court did not intend its ruling to imply that cases
involving post-secondary educational institutions are wholly
inapplicable.)

        The Court further notes that case law under the IDEA
undermines Plaintiffs' strict liability theory of "meaningful
access."  In the IDEA context, minor failures in implementing an
IEP are not automatically treated as violations of the statute.
<u>See</u> <u>Van Duyn v. Baker Sch. Dist. 5J</u>, 502 F.3d 811, 822 (9th Cir.
2007).  Rather, the Ninth Circuit has held that only a "<u>material</u>
failure to implement an IEP violates the IDEA.  A material
failure occurs when there is more than a minor discrepancy
between the services a school provides to a disabled child and
the services required by the child's IEP."  <u>Id.</u> (emphasis in
original).  If failures to implement services in an IEP are not
automatically considered violations of the IDEA, it follows that
similar failures would not give rise to per se liability under
Section 504.

        Plaintiffs also distort the "meaningful access"
standard by implying that the disabled child's progress (or lack
thereof) is the controlling factor in determining whether he had
meaningful access.  <u>See</u> Reply at 13 ("[B]ased on [Bryan's] lack
of progress and actual regression [in Hawaii], the overwhelming
weight of the evidence established that his program in Hawaii did
not provide such access.").  In the Court's view, any progress or
regression is relevant to whether a child has received meaningful
access, but not determinative.  Certainly, any progress or
regression is relevant to whether the child has suffered an
injury and is entitled to a remedy under Section 504.  Moreover,
the child's individual needs and circumstances are relevant in
determining whether an accommodation is reasonable.  <u>See</u> <u>Bird</u>,
303 F.3d at 1020.  However, the "meaningful access" standard
focuses on the opportunities given to disabled individuals,
rather than their progress.  <u>Cf.</u> <u>Choate</u>, 369 U.S. at 304
("Section 504 seeks to assure evenhanded treatment and the
<u>opportunity</u> for handicapped individuals to participate in and
benefit from programs receiving federal assistance.")(emphasis
added).

        In any event, Plaintiffs cannot use the instant Motion
to reargue their interpretation of the law.  When reviewing the

The record reflects that Bryan enjoyed the benefits of special education in both the school and home settings.  See Bird, 303 F.3d at 1021.  Plaintiffs admit that the DOE "provided approximately 75 percent of the services mandated [under Bryan's IEP]."  See Plaintiffs' Trial Exhibit 300 at 8.  This admission is significant, given that Bryan's IEP designated at one time as many as 68.25 hours of skills trainers services per week.  See, e.g., Joint Exhibit 3 at 3.  Plaintiffs' own autism expert, Dr. Betty Jo Freeman, testified that 68 hours of intervention was "ridiculous,"[5] and that the standard of practice for a child with severe autism is "25-30 hours a week with people who are trained."  See Trial Transcript vol. 2 at 111-12, 117 (Sept. 10, 2008).  Indeed, Dr. Dru Copeland, a psychologist who served as the autism consultant in the West Hawaii District from August 2002 through March 2007, testified that Bryan had the most hours in his IEP out of all of the autistic children with whom she

---

jury instructions with the parties, the Court resolved each of Plaintiffs' objections to their satisfaction.  See generally Transcript of Status Conference (Sept. 29, 2008); Transcript of Status Conference at 8 (Oct. 6, 2008).  Moreover, Plaintiffs agreed to the Court's jury instructions as read.  See Trial Transcript vol. 17 at 34-35 (Oct. 8, 2008).  With the parties' agreement, the Court's limiting instruction, which emphasized the differences between Section 504 and the IDEA, was given multiple times during the trial.  It should therefore come as no surprise to Plaintiffs that the Court is unconvinced by the theory upon which their Motion is largely based.

[5] Dr. Freeman explained: "[I]f you train people, children don't need 68 hours . . . [Bryan] needs down time."  See Trial Transcript vol. 2 at 112 (Sept. 10, 2008).

worked in the West Hawaii District.  <u>See</u> Trial Transcript vol. 11 at 84-85 (Sept. 26, 2008).  She testified that Bryan's IEP had approximately 15 more skills trainer hours per week than the IEPs of other autistic children with similar needs as Bryan.  <u>Id.</u> at 85.

Moreover, Bryan's father testified that both he and Bryan's mother were pleased with the education and support that Bryan received in second grade at Waikoloa Elementary School, from 1999-2000.  <u>See</u> Trial Transcript vol. 4 at 91 (Sept. 16, 2008).  He further testified that Bryan was a model student during his fourth and fifth grade years, from 2001-2003.  <u>Id.</u> at 92-93.

Several DOE witnesses described the multitude of special education services that were, in fact, provided to Bryan while he lived in Hawaii.  Dr. Copeland testified that in accordance with Bryan's IEP, she spent about six hours per week working with Bryan, his teachers, his skills trainers, and his parents - more hours than any other children with whom she worked.  <u>See</u> Trial Transcript vol. 11 at 86-87 (Sept. 26, 2008).  Four of Bryan's special education teachers from 1999-2005 (Rebecca Pierson, Shirley Revelle, Bill Brown, and Jennifer Harris) testified at length as to the types of special education services they provided to Bryan in the classroom.  <u>See generally</u> Trial Transcript vol. 9 at 167-222 (Sept. 24, 2008) and Trial Transcript vol. 10 at 4-81 (Sept. 25, 2008) (Ms. Pierson's testimony); Trial Transcript vol. 11 at 211-217 (Sept. 26, 2008)

and Trial Transcript vol. 12 at 8-108 (Sept. 30, 2008) (Ms. Revelle's testimony); Trial Transcript vol. 15 at 5-41 (Oct. 3, 2008) (Mr. Brown's testimony); Trial Transcript vol. 13 at 82-187 (Oct. 1, 2008) (Ms. Harris's testimony).  Tristine Graetz, an educational assistant assigned to Bryan in the 1999-2000 school year at Waikoloa Elementary, testified that she was responsible for helping Bryan on and off the bus, doing the "skills training that was set out for him, going through his daily routine, his picture schedule, toileting," tooth-brushing, and helping him at recess.  See Trial Transcript vol. 13 at 191 (Oct. 3, 2008). Richi Stallard, who worked as one of Bryan's skills trainers from August 2003 until February 2004, described how she would take Bryan on community outings to Long's, K-mart, or Wal-Mart. See Trial Transcript vol. 8 at 29 (Sept. 23, 2008).

        Defendant also presented substantial evidence that the educational professionals who worked with Bryan were caring and effective, even if they lacked certain qualifications required by Bryan's IEP, the Settlement Agreement, or the various administrative decisions.  One striking example is Mr. Brown, Bryan's special education teacher during the summer of 2004. Although Mr. Brown was not a certified special education teacher - and did not have a college degree - Barbara Coffman, one of Bryan's former skills trainers, testified that Mr. Brown would bring in his guitar and lead the class in song, while the skills trainers would practice the sign language to the words of the songs.  See Trial Transcript vol. 15 at 6 (Oct. 3, 2008); Trial

14

Transcript vol. 10 at 188-89 (Sept. 25, 2008).  Ms. Coffman

testified:

> [W]hat I observed was Bryan being very delighted at the
> sound of that.  Bryan didn't often show joy, but he would
> laugh during the music, he would keep eye contact with
> Bill, and he was making a lot of attempt to do the signs.
> He was very engaged.

See Trial Transcript vol. 10 at 188-89 (Sept. 25, 2008).  Dr.

Copeland confirmed that the children "loved" Mr. Brown, and

although he was not certified as a special education teacher, he

was "very responsive" any time Dr. Copeland asked him to make

adjustments.  See Trial Transcript vol. 11 at 93 (Sept. 26,

2008).

Moreover, Dr. Copeland provided highly credible

testimony that Ms. Pierson was an "attentive" and "very good"

special education teacher, and Ms. Harris, Bryan's teacher from

2004-2005, was "excellent."[6]  Id.  She also testified that

although Bryan's special education teacher in 2003-2004 was "not

the strongest," he was responsive to her suggestions and even

organized weekly meetings to review Bryan's educational program.

Id. at 90.  With respect to Bryan's skills trainers, Dr. Copeland

testified that for the entire time she worked with Bryan, some

skills trainers were more competent than others, and some were

more responsive to training than others, but all were responsive

---

[6] Regarding Ms. Harris, Dr. Copeland testified: "[S]he ran
a pretty tight ship.  And she worked with each [child], including
Bryan, individually herself every day. We collaborated a lot on
different approaches and she made a lot of materials for
[Bryan]."  See Trial Transcript vol. 11 at 94 (Sept. 26, 2008).

to Bryan's needs.  Id. at 96.

It was also highly evident to the Court that the DOE professionals who worked closely with Bryan cared deeply for him. See Trial Transcript vol. 11 at 78-79 (Sept. 26, 2008) (Dr. Copeland describing how she would sing a made-up song to Bryan as a way of connecting with him and being together, "Hey, there, Bryan Boy, what ya, what ya doin', Bryan Boy.  You're the smartest boy that I have ever known . . ."); Trial Transcript vol. 12 at 28-29 (Sept. 30, 2008) (Ms. Revelle stating that the first moment she felt she had developed a relationship with Bryan was when they "had been working together for a while and we were doing something, he came over and he rested his forehead on my forehead, and we just let it sit there for a minute," which was "pretty moving" for her); Trial Transcript vol. 10 at 122-23 (Sept. 25, 2008) (Sheri Adams, speech pathologist, recounting how when Bryan would gaze into her eyes, she "felt extreme frustration that despite all efforts, all attempts, that that look from him was almost a plea, Help me, continue to work harder, do more, unlock me from myself.")

Defendant also presented evidence that it took steps, albeit with tempered success, to ensure that Bryan's skills trainers were trained in the methods required by Bryan's educational program.  Judith Radwick, who served as a District Educational Specialist ("DES") for the DOE, West Hawaii District, explained that in 2002, the responsibility switched from the

16

Department of Health ("DOH") to the DOE to recruit and staff skills trainers for the DOE's special education programs.  See Trial Transcript vol. 8 at 183 (Sept. 23, 2008).  At that time, she testified, the DOE contracted with the "same agencies as the DOH to deliver the same services."  Id.  Ms. Radwick testified that under those contracts, it was the agencies' responsibility to train their personnel in methods of working with autistic children, such as DTT, PECS, and TEACCH.[7/]  Id. at 183-84.

In addition to relying upon the agencies for the training of skills trainers, the record reflects that the DOE did undertake some training on its own.  Specifically, Sheri Adams, who served as the autism speech pathologist for West Hawaii special education from January 2002 to February 2004, testified that she taught a four-week American Sign Language ("ASL") class for Bryan's specific team.  See Trial Transcript vol. 10 at 111 (Sept. 25, 2008).  Ms. Stallard testified that she attended the entire four-week course along with her son.  See Trial Transcript vol. 8 at 28 (Sept. 23, 2008).  One of Bryan's other skills trainers, Bill Beljean, also attended the entire course, according to Ms. Stallard's testimony.  Id.  Ms. Stallard further testified that Rebecca Gavin, another skills trainer, stayed with

---

[7/] The Court notes, however, that reliance on agencies does not excuse the DOE from its obligation to provide meaningful access to public education under Section 504.  See Trial Transcript vol. 5 at 110 (Sept. 17, 2008) (Mr. Rho testifying that although the DOE can contract with third-party agencies, it is still the DOE's responsibility to provide special education services).

Bryan so that the parents could take the signing course; however, the next day Ms. Stallard and Mr. Beljean would teach the signs they learned the night before to Ms. Gavin.  Id.

In sum, the Court finds that Defendant presented substantial, compelling evidence that Bryan enjoyed the benefits of public education during his five-year enrollment with the DOE.[8/]  The jury's determination that Bryan was not denied meaningful access to public education was therefore supported by the clear weight of the evidence.[9/]

---

[8/] Plaintiffs point to several portions of Alvin Rho's testimony in arguing that evidence unequivocally shows that Bryan was denied meaningful access to public education in violation of Section 504.  Mr. Rho served as the Deputy District Superintendent from 1999 until March or April of 2002 and then became the Complex Area Superintendent for the Big Island until he retired in December 2004.  See Trial Transcript vol. 5 at 76 (Sept. 17, 2008).  In discussing the Settlement Agreement that he signed on behalf of the DOE, Mr. Rho testified that the DOE did not fulfill the part of the agreement requiring a trained pool of skills trainers, which was "designed to allow Bryan to access his education."  Id. at 120.  The Court emphasizes, however, that Mr. Rho was one of three complex superintendents for the entire Big Island, and necessarily had to rely on other professionals - notably, the district education specialists - to handle issues arising in individual cases like Bryan's.  Id. at 76, 78.  Mr. Rho testified that after signing the Settlement Agreement, he delegated the responsibility of fulfilling its terms to Ms. Radwick, the DES, and expected her to report to him immediately if she had any concerns about the DOE's ability to fulfill its promises.  Id. 137-38.  Ms. Radwick provided compelling testimony regarding the myriad efforts she made to implement Bryan's educational program.  See Trial Transcript vol. 8 at 182, 189 (Sept. 23, 2008).

[9/] The Court notes that Bryan's parents may have had unreasonable expectations as to what Defendant was obligated to provide to ensure "meaningful access" under Section 504.  For example, Bryan's father testified that during a meeting in March 2004, when the issue of sanitation in the Wiles-Bond home arose,

Because the jury only reached the question of whether Bryan was denied meaningful access to public education in violation of Section 504, the Court's analysis could end here. Nevertheless, the Court further finds that Defendant presented persuasive evidence that it did not act with deliberate indifference, which is the requisite <u>mens</u> <u>rea</u> for a damages remedy under Section 504.  <u>See</u> <u>Mark H.</u>, 513 F.3d at 938; <u>Duvall v. County of Kitsap</u>, 260 F.3d 1124, 1135-36 (9th Cir. 2001). Jury Instruction No. 23, which was agreed upon by the parties, provided the definition of "deliberate indifference":

> Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood. . . . [I]n order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness.

<u>See</u> Court's Jury Instruction No. 23, at 28 (Oct. 8, 2008).  Even if the Court assumes that Defendant knew that a harm to Bryan's right under Section 504 was substantially likely, Defendant presented overwhelming evidence that the second prong of deliberate indifference - failure to act - was not met.  That is, over the course of five years, Defendant made numerous good faith attempts to provide Bryan with meaningful access to public

---

he and/or his attorney indicated that if the home was not adequate for sanitation reasons, the DOE should pay for some other facility in order to teach the home setting skills.  <u>See</u> Trial Transcript vol. 4 at 95 (Sept. 16, 2008).  The Court further notes that Defendant's efforts to accommodate Bryan and his parents' demands resulted in agreeing to excessive IEP requirements.

education pursuant to Section 504.  <u>See also</u> Court's Order
Denying Plaintiffs' Motion in Limine #12 to Preclude Evidence or
Argument Based on Defendant's 'Good Faith' Attempts to Provide
Special Education or Related Services (Sept. 22, 2008).

Dr. Freeman testified that while Bryan was in Hawaii,
attempts were made to educate Bryan in both the home and school
settings, though she felt that insufficient training was
provided.  <u>See</u> Trial Transcript vol. 2 at 144-45 (Sept. 10,
2008).  She admitted that the people who worked with Bryan in
Hawaii were "really trying to help Bryan."  <u>Id.</u> at 145.  Even Dr.
Kimberly Smalley, a behaviorist who conducted Bryan's functional
behavior analysis in 2004, acknowledged that at certain times,
there seemed to be about 25 people crammed around the table at
Bryan's IEP meetings.[10/]  <u>See</u> Trial Transcript vol. 4 at 198-99
(Sept. 16, 2008).  Ms. Adams testified that Bryan's IEP team

_____

[10/] Dr. Smalley also testified at trial that she believed
that "the DOE broke [Bryan] and they broke him on purpose."  <u>See</u>
Trial Transcript vol. 4 at 181 (Sept. 16, 2008).  However, the
credibility of this testimony is severely weakened by
contradictory statements in Dr. Smalley's deposition.
Specifically, Dr. Smalley testified in her deposition that
Bryan's deteriorating behaviors stemmed from

> behavioral drift.  His plan had kind of faded away, you
> know.  <u>I don't think it was intentional</u>. But either staff
> wasn't available or wasn't trained . . . or the rules got
> a little lax . . . You know, for a whole variety of
> explanations, the plan wasn't being followed and wasn't
> being implemented, his engagement was extraordinarily
> low, he wasn't doing anything. . . . He was literally on
> the floor [self-stimulating] and urinating all day, so
> that was huge.  And I think they also had the additional
> problem of his becoming pubescent.

<u>See</u> Trial Transcript vol. 4 at 199-203 (Sept. 16, 2008) (emphasis
added).

engaged in "a lot of discussion, a lot of effort, a lot of hopefulness that [they] would see measurable progress."  See Trial Transcript vol. 10 at 111 (Sept. 25, 2008).

Defendant also presented evidence of its good faith attempts to recruit skills trainers in order to fulfill the skills trainer hours required by Bryan's IEP, the Settlement Agreement, and various administrative decisions.  In particular, Ms. Radwick testified that the DOE sought to fulfill its responsibility to provide skills trainers by contracting with three agencies (The Institute for Family Enrichment or TIFFE, Alakai Na Keiki, and Child & Family Services or CFS), supporting the agencies in their recruitment efforts, placing flyers in schools, and advertising in the local newspaper.  See Trial Transcript vol. 8 at 182, 189 (Sept. 23, 2008).

The Court notes that the amount of money that the DOE spent and/or was willing to spend on Bryan is also relevant in determining whether it "failed to act" to prevent the violation of Bryan's rights under Section 504.  In fact, Plaintiffs introduced a letter dated September 17, 2004, in which Plaintiffs' former attorney, Shelby Floyd, estimated that the total annual cost of providing the services in Bryan's IEP through existing DOE contracts with providers would be $244,990.00 to $270,000.00.  See Defendant's Exhibit 765.  In addition, Kate Tolentino, who worked with Bryan from September 2004 through November 2004 as the DES for special education for North Hawaii, provided credible testimony that the DOE approved a

21

proposal from Pacific Child & Family Associates ("PCFA"), dated November 5, 2004, for a total annual cost of approximately $191,600.00.  See Trial Transcript vol. 16 at 56 (Oct. 7, 2008); Joint Exhibit 76.

The Court further adds that Defendant presented substantial evidence that Bryan was not discriminated against "solely by reason of" his disability.[11]  See Court's Jury Instruction No. 22, at 27 (Oct. 8, 2008); 29 U.S.C. § 794.  That is, even assuming that Defendant failed to provide Bryan with meaningful access to public education, Defendant presented evidence of other factors that caused or contributed to any such

_____

[11] On October 8, 2008, after the Court read the jury instructions, Plaintiffs misstated the meaning of the "solely by reason of" inquiry in their closing argument.  See Trial Transcript vol. 17 at 52 (Oct. 8, 2008) ("You heard in several of the instructions the term 'solely by reason of his disability' in regard to liability.  What that means is, if Bryan were not disabled, he would have received the services.").  Therefore, the Court found it necessary to explain the following to the jury:

> Another [clarification] is with respect to Jury Instruction No. 22, which reads: The fourth element of a Section 504 claim also requires Plaintiffs to prove by a preponderance of the evidence that the denial of "meaningful access" to public education was "solely by reason" of Bryan's disability.  Solely by reason of Bryan's disability.  This means that if the alleged discrimination was motivated by a lawful factor other than the disability, even if the disability was in part a motivating factor, plaintiffs have failed to . . . carry their burden of proof.  If there's some other lawful factor that was a motivating factor, even if disability was in part a motivating factor.

Id. at 125; see also Weinrich v. Los Angeles Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997); Dempsey v. Ladd, 840 F.2d 638, 641 (9th Cir. 1987); Doe v. Arlington County Sch. Bd., 41 F.Supp.2d 599, 608 (E.D. Va. 1999).

assumed failure. For example, several DOE witnesses testified
that there was a chronic shortage of skills trainers on the Big
Island.  See, e.g., Trial Transcript vol. 8 at 182 (Sept. 23,
2008) (Ms. Radwick testifying that there was a shortage of skills
trainers on the west side of the Big Island); Trial Transcript
vol. 16 at 76 (Oct. 7, 2008) (Ms. Tolentino testifying that there
was a chronic and systematic shortage of skills trainers for the
entire Big Island).  Linda Price, who served as the Neighbor
Island Administrator for CFS between February 2002 and October
2004, testified that both CFS and TIFFE had requests from the DOE
"for more skills trainers than we were able to hire."  See Trial
Transcript vol. 13 at 9 (Oct. 1, 2008).  Moreover, Kelly Stern,
who recruited skills trainers for TIFFE from February 2003 to
August 2005, testified that she was never able to find a single
skills trainer who met the qualifications specified in Bryan's
IEP and the Settlement Agreement (namely, DTT, TEACCH, PECS, and
ASL).  See Trial Transcript vol. 12 at 112, 126 (Sept. 30, 2008).
Ms. Price also indicated that potential skills trainers were
intimidated by the requirement of an interview with the Wiles-
Bond parents and chose not to apply.  See Trial Transcript vol.
13 at 18 (Oct. 1, 2008).  In addition, factors relating to the
parents' demands and lack of cooperation, poor home conditions,
and puberty may have contributed to any alleged failure to
provide Bryan with meaningful access to public education under

Section 504.[12/]  <u>See, e.g.</u>, Trial Transcript vol. 11 at 197-98
(Sept. 26, 2008) (Dr. Copeland opining that Bryan's problems
during the 2003-2004 school year were caused by many factors,
including puberty); Trial Transcript vol. 4 at 199-203 (Sept. 16,
2008) (Dr. Smalley recalling in her deposition that one reason
for Bryan's deteriorating behavior was that he was becoming
pubescent); Trial Transcript vol. 7 at 71 (Sept. 19, 2008) (Cara
Entz testifying that the conditions of the Wiles-Bond home made
it an unsafe work environment); Trial Transcript vol. 8 at 39-40
(Sept. 23, 2008) (Ms. Stallard testifying that Bryan's living
area was dirty and it was uncomfortable to work there).

Finally, the Court notes that certain evidence
indicated that the DOE did not cause harm to Bryan that would
give rise to liability.  Jury Instruction No. 37, which was
agreed upon by the parties, provided:

> With respect to Plaintiffs' Section 504 disability
> claim, the DOE is not liable for the fact that Bryan is
> autistic or from the natural progression of Bryan's
> autism.  The DOE would only be liable to the extent that
> you determine the DOE aggravated Bryan's autism or caused
> him other harm.

<u>See</u> Court's Jury Instruction No. 37, at 42 (Oct. 8, 2008).  Most
significantly, Dr. Siegel, Defendant's expert in autism and child
development, analyzed whether Bryan emerged from his experiences

---

[12/] The Court also notes that Bryan was diagnosed as mentally
retarded, with Dr. Bryna Siegel opining that Bryan had severe
mental retardation and Dr. Freeman agreeing with Dr. LeGoff's
assessment that Bryan had mild to moderate mental retardation.
<u>See</u> Trial Transcript vol. 14 at 34 (Oct. 2, 2008) (Dr. Siegel);
Trial Transcript vol. 10 at 150 (Sept. 10, 2008) (Dr. Freeman).

in Hawaii on the same developmental trajectory that she would have expected based on what he was like prior to arriving in Hawaii.[13]   See Trial Transcript vol. 14 at 31 (Oct. 2, 2008). She concluded that "Bryan was continuing to progress along his expected developmental trajectory."[14]   Id. at 66, 79. Moreover, Dr. Freeman, Plaintiffs' autism expert, admitted that she did not know Bryan's level of functioning when he arrived in Hawaii.[15]   See Trial Transcript vol. 2 at 131 (Sept. 10, 2008).

---

[13]   The jury was undoubtedly impressed that Plaintiffs' co-counsel, Mr. Levin, had utilized Dr. Siegel as an expert witness on numerous occasions.   See Trial Transcript vol. 14 at 196 (Oct. 2, 2008).

[14]   Plaintiffs argue that Dr. Siegel "confirmed that Bryan needed to recoup from the losses he suffered in Hawaii."   See Reply at 12.  However, Dr. Siegel actually testified: "The only thing of interest to me was whether [Bryan] had recouped and was on, if we assumed he had losses, that he had recouped to the extent that he was back on the developmental trajectory that we would expect" for a child his age "who had autism and severe disability."   See Trial Transcript vol. 14 at 160 (Oct. 2, 2008). The Court further notes that even assuming Bryan experienced a regression in Hawaii, as suggested by Dr. Freeman and Dr. Smalley, other factors besides lack of services may have been to blame, such as the parents' demands and lack of cooperation, poor home conditions, Bryan's mental retardation, and puberty.   See, e.g., Trial Transcript vol. 11 at 197-98 (Sept. 26, 2008); Trial Transcript vol. 4 at 199-203 (Sept. 16, 2008); Trial Transcript vol. 7 at 71 (Sept. 19, 2008); Trial Transcript vol. 8 at 39-40 (Sept. 23, 2008).

[15]   There was also evidence that Bryan had suffered regressions in Maryland and California.   See Trial Transcript vol. 4 at 85 (Sept. 16, 2008) (Bryan's father testifying that in March of 1999, he wrote that Bryan's educational progress in Maryland during the past four years was "slow and limited overall, marked by regressions, particularly during nonattendant school - school periods and summer breaks and long holidays"); Trial Transcript vol. 2 at 141 (Sept. 10, 2008) (Dr. Freeman agreeing that Bryan had a meltdown in California in 2005).

Accordingly, based on each cited ground independently and cumulatively, the Court finds that the verdict for Defendant on the disability claim under Section 504 reflects the clear weight of the evidence.

### 2.    Retaliation Claim

With respect to the Parent Plaintiffs' retaliation claim under Section 504, the jury found that Plaintiffs did <u>not</u> prove by a preponderance of the evidence that Defendant subjected Ann Kimball Wiles or Stanley Bond to an adverse action at the time, or after, the "protected activity" under the Rehabilitation Act occurred.  <u>See</u> Special Verdict Form at 4, 6 (Oct. 9, 2008). Jury Instruction No. 27, which was agreed upon by the parties, defined "adverse action" as follows:

> An action becomes an adverse action if a reasonable person would have found the action materially adverse, meaning it might have dissuaded a reasonable person from engaging in a protected activity.  The action must constitute more than a trivial harm, petty slight, or minor annoyance.

<u>See</u> Court's Jury Instruction No. 27, at 32 (Oct. 8, 2008); <u>see also</u> <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 68 (2006) (defining "materally adverse" as an action that would have likely "dissuaded a reasonable worker from making or supporting a charge of discrimination").

Plaintiffs argue that the verdict ignores numerous instances in which the DOE knowingly acted in an adverse manner toward Parent Plaintiffs.  <u>See</u> Motion at 23-25.  Defendant counters that many such instances were, in fact, either "actions

which were being performed to accommodate Bryan or for Bryan's best interests," or evidence of the "DOE's good faith attempts to provide Bryan with the services set forth in his IEPs, court orders and the Settlement Agreement."   See Opposition at 16. After grouping the allegedly adverse actions into nine categories and considering each one in turn, the Court concludes that significant evidence supports the jury's determination that the Parent Plaintiffs were not subject to any materially adverse actions.

### (a)   Five-year Litigation History

Plaintiffs characterize as adverse several events from the procedural history of this case.  That is, Plaintiffs assert that the DOE acted in an adverse manner by: "refusing to adhere to the May 21, 2001 stipulated decision"; "forcing Bryan's parents to sue to get the services from that decision";"not implementing the settlement agreement"; "forcing Bryan's parents to again file for due process in 2004"; "ignoring the hearing officer's May 11, 2004 decision"; and "forcing Bryan's parents to go back to hearing in July 2004."  See Motion at 23-24.  Although the Court acknowledges that this case has a long procedural history, the Court does not agree that the DOE's attempts to defend itself using its statutorily prescribed rights under the IDEA and Section 504 are, by nature, retaliatory.  Indeed, as previously noted, Defendant's efforts to accommodate Bryan and his parents' demands resulted in agreeing to excessive IEP requirements.  Moreover, as discussed previously, the Court finds

27

that Defendant made good faith efforts to comply with the terms
of Bryan's IEP, the Settlement Agreement, and the various
administrative decisions, even if some of those efforts were
unsuccessful.[16]   The Court finds that Defendant presented
sufficient evidence for the jury to conclude that the litigation
history alone would not chill a reasonable person from engaging
in advocacy.[17]

### (b) Attempted Move from Waikoloa to Kahakai

Plaintiffs contend that Defendant acted in an adverse
manner toward them by "attempting to move Bryan" from Waikoloa

---

[16] Plaintiffs also allege that Mr. Rho, on behalf of the
DOE, acted adversely toward the parents when he "knew at the time
he signed the July 1, 2002, settlement agreement . . . that the
DOE could not perform its terms, even though DOE knew Bryan
needed those services to access his education." See Reply at 4;
Motion at 24; see generally Trial Transcript vol. 5 at 74-168
(Sept. 17, 2008).  The Court notes that even if Mr. Rho knew that
the DOE could not perform the terms of the Settlement Agreement
at that time, it does not mean that the DOE could not perform in
the future with further endeavors.  Moreover, Mr. Rho testified
that after signing the Settlement Agreement, he delegated the
responsibility of fulfilling its terms to Ms. Radwick, the DES,
and expected her to report to him immediately if she had any
concerns about the DOE's ability to fulfill its promises.  See
Trial Transcript vol. 5 at 137-38.  In any event, Plaintiffs do
not explain how Mr. Rho's knowledge about the DOE's abilities
would deter a reasonable person from engaging in advocacy.  This
particular allegation goes more toward whether the DOE acted with
the mens rea of deliberate indifference, which, as discussed
supra, the evidence suggested the DOE did not.

[17] As Defendant points out, the actions of the DOE clearly
did not dissuade Bryan's parents from engaging in protected
conduct, as evidenced by their "continued conduct of filing
repeated due process hearing requests, requests for IEP meetings,
motions for injunctive relief, and the instant litigation."  See
Opposition at 16.  The Court is aware, however, that the
"materially adverse" standard is objective.

Elementary back to his home school, Kahakai Elementary in 1999 and 2000 "against his parents' wishes," "without his parents' consent," and "with the intention of forcing them to bear the burden of proof that placement there was not appropriate."  See Motion at 23.  However, Ms. Radwick offered credible testimony that the reason the DOE wished to move Bryan back to Kahakai was because Bryan lived about 45 miles from Waikoloa.  See Trial Transcript vol. 8 at 170 (Sept. 23, 2008).[18/]  According to Ms. Radwick, the DOE was concerned that the bus ride was too long for a first grader like Bryan.  Id.  Ms. Radwick testified that she received complaints from the people at Waikoloa about "Bryan's coming to school soaking wet with urine" and "upset" and "tired because he had to get on the bus so early."  Id. at 171.  Nevertheless, she testified, the DOE kept Bryan at Waikoloa for the remainder of the school year in part because "it was difficult trying to get the parents into meetings . . . because they wanted Bryan to stay where he was."  Id. at 172-73.  Ms. Radwick's testimony suggested that far from an adverse action, the DOE's attempt to move Bryan back to his home school was an effort to serve his best interests.

### (c) Untrained/Unqualified Skills Trainers

Plaintiffs maintain that the parents were subject to an

---

[18/] Ms. Radwick also testified that it was always the DOE's position that Waikoloa would be a temporary placement, and the DOE wanted to improve the program at Kahakai so Bryan could return there.  See Trial Transcript vol. 8 at 170 (Sept. 23, 2008).

adverse action when Defendant assigned an "untrained" adult to "work with Bryan as a means of placating his mother." See Motion at 23.  Plaintiffs refer to an e-mail written by Mahea Edwards, in which she states that there is a new TA at the school who is currently untrained in working with children with autism and that "[Bryan's mother] seems pacified with his presence." See Defendant's Exhibit 633.  The e-mail further provides, however, that the TA is "attending the 3-day training next week." Id. The Court does not see how a reasonable person would be dissuaded from advocating on their son's behalf simply because a DOE official referred, in an internal e-mail, to the person seeming "pacified."  The jury was justified in viewing the DOE's action as an effort to accommodate Bryan's disability, rather than an adverse action.

Plaintiffs further allege that Defendant acted in an adverse manner by "employing unqualified skills trainers throughout the five years Bryan was in the DOE system." See Motion at 24.  As discussed supra, Defendant offered substantial evidence that the skills trainers hired for Bryan were caring and effective, even if they did not possess all of the academic credentials or were not as experienced as Bryan's IEP, the Settlement Agreement, and the administrative decisions required. Ms. Radwick testified that the DOE hired agencies to train skills trainers in the techniques required by Bryan's IEP. See Trial Transcript vol. 9 at 99 (Sept. 24, 2008).  Thus, the jury's finding that the DOE's actions with respect to the employment of

30

skills trainers were not adverse was supported by the weight of the evidence.

### (d) Cara Entz and PCFA

Plaintiffs submit that Defendant used Ms. Entz, a clinical director for PCFA, to "obtain further delay of Federal Court oversight, instead of procuring services needed by Bryan in a timely manner." See Motion at 24. Plaintiffs refer to the fact that on the second day of Ms. Entz's visit, on or about October 21, 2004, she was taken to Honolulu to meet with Judge Kurren and DOE personnel to share her observations of Bryan and explain her proposal. See Trial Testimony vol. 7 at 30-31, 33 (Sept. 19, 2008) (testimony of Ms. Entz).

Although the hearing struck Ms. Entz as "very unusual," id. at 31, she testified that the purpose of the hearing was to share her insight with Bryan's entire team - including Plaintiffs' attorney, the DOE attorneys, and Judge Kurren himself - regarding broad parameters as to what she would recommend as a program for Bryan. Id. at 83-84. She further testified that the DOE appeared to be very receptive to her presence and interested in what she had to say. Id. at 84. Moreover, Ms. Tolentino testified that a proposal from PCFA, dated November 5, 2004, was subsequently approved for Bryan, for an annual sum of approximately $191,600.00. See Trial Transcript vol. 16 at 56 (Oct. 7, 2008); Joint Exhibit 76. The Court concludes that a reasonable person would view the DOE's decision to bring Ms. Entz

31

before Judge Kurren as a good faith effort[19/] to get an expert's

opinion on Bryan's educational program, rather than as an attempt

to further delay the provision of services.   The jury had ample

justification for finding that the Defendant's actions with

respect to Ms. Entz and PCFA were not materially adverse.

### (e) Rebecca Pierson's Letter

Plaintiffs argue that a letter that Ms. Pierson sent to

the parents constituted an adverse action.   See Motion at 23.   In

the letter, dated February 13, 2001, Ms. Pierson wrote in

relevant part:

> You have forced your way into my classroom, you have
> dismissed 2 TA's and yet you expect a full program in
> place for Bryan.  If I spend the full day with Bryan, how
> do I explain to the rest of my parents that I am not
> giving any time to their child?  I could give you their
> phone numbers and let you explain it to them.  Better
> yet, why don't I give them your phone number and let them
> call you.

Defendant's Exhibit 885.   Although Plaintiffs characterize the

letter as accusatory and threatening, the Court finds that a

reasonable person would read the letter as an expression of

frustration, attempting to explain Ms. Pierson's position of

being overburdened, and would not be dissuaded from engaging in a

protected activity.   See Court's Jury Instruction No. 27, at 32

(Oct. 8, 2008); Burlington Northern & Santa Fe Railway Co., 548

---

[19/] Contrary to Plaintiffs' argument, Jury Instruction No. 27
does not "confirm that 'good faith' is irrelevant to the issue of
whether a reasonable person would consider its actions as
'adverse' and likely to deter advocacy."  See Reply at 6 n.2.
Rather, a reasonable person would consider whether an action was
taken in good faith and, therefore, would not be dissuaded from
engaging in a protected activity.

U.S. at 68.  The Court therefore concludes that the jury's finding - that the letter did not constitute an adverse action - was supported by the clear weight of the evidence.

### (f) "Stolen" E-mails

Plaintiffs assert that the parents were subject to an adverse action when Defendant used "stolen e-mails and false accusations in Court to undermine Bryan's parents' hiring of Christie Edwards and to oppose a pending motion for a temporary restraining order."  See Motion at 24; Plaintiffs' Exhibit 355, 356.  The Court is troubled by Defendant's attempt to use unverified and suspicious e-mails in federal court. Nevertheless, as Bryan's father testified, Judge Gillmor refused to consider the e-mails after they were presented to her, admonishing Defendant's lawyer that "these look like personal e-mails."  Id. at 31.  Moreover, according to Bryan's father, after the hearing before Judge Gillmor, Judge Kurren ordered an investigation into the source of the e-mails.  Id. at 32.  This Court finds that Judge Gillmor's rejection of the e-mails and the subsequent investigation ordered by Judge Kurren should have given Plaintiffs some assurance that such tactics would not be tolerated and the e-mails would have no bearing on the litigation.  The Court cannot say that a reasonable person would be dissuaded from advocacy under these circumstances.  Thus, the jury's finding that Defendant's attempt to use the e-mails was not an adverse action was supported by the weight of the evidence.

33

### (g) Confidential Information

Plaintiffs allege that Defendant sent "people into the family home to obtain confidential information about the family." See Motion at 25.  Plaintiffs appear to be referring to one person in particular: a skills trainer named Jeremy Watson who worked with Bryan in the beginning of November 2004.  See id.; Trial Transcript vol. 16 at 143 (Oct. 7, 2008).  Bryan's father testified that he and his wife were concerned that Mr. Watson was "taking photographs of Bryan using his cell phone" and had found real estate material that was hidden in a drawer.  See Trial Transcript vol. 16 at 143 (Oct. 7, 2008).

However, Mr. Watson provided credible testimony that he did, in fact, take photographs of Bryan after having a conversation with Dr. Copeland and Bryan's mother about returning Bryan to a visual schedule.  See Trial Transcript vol. 15 at 169 (Oct. 3, 2008).  Mr. Watson explained that "[b]ecause Bryan responded best [to] actual pictures of the items . . . we took a handful of pictures of both of what expectations we had of him and leisure items that he would enjoy, such as the dog, his bouncy ball, things like that, to also set up a schedule of positive reinforcement."  Id. at 170-71.  According to Mr. Watson, Bryan's mother was aware that it would be necessary to take photographs to put that program into context for Bryan.  Id. at 171.  With respect to the real estate materials, Mr. Watson testified that there were flyers "splashed across the kitchen table," and he mentioned them to Dr. Copeland.  Id. at 191.

34

Based on Mr. Watson's credible testimony that he had
Bryan's mother's approval to take photographs and that any real
estate materials were in plain view, the Court finds that a
reasonable person would not be dissuaded from advocacy under such
circumstances.  Therefore, the jury's determination that the
parents were not subject to an adverse action was firmly
supported by the evidence.

### (h) Condition of Wiles-Bond Home

Plaintiffs allege that Defendant acted adversely when
it "attacked the parents for the condition of the home" rather
than deal with Bryan's needs.  See Motion at 25.  Plaintiffs rely
upon the testimony of their former counsel, Shelby Floyd, who
represented that she checked with Dr. Copeland to see whether the
condition of the home was really a problem and was told it was
not.  See Trial Transcript vol. 6 at 136 (Sept. 18, 2008).

However, Dr. Freeman herself acknowledged that what
goes on in the home setting is an indispensable component of
educating any child.  See Trial Transcript vol. 2 at 133 (Sept.
10, 2008).  Defendant presented significant evidence that the
condition of the home - specifically, Bryan's living space - was
cause for concern for some of his skills trainers.  For example,
Ms. Coffman testified that there was frequently urine on the
floor of Bryan's living space, the bathroom was dirty, and the
kitchen pantry was filled with live and dead roaches.  See Trial
Transcript vol. 10 at 175-76, 182 (Sept. 25, 2008).  Similarly,
Ms. Stallard testified that it was "pretty dirty" in Bryan's

35

living space and "it was very uncomfortable to be there."  See
Trial Transcript vol. 8 at 39-40 (Sept. 23, 2008).  Ms. Entz also
testified that she formed the impression that the Wiles-Bond
home, in the condition in which she saw it, would not be a very
safe place for people to work.  See Trial Transcript vol. 7 at 71
(Sept. 19, 2008).  Based on such testimony, Defendant did appear
to be legitimately facing complaints from skills trainers about
the condition of the home, rather than making up excuses to dodge
its obligations to Bryan.  Accordingly, the jury had
justification for not deeming adverse Defendant's actions
regarding the condition of the home.

### (i) Household Tasks

        Plaintiffs claim that Defendant accused the parents of
asking skills trainers to do "'household tasks' that were
actually functional skills training required as part of Bryan's
program."  See Motion at 25.  Ms. Stallard testified that the
skills trainers were asked to work with Bryan on laundry and
cooking skills as part of his IEP.  See Trial Transcript vol. 8
at 35 (Sept. 23, 2008).  However, when she would try to work with
Bryan on his laundry, Ms. Stallard testified, the washer and
dryer would be full of the family's laundry, and she would have
to either fold the family's clothes or leave them on the parents'
bed, which made her uncomfortable.  Id. at 49-50.  Ms. Stallard
also testified that although she was supposed to work with Bryan
on cooking skills, the food that was left for him required use of
the stove, which "Bryan couldn't manage," and thus she would

prepare the food herself.  Id. at 50.  Based on Ms. Stallard's credible testimony, it appears that the skills trainers were expected to complete household tasks that went beyond the functional skills training in Bryan's IEP.  Accordingly, a reasonable person would find that Defendant had some basis for its claims that skills trainers were asked to do household tasks, and would not be dissuaded from advocacy as a result of such claims.  The jury did not err in finding that Defendant did not act in an adverse manner.

In sum, the Court finds that the jury's verdict for Defendant on the retaliation claim is supported by the clear weight of the evidence.

### 3.  Evidentiary Rulings

Plaintiffs claim that a new trial is warranted because the Court erroneously permitted the admission of evidence regarding: (1) the Parent Plaintiffs' conduct toward Bryan; and (2) the rural nature of Kona, Hawaii.  A court may grant a new trial based on an erroneous evidentiary ruling only if the ruling "substantially prejudiced" a party.  Harper v. City of Los Angeles, 533 F.3d 1010, 1030 (9th Cir. 2008) (quoting Ruvalcaba v. City of Los Angeles, 64 F.3d 1323, 1328 (9th Cir. 1995)); U.S. v. 99.66 Acres of Land, 970 F.2d 651, 658 (9th Cir. 1992).  The Court finds no error in its evidentiary rulings.

### (a)  Parents' Conduct Toward Bryan

Plaintiffs challenge the Court's decision to allow Defendant to present evidence that the parents acted in an

unaffectionate or unloving manner toward Bryan.  Plaintiffs argue
that such evidence should have been excluded as irrelevant and
unfairly prejudicial.  The Court disagrees.

Under Rule 401 of the Federal Rules of Evidence,
evidence is relevant if it has any tendency to make the existence
of any fact that is of consequence to the determination of the
action more probable than it would be without the evidence.  Fed.
R. Evid. 401.  "Evidence which is not relevant is not
admissible."  Fed. R. Evid. 402.  The Court finds, as it did
during trial, that evidence of the parents' interactions with
Bryan is highly relevant to the issue of whether Bryan's
educational program was implemented consistently in the home
setting.  Dr. Freeman agreed that an "integrated program for a
person with Bryan's special needs requires a program which is
integrated between the school and the home."[20/]  See Trial
Transcript vol. 2 at 133 (Sept. 10, 2008).  She explained that
the "parents need to be able to carry out at home what's going on
at school," id. at 111, and that "having inconsistency in a
[special education] program is the worst thing you can do for a

---

[20/] Contrary to Plaintiffs' argument, Dr. Freeman's general
opinions regarding the implementation of educational programs in
the home setting are still relevant despite the fact that she
only observed Bryan in California and not in Hawaii.  Moreover,
Defendant offered the testimony of percipient witnesses who
observed the parents directly interacting with Bryan.

child with autism."[21]  Id. at 59.  Agreeing with Plaintiffs'

second autism expert, Dr. Daniel B. LeGoff, Dr. Freeman further

opined that Bryan's parents are not able to provide Bryan with an

adequate level of supervision or behavioral intervention at their

current home in California.  Id. at 153-53.

Likewise, Dr. Smalley testified that if Bryan "didn't

practice things at home, he wouldn't be able to then do them at

home."  See Trial Transcript vol. 5 at 18 (Sept. 17, 2008).  Ms.

Entz similarly testified that parent training is "key," and her

organization aims to "teach the parents how to do what we do in a

parent-friendly manner so that they can carry it on when we're

not there."  See Trial Transcript vol. 7 at 10 (Sept. 19, 2008).

Ms. Graetz described how she used a variety of programs to help

Bryan with his toileting, and would document her efforts in a

communications log that would get sent home to the parents.  See

Trial Transcript vol. 13 at 48-49 (Oct. 3, 2008).  Although she

hoped that the parents would use the communications log to send

back similar information about Bryan's toileting, she testified

that she was frustrated because the parents would rarely send

anything back about what happened after Bryan left school.  Id.

at 49.  Ms. Graetz testified that she "remembered wishing we had

more feedback from the home side so we would know how to better

_____

[21] Dr. Freeman also agreed that, for every child, "what goes
on in the home is an indispensable component of succeeding and
educating a child . . . to his potential."  See Trial Transcript
vol. 2 at 133 (Sept. 10, 2008).

help them and make the program work." Id. at 50.  Given that

several witnesses emphasized the importance of the parents' role

in implementing Bryan's educational program at home, the Court

finds that evidence of the parents' conduct toward Bryan is

undeniably relevant and, therefore, was properly admitted.[22/]

    The Court further observes that such evidence was also

appropriately admitted under Rule 403.  Rule 403 provides that

relevant evidence may nevertheless be excluded "if its probative

value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless

presentation of cumulative evidence."  See Fed. R. Evid. 403.

Although evidence of the parents' lack of affection toward Bryan

is certainly prejudicial, the Court finds, as it did during

trial, that such evidence is not unfairly prejudicial.

Furthermore, the highly probative value of the evidence

substantially outweighs any risk of unfair prejudice.  Id.

    Thus, the Court finds no error in its decision to allow

Defendant to present evidence of the parents' conduct toward

_____

    [22/] Plaintiffs appear to primarily object to Ms. Stallard's
testimony.  In particular, Ms. Stallard testified that she
observed very little interaction between the parents and Bryan,
and characterized their relationship with Bryan as "virtually
nonexistent."  See Trial Transcript vol. 8 at 54-55 (Sept. 23,
2008).  Ms. Stallard also testified that she did not observe many
instances where Bryan's mother showed affection toward him, and
could not recall any instances where Bryan's father showed
affection toward him.  Id. at 53-54.

40

Bryan.

### (b)   Remoteness of Kona

Plaintiffs further assert that the Court erred in
allowing Defendant to present evidence of the rural nature of
Kona, contending that the sole purpose of such evidence was to
give the jury the impression that the remoteness of Kona excused
Defendant from complying with the obligations of Section 504.
Although Plaintiffs are correct that there is no "rural"
exception to Section 504, the Court nevertheless finds that
evidence of the rural nature of Kona is relevant and not unfairly
prejudicial.

Such evidence directly pertains to whether Defendant
acted with deliberate indifference. As discussed in the Court's
Order Denying Plaintiffs' Motion in Limine #12 to Preclude
Evidence or Argument Based on Defendant's 'Good Faith' Attempts
to Provide Special Education or Related Services (Sept. 22,
2008), Defendant's good faith attempts to provide Bryan with
special education services are relevant to the second prong of
the deliberate indifference inquiry: whether Defendant failed to
act upon the likelihood that Bryan's rights under Section 504
would be violated. See Duvall, 260 F.3d at 1135-36.  It follows
that evidence of circumstances that purportedly frustrated
Defendant's good faith efforts are likewise relevant.

In fact, Dr. Freeman acknowledged that she was aware of
the national difficulty in recruiting special education teachers
and skills trainers, and agreed that this difficulty increases

41

the more rural a community is.  See Trial Transcript vol. 1 at
146-47 (Sept. 10, 2008).  As discussed supra, despite the
shortage of skills trainers on the Big Island, Ms. Radwick
testified that Defendant undertook several efforts to recruit
skills trainers for Bryan.  See Trial Transcript vol. 8 at 182,
189 (Sept. 23, 2008).

     Furthermore, rural school conditions are clearly
relevant in light of the fact that Section 504 "seeks to assure
evenhanded treatment," in that disabled students must be afforded
the same opportunities as non-disabled students.  See Traynor,
485 U.S. at 548; Choate, 469 U.S. at 304.  Evidence of rural
school conditions in Kona allows the jury to compare the
opportunities of disabled and non-disabled students.[23/]  Such
evidence is also relevant to whether Defendant discriminated
against Bryan "solely by reason of" his disability.  See Court's
Jury Instruction No. 27, at 32 (Oct. 8, 2008); 29 U.S.C. § 794.
Accordingly, the Court finds that the rural nature of Kona is
highly relevant.

     Moreover, the strong probative value of such evidence
is not substantially outweighed by the danger of unfair prejudice
or misleading the jury under Rule 403.  See Fed. R. Evid. 403.
In light of Jury Instructions No. 20 and 21, the Court is

_____

     [23/] As discussed previously, the Court notes that Plaintiffs
ultimately presented virtually no evidence of the educational
opportunities afforded to non-disabled students in Hawaii in
general, or Kona in particular.

confident that the jury understood that Section 504 applied to Defendant, notwithstanding the rural nature of Kona.[24/]   In addition, Plaintiffs aggressively cross-examined several witnesses regarding how the rural nature of Kona was not an excuse for any alleged failure to provide meaningful access to public education under Section 504.   See, e.g., Trial Transcript vol. 14 at 162-64 (Oct. 2, 2008) (Dr. Siegel); Trial Transcript vol. 13 at 59-60 (Oct. 1, 2008) (Ms. Price); Trial Transcript vol. 9 at 9-12 (Sept. 24, 2008) (Ms. Radwick).   The Court finds no error in its ruling.[25/]

## III. (RENEWED) MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.   STANDARD

Federal Rule of Civil Procedure 50 ("Rule 50") states, in relevant part:

(a) Judgment as a Matter of Law.
(1) In General.   If a party has been fully heard on an issue during a jury trial and the court finds that a

---

[24/] The Court further notes that the jury was even instructed to disregard publicity about possible cuts to the DOE budget. Jury Instruction No. 17, which was agreed upon by the parties, provided:

During trial, there has been publicity regarding possible budget cuts that the DOE may be facing.   You are instructed to disregard this information when considering the evidence in this case.   This information is not relevant to this trial or your deliberations on the evidence.   I am instructing you that it cannot play a role in your deliberations or decisions.

See Court's Jury Instruction No. 17, at 20 (Oct. 8, 2008).

[25/] Because the Court finds that both evidentiary rulings challenged by Plaintiffs were proper, it need not analyze whether Plaintiffs were "substantially prejudiced" by the rulings. See Harper, 533 F.3d at 1030.

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
(A) resolve the issue against the party; and
(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
(2) Motion.  A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.
(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.  If the court does not grant a motion for judgment as a matter of law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment or - if the motion addresses a jury issue not decided by a verdict - no later than 10 days after the jury was discharged.  The movant may alternatively request a new trial or join a motion for a new trial under Rule 59.
In ruling on a renewed motion, the court may:
(1) if a verdict was returned:
(A) allow the judgment to stand,
(B) order a new trial, or
(C) direct entry of judgment as a matter of law; or
(2) if no verdict was returned:
(A) order a new trial, or
(B) direct entry of judgment as a matter of law.

Fed. R. Civ. P. 50(a) and (b).

The Ninth Circuit "strictly adhere[s] to the requirements of Rule 50(b), which prohibit a party from moving for judgment as a matter of law after the jury's verdict unless that motion was first presented at the close of evidence." Image Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1212 (9th Cir. 1997).  If a party fails to make a motion for judgment

as a matter of law under Rule 50(a) <u>before</u> the case is submitted to the jury, "a party cannot question the sufficiency of the evidence either before the district court . . . or on appeal." <u>Cabrales v. County of Los Angeles</u>, 864 F.2d 1454, 1459 (9th Cir. 1988) (emphasis altered), <u>vacated on other grounds</u>, 490 U.S. 1087 (1989).

The single exception to this rule is the plain error doctrine. <u>Id.</u> Only where there is such plain error apparent on the face of the record that failure to review would result in a manifest miscarriage of justice should the motion be granted. <u>Id.</u> In other words, there must be "an absolute absence of evidence to support the jury's verdict" for a court to grant a post-trial motion for judgment as a matter of law where the party failed to move for judgment as a matter of law before the case was submitted to the jury. <u>See</u> <u>Image Technical Servs.</u>, 125 F.3d at 1212.

B.   **DISCUSSION**

Plaintiffs argue in the alternative that the Court should enter judgment as a matter of law in their favor. <u>See</u> Motion at 28-34. Plaintiffs admit that they did not make a Rule 50 motion during trial. <u>Id.</u> at 29-31. According to Plaintiffs, however, Defendant and the Court share the blame for Plaintiffs' failure to move for judgment as a matter of law at the close of the evidence. That is, Plaintiffs claim that they were "effectively prevented" from making a Rule 50 motion by

45

Defendant's "preemptive" motion for judgment as a matter of law at the close of the evidence during a side bar, and the Court's summary denial of that motion.  Id. at 29-31; Reply at 19-20.

This excuse rings hollow.  Plaintiffs could have made a Rule 50 motion during the side bar immediately following the close of evidence.[26]  In any event, Plaintiffs had ample time to file a Rule 50 motion.  The record reflects that all evidence and testimony concluded by 2:30 p.m. on October 7, 2008.  The Court read the jury instructions and held final arguments the following day, on October 8, 2008.  The jury did not begin deliberations until 3:25 p.m. that day.  Plaintiffs failed to file a Rule 50 motion at the close of evidence or any time leading up to when the case was submitted to the jury.[27]  See Fed. R. Civ. P.

_____

[26]  The following exchange took place at sidebar:

DEFENDANT'S COUNSEL: And, Your Honor, for the record, we renew our Motion for Directed Verdict at this time.
THE COURT: And I'll rule against you. I find that a reasonable jury could conclude that the plaintiffs have established all the essential elements by a preponderance of the evidence.
PLAINTIFFS' COUNSEL: Thank you, Your Honor.
(End of sidebar.)

See Trial Transcript vol. 16 at 158 (Oct. 7, 2008).

[27]  Moreover, as Defendant points out, "Plaintiffs' counsel has filed numerous pleadings after the close of business throughout the trial, including the instant Motion filed at 10:42 p.m. (HST)."  See Opposition at 25.   The Court adds that Defendant is not, as Plaintiffs mistakenly assert, arguing that Plaintiffs are now barred from seeking judgment as a matter of law because Plaintiffs failed to file a written motion.  See Reply at 19.

50(a)(2) (stating that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury) (emphasis added); cf. Pro Football Weekly, Inc. v. Gannett Co., Inc., 988 F.3d 723, 726 (7th Cir. 1993) (finding that the district court properly determined that the defendant had renewed its motion for judgment as a matter of law when it objected to a jury instruction during a jury instruction conference held immediately before the case was submitted to the jury).

The Court therefore reviews this Motion under the plain error doctrine, which is the sole exception to Rule 50's requirement of a prior motion at the close of evidence.  See Cabrales, 864 F.2d at 1459.  Plaintiffs do not and cannot demonstrate "an absolute absence of evidence to support the jury's verdict."  See Image Technical Servs., 125 F.3d at 1212. As discussed supra, the Court finds that the jury's verdict on the disability claim under Section 504 is supported by the clear weight of the evidence.  Likewise, the jury's verdict on the retaliation claim is supported by the clear weight of the evidence, and the evidentiary rulings challenged by Plaintiffs were sound.[28/]  The Court finds no plain error on the face of the record; thus, Plaintiffs are not entitled to judgment as a matter of law.  See Image Technical Servs., 125 F.3d at 1212 (noting

---

[28/] Accordingly, the Court would deny Plaintiffs' motion for judgment as a matter of law even if it had been properly first presented at the close of evidence or at any time prior to the case being submitted to the jury.

47

that where the record reflects sufficient evidence to support the jury's verdict, under the plain error standard the court need not inquire any further).

## IV.   CONCLUSION

Having found that the verdict is not against the clear weight of the evidence for any claim, that the evidentiary rulings were proper, and that the jury did not reach an erroneous result, the Court denies Plaintiffs' motion for a new trial. Having found no plain error on the face of the record, the Court denies Plaintiffs' alternative motion for judgment as a matter of law.  The Court finds that no miscarriage of justice will result from the denial of Plaintiffs' motions.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 19, 2008.



_____
Alan C. Kay
Sr. United States District Judge

Wiles, et al. v. Dep't of Educ., Civ. Nos. 04-00442; 05-00247 ACK-BMK, Order Denying Plaintiffs' Motion for a New Trial or, Alternatively, for Judgment as a Matter of Law.